Page 1

1            IN THE UNITED STATES DISTRICT COURT
2           FOR THE NORTHERN DISTRICT OF GEORGIA
3                    ATLANTA DIVISION
4
5    DONNA CURLING, et al.            )
                                      )
6              Plaintiffs             )
                                      )
7               vs.                   )Case No.
                                      )1:17-CV-2989-AT
8    BRAD RAFFENSPERGER, et al.       )
                                      )
9              Defendants             )
     _____)
10
11
12
13
14
15
16       VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
17                JUAN GILBERT, Ph.D.
18            Friday, October 29, 2021
19                   Volume I
20
21
22   Reported by:
     CARLA SOARES
23   CSR No. 5908
24   Job No. 4871592
25   Pages 1 - 289

```
                                            Page 5
1                       INDEX
2    WITNESS
3    JUAN GILBERT, Ph.D.                 EXAMINATION
     Volume I
4
5                 BY MR. CROSS                    9
6
7                      EXHIBITS
8    NUMBER              DESCRIPTION            PAGE
9    Exhibit 1                                   10
10          Declaration of Dr. Juan Gilbert
11
12   Exhibit 2                                   41
13          Document entitled "Georgia Voter
14          Verification Study"
15
16   Exhibit 3                                   56
17          United States Patent,
18          No. US 11.036,442 B2
19
20   Exhibit 4                                  141
21          Article entitled "Why computer
22          scientists prefer paper ballots"
23
24
25
```

Page 6

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|

1                      EXHIBITS

2    NUMBER                 DESCRIPTION              PAGE

3    Exhibit 5                                        179

4          Document labeled "Exhibit A"

5

6    Exhibit 6                                        209

7          E-mail string, top e-mail to Scott

8          Tucker from Michael Barnes, dated

9          1-15-20

10

11   Exhibit 7                                        260

12         Twitter page

13

14   Exhibit 8                                        270

15         Letter to Juan E. Gilbert, Ph.D. from

16         Bryan P. Tyson, dated 11-8-19

17

18   Exhibit 9                                        274

19         Trial transcript, dated 3-24-09

20

21             (Exhibits attached to transcript.)

22

23

24

25

```
 1                    JUAN GILBERT, Ph.D.,
 2      having been administered an oath, was examined and
 3      testified as follows:
 4                    MR. CROSS:  Before we begin the
 5      questioning, is everybody on -- does everybody here
 6      have access to the Exhibit Share or is it only the
 7      lawyers and the witness?
 8                    VERITEXT CONCIERGE:  Everybody should have
 9      access.
10                    MR. CROSS:  Okay.  We need -- can we go
11      off the record?  I didn't realize that.
12                    THE VIDEO OPERATOR:  Okay.  Going off the
13      record at 10:07.
14                    (Recess, 10:07 a.m. - 10:09 a.m.)
15                    THE VIDEO OPERATOR:  Back on the record at
16      10:09.
17                              EXAMINATION
18      BY MR. CROSS:
19           Q    Good morning, Dr. Gilbert.
20           A    Good morning.
21           Q    Can you hear me okay?
22           A    Yes, I can.
23           Q    Is there any reason why you feel you
24      cannot testify truthfully and completely today?
25           A    No.
```

```
 1    said, "incomplete report."
 2         Q    You said you read what was given to you.
 3    I just wanted to confirm that, to your
 4    understanding, what was given to you was
 5    Dr. Halderman's complete July 1 report; is that
 6    right?
 7         A    Yes.
 8         Q    Did I understand correctly, you reviewed
 9    that report carefully before responding to it,
10    right?
11         A    Yes.
12         Q    But nowhere in your July 16 declaration do
13    you indicate that you've conducted any examination
14    of any election equipment used in Georgia; is that
15    right?
16         A    Correct.  I have not examined any
17    equipment.
18         Q    You did not think that was relevant to
19    respond to Dr. Halderman's analysis, examining that
20    equipment?
21         A    In my response, no.
22         Q    Why not?
23         A    I only responded to things that I could
24    respond to without having examined the equipment
25    using the expertise that I have in the area.
```

1    Q   Why didn't you examine the equipment

2  yourself so that you could respond to his precise

3  findings where he examined the equipment?

4    A   I was not provided the equipment.

5    Q   Did you ask for it?

6    A   No.

7    Q   Why not?

8    A   I believe I mentioned this in the

9  declaration or previous declarations.   I was not

10  aware that that was an option for me to have

11  equipment given the nature of past cases where this

12  equipment was never given to experts.   So it's

13  just -- it's something that never crossed my mind.

14    Q   That's an exchange that you and I had in

15  the September hearing where I asked you in September

16  of last year why you did not look at the equipment.

17  But you knew as of July this year when you prepared

18  your declaration that Dr. Halderman had access to

19  election equipment from Fulton County; right, sir?

20    A   I believe so, looking at that declaration,

21  yes.

22    Q   Even though you knew Dr. Halderman had

23  access, even though you were reviewing and

24  responding to his report regarding that access, you

25  did not think it was relevant to ask for access to

Page 15

1    the equipment yourself?
2         A    No.
3              MR. MILLER:   Objection to form.   Asked and
4    answered.
5    BY MR. CROSS:
6         Q    You think it's appropriate for an expert
7    who's opining on the security and reliability of an
8    election system not to actually examine that system
9    for himself?
10        A    Yes.
11        Q    You don't actually -- in your declaration
12   from July of this year, you don't actually offer any
13   disagreement with any of Dr. Halderman's findings
14   based on his analysis of that equipment; correct,
15   sir?
16        A    Can you elaborate on what finding in
17   particular, or specific findings?
18        Q    Any of them.
19        A    I need to know exactly which findings.
20        Q    Okay.  Well, direct me to your -- a
21   portion of your July 16 declaration where you
22   disagree with any of his findings in his July 1
23   report.
24        A    I don't understand -- you said disagree
25   with any of his findings.

Page 25

```
 1    Dr. Gilbert, you keep saying it did not occur to you
 2    to examine the election equipment even though you
 3    knew Dr. Halderman was examining it.
 4              Can you explain that to me?  Why would it
 5    not occur to you to look at election equipment where
 6    you are tasked with responding to the expert who has
 7    himself examined that equipment?
 8              MR. MILLER:  Objection.  Asked and
 9    answered.
10              THE WITNESS:  Because I didn't see it as a
11    necessity.  I wasn't going to get the equipment and
12    break the equipment or replicate his hacks.
13    BY MR. CROSS:
14         Q    But couldn't -- there's no other analysis
15    you could have done with the equipment to respond to
16    his report?
17         A    The analysis that I have done I feel is
18    sufficient to respond to his report.
19         Q    But you've done no analysis of any
20    election equipment used in the State of Georgia; is
21    that correct, sir?
22              MR. MILLER:  Objection.
23              THE WITNESS:  I have not had access to any
24    equipment in the State of Georgia.
25    ///
```

Page 36

1    Georgia should take before proceeding with the
2    current election equipment in light of
3    Dr. Halderman's findings?
4         A   I can't think of anything at this time.
5    I'd have to go back and review, again, his report
6    and do a point-by-point measure.
7              And I would also say that the RLA is --
8    again, getting at the QR code, the RLA would also be
9    a measure to identify differences between QR codes
10   and the human-readable portion of the text.
11        Q   One of the measures you said the state
12   should take is reminding voters to verify their
13   ballots before they're scanned or tabulated, right?
14        A   Yes.
15        Q   Do you understand Georgia already requires
16   that?
17        A   I may have read that.  It wasn't at the
18   top of my mind.
19        Q   Given that Georgia already requires that,
20   why would you expect that to have a meaningful
21   impact on the security and reliability of this
22   election system?
23        A   Reminding voters did show some improvement
24   on voters verifying their ballots.
25        Q   In fact, the Rice study and the Michigan

1    this year for which you are the inventor; right,

2    sir?

