Page 1

1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
2                         ATLANTA DIVISION

3

    DONNA CURLING, ET AL.,

4
                    Plaintiffs,
5                                     CIVIL ACTION FILE
        vs.                           NO. 1:17-CV-2989-AT
6

    BRAD RAFFENSPERGER, ET AL.,

7
                    Defendants.
8

9

10

11            REMOTE VIDEOTAPED ZOOM DEPOSITION OF
                        DAVID HAMILTON
12

                      January 18, 2022
13                      10:06 A.M.

14

15        Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC

16

17

18

19

20

21

22

23

24

25

Page 5

1                          INDEX TO EXHIBITS
2       Plaintiffs'
          Exhibit           Description              Page
3
4       Exhibit 1    Email Chain, Bates Numbers        18
                     FORTALICE001200 through
5                    -001201
6       Exhibit 2    LinkedIn Profile of David         22
                     Hamilton, No Bates Numbers
7
        Exhibit 3    Email Chain dated August          40
8                    2016, Bates Numbers
                     FORTALICE000002952 through
9                    -2953
10      Exhibit 4    Fortalice Red Team                46
                     Penetration Test and Cyber
11                   Risk Assessment Report for
                     State of Georgia, Office of
12                   the Secretary of State,
                     November 2018, Bates Numbers
13                   Payton 000070 through
                     -000119
14
        Exhibit 5    Declaration of David              53
15                   Hamilton, No Bates Numbers
16      Exhibit 6    Task order from Fortalice to      84
                     the Secretary of State's
17                   office dated March 11, 2021,
                     Bates Numbers
18                   FORTALICE000001 through -2
19      Exhibit 7    Weekly Updates from               65
                     Fortalice to the Secretary
20                   of State's Office, Bates
                     Numbers FORTALICE002781
21                   through -2788
22      Exhibit 8    Email Chain, Bates Numbers        90
                     STATE-DEFENDANTS-00126678
23                   through -126682
24      Exhibit 9    Email Chain, Bates Numbers        94
                     STATE-DEFENDANTS-00126696
25                   through -126698

1                        INDEX TO EXHIBITS
2        Plaintiffs'
          Exhibit              Description              Page
3
         Exhibit 10    News Article, "UPDATE:          102
4                      Ransomware Attackers Hit
                       Hall County Election
5                      Infrastructure, dated
                       October 23, 2020, No Bates
6                      Numbers
7        Exhibit 11    Email Chain, Bates Number       104
                       STATE-DEFENDANTS-00104972
8
         Exhibit 12    Email Chain, Bates Numbers      109
9                      STATE-DEFENDANTS-00158821
                       through -158822
10
         Exhibit 13    Election Office Notes, 10 AM    116
11                     6/15/20 Meeting, Bates
                       Numbers
12                     STATE-DEFENDANTS-00158823
                       through -158825
13
         Exhibit 14    Email Chain, Bates Numbers      125
14                     STATE-DEFENDANTS-00171971
                       through -171973
15
         Exhibit 15    Email Chain, Bates Numbers      134
16                     FORTALICE001209 through
                       -1212
17
         Exhibit 16    Supplemental Declaration of     144
18                     David Hamilton, No Bates
                       Numbers
19
         Exhibit 17    Email Chain, Bates Numbers      149
20                     STATE-DEFENDANTS-00126614
                       through -126616
21
         Exhibit 18    Email Chain, Bates Numbers      152
22                     FORTALICE001163 through
                       FORTALICE001166
23
         Exhibit 19    Report from Fortalice           158
24                     Solutions dated July 14,
                       2020, Bates Numbers
25                     FORTALICE000625 through -629

Page 7

1                    INDEX TO EXHIBITS
2       Plaintiffs'
          Exhibit          Description          Page
3
        Exhibit 20  Email from David Hamilton     165
4                   dated 4/29/2021, Bates
                    Number
5                   STATE-DEFENDANTS-00170625
6       Exhibit 21  Email from Dave Hamilton      172
                    dated 8/21/2020, Bates
7                   Number
                    STATE-DEFENDANTS-00161203
8
        Exhibit 22  Document, Bates Numbers       172
9                   STATE-DEFENDANTS-00161204.xl
                    sx through -161204.xlsx
10
        Exhibit 23  Document Titled "2020         176
11                  Security of the Voter
                    Registration System
12                  Artifacts and Attestation
                    Pursuant to Rule
13                  590-8-3-.01" dated December
                    18, 2020, Bates Numbers
14                  STATE-DEFENDANTS-00182171
                    through -00182214
15
        Exhibit 24  Email Chain, Bates Numbers    179
16                  STATE-DEFENDANTS-00182118
                    through -182120
17
18           (Original exhibits are attached to the
19       original transcript.)
20
21
22
23
24
25

Page 9

1           VIDEOGRAPHER:  Would the court reporter
2       please swear in the witness.
3           DAVID HAMILTON, having been first duly sworn,
4       was examined and testified as follows:
5           EXAMINATION
6       BY MS. KAISER:
7           Q.   Good morning, Mr. Hamilton.
8           A.   Good morning.
9           Q.   Can you please state your name and address
10      for the record?
11          A.   David Hamilton, 4570 Summerwood Drive, and
12      that's in Cumming, Georgia 30041.
13          Q.   Thank you.
14               Are you represented by counsel today, sir?
15          A.   For the purposes of this proceeding, yes,
16      by Carey Miller.
17          Q.   Okay.  All right.  Have you ever been
18      deposed before?
19          A.   Not via video, no.
20          Q.   All right.  Let me just walk you through a
21      couple of rules of the road, just to -- just to
22      level-set here.
23               So I'm going to be asking you a series of
24      questions.  I'll try to make my questions clear, but
25      if you do not hear a question or you don't

Page 12

1          A.    Sorry.

2          Q.    I think time is a little confused for all

3     of us because of COVID.

4          A.    The years, yeah.

5          Q.    Right.  All right.  So thank you.

6                So when did you first learn that we wanted

7     to take your deposition in this case?

8          A.    I guess middle of last week.

9          Q.    Okay.  And how did you learn that?

10         A.    I -- we got the -- I got an email from --

11    I'm blanking on it -- Ryan Germany and -- and said

12    that I may get a subpoena.  And lo and behold, I

13    did.  So...

14         Q.    So Mr. Germany reached out to you first

15    about this deposition; is that right?

16         A.    Just to let -- let me know that it may be

17    coming.

18         Q.    Did you meet with -- with counsel for the

19    State before today in preparation for the

20    deposition?

21         A.    Yes, ma'am.

22               MR. MILLER:  Objection on relevance.

23    BY MS. KAISER:

24         Q.    And when did you do that?

25         A.    I guess last week.  I can't remember the

1          A.   Okay.  I'm sorry.  I probably talked over

2     the end of your question.  I'm sorry.

3          Q.   No problem.  Thank you.

4               Have you spoken with anyone besides

5     counsel for the State about this deposition?

6          A.   No.  I take that back.  Yes, my wife.

7          Q.   What did you tell your wife with respect

8     to the deposition?

9          A.   Just that I was being deposed for the case

10     that I gave testimony in a couple years ago.  So...

11          Q.   Okay.  Thank you.

12               And I believe you said that the way that

13     you learned about the deposition was receiving an

14     email from Mr. Germany; is that correct?

15          A.   Yes, ma'am.

16          Q.   And then -- so that was -- was that on a

17     personal email address?

18          A.   Same one that you have here, yeah.

19          Q.   I'm -- okay.  Yeah.

20               Did anybody from the State's -- from the

21     Secretary of State's office or their counsel contact

22     you last year regarding having your deposition taken

23     in this case?

24          A.   No.

25               MR. MILLER:  Objection.  Relevance.

Page 16

1     BY MS. KAISER:

2          Q.   Do you have any idea why the Secretary of

3     State's counsel told us that they were unable to

4     locate you in late 2021?

5          A.   I --

6               MR. MILLER:  Objection.  Relevance.  Lack

7          of foundation.

8     BY MS. KAISER:

9          Q.   You may answer the question, Mr. Hamilton.

10         A.   No, I don't.

11         Q.   Do you live at the same home address as

12    when you worked at the Secretary of State's office?

13         A.   Yes, ma'am.

14         Q.   And did the Secretary of State's office

15    have that address on record, to your knowledge?

16         A.   Probably not, because I wasn't an

17    employee.

18         Q.   Understood.

19              But they did have your email address; is

20    that correct?

21         A.   Yes, ma'am.

22         Q.   And so they were able to contact you when

23    they tried?

24         A.   I believe so, yes.

25         Q.   Thank you.

Page 19

1    an email from dhamilton@imperialhealth.com dated

2    July 10, 2020.

3                Do you see that?

4         A.   I do.

5         Q.   And is that your -- is that your email

6    address?

7         A.   It was at Imperial Health down in

8    Louisiana, right.  This was a fractional --

9         Q.   And --

10        A.   -- engagement between the two and I was

11   half-timing it, sometimes in Louisiana, sometimes at

12   the State.

13        Q.   Understood.

14             So during the time you were working with

15   the Secretary of State's office, you were also

16   working with Imperial Health; is that right?

17        A.   Correct.  And other clients as well.

18        Q.   Okay.  If you look -- if you look through

19   this email chain -- and it starts at the -- it

20   begins at the end, if you will, so the first email

21   is at the bottom.

22        A.   Okay.

23        Q.   And this looks to be -- the subject of

24   this email chain is "FortaliceSOSGA - Rules of

25   Engagement."

Page 20

```
 1              Do you see that?
 2       A.    Uh-huh.
 3       Q.    All right.  And there's an email from Paul
 4   Brandau at Fortalice Solutions.
 5              Do you see that?
 6       A.    Right.
 7       Q.    All right.  What is Fortalice Solutions?
 8       A.    Fortalice is a -- is a vendor, a partner,
 9   of the State that provides security services, pen
10   testing, pay-as-you-go kind of investigative
11   services on things that are security based.
12       Q.    Okay.  And Mr. Brandau sent this email to
13   Merritt Beaver, as well as you and some others in
14   the Secretary of State's -- or, sorry, and some
15   others at Fortalice; is that right?
16       A.    Correct.
17       Q.    And who is Mr. Beaver?
18       A.    I'm sorry?
19       Q.    Who is Merritt Beaver?
20       A.    He's the CIO for the State of Georgia --
21   for the Secretary of State of Georgia.
22       Q.    Okay.  And then on the first -- first page
23   of the document, you see a response from Mr. Beaver
24   to you and Mr. Brandau.
25              Do you see that?
```

Page 21

1      A.   Yeah, I do.

2      Q.   Okay.  And so does it appear to you that

3  this document relates to your work for the Secretary

4  of State's office?

5      A.   It does.

6      Q.   Okay.  And your response at the top of the

7  page, where we started, that was sent from your

8  Imperial Health email address; is that correct?

9      A.   Right.  Just on error --

10     Q.   Did you --

11     A.   -- because -- because -- because I was

12 probably down there and I didn't change the thing at

13 the top of Outlook.

14     Q.   Did you ever collect any emails from your

15 Imperial Health email account for the purposes of

16 this case?

17     A.   No, ma'am.

18     Q.   Okay.  You can put that document aside for

19 now.

20     A.   Okay.

21     Q.   I'm just going to ask you a few questions

22 about your background, Mr. Hamilton.

23          Where did you get your undergraduate

24 degree?

25     A.   I did not go to college.

1      Q.   Oh, okay.  Do you have any certifications

2   or -- or professional -- I believe you have some

3   professional certifications; is that correct?

