1          UNITED STATES DISTRICT COURT

         FOR THE NORTHERN DISTRICT OF GEORGIA

2                  ATLANTA DIVISION

3          Civil Action No. 1:17-cv-02989-AT

4

5   DONNA CURLING, et al.,

6            Plaintiffs,

7   vs.

8   BRAD RAFFENSPERGER, et al.

9            Defendants.

10

11

12          VIDEOTAPED DEPOSITION OF

13              CATHLEEN LATHAM

14

15              August 8, 2022

16               10:15 a.m.

17

18          Warner Robins, Georgia

19

20

21      Laura M. MacKay, RPR, CCR-B-1736

22          (Appearing remotely)

23

24

25

Page 2

1                           INDEX TO EXHIBITS

2

3    EXHIBIT         DESCRIPTION                              PAGE

4    For the Plaintiffs:

5      Exhibit 1     Subpoena to Produce Documents          49

6      Exhibit 2     Subpoena to Produce Documents          51

7                    served by Coalition plaintiffs

8      Exhibit 3     Screen shot from Hampton video         53

9      Exhibit 4     Letter dated 12/23/20 re Notice of     58

10                   Obligation to Preserve Documents

11                   Related to Dominion

12     Exhibit 5     Draft executive order dated            62

13                   December 16, 2020, from President

14                   Trump

15     Exhibit 6     iPhone text message string screen      74

16                   shots

17

18

19

20

21

22

23

24

25

Page 10

1          court reporter will swear in the witness.

2              MR. CHEELEY:  This is Bob Cheeley,

3          counsel for Cathy Latham.  And I would object

4          to Fulton County being on this call.  They're

5          not a party to the case.

6              MR. CROSS:  They are.  They're a

7          defendant.

8              MR. CHEELEY:  Okay.  I didn't realize

9          that.

10             MR. CROSS:  And like I said, Bob, I

11         don't -- this is David Cross by the way.  I

12         don't know if you can see me.  I don't see

13         their counsel on here anyways, but they are a

14         party.

15             Laura, you want to swear the witness.

16             THE COURT REPORTER:  Sure.

17                        CATHLEEN LATHAM,

18     having been duly sworn, was examined and testified

19     as follows:

20                        EXAMINATION

21     BY MR. CROSS:

22         Q.  Good morning, Mrs. Latham.

23         A.  Good morning.

24         Q.  Have you been deposed before?

25         A.  No, sir.

Page 12

1          Do you have any questions about the

2     process?

3          A.  No.

4          Q.  Okay.  And you understand you are under

5     oath today?

6          A.  Yes.

7          Q.  And do you understand that's the same oath

8     you would take if you were testifying live in a

9     courtroom?

10         A.  Yes.

11         Q.  Can you state your full name for the

12     record.

13         A.  Cathleen Latham.

14         Q.  And do you have a middle name or a first

15     name?

16         A.  Just my maiden name.

17         Q.  And what is that?

18         A.  Alston.

19         Q.  Where do you currently reside?

20         A.  Texas.

21         Q.  What's your address there?

22         A.  I'm not giving it.  It's brand new and

23     Marilyn Marks has sent people to my house to

24     intimidate me and interview me and stuff, and I

25     prefer not to be harassed.  I will give my Georgia

Page 24

1   sometimes referred to as Misty Hayes?

2        A.   Fifth Amendment.

3        Q.   Have you ever spoken with Misty Hampton?

4        A.   Fifth Amendment.

5        Q.   Are you aware that Missy Hampton previously

6   served as the Coffee County election supervisor?

7        A.   Fifth Amendment.

8        Q.   There's literally nothing you can tell me

9   about any communication you ever had with

10  Ms. Hampton that you don't believe would incriminate

11  you; is that right?

12       A.   Fifth Amendment.

13       Q.   Did you ever visit the election office in

14  Coffee County?

15       A.   Fifth Amendment.

16       Q.   Were you ever physically inside the

17  election office at Coffee County?

18       A.   Fifth Amendment.

19       Q.   Were you ever inside the election office at

20  Coffee County when Misty Hampton was the election

21  supervisor?

22       A.   Fifth Amendment.

23       Q.   Are you familiar with the election

24  management system server that each county in Georgia

25  has to manage the Dominion voting system?

1      A.   Fifth Amendment.

2      Q.   Are you aware that in Coffee County there

3  is a room in the election's office where their EMS

4  server is located?

5      A.   Fifth Amendment.

6      Q.   Are you aware in that room there's also a

7  central scanner and a computer called the ICC?

8      A.   Fifth Amendment.

9      Q.   Were you ever at any point in the Coffee

10  County room where the EMS server and ICC are housed?

11      A.   Fifth Amendment.

12      Q.   Did you yourself ever access the EMS server

13  in Coffee County?

