Page 1

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION
3                      CASE NO.:  1:17-cv-2989-AT
4      DONNA CURLING, et al.,
5           Plaintiffs,
6      vs.
7      BRAD RAFFENSPERGER, et
       al.,
8
            Defendants.
9      _____/
10     VIDEOCONFERENCE
       VIDEOTAPED
11     DEPOSITION OF:       DOUG LOGAN
12     DATE:                FRIDAY, NOVEMBER 18, 2022
13     TIME:                9:02 A.M. - 3:54 P.M.
14     PLACE:               VIA VIDEOCONFERENCING TECHNOLOGY
15     STENOGRAPHICALLY
       REPORTED BY:         JAZZMIN A. MUSRATI, RPR, CRR
16                          Registered Professional Reporter
                            Certified Realtime Reporter
17
18
19
20
21
22
23
24
25

```
 1                    C O N T E N T S
 2      TESTIMONY OF DOUG LOGAN                         PAGE
 3          DIRECT EXAMINATION                            8
        BY MR. BROWN
 4          CROSS-EXAMINATION                           198
        BY MR. JIHADI
 5          CROSS-EXAMINATION                           209
        BY MS. LaROSS
 6          CERTIFICATE OF OATH                         226
            CERTIFICATE OF REPORTER                     227
 7          ERRATA SHEET                                228
            READ AND SIGN LETTER                        229
 8
 9                    PLAINTIFF EXHIBITS
10      EXHIBIT                                         PAGE
11          Exhibit 1....................................  36
                7/27/22 Ichter Davis Letter
12          Exhibit 2....................................  36
                4/19/21 Board of Selectment Meeting
13          Exhibit 3....................................  75
                Logan Messaging Thread
14          Exhibit 4....................................  75
                Logan Messaging Thread
15          Exhibit 5.................................... 106
                Data Log
16          Exhibit 6.................................... 124
                SullivanStrickler Log Files
17          Exhibit 7.................................... 133
                Photographs
18          Exhibit 8.................................... 159
                1/8/21 Email String From Paul Maggio To
19              Sidney Powell
            Exhibit 9.................................... 184
20              Screenshot
            Exhibit 10................................... 195
21              Coalition Plaintiffs' Response on Brief
                on Law Enforcement Investigative
22              Privilege
23
24
25
```

Page 7

```
 1      plaintiffs.

 2           MS. LaROSS:  Diane LaRoss for the State

 3      defendants.

 4           MR. JACOUTOT:  Bryan Jacoutot for the State

 5      defendants.

 6           MS. HERNANDEZ:  Danielle Hernandez for the

 7      State defendants.

 8           MR. PICO-PRATS:  Javier Pico-Prats for the

 9      State defendants.

10           MS. EDMONDSON:  Anna Edmondson for the State

11      defendants.

12           MR. JACOUTOT:  We're also joined by Bryan Tyson

13      for the State defendants.

14           MR. LOWMAN:  And this is David Lowman for the

15      Fulton County defendants.

16           THE STENOGRAPHER:  Raise your right hand,

17      please.

18           Do you swear or affirm the testimony you are

19      about to give will be the truth, the whole truth, and

20      nothing but the truth?

21           THE WITNESS:  Yes, ma'am.

22      Thereupon,

23                     DOUG LOGAN,

24      having been first duly sworn or affirmed, was examined

25      and testified as follows:
```

1               DIRECT EXAMINATION

2     BY MR. BROWN:

3        Q.  Please state your name for the record.

4        A.  Douglas Logan.

5        Q.  Mr. Logan, first, thank you for appearing today.

6            I first need to ask you a formal question.  Are

7     you under any medication or any drugs that would have

8     any impact upon your ability to testify truthfully

9     today?

10       A.  No, sir.

11       Q.  You have had the flu?  Are you feeling -- had a

12    cold.  Are you feeling okay?

13       A.  I'm feeling all right today.  Not 100 percent

14    yet, but it's okay.

15       Q.  Okay.  Well, if you need a break, or counsel, if

16    anybody else needs a break, just so indicate, and that's

17    fine.  Typically I will take a break about every hour

18    anyway, just so everybody can stretch and regroup.  But

19    if you need a break, that's fine.

20           Particularly, since we're on Zoom, it's easy to

21    talk over each other and difficult for the court

22    reporter to straighten out the testimony.

23           So I will do my best not to interrupt you, and if

24    you could do the same for me.

25           If there are any questions that I have that are

1    it, right?

2        A.  I -- I assume not, but I honestly don't remember.

3        Q.  Okay.

4        A.  Yeah, I really -- I don't know.

5        Q.  Okay.  So you -- you testified that you left

6    Tomotley on Christmas Eve, correct?

7        A.  (No audible response.)

8        Q.  You need to say -- you need to say yes.  Or New

9    Year's Eve?

10       A.  No.  I -- I ceased being -- staying at Tomotley

11   on Christmas Eve.  Correct.  Yes.

12       Q.  So by the time you left, had Coffee County been

13   identified as a potential location to do additional

14   work?

15       A.  As far as I knew, you know, after things finished

16   at the end of -- as of December, there was no more --

17   there was not going to be any more attempts to have any

18   forensic images.  You know, I was surprised by the

19   Coffee County stuff.

20       Q.  And by the end of December, was that because the

21   election was finished or finished enough?

