Page 1

1              UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF GEORGIA

3                     ATLANTA DIVISION

4

5              Civil Action No. 1:17-cv-02989-AT

6      _____

7      DONNA CURLING, et al.,

8            Plaintiffs,

9      vs.

10     BRAD RAFFENSPERGER, et al.,

11           Defendants.

12     _____

13          VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

14                   JEFFREY E. LENBERG

15     DATE:          November 21, 2022

16     TIME:          10:05 a.m. to 6:21 p.m. Eastern

17     LOCATION:      Witness location

18

       REPORTED BY:  Felicia A. Newland, CSR

19

20              Veritext Legal Solutions

             1250 Eye Street, N.W., Suite 350

21              Washington, D.C. 20005

22

1                    C O N T E N T S

2      EXAMINATION BY:                              PAGE

3            Counsel for Coalition Plaintiffs        10

4            Counsel for Curling Plaintiffs         229

5            Counsel for State Defendants           307

6            Counsel for The Witness                321

7            Counsel for Coalition Plaintiffs       325

8                 LENBERG DEPOSITION EXHIBITS

9       NO.  DESCRIPTION                            PAGE

10     Exhibit 1   Subpoena                          11

11     Exhibit 2   Jeffrey Lenberg Declaration, October 21,   15

12                 2022

13     Exhibit 3   Logan Signal messages             73

14     Exhibit 4   Harvey memo on system copies      96

15     Exhibit 5   Coffee County ICC & ICP Reports  114

16     Exhibit 6   Coffee County and Pierce County Records  136

17                 Request

18     Exhibit 7   Color photograph, Cellebrite kit for  154

19                 copying

20     Exhibit 8   Measuring the desk message       157

21     Exhibit 9   Color photograph, Lenberg light ring  181

22     Exhibit 11  Color photograph, pictures coming -  193

Page 7

```
 1                  going

 2       Exhibit 13    Handwritten notes                       195

 3       Exhibit 12    ICP - Analysis - Updated, Dominion 5.5  199

 4       Exhibit 14    Thumb drive contents - CCBOE Docs       200

 5                     Responsive to Subpoenas

 6       Exhibit 15    Ben Cotton Signal & Coffee County       206

 7                     Related E-mails

 8       Exhibit 16    Moncla Signal Communications Annotated  210

 9       Exhibit 17    Lenberg vote stealing attack            234

10

11        *(Exhibit 10 not marked.  Exhibits attached to

12         transcript.)

13

14

15

16

17

18

19

20

21

22
```

Page 10

1                    MS. HERNANDEZ:  Yes, Alexander Denton

2       and Danielle Hernandez are also here on behalf of

3       the State Defendants.

4                    VIDEOGRAPHER:  Thank you very much.

5                    MS. HERNANDEZ:  You're welcome.

6                    VIDEOGRAPHER:  Will the court

7       reporter please swear in the witness?

8                         *  *  *  *  *

9       Whereupon,

10                   JEFFREY E. LENBERG

11      was called as a witness and, having been first duly

12      sworn, was examined and testified as follows:

13        EXAMINATION BY COUNSEL FOR COALITION PLAINTIFFS

14      BY MR. BROWN:

15            Q    Good morning.  Please state your full

16      name for the record.

17            A    Jeffrey Earl Lenberg.

18            Q    And you're in New Mexico right now.

19      Is that right?

20            A    That's correct.  That's correct.

21            Q    And you are represented by counsel?

22            A    I am.

1    of people that she didn't know who they were or had

2    never, you know, recognized names and stuff before.

3              I don't know.  It was just a concern

4    she had about what she felt was an abnormal number

5    of absentee votes.  And, of course, those all get

6    counted typically on the high-speed scanners, on

7    the ICCs, which is what we were looking at in

8    Coffee County, the potential anomalies on those.

9         Q    Were you able to follow up on that

10   concern with respect to Pierce County?

11        A    No.  They never produced results to

12   that records request that I -- I believe I sent to

13   them.

14        Q    How about Dougherty County, other

15   than that conversation with the elections director

16   there, were you able to pursue that at all?

17        A    I did not.

18        Q    Okay.  Any other counties other than

19   Pierce, Dougherty, Ware, Liberty, and Coffee?

20        A    Not that I recollect.

21        Q    Okay.  Going back up to Coffee

22   County -- I have got to keep my place in my

1   notebook here, but you identified two anomalies.

2   One was the remote with Dominion, the other was

3   the, what you called, reversals, or rejection, rate

4   relating to the ICPs.  Were there any other

5   anomalies with respect to the machines that you

6   investigated in Coffee County?

7            A      Not that I recollect.

8            Q      Did you investigate anything relating

9   to the poll pads?

10           A      Ms. Hampton -- while I was there,

11  keep in mind, this was the first time I had seen

12  this, you know, current generation of voting

13  machines, other than me voting at my voting

14  location in New Mexico, so I was learning as much

15  as I could.  And she was very helpful in

16  explaining, you know, basic voting systems, Georgia

17  election law.  She was quite knowledgeable about

18  Georgia election law.  And also about her voting

19  machines.  She -- she runs herself.  She knows the

20  whole thing.

21              And so the pollbooks, they actually

22  showed me the pollbooks.  I believe they actually

1    demonstrated to me the pollbook.  But other than

2    telling me how it worked, demonstrating it, they

3    showed me that -- or she showed me that it was

4    connected to the internet during its operation and

5    that they literally could go order Domino's Pizza

6    and have it delivered while it was connected to the

7    internet.

8              Q    Okay.  Let me shift gears a little

9    bit.

10             Did you know --

11             MR. CLEMENTS:  How much --

12   BY MR. BROWN:

13             Q    Do you know --

14             MR. CLEMENTS:  Bruce, if you're about

15   to shift gears, is there a way that we could maybe

16   take a quick restroom break?

17             MR. BROWN:  Absolutely.  Let's break

18   for ten minutes.  Thank you.  Thank you.

19             VIDEOGRAPHER:  Going off the record.

20   The time is 11:28 a.m.

21             (Recess from 11:28 a.m. to 11:42 a.m.)

22             VIDEOGRAPHER:  Going on the record.

1      marked exhibits.  I clicked on that and see it.

