```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF GEORGIA
 3                      ATLANTA DIVISION
 4   _____
 5   DONNA CURLING, ET AL.,              )
 6        Plaintiffs,                    )CIVIL ACTION FILE
 7   vs.                                 )NO. 1:17-CV-2989-AT
 8   BRAD RAFFENSPERGER, ET AL.,         )
 9        Defendants.                    )
10   _____)
11
12              VIDEOTAPED DEPOSITION OF
13           MICHAEL IAN SHAMOS, PH.D., J.D.
14                   July  19, 2019
15                      9:16 a.m.
16
17
18        Ross Alloy Belinfante Littlefield, LLC
19                 500 14th Street N.W.
20                   Atlanta, Georgia
21
22
23
24   Robin K. Ferrill, CCR-B-1936, RPR
25   PAGES 1 - 217
```

Page 1

```
 1                        INDEX
 2                  VIDEOTAPED DEPOSITION OF
 3              MICHAEL IAN SHAMOS, PH.D., J.D.
 4                      July  19, 2019
 5   EXAMINATION BY                                      PAGE
 6   Mr. Cross                                        9, 201
 7   Mr. Powers                                          151
 8   Mr. Miller                                     191, 213
 9                   DESCRIPTION OF EXHIBITS
10   PLAINTIFFS' EXHIBIT   IDENTIFICATION                PAGE
11   Exhibit 73  Declaration of Michael Shamos,            6
12               Ph.D., J.D.
13   Exhibit 74  PowerPoint entitled, Cybersecurity      121
14               Considerations for Voting Systems,
15               Wenke Lee, Ph.D.
16   Exhibit 75  Cloudburst Security document           134
17               entitled, Office of the Georgia
18               Secretary of State Cyber Risk
19               Assessment, October 2017, Bates
20               stamped Payton 1  - 69
21   Exhibit 76  Fortalice document entitled, State     143
22               of Georgia, Office of the
23               Secretary of State, November 2018,
24               Bates stamped Payton 70 - 119
25
```

INDEX CONTINUED

DESCRIPTION OF EXHIBITS

| PLAINTIFFS' EXHIBIT | IDENTIFICATION | PAGE |
|---|---|---|
| Exhibit 77 | Document entitled, Diebold in the News - A Partial List of Documented Failures, Pages 1 - 28 | 170 |

