Page 1

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF GEORGIA

2                     ATLANTA DIVISION

3     DONNA CURLING, ET AL.,        )

                                    )

4          Plaintiffs,             )

                                    )

5     vs.                           )      CIVIL ACTION NO.

                                    )

6     BRAD RAFFENSPERGER, ET        )      1:17-CV-2989-AT

      AL,                           )

7                                   )

           Defendants.              )

8

9

10

11

12

13     VIDEOTAPED 30(b)(6) DEPOSITION OF GABRIEL STERLING

14                  (Taken by Plaintiffs)

15                  February 24, 2022

16                     9:07 a.m.

17

18

19

20

21

22

23

24

25     Reported by:   Debra M. Druzisky, CCR-B-1848

Page 4

1                    INDEX TO EXAMINATION
2     Witness Name:                                Page
3     GABRIEL STERLING
4        By Mr. Cross                                8
5        By Mr. McGuire                            245
6        By Mr. Brown                              268
7

8

9        INDEX TO CURLING PLAINTIFF'S EXHIBITS
10      No.              Description              Page
11    Exhibit 1    2-23-22, Curling Plaintiffs'      9
                   Fourth Amended Notice of
12                 Deposition of Office of the
                   Secretary of State re: The
13                 above-captioned action.
14    Exhibit 2    LinkedIn Web page print-out re:  13
                   Gabriel Sterling.
15

      Exhibit 3    Excerpted pages of "Integrity    76
16                 Counts" by Brad Raffensperger.
17    Exhibit 4    Video excerpt of speech by      151
                   Gabriel Sterling re: Universite
18                 de Geneve function.
19    Exhibit 5    7-15-19, State Defendants'      154
                   Objections and Responses to
20                 Curling Plaintiffs' First Set of
                   Interrogatories re: The
21                 above-captioned action.
22    Exhibit 6    8-23-21, State Defendants'      157
                   Responses and Objections to
23                 Curling Plaintiffs' Second Set
                   of Interrogatories re: The
24                 above-captioned action.
25

Page 5

1    INDEX TO CURLING PLAINTIFF'S EXHIBITS (Continued.)

2        No.              Description              Page

3    Exhibit 7    11-23-21, State Defendants'        179
                  Responses to Curling Plaintiffs'
4                 First Requests for Admission re:
                  The above-captioned action.

5
     Exhibit 8    State Defendants 113751,           223
6                 12-29-20, E-mail string from
                  Gabriel Sterling to Beau Roberts
7                 re: GA AV 20201228.

8    Exhibit 9    State Defendants 172679 thru       230
                  686, 3-1-21, E-mail string from
9                 Blake Evans to Andrew Jackson
                  re: 3 images forward.

10
     Exhibit 10   State Defendants 169353,           233
11                10-26-20, E-mail string from
                  Gabriel Sterling to Michael
12                Barnes re: BMDs and printers.

13   Exhibit 11   State Defendants 192602 thru       237
                  603, 11-10-20, E-mail string
14                from John Poulos to Gabriel
                  Sterling re: AP calling -
15                Dominion Voting and misinfo.

16                          - - -

17

18

19

20

21

22

23

24

25

1          INDEX TO CGG PLAINTIFF'S EXHIBITS
2      No.                Description                    Page
3   Exhibit 12   Audio recording of telephone          256
                 call.
4
    Exhibit 17   State-Defendants 11151729 thru        276
5                781, 9-17-21, Carahsoft
                 Statement of Work for Georgia
6                Secretary of State.
7   Exhibit 18   Dominion Voting brochure re:          280
                 Mobile ballot printing.
8
    Exhibit 19   4-2-19, Georgia Code Annotated        284
9                Section 21-2-498 re:
                 Pre-Certification Tabulation
10               Audits, Rules and Regulations,
                 Risk-Limiting Audit Pilot
11               Program.
12  Exhibit 20   Rule 183-1-15-.04 re: Audit.          295
13  Exhibit 21   Arlo document re: Ballot              299
                 manifest.
14
    Exhibit 22   11-19-20, Excel spreadsheet re:       304
15               Arlo audit report.
16  Exhibit 23   11-17-21, State of Georgia            321
                 letterhead from Brian Kemp to
17               Members of the State Election
                 Board re: 2020 election.
18
    Exhibit 24   11-14-20, Audit Board Batch           312
19               Sheet re: DeKalb Tucker Election
                 Day.
20
    Exhibit 25   11-14-20, Audit Board Batch           314
21               Sheet re: DeKalb Tucker Library
                 Advance.
22
    Exhibit 26   (Exhibit not identified by
23               counsel.)
24  Exhibit 27   Audit Board Batch Sheet re:           307
                 DeKalb 2339 Absentee.
25

Page 7

    INDEX TO CGG PLAINTIFF'S EXHIBITS (Continued.)

     No.                  Description                   Page

Exhibit 28   Audit Board Batch Sheet re:         319
             DeKalb 1956 Absentee.

Exhibit 29   Audit Board Batch Sheet re:         320
             DeKalb 1836 Absentee.

Exhibit 30   1-24-22, The Georgia Assembly        365
             letterhead from Senators Walker
             and Blackmon to Members of the
             State Election Board re: 2020
             election.

Exhibit 31   (Exhibit not identified by
             counsel.)

Exhibit 32   11-4-20, Fox5Atlanta Web page        353
             article by Brooke Zauner re:
             Software glitch causes delay in
             counting thousands of votes in
             Gwinnett County.

Exhibit 33   12-3-20, Whittier Daily News Web     366
             page article by Conny McCormack
             re: A behind the scenes look at
             Georgia's vote counting.

                        - - -

1              THE VIDEOGRAPHER:  All right.  This

2       will be the deposition of Gabriel Sterling

3       in the case of Curling versus

4       Raffensperger, File Number

5       1:17-CV-2989-AT.  Today's date is February

6       24th, 2022, and the time is 9:07 a.m.  And

7       we are on the record.

8              Would the court reporter please swear

9       in the witness?

10                     GABRIEL STERLING,

11    having been first duly sworn, was examined and

12    testified as follows:

13                     EXAMINATION

14    BY MR. CROSS:

15       Q.   Good morning, Mr. Sterling.

16       A.   Good morning, Mr. Cross.

17           (Whereupon, a technical discussion

18        ensued off the record.)

19    BY MR. CROSS:

20       Q.   All right.  Mr. Sterling, I understand

21    you've been deposed before, I think relatively

22    recently, in fact, so this will be similar to your

23    prior experience.

24              You -- do you understand that you're here

25    to testify today on behalf of the Secretary of

Page 9

1    State's office on specific topics that they've

2    designated you on?

3         A.   Yes.

4         Q.   Okay.  And do you have the Exhibit Share

5    in front of you?

6         A.   I do.

7                        (Whereupon, Plaintiff's

8                        Exhibit 1 was marked for

9                        identification.)

10   BY MR. CROSS:

11        Q.   Okay.  Can you pull up Exhibit 1, please?

12        A.   Okay.

13        MR. RUSSO:  Hey, David, I don't mean

14   to interrupt, but I'm just going to raise

15   one quick issue here.  You guys are going

16   to split, I understand Bruce said you all

17   are splitting time today?

18        Okay.  So you guys figured that out.

19   I just wanted to make sure it was -- we

20   were clear that that was our understanding

21   also --

22        MR. CROSS:  Yeah.

23        MR. RUSSO:  -- before we got started.

24   Okay.

25        THE WITNESS:  I've got Exhibit 1

Page 10

```
 1      pulled up.

 2   BY MR. CROSS:

 3      Q.   Okay.  Have you seen Exhibit 1 before?

 4      A.   I don't think I've seen this one, no.

 5      Q.   Okay.  All right.

 6      A.   Not that I recall.

 7      Q.   Scroll down to -- what page is this, page

 8   numbers.  It's Page 8 of the P.D.F.  The top of --

 9   the top says Amended Topics.  Just tell me when

10   you've got that.

11      A.   I'm there.

12      Q.   Okay.  Have you seen this list of topics

13   before?

14      A.   Allow me a moment.

15      Q.   Sure.

16           (Whereupon, the document was

17        reviewed by the witness.)

18   BY MR. CROSS:

19      Q.   And I can make it easier on you.  There

20   are specific topics in here you've been designated

21   on.  And so if you want to --

22      A.   I know.  I'm just reading them to make

23   sure that they're all the ones I already saw.  So.

24      Q.   Okay.  Yeah.  Got it.  Got it.

25           (Whereupon, the document was
```

Page 11

1           reviewed by the witness.)

2               THE WITNESS:   Yeah, this essentially

3         comports to the list I've -- I remember

4         looking over, so yes.

5    BY MR. CROSS:

6         Q.   Okay.  So just so we're on the same page,

7    if you look at topic one.

8         A.   Let me scroll back up to it.  Bear with

9    me.

10        Q.   Okay.

11        A.   The one listed as implementation and

12   operation of Georgia's yadda, yadda, yadda?

13        Q.   Yes, sir.

14        A.   Okay.

15        Q.   Look at that, you'll see topics A, B, C

16   and E, and H.  Are you prepared to testify on those

17   topics today?  So it's A, B, C, E and H.

18             (Whereupon, the document was

19        reviewed by the witness.)

20             THE WITNESS:  Yes.

21   BY MR. CROSS:

22        Q.   All right.  And then if you look at topic

23   two, are you prepared to testify on topic 2(c) to

24   that?

25             (Whereupon, the document was

Page 12

1      reviewed by the witness.)

2            THE WITNESS:   Yes.

3    BY MR. CROSS:

4       Q.   And then are you prepared to testify on

5    all the other topics here except for 16?

6       A.   Yes.

7       Q.   Okay.  And on 16, are you prepared to

8    testify at least as to documents that you're

9    familiar with, such as E-mails you sent or

10   received?  Is that fair?

11      A.   Hold on a second.  I'm having a -- there.

12   I had to blow the screen back up.

13            Ask that question again.  I apologize.  I

14   was having a technical issue.

15      Q.   Sure.  On 16 it just involves documents

16   that were produced in discovery by the State

17   defendants, and they said it was a case-by-case

18   basis.

19            But I assume you're prepared today to

20   testify about documents that you're familiar with,

21   like E-mails that you sent or received.  Is that

22   fair?

23      A.   Yeah.  Sure.

24      Q.   Okay.  All right.  We'll come back to

25   this.

Page 20

1    maybe 500 to a thousand dollars more a month was

2    what I was actually going to be able to take home

3    based on all those things.

4         Q.   And when you came back as C.O.O., did you

5    come back to the salary you had when you left or

6    did you have a different salary?

7         A.   I think it was slightly higher, like 124

8    or something like that.

9         Q.   124,000?

10        A.   I believe so, yeah.  I can't recall right

11   now.  It's been over a year.

12        Q.   And so what was it before you became the

13   implementation manager?

14        A.   Again, I think it was, like, 115,

15   something like that.

16        Q.   All right.  Thank you.

17        A.   I could be off a little bit one way or the

18   other, but those basic numbers are probably right.

19        Q.   All right.  And just briefly on your

20   education, your degree is in political science, not

21   computer science; is that right?

22        A.   Yes.

23        Q.   Okay.  Do you have any formal education in

24   computer science?

25        A.   Formal education?  No, no formal education

1    other than the fact that I'm 51 years old and been
2    in and around computers since I was 12 years old,
3    you know, like anybody born in the early '70s who
4    came up at the time when we started doing those
5    things.
6         Q.   I see you worked on the Bush/Quayle
7    campaign in '92.
8         A.   Yes, I did.  I was 21 years old.
9         Q.   I worked on that campaign in South
10   Carolina.
11        All right.  You're familiar with an
12   election security expert named Alex Halderman;
13   right?
14        A.   I'm aware of him, yes.
15        Q.   And you're aware that Dr. Halderman
16   prepared a report that he produced on July 1 of
17   last year involving his assessment of Georgia
18   voting equipment that was provided by Fulton
19   County; is that right?
20        A.   I didn't know it was provided by Fulton
21   County.  I was aware that there was a report that
22   he did, and I did not know that it was July, but I
23   know that there's a report that was produced.
24        Bear with me a second, because I'm stuck
25   on this exhibit still.  I can't figure out how to

Page 29

1        A.    I guess I would probably have to call him

2    and ask him.  It didn't occur to me to ask him

3    beforehand.

4        Q.    And has Jordan Fuchs read the report?

5        A.    As I stated, the only person I'm aware of

6    reading the report in our office is Ryan Germany.

7        Q.    And so in preparation for today's

8    deposition, you didn't ask anyone in the office

9    other than Mr. Germany whether they had read this

10   report; is that right?

11       A.    I didn't ask Mr. Germany.  He informed me

12   a couple weeks ago when he read it, I believe.  So

13   it wasn't a question of me asking him if he had

14   done it.  He said, hey, I read it.  I said, oh,

15   okay.

16       Q.    So in preparation for today, you didn't

17   ask anyone at all whether they had read it?

18       A.    No.  I wasn't under the impression I would

19   need to.

20       Q.    Okay.  Don't you need to understand the

21   specific vulnerabilities identified in the report

22   to be sure that you mitigate them?

23       A.    Me personally?  I don't think that I would

24   need to, because that's not necessarily my role.

25   Dominion, who is our contractor, we have a contract

Page 30

1    list to keep up with security protocols, and it
2    calls for them to do those kind of things and
3    mitigate any things they become aware of.
4         Q.   Right.  Remember, you're testifying today
5    as the Secretary's office, and that includes on
6    election security.  So my question to you is --
7         A.   And again -- sorry.  Go ahead.
8         Q.   Yeah.  My question is, doesn't the
9    Secretary's office need to understand the specific
10   vulnerabilities in order to make sure they mitigate
11   those vulnerabilities?
12        A.   I think we would always look to mitigate
13   any vulnerabilities we become aware of.  But it's
14   also the responsibility of the person that we've
15   contracted with to inform us and to make those
16   mitigations necessary.  If there seems to be
17   process changes, then they would bring those to us
18   as well.
19             As you understand, this -- these are very
20   complicated things we have to do.  We have to go
21   through reprogramming potentially.  And if they do
22   have to do changes, it has to go through E.A.C.
23   certification.  And then we would probably have to
24   send it through our own certification again if
25   there was any changes that were done.

Page 32

1      Q.   Does that surprise you, sir?

2      A.   I don't -- again, I'm not sure that's the

3  case, so I -- I don't know.

4      Q.   Okay.  So as you sit here today testifying

5  on behalf of the Secretary's office, you can't say

6  one way or the other whether the specific

7  vulnerabilities in Dr. Halderman's report have been

8  mitigated in any way because you don't actually

9  know what they are; right?

10      A.   Yeah.  I don't know if they exist.

11           MR. BARGER:  And David, I mean, I --

12      what topic does that go to?  We're getting

13      somewhat outside the scope, I think, of

14      the 30(b)(6) topics.

15  BY MR. CROSS:

16      Q.   So Mr. Sterling, you said that bad actors

17  doing bad things.  I want to make sure I understand

18  that.  What do you mean, what relevance does that

19  have to Dr. Halderman's report?

20      A.   I was saying in general I've heard

21  election security experts, Halderman and others.

22  Nearly everything I've read or seen from anybody on

23  that front involves having a bad actor having

24  access to things they shouldn't legally or by rule

25  have access to to do things they shouldn't legally

Page 34

1    which are much more easily reproducible than

2    something onsite of a B.M.D.  I know less about

3    D.R.E.s, honestly, but B.M.D.s is what I know more

4    about.

5         Q.   And when you say, you mentioned

6    hand-marked paper ballots are more reproducible,

7    what does that mean?

8         A.   I mean, if somebody wanted to do something

9    untoward, it would be easier to take a hand-marked

10   paper ballot, or a stack of them and -- or even

11   voted ones and double bubble things so that --

12   throws votes out.

13        That's a much easier thing to do if you

14   have somebody who is a bad actor again, who is

15   inside the -- who's inside the castle walls, for

16   lack of a better word.

17        So that's what I mean by that.  I mean,

18   there's vulnerabilities to every system, and

19   that's -- it's frankly easier in many ways to do

20   that with hand-marked paper ballots than it is on a

21   B.M.D. ballot.

22        Q.   But you understand that an insider who

23   alters hand-marked paper ballots, it would take

24   hours for them to alter any significant number of

25   hand-marked paper ballots if they wanted to alter,

1  say, thousands to swing an election; whereas, with

2  malware, they could get that on the election system

3  in a matter of minutes in the voting booth with a

4  U.S.B. stick and alter tens of thousands or

5  millions of votes, wouldn't they?

6       A.   I mean, that's --

7            MR. RUSSO:   Objection to form.

8            THE WITNESS:   No, I don't agree with

9       that, actually, honestly, because that's

10      not how the systems are set up.

11  BY MR. CROSS:

12      Q.   How so?

13      A.   The possibility of getting a single stick

14  into a single B.M.D. and affecting millions of

15  votes is physically impossible.

16      Q.   What's the basis for that understanding?

17      A.   Because a B.M.D. is a -- is simply a

18  printer.  That's all that it does.  And it's

19  applied to one printer at a time.  So it doesn't --

20  they don't talk to each other in the middle of

21  these things, I mean.

22           And then we have 159 different counties

23  with 30,000 different B.M.D.s.  It would require a

24  Herculean effort to go and do that.  That's my

25  point, is that it would be physically easier to

1    alter hand-marked paper ballots in large numbers in
2    a back room somewhere than it ever would be to do
3    something to a B.M.D. from everything I've seen of
4    how these things would have to function, especially
5    considering the regulations and testing around
6    them.
7          I mean, you have L & A testing before each
8    and every one.  After the last election we had hash
9    testing of several -- in several different counties
10   to make sure there wasn't anything that had been
11   changed.
12         And in the L & A testing, we know we have
13   very robust L & A testing in the fact that it
14   caught a couple of issues in both Douglas and
15   Richmond County on the November election ballot
16   having to do with the United States Senate race.
17         So I do, I disagree vociferously with the
18   idea that somehow it is easier to do.  And I
19   believe, in my review for some of these items, that
20   even one of your own experts said it would be
21   easier to go after the scanners than to go after
22   the B.M.D.s.
23        Q.   Where did you read that one of our experts
24   said it's easier to go after a scanner than a
25   B.M.D.?

Page 38

1        Q.    Okay.  You mentioned L & A testing.  Are

2   you aware that multiple election security experts

3   have testified in this case that L & A testing

4   cannot detect malware?

5        A.    No.

6               MR. RUSSO:  Objection to form.

7               THE WITNESS:  No.

8   BY MR. CROSS:

9        Q.    You mentioned hash testing.  Are you aware

10  that multiple election security experts have

11  testified that hash testing cannot detect malware?

12       A.    No.  And I -- from what little I do know

13  about computer security from my learning over the

14  last few years, that would be very difficult unless

15  the people were -- it would take a her -- it would

16  take a large effort to do -- to get around hash

17  testing.

18            Because usually, if you change any

19  particular number or letter or anything in code, if

20  you use the proper third-party hash testers, you

21  should -- you should be able to get around them.

22  So I don't know that I agree with that even if your

23  experts say that, because I'm sure there are

24  experts that believe otherwise.

25       Q.    Is there any identi -- any cybersecurity

1  expert you can identify today that says that hash

2  testing is a reliable way to determine whether a

3  software has been compromised with malware?

4       A.   No.  But again, it's not my role

5  necessarily to know that.

6       Q.   Okay.  Whose role is it at the Secretary

7  of State's office to know that?

8       A.   Nobody.  It's supposed to -- you're asking

9  me to prove a negative against something else

10 that's said.  So I'm not going to dual about that

11 right now.

12          It's, you know, security is always a --

13 one of the highest hallmarks we have right now, and

14 we discuss it weekly internally on how we're

15 dealing with things.  And most of that security

16 comes down to physical security, processes and

17 training.  So that's, that's how we focus on it.

18          The computer side of it is really going to

19 be our systems managers and then dealing with

20 Dominion.  Because again, under our State contract,

21 Dominion has the responsibility to keep their, we

22 called it future proofing when we were negotiating

23 the thing, to inform us of vulnerabilities and also

24 stay ahead of those vulnerabilities if they are

25 identified.

Page 40

1      Q.   Well, throughout this case, including

2   yourself, the Secretary's office typically mentions

3   L & A testing and hash testing when we talk about

4   looking for malware on machines.

5           So my question to you is, who at the

6   Secretary's office is responsible for understanding

7   whether those tests can actually reliably identify

8   malware in voting equipment?   Who has that

9   responsibility?

10          MR. RUSSO:   Objection to form.

11          THE WITNESS:   Essentially, it's the

12      responsibility of the office and the

13      elections division and the people managing

14      the contract with Dominion.

15          We have contractors who have

16      responsibilities who are not necessarily

17      employees of the office for many things

18      across the agency.   We -- our C.I.O. is a

19      contractor.

20          We have some -- we have a -- right

21      now I believe it's one cybersecurity.   We

22      have an opening as well for another one

23      over our election system that's mainly for

24      our side.

25          We had to look over the voter

1      registration system, because that's

2      something we directly control, versus

3      right now Dominion, they own their

4      software, they -- you know, and we own the

5      equipment and everything, but it's their

6      job to work with us in tandem, because

7      that's what contractors do, to make those

8      things work properly and as safely as

9      possible.

10         (Whereupon, Ms. LaRoss joined the

11      deposition.)

12   BY MR. CROSS:

13      Q.    But the only --

14      A.    And one other thing I left out, let me

15   finish up the answer, another reason that we know

16   that there was no malware, at least in the 2020

17   election, was we did a hand tally that showed that

18   the machines counted the ballots as they were

19   presented.

20      Q.    We'll come back to that.

21          And just so I understand, you think the

22   hand tally that you did in 2020 shows that the

23   machines were not compromised in any way?

24      A.    Absolutely.

25      Q.    And what's the basis for that belief?

Page 42

1      A.    Because we did a hand tally that showed
2   that the machine count matched the human count.   I
3   mean, we were off by point 1053 percent in the
4   overall totals and off by point 0099 percent in the
5   margin between those two things, which is well,
6   well, well below the normal amount of difference
7   you see in a hand count.
8            If I remember, there was a, I want to say
9   it was University of Wisconsin, but I can't recall
10  exactly right now, study that basically says, when
11  you do hand tallies of elections, you usually
12  expect there to be a 1 to 3 percent deviation just
13  because human beings are counting it versus
14  machines.
15            And in this particular case, too, you had
16  for all the hand-marked paper ballots, anything
17  that had questionable marks had to go through human
18  beings again, which they might come to a slightly
19  different conclusion than they did the first time
20  with those particular bipartisan review committees.
21  So that could move part of that as well.
22            But being that close point 1053 percent in
23  the total ballots cast and point 0099 percent in
24  the margin essentially shows me that the machines
25  counted exactly as they were marked and read by

1     those individuals.

2              Secondarily to that, and this will

3     probably go to one of your other questions here, we

4     did work with the Center for Innovation Election

5     Research and the University of Georgia to do

6     studies to look at reviews of ballots, and we saw

7     that, at a minimum, 24 or 25 percent of people were

8     actually taking time to review their ballots.

9              So if there had been anything in the

10    middle of the election, we would have had more

11    people going to their poll workers saying, there's

12    a problem here.  And we saw none of that anywhere

13    in the State of Georgia in any county at all.

14              (Whereupon, Mr. McGuire joined the

15         deposition.)

16    BY MR. CROSS:

17         Q.   The 24 to 25 percent of voters that are,

18    you said, taking time to review ballots, that was

19    as --

20         A.   Yes.

21         Q.   -- little as one second, wasn't it?

22         A.   Yes.

23         Q.   And you think that a voter can reliably

24    review a ballot in only one second?

25         A.   I think, if they review over it and

Page 46

1        A.    We're agreed that they can't --

2             MR. RUSSO:  Objection to form.

3             THE WITNESS:  We agree that they

4        can't know what the tabulation is on a

5        hand-marked paper ballot either.

