Page 1

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3

4

  Donna Curling, et al.,

5

               Plaintiffs,

6                               CIVIL ACTION FILE
          vs.

7                               NO. 1:17-cv-02989-AT

  Brad Raffensberger, et

8  al.,

9             Defendants.
  ~~~~~~~~~~~~~~~~~~~~~~~~~~

10

11

12

             VIDEO 30(b)(6) DEPOSITION OF

13               SECRETARY OF STATE
                     THROUGH

14           ROBERT GABRIEL STERLING

15

16             October 12, 2022

17                9:26 a.m.

18

19

          Suite 3250, One Atlantic Center

20           1201 W. Peachtree Street
                 Atlanta, Georgia

21

22

23

24

          S. Julie Friedman, CCR-B-1476

25

Page 4

1                    INDEX OF EXAMINATIONS
2     WITNESS:
      Robert Gabriel Sterling
3                                                 Page
4      CROSS-EXAMINATION                            11
       By Mr. Cross
5
       CROSS-EXAMINATION                           361
6      By Mr. Brown
7
                     INDEX TO EXHIBITS
8
9       Exhibit        Description         Page
10     Exhibit 1    10-10-22 PLAINTIFFS' SEVENTH     12
                    AMENDED NOTICE OF  DEPOSITION OF
11                  OFFICE OF THE SECRETARY OF STATE
12     Exhibit 2    9-28-21 Report of Investigation  28
                    by Blanchard, SEB2020-250,
13                  CONFIDENTIAL, SOS-INV000136-143
14     Exhibit 3    Photograph from YouTube Video of  39
                    Post-it with Password
15
       Exhibit 4    Series of Tweets Beginning with   46
16                  3:51 PM Tweet by Sterling
                    Responding to Adida's Tweet
17
       Exhibit 5    2/10 Transcript of Secretary      51
18                  Raffensperger Interview labeled
                    "APC Raffensperger 20122
19
       Exhibit 6    Still Photo from The Carter       62
20                  Center, Restoring Confidence in
                    American Elections Panel 3 (April
21                  29, 2022), YouTube (May 9, 2022),
                    with a Quote from Sterling
22
       Exhibit 7    E-mail Chain Ending with Tuesday, 77
23                  5-11-21 4:25 PM E-mail, from
                    Watson, to Jones, Subject: Re:
24                  Coffee County, ATTORNEYS EYES
                    ONLY, SOS-INV000007-8
25

Page 5

1                        INDEX TO EXHIBITS
2
      Exhibit          Description            Page
3
    Exhibit 8    8-2-22 Letter, from Ellis, to        138
4                Reynolds, GBI, Re: Request for
                 Assistance in Investigation
5
    Exhibit 9    E-mail Chain Ending with Friday,     195
6                4-1-22 1:19:51 PM E-mail, from
                 Germany, to Ellis, Subject: RE:
7                Server, ATTORNEYS EYES ONLY,
                 SOS-INV000053-55
8
    Exhibit 10   E-mail Chain Ending with Monday,     209
9                8-1-22 10:00:50 PM E-mail, from
                 Sterling, to Miller, et al.,
10               Subject: Re: Curling v.
                 Raffensperger; 1:17-CV-2989 -
11               STATUTORY ELECTRONIC SERVICE,
                 ATTORNEYS EYES ONLY,
12               SOS-INV0000087-92
13  Exhibit 11   E-mail Chain Ending with Monday,     219
                 4-25-22 2:39:37 PM E-mail, from
14               Germany, to ORR Administration,
                 et al., Subject: RE: Open Records
15               request, SOS-INV000048-50
16  Exhibit 12   Monday, 11-16-20 19:24 UTC          225
                 Message # 155, from Hampton, to
17               Voyles, Subject: ORR
18  Exhibit 13   E-mail Chain Ending with Monday,     233
                 8-1-22 10:05:21 PM E-mail, from
19               Germany, to Tyson, et al.,
                 Subject: FW: GASOS ORR #22-360,
20               SOS-INV000060-66
21  Exhibit 14   E-mail Chain Ending with Tuesday,    233
                 7-12-22 1:12:37 PM E-mail, from
22               Koth, to Ellis, Subject: FW: Open
                 Records request, SOS-INV000014-17
23
    Exhibit 15   4-25-22 3:50 PM Printout of Case     237
24               Sheet for SEB2020-250-Coffee
                 County Misc
25

```
 1                        INDEX TO EXHIBITS
 2      Exhibit         Description          Page
 3    Exhibit 16    34 Interior Stills Taken From      240
                    Video from Camera 1
 4
      Exhibit 17    Still Shots from Video of Coffee   243
 5                  County Election Board Office
                    Beginning with 12-11-20
 6                  10:31:07.148 AM
 7    Exhibit 18    2-26-21 6:05 PM Tweet by Juha,     262
                    Re: Mike Lindell's Plane Flights
 8
      Exhibit 19    Excel Spreadsheet - IP Addresses   280
 9                  that have Downloaded CC Data,
                    08122022-000137-161
10
      Exhibit 20    E-mail Chain Ending with 4-27-21   285
11                  8:25:34 PM E-mail, from Maggio,
                    to Federalattorney, Subject: FW:
12                  Coffee County Forensics FEDEX
                    Request, 08122022-000100-102
13
      Exhibit 21    Wednesday, Jul 27, 2022, 2:53 PM   291
14                  E-mail, from Brown, to
                    Belinfante, et al., Subject: JSON
15                  Format Cast Vote Records on the
                    Internet
16
      Exhibit 22    E-mail Chain Ending with Tuesday,  297
17                  August 17, 2021 4:38:20 PM
                    E-mail, from Johnson, to McClain,
18                  Subject:Re: SullivanStrickler /
                    Spalding County Board of
19                  Elections : Forensic Collection
                    Agreement, ATTORNEYS EYES ONLY,
20                  SOS-INV000103-128
21    Exhibit 23    Thursday, 3-10-22 Virtual          307
                    Videotaped 30(b)(6) Deposition of
22                  Sanford Merritt Beaver, Volume
                    II, excerpted pp 418 - 421 & 436
23
      Exhibit 24    10-12-22 "Rolling Stone" Article   335
24                  by Glawe, "Pro-Trump Georgia
                    Officials Plotted to Swipe Voting
25                  Data.  We Caught Them
```

Page 7

1                    INDEX TO EXHIBITS

2

      Exhibit          Description           Page

3

      Exhibit 25    11-17-20 Official Election      407
4                   Bulletin, RE: Open Records
                    Requests -- Security Information
5                   Exempt

6     Exhibit 26    12-9-20 Press Release - Secretary  409
                    of State's Office Opens
7                   Investigation into Coffee
                    County's Handling of Recount

8

      Exhibit 27    1-4-21 4:21:48 AM E-mail, from    411
9                   Favorito, to Harding, et al.,
                    Subject: Final Ballot Inspection
10                  Plan, 10102022-000141

11    Exhibit 28    5-5-21 Letter, to The Honorable   414
                    Karen Fann, President, Arizona
12                  State Senate, from Karlan, Civil
                    Rights Division, DOJ

13

      Exhibit 29    5-6-21 Dominion Voting, Customer  416
14                  Notification: Maintaining Secure
                    Chain of Custody for Your
15                  Dominion Voting System,
                    Confidential,
16                  STATE-DEFENDANTS-00101937

17    Exhibit 30    5-27-22 Press Release - The MITRE  421
                    Corporation, an Independent
18                  Federal Lab, finds Georgia
                    Election System Secure

19

      Exhibit 31    July 2022 MITRE Document -        421
20                  Independent Technical Review:
                    Security Analysis of Georgia's
21                  ImageCast X Ballot Marking
                    Devices

22

23

24

25

Page 8

1                      INDEX TO EXHIBITS

2

    Exhibit          Description          Page

3

   Exhibit 32    E-mail Chain Ending with        432

4                 Wednesday, 8-18-21 12:49 PM

                  E-mail, from Evans, to Johnson,

5                 et al., Subject: RE: Spalding

                  County Equipment

6

7       (Original Exhibits 1 through 32 have been

    attached to the original transcript.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 11

1            Will the court reporter please swear in

2       the witness.

3            ROBERT GABRIEL STERLING, having been first

4       duly sworn, was examined and testified as

5       follows:

6            THE VIDEOGRAPHER:  Counsel, you may

7       proceed.

8       CROSS-EXAMINATION

9       BY MR. CROSS:

10       Q.    Good morning, Mr. Sterling.

11       A.    Good morning, Mr. Cross.

12       Q.    So do you understand your testimony today

13   as a representative of the Office of the Secretary of

14   State for Georgia.

15       A.    That's my understanding.  Yes.

16       Q.    And you understand that means that you're

17   testifying to the knowledge the Secretary's Office

18   has on a particular topic?

19       A.    Yes.

20       Q.    Okay.  Let me go ahead and hand you the

21   first exhibit, which is Tab 2, the notice.

22            If you could, share that with everybody

23   else.

24       A.    Is it the same thing here?

25       Q.    Yeah.

Page 13

```
 1        A.    Yes.  I just took it.

 2        Q.    Yeah.  And is there any reason you cannot

 3   give full and complete testimony today?

 4        A.    Not that I'm aware of.

 5        Q.    Okay.  And have you ever been convicted of

 6   or charged with any crime?

 7        A.    No.

 8        Q.    Okay.  All right.  Take a look --

 9        A.    Wait.  Do speeding tickets count?

10        Q.    No.

11        A.    Okay.

12        Q.    Those are not crimes.

13              Take a look at Exhibit 1, if you would,

14   and turn to Page A-4 where it says, "AMENDED TOPICS."

15        A.    Yes, sir.

16        Q.    And you'll see that there's a topic there,

17   No. 1; and it continues on to the top of the next

18   page.

19              And are you prepared to testify to the

20   knowledge of the Secretary's Office on that topic

21   today?

22        A.    Yes.

23        Q.    Okay.  Now what did you do to prepare for

24   your testimony today?

25        A.    Interviewed several individuals in the
```

Page 14

 1   office and -- or -- and people who also left the

 2   office.  Pam Jones left the office.  Chris Harvey's

 3   left the office.  Frances Watson has left the office,

 4   but I did --  I did interview all of them.

 5          The current director in this investigation

 6   is our chief investigator, Sara Koth.  Josh --  Oh,

 7   what's the last name?  Can't think of it.  One of our

 8   other investigators who was the main person on the

 9   ground.  Blanchard, that's the last name.

10          Let's see.  Blake.  Talked to Blake Evans.

11          Conferred with counsel.

12          Read over my former -- what do you call

13   it -- deposition.  I read through Chris Harvey's

14   deposition.

15          I reviewed other documents, including

16   things from a Channel 11 interview, the video from

17   The Carter Center.

18          Let's see who else did I interview with.

19   Ryan Germany in my office.  I might have said that

20   already.  I apologize.

21          And generally reviewed my own memory of

22   some of the stuff since this took place over the last

23   two years, and I was in a position to really be aware

24   of or be a part of the decision making process on

25   most of these -- the situation surrounding Coffee

1    County and any of the other potential items that

2    might have been -- where access might have been

3    improperly given to somebody or allegation of -- of

4    that kind.

5           And I probably spent -- I --  I couldn't

6    even put a number to how many hours.  I think

7    probably about three weeks' worth of time, depending

8    on my own time, doing it and doing the interviews and

9    doing research and re-reviewing the documentation.

10        Q.    Did you review any documents beyond your

11   prior deposition testimony and Mr. Harvey's

12   deposition testimony?

13        A.    Yes.

14        Q.    What other docs?

15        A.    Should I repeat the ones I already stated

16   or --

17        Q.    No.  The only thing I heard from documents

18   was those two --

19        A.    I also --

20        Q.    -- last --

21        A.    -- looked at the transcript of the Channel

22   11 interview.

23        Q.    Oh, the Channel 11.  Okay.

24        A.    I looked at the video or part of the video

25   from my thing at The Carter Center.

Page 16

1          Q.     Okay.

2          A.     Let's see.  I reviewed e-mails from

3     different people in and around this.  I reviewed

4     other e-mails from the investigative side; e-mails,

5     some from discovery from this case and -- and others

6     as well.

7                 I looked over the -- the videos from

8     Coffee County by Misty Hampton.  I looked at her

9     statement or declaration that she did not commit

10    voter fraud.

11                I mean, I've --  I'll try to list

12    everything I can remember right now, but some may be

13    triggered by some of the questions.

14                Let's see.  What else.  The adjudication

15    guide, I reviewed it.  I'm not going to say I read

16    all 80 pages of it, but I reviewed big parts of that,

17    and that's the Dominion adjudication guide.

18                The adjudication --  I'm sorry.  The

19    Dominion bulletin which everybody telling to keep

20    your stuff secure and why.

21                The CISA item about different potential

22    vulnerabilities.

23                Those are the main -- main things come to

24    mind right now.

25          Q.     Okay.  The Dominion bulletin about keeping

```
 1   equipment secure, is that the one that went out in
 2   May 2021 regarding Cyber Ninjas?
 3        A.   I believe it was May 6th, and now that
 4   Cyber Ninjas was part of the impetus behind this.
 5             THE COURT REPORTER:  I'm sorry.  I'm
 6        sorry?  I'm sorry.
 7             MR. CROSS:  You've got to slow down.
 8             THE COURT REPORTER:  Let's have the
 9        question again.
10             THE WITNESS:  Okay.
11             THE COURT REPORTER:  And then a pause and
12        the answer --
13             THE WITNESS:  Okay.
14             THE COURT REPORTER:  -- please.
15        Q.   (By Mr. Cross)  The Dominion bulletin
16   regarding keeping equipment secure, was that the one
17   that went out on May 6th, 2021 that related, in part,
18   to Cyber Ninjas?
19        A.   Correct.
20        Q.   Okay.  You said you reviewed a statement
21   or declaration from Misty Hampton saying she did not
22   commit voter fraud.  Can you describe that for me.
23        A.   It was a very short statement, David.  I
24   believe.
25             THE WITNESS:  Should I hold up for a
```

Page 18

```
 1        second, court reporter, on this?
 2               THE COURT REPORTER:  Okay.
 3               THE WITNESS:  Miss Friedman, thank you.
 4               THE COURT REPORTER:  Yes.
 5               THE WITNESS:  Now I forgot where I was.
 6        If somebody can read back the last section
 7        before this.
 8               THE COURT REPORTER:  No.  I can't.
 9               THE WITNESS:  Okay.  Oh.
10        Q.     (By Mr. Cross)  My question --
11        A.     No, no.
12        Q.     -- was that -- that you reference a
13   statement or declaration that Miss Hampton signed
14   saying she did not commit voter fraud, and my
15   question was can you tell me what -- about that.
16        A.     It was -- I believe it was on her
17   letterhead.  It was dated January 7th, 2021, where
18   she stated that she would never, have never, and
19   would not consider committing voter fraud, something
20   along those --  It was a very declarative statement,
21   but it was only like two sentences, so that's what
22   that was.
23        Q.     And what was the date of that?
24        A.     I believe it was dated January 7th.  It
25   came into the -- the Secretary's Office's possession
```

Page 19

1    at the end of January.  I want to say January 26th.

2         Q.    It was dated January 7, 2021?

3         A.    Correct.  And it came into the Secretary's

4    Office possession through Investigator Blanchard on,

5    I believe, January 26, 2021.

6              MR. TYSON:  And, David, now that I

7         understand what the document is, that is one of

8         the exhibits to the report of investigation that

9         would was held based on investigative privilege,

10        so just to clarify.  That's --  That's why you

11        don't know what that is and haven't seen it

12        before.

13             MR. CROSS:  Okay.  I mean, if he reviewed

14        it for his testimony and relied on it, we'd ask

15        for production of that.

16             MR. TYSON:  Well, let us take a look at

17        that.

18             MR. CROSS:  Okay.

19             MR. TYSON:  Maybe we can figure that out.

20        It's short so --

21             MR. CROSS:  Sure.  Thanks.

22        Q.    (By Mr. Cross)  Okay.  So that was --

23   That was a statement that was prepared with respect

24   to the original SEB 2020-250 investigation in Coffee

25   County?

1        A.      Yes.

2        Q.      Okay.   Got it.   That was not a statement

3   that concerned the breach allegations that had come

4   to light later involving January 7th?

5        A.      Correct.

6        Q.      Okay.

7        A.      It was ironically dated that date, but

8   that was the date she signed it.   Now this came

9   from --

10       Q.      Maybe she was busy that day.

11       A.      This came from the visit on December 10th,

12  I believe, of Miss Watson, Pam, and Josh, along with

13  two Dominion representatives, Scott and Tom Feehan.

14  Scott's last name escapes me right now.

15              And basically said they would ask her,

16  well, did you commit any fraud, because this was

17  related to her videotape where she talked about where

18  it could it be done; and she --   They requested that

19  she put that in writing essentially, and that's when

20  Josh --

21              She had it down there.   They were bugging,

22  pestering her about it; and she finally say I have it

23  here; and Josh was down there anyway.   And we picked

24  it up on that date.

25       Q.      Got it.   Okay.   I think you said you

Page 23

1          early summer of late spring of 2022.

2          Q.     (By Mr. Cross)   Okay.

3          A.     But I'm -- I would have to --  I'm not

4     exactly positive on when I first learned about the

5     final version of that.  Am I --

6               We learned they were doing it, I think;

7     and then I saw the final version, like I said,

8     sometime a couple months ago, so there was a scope of

9     window there when they were --  I knew they were

10    working on it, so obviously, they had to have given

11    the Halderman report over at some point.

12         Q.     Understood.  Okay.  And that timing in

13    your mind is sometime around early summer?

14         A.     I think.  Yeah.

15         Q.     Okay.  Did you interview or speak with any

16    SEB members for the deposition today?

17         A.     No.

18         Q.     What about any Coffee County employees?

19         A.     No.

20         Q.     Anyone on the Board of Elections there?

21         A.     No.

22         Q.     Any of their counsel?

23         A.     No.

24               Ryan Germany generally talks --  Since he

25    is our attorney, he talks to their attorney on stuff.

1        Q.     Okay.

2        A.     Bless you.

3               MR. KNAPP:  Excuse me.  Thank you.

4        Q.     (By Mr. Cross)  Did you speak with Jim

5    Persinger, the State's consultant?

6        A.     I have spoken with Jim Persinger about

7    this, but only on one specific topic surrounding the

8    Poll Pads.

9        Q.     Okay.  So what steps, if any, did you take

10   to educate yourself on the Secretary's Office's

11   knowledge about any analysis done of the voting

12   equipment and devices that were taken from Coffee

13   County?

14       A.     The Persinger side, also, I was aware of

15   the steps that we took when we first learned about it

16   after the information withheld from us for nearly a

17   year that there was a potential this happened.

18               When it was brought up in our previous

19   deposition in late February of '22, went and

20   discussed it with Ryan Germany; and we then said,

21   okay, we already have the EMS in our possession

22   because of the issues surrounding the previous

23   password issue.

24               Now that being said, it goes into a

25   longer --  This is a long soap opera kind of thing in

Page 25

1   Coffee County, obviously; and I -- it --   I don't

2   know how deep you want to go into all these things.

3              But I mean, we started with that.   We

4   called Dominion.   Can you get into this particular

5   service?   I said it's already in our possession, and

6   we don't know the password.   It's difficult to do

7   that in some ways.

8              So they tried it, and then one of their

9   employees came down, and on April --   I want to say

10  April 11th, but it was sometime the week of April

11  11th on another item and came to --

12             And they tried to get into it working

13  their team remotely from Denver, and then they tried

14  another round of that.   I believe they tried imaging

15  it in March.   This was March into April and into May

16  trying, but they were trying to get into it, and they

17  were unsuccessful in doing so.

18             Then we decided this -- this path isn't

19  working, and the rationale behind that was we

20  understood already that some of the players involved

21  in Coffee County were not necessarily the most honest

22  in terms of telling us the truth about things.

23             Misty Hampton kind of showed already she

24  had --   She kind of held some disdain for the system.

25  Was not a fan of the office.

1            And from my interviews with Frances, Josh,

2    and Pam and Chris Harvey, there had always been

3    problems around her.  She was very dismissive of any

4    issues around this situation.  Said she wasn't

5    trained on things, when, in fact, we have records

6    that she likely had been trained.  She had options

7    and abilities to get trained, 'cause we looked up and

8    found on items on Firefly, which our communications

9    system we use with our counties.

10           So we knew it would be difficult and -- to

11   just go interview people, so it was decided

12   internally, mainly with Ryan Germany saying, look, we

13   know these people don't necessarily tell the truth.

14   We know, you know, Scott Hall, who was -- who -- who

15   was the one Miss Marks made the recording of, you

16   know, he signed an affidavit and I believe that

17   Sidney Powell or the Lin Wood's suit, one of the two.

18   They all kind of run together at the time.

19           THE COURT REPORTER:  All right.  Who?

20      Sidney Powell or --

21           THE WITNESS:  Lin Wood, L-I-N W-O-O-D,

22      lawsuit.

23           So we decided we needed to get binary

24      things we could prove, so when we questioned

25      them, we could hold them to account and know

Page 27

1    they weren't just -- have to follow up later on.

2    That was the intent of trying to get into the

3    server first.

4          So, finally, we decided that we have

5    Persinger, who is there as an expert; and he was

6    able to get into it; and that's when we

7    discovered --

8          He took possession of it from our Center

9    for Elections from Michael Barnes.

10          By the way, I did interview Michael Barnes

11    as well and Chris Bellew, both from our Center

12    for Elections.

13          That I think it was right before July 4th

14    we took possession of it; and then not long

15    after that, we discovered that somebody had

16    connected the device on that January 7th date, I

17    believe.

18          And at that point, we knew, yes, there was

19    some validity to this that we need to very much

20    track down; and that started the process, too,

21    of us understanding, okay, this may be a

22    discussion that needs to be had with the GBI.

23          So there was some beginning discussions

24    really starting from June when it first looked

25    like maybe there was something potentially here,

1       but for sure once we knew Persinger said, yes,

2       somebody plugged something in that wasn't

3       appropriate.

4               So those -- those are the main --  Those

5       are some of the things we did to try to discover

6       what was done on that front.

7       Q.    (By Mr. Cross)  Is it important for the

8  Secretary's Office to provide correct information to

9  voters regarding elections and election security?

10      A.    It's important to give them the best

11 information they have at any given time.  Yes.

12      Q.    And --  And to make sure that that

13 information is correct, right?

14      A.    There --  You always want to have the

15 most -- best information you have and have that be

16 correct, but that sometimes you have limited

17 information.  And you can sometimes make judgments,

18 and you can be incorrect, or you can be correct and

19 to correct it later.  That's just human nature; and

20 the way of the world, unfortunately.

21      Q.    All right.  Let me hand you Exhibit 2, and

22 this is Tab 1-A.

23              (Exhibit 2 was marked for identification.)

24              THE WITNESS:  Can I give -- put one to the

25       side now?  Are we done with this?

Page 29

```
 1          Q.    (By Mr. Cross)  Sure.

 2          A.    Okay.

 3                MR. CROSS:  I'll give those to Bruce.

 4                THE WITNESS:  Okay.

 5          Q.    (By Mr. Cross)  And if you look at Exhibit

 6    2, do you recognize this as an investigative --

 7    excuse me -- an investigative report for the SEB Case

 8    2020, dash, 250?

 9          A.    Yes.

10          Q.    And is this a document you've seen before?

11          A.    Yes.

12          Q.    And the report is dated September 28th,

13    2021, right?

14          A.    Yes.

15          Q.    And there are three different complaints

16    that are identified in here.  Do you see that?

17          A.    Yes.

18          Q.    The first is a complaint from the Coffee

19    County Board of Elections that they were unable to

20    repeatedly duplicate credible election results for

21    the November of 2020 election.

22                Do you see that?

23          A.    Yes.

24          Q.    And that complaint proved to be

25    inaccurate, right?
```

1    A.    Well, they couldn't do it, because they --

2  Misty had inappropriately batched her ballots, and

3  our investigators went down and showed that, so they

4  did a hand count to show that the election night

5  reporting results that were reported did match the

6  actual ballots.

7    Q.    Oh.

8    A.    So they couldn't do it, so that's not

9  incorrect to say that they -- they -- they were

10  incorrect in saying we can't certify because of this

11  issue.

12    Q.    Yeah.  And then the second complaint

13  involved a YouTube video that showed the Coffee

14  County elections supervisor Misty Martin discussing

15  the ways in which the election software could be

16  manipulated.  Do you see that?

17    A.    Yes.

18    Q.    And one of the things that came to light

19  was that in that video, there was a password for the

20  Dominion system that was apparent, right?

21    A.    Yes.  In fact, it was our Investigator

22  Blanchard who noticed in his reviewing the first

23  time.  Zoomed in.  Saw that it was the password.

24          THE COURT REPORTER:  And I'm sorry.

25          THE WITNESS:  I'm trying.

