Page 1

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION
3
4
       Donna Curling, et al.,
5
                     Plaintiffs,
6                                      CIVIL ACTION FILE
             vs.
7                                      NO. 1:17-cv-02989-AT
       Brad Raffensberger, et
8      al.,
9                    Defendants.
       ~~~~~~~~~~~~~~~~~~~~~~~~~
10
11
12           VIDEO 30(b)(6) DEPOSITION OF
        COFFEE COUNTY BOARD OF ELECTIONS & REGISTRATION
13                        THROUGH
                      WENDELL STONE
14
15
                   September 1, 2022
16
                      9:07 a.m.
17
18
19           Suite 3250, One Atlantic Center
                1201 W. Peachtree Street
20                   Atlanta, Georgia
21
22
23
            S. Julie Friedman, CCR-B-1476
24
25

Page 4

1                       INDEX OF EXAMINATIONS
2       WITNESS:
        Wendell Stone
3                                                        Page
4        Cross-Examination                                 9
          By Mr. Cross
5        Cross-Examination                               210
          By Mr. Brown
6        Cross-Examination                               221
          By Mr. Miller
7        RECROSS-EXAMINATION                             266
          BY MR. CROSS
8        RECROSS-EXAMINATION                             277
          BY MR. MILLER
9
10                      INDEX TO EXHIBITS
11      Plaintiff's
          Exhibit        Description          Page
12
        Exhibit 1     8-25-22 Subpoena to Testify At A     12
13                    Deposition in a Civil Action,
                      Coffee County Board of Elections
14                    & Registration
15      Exhibit 2     1-7-21 and 1-8-21 -- Three Screen     32
                      Shots From Video of Two Men
16                    Entering Office Carrying/Pulling
                      Items
17
        Exhibit 3     Screen Shots from Camera 1 1-7-21     34
18
        Exhibit 4     E-mail Chain Ending with Tuesday,     56
19                    May 11, 2021 3:30 PM E-mail, from
                      Watson, to Jones, Subject: Fwd:
20                    Coffee County
21      Exhibit 5     5-6-21 Dominion Voting, Customer      60
                      Notification:  Maintaining Secure
22                    Chain of Custody for Your
                      Dominion Voting System,
23                    CONFIDENTIAL,
                      STATE-DEFENDANTS-00101937
24
25

Page 5

1                        INDEX TO EXHIBITS
2       Plaintiff's
          Exhibit         Description           Page
3
        Exhibit 6     A Series of Photographs Showing     78
4                     Compact Flash Cards with
                      Handwritten Tags, Flash Drives,
5                     Etc., 08122022-000236-265
6       Exhibit 7     Screen Shots from Camera 1 on       89
                      1-27-21 Through 1-29-21
7
        Exhibit 8     1-28-21 and 1-29-21 Screen Shots    91
8                     of Individuals Entering and
                      Leaving the Elections Office
9
        Exhibit 9     Two Photographs of Jeffrey          99
10                    Lenberg
11      Exhibit 10    Composite Exhibit of Coffee        100
                      County Board of Elections and
12                    Registration Board Meeting
                      Minutes Beginning with 10-6-20
13
        Exhibit 11    8/12/22 12:20 PM (GMT-05:00)       106
14                    E-mail, from Chaney, to
                      Thomas-Clark, et al., Subject:
15                    Coffee Co Board of Elections
16      Exhibit 12    Typewritten Sheet Beginning:       116
                      3.4.22 (3) All documents,
17                    including communications...;
                      E-mail Chain Ending with Tuesday,
18                    4-12-20 3:50 PM E-mail, from
                      Herzog, to Germany, Subject: FW:
19                    Response to 4/12/22 Emma Brown
                      Washington Post inquiry
20
        Exhibit 13    Photograph of Voyles and Eric      122
21                    Chaney Sitting at a Table with
                      Laptop in Elections Office
22
        Exhibit 14    Messages - Eric Chaney (With       126
23                    Hampton) Beginning 3/15/18 7:40
                      PM
24
25

1                   INDEX TO EXHIBITS
2       Plaintiff's
         Exhibit         Description          Page
3

         Exhibit 15   Messages - Andy Thomas &          146
4                     Ernestine Thomas-Clark & Eric
                      Chaney & Matthew McC & Wendell
5                     Stone, Beginning with 1-4-12 7:21
                      PM Text
6
         Exhibit 16   2-25-21 Resignation Letter, from   153
7                     Ridlehoover, to Board of
                      Elections  Chairperson
8
         Exhibit 17   2-25-21 Resignation Letter, from   153
9                     Hampton, to Board of Elections
                      Chairperson
10
         Exhibit 18   Juha, Keskinen (@MacFinn44),       156
11                    TWITTER (Feb. 26, 2021, 6:05 PM)
                      Twitter Post
12
         Exhibit 19   Text Message Between Hampton and   158
13                    Rowell (Withdrawn to
                      Attorney-Client Privilege)
14
         Exhibit 20   Message # 249 - From Vickers, to   160
15                    Hampton, Subject: FW
                      [EXTERNAL]Re: Open Records
16                    Request
17       Exhibit 21   Summary, Dyanna Hours Claimed      163
                      Period 11-16-20 - 2-19-21
18
         Exhibit 22   Screen Shots from Camera 1 1-8-21  165
19                    Man Leaving with Equipment
20       Exhibit 23   E-mail Chain Ending with           174
                      Thursday, 7-15-21 1:57 PM E-mail,
21                    from Hampton, to Vickers,
                      Subject: Re: Open Records Request
22
         Exhibit 24   4-12-22 Letter, to Marks, from     178
23                    Herzog, Consolidation of
                      Outstanding Open Records Requests
24
25

