1          UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF GEORGIA

3             ATLANTA DIVISION

4

5         Civil Action No. 1:17-cv-02989-AT

6    _____

7    DONNA CURLING, et al.,

8         Plaintiffs,

9    vs.

10   BRAD RAFFENSPERGER, et al.,

11        Defendants.

12   _____

13

14       VIDEOTAPED DEPOSITION OF DEAN M. FELICETTI

15   DATE:          September 2, 2022

16   TIME:          9:12 a.m. to 4:28 p.m.

17   LOCATION:      Witness location

18

     REPORTED BY:  Felicia A. Newland, CSR

19

20              Veritext Legal Solutions

             1250 Eye Street, N.W., Suite 350

21               Washington, D.C. 20005

22

Page 5

1                    C O N T E N T S

2    EXAMINATION BY:                                PAGE

3          Counsel for Curling Plaintiffs            9

4          Counsel for Coalition Plaintiffs         310

5          Counsel for State Defendants             321

6          Counsel for Curling Plaintiffs           331

7               FELICETTI DEPOSITION EXHIBITS

8    NO.  DESCRIPTION                                PAGE

9    1    SUBPOENA TO TESTIFY AT A DEPOSITION IN A    15

10        CIVIL ACTION

11   2    Picture of Jim Nelson, Senior System        25

12        Engineer at SullivanStrickler LLC

13   3    Picture of Jennifer Jackson, Senior         26

14        System Engineer at SullivanStrickler LLC

15   4    Picture of Karuna Naik, Senior System       29

16        Engineer at SullivanStrickler LLC

17   5    Picture of Paul Maggio, Senior System       30

18        Engineer at SullivanStrickler LLC

19   6    Engagement Agreement, November 30, 2020     49

20   7    Engagement Agreement, MI AZ, December 6,    78

21        2020

22   8    January 8, 2021 Maggio e-mail chain         81

Page 6

1       invoice

2    9   Phone text message, 8/12/2022           113

3    10  Coffee County Board of Elections and     121

4       Registration Elections Office Security

5       Video, January 7, 2021

6    11  January 8, 2021 From 5pm to 6pm missing  138

7       video

8    12  Bates Numbers 08122022 000236 to 265     142

9    13  Password Memos, 08122022-000123 through  183

10      125

11   14  Maggio hard drive contents (screenshots) 197

12   15  8/17/2022 Maggio Production (Triage       203

13      reports) Folder Structure

14   16  Bates Numbers 08122022-000126 through     236

15      136

16   17  Bates Numbers 08122022-000137 through     241

17      161

18   18  Bates Numbers 08122022-000175 through     246

19      176

20   19  Bates Numbers 08122022-000098 through     251

21      105

22   20  Bates Numbers 08122022-000204 through     254

Page 7

1         205

2     21  Excel Attachment, 08122022-000205.XLSX     254

3     22  Bates Numbers 08122022-000022 through 33    257

4     23  Maggio-000057 58 Excel                      260

5     24  May 7, 2021 Barnes e-mail chain re:         266

6         Cyber Ninjas

7     25  Subpoena                                    273

8     26  STATE-DEFENDANTS-001 01937                  276

9     27  ICS Advisory (ICSA-22-154-01)               280

10        Vulnerabilities Affecting Dominion

11        Voting Systems ImageCast X

12    28  Copy of Check to Defending the Republic     296

13

14     *(Exhibits attached to transcript.)

15

16

17

18

19

20

21

22

Page 8

1                    P R O C E E D I N G S

2                       *  *  *  *  *  *  *

3                    VIDEOGRAPHER:  Today's date is

4      September 2, 2022, and we are on the record at

5      9:12 a.m.  This will be the videotaped 30(b)(6)

6      deposition of SullivanStrickler, LLC, given by Dean

7      Michael Felicetti.

8                    Would counsel present please

9      identify themselves for the record.

10                   MR. CROSS:  David Cross,

11     Morrison & Foerster for the Curling Plaintiffs.

12     And with me is my colleague, Adam Sparks.

13                   MR. BROWN:  Bruce Brown for the

14     Coalition Plaintiffs.

15                   MR. COLEMAN:  Eric Coleman on behalf

16     of SullivanStrickler.

17                   MS. CLARK-PALMER:  Amanda

18     Clark-Palmer on behalf of SullivanStrickler.

19                   MR. RUSSO:  Vincent Russo, Robbins

20     Firm, on behalf of the State Defendants.

21                   MS. LAROSS:  Diane LaRoss from Taylor

22     English, also on behalf of the State Defendants.

1                     VIDEOGRAPHER:  Thank you.

2                     Will the court reporter please

3        swear in our witness?

4                        *  *  *  *  *  *  *

5        Whereupon,

6                     DEAN MICHAEL FELICETTI

7        was called as a witness and, having been first duly

8        sworn, was examined and testified as follows:

9           EXAMINATION BY COUNSEL FOR CURLING PLAINTIFFS

10          BY MR. CROSS:

11                  Q      Good morning.

12                  A      Good morning.

13                  Q      Can you state your -- oh, grab your

14          mic.

15                  A      Oh, my bad.

16                  Q      That's all right.  I did the same

17          thing.

18                     MS. CLARK-PALMER:  Do you want it on

19          your lapel or the tie?

20                     MR. CROSS:  The tie is probably best.

21                     Are you getting him okay?

22                     THE WITNESS:  Am I good?

```
                                              Page 10

1        BY MR. CROSS:

2                 Q      Good morning.

3                 A      Hi.

4                 Q      Can you just state your full name and

5        address?

6                 A      Sure.  Dean Michael Felicetti,

7        56 Ocean Ridge Drive, in Charlestown, Rhode Island.

8                 Q      So you are not local?

9                 A      No.

10                Q      Okay.

11                A      No.

12                Q      And you're employed by the

13       SullivanStrickler firm?

14                A      Yes.

15                Q      Have you been there since 2017?

16                A      No.

17                Q      How long have you been there?

18                A      Two years August.

19                Q      Okay.  Where were you before that?

20                A      I was a partner in a company called

21       the Oliver Group.

22                Q      And what are your responsibilities at
```

Page 14

```
 1              A      Oh --
 2              Q      -- the secrets of the casino.
 3              A      Of course.  Of course.
 4              Q      Was that your first job out of
 5      college?
 6              A      First career job, yes.
 7              Q      Okay.  And did you graduate -- you
 8      got your associates degree, you said, in '92?
 9              A      It was.
10              Q      And you also coach basketball?
11              A      I do.  I'm a high school basketball
12      coach, going on 13, 14 years now, I think.
13              Q      Nice.
14              A      I love it.
15              Q      Okay.  So do you understand that
16      you're testifying today on behalf of
17      SullivanStrickler as a corporate representative?
18              A      Yes, sir.
19              Q      And just yes or no; has -- has -- I
20      assume someone has explained to you what that
21      means?
22              A      Yes.
```

Page 22

```
 1          A     Okay.

 2          Q     -- so only tell me what you know.

 3          A     I appreciate that.

 4          Q     You know, in natural conversation, we

 5    assume things all the time, but I'm not looking for

 6    that today.

 7          A     Excellent.

 8          Q     Okay.  You said in addition to -- oh,

 9    so we're talking about the documents.

10                Are there any other documents --

11    well, sorry, let me take a step back.

12                Is there anything else you can tell

13    me about the documents that you reviewed in

14    preparation for today?

15                We talked about the photos.  We

16    talked about reports.  What else?

17          A     No.

18          Q     Okay.  Is there anything that you're

19    aware of that was produced to us by Mr. Maggio that

20    you did not review in preparation for today?

21          A     No.

22          Q     You said you also spoke with team
```

Page 23

1   members.  Who did you speak with for today's

2   deposition?

3        A     I spoke with the team members that

4   were on-site at Coffee County, Georgia.

5        Q     And who were those people?

6        A     Jim Nelson, Paul Maggio, Jennifer

7   Jackson, and Karuna Naik.

8        Q     And Naik, is that N-A-I-K?

9        A     Yeah.

10       Q     And Karuna is K-A-R-U-N-A?

11       A     Yeah.

12       Q     Okay.

13       A     Good job.

14       Q     You obviously coach kids, you just

15   gave me a gold star.

16       A     Yes, that's it.

17       Q     All right.  So if we can walk through

18   each of those.  Who is Jim Nelson?

19       A     Jim Nelson is a IT/technical expert

20   that works for SullivanStrickler.

21       Q     What is his role?

22       A     His role in the company?

Page 24

1          Q     Yes, sir.

2          A     He handles data migration, data

3    collection, converting legacy data, back-up tape

4    data, historical data, taking data that may be

5    inaccessible for review.  I guess that's the wrong

6    term, but to took at it natively or to be able to

7    look at these files, he'll take some historic data

8    that may be a challenge to convert and put it into

9    a format that is reviewable, whether that's IT,

10   information.gov, forensics, et cetera.

11         Q     Do you know just generally how long

12   he's been at the firm?

13         A     No.

14         Q     All right.  Do you know generally

15   what his education and experience are?

16         A     Experience, I knew he worked at a

17   company called eMag, which was not unlike the

18   company SullivanStrickler.  So it was a very

19   similar company dealing with data and IT services.

20   Other than that, I don't -- I don't know what

21   his . . .

22         Q     All right.  Let me hand you what's

1          been marked as Exhibit 2.

2                     A      Sure.

3                        (Felicetti Deposition Exhibit Number 2

4                        marked for identification.)

5          BY MR. CROSS:

6                     Q      Who is this?

7                     A      That is Jim Nelson.

8                     Q      Okay.  Is this the Jim Nelson we were

9          just talking about who's at SullivanStrickler,

10         right?

11                    A      Yes, sir.

12                    Q      Okay.  Thank you.

13                        What was -- well, actually I'll come

14         back to that.  Never mind.

15                        You also mentioned Jennifer Jackson.

16         Who is she?

17                    A      She is the CRO at SullivanStrickler,

18         chief relationship officer.

19                    Q      And what is her role?

20                    A      Relations with our clients with

21         regards to communication, updates, marketing, as

22         well as project management.  That's it that I can

1        think of.

2              Q     Does she have any computer science

3        background?

4              A     She's technical.  She has an

5        e-Discovery background, so I guess by virtue of

6        that, yes.

7              Q     Do you know about how long she's been

8        at the firm?

9              A     No.

10             (Felicetti Deposition Exhibit Number 3

11             marked for identification.)

12       BY MR. CROSS:

13             Q     All right.  Let me hand you

14       Exhibit 3.  Who is that?

15             A     Jennifer Jackson.

16             Q     Is this the Jennifer Jackson that

17       we've been talking about at your firm?

