# VOTERGA
# SAFE COMMISSION
# RECOMMENDATIONS

This document provides minimal objectives, requirements and legislative recommendations as necessary to achieve verifiable, auditable and recount capable voting. They are intended to assist the SAFE commission in its efforts to evaluate voting systems and advise Georgia officials on how best to improve election integrity while implementing a new system.

*Recommended Objectives,*
*Proposed Requirements,*
*Legislative Suggestions*

*with Legislative Appendices*

# *VoterGA*

## *Table of Contents*

ABOUT VOTERGA AND THE AUTHOR ........................................................................... 2

BACKGROUND AND NEW SYSTEM OBJECTIVES ..................................................... 3

BALLOT STANDARDIZATION ...................................................................................... 4

    Requirements: ................................................................................................................ 4

    Legislative Recommendations: ..................................................................................... 4

BALLOT SECRECY ......................................................................................................... 5

    Requirements: ................................................................................................................ 5

    Legislative Recommendations: ..................................................................................... 5

VERIFIABLE VOTE TABULATION .............................................................................. 6

    Requirements: ................................................................................................................ 6

    Legislative Recommendations: ..................................................................................... 6

ELECTION PREP SECURITY ......................................................................................... 7

    Requirements: ................................................................................................................ 7

    Legislative Recommendations: ..................................................................................... 7

AUDITING ........................................................................................................................ 8

    Requirements: ................................................................................................................ 8

    Legislative Recommendations: ..................................................................................... 8

RECOUNT TABULATOR VERIFICATION ................................................................. 10

    Requirements: .............................................................................................................. 10

    Legislative Recommendations: ................................................................................... 10

BALLOT INSPECTION TRANSPARENCY ................................................................. 11

    Requirements: .............................................................................................................. 11

    Legislative Recommendations: ................................................................................... 11

OTHER REQUIREMENTS ............................................................................................ 12

    Requirements: .............................................................................................................. 12

    Legislative Recommendations: ................................................................................... 12

CONCLUSION ................................................................................................................ 13

APPENDICES ................................................................................................................. 14

*VoterGA*                                    *SAFE Commission*
                                             *Recommendations*

## ABOUT VOTERGA AND THE AUTHOR

Voters Organized for Trusted Election Results in Georgia, known as *VoterGA,* has operated as a leading election integrity organization in Georgia for 13 years. It is a non-profit, non-partisan, dues free, all volunteer organization that has received local, state and national recognition for its research, analysis and reports involving election integrity and Georgia's current voting system. The focus of VoterGA has always been to restore the integrity of Georgia elections through verifiable, auditable and recount capable voting. It also emphasizes the removal of ballot access petitioning requirements so that all Georgians can run for office on a fair and equal basis with candidates of major political parties. The organization web site is voterga.org.

Garland Favorito is a co-founder of VoterGA and volunteer Elections Director of the Constitution Party of Georgia. Mr. Favorito also has 16 years of volunteer involvement in regards to Georgia's voting machines, dating back to 2002 before the state purchased and implemented the machines. He makes presentations throughout the state and is recognized as a leading expert on the usage and risks of Georgia's voting machines. He can be reached at 404 664-4044 or Garlandf@msn.com

Mr. Favorito is a career Information Technology professional with over 40 years of in-depth experience in internet systems design, business systems analysis, database administration, application development, systems integration, systems life cycle methodologies, computer programming, project management, and multi-factor security for financial transactions. His experience centers on medium and large-scale mission-critical applications in nearly all facets of American business. His industry experience includes banking, financial systems, health care, accounting, manufacturing, inventory, purchasing, retailing, utilities, telecommunications, insurance, software development and the service industry.

*VoterGA*

*SAFE Commission*
*Recommendations*

## BACKGROUND AND NEW SYSTEM OBJECTIVES

Secretary of State Kemp established the Secure, Accessible & Fair Elections (SAFE) Commission in April 2018 to study options for Georgia's next voting system. Commission members are tasked with conducting cost analysis of market options, researching post-election audit procedures, and providing legislative recommendations to lawmakers before the next session of Georgia's General Assembly. The first meeting was held on June 13th in Marietta.

As a consistent leader for election integrity in Georgia for the past 13 years, VoterGA polled some of its most knowledgeable members to provide input for the commission from the perspective of a Georgia voter. Below is a short list of simple, high level objectives that we believe the SAFE commission must achieve to provide Georgia with verifiable, auditable and recount capable voting:

- **Ballot Standardization** – The official ballot must be a durable paper instrument with human readable vote marks in same style and appearance for all types of voting;

- **Ballot Secrecy** – The system must ensure voter anonymity by not linking vote records and ballot images to a voter;

- **Verifiable Vote Tabulation** – The system must tabulate human readable vote marks that can be verified by the voter or a disabled voter's assistant;

- **Election Prep Security** – Counties must perform decentralized election preparation or have procedures to verify the accuracy and security of central data received;

- **Auditing** – Tabulated results must be verified with a public hand tally of a percentage of voter created human readable vote marks on physical ballots according to Risk Limited Auditing, mandatory full race precinct audits or comparable procedures acknowledged as best practices;

- **Recount Tabulator Verification** – Tabulated results must be verified or corrected during all recounts of a contest by using a manual tally of human readable marks on all physical ballots;

- **Ballot Inspection Transparency** - The public must be allowed to view the paper ballots and ballot images previously cast for an election under reasonable conditions set by the ballot custodian according to state law.

The following sections present a **minimal** set of requirements and corresponding legislative suggestions for each objective.  These requirements are independent of the type of equipment and vendor that the SAFE commission may eventually recommend.

*VoterGA*

*SAFE Commission*
*Recommendations*

# BALLOT STANDARDIZATION

The official ballot must be a durable paper instrument with human readable vote marks in the same style and appearance for all types of voting.

## Requirements:

Today, mail-in voters use a durable paper ballot to record their votes but voters using electronic machines or municipally controlled lever machines have no such ballots. Some ballot marking systems under consideration by the commission produce voter selections on paper but not full paper ballots.

Voters need ballots with human readable vote marks to verify what races or detailed questions may have been overlooked on the ballot. The following requirements are proposed to standardize the ballot across all voting types:

- The ballot must be a durable paper Instrument;
- The ballot used by voters within an identical combination of districts must be consistent in style and appearance across all types of voting including mail-in, Election Day, early voting, provisional and disabled elector voting;
- The voting system must have the option to produce ballots on demand at polling locations in the same style and appearance as mail-in and provisional ballots;
- The voting system, ballots and procedures to be used must also apply to municipalities to reduce voter confusion and so that lever based voting machines can be decommissioned.

## Legislative Recommendations:

Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to primaries and elections generally, is amended by revising paragraph (18), of Code Section 21-2-2, relating to definitions as follows:

"(18) 'Official ballot' means a <u>durable paper</u> ballot, ~~whether paper, mechanical, or electronic~~, which is furnished by the superintendent or governing authority in accordance with Code Section 21-2-280<u>.</u> ~~, including ballots read by optical scanning tabulators"~~
<u>and is of the same size and appearance for all types of voting conducted for a ballot style in a primary or general election"</u>

Note: See the Legislative Appendix entitled *Lever Machine Decommissioning* for code changes needed to decommission obsolete lever voting machines as based on HB680 content from 2017.

