# EXHIBIT B



# *Curling v. Raffensperger,*

## Civil Action No. 1:17-CV-02989-AT

DEFENDANTS' CLOSING ARGUMENT

FEBRUARY 1, 2024

"A share in the sovereignty of the state, which is exercised by the citizens at large, in voting at elections is one of the most important rights of the subject, and in a republic ought to stand foremost in the estimation of the law."

- Alexander Hamilton

Second Letter from Phocion (April 1784), reprinted in 3 The Papers of Alexander Hamilton, 1782–1786, 530–58 (Harold C. Syrett ed., 1962).

# The Bookends

"Federal judges can have a lot of power—
especially when issuing injunctions. And
sometimes we may even have a good idea
or two. But the Constitution sets out our
sphere of decisionmaking, and that sphere
does not extend to second-guessing and
interfering with a State's reasonable,
nondiscriminatory election rules."

*New Georgia Project v. Raffensperger*, 976
F.3d 1278, 1284 (11th Cir. 2020)

# The Bookends

**United States Constitution:**
◦ Article I, Section 4: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof."

---

"Although Georgia's election system is not perfect, the challenged practices violate neither the constitution nor the VRA. As the Eleventh Circuit notes, federal courts are not "'the arbiter[s] of disputes' which arise in elections; it [is] not the federal court's role to 'oversee the administrative details of a local election."' *Curry v. Baker*, 802 F.2d 1302, 1306 (11th Cir. 1986)."

*Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1251 (N.D. Ga. 2022).

Courts do not "sit as a guarantor of a flawless election."
*Georgia Shift v. Gwinnett Cty.*, No.1:19-CV-01135-AT, 2020 WL 864938, at *6 (N.D. Ga. Feb. 12, 2020)

# Underlying Presumptions

# Structure of Closing

Standing: Tyson

*Anderson/Burdick*: Belinfante

Remedies/Remaining Factors: Miller

# Standing

"Article III of the Constitution limits the subject-matter jurisdiction of federal courts to 'Cases' and 'Controversies.' U.S. Const. art. III, § 2. 'To have a case or controversy, a litigant must establish that he has standing,' which requires proof of three elements. *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019). **The litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision**. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)."

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (emphasis added)

# Standing: Injury

Must be "for each claim and . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

# Standing: Injury

"To prove injury in fact based on an organization's diversion of resources to protect individuals from harm, the organizational plaintiff must prove both that it has diverted its resources and that the injury to the identifiable community that the organization seeks to protect is itself a legally cognizable Article III injury that is closely connected to the diversion. . . . The harm must be concrete and imminent."

*City of S. Miami v. Governor of Fla*., 65 F.4th 631, 638-39 (11th Cir. 2023)

# Standing: Traceability

In the absence of any evidence that the Secretary controls ballot order, the voters and organizations likewise cannot rely on the Secretary's general election authority to establish traceability. *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020).

"A declaratory judgment against the Secretary does not bind the [local] Supervisors, 'who are not parties' to this action  As nonparties, the [local] Supervisors are not 'obliged … in any binding sense … to honor an incidental legal determination [this] suit produces.'"  *Id.*

"While the Secretary has rulemaking authority, as in *Jacobson*, this power is limited to rules and regulations that are "consistent with law." O.C.G.A. § 21-2-31(2). And the law gives the authority to conduct the signature-verification process to local supervisors, not the Secretary. *Id*. § 21-2-386(a)(1)(B)."  *Ga. Republican Party, Inc. v. Sec'y of State for Ga.*, 20-14741-RR, 2020 WL 7488181, at *2 (11th Cir. Dec. 21, 2020)

# Standing: Redressability

"'it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision"' of the court."

*Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cty. Bd. of Registration & Elections*, 36 F.4th 1100, 1116 (11th Cir. 2022)

## Plaintiffs' Injury

Ultimately, after once again delving into the risks proposed by the current configuration of Georgia's BMD voting system, the Court concludes that — for purposes of summary judgement — Plaintiffs have presented enough concrete evidence to support CGG's concern and fear that there is a substantial risk of injury to its members' right to have their votes counted as cast if they are required to vote on Georgia's BMD system. *See City of S. Miami*, 65 F.4th at 639. Because Plaintiffs have sufficiently shown that CGG "has diverted its resources *and* that the injury to the identifiable community that the organization seeks to protect is itself a legally cognizable Article III injury that is closely connected to the diversion," *see City of S. Miami*, 65 F.4th at 638–39, they have satisfied the injury-in-fact element for CGG's standing.

MSJ Order, p. 94

# Individual Standing in Voting Cases

"By contrast, **'no single voter is specifically disadvantaged'** if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.' *Bognet v. Sec'y Commonwealth of Pa*., 980 F.3d 336, 2020 U.S. App. LEXIS 35639, 2020 WL 6686120, at *12 (3d Cir. Nov. 13, 2020) (internal quotation marks omitted). Vote dilution in this context is a 'paradigmatic generalized grievance that cannot support standing.' *Id*. (internal quotation marks omitted)."

*Wood v. Raffensperger*, 981 F.3d 1307, 1314-1315 (11th Cir. 2020) (emphasis added)

# Individual Standing in Voting Cases

"This is a textbook generalized grievance. *Bognet*, 2020 U.S. App. LEXIS 35639, 2020 WL 6686120, at *12 ("Voter Plaintiffs' dilution claim is a paradigmatic generalized grievance that cannot support standing. . . . Put another way, a vote cast by fraud or mailed in by the wrong person through mistake, or **otherwise counted illegally, has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged.** Such an alleged dilution is suffered equally by all voters and is not particularized for standing purposes.") (internal punctuation omitted) (collecting cases)."

*Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1322 (N.D. Ga. 2020) (emphasis added)

# Individual Standing in Voting Cases

"Even if we assume that absentee voters are favored over in-person voters, that harm does not affect Wood as an individual—it is instead shared identically by the four million or so Georgians who voted in person this November. '[W]hen the asserted harm is . . . shared in substantially equal measure by . . . a large class of citizens,' it is not a particularized injury. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). And **irregularities in the tabulation of election results do not affect Wood differently from any other person.** His allegation, at bottom, remains 'that the law . . . has not been followed.' *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1332 (11th Cir. 2007)."