3            A    Yes, this appears to be the patent.

4            Q    Have you seen this patent before?

5            A    This appears to be what we submitted, yes.

6            Q    If you turn to the page -- it looks like

7    it's -- if you go past the figures, so after

8    Figure 6, you'll get to where it starts to describe

9    the patent, and it has "Transparent Interactive

10   Printing Interface."

11            Do you see that?

12            A    Yes.

13            Q    And this concerns the new BMD prototype

14   that we've been discussing today that you developed,

15   right?

16            A    Yes.

17            Q    Do you see under "Background"?

18            A    Yes.

19            Q    Do you see what's written here in this

20   patent that you helped prepare, and for which you're

21   identified as the inventor, it reads,

22   "Ballot-marking devices (BMDs) such as electronic

23   ballot markers (EBMs) electronically-assisted ballot

24   markers, in voting machines are often

25   nontransparent, hackable, and overly complex."

Page 58

1      That's written here; correct, sir?

2      A    Yes, it is.

3      Q    It also goes on, "Such conventional

4    devices often result in a trade-off between

5    consistency and transparency," right?

6      A    Yes.

7      Q    And at the end it reads, "It is typically

8    difficult or impossible to fully examine and trace

9    the process and result of entering selections for a

10   ballot using conventional BMDs and EMDs."

11          Do you see that?

12     A    Yes, I do.

13     Q    In preparing the patent for which you're

14   identified as an inventor, were you careful to be

15   accurate and truthful in the information that you

16   included there?

17     A    I was careful to be truthful in the

18   information and as accurate as possible using

19   language that I've seen in other places about BMDs.

20          These are allegations against BMDs.  And I

21   would say I don't necessarily agree with all the

22   allegations, but these are common allegations

23   against BMDs.  So I'm stating what is the common

24   allegation against BMDs.  And that's why it's in

25   background, to say these are the common allegations

Page 59

1    against BMDs.

2         Q    Dr. Gilbert, nowhere here does it say that

3    these are allegations that you do not believe to be

4    true; right, sir?

5         A    Right.   In a patent submission, I don't

6    think I would say that I don't agree with these or I

7    don't believe these things.   I wouldn't say that in

8    a patent application.

9              What I'm doing is stating what is commonly

10   said or communicated in the -- in a community around

11   BMD allegations.

12             These allegations that I am setting forth

13   are -- even right as we're here now -- are the bases

14   for these allegations.   So these are, I would argue,

15   common -- common allegations that are said.

16        Q    Dr. Gilbert, do you understand you're

17   under oath today?

18        A    Yes, I am under oath, and I would say --

19        Q    Do you understand --

20        A    -- they're common allegations.

21        Q    Do you understand that not being truthful

22   under oath today is a felony?

23        A    Yes, sir.

24        Q    Okay.

25             MR. MILLER:  Object.  This is --

1          Q    The testing that you did with the ES&S BMD

2      years ago, was that cybersecurity testing?

3          A    No, it was accessibility testing.

4          Q    You've never done cybersecurity testing on

5      BMD equipment or software; is that right?

6          A    I don't -- what do you mean by "cyber"?

7               So I just -- as I explained, I created a

8      transparent voting machine which we did election

9      security testing to get at a vulnerability

10     Dr. Halderman had identified as voters not

11     verifying.  So that's an example where I have done a

12     test of election security, not cybersecurity.

13     Election security.

14         Q    Thank you.  That's a fair distinction.

15     Let me ask a better question.

16              As I understand it, you have not conducted

17     any test to determine the extent to which any BMD

18     software or hardware can be hacked; is that fair?

19         A    Can be hacked?  I have not hacked any,

20     so -- that's not what I do.  I don't know if that

21     answers your question or not.  But I don't hack

22     these systems.  I said that time and time again.

23              MR. MILLER:  David, I don't know where you

24     are on your timeline.  Do you want to take a short

25     break and come back, if that's all right with you?

1    BY MR. CROSS:

2        Q    As you sit here today, do you have any

3    reason to believe that Georgia is auditing anything

4    other than a single election statewide every two

5    years?

6        A    I don't -- I don't know.

7        Q    So for any election where Georgia is not

8    conducting an RLA, do you understand that the QR

9    code is the only thing that gets tabulated?

10       A    In any election that they don't do an RLA,

11   then the QR code would be the tabulation that comes

12   from a computer that is a scanner.  I'm going to

13   refer to it as a scanner.

14       Q    And you understand for any election where

15   there's no RLA but there's a recount, the recount

16   relies on the QR code.  They just run the ballots

17   back through the scanners.

18            Do you understand that, sir?

19       A    No, I do not.

20            My understanding, I believe -- again, I

21   have to go back to those previous declarations where

22   I -- my understanding is that they would actually

23   recount the human-readable text.

24       Q    Even in a recount as opposed to a

25   risk-limiting audit?

Page 75

```
 1          A    Find what change?
 2          Q    That their ballot, even as to the
 3     human-readable text, does not accurately reflect all
 4     of their selections.
 5          A    Those studies suggest that a few number
 6     would identify a human-readable change on that
 7     ballot.
 8          Q    In the scenario where that happened, where
 9     both the QR code and the human-readable text has
10     been changed with respect to one or more selections
11     voters made, an RLA would not detect that; right,
12     sir?
13          A    If a human didn't detect the change, then
14     the RLA would not detect it if the QR code and the
15     human-readable text match.
16          Q    In the State of Georgia, even if an RLA
17     were to find -- strike that.
18               In the State of Georgia, even if an RLA
19     were to generate a different outcome for an election
20     than what was originally reported and certified
21     based on the tabulation of running the ballots
22     through the scanners at the polls, there's no legal
23     authority in Georgia that allows the Secretary of
24     State or anyone to rerun the election, right?
25               MR. MILLER:  Objection.  Calls for a legal
```

Page 89

1    know -- I haven't seen any data to see how accurate

2    it is, how it works.  I haven't seen any of that.

3        Q    That's not something you considered for

4    your opinions; is that right?

5        A    I haven't seen it, so I don't know that I

6    can opine on that as far as Dominion's -- how they

7    do it, the accuracy.  I don't have any knowledge of

8    that.

9        Q    Do you share Dr. Shamos's recommendation

10    against using QR codes with BMDs for elections in

11    the United States?

12        A    I think BMDs can -- QR codes can be used,

13    so I'm not totally against them.  But I think -- if

14    I had my choice, I would recommend not using them to

15    eliminate all these discussions and concerns around

16    them.

17        Q    Looking at paragraph 15 of your July

18    declaration again -- and if you need to pull that up

19    again, Dr. Gilbert, feel free.  It's --

20        A    I got it.

21        Q    Okay.

22        A    Okay.  I got it.  Yeah.

23        Q    Where you indicate here that you're not

24    aware that Dr. Halderman has provided equipment

25    marred by undetectable hacks to any other

Page 97

1          Q    Are you aware that no one at the Secretary
2     of State's office has actually reviewed
3     Dr. Halderman's report?
4          A    No, I'm not aware of that.
5          Q    Does that surprise you?
6          A    I don't have an opinion either way.  I
7     don't know.
8          Q    Given the many findings Dr. Halderman has
9     about the security of the election equipment used in
10    Georgia, wouldn't you expect those who are
11    responsible for administering elections to at least
12    read the report to determine whether they need to
13    address any of those findings?
14              MR. MILLER:  Objection.  Asked and
15    answered.
16              THE WITNESS:  I don't -- I don't have an
17    opinion.  I think someone should read it.  I don't
18    know who.  I don't know the protocols of chain of
19    custody and how those things work in the State of
20    Georgia, so I can't answer that directly because I
21    don't -- these are things that I don't know and are
22    outside of my expertise.
23    BY MR. CROSS:
24         Q    We talked about the Michigan and Rice
25    voter verification studies, and one thing you

Page 98

1   pointed out about those was that they did not occur

2   in a real election, right?