4      A.   I do, yes, ma'am.

5      Q.   Can you tell me about those?

6      A.   I have a CISSP, which is the certification

7   for information security professionals.  I have a

8   CISM through ISACA.  I have a CDPSE, which is a

9   privacy standard certification.  I have a

10  healthcare-specific privacy and compliance

11  certificate and also a certified C|CISO certificate.

12     Q.   That's C-S-E-L?

13     A.   C, and then a bar, C-I-S-O.  Right.

14     Q.   Would you say that you have any training

15  in cybersecurity?

16     A.   Yes, ma'am.

17     Q.   How long have you worked in the

18  cybersecurity field?

19     A.   Probably about 15 years now.

20          MS. KAISER:  Pull up Tab 1, please.

21  BY MS. KAISER:

22     Q.   I'm going to add Exhibit 2 to the Exhibit

23  Share.

24     A.   Okay.

25          (Plaintiffs' Exhibit 2 was marked for

Page 23

 1          identification.)

 2               THE WITNESS:  Oops, it logged me out.

 3          Hang on a second.

 4     BY MS. KAISER:

 5          Q.   Sure.

 6          A.   Crap.  I'm looking at the wheel.  Hang on.

 7     It's thinking.

 8               Okay.  Number 2.

 9          Q.   Do you recognize this document,

10     Mr. Hamilton?

11          A.   Uh-huh.  Yes.

12          Q.   Is this a copy of your profile from

13     LinkedIn?

14          A.   Looks like it.

15          Q.   And is this something that you update

16     regularly?

17          A.   I haven't in a while.  Since -- since I

18     landed at -- at Shepherd, there's not much point in

19     it.

20          Q.   Okay.  And that was -- when did you begin

21     with Shepherd?

22          A.   June, right as I left TrustPoint.

23          Q.   In 2021?

24          A.   Yes, ma'am.

25          Q.   On -- at the bottom of page 1 of this

Page 24

1      document, it indicates that you worked for

2      TrustPoint Solutions from October 2013 to June 2021;

3      is that correct?

4            A.    It is.

5            Q.    And what is TrustPoint Solutions?

6            A.    They're a provider of security and

7      infrastructure services predominantly in healthcare.

8      They have some business outside in the public

9      sector.

10           Q.    Sorry.  I think you mentioned this, but

11     during the time that you had the title of chief

12     information security officer for the Georgia

13     Secretary of State's office, were you employed by

14     TrustPoint Solutions?

15           A.    Yes, ma'am.

16           Q.    So did you do work for the Secretary of

17     State's office on a contract basis?

18           A.    No, not directly.  Always through

19     TrustPoint.

20           Q.    So you mean you, yourself, were not under

21     contract; the company --

22           A.    Correct.

23           Q.    -- TrustPoint was?

24           A.    Correct.

25           Q.    How much time did you spend per month on

1    work at the Secretary of State's office, roughly?

2        A.   I guess it averaged out to be probably

3    half-time.   There was some spikes there where it was

4    more full time as things ramped up for events such

5    as elections and things, incorporations.   End of

6    year was a pretty busy time for the corporation

7    side.   But as you look across, I would imagine it

8    would compute to be about half-time.

9            There were some times where I didn't --

10   wasn't there at all during a week because I was at a

11   different client.

12       Q.   When you say "there at all," were you

13   physically at the Secretary of State's office?

14       A.   Yes, ma'am.

15       Q.   And when did you begin working for the

16   Georgia Secretary of State's office?

17       A.   Summer of 2018.   That's when the

18   engagement first began.

19       Q.   And so from roughly summer of 2018 until

20   June of 2021, you spent approximately half your time

21   working on security issues for the Georgia Secretary

22   of State's office; is that correct?

23       A.   Yes, ma'am.

24       Q.   And what were your responsibilities for

25   the Georgia Secretary of State's office?

1      A.    Just overseeing the -- the corporate

2   information security program, which included the --

3   the election side as far -- insofar as it -- the

4   registration side of the house.   Not the Dominion

5   side, but the -- the corporation side of the house,

6   which is where you get a business license in

7   Georgia, and then also the Bureau of Licensing,

8   which is all the professional boards, the nursing

9   board and the barbershop folks and all those folks.

10  It's where you kind of go for -- that was the only

11  place that had PHI, so -- protected health

12  information.

13     Q.    Understood.   Okay.

14           And when you said -- you said that that

15  encompassed the election side insofar as the

16  registration side of the house.

17           Can you explain what you mean by that?

18     A.    Well, there's -- there was a couple of

19  different buckets, right?   The -- the -- the main

20  things that I was concerned with is the -- is the

21  voter registration, the MVP site; security of the --

22  more or less the public-facing sites that managed

23  the registration of a voter.

24           Didn't have anything to do with the

25  tabulation of votes or the voting machines

 1    themselves.  All that was handled by the vendor.
 2           Q.    Interesting.  Okay.
 3                 Who did you report to at the Secretary of
 4    State's office?
 5           A.    Mr. Beaver.  Merritt Beaver, the CIO.
 6           Q.    And did anybody report to you?
 7           A.    Yes.  There was -- we had a couple of --
 8    three.  At one point there was one, then it got back
 9    up to three when we restaffed.  There were several
10    names in there.  Do you want me to try to recall
11    them?
12           Q.    Yes, if you can.
13           A.    Okay.  When I got there, it was -- I just
14    can't recall his name.  Heavyset fella.  I can't --
15    probably have to go to LinkedIn to figure that one
16    out.  I can't recall his name.
17                 When I left --
18           Q.    Do you recall -- I'm sorry.  Please
19    finish.
20           A.    I was just going to say when I left, I can
21    tell you who those folks were.
22                 Ronnell Spearman, who is -- who I think is
23    still there; Kevin Fitts; and then there was one
24    person that hired just as I was leaving.  I actually
25    never got to meet him in person and I can't recall

Page 28

1    his name.
2         Q.    Do you recall the titles of the -- the
3    people that reported to you?
4         A.    Yeah.    Just security analyst.
5         Q.    As part of your work with the Secretary of
6    State's office, did you work with any outside
7    vendors?
8         A.    Yes, ma'am.
9         Q.    What vendors were those?
10        A.    Probably the largest being Fortalice.
11   They were kind of my right hand, made up for us not
12   having a big staff of folks.
13            Beyond that, we had Dell Secureworks.  We
14   had Palo Alto.  A lot of the providers of the
15   solutions that we used.  Critical Start would be an
16   example.  Just -- Clawless [phonetic].
17        Q.    And I think you -- you may have mentioned
18   this before, but what services did Fortalice provide
19   for the Secretary of State's office?
20        A.    Security services.   They did pen testing.
21   You know, we have an annual pen test where we have
22   somebody come in from the outside.
23            And also incident response.   So if there
24   was something that came up where we needed some
25   investigative specialty, kind of a subject matter

1   expert on intrusion or one of those guys, they have
2   a bench of people.
3           They're -- they hired on about the same
4   time that TrustPoint did.  We kind of came in about
5   the same time.  And we decided to use Fortalice for
6   that half and -- and TrustPoint for the guy that sat
7   in the seat, which was me.
8           It actually started off being Gaylon
9   Stockman, but once things got ramped up, Gaylon left
10  TrustPoint for another job, so it ended up being
11  just me.  The idea was to kind of alternate us back
12  and forth to give enough time, but it just didn't
13  work out that way in the end.
14          Q.   So originally the job was supposed to be
15  split between two people from TrustPoint --
16          A.   Correct.
17          Q.   -- TrustPoint?
18          A.   Yeah, that was how -- that was how the SOW
19  was written, statement of work.
20          Q.   And would that have provided more hours
21  overall of support from TrustPoint, more like a
22  full-time person?
23          A.   No, I think the statement of work was
24  still half-time at that point, but the issue was
25  that both Gaylon and I had other commitments that I

1      Q.   As chief information security officer,

2   would you say that you had a relatively senior

3   position in the Secretary of State's office?

4      A.   Yeah, as far as a contractor can go.   You

5   know, I didn't have any signing authority.   I didn't

6   have a budget.   I didn't -- you know, it's not like

7   a regular engagement where, you know, there's some

8   distance there.

9         If -- if I was a full-time employee, it

10   would have been a different situation, I think.   But

11   I relied on -- on Merritt for a lot of the back

12   office-type operations, and most -- most of my

13   engagement was -- there was basically making

14   recommendations and just -- you know, "I think we

15   should do this," and, you know, Merritt could say

16   yea or nay and we went from there.

17      Q.   Do you have a view on whether having a

18   half-time chief information security officer was

19   adequate for an entity the size of the Georgia

20   Secretary of State's office?

21         MR. MILLER:   Objection.   Lack of

22      foundation.   Calls for speculation.

23         THE WITNESS:   I can say that I do -- or I

24      did, rather, in the past fractional CISO work

25      for a lot of firms and it worked very well.

Page 35

1          A.   I -- I didn't spend an awful lot of time

2      reading them.  We just kind of glazed over them.

3              But, no, I -- I felt pretty good about my

4      memory about things, what happened.  So...

5          Q.   Did you ever recommend to the Secretary of

6      State at any point that they should have a full-time

7      chief information security officer?

8          A.   Yes.

9          Q.   Do you recall approximately when you made

10     that recommendation?

11         A.   I think, basically, when -- when James

12     Oliver -- he was my predecessor.  He was a full-time

13     employee.

14              I think initially when we came in, you

15     know, our edict was to kind of coach him up and get

16     him, you know, kind of more out there.

17              And James, very nice man, but he was kind

18     of reserved and quiet, and it's kind of hard to do

19     this job when you seal yourself in your office.  You

20     kind of have to be out there and evangelize security

21     and get people excited about it, and he just didn't

22     have that gene.

23              So I -- you know, when the Secretary of

24     State made the decision to part ways with James, I

25     really thought the next step was for me to help the

Page 36

1    Secretary of State find another full-time employee.

2                  In the end, it wasn't.  What they decided

3    to do is do a fractional kind of a situation where

4    they'd continue that relationship and kind of let me

5    sit in the chair.

6                  That's not unheard of, but it's -- I mean,

7    I would have rather have them have a full-time

8    employee just for consistency, right?  Because you

9    never know if I'm going to get pulled away on

10   another -- on another deal or -- you know.  It would

11   have been better, I think, to have a full-time, and

12   I could advise that person kind of as a -- think of

13   it as like a mentor relationship.

14        Q.    And I believe you said that you didn't --

15   you personally didn't have a budget.

16                Did you ever make a recommendation that

17   the chief information security officer should have a

18   budget?

19        A.    No.  I mean, they -- they had a budget for

20   security; it's just I wasn't -- I didn't have any

21   signing authority.  I couldn't go spend money.  You

22   know, I didn't have an expense account or anything

23   like that.

24                Anything I wanted to spend money on, I had

25   to go to -- go to Merritt for, and he worked it out

Page 45

```
 1     BY MS. KAISER:
 2          Q.   Did you have any --
 3          A.   -- the wrong place to put it.
 4          Q.   Did you have any involvement with making
 5     that transition of the Kennesaw server?
 6          A.   No, ma'am.  No, ma'am.  That was way
 7     prior.  2016, I guess.  So...
 8          Q.   We've mentioned Fortalice several times
 9     now.
10               Are you aware that Fortalice conducted a
11     series of cyber risk assessments for the Secretary
12     of State's office in 2017 and 2018?
13          A.   Yes, I -- I have knowledge of those.
14          Q.   What role, if any, did you have in working
15     with Fortalice on those cyber risk assessments?
16          A.   The second one in 2018, I believe that was
17     during my tenure, at least I got the report.  The
18     2017, I think they just passed it to me as history.
19     So...
20          Q.   And can you tell me, in general terms,
21     what Fortalice found in its 2017 and 2018 cyber risk
22     assessments for the Secretary of State's office?
23          A.   There was a number of items.  They
24     classified them as high, medium, low, based on their
25     experience, and then gave us an opportunity to
```

Page 46

1    either accept or -- or deny, you know, what was

2    going on.