14      A.   Fifth Amendment.

15      Q.   Did you ever touch the server?

16      A.   Fifth Amendment.

17      Q.   Did you ever see the server?

18      A.   Fifth Amendment.

19      Q.   Did you ever access the ICC in Coffee

20  County?

21      A.   Fifth Amendment.

22      Q.   Did you ever touch it?

23      A.   Fifth Amendment.

24      Q.   Did you ever see it?

25      A.   Fifth Amendment.

Page 29

```
 1           MR. CHEELEY:  Thank you.
 2    BY MR. CROSS:
 3       Q.  Are you familiar with Paul Maggio?
 4       A.  Fifth Amendment.
 5       Q.  Have you ever spoken with him?
 6       A.  Fifth Amendment.
 7       Q.  Have you ever communicated with him at all?
 8       A.  Fifth Amendment.
 9       Q.  Are you aware of a team that included Paul
10    Maggio traveling to Coffee County on or around
11    January 7th of 2021 to access Coffee County's
12    election equipment?
13       A.  Fifth Amendment.
14       Q.  Are you aware of that team accessing the
15    EMS server in Coffee County at that time?
16       A.  Fifth Amendment.
17       Q.  Have you ever discussed those circumstances
18    with Anthony Rowell?
19       A.  Fifth Amendment.
20       Q.  Have you ever discussed those circumstances
21    with Eric Chaney?
22       A.  Fifth Amendment.
23       Q.  Do you know Eric Chaney?
24       A.  Fifth Amendment.
25       Q.  Have you ever had any communications with
```

Page 32

```
 1   County's election equipment in January of 2020?
 2        A.   Fifth Amendment.
 3        Q.   Do you believe disclosing any information
 4   at all about those circumstances may incriminate
 5   you?
 6        A.   Fifth Amendment.
 7        Q.   Do you believe you have committed any
 8   crime?
 9        A.   Fifth Amendment.
10        Q.   Did Misty Hampton authorize Paul Maggio or
11   anyone else to access Coffee County's election
12   equipment on or around January 7th of 2020?
13        A.   Fifth Amendment.
14        Q.   Did Eric Chaney authorize that?
15        A.   Fifth Amendment.
16        Q.   Did anyone on the Coffee County board --
17   election board authorize that?
18        A.   Fifth Amendment.
19        Q.   Do you know if anyone on the Coffee County
20   election board was aware that that was happening?
21        A.   Fifth Amendment.
22        Q.   Are you aware that Eric Chaney did in fact
23   know that it was happening?
24        A.   Fifth Amendment.
25        Q.   Do you know what, if anything, the
```

1   individuals who accessed the Coffee County election

2   equipment on or around January 7, 2021, what, if

3   anything, they took with them from that office?

4        A.   Fifth Amendment.

5        Q.   Do you know whether they copied software

6   from any of the election equipment in that office?

7        A.   Fifth Amendment.

8        Q.   Do you know what devices they physically

9   connected to Coffee County's EMS server at that

10  time?

11       A.   Fifth Amendment.

12       Q.   Do you know what equipment they physically

13  connected to the ICC in Coffee County January 7 of

14  2020?

15       A.   Fifth Amendment.

16       Q.   Do you know whether they took a forensic

17  image of any of the voting equipment in Coffee

18  County?

19       A.   Fifth Amendment.

20       Q.   Did they access any of the BMDs at that

21  time in Georgia in Coffee County?

22       A.   Fifth Amendment.

23       Q.   Did they access any of the poll packs in

24  Coffee County at that time?

25       A.   Fifth Amendment.

Page 34

1      Q.   Did they access any of the flash drives

2  that are used with the voting equipment at that time

3  in Coffee County?

4      A.   Fifth Amendment.

5      Q.   Did they access any computers or other

6  electronic devices in the office at that time?

7      A.   Fifth Amendment.

8      Q.   Did they copy any data from any of the

9  voting equipment or other devices in the Coffee

10 County elections office on or around January 7 of

11 2021?

12     A.   Fifth Amendment.

13     Q.   Mrs. Latham?

14     A.   Yes, sir.

15     Q.   What are you looking at on your phone?

16     A.   My friend just sent me a text, I was just

17 answering her.  I didn't answer her.  She was

18 telling me she ate her kolache.

19     Q.   Is it about this deposition?

20     A.   No, sir.  Would you like to see?

21     Q.   Sure.

22     A.   "I just ate my sausage kolache and they

23 were good."