22       A.  Yes, sir.

23       Q.  Okay.  So then how did -- how did Coffee County

24   come up in 2021, from your perspective?

25       A.  So I -- I got a phone call from Jim saying that

1   they had gotten forensic images, and I was really

2   surprised.  And I asked -- I asked, how?  And I don't

3   remember the specific details of what was said, but he

4   told me that -- I think the wording was that, like,

5   everyone had approved of it, that the board had approved

6   of it even.

7        But I am not sure how good my memory is on that

8   right now honestly.  There's a lot of things I've gotten

9   wrong when I've looked back to the facts, from messages

10  or other things in that regard.

11       Q.  Sure.  Particularly on dates and sequences, that

12  can happen a lot.  I understand.  Be careful --

13  you're -- I appreciate you being very careful about your

14  level of confidence in your recollection, and that is

15  very helpful.

16       Now, so he -- he called at some point in January

17  saying -- let me piece that apart a little bit.

18       When he called you, the data had already been

19  captured, correct?

20       A.  Correct.

21       Q.  And did you understand at that time that

22  SullivanStrickler had done it?

23       A.  I don't know.

24       Q.  And it was your understanding that contrary to

25  other attempts in Georgia, this one had been authorized;

Page 44

1    he was involved in Election Integrity work in Georgia,

2    the probability is high I had a phone call with him at

3    some point.

4         Q.  But you don't -- you don't recall?

5         A.  No.  He's not in my contacts.  Yeah.

6         Q.  I want to explore one sort of piece of this.  In

7    the time period prior to you actually physically going

8    to Coffee County, say December 1st -- I mean,

9    January 1st, after you left Tomotley, to when you went

10   to Coffee County.  Are you with me?

11        A.  Uh-huh.

12        Q.  And before you left Tomotley, you had not

13   received any information about any specific plan to do

14   any work in Georgia, correct?

15        A.  I did not have any specific plans of any work

16   that was going to happen in the future.  Obviously I

17   talked about the things, you know, that we had -- we had

18   tried to do in Georgia prior.

19        Q.  And then at some point, mid January, I guess,

20   Penrose called you and said, we got some data out of

21   Georgia; is that right?

22        A.  Correct.

23        Q.  And were you involved in any way in planning or

24   facilitating the trip that SullivanStrickler took to

25   Georgia in the first or second week of January?

1    A.  No, sir.

2    Q.  Did you know it was happening at the time?

3    A.  I don't believe I knew about it at the time.

4    Q.  And then shortly thereafter, we'll get to the

5    documents, but shortly thereafter, Penrose told you, and

6    you obtained access to the data on -- on

7    SullivanStrickler's ShareFile, correct?

8    A.  Yeah.  When Jim called me up to tell me about it,

9    I recall being very surprised that -- that it had even

10   happened, so...

11   Q.  And before going to Georgia, did you speak to

12   anyone else about going to Georgia in mid January, other

13   than Jim Penrose?

14   A.  Yeah, Jeff Lenberg.

15   Q.  Who else?

16   A.  I don't remember exactly where in the time line I

17   talked with Charles Bundren, but I think one of the

18   times was before I went there.

19   Q.  And Bundren -- was Bundren your attorney at that

20   time?

21   A.  He was the attorney that -- yeah, that we were

22   doing work under.  Jim told me he was engaged

23   specifically, you know, for this stuff, and he was the

24   main attorney on this work.

25   Q.  And I just need to ask it again:  You were not

1   made?

2       A.   I don't -- I don't remember.  I mean, Jim, I

3   think was the one who introduced me to him, but I don't

4   remember the context exactly.  I don't remember.

5       Q.   Was it your understanding that Penrose sort of

6   decided or suggested that the both of you go to Coffee

7   County?

8       A.   I -- I really don't know.  I am not sure if he

9   was the one who orchestrated that detail or not.  He

10   told me that Jeff needed help and...

11       Q.   Did you have -- did you have an understanding at

12   the time of the purpose of your visit?

13       A.   As I recall, it was -- he said that some -- you

14   know, that some weird stuff had happened in Coffee

15   County and the clerk had some questions about it.  And

16   so I had -- I went there with very vague information.  I

17   remember that for sure.  I don't remember exactly how

18   much information I had.

19       Q.   Since the election system had already been copied

20   and you had access to it, why did you need to go to the

21   county, physically, to do your work?

22       A.   Because they -- they -- the clerk had questions

23   on things.  I -- I don't know.  I was told I needed --

24   that Jeff needed some help, you know, and he was --

25   needed some answers and questions of the clerk there.

1    You know what we did, you have a copy of our report, you

2    know.

3       Q.  And so when you got there, in Coffee County, did

4    Misty Hampton explain to you the questions that she had,

5    that she wanted you to look into?

6       A.  Yes, sir.

7       Q.  And just --

8       A.  And she was just looking for answers.  I mean, I

9    wouldn't say she wanted us to specifically look into.

10   You know, she was looking for answers on things.  And so

11   we answered questions as best we could, and we said --

12   you know, Jeff came up with a way to -- to assess the

13   system.  He suggested that it should be done as a way to

14   validate if what she said was real or not.

15      Q.  And so --

16      A.  And the people in the office did the work to make

17   it happen.  You know, mostly I observed, you know...

18      Q.  The -- why did you change the clock on the -- on

19   the EMS?