2                   MR. BROWN:  Okay.  Thank you.

3      BY MR. BROWN:

4            Q     Okay.  If you would look at

5      Exhibit 3.

6                   MR. BROWN:  For the record, Exhibit 3

7      is a document that was produced by Doug Logan,

8      which he represented to be a capture of his Signal

9      messages.

10     BY MR. BROWN:

11           Q     And do you see that there,

12     Mr. Lenberg?

13           A     Yes, I do.

14           Q     And you communicated with Mr. Logan

15     via Signal, correct?

16           A     Yes.

17           Q     And at some point -- I believe you

18     testified at some point in mid-January you were

19     deployed to Coffee County, correct?

20           A     Yeah.  I see a date of January 17th,

21     and that would be correct.  That would be the time

22     we went there, Doug and I.  Jim, you know --

1    basically, I went down at Jim's suggestion, and

2    agreement with me to do that.  And then he

3    contacted Doug to see if he could come up and work

4    with me on -- on it.

5            Q    Had you worked with Mr. Logan before?

6            A    I had met Mr. Logan in Washington,

7    D.C.

8            Q    And what was the occasion for meeting

9    him in Washington, D.C.?

10           A    I -- I don't remember a specific

11   reason.  I was with Jim Penrose and -- and was at a

12   meeting of some of these tech people.  I actually

13   only attended one of those meetings.  Doug was at

14   that meeting, and so basically I met Doug there,

15   but I did not work with Doug at that time.  I had

16   not done any work with him until I went to Georgia.

17           Q    Okay.  And so in D.C., you met with

18   Penrose once, I believe, by yourself, just the two

19   of you.  Is that right?

20           A    The first time, yeah.

21           Q    And then another time you had a

22   meeting with tech people.  Is that right?

```
                                                  Page 88

 1              A     Correct.

 2              Q     And you flew to Coffee County, right?

 3              A     Uh-huh.  Flew and drove.

 4              Q     Okay.  Now, looking at Exhibit 3,

 5         which is the Signal exhibit that we pulled up.

 6              A     Uh-huh.

 7              Q     Do you have that in front of you?

 8              A     Uh-huh.

 9              MR. CLEMENTS:  We have the -- there's

10         multiple pages, Bruce.  Are we on page 1?

11              MR. BROWN:  We are.

12              MR. CLEMENTS:  Okay.

13              THE WITNESS:  Yes.  Uh-huh.

14         BY MR. BROWN:

15              Q     And do you see your text message

16         right in the middle of page 1 where you say, "I am

17         now in Coffee County," right?

18              A     Uh-huh.  I do.  Yes, I do.

19              Q     If you go down one line, it's on

20         the -- also on the 17th.  You -- you say, "It will

21         be Monday evening.  She thinks that she can do it

22         then."  Do you see that?
```

1          A      Yes, I do.

2          Q      And the "she" is -- is Misty Hampton?

3          A      I believe so.

4          Q      And what does the "it" refer to in

5      that sentence?

6          A      To be able to do some testing with

7      her machines at -- at -- you know, under her

8      control.  And obviously we were trying not to

9      impact her normal work schedule also.  She had

10     plenty of work to do, so we were trying to be

11     accommodating.

12         Q      Okay.  Let's skip to page 8 of

13     Exhibit 3.  Sadly, these messages are not in -- in

14     date order, they're in order of the thread name.

15     So we're going to have to skip around a little bit.

16         A      Uh-huh.  I see some 1/17/21.  What --

17     what particular message are you -- do you want us

18     to look at?

19         Q      Right in the middle of the page, you

20     will see a January 16, actually, a text -- Signal

21     message from you.  Do you see that?

22         A      Yes, I see that.

1              Q     And you're saying, "I'm planning a

2        trip to met up with Misty in Coffee County.

3        Leaving tomorrow."  Do you see that?

4              A     I do, yeah.

5              Q     And then in the next line, Mr. Logan

6        says, "For your interest, she's in that group

7        you're riding in."

8              A     Uh-huh.

9              Q     Do you know what that refers to?

10             A     There was a Signal group that I -- I

11       don't know everybody that was on it, but at one

12       point in time there was a Signal group that Doug

13       and -- at least Doug and Misty and I were in, and I

14       don't know who else was.

15             Q     Okay.  So you -- so the record

16       reflects that the next day, on the 18th --

17             A     Uh-huh.

18             Q     -- you actually visited the Coffee

19       County Elections, correct?

20             A     I believe that's correct.

21             Q     And what is your understanding of the

22       authorization that you had to do what you were

1     doing in Coffee County?

2          A     Well, my understanding is that

3     Ms. Hampton was the election supervisor for the

4     county and that she had full authority -- as long

5     as she kept everything under her chain of custody,

6     that she had full authority to test her machines or

7     get consultants to come in to help her look at what

8     her machines were doing that she was concerned

9     about.

10               And so as I already mentioned, there

11    had been a couple of major anomalies raised and as

12    a result, she was interested in having expert

13    consultants, like Doug Logan and I, come in and

14    help see if we could figure out possibly what the

15    anomaly might have been about.

16          Q     So were you working for her or was

17    she your client, as it were?

18          A     I don't know how to answer that.

19    It -- it was a volunteer thing.  I did not -- you

20    know, they didn't pay me, no one paid me.  Okay?

21    So to be there, I was volunteering as an expert

22    trying to help, trying to learn at the same time

1      about these systems and trying to understand so we

2      could figure out is there a real problem with the

3      machines or is there not.  That's what we were

4      trying to determine at the time.

5              So it was my understanding that she

6      had full authority to be able to test her machines.

7      She runs logic and accuracy testing just like

8      everybody else does, so running an additional test

9      and allowing us to observe it did not seem to be

10     improper at all.

11             Q    Now, the -- I'm not suggesting that

12     this was necessary, but I just need to ask you.

13     You didn't have like a court order allowing you to

14     do this, did you?

15             A    There was no court order to do it.

16             Q    And were you doing this pursuant to

17     any kind of engagement with a lawyer?

18             A    I did not have any specific

19     engagement with a lawyer.

20             Q    It was your understanding, I take it,

21     that -- that Misty's authorization was sufficient

22     for you to have permission to enter the Coffee

1    County Election's Office and work with her on the

2    election systems, correct?