(Original exhibits attached to the Original transcript.)

```
 1                  VIDEOTAPED DEPOSITION OF
 2             MICHAEL IAN SHAMOS, PH.D., J.D.
 3                       July 19, 2019
 4            (Plaintiffs' Exhibit 73, Declaration of
 5       Michael Shamos, Ph.D., J.D., marked for
 6       identification.)
 7            THE VIDEOGRAPHER:  We are on the record and
 8       the time is 9:16 a.m.  Today is July 19th, 2019.
 9       And this is the video deposition for Dr. Michael
10       Shamos.
11            Will counsel please identify themselves and
12       who they represent.
13            MR. CROSS:  David Cross of Morrison &
14       Foerster on behalf of the Curling plaintiffs.
15       And with me is my colleague, Catherine Chapple.
16            JOHN POWERS:  John Powers, the Lawyers
17       Committee For Civil Rights Under Law
18       representing the Coalition plaintiffs.
19            MR. SPARKS:  Adam Sparks and Halsey Knapp,
20       for Krevolin & Horst, also representing the
21       Curling plaintiffs.
22            MS. RINGER:  Cheryl Ringer representing
23       Fulton County defendants.
24            MR. RUSSO:  Vincent Russo and Carey Miller
25       with the Robbins firm representing the State
```

```
 1         defendants.
 2                THE VIDEOGRAPHER:  Thank you, Counsel.
 3                Will the court reporter please swear in the
 4         witness.
 5    MICHAEL IAN SHAMOS, Ph.D., J.D.,
 6                called as a witness, having been duly sworn
 7    by a Notary Public, was examined and testified as
 8    follows:
 9                MR. CROSS:  We probably should just note
10         for the record that Ms. Marks is here, too; I
11         don't think there is an appearance here.  And
12         Dr. Halderman, as well.
13                MR. RUSSO:  And, David, before we start, we
14         want to make sure our objection to the
15         deposition notice is on the record.
16                The deposition was noticed as a de bene
17         esse deposition, but it indicates that questions
18         would be regarding all the claims and defenses
19         in the case.  So to the extent that the
20         deposition is outside the scope of Dr. Shamos'
21         declaration, which is his direct testimony for
22         purposes of this, we do object to that.
23                MR. CROSS:  So you are saying I couldn't
24         cross-examine him live at a hearing on any issue
25         relevant to the claims or defenses in the case?
```

```
 1   particular ballot won't indicate to that voter
 2   whether the actual tabulation of that ballot is
 3   accurate, right?
 4        A.   I think the voter can be assured that if
 5   their -- if nobody -- after he cast the ballot has
 6   tampered with the ballot, if there is a hand recount,
 7   it will be counted accurately.
 8        Q.   That assumes that the election results
 9   require a hand recount, which doesn't often happen,
10   right?
11        A.   I agree.  I said, "if there is a hand
12   recount."
13        Q.   All right.  So we understand with a
14   ballot-marking device that produces a paper ballot
15   that includes a non-human-readable portion that's
16   going to be used to tabulate that ballot --
17        A.   Yes.
18        Q.   -- we agreed that apart from a hand
19   recount, no matter how carefully that voter reviews
20   that ballot, they have no way of knowing whether that
21   tabulation is going to be accurate.
22        A.   No, that's not true.  I'll say, first, I'm
23   not a fan of bar codes; however, as I say, you can
24   always test the machine in realtime to see if it is
25   producing an accurate bar code.
```

Page 56

```
 1       Q.   Well, the voter can't?
 2       A.   The voter can't, no.
 3       Q.   So the voter cannot have the confidence
 4   I've just --
 5       A.   The voter can have the confidence if there
 6   are people at the election center -- at the polling
 7   place who are doing the testing and certify that the
 8   machine is working.
 9       Q.   Which, to your scenario before, assumes
10   there's not an insider that's manipulated that in
11   some way, right?
12       A.   Yes.  All voting systems have risks.
13       Q.   But you agree -- you said you are not a fan
14   of the bar codes.  You agree that if a BMD is going
15   to be used, the more reliable approach is one that is
16   readable by the human voter, and that what's going to
17   get tallied is what they can actually read
18   themselves; is that fair?
19            MR. RUSSO:  Objection.  This is outside the
20       scope of his declaration.
21       A.   Yes, I agree.
22       Q.   (By Mr. Cross) Thank you.
23            On paragraph 52, again, the last sentence
24   reads, "A BMD never makes a mark that would not
25   constitute a vote."  Do you see that?
```

1  something different than air grabbed?
2       A.   The terms are not related.  I mean, an
3  Internet-facing system is not air gapped.  There are
4  air-gapped systems that have nothing to do with the
5  Internet either way.  Yes.
6       Q.   Thank you.  Let me try it this way:  Is an
7  air-gapped system something more than a system that's
8  not interfacing -- Internet facing?
9       A.   Yes, so I can have a system that -- let's
10 just forget about the Internet completely.  I have
11 different components of a system, I have some in this
12 room and I have some in that room.  If it is not
13 possible for one computer to communicate with another
14 computer except by the physical moving of media from
15 one to other, they are air gapped.  It doesn't
16 directly relate to the Internet.  But, of course, if
17 I can get to your system through the Internet, it's
18 not air gapped.
19      Q.   So you say except for removal of media --
20 so you would consider a system where removal of media
21 is sometimes connected to an Internet-facing
22 computer, and it's also connected to that standalone
23 system, would you still consider that system air
24 gapped?
25      A.   No.  The systems is in use for election