6   BY MR. CROSS:

7        Q.    Okay.  So it's your view that using a Q.R.

8   code is no different than voters using hand-marked

9   paper ballots for tabulation purposes?

10       A.    It's not no different, because it's

11  obviously physically different.  It also has a

12  situation where it is much more likely to have

13  something go wrong on a hand-marked paper ballot

14  where there might be stray marks and accidental

15  bubbling in on the same line.  We've seen in the

16  past over-votes and under-votes based on that.

17            So I believe it's actually riskier for

18  voters to use hand-marked paper ballots than it is

19  to use a B.M.D. ballot, yes.

20       Q.    Are you familiar with an election security

21  expert named Michael Shamos?

22       A.    No.

23       Q.    You're not aware the Secretary's office

24  hired him as an expert in this case, offered him up

25  as testimony as an election security expert?

Page 47

1          A.    No.

2          Q.    No one ever told you that Michael Shamos

3     testified in the summer of 2019 before the

4     Secretary announced the B.M.D. system that you

5     should not use B.M.D.s with Q.R. codes?

6          A.    No.   And let's be aware of something here.

7     I mean, the Secretary didn't announce the B.M.D.

8     The State legislature after, you know, several

9     years of review after the S.A.F.E. Commission

10    passed legislation HB 316 to basically mandate the

11    use of a B.M.D.

12         Q.    But they did not mandate the use of Q.R.

13    codes, did they, sir?

14         A.    They did not.

15         Q.    That's a decision that the Secretary's

16    office made in choosing the Dominion system over

17    non-Q.R. code options; correct?

18         A.    As I understand it, the two final bidders

19    were both using Q.R. codes.  So we really didn't

20    have much of a decision on that.

21         Q.    Well, you narrowed down to the final

22    bidders, but there was a bid that came in from a

23    provider that did not use a Q.R. code; correct?

24         A.    That was under the Georgia procurement law

25    well out of bounds of an ability to be a person in

Page 49

1      Q.   So you're saying, even if you'd been aware

2    of Dr. Shamos's testimony, you would have adopted a

3    system that your own election security expert

4    advised against?

5      A.   Mr. Cross, I did not say that.  What I

6    said is the laws demanded that we have -- we're

7    down to the last two bidders, and the only two

8    bidders that were qualified had a Q.R. code in it.

9      Q.   But if you had known going into that

10   process that your own election security expert

11   advised against Q.R. code, then you could have made

12   a deliberate decision to seek bids only from

13   providers that had a non-Q.R. code option; right?

14            MR. RUSSO:  Objection to form.

15            THE WITNESS:  The decision of one

16        individual, whether they were our expert

17        or somebody else's expert, cannot outweigh

18        the myriad of decisions around how you

19        have to do -- implement a system this size

20        and scope and a unified system in the

21        State of Georgia.

22            It would have been potentially

23        something else to take into account.  You

24        could have maybe had some additional

25        points for that.  And in fact, for all I

1          Those are the facts, are they not, sir?

2      A.   They are not.  I did not adopt it.  The

3  state legislature adopted it, Mr. Cross.  The

4  Secretary of State's office didn't adopt it.  We

5  supported it, but it was the state legislature who

6  adopted it.  And then, following Georgia

7  procurement law, we procured a system following the

8  law.

9      Q.   Are you familiar with an election security

10  expert named Dr. Juan Gilbert?

11      A.   The name, but I don't know much about him,

12  no.

13      Q.   Are you aware that he is another election

14  security expert the Secretary's office has brought

15  to testify into this case?

16      A.   That might be why I'm aware of his name.

17      Q.   Are you aware that Dr. Gilbert testified

18  under oath that he wanted -- if he wanted to have a

19  cybersecurity assessment done of voting

20  equipment --

21          MR. RUSSO:  Objection to form.

22  BY MR. CROSS:

23      Q.   -- Dr. Halderman and Dr. Andrew Appel are

24  the two experts he would ask to do that?  Have you

25  heard that before?

1      A.    I apologize.  My learned counsel objected

2    in the middle of your question.  Can you repeat the

3    question for me, please?

4      Q.    Sure.  Sorry.  Let me do that again.

5            Are you aware that Dr. Gilbert, the

6    elect -- the Secretary's own election security

7    expert testified that, if you wanted to have a

8    cybersecurity assessment done of voting equipment,

9    there are two experts he would ask to do that,

10   Dr. Alex Halderman and Dr. Andrew Appel?

11           Had you heard that before?

12     A.    No.  But I do want to ask a question.

13   When you say "voting equipment," to what is he

14   and/or you referring to?

15     Q.    Cybersecurity assessment of voting

16   equipment just like that used in Georgia.

17     A.    Well, when you say "equipment," there's

18   lots of different pieces.  Every single piece of

19   equipment we're talking about or, I mean, what

20   specifically was he referring to or do you know?

21     Q.    The voting machines, like, the B.M.D.s.

22     A.    Okay.  Then no, I'm still not aware of

23   that, no.

24     Q.    But you publicly said that Dr. Halderman's

25   report looking at the Fulton County equipment were,

Page 57

1    in your words, a "load of crap."   Right?

2         A.    Yes.

3         Q.    And do you still believe that?

4         A.    From what I understand of it, again, I

5    haven't read the report, but what I've seen of

6    Dr. Halderman -- and this is the situation in many

7    people, and I said earlier on, if you're looking at

8    any system that has a computer in it from a solely

9    one position, not usability, not functionality, not

10   the ability to get the actual job done, but

11   security, security, security, we'd get the most

12   secure system in the world that no human being

13   could run or you could have the easiest system in

14   the world that was open to every cyber thing in the

15   world, it's always going to be a balancing act in

16   those things.

17          And I think it's important to have people

18   who are viewing it from one thing, and one thing

19   only, like the cybersecurity side.   But they are

20   not the controlling factor in all things.

21          The same way I wouldn't have, you know,

22   somebody who was a voting advocate say you can't

23   have voter registration, you can't have voter ID,

24   you can't have all those things, because that's

25   what they want to make it easy to vote.

1          So when you look at it from a single

2     prism, yes, there's -- you're going to -- you're

3     going to find more identifiable issues potentially

4     because it's what you are trained to go after.

5          But it all has to be balanced out to it be

6     usable, follow the law, and so have voters be able

7     to function in it and have counties and the county

8     workers be able to use it.

9          Q.   So what's the basis for your public claim

10    that Dr. Halderman's report is a load of crap when

11    you, yourself, have not read it and are not

12    familiar with it?

13          A.   Because what I said, as I've said

14    previously, I've seen the cyber experts before, and

15    they nearly always have to do with bad actors.  And

16    what I mean by "load of crap" is that the

17    vulnerabilities that exist potentially from

18    whatever report they do are the same for any system

19    in the world that uses a computer.

20          And therefore, if the -- if your way to

21    mitigate that is to stop using computers

22    altogether, it's not a reasonable thing to do.  If

23    the -- and it's the same way it's not reasonable to

24    say you can't have voter registration, you can't

25    have signature matching, you can't have voter ID on

1   the other side, you want to have security that way.

2            That's what I mean by it's a load of crap,

3   because it's not unique to any particular system.

4   It would be the same for nearly every system.

5   Would the vulnerabilities be slightly different

6   because of the configurations of any particular

7   system?  Of course they would.

8            But overall, we have mitigations, we have

9   policies and we have procedures that would mitigate

10  most things that I was already aware of.  And if

11  there's something else that has to happen, then

12  under a State contract Dominion would have to take

13  steps to mitigate many of these things.

14           And I've seen no real evidence yet of

15  anybody making a claim anything has actually

16  happened.  And there's always, like I said, in any

17  system there's going to be vulnerabilities, but you

18  have to have training and you have to have policies

19  and procedures and, you know, testing where you can

20  that can mitigate those items.

21           And I just -- I know you asked me not to

22  go into long speeches, but I'm trying to answer

23  your question as best I can.

24           I was asked that question in a public

25  forum by a Democrat from my home town, and at that

1  point I was kind of irritated because I believe

2  some of these cyber experts, you know, yes, guess

3  what, there -- every computer in the world can be

4  reprogrammed to do something just about.  That's

5  what they're pro -- that's what they're there for.

6        I mean, the Dominion machines, the touch

7  screens started out life as a point of sale thing

8  inside restaurants.  That's what they started off

9  as.  A printer is just a printer.

10        I mean, so when I say it was a load of

11  crap, it was my fast and relatively punchy way of

12  answering it in a public forum.  If I was sitting

13  down doing a longer testimony talking about it, I

14  would give more context like I just have here.

15    Q.   Is it your view that the vulnerabilities

16  Dr. Halderman has identified are not a

17  significant -- are not a significant concern

18  because there are measures that prevent what you

19  call bad actors from doing bad things with the

20  system?

21    A.   I can't speak directly to the report or

22  the vulnerabilities because, again, as you pointed

23  out, I haven't read the report yet, as I said

24  earlier.  So I don't know honestly or not, or if

25  they're the same kind of things that were

Page 61

1    identified in the earlier review by the E.A.C.   I
2    mean, they could be similar.   I don't know.
3        Q.   But isn't it important for the Secretary's
4    office to figure that out, whether the
5    vulnerabilities Dr. Halderman has identified,
6    whether they can't -- cannot be exploited because
7    there are mechanisms in place to prevent that?
8            Shouldn't the Secretary's office know
9    that?
10       A.   At the end of the day, working with
11   Dominion I believe that we will.   Of course,
12   litigation tends to complicate things and make
13   things more difficult for us to actually do our
14   jobs in many ways.
15           And I would like to -- at the end of the
16   day, after all this is done, we always focus on
17   security.   We will always work with our partner to
18   be as secure as we can and have as an up-to-date a
19   system as we can.
20           But I can't speak directly to
21   Dr. Halderman's report as I have not read it yet.
22   And you pointed out, Mr. Germany in our office has,
23   but I'm not aware of anybody else that has yet.
24       Q.   You said litigation complicates things.
25   But the only reason that there is a forensic

Page 65

1       Q.    Maybe you should talk to Mr. Poulos about

2    that.

3             All right.  To come back to this issue of

4    bad actors, are you aware that one of the positions

5    that the State has taken in our case, including

6    through their experts, is that hand-marked paper

7    ballots present a serious security challenge

8    because of what the State calls insiders that can

9    manipulate those ballots?

10      A.    Not specifically.  But in general, I'm

11   aware of that, yes.

12      Q.    So doesn't the same concern apply to the

13   B.M.D.s, that if you cannot trust your election

14   workers and others who have access to the ballots,

15   don't you have the same concern for those same

16   people when they have access to B.M.D.s?

17      A.    I think the same concerns would go in all

18   directions.  And I think it's -- functionally

19   requires less technical know-how to spoil or do

20   multiple hand-marked paper ballots than it would to

21   work on a B.M.D., and essentially, especially since

22   B.M.D.s are used in two particular locations.

23            They are used for early voting in advance

24   and in-person voting where there would be a lot

25   more individuals around outside of the bad actors.

Page 66

1    Hand-marked paper ballots taken into a back room

2    could be produced in a much more, you know, ready

3    way than what's done in a scanner on the day of.

4         So yeah, I see what you're saying.  But

5    again, it's sort of apples and oranges because of

6    the use and deployment of the two systems.

7         Q.   Are seals on the B.M.D.s, is that one of

8    the security measures that you have in mind to

9    prevent exploitation of vulnerabilities?

10        A.   Yes.

11        Q.   And --

12        A.   That's one of them.

13        Q.   Would it be appropriate to use B.M.D.s in

14   an election if the election workers, when they

15   pulled out the B.M.D.s to use them, say, found that

16   the seals were missing or broken?

17        A.   It depends, honestly.  If the way they

18   were stored they were broken sitting there because

19   of the way they stored them -- I'm not going to try

20   to answer a hypothetical like that because it's

21   just too broad.

22        Q.   Well, what is -- what is the -- well, I

23   guess I'll ask a different question.

24        Does the Secretary have guidance for the

25   counties, a written policy that says, if you

Page 67

1    discover B.M.D.s that have broken or missing seals,

2    here are the specific steps you should take to

3    determine whether to use those in an election?

4    Does that exist?

5        A.   I don't know if it's a specific of if it's

6    broken do this, but I think that's to say you have

7    to record those seals on the -- those -- the

8    close-out forms that you have.  So I don't think

9    it's a specific thing other than I think -- and

10   again, this is me -- I don't want to speculate.

11           But in seeing some of the training,

12   basically, if you see something that's broken or

13   not correct or the numbers are off, you report it

14   to the higher-ups eventually.

15           And again, the counties are running these

16   elections.  They don't come back to the State and

17   do a lot of these things except on the final forms

18   they were turning in is my understanding.

19       Q.   You mentioned that the hand tally

20   validated that the machines were not compromised in

21   the 2020 election.  But the hand tally was only

22   done on the presidential election; right?

23       A.   That's correct.

24       Q.   So there's no hand tally that validates

25   that there was no compromise for down ballot

Page 68

1   elections, like the Senate election; correct?

2       A.   That's correct.

3       Q.   Were you aware --

4       A.   At the same time, there's no evidence that

5   anything -- if you look at -- you saw my degree's

6   in political science.  Nothing that we saw looked

7   untoward or out of place and looked relatively

8   normal in the scheme of how the State has been

9   going for the last few years.

10          So I didn't -- there's no need -- belief

11  on my side that anything was compromised.  And

12  because the presidential race was the highest

13  profile one that was so close, I have no reason to

14  believe that the rest of the ballot wasn't correct.

15  But you're right, we have not done a hand tally on

16  every other thing as well.

17      Q.   Are you aware that, in December of 2020,

18  Dr. Halderman in a hearing showed that he was able

19  to hack the B.M.D. equipment for Fulton County in

20  only three days to change the Q.R. code on a ballot

21  so the Q.R. code would have a different tabulation

22  than what the voter would read?

23          Had you heard that before?

24      A.   The specifics of what you just laid out,

25  not exactly.  But I knew there was some period of

Page 69

1    time he was able to do that, yes.

2        Q.    And did the Secretary's office take any

3    specific steps to protect against that

4    vulnerability in the 2020 or subsequent elections?

5        A.    Well, in September we were probably -- we

6    were getting ready for early voting.  We, again, we

7    did the L & A testing.

8              We can't go through, since I don't even

9    know if we were aware of what he's claiming to be

10   hacked or having done it -- because I don't know

11   that our side got to see what his full claim was or

12   even the path by which he did it.  I just, I'm not

13   aware if we have that information or not.  So it's

14   hard to mitigate against something if you don't

15   have the details of it, A.

16             And B, we have no reason to believe that

17   that occurred.  And having somebody have access for

18   three days would kind of be noticed in most

19   situations in most of our counties, especially as

20   we were doing the run-up to get to.  We were

21   already involved at that point in the absentee

22   ballot processing.  So it would -- we were in

23   election mode then.

24             So the -- we did not do anything specific

25   because there wasn't anything specific that we were

1   Doing it to 30 some odd thousand of them is

2   something different, especially considering you

3   have -- there's different paths and different

4   passwords and different pass codes for all of those

5   things.

6       Q.   So just so we're clear, there are no

7   specific steps that you can identify the

8   Secretary's office took to mitigate against the

9   hack that Dr. Halderman demonstrated in September

10  of 2020, there's nothing specific to that; right?

11      A.   Nothing specific to that because we

12  already have equipment handling rules around those

13  things that, if a B.M.D. went missing for three

14  days, it would normally, from my point of view,

15  have been noted by the elections director in

16  whatever county that occurred.

17      Q.   But again, but as you pointed out before,

18  we have to worry about insiders, degrees in the

19  State that said they don't want to use hand-marked

20  paper ballots as the primary means of voting.

21          You wouldn't notice if an insider who

22  already has authorized access to a B.M.D. did

23  something to it; right?

24      A.   I believe you're twisting my words.  My

25  point was, in any system an insider can cause

Page 72

1    problems, period.  We have no reason to believe

2    that there are negative insiders that exist in any

3    of our counties right now.  But of course, if there

4    are bad guys, they may not want you to know that.

5            But again, we've seen no -- there's

6    nothing indicating that anywhere that we've seen in

7    my three years in the office.

8        Q.   So then we need not worry about insiders

9    engaging in bad acts as a reason not to adopt

10   hand-marked paper ballots, we're agreed on that;

11   right, sir?

12       A.   No.  What I said was it's easier if there

13   is somebody to do it that way than the other way.

14   I believe this is a safe -- is a high -- B.M.D.s

15   are safer and better for the voters and also have a

16   level -- added level of security that is more

17   difficult to do things along the lines of hacking

18   thousands and thousands of B.M.D.s versus having

19   stacks of ballots you go through and mark or you

20   have stacks of ballots that are voted and double --

21   basically cancelling out votes by putting multiple

22   marks into a single line.

23           All of them have vulnerabilities.  You

24   have to have systems in place to try to mitigate

25   them regardless.

Page 76

```
 1              (Whereupon, a discussion ensued
 2         off the record.)
 3              (Whereupon, there was a brief
 4         recess.)
 5              THE VIDEOGRAPHER:  All right.  We're
 6         back on the record at 10:24.
 7                        (Whereupon, Plaintiff's
 8                         Exhibit 3 was marked for
 9                         identification.)
10  BY MR. CROSS:
11      Q.   Mr. Sterling, grab Exhibit 3, please, if
12  you would.
13      A.   Okay.  Which page would you like to focus
14  on?
15      Q.   Well, we're going to look at a number of
16  pages.  But do you have Exhibit 3 in front of you?
17      A.   Yes, I do.
18      Q.   And do you recognize this as portions of
19  Secretary Raffensperger's book called Integrity
20  Counts?
21      A.   I read it once a while back, so I'm a --
22  this looks like it, yes.
23      Q.   Did you assist at all in preparing this
24  book?
25      A.   In some specific parts, yeah.
```

Page 77

1    Q.   How so?

2    A.   I was asked for specifics on certain -- I

3    couldn't tell you exactly.  I mean, what happened

4    on this date, I believe that kind of thing.  It was

5    sort of in a general way.

6    Q.   Did you write any portions of it or --

7    A.   No.

8    Q.   -- or edit?

9    A.   I'm not that good.  No, I did not write

10   any portion of it.

11   Q.   Okay.  But you read drafts of excerpts

12   before it went out, and your views were requested;

13   is that generally right?

14   A.   My views were not requested, no.  It was

15   more about specifics of, you know, act -- questions

16   of fact on those kind of things, making sure that

17   those were more properly vetted.

18   Q.   Okay.  All right.  So if you go down to

19   the bottom of each sort of P.D.F. page, you'll see

20   that there is a book page, we'll say, like, Page X

21   of 240.

22   A.   Uh-huh.

23   Q.   Scroll down to where it says Page 46 of

24   240, please.

25   A.   Okay.

1    Q.    Just let me know when you've got it.

2    A.    I'm there.

3    Q.    Okay.

4    A.    If you want me to read it real quick or...

5    Q.    Well, for -- I want to make sure to give

6    you context.  So if you start at Page 45 of 240 --

7    A.    Oh.  Okay.

8    Q.    -- look at the bottom of the left-hand

9    column.  Do you see that Mr. Raffensperger writes:

10                "Every politician has a stump

11         speech, and mine went something like

12         this"?

13                And then what follows in italics is --

14    A.    Yes.

15    Q.    -- the stump speech for Mr. Raffensperger?

16           If you come to the top of Page 46 of 240,

17    you see here he writes that in a stump speech he

18    said:

19                "As we change over to new voting

20         machines, Georgia has a once in a

21         lifetime opportunity to create a

22         process that is objectively fair and

23         yields an outcome that Georgians,

24         individually and as a whole,

25         subjectively trust."

1          Do you see that?

2     A.   Yes.

3     Q.   And do you agree with that assessment?

4     A.   Yes.

5     Q.   And why is it important for Georgians

6     individually to subjectively trust the voting

7     machines and the election process in Georgia?

8     A.   It's important for Georgians and every

9     American to have an implicit trust in the election

10    system to pick our leaders.  If you erode that

11    trust, then the elections and the faith in

12    elections falls apart.

13    Q.   Why is that?

14    A.   If you can't trust the outcomes of

15    elections, then what's the point of elections?

16    Q.   All right.  Come down to the next page, 47

17    of 240.

18    A.   Uh-huh.

19    Q.   And do you see at the bottom of the

20    left-hand column he refers to an op ed that he

21    wrote?

22    A.   Yes.

23    Q.   And then portions of that op ed are in

24    italics on Page 47.  Do you see that?

25    A.   Yes, sir.

Page 80

```
 1        Q.   And if you come to the right-hand column,
 2    do you see the paragraph that begins:
 3              "It is through voting that we
 4         actually live the proposition that we
 5         are all equal"?
 6              Do you see that?
 7        A.   Yes.
 8        Q.   And here Secretary Raffensperger wrote:
 9              "Every registered voter gets one
10         vote.  Bill Gates gets one vote.  The
11         19-year-old college student gets one
12         vote.  And thus we reaffirm, as
13         regularly and as often as every
14         election season, the idea that makes
15         us one.  We are all equal before the
16         law.  We all count.  We all have a
17         voice."
18              Do you see that?
19        A.   Yes.
20        Q.   And do you agree with that assessment?
21        A.   Yes.
22        Q.   And what -- why is it important for an
23    individual voter's voice to be heard in an
24    election, as Secretary Raffensperger describes
25    here?
```

1      A.   Because it's the foundational section of

2   our democratic republic.

3      Q.   Okay.  And then if you come to the next

4   paragraph, he wrote:

5           "My view is that this election is

6       about using this unique and historic

7       opportunity to create a voting system

8       that is modern, efficient, accurate,

9       secure, safe, verifiable, fair,

10      accessible and trustworthy."

11          Do you see that?

12     A.   Yes.

13     Q.   And do you agree with him on that?

14     A.   Yes.

15     Q.   Just to go back briefly to a subject we

16  talked about earlier, the hand tally that was done

17  with the presidential election in 2020, there was

18  no effort made to determine whether the Q.R. code

19  on any individual ballot actually corresponded to

20  the human readable portion of that ballot.

21          Do I understand that right?

22     A.   Restate the question for me, please.

23     Q.   Sure.  In the hand tally that you referred

24  to in November of 2020, there was no effort in that

25  hand tally to determine whether the Q.R. code on

Page 82

1   any given ballot would be tabulated in the same way
2   as the human readable portion indicated the
3   selections were on that ballot; right?
4       A.   On individual ballots, no.  A whole point
5   of a hand tally in that posture is to get to an
6   aggregate to show that the machines counted them as
7   the ballots were marked.  And that's what that
8   tally showed.
9       Q.   Well, then let's be clear.  I want to make
10  sure we're talking about the same thing.  You
11  said --
12      A.   Okay.
13      Q.   -- that the hand tally showed that the
14  ballots were tabulated as they were marked, but
15  that's, I think you said that's at an aggregate
16  level; right?
17      A.   Yes.  It's not on individual ballots, no.
18  They did not go to say individual ballot 17A
19  matches up.  However, in hand counting five million
20  of them and coming at a point 1053 percent on the
21  totals and point 0099 percent on the margin showed
22  that there's no indication that a Q.R. code did not
23  match the human readable portion.
24      Q.   But you didn't test that?  No one at the
25  Secretary's office or the counties tested that;

Page 83

1    right?

2        A.   Not to my knowledge.   Because in the

3    aggregate it showed what the outcome was.

4        Q.   Well, you understand that malware could

5    alter Q.R. codes so that they don't match the human

6    readable selection, that those could wash out in

7    opposite directions over the course of five million

8    votes; right?

9             MR. RUSSO:  Objection to form.

10            THE WITNESS:  I understand that

11        that's a claim that could be made, yes.

12   BY MR. CROSS:

13       Q.   And the individual voters who had their

14   ballots altered in that way, assuming that

15   happened, and I'm not suggesting it did, but just

16   so we understand the vulnerability, if something

17   like that were to happen, those individual voters

18   would have lost their vote even though the election

19   outcome might be right; right?