```
                                                    Page 31

 1              THE COURT REPORTER:  I've got to keep up

 2        with you.

 3              THE WITNESS:  I am doing my best, but I

 4        will continue to try to slow down.

 5              Do you want me to repeat the last one

 6        again?

 7                    It was our Investigator Josh Blanchard who

 8        discovered when reviewing the video that the

 9        password was the password, in fact.  It was on a

10        small yellow Post-it note at the bottom of her

11        main EMS screen, and that's Election Management

12        System.

13        Q.    (By Mr. Cross)  And what was that password

14   for, what specific equipment?

15        A.    I believe just to sign into that EMS

16   itself.

17        Q.    The EMS server?

18        A.    Correct.

19        Q.    Okay.

20        A.    And further from the investigation itself,

21   it was discovered they only use one password for

22   their county, when the rule and operating practice is

23   each individual should have their own password to log

24   in.

25        Q.    To the EMS server?
```

1       A.      Correct.

2       Q.      Okay.  And then if you look at Complaint 3

3   in the top the next page, this was a complaint from a

4   voter concerning an absentee ballot, right?

5       A.      Correct.

6       Q.      So at the time of the investigative report

7   that was prepared on September 28, 2021, do I

8   understand correctly that this investigation did not

9   involve allegations of unauthorized access to the

10  system?

11      A.      Correct.  It was --  It was spurred by two

12  items, both the video and their claim that they could

13  not certify.

14      Q.      Got it.  So --

15      A.      And then, obviously, this third one, which

16  was a specific voter's complaint.

17      Q.      So this was a -- a -- a different set of

18  facts that was being investigated from what came to

19  light later regarding the unauthorized access on

20  January 7th; is that fair?

21      A.      Correct.  But that there was an issue with

22  this that comes to light, and that Coffee County

23  like --  So it's kind of a soap opera.

24          Because of the password situation, which

25  when Frances and the other investigators --  Our

Page 33

1   chief investigator, Frances Watson, and the other

2   investigators went to Coffee County.  She, at that

3   point, is my understanding, still had not changed the

4   password; and they basically directed her to do so,

5   so they did that.

6            I believe, December 14th was when the --

7   it was changed in the system.

8            Now going further out from there, Misty

9   resigned in lieu of being fired -- I believe it was

10  for falsifying hourly pay wage items -- her and her

11  daughter and one other person, I believe.

12           The new director came in, James Barnes, so

13  I want to say that was March or April of '21.

14           Now there were no elections going on after

15  that, so he had no reason to touch the Election

16  Management System.  Come May of -- of 2021, he tries

17  to get in using the password that he thought he had.

18  He couldn't do it.  This is late May.

19           So he calls up to the Center for

20  Elections.

21       Q.   Can I just ask you one quick question.

22       A.   Yes.

23       Q.   The password that he was using, that --

24  was that the password that had been entered on

25  December 14 at the direction of the Secretary's

Page 34

1    Office?

2         A.      Apparently not --

3         Q.      Was that an issue?

4         A.      -- because the password he had was

5    ineffectively.

6              So I'll get --  I'm going to come around

7    to answer what you probably are trying to ask.

8              So he couldn't get in, and that was late

9    May.  He calls the Center for Elections and talks to,

10   I believe, either Chris Bellew or Michael Barnes

11   directly.  I think Michael Barnes on this phone call.

12   He gives them the password we have on file in our

13   little system there.  It's the same one.

14              He tries it.  It doesn't work.

15              So they said okay.  We cannot get into the

16   system right now.  So our standard operating

17   procedure would be if you're going to work on a

18   system, an EMS, you would take an EMS with you there

19   in case you can't get in to switch it out.

20              So Chris Bellew drove down there on

21   June --  I want to say it was 8th.  And went in.

22   Attempted to get in with the password they had and

23   the password that James Barnes had, and they couldn't

24   get in, so it was not the password that had been

25   changed on December 14th.

1          Now we know that password was used,

2    because they ran the January 5th runoff, and it ran

3    properly.  They reported.  Everything went as was

4    expected.

5          So Misty and the collections of election

6    workers there had that password and ran the election.

7    She claimed after the fact that she didn't have the

8    password, and it hadn't been changed, and she

9    couldn't even do that.  I think at one point she

10   might have made a claim the State can do it; but, of

11   course, since the EMS is not connected to the

12   Internet, we wouldn't have the ability to do that

13   anyway.

14         So that's where this -- this came in.  The

15   password was changed.  It wasn't passed on to the new

16   employees.  It was a claim that there was no change,

17   which, obviously, through investigation, we

18   discovered there was and that they'd used the system

19   properly in the January 5th runoff election.  So it

20   was changed out on that January 8th date, and I

21   believe even the report --

22       Q.    June.

23       A.    Sorry.  June.  Pardon me.  Thank you.

24   June 8th.  Thanks for correcting me.

25         It was sometime on --  I believe it was

Page 36

1   like 4:00 o'clock in the afternoon, 'cause we can

2   see.  They can --  They have a -- a record when they

3   first set it up, and there's paperwork showing that.

4            I didn't --  I didn't review it, but Chris

5   Bellew walked me through it in my interview with him,

6   and Chris Bellew is like the number two person

7   essentially at the Center for Elections.  And he

8   physically was the one who went to Coffee County for

9   that purpose.

10       Q.    Okay.  I don't think we've received any

11  records or paperwork regarding swapping out the EMS

12  server other than the logic and accuracy report.

13       A.    I think that's --  Well, I believe that's

14  what it is.

15       Q.    Oh, that's what it is.  Okay.

16       A.    Yes.

17            MR. TYSON:  Yeah.

18            THE WITNESS:  And it shows the time and

19       date when they did that.

20       Q.    (By Mr. Cross)  Got it.  Okay.  Okay.  So

21  just so I understand, are you saying that Miss

22  Hampton changed the password on the EMS server on

23  December 14, which the Secretary's Office had

24  directed her to do, because it was --  The original

25  password was -- was publicly released in the video,

Page 37

1    but then that password was not shared with the

2    incoming Elections Director James Barnes?

3         A.      Yes.

4              It's my understanding, too, that Chris

5    Harvey had told Miss Hampton to change the password

6    by phone call after the video was released; and,

7    apparently, she had not done that, so that is the

8    reason that the -- that EMS was taken back.

9              There was no indication that there was any

10   authorized access.  This was completely around

11   something we were aware of already, which was the

12   video, which, you know, showed the password.

13             Her reticence to do so.  She finally did

14   so, and then did not pass it on to -- to the new

15   incoming employees.

16             And I could not tell you why she said

17   that, and I could not tell you why she chose to say

18   she never changed the password.

19             Now there's one thing we can't show.  We

20   don't know if it was her herself who changed the

21   password, her -- another employee in the office,

22   because they didn't follow the rules of having

23   individualized passwords to do -- to do items for the

24   log files.

25         Q.    When did Miss Hampton say she did change

Page 39

1      Q.    Right.  But how do you know what Miss

2  Hampton meant was that she didn't change it after the

3  January election as opposed to before?

4      A.    Well, no.  We were asking her we need the

5  password to get in.

6          I don't have a password to get in

7  essentially is what she was saying.

8          I --  I couldn't speak to dates or times

9  or anything else on those -- on those fronts, and I

10  think we only saw one change of password in the log

11  file, and that was at -- on December 14th.

12      Q.    Okay.  Let me hand you Exhibit 3.

13      A.    Are we done with this one?  Can I put it

14  away?

15      Q.    No.  Hang on to that.  We're going to come

16  back to it.

17          (Exhibit 3 was marked for identification.)

18      Q.    (By Mr. Cross)  So Exhibit 3 is Tab 5.

19      A.    Uh-huh.

20      Q.    Do you recognize Exhibit 3 as the password

21  on the Post-it note on the YouTube video we've been

22  talking about?

23      A.    Yes, sir.

24      Q.    Okay.  And so that --  The concern the

25  Secretary's Office had in December of 2020 was that

Page 40

1    this was the password to the EMS server and that that

2    was released publicly, and so it needed to be

3    changed; is that right?

4        A.    Correct.

5        Q.    Okay.  Would it surprise you to learn that

6    that actually is not and has never been the password

7    to the EMS server in Coffee County?

8        A.    Yes.

9        Q.    Would it surprise you to learn that the

10   EMS server password isn't even that style of

11   password, the 16-digit alphanumeric?

12       A.    I don't know if it would surprise me or

13   not, but I'm curious as to what that would be a

14   password for then since it was on the EMS, but --

15       Q.    Are you --

16       A.    -- I see.

17       Q.    -- familiar with the election project

18   files that go out to the counties --

19       A.    Yes.

20       Q.    -- when there are elections?

21             THE COURT REPORTER:  And --

22             MR. CROSS:  Sorry.

23             THE WITNESS:  Sorry.

24       Q.    (By Mr. Cross)  Yeah.  Just get that

25   again.  Are you familiar with the election project

Page 41

1   files that go out to the counties before elections?

2         A.    Yes.

3         Q.    And are you aware that those election

4   project files use 16 digit alphanumerics just like

5   the one in Exhibit 3?

6         A.    Yes.

7         Q.    Do you know what the basis was that the

8   Secretary's Office concluded that the password in

9   Exhibit 3 was for the EMS server as opposed to an

10  election -- election project file?

11        A.    The investigator looked at it.  Chris

12  called her about it.  She didn't deny it, so I assume

13  they thought it was correct.

14        Q.    But no one from the Secretary's Office

15  ever tried to enter that or have anyone in Coffee

16  County enter that password in the EMS server at the

17  time to see if it actually accessed the server?

18        A.    Not that I'm aware of.  Again, this goes

19  back to in real life Misty Hampton was a difficult

20  person to deal with.  She could have easily said,

21  guys, this is just this other thing.

22              But, also, she shouldn't have it out

23  there.  Let's be fair.

24              But, secondarily, she never said that.

25  When she was confronted with it by them, she never

Page 42

1    said that's what this is so --

2         Q.    And for that testimony, you're relying on

3    interviews with the investigators and Mr. Blanchard?

4         A.    Mr. Blanchard is an investigator.  Pam

5    Jones, an investigator; and then Frances Watson was

6    our chief investigator who went down there, because

7    we were taking this seriously to say you can't do

8    these things.

9              And instead of saying this wasn't the

10   password for that, she just said, well, we didn't --

11   There's nothing wrong here.  I don't understand why

12   you're here.  She was very combative.

13             The county attorney was also in there, and

14   I talked to him.

15             But from talking to the investigator that

16   said he was much more interested to hear, well, how

17   do we move forward --

18        Q.    That's right.

19        A.    -- how do we move forward in -- in a way

20   just to get us straight basically.

21             And Miss Hampton was not cooperative.  She

22   was combative.  Again, every investigator kind of

23   agreed on her demeanor and approach to the situation.

24             So, again, if we have a person who was

25   acting in good faith on this front, they would have

Page 43

1    said, no, guys.  This is something else.  Also,

2    something I shouldn't have publicly available,

3    because it does provide something you shouldn't have

4    out in the public, and so that's --  That's where we

5    stood at that point.

6         Q.    All right.  Take a look back at Exhibit 2,

7    if you would, please, the investigative report from

8    2021.

9         A.    What page?

10        Q.    Flip to Page 4, please.  And here, do you

11   see the heading in Complaint 2 --

12        A.    Yes.

13        Q.    -- which involves the YouTube video?

14        A.    Yes, sir.

15        Q.    Up at top of Page 5, if you look at the

16   end of the first paragraph, there's a reference to

17   Supervisor Jones said.

18             Do you see that?

19        A.    Yes.

20        Q.    That's Pam Jones?

21        A.    Yes.  Well, yes.  'Cause that was her

22   position.  Yes.

23        Q.    All right.  And so here it indicates that

24   Pam Jones said to Miss Hampton and whoever's in this

25   meeting that the video was misleading, referring to

Page 45

1      Q.     The Secretary's Office is not always
2   provided correct information about the voting system
3   breach in Coffee County; is that fair?
4      A.     It depends on the time, but at the initial
5   phases of this, obviously.  I mean, even if you put
6   this in more context, Mr. Blanchard was down there in
7   January, our investigator; and Misty Hampton did not
8   say anything untoward or weird or odd or anything had
9   happened.
10           So yeah.  I --  I would say that's a
11  correct statement.  Now we obviously have more
12  information now.
13     Q.     Right.  But even just recently, the
14  Secretary's Office has disseminated information that
15  did not accurately characterize what happened in
16  Coffee County, right?
17     A.     To what are you referring?
18     Q.     Well, you personally did.
19     A.     I wouldn't call that recently.
20           The Carter Center, is that what you're
21  referring to?
22     Q.     No.
23     A.     Okay.
24     Q.     Let me hand you Exhibit 4.
25  ///

1  might have been put on there, so I couldn't say.

2       Q.    Well, did you see that in his statement in

3  the -- the tweet that you re-tweeted, he stated that

4  the breach, the unauthorized access in Coffee County

5  lasted only a few hours; and that's why there's not

6  cause for concern?

7       A.    No.  I didn't see that part.

8       Q.    But that's not an accurate statement.

9  Right, sir?

10       A.    That is correct.

11       Q.    In fact, we know from the surveillance

12  video is that the unauthorized access lasted over a

13  period of -- of many days and many hours throughout

14  the month involving a variety of different people?

15       A.    Yes.  He also said on that particular item

16  that we have to operate as if they already have all

17  the source code already.  I believe it's the same

18  thread, but could have been a different thread, so

19  the length of it has less to do with, I think, from

20  my point of view and from --  I'm not going to speak

21  for Mr. Adida here.

22         But I don't believe that's misleading.

23  No.

24       Q.    To --  To tell the voters publicly that --

25  that the unauthorized access in Coffee County lasted

Page 48

1    only a few hours as opposed to -- five, six -- eight

2    days?

3          A.    Again, I don't find it to be --  That's

4    when Mr. Adida did, and I didn't necessarily see that

5    particular thing so --

6              But my point is the underlying part of

7    that is that he also said we have to act as if they

8    already have all this information already, so it

9    doesn't matter if it's eight hours or eight days in

10   terms of that situation.

11         Q.    But --  But even that is directly at odds

12   with the position that the Secretary's Office has

13   taken before this breach came to light, right?

14         A.    I'm not sure what you mean.

15         Q.    Do you recall -- if I can --  I can pull

16   it up if we need to.

17              Do you recall that Secretary Raffensperger

18   did an interview where he said that Dr. Halderman's

19   findings had no value in the real world, because he

20   got access to the equipment and the software in a way

21   that would never happen.

22              But now you're saying Mr. Adida says we

23   should just assume that.

24         A.    No.  Two different things about this, Mr.

25   Cross; and I don't want to verbally spar with you.

1    I'll leave it at that for now.

2         Q.    Okay.  Let me hand you --

3              MR. CROSS:  I think this is Exhibit 6?

4              THE VIDEOGRAPHER:  Five.

5              MR. CROSS:  Five.

6              THE VIDEOGRAPHER:  Five.

7              (Exhibit 5 was marked for identification.)

8         Q.    (By Mr. Cross)  And this is an interview

9    that I referenced a moment ago that Secretary

10   Raffensperger gave, I think, in February of this

11   year, if I remember the -- have the date right, if

12   you look at --

13        A.    Was it --

14        Q.    -- the top.

15        A.    -- this year, or was it --  It says,

16   "2/10."  But it doesn't have a year on it.

17        Q.    Right.  It could not have been 2/10 of the

18   prior year, because it talks about Dr. Halderman and

19   his report --

20        A.    Okay.

21        Q.    -- which came out in July of 2021.

22        A.    Thank you.

23        Q.    So turn to Page 13, if you would.

24        A.    (Witness complies with request of

25   counsel.)

Page 52

1      Q.    If you look down towards the bottom, do
2   you see Mark Niesse with the AJC asked a question 39
3   minutes into the interview?
4      A.    39 minutes, 43 seconds --
5      Q.    Right.
6      A.    -- yes.
7      Q.    And then Secretary Raffensperger responds
8   by saying you're talking about the Halderman report.
9   And Halderman was given actually the security code,
10  so he had total access to the equipment; and he had
11  it for 12 weeks.  And he comes back with his points.
12  He said, well, if you have that kind of access, that
13  you can change things.
14          And Secretary says, well, Doug, yeah.
15  Just like the guy that's got to come in and work on
16  your server, your security system for your house, he
17  can have all the access codes.  Yeah.  I guess he can
18  come back maybe at 2:00 a.m.
19          The question I was asking you was --
20          Well, let me ask you one more foundational
21  question.  Are you aware that the Secretary of
22  State's Chief Information Officer, Merritt Beaver,
23  testified in his deposition as a 30(b)(6) witness, as
24  a corporate rep, that it's critically important to
25  protect the Dominion software because releasing it

Page 53

1   provides a roadmap -- that was his word --

2        A.    Yeah.

3        Q.    -- a roadmap for hacking the system?

4        A.    Yes.

5        Q.    Do you disagree with that?

6        A.    No.

7        Q.    Okay.  So my question to you is:

8   You're --  You're citing that Adida is saying, well,

9   we should just assume that bad actors have not just

10  the software, but the source code, whereas Secretary

11  Raffensperger is saying no, no.  We don't even have

12  to worry about Dr. Halderman's findings because he

13  had access to the software.  How do you reconcile

14  those positions?

15            MR. TYSON:  I'll object to form.

16            THE WITNESS:  Two different ways.  Our

17        office has to run an entire election system, and

18        that's what Secretary Raffensperger is referring

19        to in terms of the overall system would still be

20        safe given these -- this level of access he had.

21        Q.    (By Mr. Cross)  Uh-huh.

22        A.    Coffee County itself had a breach.  Part

23  of the security of our system overall is there's 159

24  different jurisdictions.

25            And, again, I'm not a technical expert;

Page 63

1           THE WITNESS:  No.

2           THE COURT REPORTER:  Oh, geez.  I did.

3     I'm so sorry.  Okay.

4           THE WITNESS:  Wasn't me.

5     Q.    (By Mr. Cross)  Okay.

6           MR. KNAPP:  That's a familiar tune.

7           MR. BROWN:  You want to start over?

8           MR. CROSS:  Sure.

9           THE VIDEOGRAPHER:  Can you repeat that

10    whole deal.

11          MR. CROSS:  I think so.

12    Q.    (By Mr. Cross)  So in this -- on --  On

13    this panel that you served on, on April 29th of 2022,

14    you said, "So we're still dealing with that here, and

15    we still have to prove negatives in all these cases.

16    It's similar across the board.  But like we had

17    claims... even recently there was people saying:  'We

18    went to Coffee County.  We imaged everything.'

19    There's no evidence of any of that.  It didn't

20    happen."

21          Do you see that?

22    A.    Yes.

23    Q.    How did the Secretary's Office reach the

24    conclusion as of April of this year that the breach

25    of the voting system in Coffee County did not happen?

1          MR. TYSON:  And I'll object to form.  It

2     was --

3          THE WITNESS:  At that point, everything we

4     saw pointed to the normal misinformation,

5     disinformation.  I mean, having Scott Hall

6     involved, having Miss Marks be involved, since

7     we didn't find either of them to be honest,

8     appropriate, trustworthy on this particular

9     front, because they both attack our office all

10    the time.  It was --

11         Then if you continue after this, it goes

12    we had the same kind in Ware County, which

13    turned out to be nothing.

14         So it was very similar kind of claims

15    especially around this going back to that same

16    timeline, and our office also was under the

17    impression in a general way that if somebody had

18    done that, if you'd seen the behaviors of the

19    people involved like the Cyber Ninjas and the

20    Trump team and Sidney Powells and the Lin Woods,

21    if they had gotten access, normally that the

22    modus operandi had been to wave a big red flag.

23    We got this.  We're in here.  We're doing those

24    things.

25         If you go back to the real time, the

1              Let me --  Let me just bring you back to

2      my question.

3              A.    I --  I'm telling you the answer to the

4      question, which is we had all the indications that it

5      looked like every other false claim; and this was

6      March.

7                   Now we were still investigating, and I

8      should have put that caveat there, but I felt firm

9      enough to go like this probably didn't happen.

10     And -- and nearly every person --

11             Q.    Well, you didn't say probably.

12             A.    Okay.  You're right.  I just --  I

13     literally just said I shouldn't have been certain

14     when I said that.  I was wrong; and I've said this

15     publicly already, that I was wrong on this.

16             Q.    Okay.  So my question to you is what

17     investigation, if any, had been done by the

18     Secretary's Office or at its direction that -- that

19     led you to the point where you felt comfortable

20     saying the breach did not happen?

21             A.    Again, I'm going to repeat myself and what

22     I just --

23             Q.    I know.

24             A.    -- said, and --

25             Q.    And is it --

Page 69

```
 1              MR. TYSON:  I think you made your point,
 2        and we should start back at the question and
 3        get --
 4              MR. BROWN:  Yes.
 5              MR. TYSON:  -- the answer.
 6              MR. BROWN:  Sorry.
 7        Q.    (By Mr. Cross)  Let's just be clear.  The
 8  question is:  What investigation, if any, had been
 9  done by the Secretary's Office or at its direction as
10  of the time that you said publicly in April of 2022
11  that the breach we now know happened of the voting
12  system in Coffee County, that it did not happen?
13        A.    At that point, we had attempted to get
14  into the server.  We had only a statement from --
15  what do you call it -- a statement from Scott Hall
16  and a snippet of a phone call that we'd eventually
17  gotten ahold of the entire thing by then, and this
18  was 90 seconds of an overall phone call.
19              We also had the previous investigation,
20  where none of this had come up.
21              At this point our office was also aware --
22  or had asked.  The question had been asked.  Did
23  anybody -- and this goes back to --
24              You go back to the e-mails from May of
25  '21.
```

Page 71