Page 7

1                          INDEX TO EXHIBITS
2        Plaintiff's
           Exhibit          Description            Page
3
           Exhibit 25   1-8-21 3:48:30 PM E-mail, from      183
4                       Maggio, to Powell, Subject: RE:
                        SSA1722: Jim Penrose - Coffee
5                       County GA Forensics Engagement
                        Agreement, 08122022-000034 - 53
6
           Exhibit 26   11-30-20 SullivanStrickler           185
7                       Engagement Agreement Forensic
                        Analysis, 08122022-000110 - 122
8
           Exhibit 27   SSA1722 HARD DRIVE CONTENTS           187
9
           Exhibit 28   Spreadsheet of E-mail Addresses      190
10                      with Access to Coffee County
                        Data, 08122022-000126-136
11
           Exhibit 29   Spreadsheet of IP Addresses That     192
12                      Have Downloaded Coffee County
                        Data, 08122022-000137-161
13
           Exhibit 30   CISA - ICS Advisory                  200
14                      (ICSA-22-154-01)
                        Vulnerabilities Affecting
15                      Dominion Voting Systems ImageCast
                        X
16
           Exhibit 31   12-17-20 Still v. Raffensperger      214
17                      Lawsuit, Verified Petition for
                        Emergency Injunctive and
18                      Declaratory Relief
19
20                         INDEX TO EXHIBITS
21       Defendant's
           Exhibit          Description            Page
22
           Exhibit 0001 Ga Comp. R. & Regs. 183-1-12-.04,    229
23                      183-1-12-.04. Storage,
                        Maintenance, and Transport of
24                      Statewide Voting System
                        Components
25

Page 8

1                    INDEX TO EXHIBITS
2       Defendant's
          Exhibit        Description         Page
3
        Exhibit 0002 1-7-21 Screen Shots of Men        249
4                    Entering Front Door of Elections
                     Office with Equipment
5
        Exhibit 0003 E-mail Chain Ending with Friday,  255
6                    May 7, 2021 1:51:10 PM E-mail,
                     from Germany, to Feehan, et al.,
7                    Subject: RE: [EXTERNAL] RE:
                     Dominion notice to Customers re:
8                    Chain of Custody, Ending Dominion
                     089394
9
10
          (Original Plaintiff's Exhibits 1 through 31 and
11      Defendant's Exhibits 1 through 3 have been attached
        to the original transcript.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1           THE VIDEOGRAPHER:  Today's date is
2      September 1st, 2022, and we are on the record at
3      9:07 a.m.  This will be the videotape 30(b)(6)
4      deposition of Coffee County Board of Elections
5      given by Wendell Stone.
6           Would counsel present please identify
7      themselves for the record.
8           MR. CROSS:  David Cross of Morrison &
9      Foerster on behalf of the Curling Plaintiffs;
10     and with me is my colleague, Adams Sparks.
11          MR. DELK:  Steven Delk on behalf of the
12     witness.
13          MR. MILLER:  Carey Miller here on behalf
14     of the State Defendants.
15          I will be having, joining me later Diane
16     LaRoss also on behalf of the State Defendants.
17          THE VIDEOGRAPHER:  Thank you.
18          Would the court reporter please swear in
19     witness.
20          WENDELL STONE, having been first duly
21     sworn, was examined and testified as follows:
22     CROSS-EXAMINATION
23     BY MR. CROSS:
24     Q.   Good morning, Mr. Stone.
25     A.   Good morning.

1        Q.     Can you just state your full name for the
2    record.
3        A.     My name is Wendell Stone.
4        Q.     So no middle name?
5        A.     No middle name.
6        Q.     Okay.  And where do you currently live.
7        A.     I live in Coffee County in the Ambrose
8    community of Coffee County, Douglas as the county
9    seat.
10        Q.     Okay.  What's your current address?
11        A.     125 Marv Day Road, Ambrose, Georgia
12    31512.
13        Q.     Okay.
14             MR. DELK:  And, David, if I can just
15        stipulate here at the beginning, I'll try to
16        stay out of your hair.  Mr. Stone is testifying
17        solely today in a representative capacity on
18        behalf of the Board, and no answer he provides
19        will be representative of any of his individual
20        thoughts or opinions or testimony in this case.
21             MR. CROSS:  Okay.  Understood.  There
22        maybe be some questions that get to him
23        personally, but if they do we can --
24             Mr. Delk:  Sure.
25             MR. CROSS:  -- take them as they come.

Page 11

1       Q.    (By Mr. Cross)  Okay.  So, Mr. Stone, you
2    understand you're -- you've taken the same oath you
3    would take if you were testifying in a courtroom?
4       A.    I do.
5       Q.    Okay.  Have you been deposed before?
6       A.    No.
7       Q.    Just briefly then --  I'm sure Mr. Delk
8    has gone over it with you.
9            The court reporter next to you is going to
10   take down everything we say.  There's a video.  It's
11   just important that we not speak over each other, so
12   she can get a complete record.
13           If you have any questions about anything I
14   ask you, please just let me know.  I'm happy to
15   clarify.
16           If you want to take a break at any point,
17   absolutely fine.  The only thing is if there's a
18   question pending, you have to answer that question
19   before we break.
20      A.    Thank you.
21      Q.    Mr. Delk may object from time to time.
22   You still have to answer the question unless he
23   instructs you not to.
24      A.    I understand.
25      Q.    Okay.  So you understand you're here

1   testifying as a representative on behalf of the

2   Coffee County Board of Elections; is that right?

3       A.    I do.

4       Q.    Okay.  And what did you do to prepare for

5   today's deposition?

6       A.    To prepare for today's deposition, I read

7   the subpoenas.  I met with counsel.

8       Q.    And how long did you meet with counsel?

9       A.    You mean for a total, how long did I meet

10  with counsel?

11      Q.    Yeah.  About how long did you meet with

12  counsel to prepare for today?