18             A     Yes, sir.

19             Q     All right.  You mentioned Karuna

20       Naik.

21             A     Yes.

22             Q     Who is she?

Page 27

```
 1              Is it Nake or Nik [pronounced

 2      phonetically]?

 3          A    I'm sorry.  Now I put you on the

 4      spot.  Some people call her Nik.  I call her Naik

 5      [pronounced phonetically], so can we call her Naik

 6      for this?

 7          Q    Sure.

 8          A    It's just easier for me.

 9          Q    Okay.

10          A    She is a forensic expert, recently

11      promoted to our director of forensics.

12          Q    When you say "forensic expert," what

13      does that mean?

14          A    She provides the level of forensic

15      collection expertise that allows her the ability to

16      provide defensible forensic collection of data.

17          Q    When you say --

18          A    Does that help?

19          Q    Yes.

20               And when you say "defensible forensic

21      collection," what does that mean?

22          A    There are ways to collect data in
```

1    which you keep metadata intact or data intact

2    without leaving a footprint.  And obviously that's

3    what we do, and that's -- she is an expert at that,

4    as well as she is now managing the team, or as her

5    promotion, handling other experts.

6            Q      When you say "collecting data without

7    leaving a footprint," what does that mean?

8            A      When you are asked to image the data

9    by a law firm, the goal is to obviously not leave a

10   footprint, like modifying timestamps, date stamps,

11   that you touched the data, that you altered the

12   data, et cetera.  So you collect it in a way in

13   which the metadata, the data around the data, both

14   external and internal, remains intact.

15               So does that answer your question?

16       Q      Yes.

17               And is sort of part of the idea that

18   you're collecting the data in a way that one does

19   not alter the data; and, two, sort of doesn't leave

20   traces behind on the original equipment that the

21   data had been touched or copied or accessed?

22           A      Yes.  A pristine copy, or a

Page 29

1        preservation copy it's also referred to as.

2                Q      Okay.   And that's among the services

3        that SullivanStrickler provides?

4                A      Yeah.   Yes.

5                Q      And was that among the services that

6        were engaged for Coffee County?

7                A      Yes.

8                Q      Is there a difference between

9        Ms. Naik's training expertise and Mr. Nelson's?

10               A      Yes.

11               Q      In what way?

12               A      Different technologies warrant

13       different skill sets with regards to collections of

14       data.

15               Q      And let me show you Exhibit 4.

16                  (Felicetti Deposition Exhibit Number 4

17                  marked for identification.)

18       BY MR. CROSS:

19               Q      Who is this?

20               A      This is Karuna Naik of

21       SullivanStrickler.

22               Q      Okay.

Page 30

```
 1              A     She's the best.  No, she's the best
 2       to work with.
 3              Q     And then last, you mentioned Paul
 4       Maggio.  What is his role at the firm?
 5              A     He is the chief operating officer of
 6       the firm.
 7              Q     And what does he do as the chief
 8       operating officer?
 9              A     Provides technical services from
10       forensic collections to e-Discovery services, as
11       well as the overall day-to-day operations of the
12       organization.
13              Q     Does he have forensic expertise in
14       the way that you described for Ms. Naik?
15              A     He has forensic expertise of
16       different technologies.
17              Q     All right.  Let me hand you
18       Exhibit 5.
19              A     Sure.
20                 (Felicetti Deposition Exhibit Number 5
21                 marked for identification.)
22
```

Page 31

1      BY MR. CROSS:

2              Q      Who is this?

3              A      Paul Maggio, the COO of

4      SullivanStrickler.

5              Q      Okay.  Thank you.

6              A      You're welcome.

7              Q      Were there -- was there anyone else

8      at SullivanStrickler that was part of or supported

9      the team that did the work for Coffee County?

10             A      No.

11             Q      Is there someone at SullivanStrickler

12     named Greg Freemyer?

13             A      Yes.

14             Q      And what is his role at the firm?

15             A      He provides forensic services.  He

16     was previously the director of forensic services,

17     but now Karuna is.  He is in charge of R&D.

18             Q      And did he have any involvement with

19     the team that did the work in Coffee County?

20             A      I don't know.

21             Q      Do you know each of these people,

22     Mr. Nelson, Mr. Maggio, Ms. Jackson, and Ms. Naik,

```
 1          personally?

 2                  A       Personally, how?   Personally versus

 3          virtually?

 4                  Q       Fair enough.

 5                          Have you met them personally?

 6          A       Yes.

 7                  Q       Have you worked with them on

 8          projects?

 9                  A       Yes.

10                  Q       With respect to the services that

11          were provided for Coffee County, now I'd like to

12          drill down a little more and just understand what

13          the role was for each of them on that specific

14          team.

15                  A       Of course.

16                  Q       So if we can go back and we'll start

17          with Paul Maggio.   What was his role with respect

18          to those services?

19                  A       Paul Maggio was team lead and was in

20          charge of the forensic collection of the polling

21          pads.   And he was our main point of contact

22          on-site/project manager, the lead.
```

1            Q    And when you say he was responsible

2    for the forensic collection of poll pads, what does

3    that mean?

4            A    Each on-site expert, because of skill

5    set, focuses on certain areas, buckets of data.  So

6    that was his, for lack of a better term, buckets of

7    data to forensically collect.

8            Q    Meaning Mr. Maggio was personally

9    responsible for collecting the data off of the

10   electronic poll pads in the Coffee County office?

11          A    Yes.

12          Q    Was there anything else that he was

13   responsible for the forensic collection of in that

14   office?

15          A    No.

16          Q    And you said he was the lead.  Did he

17   otherwise have responsibility for generally

18   overseeing the work of the team?

19          A    Yes.

20          Q    What was Mr. Nelson's role on that

21   team?

22          A    He collected the -- collected -- he

1        imaged the EMS server.

2               Q       When you say "imaged the EMS server,"

3    what does that mean?

4               A       Forensically imaged, created a

5    forensic image of the drives in the server.

6               Q       Is this what we talked about before

7    capturing what you said is a pristine image?

8               A       Yes.

9               Q       Was there anything else he was

10   responsible for collecting in Coffee County?

11              A       No.

12              Q       Did he have any other

13   responsibilities on this --

14              A       Can I go back to that question?

15              Q       Sure.

16              A       Is that okay?

17                      There may have been a hard drive.

18              Q       In the --

19              A       Do you mind if I look at my notes?

20              Q       Sure.

21              A       Okay.

22                      Oh, yeah.  He also collected thumb

Page 35

1      drives and hard drives.   Sorry about that.

2                Q      That's okay.

3                The notes you're looking at, are

4      those notes you took when you spoke to these

5      individuals to help prepare for today?

6                A      Yes.

7                Q      Okay.  The thumb drives that

8      Mr. Nelson talked about, what can you tell me about

9      those?

10               A      I don't know.

11               Q      Those were thumb drives that were

12     found in the Coffee County election office, and --

13     and he was responsible for collecting data off of

14     those?

15               A      Those specific thumb drives, yes.

16               Q      Were there other thumb drives that

17     someone else was responsible for?

18               A      Yes.

19               Q      Okay.  Got it.  We'll come back to

20     that.

21               A      Sure.

22               Q      Do you have an understanding of what

```
 1          was collected off the thumb drives that Mr. Nelson

 2          collected from?

 3                A     I do not.

 4                Q     Was there anything -- what can you

 5          tell me about those thumb drives?

 6                A     They were -- as I understand it, they

 7          were -- there was a large repository of thumb

 8          drives that was -- the imaging was facilitated by

 9          somebody else.  And these particular thumb drives

10          were tied into the EMS server, the election

11          management server.  And I don't -- unfortunately, I

12          don't have any other details other than that.

13                Q     The ones that Mr. Nelson imaged were,

14          to your understanding, thumb drives that were used

15          with the EMS server?

16                      Just when you say "tied into," what

17          do you mean?

18                A     I don't know.  I don't know, no.

19                Q     And then you said Mr. Nelson also was

20          responsible for imaging hard drives.  What can you

21          tell me about that?

22                A     As I understand it, there was one
```

Page 37

1          hard drive that failed during imaging.  The hard

2          drive didn't fail, the image creation failed, let

3          me rephrase that.  And so it was given to Jim to

4          take a look at.  So it was an image.

5                    Q       Just one?

6                    A       Yeah.  As I understand, it was one.

7                    Q       Okay.  What can you tell me about

8          that hard drive in terms of what was on it, what it

9          was used for?

10                   A       I don't know.

11                   Q       Okay.  Do you know whether he was

12         able to get the data off of it?

13                   A       I do.  He was able to image it.

14                   Q       Are we talking about just a

15         standalone hard drive or a hard drive inside of

16         another device?

17                   A       It -- I don't know.

18                   Q       Do you have any information about

19         what that hard drive was used for in the office?

20                   A       I do not know.

21                   Q       Any information on the type of data

22         that was on it?

Page 38

1          A     I do not know.

2          Q     Okay.  You said there was another set

3    of thumb drives that were imaged by someone else.

4    Who was that?

5          A     Karuna.

6          Q     Okay.  What were those thumb drives

7    used for?

8          A     Those thumb drives were a collection

9    of -- let me think.  Can I look at my notes again?

10         Q     Uh-huh.

11         A     Sorry.  This is a lot.

12               Thumb drives.  (Witness reading from

13   document.)  I do not know.

14         Q     These thumb drives, or thumb drives,

15   were in the elections office?

16         A     Yes.  Yes, sir.

17         Q     And to your understanding, they were

18   used with the election equipment?

19         A     Yes, sir.

20         Q     So to take a step back, what was

21   Ms. Naik's role on the team?

22         A     Forensic imaging.

Page 39

1        Q      What all did she have responsibility

2     for forensic imaging in addition to the thumb

3     drives?

4        A      SD cards, CompactFlash cards.

5        Q      Is there a difference between an SD

6     card and a CompactFlash card?

7        A      CompactFlash cards.

8        Q      Okay.  Basically the same thing?

9        A      Yeah.

10       Q      What was on the CompactFlash cards

11    that she imaged?

12       A      I believe it was the -- hold on one

13    sec.  I should know this.  Can we come back to

14    that?

15       Q      Sure.

16       A      So maybe it'll --

17              THE WITNESS:  Is that all right with

18    you guys?