# *VoterGA*

*SAFE Commission*
*Recommendations*

## BALLOT SECRECY

The system must ensure voter anonymity by not linking vote records and ballot images to a voter.

### Requirements:

When the Georgia voting system was implemented it contained a link from cast ballots to voter registration information.  That link potentially infringed upon voter privacy. As we move to a new system, no such link should exist and we must ensure that the low volume of disabled voters use the same type of ballot as other voters to better protect the privacy of the votes they may cast.  The following requirements are proposed to ensure voter anonymity for all Georgia voters including those using electronic ballot markers:

- Ballot marking devices deployed for voters with disabilities must produce a ballot consistent in style and appearance with all other ballots;
- The voting system must demonstrate to the satisfaction of the commission members that it ensures voter anonymity by not linking vote records and ballot images to a voter.

### Legislative Recommendations:

Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to primaries and elections generally, is amended by adding paragraph (7.1) Code Section 21-2-2, relating to definitions as follows:

"(7.1) 'Electronic ballot marker' means an electronic device that does not compute or retain votes; may integrate components such as a ballot scanner, printer, touch screen monitor, audio output, and a navigational keypad; and uses electronic technology at the discretion of an elector to independently and privately make human readable marks that shall be counted as votes cast and printed on a paper ballot with the same size and appearance as other ballots used in the primary or election for electors voting the same ballot style."

Note: See the Legislative Appendix entitled *Electronic Ballot Markers* for code changes needed to support the *'electronic ballot marker'* definition above as based on SB403 content from 2017.

*VoterGA*                                    *SAFE Commission*
                                             *Recommendations*

## VERIFIABLE VOTE TABULATION

The system must tabulate human readable vote marks that can be verified by the voter or a disabled voter's assistant.

### Requirements:

Today the actual votes cast in an electronic voting machine media cannot be verified by the voter because the votes are embedded internally in voting machine media. About half of the replacement systems that the commission is currently considering do not provide any improvements in verifiable voting because they embed votes into digital bar codes. The following requirements are proposed to ensure that voters have the opportunity and motivation to verify all votes to be tabulated:

- The system must tabulate only human readable vote marks on each ballot;
- The system must tabulate only human readable vote marks made by any ballot markers that are used by disabled voters;
- The ballot scanner must detect vote mark errors such as undervotes and overvotes when the ballot is scanned and give the voter an opportunity to confirm or correct their ballot before it is cast and tabulated;
- Georgia election code should require any Direct Recording Electronic equipment that may be used in the future to have an independent audit trail of each human readable vote mark cast.

### Legislative Recommendations:

Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to primaries and elections generally, is amended by revising paragraphs (2) and (4.1), of Code Section 21-2-2, relating to definitions as follows:

"(2) 'Ballot' means 'official ballot' or 'paper ballot' and shall include the durable paper instrument, ~~whether paper, mechanical, or electronic~~, by which an elector casts his or her vote with human readable vote marks that shall be counted as the votes cast".

"(4.1) 'Direct recording electronic' or 'DRE' voting equipment means a computer driven unit for casting and counting votes on which an elector touches a video screen or a button adjacent to a video screen to cast his or her vote and produce a voter verified, independent. paper ballot audit trail of human readable vote marks that are tabulated as votes cast".

*VoterGA*

*SAFE Commission*
*Recommendations*

## ELECTION PREP SECURITY

Counties must perform decentralized election preparation or have procedures to verify the accuracy and security of central data received.

### Requirements:

In 2017, the central ballot building server was found to be exposed to the internet for an extended period of time and thus may have been compromised. The counties have no procedures to verify the security of the information they receive from the central preparation facility. The following requirements are mutually exclusive and represent alternative ways to improve election preparation security:

- The system must provide the option to decentralize election preparation to counties so as to protect the election preparation process from a single point of attack;
- The system must provide procedures for county election officials to verify that any election preparation data received from a central source is accurate, secure and has not been compromised by tampering.

### Legislative Recommendations:

**Option 1: Continue with improved centralization security for election preparation:**

Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to primaries and elections generally, is amended by revising paragraph (15) and adding paragraph (16) for subsection (a) of Code Section 21-2-50, relating to the powers and duties of the Secretary of State and prohibition against serving in a fiduciary capacity, as follows:

"(15) To develop, program, build, and review ballots for use by counties and municipalities on ~~direct recording electronic (DRE)~~ voting systems in use in the state.

(16) To provide counties with security procedures that the counties must use to ensure that any information received from the central ballot preparation facility is accurate, safe and has not been compromised by tampering."

**Option 2: Decentralization of election preparation to counties:**

Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to primaries and elections generally, is amended by revising paragraph (15) of subsection (a) of Code Section 21-2-50, relating to the powers and duties of the Secretary of State and prohibition against serving in a fiduciary capacity, as follows:

"~~(15) To develop, program, build, and review ballots for use by counties and municipalities on direct recording electronic (DRE) voting systems in use in the state.~~RESERVED"

*VoterGA*                                            *SAFE Commission*
                                                     *Recommendations*

## AUDITING

Tabulated results must be verified with a public hand tally of a percentage of voter created human readable vote marks on physical ballots according to Risk Limited Auditing, mandatory full race precinct audits or other comparable procedures proposed by election audit experts.

### Requirements:

Today, Georgia has no procedures to audit the counts reported by electronic voting machines. Procedures for randomly selected, mandatory, full race precinct audits were proposed with HB790 in 2006 but not adopted. Risk Limiting Audit (RLA) procedures were proposed with SB403 in 2017 but not adopted. The following RLA requirements are proposed to implement proper audit procedures once Georgia has obtained auditable equipment:

- An audit must be defined as hand tally of human readable marks to ensure with reasonable certainty that system vote tallies are accurate;
- The Secretary of State must be authorized to immediately conduct audits on any race;
- The Secretary of State must be authorized to  make recommendations and implement audit procedures in accordance with legislative guidelines and acknowledged best practices;
- Risk limiting audits must be required for Georgia elections and be conducted until there is adequate statistical evidence to confirm confidence in the results according to an established risk limit;
- The system and procedures should support randomly selected, mandatory full race, precinct audits if deemed practical
- Audits must be conducted transparently in a manner that allows for public viewing and oversight including access to evidence and reports;
- The scope of election auditing must include ballots from all types of voting for an election including Election Day, early, mail-in and provisional;
- The choice of ballots to be audited must be determined randomly after the unofficial results have been published;
- Auditing must be completed prior to the certification of an election.