*Wood v. Raffensperger*, 981 F.3d 1307, 1315 (11th Cir. 2020) (emphasis added)

## Individual Plaintiffs

- There is a risk that hand-marked paper ballots may not be counted correctly by scanner as well
  - Schoenberg, Vol. I, 108:15-21
  - L. Digges, Vol. I, 208:1-24 (assuming scanner counts votes correctly)
  - Price, Vol. II, 31:10-16.
  - W. Digges, Vol. II, 41:5-9.
  - Nakamura, Vol. II, 115:11-16, 117:3-23.
  - Curling, Vol. V, 13:19-25
  - Missett, Vol. VIII, 167:13-168:4

```
 3        When you go to put it in the scanner, when you scan your
 4   BMD ballot you don't know how it is being counted; correct?
 5   A.   Correct.
 6   Q.   And when you put a hand-marked paper ballot in a scanner,
 7   you don't know how it is being counted; correct?
 8   A.   Correct.
 9   Q.   And, frankly, if you're going to have a hand tally, you
10   don't know how that is being counted; right?
11   A.   Correct.
12   Q.   Okay.  So you can't be sure with any of them how they are
13   being counted correctly; right?
14   A.   Well --
15   Q.   Barring something else --
16   A.   Yes.
```

# Individual Plaintiffs

- No evidence that vote was ever not correctly counted in a Georgia election or that any BMD was hacked
  - Schoenberg, Vol. I, 90:2-8
  - L. Digges, Vol. I, 210:6-19
  - Dufort, Vol. I, 188:14-20
  - Price, Vol. II, 32:25-33:7
  - W. Digges, Vol. II, 45:25-46:2
  - Davis, Vol. II, 195:7-20
  - Curling, Vol. V, 14:1-3
  - Halderman, Vol. VIIB, 227:23–229:20
  - Missett, Vol. VIII, 161:4-11, 162:7-11

```
 3   Q.   And so you have no evidence that any vulnerability in a
 4   Dominion ICX BMD has been exploited to alter election results
 5   in an actual election; right?
 6   A.   I don't think there is any good evidence of that
 7   happening -- happened in a past election.
 8   Q.   And to be clear, you don't have any evidence, or you don't
 9   have any good evidence?
10   A.   Any evidence.  Any -- any evidence that is -- that is at
11   all convincing.
```

# Individual Plaintiffs

Scientists say no credible evidence of computer fraud in the 2020 election outcome, but policymakers must work with experts to improve confidence

16 November 2020

Anyone asserting that a US election was "rigged" is making an *extraordinary* claim, one that must be supported by persuasive and verifiable evidence. Merely citing the existence of technical flaws does not establish that an attack occurred, much less that it altered an election outcome. It is simply speculation.

The presence of security weaknesses in election infrastructure does not by itself tell us that any election has actually been compromised. Technical, physical, and procedural safeguards complicate the task of maliciously exploiting election systems, as does monitoring of likely adversaries by law enforcement and the intelligence community. Altering an election outcome involves more than simply the existence of a technical vulnerability.

DX 67 (admitted); Tr. Vol. VIIB 234:5–23

- "Counted as cast" based on the evidence at trial is a generalized grievance.

- Even if it is not, Plaintiffs have only shown speculative fears of hypothetical future harms. *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1338–39 (11th Cir. 2021).

# Associational Standing in Voting Cases

"The organizations also argue that their members have suffered present harm because the members have refused 'essential health, social, and government services' to avoid racial profiling under S.B. 168. But Clapper forecloses this theory. 'Where a "hypothetical future harm" is not "certainly impending," plaintiffs "cannot manufacture standing merely by inflicting harm on themselves."' *Muransky v. Godiva Chocolatier, Inc*., 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting *Clapper*, 568 U.S. at 416). And **we have rejected the argument that plaintiffs have standing based on their 'subjective fear of . . . harm' and its 'chilling effect.'** *Corbett v. Transp. Sec. Admin*., 930 F.3d 1225, 1238-39 (11th Cir. 2019). Because the members' feared racial profiling is not 'certainly impending,' their self-imposed harms do not create a cognizable injury sufficient to support Article III standing."

*City of S. Miami v. Governor of Fla*., 65 F.4th 631, 638 (11th Cir. 2023) (emphasis added)

## Membership Issues

- Members must have ability to bring case on their own, so same problems with individual standing apply.

- Only potential injury is speculative.

- CGG has not provided evidence to support associational standing.
  - CGG has members that are plaintiffs in this case. Martin, Vol. I, 129:22-23.
    - Third-party standing issues.
  - CGG cannot identify its members. Martin, Vol. I, 131:6-24.
  - People become members of CGG by showing an interest in the organization and have no dues or other requirements. Martin, Vol. I, 124:25-125:4.
  - CGG does not have members in every Georgia county. Marks, Vol. XV, 12:9-11.

# Organizational Standing in Voting Cases

"Although an organization can establish standing under a diversion-of-resources theory, it cannot do so by inflicting harm on itself to address its members' 'fears of hypothetical future harm that is not certainly impending.' *Clapper*, 568 U.S. at 416. To prove injury in fact based on an organization's diversion of resources to protect individuals from harm, the organizational plaintiff must prove both that it has diverted its resources and that the injury to the identifiable community that the organization seeks to protect is itself a legally cognizable Article III injury that is closely connected to the diversion. **As our sister circuit has explained, 'an organization can no more spend its way into standing based on speculative fears of future harm than an individual can.'** *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020). The harm must be concrete and imminent."

*City of S. Miami v. Governor of Fla*., 65 F.4th 631, 638-39 (11th Cir. 2023) (emphasis added)

# Organizational Standing in Voting Cases

"The complaint's allegations with respect to injury all boil down to prior system vulnerabilities, previous equipment malfunctions, and past election mistakes. Past may be precedent. **But the Supreme Court has not been sympathetic to claims that past occurrences of unlawful conduct create standing to obtain an injunction against the risk of future unlawful conduct.** *See O'Shea v. Littleton*, 414 U.S. 488, 495-98, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974) (allegation, based on past examples, of discriminatory prosecution); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983) (allegation, based on plaintiff's past experience, that policy of using constitutionally excessive chokeholds increased risk of experiencing another)."

*Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) (emphasis added)

## Bases for Organizational Injury

Here, CGG has been forced to divert resources to protect its members' right to have their votes counted as cast if they are required to vote on Georgia's BMD voting system. The harm CGG fears is not based on unsupported or speculative notions, but is shown by testimony, documentation, and expert evidence. While Plaintiffs' assembled record may not ultimately carry the day at trial, the Court deems it sufficient to establish the organization's injury in fact at summary judgment.