3        A    Right.

4        Q    And then we talked about the Georgia voter

5   verification study that the Secretary of State

6   commissioned.  One of the things you pointed out

7   about that is they didn't flip votes like they did

8   in the Michigan and Rice studies, right?

9        A    I haven't read it, but I suspect they

10  didn't flip the votes.

11       Q    Is it your opinion that the only way to

12  conduct a valid study of voter verification is to do

13  it in an actual election where you're flipping

14  votes?

15            MR. MILLER:  Objection to form.

16            THE WITNESS:  No.

17  BY MR. CROSS:

18       Q    So you're not suggesting that that's

19  required, right?

20       A    No, I am not.

21       Q    And the study that you've talked about

22  today that you performed with your new BMD prototype

23  has the same condition as the Michigan and Rice

24  studies in that that was not conducted in a real

25  election, right?

Page 99

1      A    Correct.

2      Q    Are you aware that you're the only expert

3   in this case retained by defendants that, to our

4   knowledge, has even read Dr. Halderman's July 1

5   report?

6      A    I was not aware.

7      Q    Does that concern you?

8      A    You just informed me.  I haven't had a

9   chance to form an opinion on it.  I don't know.  I'd

10  have to think about it.

11     Q    As you sit here today as an election

12  security expert, does that raise any concern for

13  you?

14     A    I don't know.  I'd like to hear more

15  context around why that is.  It generates questions

16  for me, and I don't know.  I don't have an opinion

17  at this point.  It's something I have to digest and

18  then think about.

19     Q    What questions does it generate?

20     A    First of all, why is that the case?  Is

21  there -- there may be a justification for that.  I

22  don't know.

23     Q    What justification comes to mind?

24     A    I don't have one.

25          MR. MILLER:  Objection.  Relevance.

Page 131

1    counties could find themselves conducting all sorts

2    of investigations every time somebody makes a claim,

3    right?

4              MR. MILLER:  Objection.  Calls for

5    speculation.

6              THE WITNESS:  I have some work that I'm

7    doing in that area which is confidential at the time

8    that I'm not privy to talk about, unfortunately.

9              But to kind of help with that question,

10   that is something that needs to be addressed.  I

11   don't -- I don't know what the protocols are in

12   Georgia or any place where, you know, these things

13   happen with paper ballots.  They just spoil it, and

14   you do it over.  And that's -- that's essentially

15   what happens if there's a mistake found.

16             But, like, in Florida in 2018 when all

17   those undervotes happened, and South Florida,

18   Broward County, some people spoiled their ballots or

19   had an issue, and they were able to get it right.

20   But no one thought that, "Wait a minute, we have a

21   problem here."

22             So it can happen on both sides.

23   BY MR. CROSS:

24        Q    I think you testified a moment ago that

25   with DREs, there would be no way to determine

1    whether a vote was flipped because there's no paper

2    trail.  But that's true of BMDs as well, right?

3          If a voter comes and says, "Hey, this

4    ballot flipped my vote," the poll worker has no

5    ability to determine whether that's accurate looking

6    at the ballot or looking at the BMD, right?

7    A    In the current state, meaning the current

8    state of BMDs, if that was to happen, the poll

9    worker could not determine if it was a mistake on

10   the voter's part or the -- an error or anything like

11   that.  I don't know how they would determine it by

12   just looking at the paper itself.

13         MR. MILLER:  David, I'm not sure where you

14   are on your outline, but at an appropriate time, I

15   think a short lunch break might be good.

16         MR. CROSS:  Sure.  We're almost at a

17   breaking point.

18   Q    Do you mind just a few more minutes,

19   Dr. Gilbert?

20   A    I'm fine.

21   Q    Okay.  So take as an assumption based on

22   what I was able to look up that approximately

23   5 million voters voted in the presidential election

24   in Georgia in 2020.  Okay?

25   A    Okay.

Page 134

1          But yeah, I think that what I'm getting
2     at, the point that I'm making is a small number of
3     individuals whose votes get flipped would speak up,
4     and this would -- I don't know what the protocols
5     are or the steps are.  Again, that's something we're
6     working on, what to do when this occurs.  But I
7     don't know what the scenarios are currently in place
8     for something like this.
9               MR. CROSS:  Let's go off the record.
10              THE VIDEO OPERATOR:  Okay.  Going off the
11    record at 1:08.
12              (Recess, 1:08 p.m. - 1:45 p.m.)
13              THE VIDEO OPERATOR:  Back on the record at
14    1:45.
15    BY MR. CROSS:
16         Q   Dr. Gilbert, we've talked about a couple
17    of ways that you've identified where hand-marked
18    paper ballots can be altered such as with changing
19    undervotes and overvotes, right?  We talked about
20    that today?
21         A   Right.
22         Q   That can only happen after the ballots
23    have been tabulated in a system where the ballots
24    are tabulated on the scanner in the polls, right?
25         A   It happens whenever the opportunity

1    presents itself.  So it depends on the precinct and

2    how they handle their ballots.  If they -- do the

3    voters automatically do it?  Is it a centralized

4    tally?  It just depends on the scenario.

5         Q    So let's talk about a specific scenario, a

6    scenario in which Georgia has voters vote on

7    hand-marked paper ballots at the polls.  That voter

8    takes that ballot, walks over to the scanner in

9    exactly the way they do today, and puts it into the

10   scanner themselves.

11        The only way that that vote could be

12   altered or that ballot could be altered in the way

13   that you've described would be after it runs through

14   the scanner and is tabulated, right?

15        A    In that particular scenario, that seems to

16   be the case.

17        Q    And so whatever alteration might happen to

18   that ballot after it's tabulated would not affect

19   the outcome of that election based on the results

20   that come out of the tabulation of the ballots,

21   right?

22        A    Not necessarily.

23        My understanding is that certain margins

24   require an audit or recount; therefore, it would

25   have an impact.

1      background, so I cannot speak to his credentials.

2              The fact that he was appointed to some

3      commission and given a title does not guarantee he

4      knows what he's doing or his credentials.  So I

5      can't speak to that.  I'm sorry.

6      BY MR. CROSS:

7          Q   No, no.  That's fair.  That's fair.

8              You're not disputing that experts like

9      Dr. Halderman and Dr. Appel have the necessary

10     computer science expertise to evaluate the security

11     of election systems like that used in Georgia,

12     right?

13         A   No, I do not dispute that.  In fact, if I

14     was asked the question, "I have an election system.

15     We need someone to evaluate the security of it to

16     find vulnerabilities," at the top of my list would

17     be Appel, Halderman.  That's where I would start.

18         Q   Now, if you look here, if you continue on

19     in Exhibit 4, Dr. Lee goes on to say, "I ultimately

20     chose to vote against the Commission's final report

21     even though we agreed on many points."

22             Do you see that?

23         A   Yes.

24         Q   If you go to the next paragraph, he

25     writes, "The SAFE Commission was charged with

Page 186

```
 1    top.
 2         A    I got it.  I got it.  I'm on that page
 3    now.
 4         Q    Okay.  If you come down below, do you see
 5    the third paragraph where Dr. Halderman wrote, "To
 6    assist the Court in understanding the risks that the
 7    system creates, Curling Plaintiffs asked me to
 8    conduct a security analysis of the ImageCase X (ICX)
 9    BMD and associated equipment used in Georgia
10    elections"?
11              Do you see that?
12         A    I do see that.
13         Q    Were you asked, for the purpose of your
14    engagement, to conduct the same type of analysis or
15    were you asked to do something different?
16         A    I was not asked to do that.  No, I was
17    not.
18         Q    If you come down below, you'll see the
19    next heading is "Principal Findings."
20              Do you see that?
21         A    Yes, I do.
22         Q    And then at the bottom, you'll see, just
23    before the number 1 paragraph, it reads, "The most
24    serious vulnerabilities I discovered include the
25    following."
```

1          Do you see that?

2      A   I do.

3      Q   And in your declaration, you don't dispute

4  that any of the number of vulnerabilities that he

5  has in paragraphs 1 through 7 are present in the

6  election equipment used in Georgia, right?