3              It gives us a good basis for kind of

4    reprioritizing our work within the State to figure

5    out where we should spend our money and time trying

6    to go after the things that are the most vulnerable.

7    It's a judgment call.

8              MS. KAISER:  Can you pull up Tab 3,

9       please.

10              (Plaintiffs' Exhibit 4 was marked for

11       identification.)

12              THE WITNESS:  Is there another document?

13       I'm sorry.

14    BY MS. KAISER:

15       Q.    It's being loaded right now.

16       A.    Okay.  I'm sorry.

17       Q.    It takes a minute with larger documents,

18    so apologies --

19       A.    Gotcha.

20       Q.    -- for the delay.

21       A.    Okay.  Exhibit B.  Okay.

22       Q.    So if you scroll down to the next page,

23    you'll see this is the cover page of the report.

24              Do you recognize this as the 20- --

25    November 2018 report that Fortalice provided to the

1      Secretary of State's office?

2            A.    I think so.  Let me go down to the meat of

3      it here.  Hang on.

4                  MR. MILLER:  Mary, this is another sealed

5            document.  I can't recall from the 2019 hearing

6            if we -- how we designated this.

7                  THE WITNESS:  Yeah, this kind of thing

8            should never be made public, but I get it.

9                  MR. MILLER:  So, Mary, I'll -- I'll ask at

10           this point if we treat it as attorneys' eyes

11           only.

12                 And, Ms. Marks, if you could please drop

13           off for the period of time.

14                 MS. MARKS:  Sure, I will.  And if you will

15           let me know when I can safely come back on.

16           Thank you.

17                 (Ms. Marks left the Zoom deposition.)

18     BY MS. KAISER:

19           Q.    Mr. Hamilton, have you had a chance to

20     take a look at the document now?

21           A.    I have, yep.

22           Q.    And do you recognize this as Fortalice's

23     2018 Red Team Penetration Test and Cyber Risk

24     Assessment?

25           A.    I do, yep.

1        Q.    If you could turn to page 8 of the report.

2        A.    Okay.

3        Q.    The top section there says "2017 Top Ten

4    Risks Status in 2018."

5              Do you see that?

6        A.    Correct.

7        Q.    That next paragraph reads, "The following

8    table lists the top ten risks from the Georgia

9    Secretary of State's 2017 cyber risk assessment and

10   progress made to date on those risks."

11       A.    Right.

12       Q.    If you skip one sentence, it says, "Of the

13   top ten risks from the 2017 report, three were not

14   tested during the 2018 assessment, three were

15   remediated in the past year with compensating

16   controls and three remain unresolved."

17             Do you see that?

18       A.    I do.

19       Q.    So do you understand this section of the

20   report to address progress made on the top ten risks

21   identified by Fortalice in 2017?

22       A.    Uh-huh.  Yes.

23       Q.    Do you know why three of those top ten

24   risks were not tested in 2018?

25       A.    I do not.  Usually, it's a -- when a --

 1    when a security firm does a -- a pen test or a

 2    security assessment, they use last year and the

 3    current year to show progress or show kind of a

 4    trend, are you getting better or are you getting

 5    worse.  So usually you test the same things.

 6            The only reason I would think that we

 7    missed is if they were specifically taken out of

 8    scope.

 9        Q.   Okay.  And this report says that of the

10    top ten risks identified in 2017, only three had

11    been remediated in 2018; is that correct?

12        A.   That's what this states, correct.

13        Q.   If you can flip to page 5 of the report.

14        A.   Okay.  Hang on.  It's back.  Hang on.

15            Okie-doke.  I'm here.

16        Q.   The second paragraph on page 5, it reads,

17    "In order for Georgia Secretary of State to best

18    protect the confidentiality, availability and

19    integrity of data it holds in trust for the

20    residents of Georgia, Fortalice recommends

21    implementing the following controls."

22            Do you see that?

23        A.   Right.

24        Q.   And that first bullet point reads, "There

25    are 20 recommendations...."

Page 50

1            Do you see that?

2       A.    I do.

3       Q.    And are those recommendations detailed on

4    pages 6 and 7 of the report --

5       A.    I believe so.

6       Q.    -- in this table?

7       A.    Yeah.

8       Q.    What steps did the Georgia Secretary of

9    State's office take to implement these 20

10   recommendations from Fortalice?

11      A.    I can't speak to the first half of that

12   year because I wasn't there, but it might have had

13   something to do with -- and this is a little bit of

14   speculation on my part -- is that that might have

15   been the reason for our involvement, is that Merritt

16   didn't feel like things were moving along fast

17   enough.

18            So he wanted -- that was one of the things

19   that we were to come in and coach up for James

20   Oliver is to kind of get him excited about this

21   stuff and get moving on some of these things that

22   were identified.

23            And I think this was the list that I gave

24   the status on I guess about halfway through the

25   tenure.   That was one of the exhibits or the

Page 51

1    statements that I made to the Court.

2              So I don't know what the status is now, of

3    course, because I've been gone six months, but they

4    were well on their way to taking care of those

5    and -- and others that were found along the way.

6    So...

7              Security is -- itself truly is a -- it's a

8    journey; it's not a destination.  You're never done.

9    I mean, there's always -- the threat landscape

10   changes every day.  Things change every day.

11             So, you know, it's a snapshot in time.  At

12   the time that Fortalice did this, this is what they

13   found.  They could have waited three weeks and did

14   another one and found something else and not found

15   three others.  So it's just a snapshot in time.

16        Q.   Sure.

17             At the bottom of page 5 of the report, the

18   last paragraph there, it says, "Although Fortalice

19   only explicitly recommends additional staff for one

20   of the twenty findings, we believe that additional

21   resources could accelerate the timeline for

22   addressing the security risks in this report."

23             Do you see that?

24        A.   I do.

25        Q.   To your knowledge, did the Secretary of

Page 53

1              MS. KAISER:  Will you add Tab 4, please,

2          Zach.

3     BY MS. KAISER:

4          Q.   We're going to bring up the next exhibit,

5     Mr. Hamilton.

6          A.   Okay.

7              (Plaintiffs' Exhibit 5 was marked for

8          identification.)

9     BY MS. KAISER:

10         Q.   If you scroll down to the second page, I

11    believe you -- you stated that you -- you know, you

12    made a statement in this case.

13             Do you recognize this to be the

14    declaration that you provided in this case?

15         A.   Yes, ma'am.  One of two, correct.

16         Q.   Correct.

17             Let's see.  This one is dated August --

18    August 25, 2020.

19             Do you see that?

20         A.   That sounds about right, yep.

21         Q.   Okay.  Did you draft this document, sir?

22         A.   I did.

23         Q.   And the purpose of your declaration, as

24    you mentioned, was to go through the recommendations

25    from Fortalice and give a status update on how they

Page 54

1     were being resolved or remediated; is that right?
2          A.    Correct.
3          Q.    I just want to walk through a couple of
4     these.
5               So Number 2, the "Two-Factor
6     Authentication," do you see that?
7          A.    Uh-huh.
8          Q.    It says the "Status" was "Accepted and
9     Partially Remediated."
10         A.    Uh-huh.
11         Q.    Do you see that?
12              All right.  And Number 5 was "Non-Unique
13    Local Admin Passwords."
14              Do you see that?
15         A.    I do.
16         Q.    The "Status" was "Accepted and
17    Compensating Control Applied."
18              Do you see that?
19         A.    Correct.
20         Q.    What did you mean by "compensating control
21    applied"?
22         A.    The long-term solution would be to go to a
23    PAM, which is a privileged account management
24    solution, but that's a pretty heavy lift
25    financially.

Page 58

1    wouldn't move that fix back into the code line, so

2    the very next time they did a revision, they would

3    re-break the thing.

4             And that is kind of a, you know, 101

5    change control operation.  Somebody wasn't watching

6    the store.  So...

7             And we tried to help grow them.  You know,

8    we gave them a lot of feedback, probably a lot more

9    than they ever wanted.

10            And then they were purchased by another

11   firm, and that gentleman -- they had a CISO there.

12   He's the gentleman that actually attested to the

13   fact that their minimum security met the minimum

14   based on what I had sent them.  I think he was

15   hopeful that it would get that way, but I had my --

16   like I said, I had my doubts, so to speak.

17        Q.   All right.  Well, going back to your

18   declaration, Mr. Hamilton, we can -- we can keep

19   walking through them one by one, but by my count,

20   there were 11 out of 20 recommendations that,

21   according to your declaration, had not been fully

22   remediated.

23        A.   Right.

24        Q.   Does that sound about right?

25        A.   (Nodded head.)

1      Q.    Okay.  And that was the status as of

2   August 2020; correct?

3      A.    Correct, so basically three months into my

4   tenure.  That's about right, yeah.

5      Q.    Three months into your tenure.  Okay.

6           And -- but that was nearly two years after

7   Fortalice issued their cyber risk assessment in

8   November 2018; is that correct?

9      A.    Correct.

10           MR. MILLER:  Objection.  Lack of

11      foundation.

12   BY MS. KAISER:

13      Q.    And so nearly two years after Fortalice

14   issued that report, at least half of their

15   recommendations had not been fully implemented; is

16   that correct?

17           MR. MILLER:  Objection.  Asked and

18      answered.

19           THE WITNESS:  It sounds like it, yeah.

20   BY MS. KAISER:

21      Q.    Based on your experience and training,

22   does it seem reasonable to have a cybersecurity

23   vendor identify security risks in your system and

24   then not take recommended steps to address those

25   risks for nearly two years?

Page 60

1          MR. MILLER:  Objection to form.  Lack of

2    foundation.  Calls for speculation.

3          THE WITNESS:  In -- in my professional

4    opinion, it's not uncommon.  Some of -- some of

5    the things that we're faced with have budgetary

6    constraints.

7          The bottom line is we present -- as

8    security people, we present to the business and

9    say, "Here's the nine things we've got to do.

10   You know, what's our bucket of money look like?

11   What does it take, you know, horsepower,

12   people, whatever?"  And then the business makes

13   the decision finally on -- on what -- what to

14   focus on.  We make recommendations and then we

15   move on those.

16          But we made pretty good headway, I

17   think --

18   BY MS. KAISER:

19        Q.  Were you pushing the Secretary of

20   State's --

21        A.  -- before I left.  So...

22        Q.  Were you pushing the Secretary of State's

23   office to move faster or make more headway on these

24   recommendations from Fortalice?

25        A.  Yes, ma'am.  I was kind of the evangelist,

Page 61

 1     and, yeah, I was -- I was not shy about it.  So...

 2          Q.    Why were you pushing that?

 3          A.    Just to get -- get moving, right?  We had

 4     the time and some of the things, like was outlined,

 5     are low cost or no cost.  It doesn't mean that it --

 6     I mean, no cost is nobody has to write a check to a

 7     vendor.

 8               But the big thing is -- is the headcount.

 9     It's the talent that you have in-house that are able

10     to do these tasks.  And a lot of my time there

11     was -- was training, mentoring, kind of teaching

12     people how to kind of ramp things up.  So -- yep.

13          Q.    Have you -- you felt that these

14     recommendations from Fortalice were good ones,

15     correct, that would improve the security of the

16     system?