24     Q.   All right.  Great.

25          Just to keep things simple, let's not

Page 53

```
 1              MR. CHEELEY:  You can keep them.
 2              THE WITNESS:  Oh, good.  I'll add it to
 3        my collection.
 4   BY MR. CROSS:
 5        Q.  The representation that Mr. Cheeley just
 6   made, Ms. Latham, did you authorize him to make that
 7   representation?
 8              MR. CHEELEY:  Attorney-client privilege.
 9   BY MR. CROSS:
10        Q.  Let me hand you what's going to be marked
11   as Exhibit 3.
12              The table is big.  Thanks, Ms. Latham.
13              (Exhibit 3 marked.)
14   BY MR. CROSS:
15        Q.  Let me ask you, Mrs. Latham -- Ms. Latham,
16   have you ever seen Exhibit 3 before?
17        A.  Fifth Amendment.
18        Q.  Do you recognize this as a screen shot from
19   the video that Misty Hampton put up online where she
20   was in the elections office of Coffee County?
21        A.  Fifth Amendment.
22        Q.  Do you recognize the Post-it note there on
23   her computer screen in Exhibit 3 as containing
24   the -- what was supposed to be a confidential
25   password to the Coffee County EMS server in or
```

1   around December of 2021 sorry -- 2020?

2        A.   Fifth Amendment.

3        Q.   Is there anything at all you can tell me

4   about Exhibit 3?

5        A.   Fifth Amendment.

6        Q.   Do you know whether the password on the

7   Coffee County EMS server was changed at some point

8   after this video came out in 2020?

9        A.   Fifth Amendment.

10       Q.   Do you know why the EMS password in Coffee

11  County stopped working in 2021?

12       A.   Fifth Amendment.

13       Q.   Do you know that when James Barnes came in

14  to replace Misty Hampton as the elections supervisor

15  in Coffee County, he could not get the password to

16  work for the EMS server?

17       A.   Fifth Amendment.

18       Q.   Did you ever discuss that with Mr. Barnes?

19       A.   Fifth Amendment.

20       Q.   Did you ever discuss that with any member

21  of the Coffee County election board?

22       A.   Fifth Amendment.

23       Q.   Did you ever discuss that with anyone at

24  all?

25       A.   Fifth Amendment.

Page 67

```
 1        record at 12:09 p.m.
 2   BY MR. CROSS:
 3        Q.   Mrs. Latham, do you understand you're still
 4   under oath?
 5        A.   Yes, sir.
 6        Q.   You were in Washington DC on or around
 7   December 17 of 2020, correct?
 8        A.   I don't remember what days I went.
 9        Q.   Do you recall being in DC in December of
10   2020, right?
11        A.   Yes.
12        Q.   And you spent some time at the Willard
13   Hotel while you were there?
14        A.   That's where I slept, yes.
15        Q.   And your attorney Preston Haliburton was
16   there with you, correct?
17        A.   No.  Not at the Willard.
18        Q.   Mr. Haliburton was never at the Willard in
19   December of 2020 with you?
20        A.   No, sir.  Not that I can recall, no.
21        Q.   But you're aware that there was a war room
22   set up at the Willard Hotel in December of 2020 by
23   individuals associated with the Trump campaign to
24   look for evidence of election fraud; is that right?
25             MR. CHEELEY:  Counsel, I have an e-mail
```

1          MR. CHEELEY:  No, she won't.

2          MR. CROSS:  We'll deal with that later.

3   BY MR. CROSS:

4       Q.  Ms. Latham, my question to you is, you were

5   aware that there was a war room set up by

6   individuals associated with the Trump campaign at

7   the Willard Hotel purportedly looking for election

8   fraud, right?

9       A.  Fifth Amendment.

10      Q.  Were you ever in that war room?

11      A.  Fifth Amendment.

12      Q.  What IT individuals did you meet with while

13  you were in DC in December of 2020?

14      A.  Fifth Amendment.

15      Q.  Do you remember telling Marilyn Marks on

16  December 17, 2020, that you were in DC meeting with

17  IT?

18      A.  Fifth Amendment.

19      Q.  Who were those individuals you were meeting

20  with at that time?

21      A.  Fifth Amendment.

22      Q.  So you were in DC staying at the Willard

23  Hotel on or around December 17, 2020, the same day

24  that one of the two executive order -- draft

25  executive orders was drafted and you're saying today

1    that you can't tell us anything about your

2    involvement with that; is that right?

3        A.  Fifth Amendment.

4        Q.  Who else was with you in DC in December of

5    2020?

6        A.  Fifth Amendment.

7        Q.  Bill Ligon was there, right?

8        A.  Who?

9        Q.  L-I-G-O-N.  Is it Ligon, Ligon

10   [pronouncing], Bill Ligon?

11       A.  Fifth Amendment.

12       Q.  Ms. Latham -- Mrs. Latham, are you or have

13   you been under investigation by any federal or state

14   authorities?