20      A.  If you have malicious code that's in place to

21   enact imperfect -- well, here's the best way to give an

22   example.  Are you familiar with Volkswagen?  Have you

23   heard about --

24      Q.  Yes.

25      A.  -- you know, Volkswagens, the way that they

Page 50

1    that could have been in place are likely also to trigger

2    again, then you would see the -- the resulting behavior.

3         Because we didn't know if there was anything.  So

4    we wanted to mimic the real world situation as much as

5    possible to make sure we have a scientific test that

6    would have a chance of reproducing the issue, if it

7    existed.

8         Q.  Did you set the clock back when you left?

9         A.  I didn't set the clock or unset the clock.  So

10   that was something that was -- that was done by the

11   County.  So I don't -- I assume that it was done, but I

12   really don't know.

13        Q.  And did -- how did the County know to do that?

14   Did you or Mr. Lenberg suggest, first let's change the

15   date?

16        A.  Part of the suggestion is in order to test it and

17   in order to explain as to why that would be -- create a

18   better test.

19        Q.  And so when y'all were down there, the County

20   actually -- or Misty Hampton actually changed it

21   pursuant to your -- did you tell her how to do it?

22        A.  I don't recall.  Misty is very proficient on a

23   computer.  I don't think I'd need to tell her something

24   like that.  But I have no idea if we did or didn't.

25        Q.  And you don't know whether it was reset, right?

1      A.  I don't know.  I mean, I can tell you that on

2    Windows it will automatically fix itself on certain time

3    intervals.  So it should, you know, at least on the

4    Windows system.  And I know that when you -- when you

5    boot up the ICP device, I believe one of the things that

6    displays for you to check and validate before you start

7    an election is the date and time.  So, yes, it should

8    have been fixed.  You know, naturally those things

9    should have resolved themselves, but I don't -- I don't

10   know.

11      Q.  And then you also made a number of -- did you

12   scan a number of ballots when you were down there?

13      A.  Did I scan any ballots?  No.  I did not scan any

14   ballots.

15      Q.  Were --

16      A.  Per the test, yes, ballots were run through

17   the -- for the ICP device.

18      Q.  And those were ballots from the 2020 election?

19      A.  I do not recall exactly how those were created.

20   That was not something I was a part of.

21      Q.  Who was doing that?

22      A.  I believe it was all done by -- by people in the

23   office.  But beyond that, I'm not sure.

24      Q.  Was it done pursuant to your instruction or -- or

25   what?

Page 52

```
 1        A.  I mean, beyond saying, hey, we need to equi- --
 2    equivalent ballots to run a good test, I don't know if
 3    there was any -- any direction or instruction involved,
 4    you know.  You know, it was -- this is a way to do a
 5    scientific test if you want to implement it.
 6        Q.  And the -- this particular test is something that
 7    could not be evaluated simply by looking at the copy of
 8    the software that SullivanStrickler had made, right?
 9        A.  Oh, absolutely.  I mean, while it's -- there is
10    no -- there is no substitute for having a live version
11    of the systems.  What you can do with a live version of
12    the system is drastically different than what you can do
13    with a forensic copy.  It is immensely more complicated,
14    more difficult to work -- to do anything, similar type
15    of test of any sort.  So, no, we could not just look at
16    a forensic image and know whether this was the case.
17    Absolutely not.
18        Q.  Did it -- did it concern you, at any time, that
19    if you could have access, that kind of access to the
20    Coffee County system, that someone who didn't have your
21    motivation and integrity could also gain access and
22    figure out, for example, how to implant malware in the
23    system?
24        A.  I mean, there's a statement in the security field
25    called security via obscurity, and they say security via
```

Page 75

1       Q.  I'm going to hand to you a document, Exhibit 3,

2    which is going to be Tab 4, and then also if you would

3    mark as Exhibit 4, Tab 4.5.

4            (Whereupon, Plaintiff Exhibit 3 was marked for

5        identification.)

6            (Whereupon, Plaintiff Exhibit 4 was marked for

7        identification.)

8       A.  Okay.  I'm opening Exhibit 3 now.  I figured.

9    BY MR. BROWN:

10      Q.  Yeah.  And could you, for the record, tell me

11   what Exhibit 3 is.

12      A.  So Exhibit 3 looks like a copy of the Signal

13   messages I pulled and turned over.

14      Q.  And going -- I'm going to ask you some questions

15   about the chart that you have here.

16      A.  Yeah.

17      Q.  First, how did you select the -- the text to put

18   in this chart?

19      A.  So I did searches specifically for Coffee, Coffee

20   County, Misty, I believe Georgia, GA, in addition to

21   specifically looking at the individuals that I could

22   remember had any association with anything associated

23   with Coffee County, and specifically looking through

24   their communications in the time period where they might

25   have said something.

1     Q.  If you go to Page 10, on the second visible line

2     is Patrick Colbeck?

3     A.  Uh-huh.

4     Q.  Who is he?

5     A.  He's someone out of Michigan.  I think he used to

6     be a politician there.

7     Q.  Do you know what he's doing on this list?

8     A.  No, sir.

9     Q.  And just for the record, I sort of skipped over

10    this on this chart, but in I think it's the second

11    column, that's -- that's for the particular device or

12    folder.

13         Do you see that?

14    A.  Yeah, hold on.  I got to look at the beginning of

15    this.  I'm not really familiar with these logs.

16         Yeah, it does.  It says the path and then the

17    folder.  So the second column is the folder.  And so

18    they're saying their access was specifically limited.