3            A    That's correct.  In fact, I've done

4    that several places in the country.  It's -- it's

5    not a problem.  All election offices are in -- you

6    know, have a locked door to get into them.  And I

7    have visited across the country with -- with

8    different election officials, never had any concern

9    about that.  As long as they bring you in, right?

10    If they bring you in and they escort you so that

11    they have full chain of custody.  Obviously, you're

12    on video and so on.

13            Q    And did you have an understanding of

14    whether Misty had authority to give you that

15    authority?

16            A    Please reword the question.

17            Q    If you were -- she is employed by the

18    Coffee County Elections and by -- and reports to

19    the Coffee County Board of Elections, right?

20            A    That's right.

21            Q    You knew that, right?

22            A    Yes, that's correct.

1          Q     And do you know if the Coffee County

2     Board of Elections or any of the board members

3     approved her giving you authorization to do your

4     work there?

5          A     I do not know.

6          Q     Did you ask?

7          A     I don't recall asking that question.

8          Q     Did you --

9          A     Again, it was based on the fact that

10    they do logic and accuracy testing.  I've observed

11    it in other locations.  This was really no

12    different than visiting any other election office,

13    as far as I was concerned, to be able to observe

14    the testing.

15         Q     And did you touch the equipment

16    yourself?

17         A     I did not.  Neither did Doug Logan.

18    We specifically when we went in said, "Look, we're

19    here to help.  We don't want to break any chain of

20    custody in any way, so we will be very careful not

21    to, you know, be in any of your space unescorted.

22    And we are not going to operate your equipment."

Page 95

1       So they operated -- Misty operated her equipment,

2       the ICP, the ICC, and so on.  We did not, Doug and

3       I did not.

4               Q     Well, she operated it pursuant to

5       your instructions, correct?

6               A     We helped develop test criteria for

7       her in trying to be able to repeat the -- the issue

8       that she saw on -- during the runoff election.

9               Q     Right, but she --

10              A     So we guided her testing, yes.  We

11      guided her testing.  We gave her recommendations.

12              Q     And she followed them?

13              A     Yes.

14              Q     Was there any instance in which she

15      refused to do something that you asked her to do

16      with respect to the election equipment?

17              A     Not -- that's -- that's a strange

18      question.  It's -- I'm trying to -- I'm not -- can

19      you reword the question?

20              Q     Yeah.

21                    Did there ever -- you're giving her

22      direction or you're talking about different things

1      ahead.

2           Q    All right.  There -- you were

3      there -- we got offtrack because you brought up the

4      idea of the security video and incorrectly stated

5      that it was leaked.

6             But let me get back to where we were;

7      and that is you went into the election office on

8      the 18th.

9           A    Uh-huh.

10          Q    Walk me through what you did with

11     Misty Hampton, not -- what I want to do is -- well,

12     let me back up and make this easier.

13          You were there on the 18th and the

14     19th, correct?

15          A    Correct.

16          Q    And then you, but not Mr. Logan, came

17     back the next week, correct?

18          A    That's correct.

19          Q    You were there from the 25th to the

20     29th, correct?

21          A    I think -- I don't remember the exact

22     hours, but a little bit each day, I believe, I was

1      back there.

2                  Q     Okay.

3                  A     Uh-huh.

4                  Q     Walk me through what you and

5      Mr. Logan and then what you, yourself, did in the

6      election office in Coffee County.

7                  A     Okay.  To the best of my

8      recollection, I will.  I didn't keep, you know,

9      detailed minute-by-minute notes, so it'll be, you

10     know, as good as I can recall.

11                 So on the 18th, again, we went there

12     because of this -- what we considered to be a major

13     anomaly, trying to determine if it was a real issue

14     or not.  The desire was to try to have them run

15     testing on the equipment at our suggestion,

16     recommendation, to see if we could reveal or get

17     anomalies to occur.  And so that's what we did.

18                 So we showed up there.  The -- if I

19     recollect correctly, and I'm pretty sure I do, the

20     ICPs, the slow-speed tabulators, needed to have

21     QR-coded -- well, they can read either type of

22     ballot, but I believe what was done was Misty got

1    on her BMD, an ICX that she had there, and she

2    created a number of ballots.  I believe she created

3    like 20 for Biden and 20 for Trump, if I remember

4    correctly.

5              Meanwhile, she got out, I believe, 40

6    blank ballots that were left over from the 2020

7    election, and we helped fill out those ballots by

8    hand.  And those were the ballots that were used to

9    test the ICC.  Where typically the ICC will be

10   running absentee ballots that are not made on a

11   BMD, they're made -- you know, filled in by hand.

12   And so we purposely created paper ballots by hand.

13   And then they were used for the testing.

14              And so what happened was the ICP

15   testing, I believe, if I recollect, Misty's

16   daughter, and I don't remember her name, but she's

17   an election trained official.  She actually runs

18   one of the precincts there, or did at that time,

19   run one of the precincts during the election, she

20   came in to assist.  And she ran the ICP, while Doug

21   observed that, and Misty Hampton ran the ICC, while

22   I observed that.

1              And we basically ran lots.  When you

2        do testing like this, you've got to get statistics

3        right, so you run batch after batch after batch.

4        And we were running the same ballots over and over

5        and over and over, which by the way is an

6        interesting thing to note is we learned a lot of

7        things.

8                    Coffee County was a great learning

9        experience to begin to understand our election

10       systems and the concerns with it.  And one of them

11       that was-- would surprise most voters in the

12       country is that you can take a ballot, any ballot,

13       and you can run that same ballot through a machine

14       thousands of times and it will not object at all.

15       It does not know that it's not -- it does not know

16       that it's the same ballot being run over and over.

17                    So if you take a high-speed scanner,

18       for example in Maricopa County, and -- and you just

19       run that over and over, or the video that we saw in

20       Fulton, where -- where observers were not there and

21       it was being run, or in Michigan there was

22       testimony of an observer watching a machine

1      operator run the same set of ballots multiple

2      times.  So anyway that was a surprise to us that we

3      could do that, so -- but we did it.  And it worked

4      successfully.  And we discussed statistics.