Page 70

```
 1    management should never, at any point in their life,
 2    have ever been -- ever be connected to the Internet.
 3         Q.   Including by removable of media that at
 4    some point was connected to an Internet-facing
 5    computer, for example?
 6         A.   That's right.
 7         Q.   Why is that?
 8         A.   Because of the possibility of infections
 9    from malware.
10         Q.   What if you had a server that was connected
11    to phone lines, say, by a modem, is that air gapped?
12         A.   So air gapped refers to a gap between two
13    things.  So if it's connectable by a phone line to
14    something else, it's not air gapped from that thing.
15    It's copper-connected.
16         Q.   Would it be Internet facing?
17         A.   Not necessarily.
18         Q.   It would depend on the connection.  A
19    connection with the phone lines via modem and a
20    server could be Internet facing and it might not be.
21         A.   Usually aren't.  I mean, in the United
22    States, there are jurisdictions that transmit vote
23    totals via modem to a central count station.  It's
24    not over the Internet; it's over a direct phone line
25    connection.
```

1      MR. RUSSO:  Objection --
2      A.   No, I haven't, and I doubt that anybody
3  could.  So we are talking about a complete history of
4  a voting machine from its birth.  I don't think
5  anybody has an audit trail of that.
6      Q.   (By Mr. Cross) And you haven't undertaken
7  that analysis to determine whether it's true, even
8  today, for those?
9      A.   No.
10     Q.   And that's not something you discussed with
11 anyone at the State for your opinions, right?
12          MR. RUSSO:  Objection.
13     A.   No.
14     Q.   (By Mr. Cross) All right.  Flip to
15 paragraph 95.  Do you see the sentence beginning
16 about the third line from the bottom of paragraph, it
17 reads, "And time is a luxury the hacker does not have
18 because he cannot be alone with a voting machine, as
19 Dr. Halderman is in his laboratory, for any length of
20 time."  Do you see that?
21     A.   Yes.
22     Q.   But a hacker could cause problems with a
23 DRE being alone with it for a matter of minutes, half
24 an hour, maybe less, right?
25     A.   Yes, one DRE machine.

Page 97

```
 1        Q.    And they could do the same with a single
 2   memory card, right, access to a single memory card --
 3        A.    Yes.
 4        Q.    -- in a half an hour?
 5        A.    Yes, they'd have to have access to the
 6   machine.
 7        Q.    The memory card?
 8        A.    Oh, well, but the memory card ultimately
 9   then has to be inserted in a machine.
10        Q.    But they could manipulate the memory card
11   in a matter of minutes if they had access to it,
12   right?
13        A.    Yes.
14        Q.    All right.  Flip back to paragraph 72.  At
15   the end of this paragraph you write, "Further, once
16   installed, the malware is detectable because it
17   differs from the legitimate software."
18        A.    Yes.
19        Q.    "Simply by dumping the contents of a
20   machine's memory, one could detect the difference
21   during an audit."  Do you see that?
22        A.    Yes.
23        Q.    Where in your declaration do you describe
24   or discuss any analysis that you have performed on
25   memory cards that have vote-stealing malware to
```

Page 98

1    of his opinion.
2         MR. CROSS:  Are you seriously saying he's
3    not offering an opinion on parallel testing in
4    this case?
5         MR. RUSSO:  He didn't review Georgia's
6    parallel testing procedures.
7         MR. CROSS:  Okay.  So will you stipulate
8    that he's not offering any opinion that the
9    parallel testing in this case offers any
10   reliability or is relevant in any way?
11        MR. RUSSO:  No.
12        MR. CROSS:  Great.  Than we are going to
13   continue with our questioning.
14        THE WITNESS:  I don't mind.  I'm given to
15   understand that the process you outlined is
16   what -- is the process followed in Georgia.  I
17   castigate Georgia for not following my
18   recommendations on how parallel testing should
19   be done.
20        Q.   (By Mr. Cross) And you would agree that
21   nothing can be reliably concluded about the
22   reliability of DREs across the state, the 27,000 DREs
23   in the state-wide election, or even across county or
24   municipal elections, based on parallel testing of a
25   single DRE.  We agree on that, right?