20            MR. RUSSO:  Objection.  Form.

21            THE WITNESS:  I'm -- you're -- this

22        is at a level of convoluted to where I'm

23        trying to follow it here.  Are you saying

24        the malware -- walk me through your logic

25        train on this, because I'm not quite

Page 84

1           following it.  I apologize.

2                (Whereupon, Mr. Stark entered the

3            deposition.)

4     BY MR. CROSS:

5           Q.   Yeah.  So let's say that you had a -- you

6     had a situation where malware changed the Q.R. code

7     on a ballot for some small number of ballots so

8     that the Q.R. code tabulated differently than the

9     human readable portion.

10                That's where we are so far.  Do you

11    understand that?

12          A.   I'm getting what you're saying on that.

13    But then you also said it did it the opposite side,

14    so it was a wash.  So again, the outcomes -- if the

15    outcomes remain the same, again, this is where I'm

16    kind of getting lost on --

17          Q.   Got it.

18          A.   -- the individual voter losing their vote,

19    because the outcome is the outcome.  Because if

20    they washed, it was evenly matched, that'd be some

21    super smart malware, because they don't talk to

22    each other and no one know how many people are

23    going to be voting on a B.M.D.

24                So the logic train on this requires a lot

25    of logical leaps to get to that point.  Could it

Page 85

1    happen in any -- in any kind of way?  I don't

2    believe it could.  But technically, I guess if you

3    somehow managed to do many, many things in the

4    smartest possible way and make it undetectable, I

5    suppose you could.

6           But again, the real world in which we

7    counted those ballots, the aggregate showed that it

8    was the same.  So I just can't accept the

9    supposition that somehow malware got in and did a

10   complete wash.  Because again, what would be the

11   point of it, then?

12       Q.   Yeah.  And just to be clear, I'm not -- we

13   are not suggesting in any way that there was

14   malware that manipulated the results in the

15   November 2020 presidential election.

16       A.   Okay.

17       Q.   I'm just, I'm talking about how

18   vulnerabilities could work.  And I want to make

19   sure we're -- we understand what we're talking

20   about.  So let me ask it this way.

21          Let's say hypothetically that there was

22   malware on a single B.M.D. that changed the Q.R.

23   code -- that changed the Q.R. code on only a

24   handful of ballots.

25          Okay?

Page 86

1    A.   Okay.

2    Q.   A small number, not enough to swing the

3  election outcome, and not even enough to be

4  captured in a -- in an audit.

5        Would you agree with me that the

6  individual voters who were affected by that on

7  their ballots, even though the outcome is the same

8  as it otherwise would be, if those individual

9  voters did not have their votes counted as

10 intended, we're agreed on that count?

11        MR. RUSSO:  Objection to form.

12        THE WITNESS:   In this narrow

13     definition that you have laid out of

14     things that there is no proof of, again,

15     with what you have laid out, obviously

16     those individuals who were affected by

17     something like that that no one has seen

18     exist, yes, those votes or one of their

19     votes or some parts of their votes would

20     have been undercut.

21        By the same token, when somebody

22     double votes in a system when -- even

23     though we have guardrails up, that

24     undermines somebody's vote.   In every

25     election there's always going to be some

Page 87

1      issues around those kind of things where
2      people have their votes, you know, hit
3      unfortunately.  But you try to do
4      everything you can to avoid that.
5  BY MR. CROSS:
6      Q.   And again, I'm not suggesting this has
7  happened.  I'm talking about protecting against a
8  vulnerability where something could happen in the
9  future.
10          And what I'm trying to get at is, do you
11  agree that what matters to voters isn't just the
12  outcome of the election but also that their
13  individual vote counts, that what Secretary
14  Raffensperger refers to as their voice, their voice
15  is heard on their ballot?
16      A.   Both count.
17      Q.   All right.  Turn to -- all right.  Turn to
18  where it says Page 52 of 240.
19      A.   I'm there.
20      Q.   And if you come down to the bottom, do you
21  see here Secretary Raffensperger writes, at the
22  bottom of the left-hand column, he's referring to
23  the new system -- do you see where he refers to,
24  "however, a ballot marking device with a verifiable
25  paper ballot"?

1          Do you see that?

2       A.   One moment.   "However" -- yeah, I'm there.

3    I got you.

4       Q.   Okay.   And then if you come down a little

5    further, I think it's six lines from the bottom,

6    you see the sentence that begins in the middle,

7    "the resulting printed paper ballot"?

8       A.   Yes.

9       Q.   And here Secretary Raffensperger wrote:

10          "The resulting printed paper

11       ballot is then counted using a digital

12       scanner and a tabulator.   This printed

13       paper ballot, which is the official

14       ballot, is then fed through a scanner

15       into a locked ballot box so that all

16       originals are saved for auditing and

17       recounts.

18          "Additionally, the voter has the

19       ability to proofread the ballot before

20       it is scanned and have it voided and

21       start over if there is an error."

22          Do you see that?

23       A.   Yes.

24       Q.   And on this last point, the only error

25    that a voter could catch on a ballot is in the

Page 89

1    human readable portion of the ballot, not in the

2    Q.R. code; right?

3              MR. RUSSO:   Objection to form.

4              THE WITNESS:   Yes.   But it's the

5         same -- again, as I pointed out earlier,

6         the same could be said for a hand-marked

7         paper ballot, they have no way of

8         necessarily knowing that, how it's going

9         to be scanned, the same thing in the Q.R.

10        code.

11   BY MR. CROSS:

12        Q.   Right.   But they would know that, on a

13   hand-marked paper ballot, when they fill it out,

14   and if they review it after they do so, that at

15   least the paper ballot will accurately reflect

16   their vote selections; right?

17        A.   Well, Mr. Cross, the paper ballot

18   accurately revotes [sic] their vote selections on

19   the other.

20        Q.   But the tabulation --

21        A.   If they're reviewing it for a hand tally

22   or a recount, that's -- I mean, I'm sorry, not for

23   a recount, but for a hand count tally or auditing,

24   that would be the same.

25             So on that front, they are fundamentally

Page 90

1   the same because a human being can never know how a
2   computers been programmed to read either the tick
3   marks and the bubble-in sheets or the Q.R. code,
4   which is essentially just the tick marks that the
5   bubble is.
6        Q.   Is it your belief that voters would not
7   have more confidence in a ballot where what's
8   getting tabulated is what they can read as opposed
9   to a Q.R. code that they cannot read?  Do you --
10       A.   But again, Mr. Cross, your point is
11   you're -- I think you're avoiding the point that
12   they can't know any more on that than they can on a
13   Q.R. code if the computer being [sic] scanned and
14   doing the tabulation is reading it properly.
15       Q.   I understand that.  But I thought we
16   agreed that voter confidence is important.
17       A.   Well, if people are telling them that
18   it -- that, you know, it's not, that undermines
19   voter confidence even if it's not true.
20       Q.   All right.  But we agree that voter
21   confidence in the voting system is important;
22   right, Mr. --
23       A.   Yes --
24       Q.   -- Sterling?
25       A.   -- we are.

Page 91

1      Q.   Okay.   And is it your belief that voters
2  do not have greater confidence in a ballot where
3  they can actually read what's being tabulated than
4  a Q.R. code?
5           Do you believe voters are just totally
6  indifferent to that?
7      A.   Mr. Cross, you've said they can read
8  what's being tabulated.   Neither one can they do
9  that.   That's my -- I'm not accepting the
10  underlying point of your question.
11      Q.   So let me ask it this way.   Is it your
12  belief that voters have just as much confidence in
13  a system that uses Q.R. codes as one that does not?
14  Is that your belief?
15      A.   I think "voters" is a very broad
16  statement, because we have, you know, seven million
17  registered in the state.   So I'm not going to
18  attempt to get in the mind of seven million
19  individuals.
20      Q.   Well, do you have any view, as the
21  individual at the Secretary of State's office who
22  was responsible for implementing this new system,
23  do you have any view or understanding as to whether
24  the majority of Georgia voters have an -- have
25  greater confidence in a system that does not use

Page 92

1   Q.R. codes than one that does?

2        A.   I think that there has been so much

3   misinformation and disinformation put around Q.R.

4   codes that in some ways it probably has undermined

5   many people's belief in that.

6        But I think the most thing they looked at

7   is looking at the outcomes and then having three

8   counts in a row to show that the votes were cast in

9   the way that they were presented to the computers

10  should instill that confidence.

11        So I understand what you're trying to get

12  to.  You believe that a hand-marked paper ballot is

13  a better thing that instills more confidence.  I

14  don't necessarily agree with that or know that to

15  be the case.  I haven't looked at any polling.  I

16  don't know.

17        But again, it's -- we have a system that

18  we procured and put in place that follows the laws

19  of the State of Georgia right now.

20        Q.   And I wasn't mentioning hand-marked paper

21  ballots.  Again, you can have a B.M.D. ballot that

22  doesn't use a Q.R. code.  So all I'm asking --

23        A.   I see what you're saying.  Yeah.  Okay.

24        Q.   Right.  Do you have any, just based on

25  your experience in your role at the Secretary's

Page 93

1    office, do you have any understanding one way or
2    the other as to whether most Georgians have greater
3    confidence in a system that does not use a Q.R.
4    code than one that -- than one that does, even if
5    it's still --
6         A.   I'm not -- sorry.  I'm not going to do --
7    I'm not going to speculate on "most Georgians."
8    That's kind of a -- not really my position.
9         Q.   So you just, you don't have a belief or an
10   understanding one way or the other on that; is that
11   fair?
12        A.   I'm not going to speculate on what seven
13   million individual Georgians think.
14        Q.   Well, I'm not asking you to speculate.
15   You spent over a year implementing this system.
16   You spent multiple years working with the
17   Secretary's office defending this system.
18        And my question is, based on that
19   experience and the knowledge that you have, do you
20   have some belief or understanding as to whether
21   Georgians generally have greater confidence in the
22   system without a Q.R. code than one with?
23        MR. BARGER:  And I'm going to just go
24        ahead and object to the form and also as
25        to any opinion testimony that you're

1           Early on, the early days, yes, there

2       was a lot of questions about that.  It was

3       mainly misinformation, disinformation

4       around Dominion.  But the vast majority

5       once we did the hand tally came in from

6       the absentee ballot side, mainly focused

7       on Fulton County.

8   BY MR. CROSS:

9       Q.   Okay.  Is there any election security

10  cybersecurity expert you can identify who has done

11  a forensic assessment of the voting equipment,

12  meaning the B.M.D.s, the printers, the scanners,

13  the election management servers, of the ENet system

14  and the voter registration system, is there any

15  election security expert that you can identify

16  who's done a forensic examination of those

17  components to determine whether there's been any

18  compromise?

19      A.   I believe we have our outside third-party

20  group, Fortalice, who's done some assessments on

21  that.  I can't -- I'm juggling so many things right

22  now, I can't remember specifically on that, but

23  Fortalice is generally the people who we do some

24  kind of stuff with.

25           We were in the middle right now, once we

Page 97

1   had our warehouse established, of getting some
2   stuff over to the cybersecurity center in Augusta,
3   but we have not been able to get that over to them
4   yet.
5           Q.   So there's no one -- no one other than
6   Fortalice who you can point to right now that's
7   done any assessment like that; is that right?
8           A.   I don't believe so.  Now, I could be
9   wrong, but I don't believe so.
10          (Whereupon, Ms. Elson entered the
11       deposition.)
12  BY MR. CROSS:
13          Q.   And you mentioned Augusta.  Are you
14  talking about the set-up with Dr. Alex Schwarzmann?
15          A.   Correct.  Yeah.
16          Q.   And this is -- this is the set-up at
17  Augusta University where you have a mirror set-up
18  of the voting system ranging from the E.M.S. server
19  to the printer to the scanner to the B.M.D. set up
20  at Augusta University; is that right?
21          A.   Again, I don't believe it's actually set
22  up yet.  We were in the middle of trying to do that
23  and COVID hit and we were -- and then we had stuff
24  to get deployed.  But it's -- that's -- our
25  intention is to get that stuff over to them, but

Page 98

1  that has not been officially set up yet, Mr. Cross.

2      Q.   And I was going to ask about that.  So

3  while we're there, Dr. Schwarzmann talked about

4  this as early as February of 2020 in an interview,

5  and it looked like it had not been set up yet.

6          What's the reason for that?  Was it COVID?

7  Is that what you said?

8      A.   COVID was the biggest thing in the middle.

9  And then we had to -- we were on path.  COVID kind

10 of got in the way.  Then we had elections.  And as

11 is pretty well known, we've been very busy with

12 both false election claims and litigation and

13 regular work and staffing issues.

14         And as an example, there was -- to get

15 stuff off of trucks we had in storage to put into

16 the new warehouse, we had to wait for two months

17 for a plate to offload stuff.  I mean, it's those

18 kind of real world things kind of got in the way of

19 it.

20     Q.   And do you have an estimated time for

21 getting that set up?

22     A.   We were supposed to do an inventory and

23 get it off of that last week when I had my

24 emergency dental surgery.  So soon, but I don't

25 have an exact date right now for you.  I apologize.

Page 99

1      Q.   What's the purpose of that set-up at
2   Augusta?
3      A.   As I understand it when we had the initial
4   discussions, and again, it's been a little while,
5   was to have that mirrored system, as you pointed
6   out, Mr. Cross.
7           And I think we were even talking about
8   maybe a dual mirrored system, one that's going to
9   be pristine and one that will be tested on to see
10  if they can replicate anything that is discovered
11  or any vulnerabilities or any claims to see if they
12  can be, you know, reproduced, and if they can be
13  reproduced, then possibly look into any mitigation
14  if necessary.  That's sort of the goal overall.
15     Q.   Who is responsible for that project, for
16  getting it set up and coordinating with Augusta?
17     A.   I guess, for lack of a better word, me.  I
18  mean, it would be me and Blake Evans from our
19  office.  And I think -- we had a warehouse manager
20  who accepted the deal and he would have been part
21  of that process, but he ended up taking another
22  job.  So we don't have a warehouse manager right
23  now to help coordinate some of that.
24     Q.   Given that you and others at the
25  Secretary's office have publicly defended the

1   reliability and security of this system, why do you

2   need Augusta to do this set-up to do further

3   security testing?

4       A.   Because we view, I'm sure this sounds

5   cliché, cybersecurity is a never-ending race.  You

6   can always be looking for new things.  You can

7   always be looking for new threats.  And mitigating

8   those threats, when you mitigate one, another one

9   may pop up.  So you can never, like, say, stop,

10  we're done.  So this is just an ongoing kind of

11  process.

12      Q.   Do you know whether Dr. Schwarzmann or

13  anyone in his department has read any of

14  Dr. Halderman's reports or testimony in this case?

15      A.   I do not.

16      Q.   Who would you ask if you wanted to know?

17      A.   I would probably call Dr. Schwarzmann.

18      Q.   Well, you -- I think you said you're one

19  of the primary people responsible for coordinating

20  with him.  Why not have him review Dr. Halderman's

21  report and do his own assessment of the election

22  equipment to determine whether he agrees or

23  disagrees with Dr. Halderman?

24      A.   We haven't gotten to that kind of point

25  yet.  Like I said, I'm just trying to get him the

Page 101

1    equipment right now.

2         Q.    Okay.   Is that something you would

3    anticipate doing, or you just don't know one way or

4    the other as you sit here?

5         A.    I don't know one way or the other.   But

6    logically, it would probably make sense.   I mean,

7    again, Dominion is the person responsible for kind

8    of doing these mitigations.   But we want to have,

9    you know, our own other expert on that side be able

10   to look at some of those things potentially.

11             And we can't have perfect information

12   100 percent of the time and get everything executed

13   100 percent perfectly in the fastest possible way

14   because we have the real world we have to deal

15   with.   So I want to get the stuff over to them, and

16   we will do this in due course.

17        Q.    Are you aware that the Secretary's expert,

18   Dr. Juan Gilbert, testified at his deposition, I

19   went through and finding by finding in

20   Dr. Halderman's report, and he testified each time

21   he did not disagree with any of the findings?

22             Were you aware of that?

23        A.    No, I was not.

24        Q.    Does that affect your view on whether you

25   think that that report is a load of crap?

1     A.   No.   Because again, the underlying thing

2 of it, as I said, every system in the world has

3 vulnerabilities.   It's a question of what you do to

4 mitigate around them.

5          And I've seen for most people who are on

6 the cybersecurity side, they exclusively focus on

7 that, and only that, and kind of ignore mitigations

8 for the most part.

9     Q.   Are you aware of whether the Secretary's

10 office has had any cybersecurity experts or

11 election security experts review Dr. Halderman's

12 July of 2021 report other than Dr. Gilbert?

13     A.   I believe, like I said, I know Dominion

14 has it, and they are a contractor of the State.

15     Q.   Anyone else?

16     A.   Not off the top of my head, no.

17     Q.   If you wanted to know the answer to that,

18 who would you ask?

19     A.   I would assume Ryan Germany with my

20 office.

21     Q.   All right.   Look at Page 54 of 240, if you

22 would, please, in Exhibit 3.

23     A.   Okay.   I'm there.

24     Q.   If you come to the bottom of the

25 right-hand column here, the last full paragraph

Page 103

1    before the number seven paragraph.

2         A.   Uh-huh.

3         Q.   Do you see that?

4         A.   Uh-huh.

5         Q.   And just to give you some context so you

6    know what we're looking at, if you go back to Page

7    50, if you scroll up to Page 50 of 240 and look at

8    the --

9         A.   I'm there.

10        Q.   -- at the bottom right column, do you see

11   here what Secretary Raffensperger is writing about,

12   it's what the S.A.F.E. Commission recommended in

13   January of 2019, that's these numbered paragraphs?

14        A.   Yes.

15        Q.   And so then if you come back to Page 54

16   and you look just above their number seven

17   recommendation, the last thing there from the

18   S.A.F.E. Commission was:

19             "Additionally, Georgia law should

20         be updated to clarify that the human

21         readable component of the ballot is

22         the official vote record."

23             Do you see that?

24        A.   Yes.

25        Q.   That has not happened; right?

1      A.   I don't know that's the case.  I believe

2   that the paper ballot is viewed as the -- if there

3   is -- I'm not sure, honestly, about how the law

4   reads on that section of it.  I know that the paper

5   ballot is the official ballot.  And -- but I guess

6   recounts are done using the Q.R. codes.

7          So I can see where there could be -- that

8   may not have been on that depending on how it's

9   done.

10      Q.   Right.  The official vote tally in any

11   election using the current system comes from the

12   scan of the Q.R. codes; right?

13      A.   Correct.  Either it would be the first

14   count or any recounts.

15      Q.   And do you know whether the Secretary's

16   office disagrees with this recommendation from the

17   S.A.F.E. Commission that the human readable

18   component of the ballot should be the official vote

19   record?

20      A.   No, I don't -- I don't believe we would

21   agree with that, no.  But again, it's the

22   legislature's decision.

23      Q.   Has the Secretary's office taken any

24   efforts to advocate for that change with the

25   legislature in Georgia?

1      A.   I don't know at this point -- at this
2  point if the Secretary's office took any positions
3  that the legislature would be too inclined to
4  listen.  But not off the top of my head, no.
5      Q.   The legislation that was adopted that led
6  to the Dominion B.M.D. system, did you help write
7  that?
8      A.   Me personally?  Not specifically.  But I
9  was in the room sometimes with Mr. Germany and --
10  let's see.  I remember that Barry Fleming was the
11  key author on that.
12          So that was where a lot of that -- those
13  discussion points came up and to kind of get into
14  the specifics of it of how you put it from S.A.F.E.
15  Commission language to the law.  But yeah,
16  basically.
17          I was -- like I said, I'm not a lawyer,
18  but I was around those conversations about how this
19  ought to come together.
20      Q.   Okay.  How the legislation that came out
21  that led to the Dominion B.M.D.s, how that
22  developed coming out of the S.A.F.E. Commission
23  recommendations; is that what you're referring to?
24      A.   Yes.  HB 316, which was the final version
25  of a bill to move to a B.M.D. and to decommission

1    the D.R.E.s.

2        Q.    Okay.   And do you know at a high level or

3    just generally what the Secretary's office

4    involvement was in that?

5            You mentioned Mr. Germany.   So that just

6    so I understand it, did individuals at the

7    Secretary's office help prepare that legislation?

8        A.    Mr. Rayburn, Kevin Rayburn, who's left the

9    office and went on to be general counsel of the

10   E.A.C., was also pretty -- very involved in the

11   specifics of a lot of that.

12       Q.    All right.   Turn to the Page 68 of 240, if

13   you would, please.

14       A.    All right.   I'm there.

15       Q.    All right.   If you look at the top of the

16   second right -- or sorry, if you look at the top of

17   the column on the right, do you see that on Page

18   68?

19       A.    "They politely told us"?

20       Q.    Yes.

21       A.    Okay.

22       Q.    And then in the next sentence, Secretary

23   Raffensperger writes:

24            "Election integrity wasn't

25          something that Republicans, or by

1        extension then-sitting president

2        Donald J. Trump, saw the value in

3        defending in the lead-up to the 2020

4        election."

5             Do you see that?

6    A.   Yes.

7    Q.   And do you agree with that assessment?

8    A.   Yes.

9    Q.   And do we agree that election integrity is

10   something that's important to Georgia voters

11   generally?

12   A.   Yes.  But now, the idea of what election

13   integrity is varies from person to person, but yes.

14   As a general thought, yes.

15   Q.   All right.  Come down, then, to Page 71.

16   It should be the next page in the exhibit.

17   A.   Yes, sir.  I'm there.

18   Q.   And if you look at the right column, do

19   you see the paragraph that begins, "I had been

20   elected Secretary of State"?

21   A.   Yes.

22   Q.   And then there Secretary Raffensperger

23   writes:

24        [As read]  "Georgia was one of

25        only five states using

Page 108

1      direct-recording electronic, or

2      D.R.E., voting machines.  And with

3      mounting concerns of potential foreign

4      and domestic attempts to hack and

5      alter the results of American

6      elections, Georgia moved toward

7      replacement in time for the March 2020

8      presidential primary."

9          Do you see that?

10   A.   Yes.

11   Q.   And the replacement he's referring to

12  there is what became the Dominion B.M.D. system

13  used today; right?

14   A.   Yes.

15   Q.   Why weren't the physical security measures

16  and other measures that were in place to protect

17  the D.R.E.s against the hacks and the alterations

18  that Secretary Raffensperger notes here, why

19  weren't those sufficient to protect the D.R.E.

20  system to continue using it?

21   A.   I don't --

22          MR. RUSSO:  Objection.  Object to the

23      form.

24          Go ahead.

25          THE WITNESS:  I don't know that they

Page 109

1     weren't.  I do know that they were very
2     old.  And because of the way that the
3     physical hardware and the I.P. were split,
4     that we couldn't update them at all.  And
5     they were beginning to physically fall
6     apart.
7          So there were concerns around that,
8     and everybody -- I say "everybody."  Many
9     people were of the belief that having a
10    paper-based system was one of the better
11    guarantors of avoiding any kind of outside
12    attempts to do that.
13  BY MR. CROSS:
14         Q.    Did you say --
15         A.    I mean, to this point even today, there's
16  a belief that things were done that didn't actually
17  occur, and that's maybe to more what he's referring
18  here.  Like, people all hacking machines and
19  flipping votes from Hillary Clinton to Donald
20  Trump, that was -- that was sort of a belief out
21  there with many people.
22         Q.    All right.  Go to the next page, 72,
23  please.
24         A.    Okay.  I'm there.
25         Q.    And actually, sorry, just so you have

Page 110

1   context, if you go back to 71, the bullet points

2   there that start on 71 and go to 72 --

3       A.   Uh-huh.

4       Q.   -- do you see here that what Secretary

5   Raffensperger is referring to is things that were

6   intended to come out of the draft legislation that

7   became House Bill 316?