```
 1        Q.    James --
 2        A.    James.
 3        Q.    -- Barnes --
 4        A.    Barnes.
 5        Q.    -- discussed --
 6        A.    Sorry.
 7        Q.    That's good.
 8        A.    B's and J's.
 9        Q.    Go ahead.
10        A.    James Barnes had discussed with Josh
11   Blanchard that he had gone to ask every employee and
12   every board member if anybody had seen anybody come
13   to work on these things, if somebody from Cyber
14   Ninjas or anything else; and everybody had said no.
15             They said at that time, too, they were
16   going in to look into -- that he was going to go to
17   the IT department -- this is Mr. Barnes -- go to the
18   IT department to see if he could get Misty's old
19   e-mails to see if there was any -- any correspondence
20   with them, and they never came back to us after that.
21             And at that point, we had been left that
22   there was nothing to investigate.  Nothing had
23   happened here.
24             As I said, this was a long period of time
25   on these things; and in the public, people have
```

Page 72

1   conflated several of these items together, so those

2   are the things we absolute --

3           We knew we couldn't get in the server yet.

4   We knew that everybody there had already been asked

5   about this who you would normally interview anyway.

6           Misty had never brought it up when any of

7   our investigators were there, so there was -- so

8   there was no real --

9           And, also, in real time, overstock.com guy

10  was just sort of like the font all attempts to breach

11  as sent from the Trump world.  Was saying we couldn't

12  get into Georgia.

13          If you go back to the overstock.com thing

14  in July, I think is when he said something.  It

15  was --  It was the summer of '21, he had put out.

16  Basically said, we tried to get into Georgia.  We

17  couldn't, and maybe he was talking about another

18  area, but that's with all sort of conflated at the

19  same time.

20          I remember in my gut at the time.  I said

21  he's probably referring to Ware County, because that

22  was one claim we had had on those things.

23      Q.    So let's break that down a little bit.

24  You --  You said that there was no evidence of any

25  potential unauthorized access in Coffee County as of

Page 73

1    April of this year other than the snippet of a call
2    between Mr. Hall and Miss Marks.
3              But that's not true, is it, sir?
4        A.    I don't believe the business card's
5    evidence of breach.
6        Q.    But, well, let's look at it.
7        A.    But we investigated that.
8        Q.    Whoa, whoa.
9        A.    Sorry.  No.  Hold on.
10       Q.    Because Frances Watson and Chris Harvey
11   fundamentally disagreed with you.  So did James
12   Barnes.  Right.
13             Are you aware of that?
14       A.    David, if you're going to frame a question
15   that way --  And I don't want to argue.  I want to be
16   able to answer.
17             My point was they looked into it, and they
18   found nothing to investigate as they interviewed
19   everybody and said that, yes, they think it was
20   something concerning.  They all agree it's something
21   concerning.
22             They looked into it, and a business card
23   by itself doesn't do that.
24             If you look at the exhibits, they -- they
25   had James Barnes go ask every person --  Did anybody

Page 74

1   see this?

2            No.

3            Are you aware of anything along these

4   lines?

5            No.

6            Where do you go at that point on those

7   fronts?

8        Q.   Well, that's a great question, Mr.

9   Sterling.  Did --

10       A.   Oh, one of -- one of --

11       Q.   You were dealing --

12       A.   -- the things --

13       Q.   Well, let me answer your question.

14       A.   Go ahead.

15       Q.   You --  You were dealing with a county

16   that you had already found was unreliable where you

17   had an open investigation, a rogue county that

18   included members of the Coffee County Election Board

19   like Eric Chaney, right?

20       A.   Yes.

21       Q.   Okay.  So the Secretary's Office conducted

22   an investigation in May of 2021 relying, as I

23   understand it, largely, if not entirely on feedback

24   from a county where it already knew that members of

25   the Coffee County Election Board that were still

1   there were not reliable people.  That's how you

2   reached the conclusion that this didn't happen was

3   you -- you asked the County, and the County that you

4   already said you couldn't trust.

5          A.     I didn't say --

6          Q.     And they said we didn't do it.

7          A.     Misty was the one we said we couldn't

8   definitely trust at all, because she had been

9   misleading already, obviously.

10          The secondary part of this, too, if I

11   remember correctly, it was discussed -- and this is

12   one of those things where it's not within a report;

13   this just kind of came up -- that Mr. Barnes was

14   going to try to pull the security tapes.

15   Unfortunately, this is where a left hand and a right

16   hand didn't seem to know which -- what each other

17   were doing.

18          He went to ask for the tapes around that

19   period of time.  They were no longer in the security

20   system on that side.  Unbeknownst to him, as I

21   understand it, Misty Hampton had done an ORR for

22   those tapes, I guess, to try to prove her innocence

23   on the question of the hourly timing of her --  I

24   don't know.  I can't -- as to why she did a ORR at

25   that period of time.  But they existed in another

Page 81

1            He went to them and said, well, we did --

2    That's all been deleted by now.

3            He was unaware that Misty Hampton had done

4    an ORR.  Because like I said, the left hand and right

5    hand didn't know what they were doing.

6            So even if we had gone to ask them, we

7    would have gone through James Barnes, who would have

8    gone to the County and perhaps gone to the county

9    attorney; but that's a hypothetical at this point,

10   because he said it doesn't exist.

11       Q.    Wait.  But you guys are the -- are --

12   are --

13           You're the Secretary's Office.  You have

14   law enforcement authority to conduct an investigation

15   into election security breaches, right?

16       A.    Potential ones, yes.

17       Q.    Okay.  Why in the world would you rely on

18   James Barnes, who was brand new to the office,

19   instead of sending your investigator yourself to find

20   out whether that surveillance video existed?

21           Wouldn't that be the normal course of a --

22   of a -- of a sound investigation?

23       A.    If the person who --

24           MR. TYSON:  Object to form.

25           THE WITNESS:  If the person who reported

Page 82

1           it is dealing with their own internal people and

2           says the stuff you need doesn't exist, no.

3           Normally, you would not send somebody at that

4           point.   No.   That doesn't make any sense.

5                   We're going to not take your -- not --

6           You're new to this.   You reported this.   Now we

7           think you're going to try to cover it up, and

8           we're going to go deeper into it?

9           Q.    No, no.   I'm not suggesting that.   I --

10    I'm --   I'm asking a very different question.

11               James Barnes is brand new to the office at

12    this point.   He's been there about five to six weeks,

13    right?

14          A.    Correct.

15          Q.    Okay.   Instead of relying on someone brand

16    new to the office, no background there whatsoever,

17    why not send your investigator down to speak with the

18    members of the election board with people like Tracie

19    Vickers and others who -- who have at lot more

20    history and a lot more background on what might have

21    happened?

22          A.    Because the gentleman who reported it

23    says, I've looked.   I'm asking this.   Nobody's seen

24    anything.   We have no evidence.   We've asked for

25    videotapes.   They don't exist.

Page 84

```
 1   these kinds of claims everywhere; and, again, we were

 2   trying to get into --  Actually, it's a different

 3   time.  I apologize.

 4           This looked like another one of those many

 5   claims that there was nothing there, and somebody

 6   might have tried to do something, but there's no

 7   evidence that was coming to the surface that would

 8   rise to that point.

 9           And we had the videotape, and we had them

10   claiming they couldn't do certification.  We sent the

11   chief of investigations in there, 'cause there was

12   actual stuff we could that was wrong.

13           Having a business card, then following up

14   and asking -- asking the questions.  Let's look into

15   your IT.  Is there any communications?  No.  Is there

16   any of this?  No.

17           You don't then expend resources on things

18   where it looks like this is a dead end.  That's not

19   what you do and --

20       Q.   In a --  In a county that you already have

21   identified through an open investigation was not a

22   reliable county.  A county that literally had held up

23   the presidential election, because they refused to

24   certify election results, you -- you -- you guys

25   thought that that was a reliable county to just
```

Page 85

1    simply say, well, they say it didn't happen; and they
2    don't have video so that's the end of that?
3        A.    It's not --
4              MR. TYSON:  Object to form.
5              THE WITNESS:  It's not they said it didn't
6        that.  We handed to our investigators.  The
7        investigators, who are the law enforcement
8        people, make those decisions; and they basically
9        said there's nothing there.  We're moving on to
10       the next thing.
11             I mean, it's not like, again, with
12       hindsight being 20-20, yes.  You should go in to
13       go deeper on some of those things; but if we had
14       to spend resources on every single one of these
15       claims in a gajillion (ph.) ways in this
16       state --
17             I mean, I'm going to give you an example
18       just to put it in perspective for everything.
19       There was a claim of pristine ballots in Fulton
20       County.  I think we're all aware of that claim.
21       It was supposed to be in a particular batch.  We
22       had --  We sent two investigators down to that
23       batch.  They went through all of them.  I think
24       it was 20 man-hours, and they came back and said
25       there's nothing there.

1          They went back to the complainant, who

2      said, well, maybe there's a different batch.

3      It's this batch number.  It was a batch number

4      that didn't exist.  At that point, we were done.

5          My point is we expended resources and

6      time.  You have to triage these things; and,

7      again, hindsight being 20-20, we now know a lot

8      more than we did then, and we know a lot more

9      than we did then, in part, because of what y'all

10     were able to get the ORRs, so that's where we

11     stood.  That's where we stood at this time.

12     Q.    (By Mr. Cross)  The situation we're

13 talking about is one where it was publicly known that

14 Cyber Ninjas was trying to get access to voting

15 equipment across the country.  The Dominion alert

16 went out literally the day before, which is what

17 prompted Mr. Barnes's e-mail, right?

18     A.    Correct.

19     Q.    Okay.  You also had an election management

20 server, an EMS server that you couldn't even access.

21 That didn't raise any red flags?

22     A.    That's not --

23          MR. TYSON:  I'll object to form.

24          THE WITNESS:  As I stated before, we knew

25     the history of that.  We understood the history

1     of that.  We knew what had happened essentially.

2     We -- we --  Or we had good assumptions to what

3     had happened.

4          Misty was gone.  The EMS was changed out.

5     The bad --  The not-good-at-her-job elections

6     director was no longer there, so those were --

7     that was not --  We would not have put those

8     together.  No.  Because they're not related.

9          As you can see, we now know --  If you

10    want to go back into 2020, we know that password

11    was changed on December 14th, well before the

12    January 7th unauthorized access, so they're

13    unrelated items.

14    Q.    (By Mr. Cross)  Well, but you now know

15  they're unrelated items, because you've had access to

16  the server and seen that people had access to it.

17    A.    No.  I do not know that.  They're --

18  They're not --  They're unrelated items mainly

19  because it -- they --

20          It was changed out, because the password

21  was changed.  The password was changed before the

22  unauthorized access.  That makes them unrelated.

23          Now it's --  It's now a piece of evidence

24  that the unauthorized access occurred, but the reason

25  we had it had nothing to do with the unauthorized

1    access.  So no.  You wouldn't just -- your brain

2    would not jump --  No normal process of -- of logic

3    would jump to that.

4         Q.    But let me just ask you candidly, Mr.

5    Sterling.  Do you --  Do you understand how a third

6    party looking at this says --

7         A.    Hold on one second.

8               I apologize, Mr. Cross.

9         Q.    It's okay.

10              Do you --  Do you understand how a third

11   party looking at this set of circumstances might

12   wonder in good faith whether the Secretary's Office

13   just didn't want to know the answer, because it would

14   be politically embarrassing to have to disclose that

15   a system that the Secretary had claimed cannot be

16   breached had been breached at an extraordinary level?

17              Do you understand how that might be a good

18   faith belief that reasonable people might take?

19        A.    No.

20              MR. TYSON:  And I'll -- I'll object to

21        form here.  This is outside what the Secretary's

22        Office knows.  We're now asking about what

23        reasonable people might think.

24        Q.    (By Mr. Cross)  You don't think that that

25   would be a reasonable view that anybody could take?

1          MR. TYSON:  The same objection.

2          THE WITNESS:  No.  And let me tell you

3     why.

4     Q.   (By Mr. Cross)  Okay.

5     A.   Our office was wildly transparent.  We

6 investigated and traced down things left and right.

7 We brought in the SEB.  We literally stood up to the

8 President of the United States trying to pressure us

9 to do things, and yes.  It would be embarrassing.

10          But let me tell you how this office

11 manages problems like this.  You get ahead of them,

12 you disclose them, and then you address them.  Hiding

13 things was -- was not a good thing to do.

14          It's better to admit every system,

15 regardless of the system, if there is a bad actor who

16 allows a -- a unauthorized access to any system is a

17 problem.  It is a security problem.  It is a legal

18 problem.  It undermines people's faith in the

19 systems, and we get that.  That's why the people who

20 did this need to be held accountable.

21          And if we had known then, if we -- if we

22 had known earlier, we would have acted differently

23 more than likely and been able to do different

24 things.

25          But the situation is we didn't.  Again,

Page 90

1    knowing the level that we thought the likelihood of

2    this was, we never stopped the investigation.  We

3    kept on trying to get into that server until we

4    advised that, okay, what we're doing isn't working.

5    And then we finally said, okay.  Let's get to

6    Persinger, who seems to have an expertise in this.

7    We never stopped investigating once it became -- we

8    became aware of it.

9              So in the second we discovered it, I mean,

10   frankly, I was pissed, 'cause Misty broke the law;

11   and people did things that were stupid and dumb; and

12   again, hindsight, of course, we can look back and

13   say, wow, I really wish we'd dug further into that,

14   knowing what we know now.  But we didn't know what we

15   know now.

16       Q.    But, Mr. Sterling, you said that the

17   Office has been transparent about this.  But the

18   Office has given a lot of inconsistent information

19   about what it did, when it did it, and what it knew,

20   right?

21             MR. TYSON:  Object to form.

22             THE WITNESS:  I would say there have been

23        misstatements and conflated items and bad

24        questioning and bad answering.

25             And like I said earlier, it's been sort of

Page 91

1          a soap opera with Coffee County, so it's easy

2          for people to get tripped up on their own words

3          and their own timeline when they're hearing

4          questions a certain way.

5          Q.     (By Mr. Cross)   But the Secretary himself

6     gave an interview just recently where he stated that

7     the Office began investigating these allegations very

8     soon after the breach happened, right?

9          A.     Yes.   And he was wrong.

10         Q.     Right.   Okay.   And --   And what's the

11    basis for your testimony that he was wrong about

12    that?

13         A.     Okay.   'Cause I've had discussions with

14    Secretary about this interview; because when I saw

15    the interview, I was, from my point, rightfully

16    irritated for two reasons.

17              One it was supposed to be exclusively an

18    interview about the action, so Mr. Richards, the

19    journalist sort of, for lack of a word, ambushed him;

20    so the Secretary wasn't briefed on any kind of

21    timelines we knew at that point or anything.

22              And the secondary thing I was irritated

23    about was, normally, the Secretary answers with it's

24    under investigation.   He was hearing the question of

25    like the stuff from back in December, and we did

Page 93

```
 1   interview and then follow-up in the Secretary's
 2   Office, conflicting information was given on when
 3   this investigation occurred.  Right.
 4             So he said it was very soon after.  I get
 5   your testimony that --
 6        A.    Uh-huh.
 7        Q.    -- that -- he was talking about the
 8   original investigation.
 9        A.    Yeah.
10        Q.    But within minutes of answering on that,
11   according to the station, an aide to Raffensperger
12   corrected the Secretary of State's response off
13   camera and offered May of 2021 as the correct date.
14        A.    Right.
15        Q.    Then --
16        A.    And that was wrong.  That was Mike
17   Hassinger.  He's new to the office, and he got '21
18   and '22 confused.
19        Q.    Help me understand.  Why is that wrong?
20   We --  We have just spent several minutes talking
21   about the investigation that, in fact, was done in
22   May of 2021 --
23        A.    Because we're talk --
24        Q.    -- hold on -- hold on -- into a potential
25   compromise.  Well, Chris Harvey himself said --
```

Page 94

 1        A.      Uh-huh.

 2        Q.      -- there might be a compromise in the

 3    voting equipment.  We need to look into that.

 4              So May 2021 is, in fact, the correct date

 5    of when this investigation first began, based on what

 6    we have, right?

 7        A.      There's two different things about this.

 8    There's the investigation number that was assigned

 9    that was given in December.  It's got to be a new --

10              THE COURT REPORTER:  I --  I'm sorry.

11        There's an investigation --

12              THE WITNESS:  Number that's been assigned.

13        It was going back.  This is where I say this is

14        confusing.  The intent, I believe, Mr. Hassinger

15        was trying to talk about.  He didn't know about

16        those e-mails yet.  They didn't -- we hadn't --

17        We hadn't found them on our end yet about the

18        back-and-forth.

19        Q.     (By Mr. Cross)  So what was he talking

20    about for May?

21        A.      He was talking about 2022 is when we were

22    able to hand over --

23              Again, his dates were just wrong.  I don't

24    know why he said that, that date.  He was just wrong.

25    He's new to the office.  He was standing right there.

Page 95

1          I found out about it after the fact.   I
2    yelled at him.   I said, "You gave him the wrong dates
3    for when we kicked off the -- the secondary
4    investigation, Mike."
5          Q.    Can I just clarify.   Are you saying he --
6    he meant to say May of 2022?
7          A.    I don't know what he meant to say.   It was
8    just wrong.   I said --
9          Okay.   He said, "Well, that's what I
10    thought."
11          I was like, "Well, no.   It's not, Mike."
12          So I --  I had a lot of yelling that day.
13      Q.    I guess what I'm getting hung up on, Mr.
14    Sterling, is why is it wrong to say that the
15    Secretary's Office was investigating a potential
16    compromise of the Coffee County election equipment as
17    of May of 2021, when we have now spent quite some
18    time looking at e-mails showing that that actually
19    did happen?
20      A.    Except what you're talking about -- here's
21    the thing -- from my point of view and what he was
22    thinking are two separate things.
23      Q.    All right.
24      A.    This -- now -- now --  Now you want me to
25    answer the question.   I'm answering your question,

Page 99

1   of thing.

2        Q.    Okay.  So come back to Exhibit 7, the

3   Frances Watson --

4        A.    Yes, sir.

5        Q.    -- e-mail thread.  We do not have from the

6   State that we've seen any further communications,

7   e-mails, documents of any type regarding this

8   investigation beyond Miss Watson's May 11th e-mail.

9        A.    Correct.

10        Q.    Okay.  So do I understand correctly that

11   the investigation into the Cyber Ninjas' potential

12   access in Coffee County, that that ended or paused?

13              It --  It didn't go any -- any further

14   than what's reflected in Exhibit 7, because the

15   feedback from Mr. Barnes was we've not found any

16   indication of an unauthorized access?

17        A.    That, plus the --  He was going to go to

18   the IT and see.  Since we never heard back, there

19   was, I think, an assumption made of, well, we didn't

20   find anything there; and I know there was a

21   conversation.  Of course, my understanding of the

22   conversation, which it will be --

23              We asked for videos, and the security team

24   says they don't have them for this period of time;

25   and, again, that was the right hand, left hand thing,

1   not knowing what they were doing.

2        Q.    So when a representative of the

3   Secretary's Office told 11 Alive, the local news

4   station, that the Office did not know about or begin

5   investigating Coffee County until -- until July of

6   2022, that's -- that's not an accurate statement,

7   right, 'cause the --

8        A.    David --

9        Q.    -- Office itself was investigating this in

10  May of 2021.

11       A.    Two separate investigations based on two

12  different sets of information.

13       Q.    I get that --  I get it.

14       A.    So you're choosing to put them together.

15  We're viewing it as two separate entities.  This is

16  a --  It's a different way of looking at it, I

17  suppose.

18            You're right.  Our office did look at it.

19  There was nothing to pursue that they could see at

20  that time from the evidence they had as a

21  professional, POST-certified law enforcement

22  investigators.

23            Now we have extra information that came,

24  because we had Mr. Persinger able to get into the

25  system.  We see, yes, there actually was an outside

Page 101

1    device that was plugged in.  At that point, it took a

2    different direction.

3            Again, I keep saying this.  Hindsight is

4    20-20, and we never stopped the investigation once

5    the claim was made to us, I guess, at the end of

6    February.  When we got the snippet of Miss Marks's

7    recording.

8            So we started to try to do it then with --

9    with Dominion, with the resources we had; and part of

10   it was, you know, frankly, dollar bills.  How -- how

11   are we going to pay?  How are we going to afford to

12   get into this, and what can we do.

13           And that's, I think, June.  I said okay.

14   We need to get Persinger to try to get into this.

15   We've --  We've got to figure out binarily one way or

16   the other did anything like that happen; and because

17   we figured out we -- that Persinger might have the

18   skill set to do that.

19           I didn't know Persinger existed for a

20   period of time until probably May or June so -- of

21   '22.  Probably need to make that clear.

22        Q.    Mr. Sterling, I -- I get that -- that the

23   Secretary's Office has what you're characterizing as

24   a different investigation now into the unauthorized

25   access at Coffee County.

1             But there's a very specific statement that
2    was made by the Secretary's Office, which was the
3    Office, not just you or Mr. Hassinger or anyone else,
4    that the Office did not know about or begin
5    investigating Coffee County until July 2022 with
6    respect to a potential unauthorized access.  That's
7    not an accurate statement, right?
8             There --  The Secretary's Office had
9    multiple investigators on that in May of 2021.
10        A.    And let's remember it was --
11        Q.    Isn't that right?
12        A.    Okay.
13        Q.    Yes or no?
14        A.    I'm going to say yes on this.
15             But let's remember something.  We knew
16    about SullivanStrickler before we knew about Cyber
17    Ninjas, obviously; and, again, thanks, in part, to
18    this case.  I get that.
19             The point is it's two different things in
20    the way we're looking at it.  I can even concede the
21    point.  Yes.  You're right.  Our office was looking
22    at a Cyber Ninja potential thing, and there no --
23    nothing --  No evidentiary items that allowed us to
24    say, yes, we should go dig deeper on that.  Again,
25    hindsight being 20-20, it doesn't.

1            So I'm not going to say that --  They're

2    not the same investigation.  They're tied together

3    the same way that, I guess, you're trying to conflate

4    the server issue to this.  In hindsight, you can say

5    yes.  There might --  Might give you some pause on

6    that, but you --

7            In the real time, with the environment

8    that we were in, no.  It didn't seem that way, and

9    that's --  And we've treated as two different kinds

10   of things, 'cause, obviously, we have at lot more

11   information now that we've gotten into that server

12   and that EMS.

13       Q.   Well, and let me follow up on that, 'cause

14   I want to make sure we're on the same page on that.

15            You say you've treated it as two different

16   things.  It's different investigations.

17       A.   Uh-huh.

18       Q.   But the representations made to us and the

19   Court repeatedly was that this was all the same

20   investigation, that, in fact, the investigation

21   that's happened this year into the unauthorized

22   access of -- of the voting system in Coffee County

23   was all part of the original SEB 2020, dash, 250 as a

24   single investigation.

25       A.   Because they reopened the case there.

Page 104

1   That case number was easy to get from the SharePoint

2   system to do it that way.

3        Q.    But --

4        A.    I --  Yeah.

5        Q.    -- doesn't that mean they're separate

6   investigations?

7        A.    But hold on.  I'm --

8             You're talking in two different realms.

9   You have legal world and SOS world.  I'm talking

10  about that particular interview is for the public and

11  everything, 'cause they were two very different kinds

12  of things.

13            One, we have a lot more evidence and a lot

14  more situational awareness now than we did in the May

15  turn; and then, obviously, going back, if you look

16  back in January, if someone had said something to us

17  then, who was down there.  I mean, we had an

18  investigator in the room.  They're talking to Misty

19  getting that statement.

20            I'm going to say this again.  Hindsight's

21  20-20.  This is all part of the same ark of problems;

22  and we use that investigation number, 'cause it was a

23  easy thing to do to -- to put it in that same

24  investigation number.

25            I think there's a new investigation number

```
 1          about here with these so --
 2                  THE WITNESS:  So like --
 3                  MR. TYSON:  And I don't need to --
 4                  THE WITNESS:  Okay.
 5                  MR. TYSON:  I'm just trying to help
 6          clarify for him.  He can ask you questions --
 7                  THE WITNESS:  Okay.
 8                  MR. TYSON:  -- about that.
 9          Q.    (By Mr. Cross)  One of the things that
10   Secretary Raffensperger mentioned in the interview
11   we're talking about was he -- he suggested there was
12   testimony before a grand jury related to this that
13   was not truthful.
14                  Do you know what that was about?
15          A.    I think he was --  Not in front of the
16   grand jury.  I think he was referring to the State
17   Senate Committee.
18          Q.    'Cause he said grand jury.
19          A.    I know he did.
20          Q.    Okay.
21          A.    Again --
22          Q.    He was just mistaken?
23          A.    Well, let me rephrase my frustration with
24   the Secretary after this interview.
25                  Yes.  He was mistaken.  He was --
```

1     Q.     Okay.

2     A.     -- just putting those together so --

3     Q.     So there has not been a grand jury

4  convened by the State to investigate unauthorized

5  access of -- of the voting system?

6     A.     Not that I'm aware of.

7            Then, I mean, just to build on that, I

8  believe in context that was Misty who testified to

9  the State Senate Committee, the same one that Rudy

10 Giuliani and those guys --

11    Q.     Uh-huh.

12    A.     -- went to.

13    Q.     So fast-forwarding from 2021, February of

14 2022 is when the Secretary's Office gets the snippet

15 of the call with Miss Marks and Mr. Hall?

16    A.     Correct.

17    Q.     Okay.  And then that gets shared with Ryan

18 Germany, who calls for an investigation into those

19 allegations, right?

20    A.     Yes.  I think we didn't do that.  I'm not

21 sure of the time of this.  I've had a discussion

22 about it, but I don't know if we did an investigation

23 until we got the full audio of the full tape.  I'm

24 not sure of the timing on that.  Would have been

25 around --  It would have been kind of back-to-back,

Page 110

1  so it would have been the same.  Within a week or

2  two, I think, of that's when we -- when it was all

3  produced.

4        Q.    Right.  Ryan --

5        A.    He was the one, though, who -- who said

6  yes.  Let's open something on this.

7        Q.    Yeah.  Mr. Germany called for an

8  investigation into this in March of that year, right?

9        A.    Correct.  And it --  Like I said, I don't

10  know if it predated us getting the full -- full audio

11  or postdated it, but it was --  They were all

12  within --

13        Q.    Sure.

14        A.    -- you know, a week or two of each other,

15  I believe.

16        Q.    Okay.  So now we're in a timeframe where

17  you've got the investigation -- we can say with a

18  little "i," if you want -- from May of 2021 involving

19  Cyber Ninjas.

20        A.    Uh-huh.

21        Q.    You've now got the call where Mr. Hall

22  says they imaged everything.

23        A.    Uh-huh.

24        Q.    You've got the EMS server and the ICC in

25  your possession.  You've now got an investigation

Page 111

1    opened into these allegations.

2            Why didn't the Secretary's Office at that

3    point obtain the surveillance video that we, the

4    Plaintiffs, later had to obtain months later?   Why

5    did it --   Why did we have to get that?

6        A.    I think, step one, we had decided kind of

7    internally was we wanted to get into the server first

8    to see what time this all -- so we could go back and

9    have binary questions we could ask the individuals.

10           Bob Guessum (ph.)?

11           MR. CROSS:  Bruce, you mean?

12           THE WITNESS:  Bruce.  Sorry.

13       Q.    (By Mr. Cross) Go ahead.  Go.

14       A.    I have a problem.  When I hear people

15   talking, I tend to try to listen; and it throws me

16   off.

17           MR. BROWN:  Okay.

18           THE WITNESS:  My problem not yours.

19           So Ryan and the chief investigator said

20       let's get into the server first before we start

21       trying to go down, start interviewing people who

22       we know.  Like Misty testified.  You're not

23       going to get good stuff out of them, so let's

24       get --  Let's get the actual evidence first and

25       see if something happened, so we start trying to

1         drop box.  It was in the front section of that.

2         I believe that's why that one was placed on the

3         outside door.

4         Q.    (By Mr. Cross)  So the -- the GBI was not

5    called in to investigate until August of this year,

6    right?

7         A.    The official request made in August.  I

8    think the initial discussions with Steven Ellis were

9    at the end of June, early July.  And it definitely

10   kicked up after we discovered that there was a device

11   that was plugged in.

12        Q.    Which was when?

13        A.    After July 4th.  So July 6th or 7th, I

14   think is when we became aware of that, give or take.

15        Q.    Okay.

16        A.    So then Steven kicked up -- he's --  He's

17   basically the person who talks to the GBI.  He's our

18   deputy general counsel and elections counsel, Steven

19   Ellis.

20             And then they have discussions on how do

21   we do this.  Well, you've got to figure out

22   parameters.  We'll go start lining up people.  At

23   some point, you guys send an official letter.  So

24   that was kind of how it all went through.

25        Q.    As of August of this year, no one for the

Page 116

1    State had conducted any interviews of anyone involved

2    in the unauthorized access of the voting system in

3    Coffee County, right?

4        A.    Direct interviews other than with James --

5    James Barnes because he said he had talked to people,

6    and they said that it had happened in May.

7              Separately from this, as I said, it was an

8    investigative decision to get hard binary evidence

9    first, and we were working on a plan to

10   essentially -- because of the timing of this, we were

11   getting ready to send down our investigators with

12   Steven Ellis to like --  As an example, they were

13   going to go the pizza place that she had said she had

14   bought pizza for to see do they have credit card

15   receipts.

16             And we were looking for binary things that

17   could go to saying the credibility is -- is proper

18   for this witness, or it's not.  We can impeach them

19   or say they did know or they didn't know.  We were

20   trying to get those facts, and that was --  And

21   that's an investigatory decision that was made

22   starting in March.  We had to get into this first

23   before we interview anybody so that we can have more

24   information than they do basically was kind of --

25        Q.    (By Mr. Cross)  Who --

Page 117

```
 1        A.      -- the plan.