13      A.    I probably met with counsel for four

14  hours.

15      Q.    Okay.  And did you speak with anyone other

16  than counsel to prepare for today?

17      A.    No.

18      Q.    Okay.  Did you look at any documents?

19      A.    Other than the subpoenas, no.

20      Q.    Okay.  All right.  Let me hand you what

21  we're going to mark as Exhibit 1.

22          (Exhibit 1 was marked for identification.)

23      Q.    (By Mr. Cross)  This is a copy of one of

24  the deposition subpoenas.  You can flip through it,

25  and just tell me if you've seen this before.

```
1              MR. DELK:  -- have no trouble with the
2         Board.
3              MR. CROSS:  I know.  I'm kidding with you.
4              THE WITNESS:  And -- and, again --
5              MR. DELK:  Well, no.  No.
6              MR. CROSS:  Yeah.  We're good.
7              THE WITNESS:  Don't say --
8              MR. DELK:  Wait till --
9              THE WITNESS:  -- anything.
10             MR. DELK:  -- the question's on the table.
11             MR. CROSS:  Yeah.  Yeah.
12        Q.   (By Mr. Cross)  All right.  So just so
13   we're clear, your testimony on behalf of the Coffee
14   County Elections Board is that the Board itself was
15   not aware of the events that you saw in the video
16   that you reviewed for January 7 of 2021.  The Board
17   was not aware of those events before press reports
18   came out in recent weeks; is that fair?
19        A.   That's correct.
20        Q.   Okay.  But there's one exception at least
21   to that, right, which is Eric Chaney?
22             MR. DELK:  Object to the form.
23             THE WITNESS:  Excuse me?
24             MR. DELK:  I'm just stating an objection.
25             Listen to his question.  Unless I tell you
```

Page 48

```
 1    that we expected to carry out the policies in
 2    accordance with the law and the requirements of the
 3    Secretary of State.
 4         Q.    Did the Board approve any of these
 5    individuals coming in to do what that they did on
 6    January 7 of 20 --
 7         A.    The Board --
 8              MR. DELK:  Make sure you let him finish
 9         his question.  I know you know where you're
10         going with it, but --
11              THE WITNESS:  Yeah.
12              MR. DELK:  -- just try to let him finish,
13         so it makes everything --
14              THE WITNESS:  You know me, Steve.
15              MR. CROSS:  It's okay.
16              MR. DELK:  Okay.  You're doing fine.
17         Q.    (By Mr. Cross)  You were doing fine.
18              Let me try the question again just so we
19         get it out.
20              Did the Board approve any of the
21    individuals coming in on January 7, 2021, to be in
22    the office and do any of the work they did there?
23         A.    The Board did not approve that.
24         Q.    Okay.  Do you know whether Eric Chaney
25    approved that on behalf of the Board or as a member
```

Page 49

1    of the Board?

2              MR. DELK:  Object to the form.

3              THE WITNESS:  I do not know if Eric Chaney

4         approved of that.

5              I will say any decision made requires a

6         quorum of the Board.

7         Q.   (By Mr. Cross)  So Mr. Chaney would not

8    have the authority on his own to approve that work?

9         A.   No.

10        Q.   Okay.  And as you sit here, the -- the

11   Board does not have any insight or understanding as

12   to why Mr. Chaney was here for that work that

13   occurred.

14        A.   The Board --  The Board does not.

15        Q.   Is that something the Board is looking

16   into now?

17             MR. DELK:  Object to form.

18        Q.   (By Mr. Cross)  Or are you relying on the

19   State for that?

20        A.   When the Secretary of State notifies us of

21   its findings.  As I said, as a Board, we have not had

22   any official notice from anyone that our security

23   was -- was breached; and when the Secretary of State

24   notifies us, I'm sure we will properly investigate

25   the situation.

1          Q.    Do you know if any members of the Board

2     have had any communications with Ed Voyles about his

3     participation in the events?

4          A.    I -- I don't --  I don't know.

5          Q.    So we'll look through a few pictures in a

6     moment.

7                But do I understand correctly?  There has

8     been no communication from anyone at the state level

9     with the Board of Elections about what occurred in

10    the Elections Office on January 7, 2021?

11         A.    There has been no communication with the

12    Secretary of State's Office.

13         Q.    So to your --  To the knowledge of the

14    Board, no one on a behalf of the State has, for

15    example, contacted any of the individuals who were,

16    you know, present for those events?

17                MR. DELK:  I'll object to the extent --  I

18          don't know if he's aware of any communication

19          between respective counsel.

20                But subject to that, you can respond.

21                THE WITNESS:  I'm not aware.

22         Q.    (By Mr. Cross)  And fair to say no one for

23    the State has contacted any of the board members

24    about the events of January 7th?

25         A.    That's correct.

1          The subject, "Coffee County."  And

2     attachment, you see it says, "cyber ninja.pdf"?

3          A.   I do.

4          Q.   And if you flip to the next page, do you

5     see there's a -- a picture of what looks to be a

6     business card.  It says "Doug Logan, Cyber Ninjas" in

7     the bottom left?

8          A.   I do.

9          Q.   And do you understand this is a business

10    card that Mr. Barnes reported to Mr. Harvey that he

11    found in the -- in the Elections Office attached at

12    the base of Misty Hayes' computer monitor?

13         A.   Yes.

14         Q.   Okay.  And do I understand correctly that,

15    to the best of your knowledge on behalf of the Board,

16    no one on the Board was aware that Mr. Barnes had

17    made this report to the Secretary's Office until just

18    recently?

19         A.   I don't recall the Board being notified of

20    that.

21              MR. CROSS:  And okay.  47.

22         Q.   (By Mr. Cross)  You can set that aside;

23    but just keep it close, 'cause we may look at it

24    again.