19              MR. COLEMAN:  That's up to you.

20              THE WITNESS:  It should --

21    BY MR. CROSS:

22       Q      It's okay.

Page 40

```
1              A      -- but right now I don't know.
2              Q      Okay.  So she imaged CompactFlash
3      drives and thumb drives.  Anything else in the
4      office?
5              A      No.  That was it.
6              Q      Did she have any other
7      responsibilities on that team?
8              A      Those were her primary
9      responsibilities.  I guess -- no, that would be it.
10             Q      That takes us to Jennifer Jackson.
11     What was her role?
12             A      Documentation, chain of custody.
13             Q      What do you mean by "chain of
14     custody"?
15             A      So for each piece of -- each target
16     piece of media that was imaged, we tagged with a
17     code, an identifier, take a picture, and log for
18     chain of custody.  So we have a -- a means of which
19     to track everything that was going to be collected.
20             Q      Why is chain of custody important
21     with data and devices like this?
22             A      The chain of custody is required,
```

Page 41

1    one, for the ability obviously to track when data

2    is handed to a third party for imaging, to identify

3    the fact that we are in ownership of that

4    particular piece of media for a certain length of

5    time.   And it's used for tracking, logging

6    historical information, et cetera.   So we can track

7    back where a particular drive was imaged from, who

8    the -- what's your -- what it was labeled as, any

9    other identifiers.

10            It's also used as a means to

11   physically check media for any damage, any --

12   anything that looks out of place.   So you're in a

13   position to look at something and say, "Well, you

14   know, before we move forward with this, please note

15   that, I don't know, it looks like it failed," or

16   something like that.   But it's another means in

17   which to -- to track information, not only the

18   physical state of it, but just the documentation to

19   track it all the way back.

20            Q    Is maintaining chain of custody with

21   respect to computer equipment and data, is that

22   generally considered a best practice?

Page 43

```
 1        analysis, at that point you're now digging deeper
 2        into the things that you would be talking about,
 3        last access, modified, et cetera, et cetera, but
 4        chain of custody wouldn't get you that.
 5              Q     I see.  In that situation, okay.
 6                    When your firm is engaged to access
 7        computer equipment, is it important to -- to
 8        maintain the chain of custody in terms of from
 9        start to finish who had access to that equipment,
10        what was done with it, all the way through the end
11        of the point at which the project ends?
12              A     Yes.
13              Q     Okay.  Why is that important?
14              A     Taking ownership of -- of devices
15        becomes the responsibility of the forensic company
16        that's handling the work.  At which point, the
17        ability to hand it back and have a means to track
18        that is tracking that chain of custody, and it's
19        vital.
20              Q     Did SullivanStrickler carefully track
21        the chain of custody with respect to the Coffee
22        County project?
```

Page 44

1          A      Yes, sir.

2          Q      And to your understanding, did it

3      comply with firm policy and best practices?

4          A      Yes, sir.

5          Q      It sounds like Ms. Jackson was one of

6      the people responsible for that.   Is that right?

7          A      Yes, sir.

8          Q      Was anyone else -- did anyone else

9      have responsibility with respect to the chain of

10     custody?

11         A      No.   No.

12         Q      You said she was responsible for

13     documentation.   What do you mean?

14         A      Logging.   As part of the chain of

15     custody, logging a code that we identify a piece of

16     media as, as well as any physical labels that may

17     be on a device or a hard drive, and our internal

18     code that we use for tracking.

19                Does that help?

20         Q      Yes.

21         A      Okay.

22         Q      But just -- I understand what you

1       mean, but for the record, explain what you mean

2       when you say "internal code for tracking."

3              A      So SullivanStrickler utilizes a

4       project code, an internal code, that we reference

5       not only in chain of custody, but in the

6       communications back and forth as a means for

7       tracking and consistency.

8              Q      Does every project get assigned an

9       internal code?

10             A      Yes, sir.

11             Q      And one was assigned here, right?

12             A      Yes, sir.

13             Q      Do you recall was the code here

14      SSA1722?

15             A      I can't tell you right now, but I'm

16      going to check.

17                    Yes, sir.

18             Q      Okay.  What other responsibilities

19      did Ms. Jackson have, if any, on this team?

20             A      I -- I don't know aside from chain of

21      custody.

22             Q      Who took the photos that were

Page 46

1     produced?

2              A       Jennifer Jackson.

3              Q       Is that part of her responsibility in

4     terms of documenting the work?

5              A       Yes, sir.

6              Q       So taking those photos, is that a --

7     is that a part of your standard procedures for this

8     type of project?

9              A       It is a normal procedure.

10             Q       Do you know whether anyone involved

11    with the work, including people in Coffee County's

12    office, did anyone object to the photos?

13             A       I don't know.

14             Q       Sorry, I may have asked you before.

15    Is there anyone else who had any responsibility

16    either on or supporting the Coffee County team

17    beyond these four individuals?

18             A       No.

19             Q       How did the firm select the team

20    members for the Coffee County project?

21             A       Based on experience, capabilities.

22             Q       Who generally makes the decision on

Page 47

1      who is assigned to a project like this?

2             A     Paul Maggio.

3             Q     So in the general course, Paul Maggio

4      would have selected the people for this team?

5             A     Yes.

6             Q     Do you know whether employees at the

7      firm have the option to opt out of a project if

8      they are asked to work on it?

9             A     They do.

10            Q     Do you know whether anyone was asked

11     to work on the Coffee County project and declined?

12            A     I do not know.

13            Q     Okay.  Who would you ask if you

14     wanted to know?

15            A     Paul Maggio.

16            Q     Do you know whether anyone, whether

17     on the team or otherwise, at SullivanStrickler

18     expressed any concerns about taking on this work?

19            A     I don't know.

20            Q     Do you know whether anyone expressed

21     any concerns at all about working on the team?

22            A     I don't know.

Page 48

1      Q      Who engaged SullivanStrickler to do
2  the work in Coffee County?
3      A      Jim --
4      Q      Penrose?
5      A      Yes, Jim Penrose and Doug Logan.
6      Q      When did they first reach out to
7  SullivanStrickler for the work, approximately?
8      A      Early January for Coffee County.
9      Q      What's the basis for that testimony?
10     A      Can you repeat the question?
11     Q      Sure.
12            What's -- what's the basis for your
13  understanding that Mr. Penrose and Mr. Logan
14  reached out to the firm, specifically for Coffee
15  County, in early January?
16     A      By virtue of requests for other
17  services outside of Coffee County.  The request
18  came in that pointed to Coffee County, I believe,
19  in early January.
20     Q      Okay.  And just so I understand, for
21  that testimony, are you relying on documents you
22  looked at or people you spoke with or both?

```
 1              Q      -- you've got a stack of documents
 2       with you.
 3              A      Yes.
 4              Q      What do you have with you?
 5              A      I have the production stack.
 6              Q      On any of the documents that you have
 7       with you, do you have notes on any of those
 8       documents?
 9              A      I do not.
10              Q      Okay.  I didn't know if it would be
11       helpful for you to look at them.
12              A      No.
13              Q      All right.  So do you recognize
14       Exhibit 6?
15              A      I do.
16              Q      Is this an engagement agreement for
17       forensic analysis of the SullivanStrickler firm?
18              A      Yes, sir.  Excuse me.
19              Q      Do you need some water?
20              A      I'm good.
21              Q      Okay.
22              A      Thanks.
```

1          Q      And this engagement agreement is with

2     Jesse Binnall of the Harvey & Binnall firm.   Is

3     that right?

4          A      Yes, sir.

5          Q      And it's dated November 30, 2020?

6          A      Yes, sir.

7          Q      Is this engagement agreement, does it

8     reflect the standard agreement and the standard

9     terms that SullivanStrickler uses?

10         A      Yes, sir.

11         Q      Does SullivanStrickler have different

12    types of standard agreements depending on the type

13    of project it's doing or does it have a standard

14    agreement sort of across the board?

15         A      The agreement is standard aside from

16    if there was different services being provided.   So

17    aside from forensic work, there may be back-up tape

18    recovery work, something like that.   Mostly the

19    format on all the agreements or the template that

20    we use are as here.

21         Q      Okay.   So the SullivanStrickler firm

22    has a standard agreement it uses for all its

Page 62

```
 1        SullivanStrickler has a license to?

 2             A    Yes, sir.

 3             Q    Was Relativity ultimately used with

 4        respect to the Coffee County work?

 5             A    I don't know.  I would say no based

 6        on we didn't host anything in Relativity, so the

 7        short answer is no.

 8             Q    Okay.  To the best of your knowledge,

 9        nothing was -- none of the data copied from Coffee

10        County was loaded into a Relativity platform?

11             A    Correct.

12             Q    And then the next bullet, "Storage.

13        Devices may be stored at the Vault for the

14        following fees:"

15                  Do you see that?

16             A    Oh, yes, sir.

17             Q    What's "the vault"?

18             A    We -- our building is a vault.  It's

19        an old accounting facility that was owned by a

20        bank.  So we securely manage and vault physical

21        media and data.

22             Q    So literally like an old bank vault?
```

Page 63

```
 1              A      Yes, it is.

 2              Q      Like a big steel door?

 3              A      It's very cool.

 4              Q      Okay.

 5              A      It's very cool.  You're welcome to a

 6       tour when this is all done.

 7              Q      Was any of the Coffee County data --

 8              A      Strike that you're welcome to a tour

 9       thing.  My bad.  Oops.  I'm trying my best here,

10       give me some slack.

11              Q      Yeah, you're doing fine.

12              A      Okay, thanks.

13              Q      You're doing fine.

14                     Was the Coffee County data ultimately

15       stored in the vault for any period?

16              A      Yes, sir.

17              Q      Is there data from Coffee County

18       still stored in the vault?

19              A      Yes, sir.

20              Q      Was that data ever stored outside of

21       the vault?

22              A      No, sir.
```

Page 64

1          Q      And that data was ultimately uploaded

2     to a file share site on the internet?

3          A      Yes, sir.

4          Q      Okay.  Do you know why with the

5     Binnall Agreement, there's a lot more detail and

6     what looks to be a lot broader scope of work

7     anticipated for Georgia than there was for Nevada?

8          A      I do not.

9          Q      If you wanted to know the answer to

10    that, who would you ask?

11         A      Paul Maggio.

12         Q      You said earlier that your

13    understanding from talking to Mr. Maggio was that

14    the firm was first engaged to do work in Georgia in

15    early January 2021, but we have an agreement with

16    Mr. Binnall from November 30 that anticipates a

17    pretty broad scope of Georgia work.

18              Do you know -- can you explain that

19    to me?

20         A      Sure.  As I understand it, the -- and

21    I don't know anything really other than Coffee

22    County, so I don't know what was done in Nevada,

Page 72

1          Q      With respect to Coffee County in

2     particular, did the firm get what it believed were

3     assurances from Coffee County election officials

4     that it was allowed to do the work that it was

5     doing?

6          A      Assurance in that they pointed out

7     what needed to be imaged and identified what we

8     were to be collecting, yes.

9          Q      And by "they," you're talking about

10    Coffee County election officials who were

11    on-site --

12         A      People that were on-site, correct.

13    Yes, sir.

14         Q      On-site in the elections office

15    during the copying?

16         A      Yes, sir.

17         Q      And it was the understanding of

18    SullivanStrickler that at least some of those

19    individuals giving that direction were election

20    officials for Coffee County?