### Legislative Recommendations:

Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to primaries and elections generally, is amended by revising Code Section 21-2-498, which was previously reserved, as follows:

"21-2-498.
(a) As used in this Code section, the term 'risk-limiting audit' means a manual tally audit protocol that makes use of statistical methods to limit to acceptable levels the risk of certifying a preliminary election outcome that is inconsistent with the election outcome that would be obtained by conducting a full, manual tally count. Any audit performed under this Code section

*VoterGA*

shall determine voter intent manually via human inspection of human readable marks on the original, voter-verified and voter-verifiable paper records, cast and counted in the contest.
(b) Beginning with the 2020 presidential preference primary, the Secretary of State in conjunction with local election superintendents shall be authorized to conduct post-election, risk-limiting audits for any primary, general, or special election, any runoffs of such elections, or any ballot question, in accordance with requirements set forth by rule or regulation of the State Election Board.
(c) Upon implementation of an optical scan voting system in accordance with subsection (a) of Code Section 21-2-300, the Secretary of State in conjunction with local election superintendents shall conduct manual tally, post-election, risk-limiting audits for all federal and gubernatorial primary and general elections, any runoffs of such elections, and any state-wide ballot question, in accordance with requirements set forth by rule or regulation of the State Election Board.
(d) In conducting each audit, the Secretary of State and local election superintendents shall:
   (1) Choose the ballots to be audited randomly after the election is held
   (2) Complete the audit prior to final certification of the contest;
   (3) Ensure that all ballots are included in the audit, whether cast in person, by absentee ballot, advance voting, provisional ballot, or otherwise;
   (4) Provide to the public a report of the unofficial final tabulated vote results for the contest prior to conducting the audit;
   (5) Perform the audit by manual tally in public view and with public oversight;
   (6) Provide to the public details of the audit within 48 hours of completion and;
   (7) Complete the audit prior to final certification of the contest.
(e) For each contest election being audited, the State Election Board in conjunction with the local election superintendents shall set a risk limit no larger than 10 percent, while providing a minimum 90 percent chance of detecting and correcting a result where the outcome of the original tabulation is inconsistent with the election outcome obtained by conducting a full recount.
(f) If the audit of any contest leads to a full manual tally count of the ballots cast, the results of such manual tally count shall determine the official contest results.
(g) The State Election Board shall promulgate rules, regulations, and procedures to implement and administer the provisions of this Code section. ~~Reserved~~."

# *VoterGA*

*SAFE Commission*
*Recommendations*

## RECOUNT TABULATOR VERIFICATION

Tabulated results must be verified or corrected during all recounts of a contest by using a manual tally of human readable marks on all physical ballots.

### Requirements:

Today if a Georgia election has a recount, the electronic votes are "recanvassed", not fully recounted as the law states. Mail-in ballots are run through the tabulator a second time for the recount. If the tabulator counted incorrectly during the election it will most certainly count incorrectly during the recount. The following requirements are proposed to verify the tabulator counts as part of a recount:

- Recounts must be performed by hand counting eligible paper ballots to verify that tabulator election results and obtain the most accurate results possible.

### Legislative Recommendations:

Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to primaries and elections generally, is amended by revising subsection (a) of Code Section 21-2-495, relating to procedure for recount or recanvass of votes and losing candidate's right to a recount, and adding a new subsection to read as follows:

"(a) In precincts where paper ballots have been used, the superintendent may, either of his or her own motion or upon petition of any candidate or political party, order the recount of all the ballots for a particular precinct or precincts for one or more offices in which it shall appear that a discrepancy or error, although not apparent on the face of the returns, has been made. Such recount may be held at any time prior to the certification of the consolidated returns by the superintendent and shall be conducted under the direction of the superintendent. Before making such recount, the superintendent shall give notice in writing to each candidate and to the county or municipal chairperson of each party or body affected by the recount. Each such candidate may be present in person or by representative, and each such party or body may send two representatives to be present at such recount. If upon such recount, it shall appear that the original count by the poll officers was incorrect, such returns and all papers being prepared by the superintendent shall be corrected accordingly. <u>The superintendent shall recount the paper ballots manually</u>"

"(e) <u>In performing a recount under this Code section in precincts in which paper ballots have been used, the superintendent shall recount the paper ballots manually</u>"

*VoterGA*                                    *SAFE Commission*
                                             *Recommendations*

## BALLOT INSPECTION TRANSPARENCY

The public must be allowed to view cast ballots and ballot images under reasonable conditions set by a ballot custodian according to state law.

### Requirements:

Today, ballots are sealed after election certification and the public is prohibited from viewing them. A court has already refused to grant a candidate access to view ballots cast in their own race. The following requirements are needed for ballot inspection transparency allowing the public to inspect ballots cast in an election under designated conditions once the election has been certified:

- Ballot custodians must allow candidates to publicly inspect ballots in control of the custodian once reasonable notice is given;
- Ballot custodians must allow voters to publicly inspect ballots in control of the custodian once reasonable notice is given;
- Ballot custodians must allow members of the public to publicly inspect ballots in control of the custodian once reasonable notice is given.

### Legislative Recommendations:

Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to absentee voting, is amended by adding a new Code section to read as follows:

"21-2-391.

Any member of the public shall be given the opportunity, upon request, to inspect ballots and ballot images cast in an election or primary for a period of two years after the date of such election or primary.

Such members of the public shall be entitled to create reproductions of such ballots at his or her expense. Such inspection shall be made at a reasonable time and place determined by the custodian of such election or primary ballots. This Code section shall be applicable to elections or primaries held prior to July 1, 2019, and to any election or primary held after that date."

*VoterGA*

*SAFE Commission*
*Recommendations*

## OTHER REQUIREMENTS

### Requirements:

The SAFE commission should also consider other requirements not directly related to verifiable, auditable and recount capable voting. The following requirements are suggested for consideration by the commission:

- The tabulator must be able to support the option of ranked choice voting;
- The election certification deadlines may need to be extended to allow for proper election auditing;
- The Effective Date for implementation of the new system and associated election code changes should be January 1, 2020 if feasible.

### Legislative Recommendations:

These related legislative changes are outside the scope of this report.

*VoterGA*                                      *SAFE Commission*
                                               *Recommendations*

## CONCLUSION

Georgia does not currently have procedures for auditing, public transparency or full recounts as described in this document. These are activities that Georgia voters expect to be performed during the conduct of elections to restore their trust in the elections process. The responsibilities to carry out these expected new or improved activities will rest with county election directors. These responsibilities may increase the amount of time required, resources expended and funds needed. The Secretary of State's office should assist the counties in carrying out new responsibilities in the means that the county election directors deem necessary.

The intent of this document is to remain vendor neutral in regards to most new equipment type options that the SAFE commission may eventually choose so as to leave all commission options open. However, our members and many members of the general public have clearly expressed the need for the following types of system and vendors:

- Durable, hand marked paper ballots for maximum cost effectiveness and implicit voter verification;
- On demand ballot printers as the commission determines is needed to help avoid the costs of wasted paper, ease the administrative burden for county election directors and help prevent fraud;
- Ballot markers that produce the same style and appearance of ballots for disabled voters as for other types of voting, thus, helping to ensure their anonymity and afford users of assistive technology the same protections as other Georgia voters;
- Tabulators that tabulate only human readable vote marks and are legally prohibited from counting votes embedded in any type of digital bar code;
- Vendors who can restore trust in Georgia elections by offering products not subject to intense statewide or nationwide criticism.

We thank the commission for receiving this report and for the previous opportunity given us to make a short presentation on related topics. We are prepared to offer any volunteer assistance to the commission as it deems necessary.