MSJ Order, p. 86.

- Right to have individual votes "counted as cast" cannot be vindicated on any election system, including a hand-marked paper ballot system.

- Imminence was construed in Plaintiffs' favor at MSJ stage.

- Imminence affected by implementation of remedial CISA recommendations.

## Facts on Organizational Standing

- If it is diverting resources, CGG is diverting resources based solely on speculative future harms based on the evidence at trial.

- CGG is only diverting resources in pursuit of this litigation, which is its mission.
    - CGG's primary monetary expense for at least last three years is litigation. Martin, Vol. I, 129:7-11, 117:9-18.
    - Spending money on this litigation is what has caused CGG's reduction in its other activities. Martin, Vol. I, 130:16-23; 120:9-121:5.
    - Even during the litigation, CGG has spent time monitoring SEB activities and proposing rules. Martin Vol. I, 123:24-124:7. That is consistent with its mission as an educational organization. Martin Vol. I, 129:12-21.

- Kraken, Inc.

## Traceability/Redressability

Although the Court fully acknowledges that it "does not sit as a guarantor of a flawless election," *Ga. Shift v. Gwinnett Cnty.* No. 1:19-cv-1135, 2020 WL 864938, at *6 (N.D. Ga. Feb. 12, 2020), the evidence presented by Plaintiffs at this juncture demonstrates it is feasible to provide meaningful relief to redress the challenged State conduct, practices, and associated harms at issue. While this relief may not extend to a new legislative Hand Marked Paper Ballot system that Plaintiffs seek as the gold standard, but which the legislature would have to enact, there are remedial measures that could be implemented without the Court invading the legislature's sphere. Under the circumstances, the Court finds that the redressability requirement is satisfied.

MSJ Order, p. 102

## Evidence on Traceability/ Redressability

- As will be discussed in merits, there is no evidence presented at trial that "remedial measures" will redress the claimed injuries.

- Undisputed evidence demonstrates that there would be costs imposed on non-party counties. Tr. Vol. XVIB, 23:23–24:7.

```
23   Q.   Okay.  If in this hypothetical county that has chosen --
24   you know, pursuant to a court order preventing the State from
25   enforcing the uniformity requirement and this hypothetical
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

24

```
1   county has chosen to allow something other than voting on a
2   BMD -- and let's say they chose something that required these
3   mobile ballot printers, who would bear the cost of acquiring
4   any additional potential ballot printers, if they were
5   necessary?
6   A.   As I understand it, and our position would be, that the
7   counties would have to do that, if they make that decision.
```

## Evidence on Traceability/ Redressability

- Undisputed evidence demonstrates that if the sole remedy is enjoining the application of O.C.G.A. § 21-2-300, non-party counties would still decide whether to use BMDs for all in-person voters or not, preventing any redressability. Tr. Vol. XVIB, 23:23–24:7.

- If remedy is imposing audits, undisputed evidence demonstrates that counties would have to conduct those audits. Tr. Vol. XV, 223:14–17, 224:1–9.