7          MR. MILLER:  Object to form.

8          THE WITNESS:  Number one, alternate QR

9  codes, that -- I trust that he was able to do that,

10 so I don't dispute that.

11         I would say, you know, given access and

12 time that he was given, I think these -- I don't

13 question him being able to accomplish any of these.

14 BY MR. CROSS:

15     Q   Come to the -- it's page 7 of 97.  Near

16 the top it says, "Mitigation" in bold.

17     A   Got it.

18     Q   Do you see here -- do you see the

19 sentence, it's the second sentence that begins,

20 "However"?

21     A   Yes.

22     Q   And Dr. Halderman wrote, "However, merely

23 patching these specific problems is unlikely to make

24 the ICX substantially more secure."

25         Do you see that?

1           A   I do.

2           Q   In your declaration, you don't disagree

3    with that opinion, right?

4           A   I don't agree -- I don't know that I agree

5    or disagree with it as far as what he -- what he's

6    constituting as patching.  I don't know what that

7    means.  Merely patching, I'm not sure what the

8    context is, what that means.

9           Q   You didn't undertake any analysis into

10   what kind of patching could be adopted to mitigate

11   the vulnerabilities he identifies in his report,

12   right?

13          A   No, I did not.  And I would say that -- I

14   would like -- it would be interesting for

15   Dr. Halderman to say what patching he's referring

16   to.

17              In addition to that, I go back to our

18   previous discussion about this.  When he says the

19   patching, is that referencing reliably secure?  Is

20   that the same thing or not?

21          Q   All right.  If you come down, do you see

22   below that, it says, "Main Conclusions"?  It's

23   Section 1.2?

24          A   Yes, I do.

25          Q   And then he's got a number of paragraphs

1    individual voters, which I would also say I would

2    agree with that.  Just as I stated earlier, people

3    with disabilities are individual voters, and they

4    want the right to a private ballot and a fair ballot

5    as well.  Shouldn't their votes be counted and not

6    be disenfranchised either?

7              So yes, I completely agree with that.

8    Yes.  You're right.  Individual voters, every one,

9    including those with disabilities.

10        Q    I will say, Dr. Gilbert, that we have

11   found something that we're in violent agreement on,

12   particularly for voters with disabilities.

13        A    Okay.  So he's talking -- the third one is

14   about QR codes.  Let's see.  In my -- let's see.

15   Let me look for QR codes.  Do I talk about QR codes

16   in here?

17              In my declaration, paragraph 12, I talk

18   about QR codes.

19        Q    Just so we're clear, you don't dispute

20   that -- strike that.

21              You don't dispute Dr. Halderman's finding

22   that the QR codes and the human-readable text can be

23   altered by hacking the election equipment that's

24   used in Georgia; you don't dispute that, right?

25        A    I do not dispute that, given time and

1    access, that you can modify the software or certain

2    malware to change QR codes and the ballot summary.

3    I do not dispute that.

4         Q    And you haven't undertaken any analysis to

5    determine how much time it would take for a hacker

6    to do that if they wanted to do it, right?

7         A    No, I have not done that.  As I mentioned

8    earlier, I don't hack systems.  That's not my

9    expertise, so I wouldn't have done that.

10            That's a great question to ask

11   Dr. Halderman, how long does it take to do such an

12   exercise.

13            MR. CROSS:  You might want to write that

14   down, Carey.

15            THE WITNESS:  And with that, as far as the

16   time it takes, again, that's not my area, but I

17   think it would be interesting to find the answer to

18   that.

19            And I'd be interested -- again, in the

20   same spirit that I mentioned earlier about

21   Dr. Halderman hacking a system and giving it to a

22   third party, the same thing could be true where

23   Dr. Halderman is given a system and then put on the

24   clock to determine how long it takes him to hack it,

25   not one that he's seen for 12 months.

1        A    Got it.

2        Q    Do you see in the third paragraph down

3   that begins "Fulton County"?

4        A    Yes.

5        Q    And here Dr. Halderman writes, "Fulton

6   County did not provide the off-the-shelf laser

7   printer used in conjunction with the BMD.  Instead,

8   Plaintiffs acquired a unit of the same model, an HP

9   LaserJet M402dne, from a commercial source."

10            Do you see that?

11       A    Yes.

12       Q    And you don't dispute in your declaration

13   that the printer that's used with the BMD system in

14   Georgia is, in fact, an off-the-shelf printer like

15   the one that Dr. Halderman used, right?

16       A    No, I do not dispute that.  I don't have

17   access to the actual printer being used, but I

18   didn't dispute that at all.

19       Q    And then if you come down, do you see the

20   paragraph that begins, "In July 2021" on the same

21   page, a couple below where we were?

22       A    Let's see.

23       Q    Two paragraphs --

24       A    I got it.  I see it.

25       Q    Here Dr. Halderman wrote, "In July 2021, I

1    received access to further election system data.

2    State Defendants provided Plaintiffs copies of data

3    sent to the Secretary of State by Georgia counties

4    following the November 2020 and January 2021

5    elections."

6              Do you see that?

7        A    Yes.

8        Q    He goes on to talk about the election

9    packages that he received.

10             Do you see that?

11       A    Yes.

12       Q    You don't address that data in your

13   declaration, right?

14       A    No, I do not.

15       Q    Do I understand, is that not something

16   you've analyzed?

17       A    No, I have not analyzed that.

18       Q    If you come to the next paragraph, do you

19   see where it reads, "Five of the county data sets"?

20       A    Yes.

21       Q    He writes, "Five of the county data sets

22   provided by State Defendants contained copies of the

23   installation file for the October 2020 ICX software

24   update, version 5.5.10.32."

25             He goes on to say, "The presence of this

1    file may indicate that the counties returned data to

2    the Secretary on the same USB drives that they used

3    to receive or distribute the software update,

4    without first wiping the device."

5            Do you see that?

6        A    Yes.

7        Q    And you don't dispute his opinion there on

8    what that indicates in your declaration, right?

9        A    I do not discuss that in my declaration.

10       Q    You previously testified in this case that

11   your understanding is that the BMD election system

12   is air-gapped, right?

13       A    Yes.

14       Q    I think you testified before that you're

15   assuming that to be true based on some materials you

16   looked at describing how the system is supposed to

17   operate and be set up; is that right?

18       A    Correct.

19       Q    You've not yourself confirmed that any

20   aspect of Georgia's election system is, in fact,

21   air-gapped, right?

22       A    I have not had a Georgia system in my

23   possession to do any evaluation.

24       Q    And you did not undertake any analysis or

25   investigation with your client in this case to

Page 209

1    determine whether the election system is in any way

2    air-gapped, right?

3         A    No.   I use -- I cited in my previous

4    declarations what I used.   Those documents were

5    referenced in my declaration.

6         Q    You did not undertake any analysis or

7    investigation to determine whether any equipment or

8    devices that were used with the old DRE system have

9    also been used with the new BMD system, right?

10        A    All I had was what I put in my

11   declaration, the documents that I referenced.   I

12   didn't have access to an old DRE, I did not have

13   access to the new BMD or any election system.   I

14   have not had access to any election system from the

15   State of Georgia ever.

16             MR. CROSS:  Oh, why did it do that?  Hold

17   on.   Sorry.   I was just pulling up a new exhibit.

18   It's going to be Exhibit 6.   Give me one second.

19             (Exhibit 6 was marked for identification

20         and is attached hereto.)