17          A.    Yeah.  That's why on -- on the -- on the

18     statement where I said "Accepted" -- in any -- in

19     any situation where a -- a security firm comes in

20     and does an assessment or a pen test and they

21     present you with the findings, you're able to accept

22     those or not accept them.

23               An example of not accepting is either it

24     was out of scope or something that had long been

25     fixed and they missed it.  You know, things like

Page 62

1    that.

2            So in most of these cases, I believe I

3    accepted most of these because I verified that they

4    were still valid.

5        Q.   Has Fortalice done any additional work for

6    the Secretary of State's office since the

7    penetration testing in 2018?

8        A.   I -- I -- they had an annual -- they had

9    an annual test and assessment, a pen test.

10       Q.   And when you say "pen test" --

11       A.   I know we --

12       Q.   -- is that --

13       A.   Penetration test.  That's somebody from

14   the outside tries to get in.  There's three forms of

15   that.  There's, you know, the white hat, the black

16   hat, and the gray hat.

17           So this was very much -- we did not give

18   them the keys to the castle.  We wanted them to

19   replicate the outside world, so that becomes a black

20   hat operation.

21           Gray hat is when you give them a little

22   bit of a path, you know a little bit about the

23   environment.

24           And then white hat, of course, is you give

25   them carte blanche to the environment and then they

Page 63

1    just go -- usually that's an internal pen test.

2               But all of these were external.

3        Q.   And to your understanding, Fortalice did

4    one of these pen test assessments each year since --

5        A.   Yes, ma'am.

6        Q.   -- 2018?

7               And did they test the -- the entire part

8    of the Secretary of State's network or -- or

9    portions of it in those years, do you know?

10       A.   Most of it was just the business network,

11   right?  It was the business network and the

12   public-facing websites, nothing specific to --

13              You know, every business has a certain

14   number of IP addresses that face the public, and I

15   think in previous years, because of cost, they had

16   kind of truncated that list a little bit.  Because

17   they do charge per IP address.

18              And I know one of the years that I was

19   there, I went ahead and had them test everything,

20   every public IP address that we had.  It was

21   expensive to do, but you -- you kind of want a basis

22   to kind of run from.  So...

23       Q.   Did these pen -- penetration tests include

24   the portions of the election system that the

25   Secretary of State is responsible for?

Page 64

1     A.    Yes, ma'am.  The registration side, yes.

2     Q.    Did you personally work with Fortalice on

3  these penetration tests?

4     A.    No.  I -- I'm just the client.  They're

5  done in a vacuum and then they report back in a

6  draft mode and we talk about them, and then they

7  make a final report.

8     Q.    Did they provide those reports to --

9     A.    To Merritt, yeah.  Again --

10     Q.    Did you review --

11     A.    -- that was done because they were the

12  customer.

13     Q.    Correct.

14           But did you review those reports?

15     A.    I did.

16     Q.    And you said that there were discussions

17  of the reports.

18           Were you involved in the discussions?

19     A.    I would say most of them, but maybe not

20  all of them.

21     Q.    So to your knowledge, Fortalice conducted

22  and provided a report regarding a penetration test

23  in 2019; is that correct?

24     A.    I would think so, yes.

25     Q.    And in 2020?

Page 65

```
 1          A.   I'm not sure because of the COVID stuff.
 2     I don't know if that happened.
 3          Q.   And how about 2021?
 4          A.   Again, I don't know.
 5          MS. KAISER:  Can you mark Tab 6, please?
 6     I'm sorry, Tab 7.
 7     BY MS. KAISER:
 8          Q.   We're adding two documents to your folder,
 9     Mr. Hamilton.  I'd actually like to start with the
10     second one.
11          A.   Okay.
12          MS. KAISER:  7; is that right?
13          (Plaintiffs' Exhibit 7 was marked for
14          identification.)
15     BY MS. KAISER:
16          Q.   Exhibit 7.
17          A.   Okay.
18          Q.   Do you recognize this document?
19          A.   Something I guess from Fortalice.  I --
20     we -- we didn't have Microsoft Teams then.  I guess
21     that would be a Fortalice thing.
22          Q.   Yeah, that was one of my questions.  It
23     says -- at the top of this page, it says, "This page
24     is automatically updated from the Wiki in Microsoft
25     Teams."
```

```
 1              MR. MILLER:  Objection.  Lack of
 2        foundation.
 3    BY MS. KAISER:
 4        Q.   Let's see.  If you move forward on this
 5    document to the February 26, 2021, entry.
 6        A.   Okay.
 7        Q.   It's on the page ending in -2785.
 8        A.   -2785.  Okay.  I got it.
 9        Q.   The last bullet there says, "Weekly
10    update."  It says, "vCISO services have been
11    mentioned."
12        A.   Right.
13        Q.   "Kyle and Paul are setting up meeting to
14    discuss with Dave Hamilton to get them caught up on
15    a backlog of security tasks."
16             Do you --
17        A.   Right.
18        Q.   -- see that?
19        A.   Right.
20        Q.   Do you know what that is referring to?
21        A.   Yeah.  I had mentioned to Fortalice that I
22    was planning on leaving the State as soon as I found
23    another position and that they needed to -- you
24    know, as the other partner, if they had the ability
25    to step in.
```

Page 69

1              You know, I wanted to take care of the
2     State.  TrustPoint did not have any resources they
3     had left, so there wasn't anybody from our firm.
4     And I checked it out with my boss and he said it
5     would be fine to kick it to them and say, "Listen,
6     you know, we want to take care of our customer and
7     if you're getting ready to leave, then, you know,
8     you need to give it to them."
9              They subsequently decided that they
10     couldn't fill that seat because of a conflict of
11     interest.
12          Q.   What was the backlog of security tasks
13     that are --
14          A.   I think --
15          Q.   -- mentioned here?
16          A.   I think I pitched to them that there was
17     definitely work to be done, it was a work in
18     progress, and it wasn't going to be -- I think my
19     emphasis there was for -- for them to please be
20     interested, you know.
21              Because they would want to bill,
22     obviously.  They didn't want to just come in and be
23     a -- more of a maintainer than a fixer, right?  So
24     my emphasis there was just to kind of get them
25     interested in coming in and stepping in for me.

Page 70

1       Q.   In your view, why was there a backlog of
2   security tasks?
3       A.   Well, I think it was just, you know, we
4   needed some help.  You know, we had some staff
5   turnover and some people leave and I was getting
6   spread pretty thin between there and Imperial and I
7   wasn't there every week, and I just felt like I
8   needed to kind of get people interested in coming to
9   help.
10      Q.   If you move forward in the document to the
11  entry for April 16, 2023 [sic], it's on the page
12  ending in -2784.
13      A.   -2784.  Okay.  April 16 you said?
14      Q.   16, yes.
15      A.   Yes, ma'am.  Got it.
16      Q.   It says "Project Status," and the second
17  bullet point there says, "Pen test wrapping up."
18           Do you see that?
19      A.   Okay.  Adam Brown.  Okay.
20           Yeah, I worked with --
21      Q.   Does that suggest --
22      A.   -- Adam.
23      Q.   Does that suggest to you that Fortalice
24  did conduct penetration testing in 12 --
25      A.   Sounds like it, yeah.

Page 72

1              COURT REPORTER:  Thank you.

2    BY MS. KAISER:

3         Q.   If you go up to the first entry in the

4    document for July 15, 2021.

5              Do you see that?

6              The last bullet point there under "Weekly

7    Update," it says, "Red team establishing assumed

8    breach."

9              Do you see that?

10        A.   What -- I'm sorry.  Which page are we on

11   again?  I got lost.

12        Q.   Sorry.  We're on the first page of the

13   document.

14        A.   Oh, sorry.  Okay.

15             Yep, I got it.

16        Q.   What does, "Red team establishing assumed

17   breach" mean?

18        A.   There's a couple of different ways to

19   approach a client when you're doing red team

20   exercises.  And I wanted -- I wanted them to -- or

21   somebody -- probably was me -- wanted them to act

22   like, you know, we had a breach and we needed to

23   also exercise the incident response plan as part of

24   the red team exercise.

25        Q.   What is the incident response plan?

1    A.   It's a set of documentation, policies,

2    procedures that tells people what their roles are.

3    There's certain people that are identified in the

4    organization that kind of -- think of it like

5    everybody heads to the war room and chats about it.

6         When -- when the security team has an

7    event, that event then -- with further kind of

8    research, if it seems like it is a security issue,

9    then we refer to it as an incident.

10        It is not the security team's privy to

11   deem something as a breach.  We can only show it as

12   a potential breach, and then it's up to management

13   to make that decision whether something is actually

14   a breach.  We just -- we just give the facts to

15   leadership and they make the determination whether

16   something's a breach or not.

17        Only the senior leadership team can

18   implement the incident response plan and kind of

19   move forward with that.

20    Q.   Who is on the -- that management team?

21    A.   Legal -- by name or title?  I'm sorry.

22    Q.   Either.

23    A.   Okay.  So it would be somebody from legal,

24   somebody from public relations, somebody -- usually

25   two or three people from the senior leadership team,

Page 74

1    somebody from operations, service desk.  Anybody

2    involved directly in the incident gets drafted into

3    that meeting.

4              It's just basically to get all the facts

5    out on the table.  You whiteboard everything and

6    then you -- there's a playbook that we kind of go by

7    to certify something as real.  We score it based

8    on -- it's a judgment, right?  We score it based on

9    criticality, and that's how that kind of runs

10   through that program.

11        Q.   And were you part of that management team?

12        A.   I was as the -- as the CISO, yes.

13        Q.   Do you recall what they -- what the

14   results or findings were from Fortalice's 2021

15   penetration testing?

16        A.   Not -- not by heart.  Sorry.

17        Q.   Do you recall anything generally?

18        A.   I think it was just a continuation of

19   the -- you know, the path that they were on.  I

20   think they found some new things, I think there was

21   some things from the old report, and then there was

22   things that we fixed.  So just part of that journey

23   that I mentioned.

24        Q.   Do you recall whether Fortalice sent a

25   final version of their report from this penetration

1   know, prioritizing certain remedies and that kind of

2   thing.  I just wanted to go back to that for one

3   minute.

4         A.   Sure.

5         Q.   You would agree that the --

6         A.   Sure.

7         Q.   -- Secretary of State is responsible for

8   what's considered critical infrastructure, including

9   the election system, would you not?

10        A.   Yes.

11             MR. MILLER:  Objection.  Lack of

12        foundation.  Calls for speculation.

13   BY MS. KAISER:

14        Q.   And do you agree that all reasonable

15   measures should be made to secure such critical

16   systems?

17             MR. MILLER:  Same objection.

18             THE WITNESS:  Reasonable, right, yep,

19        reasonable and appropriate.  It's all based on

20        judgment.

21   BY MS. KAISER:

22        Q.   So you were not suggesting that it's

23   appropriate to leave significant vulnerabilities

24   unmitigated when you're dealing with --

25             (Cross-talk.)

Page 98

1          A.    Not at all.

2          Q.    -- critical infrastructure?

3                MR. MILLER:  Objection.

4                THE WITNESS:  Not at all.

5    BY MS. KAISER:

6          Q.    And you were not suggesting it's

7    appropriate to take no measures to mitigate

8    significant vulnerabilities with critical

9    infrastructure systems?

10               MR. MILLER:  Same objection.

11               THE WITNESS:  Correct, I was not.  If we

12         can't fix it one way, there's usually other

13         compensating controls that we can do.  So...