15       A.  Fifth Amendment.

16       Q.  Are you being or have you been called to

17   testify in any federal or state grand jury

18   proceeding?

19       A.  Yes, that's why I'm claiming my Fifth

20   Amendment.

21       Q.  What is that proceeding?

22       A.  Fifth Amendment.

23       Q.  How does that proceeding relate to this

24   case?

25       A.  Fifth Amendment.

                                            Page 128

1          THE VIDEOGRAPHER:  It's Mary Kaiser.

2          MR. CROSS:  She's with us.  She's one of

3      my colleagues.

4          THE WITNESS:  Okay.

5   BY MR. CROSS:

6      Q.  All right.  So the morning of January 7,

7   2021, you learned from Scott Hall that there was a

8   team of five people heading from Atlanta to Coffee

9   County?

10     A.  I just said, "Team left Atlanta" -- I'm

11  telling you what's there.  It was a very brief

12  message.

13     Q.  But you sent that on to Ms. Hampton because

14  you understood that team was going to meet with her?

15     A.  I'm assuming.  At this point I don't know.

16     Q.  And you understood that Scott Hall was

17  separately flying in to Coffee County, right?

18     A.  It just said, I am flying in or whatever,

19  whatever he would have said.  So I just said, Scott

20  is flying in.

21     Q.  Okay.

22     A.  I just assumed it was all one plane -- I

23  don't know -- that he was coming.

24     Q.  Well, tell me everything you know about the

25  individuals who traveled from Atlanta to Coffee

1   County on the morning of January 7, 2021, with

2   respect to these text messages.

3       A.  All I know is that there was a guy named

4   Paul Maggio and Scott was flying in.

5       Q.  To see Misty Hampton?

6       A.  They were coming in to Coffee County, yeah.

7   That's all I know.

8       Q.  But to the elections office to see Misty

9   Hampton?

10      A.  I don't know.  I just let her know.

11      Q.  Well, you let me her know because you

12  thought they were going to see her, right?

13      A.  I was sent an e-mail that said, "Let Misty

14  know."

15      Q.  And then she responds "Yay" with four

16  exclamation points.  Do you see that?

17      A.  Yep, I see that.

18      Q.  And then she asks you, "What is Scott's

19  last name?"

20      A.  I said, "Hall."

21      Q.  Right.  You responded "Hall."  And then she

22  writes:  "Is someone coming at 10 to vote review

23  panel?"  Do you see that?

24      A.  Yes.

25      Q.  What was that about?

Page 131

1              Do you see that?

2        A.   Uh-huh.

3        Q.   What was that about?

4        A.   Voter review panel I'm assuming.

5        Q.   All right.  Turn to page 3 in Exhibit 6.

6    Yeah, there you go.

7              So if you look at the top you'll see we

8    pick up with that other text left off --

9        A.   Uh-huh.

10        Q.   -- "How is it today?  Finished?"

11   Ms. Hampton writes --

12        A.   Thank you.  I was wondering where the rest

13   of that was.

14        Q.   Yeah, sorry.  It kind of got out of order.

15        A.   Yeah.

16        Q.   And Ms. Hampton writes:  "All were very

17   simple."  Do you see that?

18        A.   That was the voter review panel.

19        Q.   Right.

20        A.   Yes.

21        Q.   And then you write still the morning of

22   January 7:  "Good.  Scott has landed and the rest of

23   team is almost at Douglas."

24        A.   Yep.  Because I got another e-mail message,

25   so I just copied it and copied the concept of the

1  message.

2      Q.  Well, this one you didn't copy and paste.

3  You put in your own words?

4      A.  Right, I put in -- that's what I said.  I

5  copied the gist of the message, yeah.

6      Q.  And so why was Mr. Hall communicating with

7  you about this instead of Ms. Hampton?

8      A.  I don't know.

9      Q.  You didn't ask him?

10     A.  It was just -- I got an e-mail, so I just

11  sent it on to her.  And I don't know what time that

12  was.

13     Q.  When you say --

14     A.  But it I will look.  It looks like it was

15  almost after school, so...  Or maybe.  I don't know.

16     Q.  And when you say "...the rest of the team

17  is almost in Douglas," who is the rest of the team?

18     A.  I told you what his e-mail said.

19     Q.  So Paul Maggio and four others?

20     A.  It said the -- I remember him saying, "I've

21  landed, rest of team is almost to Douglas."  I don't

22  know.