19    You know, when they're saying that specifically, it is

20    limited to the thumb drives folder.

21    Q.  And do you recall who issued you your credentials

22    to get on -- specifically to the Cotton County (sic)

23    folders?

24    A.  I believe that Jim Penrose requested that

25    SullivanStrickler give me access.  That -- that would at

1    least be the normal flow of things.  But I don't -- I

2    don't know for sure.  I just know the access was

3    granted.

4        Q.  Did you -- did you always sign in under your own

5    name and credentials, or did you ever use someone else's

6    credentials?

7        A.  I would never use someone else's credentials.

8    No.  I always signed in under my credentials.

9        Q.  Did you know that Ben Cotton would sign on using

10   Jim Penrose's credentials?

11       A.  I understand that while he was waiting for his

12   own credentials, to expedite things, he logged in as

13   his -- that Jim provided him his credentials for him to

14   log in that time.

15       Q.  Are you aware of anyone else logging in under

16   credentials that were not their own with --

17       A.  No, sir.  The only reason why I know that is

18   because I saw it come up in his deposition.

19       Q.  Okay.  Hang on just one second.

20           Sorry for the delay.

21       A.  That's fine.

22       Q.  I think my last -- I think I was interrupted here

23   before I could focus on your answer to my last question,

24   which was whether you're aware of anyone else getting --

25   using credentials that were not their own with respect

1   engaged in collecting images of electronic voting

2   systems?

3       A.  I don't know anything about that, no.

4       Q.  Do you know what --

5       A.  And I don't -- I would say that's kind of a

6   mischaracterization, they weren't like in the business

7   of doing that.  So I don't know anything about their

8   involvement and what they're doing right now, besides

9   occasionally I see, you know, them put out various

10  things that comes across my social media feeds of sorts.

11  That's all I know about what they're doing right now.

12      Q.  Did you or to your knowledge Mr. Lenberg return

13  to Coffee County after your initial visit on the 18th of

14  January?

15      A.  I never returned to Coffee County.  I do believe

16  that Jeff did.  But don't you have surveillance footage

17  on that?  I don't have any details.

18      Q.  Yeah, we do.  But do you know -- do you know --

19  based upon your recollection, do you know why he stayed

20  longer and you left?

21      A.  As I recall, he said that he was going to

22  complete any of the work that needed to be done.  And I

23  had a lot of things on my plate, so I didn't even really

24  follow up with it any further.  So he was --

25      Q.  But he was --

1      A.  He was still trying to figure things out on the

2    ICC devices.

3      Q.  So he was continuing the same work that you two

4    were doing; fair to say?

5      A.  That is my understanding, but you'll have to ask

6    him.

7      Q.  Did -- the security footage indicates -- I'll

8    just tell you, you don't have to believe me -- indicates

9    that a Secretary of State investigator actually came to

10   the elections office while Mr. Lenberg was there.  Did

11   any -- do you recall that or did you hear about that?

12     A.  I do believe I was told about that.

13     Q.  And who told you?

14     A.  I believe Jeff mentioned something to me.

15     Q.  And what was -- what was his concern?

16     A.  I don't recall.

17     Q.  Okay.  Did that change his plans or his

18   operations there in any way?

19     A.  I'm not sure.  You would have to ask him.

20     Q.  Did you talk to anyone at SullivanStrickler

21   before you went to Coffee County to see if you needed to

22   follow up on anything they had done?

23     A.  I mean, I don't recall doing so.  But obviously

24   there was a message in the chat message, where I reached

25   out to Greg and asked him some questions.  And that

1    Q.  Okay.  You know, one of the photos shows him with

2    I think a ring, like one of those rings that you use to

3    give better light for a video.  Were you there when he

4    was doing that?

5    A.  There was a ring?

6    Q.  You know -- I don't know what you call them, but

7    the light ring that you use -- you've seen it now with

8    people using Zoom, to make a better --

9    A.  Yeah.  I don't recall that.  I think I would.

10   Q.  Did Ms. Hampton bring in a BMD for you all to

11   work on?

12   A.  No, sir.

13   Q.  Okay.  And were you --

14   A.  Not any time while I was there, at least.

15   Q.  And were you able to work on the BMD software at

16   all?

17   A.  No, sir.  Until you told me that there was --

18   theoretically one of the thumb drives there was a copy

19   of an ADK file, I didn't even think that stuff had been

20   captured in Coffee.

21   Q.  Okay.  I want to dive a little bit in greater

22   detail, the tests that you did in Coffee County while

23   you were there.

24        Just sort of physically, can you walk me through

25   what you did, what you asked her to do, and what you did

1    while you were there?

2        A.  Well, the idea was that if -- if -- if it's

3    rejecting a ballot based on the race of the candidate,

4    then that's something that should be reproducible.  And

5    therefore, if you had -- you know, if you had ballots

6    from one candidate and the other candidate, you're going

7    to see different rejection rates that are noticeably

8    different between them if you feed through the machine.

9    That was the concept and the idea to prove if, you know,

10   Misty's theory was accurate.

11       So I forget the numbers, I think they're in the

12   report, but it was something like 10 or 20 of each

13   ballot -- each ballot type was repetitively fed through

14   a machine.  And periodically those results were pulled

15   off of the card.  You know, all that stuff was done by

16   Misty and the person helping her and compared against,

17   you know, what the printout was, making sure the

18   printouts were, you know, accurate, and it was, you

19   know, the right numbers, and that the rejection rates

20   were compared.  It was pretty simple.