5                    And then we ended up at the end, Jim

6      wanted a brief summary of our findings.  We didn't

7      write formal reports.  We just wrote up -- because,

8      of course, we were drinking from a firehose at that

9      point and looking at anomalies and hearing about

10     anomalies all over the place.  So we wrote brief

11     reports, which you have copies of, the ICC report

12     and the ICP report.

13                    I apologize if they aren't pretty.

14     They seem to be like stuff missing or whatever, but

15     it's not missing.  That was what I had, that's the

16     actual report.  It wasn't intended to be put out to

17     the press, it was intended for a quick note back to

18     Jim Penrose.

19                    MR. BROWN:  Let's go ahead and mark

20     as Exhibit 5 Tab 9, which is Mr. Lenberg's Coffee

21     County ICC and ICP reports.

22                    THE WITNESS:  Yeah.  And they are

1          Q     And then let's go ahead and look at

2     your report if that's pulled up yet.

3          A     Okay.

4          Q     And do you see it?

5          A     Which one -- yeah, we do.

6                Which one?

7          Q     Let's go to the ICC one first, if we

8     could.

9          A     Okay.

10          Q     Which is the last page.

11          A     Yeah.  The ICC one is the one I

12     wrote.  Doug wrote the other one.

13          Q     Okay.

14          A     I'm a man of few words.  I only have

15     one page.

16          Q     If you look at the results, which I

17     want to go to, you state, "The scanner worked

18     extremely well with no rejects for almost all of

19     the configurations that we -- that were run over a

20     several-hour period.  Midway through the testing,

21     we reconfigured the ICC to have a date of

22     November 5th instead of the current date."

Page 117

1          Do you see that?

2     A    Yes, I do.

3     Q    And why did you change the date?

4     A    The reason I did that is, again, I'm

5   a testing expert and I'm also a vulnerability

6   spotter expert, if you will, assessment, and -- and

7   I'm an expert in that area.  So one of the things

8   that a bad actor would do potentially is use the

9   date as a trigger.  Okay?  So they -- they would

10  potentially us a date.

11          So, for example, they could say --

12  they could put in the firmware, you know, prior to

13  November 3rd, worked perfectly, and then on and

14  after November 3rd, for a period of time do the

15  subversion that's built in.  And, oh by the way, if

16  40 days goes by, or whatever the canvassing period

17  is, go back to working perfectly.

18          So that was the reason it dawned on

19  me, wait a second, it's been working perfectly all

20  this time.  And, again, we were trying to see if we

21  could get it back into the state where it was

22  misbehaving on the -- during the runoff.

1          actual election night, correct?

2                    A     That's correct.

3                    Q     Okay.  And you -- you asked Misty to

4          change the date in both the EMS and the ICC,

5          correct?

6                    A     I believe so.

7                    Q     And did you ask her after your

8          testing was done to reset the clock?

9                    A     I did.  To my recollection, I did.  I

10         asked her to set it back.

11                   Q     Okay.  And do you know if she did one

12         way or the other?

13                         I mean, did you see her reset it?

14                   A     You're asking me detail that I --

15                   Q     You don't remember?

16                   A     I don't remember.

17                   Q     Okay.  Did you think that it was

18         necessary for you to obtain -- or Misty to obtain

19         any additional authorization to change the clock on

20         the EMS server?

21                   A     No.

22                   Q     You say after you mention in your

Page 134

1          accessed, which means off-scale vulnerability.

2          Anybody could download any software, any results,

3          any files, and reconfigure anything they want as

4          far as how the system is going to operate.

5                    Q     Now, the -- you looked at the -- you

6          had looked at the manuals -- or at some point, you

7          looked at the manuals describing the parameters.

8          Is that right?

9                    A     Yes.

10                   Q     Now, my question is:  Why did you

11         have to be inside of Coffee County's election

12         office hands on to the equipment to be able to --

13         to --

14                        MR. CLEMENTS:  Objection.  Lack of

15         foundation.  Hands on, I believe the testimony has

16         been observation of Misty Hampton and the other

17         election worker.

18                        MR. BROWN:  Okay.  A very refined and

19         excellent objection.  Let me reframe my question.

20         BY MR. BROWN:

21                   Q     You described the -- the manuals that

22         Dominion has about the parameters, correct?

1          A      Correct.

2          Q      Given the information that is

3    publicly available, why did you need to be inside

4    of Coffee County directing or working with Misty

5    Hampton physically on the machines to be able to

6    detect this vulnerability?

7          A      I have no idea how I would do that

8    remotely.  I -- you know, have you ever tried to

9    help someone on a computer, you know, over a phone?

10   I've done that many times.  It's very, very

11   difficult to try to help them.

12                You're saying that I could have

13   directed her how to change things over the phone?

14   Is that what you're saying?

15         Q      No.  What I'm saying is that having

16   you physically present is a material enhancement to

17   your ability to evaluate the vulnerability of the

18   system, correct?

19         A      Because I could see what was on the

20   EMS screen.  I could see the actual settings that

21   were on the screen, I could observe them, I could

22   observe the changed behavior or not changed

Page 136

1    behavior.  I can't do that over the phone or a Zoom

2    call.

3              Q    Okay.  We're going to take a break in

4    a few minutes to -- to get a bite, although I know

5    it's earlier there than here, but bear with me.

6              MR. BROWN:  If we could mark as the

7    next exhibit, which is Exhibit 6, Tab 16.

8              (Lenberg Deposition Exhibit Number 6

9              marked for identification.)

10             MR. CLEMENTS:  It's still loading.

11             THE WITNESS:  By the way, you guys

12   might notice I keep looking up, I -- I have

13   graduated lenses.

14             MR. BROWN:  I do, too.

15             THE WITNESS:  And so you know the

16   behavior.  I'm not trying to be, you know, in any

17   way condescending or anything.  It's --

18             MR. BROWN:  I want to -- I want to

19   make sure the court reporter doesn't note that as a

20   yes.

21             THE WITNESS:  That's correct, that is

22   not meant to be a yes.  It's I'm trying to read

Page 139

1      case, it didn't make any difference, it didn't

2      matter.  There were major anomalies that we were

3      looking at trying to understand what those

4      anomalies really were and how they might

5      potentially be used elsewhere as well.  So it

6      doesn't matter if they were used in that particular

7      case or not, we were trying to understand can the

8      machines be inaccurate, if you will.