Page 106

1    A.    The only thing a parallel testing on a
2  single DRE will reveal is whether all of the voting
3  machines in the state have been infected, because
4  then the machine being tested would also have been
5  infected.
6    Q.    Right.  The only way you could have any
7  confidence that the machine you have indicates
8  anything about the reliability of the 27,000, is if
9  all 27,000 are affected?
10    A.    Yes, I don't have confidence in a procedure
11  which selects one machine out of 27,000.
12    Q.    Let's say that only a hundred out of 27,000
13  DREs were infected by malware.  Okay?  And you are
14  using the system, as we understand it in Georgia, of
15  one machine, that would mean that you would have a
16  statistical probability of finding one of those
17  hundred only one out of 270 times, does that sound
18  about right?
19         MR. RUSSO:  Objection.
20    A.    That sounds quite right.
21    Q.    (By Mr. Cross) Which would mean that if you
22  did 270 of these tests, you would find an infected
23  machine statistically only once?
24    A.    On average, yes.  I'm not defending the
25  process.

Page 107

```
 1        Q.   Do you agree with me, then, that the DRE
 2   voting system currently being used in Georgia is also
 3   not completely secure?
 4        A.   Of course.  Since none are, it isn't.
 5        Q.   Now, let's consider a situation where --
 6   and this is a hypothetical situation -- where some
 7   vulnerabilities are found in an electronic voting
 8   system.  What vulnerabilities theoretically could be
 9   found in an electronic voting system?
10        A.   Well, I think the experts in this case and
11   the outside security companies that were hired did a
12   pretty good job of cataloging what the
13   vulnerabilities are.
14        Q.   Are you aware of any?
15        A.   I'm aware of all of those.
16        Q.   And what are they?
17        A.   There's a mountain of them.  Okay.  Because
18   the system consists of a huge number of pieces.  The
19   pieces are geographically distributed.  Things have
20   to be moved from one place to another by who knows
21   what mechanism.  Computers are involved that can be
22   penetrated.  Hardware is involved that can be
23   penetrated.  Memory cards can be penetrated.  You
24   draw a diagram surrounding every block in the
25   diagram, there's going to be some kind of threat that
```

Page 165

1   could be mounted against that block in the diagram.
2       Q.   Is there any point, in your professional
3   estimation, that an electronic voting system could be
4   so vulnerable with respect to security that you would
5   not recommend using them in elections?
6       A.   Many times.  I think I recommended not
7   certifying about half of the systems I examine.
8       Q.   And what were those systems?
9       A.   Well, I don't remember them now.  I haven't
10  done a certification exam since 20 years, but there
11  are plenty.
12      Q.   If there was a high degree of likelihood
13  that advanced persistent threats could infiltrate an
14  election system, would you recommend that election
15  system be replaced?
16      A.   Okay.  Let's distinguish between election
17  system and tabulation system.  Okay.  So you phrased
18  it as election system.  If election system includes
19  Internet-facing components, then advanced persistent
20  threats are a significant possibility, not if it's
21  not Internet facing.  And so the tabulation systems
22  are not Internet facing, shouldn't be, and so I
23  wouldn't consider APT as a serious threat to those.
24  But, for example, the registration system that's
25  Internet facing, who knows what's going on there.

Page 166

```
 1                  C E R T I F I C A T E
 2    STATE OF GEORGIA   )
 3                       ) ss.:
 4    FULTON COUNTY      )
 5
 6        I,  Robin Ferrill, Certified Court Reporter
 7    within the State of Georgia, do hereby certify:
 8             That MICHAEL IAN SHAMOS, Ph.D., J.D., the
 9    witness whose deposition is hereinbefore set forth,
10    was duly sworn by me and that such deposition is a
11    true record of the testimony given by such witness.
12             I further certify that I am not related to
13    any of the parties to this action by blood or
14    marriage; and that I am in no way interested in the
15    outcome of this matter.
16             IN WITNESS WHEREOF, I have hereunto set
17    my hand this 20th day of July, 2019.
18
19
20
21          ROBIN K. FERRILL, RPR
22
23
24
25
```

Page 216