8       A.   Yes.

9       Q.   And then if you come down to the next

10  page, one of the things that he includes there in

11  the second-to-last bullet -- or the second bullet

12  on the --

13      A.   On the next page or were we on 72 still?

14      Q.   72.  Go to 72.

15      A.   Okay.

16      Q.   See the three bullets on the top left?

17      A.   Uh-huh.

18      Q.   And then he writes one of the things that

19  was thought to come out of the legislation, the

20  draft legislation, was:

21          "Conduct an audit immediately

22      following each election to confirm

23      election equipment worked properly."

24          Do you see that?

25      A.   Yes.

1      Q.    That's not done in Georgia; right?

2      A.    I disagree.   The -- we consider that the

3    audit that we did after the general election, the

4    Secretary gets to choose one, when you do that,

5    that shows that the machinery actually counted the

6    ballots as cast correctly.   That is the intent of

7    that, and that's what that's referring to.

8      Q.    Well, the -- that was -- that was a hand

9    tally or an audit, if you want to use that word, of

10   a single election contest in the November 2020

11   election; right?

12     A.    Yes.

13     Q.    And the law that was adopted in Georgia

14   only requires a single statewide audit every other

15   year.  Do you understand that?

16     A.    And they consider -- they consider that

17   particular thing to be met with that audit.

18     Q.    Okay.   But I just want to make sure,

19   what's written here is not a single statewide

20   election of a single contest every other year.

21   What's written here is, "conduct an audit

22   immediately following each election," not every

23   other year, not only statewide, "each election to

24   confirm election equipment worked properly."

25           That's what's written here; right?

Page 112

1      A.   That's what's written there, yes.   But I
2  think they came to the point that doing it every
3  two years is what the -- met that point in their
4  outline of what they were trying to do.
5      Q.   All right.  Go to -- sorry.  Stay on this
6  page.
7      A.   Okay.
8      Q.   If you look at the top of the next column,
9  still on Page 72, here Secretary Raffensperger
10 wrote:
11          "In the meantime, Deputy Secretary
12      of State Jordan Fuchs was organizing a
13      multi-disciplinary evaluation team to
14      review the proposals."
15          Do you see that?
16      A.   Yes.
17      Q.   And these are the proposals that came in
18  in response to the R.F.P. for the new system in
19  2019; right?
20      A.   Correct.
21      Q.   And then Secretary Raffensperger goes on:
22          [As read]  "That group included,
23      among others, a cybersecurity expert,
24      an advocate for people with
25      disabilities, election directors from

Page 113

1      large and small counties," and then in
2      parentheses, "(their needs are quite
3      different from each other), and an
4      attorney who is an expert in election
5      law."
6          Do you see that?
7    A.   Yes.
8    Q.   Did you work with this multi-disciplinary
9    evaluation team?
10       A.   I was brought in as a subject matter
11   expert when it came to there was a section of the
12   bid having to do with their individual businesses,
13   which the intent of that was to make sure they had
14   the capital available and the ability to actually
15   fulfill this very large order.
16       I was never actually -- the stuff was so
17   plain, I was never actually, I don't believe I was
18   asked any questions during the evaluation process.
19   I can't recall for certain.  I might have asked a
20   couple of individual ones.
21       But no, the individuals who did that were
22   off on their own doing their evaluations, and then
23   they came together I think three times all
24   together.  And one on the final they had to drop
25   off because his mom died, and so he couldn't make

1      Q.    Okay.  If you wanted to know what this

2    team considered, what they discussed, who would you

3    ask?

4      A.    I would probably go to the bid documents

5    and re -- and look at what they reviewed there.  I

6    think some notes are -- I think the real time notes

7    are also part of that record, but I'm not positive.

8    But you can look at it.  I think it's a public

9    record.

10     Q.    The discussions and the notes, the files

11   for this committee?

12     A.    Yes.  That's my understanding.

13     Q.    And when you say "public record," do you

14   mean it's publicly available, like, I could find it

15   on-line, or just that you could get it through --

16     A.    You should be able -- I believe you can

17   find it on-line.  I don't think it's an O.R.R., an

18   open records request kind of thing.  I believe you

19   can find it on-line under the Department of

20   Administrative Services procurement tab and look

21   for, you know, statewide voting system solution.  I

22   believe that would have all those documents.

23     Q.    All right.  Go to Page 75, if you would,

24   please.  It's the beginning of Chapter 7, 2020.

25     A.    I've got it.

1      Q.   If you look at the right column and go --

2   the long paragraph that ends towards the bottom

3   half of the second -- of the right column, do you

4   see the sentence, the last sentence that begins

5   "with our outside counsel"?

6      A.   Yes.

7      Q.   And here the Secretary writes:

8           "With our outside counsel at the

9      attorney general's office, who brought

10     in Georgia's leading conservative

11     election lawyers, I was confident we

12     could successfully defend all of our

13     election integrity measures."

14          Do you see --

15     A.   Yes.

16     Q.   -- that?

17     A.   Yes.

18     Q.   Do you know why it was important for the

19  Secretary to bring in specifically conservative

20  election lawyers to defend the election integrity

21  in Georgia?

22     A.   Because I think liberal election lawyers

23  would probably, from our point of view, attack some

24  of the things we considered to be election

25  integrity measures.

1    Q.   And why would you assume that?

2    A.   Well, because Marc Elias, and then as

3  discussed in this particular page the Four Pillars

4  program, and they were doing things to attempt to

5  weaken identification of individuals, extend times

6  that ballots can be received, you know, even

7  outside of the normal what the law called for,

8  things along those lines.

9    Q.   Why not obtain -- retain non-partisan

10  counsel to defend the election integrity?

11    A.   Frankly, I couldn't tell you.  Because I

12  don't think the -- seemingly in election law, I'm

13  not sure that there's such a thing as a

14  non-partisan counsel.

15    Q.   All right.  Come to Page 88, please.

16    A.   Yes, sir.  All right.  I'm there.

17    Q.   If you look at the top of the right-hand

18  column and go to the second sentence that begins,

19  "I first explained," do you see that?

20    A.   Yes, sir.

21    Q.   And there Secretary Raffensperger writes:

22        "I first explained that 'counties

23    run elections.'  We have" --

24    A.   Yes.

25    Q.   "We have 159 counties, and more

Page 118

1           than 150 of them did a great job."

2               Do you see that?

3          A.   Yes, sir.

4          Q.   Do you agree with Secretary Raffensperger

5     that counties run elections in Georgia?

6          A.   Yes, sir.

7          Q.   Who is responsible for securing elections,

8     from the voting equipment to the servers to

9     anything that touches the election system in

10    Georgia?

11         A.   The counties.  We are responsible for our

12    E.M.S. at our Center for Elections, but the

13    counties secure the voting equipment and secure

14    their E.M.S.s.

15         Q.   Does the Secretary's office have any

16    program or practice of doing -- sort of assessing

17    whether the counties are complying with the

18    security measures that need to be taken to secure

19    the election system?

20         A.   We've worked in the past with C.I.S.A.,

21    the -- I always get that acronym wrong, it's

22    C-I-S-A -- to do assessments of counties to make

23    sure they have physical -- they're following the

24    physical protocols necessary.

25               In fact, we just met with them I want to

1    say a month ago to request we do another round of

2    that again.  So we do have some of those things

3    where we work with the federal government to help

4    counties move along on that front.

5              We also in the 2020 election cycle set up

6    some grants for security as well to help them

7    mitigate some of the things with the new equipment

8    they had to do.

9              So there's several things along those

10   lines, but it's really fundamentally the counties'

11   responsibility.  I mean, our grants were relatively

12   small, and they're really held for the smaller

13   counties than the bigger counties.

14       Q.   And what have you done with C.I.S.A. to

15   check the security measures at the county level?

16       A.   They physically send inspectors out to

17   look and make sure a block's here, is there a date,

18   is there a file, those kind of items.  Like, the

19   physical security was the biggest front-line thing

20   to try to do with the counties.

21       Q.   How often is that done in Georgia?

22       A.   I don't know the answer to that question.

23   I mean, I know we did it once early on when I was

24   here, and we're talking about them going out and

25   doing it again, you know, in a relatively soon time

Page 120

1    frame.

2           Like I said, we met last month and had --

3    started having some initial discussions about

4    having that done again.

5        Q.    Does that process generate a report?   Does

6    C.I.S.A. say, here's what we did and here's what we

7    found?

8        A.    I don't know.

9        Q.    How would you find that out?

10        A.    I guess I'd probably go and talk to either

11    our elections director or Ryan Germany.

12        Q.    And Blake Evans is the elections director

13    today.

14        A.    Correct.

15        Q.    Is that right?

16        A.    Yes, sir.

17        Q.    And would it be the responsibility of the

18    counties to address any concerns that come up in

19    those assessments?

20        A.    Yes.

21        Q.    All right.  If you go -- stay on Page 88.

22        A.    Okay.

23        Q.    Look at the middle of the right column.

24    Do you see the second full paragraph that begins,

25    "but the county"?

1      A.   Yes.

2      Q.   And absentee ballots in Georgia are

3  hand-marked paper ballots; right?

4      A.   Correct.

5      Q.   And so is it fair to say that the

6  Secretary's office finds the hand-marked paper

7  ballots that are done through the absentee system

8  just as reliable as the electronic voting equipment

9  that's used?

10     A.   No.  We -- on the reliability side, you

11  are much more likely to have an over-vote or an

12  under-vote on a hand-marked paper ballot done at

13  home.  So on that front, they're not quite as

14  reliable, no.

15     Q.   So then why does the Secretary believe

16  that hand-marked paper ballots through the absentee

17  system historically was a strength for Republicans,

18  not a weakness, if they're less reliable than the

19  voting machines?

20          MR. RUSSO:  Objection to form.

21          THE WITNESS:  What he's referring to

22      there is in a political way.

23      Historically, up until the 20 -- I want to

24      say 2018 election -- every previous

25      election from 2006, which was after the

Page 123

1    2005 passage of the law, up until 2016,

2    Republicans had generally done better on

3    absentees than Democrats.

4         But the previous two election cycles,

5    the Democrats worked very hard to set up

6    good systems for tracking and getting

7    absentee ballots out.  And they just,

8    frankly, did a better job of working the

9    system the way -- legally the way it was

10   constructed than Republicans had

11   previously.

12        And his point saying the Republicans

13   could have made them a strength in 2020

14   given COVID-19, I think that's more of an

15   allusion to the fact that there were

16   Republicans who were saying, don't trust

17   absentee ballots, like the president at

18   the time.

19   BY MR. CROSS:

20        Q.   You're not suggesting that the hand-marked

21   paper ballots that are used in Georgia's absentee

22   system are unreliable; right?

23        A.   No, I'm not suggesting they're unreliable.

24   I'm saying they are less reliable in terms of

25   avoiding over-votes and under-votes than a

Page 124

1    B.M.D.-marked ballot.

2         Q.   Is there any other way in which you

3    believe they're less reliable than a B.M.D. ballot?

4         A.   I believe they're more open to having

5    issues done with them after the fact.  However, in

6    our system, the current system much more so than

7    the previous system with absentees, where if there

8    was an adjudication, it was all done manually and

9    there was no log file that was done.

10              Now, in the current system, there is a log

11   file.  So I think on that front, the absentees

12   under the current system are better than the

13   absentees in the old system in terms of just the

14   way they're being processed, but not the physical,

15   you know, attributes of the absentee ballots

16   themselves.

17        Q.   Okay.  All right.  Turn to Page 98,

18   please.

19        A.   Okay.

20        Q.   Do you see here the second paragraph in

21   the left column where Secretary Raffensperger

22   writes:

23              "For 60 days from Election Day

24         until January 2nd when President Trump

25         called and asked me to 'find 11,780

1    votes,' we investigated all complaints

2    received and looked for any evidence

3    of widespread fraud"?

4         Do you see that?

5    A.   Yes, sir.

6    Q.   Who was responsible for that investigation

7    or those investigations on behalf of the

8    Secretary's office?

9    A.   For the largest part of that, it would

10   have been our investigations division, which was --

11   at that point had the director of Frances Watson.

12   She would be overseeing all of that.

13        There was one particular part of the

14   investigation where we partnered with the G.B.I. to

15   do a signature match in Cobb County where we

16   basically needed more people to deploy on that.

17        So that was the only time we used a lot of

18   other resources, which was for that ballot -- or

19   sorry, envelope review of about 15,000 and a

20   handful of extras of the -- of the absentee ballot

21   envelopes.

22   Q.   And the G.B.I. piece, that only concerned

23   absentee ballots; do I understand that right?

24   A.   Doing the -- making sure the signature

25   match was done properly, yes.  That was what the

Page 126

1    G.B.I. piece was.  So the vast majority of them
2    were directly under Frances Watson through our
3    investigations division.
4         Q.   All right.  And if you come down to this
5    paragraph, do you see that Secretary Raffensperger
6    reports with respect to these investigations, he
7    writes:
8              "We did not see any evidence of
9         widespread fraud."
10             Do you see that?
11   A.   Yes.
12        Q.   Was there any evidence of any fraud at all
13   in the November 2020 election found by the
14   Secretary's office?
15        A.   The --
16             MR. RUSSO:  Objection to form.
17             THE WITNESS:  The use of the term
18        "fraud" is kind of a large, fraught word.
19        We definitely found instances of what we
20        referred to as illegal voting, as there is
21        in every election.
22             At the time of this writing, there
23        were -- we knew there were two dead people
24        that had voted.  By -- at this point we
25        now know there were four.

```
 1            THE VIDEOGRAPHER:  Back on the record
 2       at 11:22.
 3   BY MR. CROSS:
 4       Q.   All right.  Go to Page 118.
 5       A.   Can you hold on one second for me?  I
 6   apologize.
 7            (Whereupon, a technical discussion
 8        ensued off the record.)
 9            THE WITNESS:  Okay.  Go ahead.
10   BY MR. CROSS:
11       Q.   All right.  Go to Page 118 of the
12   Secretary's book, please.
13       A.   Okay.  The one that says -- starts off,
14   "in every case"?
15       Q.   Yes.
16       A.   Okay.
17       Q.   And if you come down, do you see the
18   heading that says Forensic Audit of Dominion
19   Equipment?
20       A.   Yes.  I've got it.
21       Q.   And then at the bottom of that page,
22   there's a paragraph that reads:
23            "Pro V & V was not the first to
24        work with us to protect our election.
25        We also partnered with the Department
```

1           of Homeland Security, the Georgia

2           Cyber Center, Georgia Tech security

3           experts and other election security

4           experts."

5                Do you see that?

6      A.   Yes.

7      Q.   What Georgia Tech security experts did the

8  Secretary's office partner with to protect

9  elections in Georgia?

10      A.   What's his name?   I can't recall his name

11  right now.   He's bald.   He looked at a couple of

12  our cybersecurity forms that we had done that were

13  coordinated with the Center for Election Innovation

14  and Research.   He has a Greek last name, if memory

15  serves.   I just can't recall it right now.

16      Q.   Is it Angelos Keromytis?

17      A.   Ah.   There we go.   Yes.

18      Q.   And what work has Dr. Keromytis done with

19  respect to Georgia election security?

20      A.   Basic overviews and discussions.   There's

21  never been a -- there's been no reports or anything

22  issued.   I remember we were having some discussions

23  with him.

24           And again, some of this is pre-COVID.   So

25  COVID kind of shut some of these things down that

1    we were doing.  But I remember he had had some

2    discussions we -- with our side and with several

3    people we had in a room kind of discussing those

4    things who were other experts on cybersecurity and

5    elections.

6          But there's not, like, a report that was

7    done or anything, but they had come in to kind of

8    review and say, what are you doing and those kind

9    of items in a general kind of way.

10         Q.   When was Dr. Keromytis first engaged to

11   advise the State on election security?

12         A.   Likely -- again, I don't think he was

13   engaged so much as he was brought in by the Center

14   for Election Innovation and Research, or even if we

15   engaged him -- I think there was a discussion of

16   it, but then COVID hit.  So I can't recall exactly.

17   But I know he was in meetings starting in 2019, if

18   memory serves.

19         Q.   And do you know whether he was retained by

20   the Secretary's office or someone else on behalf of

21   the State, or was he brought in informally?

22         A.   I don't know for certain.  My best guess

23   is it was informally with the intention of doing it

24   more formally, but then COVID yet.

25         Q.   If you wanted to know whether there was an

1    actual retention, who would you ask?

2         A.    I would probably talk to either our

3    procurement side or to Ryan Germany.

4         Q.    How often has Dr. Keromytis met with

5    individuals on behalf of the Secretary's office

6    regarding election security?

7         A.    I don't know.

8         Q.    Who would you ask --

9         A.    Let me be --

10        Q.    -- if you wanted to know that?

11        A.    I know there was at least two times he

12   did.  I would have to ask individuals, mainly Ryan

13   Germany probably.

14        Q.    Did you participate --

15        A.    I re -- well, I remember I met with him in

16   a group setting at least twice -- at least twice.

17   Pardon me.

18        Q.    Okay.  And who all participated in those

19   group meetings?

20        A.    I would have to refresh my memory.  I

21   honestly can't recall.

22        Q.    What's your best recollection of who

23   participated, who was there?

24        A.    David Becker from the Center for Election

25   Innovation and Research; Ryan Germany; I believe at

1    the time probably Kevin Rayburn; Chris Harvey, the

2    elections director at the time.

3            And I want to say there was a couple --

4    there was some -- two other people had come in from

5    out of town that I can't recall right now, but we

6    could -- I would have to -- I would have to look it

7    up to honestly tell you for certain.

8        Q.    All right.  Where would you look to find

9    out?

10       A.    I'd probably go to our scheduling

11   calendars and look.

12       Q.    Do you recall whether Jordan Fuchs was in

13   any of those meetings?

14       A.    I think she might have been in parts of

15   them but maybe not for the whole thing.  I just

16   honestly don't recall.

17       Q.    And what about the Secretary?

18       A.    The Secretary was going to be there for

19   parts of the discussion.  But again, I do not

20   believe he was there for all of the discussions.

21       Q.    Okay.  And what was the purpose of those

22   meetings with Dr. Keromytis?

23       A.    Well, it wasn't just with Dr. Keromytis.

24   It was several different people, I believe, who

25   were basically, what are the threats you're seeing

1    out there, what kind of things should we be on the

2    lookout for, those kind of -- in a general kind of

3    way.  I couldn't give you specifics now, because it

4    has been a couple of years.

5         Q.   Were there other election security experts

6    in those meetings?

7         A.   I believe so.  I mean, I know I remember

8    we flew -- somebody flew in, but I can't recall who

9    they are.  I'd have to check.

10        Q.   Do you recall where they came from?

11        A.   Out of state.  That's the best I can give

12   you.

13        Q.   Okay.  You just don't recall anything

14   about that other individual?

15        A.   I think there was two.  I can remember

16   kind of what they looked like, but I can't remember

17   specifically.  But again, it's been a couple of

18   years.

19        Q.   Do you know whether there were any notes

20   or minutes from those meetings?

21        A.   I do not.

22        Q.   Were there any specific election security

23   concerns that were discussed in those meetings?

24        A.   Again, on specificity's side, I don't

25   think there was, like, there's this vulnerability,

1  there's this fix.  I think it was in a general way.

2       Because we were still coming off the 2018

3  claims of stuff, and we're looking at a new system

4  and kind of what do you look for as in a general

5  way what do you -- what should -- what boxes should

6  you check, that kind of thing.

7       But it wasn't, like, there's a report,

8  there's this or -- just a generalized sort of

9  discussion to kind of say what should you be

10  looking for.  That's my -- that's my recollection.

11       Q.   And what was discussed about what you

12  should be looking for with respect to election

13  security?

14       A.   I would have to -- I wouldn't attempt to

15  characterize it.  I'd have to go back and refresh

16  my memory.

17       Q.   Okay.

18       A.   I mean, because at the time we were

19  talking about foreign actors.  And I think one of

20  the big things we talked about, I do remember this,

21  was it was really more around the voter

22  registration system.

23       And I remember somebody said, basically,

24  if you really wanted to screw with something, you

25  know, you go into the voter registration system and

Page 138

1    updating system.  And we'll be moving to the cloud,

2    which provides for an additional level of security

3    under the FedRAMP, the -- on the Salesforce FedRAMP

4    cloud.

5         Q.   So do I understand correctly that among

6    the reasons to move away from ENet were security

7    concerns about that system as well?

8         A.   No.  Not security concerns so much as you

9    can make things better.  We didn't have specific

10   things we were worried about on the security side

11   for that.  Although, I think having something on

12   the FedRAMP is some -- is probably better even when

13   you have lots of security around your own data

14   center, which we have.

15        Q.   So are there any other meetings or

16   communications that you're aware of with

17   Dr. Keromytis or these other two individuals at

18   these two meetings in 2019 that you thought might

19   be election security experts regarding election

20   security?

21        A.   There may be, you know, correspondence

22   with other individuals from the meetings that I'm

23   not aware of.  I imagine there probably is, but I'm

24   not a -- like I said, I'm not aware of them.

25        Q.   Who would you ask to find out -- to find

1  out?

2      A.   Well, I mean, if -- not knowing what the

3  discovery is in this case, I mean, if there were

4  cybersecurity in there, I'm assuming -- and there

5  were E-mails in the State, you probably have them

6  if they exist.

7      Q.   Does Dr. Keromytis work directly with

8  Jordan Fuchs on election security issues?

9      A.   I don't know.  I mean, Jordan doesn't

10 really, she's not operationally doing stuff inside

11 election things, so I wouldn't -- maybe as an "to

12 advise" thing.  But outside of that, I wouldn't

13 know anything, no.

14     Q.   Do you know why Dr. Keromytis would have

15 Jordan Fuchs's cell number?

16     A.   Probably because they were in the meeting

17 together and they probably shared information.

18     Q.   Do you know why Jordan Fuchs would ask

19 Dr. Keromytis to call her on her cell specifically

20 about an election security concern?

21          MR. RUSSO:  Objection to form.

22          THE WITNESS:  No.

23 BY MR. CROSS:

24     Q.   Who would you ask if you wanted to know?

25     A.   I would guess Dr. Keromytis or Jordan

Page 140

1      Fuchs.

2          Q.    If you look back at this language we just

3      read, I asked you about the Georgia Tech security

4      experts, it also indicates other election security

5      experts.

6              Are there any election security experts

7      the Secretary's office has worked with on the

8      security of Georgia elections beyond the ones we've

9      already talked about?

10         A.    I don't know who the Secretary might be

11     referring to specifically here.

12         Q.    So there's no one you're aware of beyond

13     Dr. Keromytis, the two individuals in this meeting

14     that you can't recall, and whatever you're trying

15     to set up with Dr. Schwarzmann; is that fair?

16         A.    Well, again, you're mainly focusing on the

17     cybersecurity side.  We also have other security

18     side.  Like we -- like I said, we meet with

19     C.I.S.A.  We do those things.  We work with Center

20     For Election Innovation and Research on what are

21     the best practices for securing elections.

22             We work, from our point of view, working

23     with the Center for Civic Design to make sure your

24     absentee ballots are -- and applications and -- are

25     done -- the instructions are done better.

Page 141

1        All those from my point of view are about

2    the system working and making it secure.  Then if

3    you're talking about the narrow band of

4    cybersecurity, I think you -- we've gone over the

5    specific ones we've talked about there.

6        Q.   Why has the Secretary's office never

7    engaged an election security expert to do a

8    forensic assessment of voting equipment in the

9    state of Georgia?

10       A.   We rely on our partner through our

11   contracts to make sure our systems are secure.  And

12   like I said, we are working to try to get something

13   over to the cyber center so we have another set of

14   eyes in case a specific issue comes up.

15       Q.   And by "partner," do you mean Dominion?

16       A.   Yes.

17       Q.   And the cyber center, that's the

18   Dr. Schwarzmann --

19       A.   Correct.

20       Q.   Okay.

21       A.   Correct.  And Colonel Toler I believe is

22   the other person we met with over there.

23       Q.   And he works in Dr. Schwarzmann's

24   department?

25       A.   No.  Dr. Schwarzmann works beneath him.

Page 142

1    He's over the whole cyber center.

2         Q.   They're both --

3              (Whereupon, technical difficulty

4         caused Mr. Cross to disconnect from

5         the deposition.)