 2                Ryan Germany --

 3                MR. TYSON:  Okay.

 4                MR. CROSS:  -- was the main person.

 5                MR. TYSON:  Slow down, if you can.

 6                THE WITNESS:  Sorry.

 7        Q.      (By Mr. Cross)  Who --  Who made that

 8   investigative decision?

 9        A.      Ryan Germany.

10        Q.      Okay.  And you said a number of times that

11   the Secretary's Office did not have access to the EMS

12   server, because of the password change; is that

13   right?

14        A.      Correct.

15        Q.      But that's --  Are you aware that's not

16   accurate?

17        A.      And --

18        Q.      Let --  Let me --

19        A.      No.

20        Q.      -- ask it this way.

21                Are --  Are you aware that the data that

22   sits on -- on an EMS server is not encrypted?

23        A.      No.  I'm not.

24        Q.      Okay.  So are --

25        A.      Let me say this.  We couldn't get into the
```

Page 118

1   EMS server itself to look at it and get to the log
2   files is my understanding without that password.
3        Q.   Right.
4        A.   That -- That was the issue.  We couldn't
5   get to see what is there.  I think and -- Again, I
6   think Dominion attempted to image it; and they
7   couldn't come to any conclusions on it until we get
8   to Mr. Persinger, and he was able to do all the
9   proper things, 'cause that's his job.  He knows how
10  to do those items.
11       Q.   Dominion tried to image it in April,
12  right?
13       A.   I believe it was April.  Yeah.  April --
14       Q.   April?
15       A.   The third week of April, so seven --  They
16  first came down the 11th, and I think they came back
17  the following week.
18       Q.   Right.
19       A.   It was somewhere in that time range, yes,
20  of '22.
21       Q.   They tried to image the server, and they
22  could not?
23       A.   There was an issue with that, I believe.
24  Yes.
25       Q.   So but are you aware that because the --

1  the data that sits on the -- the Dominion EMS server

2  is unencrypted, a simple way to access that data is

3  just simply to take a forensic image, put that on a

4  new device, and you no longer need a password to

5  access it.  Were you aware of that?

6       A.   I was not aware of that, and I don't

7  believe that Dominion viewed it that way.  I think

8  they wanted to get into it, so they could do --

9            We --  We understood what we were trying

10  to do.  We are trying to get to those log files, and

11  they were telling us they couldn't see a way to get

12  to those log files; and it was our understanding that

13  without the password, we couldn't do that.

14       Q.   And --  And we all agree that it's

15  important to preserve whatever data, the log files

16  and other things, that are on that original EMS

17  server, right?

18       A.   Correct.

19       Q.   And that server is part of an ongoing

20  criminal investigation?

21       A.   Correct.

22       Q.   And --  And did the Secretary's Office

23  takes steps to preserve the data on the original EMS

24  server?

25       A.   By trying to image it and keep it.  I

Page 120

1   mean, we couldn't even get into it to do anything

2   extra -- to image it, take anything off, or molest it

3   in any way.  So the fact that we couldn't get into it

4   kind of preserved in its natural state from when it

5   was picked up originally.

6        Q.    Why didn't the Secretary's Office bring in

7   someone like Fortalice, which Mr. Beaver testified is

8   essentially serving as the CISO, the chief

9   information security officer.  What --

10            If Dominion couldn't get in and you

11  couldn't get in yourself, why not bring in Fortalice

12  or someone early on?

13       A.    Actually, he's not the CISO.  He's the

14  CIO.

15       Q.    No.  Beaver is.  But Mr. Beaver testified

16  in his --

17       A.    Oh, okay.

18       Q.    -- deposition that Fortalice is serving in

19  that CISO role.

20       A.    To a degree.  I think there's a question

21  of time and cost, basically.  I don't think -- it

22  didn't --  Wasn't actually said, hey, we're not going

23  to do it because of that.

24            Let's --  Let's go through Dominion first.

25            And then we said, well, we've got this

Page 121

1  other person over here who might be better suited to

2  do it.  Honestly, that's -- that's kind of where it

3  was in terms of we know they can do that, so that's

4  Persinger's job.  They can do that.

5            Now Fortalice, there might have been a

6  discussion about that for a moment; but I --  I don't

7  recall one, honestly.

8        Q.    Okay.  So when was the decision made to

9  bring in Mr. Persinger?

10       A.    The discussions were late May, early June.

11  I think, like I said, there was a question because of

12  DOAS not necessarily paying quickly.  Would he be

13  willing to do something like that.

14       Q.    Uh-huh.

15       A.    And that got worked out, and he was able

16  to figure out how to get ahold of it in July, so it

17  was like within a couple of weeks of the decision

18  being made, it got -- it got executed.

19       Q.    All right.  Who made that decision to

20  bring him in?

21       A.    That would be basically Ryan and myself

22  more than anything.

23       Q.    Ryan Germany?

24       A.    Yes.

25       Q.    And what was Mr. Persinger's assignment?

Page 124

1              THE WITNESS:  That's right.  December

2      14th.  It's ten -- today.  December 14th of

3      2020.

4              And some of the other details, I -- I

5      couldn't speak to necessarily, 'cause that's --

6      The GBI is now leading on this --

7      Q.    (By Mr. Cross)  Uh-huh.

8      A.    -- as part of an active criminal

9  investigation, so I don't want to get too deep into

10 what the Office itself may know, because the GBI is

11 leading on that; and they can choose to keep us in

12 the loop or not.

13             They're not keeping us out of the loop,

14 but they're kind of keeping, you know --  They're

15 running lead, and they are the GBI.

16     Q.    Was there --  Does the Secretary's Office

17 have any indication of remote access to the EMS

18 server?

19     A.    Not that I'm aware of.

20     Q.    Is that something they looked for?

21     A.    I don't --  I don't know.

22     Q.    Okay.  Does the Secretary's Office, has it

23 looked for whether there is any sort of malware on

24 the EMS server?

25     A.    It's my understanding.  Yes.

1    Q.    And that was Mr. Persinger?

2    A.    Yes.

3    Q.    And they did not find any?

4    A.    Not that I'm aware of.

5    Q.    Has his --  Has anybody from the

6    Secretary's Office examined whether any of the

7    software was altered in any way on that server?

8    A.    If I remember correctly from the

9    discussion, nobody from the Secretary's Office has.

10   This was all Mr. Persinger's --

11   Q.    Uh-huh.

12   A.    -- information on this.

13         MR. TYSON:  And I think that's as far as

14   you need to go --

15         THE WITNESS:  Okay.

16         MR. TYSON:  -- investigative work

17   productwise.

18         MR. CROSS:  Well, I guess we've asked --

19   Take that to the judge then.

20         You're not going to let him share what Mr.

21   Persinger has found?

22         MR. TYSON:  No.  Not at this --  Not at

23   this point.

24         Yeah.  I think he can testify whether

25   there -- they found malware or not.  I think we

Page 127

1          far afield from the knowledge of that; and,

2          plus, this gets into Persinger's process, so I

3          don't see where we're -- where we're within the

4          scope.

5                    MR. CROSS:  That's a critical component of

6          understanding the scope of the unauthorized

7          access, what they did.

8                    MR. TYSON:  What Persinger did to the

9          server?

10                   MR. CROSS:  Well, because it affects --

11         You've altered the evidence that we are

12         ourselves relying on.

13                   MR. TYSON:  I just think you're factually

14         incorrect on that.

15                   MR. CROSS:  Well, you need to talk to your

16         consultant if you don't know the answer to that.

17                   MR. TYSON:  Okay.

18         Q.    (By Mr. Cross)  Are you aware that Mr.

19    Persinger altered the password on the original the

20    EMS server?

21         A.    No.

22         Q.    You're not aware that he was directed to

23    do that by someone in the Secretary's Office?

24                   MR. TYSON:  Again I'll object in terms of

25         direction from Secretary's Office and then work

```
 1        product.
 2            Q.     (By Mr. Cross)  Do you know one way or the
 3        other whether he was directed to do that by someone
 4        in the Secretary's Office?
 5            A.     I do not.
 6            Q.     So you can't share any insight into why he
 7        would have done that?
 8                MR. TYSON:  Again, object to form.  You're
 9                assuming that he changed it.
10            Q.     (By Mr. Cross)  Do you --  Are you aware
11        when you change the password on a Dominion EMS
12        server that --
13                MR. KNAPP:  In Coffee County?
14                MR. CROSS:  What?
15                MR. KNAPP:  You talking about Coffee
16                County?
17                MR. CROSS:  No, no.  Just in general.
18                MR. KNAPP:  Okay.
19            Q.     (By Mr. Cross)  Are you aware that when
20        you change the password on a Dominion EMS server,
21        that that single operation deletes data, including
22        historical on the products?
23            A.     No.
24            Q.     So you're not aware that this was done and
25        that there are log files that have been lost from the
```

Page 129

1   original EMS server because of this action by Mr.

2   Persinger?

3            MR. TYSON:  Again, I object to --

4            THE WITNESS:  No.

5            MR. TYSON:  That's fine.

6       Q.   (By Mr. Cross)  You've never heard this

7   before?

8            MR. TYSON:  And I'll object to form again.

9            THE WITNESS:  Do I answer?

10           MR. TYSON:  You can answer, if you know.

11           THE WITNESS:  No.

12           MR. CROSS:  All right.  Why don't we --

13       Why don't we take a short break.  I think we've

14       been going over an hour.

15           THE WITNESS:  We have.

16           MR. CROSS:  Okay.

17           MR. TYSON:  Okay.

18           THE WITNESS:  I -- my timing -- my --

19       my --

20           MR. CROSS:  I figured you were going to

21       give me a heads-up on a break, but we can break

22       now.

23           THE WITNESS:  I'm doing okay.

24           MR. KNAPP:  Your biological clock.

25           THE WITNESS:  Yeah.

1          MR. KNAPP:  Yes.

2          THE VIDEOGRAPHER:  We're going off the

3     record at 11:28.

4          (Recess from 11:28 a.m. to 11:43 a.m.)

5          THE VIDEOGRAPHER:  We are on record at

6     11:43.

7     Q.    (By Mr. Cross)  Mr. Sterling, are you

8  aware of any changes made to the original EMS server

9  after the Secretary's Office took possession from

10 Coffee County?

11    A.    The Coffee --  You mean the Coffee County

12 EMS, not --

13    Q.    Correct.

14    A.    -- made by Coffee County.

15          I am not aware of any changes that would

16 have been made to that.  No.

17    Q.    Okay.  And what about the ICC?

18    A.    Not that I'm aware of.

19    Q.    Okay.  The --  The Secretary's Office took

20 the EMS server from Coffee County in June of 2021, as

21 I understand it, because the password didn't work; is

22 that right?

23    A.    June 8th.  Yes.

24    Q.    Okay.  Why did the --  And sorry.  Just to

25 take a step back, are you aware that James Barnes

1    testified in his deposition that his understanding in

2    dealing with the folks who came there, Chris Bellew

3    and a Mr. Patel --

4         A.    Uh-huh.

5         Q.    -- his understanding that they were taking

6    the EMS server was because there was a concern about

7    a compromise per Mr. Harvey's e-mail?

8         A.    No.

9         Q.    But your testimony on behalf of the

10   Secretary's Office is that that server was taken and

11   that had nothing to do with any concern that it had

12   been compromised?

13        A.    Correct.

14        Q.    Okay.

15        A.    Mr. Barnes also stated, I believe, in his

16   deposition that no one followed up with him after he

17   talked to Chris; and obviously, we have evidence to

18   show.

19             This is time differentials on these

20   things.

21        Q.    Uh-huh.

22        A.    So I don't think that anybody --

23        Q.    Uh-huh.

24        A.    I don't think anybody's misleading

25   anybody.  This --  This is my memory and

```
 1    understanding from a year out or something --
 2         Q.     Uh-huh.
 3         A.     -- like that.
 4         Q.     The --  Why did the Secretary's Office
 5    take the ICC when it took the EMS server?
 6         A.     I think they're connected.  I don't know.
 7         Q.     But you're aware that the password, the
 8    ICC password still worked.  It was fully operational?
 9         A.     Maybe it was.  I don't know.  I don't have
10    an understanding as to why they took both of them.
11         Q.     Okay.
12         A.     I think I said that they're --
13         Q.     Well, and I'm not asking you to
14    speculate --
15         A.     Okay.
16         Q.     -- if you don't know.
17         A.     I'm going to say one thing.  As I
18    understand it, their SOP is to just do that.  Like I
19    said --  Like I said, take it down there and replace
20    it, so that's -- I didn't --
21              Once they said they did that, I just kind
22    of left it at that.
23              MR. TYSON:  David, do you want us to check
24         with CES on a break on that point on what the --
25              MR. CROSS:  Sure --
```

Page 133

```
 1              MR. TYSON:  -- reason was?

 2              Okay.  For sure --

 3              MR. CROSS:  That's fine.

 4              MR. TYSON:  -- we can -- we can get into

 5         that.

 6              MR. CROSS:  Yeah.

 7         Q.   (By Mr. Cross)  Are you aware that the

 8    clock on the EMS server was changed, on the original

 9    Coffee County EMS server was changed in January of

10    2021?

11              MR. TYSON:  Object to form.

12              THE WITNESS:  No.

13         Q.   (By Mr. Cross)  And --  And you use

14    computers, right?

15              You can look at your computer, and you can

16    pull up a clock that tells you the date and time,

17    right?

18         A.   Yes.

19         Q.   Okay.  And you understand an EMS server

20    has that same function?

21         A.   Yes.

22         Q.   Okay.  So you had not heard before now

23    that when Doug Logan and Jim Persinger were there

24    accessing the system that --

25         A.   Jim Persinger?
```

1      Q.      Sorry.  Let me get that right.

2      A.      So we can both do that.  It's okay.

3      Q.      Yeah.  No.

4      A.      It shows --

5      Q.      No.  Thank you.

6      A.      -- we're human.

7      Q.      They all start to run together.  Let me

8  try that again.

9              In January of 2021 when Jeff Lenberg was

10  there, you have not heard before now that the clock

11  on the EMS server was reset to November 5th so that

12  the server would think in that moment that it was

13  November 5th of 2020?

14      A.      No.

15      Q.      And have you heard that the clock on the

16  ICC in that same timeframe was reset to November 3rd,

17  2020, which was the election date?

18      A.      No.

19      Q.      So I gather you don't have any insight

20  from the Secretary's Office on any investigation why

21  that was done?

22      A.      Again, given the timing of it, we may not

23  have been aware of it.  GBI might be aware of it --

24      Q.      Okay.

25      A.      -- because of the -- the handoff and those

Page 135

1    things.

2        Q.    Okay.  But you are aware that Jeff Lenberg

3    spent the better part of each of five days in January

4    of 2021 in that office with access to the equipment?

5        A.    Yes.

6        Q.    And what, if anything, can you share with

7    me about what the Secretary's knowledge has about

8    what he was doing or might have been doing?

9        A.    Once we hand --

10            At that point, we had that information, I

11   believe.  GBI was taking the lead on that, so

12   Secretary's Office would not have specific knowledge.

13       Q.    Okay.  Who made the decision to -- to

14   replace the ICC and the EMS server in June of 2021?

15       A.    I wouldn't call it a decision.  It's a

16   standard operating procedure.  You couldn't get into

17   it, so change them out.  That's a State --

18            I guess Center for Elections did that,

19   'cause they took it down there, and they -- and

20   the --  They were hoping to be able to get into it,

21   but they had that so that they could run their

22   elections and do their items, so that was, like I

23   said, a normal standard operating procedure, so I

24   guess policy made the decision more than anything.

25       Q.    Is there a written policy or documentation

Page 136

1   you can point us to that lays out that policy?

2        A.    No.  My discussions with Michael Barnes,

3   basically, that's just what we do; and it's always

4   what we did in the old systems, too, under the old

5   GEM system.  If some of that happened, they would

6   take the GEMS with them.

7        Q.    But, again, the ICC had no access issue.

8        A.    Again, I couldn't say why.

9        Q.    Okay.  And as I understand it, they came

10  down on June 8th, confirmed that the EMS server was

11  inaccessible, and they replaced both that day; is

12  that right?

13       A.    It's my understanding.  Yes.

14       Q.    Okay.  And do you have any insight into

15  why the decision was made not to replace any

16  additional voting equipment in that office at that

17  time?

18       A.    Because, again, there was no issue around

19  that.  They had an issue with a password getting into

20  the EMS.  That was the only thing that was in

21  contention.

22             Again, hindsight being 20-20, you can now

23  see these things potentially having been connected in

24  that -- in that -- in that --

25       Q.    Uh-huh.

Page 137

```
 1        A.     -- kind of way.
 2               But at the time, these were two CES guys.
 3    These weren't investigators.  Like I'm going down
 4    there to work on the EMS.  I'm going to change out
 5    the EMS, 'cause we can't get into the EMS.
 6               So they did a normal situation and a
 7    normal office thing.  It's --  You know, it's just a
 8    normal process.
 9        Q.     On how many prior occasions has the State
10    replaced an EMS server for a county in the Dominion
11    system that was inaccessible?
12               MR. TYSON:  And I'll object to scope.  I'm
13          not sure that's within the scope of what we
14          tried to do.
15               But if you know, you can answer.
16               THE WITNESS:  Because of inaccessibility,
17          none that I'm aware of other than this one.
18    I --
19               Under the old system, I was under --
20          Michael's told me, yeah, it happened on
21          occasion; and I know we changed out one server
22          for Spalding, because there were concerns
23          because when the new board came in, they said
24          this door was unlocked.  We don't know who was
25          here.
```

Page 139

1          A.      Thank you.

2                  MR. CROSS:  Let me get one back.

3                  MR. BROWN:  Yeah.  Okay.  That's -- Okay.

4          Q.      (By Mr. Cross)  All right.  So Exhibit 70

5     (sic) is an e-mail from -- I'm sorry -- a letter,

6     sent via e-mail, from Steven Ellis in your office,

7     right?

8          A.      Correct.

9          Q.      And you said that he's the deputy general

10    counsel, and he oversees elections and

11    investigations?

12         A.      On the investigation side, it's general

13    elections investigations; but yes.

14         Q.      Okay.  And he -- This is a letter that he

15    sent to the GBI on August 2nd of 2022, right?

16         A.      It's the official request for the GBI to

17    get involved.  Yes.

18         Q.      In the second paragraph, he writes --

19    With respect to the -- the unauthorized access to the

20    State's voting system in Coffee County, he writes,

21    "The suspected unauthorized access took place

22    following the January 2021 runoff elections and the

23    possibly accessed system has not been used in an

24    election since that time."

25                 Do you see that?

1      A.    Yes, sir.

2      Q.    That's --  That's not actually accurate,

3  right, that the possibly accessed system has not been

4  used in an election since that time?

5      A.    I don't believe it was used in --  I don't

6  recall there being any special elections down there.

7      Q.    Well, there were three elections in Coffee

8  County since January of 2021, right; or you just

9  don't know?

10     A.    Well, I'm trying to think.  Well, the EMS

11 is what we're talking about specifically here.

12 That's the evidence we have of that at that time.

13          So there have been no elections done on

14 the EMS, and that's what he's referring to here.

15     Q.    Well, hang on.  There's been three

16 elections in Coffee County since June 8 of 2021,

17 right?

18     A.    Yeah.

19     Q.    Okay.

20     A.    Well, let's see.  There could have been.

21 I'm not positive.  I'm trying to think of dates in my

22 head where there have been specials, or just we had

23 the primary, primary runoff.  And what else?

24          MR. TYSON:  Municipal.

25          THE WITNESS:  Municipal's in 2019.  Okay.

Page 141

```
 1              MR. TYSON:  Twenty twenty --
 2              THE WITNESS:  2021.  Yeah.
 3         Q.    (By Mr. Cross)  Right.
 4         A.    If they had any, 'cause not every county
 5    has them, so I'll take your word for it that, yes,
 6    there were three.
 7              But, again, this is a discussion about the
 8    EMS at that time.
 9         Q.    Right.  But we now know from the
10    information obtained from Sullivan|Strickler, the
11    photos, that what was accessed would be on the EMS
12    server and the ICC, right?
13         A.    Correct.
14         Q.    It included a number of compact flash
15    drives, thumb drives, laptops.
16              You understand that, right?
17         A.    Yes.
18         Q.    And the Poll Pads?
19         A.    Yes, sir.
20         Q.    All of that equipment or at least some of
21    it, which wasn't just possibly accessed -- we know it
22    was accessed -- was used in multiple elections since
23    January of 2021 and since June 8 of 2021?
24         A.    Yes.  To --  To be clear, this is
25    referring to the EMS, 'cause that's the information
```

Page 142

1    we had at the time, so understand that as well.

2        Q.    Okay.

3        A.    'Cause we --  As Mr. Persinger pointed

4    out, we knew.  That's when we figured that out.

5    That's when we kicked this off.

6        Q.    So okay.  So I -- so the --

7              So Mr. Ellis's letter, when it says, "the

8    possibly accessed system," it's referring to EMS

9    server that was installed on June 8?

10       A.    Correct.

11       Q.    Okay.  Okay.  Thank you.

12             In a court hearing on September 9th of the

13   this year, your counsel stated, quote, the access

14   these people had to the system was that they wanted

15   access to show something and not necessarily alter

16   something from what we know.

17             What's the basis for the Secretary's

18   belief that the -- the individuals who had this

19   access, that was -- that they did not alter

20   something?

21       A.    I think in the context of the statement,

22   the goal of the people, their stated goal publicly in

23   November through December through January was to

24   prove the election was stolen.  That's what they were

25   attempting to do.  They're trying to say, look, we

1    have now found the fraud.  This is the machinery that

2    caused it.  This is the situation that occurred.

3    That was their -- from their --  That was their

4    stated intent.

5              So I think that's the basis of that

6    statement.  Their intent --  Their intention would

7    have been to prove the election was stolen; and if

8    they had, they probably would have a giant red flag

9    on a mountaintop waving it around.

10   Q.    Uh-huh.  But -- but --  So fair to

11   say this -- this is -- this is a guess about what

12   their intentions were.  You don't actually know what

13   their intentions were.

14   A.    I can't get into the mind of anybody,

15   obviously, who's not ourselves in our office; and

16   the --  It's based on their statements and based on

17   the environment at the time.

18             The goal was to prove that the election

19   was stolen from President Trump.  Like these election

20   deniers, conspiracy theorists all point --  There's

21   the fraud.  There it is, and this is why he should

22   still be president.

23   Q.    Well, and let's pause on that.  Because as

24   you pointed out earlier, the situation here is

25   actually quite different than what you refer to as

Page 144

1    their modus operandi.  Their modus operandi before

2    the breach in Coffee County was to be very public, as

3    you pointed out, right?  To say, look, we're doing

4    this.  We're getting access, and we're going to show

5    that the election was wrongly decided, right?

6          A.    Except in the other cases where they were

7    public, they were granted access by some authority

8    that seemed to be okay with it.  In -- In Arizona,

9    the State Senate, obviously.  In Michigan, I believe

10   there was, I believe, another group that did that.

11          So this goes back to looking back at what

12   we know now.  Misty and them all realized there were

13   violating laws and rules here.  Maybe we don't waive

14   a flag at this until we know for certain we found

15   something, so maybe they'd gotten more sophisticated,

16   'cause they'd gone through the November time period

17   and the December time period.  I can't remember where

18   the Arizona ridiculous thing was going on at that

19   point.

20          So, again, I can't get into their

21   mind-set, and you're right.  This seems a little bit

22   different; but the rationale behind it might have

23   been, hey, I don't want to go to jail.

24          Q.    Well, but you're drawing the distinction

25   that I'm -- I guess I'm having hard time to

1    understand.

2              Because according to the folks that did

3    this -- Misty Hampton, SullivanStrickler -- they have

4    the same authorization they had in other

5    circumstances.  They had the authorization of the

6    elections director.  They had the authorization of

7    multiple members or at least one member of the Coffee

8    County Election Board, and they had Cathy Latham

9    holding herself out as an election official telling

10   them they were authorized.

11        A.   But she wasn't an election official.

12             MR. TYSON:  Object to form.

13        Q.   (By Mr. Cross)  Sure.  But -- but --

14        A.   My point is it wasn't a public kind of

15   thing on that front, so I think there's a --

16             I can't get in their mind-set.  You're

17   right.

18        Q.   Uh-huh.

19        A.   I can't know why they didn't do it that

20   way; but, again, everything we've seen shows that.

21   And, again, new information you just gave me as to

22   that, it looks like they were trying to see what was

23   the configuration with those dates, if something

24   different would happen.  That's why --  Maybe that's

25   why they moved those dates on those machines, if