25         A.   Okay.

1          A.    I do.

2          Q.    Are you aware of any contact anyone on

3    behalf of the State had with anyone in Coffee County

4    to investigate this report for Mr. Barnes?

5          A.    And I'm not aware --   The Board is not

6    aware any investigation.

7          Q.    Do you have any insight into why the State

8    did not follow up on an investigation that was called

9    for by the state election director and the head of

10   the investigative unit into what Mr. Harvey refers to

11   as possible access to the voting equipment in Coffee

12   County?

13              MR. DELK:  Object --

14              THE WITNESS:  I don't.

15              MR. MILLER:  Object to form.

16              MR. DELK:  -- to the form.

17              THE WITNESS:  I don't.

18         Q.    (By Mr. Cross)  Is it a concern that when

19   your -- your election supervisor alerted the

20   Secretary's Office in May of 2021 to possible access

21   to the Coffee County equipment, that there is no

22   indication that any further -- any investigation was

23   done with respect to contact with the County

24   officials?

25              Is that a concern to the Board?

Page 69

```
 1              MR. CROSS:  Yeah.
 2              THE WITNESS:  Uh-huh.
 3              MR. DELK:  You're doing okay.  Just make
 4         sure he's done.
 5         Q.    (By Mr. Cross)  Are you aware of
 6    communications between anyone in the Secretary's
 7    Office and the Coffee County Board regarding efforts
 8    to determine whether the EMS server or the ICC had
 9    been improperly accessed?
10         A.    I'm not aware.
11         Q.    Are you aware of whether the Secretary's
12    Office has found any evidence that the EMS server was
13    at some point improperly accessed?
14         A.    I am aware of that.
15         Q.    And how are you aware of that?
16         A.    That information was shared by counsel.
17              MR. DELK:  Well, I'm going to instruct
18         you.  Don't get into anything we've talked
19         about.  If he's referencing documents, you can
20         discuss that; but anything else, do --
21              THE WITNESS:  Okay.
22              MR. DELK:  -- not discuss.
23              THE WITNESS:  Well, I'm --  He asked me if
24         I was aware of it.
25         Q.    (By Mr. Cross)  That's fine.  That's fine.
```

1      A.    Yes.

2      Q.    Okay.  Does the Board have any

3   understanding about how the password or why the

4   password stopped working for that server?

5      A.    No.

6      Q.    Was there any concern at the Board about

7   the fact that that password no longer worked?

8      A.    No.

9      Q.    Do you recall in late 2020 a video went

10  online with Misty Hampton and others in the Elections

11  Office in Coffee County using the -- the voting

12  equipment?

13     A.    I do.

14     Q.    And that video was actually filmed during

15  an official Board meeting, right?

16     A.    To my knowledge, yes.

17     Q.    Were you there for that meeting?

18     A.    Yes.

19     Q.    Okay.  What was the purpose of that video?

20     A.    Now you're going to have to tell me which

21  video you're referring to.  Are you talking about --

22          MR. DELK:  Let him ask the question, and

23      you answer if you're able.

24          THE WITNESS:  Well, he needs to --

25          MR. DELK:  He's talking about the video

Page 72

1          that was posted online.

2                  THE WITNESS:  The video that --  The

3          YouTube video?

4                  MR. DELK:  Yes.

5                  THE WITNESS:  Okay.  What was the purpose

6          of that video?

7                  You will have to ask Misty Hampton the

8          purpose of that video.

9                  I'm getting a cramp in my leg.

10                 That as a Board member and as the Board

11         participated in it, we were led to believe that

12         the system was not secure, and my -- my belief

13         is that that was the reason; but as I said,

14         you'll have to ask Misty Hampton why that video

15         was posted online.

16                 We were led to believe in that video that

17         things could be done to alter the outcome of an

18         election.  However, in retrospect, the things

19         that we were shown had to be the -- the --

20         the --  In the adjudication process, a person

21         who has knowledge and training in the system is

22         the person who could change the outcome of or

23         the -- the voter's intent in some kind of way.

24                 Now I couldn't do it.  I don't have that

25         training.  You couldn't do it.  I mean, nobody

Page 73

1          in here could do it, unless they've had that

2          training, and the person with the training at

3          that time in our -- in our County was Misty

4          Hampton.

5                 That --  I just want to say this.  That

6          video was not posted with the approval of the

7          Board of Elections.  There was nobody that said

8          are you in favor of this.  That video appeared;

9          and so, again, I'm going to say you will have to

10         ask Misty Hampton why that video.

11         Q.    (By Mr. Cross)  Are you aware that

12    somebody made an Open Records Request for that video?

13            Was the Board aware of that is what I

14    mean.

15         A.    An Open Records Request for that video?

16         Q.    Before it went public?

17         A.    I'm not aware of that.

18         Q.    Are you --  Are you aware of any knowledge

19    the Board has about Ed Voyles encouraging or

20    facilitating an Open Records Request for that video?

21         A.    I'm not aware of that.

22         Q.    Are you aware the video posted online was

23    put up by a local journalist?

24         A.    I'm not aware of that.

25         Q.    Was it the Board's understanding that

1          Fair to say it would be a serious concern

2     to the Board of Elections if someone had left

3     something behind in the system like malware that

4     could alter votes or election outcomes?

5          A.    I --

6               MR. DELK:  Object to the form.

7               THE WITNESS:  I would say that it's --  It

8          would be a concern to the Board.  Yes.

9          Q.    (By Mr. Cross)  And --  And given the

10    extent of the intrusion that we've seen into the

11    system, does the Board expect the State to undertake

12    some measures to figure out whether that happened?

13         A.    Yes.

14         Q.    Do you think as the Board, it is

15    appropriate to require voters in your County to vote

16    on equipment that no one has looked to see whether it

17    has been compromised, whether it still works?