21         A      Yes, sir.

22         Q      Is it your understanding now, with

Page 75

```
 1        discussions with Mr. Maggio and others?
 2              A     Yes.
 3              Q     The work that was done in Coffee
 4        County, was that done -- was the customer for that
 5        work Sidney Powell?
 6              A     Sidney Powell paid the bills.
 7              Q     What's your understanding of who the
 8        customer was for the purpose of the engagement
 9        agreement for the Coffee County work?
10              A     Sidney Powell.   Very good.
11              Q     So is it SullivanStrickler's
12        understanding still today that Sidney Powell had
13        all of the necessary legal rights and permissions
14        for the work that she engaged SullivanStrickler to
15        do in Coffee County?
16              A     Yes, sir.
17              Q     What is the basis for that
18        understanding?
19              A     Borrowed license at the time -- no,
20        see, I don't -- I don't know.
21              Q     That's okay.
22              A     Yeah, sorry.
```

Page 78

1                         Okay.  So let's look at 7.  I'm going

2          to hand you Exhibit 7.

3                         (Felicetti Deposition Exhibit Number 7

4                         marked for identification.)

5          BY MR. CROSS:

6                    Q       And do you recognize this as an

7          engagement agreement for forensic analysis where

8          Sidney Powell retained the firm?

9                    A       Yes, sir.

10                   Q       And this is dated December 6, 2020.

11         Is that right?

12                   A       Yes, sir.

13                   Q       So this is about a week after the

14         engagement with Mr. Binnall that was November 30,

15         2020, right?

16                   A       Yes, sir.

17                   Q       And if you look on the first page of

18         the agreement, there's a -- it looks like an

19         eSignature by Sidney Powell.  Do you see that?

20                   A       Yes, sir.

21                   Q       There doesn't look to be a signature

22         by Mr. Maggio, but is it -- was this engagement

1    tabulate the votes in the state of Michigan.

2                    Do you see that?

3          A    Yes, sir.

4          Q    So do I understand correctly that

5    this agreement with Ms. Powell was signed with

6    respect to forensic collection and analytics work

7    that was anticipated in Michigan?

8          A    Yes, sir.

9          Q    All right.  How did it come to be

10   that the work done in Coffee County was done for

11   Ms. Powell instead of Mr. Binnall?

12         A    As I understand it, the focus

13   shifted, I don't want to say from Michigan, but

14   maybe after Michigan, to Coffee County.  And I

15   don't know why there are two different engagements,

16   one specifically for Jesse Binnall, versus this

17   one.

18         Q    Okay.  SullivanStrickler performed

19   forensic collection of data pursuant to the Binnall

20   agreement, right, in some jurisdiction?

21         A    I don't know.  I don't know what

22   happened in Nevada.

Page 81

1              Q     Okay.  Is it your understanding that

2       the Binnall Agreement ended up being for work only

3       that would have occurred in Nevada?

4              A     Yes, sir.

5              Q     And so any work that was done in

6       Michigan and Georgia was done pursuant to the

7       Powell Agreement?

8              A     Yes, sir.

9              Q     All right.  You can put that aside

10      for the moment.

11             A     Okay.

12             Q     I'll have some more questions in a

13      minute.

14                   To kind of help with the context

15      here, let me hand you Exhibit 8.

16             A     Sorry.

17                   (Felicetti Deposition Exhibit Number 8

18                   marked for identification.)

19      BY MR. CROSS:

20             Q     All right.  So Exhibit 8, this is an

21      e-mail thread between individuals at

22      SullivanStrickler, Ms. Powell, and a variety of

Page 82

1    other folks that relate to, at least in part, the

2    work that was done in Coffee County.

3              Do you see that?

4         A    Yes, sir.

5         Q    Is this a document that you've seen

6    before today?

7         A    I've seen this before.

8         Q    So is this one of the things that

9    you -- you reviewed in preparing for the

10   deposition?

11        A    Yes, sir.

12        Q    All right.  If you look at the last

13   page of the e-mail, there's an attachment, a

14   SullivanStrickler invoice.  You can flip all the

15   way to the back.

16        A    Yep.

17        Q    Is this in the form of a standard

18   invoice for forensic work?

19        A    Yes, sir.

20        Q    And if you look here, it's sent to

21   Sidney Powell, Defending the Republic.  Do you see

22   that?

Page 86

```
1          Doug Logan" -- there's a cell number -- "will be
2          joining you and flying out there with you."
3                    Do you see that?
4          A    Yes, sir.
5          Q    So do I understand correctly that
6     when the work was first contemplated for
7     SullivanStrickler to access voting equipment, that
8     first came at the direction of Jim Penrose and Doug
9     Logan?
10         A    Yes, sir.
11         Q    And did -- did they remain key points
12    of contact throughout the work that was done by the
13    firm with respect to copying election equipment?
14         A    Yes, sir.
15         Q    Including Coffee County?
16         A    Yes, sir.
17         Q    Okay.  And then it goes on.  "Your
18    POC on the ground Nevada is Todd from our team."
19                    Do you know who Todd is?
20         A    I do not.
21         Q    And then below, do you see where it
22    says, "Todd, the SullivanStrickler POC for the
```

1           Q     So do you understand that Tricia is

2     someone who works with Ms. Powell?

3           A     Yes, sir.

4           Q     Okay.  Do you know who she is?

5           A     I do not.

6           Q     All right.  And here now on

7     January 7th in the morning, the subject line of

8     the -- even though we're still on the same e-mail

9     thread, the subject line now refers to "Coffee

10    County, Georgia Forensics Engagement Agreement."

11              Do you see that?

12          A     Yes, sir.

13          Q     So the project number SSA1722 is

14    still the same project number that we have down in

15    the thread referring to Wayne County, Michigan

16    forensics.

17              Do you see that?

18          A     Yes, sir.

19          Q     So do I understand correctly that

20    SullivanStrickler -- the Coffee County work was

21    part of the same project as Michigan?

22          A     Yes, sir.

1    County?

2              A    Yes.  Yes, sir.

3              Q    Okay.  Then the afternoon, January 8,

4    2021, Mr. Maggio sends another update.  "Everything

5    went smoothly yesterday with the Coffee County

6    Election.  Everyone involved was extremely

7    helpful."

8              Do you see that?

9              A    Yes, sir.

10             Q    And this e-mail was -- he's

11   addressing Sidney, right?

12             A    Yes, sir.

13             Q    When he wrote, "Everyone involved was

14   extremely helpful," is it your understanding that

15   included individuals in the Coffee County office

16   who identified themselves as election officials?

17             A    Yes, sir.

18             Q    Okay.

19             A    Well, the people that were there that

20   identified themselves as officials, yes, but there

21   were also people there that we wouldn't know -- I

22   hate to assume, but they presented themselves as

Page 108

1    officials, even having an office there and things

2    like that.

3              Q    Understood.  And we'll walk through

4    the photos to identify those folks.

5              He further provides in his report on

6    the afternoon of January 8, "We are consolidating

7    all of the data collected and will be unloading it

8    to our secured site for access by your team.

9    Hopefully we can take care of payment today."

10             Do you see that?

11             A    Yes, sir.

12             Q    He's working hard to get paid.

13             A    I noticed that.  I guess when you

14   read it, it's --

15             Q    No, I respect it.

16             A    Thank you.

17             Q    We all have clients.

18             And when he indicates, "We're

19   consolidating all the data collected," what is --

20   is that a general practice in those type of

21   engagements?

22             A    It is.  When there are multiple data

Page 111

1          Q     Okay.  Are you familiar with Scott

2     Hall?

3          A     I am.

4          Q     How do you know Scott Hall?

5          A     Based on discussions with the team

6     and his involvement in the collections.

7          Q     What is your understanding of his

8     involvement with the collections?

9          A     That he was on-site.

10         Q     In Coffee County on January 7th --

11         A     Yes, sir.

12         Q     I'm sorry, let me just make sure I

13    get the question done.

14         A     Yeah.  Yeah.  I'm sorry.

15         Q     No, you're good.  It's common.

16               All right.  And did you discuss with

17    Mr. Maggio Mr. Hall's involvement in the Coffee

18    County project?

19         A     Yes, sir.

20         Q     What did Mr. Maggio have to say about

21    Mr. Hall's involvement?

22         A     He was a senior --

Page 112

```
 1              MR. CROSS:  Exhibit 9.
 2              THE WITNESS:  He had a senior role in
 3      oversight, to some extent.
 4      BY MR. CROSS:
 5         Q      So you had said earlier, and we see
 6      in the e-mails, that Jim Penrose and Doug Logan
 7      were principal points of contact for Coffee County,
 8      right?
 9         A      Yes, sir.
10         Q      When did Mr. Hall, Scott Hall, become
11      involved with the Coffee County project?
12         A      I believe -- I don't know.  I know he
13      was there on-site that day.
14         Q      Okay.
15         A      Anything prior to that, I'm not fully
16      aware.
17         Q      Do you know why he was involved?
18         A      I don't.
19         Q      All right.  Let me hand you what's
20      been marked as Exhibit 9.  And we're looking at
21      Tab 16.
22
```

Page 113

```
 1              (Felicetti Deposition Exhibit Number 9
 2              marked for identification.)
 3      BY MR. CROSS:
 4          Q      Is Exhibit 9 one of the documents you
 5      looked at in preparation for today?
 6          A      Yes, sir.
 7          Q      This is an e-mail -- sorry, strike
 8      that.
 9              This is a text thread between Paul
10      Maggio and Cathy Latham, right?
11          A      Yes, sir.
12          Q      And this comes from Paul Maggio's
13      phone, right?
14          A      Yes, sir.
15          Q      So the green is from -- are texts
16      that Mr. Maggio is sending and the black, those are
17      texts that Ms. Latham is sending, right?
18          A      Can you repeat that?  I'm sorry.
19          Q      Yeah, sorry.
20              Since this came from Paul Maggio's
21      phone, the green texts are the ones that Mr. Maggio
22      sends, the black texts are ones that Ms. Latham
```

1      sends, right?

2              A      Yes, sir.

3              Q      Okay.  So what we see here is on

4      January 7, 2021 at 11:09 a.m., Ms. Latham sends a

5      text to Mr. Maggio with an address in Douglas,

6      Georgia.

7                      Do you see that?

8              A      Yes, sir.

9              Q      Are you aware that that's the address

10     for the Douglas local airport?

11             A      I am not.

12             Q      Okay.  And then Mr. Maggio responds a

13     minute later, "Received.  We will pick up Scott."

14     Do you see that?

15             A      Yes, sir.

16             Q      Did you understand that Scott Hall

17     flew into the Douglas, Georgia airport on the

18     morning of January 7 --

19             A      Yes, sir.

20             Q      -- of 2021?

21                    Okay.  And so what we see here is

22     Ms. Latham coordinating with Mr. Maggio on somebody

1        is picking up Scott Hall from the airport, right?