*VoterGA*

*SAFE Commission*
*Recommendations*

## LEGISLATIVE APPENDICES

### Electronic Ballot Marker Changes

These legislative changes are suggested to further modify Chapter 2 of Title 21 of the Official Code of Georgia Annotated for the use of 'electronic ballot marker' as defined in the *Ballot Secrecy* section:

Said chapter is further amended by revising subsection (a) of Code Section 21-2-267, relating to equipment, arrangement, and storage at polling places, as follows:
"(a) The governing authority of each county and municipality shall provide and the superintendent shall cause all rooms used as polling places to be provided with suitable heat and light and, in precincts in which ballots are used, with a sufficient number of voting compartments or booths with proper supplies in which the electors may conveniently mark their ballots, with a curtain, screen, or door in the upper part of the front of each compartment or booth so that in the marking thereof they may be screened from the observation of others. A curtain, screen, or door shall not be required, however, for the self-contained units used as voting booths in which direct recording electronic (DRE) voting units <u>or electronic ballot markers</u> are located if such booths have been designed so as to ensure the privacy of the elector. When practicable, every polling place shall consist of a single room, every part of which is within the unobstructed view of those present therein and shall be furnished with a guardrail or barrier closing the inner portion of such room, which guardrail or barrier shall be so constructed and placed that only such persons as are inside such rail or barrier can approach within six feet of the ballot box and voting compartments, or booths, ~~or voting machines~~, as the case may be. The ballot box and voting compartments or booths shall be so arranged in the voting room within the enclosed space as to be in full view of those persons in the room outside the guardrail or barrier. ~~The voting machine or machines shall be placed in the voting rooms within the enclosed space so that, unless its construction shall otherwise require, the ballot labels on the face of the machine can be plainly seen by the poll officers when the machine is not occupied by an elector.~~ In the case of direct recording electronic (DRE) voting units <u>or electronic ballot markers</u>, the ~~units~~ <u>devices</u> shall be arranged in such a manner as to ensure the privacy of the elector while voting on such ~~units~~ <u>devices</u>, to allow monitoring of the ~~units~~ devices by the poll officers while the polls are open, and to permit the public to observe the voting without affecting the privacy of the electors as they vote."

Said chapter is further amended by revising Code Section 21-2-293, relating to correction of mistakes and omissions on ballots, as follows:
"21-2-293.
(a) If the election superintendent discovers that a mistake or omission has occurred in the

printing of official ballots or in the programming of the display of the official ballot on DRE voting equipment <u>or electronic ballot markers</u> for any primary or election, the superintendent is authorized on his or her own motion to take such steps as necessary to correct such mistake or omission if the superintendent determines that such correction is feasible and practicable under the circumstances; provided, however, that the superintendent gives at least 24 hours notice to the Secretary of State and any affected candidates of the mistake or omission prior to making such correction.

(b) When it is shown by affidavit that a mistake or omission has occurred in the printing of official ballots or in the programming of the display of the official ballot on DRE voting equipment <u>or electronic ballot markers</u> for any primary or election, the superior court of the proper county may, upon the application of any elector of the county or municipality, require the superintendent to correct the mistake or omission or to show cause why he or she should not do so."

Said chapter is further amended by revising Part 5 of Article 9, relating to electronic recording voting systems, by repealing the part and inserting in lieu thereof the following:
"Part 6
<u>21-2-379.21.</u>
<u>Each polling place in this state utilizing optical scanning voting systems shall be equipped with at least one electronic ballot marker that meets the requirements as set forth in this part.</u>

<u>21-2-379.22.</u>
<u>No electronic ballot marker shall be adopted or used in primaries or elections in this state unless it shall, at the time, satisfy the following requirements:</u>
<u>(1) Provide facilities for marking ballots for all such candidates and questions for which the elector shall be entitled to vote in a primary or election;</u>
<u>(2) Permit each elector, in one operation, to mark a vote for presidential electors for all the candidates of one party or body for the office of presidential elector;</u>
<u>(3) Permit each elector to mark votes, at any election, for any person and for any office for whom and for which he or she is lawfully entitled to vote, whether or not the name of such person or persons appears as a candidate for election; to mark votes for as many persons for an office as he or she is entitled to vote for; and to mark votes for or against any question upon which he or she is entitled to vote;</u>
<u>(4) Preclude the marking of votes for any candidate or upon any question for whom or upon which an elector is not entitled to vote; preclude the marking of votes for more persons for any office than the elector is entitled to vote for; and preclude the marking of votes for any candidate for the same office or upon any question more than once;</u>
<u>(5) Permit voting in absolute secrecy so that no person can see or know for whom any other elector has voted or is voting, save an elector whom he or she has assisted or is assisting in voting, as prescribed by law;</u>

*VoterGA*

*SAFE Commission*
*Recommendations*

(6) Be constructed of material of good quality in a neat and workmanlike manner;

(7) When properly operated, mark correctly and accurately every vote cast;

(8) Be so constructed that an elector may readily learn the method of operating it; and

(9) Be safely transportable.

21-2-379.23.

(a) Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any electronic ballot marker may request that the Secretary of State examine the device. Any ten or more electors of this state may, at any time, request that the Secretary of State reexamine any such device previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination or reexamination. The Secretary of State shall publish and maintain on his or her website the cost of such examination or reexamination. The Secretary of State may, at any time, in his or her discretion, reexamine any such device.

(b) The Secretary of State shall thereupon examine or reexamine such device and shall make and file in his or her office a report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion, the kind of device so examined can be safely and accurately used by electors at primaries and elections as provided in this chapter. If this report states that the device can be so used, the device shall be deemed approved, and devices of its kind may be adopted for use at primaries and elections as provided in this chapter.

(c) Any device that is not so approved shall not be used at any primary or election and if, upon the reexamination of any such device previously approved, it shall appear that the device can no longer be safely or accurately used by electors at primaries or elections as provided in this chapter because of an inability to accurately record votes, the approval of the same shall immediately be revoked by the Secretary of State, and no such device shall thereafter be purchased for use or be used in this state.

(d) When a device has been so approved, no improvement or change that does not impair its accuracy, efficiency, or capacity shall render necessary a reexamination or reapproval of such device, or of its kind.

(e) Neither the Secretary of State, nor any custodian, nor the governing authority of any county or municipality or a member of such governing authority nor any other person involved in the examination process shall have any pecuniary interest in any device or in the manufacture or sale thereof.

21-2-379.24.

(a) The superintendent of each county or municipality shall cause the proper ballot design and style to be programmed for each electronic ballot marker which is to be used in any precinct within such county or municipality, cause each such device to be placed in proper order for voting, and examine each unit before it is sent to a polling place for use

*VoterGA*

in a primary or election to verify that each device is properly recording votes and
producing proper ballots.

(b) The superintendent may appoint, with the approval of the county or municipal
governing authority, as appropriate, a custodian of the electronic ballot markers, and
deputy custodians as may be necessary, whose duty shall be to prepare the devices to be
used in the county or municipality at the primaries and elections to be held therein. Each
custodian and deputy custodian shall receive from the county or municipality such
compensation as shall be fixed by the governing authority of such county or municipality.
Such custodian shall, under the direction of the superintendent, have charge of and
represent the superintendent during the preparation of the devices as required by this
chapter. The custodian and deputy custodians shall serve at the pleasure of the
superintendent. Each custodian and deputy custodian shall take an oath of office prepared
by the Secretary of State before each primary or election which shall be filed with the
superintendent.