```
1   Q.   Okay.  Do State officials currently conduct audits of
2   elections?
3   A.   State officials do not conduct the audit, no.  But we
4   contract with Verified Voting to use the Arlo tool to allow the
5   counties to do that.
6   Q.   Okay.  Do you have an understanding of whether the
7   Secretary has the authority to order counties to conduct more
8   audits, sitting here today?
9   A.   We cannot.
```

# The One-Plaintiff Rule Does Not Apply to the Differing Claims

Cases covering this issue involve cases where there was only a single complaint even with multiple Plaintiffs. *Florida v. United States HHS*, 648 F.3d 1235, 1240 (11th Cir. 2011); *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc*., 547 U.S. 47, 52 n.2 (2006).

MSJ Order cited *Shaw v. Hunt* regarding fee issues.

But in that case, "the district court allowed a group of ten registered Republican voters residing in the Fourth, Sixth, Ninth, and Tenth Congressional Districts to join the action as permissive intervenors ("Original Intervenors"), **on the condition that they adopt plaintiffs' complaint**." *Shaw v. Hunt*, 154 F.3d 161, 163 (4th Cir. 1998) (emphasis added).

Key difference is different complaints with different plaintiffs seeking different relief.

Evidence during trial shows seeking different relief.

# Structure of Closing

Standing: Tyson

*Anderson/Burdick*: Belinfante

Remedies/Remaining Factors: Miller

# Georgia Elections Overview

# Georgia Elections Overview: Role of Secretary, SEB, Counties

<u>Secretary of State</u>:

O.C.G.A. § 21-2-50: provide forms, build ballots, conduct training for county election superintendents.

O.C.G.A. § 21-2-300: determine uniform voting equipment, furnish a "uniform system of electronic ballot markers and ballot scanners ... certified by the [US EAC].

<u>State Election Board</u>:

O.C.G.A. § 21-2-31: promulgate rules and regulations to obtain uniformity, promote elections, and investigations.

<u>County Election Superintendents</u>:

O.C.G.A. § 21-2-70: train and appoint poll officers and poll workers, purchase and make available election supplies.

O.C.G.A. § 21-2-99: train poll officers and poll workers, provide certification.

O.C.G.A. §§ 21-2-380-390: absentee ballot and advance voting administration.

O.C.G.A. § 21-2-379.26: securely store election devices and equipment.

# Georgia Elections Overview: Role of Secretary, SEB, Counties

<u>Secretary of State</u>:

<u>SEB R. 183-1-12-.05</u>: determine all modifications, upgrades, and changes to election equipment, exclusive authority to authorize internet connections.

<u>SEB R. 183-1-12-.06</u>: authorize movement of voting system equipment.
- ◦ Enhanced chain of custody requirements (Sterling)

# Georgia Elections Overview: Role of Secretary, SEB, Counties

County Election Superintendents:

◦ SEB R. 183-1-12-.03: confirm acceptance testing.

◦ SEB R. 183-1-12-.05: maintain security of EMS, including locks and passwords.

◦ SEB R. 183-1-12-.04: maintain security of election equipment and polling places.

◦ SEB R. 183-1-12-.06: administration of oaths, security for EMS, audit of election equipment.

◦ SEB R. 183-1-12-.07: review ballots prior to election.

◦ SEB R. 183-1-12-.08: conduct logic and accuracy testing.

◦ SEB R. 183-1-12-.09: securely transport voting equipment to polling locations

◦ SEB R. 183-1-12-.10: protocols for opening of the polls.

◦ SEB R. 183-1-12-.11: protocols for polling place activity.

◦ SEB R. 183-1-12-.12: protocols for close of polling locations.

◦ SEB R. 183-1-12-.13: storing ballot images.

◦ SEB R. 183-1-12-.14: maintain all components of election equipment, report "any malfunction or problem" to the Secretary.

◦ SEB R. 183-1-12-.20: emergency paper ballot rule.

◦ SEB R. 183-1-14-.11: absentee ballot administration.

# Plaintiffs' Substantive Claims

# What Remains
(SJO at *44)

## Curling
- Count III: violation of the fundamental right to vote under the Due Process Clause of the Fourteenth Amendment), and
- Count IV: violation of the Equal Protection Clause of the Fourteenth Amendment.

## Coalition
- Count I: violation of the fundamental right to vote under the First and Fourteenth Amendments, and
- Count II: violation of the Equal Protection Clause of the Fourteenth Amendment.

# Applicable Legal Analysis

In this Circuit, courts analyze First and Fourteenth Amendment claims that challenge election practices under the balancing test outlined by the Supreme Court in *Anderson v. Celebrezze*, and *Burdick v. Takushi*.

Most of the parties agree that this test should apply to each of Plaintiffs' constitutional claims.

The Court ... will therefore analyze all of these claims together under the *Anderson-Burdick* test.

(MSJ Order at *40)

# The *Anderson-Burdick* Test

This test requires the Court to

1. Weigh the 'character and magnitude' of the burden that the State's rule imposes" on Plaintiffs' voting rights,

2. Against the interests that the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary.

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citing *Burdick*, 504 U.S. at 434).

(MSJ Order at *44)

# Three Prongs of *Anderson-Burdick's* First Step

"The Court first considers "the character and magnitude of the

[1] **burden**

[2] **imposed** by

[3] the allegedly unconstitutional **conduct**."

(MSJ Order at *45 (brackets and emphasis added))



# The Alleged Burden



# The Burden on Voting

When a state election law provision imposes only "**reasonable, nondiscriminatory restrictions**" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. If [the regulation] imposes only "reasonable, nondiscriminatory restrictions" upon those rights, the State's important regulatory interests are generally sufficient to justify the restrictions.

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

To deem **ordinary and widespread** burdens like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes. The Constitution does not require that result

*Clingman v. Beaver*, 544 U.S. 581, 593 (2005) (emphasis added).



# The Burden on Voting

Here, the Court understands the claimed constitutional burden to be the

[1] **__risk of harm__** that the current election system's security vulnerabilities and operational issues imposes on

[2] Plaintiffs right **to cast an effective, accurately counted vote**.

MSJ Order (emphasis and brackets added) at *45



# The Burden on Voting

"No election system is flawless." (MSJ Order at *41).

"It is true that electronic voting systems are not *per se* unconstitutional." (MSJ Order at *46).