21   BY MR. CROSS:

22        Q    All right.   Pull up Exhibit 6, if you

23   would, please, Dr. Gilbert.   Just let me know when

24   you have it.

25             Hold on.   Sorry.   It's Exhibit -- it's

1        Q   Are you aware that this is an exhibit that

2    we introduced during the hearing in September of

3    last year in which you also testified?

4        A   Like I said, I don't remember this, but

5    okay.

6        Q   There's no indication in your declaration

7    that you've had any -- conducted any investigation

8    into what's being discussed here and whether USB

9    drives that were used with the DRE system have also

10   been used with the new BMD system.  That's not

11   something you've looked into, correct?

12            MR. MILLER:  Objection.  Relevance.

13            THE WITNESS:  No, I have not.

14   BY MR. CROSS:

15       Q   And you previously testified in this case

16   that the new BMD system is completely separate and

17   unconnected to the old DRE system, right?

18       A   Yes, I did.

19       Q   But if the counties were using USB drives

20   with the new Dominion system that they previously

21   had used with the DRE system, that certainly would

22   raise the possibility for an exchange of data

23   between those two systems, right?

24            MR. MILLER:  Objection.  Relevance.

25            THE WITNESS:  I think you said it

Page 215

1    correctly.  Possibility.

2              So it's possible that these drives could

3    have been completely wiped and reformatted.  It's

4    possible that they could have been tainted.  So it's

5    possible a lot of different things based on what you

6    are saying.

7    BY MR. CROSS:

8         Q    You didn't think that it was relevant for

9    your opinions in this case to determine whether the

10   counties or the state are using USB drives with the

11   new system that were previously used with the DRE

12   system without wiping them, without securing them,

13   without ensuring that they're not compromised?

14        A    I did not ask that question.

15        Q    Do you think that that's a relevant

16   question for evaluating the security of the new

17   election system?

18        A    I think that is a relevant question, and

19   it should be asked.

20             I think the protocol of what's obviously

21   exchanged -- anything connected to the voting system

22   should be evaluated, obviously.

23        Q    Evaluated how?

24        A    All kinds of ways.  It depends on what

25   you're connecting to it.

1      Q   I'm sorry.  Can you explain what you mean?

2      A   For example, if you're connecting a USB to

3  the system, it should be wiped.  That's a clean -- a

4  way to clean the -- keep the system clean, avoid

5  issues.  Standard protocol in many places in shops

6  that have technology.

7          So evaluating what is connected, what's

8  the data on there, those questions are things that

9  have to be looked at.

10     Q   Why didn't you look at that on behalf of

11  the state with respect to things like the USB drives

12  that we see being discussed here for your work?

13     A   I was -- I was focused on what was

14  given -- I was not given USB drives.  I was not

15  given any technology.

16          My focus, again, was on Dr. Halderman and

17  Appel's analysis.  That's where my focus was on.  I

18  don't have any equipment, never have received any

19  equipment, technology, from the State of Georgia.

20     Q   If you come back to Dr. Halderman's

21  report, the July 1 report, the page we were on

22  before, page 19 of 97 --

23     A   Okay.

24     Q   -- at the bottom, do you see where it

25  says, Section 4.3, "Testing Process"?

1          A    Yes, I do.

2          Q    You don't offer an opinion in this case

3     that Dr. Halderman's methodology for his analysis in

4     his report was in any way improper or unsound,

5     right?

6          A    I do not.

7          Q    Come to page 22 of 97.  You'll see there's

8     a heading in the middle of the page, Section 5.2,

9     "Defeating QR Code Authentication."

10         A    Yes.

11         Q    And here he writes, "Issue:  ICX QR codes

12    are not protected against 'replay' attacks, so

13    copies of valid QR codes will be accepted as

14    genuine."

15              Do you see that?

16         A    Yes.

17         Q    You don't dispute in your declaration that

18    ICX QR codes are not protected against replay

19    attacks, right?

20         A    I do not.

21         Q    If you come down to page 24 of 97, do you

22    see where it says, "Copying Ballots"?

23         A    Yes.

24         Q    And here he wrote, "A copy of a genuine

25    ICX ballot will be indistinguishable from a second

1   genuine ICX ballot with the same votes.   In tests,

2   the ICP accepted ballots copied using an office

3   photocopier," and he refers to Section 11.1.   He

4   says, "This could allow a variety of ballot-box

5   stuffing attacks."

6           Do you see that?

7       A   I do see that.

8       Q   And you don't dispute in your declaration

9   his finding on the ability to copy the ballots,

10  right?

11      A   I do not.

12      Q   Next, he refers again to the replay

13  attack.

14          Do you see that?

15      A   Yes.

16      Q   Come to page 29 of 97.

17      A   Okay.

18      Q   Do you see there's a picture at the top

19  of -- it looks like access cards?

20      A   Yep.

21      Q   Do you see where it says, "Forged ICX

22  Smart Cards"?

23      A   Yes.

24      Q   And then he writes, "Weaknesses in the ICX

25  authentication protocol allow an attacker to read

1    and forge Voter, Technician, and Poll Worker cards."

2              Do you see that?

3         A    Yes, I do.

4         Q    He goes on to say at the end, "a real

5    attacker could go on to create nearly

6    indistinguishable counterfeits."

7              Do you see that?

8         A    I do.

9         Q    You don't dispute that finding in your

10   declaration, right?

11        A    I do not.

12        Q    If you come down to the heading 6.1 on the

13   same page --

14        A    Yep.

15        Q    -- it reads, "Extracting Election Secrets

16   from Poll Worker Cards."

17             Do you see that?

18        A    I do.

19        Q    Here he writes, "Anyone with access to a

20   single Poll Worker Card and the corresponding PIN

21   can easily extract secret keys and other values used

22   for securing election data throughout the county."

23             Do you see that?

24        A    I do.

25        Q    And you don't dispute that finding in your

```
 1    declaration, right?
 2            A    I do not.
 3            Q    All right.  Come to the next page, heading
 4    6.2.
 5            A    Yes.
 6            Q    It says, "Forging Technician Cards to
 7    Install Malware on any ICX."
 8                 Do you see that?
 9            A    I do.
10            Q    And here he writes, "Anyone can create
11    forged Technician Cards without using any secret
12    information.  Such cards can be used to access any
13    ICX's Android operating system and the ability to
14    install malware."
15                 Do you see that?
16            A    I do.
17            Q    And you don't dispute that finding in your
18    declaration, right?
19            A    No, I do not.
20            Q    Come down to the next page, please,
21    heading 6.3.
22            A    Got it.
23            Q    Here it reads, "Creating 'Infinite' Voter
24    Cards."
25                 Do you see that?
```

1          A    Yes.

2          Q    He writes, "Voters can clone Voter Cards

3     or create 'infinite' Voter Cards that allow printing

4     an unlimited number of ballots of any available

5     ballot style."

6               Do you see that?

7          A    I do.

8          Q    You don't dispute that finding in your

9     declaration, correct?

10         A    I do not.

11         Q    Come to the next page, 33 of 97,

12    heading 7.

13         A    Page 33, you said?

14         Q    Yes, sir.   Heading 7.

15         A    I'm there.

16         Q    Okay.   Come down to heading 7.1.

17              Do you see that?

18         A    Yeah, I'm there.

19         Q    He writes, "The ICX does not require that

20    applications be signed by a trusted source, allowing

21    the installation of arbitrary APKs."

22              Do you see that?

23         A    Yes.

24         Q    You don't dispute that finding in your

25    declaration, correct?

1          A    I do not.

2          Q    Come to the next page, please,

3     heading 7.2.

4          A    Yes.

5          Q    Here he writes -- the heading is

6     "Obtaining the Real APK."  And he writes, "The ICX

7     App's APK can be easily extracted given only brief,

8     one-time access to a single BMD."

9               Do you see that?

10         A    Yes.

11         Q    You don't dispute that finding in your

12    declaration, correct?