14   BY MS. KAISER:

15         Q.    I have a couple of questions about

16   Georgia's prior election system, by which I mean the

17   DRE voting system.

18         A.    Oh, yeah.  I probably won't be much --

19         Q.    Are you aware of any --

20         A.    -- help there, but --

21         Q.    Are you aware of any efforts made by

22   anyone in the Secretary of State's office to

23   determine whether malware was located on any

24   component of the -- of the prior DRE system?

25               MR. MILLER:  I'm going to note an

1    if you insist, then let the games begin.  Fair

2    warning."

3              Do you see that?

4         A.   Yep.

5         Q.   And it looks like -- it looks like this

6    was sent to soscontact@sos.ga.gov?

7         A.   Right.  That's just the -- the basic

8    website.  It's like sending a note to the webmaster,

9    right.

10        Q.   Okay.  And then this was forwarded on to a

11   group of people, including -- let's see -- including

12   Chris Harvey and Kevin Rayburn.

13             Do you see that?

14        A.   Yep.  James Oliver.  Right.

15        Q.   Right.

16             But you don't recall -- you don't have any

17   recollection of this email or this incident?

18        A.   No, ma'am.

19        Q.   And you don't recall any similar threats

20   during your time at the Secretary of State's office?

21        A.   No, nothing like that.  It's been my

22   experience that people who threaten usually don't do

23   it.  It's the people that don't say anything that do

24   things like this.

25        Q.   Do you know whether there has ever been a

1    cybersecurity assessment done of Georgia's voting

2    equipment?

3         A.   I do not.  As I understood it, that was

4    the privy of the Dominion folks and that they were

5    independently certified.  I don't know much about

6    that process.

7         Q.   So you're not aware of any cyber

8    assess- -- cybersecurity assessment of the voting

9    machines?

10        A.   No, ma'am.

11        Q.   Are you aware of any reports or

12   conclusions regarding any security vulnerabilities

13   with the BMD system?

14        A.   Not -- not specifically, because it kind

15   of fell outside my scope.  So...

16        Q.   Are you generally aware of any?

17        A.   No, I -- I can't recall any that -- I

18   mean, there was always the underpinnings of somebody

19   trying to do something, but we live with that every

20   day.  So...

21        Q.   So you're not personally aware of any

22   security breaches or vulnerabilities involving the

23   BMD system.

24             MR. MILLER:  Objection.  Asked and

25        answered.  Lack of foundation.

1        A.    Correct.

2        Q.    Do you know what he meant by that?

3        A.    The actual specific software that goes on

4    there we did not have any experience with, so I

5    think I had asked somebody along the line, I said,

6    "If -- if the vendor should do the install, then let

7    them do the install."

8            But I would do that with other examples,

9    too.  That's probably where that came from.

10       Q.    And when you mean [sic] "the software,"

11   you mean the actual EMS software that did --

12       A.    Correct.

13       Q.    -- the ballot design?

14       A.    Yeah.  Yeah.  So in other words, right,

15   you've got a Windows -- a Windows box that runs

16   Windows and on top of that are individual

17   applications.  This would be an individual

18   application on top of that.

19            (Plaintiffs' Exhibit 13 was marked for

20        identification.)

21   BY MS. KAISER:

22       Q.    Can you look at the next exhibit, 13?

23       A.    Okay.  Hang on.  Oh, I don't have that one

24   yet.  Hang on.

25            All right.

1          Q.   And I'll represent to you this was an

2     attachment to the prior email that we were just

3     looking at.

4          A.   Right.

5          Q.   This -- so it says "Site Visit."

6     "Election Office Notes" --

7          A.   Right.

8          Q.   -- "10am 6/15/20 Meeting."

9               You see that?

10         A.   Right.

11         Q.   And did you recall this meeting -- I

12    mean -- sorry -- do you recall attending that

13    meeting?

14         A.   Vaguely, yeah.  I -- I definitely -- this

15    would be like one of my normal hit lists that I list

16    when I go somewhere.  Yep.

17         Q.   So do you think that these are notes that

18    you took at that meeting?

19         A.   Yes.

20         Q.   What was the purpose of the meeting?

21         A.   To get a feeling for where he is today and

22    where he wanted to be and how much of a heavy lift

23    it was going to do to -- to get it running.

24         Q.   And when you say "he," you mean --

25         A.   Michael Barnes.  I'm sorry.  Yeah.

1      Q.   So this was kind of the level set about

2    the project of getting the new servers going for the

3    EMS --

4      A.   Right.

5      Q.   -- software?

6      A.   This was the feedback to the PMO so they

7    could break it into tasks and figure out what other

8    groups needed to help.

9           And some of the errata I put in here was

10   just typical security guy, head on a swivel, you

11   know, walking around the facility, things I noticed

12   that we could do better.  So just a heads up.

13          And, you know, the idea of giving it back

14   to the PMO would be so he could kind of filter it

15   through the different groups of responsibility.

16   So...

17     Q.   Under "Basic Overview," about -- I think

18   it's about eight bullets down, it says, "No patching

19   of VMware in recent memory, no firmware updating of

20   the hosts, controllers, network gear, etc."

21          Do you see that?

22     A.   Correct.  Yeah.

23     Q.   What did you mean by that?

24     A.   Because it was off-net, they had no way to

25   patch it.  They didn't know how, let's put it that

Page 121

```
 1      BY MS. KAISER:
 2           Q.   So you don't --
 3                MS. KAISER:  Sorry, Ms. Barnes.  Thank
 4           you.
 5      BY MS. KAISER:
 6           Q.   So you don't know what it meant that
 7      the -- that GEMS was now supported by Dominion?
 8                MR. MILLER:  Objection.  Lack of
 9           foundation.
10                THE WITNESS:  I didn't take that away, I
11           guess, from that meeting.  I was just -- I was
12           focused on getting the new stuff loaded.
13      BY MS. KAISER:
14           Q.   A few bullets down says, "No history of
15      patching anything," and that looks like a frowny
16      face next to it.
17           A.   Yeah.  I can do one --
18           Q.   What did you mean --
19           A.   -- right here.
20           Q.   What did you mean by that?
21           A.   It's just a -- it's -- it's basically
22      repeating what he told me.  He says there's no --
23      there's no history of patching anything.
24                Because there was an assumption that it
25      was off-net, it didn't need to be patched.  The
```

1   reason people patch is because they're afraid of the

2   Internet.  It's not on the Internet; we don't need a

3   patch.

4          That's not necessarily the way I think,

5   so -- you still gotta be current for the support

6   reasons.

7          Q.   So why did you include a frowny face after

8   that comment?

9          A.   Just -- it's kind of -- for me, when I see

10  a frowny face, it's to kind of remind me that that

11  was a bad thing.  Just a note-taking style.

12         Q.   So that was something that you thought

13  needed to be changed?

14         A.   Yes.

15         Q.   Two bullets down from that, it says, "Need

16  to be able to scan every USB attached storage device

17  connected to prior [sic] use.  Cannot ensure USB is

18  free from malware, keylogging, etc."

19              Do you see that?

20         A.   Yes.

21         Q.   What did you mean by that comment?

22         A.   So it was common practice for the -- for

23  the data to be shared with the counties once they

24  drafted or came up with a -- a strawman of what

25  their ballot looks like.  They would share that data

Page 123

1   via USB.  They would, you know, FedEx it to them and

2   then they'd -- they'd mark up changes and then

3   they'd FedEx the USB key back.

4           Even though Michael had an internal

5   process that when he started the event, he would

6   take a USB drive out of the package and start, he --

7   he thought that was good enough and -- because he

8   encrypted it and did a lot of other things.

9           But, you know, I had a different

10  experience in life, so I decided that I thought that

11  he needed to go to a more secure managed solution

12  for USB drives, and I proposed moving to a -- an

13  actual managed USB key program.

14          And I'm not sure if that ever got funded

15  or not.  It was not an insignificant amount of

16  money, but I think they decided that the -- you

17  know, the juice wasn't worth the squeeze, so to

18  speak.

19      Q.   So to -- to your knowledge, at the time

20  you left the Secretary of State's office, that

21  recommendation had not been implemented --

22      A.   No.  They had -- they had quotes -- we had

23  quotes and we actually had sample units that Michael

24  Barnes had where he was using it for his work flow

25  to see how it moved.

1          But I think I left before that decision

2     was made.  So...

3          Q.   And why did you make that recommendation?

4          A.   Because he was using commodity-based USB

5     drives.

6          Q.   And why was that not a best practice, in

7     your view?

8          A.   Because they're not made in the U.S.

9     They're -- they could have all kinds of things on

10    them.  We don't know.

11         The only way to really make sure is to,

12    you know, wipe the thing free of -- it has to go

13    through a process of sanitization before you use it.

14         And, you know, I just -- I really like the

15    idea of a managed USB.  The name of it is called

16    DataLocker, and -- and it actually has code on it

17    that you're able to track, much like a LoJack, and

18    it keeps a log of every file ever written and a

19    log -- a file of every -- every time it's read,

20    every time it's loaded, every time anything happens

21    to it, and it uploads it to a cloud-based service so

22    you can see where these drives are; and if someone

23    got ahold of one of these drives and put it in a USB

24    slot that wasn't authorized, that it would wipe the

25    contents securely and -- kind of like bricking a Mac

1      if you don't -- if you're not the owner kind of

2      deal.

3              But it was a pretty significant outlay of

4      cash to get that done.  And I think he liked the

5      idea.  I think -- he wasn't as paranoid as I was.

6      Michael Barnes.  Sorry.  Didn't mean to say "he."

7              MS. KAISER:  Can you add Exhibit 12,

8          please -- Tab 12?

9              THE WITNESS:  14.

10             (Plaintiffs' Exhibit 14 was marked for

11         identification.)

12     BY MS. KAISER:

13         Q.   If you look at the first email in this

14     chain, it's from Michael Smith at DataLocker.

15             Do you see that?

16         A.   Yeah, all the way at the bottom?  Got it.

17     Okay.

18         Q.   Is this the vendor that you were just

19     discussing?

20         A.   Yes, ma'am.

21         Q.   So it looks like in July of 2020, you

22     reached out to DataLocker and they sent you a

23     response.

24         A.   Correct.

25         Q.   And then your email at the top of

1       page 1 --

2               A.      Yep.

3               Q.      -- you responded to Michael Smith?

4               A.      Right.   Talked about two use cases.

5       Right.

6               Q.      And so this was your explanation of why

7       you were interested in using DataLocker?

8               A.      Correct.

9               Q.      And under -- under item 1 there, you say,

10      "We have a group in the Election Center that uses

11      consumer grade USB flash drives and software

12      encryption to move data regarding ballots and poll

13      information (not votes) to and from the 159 counties

14      in Georgia."

15                      Do you see that?

16              A.      Correct.   I do.

17              Q.      Further -- in the next -- top of the next

18      paragraph, you say, "Today these drives are erased

19      and loaded at the EC...."

20                      Do you see that?

21              A.      Right.

22              Q.      Is that the Election Center?

23              A.      It is.   Marietta, right.

24              Q.      It says, No. 2, "The environment where

25      these drives are initially populated is currently

1      air gapped, and my group is reengineering the way

2      that it interacts with the world - maintaining its

3      logical and physical separation."

4              Do you see that?

5          A.   Correct.   Right.

6          Q.   And so the environment that you're talking

7      about there, that's the EMS system that was on

8      the --

9          A.   (Nodded head.)

10         Q.   Yeah.   Okay.

11         A.   Correct.   Yeah.

12         Q.   -- that was in the Election Center.

13             So were people in the 159 counties using

14     USB drives to move data in and out of the air-gapped

15     EMS system?

16             MR. MILLER:   Objection.   Lack of

17         foundation.

18             THE WITNESS:   Well, yes, but they were

19         provided by Michael's -- Michael Barnes' group.