23     Q.  But so you understood that Scott Hall flew

24  in and the rest of the team was traveling from

25  Atlanta --

1        A.  Yes.

2        Q.  -- by car?

3        A.  I don't know.

4        Q.  And then she writes back:  "Okay.  The

5   Democratic man is still here."  Do you see that?

6        A.  Yes.

7        Q.  Who was that?

8        A.  I have no idea.  I thought she meant

9   Dominion.  I don't know.

10       Q.  And then January 7, still the same day

11  3:40 p.m. she writes:  "Going great so far."  Do you

12  see that?

13       A.  Yes.

14       Q.  And that was about the work that Mr. Hall

15  and Mr. Maggio were doing; is that right?

16       A.  I am assuming.  I don't know.

17       Q.  But as you sit here, your best recollection

18  of what that was was her giving an update on what

19  Mr. Hall and Mr. Maggio were doing in the election

20  office?

21       A.  I don't know.

22       Q.  And you didn't ask her?

23       A.  No, but I went after 4:00 to go check on

24  the voter review panel because oftentimes they need

25  somebody to sign off and look at the things.  So I

Page 134

1   didn't respond because I was probably on my way

2   there.

3        Q.   To the elections office?

4        A.   Yeah.   I went up there, went and checked to

5   make sure they didn't need my signature, and then I

6   went across the street and had early dinner with my

7   husband.

8        Q.   So you were in the elections office on

9   January 7?

10       A.   I walked into the front part.   I didn't go

11   into the office.

12       Q.   Who did you see in the Coffee County

13   elections building on January 7, 2021?

14       A.   There were people in there, and I get

15   uncomfortable when there's others.   You know what I

16   mean?   So I just went in there, asked if they needed

17   me to do any voter review panel.

18       Q.   When you say "there were people in there,"

19   people where?

20       A.   In -- outside of the -- inside the glass

21   room because I was outside.

22       Q.   So January 7, 2021, sometime in the

23   afternoon or early evening, you arrive at the Coffee

24   County elections office, you see individuals in that

25   room where the ICC and the EMS server are?

Page 169

1    immediately before.

2        A.   Yeah.

3        Q.   Do you see that?  Is that right?

4        A.   Yeah.

5        Q.   Okay.  And so then it jumps from January 7

6    to January 10th, and you write, "Hey, did you-all

7    finish with the scanner?"  Do you see that?

8        A.   Uh-huh.

9        Q.   "Yes"?

10       A.   Yes, sorry.

11       Q.   Finish doing what with the scanner?

12       A.   They were scanning those ballots.

13       Q.   What ballots?

14       A.   January 5th, which is what I assumed

15   from -- because I had forgotten why -- what I had

16   talked to Scott about, and he was there to scan

17   ballots.

18       Q.   I see.  I understand.

19       A.   Yeah.

20       Q.   So the -- when you were asking her on

21   January 10th if they were finished with the scanner,

22   you were asking if they were done scanning the

23   ballots that Scott Hall had come to --

24       A.   No.  I was asking was she finished with the

25   scanner.

1     Q.   Finished using the scanner?

2     A.   Yeah.

3     Q.   To scan the ballots?

4     A.   Uh-huh.

5     Q.   Which is what you had -- you had talked to

6   Scott Hall about?

7     A.   Over here.  But I hadn't talked to Scott

8   Hall.  I was just asking her if she was finished

9   with the scanner.

10     Q.   Right.  But this is three days later --

11   four days later after you had spoken to Scott Hall

12   about scanning ballots?

13     A.   Uh-huh.

14     Q.   "Yes"?

15     A.   Yes.

16     Q.   Okay.  And why were you wondering four days

17   later if they were done with the scanner?

18     A.   Because the scanner had been borrowed.  I

19   was just wondering if they were finished with the

20   scanner.

21     Q.   Okay.  And when you say the scanner was

22   borrowed, what do you mean?

23     A.   She had borrowed a scanner.  I was just

24   being nosey, did you finish with the scanner.

25     Q.   I'm sorry, who is "she"?

1      A.   Misty.  This is who we're talking with.

2      Q.   Okay.  Where had she borrowed a scanner

3  from?

4      A.   I'm going to plead the Fifth on that.

5      Q.   Okay.  Did she -- so she -- sorry.  Strike

6  that.

7           Misty Hampton had borrowed a scanner so

8  that Scott Hall and others could scan ballots; is

9  that what I understand?

10     A.   That's what I understand, yes.

11     Q.   Okay.  And you're uncomfortable telling me

12  where she got the scanner from?

13     A.   Yeah, because just -- I don't know where

14  everything went, and I'm not going to pull anybody

15  in to something, so...

16     Q.   Well, hold on.  I just want to be -- I

17  want --

18     A.   I mean, I just know a scanner had to be

19  borrowed and I was curious was they finished with

20  the scanner.  I was just asking.