21       Q.  What I'm going to do now is take a lunch break,

22   because I need to get some documents as exhibits, and I

23   don't want to waste any time.  So if we could take a

24   45-minute break, and then I will get organized and we'll

25   be able to march through the rest of your deposition

1    quicker.  Is that all right?  So have some lunch and see

2    you a little bit before 1:00.

3        A.  Sounds good.

4        Q.  Thank you, sir.  Appreciate it.

5            THE VIDEOGRAPHER:  Off the record at 12:05 p.m.

6            (Whereupon, a break was taken from 12:05 p.m.

7        to 12:55  p.m.)

8            THE VIDEOGRAPHER:  This begins Media Unit

9        Number 3.  We're back on the record at 12:55 p.m.

10   BY MR. BROWN:

11       Q.  Mr. Logan, this -- we're back on the record.  I

12   would like to mark, I believe, as Exhibit 6, they'll

13   correct me if I'm wrong, Tab 15.

14           (Whereupon, Plaintiff Exhibit 6 was marked for

15       identification.)

16   BY MR. BROWN:

17       Q.  And that may take a minute to appear.  Let me

18   know when that comes up.

19       A.  There we go.

20       Q.  And I am not sure if the first part of that is

21   the same as what we have seen before, but if you would

22   scroll down to the twelfth page of that PDF.

23       A.  Okay.

24       Q.  And does this show the activity on that

25   particular folder that SullivanStrickler had?

1      A.   Yeah, this looks like the download logs.

2      Q.   Okay.  And if you would scroll over to -- or

3   scroll down to, let's see, Page 15.

4      A.   Okay.

5      Q.   You'll see in the middle of the page that you are

6   uploading things to the site.

7           Do you see that?

8      A.   Yes, sir.

9      Q.   And what were you uploading?

10     A.   So I had converted the forensic image into a

11   virtual machine, and I uploaded that result to the site.

12     Q.   So you uploaded a virtual machine; is that what

13   that is?

14     A.   Correct.

15     Q.   And just for the record, tell me what that is and

16   how was that different than what -- from what you

17   downloaded?

18     A.   So a forensic image, when it's captured, it's

19   captured in a manner that is immutable, you cannot

20   change it.  And it's designed, you know, for that so

21   that you have the official record what the system looked

22   like if you were using it in a court case.  But

23   converting it to a virtual machine allows you to

24   potentially, you know, boot up the device and be able to

25   utilize it like it was the computer in order to take a

1   look at the way the things operate, and more closely

2   examine it like it was a local system you were using.

3       Q.  If you look on that same -- and so you did that,

4   it looks like, on January 16th; is that correct?

5       A.  If that's what the log says, then that's correct.

6       Q.  And then if you look at the bottom of that same

7   page, over to the next page, what is the reference to

8   fixed?  What does that mean, in this third column?

9       A.  So the first time I did the conversion, something

10  happened, and it seems to have taken out a bunch of

11  files, and it didn't actually function and work right.

12  I don't -- to this day, I don't really understand

13  exactly what was wrong.  But I redid the process and

14  uploaded a version that actually functioned.

15      Q.  So which part wasn't working, the virtual

16  machine?

17      A.  The virtual machine had a lot of files missing

18  from it when it booted up, which that shouldn't have

19  happened.  I don't really understand it.  I've never

20  seen, you know, a partial conversion in such that

21  matter, but that's what had happened somehow.

22      Q.  And were you ever able to determine the cause of

23  that issue?

24      A.  I wasn't concerned with it.  I mean, I just

25  assumed that something hadn't copied right.

1    Q.  Did you touch any of the equipment at Coffee

2    County?

3    A.  No, sir.

4    Q.  I take it you instructed or asked Ms. Hampton to

5    do so?

6    A.  As I stated initially when you asked a very

7    similar question, she presented a problem she had, and

8    mostly Jeff came up with a way to test that.  And then

9    the test was conducted, you know.

10   Q.  Was there anything you asked -- you or

11   Mr. Lenberg asked her to do that she refused to do?

12   A.  I -- nothing -- nothing comes to mind.  But I

13   don't -- I don't believe there was clear instructions,

14   do A, B, C, D, E.  The idea was -- you know, we -- to

15   rerun an election with predefined ballots to see what

16   the results are.  She knew very well how to run an

17   election.  We didn't have to give her any instructions

18   on that.  She was the one who could instruct us on how

19   to do that effectively.  She was doing advanced logic

20   and accuracy testing.

21   Q.  Did you go into the small EMS server room when

22   you were there?  They call it the Gems room.

23   A.  I -- I know what you're talking about.  And, yes,

24   I do believe I was in that room at one point in time.

25   Q.  And was Ms. Hampton there with you when you were

1    there?

2        A.   There was always someone with me whenever I was

3    around any of this equipment.  I don't remember

4    specifically if it was her.  It was probably her.

5        Q.   Okay.  So you mean -- just to follow up on

6    that -- somebody from Coffee County, either her or her

7    assistant, was with you at all times?

8        A.   Correct.

9        Q.   Did you -- did you have a Cellebrite kit when you

10   were there?

11       A.   No, sir.

12       Q.   I'm not going to quibble with you, but let me

13   just show you what we'll mark as Exhibit 7, Tab 10.