9            Q      Sure.

10           A      Can they -- can they inaccurately

11     register the votes.  That's what I meant by that,

12     not the overall vote tally in Coffee County or in

13     Georgia.

14           Q      I understand.

15                  And then you say the same thing to

16     Tracie Vickers, who's the county clerk in Coffee

17     County --

18           A      That's correct.

19           Q      -- if you go to the next page.

20                  And then you -- to wrap up the first

21     visit to Coffee County, I may have some follow-up

22     questions to that, but you testified that it --

1      that you detected the anomaly with the red value

2      before --

3              A      Right.

4              Q      -- the end of the day on the 18th.

5      Fair to say?  I'm sorry, the 19th.

6              A      It might have been the 19th, that

7      sounds correct.

8              Q      And then after that Mr. Logan had to

9      leave, correct?

10             A      Yes.  And I left at the same time

11     that he did.

12             Q      And then you came back a week or

13     so --

14             A      That's correct.

15             Q      -- later, right?

16             A      That's correct.

17             Q      What did you do when you came back?

18             A      Do you want a break before we get --

19     that could go for a while if you want.  I don't

20     know that it will.

21             Q      Just tell me generally and then we'll

22     break.

1    understanding.

2            Q    All right.  Well --

3            A    I may be wrong, but that's -- that's

4    my recollection.

5            Q    Okay.  Well, we'll move on.

6                 You mentioned that you -- you

7    obtained a copy of what SullivanStrickler had

8    uploaded from Michael Lynch or Stephanie Lambert.

9    Is that correct?  Did I get that right?

10           A    Correct.  Michael Lynch delivered

11   that to me.  It was apparently shipped to him.

12           Q    Okay.  And how did he get it?

13                He got it from SullivanStrickler or

14   from Penrose?

15           A    I -- I don't know where he got it,

16   other than what I see in the e-mail, that it was

17   being FedExed.

18           Q    And what was your understanding of

19   Lynch's role in all of this?

20                What was he -- he was a PI for

21   Lambert?

22           A    He is basically a PI for Lambert

1          to describe your activities there?

2                 A     I -- I don't know.  I can't answer

3          that.

4                 Q     You don't remember that?

5                 A     I wasn't in that conversation.

6                 Q     I didn't ask that.  I said -- I asked

7          if you advised her to create a code to describe

8          your activities?

9                        MR. CLEMENTS:  You didn't ask that,

10         Bruce.  You're implying it.  So if you want to ask

11         a question, ask it clearly.

12         BY MR. BROWN:

13                Q     Well, all right.  Well, I meant to

14         and must have misspoke, but let me ask it this way:

15         Did you discuss with Misty Hampton the need to use

16         a code to describe your activities there?

17                A     I did not.

18                Q     All right.  Referring to the 25th

19         now.  This is skipping -- skipping up a week.  You

20         can ignore that exhibit for now.

21                A     Okay.

22                Q     Now, was your visit there, was it

1       interrupted by anything?

2              A     At one point there was a -- what I

3       believe someone from the Georgia Investigative

4       Office that showed up that needed to ask Misty some

5       questions, Ms. Hampton some questions.  I was in

6       the office chatting with her and when the gentleman

7       showed up, I politely left so that he could have

8       whatever interaction he needed with her.

9              Q     Did you know -- did you talk with the

10      investigator while he was there?

11             A     I did not.  I didn't have any

12      discussion with the investigator.  I just politely

13      said, "Here, you know, you need to talk with her,

14      I'll go ahead and leave."

15             Q     Did he ask -- did he say "Who are

16      you?  What are you doing here"?

17             A     I did not.

18             Q     Did he ask you that?

19             A     Not that I recollect.

20             Q     Did he -- okay.

21                   And your testimony -- your testimony

22      is that -- that you couldn't do what you were there

1     privileges.  And she had stated that it didn't

2     matter whether it was one marked for adjudication

3     or not, and I just wanted to verify that was

4     actually the case.  So that's why I was asking her

5     the question, it was based on the video that --

6     that they had released from Coffee County.

7            Q     And do you know who paid Misty for

8     the work that she did in Michigan?

9            A     Stephanie Lambert did.

10           Q     Let's go down to page 9.

11                 MR. CLEMENTS:  Which page, Bruce?

12     BY MR. BROWN:

13           Q     I think it's page 9 of that exhibit.

14     And it's the -- just a point of reference, the

15     first message that I have on this page is 1/18 at

16     9:47, to make sure we're on the same page.

17           A     Yes, I see that.

18           Q     Okay.  If you -- if you scroll down,

19     you will see a message from you on April 20, 2021.

20     "Did you get Misty's EMS running in a VM?  If so,

21     can I download it as soon as possible?"

22                 Do you see that?

1          A     Where was this?

2          Q     This is on April 20, 2021, at 2:33.

3          A     Yes, I see that.

4          Q     And -- and who is this directed to,

5     if you recall?

6          A     It would have had to have been Doug

7     Logan.  Doug's the only guy that I know of that

8     would be able to do that.  And he would have had

9     access to that through Sullivan and Strickler --

10    or -- yeah.

11         Q     He's referring to a virtual machine.

12    Is that right?

13         A     That's correct.

14         Q     And were you able to download it?

15         A     I did not download it.

16         Q     If you -- if you keep going there, it

17    says --

18         A     That I recollect.  I -- I don't

19    recollect downloading it, let's put it that way.

20         Q     No.  Fair enough.

21               If you go down a couple of hours to

22    the same day at 4:37, Doug says, "Talk to Jim to

1    November 3rd, that second week that you were there,

2    does that refresh your recollect?

3                    MR. CLEMENTS:  We would have to see

4    it, Bruce.  You can't refresh it through an oral

5    representation, but if you've got something for him

6    to look at, let's go ahead and do it.

7    BY MR. BROWN:

8         Q    Do you remember doing that or having

9    her do that?

10        A    I don't remember.

11        Q    Would there be any -- would there be

12   any reason to change the clock again if you were

13   not continuing to run the ballots?

14        A    If -- if we were going to test, we

15   would want to change the time, so it's possible.

16        Q    As a security professional, do you

17   think it's problematic for a third party, even

18   accessing through a local official, to be changing

19   a clock on voting system equipment?