6              THE REPORTER:  Let's go off the

7         record.

8              (Whereupon, there was a brief

9         recess.)

10             THE VIDEOGRAPHER:  Back on the record

11        at 11:50.

12   BY MR. CROSS:

13        Q.   All right.  Sorry about that,

14   Mr. Sterling.

15        A.   Technology help -- don't help unless it

16   helps, I know.

17        Q.   That's right.

18             Okay.  So do you still have, I think it's

19   Exhibit 3 up?

20        A.   I'm on Page 118 if that's where you wanted

21   to be.

22        Q.   Okay.  All right.  Go to Page 142, please.

23        A.   Okay.  All right.  I'm there.  Which

24   column?

25        Q.   The right column.  Do you see the heading

1    that reads Courts: The Ultimate Fact Check?

2        A.    Yes.

3        Q.    And you see, if you go to the second

4    paragraph under that heading, do you see the

5    paragraph that begins, "in the weeks and months"?

6        A.    Yes, sir.

7        Q.    And then the second sentence in that

8    paragraph, Secretary Raffensperger writes:

9            "The ultimate fact check in the

10        United States, however, occurs in

11        courts of law where witnesses swear to

12        tell the truth or risk imprisonment

13        and where lawyers must also tell the

14        truth or risk disbarment.  If you want

15        to know the truth, watch what happens

16        in court."

17            Do you see that?

18        A.    Yes.

19        Q.    Do you agree with Secretary Raffensperger

20    on that?

21        A.    In a generalized statement, yes.

22        Q.    Secretary Raffensperger has repeatedly

23    referred to Judge Totenberg in our case as a

24    radical left wing activist judge.  Have you heard

25    those comments, including just recently on a -- on

Page 144

1    a radio show?

2              MR. RUSSO:  Objection to form.

3              THE WITNESS:  The general feeling and

4         tone of that, if not the exact verbiage.

5         But generally speaking, yes, I'm aware of

6         that.

7    BY MR. CROSS:

8         Q.   Is that -- do you share his view?

9              MR. RUSSO:  Objection to form.

10        Relevance.

11             THE WITNESS:  I don't know if I

12        would -- I don't have enough information

13        she's -- whether she's a radical leftist

14        or not.

15   BY MR. CROSS:

16        Q.   Do you know what the basis is for

17   Secretary Raffensperger to say that about Judge

18   Totenberg?

19             MR. RUSSO:  Objection to form again.

20             THE WITNESS:  I can't get into the

21        man's mind, sir.

22   BY MR. CROSS:

23        Q.   Well, if you wanted to know why he's

24   saying that or why he believes that, would you ask

25   him?

1    A.   Generally speaking, if you want to know
2    what somebody thinks, you would generally ask them.
3    Q.   So as you sit here, you're -- you don't
4    have any understanding as to why he's saying that?
5    A.   Not specifically, no.  I know he has those
6    feelings.
7    Q.   Okay.  All right.  Turn to Page 160,
8    please.
9    A.   Okay.
10   Q.   And do you see the second-to-last
11   paragraph, the last full paragraph that begins with
12   "additionally" at the bottom of the right-hand
13   column?
14   A.   Yes, sir.
15   Q.   Here Secretary Raffensperger writes:
16       "Additionally, the touch screen
17    interfaces and attached printers are
18    never attached to the poll pads and
19    are air-gapped so they cannot connect
20    to the Internet."
21       Do you see that?
22   A.   Yes.
23   Q.   And do you believe that to be true?
24   A.   Using the general layman's terms of that,
25   yes.

1      Q.    And I was going to ask, what is your
2   understanding of what "air-gapped" means in this
3   context?
4      A.    In this context it basically means you're
5   not through Bluetooth or WiFi going to have the,
6   either the B.M.D., the printer or the scanner or
7   any of those items be attached to the Internet.
8      Q.    And would you consider voting equipment
9   air-gapped even if there are -- there's removal
10  media that is sometimes connected to components of
11  the election system that are also used with
12  Internet connected computers?
13     A.    I know that in the -- a term of art and
14  specificity in the cybersecurity world is that that
15  may not be considered air-gapped.  But for reg --
16  when we're having these discussions, when you're
17  talking to regular voters and regular citizens,
18  they're thinking about being connected directly to
19  the Internet in real time versus a removable media
20  item.
21           And that would be the sec -- I'm assuming
22  that's what the Secretary's referring to here.  But
23  you'd have to talk to him directly to know for
24  certain, because it's his -- it's his mindset.
25     Q.    All right.  Come down to Page 186, please.

1          voted for the Republican nominee before

2          any of these things happened would --

3          should undermine that, no, any more than

4          anybody voting for Stacey Abrams when

5          she's claimed she was cheated out of the

6          election either.

7                And in fact, stating that we voted

8          for him and stating that he lost I think

9          would probably increase people's, you

10         know, belief in the outcome of the

11         election.

12    BY MR. CROSS:

13         Q.   Do you agree with Secretary Raffensperger

14    that President Trump was attempting to overturn the

15    will of Georgia's voters?

16              MR. RUSSO:  Objection to form.  And

17         objection based on relevance.

18              THE WITNESS:  And what -- where is

19         he -- I need some context for where that

20         statement is specifically.

21    BY MR. CROSS:

22         Q.   Looks like for some reason that page is

23    not here.  It's in Chapter 10 of his book, The

24    Aftermath, Our Hope.  He writes:

25              "President Trump was attempting to

Page 150

1      overturn the will of Georgia voters,

2      and my duty was to prevent that from

3      happening."

4          MR. RUSSO:  Same objection.

5   BY MR. CROSS:

6      Q.   Do you agree -- do you agree with that?

7      A.   I believe the Secretary views his role as

8   following the law and following the Constitution

9   and telling the truth.

10          MR. CROSS:  All right.  We can break

11      for lunch.

12          THE WITNESS:  Okay.

13          THE VIDEOGRAPHER:  Going off the

14      record at 11:59.

15          (Whereupon, a discussion ensued

16       off the record.)

17          (Whereupon, there was a luncheon

18       recess.)

19          THE VIDEOGRAPHER:  We are back on the

20      record at 12:36.

21   BY MR. CROSS:

22      Q.   All right.  Mr. Sterling, let me pull up

23   the next exhibit.

24      A.   So we're leaving the book and going to

25   another exhibit in the whatchamadigger?

Page 152

```
 1        Q.   Go ahead and do that.

 2        A.   58 seconds?

 3             (Whereupon, a video recording was

 4        played.)

 5             THE WITNESS:  Okay.

 6   BY MR. CROSS:

 7        Q.   So Mr. Sterling, Exhibit 4 is a video

 8   where you spoke at a -- some sort of event; is that

 9   right?

10        A.   Yes.

11        Q.   And what was that event?

12        A.   Democracy Week in Geneva sponsored by the

13   University of Geneva and the Albert Hirschman

14   center for democracy [sic] at the University of

15   Geneva in the state of Geneva.

16        Q.   Okay.  And everything we just heard in

17   Exhibit 4 in the video, does that still represent

18   your view today?

19        A.   Yes.

20        Q.   And why is it historically important in

21   Georgia for Georgians to vote in person?  What is

22   it about the pageantry that's important?

23        A.   This is a personal opinion more than

24   anything.  It's -- I guess the best way to

25   characterize it is it's I am getting in my car, I
```

1   am going through the -- I guess "pageantry" is not

2   the right word.  I couldn't think of the right

3   word, so I used the best word I could think of in

4   the moment.

5            It's essentially, it's a cultural and

6   civic duty that you are now exercising in a very

7   public kind of way.  I mean, I was saying that

8   there's a difference in Georgia because

9   historically, like I said, 95 to 96 percent of --

10  or 97 percent of people vote in person, just either

11  advanced in person or at their polling location,

12  and that's just been historically how it's normally

13  been done.

14           Now, I don't know whether it's important

15  or not.  It just is.  I mean, it is a statement of

16  fact that that is what people do in this state.

17     Q.   And you mentioned M.L.K.  What was the

18  significance of M.L.K. and the point that you were

19  making about voting in person?

20     A.   The point about that is we have a large

21  population in the state that for many years was

22  denied the right to vote easily, and not just this

23  state, but this country.  And M.L.K. is from

24  Georgia.  That was the rationale behind making that

25  emotional connection in that particular part of the

1    talk.

2         Q.   Okay.  Thank you.

3                        (Whereupon, Plaintiff's

4                        Exhibit 5 was marked for

5                        identification.)

6    BY MR. CROSS:

7         Q.   All right.  Grab the next exhibit, please,

8    if you would, Exhibit 5.

9         A.   Bear with me.

10             UNIDENTIFIED SPEAKER:  It'd really

11        help if you were --

12             THE WITNESS:  Hold on.

13             UNIDENTIFIED SPEAKER:  -- managing

14        that.

15             THE WITNESS:  Oh, sorry.  Okay.  All

16        right.  I pulled it up.

17   BY MR. CROSS:

18        Q.   All right.  And you see that this is

19   entitled State Defendants' Objections and Responses

20   to Curling Plaintiffs' First Set of

21   Interrogatories?

22        A.   Yes.

23        Q.   And if you come down to the very last

24   page, you'll see that there's a verification of the

25   responses that you signed, looks like July of 2019.

1   Do you see that?

2        A.   I don't know if I signed it July -- on

3   July 19th, but -- July of '19, but I know I did

4   sign this.

5        Q.   Okay.  All right.  Come down to

6   interrogatory number seven, please, which is at the

7   bottom of --

8        A.   Do you know what page that's on to make it

9   a little easier?

10       Q.   Yeah.  It starts at the bottom of Page 9.

11       A.   Bear with me.  I'm not used to this

12   computer, so I'm having to navigate.

13       Q.   Okay.

14       A.   The one that says, "describe with

15   specificity each alternative system"?

16       Q.   You know what, I'm sorry.  I jumped too

17   far.  Go to interrogatory number two.

18       A.   Number two, okay.

19       Q.   Yeah.  It's at Page 3.  Just let me know

20   when you've got that part.

21            (Whereupon, the document was

22        reviewed by the witness.)

23            THE WITNESS:  I'm on the question

24        now.  I've read the question.

25   BY MR. CROSS:

1      Q.    Okay.  So you see interrogatory number two

2    states:

3             "Describe with specificity each

4        known, attempted or suspected security

5        vulnerability or security breach

6        involving any part of the election

7        system since Georgia adopted and

8        implemented D.R.E.s..."

9             Do you see that?

10     A.    Yes.

11     Q.    And then if you come down to the response,

12    come down to the top of Page 4, you see the

13    paragraph that reads, "subject to and without

14    waiving the foregoing objection"?

15     A.    Yes.

16     Q.    And the response indicates:

17             [As read]  "State defendants state

18        that the incident involving Kennesaw

19        State University" or "(K.S.U.) Web

20        server and the hacking attempt by

21        Logan Lamb, information regarding both

22        of which is already well known to

23        Curling plaintiffs, are the only

24        incidents responsive to this

25        interrogatory."

1              Do you see that?

2         A.    Yes.

3         Q.    What investigation was undertaken at the

4    Secretary's office to prepare that response to this

5    interrogatory?

6         A.    Specifically I'm a -- it's my dealing with

7    the -- our attorneys and then with relevant staff.

8         Q.    What staff?

9         A.    Mainly, in that particular case, and this

10   is D.R.E. time, it's really Michael Barnes would

11   have been the main person to deal with anything

12   around those.

13        Q.    Was there anything else done?  For

14   example, did you engage any cybersecurity experts

15   or other election security experts to do any

16   assessment of the election system to answer this

17   interrogatory?

18        A.    Not to my knowledge.

19        Q.    All right.  You can put that aside.

20              Sorry.  I'm just trying to get the next

21   one here.

22                        (Whereupon, Plaintiff's

23                        Exhibit 6 was marked for

24                        identification.)

25   BY MR. CROSS:

1      Q.   All right.  Grab Exhibit 6, if you would,

2   please.

3      A.   Okay.  All right.  I have it up.

4      Q.   And do you see that this is the State

5   Defendants' Responses and Objections to Curling

6   Plaintiffs' Second Set of Interrogatories?

7      A.   Yes, sir.

8      Q.   And if you come down to Page 24 of the

9   P.D.F., you'll see a verification that you signed

10   for this as well.

11      A.   Yeah.

12      Q.   And that one, do you see it's dated August

13   23rd, 2021?  Do you see that?

14      A.   Yes.

15      Q.   Okay.  And then if you come to the next,

16   Page 25 of the P.D.F., just beyond your

17   verification, do you see where it says

18   interrogatory number 15?

19      A.   One moment, please.  I'm sorry.  I was

20   going the other direction assuming that was the way

21   you were going, so let me --

22      Q.   Oh.

23      A.   -- scroll back down.

24      Q.   Sorry.

25      A.   That was my fault for making an

1     assumption.  Okay.  So I'm on Page 24 of 32,

2     interrogatory number 15.

3          Q.   Yeah.  And do you see where it says --

4     right.  So you've got interrogatory number 15.  And

5     do you see that you've got requests for 15, 16, 19

6     and 20 and 21, 24, 25?

7               They continue for a few pages.  Do you see

8     that?

9          A.   Yeah.  I mean, I see it.  And I saw it

10    before.  But that's -- do you want me to read it

11    in -- for specificity in the case now or just

12    acknowledging that I've seeing this.

13         Q.   Just right now I'm just asking if you've

14    seen it.  And then if you come on beyond that,

15    you'll get to a heading that says Response to

16    Revised Interrogatory 15.

17              Do you see that?

18         A.   Yes.

19         Q.   And then you see that there are responses

20    from state defendants to those revised

21    interrogatories that go through the end of the

22    document.

23              Do you see that?

24         A.   All the way to the end?

25         Q.   Yeah.

Page 160

1      A.   Responses, yes, I see that.

2      Q.   Okay.  Have you seen these revised

3  interrogatories and the responses before now?

4      A.   Yeah.

5      Q.   When did you see them?

6      A.   I think in preparation for this

7  deposition, spitballing, two or three weeks ago

8  when I saw these revised ones again.  I might have

9  seen them before, but I remember going over them

10  again a couple weeks ago, two or three weeks ago.

11      Q.   Okay.  And let me just pause there for a

12  moment.  What did you do specifically to prepare to

13  be a corporate representative on the designated

14  topics today?

15      A.   Meeting with the attorneys and then

16  dealing with different staffers within the office,

17  specifically, you know, Merritt Beaver, Michael

18  Barnes, Ryan Germany on our side, to kind of go

19  over some of these things.

20           Occasionally, I think I might have had --

21  gone to Blake Evans for some stuff.  But in gen --

22  just basically talking to other staffers and

23  looking over what the questioning was going to be

24  around.

25      Q.   When did you start that process?

Page 169

1    those are the ones where I kind of had to re --

2    either refresh my memory or be shown them for the

3    first time.

4        Q.   What did the two E-mails with Mr. Barnes

5    concern?

6        A.   I remember one was specifically where

7    there was sort of an ambiguous E-mail from him

8    about use of, what do you call it, media that they

9    already had.  That was one that there was a

10   specific thing that -- and then there was another

11   one that I can't recall right now.  That one stuck

12   out in my mind.

13       Q.   Okay.  All right.  Take a look at, if you

14   still have the exhibit in front of you, the revised

15   interrogatory responses, and take a look at --

16       A.   Okay.

17       Q.   -- take a look at 15.  And if you come to

18   the second paragraph that begins "additionally," do

19   you see that?

20       A.   One moment, because I'm back in the

21   questions again.  So where am I looking?  I'm on

22   Page 29 of 32.  So where am I looking on this?

23       Q.   Do you see the heading Response to Revised

24   Interrogatory 15?

25       A.   Yes.

1        Q.    And then you'll see the second paragraph
2    that begins "additionally"?
3        A.    Yes.
4        Q.    And the last sentence there reads:
5              "You asked state defendants to
6          'describe with specificity each
7          successful or attempted instance of
8          unauthorized access to or copying or
9          alteration of' the following."
10             And then there's a list of various types
11   of computer equipment in the election system.  Do
12   you see that?
13       A.    Yes.
14       Q.    And then if you come down to the next page
15   at the end of the lettered bullets, do you see
16   the --
17       A.    Yes.
18       Q.    -- the paragraph that begins, "as you
19   know"?
20       A.    Yes.
21       Q.    And the last sentence in that paragraph
22   reads:
23             "To investigate each of these
24          interrogatories is extremely
25          burdensome and would require

1        significant time."

2             Do you see that?

3    A.    Yes.

4    Q.    Did I understand correctly that the state

5 defendants, including the Secretary's office, did

6 not undertake such an investigation for this

7 response?

8    A.    As we point out in the response itself,

9 these are in the possessions of the counties, and

10 there's over 30,000 of them.  So I think the

11 statement that it would be burdensome and require

12 significant time and resources still applies.

13          So we did not send anybody to go and look

14 at each individual B.M.D. or each individual E.M.S.

15 and printers and scanners, et cetera, that are

16 listed in the lettered items above, correct.

17    Q.    And then if you come to the very last

18 paragraph there, above the heading regarding

19 interrogatory 16, it reads:

20          "In an effort to provide

21      information responsive to this

22      request, state defendants respond that

23      they do not have knowledge of any

24      election equipment used with the

25      Dominion election system being hacked

1        in an election in Georgia."

2            Do you see that?

3    A.    Yes.

4    Q.    And do I understand correctly, there was

5    not a specific investigation undertaken for that

6    response; is that right?

7    A.    Well, I think the statement there kind of

8    stands on itself, that we were unaware of anything

9    that was reported or anything.  We have no evidence

10   of anything.  So that I think this, again, stands

11   on its own.

12   Q.    Right.  But you didn't undertake a

13   particular investigation or an inquiry to prepare

14   that response, you just relied on what you'd

15   already known or did not know as of that date;

16   right?

17   A.    We relied on the fact that there was no

18   reports of anything untoward along those lines.

19   And we had done a lot of the other things that we

20   mentioned earlier, which included the hand tally,

21   which included the L & A, which included the hash

22   testing and those kind of items.

23            So things were done, not necessarily at

24   the request of this specific interrogatory, that

25   could give us the ability to say we are not aware

1  of any issues regarding what's being alleged or

2  asked here.

3       Q.   So in preparing this response, for

4  example, you did not go, and before you verified

5  it, you didn't go and review investigative files or

6  speak with Frances Watson or others in the

7  investigative department; right?

8       A.   I personally didn't.  However, employees

9  together, staff, Mr. Germany, Blake, Frances at the

10  time, she's no longer with the office, obviously,

11  I'm sure they were all discussed with them, and it

12  was represented to me that we have no knowledge.

13            And I am still aware of no alleged actual

14  acts other than some of the claims made by the

15  President, some of their failed lawsuits.  So I

16  have no evidence of anything like that happening --

17  former president, pardon me.

18       Q.   But when you verified this, you relied on

19  the representations from counsel that this was

20  accurate; is that right?

21       A.   And staff.

22       Q.   What staff?

23       A.   State staff.

24       Q.   Sorry.  Who specifically?

25       A.   Mr. Germany.  I mean, everybody involved

Page 174

1  in pulling these together, which my assumptions

2  were would be our investigations division,

3  Mr. Germany working with our counsel and, you know,

4  working with our elections divisions.

5          Again, we've seen no evidence of that in

6  the state of Georgia.

7      Q.   I just want to make sure I understand that

8  you're assuming that people in the investigation

9  division or otherwise were consulted in preparing

10 this response, you did not personally confirm that;

11 right?

12     A.   I did not personally go to our acting

13 person and ask that question, no.

14     Q.   Okay.  And you did not personally confirm

15 with counsel, for example, that they or anyone else

16 had consulted the investigations division for this

17 answer; right?

18         MR. RUSSO:  And I'm just going to

19     object to the extent it calls for

20     attorney-client privileged communication.

21         THE WITNESS:  Again, it's sort of

22     like a dog that didn't bark.  It wouldn't

23     occur to me that anything would be

24     represented to me incorrectly.

25 BY MR. CROSS:

1      Q.   And I'm not suggesting that it's

2    incorrect.   I just want to understand what you're

3    relying on, Mr. Sterling, versus what you're

4    assuming.   That's all I'm trying to get at.

5      A.   Okay.

6      Q.   So for this response, you did not confirm

7    with counsel or others that, in preparing this

8    response, someone actually consulted the

9    investigations department.   That's something you're

10   assuming happened.   You don't know that it

11   happened.

12        Is that right?

13      A.   That is correct.   I am making an

14   assumption of that particular, very specific

15   statement, yes.

16      Q.   Okay.

17      A.   But also, outside of that I have my own

18   basic knowledge that I talked to the investigators

19   and the chief investigator and the acting chief

20   investigator.   And I'm making an assumption there

21   that if some -- if there was a claim of a hack or

22   there was evidence of it, it would have kind of

23   bubbled up to the top to begin with.   And I am not

24   aware of anything like that.   So it didn't occur to

25   me to say, are you sure?

1        Q.   Yeah.   But the -- we've seen that

2    information regarding the security of the election

3    system does not always get shared with folks across

4    the office, including yourself; right?

5              MR. RUSSO:   Objection to form.

6              THE WITNESS:   And again, in the

7         investigation side, I don't have -- that

8         statement is not the case.

9    BY MR. CROSS:

10       Q.   So you're saying you have complete

11   visibility into everything that the investigations

12   department and the Secretary does, what they

13   investigate, how they investigate and what they

14   find with respect to election security?

15       A.   No.   What I said was, if something had

16   reached that level of what would be an accused

17   hacking or anything like that, again, in all

18   likelihood my assumption is it would have bundled

19   up -- bubbled up to the senior leadership, and that

20   did not happen.

21       Q.   And yet it did not bubble up to senior

22   leadership that Dr. Alex Halderman had created a

23   nearly hundred-page report identifying

24   vulnerabilities with the election system in July of

25   2021; right?

1          MR. RUSSO:  Objection.

2          THE WITNESS:  I believe -- I don't

3     believe I said that.  We were aware that

4     happened.  It's inside of a lawsuit, which

5     is litigation, which is a different animal

6     than the actual regular functioning of the

7     office.

8  BY MR. CROSS:

9     Q.   So information that's developed in a

10 lawsuit is treated differently than information

11 that arises in the ordinary course; is that right?

12    A.   I would say in a general statement that

13 that's correct, yes.

14    Q.   All right.  And the response here refers

15 to being "hacked in an election in Georgia."  Do

16 you see that?

17    A.   In the final sentence, yes.

18    Q.   Yeah.  If you come back to the request,

19 which is quoted in that second paragraph we read

20 earlier, "describe with specificity each successful

21 or attempted instance of unauthorized access to or

22 copying or alteration of" the following equipment,

23 I just want to make sure we're not missing each

24 other on terminology.

25          As a representative of the Secretary of

1    State's office, as the individual who verified the
2    responses to these interrogatories, are you aware
3    of any successful instance of unauthorized access
4    to or copying or alteration of data or software on
5    any equipment used with the Georgia election
6    system?
7              MR. RUSSO:  Objection to form.
8              THE WITNESS:  I am not.
9    BY MR. CROSS:
10       Q.    Okay.  And would that include, for
11   example, like, the voter registration system?
12       A.    Yes.
13       Q.    Okay.  Are you aware of any attempted
14   instance of unauthorized access to or copying or
15   alteration of the election system in Georgia?
16             MR. RUSSO:  Objection to form.
17             THE WITNESS:  It depends on what
18        you're defining as the election system in
19        Georgia.  I mean, there was the Logan Lamb
20        issue.  There is, if I remember correctly,
21        around that that was really about an
22        F.T.P. site, not the actual registration
23        system itself.
24             So I want to be careful by answering
25        these things.  I'm unaware of anybody

1      actually getting into the registration

2      system itself or even attempting other

3      than people -- oftentimes we see people go

4      to SOS.GA.gov assuming they're finding a

5      way to get there.