```
 1    that's actually the case.  I'm just taking your word
 2    for it --
 3         Q.    Uh-huh.
 4         A.    -- right now.
 5               So, again, these people were hired by
 6    Sidney Powell essentially.  That was --  I guess
 7    SullivanStrickler was hired by another law firm first
 8    and transferred over to Sidney Powell, and they were
 9    given the marching orders to potentially go forth and
10    find fraud.
11               And I think at this point, too, in
12    November and December, everybody was kind of
13    running a --  I say everybody.  The election deniers
14    were in a tumult.  They were --  They were very spun
15    up and very public about they were doing.  Lin Wood
16    was having rallies.  You know, Sidney Powell would go
17    to rallies and --
18         Q.    Including Robert Sinners.
19         A.    Including Robert Sinners.  I don't think
20    it was rallies or not; but he was, you know, on those
21    things.
22               So looking back on this now, I can't say
23    for certain; but there's two things I take away from
24    this.  One, they didn't find anything; and, two,
25    their -- their goal wasn't necessarily to add
```

Page 147

1    anything or do anything.  I don't know if they had
2    skill sets or not.
3              But you're --  You're right.  We can't
4    know that with suppositions based on what we've seen
5    and the evidence that we can get that I don't have
6    access to now, because the GBI is now in charge of
7    the investigation.
8              So I can't know for certain.  You are
9    correct.
10        Q.    So one -- one key difference here with
11   respect to the access in Coffee County versus others
12   is that they kept it quiet, despite having
13   authorization from local officials.  And I'm not
14   suggesting that's lawful authorization.
15        A.    Yeah.
16        Q.    They were authorized by local officials.
17              Another key difference is timing.  Right.
18   This is January 7th through the end of the month.
19   This is after Congress has already certified the
20   election and Biden is declared the winner.
21              So my question to you is:  Has your office
22   considered whether that -- those set of
23   circumstances, coupled with the amount of time they
24   spent there, the changes that they made to the EMS
25   server that we know of so far, whether any of that

Page 148

1  conveys to you that they actually were not just

2  looking historically, but looking prospectively?

3      A.    I think that we take any of these

4  unauthorized access seriously and have to take

5  that --  Not knowing means you have to at least look

6  and see if that's there, so I'm --

7           Again, since it's a little out of our

8  hands now, I'm hoping the investigators will look to

9  see if any -- anything was done along those routes,

10  so any of that kind of thing.

11           The reality of it is I still say looking

12  at it, looking back, you're assuming rational actors

13  on some of this thing.  The president's been --  You

14  know, the president's been certified.

15           There were people who -- to this day, who

16  on my Twitter, if you probably go -- you seem to like

17  it, you can go back and look -- are saying put

18  President Trump back, damn it.  Okay.  So there's

19  people who still believe if they showed enough, they

20  could go to -- go to a court somewhere and overturn

21  it.

22           Now I think that's obviously beyond the

23  pale; but, again, we can't get in the motivations of

24  people who believe in their heart of hearts that the

25  election was stolen, all these terrible things

```
1    the likelihood in our -- in our mind is probably not;
2    but again, that's kind of out of our hands until GBI
3    finishes everything on the criminal side.
4         Q.     It sounds like you had a concern that if
5    the Secretary's Office replaced additional voting
6    equipment in Coffee County, which it ultimately did,
7    that that might imply that the system's compromised.
8              But why -- why couldn't --  I guess I want
9    to understand why you have that concern.   Because
10   can't the Secretary's Office just convey to the
11   public that it's not aware of any compromise, but the
12   mere potential is enough to say we're not going to go
13   forward with this equipment, and we're going to
14   figure out a different system that voters can have
15   confidence in?
16        A.     There's two different things that you're
17   asking.
18              Again, our office doesn't believe that
19   there's actually likely any malware on those
20   machines.
21        Q.     Uh-huh.
22        A.     We had a plan.  We were going to send in
23   Pro V & V to potentially load a new golden record on,
24   review the hash values with third-party stuff, and I
25   know there are ways to potentially to get around
```

1           And one of the things I want to just give

2   some context on, all of our lives are not focused on

3   this one thing, obviously.  We're doing lots of

4   different things, so this is part of a amalgam of

5   different things we're working with and trying to

6   deal with.

7           So Ryan and I were both kind of

8   frustrated, going I -- I wish we had an answer to

9   this already.  What do we need to do to change that,

10  so we can --

11          A lot of our time is spent trying to clear

12  things off the decks.  Like we try to clear SEB

13  investigations off the decks, 'cause we know that

14  2022 is going to have a lot of new claims that we're

15  going to have to investigate and do again.

16          So we didn't want this one just kind of

17  hanging out there as -- as a potential issue, so that

18  was --  That was part of the rationale; and again,

19  there wasn't a (indicating) this happened.  Let's go

20  do that kind of thing.

21      Q.      To your point about not wanting this sort

22  of hanging out there, why didn't the Secretary's

23  Office replace the EMS server and the ICC last month

24  when it replaced all the other equipment, given that

25  other equipment had been used with the new EMS server

Page 157

1   and ICC?

2        A.     Internally, we didn't think --  We said we

3   already replaced it, so that should take care of it

4   kind of thing.  There was an internal debate of like

5   let's just clear them all out.

6             And then there was, well, why?  I mean,

7   it's already been replaced since they woke us.  We

8   can give them another debate point, but it was

9   ultimately decided.

10            And then by the time we said, well, maybe

11  we should, LMA had already started.  We had to start

12  the election process over again, so it's now running,

13  so you couldn't, even if you wanted to, bar -- bar in

14  making that chaos.  But a lot more difficulty in

15  running the election.

16       Q.     Well, I guess help me understand that.

17            I mean, the -- the Secretary's Office was

18  able to replace the EMS server and the ICC in Coffee

19  County in June of last year in a single day with --

20  with -- according to Mr. Barnes, without any advance

21  notice they were going to do that.

22       A.     Uh-huh.

23       Q.     So it sounds like it's a pretty simple,

24  quick process.  Why couldn't they -- they do that as

25  part of the broader process in September of replacing

Page 158

1    the rest of the equipment?

2         A.    Well, like I said there were two different

3    discussions on this point.  We replaced all the

4    stuff.  We said we already replaced that, so it

5    didn't --  It wasn't a mind-set, too, like they

6    interacted with these things.

7              And, again, remember, from our point of

8    view, we don't believe that any malware is actually

9    probably there; but we'll --  To take the debate

10   point away and -- and take away the -- the -- the

11   fear mongering around it, said let's get them all out

12   of there.

13             It then came up at another point later on.

14   Said, well, these other two things have been

15   interacting with them.

16             And then there was a internal debate point

17   of like, well, we've already replaced this.

18             Oddly, Marilyn has her hand up.

19             We've already replaced this; and then we

20   said, well, maybe we should look at it; but by that

21   point, the election --  We're in the election window

22   now.  You've got to realize we sent UOCAVA ballots

23   out starting 49 days out, so that was seven weeks

24   from the election.

25             So when the internal debate got to the

1    point, well, maybe we should look at something like

2    that, again, when we run elections, we have to look

3    at everything we're doing, this just being one sliver

4    of the cybersecurity side.  You have to look at all

5    of the processes and thing -- and everything going

6    on.

7              So it would have been more chaotic and

8    more risky to then change it out at that -- by the

9    time it had reached that point; but there was an

10   internal debate about it, because, again, most people

11   are under the impression nothing else -- we -- we got

12   everything else out of there.  This is a new EMS, so

13   there shouldn't be any issue with that, so that was

14   kind of the -- the thought process behind it at the

15   time.

16             We were trying to act reasonably as we

17   could, given the situation we were in.

18        Q.    Well, what all did the Secretary's Office

19   replace in Coffee County last month?

20        A.    I believe, if memory serves, and if I --

21   This may not be completely --

22        Q.    Uh-huh.

23        A.    -- all of it; but I remember it was the

24   BMDs, the printers, the cords.  I believe we might

25   have changed out the battery supplies, but I don't

1   recall for certain on that one.  The --  The

2   scanners.  The ICPs.  The memory cards, and I believe

3   the jump drives for everything.

4            In fact, we were originally going to

5   change all those out.  There was never a question

6   internally that we were going to do that.  That was

7   going to be done, but then I think all of that was

8   changed out.

9            And then the Poll Pads.  Pardon me.  I

10  forgot.  Them as well.

11      Q.    I mean --

12      A.    And the cords and all their --

13      Q.    Right.

14      A.    All the parent --  All the parent-child

15  things within the system were changed out.

16      Q.    There are over a hundred BMDs in Coffee

17  County, right?

18      A.    Correct.  I --  I think it's just barely

19  over a hundred, but I believe that's correct.

20      Q.    Somewhere between a hundred and a hundred

21  twenty, I think, is what we --

22      A.    Something --

23      Q.    -- refer to.

24      A.    Yeah.  I think it was a hundred and nine,

25  if memory serves, but something like that.

Page 192

1    emergency hand-marked paper ballots for elections?

2         A.    No.

3         Q.    Are you aware of any election security

4    expert who has examined any component of the State's

5    voting system since the Coffee County breach came to

6    light?

7         A.    I'm going to assume Mr. Persinger's had

8    the -- one part of that.

9              Since then, no.  We haven't had -- brought

10   anybody else in yet.  In fact, we're discussing

11   trying to go through our procurement process to get a

12   contract in place to allow for that for the long

13   term.

14        Q.    But Mr. Persinger, I assume, has forensic

15   expertise.  But he's not an election security expert,

16   right?

17        A.    Well, this becomes --  This comes into the

18   subjective idea of what an election security expert

19   is.

20        Q.    Well, is he --  Are you aware of any

21   proceeding in which he has offered opinions as an

22   expert on election security?

23        A.    I'm not.  No.

24        Q.    Are you aware of any work by Mr. Persinger

25   to examine voting equipment prior to the work he's

1   doing now?

2        A.    Not that I'm aware of.   No.

3        Q.    Are you aware --

4              Well, back up.   You know Ben Adida?

5        A.    Yes.   Uh-huh.

6        Q.    Ben Adida is an expert who testified for

7   the State in this case; do you know that?

8        A.    He testified for us?

9        Q.    He did.   He testified at a hearing in

10  September of 2020.

11       A.    Okay.   Then yeah.   I'd forgotten that that

12  was the case.

13       Q.    Yeah.

14             MR. BROWN:   It was Zoom.

15             THE WITNESS:   Okay.

16             MR. BROWN:   Wasn't that by Zoom?

17             MR. CROSS:   It was.   I think everybody was

18        by Zoom.

19             THE WITNESS:   Okay.

20       Q.    (By Mr. Cross)   And Ben Adida, does he own

21  or he runs VotingWorks?

22       A.    Something.   I'm not sure how it works, but

23  I think he founded it, and it's like a nonprofit

24  thing so --

25       Q.    And VotingWorks is a company that the

Page 194

```
 1   States contracts with for audit purposes?
 2       A.     Correct.
 3       Q.     Maybe among others.
 4              Sorry.  You say correct?
 5       A.     They are.  There are none among others,
 6   but they are.  They are the ones we can contract
 7   with.
 8       Q.     Okay.  Are you aware that Ben Adida always
 9   advises his clients to adopt hand-marked paper
10   ballots, plus, one BMD for disability purposes?
11              MR. TYSON:  And I'll object to form and
12       scope.
13              THE WITNESS:  I am not aware of that, but
14       that wouldn't --  I wouldn't find that
15       surprising from Ben.  No.
16       Q.     (By Mr. Cross)  Why?
17       A.     Because I believe that's his understanding
18   and belief; and of course, in Georgia, we have a law
19   that says we have to have BMDs for everything.
20       Q.     All right.  Let me hand you --
21              MR. CROSS:  Are we at nine?
22              THE WITNESS:  Nine, I think.
23              MR. CROSS:  Is it nine?
24              THE VIDEOGRAPHER:  Yes.
25       Q.     (By Mr. Cross)  Okay.  Let me hand you
```

Page 197

1      Q.      How many ballot builders are there?

2      A.      If memory severs, there's four that are

3   State employees and two that are contract employees

4   right now.

5      Q.      Contract employees contracted by the

6   State?

7      A.      Correct.  And these contracts are direct,

8   are through a State contract.  They hired -- it's

9   a -- it's a --

10              There are two state contracts for

11   temporary employees specifically.  A third, if you

12   include IT employees; and they are paid through one

13   of those three.  I can't remember which one it is.  I

14   would I want to say it's --  It's either CAI or focus

15   or corporate.  But, again, they're just --

16              It's enough to say modeling used to -- for

17   accounting to pay for contract employees, as opposed

18   to making them full employees, because full employees

19   are very expensive because there's a 63 percent

20   burden on their --  For every dollar you spend on

21   their salary, it's 63 cents additional to employ

22   them.

23      Q.      Okay.  Do they do the ballot building

24   physically on site at the Secretary's Office or where

25   do they do it?

1      A.     They do it at the Center for Elections

2   office, which is near the Braves stadium up and off

3   Interstate 120.

4      Q.     So here Miss Roberts for Coffee County

5   reaches out in April of this year and says can you

6   please send me a letter on your letterhead stating

7   that your server is in your possession.  Please

8   include why and when it was changed out.  Do you see

9   that?

10     A.     Yes.

11     Q.     Do you know why Miss Roberts is reaching

12  out to the Secretary's Office for that letter on

13  April 1st of this year?

14     A.     I vaguely recall.  I -- I --  I don't want

15  to speculate.  I think it was something around their

16  elections board wanted to understand why.

17          And, also, they say their server.

18  Technically, they're all the State's servers; but

19  they are held and used by those counties.  I just

20  want to make that clarification.

21          I believe that's what it was; but, again,

22  this was April of '22.  And, again, it was no big

23  deal to say the password didn't work.  We changed it

24  out.  Normal processes.

25     Q.     When you say that the -- the -- the State

1   servers, but they're held and used by the counties,

2   what does that mean?

3        A.    The State retains ownership of all

4   equipment unless, as in some counties, some large

5   counties buy their own equipment.  They -- They own

6   that equipment, but we still have to have -- go

7   through state acceptance and certification on those

8   pieces of equipment.

9        Q.    So the EMS server that was taken and the

10  ICC in the summer of last year from Coffee County,

11  that is and has always been owned by the Secretary's

12  Office or by the State?

13       A.    Once it was purchased and accepted, yes.

14       Q.    Okay.  All right.  Is that true for the

15  new equipment?  The State owns that, too?

16       A.    Correct.  All the equipment, not just the

17  ICC and the --  Everything that we changed out, the

18  States retains ownership of those items.

19       Q.    Okay.  Do you know why this -- the Coffee

20  County office did not already have any documentation

21  on the EMS server and the ICC being replaced in June

22  of 2021?

23       A.    I don't know that they didn't, or they may

24  be not be able to find it since they went through

25  three elections directors -- I guess two elections --

Page 200

1    Oh, an initial director election passed this time, so

2    I don't know what they did or didn't have, but they

3    probably wanted to have this as a belt and

4    suspenders.

5              Again, I'm making a supposition, so I

6    apologize, but I --

7              MR. TYSON:  Yeah.  And don't --  Don't

8        guess.

9        Q.    (By Mr. Cross)  Yeah.  If you don't -- if

10   you don't know --

11       A.    Well, I -- I couldn't suppose for certain.

12       Q.    Sure.  Okay.  Well, do you know why the

13   Secretary's Office does not have any documentation

14   regarding replacing that server and the ICC other

15   than the logic and accuracy report that we received?

16       A.    And the logic and accuracy report, that's

17   all you really need to know.  It's changed out.  It's

18   a new piece of equipment there with the L&A on it.

19   It was put there.  We have the time.  We have the

20   date.

21       Q.    But the chain of custody of voting

22   equipment, maintaining that chain of custody is

23   critically important, right?

24       A.    Yes.

25       Q.    And so does the State not have any

1  policies or practices to require documenting when it

2  replaces voting equipment in the county other than

3  just an L&A report?

4       A.    I don't know off the top of my head on

5  that one, quite honestly.  I mean, I did

6  demonstration for voting equipment for a media the

7  other day.  We had to sign all the paperwork to take

8  it from one building to another.

9            So, I mean, I know we do have paperwork on

10 those fronts; and I don't know if it would be the

11 same as it would for a complete switch out or not.  I

12 just don't know off the top of my head.

13      Q.    If you wanted to know, who would you ask?

14      A.    I would ask Michael Barnes.

15            MR. TYSON:  You want us to check on that

16      at a break?

17      Q.    (By Mr. Cross)  Sure.

18            MR. TYSON:  Okay.

19            MR. CROSS:  Thank you.

20      Q.    (By Mr. Cross)  And then if you come up to

21 the most recent e-mail where we started, Mr. --

22      A.    The first page on --

23      Q.    Yes.

24      A.    The first page.  Okay.

25      Q.    -- Mr. Germany's e-mail, to Steven Ellis,

Page 203

```
 1    that fills that role at Hall Booth?
 2              MR. TYSON:  And I'll object to scope.
 3              You can answer if you know.
 4              THE WITNESS:  I believe that's correct.
 5         Yes.
 6         Q.    (By Mr. Cross)  For example, it was Tony
 7    Rowell that was in the meeting with Misty Hampton
 8    December of 2020.  Do you remember that?
 9         A.    Yes.
10         Q.    And then it --  Here, it's a reference to
11    her.
12              Do you know if Mr. Germany reached out to
13    Jennifer Herzog?
14         A.    I believed that --  Prompting my memory --
15         Q.    Okay.
16         A.    -- that is name of the person whose
17    talking to.  Yes.
18         Q.    Has there been any consideration or
19    investigation either by or at the direction of the
20    Secretary's Office into whether any of the Coffee
21    County attorneys were aware of the -- the breach in
22    January of 2021 shortly after or -- or at the time
23    that it happened?
24              MR. TYSON:  I'll object to scope.
25              If --  If you know, and don't disclose
```

1      about the investigation.

2            THE WITNESS:  I couldn't speak to that.

3      Q.    (By Mr. Cross)  'Cause --  'Cause you

4      don't know?

5      A.    I don't.

6      Q.    Okay.

7      A.    Yeah.  Sorry.  Yeah.

8      Q.    I just want to make sure it wasn't -- it

9      wasn't like a privilege thing.  You just don't know?

10     A.    I just don't know.

11     Q.    Okay.  If --  If you wanted to know, who

12     would you ask?

13     A.    One of three people, either Ryan Germany,

14     Steven Ellis, or Sara Koth.

15            MR. TYSON:  Or the GBI?

16            THE WITNESS:  Or the GBI.  But at this --

17     at this point, it would have been an earlier

18     period of time.  This was well before the GBI

19     was involved.

20     Q.    (By Mr. Cross)  Right.  Okay.  So we

21     talked about the password change that was changed on

22     December 14 and --  And that was a directive from the

23     Secretary's Office.

24            Are --  Are you aware that James Barnes

25     testified that his understanding was that

1    county-level officials actually don't have

2    administrative rights to change a password?

3         A.    I'm aware that was his testimony, but I

4    believe that is incorrect.

5         Q.    Okay.  So the password change that

6    occurred on December 14, is it the Secretary's Office

7    understanding that Misty Hampton did that, or they --

8    they don't know for sure who did it?

9         A.    We don't know.  We only know is that

10   someone in that office who had the existing password

11   went on and changed that password, so we can't speak

12   if it was Misty, her daughter, or some other

13   employee.

14        Q.    Since the Secretary's Office thought that

15   the password should be changed after the YouTube

16   video came, why wasn't it the practice of the

17   Secretary's Office to make that change itself or to

18   oversee that change with whoever would handle that?

19        A.    I couldn't speak to that specifically.

20              Generally speaking, the board of elections

21   directors.  Counties run elections and --

22        Q.    All right.

23        A.    And, generally speaking, the Secretary of

24   State's Office says to do something, they generally

25   do it, because they don't want to go before the State

1   Election Board for having done something wrong.

2        Q.    Does the -- Since the Secretary's Office

3   owns the equipment in Coffee County in particular, is

4   the -- is -- is it supposed to have all of the

5   passwords to that equipment so that it has its own

6   access?

7        A.    Generally speaking, yes.

8        Q.    And is it my understanding that when the

9   password was changed on December 14 at the

10  Secretary's direction, is it your understanding

11  whatever that password became was ever shared with

12  your office?

13       A.    That is my understanding.  Yes.

14       Q.    And what is that based on?

15       A.    That when James Barnes called Michael

16  Barnes, no relation, to -- to see if you have a

17  different password than what I have sitting here, he

18  had the same one; and there has been --  There's no

19  indication that we ever got the information that it

20  was changed.

21       Q.    Do you know whether the password that

22  James Barnes was trying to use and that Michael

23  Barnes had -- was that what the Secretary's Office

24  believed to be the EMS server password prior to

25  December 14th?

Case 1:17-cv-02989-AT   Document 1815-17   Filed 02/06/24   Page 122 of 197

```
 1       A.    That was my understanding.

 2       Q.    Is that from Mr. Barnes?

 3       A.    Well, from Michael, yes.

 4       Q.    From Michael, yeah.

 5             And so when --

 6             THE WITNESS:  Hold on.

 7             MR. CROSS:  Sorry.

 8             THE COURT REPORTER:  Okay.

 9       Q.    (By Mr. Cross)  And so when the

10  Secretary's Office took possession of the EMS

11  server -- took possession of the EMS server in June

12  of 2021, the password that Mr. -- that Michael Barnes

13  had did not work?

14       A.    Correct.

15       Q.    And at some point this year, the

16  Secretary's Office got access to that server through

17  Mr. Persinger's work?

18       A.    I wouldn't say the Secretary's Office got

19  access to it.  Mr. Persinger got access to it.

20       Q.    But he's working at the direction of the

21  Secretary's Office?

22       A.    Yes.  Well, through the attorney.  I don't

23  know how to define the relationship, but through the

24  attorneys' offices, yes.