18               MR. DELK:  Object to the form.

19               THE WITNESS:  The equipment in question

20          has been removed; and, again, I'm going to say

21          that the election equipment --

22               MR. CROSS:  33.

23               THE WITNESS:  -- the election results are

24          secure based on -- based on the knowledge and

25          use of the computer operator --

1    now?

2         A.    I have not.

3         Q.    So do you understand that much of the

4    equipment and devices used in Coffee County with

5    elections, in fact, was not ever replaced and still

6    has not been replaced with respect to what was

7    accessed by the Sullivan|Strickler firm and others?

8              MR. DELK:  Object to the form.

9              THE WITNESS:  I'm --  I'm not aware

10        because of my role as a Board member of what was

11        actually replaced and what was left in the

12        office.

13        Q.    (By Mr. Cross)  Okay.

14        A.    My --  And if I say my assumption,

15   Stephen's going to yell at me.

16             I'm not going to say.  I mean, I'm not

17   aware of the equipment that was replaced or was left.

18        Q.    But your understanding on behalf of the

19   Board is that the only equipment that was replaced

20   was the EMS server and the ICC?

21        A.    That was my understanding.

22        Q.    Okay.  And so is it a concern to the Board

23   that compact flash drives, thumb drives, a variety of

24   other equipment that also shows up in the documents

25   produced by Paul Maggio that were copied and accessed

Page 82

1    by the -- by this team, that that equipment has

2    continued to be used for elections for a year and a

3    half?

4                    MR. DELK:  Object to the form.

5                    THE WITNESS:  It would be a concern to the

6          Board.

7          Q.    (By Mr. Cross)  It would be?

8          A.    It would be.

9          Q.    Okay.  And do you think on behalf of the

10   Coffee County Elections Board that it is appropriate

11   to require -- to require your voters in Coffee County

12   to vote using equipment and devices that was breached

13   by third parties a year and a half ago?

14                   MR. DELK:  Object to the form.

15                   THE WITNESS:  The -- Well, I mean, we

16         would look to the Secretary of State to ensure

17         that our voting equipment is up to date and is

18         free of any malware or any problems that may

19         alter the outcome of an election.

20         Q.    (By Mr. Cross)  Right.  But you've

21   testified previously that you haven't received any

22   assurances or communications at all from the

23   Secretary of State's Office about this intrusion,

24   right?

25         A.    Not that I recall.  No.

Page 86

```
 1              10:34 a.m.  We are off video record. &&&
 2                   (Recess from 10:34 a.m. to 10:50 a.m.)
 3                   THE VIDEOGRAPHER:  The time is 10:50 a.m.
 4         We are back on video record.
 5              Q.    (By Mr. Cross)  Mr. Stone, to go back to
 6         the video that -- that ended up on YouTube we talked
 7         about earlier, you were there when that video was
 8         filmed, right?
 9              A.    That's correct.
10              Q.    Did the Board learn at some point that in
11         that video, once it ended up on YouTube, there was a
12         Post-it note with a password on it that was readable?
13              A.    Yes.
14              Q.    And what's the Board's understanding about
15         what that password is used for or was used for?
16              A.    The Board did not know what the password
17         was for --
18              Q.    All right.
19              A.    -- which piece of equipment it opened.
20              Q.    All right.  Was that something the Board
21         was concerned about when that information came to
22         light, that some sort of password useable for
23         equipment in Coffee County was on the Internet?
24                   MR. DELK:  Object to the form.
25                   THE WITNESS:  I don't know what the Board
```

1          would have thought about that.

2          Q.    (By Mr. Cross)  Oh.  Let me ask a

3     different question then.

4          A.    Well, I mean --

5          Q.    Go ahead.

6          A.    -- I just want to say passwords are often

7     changed; and so I mean, that's the nature of

8     technology; and so --

9          Q.    Was there ever any discussion at the Board

10    level about the issue of this password being on the

11    Internet?

12         A.    Not that I recall.  No.

13         Q.    Oh.  Are you aware of any outreach by the

14    State to anyone in Coffee County regarding this

15    password being on the Internet?

16         A.    I'm not aware of that.

17         Q.    Are you aware of any efforts made to

18    change the password for whatever equipment that

19    password was used for?

20         A.    Beyond what James Barnes would have done,

21    no.

22         Q.    Okay.  And you're not aware of Mr. Barnes

23    actually changing any passwords on any equipment,

24    right?

25         A.    I'm not aware of that.

1    beard, the guy in the khaki pants, returning to the

2    office, right?

3         A.    Yes.

4         Q.    The next page, January 19, 2021 at 6:19

5    p.m., we see the same guy in the khaki pants in the

6    doorway, right?

7         A.    Yes.

8         Q.    The next page, the same date, same time,

9    but a few seconds later, who do you recognize in this

10   photo?

11        A.    Misty standing in the door, and that

12   appears to be her daughter.

13        Q.    In the white sweatshirt and jeans?

14        A.    In the white sweatshirt.

15        Q.    Okay.  And it's those same two individuals

16   we've just been looking at, right?

17        A.    Yes.

18        Q.    Okay.  So it looks like at January 19,

19   2021 at 6:00 p.m. Miss Hampton escorts those two

20   individuals, the gray-haired guy and the guy in the

21   khaki pants, out of the Elections Office, right?

22        A.    Yes.

23        Q.    All right.  Does the Board have any

24   insight as to what these individuals were doing in

25   the Elections Office on January 18 and January 19 of

1      2021?
2           A.     The Board has no idea why those people
3      were in the Elections Office.
4           Q.     Had you learned before this moment that
5      these individuals were in the Elections Office then?
6           A.     Before this moment?
7           Q.     Yes.
8           A.     Yes.
9           Q.     All right.  And when did you first learn
10     that?
11               MR. DELK:   And I will instruct him not to
12          get into the details of what you discussed with
13          counsel; but generally, you can respond.
14               MR. CROSS:   I'm just looking for a
15          timeframe --
16               MR. DELK:   Sure.
17               MR. CROSS:   -- not substance of
18          communication.
19               THE WITNESS:   Recently.
20          Q.     (By Mr. Cross)  Last few days?
21          A.     Yes.
22          Q.     Did -- have you seen --
23               Just yes or no.  Have you seen the video
24     that correlates to these screen shots for January 18
25     and January 19 before today?