2                A     Yes.

3                Q     And then another minute later

4        Mr. Maggio writes back, "Better yet, have Eddie

5        pick up Scott.  Our vehicle is full.  We will meet

6        him there."

7                      Do you see that?

8                A     Yes, sir.

9                Q     Who actually drove the team to

10       Maggio?  Like literally drove the vehicle?

11               A     Jim Nelson.

12               Q     Do you know what kind of vehicle they

13       were in?

14               A     I know he has a truck.

15               Q     Okay.  Like a pickup truck?

16               A     Yeah.  But I don't know if that's

17       what he drove.  And as far as in that truck, there

18       were three people; so it was Jim, Paul, and

19       Jennifer.

20               Q     And how did Ms. Naik get there?

21               A     She had to drive and pick up a

22       Cellebrite, one of our forensic tools.  So she had

1      to go and get it from, I believe, the office and

2      then meet everyone there.

3           Q     So Ms. Naik separately drove to

4      Douglas?

5           A     To -- not to Douglas.  Is that where

6      Coffee County is?

7           Q     Yes.

8           A     Oh, then yes.  Yes.  Sorry.

9           Q     That's okay.

10            And she drove there alone?

11           A     Yes.

12           Q     Did she drive back alone?

13           A     Yes, sir.

14           Q     And the other three rode back in

15      Mr. Nelson's vehicle?

16           A     Yes, sir.  Well, I believe his

17      vehicle.  He drove.

18           Q     Understood.

19           Okay.  Then Ms. Latham writes back to

20      Mr. Maggio at 11:30 a.m., "How far out" -- sorry.

21      She writes back, "How -- how far out are you?"

22           Do you see that?

1          A      Yes, sir.

2          Q      And Mr. Maggio responds, "We are in

3     town waiting for Scott to let us know when to pull

4     in."  Do you see that?

5          A      Yes, sir.

6          Q      Where did the team wait for the green

7     light from Scott Hall?

8          A      I believe the parking lot.

9          Q      Of the Coffee County elections

10    office?

11         A      Yes, sir.

12         Q      A pen with a light on it?

13         A      Oh, it's very cool.  I got it

14    yesterday.  I'm sorry.  I don't even use it.  It

15    kind of tweaks me out a little, so I want to

16    apologize.

17         Q      Oh, no, that's fine.

18         A      I'm sorry.

19         Q      Do I understand correctly, the team

20    was waiting for Mr. Scott Hall to give them

21    direction that it was time to go into the elections

22    office?

Page 118

```
 1              A     Yes, sir.

 2              Q     Do you have any understanding of what

 3       they were waiting for?

 4              A     Other than Scott being a senior --

 5       sorry, a senior leader on this effort in Coffee

 6       County, no.

 7              Q     When did the firm first start taking

 8       direction from Scott Hall for Coffee County as

 9       opposed to taking direction directly from Jim

10       Penrose, Doug Logan or Sidney Powell?

11              A      It wasn't as much direction as

12       general, if you have an issue, you collect

13       everything type of deal.

14              Q     Okay.

15              A      Nothing is specific.  And that was

16       provided by the other folks.

17              Q     Since the Coffee County was done

18       pursuant to the engagement with Sidney Powell, was

19       it the understanding of SullivanStrickler that

20       Scott Hall was part of that Sidney Powell team, and

21       that's --

22              A     Yes.
```

1           Q      Okay.  And what was the basis for

2    that understanding?

3           A      I don't know.

4           Q      Okay.  And so, again, looking back at

5    the text between Mr. Maggio and Ms. Latham

6    coordinating the team's arrival and getting Scott

7    Hall there, do I understand correctly that

8    Ms. Latham was also a key point of contact for the

9    SullivanStrickler team with respect to the Coffee

10   County work?

11          A      Yes, sir.

12          Q      So she was one of the primary points

13   of contact for organizing and facilitating the work

14   in Coffee County?

15          A      Yes, sir.

16          Q      Oh, do you know who Eddie is?

17          A      I do not.

18          Q      Do you know how Scott Hall got from

19   the airport in Douglas to the Coffee County

20   elections office?

21          A      I do not.

22          Q      Do you know if someone traveled with

Page 125

```
 1                    MR. CROSS:  Yeah, it's a very, very
 2       large -- yeah.
 3                    We can go off the record for a
 4       moment.
 5                    VIDEOGRAPHER:  The time is 11:16 a.m.
 6       We are off video record.
 7              (Recess from 11:16 a.m. to 11:17 a.m.)
 8                    VIDEOGRAPHER:  The time is 11:17 a.m.
 9       We are back on video record.
10       BY MR. CROSS:
11            Q     Before we look at the picture, we
12       talked earlier that Ms. Latham was one of the
13       principal points of contact organizing the Coffee
14       project.  Do you recall that?
15            A     Yes, sir.
16            Q     Ms. Latham was literally the person
17       who welcomed Mr. Maggio and his team at the
18       elections office the morning of January 7th, 2021.
19       Is that right?
20            A     Yes, sir.
21            Q     And when they arrived, she presented
22       herself as a Coffee County elections official.  Is
```

1          that right?

2                   A       Yes, sir.

3                   Q       If we look at page 33 in Exhibit 10

4          in the -- the screenshots of the video provided by

5          Coffee County, you'll see here Mr. Maggio is in the

6          grey sweater, right?

7                   A       Uh-huh.  Yes, sir.

8                   Q       And Jim Nelson is next to him in the

9          khaki pants?

10                  A       Yes.

11                  Q       Jennifer Jackson is in front in the

12         pink jacket?

13                  A       Yes.

14                  Q       And do you understand that's Cathy

15         Latham escorting them into the building?

16                  A       I don't know.

17                  Q       Okay.  That's fine.

18                          Then if we come to the next page, we

19         see the same woman with grey hair holding the door

20         open and Mr. Maggio and Mr. Nelson are walking in,

21         right?

22                  A       Yes, sir.

Page 142

```
 1      work?
 2              A     No.
 3              Q     And would they have had any reason to
 4      do that?
 5              A     No, sir.
 6              Q     Because the firm's understanding at
 7      the time, and still today, is that it had all the
 8      legal rights to do what it was doing?
 9              A     Yes, sir.
10              Q     All right.  Let me hand you
11      Exhibit 12.
12                   (Felicetti Deposition Exhibit Number 12
13                    marked for identification.)
14      BY MR. CROSS:
15              Q     All right.  So take a moment, if you
16      need, and flip through Exhibit 12.
17                   Do you recognize these as photos that
18      were produced by Mr. Maggio and that were taken by
19      the team on January 7, 2021 in the elections
20      office?
21              A     Yes, sir.
22              Q     Okay.  And we talked before earlier
```

Page 143

1    that Ms. Jackson, part of her responsibility was to

2    document the work, including taking photos.

3                    Do you recall that?

4         A    Yes, sir.

5         Q    Did she take these photos?

6         A    Yes.

7         Q    Is your understanding that she took

8    all of the photos?

9         A    Yes.

10        Q    Did anyone else with

11   SullivanStrickler take any photos or video?

12        A    No.

13        Q    Okay.  Did anyone else in the room --

14   sorry, strike that.

15             Did anyone else who was on-site in

16   Coffee County on January 7, 2021 take any photos or

17   video?

18        A    Not that I know of.  I don't know.

19        Q    Did you discuss that specifically

20   with any of the team members?

21        A    I did.

22        Q    And no one on the team was aware of

Page 144

```
 1        anyone else taking photos or video?
 2              A     I was directed to Jennifer Jackson
 3        whenever it came to that.
 4              Q     All right.  Is it fair to say the
 5        team's understanding or recollection from the
 6        events was that she was the only one who took
 7        photos and video?
 8              A     Yes, sir.
 9              Q     Okay.  All right.  Let's start with
10        the first page.
11              A     Sure.
12              Q     And it's got this little production
13        number ending in 236.  These are pictures of
14        CompactFlash drives, right?
15              A     Yes, sir.
16              Q     And each CompactFlash drive has a
17        little note next to it with the project number
18        SSA1722, right?
19              A     Yes, sir.
20              Q     And then below the project number
21        there's other information.  What is the information
22        that's recorded on each of those notes?
```

Page 145

1          A     The CF number is a tracking code.

2    And the -- the word next to it or -- yeah, the word

3    to the right of the CF number is the label of the

4    machine, the device that was -- that the cards were

5    removed from.

6          Q     Okay.  So each of the CompactFlash

7    drives, when the team arrived, was installed in a

8    device.  The team pulled the CompactFlash out of

9    the device, copied it.  Is that right?

10         A     No.

11         Q     Oh, sorry.  I'll tell you what, let

12   me just ask.  Walk me through the steps the team

13   took to copy the -- the CompactFlash drives that we

14   see in this picture.

15         A     As I understand it, the CompactFlash

16   disks were given to Karuna to image.  And I can

17   walk you through that process if you want to hear

18   it.

19         Q     We will in a moment.

20         A     Okay.

21         Q     Who gave her the CompactFlash?

22         A     It would have been -- there were a

Page 146

```
 1      number of people.  It would have been either Misty
 2      Hampton -- I would say Misty Hampton, because she
 3      directed, "Grab this, get this, get that, get
 4      this."
 5              Q     Misty Hampton was the elections
 6      supervisor in Coffee County at the time?
 7              A     As I understand it, yes.
 8              Q     Okay.  And you anticipated where I
 9      was going to go.
10                    Did anyone beyond Ms. Hampton direct
11      the SullivanStrickler team what to copy?
12              A     Yes, I believe so.
13              Q     What's your understanding about
14      others who gave direction?
15              A     Misty directed the larger percent,
16      but as I understand it, Cathy Latham also provided
17      direction on what was required for collection.  And
18      Scott Hall had said, "Get -- are you sure you're
19      getting everything?  Are you getting everything?"
20      So that was interpreted as, "Make sure you get
21      everything that you can."
22              Q     Okay.  And what was the idea for the
```

Page 147

1    SullivanStrickler team?   Essentially if there was a
2    device in the office that had data on it, the
3    team's task was to extract that data to the extent
4    they could?
5            A     Yes, sir.
6            Q     So looking back at the first picture
7    in Exhibit 12, so let's just take the fourth one
8    down on the left.  So you've got the project number
9    and then "CF04."  And then there's that Braxton-2."
10   Or what is that word?
11           A     It looks -- it does look like Braxton
12   or Broxton, but that information also would be
13   tracked in the chain-of-custody log that was
14   produced.
15           Q     And do you see next to that it looks
16   like there's one that refers to Ambrose?
17           A     Yes, sir.
18           Q     Do you understand that -- that the
19   references here on these notes correlate to voting
20   precincts in Coffee County, or do you know?
21           A     I do not.  We reference them as just
22   labeled.