(c) On or before the third day preceding a primary or election, including special
primaries,
special elections, and referendum elections, the superintendent shall have each electronic
ballot marker tested to ascertain that it will correctly record the votes as marked for all
offices and on all questions and produce a ballot reflecting such choices of the elector in
a manner that the State Election Board shall prescribe by rule or regulation. Public notice
of the time and place of the test shall be made at least five days prior thereto; provided,
however, that, in the case of a runoff, the public notice shall be made at least three days
prior thereto. Representatives of political parties and bodies, news media, and the public
shall be permitted to observe such tests.

21-2-379.25.

(a) All electronic ballot markers and related equipment, when not in use, shall be properly
stored and secured under conditions as shall be specified by the Secretary of State.

(b) The superintendent shall store the devices and related equipment under his or her
supervision or shall designate a person or entity who shall provide secure storage of such
devices and related equipment when it is not in use at a primary or election. The
superintendent shall provide compensation for the safe storage and care of such devices
and related equipment if the devices and related equipment are stored by a person or
entity other than the superintendent."

Said chapter is further amended by revising subparagraph (b)(2)(B) of Code
509 Section 21-2-381, relating to making of application for absentee ballot, determination
of eligibility by ballot clerk, furnishing of applications to colleges and universities, and
persons entitled to make application, as follows:

"(B) If the application is made in person, shall issue the ballot to the elector to be voted
on ~~a direct recording electronic (DRE) voting system~~ within the confines of the
registrar's or absentee ballot clerk's office as required by Code Section 21-2-383 if the

ballot is issued during the advance voting period established pursuant to subsection (d) of Code Section 21-2-385; or"

Said chapter is further amended by revising paragraph (b) of Code Section 21-2-383, relating to preparation and delivery of ballots, form of ballots, and casting ballot in person using DRE unit, as follows:
"21-2-383.
~~(b) Notwithstanding any other provision of this Code section, in jurisdictions in which direct recording electronic (DRE) voting systems are used at the polling places on election day, such direct recording electronic (DRE) voting systems shall be used for casting absentee ballots in person at a registrar's or absentee ballot clerk's office or in accordance with Code Section 21-2-382, providing for additional sites.~~"

Said chapter is further amended by revising subsection (e) of Code Section 21-2-413, relating to conduct of voters, campaigners, and others at polling places generally, as follows:
"(e) No person shall use photographic or other electronic monitoring or recording devices, cameras, or cellular telephones while such person is in a polling place while voting is taking place; provided, however, that a poll manager, in his or her discretion, may allow the use of photographic devices in the polling place under such conditions and limitations as the election superintendent finds appropriate, and provided, further, that no photography shall be allowed of a ballot or the face of ~~a voting machine or DRE unit~~ <u>or an electronic ballot marker</u> while an elector is voting such ballot or ~~machine or DRE unit~~ <u>using such electronic ballot marker</u> and no photography shall be allowed of an electors list, electronic electors list, or the use of an electors list or electronic electors list. This subsection shall not prohibit the use of photographic or other electronic monitoring or recording devices, cameras, or cellular telephones by poll officials for official purposes."

Said chapter is further amended by revising paragraph (8) of Code Section 21-2-566, relating to interference with primaries and elections generally, as follows:
"(8) Willfully tampers with any electors list, voter's certificate, numbered list of voters, ballot box, voting machine, direct recording electronic (DRE) equipment, <u>electronic ballot marker,</u> or tabulating machine"

Said chapter is further amended by revising paragraph (1) of Code Section 21-2-579, relating to fraudulently allowing ballot ~~or voting machine~~ to be seen, casting unofficial ballot, and receiving unauthorized assistance in voting, as follows:
"(3) Without having made the affirmation under oath or declaration required by Code Section 21-2-409, or when the disability which he or she declared at the time of registration no longer exists, permits another to accompany him or her into the voting compartment or ~~voting machine~~ booth or to mark his or her ballot or ~~to register his or her vote on the~~ ~~voting machine or direct recording electronic (DRE) equipment~~ <u>use an</u>

*VoterGA*

*SAFE Commission*
*Recommendations*

electronic ballot marker; or"

Said chapter is further amended by revising Code Section 21-2-580, relating to tampering with, damaging, improper preparation of, or prevention of proper operation of voting machines, as follows:
"21-2-580.
Any person who:
(1) Unlawfully opens, tampers with, or damages any ~~voting machine~~ electronic ballot marker or tabulating machine to be used or being used at any primary or election;
(2) Willfully prepares ~~a voting machine~~ an electronic ballot marker or tabulating machine for use in a primary or election in improper order for voting; or
(3) Prevents or attempts to prevent the correct operation of such electronic ballot marker or tabulating machine shall be guilty of a felony."

Said chapter is further amended by revising Code Section 21-2-582, relating to tampering with, damaging, or preventing of proper operation of direct recording electronic equipment or tabulating device, as follows:
"21-2-582.
Any person who tampers with or damages any direct recording electronic (DRE) equipment or electronic ballot marker or tabulating ~~computer~~ machine or device to be used or being used at or in connection with any primary or election or who prevents or attempts to prevent the correct operation of any direct recording electronic (DRE) equipment or electronic ballot marker or tabulating ~~computer~~ machine or device shall be guilty of a felony."

Said chapter is further amended by revising Code Section 21-2-582.1, relating to penalty for voting equipment modification, as follows:
"21-2-582.1.
(a) For the purposes of this Code section, the term 'voting equipment' shall mean a ~~voting machine,~~ tabulating machine, optical scanning voting system, electronic ballot marker or direct recording electronic voting system.
(b) Any person or entity, including, but not limited to, a manufacturer or seller of voting equipment, who alters, modifies, or changes any aspect of such voting equipment without prior approval of the Secretary of State is guilty of a felony."

Said chapter is further amended by revising paragraphs (6) and (8) of Code Section 21-2-587, relating to frauds by poll workers, as follows:
"(6) Tampers with any ~~voting machine,~~ direct recording electronic (DRE) equipment, electronic ballot marker, or tabulating ~~computer~~ machine or device;
(8) Fails to return to the officials prescribed by this chapter, following any primary or election, ~~any keys of a voting machine,~~ ballot box, general or duplicate return sheet,

*VoterGA*

tally paper, oaths of poll officers, affidavits of electors and others, record of assisted voters, numbered list of voters, electors list, voter's certificate, spoiled and canceled ballots, ballots deposited, written, or affixed in or upon a ~~voting machine~~, DRE, <u>electronic ballot marker, or tabulating machine</u> memory cards, or any certificate or any other paper or record required to be returned under this chapter shall be guilty of a felony and, upon conviction thereof, shall be sentenced to imprisonment for not less than one nor more than ten years or to pay a fine not to exceed $100,000.00, or both."