# The Burden on Voting



Defs' Ex. 194

Coalition generally agrees that "BMDs should not be used by voters who are able to mark an optical scan ballot with a pen." (Vol. XV, 61:20-62:2)



# The Burden on Voting

---

The 2021 Halderman Report

CISA's 2022 security advisory corroborating the Halderman Report, and

[T]he revelations regarding the 2021 Coffee County voting system breach are among the important new evidence that arguably further support the substantial risks posed by Georgia's BMD voting system.

(MSJ Order at *45)



# The Burden on Voting: Lack of Evidence

No expert witness knows of a Georgia ballot not being counted as cast.

No Plaintiff knows whether their ballot was cast as counted.
- Schoenberg, Vol. I, 108:15-21
- L. Digges, Vol. I, 208:1-24 (assuming scanner counts votes correctly)
- Price, Vol. II, 31:10-16.
- W. Digges, Vol. II, 41:5-9.
- Nakamura, Vol. II, 115:11-16, 117:3-23.
- Curling, Vol. V, 13:19-25
- Missett, Vol. VIII, 167:13-168:4

No State witness knows of a ballot not being counted as cast.



# The Burden on Voting: Lack of Evidence

---

## NO

## QUANTIFICATION

## OF RISK



# The Burden on Voting: CISA Recommendations

CISA **recommends** election officials **continue to take** and further enhance defensive measures to reduce the risk of exploitation of these vulnerabilities. Specifically, **for each election, election officials should**:

(Curling PX 90 (emphasis added))



# The Burden on Voting: CISA Recommendations

- Contact Dominion Voting Systems to determine which software and/or firmware updates need to be applied. Dominion Voting Systems reports to CISA that the above vulnerabilities have been addressed in subsequent software versions.
- Ensure all affected devices are physically protected before, during, and after voting.
- Ensure compliance with chain of custody procedures throughout the election cycle.
- Ensure that ImageCast X and the Election Management System (EMS) are not connected to any external (i.e., Internet accessible) networks.
- Ensure carefully selected protective and detective physical security measures (for example, locks and tamper-evident seals) are implemented on all affected devices, including on connected devices such as printers and connecting cables.
- Close any background application windows on each ImageCast X device.
- Use read-only media to update software or install files onto ImageCast X devices.
- Use separate, unique passcodes for each poll worker card.
- Ensure all ImageCast X devices are subjected to rigorous pre- and post-election testing.
- Disable the "Unify Tabulator Security Keys" feature on the election management system and ensure new cryptographic keys are used for each election.
- As recommended by Dominion Voting Systems, use the supplemental method to validate hashes on applications, audit log exports, and application exports.
- Encourage voters to verify the human-readable votes on printout.
- Conduct rigorous post-election tabulation audits of the human-readable portions of physical ballots and paper records, to include reviewing ballot chain of custody and conducting voter/ballot reconciliation procedures. These activities are especially crucial to detect attacks where the listed vulnerabilities are exploited such that a barcode is manipulated to be tabulated inconsistently with the human-readable portion of the paper ballot. (**NOTE:** If states and jurisdictions so choose, the ImageCast X provides the configuration option to produce ballots that do not print barcodes for tabulation.)



# The Burden on Voting: CISA Recommendations

1. "Ensure all affected devices are physically protected before, during, and after voting."

Balancing Interests:
- Evans (XI, 79:21-80:13).
- Sterling

Pilot Project:
- Evans (XI, 203: 15-18).

Efficacy Questionable

VVSG 2.0 Unavailable:
- Evans (XII, 203: 15-18).



# The Burden on Voting: CISA Recommendations

2. "Ensure all affected devices are physically protected before, during, and after voting."

County Obligation.
- SEB R. 183-1-12-.04 - .06.
- SEB R. 183-1-12-.09 - .14.
- Evans (XI, 79:21-80:13).

US Homeland Security and GEMA
- Evans (XI, 20:15-21)
- Sterling



# The Burden on Voting: CISA Recommendations

3. "Ensure compliance with chain of custody procedures through the election cycle."

Secretary's Form.
- SEB R. 183-1-12-.06.

County Administration.
- SEB R. 183-1-12-.06.

Evans
- Defs' Ex. 1242 at 17

Sterling

**CHAIN OF CUSTODY FORM
TRANSFER OF ELECTION RESULTS**



# The Burden on Voting: CISA Recommendations

4. "Ensure that ImageCastX and the Election Management System ("EMS") are not connected to any external (i.e., Internet accessible) networks."

County Obligation.

Addressed in SEB R. 183-1-12-.05



# The Burden on Voting: CISA Recommendations

5. "Ensure carefully selected protective and detective physical security measures (for example, locks and tamper-evident seals) are implemented on all affected devices, including on connected devices such as printers and connecting cables."

County Obligation.
- SEB R. 183-1-12-.04 - .05
- Evans (XI, 79:21-80:13).

Poll Worker Training Manual
- Defs' Ex. 1242
- Evans (XIII, 64:12-73:25)

Curling Plaintiffs' Ex. 100 (2020 election, Temple Emanu-El)
- State Investigation of Fulton County (Evans, XIII, 84:2-6).



# The Burden on Voting: CISA Recommendations

6. "Close any background application windows on each ImageCast X devices."



# The Burden on Voting: CISA Recommendations

7. "Use read-only media to update software or install files onto ImageCast X devices."

**Michael Barnes**
(V. XII, 24:1-25:9, 26:6-19.)



# The Burden on Voting: CISA Recommendations

8. "Use separate, unique passcodes for each poll worker card."

Means to prevent double voting.
- Poll pads.
- Ballot recap sheets.
- Poll worker oversight. Evans (XIII, 76:20-79:25).

Concerns with unique tabulator security keys.
- Evans (V. XIII, 56:16-57:11, 59:18-60:9, 60:23-61:7).
- Barnes (V. XII, 36:25-37:11).



# The Burden on Voting: CISA Recommendations

9.  "Use Ensure all ImageCastX devices are subjected to rigorous pre-and post-election testing."

County Obligation.
SEB R. 183-1-12-.03, 183-1-12-.08

Evans on Importance of Testing
- Curling PX 606 (2020 email).



# The Burden on Voting: CISA Recommendations

10.  "Disable the "Unify Tabulator Security Keys" feature on the election management system and ensure new crytpographic keys are used for each election."

Concerns with unique tabulator security keys.

- Evans (V. XI, 216:10-218:8; XIII, 56:16-57:11, 59:18-60:9, 60:23-61:7).
- Barnes (V. XII, 36:25-37:11).

218