13         A    I do not.

14         Q    Go on page 36 of 97, please.

15         A    Okay.

16         Q    He has heading 7.5, "Defeating Applicable

17    Defenses."

18              Do you see that?

19         A    I do.

20         Q    He writes, "Malware running on the ICX can

21    defeat the various technical and procedural defenses

22    that the Dominion system in the State of Georgia

23    currently employ."

24              Do you see that?

25         A    I do.

Page 223

1           Q    You don't dispute that finding in your

2     declaration, correct?

3           A    I don't think I dispute this.   No, I do

4     not.

5           Q    And then he goes on to refer to defeating

6     logic and accuracy testing.

7                Do you see that?

8           A    I do.

9           Q    And he -- at the end of that paragraph, he

10    concludes, "It can be easily defeated by ICX

11    malware."

12               Do you see that?

13          A    At the end of that paragraph?   I don't see

14    it.

15          Q    Do you see the short paragraph that has

16    the bolded language, "Defeating Logic and Accuracy

17    Testing"?

18          A    Yeah, I do.

19          Q    If you come to the end of that short

20    paragraph, the last sentence reads, "It can be

21    easily defeated by ICX malware."

22          A    I don't see that anywhere.   I see

23    "Defeating the QR code" --

24          Q    You're too far down.   I'm sorry.   Come up

25    above -- just below the heading 7.5, the bolded

1    language, "Defeating Logic and Accuracy Testing."

2         A    Okay.  I'm there.

3         Q    So stay in that same short paragraph.

4         A    I see it.  I see it.  "It can be easily

5    defeated by ICX malware."  I see it now.  The last

6    sentence in that paragraph.  Okay.

7         Q    Yes.  And you don't dispute that finding

8    in your declaration, right?

9         A    I did not dispute that in my declaration.

10        Q    Okay.  If you come down to where you were

11   looking at a moment ago, the bolded language at the

12   bottom of that page that reads, "Defeating the QR

13   Code MAC," do you see that?

14        A    Yes.

15        Q    At the end of that paragraph, still on the

16   same page, he concludes, "This poses no obstacle to

17   ICX malware."

18             Do you see that?

19        A    Yes.

20        Q    You did not dispute that finding in your

21   declaration, correct?

22        A    No, I did not.

23        Q    Okay.  Come to the next page, please.

24        A    Okay.

25        Q    Do you see at the bottom of the next page

1    there's a bold heading, "Defeating APK Hash

2    Validation"?

3         A   Yes.

4         Q   If you come down just three or four lines,

5    the sentence that begins "However"?

6         A   Yes.

7         Q   He writes, "Much like the QR code MAC,

8    this hash value is computed by the ICX App itself

9    and can therefore be trivially defeated by malicious

10   logic added to the app."

11            Do you see that?

12        A   Yes.

13        Q   You don't dispute that finding in your

14   declaration, right?

15        A   I did not.

16        Q   If you come to the next page --

17        A   Yes.

18        Q   -- at the top he writes, "Defeating

19   External APK Validation."

20            Do you see that?

21        A   Yes.

22        Q   Come to the beginning of the very next

23   paragraph.  Do you see where it begins, "A malicious

24   ICX App"?

25        A   Yes.

1          Q    And he writes, "A malicious ICX App can

2     easily defeat this safeguard, too, because the

3     export process is performed by the app itself."

4               Do you see that?

5          A    I do.

6          Q    You don't dispute that finding in your

7     declaration, right?

8          A    I do not.

9          Q    Come to the next bold heading on the same

10    page that reads, "Defeating Voter Verification and

11    Auditing."

12              Do you see that?

13         A    Yes.

14         Q    He writes, "Voters have no practical way

15    to verify the contents of QR code," right?

16         A    Right.

17         Q    And we're agreed on that, right?

18         A    Yes.  To my knowledge, I don't know how

19    they would verify it.  The only way I've seen

20    that -- and I don't -- I haven't seen this.  But I

21    know other systems -- and when we designed -- we

22    designed this many years ago -- take the ballot and

23    stick it in another machine to get a summary

24    display, or have the tally, the scanner, give you

25    a -- I guess a ballot summary, and you can compare

Page 227

1    it to the ballot summary that's on there.

2          But I -- other than that, people cannot

3    read the QR code itself.

4          Q   One of the things you suggested in an

5    earlier declaration in this case is that the state

6    should do parallel testing of a single BMD during an

7    election.

8          Do you recall suggesting that?

9          A   Yes.

10         Q   Do you think that testing a single BMD out

11   of over 30,000 that are used across the state

12   provides a meaningful test of the security and

13   reliability of those BMDs as a whole?

14         A   That's not what I recommended.  But to

15   answer your question, no, that would not.  You have

16   all those, and you're just testing one?  No, that

17   wouldn't make a difference.  But if you test one in

18   every precinct, that's different.

19         Q   Okay.  So it's your recommendation to test

20   one in every precinct during the election in

21   parallel testing?

22         A   That is something I have recommended.  It

23   has pros and cons.  But that's way better than just

24   picking one particular BMD in the State of Georgia

25   and parallel testing it.  Yeah, that wouldn't make

1    much sense.

2          Q    Okay.   Come to page 40 of 97 in

3    Dr. Halderman's report, section heading 8.1.

4          A    Got it.

5          Q    You see it reads, "Attaching USB Devices

6    to the ICX"?

7          A    Yes.

8          Q    And he writes, "The ICX fails to

9    adequately restrict the kinds of devices that can be

10   attached to its USB ports, including the externally

11   exposed USB cable that connects to the printer."

12         Do you see that?

13         A    I do.

14         Q    You don't dispute that finding in your

15   declaration, correct?

16         A    I do not.

17         Q    Come down to the next page under the

18   pictures.

19         A    Okay.

20         Q    Do you see where it says, "Figure 9"?

21         A    Yes.

22         Q    And here it reads, "ICX USB Interfaces are

23   Exposed to Voters and Unsealed."

24         Do you see that?

25         A    I do.

1        Q    Dr. Halderman writes, "A USB cable

2   connects the BMD to an off-the-shelf laser printer.

3   At polling places, the end of the cable attached the

4   to printer is physically accessible to voters, and

5   it is not protected by a tamper-evident seal.

6   Voters could install malware on the ICX by attaching

7   a device to the end of this cable."

8        Do you see that?

9        A    I do.

10       Q    And you don't dispute that finding in your

11   declaration, correct?

12       A    I do not.

13       Q    Come to the top of the next page, please.

14       A    Okay.

15       Q    You see there's a picture, and below that

16   it says, "Figure 10"?

17       A    Yes.

18       Q    And then it reads, "Attaching a USB Device

19   to the ICX via the Printer Cable."

20       Do you see that?

21       A    I do.

22       Q    And here Dr. Halderman writes, "The BMD's

23   USB cable is not sealed to the printer, and voters

24   can simply reach behind the printer and disconnect

25   it.  Using an inexpensive and widely available

1    adapter, any standard USB device (such as the

2    keyboard shown)" -- in the pictures -- "can attach

3    to the end of the cable and operate as if it were

4    plugged in directly to the ICX."

5            Do you see that?

6        A    I do.

7        Q    And you do not dispute that finding in

8    your declaration, correct?

9        A    I do not.

10       Q    Go to section heading 8.2.

11       A    Okay.

12       Q    It reads escaping the ICX app.

13            Are you with me?

14       A    Yes, I am.

15       Q    And then Dr. Halderman writes, "As a

16   result of Georgia's installation of a software

17   update in October 2020, the ICX's Android operating

18   system settings can be accessed by attaching a USB

19   keyboard, allowing the installation of malware."

20            Do you see that?

21       A    I do.

22       Q    And you don't dispute that finding in your

23   declaration, right?