20         I mean, it's not like the counties are going

21         out and buying their own and using them.   It

22         was stuff that was originally provided by

23         Michael.   So...

24     BY MS. KAISER:

25         Q.   But they were using USB drives,

Page 128

1    removable --

2            A.    Correct.

3            Q.    -- media.

4            A.    Uh-huh.

5            Q.    Is that consistent --

6            A.    Yeah.

7            Q.    -- with best practices, in your view?

8                MR. MILLER:  Objection.  Lack of

9        foundation.  Calls for opinion testimony.

10               THE WITNESS:  Yeah, it's -- it -- it's one

11       step above a sneakernet.  So, yeah, I mean, I

12       understand why they did it.  They didn't want

13       to use email -- I get it -- and they figured

14       that the courier system was more secure and the

15       encryption of the drives and -- you know, he

16       had an erasure kind of process that he went

17       through that we helped kind of tune up a little

18       bit so it does more of a wipe -- a DoD wipe of

19       a drive prior to use.

20               So it's just -- it's how he had done it

21       for years, and trying to change that was a bit

22       of a challenge.

23       BY MS. KAISER:

24           Q.   Based on your experience and training, you

25       recommended that the Secretary of State use a vendor

1    like DataLocker and implement a more secure process;

2    is that right?

3         A.    Correct, yeah.   Yeah, if you're going to

4    use a USB drive, it might as well be a managed,

5    FIPS-compliant device, right.

6         Q.    If we can go back for a moment to

7    Exhibit 13.

8         A.    Okay.

9         Q.    I'm just finishing off looking through

10   your notes here.

11             This is on page 2 --

12        A.    Okay.

13        Q.    -- under "Operational" --

14        A.    Okay.

15        Q.    -- the second bullet.   "Data flow into

16   system accomplished by various USB flash drives -

17   not encrypted, not serialized - so no ability to

18   track full lifecycle and pinpoint data loss."

19             Do you see that?

20        A.    Yeah.   They actually are encrypted, but

21   they were not serialized.

22        Q.    And so data was brought into the EMS

23   system through these USB drives; is that correct?

24             MR. MILLER:   Objection.   Lack of

25        foundation.

Page 158

1    with the IP addresses of -- of people that had

2    accessed the library.  And further investigation and

3    once I supplied those to PCC, they were able to

4    validate each one of those IP addresses were their

5    employees.  So...

6         Q.   And so the -- the -- what was done to

7    remedy this was just to have PCC pull the --

8         A.   Yeah, to destroy it.

9         Q.   -- pull the --

10        A.   Yeah, to pull it down, right.

11        Q.   Was anything else done to remediate this

12   incident?

13        A.   No.  I think -- I -- I know that there

14   were some phone calls that I was not involved in

15   between leadership and SOS and PCC.  I'm sure they

16   were not comfortable phone calls, because they were

17   getting -- you know, it was just -- but I wasn't

18   part of the phone call, so that's a Merritt

19   question.

20        Q.   We're going to look at the next exhibit.

21   I believe it's Exhibit 19.

22             (Plaintiffs' Exhibit 19 was marked for

23             identification.)

24             THE WITNESS:  Okay.  I got it.  That's a

25             wicked pattern.

Page 159

1      BY MS. KAISER:

2            Q.    This is --

3            A.    Okay.

4            Q.    This is a report from Fortalice Solutions.

5                  Do you see that?

6            A.    Yes.

7            Q.    Dated July 14, 2020?

8            A.    Right.

9            Q.    If you look at page 2 of the report --

10     it's the third page of the document, but it says

11     page 2 at the bottom --

12           A.    Okay.

13           Q.    -- under Section 1.1, "Overview," it says,

14     "In June of 2020, Secretary of State Georgia

15     received report of two vulnerabilities in a web

16     application hosted at

17     https://www[.]mvp[.]sos[.]ga[.]gov."

18                 Do you see that?

19           A.    Correct.   Yep.

20           Q.    All right.   So this is -- the "MVP" is the

21     My Voter Page; is that right?

22           A.    Yes.

23           Q.    And the next sentence says, "Upon

24     attempted remediation, SoSGA requested that

25     Fortalice validate the remediation attempts."

1          Do you see that?

2     A.    I do.

3     Q.    Do you recall anything about this

4  incident, about --

5     A.    Yeah.  Basically --

6          (Cross-talk.)

7     A.    Basically, we were asking Fortalice to

8  verify what we were being told by PCC as "it's

9  fixed."  Because we didn't have the -- the

10 wherewithal to, you know, go through this stem by

11 stem, we got Fortalice to do it as a third -- third

12 party.  So...

13    Q.    And what did Fortalice find?

14    A.    They found that actually they had not

15 remediated it sufficiently, and they made a

16 suggestion on how to fix it the right way.  And we

17 fed that information back to PCC.

18    Q.    This is in 2020; correct?

19    A.    Probably.  Yeah.

20    Q.    Did PCC still have responsibility for the

21 MVP page in 2020?

22    A.    No.

23    Q.    So why did you need to feed the fix back

24 to PCC?

25    A.    Because they still write the code.  They

1    still manage the application, they just don't manage

2    the hardware.   So they're still responsible for the

3    code line.

4         Q.   So when you identified a vulnerability on

5    the My Voter Page, you still had to rely on PCC to

6    fix it?

7         A.   Correct.

8         Q.   If you look at page 4 of the Fortalice

9    report --

10        A.   Okay.

11        Q.   -- under "Conclusion," it says, "The

12   remediation attempts that are currently in place

13   partially fix the issues in the original report, but

14   more work needs to be done to secure the website

15   from potential attacks."

16             Do you see that?

17        A.   Right.

18        Q.   "In addition to the checks performed,

19   Fortalice noticed other areas of potential impact

20   that, while unconfirmed, Fortalice believes could be

21   used to further exploit the site or the servers

22   hosting it.   Fortalice recommends having the

23   application thoroughly reviewed for similar issues."

24             Do you see that?

25        A.   Correct.   Right.

1    Q.   Do you know whether that recommendation

2    was accepted, to have the application reviewed for

3    similar issues?

4    A.   I -- I didn't.  I didn't have an

5    application-specific review done for them because

6    I -- I think at that point, the decision had been

7    made to jettison PCC.

8         So I think leadership looked at it as,

9    "We're going away from them, so, you know, we're

10   going to spend the time on the new stuff."

11        We did feed all this information back to

12   them, that there might be some other areas and, you

13   know, as a partner, we expect them to, you know,

14   find some of their own issues.  We don't want to

15   be -- be their QA group.  So...

16   Q.   I just want to make sure I understand the

17   timing, because, you know, I -- I've understood you

18   to say that PCC was jettisoned in 2019; is that

19   right?

20   A.   From the operational standpoint, right,

21   the care and feeding of the servers, the patching,

22   that kind of stuff, and the contract of housing the

23   servers and we're paying them to do that service.

24        But the actual code line, the development

25   and the -- and the -- you know, the changes that

1    were made to MVP and all those -- OLVR, all those

2    systems, were still under their control because they

3    were the developers.

4         Q.   Right.

5              And so by 2020, the Secretary of State's

6    office had taken over with respect to the security

7    of these applications; is that right?

8         A.   Well, insofar as we can handle it from

9    the -- from the edge.  But as far as internal to the

10   actual application, we still have to rely on PCC to

11   do what they profess they're experts at.

12             So that's why we run these monthly checks,

13   and what we do with Fortalice with pen tests is to,

14   you know, trust but verify, right?  We verify what

15   they told us to be true.

16             Because the Secretary of State doesn't

17   employ any developers, that's -- that's a bit of

18   a -- a hill to climb.  We didn't have anybody in

19   there that wrote code, so we couldn't really

20   challenge them on a code line level.  We just

21   identified, "Hey, this doesn't work right; go fix

22   it."

23        Q.   So when --

24        A.   This --

25        Q.   -- Fortalice recommended -- recommended a

1    thorough application review, is that --

2         A.    Uh-huh.

3         Q.    -- something that the Secretary of State's

4    office could carry out, or would you have to rely on

5    PCC?

6         A.    No, no, no.  We would have to actually

7    hire another company to do that as a third party.

8              So they would take the source code, they

9    would go review the source code and how the program

10   is written, and make recommendations, look at common

11   security vulnerabilities.

12             There's a term "OWASP."  It's for the --

13   you know, the top 25 things that people do wrong in

14   programs.  And they were missing some of the basic

15   stuff, so we started beating up on them about being

16   at least OWASP compliant.

17             But it would have been a third party.  I'm

18   not sure if -- if Fortalice provided that.  They --

19   they may or may not have had that as -- it sounds

20   like it is.  It sounds like, "Oh, by the way, you

21   know, we could do this for you," cha-ching, you

22   know, that kind of thing.

23        Q.    But to your knowledge, that kind of

24   thorough review of the application for similar

25   issues to the ones you identified at the time was

Page 165

1        never done?

2              A.    Not while I was there.   It might have been

3        done after I left, but, again, that's --

4              Q.    You're not aware of that?

5              A.    I'm not aware of it, right.

6                    MS. KAISER:  Tab 18, please.  I'm adding

7        Exhibit 20.

8                    THE WITNESS:  Okay.

9                    (Plaintiffs' Exhibit 20 was marked for

10        identification.)

11                    THE WITNESS:  Okay.

12        BY MS. KAISER:

13              Q.    This is an email from you dated April 29,

14        2021.

15              A.    Right.

16              Q.    Do you see that?

17                    And it says to Ronnell Spearman, Derek

18        Hawkins, and DeVon King.

19              A.    Right.

20              Q.    And are those -- are those the three

21        security analysts that reported to you --

22              A.    At that --

23              Q.    -- at this time?

24              A.    -- time, right.

25                    COURT REPORTER:  One at a time, please.

Page 176

1         Q.    -- at this risk register?

2         A.    I don't.  I don't know who it would have

3    been.

4         Q.    Okay.

5         A.    8/21/20.  Was that around the time that we

6    were doing the litigation?  I mean, I don't know if

7    that might have been it.  Maybe a lawyer asked for

8    it.  I'm not sure.

9              I was just concerned of it being public,

10   that's all.  Just trying to advise.

11             MS. KAISER:  All right.  Tab 22, please.

12             (Plaintiffs' Exhibit 23 was marked for

13             identification.)

14             THE WITNESS:  So that was 21 and 22.  This

15             will be 23?

16   BY MS. KAISER:

17        Q.    Oh, apologies.  Yep, this will be 23.

18        A.    Okay.  There it is.

19        Q.    Are you familiar with Rule 590-8-3?

20        A.    Uh-huh.

21        Q.    And just generally, what do you -- what do

22   you recall about that rule, what it requires?

23        A.    I think -- I think -- do I put it on here?

24        Q.    Yeah.  If you -- on page 3, starting --

25        A.    Yeah.

Page 177

1          Q.    -- on page 3.

2          A.    The definitions.  I just copied the rule

3     into the document.  So...

4          Q.    Right.  Right.

5                So Section (b), if you look at the middle

6     of the page, says --

7          A.    Right.

8          Q.    -- "Security of the Voter Registration

9     System is vital to the administration of elections

10    in Georgia.  As such, the system shall be maintained

11    in a manner that is consistent with the following

12    security standards."

13               Do you see that?

14         A.    Yes, ma'am.

15         Q.    And then it lists 27 security standards;

16    right?