21     Q.   I understand, but there's -- and your

22  attorney can advise you on this, but there are two

23  different things between invoking the Fifth because

24  you are worried about self-incrimination versus not

25  wanting to share information.

1          And so what I'm asking you is, are you

2     saying that you're invoking the Fifth on the

3     question of whether -- of where the borrowed scanner

4     came from because you're concerned with

5     self-incrimination or you just don't want to share

6     information?

7          A.   I really don't know where the scanner came

8     from.  I know they borrowed a scanner.

9          Q.   Okay.

10         A.   Okay.

11         Q.   That's fine.

12              How do you know they borrowed -- "they"

13    being Misty Hampton and Scott Hall and the others,

14    how do you know they borrowed a scanner?

15         A.   Because something was said about borrowing

16    a scanner.

17         Q.   Said by whom?

18         A.   Misty.

19         Q.   On a phone call or where?

20         A.   I don't know.  I really don't know.

21         Q.   Was that before or after --

22         A.   Oh, excuse me.

23         Q.   Was that before or after --

24         A.   I'm sorry, whoever listened to that.

25         Q.   This conversation where you heard they had

Page 191

1   with Misty Hampton to scan ballots, right?

2       A.   Just from that text, yes.

3       Q.   And coming back to that text, this refers

4   to the general election, but your understanding he's

5   talking about the general election for the runoff or

6   is he talking about the general election from

7   November 2020?

8       A.   What just happened, the January 5th.

9       Q.   Well, that was a special runoff election?

10      A.   Yes.

11      Q.   Okay.

12      A.   So they hadn't -- I mean, in procedure they

13  hadn't been sealed or anything, so...

14      Q.   So it's your understanding he -- well, let

15  me just ask you.  Do you know whether Scott Hall and

16  the others who came in in January of 2021 to Coffee

17  County, did they scan ballots from the November 2020

18  election?

19      A.   I don't know.

20      Q.   You don't know, okay.

21           I'm sorry, I can't remember if I asked you

22  this:  We talked earlier you were in DC in December

23  of 2020.  I can't remember if I asked you, why were

24  you there?

25           THE WITNESS:  Bob?

Page 192

1          MR. CHEELEY:  Repeat the question,

2      please.

3          THE WITNESS:  He wants to know why I was

4      in DC on --

5          MR. CHEELEY:  Yeah, you can tell him.

6      A.  I was invited to a tour.

7  BY MR. CROSS:

8      Q.  Tour of what?

9      A.  DC.

10      Q.  By whom?

11          THE WITNESS:  Do I have to say all the

12      names?

13          MR. CHEELEY:  Yeah.

14      A.  Juliana Thompson.

15  BY MR. CROSS:

16      Q.  Who was that?

17      A.  Juliana Thompson.

18      Q.  Who is that?  Who is Juliana Thompson?

19      A.  Her name is Juliana Thompson.  She's -- she

20  does tours of DC.

21      Q.  Why did she invite you to do a tour of DC?

22      A.  Because I couldn't go the previous year

23  because we get to see the Christmas trees, and I got

24  to go to the Bible museum.  I mean, it was only a

25  two-day thing --

1    Q.   Okay.

2    A.   -- because of COVID.   The previous year

3    they went several days and I couldn't go because it

4    was too expensive.

5    Q.   So you went to DC in December 2020 to do a

6    tour?

7    A.   Yes.

8    Q.   And did you see anyone while you were in DC

9    other than Juliana Thompson?

10   A.   The people on the tour.

11   Q.   Who was on the tour?

12   A.   A lot of people.   There were some people I

13   didn't know.   There were some people I met.

14   Q.   Did you see anyone who was not on the tour

15   with you?

16   A.   I don't know what you mean.

17   Q.   Did you meet with anyone in DC other than

18   the people who were on the tour with you?

19   A.   I'm going to plead the Fifth on that.

20   Q.   Okay.   Did you speak with Steve Bannon

21   while you were in DC in December of 2020?

22   A.   I'm going to plead the Fifth.

23   Q.   Okay.   All right.   I think I'm almost done,

24   Mrs. Latham.   Give me just a moment.

25        You said earlier you didn't want to provide

Page 203

1          Q.  You -- strike that.

2               Are you aware of any investigations by the

3     secretary of state into any election issues in

4     Coffee County?

5          A.  No, sir.

6          Q.  Is it fair to say then that you have never

7     been contacted by anybody working on behalf of the

8     secretary of state involving any investigations

9     about anything to do with elections in Coffee

10    County?

11         A.  Can you give me a date, date frame?

12         Q.  Calendar year 2020 or later.

13         A.  I spoke with two members before the

14    November election.

15         Q.  November of what year?

16         A.  2020.

17         Q.  What was that -- what were those

18    conversations about?