14            (Whereupon, Plaintiff Exhibit 7 was marked for

15       identification.)

16   BY MR. BROWN:

17       Q.   And while it's coming up, what is a Cellebrite

18   kit used for?

19       A.   I assume you're talking about a dongle to use the

20   Cellebrite software, and Cellebrite software is used for

21   capturing specifically mobile devices.

22            MS. MARKS:  Bruce, could you say the tab number

23       one more time for me?

24            MR. BROWN:  Tab 10.

25            MS. MARKS:  Got it.

Page 155

1    in Arizona?

2       A.  That's not what I said.

3       Q.  That's a new question.

4       A.  I -- I don't recall any of the specifics about --

5    in here.  But that's -- would definitely be why I was

6    concerned on, what was that, April 12th, which the --

7    the audit I believe started -- we arrived on site around

8    April 19th, if I remember correctly.  So I would have

9    been very concerned with how to capture forensic images

10   of ICP devices to capture and do analyses and plans.

11      Q.  If you go down, you tell Mr. Lenberg -- this is

12   in the Jeff Lenberg thread -- "Talk to Jim to get

13   Charle's (sic) approval."

14          Who -- that's Penrose, I guess.  And who is

15   Charlie?  Or Charles?

16      A.  If it's Charles, it's probably Charles Bundren.

17   But, I'm sorry, where are you?

18      Q.  It's -- on Exhibit 4, it's Line 204.

19      A.  I'm still on Exhibit 3.

20      Q.  Then it's on Page 9, Line 16.

21      A.  Yeah.  I mean, that would be Charles Bundren

22   if --

23      Q.  Okay.

24      A.  -- it's Coffee County.  Yeah.

25      Q.  If you look at the June 11, 2021, entry, so with

1    Todd Sanders.

2        A.   Uh-huh.

3        Q.   And I'm trying to figure out who it's from and

4    who it's to.  You emailed him:  "Do you know who CJames

5    is on telegram?"

6             Do you see that?

7        A.   Correct.

8        Q.   He says, "No."

9             What was your question or your concern at that

10   time?

11       A.   Well, at that point in time, someone had

12   mentioned to me that they had a copy of the Coffee

13   County VM.  And that really concerned me, because that

14   stuff should not be circulating anywhere.  And I -- I

15   asked them where they got it, and they said they got it

16   from CJames on Telegram.

17       Q.   And did you figure out who he was?

18       A.   Yes.

19       Q.   Who was he?

20       A.   Conan Hayes.

21       Q.   So he was using a pseudonym on Telegram?

22       A.   I mean, I think his middle name is James.  So

23   CJames is Conan James Hayes, so...

24       Q.   And so he had authorization from Penrose to

25   access the -- that data anyway, correct?

Page 157

1    A.  Correct.  I mean, I believe it was actually
2    authorized from Charles Bundren directly, quite frankly,
3    but I don't -- I don't know if I had visibility into
4    that, if I ever knew that.
5    Q.  Okay.  If you could go down to -- there's an
6    entry from Phil Waldron, September 22nd, 2021.  It's on
7    Line 239, on Exhibit 4; Page 12, Line 12 on Exhibit 3.
8    A.  Yep.
9    Q.  And so you were in communication with Phil
10   Waldron from time to time, then?
11   A.  Correct.
12   Q.  What about?
13   A.  Various, different things.  Different things
14   going on with Election Integrity efforts.  He would talk
15   to me at times.  He -- I mean, he introduced me to a
16   couple of people in Arizona when I was out there for the
17   audit as well, so...
18   Q.  And then he says on September 22nd, there's two
19   question marks, but "Misty from Coffee County is getting
20   hammered like Tina in Mesa County."
21       Do you see that?
22   A.  Uh-huh.
23   Q.  And do you recall what he was referring to?
24   A.  I don't know what he was talking about to this
25   day, but he said that somehow Misty was in trouble, and

1      Coffee County, or anywhere else?

2          A.  No, sir.

3          Q.  Did you ever get any contact made with you,

4      directly or indirectly, from Dominion about any

5      copyright issues or any sort of trade issues, with

6      respect to their intellectual property?

7          A.  No, sir.

8          Q.  You left -- or someone left your business card,

9      I'm sure you have seen this, in the Coffee County

10     elections office, right?

11         A.  Yes, sir.

12         Q.  And was that probably you?

13         A.  It was probably me.  I don't remember doing that,

14     but it was probably me.

15         Q.  And it was found there by the next elections

16     director, Mr. Barnes.

17             Did you get -- when is the first time that any

18     law enforcement from the State of Georgia, or the

19     Secretary of State, or the State Election Board

20     contacted you, if ever, about Coffee County?

21         A.  Somewhere in the last two months someone left a

22     voicemail on an old phone number I had.

23         Q.  And who was that?

24         A.  Someone with the Georgia Bureau of Investigation.

25         Q.  Is that the only contact you have had with any of

1    those groups?

2       A.   Correct.

3       Q.   So the Secretary of State and the State

4    defendants have taken the position that they were

5    actively investigating this starting in April of 2022.

6       Are you with me?

7       A.   Uh-huh.

8       Q.   And although they were actively investigating

9    this, I take it they didn't contact you until, what,

10   about a month ago?

11      A.   Not that I'm aware of.

12      Q.   Did you speak with the GBI, or did he just leave

13   you a message?