20        A    Not if it's changed back to the

21   appropriate time.

22        Q    But you don't know if this one was or

Page 180

1      not, right?

2              A      I don't know for sure.

3              Q      Why did you bring a light -- a ring

4      light into the Coffee County election's office?

5                      MR. CLEMENTS:  Objection.

6      Foundation.

7      BY MR. BROWN:

8              Q      Or did you bring one in there?

9              A      I bring when I go various places lots

10     of stuff with me that I may or may not use.  I very

11     well could have brought a ring light in there.

12     Again, I was trying to learn, so the possibility

13     that I might want lighting to take, you know, a

14     video of the pollbook or something like that or a

15     video of something so that I could see how it

16     actually, you know -- so I could remember what

17     Misty said about how the system functioned.  I

18     could imagine wanting to do that.  I can't

19     recollect whether we did that or not, to be honest,

20     I -- I don't know.

21                      MR. BROWN:  Let me mark as the next

22     exhibit Tab 17.

Page 184

```
 1              A     I might have.  I -- I don't remember,
 2        but I didn't find any during my search for videos.
 3              Q     And then if you scroll down, it looks
 4        like Misty Hampton has the same box after you left
 5        on the 29th, right?
 6              A     I don't -- I can't tell from the --
 7        from the --
 8              Q     You don't -- you don't recall taking
 9        any videos there?
10              A     I really don't recall either way.
11              Q     Do you remember taking any
12        photographs when you were -- when you were there?
13              A     I don't -- I don't recall.  I
14        haven't -- I did a search for video and photographs
15        and I can't find any in my search, so I -- I can't
16        say definitely either way.
17              Q     Okay.  I want to switch gears to the
18        zip file that you produced overnight that we do not
19        have the password for.  I believe the -- the files
20        that you sent overnight contained the CompactFlash
21        cards.  Is that right?
22              A     That's my belief, the zip that I
```

Page 185

1     still don't have a password, but yes, that's my

2     understanding is that it had the SLOG -- the text

3     files on it.  And I learned later probably the

4     election files as well as the result files in

5     encrypted format.

6              Q     And that would have included ballot

7     images?

8              A     It would have included what?

9              Q     Ballot images.

10             A     It would have included ballot images,

11    yes.

12             Q     And it would include the sequence of

13    the ballots?

14             A     The CompactFlash cards would have

15    contained that.

16             Q     And for what elections -- election or

17    elections would that information be about?

18             A     To be honest, at this point, since I

19    haven't opened that guide and studied it, I don't

20    know if that was the 2020 November 3rd or if that

21    was from the machine recount.  I'm not sure which

22    one.

1          Q     Okay.  But in any event, you're not

2     sure -- so it would be one election, but you're not

3     sure which election it was.  Is that fair --

4          A     That's correct.

5          Q     -- to say?

6          A     That's correct, I'm not sure which

7     one it was.

8          Q     And the -- but the CompactFlash would

9     also have information relating to the configuration

10    of the ICP, correct?

11         A     Yes.

12         Q     And the log files, that kind of

13    thing?

14         A     SLOG files, yes.  The system log

15    files.

16         Q     And did you figure out how to access

17    the information on those CompactFlash drives?

18         A     You know, I don't recollect if I did

19    or not.  There was so much going on at the time and

20    I was up in Michigan pretty quick and moved on from

21    Georgia, so to what extent I analyzed that from

22    nothing to whatever, I don't know.  I -- I don't

Page 188

```
 1        recollect what it was.
 2                Q    And how did you get this information
 3        from Misty Hampton?
 4                A    I believe it was a memory stick.
 5                Q    And you asked for it and she gave it
 6        to you, right?
 7                A    I believe so.
 8                Q    It wasn't in response to an Open
 9        Records Act request, right?
10                A    I don't believe so.
11                Q    And is it your understanding that she
12        had the authorization to give you this kind of
13        information?
14                A    Yes, I believe so.  That was my
15        understanding.
16                Q    And I may have asked you this but --
17        or you may have testified, is that this -- is it
18        the same information that SullivanStrickler would
19        have had on their ShareFile site or different?
20                A    I would expect it to be the same.
21                Q    And you got it from Misty because at
22        that time you did not have access to the
```

1          A     The primary thing is I had learned

2     about the system log files and the fact that it

3     recorded how the machines behaved, the tabulators

4     behaved per ballot, as far as whether or not they

5     reversed them.  And that is what I was particularly

6     interested in, as we've already -- I've already

7     testified about, the testing of the machines and

8     reversals.  So that was the primary reason for

9     getting it.  At that point I didn't even know

10    that -- necessarily if the election files were on

11    there.

12          Q     And this would have been toward the

13    conclusion of your visit in Coffee County or do

14    you -- the second meeting?

15          A     That's correct, the date on that file

16    is the 28th, which I believe was the last day,

17    uh-huh.

18          Q     Before I forget, has the Secretary of

19    State of Georgia ever contacted you to ask you any

20    questions about your work in Coffee County?

21          A     No.

22          Q     Has the --

```
 1          A     Not that I'm aware of.

 2          Q     Well, you probably would know if they

 3     tried to, I guess, right, or maybe not?

 4          A     I -- if they had called and left a

 5     message, we screen our calls like everybody else

 6     does because we get so many crank calls, so had

 7     they called and left a message, I might have

 8     responded to that.  But I did not get a message

 9     like that, nor did I get an e-mail or any other

10     physical contact that I'm aware of.

11          Q     I asked you about the Secretary of

12     State.  Let me just go through the other

13     organizations.

14                Has the State Election Board

15     contacted you about your work in Coffee County?

16          A     No.

17          Q     Has the GBI contacted you about your

18     work in Coffee County?

19          A     No.

20          Q     Has the Fulton County Attorney

21     contacted you about your work in Coffee County?

22          A     No.
```

1    I can't tell from here what it -- what it was.  I

2    can't tell.

3         Q    And did you -- you didn't introduce

4    any software or data into the election equipment,

5    did you?

6         A    No, I did not.

7         Q    And apart from the thumb drive that

8    you got from Misty, you didn't take any data from

9    there physically, did you?

10         A    Not that I recollect.

11         Q    And then the first picture is

12    January 18, 4:20 in the afternoon.  Do you see

13    that?