6           And you know, we have thousands of,

7      you know, I guess they call them hits,

8      some people trying to do things on that

9      front.  But that's not any good -- that's

10     no way to get to the actual ENet system.

11          So again, I'm not aware of anybody

12     getting to a point where we could say,

13     yes, that was an attempt to actually get

14     to the registration system itself.

15   BY MR. CROSS:

16     Q.   All right.  Let me pull the next exhibit.

17     A.   Let me know when it's there.

18     Q.   Okay.

19                    (Whereupon, Plaintiff's

20                     Exhibit 7 was marked for

21                     identification.)

22   BY MR. CROSS:

23     Q.   All right.  You should have Exhibit 7.

24     A.   First Requests for Admission?

25     Q.   Yes.

Page 180

1    A.    Okay.

2    Q.    Have you seen this document before?

3    A.    I don't know that I've seen this one

4    before.

5    Q.    Okay.  You can see this is State

6    Defendants' Responses to Curling Plaintiffs' First

7    Requests for Admission; right?

8    A.    Yes, I see that.

9    Q.    Okay.

10   A.    The problem I'm having now, I've seen so

11   many of these that kind of look alike, that naming

12   convention doesn't strike -- first requests for

13   admission, I don't recall seeing that, but I might

14   have seen this.

15   Q.    All right.  Take a look at -- if you come

16   to Page 2, you'll see where the requests and the

17   responses start, and you'll see number one there.

18   Do you see that?

19   A.    Under Objections and Responses to

20   Requests?

21   Q.    Yes.

22   A.    Yes, I've got it.

23   Q.    And you see the first one here reads:

24         [As read]  "Admit that Deputy

25      Secretary of State Jordan Fuchs was

1        is denied."

2               Yes.

3        Q.   Do you know what the basis is for that

4   denial?

5        A.   I do not.

6        Q.   As you sit here, are you aware of any

7   federal judges that have found that my clients,

8   Donna Curling, Donna Price, Jeffrey Schoenberg, or

9   any of their experts, Dr. Halderman, Dr. Andrew

10  Appel or others, have zero credibility?

11              MR. RUSSO:  Objection.  Form.

12              THE WITNESS:  I'm not personally

13       aware of that, no.

14  BY MR. CROSS:

15       Q.   And that's not something you discussed

16  with Jordan Fuchs?

17       A.   No.

18       Q.   All right.  Take a look at number eight,

19  which is on Page 7, please.  Just let me know when

20  you've got it.

21       A.   I'm there, yeah.

22       Q.   And number eight reads:

23              "Admit that the Secretary of

24       State's office did not work with a

25       consulting cybersecurity firm to

Page 183

1          conduct an in-depth review and formal
2          assessment of the election system."
3              Do you see that?
4      A.    Yes.
5      Q.    And if you come down to under eight, you
6  see the last sentence for the response reads:
7              "Because the Secretary of State's
8          office worked with consultants that
9          reviewed and assessed the State's
10         election system, this request is
11         denied."
12             Do you see that?
13     A.    Yes.
14     Q.    What consultants are referred to here that
15  reviewed and assessed the State's election system?
16     A.    I don't know.  But we do have a contract
17  with Dominion voting systems that they -- we have
18  to work with them, and it's on their responsibility
19  to keep us up to the highest level of security
20  possible and make us aware of any issues that may
21  come forth.
22     Q.    Are there any vendors or consultants that
23  you can think of for this response apart from
24  Dominion?
25     A.    Perhaps Fortalice, but I don't know.

Page 184

1      Q.   You're not aware of any assessment like
2  that's called for in request eight by Fortalice; is
3  that right?
4      A.   I'm sorry.  You -- somebody was scraping
5  when you were talking.  I couldn't quite --
6      Q.   Oh, I'm sorry.
7      A.   -- hear you.
8      Q.   Yeah.  Sorry.  The cybersecurity
9  assessment that's referred to in request eight,
10  you're not aware of any assessment like that by
11  Fortalice, though; right?
12     A.   Specifically, no, I'm not.  I know that
13  they're -- they are our kind of go-to for those
14  things.  And then, of course, everything is
15  reviewed by Pro V & V as well for the certification
16  by the State.
17     Q.   All right.
18     A.   And with that, it's 1:12.  I apologize.  I
19  have to use the restroom real quick, so I'll be --
20  if we can do three minutes and be back at 1:15,
21  does that work?
22     Q.   That works.
23     A.   All right.  Thank you.  I apologize.
24     Q.   Sure.
25          THE VIDEOGRAPHER:  Off the record at

 1        1:12.

 2             (Whereupon, a discussion ensued

 3        off the record.)

 4             (Whereupon, there was a brief

 5        recess.)

 6             (Whereupon, Ms. Connors joined the

 7        deposition.)

 8             THE VIDEOGRAPHER:  And we are back on

 9        the record at 1:15.

10   BY MR. CROSS:

11        Q.   Okay.  Sticking with the R.F.A. responses

12   here, Mr. Sterling --

13        A.   And which number are we on?

14        Q.   Go to number 25 on Page 16.  I tell you

15   what, actually, just jump to number 27.

16        A.   Okay.

17        Q.   Start there.

18        A.   Okay.

19        Q.   Here it reads:

20             [As read]  "Admit that you did not

21        develop procedures -- did not develop

22        procedures or take other action to

23        address any of the deficiencies found

24        by the Court in its August 15, 2019

25        order concerning the voter

1          registration database."

2               Do you see that?

3     A.    Yes.

4     Q.    And the response at the end indicates the

5     state defendants -- they object because "it

6     requires state defendants to admit or deny an issue

7     in dispute in this case in order to respond."

8               Do you see that?

9     A.    Yes, I do.

10    Q.    Do you know whether the Secretary's office

11    took -- developed any procedures or took other

12    actions that are described in request number 27?

13    A.    I do not know that -- I do not know.  From

14    reading the specific thing, other deficiencies

15    found by the Court in August 15, 2019, no, I do not

16    know one way or the other.

17    Q.    Come back up to 25, please.

18    A.    Okay.

19    Q.    25 reads:

20          "Admit that you did not develop

21     procedures or take other action to

22     address all the deficiencies found by

23     the Court in its August 15, 2019 order

24     concerning the election system."

25          And it's got a similar response which

1   state the clients can't answer one way or the

2   other.  Do you know whether any such procedures or

3   actions were taken?

4           MR. RUSSO:  Objection to form.

5           THE WITNESS:  I know we're always

6       updating procedures and actions.  Whether

7       they were in response to the August 15,

8       2019 finding of the Court, I do not know

9       the answer to that.

10  BY MR. CROSS:

11      Q.   Okay.  All right.  Come to number 43,

12  please, on Page 26.

13      A.   I've got it.

14      Q.   And here it reads:

15           "Admit the D.R.E. system is

16       completely separate from the B.M.D.

17       system."

18           Do you see that?

19      A.   Yes.

20      Q.   And the response is:

21           "...state defendants admit that

22       the B.M.D. system is separate from the

23       D.R.E. system."

24           Do you see that?

25      A.   Yes.

Page 192

1    trying to be accomplished by the lack of that word,

2    no.

3        Q.   Okay.  Okay.  All right.  So you're not

4    aware of any interactions, connections or overlap

5    of -- between the data, the equipment or the

6    software from the old D.R.E. system and the new

7    B.M.D. system; is that fair?

8             MR. RUSSO:  Objection to form.

9             THE WITNESS:  Vince, I'm sorry --

10            MR. RUSSO:  I just said, "objection

11        to form."

12            THE WITNESS:  Okay.  That would be a

13        fair statement, yes.

14   BY MR. CROSS:

15       Q.   All right.  Come to 65, please.

16       A.   Okay.  Okay.

17       Q.   And you see 65 says:

18            "Admit that security deficiencies

19        or vulnerabilities identified by

20        Fortalice with the ENet system have

21        not been fully mitigated."

22            Do you see that?

23       A.   I do.  I'm reading it real quick.

24            (Whereupon, the document was

25        reviewed by the witness.)

Page 193

```
 1              THE WITNESS:  Okay.
 2      BY MR. CROSS:
 3          Q.   And you see the response, the State did
 4      not answer this one way or the other.  They don't
 5      admit or deny it.
 6              Do you know whether security deficiencies
 7      or vulnerabilities that Fortalice identified with
 8      the ENet system, whether they have been fully
 9      mitigated?
10          A.   I know with pretty -- with a lot of
11      certainty that, if not all, the vast majority have.
12      I remember we had a discussion with Merritt about
13      this, God, a while back.
14              And I can't speak to what specifically
15      they were at this point because it's been so long,
16      but I know there were several things that were done
17      on how we managed permissions and passwords and the
18      like.  And I remember there were some bad practices
19      at the county level in some cases where, like, they
20      would have multiple people on a single user ID and
21      password.  That's been stopped.
22              They -- now, if you don't log in for I
23      believe it's 30 days, those credentials are lost.
24      They have to be -- you have to be re-upped.
25      There's multi-factor authentication on all those
```

1    things.

2         So I do know the vast majority -- I can't

3    recall what they all were.  I do know that the vast

4    majority of those were addressed inside prior to

5    the 2020 election, if memory serves.

6    Q.   As you sit here, you're not aware of which

7    of those deficiencies remains outstanding today; is

8    that right?

9    A.   Or if any, honestly.

10   Q.   Okay.  All right.  Come to 74, please.

11   A.   Okay.

12   Q.   And here it states:

13        "Admit there was no systematic

14    method of tracking the number of

15    Georgia voters that complained that

16    the B.M.D. print-out for their

17    respective votes did not match the

18    selections they each made on the

19    corresponding B.M.D. in the November

20    2020 election."

21        Do you see that?

22   A.   Yes.

23   Q.   And if you come to the second-to-the-last

24   sentence under response, you're welcome to read the

25   whole thing, but that second-to-last sentence says:

1          "State defendants further deny

2       that it does not keep track of

3       complaints made to state defendants."

4          Do you see that?

5     A.   Yes.

6     Q.   Is there some sort of a systematic method

7  or process that the Secretary's office has to keep

8  track of instances where voters complained that

9  their B.M.D. print-out did not reflect the

10  selections they made on the B.M.D.?

11    A.   There are the -- they're supposed to --

12  for spoiled ballots, they are supposed to, the

13  counties are supposed to inside the poll locations

14  use the spoil ballot.  I think there's a form,

15  there's a recap form that's supposed to list out

16  what happened with these particular ones.

17         I will say that we didn't have very many

18  at all out of the five million, or I guess the

19  three million in per -- or sorry, 3.75 million

20  in-person votes that would have been done on a

21  B.M.D. that had those situations.

22         But the -- they're supposed to be using

23  the ballot recap forms to track spoiled ballots,

24  yes.

25    Q.   And what happens to a spoiled ballot?

1   Where does it go?

2        A.    It should be held with, as I understand

3   it, the other documentation and ballots for the

4   election with a kind of a recap form basically

5   saying this is what happened with these ballots.

6        Q.    Do the counties keep those?

7        A.    Yes.   And then if memory serves, this

8   would go along with the other things that are

9   transferred to the Superior Courts, and they hold

10  them for the 22 months after that.

11       Q.    But the only -- the only reporting that

12  the Secretary gets of this type of concern where a

13  voter says that the B.M.D. print-out doesn't

14  reflect their selections, you learn about that only

15  if the county conveys that to the Secretary; is

16  that right?

17       A.    Correct.

18       Q.    Okay.   But there's no systematic method or

19  requirement for counties to convey that?

20       A.    Again, they have the ballot recap forms.

21  And there may be something in the paperwork they

22  send up, but I don't recall one specifically, for

23  that very narrow purpose, no.

24       Q.    Okay.   One of -- one of the issues that

25  arose with the new system in 2020 elections was

Page 197

1    that sometimes the printers would print two ballots

2    when the voter would vote.

3              Are you aware of that?

4        A.    Not two ballots.  What I was aware of is

5    that they would print one with, like, just a Q.R.

6    code and another one with the readable parts

7    together.  They would come out as two ballots.  So

8    I was aware that that happened in a very few

9    instances, yes.

10       Q.    And when that happened, was there any

11   investigation undertaken, like, a forensic

12   examination of the machines involved?

13       A.    I believe in a couple of those cases they

14   went and pulled the log files.  I'm not sure what

15   happened after that off the top of my head.

16       Q.    If you wanted to know, who would you ask?

17       A.    I would probably call Dominion, because I

18   think they were the ones that would have to pull

19   those log files.

20       Q.    So you're not aware of an examination of

21   the machines involved apart from the log files?

22       A.    Well, the log files would show you what

23   happened and why it happened.  So there wouldn't

24   need to be much beyond that, normally speaking, as

25   my understanding is.

1     Q.   And what's the basis for the understanding

2 that the log files would tell you why that

3 happened?

4     A.   Because the log files basically track

5 everything that happens inside the system, and you

6 can -- for smart people who understand those

7 things, they can kind of walk through and see what

8 happened as to -- to cause that kind of issue.

9     Q.   Was any of the equipment that that

10 happened with, do you know whether any of that

11 equipment was taken out of use in the elections?

12     A.   I believe that in real time when that

13 happened, I do -- I have a recollection of there

14 being at least one county that took one of those

15 machines and just put it off to the side and didn't

16 use it the rest of the day. I cannot recall what

17 county that was off the top of my head right now.

18     Q.   But the other counties or the other

19 machines, they didn't take them off-line?

20     A.   I don't know. I know specifically that

21 one did, but I cannot recall what the other ones

22 may or may not have done after that.

23     Q.   Okay.

24     A.   But again, I will say I didn't hear about

25 a machine doing it multiple times. So I'm going to

1  make somewhat of an assumption they probably took

2  some of those out of -- out of service just to

3  avoid that problem or they kept running it when the

4  problem didn't reappear.

5      Q.   And if you wanted to know whether machines

6  were taken out of service in an election, would

7  that be a question you ask the county or is there

8  someone else you could ask?

9      A.   You have to ask the county, because they

10  are in charge of running the polling locations and

11  the use of equipment.

12      Q.   Okay.  All right.  Take a look at 78,

13  please.

14      A.   Okay.

15      Q.   Here it states:

16          "Admit that the results of the

17      full hand recount of the human

18      readable text on B.M.D.-marked ballots

19      did not match the results of the Q.R.

20      code scanning for those ballots within

21      an expected margin of error."

22          Do you see that?

23      A.   Yes.

24      Q.   And do you know whether that's true or

25  not?

1      A.   As I stated a couple of times in this
2  deposition so far, being a point 1053 percent off
3  in the total votes cast and point 0099 percent off
4  in the margin is well within an expected margin of
5  error.   So I can state that unequivocally.
6      Q.   So but and I had understood you to say
7  that earlier.   Do you know why, then, state
8  defendants declined to admit or deny this response?
9      A.   No.   I'm not a lawyer, so I don't know
10  what the rationale would necessarily have been.
11      Q.   If you wanted to know why they were
12  unwilling to deny this response, who would you ask?
13      A.   Probably my lawyers.
14      Q.   Okay.  All right.  Take a look at 80.
15      A.   Okay.
16      Q.   And just so we're clear, sorry, you don't
17  have any reluctance in denying 78; right?
18      A.   Let me go back and look at it again.
19      Q.   Yeah.
20      A.   I have zero reluctance denying that
21  statement, yes.
22      Q.   All right.   So take a look at 80.   80
23  states:
24          [As read]   "Admit that the full
25      hand recount performed in connection

Page 201

1       with the November 2020 election did

2       not check whether the human readable

3       text on B.M.D.-marked ballots matched

4       the results of Q.R. code scanning."

5            Do you see that?

6    A.   Yes.

7    Q.   And is that statement, based on your

8    experience, true or false?

9    A.   Well, going back to the earlier question

10   you asked where we kind of had to go over some

11   definitional items, an individual ballot was not

12   checked to see if the B.M.D. -- if the Q.R. code

13   matched the human readable.

14        That stated, in the aggregate it showed

15   that the result of the election was essentially the

16   same when we had a hand count of those ballots

17   using the human readable portion.  So the logical

18   assumption is that the ballots were cast as

19   intended.

20   Q.   But you don't dispute that the hand

21   recount of the November 2020 election did not check

22   whether the human readable text on B.M.D.-marked

23   ballots matched the results of the Q.R. code

24   scanning for those ballots; right?  That's not

25   something --

Page 202

1        A.   I dis --

2        Q.   -- that you --

3        A.   I dispute that that's the intent of the --

4    of the hand tally that was done.  I do not dispute

5    that that wasn't done, because that wasn't the

6    intent for the hand tally.

7        Q.   Okay.  All right.  Take a look at 81,

8    please.

9        A.   Okay.

10       Q.   It reads:

11            "Admit that the full hand recount

12        performed in connection with the

13        November 2020 election did not check

14        whether the human readable text on

15        B.M.D.-marked ballots actually

16        reflected the selections each voter

17        intended for each of those ballots."

18            Do you see that?

19       A.   Yes.

20       Q.   And is that statement true or false, based

21    on your experience?

22       A.   Again, following the same logic train we

23    had in the last question, that wasn't the intent of

24    this.

25            However, when you have -- come to a point

Page 203

1    1053 percent on the total ballots cast and point

2    0099 percent on the margin, that the human readable

3    matched what was tallied even within the counties

4    and then statewide as well.

5          There is no evidence pointing to the fact

6    that the Q.R. code did not match the human readable

7    portion of the ballot.

8    Q.   But you didn't -- the State didn't

9    undertake any investigation to determine whether

10   the human readable portion of the ballots that were

11   hand tallied, whether that accurately reflected

12   what the voters selected on the B.M.D. screen;

13   right?

14   A.   That is correct.  Except for that the hand

15   tallied showed that the computers counted the way

16   the hands -- that they were marked by the -- by the

17   voter in the human readable portion.

18   Q.   Right.

19   A.   So knowing that, there's no reason to

20   believe that the Q.R. code does not match that, or

21   that in 25 percent of the ballots that the

22   hand-marked didn't match what they had chosen there

23   as well, the tick marks were somehow off in the

24   computers -- tally marks, pardon me.

25   Q.   Right.  But given that the study that the

1    systemic error on those things.

2            Again, you have to look at these precinct

3    by precinct.  And again, in my old life, political

4    consulting, no -- there was no precinct that

5    anybody looked at and said, wow, that's really

6    weird, that's really anomalous.

7            The things we saw with the hand tallies

8    were, again, essentially mainly attributable to

9    human error and mainly in Fulton County.  And

10   again, and Fulton County has a well documented past

11   of having bad management and some sloppy practices,

12   so that's not unheard of in those situations.

13        Q.   And you mentioned before you're familiar

14   with one of the experts in this case, Philip Stark;

15   right?

16        A.   Yes, I'm familiar with him.

17        Q.   Are you aware that he produced a report in

18   January of this year addressing, at least in part,

19   the human tally and the error rates that came to

20   light?

21        A.   No.

22        Q.   So that's not a report that you've ever

23   read or considered; right?

24        A.   I'm not aware of it, no.

25        Q.   Do you know whether anyone at the

Page 212

1    Secretary of State's office has reviewed that

2    report?

3          A.    I do not.

4          Q.    If that report were to identify error

5    rates that would cause concern as to whether the

6    machines had operated accurately, is that something

7    you would want to see?

8          A.    That's a large supposition, and it would

9    depend on the level and the documentation behind

10   it.

11              Because again, you can only go with the

12   data that you're given, which in this case

13   oftentimes was done by human error into the Arlo

14   system and even human error on the tally sheets

15   themselves.  So we would have to compare some of

16   those items.

17              But I wouldn't have any objection to our

18   office looking at that, no.

19         Q.    Do you know why your office has not looked

20   at that yet?

21         A.    Frankly, I didn't know it existed.  So I

22   can't look at things I don't know exist.

23         Q.    Okay.  Are you aware that the Dominion

24   scanners will tabulate a photocopy of a B.M.D.

25   printed ballot in the same way they'll tabulate the

Page 214

```
 1    necessarily made sense to have it at the central
 2    scanner at that time.
 3         Q.   All right.   Come to 106, please, on Page
 4    53?
 5         A.   One moment.
 6         Q.   Sure.
 7         A.   I clicked out of that for a moment.   You
 8    said 106; correct?
 9         Q.   Yes, sir.
10         A.   Okay.
11         Q.   And so 106 says:
12              "Admit that no expert who has
13           testified on your behalf in this
14           litigation has, to your knowledge,
15           forensically examined each B.M.D. used
16           in any actual elections in Georgia to
17           determine whether malware was loaded
18           on to it at any point in time."
19              Do you see that?
20         A.   Yes.
21         Q.   And do you see the response, the state
22    defendants, including the Secretary's office,
23    declined to answer this as seeking privileged work
24    product?
25              Do you see that?
```

Page 215

1      A.    Yes.

2      Q.    Are you aware of any forensic examination

3  of each B.M.D. used in actual elections in Georgia

4  for the purpose of this case or any other purpose

5  by any expert who's testified for the State?

6      A.    When you're saying "each B.M.D.," you're

7  referring to all 30 some odd thousand that have

8  been used in elections?

9      Q.    Yes.

10      A.    Then no, I'm not aware of that.

11      Q.    What about of any B.M.D.s?

12      A.    After the November of 2020 election, there

13  were -- Pro V & V was sent to several counties to

14  look at random B.M.D.s and scanners to see if there

15  was any issues.  They did a hash test to look for

16  those kind of items.  That is the only thing I'm

17  aware of off the top of my head specifically kind

18  of speaking to 106.

19          But then again, between the November

20  election and the January election, L & A testing

21  was done again on all those machines, and they

22  checked the hashes in those then, so there were no

23  changes noted then.

24      Q.    Come to 173, please.  We're almost done

25  with this document.

1        Because the issue was a display of two

2   columns because of the sheer size of the particular

3   Senate special election.  And we had, through our

4   very robust logic and accuracy testing, Douglas

5   County and Richmond County found the issue, and

6   then Dominion found an engineering solution that

7   allowed that -- both columns to be displayed in

8   every circumstance and that we needed to have that

9   change done and we did that prior as -- on the

10  front end to the L & A testing.

11       So we didn't see anything come out with

12  any accuracy issues or reliability or security that

13  we saw in the actual functioning, but I don't know

14  if Pro V & V did testing in and of itself for that

15  purpose when they went back to look at the

16  solution.

17       Q.   All right.  Take a look at 186, please, on

18  Page 90.

19       A.   Okay.  I'm there.

20       Q.   Here it reads:

21            [As read]  "Admit that you have no

22       evidence of any widespread voter fraud

23       in Georgia in connection with

24       elections held in Georgia on November

25       3rd, 2020 and January 5th, 2021."

1            Do you see that?

2      A.    Yes.

3      Q.    Do you know whether that is a true or

4  false statement based on your experience in the

5  Secretary's office?

6      A.    From my position and what I said earlier

7  was the use of the term "widespread voter fraud" is

8  kind of a fraught emotional loaded kind of

9  statement.

10            We know that there was illegal voting.  We

11  know that that illegal voting only totalled in the

12  tens of votes, not the tens of thousands of votes.

13  So there was not enough illegal voting to affect

14  the outcome of any election that we are -- we've

15  seen or been aware of so far.

16      Q.    And we saw earlier that Secretary

17  Raffensperger in his book states unequivocally that

18  you found -- his office found no evidence of

19  widespread voter fraud in the 2020 or 2021

20  election; correct?

21      A.    That's right.

22      Q.    So do you know why the Secretary's office

23  and the other state defendants were unwilling to

24  admit or deny this request?