25       Q.    And I know we talked about this before.
```

Page 208

1          But just to get more specific for you, do
2    I understand correctly, you were not aware that Mr.
3    Persinger installed a software program on the
4    original EMS server on the hard drive called
5    resetpassword.exe, an executable file?
6          MR. TYSON:  And I'll object to form.
7          THE WITNESS:  No.
8    Q.    (By Mr. Cross)  The --  I guess our
9    follow-up if you don't know.  But let me ask -- let
10   me ask the question, and you can tell me if you just
11   don't know.
12         Do you know why when CES came into the
13   Coffee County office in -- in May of 20 -- or
14   sorry -- I think it was June of --
15         Sometime in the May-June time period of
16   2021, CES comes in.  Why didn't they just reset the
17   password on that server as Mr. Persinger did?
18         MR. TYSON:  And I'll object to form.
19         THE WITNESS:  As I understand it, we don't
20      have easy access to do that.  It's designed as a
21      security feature in and of itself.  That's why
22      it was a little bit frustrating.  We couldn't
23      get --  We would assume there ought to be some
24      back door way to be looking at it.  That's an
25      easy way to then go in and get to do those

Page 209

1      things.

2              So that was my understanding of it.

3              MR. CROSS:  All right.  Is this ten, I

4      think?

5              THE WITNESS:  Yes.

6              (Exhibit 10 was marked for

7      identification.)

8      Q.     (By Mr. Cross)  All right.  Let me hand

9  you what's been marked as Exhibit 10.  It's Tab 59.

10             So Exhibit 10 is an e-mail that you sent

11 to -- to outside counsel including -- and, plus, Ryan

12 Germany and Steven Ellis on August 1st of 2022.

13             Do you see that?

14     A.     Are we talking beginning back here, or

15 where are you on?

16     Q.     The -- the -- The most recent e-mail at

17 the top of the first page.

18     A.     Yeah.  It was basically take the

19 information I'd gotten from -- I don't remember

20 exactly what it was, but I --

21             Yeah.  It was from Nicole.  That what's

22 she told me.  Yeah.

23     Q.     Okay.  So come down to the second-to-last

24 page.  It ends in 91.

25     A.     Okay.

1      A.    He's passed away.

2      Q.    Okay.  I'm sorry.

3      A.    He -- He left first, and then he passed

4   away suddenly.

5      Q.    Okay.

6      A.    He was very young.  He was only 47.  He

7   had a heart attack.

8      Q.    Jesus.  That's terrible.  Okay.  Oh, I'll

9   need to be healthier.

10          Okay.  So and in this e-mail, Mr. Germany

11  writes, "... can you download the file below and pen

12  an investigation into below."

13          Do you see that?

14     A.    Yes.

15     Q.    And then Mr. Callaway responds, "I got it,

16  Ryan.  I'm clear."

17          Do you see that?

18     A.    Yes.

19     Q.    And then we come up to --  The most recent

20  e-mail is one that you're sending where you're

21  conveying information from Nicole at Dominion.

22          Do you see that?

23     A.    Yes.

24     Q.    Who was Nicole?

25     A.    Nicole Nollette who is their vice

Page 212

1    president of operations.

2         Q.    How do you spell her last name?

3         A.    I believe N-O-L-L-E-T-T-E.

4         Q.    And so when you're conveying this, is this

5    the text like from an e-mail or a text message or

6    something?

7         A.    Yes.

8         Q.    Okay.  Text message or e-mail?

9         A.    I don't recall.

10        Q.    Okay.  So she says, Gabe, you are right.

11   April 11th I was up there.  When I was at CES, I had

12   to go to Best Buy.  I just remembered this.  I looked

13   up my account, and the purchase was April 11.

14        A.    Yes.

15        Q.    And then you explain below she was working

16   to gain access to the server that had the password

17   change, right?

18        A.    Yes.

19        Q.    And that's the Coffee County server we've

20   been talking about?

21        A.    Correct.

22        Q.    What led the Secretary's Office to decide

23   to bring Dominion in, in the April timeframe of this

24   year to try to get access to that server?

25        A.    Well, we actually made the decision in

Page 213

1    March; but they already had a previously scheduled

2    trip, so it didn't seem logical to make them do an

3    additional trip down; and it was basically it's their

4    server.   They should be able to know how to get into

5    it through a -- if the password's been changed.

6              And they thought they might be able to.

7    They had a couple ways they were thinking about doing

8    it, and their engineers were working on it, so

9    that's --   It seemed a logical first step of doing

10   what we're trying to do, which was to figure out if

11   there had been any -- anything untoward on the

12   machine, was to go to them first.

13        Q.     Sorry.

14             But was it the --   The recording that you

15   received from Mr. Hall or the recording of Mr. Hall,

16   it -- it -- was that the impetus to say, okay, let's

17   go look at this server that we've had for a while?

18        A.     We had had some discussions about it, so

19   let's listen to the whole thing.   As I said earlier,

20   I wasn't sure of the timeframe.   I think it was post

21   getting the full thing or free.

22             We --   We already decided we've got to

23   figure out how we're going to do this, and I couldn't

24   tell you when we originally called either Tom Feehan

25   or Nicole Nollette to say, hey, we need to get into

1   the server.   How do we do that.

2             So it was around --   They're all

3   contemporary to one another in that timeframe.

4        Q.    Did anybody come with Miss Nollette on

5   April 11th from Dominion?

6        A.    Not that I recall, but I -- I may not be

7   aware.

8        Q.    Okay.

9        A.    I know that she was talking to people

10  remotely in the Denver office about this from CES,

11  'cause we had discussions about that.

12       Q.    So is it your understanding that she's the

13  one who came up, and it was --   She's the one who

14  tried to get access to the server?

15       A.    And to a point where she'd gone to Best

16  Buy and said, hey, get this and see if this can help

17  you do that kind of thing.   That --   That was where

18  that came down from because we had an initial

19  discussion.

20             She --   In her brain, she thought it was

21  later that she'd come down in April; but I said no.

22  I'm pretty sure it was around this time.

23             And she went back and checked, and that's

24  how --   That was the impetus behind this particular

25  discussion on the e-mail.

1      Q.    Do you know what it is she purchased from
2  Best Buy to try to help with that?
3      A.    I don't.
4      Q.    If you wanted to know that, who would you
5  ask?
6      A.    Nicole.
7      Q.    But whatever she bought, fair to say it
8  didn't work?
9      A.    Correct.
10     Q.    And do you know whether -- whether Miss
11  Nollette shared with anyone at CES or anyone else in
12  the Secretary's Office around this time that the data
13  that sits on the Dominion EMS servers is not
14  encrypted, and so you could access it just by making
15  a copy?
16          MR. TYSON:  I'll object to form.
17          THE WITNESS:  Again, I think there may be
18      some point of confusion on part of this, because
19      they knew what we were trying to attempt to do,
20      which was to see the log files.
21     Q.    (By Mr. Cross) Uh-huh.
22     A.    And maybe they didn't know they could do
23  that, because that's not really --  They build these
24  machines.  They don't try to back figure their way
25  into these machines.

1          So I don't know if that was stated or not.

2     It was not stated to me.

3          Q.    Mr. Barnes testified that --

4          A.    Michael or James?  Sorry.

5          Q.    Yes.  Thank you.  That's a good

6     correction.

7               James Barnes testified that when the

8     Secretary's Office swapped out the -- the EMS server

9     and the ICC in June of last year, he said it was Mr.

10    Patel and someone named Chris.

11              Was that Chris Bellew?

12         A.    Chris Bellew.  Correct.  And that's

13    spelled B-E-L-E-W (sic).

14         Q.    Is it two L's?

15         A.    I think it's just one.

16         Q.    Oh, okay.

17         A.    I could be wrong, but I'm pretty sure it's

18    just one.

19         Q.    Okay.  And just so I understand, your

20    knowledge is that the only documentation that exists

21    within the Secretary's Office about replacing the EMS

22    server and the ICC is that L&A testing report that we

23    received?

24         A.    As I sit here right here, yes.  We're

25    obviously going to check the next break.

Page 219

1          MR. CROSS:  -- 250 investigation, so we
2     would ask for that, if it exists.
3          MR. TYSON:  Okay.  I -- I don't think it
4     exists.
5          THE WITNESS:  I don't think it exists that
6     way.  It's in --
7          MR. TYSON:  Right.  I think it's --
8          MR. CROSS:  Well, let's look at --
9          All right.  So let's --
10         MR. TYSON:  Okay.
11    Q.    (By Mr. Cross)  Maybe WhatsApp's right.
12    A.    Okay.
13    Q.    Let me hand you --
14         MR. CROSS:  Is it 11, I think it is?
15         THE VIDEOGRAPHER:  Yes.
16         (Exhibit 11 was marked for
17    identification.)
18    Q.    (By Mr. Cross)  All right.  Exhibit 11.
19    This is Tab 107.
20         So Exhibit 11, the most recent is an
21    e-mail from Ryan Germany to folks at the Secretary's
22    Office on April 25th of 2022.
23         Do you see that, Mr. Sterling?
24    A.    Yes.
25    Q.    Okay.  Come to the start of it.  Go to the

Page 220

1    third page ending in 50.

2         A.    Okay.

3         Q.    And if you look at, actually, the bottom

4    of the second page, you'll see the whole e-mail.

5              Do you see this starts with an e-mail from

6    a reporter named Kate Brumback at the AP?

7         A.    Yes, sir.

8         Q.    And so she reaches out through Open

9    Records on April 25th of 2022, and she says I'm

10   seeking any documents related to an investigation

11   into the handling of the EMS server in Coffee County

12   that was opened between February 24 of '22 -- 2022

13   and the present.

14             You see that?

15        A.    Yes, sir.

16        Q.    And then Open Records responds to her they

17   can't release any information because it's under

18   investigation.  They say you previously asked for a

19   cover sheet, and we sent that one we are using for

20   the investigation.

21             Do you see that?

22        A.    Yes, sir.

23        Q.    Do you know what they sent?

24        A.    Looking at this, I couldn't say for

25   certain.

Page 221

1      Q.    Okay.

2              MR. TYSON:  David, we could go on a break.

3      Let me see if I can find that, 'cause I have not

4      seen that document.

5              MR. CROSS:  Okay.

6              MR. TYSON:  So let us see if we can find

7      it.

8              MR. CROSS:  Sure.

9              MR. TYSON:  If there's something separate.

10     It may just be the SharePoint print.

11             MR. CROSS:  Okay.

12             MR. TYSON:  I don't know what it is, so

13     let me find out what that is, and we --

14             MR. CROSS:  That's fine.

15             MR. TYSON:  And we're happy to get it to

16     you, obviously.

17     Q.    (By Mr. Cross)  Okay.  And then if you

18     continue on in this thread, Mr. Sterling, you see

19     that Miss Brumback writes back.  She gives some more

20     information about what she's looking for.

21             Do you see that?

22             The bottom of the first page.

23     A.    Oh, yeah.  I'm reading --  I'm reading it

24     now.

25     Q.    Yeah.  And then Open Records forwards that

Page 225

1      Q.    Oh, is the 250 investigation still open?

2      A.    I don't know the answer to that.  I know

3 that everything new is now that new case number we

4 discussed earlier.

5      Q.    All right.

6      A.    Everything's going to be new; but, of

7 course, now with GBI, so it's a different kind of

8 environment.

9      Q.    All right.  Let me hand you, I think,

10 Exhibit 12.

11           (Exhibit 12 was marked for

12      identification.)

13      Q.    (By Mr. Cross)  And, actually, before you

14 look at that, let me just ask you a threshold

15 question.

16           So you're obviously familiar with Robert

17 Sinners?

18      A.    Yes.

19      Q.    He works in your office?

20      A.    Correct.

21      Q.    And -- and he --  Is he the director of

22 communications?

23      A.    Yes.

24      Q.    Okay.  And you're familiar with Eric

25 Chaney and Misty Hampton?

1       A.      Yes.

2       Q.      You know of them?

3       A.      Yes.

4       Q.      Yeah.  Do you --  Do you have any insight

5    into why Eric Chaney texted Misty Hampton Robert

6    Sinner's personal cellphone number on the night of

7    January 7, 2021, as they were finishing or had just

8    finished the copying and everything that occurred in

9    the office that day?

10      A.      No.

11              MR. TYSON:  I'll object to form and scope.

12              THE WITNESS:  No.

13      Q.      (By Mr. Cross)  Have you ever discussed

14   that with him?

15      A.      Yes.

16      Q.      And what can you share with me about that?

17      A.      When you say him, I think Robert Sinners.

18              Essentially said they must have done it

19   because my role before this was sort of head of, you

20   know -- not security -- there was a word for it --

21   election day operations, which then follows up on

22   these items for the Trump action.

23              Now when I discussed it with him, he said

24   at that point, the election's certified; I was

25   unemployed; and I was in Savannah engaging in adult

Page 227

1    beverages.  So he doesn't recall getting one.

2              I --  I asked him the question.

3              He goes I don't remember seeing one, and

4    he goes I never dealt with anything beyond that at

5    that point.

6              So that was where I --  I had asked him

7    about it, because it's a question.

8              And having worked on campaigns a big chunk

9    of my life, going to Savannah and engaging in adult

10   beverages after a loss is not an uncommon way to deal

11   with things after the fact.  It seemed logical.

12        Q.    Uh-huh.  Have you seen the text thread I'm

13   talking about where Mr. Chaney sends Mr. Sinner's

14   number to Ms. Hampton?

15        A.    I have not.

16        Q.    Okay.  He says at the same time

17   immediately after, he says let's switch to Signal.

18              Are you familiar with Signal?

19        A.    Yes.

20        Q.    And, again, you don't have any insight as

21   to why Mr. Chaney and Miss Hampton were having that

22   discussion at that time?

23        A.    No.

24              MR. TYSON:  And I'll object to scope and

25        form.

Page 228

1          THE WITNESS:   No, sir.

2      Q.    (By Mr. Cross)   And do you know whether

3   anyone either in the Secretary's Office or at their

4   direction has investigated that?

5      A.    No.

6          Bless you.

7          THE VIDEOGRAPHER:   Thank you.

8      Q.    (By Mr. Cross)  All right.  So grab

9   Exhibit 12, if you would.

10      A.    And that's the one message with No. 155 at

11   the top?

12      Q.    Yes.

13      A.    Okay.

14      Q.    So the cover page concerns an Open Records

15   Request.  You see it's from Misty Hampton, to Mr.

16   Voyles, Tracie Vickers, along with Coffee County.

17   It's dated November 16, 2020.

18          And it says please the attached for the

19   ORR.  This should complete both RR (sic).  I air

20   dropped the video to Ed Voyles.

21          Do you see that?

22      A.    Yes, sir.

23      Q.    And then if you come to the -- the very

24   last page, turn it over to the back.  Do you see that

25   there is an e-mail exchange that begins between Miss

1      Q.    (By Mr. Cross)  Do you know of any

2  investigation into whether Mr. Sinners had any

3  knowledge of the breach in Coffee County at or around

4  the time that it occurred?

5      A.    No.

6      Q.    Do you know of any investigation into

7  whether he was involved?

8      A.    No.

9      Q.    Do you know why he was hired into the

10  Secretary of State's Office immediately after,

11  literally days after Jeffrey Lenberg was last in that

12  office accessing the equipment?

13           MR. TYSON:  And I'll object to scope.

14      Personnel's not in the topics.

15           THE WITNESS:  And secondly --

16      Q.   (By Mr. Cross)  I'm just asking if you

17  know.  If you don't know, that's fine.

18      A.    Well --  well, you -- you --

19           You asked two questions.  You asked why he

20  was hired.  That's one question, and then you asked a

21  secondary question of why he was hire days after

22  Lenberg was there.

23           From the point of view of the Office, one

24  had nothing to do with the other, 'cause we had no

25  idea of the existence of Mr. Lenberg going to the

Page 233

1    some water way back.

2         Q.    Thank you.

3              (Exhibit 13 was marked for

4         identification.)

5         Q.    (By Mr. Cross)  13.  And that's Tab 60,

6    six zero; and if you look at the most recent e-mail,

7    this is an e-mail that you received from Ryan

8    Germany, along with Mr. Tyson, Carey Miller, Vincent

9    Russo, and Steven Ellis on August 1st of 2022.

10             Is that right?

11        A.    Yes.

12        Q.    All right.  You can put that aside.

13        A.    Okay.

14        Q.    Let me hand you Exhibit 14.

15             (Exhibit 14 was marked for

16        identification.)

17             MR. CROSS:  I'll ask if you want one.

18             MR. BROWN:  Thank you.

19        Q.    (By Mr. Cross)  So Exhibit 14, do you see

20   at the top?

21             This is an --  This is an e-mail that Sara

22   Koth sent to Steven Ellis on July 12th, 2022

23   regarding an Open Records Request.  Do you see that?

24        A.    Yes.

25        Q.    And if you turn to the second and third

1  page, you'll see that this concerns the same Open

2  Records Request from Kate Brumback of the AP that we

3  were looking at a moment ago?

4       A.   Yes.

5       Q.   If you look at Mr. Germany's e-mail on the

6  first page, so he sends an e-mail to Open Records,

7  Steven Ellis, Paul Kokenes, Sara Koth, on April 25th

8  of 2022 at 3:06 p.m.

9            Do you see that?

10      A.   Yes.

11      Q.   And he says to Miss Koth, "... let's

12  reopen this case in investigations, and we can note

13  that it was re-opened to deal with new allegations

14  regarding the same event."

15           Do you see that?

16      A.   Yes.

17      Q.   Can you help me understand that, 'cause

18  how did the allegations of unauthorized access that

19  occurred in Coffee County in January of 2021

20  regarding the same event of what had already been

21  investigated under 250 -- aren't those --  Aren't

22  those vastly different events?

23      A.    I wouldn't call them vastly different, and

24  I know what Ryan's mind-set basically was, was we

25  have an investigation.  We have some of the same

Page 235

1    people and -- and issues around this.

2            Essentially, Misty --  We kind of tie it

3    back to -- I think in his mind -- tie it back to the

4    video, the failure to certify, all -- all these

5    things are Misty Hampton acting badly essentially

6    or -- or Misty and the Board, so that was kind of the

7    thought process, that this is all -- this is her

8    continuing to not do the right thing.

9            Could you have opened a separate

10   investigation number?  Potentially.

11           But it -- it kind of made sense internally

12   at the time that let's just make it the same people

13   on it.  They already know some of these players.

14   It just makes --  It made sense to them at the time.

15       Q.    At some point in December of 2021, 250 was

16   referred by the SEB to the -- the AG's Office, right?

17       A.    That's correct.  I believe --  I believe

18   it was December.  Yes.  I knew at the end of 2021.

19       Q.    In reference --  The Secretary's Office,

20   at least through counsel, has said that that

21   investigation was referred back to the Secretary's

22   Office after the -- the call recorded of Mr. Hall

23   came to light.

24           Is there any documentation you're aware of

25   referring to the 250 investigation back to the

1    Secretary's Office?

2         A.    No.

3              THE WITNESS:  Can someone grab me some

4         water.

5              MR. CROSS:  Okay.  Do you need water?

6              THE WITNESS:  Yeah.  I could use some.

7              MR. CROSS:  Okay.

8              THE WITNESS:  Thank you.  I'd normally

9         gotten myself, but I don't think -- I shouldn't

10        be able to get up.

11             MR. TYSON:  Yeah.

12             (Discussion ensued off the record.)

13             MR. CROSS:  Oh, okay.

14             MR. TYSON:  It's a --  David, just for

15        reference, checked while we were working through

16        here; and the case sheet is what's printed out

17        in the SharePoint system, so it's not like a

18        document that exists.  It's a printout of the

19        status in the SharePoint system, so that's what

20        you have there.

21             If you want to mark that, we can work

22        through that, too, so --

23        Q.    (By Mr. Cross)  All right.  We can go do

24   that.  Is this just 14 or 15?

25             THE VIDEOGRAPHER:  15.

Page 243

1           MR. CROSS:  So this is going to be Exhibit

2      17.

3           (Exhibit 17 was marked for

4      identification.)

5      Q.    (By Mr. Cross)  You can ignore the cover

6 sheet.  That's from my --

7      A.    All right.

8      Q.    -- prior deposition.

9           So this is Tab 20, Exhibit 17.  So this is

10 a compilation of screenshots from video, some of

11 which is on the outside, some of which is on the

12 inside.

13      A.    Okay.

14      Q.    But if you look here, if you look to the

15 first page, you'll see that this is dated from

16 December 11, 2020.  Do you see that along --

17      A.    Yes.

18      Q.    -- the top?

19           And so this is the day where Frances

20 Watson and others from the Secretary's Office came in

21 and met with Misty Hampton, Tony Rowell, and others,

22 as part of that original 250 investigation.

23      A.    Yes, sir.

24      Q.    Okay.  And the individual there who's

25 coming in, he -- he's got a badge or a seal on his

1   shirt, long-sleeve blue shirt.   Is that Josh

2   Blanchard?

3          A.     Correct.

4          Q.     Okay.  Mr. --

5          A.     And the one in front of him is Pam, and

6   the two behind are Tom Feehan and Scott -- I'm

7   totally blanking on his last name -- both from

8   Dominion.

9          Q.     So and I was going to ask.  So the woman

10  in front of him is Pamela Jones?

11         A.     Correct.

12         Q.     And then who's the one on the left behind

13  Blanchard?

14         A.     That's Scott.

15         Q.     Scott Tucker?

16         A.     Yes.  Thank you.  I couldn't remember his

17  last name to save my life.

18                And then Tom Feehan.

19         Q.     How do you spell Tom's last name?

20         A.     F-E-E-H-A-N.

21         Q.     They're both with Dominion?

22         A.     Correct.

23         Q.     And then if you come to the next page,

24  same day, 30 minutes later, that's Frances Watson at

25  the front door, right?

Page 245

1      A.    Correct.

2      Q.    Is it customary for your investigators to

3   come to an investigation like this carrying a

4   firearm?

5      A.    Absolutely.  They are --  They are sworn

6   officers.  They --  I have to buy ammunition and guns

7   for them through my COO.  They are always --  They

8   are always armed.

9      Q.    But Mr. Blanchard is not?

10      A.    I don't know.  He may --  He may have an

11   ankle on.  I couldn't tell you.

12      Q.    Okay.  All right.  Still in Exhibit 17 --

13      A.    What page number?  I can get there.

14      Q.    That's what I was going to get you to.  Go

15   to --  All right.  Go to Page 4.

16      A.    From January 18th, 2021?

17      Q.    Correct.

18      A.    Okay.

19      Q.    Do you recognize that individual?

20      A.    I think I've been told who he is, but no.

21   I don't personally recognize him.

22      Q.    Have --  Have you been told that's Doug

23   Logan?

24      A.    Okay.  That --  That comports what I was

25   told, I believe.

1   next day, on January 20, we have Josh Blanchard

2   returning to the elections office.

3          Do you see that?

4       A.   Yes.

5       Q.   Why was Josh Blanchard in the elections

6   office on January 20?

7       A.   He was there to pick up the statements

8   that I referenced earlier from Misty Hampton, the

9   signed statement saying that I have, never did, never

10  will commit voter fraud.

11         So I see he comes in at 9:50 and leaves

12  9:52.  Then comes back in.  No.  That's at 9:59.

13  That's right.

14         Now back in.  There was your time period.

15  I don't know.

16         He was there on that day to get that

17  statement.  I talked to him directly about that.

18      Q.   Okay.  All right.  Flip to Page 35, if you

19  would, still on Exhibit 17.

20      A.   (Witness complies with request of

21  counsel.)

22      Q.   So we get to Page 35.

23      A.   Yes.

24      Q.   Do you see there's a screenshot of Jeffrey

25  Lenberg coming into the elections office on January

1   26, 2021 at 7:35 a.m.?

2        A.    Yes.

3        Q.    Then on Page 36, you see him make it into

4   the nonpublic area and --

5        A.    On Page --  Is that Page 36?

6        Q.    36.

7        A.    So it's 10:35 a.m.

8        Q.    Right.

9        A.    Okay.

10       Q.    Yeah.  And then if you go to Page 37, half

11  an hour after Mr. Lenberg comes into the office, Josh

12  Blanchard shows up again.

13       A.    Uh-huh.

14       Q.    Do you see that?

15       A.    Yeah.  I'm trying to think now.  These

16  dates were so close together, 'cause I talked to Josh

17  about both of these items.

18             And I think the first one, he's supposed

19  to get it.  She didn't have it ready or something.

20  The second one's when he actually got it, so I think

21  in my mind it was the 26th when he actually picked it

22  up.

23             So I misspoke earlier, the 20 --  I think

24  his intent was to pick it up, because he was down

25  there; and they had been --

Page 250

1    When I talked to Pam and Frances, they had
2    been kind of badgering her to get that to them,
3    the -- the -- the wet-signature version of it versus
4    just anything else, which was her statement asking,
5    you know, never committed fraud ever before.
6         Q.    Okay.
7         A.    So maybe he didn't have it ready; or I
8    don't know what was going on, on the 20th; but I
9    think -- think the 26th, when he physically picked it
10   up.
11        Q.    Where --  Where does Mr. Blanchard live?
12   Where is he stationed?
13        A.    South of Atlanta, if memory serves; but he
14   does --  He goes through this area.  This is kind of
15   his go-to sort of route.
16        If you look at his logs which, you know,
17   they basically show where he drives and does stuff,
18   there was another case down here of -- I think, what
19   was it -- vote buying in Douglas that he was
20   investigating, so when he was doing that, he went
21   by and -- one of these two times for that purpose.
22        Q.    Okay.  So we have Mr. Blanchard.  He comes
23   in --
24        Is it Agent Blanchard?
25        A.    What did we call him?

Page 252