Page 97

```
 1          A.    January 18 and January 19, not to my

 2     knowledge.  No.

 3          Q.    Okay.  And then same with Exhibit 7.  Were

 4     you aware before --

 5          A.    What --

 6          Q.    Sorry.  You can go back.  It's the one on

 7     the right.

 8          A.    This (indicating)?

 9          Q.    Yes, sir.

10                Were you aware before today that the --

11     that the gentleman who visited the office on January

12     27 of 2021, as well as January 28 and January 29 --

13     were you aware before today that that individual was

14     in the Elections Office?

15          A.    No.

16          Q.    Do you recall at any point -- just yes or

17     no -- reviewing the video that corresponds to those

18     screen shots?

19          A.    What's the day?  What are the dates on

20     this?

21          Q.    January 27 to 29.

22          A.    No.

23          Q.    All right.  So fair to say that the Board,

24     to your knowledge, does not have any insight into why

25     this individual was there or what he was doing?
```

```
 1      recall.
 2               MR. MILLER:  Dave, are we marking Mr.
 3          Lenberg's picture as an exhibit?
 4               MR. CROSS:  I wasn't going to, but I can.
 5               MR. MILLER:  I think for clarity of the
 6          record, it might be helpful, but do you really.
 7          Q.   (By Mr. Cross)  Okay.
 8          A.   It appears to be the same person.
 9               MR. CROSS:  Okay.  Do we have a copy we
10          can upload for that?
11               MR. SPARKS:  Oh, yeah.
12               MR. CROSS:  Okay.  All right.  So we'll
13          mark this picture as Exhibit 9.  Is that right?
14               MR. DELK:  Yeah.
15               MR. SPARKS:  It will be nine.
16               MR. CROSS:  Yeah.  Hand it to you guys.
17          We'll -- We'll make sure that gets into Exhibit
18          Share.
19               (Exhibit 9 was marked for identification.)
20          Q.   (By Mr. Cross)  And to your knowledge, the
21     Board does not have any information on why Jeffrey
22     Lenberg would be in the Elections Office at any
23     point?
24          A.   That's correct.
25          Q.   Do you any familiarity with Jeffrey
```

Page 100

1      Lenberg?
2             A.     I don't.
3             Q.     Never heard of him?
4             A.     Never heard of him.
5                    MR. CROSS:  All right.
6                    MR. SPARKS:  What are on, 9 or 10?
7                    MR. CROSS:  10.
8                    (Exhibit 10 was marked for
9             identification.)
10            Q.     (By Mr. Cross)  All right.  Let me hand
11     you what's been marked as Exhibit 10.  This is a
12     collection of monthly Board meeting minutes that we
13     received from the County.
14                    And actually, before you look at that, do
15     I understand correctly that the elections supervisor
16     and the assistant to the elections supervisor, those
17     individuals report to the County Board of Elections?
18            A.     That's correct.
19            Q.     Okay.  So they work --  They work for the
20     Board?
21            A.     The elections supervise --
22                    You mean they're under their direction.
23     Yes.
24            Q.     Okay.
25            A.     Yeah.

Page 101

1          Q.    Okay.  And in preparing for your testimony

2     today, did you speak with the current elections

3     supervisor or assistant?

4          A.    No.

5          Q.    Okay.  Did you speak with any former

6     employees?

7          A.    No.

8          Q.    Oh.  All right.  So do you recognize

9     Exhibit 10 as some of the Board meeting minutes?

10         A.    I do.

11         Q.    Okay.  Flip to January 12th of 2021, the

12    meeting minutes, if you would, please.

13         A.    Okay.

14         Q.    So these minutes reflect the discussion

15    the Board had on a meeting -- in a meeting at 9:30

16    a.m. on January 12th of 2021.  Is that fair?

17         A.    It is.

18         Q.    There's no indication of these -- in these

19    Board meeting minutes of any of the individuals that

20    we had seen in the video that came into the office on

21    January 7 and January 8; is that right?

22         A.    That's correct.

23         Q.    Was there any discussion in this Board

24    meeting about those individuals coming into the

25    office and what they did?

Page 106

1          Q.    (By Mr. Cross)  How did the Board first

2     learn about Mr. Chaney's resignation?

3          A.    He --  He announced it.

4          Q.    How?

5          A.    In a meeting --

6                MR. CROSS:  That will be eight.

7                THE WITNESS:  In executive session.

8                Am I allowed to say executive session?

9          Q.    (By Mr. Cross)  When was that?

10               MR. DELK:  I'll assert an objection about

11     anything that was an executive session, if I can

12     just have a standing objection on that.

13               THE WITNESS:  He announced it.

14         Q.    (By Mr. Cross)  Okay.  Let me hand you

15     what's been marked as Exhibit 11.

16               (Exhibit 11 was marked for

17          identification.)

18         Q.    (By Mr. Cross)  Do you recognize this as

19     an e-mail that Eric Chaney sent to you and others on

20     the Board on August 12th of 2022?