Page 154

```
 1        server?
 2                    A      Yes.
 3                    Q      And was data captured from those --
 4                    A      I believe it was, yes.
 5                    Q      Using one of these two processes?
 6                    A      Yes, sir.
 7                    Q      The EMS server has a computer
 8        attached to it.  Do you recall that?
 9                    A      Yes, sir.
10                    Q      Was the collection for the EMS
11        server, was it done through the computer attached
12        to the server or did they connect it directly to
13        the server itself or both?
14                    A      So can you -- I'm sorry, can you
15        repeat the question?
16                    Q      Sure.
17                           So there's two devices associated
18        with the EMS server.  There's the server itself and
19        then there's a computer that connects to the
20        server, right?
21                    A      Yes.
22                    Q      Okay.  Did they image the computer
```

Page 155

1        connected to the server?

2                A       No.   They booted the server up using

3        a bootable thumb drive that doesn't leave a

4        footprint and then pushed it off using DFIR

5        scripts.

6                Q       And did they plug the thumb drive

7        directly into the server?

8                A       I believe they did, but I don't know

9        100 percent.

10               Q       Okay.

11               A       And that's --

12               Q       All right.   I referred to an ICP

13       earlier.   I misspoke on what that is.

14                       Are you aware that in the

15       Dominion's -- well, let's back up for a moment.

16                       You don't go to Georgia obviously?

17               A       I do not.

18               Q       You live in Rhode Island?

19               A       Yes, sir.

20               Q       How do you -- what's the mechanism of

21       voting in Rhode Island at the polls?

22                       Do you write something by hand?   Do

1          A      Yes, sir.

2          Q      Okay.   And -- and the -- the

3     SullivanStrickler team on January 7th copied data

4     from scanners, too, right?

5          A      Yes, sir.

6          Q      And that's both the central scanner

7     that sits in the office and individual scanners

8     that are used at precincts?

9          A      Yes, sir.

10          Q      And these ballot-marking devices, the

11     touchscreens, the team also collected data from

12     those as well, right?

13          A      I believe so.   They were the big

14     touchscreens?

15          Q      Yes.

16          A      I believe so.   And I -- and I -- I

17     believe so.   I think they were running Android or

18     something, OS on them, but I don't know

19     specifically how they were collected.

20          Q      Okay.

21          MR. CROSS:   If we could confirm that

22     before the deposition is over.

Page 166

```
 1              A      That's okay.  I don't know why these

 2         are upside down.

 3              Q      245, these are more CompactFlash

 4         drives that the team copied on-site in Coffee

 5         County?

 6              A      Yes, sir.

 7              Q      And then 246 is another picture of

 8         Mr. Nelson and Ms. Naik in the EMS server room

 9         doing the collection?

10              A      Yes, sir.

11              Q      247, I think we may have looked at

12         this earlier.  Well, let me -- 247, this is a

13         picture in the Coffee County election office,

14         right?

15              A      Yes, sir.

16              Q      Do you know -- the computer that's

17         seen here, do you know if that's a computer that

18         you guys brought or something that you're

19         collecting from?

20              A      It looks like ours.

21              Q      All right.  Just based on the

22         information that you can see here?
```

Page 167

1          A      Yeah, based on the spreadsheet,

2     what's in document recovery, based on the task bar,

3     but I'm not 100 percent certain.

4          Q      Okay.  And you --

5          A      I could -- it very much -- it looks

6     like ours now that I'm looking at it.  It looks

7     like a Surface with a keyboard.

8          Q      Okay.  If you look at 248 --

9          A      Yeah.

10          Q      -- do you know what this is?

11          A      Yes, sir.  It looks like a USB drive.

12     I can't really tell.  Yes, it looks like a drive.

13          Q      Like an external hard drive?

14          A      Yeah.

15          Q      Okay.  And do you see where it's got

16     the project number and then "EMS 01"?

17          A      Yes, sir.

18          Q      The Dell basic warranty, the external

19     hard drive, does this look like a drive that you

20     guys brought with you?

21          A      It does.

22          Q      And is -- it's my understanding that

1      the EMS 01, that what this indicates is this is the

2      hard drive that likely contained the data taken

3      from the EMS -- sorry, copied from the EMS server?

4              A       Yes, sir.

5              Q       Okay.  And then in 249, these are

6      more CompactFlash drives copied on-site by the

7      team?

8              A       Yes, sir.

9              Q       And 250, this is another -- well,

10     strike that.

11                     250, do you see where it's got again

12     the project number and then "Tabulation 01"?  Do

13     you see that?

14             A       Yes, sir.

15             Q       And do I understand correctly that

16     in -- in the picture, in 250, that this is the

17     central scanner or what's often referred to as the

18     tabulator in the office?

19             A       Based on the label and the

20     documentation, yes.

21             Q       And, again, this is a device that the

22     team copied the data from?

1          A      Yes, sir.

2          Q      Okay.  If you go to 251, do you know

3     what this is?

4          A      It looks like a router.  Yeah, it's a

5     router, I think.  I can't really tell.

6          Q      Do you know whether the team

7     attempted to copy data from a router?

8          A      I don't think they did.  No, they did

9     not try to collect data from a router.

10         Q      Would you expect there to be data on

11    a router?

12         A      No.

13         Q      All right.  252, more CompactFlash

14    drives that the team copied?

15         A      Yeah.

16         Q      All of the data that was copied from

17    Coffee County, that was all copied on-site in the

18    office?

19         A      Yes, sir.

20         Q      Okay.  So there was never a moment

21    when someone provided equipment or devices to the

22    SullivanStrickler team from Coffee County that was

1        Q       The forensic copying that you guys

2    did in Coffee County, you were able to take all of

3    the data that you took without needing passwords to

4    any devices?

5        A       That is correct.

6        Q       And how -- walk me through sort of

7    how that's possible.

8        A       When -- passwords that are typically

9    provided, unless they -- that are on local

10   machines, or on machines, if they are not

11   encrypting the actual OS at boot, when it boots,

12   you can forensically image -- we're only looking at

13   a source.

14              So we can look at -- here's an

15   example:  So if this laptop here had a password on

16   it, when we attach our device and we boot and we

17   point to that to collect, it's just looking at a

18   block of data or the data that's on the disk.  And

19   also pieces of the disk that may not contain data,

20   but fragments of data.  So imagine it just

21   collecting that, whatever's on the disk, then

22   creating an image of that, and then taking that off

1    with it.

2              Now, if I was looking to do something

3    targeted where you said to me, you know, "We really

4    only want these files," without doing a forensic

5    image, we would require a password to attach to the

6    machine and then to filter down using Windows tree

7    viewer or searching or whatever to grab the files.

8              But there's no need -- for the

9    technologies that were here for us to need any

10   passwords to gain that -- to forensically image

11   them.

12        Q    And the forensic image captures, if

13   done correctly, all of the files, all of the data

14   sitting on the device?

15        A    Yes, sir.

16        Q    Once the data is pulled off in that

17   process, is a password needed to then access that

18   data on whatever device it's copied to?

19        A    Yes, sir.

20        Q    So the -- the data that is -- that

21   was taken -- I'll be more precise.  The data that

22   was copied in Coffee County, has anyone at

Page 176

```
 1        would upload the data to the ShareFile, and then

 2        whomever asked for access or was given access based

 3        on the attorneys, they would say, "All right.  We

 4        need access for this, this, and this."  We would

 5        create those accounts and then you would be able to

 6        pull the data down.

 7                  Does that paint a picture?

 8        Q     Yeah.

 9        A     Does that --

10        Q     Thank you.

11        A     You're welcome.

12        Q     So for anyone accessing that data and

13        wanting to actually look at the data itself, look

14        at the files, they might need a password to the

15        extent that any particular file is password

16        protected at the time you collected it?

17        A     And they would need a password from

18        us.  So everything that gets put on ShareFile is

19        password protected.  So they -- it would require a

20        password no matter what to gain access to that

21        data.

22        Q     Okay.  When the firm shared the data
```

1       from Coffee County via the ShareFile, it provided

2       log-in credentials to the individuals who were

3       given access to that data, right?

4               A      Yes, sir.

5               Q      And so the log-in credentials would

6       be, what, a user name and a password?

7               A      Yes.

8               Q      And that -- once they logged in, they

9       then would have access to -- to whatever was

10      sitting on that ShareFile site for their user

11      account?

12              A      For their account, yes.  So -- yes.

13      So permissions based on access to certain areas

14      within that ShareFile repository.  And permissions,

15      like "Ability to download, yes or no; ability to

16      upload, yes or no; you know, admin rights, no,"

17      this -- things like that.

18              Q      If a user were to share their log-in

19      credentials for your ShareFile site with another

20      individual, you wouldn't have any way of knowing

21      that, right?

22              A      I don't know.  I don't think we would

Page 189

1          A      I don't know.

2          Q      Okay.

3                 All right.  And so what we've talked

4     about on-site, January 7, 2021, the team copied

5     data from the EMS server, a scanner that sat in

6     that room, and a computer that works with that

7     scanner.  ICPs, CompactFlash drives used with ICPs,

8     and the poll pads, some laptops that we saw, and

9     some number of ICXs, or what are referred to as the

10    BMDs, the big touchscreens.  Is that right?

11         A      Yes.

12         Q      Is there anything else that you're

13    aware of the team copied data from on-site that day

14    that we have not yet talked about?

15         A      There was the -- I believe, a hard

16    drive that I mentioned when we started today

17    that -- I'm sure it's referenced in the chain, but

18    I wasn't sure what that was for.

19         Q      It was an external hard drive that

20    was sitting in the office?

21         A      Yes, sir.

22         Q      And you don't know what -- what was

1         A     No, sir.

2         Q     How was the decision made to do the

3   collection in Coffee County specifically?

4               Who made -- who made -- who picked

5   Coffee County?  Was it the client?

6         A     The client.

7         Q     Did the client -- and are we

8   talking -- for the client, are we talking about

9   Jesse Binnall or Sidney Powell or someone else?

10        A     Sidney Powell through Jim Penrose and

11   Doug Logan.

12        Q     Okay.  Does the firm have any insight

13   into how they selected Coffee County?

14        A     No.

15        Q     Are you familiar with an -- an

16   individual named Ben Cotton?

17        A     I've read the name, but that's it.

18        Q     Are you aware that Ben Cotton

19   purports to be a computer science expert who has

20   testified under oath in a proceeding in Arizona

21   that he has analyzed the data that your team

22   collected from Coffee County?