*VoterGA*

*SAFE Commission
Recommendations*

### Lever Machine Decommissioning

These legislative changes are suggested to further modify Chapter 2 of Title 21 of the Official Code of Georgia Annotated to decommission obsolete lever machines known as 'voting machines' in Georgia code:

Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to primaries and elections generally, is amended by revising paragraph (40) of Code Section 21-2-2, relating to definitions as follows:
"(40) ~~'Voting machine' is a mechanical device on which an elector may cast a vote and which tabulates those votes by its own devices and is also known as a 'lever machine.'~~ Reserved."

Said chapter is further amended by revising subsection (a) of Code Section 21-2-267, relating to equipment, arrangement, and storage at polling places, as follows:
"(a) The governing authority of each county and municipality shall provide and the superintendent shall cause all rooms used as polling places to be provided with suitable heat and light and, in precincts in which ballots are used, with a sufficient number of voting compartments or booths with proper supplies in which the electors may conveniently mark their ballots, with a curtain, screen, or door in the upper part of the front of each compartment or booth so that in the marking thereof they may be screened from the observation of others. A curtain, screen, or door shall not be required, however, for the self-contained units used as voting booths in which direct recording electronic (DRE) voting units <u>or electronic ballot markers</u> are located if such booths have been designed so as to ensure the privacy of the elector. When practicable, every polling place shall consist of a single room, every part of which is within the unobstructed view of those present therein and shall be furnished with a guardrail or barrier closing the inner portion of such room, which guardrail or barrier shall be so constructed and placed that only such persons as are inside such rail or barrier can approach within six feet of the ballot box and voting compartments, or booths, ~~or voting machines~~, as the case may be. The ballot box and voting compartments or booths shall be so arranged in the voting room within the enclosed space as to be in full view of those persons in the room outside the guardrail or barrier. ~~The voting machine or machines shall be placed in the voting rooms within the enclosed space so that, unless its construction shall otherwise require, the ballot labels on the face of the machine can be plainly seen by the poll officers when the machine is not occupied by an elector.~~ In the case of direct recording electronic (DRE) voting units <u>or electronic ballot markers</u>, the ~~units~~ <u>devices</u> shall be arranged in such a manner as to ensure the privacy of the elector while voting on such ~~units~~ <u>devices</u>, to allow monitoring of the ~~units~~ devices by the poll officers while the polls are open, and to permit the public to observe the voting without affecting the privacy of the electors as they vote."

*VoterGA*

*SAFE Commission*
*Recommendations*

Said chapter is further amended by revising subsection (a) of Code Section 21-2-230, relating to challenge of persons on list of electors by other electors, procedure, hearing, and right of appeal, as follows:

"(a) Any elector of the county or municipality may challenge the right of any other elector of the county or municipality, whose name appears on the list of electors, to vote in an election. Such challenge shall be in writing and specify distinctly the grounds of such challenge. Such challenge may be made at any time prior to the elector whose right to vote is being challenged voting at the elector's polling place or, if such elector cast an absentee ballot, prior to 5:00 P.M. on the day before the election; provided, however, that challenges to persons voting by absentee ballot in person at the office of the registrars or the absentee ballot clerk ~~whose vote is cast on a DRE unit must~~ shall be made prior to such person's voting."

Said chapter is further amended by revising paragraph (a) of Code Section 21-2-383, relating to preparation and delivery of ballots, form of ballots, and casting ballot in person using DRE unit, as follows:

Said chapter is further amended by revising paragraph (b) of Code Section 21-2-383, relating to preparation and delivery of ballots, form of ballots, and casting ballot in person using DRE unit, as follows:

"21-2-383.

(a) Ballots for use by absentee electors shall be prepared sufficiently in advance by the superintendent and shall be delivered to the board of registrars or absentee ballot clerk as provided in Code Section 21-2-384. Such ballots shall be marked 'Official Absentee Ballot' and shall be in substantially the form for ballots required by Article 8 of this chapter~~, except that in counties using voting machines or direct recording electronic (DRE) units the ballots may be in substantially the form for the ballot labels required by Article 9 of this chapter~~. Every such ballot shall have printed with other instructions thereon the following:

'I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law.'

The form for either ballot shall be determined and prescribed by the Secretary of State, except in municipal primaries or elections, in which the form of absentee ballots which follows the paper ballot format shall be determined and prescribed by the superintendent.'"

Said chapter is further amended by revising subsection (c) of Code Section 21-2-405, relating to meeting of poll officers at place of primary or election, oaths, failure of poll officer to appear, custodians of voting materials, temporary absence or disability, and poll workers working less than entire day, as follows:

"(c) After the poll officers of a precinct have been organized, the chief manager shall

*VoterGA*

designate one of the assistant managers to have custody of the electors list. In precincts in which ballots are used, the other assistant manager shall have charge of the receipt and deposit of ballots in the ballot box, the chief manager or one of the clerks shall issue the ballots to electors after they are found entitled to vote, and the other clerk shall have custody of the voter's certificate binder and shall place the voter's certificates therein as they are received and approved. ~~In precincts in which voting machines are used, the other assistant manager or clerk shall have custody of the voter's certificate binder and shall place the voter's certificates therein as they are received and approved, and the chief manager shall have special charge of the operation of the voting machine; provided, however, that~~ The chief manager may make other arrangements for the division of the duties imposed by this chapter, so long as each poll officer is assigned some specific duty to perform. In municipal primaries being held with separate precinct managers, the chief managers appointed by each party shall jointly appoint the person or persons to be in charge of the electors list. In all precincts, the chief manager shall assign an assistant manager or a clerk to keep a numbered list of voters, in sufficient counterparts, during the progress of the voting. "

Said chapter is further amended by revising subsection (h) of Code Section 21-2-418, relating to provisional ballots, as follows:

"(h) ~~Notwithstanding any other provision of this chapter to the contrary, in the event that the voting machines or DRE units at a polling place malfunction and cannot be used to cast ballots or some other emergency situation exists which prevents the use of such equipment to cast votes, provisional ballots may be used by the electors at the polling place to cast their ballots. In such event, the ballots cast by electors whose names appear on the electors list for such polling place shall not be considered provisional ballots and shall not require verification as provided by Code Section 21-2-419; provided, however, that persons whose names do not appear on the electors list for such polling place shall vote provisional ballots which shall be subject to verification under Code Section 21-2-419.~~ Reserved."

Said chapter is further amended by repealing and reserving Part 3 of Article 11, relating to preparation for and conduct of primaries and elections in precinct using voting machines.

Said chapter is further amended by revising Code Section 21-2-482, relating to absentee ballots for precincts using optical scanning voting equipment, as follows:
"21-2-482.
Ballots in a precinct using ~~optical scanning voting equipment~~ ballot scan voting systems for use ~~voting~~ by absentee electors shall be prepared sufficiently in advance by the superintendent and shall be delivered to the board of registrars as provided in Code Section 21-2-384. Such ballots shall be marked 'Official Absentee Ballot' and shall be in

substantially the form for ballots required by Article 8 of this chapter, except that ~~in counties or municipalities using voting machines, direct recording electronic (DRE) units, or optical scanners,~~ the ballots ~~may be in substantially the form for the ballot labels required by Article 9 of this chapter or~~ shall be in such form as will allow the ballot to be machine tabulated. Every such ballot shall have printed on the face thereof the following: 'I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law.'
The form for either the ballot shall be determined and prescribed by the Secretary of State."