```
1   about having to maintain passwords for 220 scanners instead of
2   10,000 scanners, like here.  So it is apples and oranges.
3         So I think -- again, this is a little bit me drawing
4   inferences, but Dominion's writing a user guide to use across
5   all their customers that run elections in different ways.  And
6   then we as election officials have to take them, put them in
7   the environment that we are operating in, and then mitigate
8   risks -- all the risks involved as best we can.
```



# The Burden on Voting: CISA Recommendations

11.  "As recommended by Dominion Voting Systems, uses the supplemental method to encourage hashes on applications, audit log exports, and application reports."

### Hash Testing
- Michael Barnes (Vol. XII, 57:11-22, 58:18-25).



# The Burden on Voting: CISA Recommendations

12. "Encourage voters to verify the human-readable votes on printout."



**BALLOT REVIEW** 12

County Obligation and Express Rule.
SEB R. 183-1-12-.11(2)(b).

Required Signage.
Poll Worker Manual (Defs' Ex. 1245)
Evans
Kirk (Vol. XIII, 162:12-163:2)

UGA Study: 80.1% of voters observed at the voting booth, which is a short distance from the scanner.
(Curling Pls.' Ex. 51 at 4, 8; Sterling Vol. XVI, 114:2-115:15).



# The Burden on Voting: CISA Recommendations

13. "Conduct rigorous post-election tabulation audits of the human-readable portion of the physical ballots and paper records ..."

Each County to Conduct RLA on One Contest per SEB Rules.
O.C.G.A. § 21-2-31

Secretary's Obligation to Select Election to Audit.
SEB R. 183-1-15-.04(1)(3).

County Obligation to Perform.
SEB R. 183-1-15-.04(1)(1).

Evans (Vol. XIII, 134:10-16).

Adida

# The Burden on Voting: Audits & Individual Voters

Here, the Court understands the claimed constitutional burden to be the

[1] **risk of harm** that the current election system's security vulnerabilities and operational issues imposes on

[2] Plaintiffs right **to cast an effective, accurately counted vote**.

MSJ Order (emphasis and brackets added) at *45

# The Burden on Voting: Audits & Individual Voters

Coalition:
BMDs are inherently unauditable.

Stark:
Any BMD renders it unauditable.

Plaintiffs:
Voters with disabilities must be relegated to unauditable and allegedly unconstitutional machines.

Adida:
Georgia's unique status.

# The Burden on Voting: Secretary's Actions

Few emails, rapid response, and generally not after 2021.
- (Curling Pls.' Exs. 608, 607, 609).
- Evans (Vol. XIII, 84:19-86:16, 87:24-89:6, 91:23-92:24).

Spalding County
- Sterling
- Evans

Ware County
- Sterling

Butts County (?)

# The Burden on Voting: Secretary's Actions – Coffee County

Three Separate Investigations
- Failure to Certify Elections (resolved in days).
- YouTube Disclosure of Password (resolved).
- Sullivan Strickler Breach (GBI investigation ongoing; *State v. Trump*).

Action When Known

State's evidence at time:
- Dominion Release
- CyberNinja Card
- *No Expert Testimony*

Coalition's evidence at time:
- Scott Hall Recording
- *Pearson v. Kemp*
- Ongoing conversations

Comparing Views of Scott Hall Conversation



# Causation

# Causation

**Section 1983:**
- *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014).
- *Zalter v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986).
- *Jackson v. Sauls*, 206 F.3ed 1156, 1168 (11th Cir. 2000).
- *Fair Fight Action v. Raffensperger*, 634 F. Supp. 3d 1128, 1199 (N.D. Ga. 2022).
- *Compare Garcia-Bengochea v. Carnival Corporation*, 57 F.4th 916, 927 (11th Cir. 2023).

**Anderson-Burdick:**
"This test requires the Court to 'weigh the 'character and magnitude' of the burden that the State's rule <u>imposes'</u> on Plaintiffs' voting rights …" (MSJ Order at * 44).

# Causation

**_Intervening Criminal Conduct Severs Causal Chain_**:
- "The causal relation does not exist when the continuum between [the] [d]efendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers. A defendant's actions are not the proximate cause of plaintiff's injury where there was an independent intervening cause." *Buckman v. Halsey*, No. 20113596, 2021 WL 4127067, at *3 (11th Cir. Sept. 10, 2021) (quotations omitted).

**_Independent Acts or Inaction of Counties Severs Chain_**
- *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020)
- *Fair Fight Action, Inc. v. Raffensperger*, 1:18-CV-5391-SCJ, 2021 WL 9553856, at *8 (N.D. Ga. Mar. 31, 2021), opinion clarified 1:18-CV-5391-SCJ, 2021 WL 9553849 (N.D.Ga. Nov. 15, 2021)

# Causation

**Section 1983 Liability Cannot Be Premised on Government Innaction**:

- *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) (due process).

- *Smith v. Arkansas State Highway Emp., Local 1315*, 441 U.S. 463, 465 (1979) (first amendment).

- *Fair Fight Action, Inc. v. Raffensperger*, 1:18-CV-5391-SCJ, 2021 WL 9553856, at *8 (N.D. Ga. Mar. 31, 2021), opinion clarified 1:18-CV-5391-SCJ, 2021 WL 9553849 (N.D.Ga. Nov. 15, 2021) ("The Court agrees with Defendants that '[t]he law does not impose constitutional liability for governments because they do not exceed their statutory obligations'").

- *Compare Curling v. Sec'y of State of Ga.*, 761 F. App'x 927, 933 (11th Cir. 2019) (citing *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 647 (2002) (regarding *Ex Parte Young*).



# The State's Rule

# The State's Rule

"This test requires the Court to 'weigh the 'character and magnitude' of the burden that the State's rule <u>imposes'</u> on Plaintiffs' voting rights …" (MSJ Order at * 44).

Plaintiffs identify no policy other than uniformity and ballot marking devices.

As-applied vs. Facial.

# The State's Rule

"This test requires the Court to 'weigh the 'character and magnitude' of the burden that the State's rule <u>imposes'</u> on Plaintiffs' voting rights …" (MSJ Order at * 44).

***Sporadic Incidents are not a Policy***
*Anderson, Burdick*, and their progeny do not apply to accidental mistakes on the part of election officials during the administration of elections. "Unlike systematic discriminatory laws, isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause." *Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980). "If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute …. [But] Section 1983 … did not authorize federal courts to be state election monitors." *Id.* at 453–454.

*Fair Fight Action, Inc. v. Raffensperger,* 634 F. Supp. 3d 1128, 1201–02 (N.D. Ga. 2022)

# The State's Rule

***The Necessity of Remedies***.

Even if the Court were to find that Anderson-Burdick applied and that Plaintiffs satisfied their burden in establishing a First and Fourteenth Amendment violation, **Plaintiffs have not proposed viable remedies**. "The absence of an available remedy is not only relevant at the remedial stage of the litigation, but also **precludes, under the totality of the circumstances inquiry, a finding of liability**." *Nipper v. Smith, 39 F.3d 1494, 1533 (11th Cir. 1994)*.
    *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1201–02 (N.D. Ga. 2022)(emphasis added)



# The State's Interest

# The State's Interest



Gabriel Sterling



Matt Mashburn

# The State's Interests: Plaintiffs' Lack of Evidence

- No election administrator.
- No expert on election administration.
- No county official.
- No poll worker.

# Structure of Closing

Standing: Tyson

*Anderson/Burdick*: Belinfante

Remedies/Remaining Factors: Miller

1

# Plaintiffs Are Not Entitled to Injunctive Relief

Plaintiffs bear the burden to demonstrate:

1. Irreparable injury absent an injunction.

2. No adequate remedy at law.

3. The balance of the equities between the Plaintiffs and Defendants weighs in Plaintiffs' favor.

4. That the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)



# FAYETTE COUNTY

## OFFICIAL BALLOT

### DEMOCRATIC PARTY PRIMARY AND NONPARTISAN GENERAL ELECTION
### OF THE STATE OF GEORGIA
### MAY 19, 2020

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e) and 21-2-383(a)]*

351-Blackrock

For President of the United States (Vote for One) (DEM)
Vote for Joseph R. Biden

For United States Senate (Vote for One)

For State Rep
Assembly Fr
One) (DEM)
Vote for De





DX 1242

# What is the Remedy?

"Although federal courts have broad equitable powers to remedy proven constitutional violations, injunctive relief must be tailored to fit the nature and extent of the established violation."

*Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984).

"In other words, the injunction must be no broader than necessary to remedy the constitutional violation."

*Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.*, 89 F.4th 1337, 1351 (11th Cir. 2024).

"There is no such thing as a suit for traditional injunction in the abstract … if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise."

*Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005).

# What is the Remedy?

rights — or otherwise. If Plaintiffs prevail at trial on one or more of their claims, there are pragmatic, sound remedial policy measures that could be ordered or agreed upon by the parties, such as (1) providing for the use of printed ballots for vote counting *without* the use of QR codes, (2) administering a broader scope and number of election audits to address vote count accuracy and other related issues, and (3) implementing other essential cybersecurity measures and policies recommended by the nation's leading cybersecurity experts and firms, including the Department of Homeland Security's CISA.

MSJ Order, ECF No. 1705 at 5

they decry as unconstitutionally unsecure." *Curling*, 761 F. App'x at 934. Thus, if the Plaintiffs succeed in challenging the State's use of the BMD system as it is currently configured — e.g., without implementing a software patch to address the vulnerabilities identified by Dr. Halderman and corroborated by CISA, utilizing QR codes that arguably enhance the risk of errors in the tabulation of Plaintiffs' votes, and lacking sufficient audits to ensure that issues would be caught — there may be sufficient grounds for the Court to enter injunctive relief directing the State Defendants to implement tailored remedial measures, given sufficient proof at trial.[67]

MSJ Order, ECF No. 1705 at 116-117

# Eliminating QR Codes



**Vol. 8A Tr. 28:13-29:04**

Q.    And it is also your belief that a BMD that prints, for lack of a better term, a full-face ballot, an absentee ballot with the bubbles filled in instead of a QR code, also cannot produce reliable results; is that right?

A.    So again, I think there are some important changes to degree of risk that come from that.

THE COURT:  Come from having a full-face ballot?

THE WITNESS:  Come from having a -- come from having a full-face ballot that makes some important modes of attack much more difficult.

I wouldn't agree that it remedies all of the risks. But I would -- I would consider that an improvement compared to the barcode-based ballots.

Q.    And you can't quantify the degree of improvement from a risk profile; correct?

A.    No.  I'm not offering a quantification.

➢ New Software Required

➢ New Printers Required

➢ $25 million cost imposed

➢ Time Required for Implementation



**Vol. 16B Tr. 8:01-14:16**

# Eliminating QR Codes



**A.**   It is my strong belief, based on my knowledge, that if we tell voters to check the human readable text and then we run RLAs on a set of contests that the security properties between hand-marked paper ballots and BMD ballots are roughly the same in that scenario because if there are contests where you don't run RLAs -- sorry, there is one more point -- and the QR code doesn't matter -- it is super scary, it is in your face, and I wish Dominion had designed a ballot where it wasn't so in your face and so scary.

But from a technical perspective, it matters not at all if voters check the text and if you run RLAs.  If you don't run -- there are going to be contests where you don't run RLAs.

**Q.**   But most of them you are not running -- when you have a general election --

**A.**   Right.

**Q.**   -- most of the races are -- there are lots of races.

**A.**   And in those contests where you don't run RLAs, the opportunity for mischief to affect the outcome, in my opinion -- and again, I can go very deep on this, but I'll stop here -- is the same with hand-marked paper ballot and with BMDs, QR code or no QR code.

**Vol. 12 Tr. 287:14-288:09**

**Q.**   And do you have an opinion on whether that is reflective of a real election scenario?

**A.**   I don't think it is.  I think the protocol that was used in the study was valid.  I think Dr. Halderman was doing a human-computer interaction study.  And the 6.6 percent seems alarming.

Then that is where, again, the power of one comes in, where a voter would notice and speak up and you have to respond.  And we saw that in Northampton.  In my studies, we notice that as well, meaning voters -- some voters would get very vocal when candidates were flipped.

And so it is hard to say, is there a specific percentage?  It is hard to say that because you will have the power of one in a real election.

**Q.**   When you say there is a specific percentage that is hard to say, do you mean like a specific minimal percentage of verification required?

**A.**   Absolutely.  Yes.



**Vol. 14 Tr. 59:09-14, 63:02-13**

# Broader Scope & Number of Audits



**A.**   I would agree with that in the sense that we -- that I can't point you to a commercial BMD available today that -- that would produce ballots that would be strongly verify -- strongly auditable as a record of voters' intent.

Vol. 8A Tr. 27:19-22

**A.**   There's no way to audit an election that is -- in which a substantial number of votes are cast using ballot-marking devices in such a way as to provide affirmative evidence that the reported outcomes are correct.  Audits can detect some kinds of failures in some aspects of an election conducted that way, but they can never provide affirmative evidence that the reported winner is actually wrong.

Vol. 9 Tr. 134:06-12



**Q.**   Okay.  Did you review anything -- any of the required signage that is -- that poll workers are required to put in polling places about review your ballot?

**A.**   No, sir.

**Q.**   And so just to be clear, you didn't review any recap sheets for BMD touch screens that poll workers are required to write down the numbers at the opening and closing of the polls?

**A.**   I don't recall.

**Q.**   Maybe if we can show a few, and that would help see if it refreshes your memory.

**A.**   I don't recall whether I have seen this one before.

Vol. 9 Tr. 178:01-11

# Broader Scope & Number of Audits

What kind of training were you putting on for audits?  Can you describe it to me?

A.  Well, we were trying to teach them how they were going to conduct a risk-limiting audit after the election, how to prepare for it, how to create what is called a ballot manifest, the sort of index of what really the ballots are, where they came from, how that leads into the auditing procedure.  The nuts and bolts of how their folks will actually conduct the audit, as well as how the results will be reported afterwards.

**Vol. 13 Tr. 134:08-16**

Q.  Okay.  As far as out of the 50 states in our union as far as conducting statewide risk-limiting audits, you mentioned Georgia and who else?

A.  So in 2024 in the coming election, we expect Michigan, Pennsylvania, Virginia, Rhode Island, Georgia, and Colorado to be the six states that carry out statewide risk-limiting audits.

**Vol. 12 Tr. 153:22-154:03**

in 2017, so it took awhile to operationalize that.  And 2020 was the first year that any state other than Colorado carried out a statewide risk-limiting audit, and that was Georgia.

**Vol. 12 Tr. 153:14-16**



A.  It would depend the election.  I have audited every election I have conducted since 2019 with the exception of the 2020 general primary because that was just a weird time.  But

Q.  And everything, you -- do you mean literally every ballot?

A.  Every single one.

**Vol. 13 Tr. 149:10-14, 152:24-25**

But in any case, it is now active in the system in Arlo for all future audits in Georgia, that first the system will do the random selection following the math, right, that has been peer-reviewed and that we did not invent, that we were simply using at VotingWorks.  And then once that is done, go through every county and kind of top off that county if there is not enough votes being audited in that one.  So we're doing at least the work of the random audit and then some.

**Vol. 12 Tr. 168:14-21**



# Cybersecurity Measures & Policies

➢ Software Updates Infeasible for 2024