24       A    I do not.

25       Q    If you stay in that same section, do you

Page 231

```
 1      see the very next paragraph begins, "In
 2      October 2020"?
 3           A   Yes, I see it.
 4           Q   Dr. Halderman writes, "In October 2020,
 5      shortly before the start of early voting in the
 6      November election, Georgia installed a purportedly
 7      de minimis software update on its BMDs to correct a
 8      user-interface glitch."
 9               Do you see that?
10           A   Yes.
11           Q   In the next paragraph he writes, "My
12      testing shows that installing the ICX software
13      update did indeed create a dangerous security
14      problem.  It left the BMDs in a state where anyone
15      with physical access, including non-technical
16      voters, could install malicious software."
17               Do you see that?
18           A   I see that.
19           Q   You don't dispute that finding in your
20      declaration, correct?
21           A   I do not.
22           Q   If you stay on that same page, the
23      paragraph we just read, do you still have that in
24      front of you?
25           A   I do.
```

1          Do you see that?

2      A   I do.

3      Q   And then Dr. Halderman writes, "The ICX

4  has built-in Terminal Emulator app that is

5  configured so that the user can easily obtain a

6  command-line shell with supervisory privileges."

7          Do you see that?

8      A   Yes.

9      Q   You don't dispute that finding in your

10  declaration, correct?

11      A   I do not.

12      Q   All right.  Come to the next page, please,

13  under heading 8.5.

14      A   Okay.

15      Q   And here it reads, "Automating Malware

16  Installation," right?

17      A   Yes.

18      Q   And Dr. Halderman writes, "The process

19  described above can be completed" -- I'm sorry.  Let

20  me try that again.

21          Here Dr. Halderman writes, "The process

22  described above can be completely automated, so that

23  an attacker can install malware by attaching a

24  single USB device to the exposed printer cable for

25  less than two minutes.  The automated process is

1    simple and fast enough that it could potentially be

2    carried out by a voter in the polling place."

3            Do you see that?

4        A    Yes.

5        Q    And you don't dispute that finding in your

6    declaration, correct?

7        A    I do not.

8        Q    Come to page 47 of 97, please.

9        A    Okay.

10       Q    Actually, go up one page -- sorry -- to

11   page 45 of 97 just so you see the heading 8.6 at the

12   bottom.

13       A    Got it.

14       Q    It reads, "Local Malware Installation

15   using a Forged Technician Card."

16           Do you see that?

17       A    I do.

18       Q    If you come to the top of the next page,

19   do you see at the very top of that page

20   Dr. Halderman writes, "One is to use a forged

21   Technician Card created using the technique

22   described in Section 6.2, which requires no secret

23   passwords, keys, or PINs, but only a widely

24   available $10 Java Card with some simple

25   programming."

1          Do you see that?

2     A    I do.

3     Q    You don't dispute that finding in your

4   declaration, correct?

5     A    I do not.

6     Q    All right.  Come down to the next section,

7   please, 8.7.

8     A    Okay.

9     Q    Here it reads, "Local Malware Installation

10  via Android Safe Mode."

11         Are you with me?

12    A    Yes.

13    Q    Here Dr. Halderman writes, "A local user

14  can reboot the ICX into 'Safe Mode,' allowing full

15  control of the Android operating system."

16         Do you see that?

17    A    Yes.

18    Q    You don't dispute that finding in your

19  declaration, correct?

20    A    I do not.

21    Q    Come to page 50 of 97, please.

22    A    Okay.

23    Q    Do you see at the top there's what looks

24  to be some computer code and then it says, "Issue"

25  underneath?

1           A    Yep.

2           Q    And here Dr. Halderman writes, "ICX

3    election definition files are not digitally signed,

4    and they can be modified by anyone with access to a

5    symmetric encryption key that is shared by all

6    scanners and BMDs within each county."

7                Do you see that?

8           A    I do.

9           Q    You do not dispute that finding in your

10   declaration, correct?

11          A    I do not.

12          Q    Then if you come down one paragraph, do

13   you see the heading that reads "Distribution and

14   Points of Attack"?

15          A    I do.

16          Q    If you come down to the second paragraph

17   under that heading, do you see where it reads --

18   it's just two sentences -- two lines -- it reads,

19   "This election definition"?

20          A    I do.

21          Q    In there Dr. Halderman writes, "This

22   election definition distribution process introduces

23   two kinds of opportunities for remote malware

24   attacks," and he identifies two examples, one at the

25   county level, one at Dominion.

Page 237

1              Do you see that?

2         A    I do.

3         Q    You don't dispute that finding in your

4    declaration, correct?

5         A    I do not.

6         Q    Come to the next -- top of the next page,

7    please.

8         A    Okay.

9         Q    Do you see section 9.2, "Directory

10   Traversal Vulnerability"?

11        A    I do.

12        Q    Here Dr. Halderman writes, "The ICX

13   software contains a critical directory traversal

14   vulnerability that allows a maliciously modified

15   election definition file to overwrite arbitrary

16   files."

17             Do you see that?

18        A    I do.

19        Q    You don't dispute that finding in your

20   declaration, correct?

21        A    I do not.

22        Q    Come down to the next section, please,

23   9.3.

24        A    Okay.

25        Q    It reads, "Arbitrary Code Execution as

1    Root."

2             Do you see that?

3        A   I do.

4        Q   Here Dr. Halderman writes, "The BMD runs

5    code with root privileges from a file that is

6    writable by the ICX App.  When combined with the

7    directory-traversal vulnerability, this allows a

8    malicious election definition file to execute

9    arbitrary code as root."

10            Do you see that?

11       A   I do.

12       Q   You do not dispute that finding in your

13   declaration, correct?

14       A   I do not.

15       Q   Come to page 54 of 97, please.

16       A   I'm there.

17       Q   Do you see the heading 9.6, "Conclusions"?

18       A   I do.

19       Q   Do you see the second paragraph that

20   begins, "Security experts"?

21       A   Yes.

22       Q   Here Dr. Halderman writes, "Security

23   experts consider arbitrary code execution to be one

24   of the most dangerous classes of vulnerabilities,

25   particularly when it can be exploited to run code

1    with root privileges, as it can on the ICX."

2           Do you see that?

3        A   I see it.

4        Q   You don't disagree with that statement in

5    your declaration, correct?

6        A   I do not.

7        Q   You see he goes on to explain --

8    Dr. Halderman does -- "In 2006, Harri Hursti

9    discovered a similar arbitrary code execution

10   vulnerability that affected Georgia's old AccuVote

11   TS-X DREs."

12          Do you see that?

13       A   Yes.

14       Q   Do you recall that vulnerability that was

15   discovered?

16       A   I do not.

17       Q   Dr. Halderman explains, "At the time,

18   Defendants' expert Michael Shamos called it 'the

19   most serious security breach that's ever been

20   discovered in a voting system.'"

21          Dr. Halderman concludes, "The

22   vulnerabilities in the ICX are as or more severe."

23          Do you see that?

24       A   I see it.

25       Q   And you don't dispute that finding in your

Page 240

1    declaration that the vulnerabilities in the ICX are

2    as or more severe, right?

3         A    I do not dispute it in my declaration, but

4    I do not agree with it.

5         Q    And what's the basis for disagreeing with

6    that when you've not examined the security -- the

7    cybersecurity of the equipment at issue here?

8         A    I don't need to examine it to make this

9    statement.

10             The DRE does not have a paper trail.  If

11   there's a vulnerability on the BMD and voters verify

12   it, you can catch it.  In other words, you can

13   prevent it.  He can hack it and change it all he

14   wants.  But if they are verifying it, he can't

15   change the outcome of the election.  He can't

16   disenfranchise people.  The DRE, you can change it

17   and it's impossible to know.

18             So Dr. Shamos is right in the context of

19   the DRE, but that doesn't apply to a BMD the same

20   way.  It is not the same.