17         A.    Right.

18         Q.    And then Section (c), "Assessments," says,

19    "The Secretary of State shall conduct or have

20    conducted regular cybersecurity assessments of the

21    Voter Registration System."

22               Do you see that?

23         A.    I do.

24         Q.    And then Subsection (d) essentially

25    requires an annual certification of compliance with

Page 178

```
1        the rule; is that right?
2               A.    Correct.
3               Q.    Was it your responsibility to prepare a
4        certification of compliance with Rule 590-8-3?
5               A.    Yes.  This is my document, so yes.
6               Q.    And this is the document for 2020;
7        correct?
8               A.    Correct.
9               Q.    Did you prepare a certification like this
10       in any other years?
11              A.    I think 2020 was the -- the only one I
12       did.  I think before that, it was somebody else or
13       it got missed.  Again, I don't know.  I --
14              Q.    On page 6 --
15              A.    Okay.
16              Q.    -- the second paragraph on page 6, it
17       says, "Currently, our agency does NOT meet the
18       requirements of the rule.  Out of the 38
19       requirements we only meet 66%."
20                    Do you see that?
21              A.    Yes.
22              Q.    And so you did an analysis and determined
23       that you only met the -- met the requirements for
24       about two-thirds of the requirements of the rule; is
25       that correct?
```

1    A.    Correct.  Yeah, it says there if we took

2    the Civix-related ones out, we'd be at 81.

3    Q.    And what is Civix?

4    A.    The new name for PCC.

5         MS. KAISER:  Tab 19, please.

6         (Plaintiffs' Exhibit 24 was marked for

7         identification.)

8         THE WITNESS:  Are we done with that one?

9    BY MS. KAISER:

10   Q.    Yes.  We're adding the next exhibit now,

11   24.

12        Do you have that document in front of you?

13   A.    Waiting for it to update.

14        24.  Okay.  There it is.  Okay.

15   Q.    All right.  This is an email chain from

16   December of 2020.

17        Do you see that?

18   A.    Uh-huh.

19   Q.    And I'm focused on your email on the --

20   starting on page 1.

21   A.    Okay.

22   Q.    It looks like you were just sharing some

23   thoughts with folks internal to the Secretary of

24   State's office.

25        Does that look right?

Page 180

1        A.    It does.

2        Q.    If you look about four paragraphs down, it

3    says, "From a security team perspective, we need

4    more time to focus on the day-to-day operations -

5    all the guys are buried in projects so there is no

6    time to 'watch' or tune things."

7              Do you see that?

8        A.    Yeah.

9        Q.    What did you mean by this comment?

10       A.    As an example, us having to build the

11   servers over at the Election Center and do a bunch

12   of stuff that are usually infrastructure related.

13   That was supposed to be a pretty quick turnaround

14   and just helping out a brother kind of a thing

15   because they were slammed.  It ended up being a very

16   long-term project and Michael Barnes didn't want to

17   let go of us.  So it -- it became kind of a

18   resource, you know, drain on all of us.

19             I think that's probably one of my -- what

20   I was saying here is we -- we really want to hand

21   this back to the infrastructure team.  That's why I

22   copied Bill Warwick and Jason and Kevin.  So I think

23   this was my, you know, mea culpa of, "Hey, you know,

24   we've got to address a lot of things and there's

25   just not enough hands."  So yeah.

Page 181

1          Q.   What effect did it have on the security
2     team's ability to do its work effectively?
3          A.   Well, I mean, we had to depend on systems,
4     right, instead of people.  And luckily we had very
5     good systems, in that we had, you know, Palo Alto,
6     XDR.  We had Cortex on the edge.  We had multiple
7     layers of security in some cases, where if one thing
8     broke, then we'd still be okay.
9               But we needed time to continue to tune
10    those as time went on.  And the idea there is to
11    reduce the amount of false positives that you get
12    or, even worse, false negatives.
13              So the idea is it's a -- it's a constant
14    thing, you know, to -- to look at this kind of
15    status of everything on a daily basis and make
16    adjustments.
17              And I -- I think my note here was just
18    underlying the fact of, "Hey, infrastructure guys,
19    we really need you to do your -- your part in this
20    so we can get back to our real jobs."  So...
21         Q.   Are you familiar with a professor at the
22    University of Michigan named Alex Halderman?
23         A.   Yes.
24         Q.   What do you know about Mr. Halderman?
25         A.   He was part of the litigation the last

1    time around.  He had some specific questions that

2    kind of trickled back towards me.  It was -- that

3    was the reason I wrote the second document, to

4    clarify some of the things that he assumed.

5         Q.   Did you review any declarations that

6    are -- that were put in by Dr. Halderman?

7         A.   At that time I did, yes.

8         Q.   Have you reviewed any testimony from

9    Dr. Halderman regarding how easily the BMD system

10   can be hacked?

11        A.   No.

12             MR. MILLER:  Objection.  Lack of

13        foundation.

14   BY MS. KAISER:

15        Q.   Were you aware of that testimony?

16        A.   In passing, I think.  I -- I -- I don't

17   know if my opinion matters when it comes to that.

18   So...

19             It's very easy for an academic to control

20   an environment, given enough time and resources and

21   money, to do anything.  So that's where the judgment

22   comes in.

23             So that's what I was trying to get across

24   to the doctor when I responded in that second note,

25   just giving him some clarity about in the

Page 183

1        operational world of running a business, we have to

2        do these things and reprioritize.

3                So that's basically what that was.

4            Q.    Do you understand that Dr. Halderman has

5        analyzed the voting equipment that is used in

6        Georgia today to assess the reliability and security

7        of that equipment?

8            A.    I didn't know that he personally had done

9        it, no.  I know --

10            Q.    So you weren't aware that he's issued a

11        detailed report finding that the current system

12        suffers from many significant vulnerabilities?

13            A.    I didn't --

14                MR. MILLER:  Objection.  Lack of

15        foundation.

16                THE WITNESS:  Yeah, I -- I didn't.  Sorry.

17    BY MS. KAISER:

18            Q.    You didn't know -- you just didn't know

19        about that report one way or the other?

20            A.    No.  I'm not --

21                MR. MILLER:  Objection.

22                THE WITNESS:  -- in the academic world.  I

23        don't spend a lot of time reading papers and

24        things like that.  So...

25

Page 184

1    BY MS. KAISER:

2         Q.   I'm sorry.   It was not a paper, but a

3    report in this case.

4         A.   Yeah, that's fine.

5              MR. MILLER:   Objection.   Lack of

6         foundation.

7    BY MS. KAISER:

8         Q.   So you were not -- not aware of it?

9              MR. MILLER:   Same objection.

10             COURT REPORTER:   The answer again, please?

11             THE WITNESS:   No, I -- I was not aware of

12        it.

13             COURT REPORTER:   Thank you.

14   BY MS. KAISER:

15        Q.   Do you understand that the current BMD

16   voting system uses QR codes to tally votes?

17        A.   I do --

18             MR. MILLER:   Objection --

19             THE WITNESS:   -- and only because I vote

20        in Georgia.   I saw them.   So...

21             COURT REPORTER:   The objection again,

22        please?

23             MR. MILLER:   Lack of foundation.

24             COURT REPORTER:   Thank you.

25             Please -- please let him get in an

```
 1            objection and her finish the question.   Thank
 2            you.
 3                 THE WITNESS:   All right.
 4     BY MS. KAISER:
 5          Q.   Are you aware that the current election
 6     equipment can be hacked in a way that QR codes can
 7     be changed so that they don't reflect what the voter
 8     actually intended when they voted on the machine?
 9                 MR. MILLER:   Objection.   Lack of
10            foundation.
11                 THE WITNESS:   I did not.
12     BY MS. KAISER:
13          Q.   Based on your experience and training, if
14     that were the case, would you take measures to
15     eliminate that vulnerability?
16                 MR. MILLER:   Objection.   Lack of
17            foundation.
18                 THE WITNESS:   I don't know if I have
19            enough information, but, yeah, it would
20            definitely go on the list.
21     BY MS. KAISER:
22          Q.   Would it be a high priority on the list?
23                 MR. MILLER:   Same objection.
24                 THE WITNESS:   I -- again, it -- it all
25            depends on what else was going on at the time.
```

Page 186

```
 1            So...
 2    BY MS. KAISER:
 3        Q.    A vulnerability that would allow a QR code
 4    to be changed to change votes, would that be
 5    considered high priority?
 6            MR. MILLER:  Objection.  Lack of
 7            foundation.  Asked and answered.
 8            THE WITNESS:  But the -- the issue is is
 9            that -- that system is out of scope for me in
10            my role for Secretary of State.  It -- it all
11            belongs to Dominion.
12            So for them, I would imagine it would
13            cause some heartburn, but not -- I -- out of
14            scope for me.
15    BY MS. KAISER:
16        Q.    Would it surprise you to learn that the
17    Secretary of State's office has taken no measures to
18    mitigate or eliminate any of the vulnerabilities
19    that Dr. Halderman has found with the existing
20    equipment in Georgia?
21            MR. MILLER:  Objection.  Lack of
22            foundation.  Form of the compound question.
23            Misstates testimony.
24            THE WITNESS:  Yeah, I -- I -- I don't know
25            what he -- he brought out.  I don't know what
```

Page 188

```
 1        on.
 2   BY MS. KAISER:
 3        Q.    If you had responsibility for voting
 4   equipment and you identified a security
 5   vulnerability in that equipment, would you consider
 6   that an important thing to -- to fix?
 7        A.    Yes.
 8             MR. MILLER:  Objection.  Lack of
 9        foundation.  Calls for speculation.
10             THE WITNESS:  Sorry.
11   BY MS. KAISER:
12        Q.    Your answer was?
13        A.    Yes.
14        Q.    Thank you.
15             MS. KAISER:  All right.  Mr. Hamilton, if
16        you'll give us just a minute to confer, I think
17        we're -- we're reaching the end of our
18        questions.
19             THE WITNESS:  Okay.
20             MS. KAISER:  So we'll go off the record
21        for just a minute, please.
22             VIDEOGRAPHER:  The time is 2:15.  We're
23        off the record.
24             (Off the record.)
25             VIDEOGRAPHER:  The time is 2:27.  We're
```

Page 189

1         back on the record.

2     BY MS. KAISER:

3         Q.   Just a few more questions for you,

4     Mr. Hamilton.

5              Are you aware that Dr. -- Dr. Halderman

6     got access to Fulton County's voting equipment in

7     August of 2020?

8         A.   No, I didn't.

9         Q.   Okay.  You were chief information security

10    officer at the time, August 2020; correct?

11        A.   Yes.

12        Q.   All right.  And were you aware that

13    Dr. Halderman testified in an evidentiary hearing in

14    September of 2020 about that election -- about

15    vulnerabilities in that equipment?

16        A.   Was that the same one that I did my

17    testifying in or is that a different one?

18        Q.   I'm sorry.  Did you ever testify at a

19    hearing?

20        A.   Yes, ma'am.  I was -- I had, like, two

21    questions asked of me, but yeah.  It was a

22    federal -- I thought it was the Curling case, the

23    initial part of it, with Judge Totenberg.  She asked

24    me to clarify a couple of terms.  But --

25        Q.   Okay.

```
 1          A.   -- that was when -- that was when we -- we
 2     got Zoom bombed that day.  Do you recall that?
 3          Q.   You know, I wasn't present at the hearing,
 4     so I can't recall.
 5          A.   Okay.
 6               MS. KAISER:  And, Carey, I'm not sure if
 7          you recall either if that was the
 8          September 2020 hearing.
 9               MR. MILLER:  My understanding of the
10          question, I think so, yeah.
11               MS. KAISER:  Okay.
12     BY MS. KAISER:
13          Q.   Well, so did -- were you present for
14     Dr. Halderman's testimony --
15          A.   No.
16          Q.   -- in a -- in a hearing?
17          A.   No, no, no.  I only -- the only people I
18     saw were the ones that were on that day, and he was,
19     I think, on a previous day.  That's why I had to
20     respond in writing for his stuff.
21          Q.   And are you aware -- are you aware that he
22     testified that he was able to hack the election
23     equipment from Fulton County?
24               MR. MILLER:  Objection.  Lack of
25          foundation.  Calls for speculation.
```

1          THE WITNESS:  Yeah, I -- I didn't realize.

2      No, I didn't hear that.

3  BY MS. KAISER:

4          Q.   And he was able to do so in just three

5      days?