19         A.  About obtaining a new scanner for Coffee

20    County.  I talked to Raffensperger and Sterling.

21         Q.  You testified a lot about events that

22    happened on January 7th of 2021.  Do you recall

23    that?

24         A.  Can you say that again?

25         Q.  Do you recall testifying earlier about

1   events that occurred on January 7th, 2021?

2        A.   Yes.

3        Q.   You went through some text messages and

4   talked about meeting Scott Hall at the election

5   office that day.   Do you recall that?

6        A.   Yes, sir.

7        Q.   My understanding is, is that you went to

8   the election office sometime in the early afternoon

9   on that day, were there for a very short period of

10  time and then left around 4:30 or 4:45 I think you

11  said to go have dinner; is that right?

12       A.   Yes, sir.

13       Q.   Did you go to the county election office at

14  any other time on that day?

15       A.   I can't recall.

16       Q.   Were you working on that day?

17       A.   Yes, sir.

18       Q.   And what hours did you work on that day?

19       A.   From 8:00 until 3:45.   Or 7:45 to 3:45.

20       Q.   And from the timeline you gave earlier in

21  your testimony, it would seem that if you would have

22  been at the election office at any other time on

23  that day, it would have been before 7:30 in the

24  morning; is that right?

25       A.   Can you repeat that?

1      Q.   Sure.   I think you said you went earlier,
2  you testified you went to the election office after
3  work; is that right?
4      A.   Correct.
5      Q.   And you were there a short period of time
6  and left around 4:30 or 4:45 in the afternoon,
7  right?
8      A.   Correct.
9      Q.   So if you would have been at the election
10 office at any other time, it would have either been
11 before you started working or after you had dinner.
12 Is that fair to say?
13     A.   Yes.
14     Q.   I mean, would it have been possible for you
15 to go to the election office during work hours?
16     A.   I mean, I taught a full schedule, I didn't
17 have a planning period, so I can't remember.
18     Q.   Is there any chance you had lunch at the
19 election office or with people from the election
20 office that day?
21     A.   No, sir, I only have a 25-minute lunch, or
22 did.
23     Q.   Okay.
24     A.   And I mean, the high school is in the
25 middle of the county.   I mean, it's in the middle of

1    nowhere.

2        Q.   So you would have remembered if you were at

3    the county election office before 7:30 in the

4    morning, right?

5        A.   Yes, sir.

6        Q.   And you would remember if you had dinner

7    with your husband and then went back to the county

8    election office after dinner, right?

9        A.   Yes, sir, I think.

10       Q.   So it would be --

11       A.   I'm hoping I would.  I was very tired.  I

12   had not had sleep in -- I just know I was extremely

13   tired.

14       Q.   Do you have any knowledge about the

15   election server being taken by the secretary of

16   state and replaced?

17       A.   Only when I saw it in a newspaper.  That's

18   the only knowledge I have when it was mentioned by

19   one of the articles.  Don't ask me what article, I

20   don't know.

21       Q.   Okay.

22            MR. ABNEY:  That's all the questions I

23       have.  Thank you very much, Ms. Latham.

24            THE WITNESS:  Thank you.

25            MR. CHEELEY:  Anyone else?

1          Q.   Jeffrey Schoenberg?

2          A.   Who?

3          Q.   Jeffrey Schoenberg.   I may be

4     mispronouncing it.

5          A.   No, sir.  No, sir.

6          Q.   Do you know who the Coalition For Good

7     Governance is?

8          A.   Yes, sir.

9          Q.   Who do you know as part of the coalition?

10         A.   Marilyn Marks.

11         Q.   What is your relationship with Ms. Marks?

12         A.   I have no relationship with her.

13         Q.   How do you know her?

14         A.   She was on several Zoom calls, you know,

15    talking about election integrity.  She reached out

16    to me.  She was able to, you know, give information

17    and stuff, like, you know, she would talk and then

18    she would ask me questions and I would try to answer

19    them to the best of my ability.  I mean...

20         Q.   Did you only communicate on Zoom calls?

21              THE WITNESS:  What did he say?

22    BY MR. PICO-PRATS:

23         Q.   Did you only communicate on those Zoom

24    calls?

25         A.   Did I something on the Zoom calls?

1      Q.   Communicate.

2      A.   On one of the Zoom calls I was just a

3  participant.   I just was listening because I didn't

4  know what her thing was.   And then, you know, she

5  and I would talk on the phone every once in a while,

6  I mean.   And then she would ask me questions and I

7  would, like -- I would have no idea.   You know, just

8  stuff like that.

9      Q.   What would the contents of the

10 communications revolve around?