14      A.   He left me a message.

15      Q.   Have you been contacted by the January 6th

16   Committee?

17      A.   No, sir.

18      Q.   The FBI?

19      A.   No, sir.

20      Q.   The Fulton County Attorney?

21      A.   No, sir.

22      Q.   So we're the only ones that have contacted you,

23   right?

24      A.   So far.  I mean, the sky is the limit now that

25   we've had this deposition, right?

1    specifically election related findings in it.

2         That's all that comes to mind right now that I

3    know of that -- there's all the DEFCON reports that

4    include software, some of the stuff that is included is

5    very similar to what is being used in Georgia.

6    Specifically Dominion ICP devices, versions of those

7    were tested and exploited as part of the DEFCON voting

8    village.

9       Q.   Okay.   And so on the same subject of the virtual

10   machines, who else worked with the uploaded virtual

11   machines in the SullivanStrickler ShareFiles?

12      A.   I don't recall that.   But based on my messages,

13   Jeff was asking for a copy of them, so he obviously did

14   at some point in time.   Conan was asking about that, so

15   he obviously worked them at some point in time.   Anybody

16   else would just be speculation for me to even mention

17   it.

18      Q.   Okay.   And we don't want you to speculate right

19   now.

20         Also, when it comes to -- we discussed Mike

21   Lindell earlier.   Have you ever flew with Mike Lindell

22   or been on his plane?   Because there has been some

23   activity with Mike Lindell's plane.

24      A.   I have never been on Mike Lindell's plane.

25      Q.   Okay.   So never been to Douglas County -- or

Page 209

```
 1            THE VIDEOGRAPHER:  Off the record at 3:24 p.m.
 2            (Whereupon, a break was taken from 3:24 p.m. to
 3        3:30  p.m.)
 4            THE VIDEOGRAPHER:  Back on the record at
 5        3:30 p.m.
 6            MR. JIHADI:  Okay.  Thank you so much,
 7        Mr. Logan.  That is all the questions I have right
 8        now.  And we will turn it over to anybody else that
 9        has questions.  Thank you.
10                      CROSS-EXAMINATION
11    BY MS. LaROSS:
12        Q.  Mr. Logan, my name is Diane LaRoss, and I guess
13    I'll go next.
14        A.  Sounds good.
15        Q.  We appreciate your time today.  Thank you.  And I
16    thought I'd better turn my video on so you could see a
17    face to the voice.
18            As you know, I represent the State defendants.  I
19    have chimed in a couple of times during your -- the
20    deposition thus far today.
21            So I have a couple of questions for you.  You
22    mentioned that when you were in Coffee County, in
23    January, I believe it was on January 18th and 19th, and
24    you were in the Coffee County election office, you had
25    testified earlier about the clock being changed on the
```

1    election equipment.

2            Do you recall that testimony earlier?

3        A.  Yes, ma'am.

4        Q.  Okay.  And you also testified, I believe, that

5    you never physically touched the election equipment in

6    Coffee County, correct?

7        A.  Yes, ma'am.

8        Q.  And did you instruct Misty Hampton how to change

9    the clock on that occasion?

10       A.  I don't recall.  I don't believe so.  But it's

11   possible.  I really don't know.

12       Q.  And do you know -- well, do you recall if she

13   knew how to do it herself, or if you -- or did someone

14   else instruct her to do it --

15       A.  I'd be really surprised if she didn't know how

16   to.  She's very computer proficient.  But I really don't

17   remember.

18       Q.  So did Mr. Lenberg instruct her on changing the

19   clock, as you recall?

20       A.  I -- I don't recall any instruction with changing

21   the clock, you know, on how to do it or whatever.  I

22   really am not sure.

23       Q.  Okay.  And the clock was changed.  Was it changed

24   in Windows, or in the files, or what part of the

25   computer system was the clock changed?

1        They said it was actually a couple of days

2    afterwards.  I don't know why exactly that would be.

3    But it's possible that the ballots were still being

4    processed on that day, and then if that was the day the

5    anomaly was detected, then that might have been a date

6    that would have been set up next.

7        Q.  So would it have been counting ballots in

8    January 2021, or would it be to go back in time to the

9    November 2020 election?

10       A.  The dates on all the systems would have been set

11   back to -- to whatever date it was from the stuff.  I

12   don't remember.  I'm sorry.  I can't tell you

13   specifically.  Jeff might be able to tell you more.  I

14   understand he has a deposition on Monday.

15       Q.  Do you recall the clock being reset after the

16   work was done on the machine, or the --

17       A.  I don't specifically recall it being set or

18   specifically recall it being reset.  I would imagine it

19   would have been, but I really -- I'm sorry, that was

20   almost two years ago.

21       Q.  Sure.  And we understand that.

22           And so you've mentioned the ballots, malicious

23   code, in your explanation here today.  Did you find any

24   malicious code in the Coffee County equipment?

25       A.  No, ma'am.

1      Q.  Did you insert any malicious code in the Coffee

2   County equipment?

3      A.  Definitely not.

4      Q.  We need to have a clear record.  So that's the --

5      A.  I suppose that would be a bad one to take the

6   Fifth, right?

7           Yeah, no.  Definitely.  I have never written

8   malicious code for any election equipment.  I have never

9   written really I'd say malicious code.  I guess proof of

10  concepts I have done in penetration testing possibly,

11  but nothing associated with any election equipment,

12  ever, nor I wouldn't do so.