14         A    Okay.

15         Q    And then the next photo has you

16    leaving the same day at 8:00?

17         A    Okay.

18         Q    And who is that in front of you?

19         A    I -- I believe it's Misty.

20         Q    And that's Mr. Logan with you?

21         A    I suspect.  It looks like it probably

22    is.

Page 225

1          A     I did.

2          Q     And what did you do there?

3          A     I went in and met with the election

4    supervisor.

5          Q     And did you examine the equipment?

6          A     I did not.

7          Q     Did you obtain copies of any data or

8    software or anything like that?

9          A     I did not.  I did put in that open

10   records requests as you've already received.

11         Q     Okay.  I can't remember.  Did you get

12   a response from them?  I just can't remember.

13         A     I don't believe I ever got a

14   response.

15         Q     Do you know what we refer to -- or

16   what they refer to as the GEMS room in the Coffee

17   County election's office?

18         A     As the what now?

19         Q     GEMS, G-E-M-S, room.

20         A     I do not know what that is.

21         Q     Were you in a room that contains the

22   ICC?

1          A      I was.

2          Q      And was somebody there with you all

3     the time or --

4          A      Yeah.  Misty Hampton was always

5     there.  We never were in -- anywhere in her office

6     area without supervision of one of the election's

7     personnel.

8          Q      I asked you about the motherboard on

9     the Dell computer and whether it would have had a

10    bluetooth or wifi chips.  And let me just follow up

11    with that line of inquiry.

12              Did you do anything to -- other than

13    that observation, do you know of any other way that

14    that machine was connected or was capable of being

15    connected to the internet?

16         A      There was one other potentially, and

17    that is through -- there was a bridge to the EMS,

18    and I have no idea if that EMS was in any way

19    connected to any other network.

20         Q      Do you know whether Clay Parikh ever

21    got a copy of the Coffee EMS files?

22         A      Who is that now?

Page 239

1      it's January 19th.

2                      MR. CLEMENTS:  Okay.  And you're

3      identifying messages between a Greg Freemyer and

4      Doug Logan?

5                      MS. MIDDLETON:  Yes, sir.  And so

6      I -- yes, I'm just going to ask --

7                      THE WITNESS:  And what time?  Which

8      one?

9      BY MS. MIDDLETON:

10         Q      There are two, sir.  There's one that

11     starts, "I am on-site at Coffee.  I think we

12     figured out how to access the CompactFlash of the

13     ICP."  And then a second one is, "Any

14     recommendations on how to best image that following

15     all appropriate protocols, et cetera."

16         A      I don't see it.

17         Q      Am I on the wrong page?

18                     MR. CLEMENTS:  Well, I think you're

19     asking him to provide an answer on someone's else

20     statement.  So at --

21                     MS. MIDDLETON:  I'm laying it for

22     context, sir.  I'm just trying to ask him if there

Page 240

1    was a separate reason he had testified he was

2    trying to get Arizona data to analyze.  And my

3    question is whether or not you were in Georgia

4    trying to get -- trying to image any of the

5    election equipment.

6              THE WITNESS:  I was not.

7    BY MS. MIDDLETON:

8         Q    Were you able --

9         A    I was not.  Strickland and Sullivan

10   apparently had already gotten the image, I was not.

11        Q    Did you image any election's

12   equipment in Coffee County?

13        A    Did I do what?

14        Q    Did you image any election's --

15        A    No.

16        Q    -- equipment in Coffee County, sir?

17        A    No, I did not.

18        Q    Why did Doug Logan accompany you to

19   Coffee County?

20              MR. CLEMENTS:  Don't speculate.

21              THE WITNESS:  It was to help me do

22   testing.  That's not speculating.  I mean, it was

1    to help me do the test that we did on the ICP and

2    the ICC.

3    BY MS. MIDDLETON:

4         Q    What did you need help with that, for

5    example, Ms. Hamilton or her daughter could not

6    help you with?

7         A    We were observing two different

8    things.  We were not doing it, we were observing.

9         Q    Uh-huh.

10        A    And so Doug observed the ICP and I

11   observed the ICC.

12        Q    Okay.  All right.

13             So turning now to what you did do in

14   Coffee County.  In Exhibit 9, there were -- we had

15   looked at some pictures of you walking into the

16   election's office.  And in those pictures, we had

17   talk about -- or you had talked with Ms. Brown

18   about a ring light, but I noticed that you are also

19   holding a backpack.  And you testified that you

20   typically bring a lot of stuff that you may or may

21   not use.  And I'm curious what kind of stuff that

22   you typically bring with you when you visit an

1    you're doing, for example, satellite testing, it

2    would be very, very formal with, you know, all

3    kinds of detailed records and -- and, you know,

4    very detailed stuff going on.  We didn't have the

5    resources or staff to do that, and that's what I

6    was complaining about there --

7         Q    I got it.

8         A    -- is that we really need to get more

9    help.

10        Q    I got it.

11             When you were in the Coffee County

12   election's office, were you in the same room as the

13   EMS server?  Were you the little room that's -- I

14   think that was the one where the investigator came

15   in to.

16        A    Not correct.  I was in the same room

17   as the ICC and the EMS with Misty Hampton.

18   Ms. Hampton, the election supervisor, invited me in

19   there to observe her running.  That's where her ICC

20   was, was in that room.  And I believe that's -- to

21   my knowledge, that's where it normally is.  And so

22   yes, I was invited in there to watch her run it.

Page 253

1              Her office is right next to that, and
2      that was the room I was sitting and talking with
3      her in the office when that investigator came in --
4              Q     Okay.
5              A     -- it was in her office, yeah.
6              Q     Thank you for that clarification.
7                    Were you in the same room?
8                    We just talked about the EMS server
9      and the ICC.  Were you ever in the same room as the
10     ICX -- the ICXs or the ICCs?
11             A     I was never, to my knowledge, in the
12     room where they stored their ICPs.  And I forget
13     how many of them they had, but they had a storage
14     room in there somewhere with the equipment stored
15     in it.  It is, by the way, not that room in your
16     video and so -- or the video that was put out,
17     that's not where the ICPs are stored, they're
18     stored somewhere else.  When I was there, that
19     equipment was not in that general admin room that's
20     out front when you first come through when you come
21     in.
22             Q     What about the ICXs, the BMD

1       Is that correct, sir?

2               A       ICC.

3               Q       Okay.

4               A       This is the high-speed scanner

5       ImageCast Central.

6               Q       So on the -- were you -- were you --

7       did you alter any programs or settings when you

8       were doing these -- changing these parameters?