25      A.    No.

Page 223

```
 1                      (Whereupon, Plaintiff's
 2                      Exhibit 8 was marked for
 3                      identification.)
 4     BY MR. CROSS:
 5          Q.    Grab Exhibit 8, if you would, please.
 6                THE VIDEOGRAPHER:  Back on the record
 7          at 2:03.
 8                MR. CROSS:  Oh.  Sorry.
 9                THE WITNESS:  Okay.  An E-mail from
10          me.  Okay.
11     BY MR. CROSS:
12          Q.    Yeah.  So if you look at Exhibit 8,
13     there's an E-mail at the top from you on December
14     29, 2020, to some folks at Dominion Voting and
15     internally at the Secretary of State's office.
16                Do you see that?
17          A.    Yeah.
18          Q.    Okay.  And if you come down, there's an
19     E-mail initially from Beau Roberts at Dominion on
20     December 28, 2020.  Do you see that?
21          A.    No.  It won't scroll.  I've got a single
22     page on mine.
23          Q.    It's --
24          A.    I'm sorry.  Yeah.  I got it.  I got it.
25     Yeah.
```

1    Q.   Sorry.  It's in the middle of that first

2   page.

3    A.   Yes.

4    Q.   And there are a couple of issues that are

5   identified, one with Paulding County and one with

6   DeKalb County.  Do you see that?

7    A.   Uh-huh.  Yes.

8    Q.   And then you write back:

9         "Are they duplicating them on

10      hand-marked or B.M.D.?"

11         Do you see that?

12    A.   Yes.  Yes.

13    Q.   And you were talking about duplicating,

14   was it the absentee ballots that were not scanning?

15    A.   Yes.  That's what I was referring to.

16   Looking at this in context, that's what I would

17   have been referring to, yes.

18    Q.   And are -- when the absentee ballots,

19   which are hand-marked, when those sometimes don't

20   scan, are those duplicated so that they can be

21   scanned?

22    A.   Yes.

23    Q.   And are those duplicated both -- well, let

24   me be more precise.

25         When that duplication occurs, is that

1   sometimes by marking a new ballot by hand or other

2   times by generating it on a B.M.D.?

3       A.    Yes.

4       Q.    And how is a duplicate ballot in that

5   situation generated on a B.M.D. given there's not a

6   voter that's coming in and using a voter card to

7   vote on the B.M.D.?

8       A.    They would just, following the same

9   process, they would take this is the ballot style,

10  they would have a card that they would then say

11  this is the ballot style to bring up, they would go

12  to the B.M.D., pull that ballot up, and then

13  basically take the hand-marked in their hand and

14  then vote it the same way it was voted on the

15  B.M.D. ballot, and then they would print the B.M.D.

16  ballot with it.

17            And it's supposed to be, when you

18  duplicate it, you're supposed to be able to track

19  back to this duplicated ballot tracks back to this

20  original document, this original artifact.

21      Q.    And so that's something that the, is it

22  the poll worker, the election workers, who does the

23  duplication in that situation with the B.M.D.?

24      A.    In the sit -- normally in that situation,

25  that's going to be at the county level with the not

Page 226

1   poll workers or poll managers, even it'd be -- it

2   would normally be county workers.

3          As an example, one of the things we saw a

4   lot of the duplications done on were in Fulton

5   County.  When they ran their absentee ballots

6   through the cutters, occasionally the cutting

7   machine would grab the ballot and slice it as well.

8          And they would take those ballots and then

9   put -- and then duplicate them onto the B.M.D. --

10  on the B.M.D. machines at the central absentee

11  ballot processing facility.  Like, I saw Rick

12  Barron himself doing some of those.

13     Q.    Okay.  Are you aware of whether the

14  existing B.M.D.s in Dominion -- or sorry, in

15  Georgia can effectively be used as ballot-on-demand

16  printers at the polls meaning, rather than having

17  voters vote on the B.M.D., you check the voters in

18  on the poll pad and then you just use the B.M.D. to

19  print whatever ballot they're supposed to get, and

20  then they can mark it by hand and have it tabulated

21  by the scanner?

22          Are you aware of whether that's do-able

23  with this system?

24          MR. RUSSO:  Objection to form.

25          THE WITNESS:  The way you've outlined

1        it, not that I'm aware of, no.

2    BY MR. CROSS:

3        Q.   You say the way I --

4        A.   And I'm sure -- go ahead.

5        Q.   Well, I just -- you say the way I outlined

6    it.  Is there some version of that that you're

7    aware of that can be done?

8        A.   Not with this -- not with the current

9    software.

10       Q.   And what is it about the current software

11   that limits that?

12       A.   Well, it's not limiting.  The software is

13   not designed to do that.

14       Q.   Not designed to do what part of what I

15   just described?

16       A.   What you just said is to print out a

17   hand-marked paper ballot to fit that.  One of the

18   issues you have is, when you're doing a ballot,

19   okay, in the state right now there are several

20   different ballot sizes.  There's not a good way to

21   necessarily shrink it down to have the tick marks

22   line up properly inside the polling place scanner

23   and the B.M.D. as we have right now set on eight

24   and a half by 11 paper.

25            There's a lot of logistical issues around

1      A.   It would require massive changes in how

2   the system's put together, additional equipment,

3   different training.  Again, I don't see the

4   advantage of going backwards in technology.

5      Q.   But the technology could do it; right?

6      A.   The technology can do it.  I mean, you

7   could -- there's -- no question there's a

8   technological way to do it.  It's a question of

9   function of training, what are the up sides, what

10  are the down sides, what are the problems, again,

11  what are the logical issues.

12          There's varied and sundry questions that

13  could to be answered on the -- need to be answered

14  if you're going to go any of those kind of routes.

15                         (Whereupon, Plaintiff's

16                         Exhibit 9 was marked for

17                         identification.)

18  BY MR. CROSS:

19      Q.   All right.  Grab the next exhibit, please.

20  I think it's Exhibit 9.

21      A.   Yes.  Blake Evans' E-mail?

22      Q.   Yeah.  So at top is an E-mail from Blake

23  Evans to Andrew Jackson, on March 1st, 2021.  Do

24  you see that?

25      A.   Yeah.

1        Q.   And then if you come down, on Page 3 -- I

2    tell you, to make it easier, do you see at the

3    bottom right corner where it says State Defendants

4    and a series of numbers?

5        A.   001726 --

6        Q.   Yeah.

7        A.   -- 79?   Yeah.

8        Q.   Go to the one that ends in 680.

9        A.   Got it.

10       Q.   And you see at the very bottom of that

11   page there's an E-mail from someone named Joseph

12   Rossi at Gmail?

13       A.   Yes.

14       Q.   Who's -- and you received this E-mail on

15   February 25th, 2021.   Do you see that?

16       A.   Yes.

17       Q.   And the E-mail purports to identify a

18   number of what this person seems to believe are

19   errors with the audit, specifically regarding

20   Fulton County.

21            Do you see that?

22       A.   Yes.

23       Q.   And do you recall this E-mail?

24       A.   Yes.

25       Q.   And if you come up to the first page, the

1    E-mail in the middle is one that you sent to Blake

2    Evans forwarding this on to him on March 1st, 2021.

3    Do you see that?

4         A.   At the very first page?  Yes.

5         Q.   And then you write in the second sentence:

6              "I think we should explain these

7         are not 'vote' totals.  They are" --

8         Q.   "They are intended to assure the

9         computers are counted correctly, which

10        it does."

11             Do you see that?

12        A.   Yes.

13        Q.   What did you mean that "these are not vote

14   totals"?

15        A.   Again, there's a fundamental

16   misunderstanding by many people, especially people

17   who believe in the "stop the steal" conspiracies,

18   that the audit is somehow the new official vote

19   total and is supposed to directly replicate what

20   was done in the original November count, which as I

21   just explained earlier it is not intended to do

22   that.  It's supposed to look at these things in the

23   aggregate.

24             Now, there are better ballot handlings

25   that Fulton County should have done to avoid these

1   human errors of both tallying and also inputting

2   that have led to many of these kind of issues.

3           That's what I mean they're not actual

4   votes.  These aren't counted as votes.  They're not

5   official certified votes.  All they're supposed to

6   do is show that the computers counted the ballots

7   as presented.  And that's what the overall audit

8   showed is what I'm saying here.

9       Q.    And when you say "counted the ballots as

10  presented," you mean at an aggregate level?

11      A.    Yes.

12      Q.    Okay.

13                      (Whereupon, Plaintiff's

14                      Exhibit 10 was marked for

15                      identification.)

16  BY MR. CROSS:

17      Q.    All right.  Pull up Exhibit 10, please.

18      A.    I've got it up.

19      Q.    Okay.  And do you see Exhibit 10 is an

20  E-mail that you sent to Michael Barnes, and you

21  copied Richard Barron at Fulton County and some

22  other folks at Fulton, on October 26th, 2020?

23      A.    Yes.

24      Q.    And if you come down to the bottom of the

25  first page, this E-mail thread originates with an

1    E-mail from Rick Barron on October 26th, 2020.   Do

2    you see that?

3          A.    Yes.

4          Q.    And he writes to Mr. Barnes:

5                "We are discovering B.M.D.s that

6          have no State certification seal on

7          them."

8                And he also goes on at the end of that to

9    say:

10                "We also have many printers that

11          haven't been tested."

12                Do you see that?

13          A.    Yes.

14          Q.    And then Mr. Barnes responds:

15                "Please get me the count as soon

16          as you can.   I will send people down

17          in the morning."

18                Do you see that?

19          A.    Yes.

20          Q.    And then you write, following up:

21                "We will get folks there per

22          Michael's E-mail earlier."

23                Do you see that?

24          A.    Yes.   Uh-huh.

25          Q.    Do you recall this situation?

Page 235

1        A.    Yes.

2        Q.    What do you recall about why Fulton County

3   was finding B.M.D.s that had no State certification

4   seal on them and printers that had not been tested?

5        A.    If memory serves, they bought additional

6   equipment outside of the State purchase directly

7   from Dominion.

8             Dominion's supposed to send things to the

9   State for us to certify and then send on to the

10  county.  It looks like in this particular instance

11  they sent a chunk directly to the county without

12  going through State certification originally, if

13  memory serves.

14       Q.    And are you sure that's what this is or

15  you're --

16       A.    I'm 99 percent sure.  I mean, I remember

17  this happening at the time, and that's what we

18  discussed.  And then we sent people down there to

19  test them and serve -- accept them and then

20  officially transfer them to Fulton County at that

21  point.

22       Q.    Did this happen with any other counties?

23       A.    No.  Not that I recall.  I mean, Fulton

24  was also, they were buying additional equipment out

25  of the gate for different things.  And for the most

Page 236

1   part, this stuff came through the Dominion

2   warehouse, State certifiers were there, and then

3   they were sent on to Fulton.

4           It looks like one truck just must have

5   gone straight in through a logistical error.

6       Q.   Okay.  So did the Secretary's office send

7   individuals down to test all of the B.M.D.s and

8   printers?

9       A.   Yes.

10      Q.   And were new seals applied, State

11  certification seals to the B.M.D.s before they were

12  used?

13      A.   Yes.

14      Q.   And the testing that was done, was that

15  logic and accuracy testing and hash testing or

16  something else?

17      A.   It was acceptance testing.

18      Q.   Okay.  Are you aware of any B.M.D.s having

19  been lost or misplaced that were intended to be

20  shipped to Georgia?

21      A.   Not that I'm aware of, no.

22      Q.   Is that something that has -- an

23  investigation has been undertaken at any point to

24  look into?

25      A.   I'm not sure of any claim of a lost one to

1       that's okay with everybody, just for a

2       moment.  So.

3              MR. RUSSO:  Yeah.

4              (Whereupon, a discussion ensued

5         off the record.)

6              THE VIDEOGRAPHER:  Off the record,

7         2:25.

8              (Whereupon, a discussion ensued

9         off the record.)

10             (Whereupon, there was a brief

11        recess.)

12             THE VIDEOGRAPHER:  All right.  We're

13        back on the record at 2:28.

14   BY MR. CROSS:

15        Q.    Sorry.  Mr. Sterling, quickly, you

16   testified earlier that you'd gotten a call from

17   Dominion's C.E.O. at some point conveying to you

18   that Dr. Halderman had asked Dominion to engage him

19   to do work and to pay him for work that he'd

20   already done with respect to their equipment.

21             Do you recall that testimony?

22        A.    Yes.  And something along those lines in a

23   general way, yes.

24        Q.    Have you since learned during the course

25   of this deposition what the actual facts were

Page 244

1    regarding that possible engagement?

2        A.    Well, you stated it on the record earlier

3    where Dominion had reached out to him originally,

4    yes.

5        Q.    Well, I want to be clear that it's not

6    just me stating it.  Are you aware that Dominion's

7    counsel --

8        A.    Yes, I am aware of that now.

9        Q.    And you're aware that Dominion's counsel

10   had a conversation with your counsel, Mr. Germany,

11   today about this subject; right?

12       A.    Yes.

13       Q.    And we both understand that what actually

14   has occurred is that Dominion approached me about

15   engaging Dr. Halderman to work as an expert on

16   their behalf and they would pay him for that work

17   that he would do for them.

18             Do you understand that?

19       A.    I don't know the timing of it.  That's my

20   basic -- so I didn't know that you were involved in

21   it, no.

22       Q.    All right.

23       A.    That's new knowledge to me.

24       Q.    Okay.  Well, then I guess just to be

25   clear, do you understand now that Dominion reached

Page 245

1     out to affirmatively engage Dr. Halderman, that
2     that was Dominion's outreach?
3         A.   It would -- I do understand that, but that
4     they sub -- eventually chose not to do that, if
5     memory -- if I'm correct.
6         Q.   All right.  Well, that would be news to me
7     if they chose not to do it.
8         A.   I mean, they haven't yet; correct?
9         Q.   Yeah.  There you go.
10        A.   Okay.
11             MR. CROSS:  All right.
12             THE WITNESS:  Okay.
13             MR. CROSS:  Thank you, Mr. Sterling.
14        I appreciate that.
15             THE WITNESS:  Thank you.
16                       EXAMINATION
17    BY MR. MCGUIRE:
18        Q.   Hello.  Mr. Sterling, can you hear me?
19        A.   Yes, Mr. McGuire.
20        Q.   Hi, there.
21             MR. BROWN:  And just -- and excuse
22        me, Rob, but just for the record, this is
23        Bruce Brown.  And Rob, I just wanted to
24        make this statement.
25             The reason why the C.G.G. plaintiffs

1     have two lawyers examining Mr. Sterling

2     today is, by pre-agreement with the

3     defendants' counsel, myself, Bruce Brown,

4     I have a potential conflict of interest

5     with one line of inquiry.  And therefore,

6     Mr. McGuire is going to take charge of

7     that line of inquiry, and then I'm going

8     to resume.

9          Thank you.

10          MR. BARGER:  And Bruce, what is this

11     potential conflict?

12          MR. BROWN:  That's all I can say.

13     Thanks.

14          MR. RUSSO:  So y'all are going to

15     both be taking the deposition due to

16     you -- because you have a potential

17     conflict?

18          MR. MCGUIRE:  I just have a brief

19     line of questioning that would cause a

20     problem --

21          MR. RUSSO:  I'm just --

22          MR. MCGUIRE:  -- for Mr. Brown.

23          MR. RUSSO:  -- trying to understand

24     what's going on.

25          MR. BROWN:  Yeah.

Page 247

1          MR. RUSSO:  I'm just trying to

2     understand what's going on.  If it will --

3          MR. BROWN:  Rather than --

4          MR. RUSSO:  (Inaudible due to

5     cross-talk).

6          MR. BROWN:  Rather than take up --

7          MR. RUSSO:  -- if there's a potential

8     conflict.

9          MR. BROWN:  No.  Because I didn't

10     want to take up the time of Mr. Sterling

11     or everybody else on this phone call, I

12     cleared this with Carey Miller, your

13     partner, yesterday.

14          MR. RUSSO:  And you explained to him

15     the conflict?

16          MR. BROWN:  I explained what I could,

17     yes.  And he said that would be fine and

18     that he would tell you.

19          Thank you.

20          MR. RUSSO:  Okay.

21     BY MR. MCGUIRE:

22     Q.    Okay.  Mr. Sterling, as Bruce said, I'm

23     Robert McGuire.  I'm counsel for the Coalition for

24     Good Government, one of the counsel.  And I wanted

25     to ask you about the Secretary's publicly stated

1           But in general, it's up to them to
2       keep the security up there.  But then we
3       have to deal with our counties to make
4       sure they keep these things secure and
5       away from things so there aren't people,
6       you know, monkeying around with them for
7       three days and a screwdriver, those kind
8       of things.
9    BY MR. MCGUIRE:
10       Q.   So it sounds like you're saying that
11   access is key to whether or not there are
12   vulnerabilities?
13           MR. RUSSO:  Let me --
14           THE WITNESS:  Not ex -- sorry.
15           MR. RUSSO:  Just objection to the
16       form of the question.
17           THE WITNESS:  Not necessarily.  That
18       is a major component.  Physical security
19       is the, obviously the front line of all
20       cybersecurity.  And that's one of our main
21       things we have to worry about at all
22       times.
23           That's why we work with the counties
24       to make sure they have these things under
25       lock and key.  Most counties have a

1     limited access log where you have to go

2     into where these things are.

3          And as I stated previously, in a

4     generalized way, every system in the

5     world, be it ES&S, Smartmatic, Clear

6     Ballot, anything that involves a computer

7     somewhere in the process, be it a scanner,

8     an E.M.S., a B.M.D., a D.R.E., any of

9     those things, they're computers.  Things

10    can be done to computers by very smart

11    people.

12         It depends on the access they get,

13    the time they have, the knowledge they

14    have.  So all those things, you know, can

15    happen, but you have to do what you can in

16    a real world environment, in an election

17    environment, in order to mitigate those

18    risks.

19    BY MR. MCGUIRE:

20         Q.   Is there some minimum amount of access

21    that your office believes a bad actor would need to

22    have in order to pose a risk to the system?

23         A.   That's too broad of a question to really

24    answer.  I mean, it depends on which kind of

25    vulnerability they're going to go after and also

Page 253

1   actors, whether that's with hand-marked paper

2   ballots or computers.  So you always have to be on

3   the lookout for that potentiality.

4           And you know, there's no way to ever know

5   for certain if there's not a bad actor somewhere.

6   But the vulnerabilities are across every kind of

7   voting system manufactured by every manufacturer

8   and every style.

9       Q.    Okay.  Besides government people, Dominion

10  folks and the experts in this case, including

11  Professor Halderman, are you aware of any

12  unauthorized person who has obtained long-term

13  access to Georgia's voting system, to any of the

14  components or to the software?

15          MR. RUSSO:  Objection to form.

16          THE WITNESS:  When you say "voting

17      system," are you referring to,

18      essentially, all the components of the

19      voting system, E.M.S.s, voter

20      registration, I mean, every part and

21      parcel?

22  BY MR. MCGUIRE:

23      Q.    Yeah.  That's what I'm --

24      A.    I am --

25      Q.    -- referring to.

1      A.    -- not aware -- I'm not aware of it, no,

2  other than what was, I think Halderman was given,

3  as I've learned from Fulton County.

4           There were claims of that in some specific

5  cases.  There was a claim that in Ware County

6  somebody -- an independent auditor got ahold of it.

7  But that turned out to be -- not to be true.  They

8  didn't misplace anything.  There wasn't anything

9  that was taken away.

10          But outside of that, no, I'm not aware of

11  anybody having inappropriate access, no.

12     Q.    So your office investigated the Ware

13  County incident and concluded that it was nothing?

14     A.    Yes.  Because there was -- there was no

15  incident.  It just didn't happen.  There was not a

16  Ware County B.M.D. taken out.  I mean, it just

17  didn't happen.

18     Q.    Okay.  And I assume your previous answer

19  encompassed this, but just for clarity let me ask.

20  Do you know of any unauthorized person who has

21  imaged any component of Georgia's voting system and

22  taken away copies with them?

23     A.    No.

24     Q.    Okay.  Do you agree with me that, if

25  someone had done that and thereby obtained

Page 255

1    long-term access to the system, that that would

2    create a real world risk?

3         A.    Well, again, I don't know what you mean by

4    "long-term access."

5         Q.    Well, let's say someone had copied it and

6    they had a copy of it --

7         A.    What is --

8         Q.    -- on an ongoing basis.

9         A.    What is "it," Mr. McGuire?

10        Q.    Let's say someone had imaged all of the

11   software in the voting system, would that be --

12   would that create a risk to the voting -- the

13   security of the voting system?

14        A.    Well, there are several different pieces

15   and parts they would have to image from each

16   individual component necessarily.  And even if they

17   did, we have 159 counties with over 18,000

18   different ballot styles with different passwords

19   that are changing for each one, they change from

20   election to election.

21             That would be a risk and vulnerability

22   that we would probably have to figure out some way

23   to mitigate if that was the case.  We have no

24   evidence that that's the case.  And I'm not -- I am

25   not a cybersecurity expert, so I don't know what

Page 256

1   the long-term possibilities of that is.

2            I do know that having 159 counties with

3   over 18,000 different ballot combinations, and

4   knowing that our voter registration system is

5   completely separated from the election machinery, I

6   mean, it'd be -- it would be very difficult to get

7   every thing imaged for every single individual one

8   and then go back and do things that became

9   undetectable, from my understanding of how these

10  systems all work, without triggering something

11  along the way or having something that would just

12  be, for lack of a better word, noticeable.

13                    (Whereupon, Plaintiff's

14                     Exhibit 12 was marked for

15                     identification.)

16  BY MR. MCGUIRE:

17      Q.   So I'm going to share with you an exhibit

18  which is in the form of a recording.  And I

19  don't -- I haven't done this before with the audio,

20  so I'm not quite sure whether it's shared.  I've

21  introduced it as an exhibit, and I'd like to see

22  if --

23      A.   Uh-huh.

24      Q.   -- you see it.

25      A.   Let me go look real quick.

Page 257

1      Q.   It's Exhibit 12.  Well, it's showing up as
2   Exhibit 2012, it looks like, but it should only be
3   12, but.  It's at the bottom.
4      A.   I've got it.  Exhibit 2012 is Exhibit 12,
5   CGG Recording?
6      Q.   Correct.
7      A.   Is that the one?
8      Q.   That's the one.
9      A.   Okay.
10     Q.   I'd like you to open that and play it.
11  It's two minutes and 35 seconds.
12     A.   Okay.
13          (Whereupon, an audio recording was
14      played.)
15          THE WITNESS:  All right.
16  BY MR. MCGUIRE:
17     Q.   So Mr. Sterling, were you able to hear the
18  whole recording?
19     A.   Yes.
20     Q.   And there are two voices on that call;
21  right?
22     A.   Apparently.  Sounds like it.
23     Q.   So I'm going to represent to you that the
24  female voice was that of my client, C.G.G.'s
25  executive director Marilyn Marks.

Page 258

1           A.    I thought I recognized it.

2           Q.    Yeah.  Do you recognize the male voice on

3      the recording?

4           A.    I do not.

5           Q.    Okay.  Before this call, before you

6      listened to this recording, which is an excerpt,

7      has the Secretary's office been aware of the

8      alleged imaging that the male caller claims he did

9      in Coffee County?

10          A.    I don't think he's claiming he did it.  I

11     think he was claiming that somebody came down from

12     Michigan and did it.  I knew that there were claims

13     in and around Coffee County that were numerous,

14     voluminous.  And I know our investigations team

15     looked into it down there.  But I don't know the

16     specifics of the outcome of that or what came of

17     that.

18                And I believe Misty, the elections

19     director, officially lost her job because she was

20     falsifying timesheets, not anything to do with this

21     kind of item.

22          Q.    Okay.  So there has -- there has been an

23     investigation of the incident that was discussed in

24     that recording?

25          A.    Or something -- I mean, Coffee County was

1   problematic.  I mean, she also did a video where

2   she -- I think she had her credentials up on the

3   screen.  But I mean, I'd have to go back and look

4   at the specifics of them.  I don't know what came

5   of it.

6              But here's the issue we had, Mr. McGuire,

7   is we had claims up and down the state like this in

8   Ware County, things like that, of those kind of

9   issues and people demanding forensic audits, not

10  understanding what a forensic audit was.

11             So I am not aware of the specifics of what

12  the outcome of that investigation was or if they

13  were specifically looking if somebody imaged those.

14  I know that they -- we sent investigators to Coffee

15  County for several different items.  I believe that

16  was one of the ones amongst them.