```
 1        David there.
 2               It's all right.  It's all right.  We'll
 3        keep it back.
 4               MR. CROSS:  All right.  But you have the
 5        audio?
 6               All right.  We're good.  Okay.
 7               THE COURT REPORTER:  It will be there.
 8               MR. CROSS:  You're fine.
 9               MR. KNAPP:  We've got the Rock over here.
10               MR. BROWN:  No.  That's all right.
11               THE COURT REPORTER:  Geez.
12               MR. BROWN:  We're good.
13               THE WITNESS:  Can we smell what he's
14        cooking now?
15               Did anybody get that Rock reference I
16        said?
17               THE COURT REPORTER:  Oh, no.
18               MR. CROSS:  You good?
19               THE COURT REPORTER:  Yeah.
20               MR. CROSS:  Okay.
21        Q.    (By Mr. Cross)  All right.  So let's just
22  pick up where we were.  So Page 37, Exhibit 17 --
23        A.    Yeah.
24        Q.    -- Josh Blanchard comes into the election
25  office around 11:07 a.m. on January 26th of 2021.
```

1        A.      Uh-huh.

2        Q.      And then the next page.   About a minute

3    later, he makes it into the public area, where he's

4    talking to Misty Hampton.

5                Do you see that?

6        A.      Is that 11:08?

7        Q.      Yes.

8        A.      Okay.   Yeah.

9        Q.      So we can tell from Pages 35 to 37 on

10   through 38, 39, 40 that Josh Blanchard is in the

11   elections office at the very same time Jeffrey

12   Lenberg is there.

13       A.      Yes.

14       Q.      And if you go to Page 40 -- and --   And

15   you can see that Mr. Blanchard goes into Misty's

16   office with him on Page 40.

17                Do you see that?

18       A.      Yes.

19       Q.      And do you understand there's a window

20   from her office into that -- that main area?

21       A.      I know that only from the videotape.

22       Q.      All right.

23       A.      Yes.

24       Q.      And so then while Mr. Blanchard is sitting

25   in Misty Hampton's office with a window into this

Page 254

1   area, we see Jeffrey Lenberg walk out in that main

2   area on Page 41 --

3         A.    Uh-huh.

4         Q.    -- at January 26, 2021 at 11:08 a.m.

5               Do you see that?

6         A.    Yes.

7         Q.    So even though this spans several pages,

8   if you look at the timestamps, you can see it all

9   happens within a matter of seconds at 11:08 a.m.

10        A.    Yes.

11        Q.    And then Mr. Lenberg comes back in at Page

12  43, only about a minute later at 11:09 a.m.

13        A.    Okay.

14        Q.    And then Josh Blanchard leaves the office

15  at Pages 45 and 46 at 11:12 a.m.

16              Do you see that?

17        A.    I'm trying to get there.

18              I say 'cause I see Mr. Lenberg come back

19  through the office, but doesn't go to Misty's office.

20  He goes further back somewhere else.

21        Q.    Yes.

22        A.    And then about two and a half minutes

23  later, Mr. Blanchard walks out the other door.

24        Q.    Okay.  So did Mr. Blanchard not see

25  Jeffrey Lenberg when he was there?

Page 255

1      A.      I talked to him and asked him the

2   question.

3              He goes, I don't recall seeing anybody

4   there.

5              And I want to put some perspective on

6   this.  It's not like there's a wanted poster of

7   election deniers to be looking for, for our

8   investigators.  Our --  We weren't of that mind-set.

9   He was there to get a document from Misty so --

10             And, again, one thing I can't possibly

11  know is I don't know where he was standing with that

12  window.  He could have been standing with his back to

13  the door, to the window.  There's no --  There's no

14  telling on that front so --

15             But no.  He says he doesn't recall seeing

16  anybody; and if he does, he says it's --  I could

17  have seen somebody.  It's just been months ago.  I

18  don't remember anything standing out in my mind that

19  there was anything there.  Just bizarre happenstance.

20     Q.      So he --  So okay.  So but Mr. Blanchard

21  does not recall seeing Jeffrey Lenberg in the office

22  that day?

23     A.      No.

24     Q.      Okay.  And --

25     A.      And one of the things when I discussed it

Page 259

1      A.      Same one.  Okay.

2              I put it back together.  Sorry.

3      Q.      That's okay.  This is the last one.

4      A.      All right.

5      Q.      If you flip to Page 53 --

6      A.      Yes.

7      Q.      -- you see the picture of Jeffrey Lenberg

8  walking in, holding a box in front of his face?

9      A.      Yes.

10     Q.      And you notice that -- I don't know if you

11  can tell but that's a ring light.  Have you ever seen

12  a ring light?

13             There's actually --  There's actually one

14  in the office right in front of you.

15     A.      I see that there's a symbol of what looks

16  like a ring light, but I couldn't say for certain

17  that is a ring light.

18     Q.      Okay.  Well, sorry.  I was going to ask

19  you.  Are you aware of whether any investigation

20  that's been done into what Mr. Lenberg brought with

21  him that day and what he used it for?

22     A.      Not that I'm aware of specific.  It looks

23  like he used it as an umbrella right here, 'cause it

24  was raining.

25     Q.      Or maybe to hide his face from the camera;

Page 260

1    but you know, so --

2         A.    So many times, I doubt he was doing that.

3    Just, again, it's raining --

4         Q.    You're --

5         A.    -- so --

6         Q.    -- the one that said earlier they're not

7    rational actors.

8         A.    Okay.  Point taken.

9         Q.    But you're familiar with people using the

10   ring cameras to light up videos like a Zoom video?

11        A.    Yeah.  Usually, when they're talking to

12   the camera, that's what the ring is intended for.

13        Q.    Are you aware any investigation by the

14   State or anyone else to determine whether Mr. Lenberg

15   or anyone else created any kind of video while they

16   were in the Coffee County Election Office?

17        A.    I'm not specifically aware; but, again,

18   the GBI has taken lead on this, so they would be the

19   people to have the discussion with; and since it's an

20   active investigation, I doubt they'd answer.

21        Q.    Yeah.  Okay.  Now I probably know the

22   answer, but I'll ask it.

23             Are you aware of any investigation into

24   whether there was any kind of Internet-based

25   broadcast from the county -- Coffee County Elections

Page 261

1   Office in January of 2021, a video?

2       A.    Investigation of that time period?  Now --

3       Q.    Yes.

4       A.    -- at that time period?

5       Q.    Correct.

6       A.    Okay.  I'm not aware of one; but, again,

7   this is in GBI's hands right now, so I think that

8   would be something that would probably fall into that

9   purview.

10      Q.    Are you aware that Mike Lindell flew into

11  Coffee County on -- late on the night of February

12  25th of 2021?

13      A.    No.

14            MR. TYSON:  I'll object to the form and

15        scope.

16            THE WITNESS:  No.

17      Q.    (By Mr. Cross)  That's not something you

18  heard before today?

19      A.    I just have a vague recollection of

20  somebody saying Lindell was around; and, again, I put

21  it in the pocket of crazy town stuff so --

22      Q.    Yeah.  Unfortunately, we all seem to be

23  living in the world of crazy town.

24            All right.  Let me give you Exhibit 18 I

25  think.

1      Q.    (By Mr. Cross)  So are you aware that

2  SullivanStrickler took the data that they copied from

3  the election equipment in Coffee County in January of

4  2021 and loaded that onto a ShareFile site on the

5  Internet?

6      A.    It was an FTP, I believe.  That's my

7  understanding.  Yes.

8      Q.    Yeah.  It's --  It's a third-party company

9  that's provides a cloud service called ShareFile?

10     A.    Yeah.  Yes.

11     Q.    Okay.  What can you tell me about any

12  investigation by the State into who had access to

13  that data?

14          MR. TYSON:  If you know.

15          THE WITNESS:  Who had access specifically,

16     I'm not sure how far that got.

17          I did have a specific conversation around

18     the Poll Pad data that was uploaded with Mr.

19     Persinger and just about the security around

20     that and what was in it, because there were --

21     there were some public claims that PII had been

22     released and was out in the wild, so that was --

23          That was the extent of it; and basically,

24     that it was --  It was already encrypted, and

25     then that SullivanStrickler put another

1    encryption on top of that.  So we said like a
2    brute force even trying to get through that
3    would take 20 to 40 years, just trying to do a
4    regular breakthrough.
5         Because there was one set of encryptions
6    for the actual thing itself, and then
7    SullivanStrickler put another level of
8    encryption on it themselves, so it had taken two
9    different encryption keys to get to the actual
10   data itself on there, and that the actual data
11   file's somewhat smaller on what would have been
12   the normal data file for the whole thing, if I
13   remember correctly.
14        That was the main thing that I -- I was
15   concerned about at the time.  I said do we have
16   any way of knowing about this.  Regardless of
17   what individuals attempted to download it, could
18   be it be viewed; and was there PII.
19        And in the 2020 election, there was no
20   real PII on there.  No driver's license numbers,
21   no Social Security numbers.  There were full
22   dates of birth, but, again, they were behind two
23   levels of encryption would require two different
24   encryption keys.
25        Like I said, brute force would have taken

Page 268

1          decades to get through.
2                    MR. BROWN:  Or the password.
3                    THE WITNESS:  Or the password.
4          Q.     (By Mr. Cross)  So just to break that
5     down, when Mr. Persinger said he had found in the
6     data that -- that SullivanStrickler obtained from the
7     Poll Pads included dates of birth, was there any
8     other PII?
9          A.     No.  That's not what he concluded.
10         Q.     Oh.
11         A.     We knew that.  I'm saying --
12         Q.     Oh, oh.  Oh, I see.
13         A.     -- from what we load, there was no
14    driver's license.  There was no Social Security.  The
15    only thing would be the full dates of birth, and we
16    would use that to do the -- the matching at the
17    poll -- at the polling location.
18         Q.     Has the Secretary's Office, Mr. Persinger,
19    or otherwise examined the SullivanStrickler data to
20    determine what, if any, PII was on that -- that -- in
21    their data set?
22                    MR. TYSON:  And I'm going to instruct you
23         not to answer as to work product anything that
24         the communications the attorneys and Mr.
25         Persinger.

1              THE WITNESS:  Then I'm not comfortable

2          answering that at all, because I think --

3              We knew from our end the only thing

4          available would have been what I just described,

5          that there was no other thing on a Poll Pad to

6          give.  Only the Poll Pads only received that

7          stuff as they are separate and apart from the

8          voter registration system.

9              THE COURT REPORTER:  Give me a second.

10             MR. CROSS:  Sure.

11             THE COURT REPORTER:  Okay.

12             MR. CROSS:  Okay?

13             THE COURT REPORTER:  Okay.

14             THE WITNESS:  Duncan causing problems.

15     Q.    (By Mr. Cross)  Do you know whether anyone

16 has determined if dates of births for voters were

17 included in the SullivanStrickler dataset?

18     A.    I don't know if they had independently of

19 that, but the data on the Poll Pads would have had

20 the full date of birth.  That's the statement I'm

21 making.

22     Q.    Got it.  Okay.  And just to talk about the

23 encryption, you said there's an original encryption

24 that's on the Poll Pads themselves, right?

25     A.    It's native to the Poll Pad environment.

1    Yes.

2        Q.    But you understand that Miss Hampton

3    provided the passwords for all of the equipment that

4    SullivanStrickler copied, right?

5        A.    Yes.

6        Q.    Okay.  And then you said there's a second

7    level of encryption from SullivanStrickler.  But you

8    understand that SullivanStrickler provided log-in

9    information to a variety of people?

10       A.    I have no way of knowing that.

11       Q.    You're not aware that SullivanStrickler

12   provided log-in information to Doug Logan and Jeff

13   Lenberg?

14       A.    When you say a number of people, I know

15   that they were part of that.  I'm using it --  I'm

16   using that as -- as a single unit, as opposed to --

17   In my mind, my big concern was out in the wild versus

18   people we already knew who have it kind of thing, and

19   they can break it down.

20            I --  I see what you're saying, but

21   essentially, my -- my --  I was asking the question

22   of:  Could Random Person X go get this and then get

23   into all that stuff who -- who might have even worse

24   intentions potentially?

25            That was like -- that was --  That was the

1    nature of my questioning of Mr. Persinger on that

2    front.

3          Q.    You were talking to Mr. Persinger about

4    someone who would not have either the original

5    passwords for the Poll Pads or the SullivanStrickler

6    log-in credentials?

7          A.    The -- the --  The back-to-back part of

8    that, yes.

9          Q.    Okay.

10         A.    And all the --  I also had talked to David

11   Greenwalt, who's with Poll Pad, so we could all kind

12   of meet to --  I would be talking my election

13   administrative language.  He could talk technical

14   language, election administrative, and -- and

15   technical --

16              THE COURT REPORTER:  I'm sorry.

17              THE WITNESS:  -- to technical.

18              Sorry.

19              THE COURT REPORTER:  He could talk?

20              THE WITNESS:  He could talk --  Mr.

21         Persinger could talk technical language to Mr.

22         Greenwalt.  Mr. Greenwalt could translate

23         technical language to -- election kind of

24         technical language to my election understanding

25         so that we were not talking past one another.

Page 273

1       Persinger.  Say this is what this does.  This is

2       what that does kind of thing.

3       Q.     (By Mr. Cross)  Okay.  What is Mr.

4  Greenwalt's first name?

5       A.     David.

6       Q.     David.  Can you tell me when KNOWiNK was

7  first alerted to the unauthorized access in Coffee

8  County?

9       A.     I can probably go back and look, but it

10  would have been around all the same time we finally

11  figured out, so probably July-August range in that --

12       Q.     Okay.

13       A.     -- I believe when they first would have

14  known.

15       Q.     Of this year?

16       A.     Yes.

17       Q.     Do you know when Dominion first learned

18  about the breach in Coffee County?

19       A.     Again, I'm making the assumption it'd be

20  around the similar time that we discovered it, which

21  would have been that July; and then it was coming off

22  of July 4th holiday; and then we had to confirm.  It

23  was somewhere in that range of probably mid to late

24  July.

25       Q.     Okay.

1      A.    Although I think it was relatively

2  quickly.  We said, guys, we --  There is a situation

3  that we've discovered from our own internals.  Look

4  at this.

5      Q.    Well, right, I mean, we -- we know --

6            I guess what I was trying to figure out

7  when -- when Nicole Nollette came in on April 11th,

8  was she there, in part because of the -- the

9  unauthorized access concerns that had come to light

10  with the Scott Hall call?

11      A.    She wasn't there because of that itself.

12  She added on something else to her trip.  She was

13  doing work with Fran Leathers, who had been hired

14  as -- as a Dominion rep, and they were going -- doing

15  some sales calls and stuff.

16            So she was there then.  While you're here,

17  can you see if you can get into this thing, because

18  of the claim that we saw in the -- come out of the

19  deposition that I did.

20      Q.    Do you know whether anyone in the

21  Secretary's Office or at their direction has talked

22  to Dominion about whether they were aware of the

23  breach earlier than that?

24      A.    I don't --  When we had discussions, I

25  mean, about this, as I said, starting from when it

1    was first brought to us in February, at the end of

2    February, our position was given the people involved

3    and the claims involved, this seemed like it was

4    another false flag --

5         Q.    Uh-huh.

6         A.    -- fake pile of stuff.

7              So we said, hey, this claim is there.  Run

8    it up the flagpole, so, you know, it out there kind

9    of thing; but it was sort of a --  I will tell you

10   that we didn't think there was probably anything

11   there, given that the people involved and --

12             So we said be aware of it; but, again, we

13   need to go through the investigation to show this, so

14   that's why we need to get into the server.  So that

15   was kind of --  They were in that same timeframe.

16             It was like okay.  Let's look into this,

17   'cause this is a real thing.  We've got -- have to

18   look at it now, because it's been claimed publicly in

19   a way that's, you know, even though we know the

20   players here have -- have been historically full of

21   crap.  So it was Scott Hall and -- and then, of

22   course, with Miss Marks, and then knowing --

23             I didn't understand at the time; but,

24   again, our take on it was it's probably --  We have

25   to go through this investigation to show that nothing

1    happened and --  Or and if it did, then we need to
2    really know, so that was kind of our position we were
3    in at that point.
4         Q.    Right.  And sorry.  And I was asking a
5    narrower question, which is:  Do you know whether
6    anyone has -- anyone has spoken to anyone at Dominion
7    to determine whether they have any knowledge about
8    the potential breach before the Scott Hall call was
9    disclosed to you guys?
10        A.    I lost the script on that question.  My
11   point in saying it that way was we all kind of had
12   the same indication.
13            And I believe our relationship with
14   Dominion would be like, well, we had heard some --
15   They would have said something to us had they been
16   aware, but a specific question was not asked of like
17   have you heard about this before --
18        Q.    Uh-huh.
19        A.    -- because that's not how you communicate
20   something like that with a partner on something on
21   that sort of front.
22        Q.    No.  I -- I --  I get that you -- you
23   expect that they would have told you.  But I just
24   want to make sure that you're not aware of any
25   communications anyone for the Secretary's Office with

Page 277

1    anyone with Dominion asking the question -- did you

2    have any inkling or awareness of the breach before

3    the Scott Hall call?

4         A.    The specific question phrased that way in

5    that timeframe, no.  But I'm not going to say we were

6    laughing about it to a degree, but that's sort of the

7    tone.  You're saying like, god, it's another one of

8    these damn things.  At least that's sort of --  That

9    was sort of the tone of conversation.

10             And if it had been something different, I

11   believe it -- my --

12             If we asked the question and they had said

13   no, that would be one thing; but if we discussed it

14   and they said no, that would have been, if they did

15   know, then a lie by omission, because I believe --

16             But I don't --  I don't believe that is

17   the case, and so it didn't occur.  Say, hey, did you

18   know about this beforehand so --

19        Q.    Do you know whether Dominion has ever

20   threatened any litigation against Coffee County or

21   the Board of Elections involving the breach?

22        A.    I do not know.

23        Q.    Do you know whether there's been any --

24   any invest -- we --

25             Take a step back.  You were talking about

Page 278

1    earlier about whether there could be access to the --
2    the Coffee County data, the Dominion data that was
3    loaded to the SullivanStrickler ShareFile site.  You
4    talked that through with Mr. Persinger.
5            Are you aware of any investigation into
6    whether that type of access has occurred?
7        A.    Specifically, I talked to Persinger about
8    one specific part of that.  Not about all of it.
9            I've asked the question through our -- or
10   through legal counsel; and I said, well, if the --
11   If there was a level of encryption put around the
12   Poll Pad was it put around the other --
13           THE COURT REPORTER:  I think there was
14       a --
15           THE WITNESS:  A level of encryption put
16       around the Poll Pad data, could not have been
17       the same thing done for the other stuff.
18           And then they said we don't know.  That's
19       part of the overall look that's being done.
20       GBI's on this now, so at that point, I'm kind of
21       cut off from knowing anything beyond that.
22       Q.    (By Mr. Cross)  I see.  So as you sit here
23   today, you're not aware of any investigation that's
24   been done --
25           Putting aside whatever the GBI is doing,

Page 279

1    you're not aware of any investigation that's been

2    done into whether the third parties, meaning someone

3    other than authorized by SullivanStrickler, so

4    someone other than SullivanStrickler saying here's

5    your log-in credentials --

6        A.    Uh-huh.

7        Q.    -- whether someone else gained access to

8    the Dominion software that sat on their shelf, I'll

9    say.

10           MR. TYSON:  Object to form.

11           You can answer.

12           THE WITNESS:  Not from our side.  But,

13    again, GBI's taking lead on this.

14       Q.    (By Mr. Cross)  Right.

15       A.    We're -- I don't --  Like we're kind of

16    like not supposed to be doing anything else on this

17    front, because they are the lead.

18       Q.    Okay.

19       A.    So even if we wanted to right now, there's

20    a process that's underway right now.

21       Q.    Have --  Has anyone at the Secretary's

22    Office examined the uploaded download file that

23    SullivanStrickler provided for that -- that ShareFile

24    site?

25           Have you seen that?

Page 280

1       A.    I have not.

2             And, again, you say the Secretary's

3   Office.  I believe attorneys may have.  Mr.

4   Persinger, who's obviously our person on that, may

5   have; but I -- I --  I put a bright line between the

6   people that we're -- like our attorneys and those

7   guys doing it versus the Office doing it.

8       Q.    All right.  Let me hand you --

9             MR. CROSS:  We're at 19?

10            THE VIDEOGRAPHER:  Yes, sir.

11            THE WITNESS:  I believe that's correct.

12      Yeah.

13            MR. KNAPP:  Yeah.

14            (Exhibit 19 was marked for

15      identification.)

16      Q.    (By Mr. Cross)  Exhibit 19.  This is Tab

17  25.

18      A.    And you expect me to read this.

19      Q.    It is hard to see, but not really.  No.

20  I don't.

21            So Tab -- Exhibit 19 is the report --

22  Well, let me take a step back.

23            There are two different things

24  SullivanStrickler gave us.  This is the download

25  upload report for the ShareFile site, and you can see

Page 281

1    at the top --

2         A.    And then it goes backwards basically, it

3    looks like.

4         Q.    Yes.  That's correct.  And seriously,

5    SullivanStrickler was unable to explain this.  But

6    you'll see the most recent date is February 26.

7         A.    Yes.

8         Q.    There's a lot of magic around that date,

9    the same day Misty Hampton's -- Jil Riddlehoover are

10   abruptly let go.  The same day Mike Lindell flies in.

11   I think it also may be the same day or pretty close

12   to the same day that the surveillance video ends; and

13   then, of course, this report ends.

14              Do you know whether anyone has

15   investigated what, if anything, may have happened

16   around or shortly after February 26th, for example,

17   whether somebody else got access to the office that

18   we don't yet know about?

19        A.    Not that I'm aware of yet.

20        Q.    Okay.

21        A.    And you --

22              MR. TYSON:  Go ahead.  Finish your answer.

23              THE WITNESS:  But, again, you -- you're

24        putting these dates together like they were

25        magic when sometimes they are coincidental.

Page 284

1       Q.    And I gather, apart from whatever the GBI

2    may now be doing, you're not aware of any

3    investigation into what Doug Logan uploaded to the

4    ShareFile site?

5       A.    Again, so this is out of our hands at this

6    point, so no.

7       Q.    But this wasn't something that was

8    investigated before the GBI?  That's what I'm getting

9    at.

10      A.    Well, if you look at the timeline on the

11   GBI on that front, essentially, we were getting ready

12   to --  Scott --  It's not Scott.  If I can get his

13   name straight.  Steven Ellis.  We were set up with

14   Sara and two other investigators to go down and begin

15   doing more of the stuff.

16            And then GBI basically said, if we're

17   going to do this, go ahead and stop; and once we did

18   the request, they said to stop doing everything else.

19            So in fact, it may have been part of the

20   long-term thing, that the first thing, they would do

21   was to go down there, now that we've gotten some of

22   this information, and start trying to do that.

23      Q.    And that directive from the GBI, was

24   that -- was that in August of this year or September?

25      A.    It would have been probably August, I

1  think, because our initial plan was to go down.  If

2  memory serves, they were going to go down from August

3  8th to 11th, if memory serves from the discussions I

4  had, so it was after the request.

5           And basically, I said okay.  Y'all just --

6  We've got this now.

7     Q.    Were you aware that in addition to the

8  ShareFile site where the Dominion data was

9  distributed over the Internet, SullivanStrickler also

10 sent that data out on hard drives on at least two

11 occasions?

12    A.    No.  I was not.

13    Q.    Let me hand you Exhibit 20.

14           (Exhibit 20 was marked for

15  identification.)

16    Q.    (By Mr. Cross)  And that is Tab 31.

17           So Tab 31 is one of the e-mails that Paul

18 Maggio produced to us pursuant to a order of the

19 Court; and if you'll look at the top, you'll see it

20 says Paul Maggio -- it's from Paul Maggio to

21 Federalattorney@protonmail, copying Greg Freemeyer,

22 also, SullivanStrickler on April 27th of 2021.

23           Do you see that?

24    A.    Yes, sir.

25    Q.    And if you come down to the middle of the

Page 292