21         A.    I think this was more recently.

22         Q.    This is the day that he resigned, right?

23         A.    Yes.

24         Q.    And in fact, he indicates, "Please accept

25     this letter as my formal resignation..." in the last

```
 1              You see that?
 2      A.    I do.
 3      Q.    And then the next one is a screenshot.
 4   She says that the EMS server computer.
 5              Do you see that?
 6      A.    I do.
 7      Q.    Has there ever been any discussion at the
 8   Board level about the fact that the computers used
 9   with the ICC and the EMS server include software that
10   is not necessary for or used with running elections
11   in the County?
12      A.    No.
13      Q.    So to your knowledge, that's not something
14   that Miss Hampton or Mr. Chaney raised with the --
15   with the full Board?
16      A.    No.
17      Q.    Okay.  Are you aware of any measures by
18   the State or the County to deal with the issue of the
19   poll pads connecting to the Internet?
20      A.    No.
21      Q.    Are you aware of any measures by the State
22   or the County to deal with any risk associated with
23   unnecessary software on the ICC and EMS computers?
24      A.    Not aware.
25      Q.    Fair to say that's something that the
```

Page 134

1        County would rely on the State to deal with?

2               A.     Yes.

3               Q.     Okay.  All right.  Flip to --  All right.

4        Flip to --

5                      MR. CROSS:  You all right, Julie?  You

6               need a break?

7                      THE COURT REPORTER:  I'm good.

8                      MR. CROSS:  Okay.  Do they have the --

9               Q.     (By Mr. Cross)  So just to answer your

10       question, Mr. Stone, Eric Chaney testified in his

11       deposition in response.

12                     Regarding these same screen shots, I asked

13              him.

14                     And there are three screen shots of poll

15              pads, three photos of poll pads that Miss

16              Hampton sent to you.  Do you see that?

17                     Yes.

18                     And on the first one, she shows that the

19              poll pad is accessing Netflix, right?

20                     Yes.

21                     And on the second one, she shows that the

22              poll pad is accessing -- what is she --  What is

23              that?  Do you know what that is, some sort of

24              game?

25                     He says I'm not sure.

Page 135

```
1              One of the things that Miss Hampton had
2         raised as a concern with you and others was the
3         that the poll pads used in Georgia are connected
4         to the Internet, right?
5              That's correct.
6              So Mr. Chaney testified that this was
7    raised with him and others.  But is it your testimony
8    that that concern was never raised with anyone else
9    on the Board?
10        A.   It is.
11        Q.   Okay.  All right.  Come back to Page 22.
12   So we're on January 6 of 2021, 4:26 p.m. in the
13   middle of the page.  It's right down here
14   (indicating), if you see that.
15              And you see Misty Hampton texts Eric
16   Chaney.  Scott Hall is on the phone with Cathy about
17   wanting to come scan our ballots from the general
18   election like we talked about the other day.  I'm
19   going to call you in a few.
20              Do you see that?
21        A.   I do.
22        Q.   Was the Board aware that Scott Hall or
23   anyone else was coming in, in January of 2021 to scan
24   ballots?
25        A.   The Board was not.
```

Page 136

1          Q.     So that's not something the Board
2      authorized?
3          A.     It is not something the Board authorized.
4          Q.     Okay.   And was the Board aware at or
5      around this time that Eric Chaney, Cathy Latham, and
6      Misty Hampton were working together to allow Scott
7      Hall and others access to the Elections Office in
8      early January of 2021?
9              MR. DELK:  Object to the form.
10             THE WITNESS:   The Board was not aware of
11     that.
12         Q.     (By Mr. Cross)  Okay.  Except for Mr.
13     Chaney himself?
14         A.     Except for Mr. Chaney.
15             MR. DELK:  Object to the form.
16         Q.     (By Mr. Cross)  All right.  Look at the
17     top of the next page, January 7, 2021.
18             So this is 7:24 p.m. January 7, so this is
19     the end of the day where we've seen from the video
20     that various individuals came into the Elections
21     Office and copied equipment.
22             Are you with me?
23         A.     Yes.
24         Q.     Okay.  And Mr. Chaney sends to Misty
25     Hampton a phone number.

Page 146

1    before that that was her way of letting Mr. Chaney

2    know that she had sent the cast ballots off to the

3    individuals who wanted them?

4         A.    I had not.  Not before this minute right

5    here.

6              MR. CROSS:  40.  Thank you.

7              (Exhibit 15 was marked for

8         identification.)

9         Q.    (By Mr. Cross)  All right.  Let me hand

10   you what's been marked as Exhibit 15.

11        A.    Uh-huh.

12        Q.    And this is Tab 40.

13              And I can tell you these are more text

14   messages that were produced by Miss Hampton in

15   response to the subpoena; and if you look at the top,

16   it indicates the individuals who are on the thread.

17   It says Messages - Andy Thomas, Earnestine

18   Thomas-Clark, Eric Chaney, Matthew McC, and Wendell

19   Stone.

20        A.    Uh-huh.

21        Q.    Do you see that?

22        A.    I do.

23        Q.    And those were all individuals on the

24   Board for Coffee County Elections as of January 2021,

25   right?

Page 147

1          A.     That's correct.

2          Q.     Yeah.  If you --  If you turn to the

3     second page, at the bottom, there's a date of

4     February 24, 2021 at 9:19 p.m.

5                 Do you see that?

6          A.     I do.

7          Q.     And here, Misty Hampton texted you and

8     others on the Board.  "I have been asked to go speak

9     at the rotary club tomorrow at noon.  I was asked to

10    talk about the election process."

11                Do you see that?

12         A.     I do.

13         Q.     So this is --  Do you recall that Miss

14    Hampton was let go on February 25th of 2021?

15         A.     That's correct.

16         Q.     Okay.  And then Matthew McC, that's

17    Matthew McCollough, right?

18         A.     That's correct.

19         Q.     He responds Tony had mentioned us

20    discussing any conversations about elections with him

21    first.  We have another new lawsuit and the

22    possibility of another after that.  So would prefer

23    we check with him on any speaking engagements,

24    interviews et, cetera.

25                Do you see that?

1    know.