Page 200

```
 1        break now.  You're in the hot seat, you -- you

 2        choose.

 3                     THE WITNESS:  I -- I really don't

 4        care.

 5                     MR. CROSS:  Why don't we do -- why

 6        don't we do one more that kind of relates to what

 7        we were looking at and then we'll --

 8                     MR. RUSSO:  Whatever is fine with me.

 9                     THE WITNESS:  Yeah, that's fine.  I

10        want to kind of get through as much as we can.

11                     MR. CROSS:  Yeah, typical witness

12        mentality.

13                     MR. COLEMAN:  It's his wife's

14        birthday.

15        BY MR. CROSS:

16               Q     All right.  Let's look at 14.  So I

17        think you said you did not look at a copy of the

18        hard drive that was provided to us.  Is that right?

19               A     Correct.

20               Q     Okay.  So this is the file structure

21        taken from our copy of the hard drive that was

22        provided to us.  So you've not seen this before?
```

1            A      I have not.

2            Q      Okay.   If you just look at the -- the

3     top where it's got the project number, SSA1722.   Do

4     you see that?

5            A      Yes, sir.

6            Q      "Hard drive contents," do you see

7     that?

8            A      Yes.

9            Q      And then there are these sort of

10    primary-level folders, "CompactFlash,

11    Dominion-Supplied Laptop, EMS Server, Miscellaneous

12    Thumbs, Polling Pads, Reports, Tabulation System."

13            Do you see that?

14            A      Yes.

15            Q      And would it be standard practice

16    when this data is collected to create a file

17    structure like this where you're storing data in

18    folders that indicate where it came from?

19            A      Yes.

20            Q      Okay.   And so here, it would be

21    standard practice that, for example, where it says

22    "CompactFlash" that would be data copied from

Page 202

1       CompactFlash drives in Coffee County?

2               A       Yes.

3               Q       Same with "EMS Server," for example?

4               A       Yes.

5               Q       And then "PW.txt," would that --

6       would it be standard practice that that would be a

7       text file that includes any passwords?

8               A       Yes.

9               Q       Okay.

10              A       And then if you look, what we've done

11      is broken down the file structure beneath those

12      higher-level --

13                      Yeah.

14              Q       -- files.  And so the standard

15      practice here would be to create a folder that

16      corresponds to each device, right?

17              A       Yes.

18              Q       So under "CompactFlash," for example,

19      we saw in the pictures there would be a

20      CompactFlash that has a note that designates it

21      CF1.  The standard practice would be to create a

22      folder that captures the data in that folder from

Page 214

 1          at, it looked like there was a router sitting on

 2          that table.

 3                  A       Right.

 4                  Q       Do you have any insight into why

 5          there would be a router sitting in that elections

 6          office where the EMS server sits?

 7                  A       I do not.

 8                  Q       Did SullivanStrickler ever access any

 9          of the voting equipment or data in Coffee County

10          remotely over the internet?

11                  A       No.  Everything was air gapped.

12                  Q       And when you say "air gapped," you

13          mean your collection of it was air gapped?

14                  A       Yes.

15                  Q       None of the devices you brought with

16          you were connected to the internet?

17                  A       That is correct.

18                  Q       Okay.  What was the process -- and

19          you may have touched on this before, but just to

20          make sure I understand.

21                          What was the process for getting the

22          data onto your ShareFile site?

Page 215

1        I know we talked before, you

2    consolidate the data, then you upload it to the

3    ShareFile site.  That's done physically in the

4    SullivanStrickler office?

5        A     Right.  So a copy is made,

6    consolidated, that we discussed, of all of the

7    targeted data that was collected.  That -- those

8    drives that were utilized to collect the data are

9    then preserved with a preservation copy.  So you

10   have a working copy, a preservation copy.  The

11   preservation copy is then -- that data is then

12   uploaded to the ShareFile.

13            Does that answer your question?

14       Q     Yes.

15       A     Okay.

16       Q     Did SullivanStrickler require anyone

17   who had -- was given access to the ShareFile for

18   the Coffee County data to sign any kind of

19   non-disclosure or any confidentiality agreement?

20       A     No.  We were working under the

21   original agreement information.

22       Q     So the way it would work is your

1    points of contact, like a Doug Logan or a Jim

2    Penrose or Sidney Powell, would -- would reach out

3    to SullivanStrickler and say, "Hey, I want you to

4    share the Coffee County data with -- with this

5    individual as well."  And then you guys would give

6    log-in credentials for the ShareFile to that

7    individual?

8         A    That's exactly right.

9         Q    Does each individual have their own

10   log-in credentials for ShareFile?

11        A    Yes.  And permissions.

12        Q    Right.

13             You talked about this before.  Each

14   individual user may have some different

15   permissions, meaning one user can upload and

16   download, but another can only download?

17        A    Or only have access to certain areas

18   within ShareFile.

19        Q    Are you aware that one or more of the

20   individuals that you guys gave log-in credentials

21   to shared their log-in credentials with -- with

22   other individuals?

Page 219

```
 1      the client never warned SullivanStrickler that by
 2      capturing data on the poll pads, that they would be
 3      capturing PII for Georgia voters?
 4              A      Correct.
 5              Q      Okay.  The data that was loaded to
 6      the ShareFile at the direction of the client, did
 7      that include all of the data collected from Fulton
 8      County -- I'm sorry, from Coffee County?
 9              A      Yes.
10              Q      So in addition to Coffee County,
11      there was a SullivanStrickler team, that included
12      at least Paul Maggio, that did some copying of
13      voting data or software in Antrim County, Michigan,
14      right?
15              A      I don't know.
16              Q      I'm setting up for a broader question
17      which is --
18              A      Yeah.
19              Q      -- what experience does
20      SullivanStrickler have, prior to Coffee County, in
21      specifically collecting and preserving data from
22      voting equipment, if any?
```

Page 220

1           A     Well, voting equipment being a

2      tablet, laptop, hard drives, servers, an extensive

3      amount, if we look at it purely from a technology

4      standpoint.

5           Q     It's fair to say there was nothing

6      unusual about the technology that was copied in

7      Coffee County, that it went beyond the firm's prior

8      experience and training in terms of doing this type

9      of forensic collection?

10          A     That's correct.

11          Q     So we talked about there's a device,

12     I think you may have referred to it as the UEFI

13     device.  Do you know what that is?

14          A     It is the -- it is a collection tool,

15     yes.

16          Q     The software that's used on that

17     collection tool, is that something -- where does

18     that software come from?  Where did it come from?

19                Like, for example, is that standard

20     software off the shelf?

21          A     It's the standard, yeah.  And I don't

22     know where it originated from.

1          Q      So it's not software that

2     SullivanStrickler wrote?

3          A      No.  No.

4          Q      So that's standard off-the-shelf

5     software that the firm obtains from some source

6     that it then uses for this type of collection?

7          A      Correct.

8          Q      And you -- you don't know the source

9     of that software that you guys use?

10         A      I do not.

11         Q      Do you know what it's called?  Is

12    there a brand?

13         A      I don't know.

14         Q      Okay.  And can you sort of to the

15    best of your ability, walk me sort of mechanically

16    how that device works?

17                The UEFI device, like, how does it

18    work?

19         A      Well, there's -- it's similar to what

20    we were doing for the -- it's similar to the DFIR

21    list, where it's bootable, not leaving a footprint

22    in grabbing data.  To the extent of the details

Page 222

1     around it, I wouldn't know.

2              Q     Okay.  Why does -- why does some

3     devices need the UEFI software and others use

4     the -- like you said, the DFIR, the D-F-I-R,

5     software?

6              A     Source technologies, how data is laid

7     down on disk, physical disk.  Operating system

8     information, whether a disk -- it's a physical

9     disk, whether it's logical, whether it's -- there

10    is a number of things.

11                  However, the list of tools that are

12    utilized by companies like SullivanStrickler are

13    pretty standard amongst all of us, but it would be

14    the technology.  So Cellebrite for iPads, X-Rays

15    for mobile phones.  Just for -- as an example,

16    there are multiple softwares that are used

17    specifically in our industry for certain

18    technologies.

19              Q     Is it fair to say that the

20    Cellebrite, the DFIR, the UEFI, those all serve

21    essentially the same purpose, but they're designed

22    to be used with different technology?

Page 226

```
 1              Q      Yeah.

 2              A      I do not believe so.

 3              Q      And were -- I may have asked you

 4       this, but just to be clear, were any of the

 5       devices, anything at all that SullivanStrickler

 6       brought in and they connected to any equipment in

 7       the Coffee County office, were any of those devices

 8       connected to the internet at any point during the

 9       collection?

10              A      They were not.

11              Q      And all of the devices that you guys

12       used to collect data, none of those devices has

13       ever been directly connected to the internet?

14              A      I don't even know if that's accurate.

15              Q      Okay.  You just don't know?

16              A      Yeah, I don't -- I don't know.

17              Q      At some point, the data was

18       consolidated and uploaded to ShareFile?

19              A      Correct.

20              Q      And so at some point, there was a --

21       a SullivanStrickler device that had the data that

22       was connected to the internet to load it to the
```

Page 227

1    ShareFile site?

2              A     Yes.

3              Q     Okay.

4              A     Which is encrypted in transmission as

5    well.

6              MS. CLARK-PALMER:  When you get to a

7    good breaking point, the food is here.

8              MR. CROSS:  Okay.  Cool.  We're

9    almost there.

10   BY MR. CROSS:

11             Q     To the best of the firm's knowledge,

12   the work that was done in Coffee County was done

13   according to standard policies and practices, and

14   you would not expect to have left any trace of that

15   work on the local equipment and devices?

16             A     Correct.  Yes, sir.

17             Q     Okay.  And as you sit here, based on

18   any information available, do you know -- have you

19   learned anything that would lead you to believe

20   that the team somehow inadvertently or

21   intentionally did leave traces behind?

22             A     No.

Page 229

1      back.

2              A      Sure.

3              Q      In the ordinary course of work for

4      SullivanStrickler, you have your own devices you

5      bring in to do a forensic collection?

6              A      Correct.

7              Q      And that includes a variety of

8      different types of devices, like hard drives, thumb

9      drives, right?

10             A      Yes.

11             Q      Okay.  It also includes things like

12     laptops?

13             A      Correct.

14             Q      Is there any standard or practice at

15     SullivanStrickler to routinely test all of that

16     equipment to determine whether that equipment has

17     been compromised in some way, like, for example, by

18     malware?

19             A      Yes, but not every device, because

20     not every device needs it.  So I guess the ones

21     that technically would require it, would fall under

22     that guide, but . . .

1          Q     How often is that sort of testing

2     done on any device that you would use in the course

3     of your work?

4          A     I don't know.

5          Q     And you said some device doesn't --

6     some devices don't need that.  Why would some

7     devices not need that?

8          A     Well, I'm thinking about hardware

9     devices used for forensic imaging where it's a

10    device that you put between source and target that

11    just moves and copies data.