Said chapter is further amended by revising subsections (d), (f), and (h) of Code Section 21-2-493, relating to computation, canvassing, and tabulation of returns, investigation of discrepancies in vote counts, recount procedure, certification of returns, and change in returns, as follows:
"(d) ~~In precincts in which voting machines have been used, the superintendent may require a recanvass of the votes recorded on the machines used in the precinct, as provided in Code Section 21-2-495.~~ Reserved."
"(f) ~~In precincts in which voting machines have been used, there shall be read from the general return the identifying number or other designation of each voting machine used and the numbers registered on the protective counter or device on each machine prior to the opening of the polls and immediately after the close of the same, whereupon the assistant having charge of the records of the superintendent showing the number registered on the protective counter or device of each voting machine prior to delivery at the polling place shall publicly announce the numbers so registered; and, unless it appears that such records and such general return correspond, no further returns shall be read from the latter until any and all discrepancies are explained to the satisfaction of the superintendent.~~ Reserved."
"(h) ~~In precincts in which voting machines have been used, when the records agree with the returns regarding the number registered on the voting machine, the votes recorded for each candidate shall be read by an assistant slowly, audibly, and in an orderly manner from the general return sheet which has been returned unsealed; and the figures announced shall be compared by other assistants with the duplicate return sheet which has been returned sealed. If the voting machine is of the type equipped with a mechanism for printing paper proof sheets, such general and duplicate return sheets shall also be compared with such proof sheets, which have been returned as aforesaid. If any discrepancies are discovered, the superintendent shall examine all of the return sheets, proof sheets, and other papers in his or her possession relating to the same precinct. Such proof sheets shall be deemed to be prima facie evidence of the result of the primary or election and to be prima facie accurate; and, if the proper proof sheets, properly identified, shall be mutually consistent and if the general and duplicate returns or either~~

*VoterGA*

~~of such returns from such precinct shall not correspond with such proof sheets, they shall be corrected so as to correspond with such proof sheets in the absence of allegation of specific fraud or error proved to the satisfaction of the superintendent.~~ Reserved."

"(b) ~~In precincts where voting machines have been used, whenever it appears that there is a discrepancy in the returns recorded for any voting machine or machines or that an error, although not apparent on the face of the returns, exists, the superintendent shall, either of his or her own motion or upon the sworn petition of three electors of any precinct, order a recanvass of the votes shown on that particular machine or machines. Such recanvass may be conducted at any time prior to the certification of the consolidated returns by the superintendent. In conducting such recanvass, the superintendent shall summon the poll officers of the precinct; and such officers, in the presence of the superintendent, shall make a record of the number of the seal upon the voting machine or machines and the number of the protective counter or other device; shall make visible the registering counters of each such machine; and, without unlocking the machine against voting, shall recanvass the vote thereon. Before making such recanvass, the superintendent shall give notice in writing to the custodian of voting machines, to each candidate, and to the county or municipal chairperson of each party or body affected by the recanvass. Each such candidate may be present in person or by representative, and each of such parties or bodies may send two representatives to be present at such recanvass. If, upon such recanvass, it shall be found that the original canvass of the returns has been correctly made from the machine and that the discrepancy still remains unaccounted for, the superintendent, with the assistance of the custodian, in the presence of the poll officers and the authorized candidates and representatives, shall unlock the voting and counting mechanism of the machine and shall proceed thoroughly to examine and test the machine to determine and reveal the true cause or causes, if any, of the discrepancy in returns from such machine. Each counter shall be reset at zero before it is tested, after which it shall be operated at least 100 times. After the completion of such examination and test, the custodian shall then and there prepare a statement, in writing, giving in detail the result of the examination and test; and such statement shall be witnessed by the persons present and shall be filed with the superintendent. If, upon such recanvass, it shall appear that the original canvass of the returns by the poll officers was incorrect, such returns and all papers being prepared by the superintendent shall be corrected accordingly; provided, however, that in the case of returns from any precinct wherein the primary or election was held by the use of a voting machine equipped with a mechanism for printing paper proof sheets, such proof sheets, if mutually consistent, shall be deemed to be prima-facie evidence of the result of the primary or election and to be prima facie accurate; and there shall not be considered to be any discrepancy or error in the returns from any such precinct, such as to require a recanvass of the vote, if all available proof sheets, from the voting machine used therein, identified to the satisfaction of the superintendent and shown to his or her satisfaction to have been produced from proper custody, shall be~~

*VoterGA*                                    *SAFE Commission*
                                             *Recommendations*

~~mutually consistent; and, if the general and duplicate returns, or either of such returns from such precincts shall not correspond with such proof sheets, they and all other papers being prepared by the superintendent shall be corrected so as to correspond with such proof sheets in the absence of allegation of specific fraud or error proved to the satisfaction of the superintendent by the weight of the evidence; and only in such case shall the vote of such precinct be recanvassed under this Code section.~~ Reserved.

Said chapter is further amended by revising subsection (b) of Code Section 21-2-495, relating to procedure for recount or recanvass of votes; losing candidate's right to a recount, as follows:

"(b) ~~In precincts where voting machines have been used, whenever it appears that there is a discrepancy in the returns recorded for any voting machine or machines or that an error, although not apparent on the face of the returns, exists, the superintendent shall, either of his or her own motion or upon the sworn petition of three electors of any precinct, order a recanvass of the votes shown on that particular machine or machines. Such recanvass may be conducted at any time prior to the certification of the consolidated returns by the superintendent. In conducting such recanvass, the superintendent shall summon the poll officers of the precinct; and such officers, in the presence of the superintendent, shall make a record of the number of the seal upon the voting machine or machines and the number of the protective counter or other device; shall make visible the registering counters of each such machine; and, without unlocking the machine against voting, shall recanvass the vote thereon. Before making such recanvass, the superintendent shall give notice in writing to the custodian of voting machines, to each candidate, and to the county or municipal chairperson of each party or body affected by the recanvass. Each such candidate may be present in person or by representative, and each of such parties or bodies may send two representatives to be present at such recanvass. If, upon such recanvass, it shall be found that the original canvass of the returns has been correctly made from the machine and that the discrepancy still remains unaccounted for, the superintendent, with the assistance of thecustodian, in the presence of the poll officers and the authorized candidates and representatives, shall unlock the voting and counting mechanism of the machine and shall proceed thoroughly to examine and test the machine to determine and reveal the true cause or causes, if any, of the discrepancy in returns from such machine. Each counter shall be reset at zero before it is tested, after which it shall be operated at least 100 times. After the completion of such examination and test, the custodian shall then and there prepare a statement, in writing, giving in detail the result of the examination and test; and such statement shall be witnessed by the persons present and shall be filed with the superintendent. If, upon such recanvass, it shall appear that the original canvass of the returns by the poll officers was incorrect, such returns and all papers being prepared by the superintendent shall be corrected accordingly; provided, however, that in the case of returns from any precinct wherein the primary or election was held by the use of a voting machine equipped with a mechanism for printing paper~~

~~proof sheets, such proof sheets, if mutually consistent, shall be deemed to be prima facie evidence of the result of the primary or election and to be prima facie accurate; and there shall not be considered to be any discrepancy or error in the returns from any such precinct, such as to require a recanvass of the vote, if all available proof sheets, from the voting machine used therein, identified to the satisfaction of the superintendent and shown to his or her satisfaction to have been produced from proper custody, shall be mutually consistent; and, if the general and duplicate returns, or either of such returns from such precincts shall not correspond such proof sheets, they and all other papers being prepared by the superintendent shall be corrected so as to correspond with such proof sheets in the absence of allegation of specific fraud or error proved to the satisfaction of the superintendent by the weight of the evidence; and only in such case shall the vote of such precinct be recanvassed under this Code section.~~ Reserved."