➢ No Plaintiffs' Expert Examined Procedures Required by Georgia law.

➢ No Additional "Measures & Policies" Offered by Plaintiffs to Resolve Their "Injury."

➢ No Relief Available to Follow Pre-existing Georgia law.



DX 1242

# Enjoining Uniformity Requirement

➤ <u>No</u> evidence of what any county would do.

➤ Still would not provide any means to verify individual votes counted as cast. Vol. 12 Tr. 267:22-268:09; Vol. 14 Tr. 113:05-16.

➤ The <u>only</u> county election official to testify described offering both options as "the worst of both worlds." Vol 13 Tr. 160:19-20.

➤ The <u>only</u> county election official to testify described the infrastructure and cost demands. Vol 13 Tr. 160:22-161:20.

➤ Overrides the State policy decision in place for 20+ years.

§ 21-2-300. Uniform election equipment throughout state; pilot programs; education of voters, election officials, and poll officers in operation of election equipment

<u>Currentness</u>

(a)(1) The equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county in this state and shall be provided to each county by the state, as determined by the Secretary of State.

(2) As soon as possible, once such equipment is certified by the Secretary of State as safe and practicable for use, all federal, state, and county general primaries and general elections as well as special primaries and special elections in the State of Georgia shall be conducted with the use of scanning ballots marked by electronic ballot markers and tabulated by using ballot scanners for voting at the polls and for absentee ballots cast in person, unless otherwise authorized by law; provided, however, that such electronic ballot markers shall produce paper ballots which are marked with the elector's choices in a format readable by the elector.

# Enjoining Uniformity Requirement

➢ HMPBs Susceptible to undervote and overvote hacks.

➢ 11% Error Rate of HMPBs nationally, disproportionate impact in minority precincts in Georgia. Vol. 14 Tr. 66:11-16; 67:23-25

➢ Administrative and fiscal burden imposed on non-party counties. Vol. 16B Tr. 20:18-23:21

➢ Cannot blue-pencil new training, procurement, and implementation requirements. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020).

Vol. 14 Tr. 79:08-22

Q.   Now, were you surprised to hear Dr. Halderman reference the ballot image as being the safety net?

A.   Yes, I was.  Honestly, I know him well enough to say I believe he misspoke, and I think he would correct his words today.

     In order for that to be the case, that means that the digital ballot scanned on the scanner would be the ballot of record, and that violates everything that any of my colleagues and I have said with respect to the NASEM report.

     For example, we made it clear, given the current state of technology, there is no known way to secure a digital ballot, period.  And to say that the digital record would be the record -- the ballot of record, you just can't do that.  That goes against -- that is saying, let's go back to DREs.

     And again, I think he just misspoke.  That is all.

# Other Remedies



# Plaintiffs' Inherent Disability Problem



**A.** Yes. When you have -- when the Help America Vote Act passed, I was alarmed. I knew it was good intention, but did it have that condition that there would be one accessible voting machine in the voting place. I was alarmed because I saw us creating a separate but equal way of voting, and separate but equal connotations don't function very well.

And so doing so can disenfranchise another group of people, one. And from a security perspective, it makes it an easier target. If all I have to do is be concerned with blind voters, that is an easier target to change votes.

**Vol. 14 Tr. 64:14-23**

**Q.** But it seems like you are also saying that they are playing a larger role in making sure that the outcome can be reliably tested?

**A.** Yes. I think it is a beautiful property of democratic systems that the more conscientious voters are helping protect the less conscientious ones, but ultimately, we all get a vote.

**Vol. 12  Tr. 236:01-06**



**Q.** And so none of the races in that election were within the margin that would have prevented an audit from occurring due to the voters voting -- the disabled voters?

**A.** Yes. At least one of those two elections included a tied contest. So if any ballots were cast using ballot-marking device or ballots using ballot-marked devices, the answer is intrinsically unknown.

**Q.** So just so I understand it, so if one disabled voter had used a ballot-marking device in that race, it would have been intrinsically unauditable?

**A.** Well, an audit couldn't show definitively who won.

**Vol. 9 Tr. 173:10-20**



# The Important Policy Decisions



24                                                                                          LC 47 2640

House Bill 894

By: Representatives Horner of the 3rd, Jasperse of the 11th, Ridley of the 6th, Ridley of the 22nd, Powell of the 33rd, and others

A BILL TO BE ENTITLED

AN ACT

To amend Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to primaries and elections generally, so as to prohibit bar codes, QR codes, and other machine codes on ballots printed by electronic ballot markers; to provide for related matters; to repeal conflicting laws; and for other purposes.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF GEORGIA:

24                                                                                          LC 47 2703

House Bill 977

By: Representatives LaHood of the 175th, Anderson of the 10th, Leverett of the 123rd, Blackmon of the 146th, Jones of the 25th, and others

A BILL TO BE ENTITLED

AN ACT

To amend Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to primaries and elections generally, so as to expand the number of contests subject to risk-limiting audits; to provide for percentages of risk limits; to provide procedures for selection of contests subject to risk-limiting audits; to provide for related matters; to repeal conflicting laws; and for other purposes.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF GEORGIA:

24                                                                                          LC 47 2602

House Resolution 837

By: Representatives Horner of the 3rd, Cox of the 28th, Barrett of the 24th, Jasperse of the 11th, Dunahoo of the 31st, and others

A RESOLUTION

Creating the House Study Committee on Dominion Election Equipment; and for other purposes.

AN ACT

To amend Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to elections and primaries generally, so as to provide that voting devices or systems used in primaries, elections, and runoffs in this state shall not utilize any form of wireless network cards or wireless technology; to provide for the removal or disabling of such cards or technology before using such systems or devices in voting; to provide for related matters; to repeal conflicting laws; and for other purposes.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF GEORGIA:

Oct. 29, 2002
[H.R. 3295]

Help America
Vote Act of 2002.

42 USC 15301
note.

An Act

To establish a program to provide funds to States to replace punch card voting systems, to establish the Election Assistance Commission to assist in the administration of Federal elections and to otherwise provide assistance with the administration of certain Federal election laws and programs, to establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Help America Vote Act of 2002".

## The Role of the Federal Courts

"It would be difficult to overstate the importance of the right to vote. But in our efforts to protect that right, federal courts must resist the temptation to step into the role of elected representatives, weighing the costs and benefits of various procedures when the State has already done so in a reasonable and nondiscriminatory way."

*Curling v. Raffensperger*, 50 F.4th 1114, 1126 (11th Cir. 2022).

"Federal judges can have a lot of power—especially when issuing injunctions. And sometimes we may even have a good idea or two. But the Constitution sets out our sphere of decisionmaking, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules."

*New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020).