21        Q    Voter verification does not prevent any of

22   the hacks that Dr. Halderman has identified from

23   occurring, right?

24        A    Voter verification would not prevent the

25   hack from occurring.  It would prevent the hack from

1    needed to protect the voter, which is there also has

2    to be an audit, right?  A reliable audit?

3         A    It depends on the -- on the technology and

4    how it all fits together.

5              But we recommended for the NASEM report

6    that if you're going to have a scanner, then you

7    need to have an audit because the scanner could be

8    compromised.

9         Q    All right.  I'm sorry.  Take a look at

10   page 55 of 97 now, heading 10.1.

11        A    Got it.

12        Q    Here you have the heading "Vulnerable

13   Storage Design."

14             Do you see that?

15        A    I do.

16        Q    And Dr. Halderman writes, "ICX audits logs

17   and protective counters are stored in regular files

18   with no protection beyond filesystem permissions,

19   which can be easily bypassed."

20             Do you see that?

21        A    Yes.

22        Q    You don't dispute that finding in your

23   declaration, correct?

24        A    I do not.

25        Q    He then goes on in the same section, "The

Page 243

1      ICX does not provide any mechanism to verify the

2      integrity of exported audit logs."

3              Do you see that?

4          A   I do.

5          Q   You don't dispute that finding in your

6      declaration, correct?

7          A   I do not.

8          Q   Come to the page 57 of 97, please.

9          A   I'm there.

10         Q   Do you see the heading 11.1, "The ICP

11     Accepts Photocopied Ballots"?

12         A   Yes.

13         Q   Here Dr. Halderman writes, "The ICP as

14     tested did not require ballots to be printed on

15     security paper, and it accepted ICX ballots

16     photocopied on normal office paper."

17             Do you see that?

18         A   I do.

19         Q   You did not dispute that finding in your

20     declaration, correct?

21         A   I did not.

22         Q   Do you see the next heading, 11.2, on the

23     same page?

24         A   I do.

25         Q   Here it reads, "A Dishonest Poll Worker

1    with Access to the ICP Memory Card can Deanonymize

2    All Voted Ballots."

3            Do you see that?

4        A   I see it.

5        Q   Dr. Halderman writes, "The ICP tested does

6    not encrypt ballot images stored on its memory

7    card."

8            Do you see that?

9        A   I do.

10       Q   You do not dispute that finding in your

11   declaration, correct?

12       A   I do not.

13       Q   Dr. Halderman goes on here to write, "ICP

14   memory cards store ballot images in the order they

15   were cast."

16           Do you see that?

17       A   I do.

18       Q   You do not dispute that finding in your

19   declaration, correct?

20       A   I do not.

21       Q   Come to the next page, please, Section

22   11.3.

23       A   Okay.

24       Q   The report itself is not 97 pages long, so

25   we're getting towards the end.  I imagine this is

1     getting monotonous.

2              Take a look at Section 11.3.  Do you see

3     where it reads, "Installed Tamper-Evident Seal could

4     be Bypassed or Defeated"?

5          A    Yes.

6          Q    Here Dr. Halderman writes, "The ICP modem

7     port door is incompletely closed when sealed,

8     allowing access to connectors inside."

9              Do you see that?

10         A    I do.

11         Q    You do not dispute that finding in your

12    declaration, correct?

13         A    I do not.

14         Q    He then goes on in the same section to

15    write, "The tamper-evident seal on the ICP tested

16    was improperly installed, leaving it easily

17    defeated."

18              Do you see that?

19         A    I do.

20         Q    You did not dispute that finding in your

21    declaration, correct?

22         A    Did not.

23         Q    Come to page 62 of 97, please.  There's a

24    heading, "References."

25         A    Got it.

Page 251

1    that they made.

2           That doesn't mean that the marks on the

3    ballot are accurate.  That doesn't mean that the

4    marks on the ballot will be translated the way they

5    marked it.  Their intent is not guaranteed to be

6    captured by the scanner.

7    BY MR. CROSS:

8        Q   But if the scanner is operating as it

9    should and they have carefully verified each of the

10   selections on their hand-marked paper ballot, then

11   they can have reasonable confidence that it's going

12   to be tabulated, at the moment it goes into the

13   scanner, correctly, right?

14          MR. MILLER:  Object to form.

15          THE WITNESS:  It goes back to

16   "reasonable."  I don't know to what extent.  But

17   hopefully they have complete confidence.  Because if

18   they don't, we have an issue with our elections.

19   But there is a level of reasonableness there that's

20   variable.

21   BY MR. CROSS:

22       Q   But with a QR code, the voter has no

23   ability -- no matter how carefully they review the

24   ballot, they have no ability to verify that what's

25   going to get tabulated as their vote when it goes

1    into the scanner is accurate even if the scanner is

2    working exactly as it should, right?

3              MR. MILLER:  Objection.  Asked and

4    answered.

5              THE WITNESS:  There's no way for a human

6    being to look at a QR code, to my knowledge, and

7    determine what's in it.  So by that definition, you

8    cannot -- you don't know what's in it.  You can't

9    read the QR code with your eyes.

10   BY MR. CROSS:

11        Q   And that's the same way with the old DREs

12   in Georgia, right?  The moment the voter casts their

13   ballot, casts their ballot on the DRE, they have no

14   way to know whether it's going to be counted as they

15   intended because they don't know whether the DRE is

16   working properly, right?

17             MR. MILLER:  Objection.  Asked and

18   answered.

19             THE WITNESS:  The DRE -- there's no way to

20   know if it's even stored, if it's stored as

21   intended, if it's modified.  You have no idea of

22   anything.

23             With the QR code, you knew it was

24   successfully scanned.  You do have that

25   determination.  Just like you do with a hand-marked

Page 253

1   paper ballot, you know that it was scanned, but you
2   don't know that it read it correctly or even stored
3   it.  You don't know that it didn't change your vote.
4   You have no idea what it did in the tally.
5   BY MR. CROSS:
6        Q    As an election security expert, do you
7   believe that an election system can be so unsecured
8   that it should not be used?
9             MR. MILLER:  Objection.
10            THE WITNESS:  Yes.
11   BY MR. CROSS:
12        Q    You've prepared something you called a
13   ballot-marking verification protocol, right?
14        A    Yes.
15        Q    And the conclusion you included in that,
16   you wrote, "Don't trust the BMD.  Audit it with the
17   BMVP."
18             Do you recall writing that?
19        A    Yes.
20        Q    And why did you write that?
21        A    Because whenever you use a computing
22   device to do the tally, you cannot trust it.  You
23   have to do the audit, which was the conclusion of
24   the National Academies report.  That's why we do the
25   audit.

Page 254

1            If you have hand-marked paper ballots, you

2       have to do the audit because the scanner could lie

3       to you.  You can hack the scanner.

4            Q    You testified in a case captioned National

5       Federation of the Blind versus Linda Lamone; is that

6       right?

7            A    Yes.

8            Q    And that was in 2014; is that right?

9            A    I don't know the year.

10           Q    Do I understand correctly that you

11      testified on behalf of the plaintiffs that were

12      challenging the election system in that case?

13           A    No, I don't recall which side I was on.  I

14      have to go back and look at my notes.  It's been a

15      long time, and I've served on several cases since

16      then.

17           Q    You don't recall that you testified on

18      behalf of the National Federation of the Blind?

19           A    I do recall that.  So were they the

20      plaintiffs?

21           Q    Yes.

22           A    Whoever they were, that's who I -- what

23      side I was on.  Does that help?

24           Q    Yes.  Yes.  Okay.  What was the thrust of

25      your opinions in that case on behalf of the National

Page 288

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12         Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [x] was [ ] was not requested.

16         I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.  Dated this 5th day of November, 2021.

21

22

23                        *Carla Soares*

24

25                        CARLA SOARES

                          CSR No. 5908