6              MR. MILLER:  Objection.  Lack of

7          foundation.  Calls for speculation.

8  BY MS. KAISER:

9          Q.   You're --

10         A.   And this is the --

11         Q.   -- not aware of that testimony?

12         A.   No.  Just as it pertains to that list that

13     I gave.

14         Q.   This is not -- this is not about the list

15     of -- from Fortalice; this is --

16         A.   Okay.

17         Q.   -- this is separate.

18         A.   Yeah.  I wasn't present for any of that.

19         Q.   Okay.  And you were not made aware of

20     Dr. Halderman's testimony regarding hacking the

21     actual election equipment from Fulton County?

22         A.   No, I was not.

23              MR. MILLER:  Objection.  Asked and

24          answered.

25              THE WITNESS:  Sorry.

Page 192

BY MS. KAISER:

Q.   Would you expect to be made aware of that -- of testimony that the election equipment that Georgia had and was using was able to be hacked in three days?

MR. MILLER:  Objection.  Calls for speculation.

THE WITNESS:  Yeah, I would think so.

BY MS. KAISER:

Q.   And as -- in your role as chief information security officer for the Secretary of State's office, that's something that you would have liked to know about; is that right?

MR. MILLER:  Objection.  Calls for speculation.

COURT REPORTER:  The answer again, please?

BY MS. KAISER:

Q.   But nobody told you about that testimony from Dr. Halderman?

MR. MILLER:  Objection.  Lack of foundation.  Asked and answered.

COURT REPORTER:  I didn't hear the previous answer to the question -- the previous question.

THE WITNESS:  No.  "No" was on both.

```
 1              Yeah.
 2                   COURT REPORTER:  Thank you.
 3                   MS. KAISER:  I just want to make sure,
 4              Ms. Barnes -- I'm sorry, I don't have access to
 5              the realtime -- which question did you not have
 6              an answer to?
 7                   COURT REPORTER:  One moment, please.
 8                   (Whereupon, the record was read by the
 9              reporter as follows:
10                        Question, "In your role as chief
11              information security officer for the Secretary
12              of State's office, that's something that you
13              would have liked to know about; is that
14              right?")
15                   THE WITNESS:  And I said, yes, that would
16              be nice to know.
17    BY MS. KAISER:
18         Q.   Do you have any idea why nobody told you
19    about this testimony from Dr. Halderman?
20                   MR. MILLER:  Objection.  Calls for
21              speculation.
22                   THE WITNESS:  I don't.
23    BY MS. KAISER:
24         Q.   Are you aware of any measures to mitigate
25    the hack that Dr. Halderman executed on the Fulton
```

Page 194

1    County election equipment?

2         A.   No, I --

3              MR. MILLER:  Objection.  Lack of

4         foundation.  Calls for speculation.

5              THE WITNESS:  No, I -- I would expect that

6         to be a Dominion thing.  So...

7    BY MS. KAISER:

8         Q.   You think -- do you think the Georgia

9    Secretary of State's office would be involved,

10   though?

11             MR. MILLER:  Objection.  Calls for

12        speculation.

13             THE WITNESS:  I -- I would think as a

14        customer, yeah.

15   BY MS. KAISER:

16        Q.   And who within the -- the Georgia

17   Secretary of State's office would have

18   responsibility over that?

19        A.   Over the machines themselves?

20        Q.   Yes, or -- yeah, over identifying or

21   mitigating vulnerabilities with the machines

22   themselves.

23             MR. MILLER:  Objection.  Lack of

24        foundation.

25             THE WITNESS:  Yeah, it was my

1        understanding that all of them are actually

2        owned by the individual counties.  So --

3              But, yeah, I still think the Secretary of

4        State would want to know that information and

5        then do -- you know, get somebody excited about

6        fixing it if that was the case.

7  BY MS. KAISER:

8        Q.   And the person within the Secretary of

9  State's office under whose purview that would fall,

10 don't you think that would be the chief information

11 security officer?

12             MR. MILLER:  Objection.  Calls for

13        speculation.  Lack of foundation.

14             THE WITNESS:  I guess if it was in scope,

15        probably, yep.

16 BY MS. KAISER:

17       Q.   So this shouldn't just be a Dominion

18 thing, as you said earlier; right?  That's something

19 that --

20       A.   Well, I mean, it's their -- it's their

21 equipment and it's their code line, so, you know, we

22 can't fix it for them.  They would have to do it for

23 us, much like PCC would have to fix their software

24 for us.

25       Q.   But the Secretary of State's office would

Page 196

1     have a great interest in making sure that those

2     vulnerabilities were fixed; correct?

3            A.    I would think --

4                  MR. MILLER:  Objection --

5                  THE WITNESS:   -- so.

6                  MR. MILLER:  -- asked and answered.  Calls

7        for speculation.

8                  MS. KAISER:  Did you get that answer,

9        Ms. Barnes?

10                 COURT REPORTER:  I heard, "I would think

11       so."

12    BY MS. KAISER:

13           Q.    Are you aware, Mr. Hamilton, that

14    Fortalice conducted an assessment of the BMD

15    equipment in 2019?

16           A.    No, actually, not -- you mean the actual

17    polling equipment in the --

18           Q.    (Nodded head.)

19           A.    No, I didn't realize they did that.  That

20    must have been on a -- on a separate statement of

21    work.

22           Q.    So you had no involvement with -- with

23    that assessment by Fortalice of the equipment

24    itself?

25           A.    No.  And it might be just because it was

1     excluded from my statement of work from TrustPoint.

2     You know, it was specifically excluded that the

3     actual voting tabulating, Dominion or whatever, was

4     excluded from my responsibilities.

5              MS. KAISER:  All right.  Just one -- one

6          more minute, Mr. Hamilton.  Thank you.

7              THE WITNESS:  Okie doke.

8              VIDEOGRAPHER:  Would you like to go off

9          the record, Counsel, or stay on?

10             MS. KAISER:  [Inaudible], please.

11             VIDEOGRAPHER:  I'm sorry.  You broke up.

12             MS. KAISER:  I said go off the record,

13         please.

14             VIDEOGRAPHER:  The time is 2:35.  We are

15         off the record.

16             (Off the record.)

17             VIDEOGRAPHER:  The time is 2:38.  We're

18         back on the record.

19    BY MS. KAISER:

20        Q.   Mr. Hamilton, just -- I just want to make

21    sure the record is clear.

22             You're not aware of any request by anyone

23    from the Secretary of State's office to Dominion to

24    fix any of the vulnerabilities that Dr. Halderman

25    identified with the Fulton County voting equipment;

1       is that correct?

2              A.    That is --

3                    MR. MILLER:  Objection --

4                    THE WITNESS:   -- correct.

5                    MR. MILLER:  -- lack of foundation.

6                    THE WITNESS:  I -- I don't recall any

7              conversation specific to Fulton County except

8              for that notebook we talked about.

9       BY MS. KAISER:

10             Q.   That was a laptop.

11             A.   Laptop, yeah, notebook.  Sorry.

12             Q.   Right.

13                  So with respect to the Fulton County

14      voting equipment that Dr. Halderman tested and was

15      able to hack, you don't recall any instruction to

16      Dominion to fix anything related to that?

17             A.   No.

18                   MR. MILLER:  Objection.  Lack of

19             foundation.  Asked and answered.

20                   THE WITNESS:  No.

21                   MS. KAISER:  All right.  No further

22             questions from me, Mr. Hamilton.  Thank you

23             very much for your time today.

24                   THE WITNESS:  Thank you.

25                   MR. MILLER:  Dave, I'm going to have a

Page 200

1      I've got it correlated now.

2           Q.   Okay.  And have you ever done any work on

3      BMDs?

4           A.   No.  I've seen them, you know, as a voter,

5      but...

6           Q.   Right.

7                And so as the voter, you have some

8      familiarity with what the BMD is; right?

9           A.   Correct.

10          Q.   And that would be the touchscreen

11     computer; right?

12          A.   Right, iPad or Android, depending on where

13     you go, I guess.

14          Q.   And when you vote on those devices, you

15     understand there's a printer connected to that

16     device; right?

17          A.   Right, HP printer.  I've seen them.

18          Q.   And then you understand that that printer

19     prints a ballot to the voter; right?

20          A.   Correct.

21          Q.   And then as a voter, you then took that

22     ballot to a scanner; right?

23          A.   Correct.

24          Q.   And so just that I'm -- so that I'm clear,

25     you've -- in your scope of work with the Secretary,

1    you never worked on the ballot-marking devices

2    themselves?

3         A.   No, sir, not in any --

4         Q.   Never worked on the printer?

5         A.   Nope.

6         Q.   Never worked on the scanner into which the

7    ballots were fed?

8         A.   No, sir.

9         Q.   Okay.  And was that type of work beyond

10   your work scope?

11        A.   It was.

12        Q.   So Ms. Kaiser asked you a couple of

13   questions concerning Dr. Halderman.

14             Do you recall that?

15        A.   Yes.

16        Q.   Are you aware that the report he worked on

17   concerned hacking of that same voting equipment?

18        A.   I -- I didn't correlate the two, no.

19        Q.   Okay.  Knowing that, that would then be

20   outside of your work scope; right?

21        A.   Yes.

22        Q.   You talked earlier with Ms. Kaiser about

23   the EMS system.

24             Do you recall that?

25        A.   Uh-huh.

Page 202

1      Q.    And I'm going to ask you for an audible
2    answer there.
3      A.    Yes.  I'm sorry.
4      Q.    And do you recall discussing with her
5    ballot building or ballot configuration?  Do you
6    recall that?
7      A.    Yes, sir.
8      Q.    And am I correct that you've never done
9    any of that ballot building yourself?
10     A.    No, not at any time.
11     Q.    Okay.  And so when you talked today about
12   your understanding of that process, was that based
13   on an understanding gleaned from others?
14     A.    Yes.
15     Q.    Ms. Kaiser asked you earlier about a
16   situation in Cobb County.
17           Do you recall what I'm talking about?
18     A.    Yes.  About the vulnerability, yes.
19     Q.    Yeah.  Okay.
20           And do you understand what that
21   vulnerability made visible?
22     A.    Yes.
23     Q.    And what was that?
24     A.    Another person's voter registration
25   information.

Page 207

1                          C E R T I F I C A T E
2

3

      STATE OF GEORGIA:
4

      COUNTY OF FULTON:
5

6

      I hereby certify that the foregoing transcript was
7     taken down, as stated in the caption, and the
      questions and answers thereto were reduced to
8     typewriting under my direction; that the foregoing
      pages represent a true, complete, and correct
9     transcript of the evidence given upon said hearing,
      and I further certify that I am not of kin or
10    counsel to the parties in the case; am not in the
      regular employ of counsel for any of said parties;
11    nor am I in anywise interested in the result of said
      case.

12

13

14

15           *Lee Ann Barnes*
16

      LEE ANN BARNES, CCR B-1852, RPR, CRR, CRC
17

18

19

20

21

22

23

24

25