11     A.   A lot of times she would call me and she

12 would say stuff like -- I mean, I can't get specific

13 because I don't remember.   But she would be, like,

14 Why are the Republicans doing this?

15          And I'm, like, I don't know.   I'm not privy

16 to the politicians.

17          It was like she thought I had some kind of

18 inside track.   And I'm, like, I don't know what

19 they're thinking.   And then she would want me to get

20 on these, like, secretary of state things, and I

21 only went on one time just so I could hear Misty and

22 whatever she was going to say.   But I mean, it was

23 that.

24          I mean, she would often send me stuff to

25 look at, and I would -- most of the time I got tired

1   of it and I would just ignore it.

2        Q.   You had mentioned discussions with

3   Ms. Marks in December of 2020.   Do you remember

4   that?

5        A.   That I had remarks with her?

6        Q.   Discussions.

7        A.   I wouldn't know when they were.   I mean --

8   I mean, I could --

9        Q.   Okay.

10        A.   I mean, if you have a specific question I

11   can try to answer it.

12        Q.   You had discussed it over -- with Mr. Cross

13   earlier that you had a phone conversation in

14   December of 2020 with Ms. Marks.

15        A.   I could have, yes.   I mean, I could have.

16   I mean, I don't remember exactly.

17        Q.   Did you --

18        A.   It's possible.

19        Q.   Sorry, I didn't mean to interrupt you.

20             Did Ms. Marks speak to you about forensic

21   examination of the Dominion equipment?

22        A.   She always said it was impossible.   She

23   said a forensic examination -- she would go into

24   this long spiel about how long it would be and all

25   this kind of stuff and it was impossible.

Page 211

1      Q.   She would say it was impossible?

2      A.   Yeah, that's the gist I got from her is,

3  yeah, that it was impossible to do a forensic.   In

4  other -- and she would clarify it as in the way most

5  people think it would be, like that, you know.

6           I think she thought she had a defin- --

7  it's my opinion, so I can't testify to that.   I'm

8  sorry.   I had an opinion about it, but no.   I can't

9  testify to that.

10          She would remark that it was impossible to

11 do a forensic audit based on what most people were

12 thinking was a forensic audit.

13     Q.   Okay.   Thank you.

14          Is it your understanding that a forensic

15 examination occurred in Coffee County?

16     A.   No, sir.

17     Q.   One second.   I'm just reviewing my notes.

18     A.   Okay.

19     Q.   Do you have any personal knowledge of any

20 access to Coffee County equipment by nonelection

21 workers?

22     A.   No, sir.

23     Q.   You don't have any knowledge of anyone ever

24 attempting to access the Coffee County equipment by

25 any means?

Page 212

1          THE WITNESS:  Did he say DeKalb County?

2   BY MR. PICO-PRATS:

3       Q.  Coffee?

4       A.  Oh, no, sir.

5       Q.  With the text messages that Mr. Cross was

6   showing you earlier, were your communications with

7   Misty Hampton in regards to any access of the

8   election equipment?

9       A.  No, sir.

10          MR. PICO-PRATS:  That's all the

11      questions I have of you.  Thank you very

12      much, ma'am.

13          THE WITNESS:  Thank you.

14          MR. CHEELEY:  Is that it?

15          MR. CROSS:  Just briefly.  This is David

16      Cross.

17                  FURTHER EXAMINATION

18   BY MR. CROSS:

19      Q.  Mrs. Latham, have you withdrawn your -- are

20   you withdrawing your Fifth Amendment invocation in

21   response to any of the questions we asked you today

22   where you invoked the Fifth?

23          THE WITNESS:  What does that mean, Bob?

24          MR. CHEELEY:  You're not.

25          THE WITNESS:  I'm not.

Page 217

1                          CERTIFICATE
STATE OF GEORGIA:
2    COUNTY OF FULTON:
                    I hereby certify that the foregoing
3    transcript was taken down, as stated in the caption,
and the colloquies, questions and answers were
4    reduced to typewriting under my direction; that the
transcript is a true and correct record of the
5    evidence given upon said proceeding.
                    I further certify that I am not a
6    relative or employee or attorney of any party, nor
am I financially interested in the outcome of this
7    action.
                    I have no relationship of interest in
8    this matter which would disqualify me from
maintaining my obligation of impartiality in
9    compliance with the Code of Professional Ethics.
                    I have no direct contract with any
10   party in this action and my compensation is based
solely on the terms of my subcontractor agreement.
11                   Nothing in the arrangements made for
this proceeding impacts my absolute commitment to
12   serve all parties as an impartial officer of the
court.
13                   This the 11th day of August 2022.
14
15
16        _____
LAURA M. MACKAY, CCR-B-1736
17
18
19
20
21
22
23
24
25