13     Q.  Then going back to the Coffee County equipment,

14  are you -- so I need to ask all the questions.  So are

15  you anywhere of anyone else who looked at the Coffee

16  County equipment in January 2021 and found malicious

17  code?

18     A.  No, ma'am.

19     Q.  And I -- I guess I need to ask this other

20  question too:  But are you aware of any individuals who

21  inserted malicious code in any of the Coffee County

22  equipment?

23     A.  No, ma'am.  And if I -- if I was aware of that, I

24  would report it to law enforcement.

25     Q.  I'm going to ask you a couple of questions about

1    as part of discovery.

2         Q.   Okay.  So that -- so that was my next question:

3    So that would have been included in the documents that

4    you produced in response to the subpoena in this case to

5    you?

6         A.   Correct.  Yes, specifically with the motion to

7    compel, I listed that document on attorney work product,

8    but said I wasn't sure if the attorney was going to

9    exert that on it.  So the judge ruled to give him ten

10   days to exert privilege on it.  He did not.  And so that

11   document was provided as part of discovery.

12        Q.   You spoke a good bit during your testimony

13   concerning election results in Georgia.

14             Do you think that Trump won the Presidential

15   election, actually won the Presidential election here in

16   Georgia in 2020?

17        A.   I don't have a clear opinion as far as it comes

18   to Georgia.

19        Q.   Okay.  So you don't -- you don't think that Biden

20   actually won or -- you don't have an opinion as to who

21   won?

22        A.   Biden was -- is our rightful President.  Do I

23   think there was cheating that was involved in this

24   election?  Yes, I do.

25        Q.   And is it your testimony that that occurred in

Page 222

1    Georgia?

2       A.   I don't have any firsthand knowledge to specify

3    whether that's true or not true in Georgia.

4       Q.   Do you think that Georgians can trust the results

5    from the 2020 election as accurate, the results that

6    have been reported by the Secretary of State's office?

7       A.   I have reviewed a lot of discrepancies associated

8    with Georgia and the way the audits were done and so

9    forth that I've reviewed at times.  And I am skeptical

10   of the reports.  First, for a race that was this close,

11   I really don't think I could say whether they should or

12   shouldn't trust in them.  I absolutely believe that

13   electronic voting machines lack the transparency

14   necessary for proper elections in place, and

15   specifically the software being used as vulnerable,

16   extremely vulnerable, and should not be in place and

17   could be easily exploited by foreign adversary.

18        So do I have knowledge of something being done

19   with it?  No.  But do I trust it?  Do I trust the

20   results?  No.

21      Q.   And getting back, I think I asked you about

22   telephone conversations with Mr. Brown.  Did you also

23   receive emails or have other communication with him,

24   other than the telephone calls?

25      A.   Yes, ma'am.  We had emails.

Page 223

1      Q.  And what did the emails pertain to?

2      A.  All associated with the motion to compel and this

3  deposition.

4      Q.  Okay.  Did any of the emails pertain to your

5  testimony that you have given here today?

6      A.  As far as what I was going to say?

7      Q.  Yes.

8      A.  Yeah.  So I -- I believe there was nothing from

9  Mr. Brown, but I was originally told that this

10 deposition was going to be in my personal capacity.  And

11 I did notify Mr. Brown that if it got into my expertise,

12 that the Thirteenth Amendment does not allow you to just

13 force someone to use their expertise and that I would

14 potentially bill him for the work.  And so in that

15 regards, I mean, that's a little bit more beyond, you

16 know, what things are, but he never agreed or even

17 replied to that message.

18     Q.  Did you ever speak with Mr. Brown concerning the

19 events about -- that you testified to today that

20 occurred in Coffee County in January 2021?

21     A.  Not outside the context of explaining why I did

22 not have the records he was requesting.

23     Q.  And I think you said you received emails from

24 Ms. Marks.

25         What did those emails pertain to?

Page 226

1                         CERTIFICATE OF OATH

2

3    STATE OF FLORIDA:

4    COUNTY OF ORANGE:

5

6        I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State

7    of Florida, do hereby certify that DOUG LOGAN personally

8    appeared before me via videoconferencing technology on

9    November 18, 2022, and was duly sworn and produced

10   driver's license/I.D. as identification.

11

12                    Signed on December 2, 2022.

13

14

15   _____

     Jazzmin A. Musrati, RPR, CRR

16   Notary Public - State of Florida

     My Commission No. GG984252

17   My Commission Expires: May 4, 2024

18

19

20

21

22

23

24

25

Page 227

1                    CERTIFICATE OF REPORTER

2      STATE OF FLORIDA:

3      COUNTY OF ORANGE:

4

5        I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State

6      of Florida, certify that I was authorized to and did

7      stenographically report the deposition of DOUG LOGAN;

8      that a review of the transcript was requested; and that

9      the foregoing transcript, Pages 1 through 229, is a true

10     and accurate record of my stenographic notes.

11       I further certify that I am not a relative, employee,

12     or attorney, or counsel of any of the parties, nor am I

13     a relative or employee of any of the parties' attorneys

14     or counsel connected with the action, nor am I

15     financially interested in the action.

16

17                    DATED:  December 2, 2022.

18

19

20     _____

       Jazzmin A. Musrati, RPR, CRR

21     Registered Professional Reporter

       Certified Realtime Reporter

22

23

24

25