9                       MR. CLEMENTS:  Objection.  Once again

10      to form.  You -- he's already established that he

11      did not touch anything to alter.  Misty was in

12      physical possession of the machine.  And the

13      continuing asking the question basically implicates

14      that he's the one touching it is improper.

15      BY MS. MIDDLETON:

16              Q       Did you direct Misty Hampton to alter

17      any programs on the ICC, sir?

18              A       Not to alter any program.

19              Q       What did you direct her to alter,

20      sir?

21              A       As already reported, I recommended to

22      her that we change -- that she change the date so

1     that in case that was causing the trigger, that was

2     a trigger requirement, that it would meet that

3     requirement.  So she did change the date on it.  So

4     that was one thing that was changed.

5          Q     Did you change anything else, sir?

6          A     You know, I believe there was one

7     more that --

8               MR. CLEMENTS:  Objection once again

9     to directing whether he's changing things.  You

10    need to be more precise on the record, please.

11    BY MS. MIDDLETON:

12         Q     Did you direct Misty Hampton to

13    change anything else, sir?

14         A     Yes, there was one other item that

15    comes to my mind and that was something else that

16    stuck out as a red flag as I was looking at the

17    documentation, and that was that there was a

18    setting that was a bolded to not change it in the

19    documentation.  And since I think outside of the

20    box, I thought we probably need to change that

21    because they made a big deal about not changing it.

22               And what it had to do with was

1   whether -- it was a crazy setting about how many

2   ballots you could run in a batch.  Okay.  And

3   typically when you put the ballots in, the default

4   is that it -- whatever stack you put in, it runs

5   and stops.  And the next set you put in will be a

6   new batch.  This particular setting, you could

7   change it so that it would add them to the same

8   batch until -- until you told it not to.  And the

9   documentation said, you know, "Only do this if you

10  need to exceed the input bin of the ICC."  And the

11  input bin was, like, 500 ballots, or something, it

12  was very large, and it might have even been higher

13  than that.  It was one of those things that

14  probably would never expect nobody to use, but they

15  bolded it and said, "Don't change it unless you

16  absolutely need to run more than, you know, the

17  capacity of the scanner."

18              So we went ahead, Misty changed it.

19  And the reason I did that was that it enabled a

20  batch to be a larger number.  Remember I talked

21  earlier about a trigger.  And if it's triggering on

22  a certain number in a batch, you want a higher

1    number to get past the trigger level.  So I asked

2    her to change that setting so that it would be able

3    to create larger batches.  So other than that, I

4    don't believe I changed any others.

5           Q      And maybe this is asked, and excuse

6    my ignorance, sir, if I'm asking the same thing.

7    But did you change -- or did you direct Ms. Hampton

8    to change any settings on the ICC?

9                  My previous question is whether you

10   changed any programs, so if we could talk about

11   that.

12          A      Any settings on what?

13          Q      On the ICC, sir.  So I'm just trying

14   to get at -- I had asked you before if you had

15   changed -- if you had directed Ms. Hampton to

16   change any programs, so I'm trying to drill down

17   and see if you changed any setting -- if you

18   directed her to change any settings, sir?

19          A      The ICP has very limited ability to

20   change items on ICP.  It's all pretty much locked

21   in in the configuration files that are on the

22   CompactFlash cards in those election definition

1     but yeah.

2              Q     Did you make open records request

3     from other counties?

4              A     I did.  I did for Pierce County.

5     And -- and you have a record of that.

6              Q     Uh-huh.

7              A     And I actually did also for Liberty

8     County, for all the material I received from

9     Liberty County, I did a records request.  I do not

10    have a copy of that, but that was gotten through a

11    records requests and produced by an election

12    supervisor there, but I could not find the -- a

13    copy of that records request.

14             Q     Correct me if I'm wrong, sir, but I

15    understood your earlier testimony to be that you

16    received Coffee County data from Mr. Lynch and then

17    you returned it after you made a copy of it.  Is

18    that correct, sir?

19             A     I was directed to make a copy for an

20    unknown purpose and give it to them.  And then at

21    some point after that, it was kept in a safe.

22    Mr. Lynch requested it back and I gave it back do

Page 295

1          him out of that safe.

2                    Q      What software was that, sir?

3                    A      It was -- I truly -- it was whatever

4          was on that drive that was sent from Strickland and

5          Sullivan -- Sullivan and Strickler, I get their

6          name backwards.

7                    Q      SullivanStrickler, sir.

8                    A      -- that they sent from Georgia to

9          Michigan to Michael Lynch.  So I --

10                   Q      Did you --

11                   A      I can't tell you exactly what was on

12         it other than it apparently was related to Coffee

13         County.

14                   Q      And did you share it with anyone

15         other than Mr. Lynch?

16                   A      No, I did not.

17                   Q      To your knowledge, did anyone receive

18         this data from Mr. Lynch?

19                   A      No.  I don't know where that copy

20         went.

21                   Q      Do you know -- are you familiar with

22         Lindell symposium when the Arizona and Antrim data

Page 332

1                CERTIFICATE OF NOTARY PUBLIC

2        I, FELICIA A. NEWLAND, CSR, the officer before whom

3        the foregoing videotaped videoconference deposition

4        was taken, do hereby certify that the witness whose

5        testimony appears in the foregoing deposition was

6        duly sworn by me; that the testimony of said witness

7        was taken by me in stenotype and thereafter reduced

8        to typewriting under my direction; that said

9        deposition is a true record of the testimony given

10       by said witness; that I am neither counsel for,

11       related to, nor employed by any of the parties to

12       the action in which this deposition was taken; and,

13       further, that I am not a relative or employee of any

14       counsel or attorney employed by the parties hereto,

15       nor financially or otherwise interested in the

16       outcome of this action.

17

18

19       _____

20              FELICIA A. NEWLAND, CSR

                Notary Public

21

         My commission expires:

22       September 15, 2024