17       Q.   Okay.  But you're not aware of any

18  findings of -- in connection with whether the

19  equipment was all imaged?

20       A.   I'm not aware of it off the top of my

21  head.  I would have to go back and check with our

22  investigations team.

23       Q.   Okay.  Are you aware of any efforts

24  undertaken to mitigate potentially unauthorized

25  access to that equipment?

1    A.   Well, like I said, every county, we have

2  S.E.B. rules and laws that surround all these

3  things.   So if anybody said, hey, go ahead and copy

4  these things, they would have been in violation of

5  both the law and the S.E.B. rules.

6    Q.   Okay.  And I believe -- I believe you

7  answered this question, but was the male -- I

8  presume the male caller was not authorized by the

9  Secretary to do the imaging that he claims was done

10  in Coffee County?

11    A.   Again, it doesn't sound like he wasn't

12  claiming that did it from my listening to it.  He

13  claims somebody from Michigan had come down to do

14  it, it sounded like.  So no, that -- no one was

15  given authorization to go do imaging of equipment.

16    Q.   Okay.  Is it -- I'm going to represent to

17  you that this call took place in March of 2021.  So

18  it's been more than a year -- almost a year since

19  the re -- since the call took place.

20         And he was obviously referring to

21  something that had happened previously; correct?

22    A.   Yes.

23    Q.   So if the male caller was telling the

24  truth on that phone call about the imaging of this

25  system and components, whether it was by him or

1   somebody else, then you'd agree that he had longer

2   access at this point to whatever those images are

3   than Professor Halderman had access to the

4   equipment from Fulton County; right?

5            MR. RUSSO:  Robert, have you guys

6        produced this call in the case?

7            MR. MCGUIRE:  I don't -- I don't

8        know.  I don't believe it has been.  But

9        you certainly have it here as an exhibit.

10           MR. RUSSO:  Okay.  And just so

11       we're -- is this a -- is it a full

12       transcript or is this the whole thing

13       or --

14           MR. MCGUIRE:  You have what I have at

15       the moment.

16           MR. RUSSO:  Okay.  I just wanted to

17       make sure he understood the whole -- the

18       whole call.

19           MR. MCGUIRE:  Sure.

20           THE WITNESS:  So I'm sorry.  Can you

21       go back and ask that question again?

22   BY MR. MCGUIRE:

23       Q.   So --

24       A.   I apologize.

25       Q.   So sure.   Let's assume the male caller was

Page 262

1    telling the truth about the imaging happening.   If

2    that's true, then you would agree with me that he's

3    had access to that image, or whatever was taken, or

4    whoever took it had access to whatever was taken

5    for longer at this point than Professor Halderman

6    had access to the Fulton County equipment; correct?

7        A.    I'm not going to accept the fact this guy

8    was telling the truth, because I've had so many

9    people lying through their teeth around a lot of

10   these things.

11           However, you're saying he could have had

12   the image.   I believe that Professor Halderman had

13   the actual equipment itself, which would have given

14   you the ports and the other things you would need

15   in order to test and do some of these things to

16   attempt to do alterations of the software itself.

17           So I think it's an apples and oranges kind

18   of comparison.

19       Q.    Sure.   But you'd agree with me that he's

20   had that image for at least as long and probably

21   longer than Halderman had access to the equipment

22   in Fulton County?

23       A.    I don't agree with that, because I don't

24   accept the premise that he has it.

25       Q.    All right.

Page 263

1      A.   And if he did, if he is telling the truth

2   and these magical technical people were -- got

3   these images and walked away with them and nobody

4   investigated to find out what they were, then he

5   potentially could have the images longer.  But I

6   don't know if that's enough in and of itself.

7           So like I said, like an apple -- it's an

8   apples and oranges comparison.

9      Q.   Right.  And I understand you don't know

10  whether this person is telling the truth, so I want

11  you to assume for the purpose of my question that

12  he is.

13     A.   Okay.

14     Q.   Assuming he is telling the truth about

15  what he asserted in the call, would you agree with

16  me that he could have shared that with virtually

17  anybody by now?  Whatever he --

18     A.   Yes.

19     Q.   Whatever was taken away could have been

20  shared with anybody by now?

21     A.   Yes.

22     Q.   Okay.  So can you tell me, when was the

23  last time you were aware of any activity in the

24  investigation of Coffee County?

25     A.   Months ago.  I mean, 2021 at some point.

1    Q.   Is it -- is it an ongoing investigation or

2  is it -- is it -- has it reached a tentative

3  conclusion?

4    A.   I would have to check.  I don't want to

5  speculate.  I mean, we have 50 continuing open

6  investigations.  Coffee County doesn't strike me as

7  one that's still open, if memory serves.  But

8  again, I don't want to speculate.  It could be

9  open, but I believe it's not.  I believe it's all

10 closed down there.

11   Q.   Okay.  Have there been any other

12 investigations of any other counties for similar

13 kinds of things?

14   A.   Calling things similar in this situation,

15 we had Morgan County where there was an issue

16 around the poll pad usage.  We had Spalding County

17 with a similar situation.  I'm not aware -- and

18 then we had the Ware County claim.

19        But outside of that, I'm not aware of

20 anything.  It doesn't mean it doesn't exist.  It

21 doesn't mean there might have been a claim of such.

22 And it doesn't mean there may or may not have been

23 an investigation.

24        I'm not aware of anything that had bubbled

25 up to say, yes, this is a substantive issue; yes,

1   this is a problem; yes, we need to do something
2   about this.   I'm not aware of any of that.   Nothing
3   has bubbled up from the investigations side to the
4   leadership of the Secretary of State's office.
5        Q.   And I think you said earlier that the
6   election director, Misty Martin, or Misty Hampton I
7   believe, she goes by both --
8        A.   She got married sometime in the middle, so
9   I'm not sure which name is her maiden name and
10  married.
11       Q.   But we know we're talking about the same
12  person; right?
13       A.   Correct.   Yes.
14       Q.   So are you -- are you telling me that her
15  termination had nothing to do with whatever the
16  allegations are that were in the call I just
17  played?
18       A.   It's my understanding she was terminated
19  for falsifying timesheets is what I -- if memory
20  serves what it was.
21       Q.   Okay.   And that's it?   Anything else?
22       A.   Not that I'm aware of.
23       Q.   How about Newton County, are you aware of
24  any allegations about images being made of
25  equipment and software in Newton County?

1      A.    No.

2      Q.    And you said there were no other counties

3 that where you were aware of that happening, other

4 than --

5      A.    Correct.

6      Q.    -- potentially Morgan, Ware, and I think

7 you said Spalding?

8      A.    Yeah.   But that was a different kind of

9 thing.   I was thinking about places around

10 equipment where there was an issue.   And those were

11 not anything having to do with people imaging

12 stuff.

13        I apologize if you took my answer to mean

14 that I was thinking anything equipment related.

15 And those were the, some of the ones I was thinking

16 about.

17      Q.    So you're not aware of anything related to

18 equipment copying or imaging of software,

19 imaging --

20      A.    Correct.

21      Q.    -- of devices?

22      A.    Correct.

23      Q.    Okay.   Are you aware of any counties

24 receiving requests after the 2020 election for

25 people to come and image their equipment and

1    software?

2         A.    Yes.

3         Q.    And what counties are you aware that that

4    happened in?

5         A.    I'd hate to try to number them at this

6    point, because I'm sure that there were --

7    President Trump and the individuals around him

8    stirred up lots of emotions to follow conspiracy

9    theories and disinformation and misinformation

10   around Dominion Voting Systems.

11             I'm sure that there were E-mails received

12   by every single county to demand a forensic audit

13   and all the things that go with that, even though

14   people really couldn't define what a forensic audit

15   was.  So I would probably venture to guess that 159

16   counties received a call from somebody to do that.

17        Q.    And are you aware of any specifically

18   that, you know, passed those requests along to the

19   Secretary of State's office or got advice or

20   guidance from the Secretary's office?

21             MR. RUSSO:   Objection to form.

22             THE WITNESS:   No.   I mean, I think

23        just in general, for lack of a better

24        word, follow the rules, follow the law,

25        you know, keep the system cordoned off and

Page 268

1       safe.

2               And that -- our elections directors

3       are a -- are for the most part a very

4       good, functional crew that defend the

5       integrity and the security of the systems.

6               MR. MCGUIRE:   Okay.   All right.

7       Well, that's really all I had.   And I'm

8       going to turn it over to Bruce now.   But I

9       appreciate your time.   Thank you.

10              THE WITNESS:   Thank you.

11                      EXAMINATION

12      BY MR. BROWN:

13          Q.   Good afternoon, Mr. Sterling.  My name is

14      Bruce Brown, and I represent the plaintiffs C.G.G.

15      in this case.

16              Could you -- I'm going to return to the

17      issue of the State's voter registration system that

18      you testified about a bit when Mr. Cross was

19      examining you.  Excuse me.

20              The -- when did the State begin to think

21      about procuring a new voter registration system?

22              MR. RUSSO:  And I'm going to object

23          as outside the scope of the 30(b)(6)

24          topics.  But while -- since we have

25          Mr. Sterling here, you can go ahead and

1          Why don't -- why isn't your attitude about

2     cybersecurity the same as you express it to be with

3     respect to this?

4          A.   Because it is -- I'm sorry.

5               MR. RUSSO:  Bruce, you've been

6          testifying most of the time, and now

7          you're arguing and being argumentative and

8          testifying.

9               MR. BROWN:  I'll take that as a

10          compliment.

11    BY MR. BROWN:

12         Q.   Can you answer the question?

13              MR. RUSSO:  So yeah, there are

14          certain topics here for the 30(b)(6) which

15          Mr. Sterling is here for.  This topic is

16          not.  But we would like to be able to move

17          forward and, if possible --

18              MR. BROWN:  I'll --

19              MR. RUSSO:  -- can we get it --

20              MR. BROWN:  Okay.

21    BY MR. BROWN:

22         Q.   Just answer the question.  You -- I'm not

23    going to pick on you, Mr. Sterling.  You did say

24    quite fairly that your description of

25    Dr. Halderman's report, which you still haven't

1   read, was "a load of crap" was a punchy line and it

2   was motivated by an understandable frustration with

3   criticism of a system because it's not absolutely

4   secure; correct?

5        A.   No.   I think it's because people are

6   trying to undermine everybody's -- you want to know

7   my underlying emotional thought on this, Mr. Brown?

8   Is that for several years now in this state many

9   people have made claims that I don't believe are

10  justifiably accurate.

11          And that started in 2018, started in 2017,

12  even 2016, when you had people claiming that people

13  were -- Russians were hacking machines and flipping

14  votes to Hillary Clinton.

15          I had a democrat state representative who

16  has been combative with me in the past ask a

17  question about the report in a way that was

18  intended to be political as a gotcha question.   So

19  you're right, my initial reaction was a punchy go

20  back right back at him because you can't take the

21  politics out of politics.

22          And this report was not presented in such

23  a way as to be, hey, here's a helpful situation.

24  It is underlying trying to undermine Georgians' and

25  Americans' faith in the overall system.   So yes, I

1   take everything with a grain of salt coming out

2   from that path.

3        But we do take cybersecurity and all

4   security seriously.  It's at the forefront of our

5   discussions every day when we talk about how we're

6   implementing the system and what we can do to make

7   it better.

8        And like I said, I now am aware, too, that

9   Dominion has this, and engineers are looking at it

10  and seeing if there are -- as with every

11  computerized system in the world with elections,

12  there's going to be some vulnerabilities.  You have

13  to do your best to mitigate them and get ahead of

14  them.

15       So if there is anything that comes out of

16  that, I know that Dominion will be happy to do

17  that.  And it's their responsibility to bring those

18  to the Secretary of State's office.  And if we

19  discover something independent of them, it's our

20  responsibility to take it to them.

21       And Debra, I apologize, and I realize I'm

22  talking really fast right now.  So.

23       So to that point, the "load of crap" thing

24  was an emotional quick punch, because every kind of

25  criticism like that I've seen is based on there are

1   bad actors.  If there's bad actors, nothing is

2   secure.  No system is secure.

3          And that's the -- and that's the

4   underlying issue when I say that that was what I

5   was -- my intention at the time.  If I learn more

6   after reading it or seeing it and people who are

7   frankly going to be smarter than me who understand

8   the specifics of it and might find a way to

9   mitigate these things or make them better, yes,

10  obviously Dominion will bring those to us and we

11  would work with them to see what we could make

12  happen.

13     Q.   The -- let me follow up.  There's a lot of

14  common ground here, believe it or not,

15  Mr. Sterling.  I think that we can agree that it's

16  important that a voting system actually has

17  integrity and security and that it's perceived by

18  voters to have integrity; correct?

19     A.   Yes.

20     Q.   Therefore, it is damaging and bad for

21  irresponsible and false claims of insecurity to be

22  advanced; correct?

23     A.   Or claims made with no evidence, yes.

24  Both of those things would be things that I think

25  would be damaging and unnecessary.

1    Q.    But it's also crucial to investigate fully

2    potentially meritorious claims about system

3    security and to mitigate any vulnerabilities found

4    if possible; right?

5    A.    State your question because I -- there's a

6    statement in there, but I don't think I disagree

7    with it.  But what are you trying to ask

8    specifically?

9    Q.    Well, it's crucial to election security to

10   take -- to take things like Dr. Halderman's report

11   seriously and to mitigate whatever vulnerabilities

12   are found if mitigation is possible; correct?

13   A.    I would lean on our contractors to look at

14   it and see if there is vulnerabilities there to

15   tell me whether or not something would be taken

16   seriously or not.

17   Q.    And what --

18   A.    I would take anything, anything that's --

19   has a found -- a substantive foundation that was

20   outside of the already existing grounds of

21   mitigation to see if any other mitigation might be

22   necessary or proper as long as it doesn't interfere

23   with the process of the elections themselves or the

24   ability of our county workers to run the election

25   or voters to vote in the election.

1    Q.   There might be some vulnerabilities just
2  in the abstract that would convince even you that
3  you can't use the system; correct?
4    A.   Not given the current situation, I
5  seriously doubt that.
6    Q.   So --
7    A.   Knowing the complexities of our system and
8  everything, I mean, I would be -- I would be -- it
9  would take a lot.
10         I'm sure that there is some level out
11  there in some world where, yes, this is so insecure
12  you can't use it.  I do not believe that to be this
13  system.  And if it was the case for this system, it
14  would be the case with any system using a computer.
15    Q.   Well, don't get me going there.  But we're
16  talking about this system, I would --
17  theoretically, I think there's a lot of people who
18  would agree with the latter statement that you
19  made, that anything that uses a computer will
20  remain vulnerable.  But we're talking about the
21  Dominion B.M.D. system.
22         And what evidence would it take for you to
23  decide, okay, I didn't know that, now I know that
24  and we can't use the system anymore?  Just give me
25  a --

Page 335

```
 1        recess.)
 2             THE VIDEOGRAPHER:  Back on the record
 3        at 4:16.
 4   BY MR. BROWN:
 5        Q.   I wanted to go back to a statement that
 6   you'd make about Dr. Halderman's report.  And I
 7   believe you said something to the effect that his
 8   report was not presented in a way to be helpful to
 9   the situation, it was trying to undermine Georgia's
10   faith in the election system.
11             Did you mean that?
12             MR. RUSSO:  I'm -- do you know where
13        he said that?  Are you talking about
14        today?
15   BY MR. BROWN:
16        Q.   Did you say that?  Do you recall saying
17   that?
18        A.   Did I say that about five minutes ago,
19   something along those lines?
20        Q.   Yeah.
21        A.   Yeah, I remember saying something along
22   those lines.  And I meant we're in an adversarial
23   issue right now.  And I don't know, and this is why
24   I think I don't know, I don't know if it was
25   submitted to C.I.S.A. in the way you can do -- I
```

1   don't -- there's a name for it where you basically

2   say I'm giving you a vulnerability and I want to be

3   reported for it, here you go, that's more I'm

4   saying it here's the problem.

5          I did mean that in the context of which

6   we're discussing it right now, yes.

7       Q.   So you think that Dr. Halderman, the

8   purpose of him doing that was to undermine faith in

9   Georgia's election system, seriously?

10      A.   I think the purpose of this lawsuit is to

11  do things like that, yes, to force us to do a

12  change.

13      Q.   Okay.  That's different than undermine --

14  than the purpose being to undermine the people's

15  confidence in the system.

16      A.   I think it's the same.

17      Q.   Okay.  Let me take you back a couple of

18  years.  When we sued to have the D.R.E.s

19  disallowed, your people said the same thing.  And

20  that --

21          MR. RUSSO:  Objection to form.

22  BY MR. BROWN:

23      Q.   That is that our suits are lousy and all

24  we're trying to do is destroy the faith in the --

25  Georgia's election system.  That is what we heard

1    see that Dominion --

2         A.    If the -- I'm sorry.  Do you have another

3    question, or do you want me to answer the first

4    question you just asked?

5         Q.    The one you -- the one I just asked.

6         A.    Okay.  Let's do a series of suppositions

7    here.  If there is an actual vulnerability pointed

8    out in this, we would work with Dominion to try to

9    mitigate it if it was something that could be

10   mitigated.

11        Q.    And if it --

12        A.    Or if it was --

13        Q.    If it wasn't, what would you do?

14        A.    If it wasn't something that -- well, it

15   depends.  You said it wasn't -- could be mitigated

16   or if there was a cost to it.  I'm not going to

17   speculate on something I haven't read.  But if

18   there was something there, yes, we would work to

19   mitigate it.

20             My point is, bringing it up in this highly

21   adversarial situation that's been now going on

22   since 2017, as I understand it, and yes, this case

23   has un -- has helped to undermine people's faith in

24   the elections.

25             This case was cited by President Trump and

Page 340

1   Sidney Powell and Lin Wood.  So yes, all those

2   things are true.  It may not have been your intent.

3   And I'm not going to go to the intent.  I'm saying

4   about the -- I'm talking about some of the outcomes

5   here.

6       Q.  But you would agree that you're not trying

7   to promote a false sense of security in your system

8   by just completely rejecting any criticism of it;

9   right?  You're looking at those criticisms

10  seriously; right?

11      A.  It -- well, I will be honest.  It depends

12  on who -- from whom they are coming and their basis

13  of fact and where they are positioned in relation

14  to our office oftentimes, I mean.

15          But yes, just because somebody is your,

16  quote, unquote, opponent doesn't mean they could --

17  they're 100 percent wrong every time.

18      Q.  Particularly when your own --

19      A.  Do I take it with more of a grain of salt?

20  Yes.

21      Q.  But particularly when your own expert,

22  your own expert agrees with his findings; right?

23      A.  Again, I'm not privy other than you saying

24  that.  And again, it's in Dominion's hands right

25  now.  These things have to be vetted out and looked

Page 341

1    at and then can things be done either through

2    programming or physical mitigations.  I don't know.

3            But yes, if something was real, my

4    assumption is we would do things to mitigate it to

5    assure the continued security of our system, which

6    I think has been proved through this election so

7    far and every election we've run them in, starting

8    with the pilots in 2019, the presidential

9    preference primary, the joint primary in June, the

10   general election in November, the elections in

11   January and the municipals in 2021.

12       Q.   But the basis for your statement that he

13   prepared the report for the purpose of undermining

14   voter confidence is simply because he was engaged

15   as the plaintiffs' expert, is that it?  Or do you

16   have some other basis for such a serious charge to

17   make?

18       A.   Mr. Brown, we are in an adversarial

19   situation here.  He is an expert from the, quote,

20   unquote, the other side.  So yeah, that is the

21   outcome, the literal outcome of this.

22            And especially with the way it was

23   discussed in the press before -- when it was still

24   lawyers' eyes only was from my point of view, my

25   personal opinion, intended to undermine people's

Page 342

1   faith in the elections in this state.

2        Q.   Did you know that the Secretary of State

3   objected to Mr. Hal -- Dr. Halderman submitting his

4   report to C.I.S.A.?

5        A.   I don't remember.  I remember at the time

6   something like that happened, but I can't remember

7   what the rationale was at -- was for it.

8        Q.   Are you aware of reports of the Dominion

9   software being copied out of Michigan and out of

10  Colorado?

11       A.   I'm aware that there was a claim of that

12  in Michigan.  I never saw evidence of that.  I

13  believe the claim in Colorado was more -- had more

14  substantive -- but I'm not sure which Democracy

15  Suite version it was.  I don't know if it was our

16  version or some other version.

17       Q.   And what difference does it -- and what

18  difference does -- might it make?

19       A.   If it's a different version, it could have

20  very different items to it and how it's supposed --

21  the work flows and things internal to the systems.

22  That would make a pretty sizable difference if

23  you're trying to, quote, unquote, hack a system.

24       Q.   And you don't know which is which, whether

25  either of those systems is the system that Georgia

Page 343

1    was using -- is using?

2        A.   I think Colorado is close to ours, but I

3    think they're on a different version.  I could be

4    wrong on that.

5        Q.   Okay.  Has the -- has the Secretary

6    investigated the significance from a security

7    standpoint of that software being released to the

8    public, either from --

9        A.   Is it --

10       Q.   -- Michigan or Colorado?

11       A.   Not specifically, no.

12       Q.   Generally?

13       A.   Not that I'm aware of.

14       Q.   Generally?

15       A.   Gen -- no.  Not that I'm aware of.

16       Q.   I mean, sitting here today shouldn't he do

17   so?

18       A.   I'm not going to speculate on that,

19   Mr. Brown, because you're giving me stuff that I

20   don't necessarily know to be true.  Like I said, in

21   Michigan I'm not sure it was actually copied.

22            In Colorado there was a claim of that, but

23   I'm not sure if it was actually, it mirrored and

24   sent to somebody else.  I have no specific

25   knowledge to that front.  You may have more

Page 344

1    information than me on the front.

2        Q.    Well, who in your office is looking at

3    that, if anybody?

4        A.    Well, I and Ryan Germany talked to

5    Dominion about some of these items.  And I'm not

6    aware of anything right now where a major concern

7    has been raised because of that.

8        Q.    Okay.  Your big defense to the relevancy

9    of Dr. Halderman's report is that he had all the

10   time in the world to hack it, so what.  And yet now

11   we know that potentially a lot of people could have

12   at least very similar software, and you and the

13   lawyer, Ryan Germany, are just sort of talking

14   about it at the water cooler and not doing anything

15   about it?

16           MR. RUSSO:  Objection.  Bruce, I

17        mean, stop arguing with the witness and

18        ask your questions.

19           MR. BROWN:  I did.

20           MR. RUSSO:  No, you didn't.

21           THE WITNESS:  Mr. Brown, can you

22        ask -- can you state your question?

23   BY MR. BROWN:

24       Q.    Is that -- so you're really not doing a --

25   I mean, I'm sort of aghast.

Page 379

1      R E P O R T E R   C E R T I F I C A T E
2    STATE OF GEORGIA )
     COBB COUNTY       )
3
4          I, Debra M. Druzisky, a Certified Court
     Reporter in and for the State of Georgia, do hereby
5    certify:
           That prior to being examined, the witness
6    named in the foregoing deposition was by me duly
     sworn to testify to the truth, the whole truth, and
7    nothing but the truth;
           That said deposition was taken before me
8    at the time and place set forth and was taken down
     by me in shorthand and thereafter reduced to
9    computerized transcription under my direction and
     supervision.  And I hereby certify the foregoing
10   deposition is a full, true and correct transcript
     of my shorthand notes so taken.
11         Review of the transcript was requested.
     If requested, any changes made by the deponent and
12   provided to the reporter during the period allowed
     are appended hereto.
13         I further certify that I am not of kin or
     counsel to the parties in the case, and I am not in
14   the regular employ of counsel for any of the said
     parties, nor am I in any way financially interested
15   in the result of said case.
           IN WITNESS WHEREOF, I have hereunto
16   subscribed my name this 3rd day of March, 2022.
17
18
19
20
           Debra M. Druzisky
21         Georgia CCR-B-1848
22
23
24
25