```
 1   if I asked you before the break.  Are you -- before
 2   whatever --
 3             Again, sort of putting aside the GBI
 4   investigation, whatever may be going on there --
 5        A.   Yeah.
 6        Q.   -- are you aware of any investigation into
 7   who the recipients were for any hard drives
 8   SullivanStrickler sent the Dominion data on?
 9        A.   No.  We haven't done that --
10        Q.   Okay.
11        A.   -- yet.
12        Q.   All right.  All right.  Take a look at
13   Exhibit 21, if you would; and this is Tab 26.
14             So this is an e-mail from my --
15             THE WITNESS:  Hold on a second.
16             MR. CROSS:  Oh.
17             THE WITNESS:  You got it?  Duncan causing
18        problems again.
19             MR. BROWN:  Mentor.  Mentor's things.
20        Q.   (By Mr. Cross)  But this is my --  This is
21   an e-mail from my mentor, the person that made me
22   what I am --
23             MR. CROSS:  You may not want to take
24        credit for this.
25             THE WITNESS:  Is that credit or blame?
```

1  received log-in credentials from SullivanStrickler

2  for the ShareFile site that had the Dominion data on

3  there, that they would sometime share those log-in

4  credentials with other folks?

5           Have you heard that before?

6           MR. TYSON:  I'll object to form.

7           THE WITNESS:  No.

8      Q.   (By Mr. Cross)  So you've not heard --

9  You've not heard before today of a Ben Cotton --

10          Well, let me back up.  Are you familiar

11  with Ben Cotton?

12     A.   Yes.

13     Q.   You understand Ben Cotton is someone who's

14  testified that he actually did analysis of the

15  Dominion software obtained from Coffee County?

16     A.   Yes.

17     Q.   And were you aware that he testified in

18  his deposition that he was provided SullivanStrickler

19  log-in credentials by Jim Penrose, meaning he said he

20  used Jim Penrose's credentials to get access to the

21  site?

22     A.   As a specific, I wasn't aware; but it

23  comports with what I understand.  Yes.

24     Q.   Okay.  So, again, putting aside whatever

25  the GBI may be doing, are you aware of any

1    investigation into the sharing of the log-in

2    credentials from SullivanStrickler with individuals

3    SullivanStrickler had not authorized to access that

4    site?

5           A.    Again, given the timing of this, no.

6           Q.    Okay.  So one of the things that occurred

7    in the -- the breach in January of 2021 was also

8    scanning of ballots, paper ballots.  Were you aware

9    of that?

10          A.    Yes.

11          Q.    And were you aware that an external

12   scanner, generic scanner was brought in to help with

13   that?

14          A.    No.  I was not aware of that.  Or I might

15   have been aware of it, but I don't recall being aware

16   of that.

17          Q.    Are you aware of any --

18                Again, putt aside the GBI, are you aware

19   of any investigation into the involvement of Cathy

20   Latham or anyone else to bring a generic scanner into

21   the office for the purpose of scanning ballots in

22   January of 2021?

23          A.    There --  In that time window there, I

24   believe that there was some discussion around that;

25   and going back to a -- a certain part of this, I do

Page 297

1   not --  I'm not sure that these were actual ballots.

2   They were ballot types, or I don't know if they were

3   the actual ballots from those things, because that

4   would have required getting them at that point, since

5   it should have already been transmitted, I believe --

6   the timing's close -- to the Superior Court, so I

7   don't know if they were live ballots or not.

8            Similar like to the video that Misty had

9   made where she used basically dummy ballots or

10  ballots of older elections to kind of show off some

11  of those things.

12           So, again, I don't know the answer to

13  that.

14           (Exhibit 22 was marked for

15      identification.)

16           MR. CROSS:  All right.  22?

17           THE VIDEOGRAPHER:  Yes.

18       Q.   (By Mr. Cross)  All right.  Let me hand

19  you Exhibit 22.  This is Tab 43.

20           Actually, sorry.

21       A.   Uh-huh.

22       Q.   Do you recognize -- sorry -- Exhibit 22 as

23  an e-mail, a cover e-mail attached to a -- a draft --

24  well, I don't know if it's a draft -- attached to an

25  engagement agreement for forensic collection and

1    preservation in Spalding County for

2    SullivanStrickler?

3          A.     Yes, sir.

4          Q.     And the date on the agreement is August

5    17, 2021.

6                 Do you see that?

7          A.     And it comports with the date of the

8    e-mail itself.  Yes.

9          Q.     Right.  What can you tell me about any of

10   investigation into the circumstances of

11   SullivanStrickler potentially being engaged to do

12   forensic collection of voting software and data in

13   Spalding County?

14         A.     An investigation has been opened.  Once

15   this was brought to light, it was sent to the State

16   Election Board Chairman.  He brought it to our

17   attention.  I believe we gave you the -- the case

18   number for it earlier when we checked in with our

19   office.

20                I know it is ongoing.  I don't want to

21   speak to where they are in it, 'cause I don't know

22   specifically to say yes or no.

23                But so far, says it doesn't appear that

24   anything happened at this point; and again, it's my

25   understanding that the county attorney basically, for

1  lack of a word, put a kibosh on this once they were

2  kind of asked about it.  That's my understanding of

3  where it is, but they're going to verify and see who

4  saw all of this.

5       Q.    What's the name of that county attorney?

6       A.    I do not recall.

7       Q.    Okay.  When did the Secretary's Office

8  first learn about this effort?

9       A.    As I understand it, when it was sent to

10 the State Election Board Chairman; and he brought it

11 up.  I don't know if it was at --  It was before the

12 meeting, he informed us about the --  He had

13 questions about this, and so I couldn't speak to

14 exactly when it was, but it was sometime, give or

15 take a week or so, before --

16           I mean, it would have been in September

17 probably; or late August, early September would be my

18 understanding of how that occurred.

19      Q.    So how did -- how did the Secretary's

20 Office first learn that there was a -- a possible

21 compromise or breach in Spalding County?

22      A.    I don't think we did learn there's a

23 possible compromise or breach.

24           We learned that SullivanStrickler was

25 talking to the -- the elections board about this and

Page 300

1    their elections director.

2         Q.    Right.   And sorry.   I don't want to trip

3    over the language.   Let --   Let me just ask another

4    question.

5              Whatever is --   Whatever's contemplated in

6    Exhibit 22, with SullivanStrickler, however one wants

7    to describe it, how did the --   Well, how did the

8    Secretary's Office first learn about that?

9         A.    When the documentation was --   'Cause I

10   understand it was the documentation was sent to the

11   election board chairman.

12        Q.    How did the electric board chairman get

13   that documentation?

14        A.    Via e-mail, I believe.

15        Q.    From whom?

16        A.    I don't recall the individual, but it's

17   basically saying this is an issue I'm concerned with,

18   and he sent it up there.

19              We can find out.   I just --   I'm not sure

20   who it was.   It was someone in Spalding County,

21   obviously; but I couldn't tell you who exactly.

22        Q.    So someone alerted --   Is it Judge

23   Duffey --

24        A.    Yes.   Correct.

25        Q.    -- in -- in September of this year?

1      A.    Yeah.  I --  I couldn't speak when he got

2    it; but, I mean --

3      Q.    I see.

4      A.    -- it might have been late August, early

5    September; but I remember discussing it early

6    September, I believe, was the first time I heard

7    about it; but, again, the days are going to be kind

8    of tight up on each other for that.

9      Q.    Okay.  And so Judge Duffey received the

10   e-mails here and the cover and the engagement

11   agreement and then alerted the Secretary's Office and

12   the GBI, and there's now an investigation?

13     A.    I know he alerted our office.  I'll make

14   an assumption he alerted the GBI.

15     Q.    I see.

16     A.    I don't know.

17     Q.    Okay.  I was going to ask.

18           Do you know --  It's something you don't

19   know, but I'll ask.

20     A.    Uh-huh.

21     Q.    Do you know whether the GBI itself is also

22   investigating whatever circumstances were

23   contemplated in Exhibit 22?

24     A.    No, sir.

25     Q.    Okay.  You just don't know one way or the

Page 302

1    other?

2         A.    I just don't know one way or the other.

3         Q.    Okay.  It --  A couple quick questions on

4    this.

5         A.    Uh-huh.

6         Q.    If you look at the e-mail from Ben

7    Johnson, to Roy McClain --

8         A.    Is that the very first one on Page 1?

9         Q.    Yes, sir.

10        A.    Okay.

11        Q.    It states iPhones - retrievable but

12   costly - these would fall under litigation hold, but

13   as long as we don't wipe them or use them, the data

14   is there.

15             Do you understand that -- I mean, from

16   what we've been able to tell --  And you can go

17   through the e-mails.  Do you have any insight into --

18   into what litigation was pending against the County

19   for -- for the effort that was contemplated here?

20        A.    Honestly, I don't know.  I think

21   there's --

22             From from my reading of it, it looks like

23   they are comporting all state litigation.  There

24   should be litigation holds on everything, but they --

25             They look like they were referencing

Page 303

1    something specific, but I don't know what it is.

2              I mean, on some levels, some of this looks

3    like legitimate discussions between elections board;

4    and it's kind of saying, well, how do we do what we

5    need to do in a proper way.

6              Well, these guys seem like they -- they

7    know what they're doing, and I don't know where that

8    relationship started.  I would love to be able to

9    know where that relationship started, on what side,

10   if somebody found a business card, or they had

11   reached out at some point.

12             But, again, I'll tell you my own -- in my

13   brain, I say this could have been somebody trying to

14   say how can we justify it properly to do something

15   like this; and that was where being around this stuff

16   and watching people act, that's my gut reaction; but

17   I --  I can't prove that one way or the other.  There

18   has to be an investigation, which our office is

19   doing.

20        Q.    For --  For a county to copy voting --

21   Dominion software from voting equipment, would it

22   require State authorization for that?

23             MR. TYSON:  I'll object to form.

24             Answer, if you know.

25             THE WITNESS:  I believe so, but I do know

Page 304

1        this.  That if they do something like that, it
2        could then interfere with a potential
3        warrantying of the --
4        Q.    (By Mr. Cross)  Uh-huh.
5        A.    -- equipment as well, which would be a not
6   smart thing to do.
7             Whether it's a specific violation of SEB,
8   I think it is.  I'm pretty sure it is.
9             But I --  I don't want to say it
10  specifically.  Yes.  Absolutely it is.
11            But sort of in the universe of data
12  security and EMS security, nobody, third party is
13  supposed to be brought into those things, into the
14  EMS area without authorization.
15            So yeah.  Yes.  I can --  I can say that
16  pretty straightforwardly.
17       Q.    And -- and --
18       A.    Sorry to talk myself through the process
19  to get there.
20       Q.    And fair to say that the events, as -- as
21  you know them currently that -- that played out in
22  Coffee County at the elections office in January of
23  2021, the access we know that was -- that occurred
24  there and the copying, all of that would have
25  required authorization by the State?

Page 311

1    in what order, and how do we set the questioning up

2    so that we can make sure that they're telling the

3    truth or not telling the truth.  I mean, this was all

4    essentially followed so -- .

5                And then we have contact with GBI.  We

6    contacted GBI.  I mean, can you have some arguments

7    about timing and what took so long on some of these

8    things versus other stuff?  Sure.  But this looks to

9    me like it was essentially followed.

10               So you're saying we didn't follow it.  I'm

11   saying we did.

12        Q.    So when Chris Harvey learned about the

13   Cyber Ninjas card and ask for an investigation by

14   Miss Watson into whether there had been unauthorized

15   access at that time, were you or Mr. Germany alerted

16   to that?

17        A.    Not that I recall.  But, again, it was a

18   little "i" investigation, as we pointed out before.

19   Just kind of look into it and see what's there,

20   'cause you have to triage some of these things given

21   the volume of what we had.

22        Q.    We talked about Ben Cotton before.  He

23   also testified that he analyzed Dominion's software

24   from Fulton County.

25               Do you know what investigation, if any,

Page 324

1    ballots in and of themselves are more easily hackable

2    in terms of low tech ways of doing it, ballot

3    stuffing.

4           Part of the reason we got to a lot of

5    these computerized things, if you looked at the

6    history of why we went to voting machines is to avoid

7    those kind of situations.

8        Q.    But the scaleability --

9        A.    It's --

10       Q.    -- is massively different.  We agree on

11   that, right?

12       A.    It --

13       Q.    The scaleability of an attack on

14   hand-marked paper ballots --

15       A.    No.  I don't agree on that, 'cause, again,

16   if all -- all the suppositions in Dr. Halderman's

17   things essentially say a lot of if, then; if, then;

18   if, then to get to that point of huge scaleability.

19           My contention is it is much more

20   detectable, even with all those things.  There's so

21   many pieces and processes and the RLAs, and I know he

22   says we only have one mandated RLA every two years.

23           I think that's too few.  The Secretary

24   thinks that's too few.  We've tried to argue the last

25   two times in legislation we need more auditing in the

Page 325

1   law.  We're trying to look at now can we do it by

2   rule.  We're --  We're having a discussion.

3       Q.    Well, can't the SEB or the Secretary do as

4   many audits as they want?  It doesn't have to be

5   mandated by --

6       A.    The Secretary can't just tell a county to

7   go do it.  You have to have some legal authorization

8   to do it.

9             So my point is we can't -- we can't --

10  the --  The chief elections officer can't just make

11  things up for them to do.  We can't just say from now

12  on, you're doing this.  You have to go through the

13  rule making.

14            So like I said, we're having discussions

15  about how do you construct an SEB rule to do this and

16  how do you structure it best, because my point on the

17  RLAs is I think it's crazy to only do one every two

18  years, because if you're doing ballot batching and

19  all the necessary steps for that.

20            If you do every two years just to do it;

21  you need to do it every single election, whether it's

22  a special, a primary -- I don't care -- a runoff.

23  You have to go through the process so you get the

24  muscle memory back.  There's enough human beings at

25  the county level to do those things.

Page 331

1          what I said, I would think you'd have a hard
2          time finding anyone who does that who would
3          disagree with what I said.
4                And I have to use the restroom again.  I
5          apologize.
6                MR. CROSS:  Okay.  And I'm almost done, so
7          we can take a break.
8                THE WITNESS:  Okay.  Okay.
9                THE VIDEOGRAPHER:  We're going off the
10         record at 3:53.
11               (Recess from 3:53 p.m. to 4:13 p.m.)
12               THE VIDEOGRAPHER:  We're on the record at
13         4:13.
14         Q.    (By Mr. Cross)  Mr. Sterling, there were a
15    few things you were going to follow up on at the
16    break.  What can you share?
17         A.    The county attorney name in Spalding is
18    Stephanie Windham.
19         Q.    Uh-huh.
20         A.    Some further detail on Spalding.  When we
21    became aware of that in --  I think it was August
22    19th.
23               MR. TYSON:  August of 2021.
24               THE WITNESS:  August of 2021, Chris Bellew
25         got an e-mail from Kim Slaughter --

1           MR. TYSON:   Uh-huh.

2           THE WITNESS:   -- who's the elections

3     director.   The details were a little off to us

4     originally, 'cause that's -- we can't be ready

5     for certification next week.   Can we do it the

6     week after, 'cause we're bringing in an IT to

7     image all this stuff.

8           And Chris got that and sent it to Michael,

9     and Michael reached out.   No.   No.   You're not

10    doing that.   You can't do that.   It's like what

11    the hell are you talking about?

12          So --

13    Q.    (By Mr. Cross)   That's Michael --

14    A.    -- we were aware of that.

15    Q.    -- Michael Barnes?

16    A.    Michael Barnes.   So we were aware of that.

17          Now SullivanStrickler did not become a

18    thing until the SE -- sorry -- the SEB chairman knew

19    about that, and this was around the time --

20          We believe when she said certification in

21    her e-mail, she meant acceptance, essentially,

22    interchanging the two things.

23          Of the server, we were going to replace

24    because Ben Johnson, who was the chair down there,

25    had gotten on a phone call with Ryan and Michael as

Page 333

1  basically spouting a whole bunch of stuff; and they

2  both said okay.  Rather than try to --  We were going

3  to go down and recertify the one.  Rather than do

4  that, let's just change it out.  Take his talking

5  point away, and then move on to the next thing.

6           And the county attorney also, we believe,

7  Ryan talked to them; and they said yeah.  We're

8  not --  We're not going to do that.  No.  So it kind

9  of went away, so that was kind of off our radar a

10  while.

11          And SullivanStrickler was not in any of

12  that correspondence.  It was just an IT firm, so that

13  was where that came from.

14     Q.    Okay.

15          THE WITNESS:  Was there anything else we

16      were --

17          MR. TYSON:  Chain-of-custody forms.

18          THE WITNESS:  Oh, yeah.  Chain-of-custody

19      forms for transfers, for county transfers

20      started being used officially in September of

21      2022.  The first one was coming over to move

22      that stuff from that WSB interview that I did.

23      That was the first time they were required.

24          The forms existed, but they weren't

25      required before.  Now they are required, so they

1      were used also for the Coffee County transfer as
2      well of all the equipment, besides the stuff
3      that was sent back in the previous summer.
4          Q.    (By Mr. Cross)  So the Secretary's Office
5  now has chain-of-custody forms that it completes when
6  it transfers or replaces voting equipment in the
7  state?
8          A.    Yes.
9          Q.    And that started last month?
10         A.    Yes.
11              Now we had the --  Well, actually, we had
12  documentation; but it wasn't the form that we use.
13  Now we're saying, hey, use the form; and we have the
14  other documentation as well.
15         Q.    The other documentation's is the L&A
16  testing?
17         A.    Correct.
18         Q.    And then did you mention --  You said you
19  did an interview?  You said something about an
20  interview.
21         A.    Oh, for the very -- the very first use of
22  the form was I was doing a interview for Channel 2 to
23  explain this is how the system works.  Then we had to
24  move stuff from the Sloppy Floyd Building over to the
25  Capitol Building to make -- to set -- to set it up

Page 335

1    and use it for that.

2              MR. CROSS:  Okay.  Okay.  Let me just go

3        ahead and mark --

4              Hand me another copy, if you will.

5              MR. KNAPP:  Here's another copy from me.

6        Q.    (By Mr. Cross) -- Exhibit 24.

7              (Exhibit 24 was marked for

8        identification.)

9              MR. TYSON:  Okay.

10       Q.    (By Mr. Cross)  And this is an article.

11   It looks like it was just published by "Rolling

12   Stone" --

13       A.    Five hours ago.  Or when it was printed.

14       Q.    -- yeah -- concerning --

15       A.    Six hours ago.

16       Q.    -- concerning the Spalding County issue we

17   were talking about.  So the article's entitled,

18   Pro-Trump Officials Plotted to Swipe Voting Data.  We

19   Caught Them."  It's published by Justin Glawe,

20   G-L-A-W-E, in "Rolling Stone" today about five or six

21   hours ago.

22       A.    So I'm assuming this is not part of

23   production beforehand.

24       Q.    No.  No.  Mr. Knapp, as in the Internet

25   sleuth he is, found this today.

 1              So I think you answered my questions,

 2    because it sounds like you've got better information

 3    than you had before.

 4         A.     Uh-huh.

 5         Q.     But if you turn to Page 3.

 6         A.     The 3 of 9 marking?

 7         Q.     Yes.

 8         A.     Yes.

 9         Q.     So if you look at the third full paragraph

10    begins in all caps, "IN AUGUST 2021..."

11         A.     Yes.

12         Q.     It states, "IN AUGUST 2021, a pair of

13    Spalding County officials were concerned about an

14    upcoming Georgia effort to verify that their election

15    system was in good order after the board discovered

16    security issues on county equipment.   A

17    representative sent by Secretary of State

18    Raffensperger was coming to Spalding County to test

19    the voting machines..."   And it goes on from there.

20              And then if you turn to --

21         A.     And let me stop you right there.   We read

22    this into the thing.   It says, "... after the board

23    discovered security issues on county equipment..."

24              That is not my understanding.   They had

25    security concerns because the door had been unlocked.

Page 337

1    They didn't know, and that's what we were going down

2    there to look at and prove.

3         Q.    I was going to ask you what the security

4    issue were.  So that your understanding is the

5    security issues that's addressed here that Spalding

6    County had was that a door was unlocked in the county

7    elections office?

8         A.    And people could have access to it, and

9    she -- I -- I believe --

10               I don't know how he knew this or what

11   he -- where this came from.  This is Ben Johnson,

12   their chair, basically saying that the previous

13   person left -- left it, you know, with password and

14   maybe --

15               He just didn't know.  That he knew it was

16   unlocked.  He knew there were people telling him

17   that, so he didn't know, and that was his concern.

18   I'm boiling down a lot of discussion, but that's the

19   main part of it.

20        Q.    So the concern was that public bad actors,

21   whomever could have had access, to the equipment, to

22   the passwords; but they didn't know for sure one way

23   or the other?

24        A.    Again, other doors were locked, so it

25   would have been county employees, but not county

1    employees should necessarily have access.  That's my

2    understanding of how the discussion went.

3         Q.    If you turn to Page 5 of 9, there's a

4    sentence here.  There's quotes with the word "NOT" in

5    caps.  Do you see that?

6         A.    "'Do NOT..."  Okay.

7         Q.    Right.  And here it says do NOT allow an

8    IT company -- not is in all caps --

9         A.    Uh-huh.

10        Q.    -- to image or conduct any activity on

11   voting equipment, an office staffer told Slaughter on

12   August 18.  That is NOT allowed, not in all caps.

13            And if you read the preceding paragraph,

14   you'll see the office staffer there is referred to

15   the Secretary's Office.

16        A.    Yes.

17        Q.    Is it your understanding that -- that is a

18   message that came from Michael Barnes?

19        A.    From what I discussed, yes.

20        Q.    Yeah.  Okay.  Okay.

21            MR. TYSON:  Mr. Evans and Mr. Barnes.

22        Yeah.

23            THE WITNESS:  Was Mr. Evans?

24            Okay.  Both of them.  The director Blake

25        Evans and Michael Barnes.

1     a serious kind of conversation.

2          Again, it may be my own -- what's the

3     word -- prejudices based around Mr. Hall and

4     what he had done, but that was kind of how I

5     took it.

6          So my curiosity wasn't overly done.  It's

7     like, oh, he's trying to bolster his claim by

8     saying something actually happened and kind of a

9     being tangential to that.

10    Q.    (By Mr. Brown)  I've got just a few

11 documents here to go over.

12          Now before I go to some of those

13 documents, in response to what you've learned, given

14 what we know now about what happened in Coffee

15 County, has the Secretary issued any reports to the

16 counties relating to how they need to enhance their

17 security?

18    A.    Well, again, they don't --  I don't think

19 most counties need to enhance it I basically think

20 we -- for lack of a better word --

21    Q.    You're answering --  You're explaining a

22 no answer.

23    A.    Oh, sorry.  No.  I'm trying to get to it.

24 I'm trying to think of what we've done.  I know we've

25 done some -- not --  Not a report.

Page 390

1          A, no.   There's been no report.

2          Q.    Okay.  Please explain.

3          A.    Essentially, 'cause we're still

4    investigating, so we can't really do a report; but we

5    said, look.  And, again, this is from discussions

6    through the liaisons, through Blake Evans and those

7    guys.  Follow the law.  Use your logs.  Make sure

8    your stuff's secure.  Follow the rules we have in

9    place.

10          Because if Misty had followed the rules in

11   place and followed the law, we wouldn't be in the

12   situation, so there's not like a new thing other than

13   don't be sloppy, you know, 'cause sloppiness can lead

14   to some of the things.  But this wasn't sloppy.  This

15   was intentional.

16          Q.    I understand.  You're describing things

17   that might have been said to the counties.

18          A.    I believe --

19          Q.    What was told --

20          A.    Sorry.

21          Q.    -- to them?

22          A.    I believe that there was in a --  I know

23   in May of '21, so post this, I don't know if we've

24   done a buzzPost.  I think --  I have to go back and

25   check.  I believe there was some buzzPost, which is

Page 435

1                    C E R T I F I C A T E

2

3

4    STATE OF GEORGIA:

5    COUNTY OF FULTON:

6

7            I hereby certify the foregoing transcript

8        was taken down, as stated in the caption, and

9        the questions and answers thereto were reduced

10       to typewriting under my direction; that the

11       foregoing pages 1 through 434 represent a true,

12       complete, and correct transcript of the evidence

13       given upon said hearing, and I further certify

14       that I am not of kin or counsel to the parties

15       in the case; am not in the regular employ of

16       counsel for any of said parties; nor am I in

17       anywise interested in the result of said case.

18            This, the 17th day of October, 2022.

19

20

                        S. JULIE FRIEDMAN, CCR-B-1476

21

22

23

24

25