2         A.    Okay.  I don't know under -- I don't

3    understand what that's really referencing --

4         Q.    Okay.

5         A.    -- to tell you the truth.

6         Q.    So if you look at all the folder names,

7    it's Compact-Flash, Dominion-Supplied-Laptop, EMS

8    Server, miscellaneous thumb drives, Polling-Pads,

9    Reports, Tabulation System.

10        A.    Uh-huh.

11        Q.    Do you that?

12        A.    I do.

13        Q.    And what concerns does the Board have

14   about the fact that SullivanStrickler, according to

15   the hard drive that's been produced, copied about a

16   half a terabyte of data across virtually all of the

17   electronic equipment in the Coffee County Elections

18   Office in January of 2021?

19        A.    Well --

20              MR. DELK:  Object to the form.

21              THE WITNESS:  -- I'm sure that the Board

22   would be concerned about this, but the Board has

23   no knowledge of this, and so it's hard for me to

24   say what concerns the Board would have.  I --

25        Q.    (By Mr. Cross)  This is the first

Page 190

1      you're -- you're learning of this?

2             A.     This is the first I'm learning of this.

3      Yes.

4             Q.     And to your knowledge, no one else on the

5      Board was aware of this except for Eric Chaney?

6             A.     To my knowledge, that's correct.

7             Q.     Eric Chaney would be the only exception,

8      since he was there?

9             A.     And --

10                   MR. DELK:  Object to the form.

11                   THE WITNESS:  And I don't know the answer

12            to that.  To tell you the truth, I don't know

13            the answer to that.

14            Q.     (By Mr. Cross)  Fair enough.  Thank you.

15                   MR. CROSS:  All right.  35.

16                   (Exhibit 28 was marked for

17            identification.)

18            Q.     (By Mr. Cross)  All right.  Let me hand

19      you what's been marked as Exhibit 28, and you can --

20                   You're welcome to flip up through this.  I

21      don't have a lot of questions on it.

22                   Mr. Stone, this is another document

23      produced by Paul Maggio and the SullivanStrickler

24      firm that was explained to us.  It indicates

25      individuals who were given access to the Coffee

Page 201

1          Q.    Okay.  So were you aware that in June of

2    2022, that agency, typically referred to as CISA,

3    issued this advisory to all jurisdictions in the

4    country using the Dominion Voting Systems that are

5    addressed in the advisory?

6               Had you heard that before now?

7          A.    No.

8          Q.    All right.  If you look at the summary, it

9    explains here that, "This advisory identifies

10   vulnerabilities affecting versions of the Dominion

11   Voting Systems Democracy Suite ImageCast X, which is

12   an in-person voting system used to allow voters to

13   mark their ballot."

14              Do you see that?

15         A.    I do.

16         Q.    And you understand that's referring to the

17   same BMD system used in Georgia?

18         A.    Okay.

19         Q.    Were you aware that this advisory --  It

20   says that it sent this same advisory to the Secretary

21   of State's Office in Georgia?

22         A.    I'm not aware of that.

23         Q.    So this is not something that the Board

24   has received any information about, has it?

25         A.    I don't recall that the Board got this.

 1      me to answer that question.

 2            Q.     All right.   And so when you say your

 3      understanding is the system is secure and reliable,

 4      you don't have any insight into what CISA found here

 5      and what the implications are of -- of the -- the

 6      intrusion we saw?

 7            A.     I don't.

 8            Q.     Okay.   'Cause that's not something that

 9      the Secretary of State's Office has been in touch

10      with the Board about?

11            A.     No.

12            Q.     No one has been in touch with the Board

13      about the vulnerabilities identified here, right?

14            A.     To my knowledge, no.

15            Q.     And no one has been in touch with the

16      Board about what the access to the EMS and the other

17      election equipment in January of 2021, what that

18      means for the reliability of the system, right?

19            A.     No.

20            Q.     All right.   Turn to third page.   You'll

21      see there's a heading, "3. Mitigations."

22                   And here it reads, "CISA recommends

23      election officials continue to take and further

24      enhance defensive measures to reduce the risk of

25      exploitation of these vulnerabilities.   Specifically,

1           this.

2           Q.    (By Mr. Brown)  Do you know what that is?

3           A.    This, the Hand Recount Recap.

4           Q.    Do you know where -- where the plaintiffs

5      in that case would have gotten that recap from?

6                 MR. DELK:  Object to the form.

7                 THE WITNESS:  I --

8           Q.    (By Mr. Brown)  If you --

9           A.    I don't know.

10                Is this not a matter of public record?

11          Q.    I'm not sure.

12                MR. DELK:  Just answer the question, if

13          you know it.

14                THE WITNESS:  I don't know.

15          Q.    (By Mr. Brown)  You --  You may have been

16     asked some these, and I'll just try to sum up quick

17     on that.

18                Are you aware of any investigation of

19     Coffee County by the Secretary of State, the SEB, or

20     the GBI into the breach in January 2021 of Coffee

21     County's election system?

22          A.    I'm not aware.

23          Q.    Have you been contacted by the F -- by the

24     GBI?

25          A.    I have not.

Page 283

1                    C E R T I F I C A T E

2

3

4       STATE OF GEORGIA:

5       County OF FULTON:

6

7              I hereby certify the foregoing transcript

8          was taken down, as stated in the caption, and

9          the questions and answers thereto were reduced

10         to typewriting under my direction; that the

11         foregoing pages 1 through 282 represent a true,

12         complete, and correct transcript of the evidence

13         given upon said hearing, and I further certify

14         that I am not of kin or counsel to the parties

15         in the case; am not in the regular employ of

16         counsel for any of said parties; nor am I in

17         anywise interested in the result of said case.

18             This, the 6th day of September, 2022.

19

20                    S. Julie Friedman

                   S. JULIE FRIEDMAN, CCR-B-1476

21

22

23

24

25