12         Q     And it's your understanding that type

13    of device, for example, it just couldn't store

14    malware on it?

15         A     Correct.

16         Q     I see.

17              And what type -- give me an example

18    of that kind of device.  Is there some sort of --

19         A     It's been a while.  I -- FTK, one of

20    the -- no, not FTK.  The -- I don't know.  I'll

21    have to get back to you, but it'll come to me.

22         Q     Okay.  We're almost --

Page 234

1    because otherwise it's going to throw -- it gets

2    complicated on Exhibit Share.  So just remind me at

3    the end to mark this as an exhibit.  We won't do it

4    for now.

5    BY MR. CROSS:

6            Q     Okay.  So the check came for the

7    Sidney Powell Engagement from Defending the

8    Republic, Inc.  And that's for the Coffee County

9    work?

10           A     Yes.

11           Q     And do you know anything about that

12   organization?

13           A     I do not.

14           Q     Okay.  Let's see.  Oh, was anybody

15   able to identify the person who came in who was

16   with Scott Hall on-site?

17           A     No.

18           Q     Did that person do anything on-site?

19           A     Not as far as collections, no.

20           Q     What did he do?

21           A     As we understand it, he was with

22   Scott Hall as a programmer.

Page 235

1    Q    And when you say "programmer," what

2  do you mean?

3    A    That's all I know.

4    Q    Somebody who would program software

5  or computers?

6    A    Yes.

7    Q    Okay.  Did he have a computer or

8  devices with him?

9    A    I don't know.

10    Q    Okay.  Did he offer any direction or

11  guidance to the SullivanStrickler team on what to

12  do?

13    A    He did not.

14    Q    Okay.  He was just there with Scott

15  Hall --

16    A    That's correct.

17    Q    -- as a programmer?

18    A    Correct.

19    Q    Okay.  Did anyone who was there that

20  day on-site, to the knowledge of the firm or the

21  team, take anything with them that they did not

22  bring in themselves apart from data that was

Page 241

```
 1                (Felicetti Deposition Exhibit Number 17

 2                marked for identification.)

 3        BY MR. CROSS:

 4                Q      And Exhibit 17 is another document

 5        that was produced to us in response to the Maggio

 6        subpoena.

 7                       Have you seen this before?

 8                A      Yes, I have.

 9                Q      What is this?

10                A      This is a representation of the

11        FileShare activity.

12                Q      So --

13                A      ShareFile, sorry, to be clear.

14                Q      I often make the same mistake.

15                       So if we look at Exhibit 17, and just

16        take the first page, "Item Name," is that a

17        particular file that's sitting on the ShareFile?

18                A      It is.

19                Q      Okay.  And then there's a date and a

20        time, right?

21                A      Yes.

22                Q      And then next to that is, "Activity."
```

Page 242

1        If we look at the first line, that's "Download,"

2    right?

3            A       Correct.

4            Q       So do I understand that what this

5    shows is that the user indicated here downloaded

6    whatever item is listed there at that date and

7    time?

8            A       Yes.

9            Q       And the user on that first line is,

10    "Conan H," Conan Hayes?

11            A       Yes.

12            Q       And then it's got his e-mail address,

13    his company, ASOG, A-S-O-G.  Then the IP address,

14    that would be the user's IP address?

15            A       Yes.

16            Q       And are you familiar with the company

17    ASOG?

18            A       I am not.

19            Q       And if you come to the page ending in

20    141, you'll see -- if you come down, do you see how

21    the -- under the location, there's Florida,

22    Virginia, Florida, and then we get to Milan

1        Lombardia.  Do you see that?

2              A    Yes.

3              Q    And that corresponds to downloads by

4      Conan Hayes on January 13 of 2021.  Do you see

5      that?

6              A    Yes.

7              Q    And then go to the page ending in

8      50 -- 150.

9              A    Excuse me, real quick.  You said

10     2020 -- oh, I'm sorry.  Okay.  Never mind.

11             Q    Yeah.

12             A    And you want me to go to where?

13             Q    150.

14             A    Okay.

15             Q    And here we have -- you'll see Doug

16     Logan has some downloads, indicates in Florida,

17     then there's New Jersey.  And then we get to

18     Florence, Toscana for Scott T on January 9, 2021.

19                  Do you see that?

20             A    Yes, sir.

21             Q    And that -- that, again, indicates

22     the location that was captured in the system for

Page 244

1    where the person was when they did the download?

2         A    Not necessarily.

3         Q    And -- and the question I was going

4    to ask is:  If someone were downloading information

5    through a VPN, for example, it may not capture

6    their actual physical location?

7         A    Correct.

8         Q    And so if, for example, someone

9    wanted to mask the physical location of where they

10   were and their IP address, there are ways for them

11   to do that such as the VPN?

12        A    Yes.

13        Q    So when -- when we look at this,

14   Exhibit 17, the IP address and the physical

15   location may or may not be the actual IP address

16   and actual physical location of the individual when

17   they did whatever they did?

18        A    Yes.

19        Q    And under "User," that indicates the

20   user log-in credentials for that activity, right?

21        A    The user name created, yes.

22        Q    Right.

1          But the firm doesn't have any way of

2     knowing whether the log-in credentials that are

3     used for any action, whether that was actually by

4     the person who was assigned those credentials,

5     right?

6          A     Correct.

7          Q     And do I understand the redactions in

8     here are for data that was not from Coffee County?

9          A     I would assume so, yes.

10         Q     Okay.

11         A     But I don't know specifically.

12         Q     Okay.  Oh, data collection.

13              So it looks like, in going through

14    this, the latest date for any action is February 26

15    of 2021.  Do you know why the log only goes through

16    February 26 of 2021?

17         A     I do not know.

18              MR. CROSS:  Okay.  If there are

19    additional logs, we would ask for production of

20    those, because our understanding is that the data

21    sat on that ShareFile longer.  In fact, I think

22    Benjamin Cotton testified that he didn't access

1     Excel file, right?

2          A     Yes.

3          Q     If you turn to 21, my understanding

4     is this -- the way the documents were produced,

5     Exhibit 21 is the attachment to that message?

6          A     Yes.

7          Q     Do you recognize Exhibit 21?  Do you

8     know what that is?

9          A     I do.

10         Q     And what is that?

11         A     This is a chain-of-custody log, a

12    tracking log.

13         Q     Explain to me -- we talked before why

14    it's important.  Can you just sort of walk me

15    through the fields and what they show?  You can

16    just pick one of the rows.

17         A     Sure.  So the photos that we looked

18    at previously, this is a spreadsheet representation

19    of what was tagged and labeled, et cetera.  So if

20    I'm looking at 20 -- 205, this guy --

21         Q     Uh-huh.

22         A     -- the first column representing the

1      identified was CS, CompactFlash, the flash drives,

2      b represented the label, and C represented whether

3      it was primary or secondary based on the labels in

4      the photos.

5              Q      What is primary versus secondary?

6              A      I don't know.  I don't know if

7      they're duplicative.  I don't know, but that's how

8      they were handed to us and labeled.

9              Q      So the primary and secondary

10     designation, that comes from Coffee County, that's

11     not your terminology?

12             A      Correct.

13             Q      I see.

14             A      Correct.

15             Q      Okay.  So grab Exhibit 12, if you

16     would, it's the photos --

17             A      Sure.

18             Q      -- that Jennifer Jackson took.  And

19     if you look at -- look at these together.

20             A      Sure.

21             Q      The photo that ends in 236.

22             A      Yes.

1          Q      The first one is CF01, and then it

2     says "BTown-1."  Do you see that?

3          A      Yes, sir.

4          Q      And so that would correspond to the

5     first row in Exhibit 21, right?

6          A      Yes.

7          Q      And then the next one in the picture

8     at 236, is CF02 BTown-2, and that corresponds to

9     the second row in 21?

10         A      Yes.

11         Q      Okay.  So if for some reason someone

12    thought it would be really fun to do, and I will

13    leave it to someone on my team, someone could go

14    through the photos using these notes and match

15    those up to the chain-of-custody log, right?

16         A      Yes.

17         Q      Okay.

18              (Felicetti Deposition Exhibit Number 22

19              marked for identification.)

20    BY MR. CROSS:

21         Q      All right.  Exhibit 22.  So

22    Exhibit 22 at the top is an e-mail from Jim Penrose

Page 290

```
1              A       Sure.

2              Q       The SullivanStrickler team went in

3       and scanned -- or sorry, copied thumb drives and it

4       copied whatever data was on those thumb drives at

5       the moment the team came in to copy them?

6              A       Correct.

7              Q       At the same time in parallel, Misty

8       Hampton is scanning cast ballots with a scanner?

9              A       Yes.

10             Q       Do you know whether -- the scans that

11      Misty Hampton created, whether those scans were

12      also at some point provided to SullivanStrickler?

13             A       Yes, they were put on a thumb drive

14      for us to scan -- to forensically image.

15             Q       Okay.  Got it.  Got it.

16                     And was that done on the 7th or

17      later?

18             A       No, the same day.  So the 7th.

19             Q       Do you know what elections she was

20      scanning ballots from?

21             A       I don't know.

22             Q       Okay.  Did the team see anyone other
```

Page 291

1      than Ms. Hampton scan ballots?

2              A    Based on my discussion with the team,

3      it was Misty.  That's it.

4              Q    So we've talked about a number of

5      folks, and we looked at pictures outside the

6      building.  Let me just make sure I get a complete

7      picture of the inside.

8                   So in the office during the day while

9      SullivanStrickler was doing its work, it was

10     obviously the four members of the SullivanStrickler

11     team?

12             A    Yes.

13             Q    Cathy Latham was there for most of

14     the day.  Is that right?

15             A    Yes.

16             Q    And I think you said earlier she was

17     helping provide some direction on what to copy?

18             A    Yes.

19             Q    Misty Hampton was there for most of

20     the day, also providing some direction?

21             A    Yes.

22             Q    Scott Hall was there for most of the

Page 333

1                    CERTIFICATE OF NOTARY PUBLIC

2       I, FELICIA A. NEWLAND, CSR, the officer before whom

3       the foregoing videotaped deposition was taken, do

4       hereby certify that the witness whose testimony

5       appears in the foregoing deposition was duly sworn

6       by me; that the testimony of said witness was taken

7       by me in stenotype and thereafter reduced to

8       typewriting under my direction; that said deposition

9       is a true record of the testimony given by said

10      witness; that I am neither counsel for, related to,

11      nor employed by any of the parties to the action in

12      which this deposition was taken; and, further, that

13      I am not a relative or employee of any counsel or

14      attorney employed by the parties hereto, nor

15      financially or otherwise interested in the outcome

16      of this action.

17

18

19

20                    FELICIA A. NEWLAND, CSR

                      Notary Public

21

        My commission expires:

22      September 15, 2024