Said chapter is further amended by revising Code Section 21-2-500, relating to delivery of voting materials, presentation to grand jury in certain cases, preservation and destruction, and destruction of unused ballots, as follows:
"21-2-500.
(a) Immediately upon completing the returns required by this article, in the case of elections other than municipal elections, the superintendent shall deliver in sealed containers to the clerk of the superior court or, if designated by the clerk of the superior court, to the county records manager or other office or officer under the jurisdiction of a county governing authority which maintains or is responsible for records, as provided in Code Section 50-18-99, the used and void ballots and the stubs of all ballots used; one copy of the oaths of poll officers; and one copy of each numbered list of voters, tally paper, voting machine paper proof sheet, and return sheet involved in the primary or election. In addition, the superintendent shall deliver copies of the voting machine ballot labels, computer chips containing ballot tabulation programs, copies of computer records of ballot design, and similar items or an electronic record of the program by which votes are to be recorded or tabulated, which is captured prior to the election, and which is stored on some alternative medium such as a CD-ROM or floppy disk simultaneously with the programming of the PROM or other memory storage device. The clerk, county records manager, or the office or officer designated by the clerk shall hold such ballots and other documents under seal, unless otherwise directed by the superior court, for at least 24 months, after which time they shall be presented to the grand jury for inspection at its next meeting. Such ballots and other documents shall be preserved in the office of the clerk, county records manager, or officer designated by the clerk until the adjournment of such grand jury, and then they may be destroyed, unless otherwise provided by order of the superior court.
(b) The superintendent shall retain all unused ballots for 30 days after the election or primary and, if no challenge or contest is filed prior to or during that period that could require future use of such ballots, may thereafter destroy such unused ballots. If a

**VoterGA**

challenge or contest is filed during that period that could require the use of such ballots, they shall be retained until the final disposition of the challenge or contest and, if remaining unused, may thereafter be destroyed.

(c) Immediately upon completing the returns required by this article, the municipal superintendent shall deliver in sealed containers to the city clerk the used and void ballots and the stubs of all ballots used; one copy of the oaths of poll officers; and one copy of each numbered list of voters, tally paper, ~~voting machine paper proof sheet,~~ and return sheet involved in the primary or election. In addition, the municipal superintendent shall deliver copies of the ~~voting machine ballot labels,~~ computer chips containing ballot tabulation programs, copies of computer records of ballot design, and similar items or an electronic record of the program by which votes are to be recorded or tabulated, which is captured prior to the election, and which is stored on some alternative medium such as a CD-ROM or floppy disk simultaneously with the programming of the PROM or other memory storage device. Such ballots and other documents shall be preserved under seal in the office of the city clerk for at least 24 months; and then they may be destroyed unless otherwise provided by order of the mayor and council if a contest has been filed or by court order, provided that the electors list, voter's certificates, and duplicate oaths of assisted electors shall be immediately returned by the superintendent to the county registrar."

Said chapter is further amended by revising paragraph (7) of Code Section 21-2-566, relating to interference with primaries and elections generally, as follows:
"21-2-566.
 (7)~~Knowingly registers fraudulent votes upon any voting machine~~ RESERVED; or"

Said chapter is further amended by revising Code Section 21-2-568, relating to entry into voting compartment or booth while another voting, interfering with elector, inducing elector to reveal or revealing elector's vote, and influencing voter while assisting, as follows:
"21-2-568.
(a) Any person who knowingly:
(1) Goes into the voting compartment or ~~voting machine~~ booth while another is voting or marks the ballot or registers the vote for another, except in strict accordance with this chapter;
(2) Interferes with any elector marking his or her ballot or registering his or her vote;
(3) Attempts to induce any elector before depositing his or her ballot to show how he or she marks or has marked his or her ballot; or
(4) Discloses to anyone how another elector voted, without said elector's consent, except when required to do so in any legal proceeding
shall be guilty of a felony.
(b) Any person who, while giving lawful assistance to another, attempts to influence the

*VoterGA*                                          *SAFE Commission*
                                                   *Recommendations*

vote of the elector he or she is assisting or marks a ballot or registers a vote in any other way than that requested by the voter he or she is assisting shall be guilty of a felony and, upon conviction thereof, shall be sentenced to imprisonment for not less than one nor more than ten years or to pay a fine not to exceed $100,000.00, or both."

Said chapter is further amended by revising paragraphs (1) and (4) of Code Section 21-2-579, relating to fraudulently allowing ballot ~~or voting machine~~ to be seen, casting unofficial ballot, and receiving unauthorized assistance in voting, as follows:
"(1) Allows his or her ballot ~~or the face of the voting machine used by him or her~~ to be seen by any person with the apparent intention of letting it be known for a fraudulent purpose how he or she is about to vote;"
(4) States falsely to any poll officer that because of his or her inability to read the English language or because of blindness, near-blindness, or other physical disability he or she cannot mark the ballot or operate the voting machine without assistance
shall be guilty of a misdemeanor."

Said chapter is further amended by repealing and reserving Code Section 21-2-581, relating to unauthorized making or possession of voting machine key.

Said chapter is further amended by revising paragraphs (6) and (8) of Code Section 21-2-587, relating to frauds by poll workers, as follows:
"(6) Tampers with any ~~voting machine,~~ direct recording electronic (DRE) equipment, <u>electronic ballot marker</u>, or tabulating ~~computer~~ machine or device;
(8) Fails to return to the officials prescribed by this chapter, following any primary or election, ~~any keys of a voting machine,~~ ballot box, general or duplicate return sheet, tally paper, oaths of poll officers, affidavits of electors and others, record of assisted voters, numbered list of voters, electors list, voter's certificate, spoiled and canceled ballots, ballots deposited, written, or affixed in or upon a ~~voting machine,~~ DRE, <u>electronic ballot marker, or tabulating machine</u> memory cards, or any certificate or any other paper or record required to be returned under this chapter shall be guilty of a felony and, upon conviction thereof, shall be sentenced to imprisonment for not less than one nor more than ten years or to pay a fine not to exceed $100,000.00, or both."

Said chapter is further amended by revising Code Section 21-2-591, relating to poll officers permitting unlawful assistance to voters, as follows:
"21-2-591.
Any poll officer who permits a voter to be accompanied by another into the voting compartment or ~~voting machine~~ booth when such poll officer knows that the disability which the voter declared at the time of registration no longer exists or that the disability which the voter declared at the time of voting did not exist shall be guilty of a misdemeanor."