# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |  |
|---|---|---|
| **DONNA CURLING, ET AL.,** | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 1:17-CV-2989-A |
| | ) | |
| **BRAD RAFFENSPERGER, ET AL.,** | ) | |
| **DEFENDANTS.** | ) | |

## PLAINTIFF DAVIS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

# Table of Contents

**BACKGROUND** ................................................................................................ 4

**LEGAL STANDARD** ......................................................................................... 7

   BALANCING OF INTERESTS ........................................................................ 10

   TIMING OF THE REQUEST FOR RELIEF ................................................... 11

**DOMINION BMD SYSTEM** ............................................................................. 12

   FINDINGS OF FACT ...................................................................................... 12

1.    Voting System Security ........................................................................ 13

2.    Logic and Accuracy (L&A) ................................................................. 14

3.    Double Counted Ballots ...................................................................... 15

4.    Voting System Selects Wrong Winners ................................................ 16

5.    Ballot Rejections and Counting Failure ............................................... 17

6.    20,000 Vote Decrease ......................................................................... 18

7.    Electronic Vote Alteration ................................................................... 19

8.    Wireless Dominion System Accessibility .............................................. 20

   CONCLUSIONS OF LAW: ............................................................................. 21

      Fundamental Right to Vote ................................................................... 21

      Equal Protection ................................................................................... 22

      Orders of the Court: ............................................................................. 23

**AUDIT PROCESSES** ....................................................................................... 23

   FINDINGS OF FACT ...................................................................................... 23

   **CONCLUSIONS OF LAW** ........................................................................... 25

      Fundamental Right to Vote ................................................................... 25

      Equal Protection ................................................................................... 26

      Orders of the Court .............................................................................. 26

**ELECTION TRANSPARENCY** ....................................................................... 27

   FINDINGS OF FACT ...................................................................................... 27

   CONCLUSIONS OF LAW: ............................................................................. 28

      Fundamental Right to Vote ................................................................... 28

      Equal Protection ................................................................................... 30

      ORDERS OF THE COURT: ................................................................. 30

**DEFENDANTS CREDIBILITY** ...................................................................... 31

   FINDINGS OF FACT ...................................................................................... 31

   Cybersecurity ................................................................................................... 31

DEFENDANT REPRESENTATIVES...................................................................... 32

Blake Evans............................................................................................................. 33

**Michael Barnes**.................................................................................................... **34**

Gabriel Sterling...................................................................................................... 35

Ben Adida............................................................................................................... 37

Ryan Germany........................................................................................................ 39

Joseph Kirk............................................................................................................. 43

    CONCLUSIONS OF LAW.................................................................................. 43

Fundamental Right to Vote..................................................................................... 43

Equal Protection..................................................................................................... 44

    ORDERS OF THE COURT:................................................................................ 45

**PROPOSED REMEDY** ......................................................................................... 45

    ORDERS OF THE COURT................................................................................. 46

## BACKGROUND

This civil rights case brought against Georgia Secretary of State Brad

Raffensperger, and the members of the Georgia State Election Board (the "State

Election Board" under 42 U.S.C. § 1983 was removed to this Court from Georgia

Superior Court in 2017.  Plaintiffs alleged that the then-existing Georgia voting

system infringed upon their fundamental right to vote and their right Freedom of

Speech and Equal Protection of Law under the 1st and 14th Amendments to the U.S.

Constitution.  Following an order of this Court enjoining continued use of the then-

existing Diebold voting system, and while this case remained pending, Georgia

implemented a new voting system including the use of a standalone electronic

ballot marker that printed a paper ballot which is then scanned into electronic form

with an attached digital image, and then tabulated though a central server (the

"Dominion BMD System").

When Plaintiffs renewed their constitutional challenge against the Dominion

BMD System, the court considered their additional claims on summary judgment,

and found that the evidence was not uncontested as to the Coalition Plaintiffs,

including Ricardo Davis at the time, regarding Plaintiff's Count One, asserting a

violation of the Fundamental Right to Vote in violation of the First and Fourteenth

Amendments, and Count Two Equal Protection of the Law in violation of the

Fourteenth Amendment. Those issues were reserved for trial. See Opinion and Order, Dkt., 1705, p.134

The case came on for a final trial on January 9, 2024. This Court heard evidence over a period of 17 days as to whether Georgia's statewide electronic voting system, as currently designed and implemented, suffers from major cybersecurity deficiencies that unconstitutionally burden Plaintiff's 1st and 14th amendment rights and ability to cast effective votes that are accurately counted. See Opinion and Order filed November 10, 2023.

Plaintiff Davis separated from the other Plaintiffs on the eve of trial, and presented evidence and argument on somewhat different claims consistent with the issues that the Court had identified to be considered at trial. In addition to the issues and practices identified by the Coalition and Curling Plaintiffs, Plaintiff Davis identified the following alleged practices as a basis for enjoining the system and other relief:

- That the Dominion BMD System is subject to penetration by malware and lacks the capability to audit whether the system displayed the right information to the voter, and whether the voter's intentions were accurately tabulated into the election results;

- That the Logic and Accuracy testing used by the Defendants to test the Dominion BMD System cannot rule out the existence of malware-based fraud in the system;

- That the Dominion BMD System may accept, and has accepted, double copied and double scanned ballots without rejection;

- That the Dominion BMD System can produce incorrect results and actually resulted in the selection of incorrect winners;

- That the Dominion BMD System systems experience QR Code signature mismatch errors that resulted in miscounts in most Georgia counties;

- That unexplained reporting anomalies of the Dominion BMD System have been documented permitting a decrease in counted votes of over 20,000 in a matter of minutes in at least one Georgia U.S. Senate race;

- That the Dominion BMD System permits the acceptance of ~~and~~ certified cast votes despite the absence of ballot images;

- That the Dominion BMD System is susceptible to wireless access permitting the changing of ballot rejection parameters during live elections.

After listening to the voluminous witness testimony and reviewing extensive documentary evidence, including the evidence submitted by Plaintiff Ricardo Davis, this Court finds that the Plaintiffs have by a preponderance of the evidence,

established the continuing existence of an unconstitutional burden on their fundamental right to vote and their right to Equal Protection of Law under the 1st and 14th Amendments.  The Court makes the following findings of facts and conclusions of law.

## LEGAL STANDARD

The Plaintiff's claims at trial were brought under the First and the Fourteenth Amendments to the U.S. Constitution.  The legal standard that should be applied was articulated by this Court in its November 11, 2023 Order on Motions for Summary Judgment.  In this 11th Circuit, courts analyze First and Fourteenth Amendment claims that challenge election practices under the balancing test outlined by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019).  The Court should therefore analyze Plaintiff's constitutional claims under the *Anderson-Burdick* test.

This test requires the Court to "weigh the 'character and magnitude' of the burden that the State's rule imposes" on Plaintiffs' voting rights "against the interests that the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citing *Burdick*, 504 U.S. at 434). Ultimately, "the level of the scrutiny to which election laws are subject varies with

the burden they impose on constitutionally protected rights." *Stein v. Alabama Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014).

Laws that severely burden the right to vote "must be narrowly drawn to serve a compelling state interest." *Lee*, 915 F.3d at 1318 (citing *Burdick*, 504 U.S. at 434). But "reasonable, nondiscriminatory restrictions that impose a minimal burden may be warranted by the State's important regulatory interests." *Billups*, 554 F.3d at 1352 (cleaned up). "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Lee*, 915 F.3d at 1318–19 (citing *Billups*, 554 F.3d at 1352).

The right to vote derives from the right of individuals to associate for the advancement of political beliefs that is at the core of the First Amendment and is protected from state infringement by the Fourteenth Amendment. *E.g., Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968); *NAACP v. Button*, 371 U.S. 415, 430 (1963). "Writing for a unanimous Court in *NAACP v. Alabama*, Justice Harlan stated that it 'is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *Anderson*, 460 U.S. at 786-87 (internal citation omitted). As discussed in both the Court's September 28, 2020 Order and this Order, the individual Plaintiffs have a strong preference to cast votes in person and do not want to be shunted out

of the regular exercise of the shared political experience of voting with their fellow citizens at their local precinct location. The First and Fourteenth Amendments afford them this right to associate for the advancement of political beliefs by exercising the franchise at the voting booth and to cast their votes effectively. *See generally, Anderson*, 460 U.S. at 788; *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968); *Reynolds v. Sims*, 377 U.S. 533, 563 (1964).

"Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds*, 377 U.S. at 562. "It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). "Although these rights of voters are fundamental, not all restrictions imposed by the States . . . impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." *Anderson*, 460 U.S. at 788. Rather, the Supreme Court has recognized that States retain the power to regulate their elections to provide fairness, honesty, and order in the democratic process. *Id.* The right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system. *Anderson*, 460 U.S. at 788. "To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election

codes." *Id.* Election laws "invariably impose some burden upon individual voters," whether they govern the "registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself," and such laws "inevitably affect[] — at least to some degree — the individual's right to vote and his right to associate with others for political ends." *Id.*; *Burdick*, 504 U.S. at 433. But, "cumbersome election machinery can effectively suffocate the right of association, the promotion of political ideas and programs of political action, and the right to vote." *Williams*, 393 U.S. at 39 (Douglas, concurring). And, "[w]hen a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Reynolds*, 377 U.S. at 566 (quoting *Gomillion v. Lightfoot*, 364 U.S. at 347).

## BALANCING OF INTERESTS

While the Court recognizes Plaintiffs' strong voting interest and evidentiary presentation that indicate they may ultimately prevail in their claims, the Court must perforce address the posture of this case as a whole as well as the Plaintiffs' burdens "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *New Georgia Project v. Raffensperger*, ---F.3d. ---- 2020 WL 5877588, at *2 (11th Cir. 2020).

## TIMING OF THE REQUEST FOR RELIEF

In election cases, the Supreme Court and Eleventh Circuit have made ever more abundantly clear the mandate that district courts must exercise great restraint in considering the grant of injunctive relief that requires new rules on the cusp of an election where the Court's Order could cause electoral disruption and voter confusion. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *Republican National Committee v. Democratic National Committee*, --- U.S. ---, 140 S.Ct. 1205, 1207 (2006); *Republican Nat'l Comm. v. Common Cause R.I.*, --- U.S. ---, 2020 WL 4680151, at *1 (U.S. Aug. 13, 2o2o); *Merrill v. People first of Alabama*, ---S. Ct ---, 2020 WL 3604049 (U.S. July 2, 2020); *New Georgia Project v. Raffensperger*, 2020 WL 5877588 at *3. The Court expressed its concerns anew to Plaintiffs' counsel about this timing issue when Plaintiffs filed a renewed motion for preliminary injunction in August 2020, shortly after the denial without prejudice of their initial October, 2020 preliminary injunction motions targeting the BMD system and other voting practices.  The timing of the relief sought plays a paramount role in the evaluation of the practicality of granting the requested remedy.

## DOMINION BMD SYSTEM

## FINDINGS OF FACT

Georgia HB316 was signed into law in April of 2019 as Act 24, and mandated that all in-person Georgia voters in all Georgia elections must vote on Ballot Marking Devices (BMD), referred to in Georgia code O.C.G.A. 21-2-300 as *"electronic ballot markers"*. (Transcript of Proceedings on 1-16-24, Vol 5A, 235:22-23)  Secretary of State ("SOS") Raffensperger and Chief Operating Officer Sterling signed a contract with Dominion Voting Systems in August of 2019 to purchase the Dominion Democracy Suite 5.5 voting system for Georgia elections. (See Dkt. 786)  The same Dominion Democracy Suite 5.5 BMD system hardware components and Democracy Suite 5.5 component software versions for each component were installed across all Georgia counties prior to the 2020 elections. (Tr. 1-11-24 Vol 3, 70:9-10)

Dominion BMD system election projects are prepared by Deputy Director of Elections Michael Barnes' office team and sent to all Georgia counties so that they can conduct elections. (Tri. 1-11-24 Vol 3, 70:11-71:5)  Dep. Director Barnes explained that the election projects contain programs, ballot definitions, an election database and other files necessary for counties to conduct elections. (Tr. 1-11-24 Vol 3:71:10-23)

The Court finds from the testimony that no substantive voter verifiability changes have been made to the Dominion BMD system since the Court found it did not comply with two Georgia statutes. (Order of the Court 10-11-20, Pg 81, 82) In consequence, Georgia voters are still unable to verify votes their votes that are embedded into, and accumulated from, a Quick Response code undecipherable to the voter.

1. Voting System Security

Plaintiffs' expert witness, Dr. Alex Halderman, conducted a demonstration where he "hacked" a Dominion Ballot Marking Device ("BMD") in front of the court by installing malware and changing election results so that they did not accurately reflect the intent of a voter. (Tr. 1-18-24 Vol 7B,140-187)  The Defendants provided no substantive evidence that they have mitigated the security risks for future Georgia elections as demonstrated by Dr. Halderman in his most recent demonstration or the demonstration he performed three years ago for the court.

The Court finds that Mr. Paul Maggio, admitted that Sullivan Strickler representatives took an image copy of a Coffee Co. Dominion ICP precinct scanner, mail-in ballot scanner, tabulation server, election management server and other Dominion election components and placed them on a secure portal. (Tr. 1-17-24 Vol 6A, 189:19-24;192:6-10)  Mr. Maggio admitted that over a dozen third

parties were given a log-in account and access to the image copies of the Coffee County Dominion BMD server and components. (Tr. 1-17-24 Vol 6A,201:2-9, Ex 115.)  Mr. Maggio admitted any third party who had access to the Dominion component images through the portal could have distributed or may still distribute the image copies to other parties. (Tr.  1-17-24 Vol 6A,201:16-20)

Plaintiffs' expert witness Dr. Halderman testified that his *"particular concern"* was that an attacker could install malware without anybody having physical access to a BMD by piggybacking on the normal pre-election processes that are used to install ballot information. (Tr. 1-18-24 Vol 7B, 195:1-197:16) Plaintiff Davis proffered that had he been permitted to question Dr. Halderman, he would almost certainly establish that the same general security concerns he expressed about the Dominion BMD would also apply to other Dominion components. (Doc. 1809, Pg 7, #14)

2. Logic and Accuracy (L&A)

Dr. Andrew Appell's testimony confirmed Dr Halderman's finding that malware can be programmed to subvert Logic and Accuracy (L&A) testing, by, for example, making tabulators count differently on different days. (Tr. 1-31-24 Vol 16B,197:19-23)  The Court finds that the Defendants did not refute Dr. Appell's testimony that malware can make tabulators count differently on different days. Defendants further did not refute Dr. Halderman's Security Analysis finding that

L&A testing typically involves only 1 or 2 ballots per BMD. (See Doc. 1681, Pg 35) Defendants likewise did not refute Dr. Halderman's Security Analysis finding that malware can subvert L&A testing by programming tabulators to cheat after counting the first *"n"* ballots. (Doc. 1681, Pg 35) Finally, the Court finds that the Defendants did not refute Dr. Halderman's Security Analysis conclusion that *"No practical method of pre-election or parallel testing can rule out malware-based fraud."* (See Dkt. 1681, Pg 35)

3. <u>Double Counted Ballots</u>

Dr. Halderman explained in his July 2021 Security Analysis that the Dominion BMD system has no ability to detect duplicate QR codes scanned into the results and thus will count them multiple times. (See Doc. 1681, Page 20 -21) Dr. Halderman explained in his Security Analysis that the Dominion BMD system scanners will accept double copied or double scanned ballots. (See Doc. 1681, Page 57) The Court finds that Mr. Ryan Germany admitted that there were double-scanned ballots into the 2020 General Election results. (Tr. 1-16-24 Vol 5A, p. 37:1-5; p. 5) Elections Director Blake Evans acknowledged he was aware of the Fulton County legal case known as *Favorito v. Wan* where senior poll managers and audit monitors signed sworn affidavits that they handled counterfeit ballots during the 2020 hand count audit. (Tr. 1-26-24 Vol 13,20:12-20) However, he testified that he was unaware of any instances of vote dilution in Georgia. While

Germany contended that Scott Hall was not truthful concerning the existence of duplicate ballots, Plaintiff Davis proffered the rebuttal testimony of senior poll manager Suzi Voyles to corroborate the evidence of ballots being double counted in the Fulton County 2020 General Election. (See Dkt. 1817, Pg 3, l. 1) Furthermore, Davis proffered that a Ballot Integrity Analysis prepared by 30-year career image analyst Phillip Davis indicated 8,000 double scanned ballots were counted statewide in Georgia's 2020 General Election results. (See Dkt. 1817, p. 5) Davis proffered that Phillip Davis could provide evidence that 4,000 of the double scanned ballots were included in Fulton County 2020 election results and 1,000 double copied ballots were included in Chatham County 2020 election results and over 7,000 test ballots were included in statewide results. (See Dkt. 1817, Pg 5)

4. Voting System Selects Wrong Winners

Ms. Jeanne Dufort testified that, in a race tallied using the Dominion BMD System, a DeKalb County District 2 Commission candidate received zero votes in the precinct where she and her family lived and voted in the May 24, 2022 primary. (Tr. 1-9-24 Vol 1,187:21-188:4)  Defendant Ricardo Davis corroborated Ms. Dufort's account of the vote count failure being discovered. (Tr. 1-9-24 Vol 1,187:21-188:4)  The Court finds Mr. Barnes' conclusion, that the Dominion BMD System's selection of the wrong winners in the Dekalb County 2022 District Commission 2 primary was attributable to "human error," unconvincing. (Tr. 1-11-

24 Vol 3,152:4-154:11 and 1-25-24 12,127:8-129:4)  Furthermore, the July 14,
2022 DeKalb County Election board materials do not explain why the system
failed to count 1800 votes. (Davis Exhibit 8)

The Court finds particularly concerning that the Defendants offered no
evidence they audited any other race in the May 24, 2022 primary after it was
discovered that the Dominion BMD system declared the wrong winners in the
DeKalb District 2 Commission primary.  Documents submitted in support of State
Election Board complaint SEB2022-348 shows scanner audit log samples of how
tabulators rejected ballots and ignored counting votes on those ballots due to a QR
code mismatch error that occurred in the May 24, 2022 primary. The Defendants
failed to offer evidence demonstrating another explanation.   SEB Complaint 2022-
348 contains samples of how the Dekalb 2022 primary experienced QR code
mismatch errors that likely contributed to the vote count failure by the Dominion
BMD system. (Davis Exhibit 10)

5. <u>Ballot Rejections and Counting Failure</u>

Plaintiff Davis offered unrebutted evidence in the form of audit logs attached
to the SEB 2022-348 complaint showing the ballot rejection and counting error
occurred in 65 of 67 Georgia counties surveyed.  Defendants offered no testimony
to explain the anomaly.  The State's witness Blake Evans authenticated a Tennessee
Secretary of State letter recommending that Williamson County Tennessee

discontinue use of the same Dominion Democracy Suite 5.5. system used by the State of Georgia after a ballot rejection and counting problem occurred there. (Tr. 1-26-24 Vol 13, 110:25-111:8, Part of Davis Ex 10)  Director Evans admitted that he did not have knowledge of any differences that may exist between the Georgia and Tennessee Dominion installations. (Tr. 1-26-24 Vol 13,111:11-19)   Plaintiff Davis proffered rebuttal testimony from David Cross to explain that the audit logs of counting errors found in Georgia were identical to the errors which led the Tennessee Secretary of State to recommend discontinuance of the Dominion Democracy Suite 5.5 BMD system. (See Dkt 1817, pp. 4-5)

6. <u>20,000 Vote Decrease</u>

Director Evans admitted to reports of an abrupt 20,000 vote reduction in the 2022 Senate race.  Although he speculated that it may have been old reporting, he eventually admitted that he does not know why Hershel Walker's vote totals decreased by 20,000 votes in a 4-minute span on election night. (Tr. 1-26-24 Vol 13, 18-19,106:10-23) The Court finds that Mr. Evans's first purported explanation that the vote drop may have been caused by an older county interim upload is not plausible if other candidate's vote totals increased. (Tr. 1-26-24 Vol 13, 19:6-9) Plaintiff Davis proffered testimony and the exhibits including the GPB Twitter feed showing opponent candidate vote totals increasing substantially during the same 4-minute time span when 2022 U.S. Senate candidate Herschel Walker's decreased.

(Dkt. 1817 p.2; Ex 1)  Plaintiff Davis proffered rebuttal testimony from Mr. Garland Favorito that he presented the GPB Twitter feed to Mr. Evans and never received such a reply.  His testimony as a fact witness, with technical and voting system technology expertise, could have explained why Mr. Evans supposition was not plausible. (Dkt. 1817 p. 6, Ex 1)

7. <u>Electronic Vote Alteration</u>

The Court finds that the Dominion BMD System scans each election ballot to produce a digital ballot image that is used to create a cast vote record which is tabulated to produce election results. (Tr. 1-10-24 Vol 2,165:23-166:6)  Dr. Juan Gilbert testified that  *"There is no known way to secure a digital ballot image."* (Tr. 1-29-24 Vol 14A,79:17-19)  Testimony by Dr. Phillip Stark at trial demonstrated that Fulton County 2020 election results contained cast vote records for which no ballot images exist.  (Tr. 1-22-24 Vol 9,160:23-161:1)  Plaintiff Davis proffered that Dr. Stark would have testified that over 17,000 Fulton County 2020 cast vote records have no corresponding ballot images. (Dkt. 1809 p.4, Ex #4)  Furthermore, Plaintiff Davis testified to a VoterGA study placed in evidence corroborating Dr. Stark's findings that over 17,000 Fulton County 2020 votes were certified despite having no corresponding ballot images. (Davis Exhibit 9), (Tr. 1-10-24 Vol 2, 166 7-11)  The same VoterGA study also provided substantial evidence that Fulton Co. 2020 digital ballot images were electronically altered prior to final certification.

(Davis Exhibit 9)  Plaintiff Davis proffered still further that the State Election

Board complaint SEB2023-025 included in Plaintiff Davis' third proffer documents

several other types of electronic vote manipulation occurring in the Fulton Co.

2020 General Election. (Davis Exhibit 7)

8. <u>Wireless Dominion System Accessibility</u>

Plaintiff Davis' proffered eyewitness depositions from Misty Hampton and

Cathy Latham corroborating how Dominion Voting System personnel accessed the

system wirelessly during Election Night of the 2021 U.S. Senate runoff to alter the

scanner's ballot rejection and counting behavior in Coffee Co. on January 5, 2021.

(Dkt. 1806, p. 2-5)  Plaintiff Davis' proffered deposition transcripts from a nation

state vulnerability expert with 30 years of experience at Sandia National Labs,

Jeffrey Lenberg, who helped find the scanner setting the Dominion personnel

wirelessly changed to alter the scanner's ballot rejection and counting behavior in

Coffee Co. on January 5, 2021 as per eyewitness testimony. (Dkt 1806, p. 5-7)

Plaintiff Davis proffered a cybersecurity forensic report showing that a Dominion

Democracy Suite 5 installation sets the system up to be accessed wirelessly from

remote devices including cell phones. (Dt. 1817, Ex L)  Defendants offered no

testimony or documentation to evidence Dominion has any software patch that

would solve all the problems uncovered in Dr. Halderman's Security Analysis and

testimony. (See trial transcript)  Moreover, Defendants did not attempt to refute

Dr. Halderman's Security Analysis conclusions that the Dominion ICX BMD *"...was developed without sufficient attention to security during design, software engineering, and testing."* (Doc. 1681, Pg 6,7)  Plaintiff Davis' further proffered additional questions for Dr. Halderman the answers to which would likely confirm that Dr. Halderman's conclusions about the ICX BMD applied to other Dominion BMD system components. (Dkt. 1809, p. 7, #14)  Defendants did not refute Dr. Halderman's Security Analysis conclusion that *"...it would be extremely difficult to retrofit security into a system that was not initially produced with such a process."* (Dkt. 1681, pp. 6,7)

The Court finds that the Tennessee Secretary of State has recommended discontinuance of the Dominion Democracy Suite system as a result of the ballot rejection system. (Davis Exhibit 10)  The Court further finds that Dr. Halderman testified that the Texas Secretary of State's office rejected use of the Dominion Democracy Suite 5.5 system. This rejection memorandum dated February 16. 2019 was written before Georgia purchased the same version of the system. (Tr. 1-19-24 Vol 8A, 92:3-5)

## CONCLUSIONS OF LAW:
### Fundamental Right to Vote

- The Court **CONCLUDES** that the Dominion BMD system still does not comply with two Georgia statutes for verifiability to the voter.

- The Court **CONCLUDES** that a potential unknown distribution of Dominion BMD system component image copies burdens the Plaintiffs fundamental right to vote by creating an additional security risk for future Georgia elections run on the Dominion BMD system.

- The Court **CONCLUDES** that Plaintiffs' fundamental right to vote has been violated, and will continue to be violated when they vote in-person and are forced by Defendants to vote on a system that is not compliant with Georgia law.

- The court **CONCLUDES** that HB316's mandate, enforced by O.C.G.A. 21-2-300, requiring all Georgia voters to vote on BMDs, severely burdens the Plaintiffs' fundamental right to vote when they vote in-person and are required to vote on BMDs that are not as secure as voting by mail using hand marked paper ballots.

<u>Equal Protection</u>

- The Court **CONCLUDES** that Plaintiffs' Equal Protection rights under the Fourteenth Amendment to the United States Constitution have been violated, and will continue to be violated, when they need to vote in-person and are forced by Defendants to vote on a system that does not provide the verifiability they would otherwise have when voting by mail.

**Orders of the Court:**

- The court **DECLARES** that Georgia's current Dominion BMD system is constitutionally deficient.

- The court **ENJOINS** the state from using the Dominion BMD system in future Georgia elections.

- The court **PROHIBITS** the state from enforcing laws requiring use of the current Dominion BMD system.

## AUDIT PROCESSES

### FINDINGS OF FACT

HB316 authorized Risk Limiting Audits (RLA) to be conducted in Georgia when it was passed in March of 2019 and signed into law. (Opinion and Order filed 11-10-23, Dkt. 964, p. 8,9)  Under this law, only one race per two years is mandated to be audited. (Opinion and Order filedf 11-10-23, Dkt. 964, p. 8,9)

Dr. Stark testified that a paper trail from a BMD is untrustworthy for any audit. (Tr. 1-22-24 Vol 9,198:7-15)  Dr. Stark further explained that a BMD printout is not the direct reflection of the choices a voter selected. (Tr. 1-22-24 Vol 9:145:8-23)  Dr. Stark explained that when you introduce technology between the

voter and the record of the vote, you lose the guarantee that the record of the vote accurately reflects what the voter did. (Tr. 1-22-24 Vol 9:135:3-5)

Defendants' expert witness, Dr. Juan Gilbert, confirmed that RLAs cannot audit what a BMD showed to the voter. (Tr. 1-29-24 Vol 14A, 112;17-20)  Dr. Stark also testified that that auditing one race does not prove that the voting system counted another race correctly. (Tr. 1-22-24 Vol 9,145:13-14)

Defendant's expert Dr. Adida testified that Georgia conducted a statewide Risk Limiting Audit for the 2020 General Election, but admitted under questioning that it was actually a full hand count audit instead, which is a type of audit significantly different than an RLA. (Tr. 1-25-24 Vol 12, 154:15-17)

Testimony and exhibits admitted at trial demonstrate that Governor Kemp's staff undertook a 36-point study that confirmed claims of massive discrepancies in the Fulton Co. 2020 hand count audit such as hundreds of double scanned ballots in the original count and thousands of double reported ballots in the hand count audit. (Ex 208)  Governor Kemp's 36-point study supports a finding that the Fulton County 2020 audit results did not match the original election results.  (Ex 208)

Plaintiff Davis proffered that the RLA sampling process used in Georgia would not detect, and has not detected, any type or double scanned, double copied or test ballots entered into election results. (Dkt 1817, Ex A and p. 5)  The Defendants have provided no evidence that any type of audit they could implement

would satisfactorily address the voting system security concerns raised by the Plaintiffs and protect their constitutional right to vote. (See trial transcript)

## CONCLUSIONS OF LAW

### Fundamental Right to Vote

1. The Court **CONCLUDES** as a matter of law, from the testimony and the exhibits admitted at trial that Georgia's auditing of only a single race every two years does not ensure the accuracy of the Dominion BMD system vote count for any other contested race that takes place in the same or different year and therefore, severely burden the Plaintiffs' Constitutional right to vote in those unaudited races.

2. The Court **CONCLUDES** as a matter of law from the testimony and the exhibits admitted at trial that Plaintiffs' Constitutional right to vote is severely burdened because even when the RLA process is employed it is based on an improper assumption that all Georgia ballots to be audited are legitimately cast while the Dominion BMD system, as implemented, is not able to detect double scanned ballots, double copied ballots or test ballots that are cast due to fraud or error.

3. The Court **CONCLUDES**, as a matter of law, from the testimony and the exhibits admitted at trial that it sees no other way to ensure the accuracy of

future Georgia vote counts required to secure Plaintiffs' fundamental right to vote other than by publicly recorded hand counts of all election ballots so as to ensure the security and protection of the Plaintiffs' constitutional right to vote.

<u>Equal Protection</u>

4. The Court **CONCLUDES** as a matter of law from the testimony and the exhibits admitted at trial that Plaintiffs' Equal Protection Rights under the Fourteenth Amendment to the United States Constitution are violated because the acceptance of double scanned ballots, double copied ballots and test ballots dilute Plaintiffs votes with respect to other votes tallied on those illegitimate ballots.

<u>Orders of the Court</u>

- The Court **ORDERS** the Defendants to establish a counting process that ensures Georgia voters' intent is accurately recorded and counted for all races in the 2024 General Election.

- The Court **ORDERS** the Defendants to establish a process and policy to detect and reject illegitimate ballots that may be fraudulently or inadvertently counted, or attempted to be counted, in future Georgia election results, including double scanned ballots, double copied ballots and test ballots.

## ELECTION TRANSPARENCY

## FINDINGS OF FACT

Dr. Appell testified that if the scanners are hacked the paper ballots can be re-counted to see what is marked on them. (Tr. 1-31-24 Vol 16B, 200:23-201:7)  The Defendants have provided no evidence that they have ever attempted to have ballots unsealed and publicly counted after the Dominion BMD system produced questionable election results. (See trial transcript)  The Court finds that the Defendant Raffensperger or his attorneys actually filed an Amicus Brief to prevent Petitioners from having an inspection of ballots or receiving copies of ballots after allegations of counterfeit ballots were made by senior poll managers who were auditors in the hand count of the 2020 Fulton County General Election. (Tr. 1-26-24 Vol 13, 20:13-21:8)  Director Evans admitted Georgia has no clearly defined policy to mitigate illegitimate ballots. or for that matter, even detect them**.** (Tr. 1-26-24 Vol 13, 114:20-116:4)  The Court finds that each ballot should be represented in the Dominion BMD system by a ballot image, a cast vote record and a certified vote, however that does not seem to always be the case as it should.  (Tr. 1-10-24 Vol 2,165:23-166:6)  Dr. Stark's previously mentioned testimony highlights discrepancies between total cast votes records and total ballot images in the Fulton County 2020 General Election. (Tr. 1-22-24 Vol 9,160:23-161:1)  The Court finds that the VoterGA study entitled *How Georgia Election Results Were*

*Electronically Manipulated* further highlights discrepancies between the total certified votes and the total ballot images in the Fulton County 2020 General Election. (Davis Exhibit 9)  The Court finds that the discrepancies in ballot image totals presented by the Plaintiffs corroborates the Defendants' expert opinion from Dr Gilbert that *"there is no known way to secure a digital ballot image"*. (Tr. 1-29-24 Vol 14A,79:17-19)  Dr. Juan Gilbert reflected this lack of transparency in actual ballots when he explained that you can check your bank account but not your vote. (Tr. 1-29-24 Vol 14A, 26:12-17)

The Court finds by a preponderance of the evidence from the testimony and the exhibits admitted at trial that the lack of election transparency demonstrated by the Defendants falls under the jurisdiction of the court's oversight over state inaction. (See Opinion and Order 11-10-23, Dkt. 1705 Page 114)  Deputy Director Barnes acknowledged in-person voted memory cards that store electronic records for a Georgia election contain ballot images, audit logs and cast vote records. (Tr. 1-25-24 Vol 12,129:19-21)  The Court that Mr. Barnes authenticated under cross examination a letter he wrote to the Bibb Co. Elections Supervisor stating she could overwrite in-person voted memory cards just weeks after an election. (Tr. 1-25-24 Vol. 12, 129:5-131:4)

## CONCLUSIONS OF LAW:

### Fundamental Right to Vote

- The Court **CONCLUDES** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that ballot images, cast vote records and audit logs are electronic election records necessary to be lawfully retained to preserve Plaintiffs fundamental right to vote.

- The Court **CONCLUDES** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that only a hand marked paper ballot can ensure Plaintiffs' fundamental right to vote by providing an accurate reflection of voter intent for recounts, audits, election challenges, any authorized independent copying of ballots, any authorized public inspection of ballots or other purpose needed to verify authenticity of the ballots and votes cast on those ballots.

- The Court finds by a preponderance of the evidence from the testimony and the exhibits admitted at trial that the lack of election transparency demonstrated by the Defendants falls under the jurisdiction of the court's oversight over state inaction in order to protect Plaintiffs fundamental right to vote. (Summary Judgement Order 11-10-23, Page 114)

- The Court **CONCLUDES** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that a digital ballot image never seen by the voter during the election process cannot be legitimately substituted for a physical ballot to reflect voter intent for recounts, audits,

election challenges, any authorized public inspection of ballots, authorized independent copy of ballots, or other purpose needed to publicly verify authenticity of the ballots and votes cast on those ballots so as to ensure Plaintiffs fundamental right to vote.

<u>Equal Protection</u>

- The Court **CONCLUDES** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that Plaintiffs; Equal Protection rights of the Fourteenth Amendment of the U.S. Constitution have been violated, and will continue to be violated, when they vote in-person by the premature destruction of original in-person voted ballot images, cast vote records and audit logs contained on in-person voted memory cards as compared to mail-in voted ballot images, cast vote records and audit logs which are not placed on memory cards and therefore, not prematurely destroyed.

ORDERS OF THE COURT:

- The Court **ORDERS** that all election records including ballot images, cast vote records and audit logs be retained and preserved in their original collected form in accordance with the 22-month retention period required by federal law (USC  20701)

- The Court **ORDERS** that all election records including ballot images, cast vote records and audit logs be retained and preserved in their original collected form in accordance with the retention period required by state law whenever state law requires a retention period exceeding that of federal law.

## DEFENDANTS CREDIBILITY

### FINDINGS OF FACT

### Cybersecurity

Particularly emblematic of the current shortcomings was the moment when no one who testified for the Defendants admitted responsibility for cybersecurity of the Secretary of State's election preparation server that prepares election projects for every county for every election. (See trial transcript) The Defendants pointed brought no witness from their vendor Dominion Voting Systems to testify in regards to cybersecurity election protection for Georgia voters, despite claims by Mr. Beaver that cybersecurity was outsourced to Dominion. (See trial transcript) Mr. Beaver, Mr. Barnes and Mr. Sterling all directed responsibility for cybersecurity to one another during their adverse witness testimony. (Sterling Tr. 1-17-24 6A, 12:20-13:25, Beaver Tr. 1-16-24 5A, 112:17-20 ~~"I report to Gabe Sterling"~~, Barnes Tr. 1-11-24 5A,159:16-160:8)

The Court finds that in the three (3) years since Dr. Halderman hacked a BMD in front of the court, as of January of 2024 the Defendants provided no substantive evidence that they have mitigated the risks demonstrated by Dr. Halderman for future elections. (See trial transcript)

<u>Defendant Representatives</u>

The Court observes that despite him having written a book concerning a number of the events at issue in this action, Secretary Raffensperger, while being no more than a few blocks away, declined to testify in these matters and sought an appeal in the 11th Circuit where he successfully avoided appearance.[1]  The Court is entitled to take an inference from the absence of his testimony that the answers to expected questions would not support the position taken by the Defendants.   See Order of the Court, USCA11 Case: 23-14115, January 5, 2024

The Defendants presented testimony from Georgia Secretary of State Chief Operating Officer Gabriel Sterling, its former Legal Counsel Ryan Germany, its current State Election Director Blake Evans and Deputy Director Michael Barnes and Chief Technology Officer Merritt Beaver and Lead Investigator Francis

---

[1] An inference that relevant evidence would have been unfavorable is justifiable where the evidence was within the control of a party in whose interest it would naturally be to produce the evidence and where the
party fails to produce the evidence without satisfactory explanation and instead produces weaker evidence or no evidence. INA Aviation Corp. v. U.S., E.D.N.Y.1979, 468 F.Supp. 695, affirmed 610 F.2d 806.

Watson as to details of the election operations and investigations conducted by the SOS office for Georgia elections.

The Defendants also offered evidence from Matt Mashburn, former Georgia State Election Board Chairman, who testified that he was not aware that the State Election Board was a Defendant in the present action, and was not willing to authenticate his own deposition transcript. (Tr.1-17-24 Vol 6A,88:14-89:1)1 Mr. Mashburn testified that he was familiar with State Election Board complaint SEB2023-025 but that he had no independent recollection of it when it was placed in front of him. [Davis Exhibit 7] Plaintiff Davis proffered the factual testimony of David Cross, to explain the evidence presented in the complaint of electronic alterations to Fulton County 2020 vote counts. (Dkt. 1817 p. 4,5)

The Court finds, based upon his demeanor and presentation, that Mr. Mashburn's testimony was not credible. (See trial transcript)

Blake Evans

The Defendants questioned Blake Evans, State Election Director, who testified he had no knowledge of votes not counted as cast in Georgia. (Tr. 1-26-24 Vol 13,20:3-7) However, Mr. Evans admitted he was aware of the 2022 DeKalb County District 2 Commission primary where the voting system selected the wrong winners. (Tr. 1-26-24 Vol 13,17:7-10) Mr. Evans further acknowledged Coffee County machine recount problems in 2020 General Election. (Tr. 1-26-24 Vol 13,

18:15-17)  Mr. Evans admitted he was aware of the *Favorito v. Wan* case where counterfeit ballots votes may have been counted but not actually cast be a voter. (Tr. 1-26-24 Vol 13,20:12-20)

Mr. Evans testified that its vendor ProV&V conducted audits in Georgia counties in November of 2020. (Tr. 1-24-24 Vol 11,233:9-234:17)  However, Defendants presented no documents showing the results of audits Evans claimed ProV&V conducted, or visits it claimed to have made during November of 2020 to any county Mr. Evans named. (See trial transcript)  Plaintiff Davis proffered responses from the counties where a ProV&V audit allegedly took place, all showing that ProV&V never visited them during November of 2020. (Dkt. 1817, Ex E)  Plaintiff Davis proffered rebuttal testimony from fact witness Bob Coovert who could have confirmed with research and documentation that Pro V&V only conducted minimal health checks, and ProV&V never visited any of the counties named to conduct audits during November 2020. (Dkt. 1817, p. 3,4)

The Court finds, from its evaluation of his demeanor and testimony, that there are issues of credibility in Mr. Evans' testimony. (See trial transcript)

Michael Barnes

Defendants presented Deputy Director of Elections Michael Barnes who attributed the malfunction where the Dominion BMD system declared the wrong winners in the 2022 Dekalb District 2 Commission primary exclusively to *"human*

*error"* (Tr. 1-25-24 Vol 12,43:2-4)  However, Barnes did not address or explain the July 14, 2022 DeKalb County Election Board Materials admitted by Plaintiff Davis showing that the Dominion BMD System failed to count 1800 votes. (Davis Exhibit 8)  Barnes admitted to being unaware of nearly all aspects of election cybersecurity, despite his role as Deputy Director in charge of ballot building for all counties and distributing election projects to all counties for all elections.  (Tr. 1-11-24 Vol 3,123:14-124:14) Barnes further admitted to advising county election managers to erase memory cards used in a Georgia election to reuse them a few weeks later despite being aware of a 22 month federal, and 24 month state, retention period for election records. (Tr. 1-11-24 Vol 3, 1:23-25)  The Court finds, from its evaluation of his demeanor and testimony, that there are issues of credibility in Mr. Barnes' testimony. (See trial transcript)

Gabriel Sterling

Chief Operating Officer Gabriel Sterling admitted in cross examination that he told researcher Joe Rossi there was 100% certainty ballots had not been tallied multiple times. (Tr. 1-17-2024 Vol 6A, 15:2-15:19) [Davis Ex 3]  However, this seems implausible at best since Mr. Sterling later admitted that he could not have been 100% certain that ballots had not been tallied multiple times because the Fulton County hand count tally sheets were not uploaded until four months after the hand count was conducted.  (Tr. 1-17-2024 Vol 6A, 27:25-28:9) [Davis Ex 5]

Sterling's initial assurance is further difficult to understand given Governor Kemp's 36-point study showing examples of hundreds of double scanned ballots and thousands of double reported ballots in the Fulton Co. 2020 hand count audit. (CGG Exhibit 208)  Moreover, former general counsel Ryan Germany admitted under oath there were double scanned ballots in Fulton County. (Tr. 1-16-24 5A, 36:21-37:5)  Finally, Sterling's initial assertion is contradicted by Director Evans' admitted knowledge of the *Favorito v. Wan* case where identical counterfeit ballots were alleged to have been counted multiple times. (Tr. 1-26-24 Vol 13,20:12-20)

Sterling claimed that we have no reports of a vote flip happening anywhere in America. (Tr. 1-16-24 Vol 5A, 199:4-5)  However, Plaintiff Davis proffered results published by the Secretary of State's office, and the Ware County Election Office, showing that in the 2020 Presidential race hand count audit a vote flip occurred where the Dominion BMD system shorted Donald Trump 37 votes and added them to the totals for Joe Biden. (Dkt. 1817, Ex J)  Davis further proffered rebuttal testimony from Garland Favorito, supported by publicly published election results, that a vote flip did occur.  (Dkt. 1817, Pg 6)

Sterling testified that in any ten-year period the BMD system is cheaper than using hand marked paper ballots. (Tr. 1-31-24 Vol 16B, 95:8-11)  However, Plaintiff Davis proffered that VoterGA cost 2019 estimates for BMD, Ballot on Demand, and hand marked paper ballot systems showed BMD systems to be the

most expensive initially and over time while hand marked paper ballot systems are least expensive initially and over time. (Dkt. 1817, Ex K)   Davis further proffered the testimony of Mr. Favorito, who created the cost estimates, and could testify as to their accuracy. (Dkt. 1817, p. 6)

Sterling testified that Secretary Raffensperger's opinion that the voting system is secure were based on work of the election team and outside inputs, but that he held no specific understanding of the system's workings. (Tr. 1-16-24 Vol 5A, 152:7-16)  Plaintiff David proffered a cybersecurity forensic report of the Dominion Democracy Suite 5 system used in 2022 Colorado elections that showed the Dominion Democracy Suite 5 system is installed in a manner that is extremely vulnerable to remote access in several ways. (Dkt. 1809, Ex L)

The Court finds, from its evaluation of his demeanor and testimony, that there are issues of credibility in Mr. Sterling's testimony. (See trial transcript)

<u>Ben Adida</u>

Defendant's witness Ben Adida testified that in 2020 Georgia was first state to conduct a Risk-Limiting Audit (RLA) in a mixed mail and in person system. (Tr. 1-12-24 Vol 12, 154:4-9)  However, Mr. Adida then immediately reversed himself, admitting that Georgia conducted a full hand count audit, which is a significantly different procedure than an RLA. (Tr. 1-12-24 Vol 12, 154:15-17)

Dr. Phillip Stark testified that a paper trail from a BMD is untrustworthy for any audit. (Tr. 1-22-24 Vol 9,198:7-15)  Dr. Stark testified that an RLA on a BMD system can't have the intended effect of limiting the risk that an incorrect outcome will become final because the vote record that it is relying on isn't necessarily a complete and accurate record of the voter's expressed selections. (Tr. 1-22-24 Vol 9:144:16-145:8)  Defendant's expert witness, Dr. Juan Gilbert, admitted under cross examination that an RLA cannot detect what a BMD showed to the voter. (Tr. 1-29-24 Vol 14A, 112;18-20)

Mr. Adida testified to his believe that a RLA will resolve all issues of discrepancy in a vote count. (Tr. 1-12-24 Vol 12, 152:13-18)  Governor Kemp's 36-point study confirmed substantial discrepancies in the Fulton Co. 2020 hand count audit. (Ex 208)  The Court finds that not one Defendant testified under oath that the 2020 hand count audit confirmed original election results. (See trial transcript) This finding is supported by a VoterGA study proffered by Plaintiff Davis entitled *Unresolved BMD Security Threats,* and corroborated by Dr. Stark's findings that contradict Dr. Adida. (Dkt. 1817, Ex H)  Plaintiff Davis also proffered reports of discrepancies and falsified tally sheets that contradict Dr. Adida's claims that an RLA can resolve all discrepancies. (Dkt. 1817, Ex B, C, D)  Davis further proffered rebuttal testimony from subject matter witness David Cross to corroborate the discrepancies found in Governor Kemp's report as an original

source of the discrepancies identified in the report. (Dkt. 1817, Pg 4)  Finally,

Plaintiff Davis proffered rebuttal testimony from Mr. Favorito to explain how the

ARLO system employed by Mr. Adida forced counties to enter their audit data into

the state's ARLO system, and how such action would break the chain of custody of

the entire audit by making county election offices dependent on the state election

office for the counties' own original source of audit results. (Dkt. 1817, p. 7)

The Court finds, from its evaluation of his demeanor and testimony, that

there are issues of credibility in Mr. Adida's testimony. (See trial transcript)

<u>Ryan Germany</u>

Ryan Germany, former Secretary of State Legal Counsel, testified to writing

a two-page report in 2017 claiming that the wiping of the state's election

preparation server just days after the Curling case was originally filed is "standard

procedure". (Davis Exhibit 1)  In a previous appearance before it, this Court found

Mr. Germany's testimony to be "flatly not credible", and nothing in his current

testimony would rehabilitate that assessment.  See Order of August 16, 2019.

Plaintiff Davis proffered a VoterGA study entitled *Election Data Destruction* that

corroborated this Court's 2019 findings showing how the state's election

preparation server was exposed for anyone in the world to hack during the live

2016 election and likely years earlier. (Dkt. 1817, Ex M)  Defendants produced no

evidence to this Court showing that the State's election preparation server was ever

properly secured since it was installed not long after the 2002 elections. (See trial transcript)  Plaintiff Davis further proffered that testimony from Mr. Favorito, who authored the study, to explain how the 2017 breach is still the most serious in Georgia history. (Dkt. 1817, Pg 6,7)

Germany testified that the SAFE Commission considered all voting system options when it evaluated new voting system in 2018 and 2019. (Tr. 1-23-24 Vol 10A, 107:23-108:14)  Plaintiff Davis proffered rebuttal exhibits [Ex F, G] showing VoterGA recommended the SAFE commission consider Ballot on Demand options and that Mr. Favorito presented the recommendation at the December 2018 meeting in Macon. (Tr. 1-23-24 Vol 10A, 107:23-108:14)  Defendants offered no corroborating evidence that the SAFE commission considered Ballot on Demand options which, if implemented, would have printed hand marked paper ballots on demand for in-person voters at polling locations in lieu of using BMDs. (See trial transcript)  Plaintiff Davis proffered rebuttal testimony from Mr. Favorito to demonstrate the SAFE Commission never evaluated Ballot on Demand Options before approving their final report in early January 2019. (Dket. 1817 p. 7, #2)

In a December 10, 2020 email to Frances Watson, Germany claimed Eric Chaney's testimony before the House Government Affairs Committee was false when he complained Coffee Co got no help from the SOS office when they experienced 2020 General Election machine recount problems. (Curling Exhibit

522) (Tr. 1-18-24 Vol 7B, 38:6-39:13)  However, Germany's email is contradicted by Eric Chaney's letter to the Committee, the exhibits included in the letter and Coffee County chairwoman Ernestine Thomas Clark's letter which was included as an exhibit. (CGG Ex. 309)  Germany was shown in the Exhibits that the first attempted machine recount added 39 votes to the 2020 Presidential race with no change in ballots cast. (Tr. 1-16-24 Vol 5A,33:23-34:6)  Germany was further shown in the Exhibits that the second attempted machine recount failed to count 185 new ballots after they were found and included. (Tr. 1-16-24 Vol 5A, 35:25-36:6)

Germany claimed that Scott Hall filed a false affidavit after finding duplicate pristine ballots during the 2020 Fulton Co. hand count audit. (Tr. 1-11-24 Vol 3,279:20-22) (Davis Exhibit 2)  Germany then claimed he did not make that statement, despite a court transcript indicating otherwise. (Tr. 1-16-24 Vol 5A.26:2-13)  Defendants objected to Plaintiff Davis' proffered rebuttal testimony from senior poll manager and first-hand witness Suzi Voyles who discovered the duplicate pristine ballots and could have testified to how and why Scott Hall's affidavit was created. (Dkt. 1820)  The Court finds, from its evaluation of his demeanor and testimony, that there are issues of credibility in Mr. Germany's testimony. (See trial transcript)

<u>Frances Watson:</u>

The Secretary of State's Chief Investigator, Frances Watson, stated she had no reason to believe Ryan Germany's December 10, 2020 Email contained false information about Coffee County's request for machine recount help from the SOS office and the office's lack of response. (Tr. 1-18-24 Vol 7B, 39:9-16)  Ms. Watson testified that she went to Coffee Co. with investigator Joshua Blanchard on December 11 2020 and determined the machine recount problems were due to batches of ballots not being separated properly. (Tr. 1-18-24 Vol 7B, 80:5-9)  The Court finds that no evidence was introduced at trial showing either of them was qualified to make such a technical determination in regards to the Dominion BMD system vote counting prerequisites.  The Court further observes that no defense witness claimed changing the size or separation of batches would cause the Dominion BMD System to count differently. (See trial transcript)  Furthermore, such a claim strains credulity as, if true, that fact alone would demonstrate the Dominion BMD System is constitutionally deficient in allowing vote counts to be accidentally and unknowingly changed by election officials without being easily detected.  Plaintiff Davis proffered testimony from Mr. Favorito who could explain as a fact witness based on his technical and voting system technology experience that changing the size or separation of batches would not cause the voting system to count differently. (Dkt. 1817 p. 7, #5)  The Court finds by observance of her

demeanor and testimony and the exhibits admitted at trial that there are issues of credibility in Ms. Watson's testimony. (See trial transcript)

Joseph Kirk

Defendants' witness Joseph Kirk testified we don't have time to put in Ballot on Demand printers before the November 2024 General Election which is still eight months away. (Tr. 1-26-24 Vol 13, 161:9-16)  The Court finds that the Defendants provided no evidence that a Ballot on Demand option was evaluated for the 2024 General Election or any estimated potential timeline. (See trial transcript)  The Court further finds that Plaintiff Davis proffered rebuttal testimony from Mr. Favorito, who recommended the SAFE Commission consider Ballot on Demand options and can testify that Georgia's entire statewide voting systems were converted from paper-based systems to a paperless electronic system in six months between the May 2002 contract signing date and the November 2002 election. (Dkt. 1817, Pg 6, #2,3)

## CONCLUSIONS OF LAW

### Fundamental Right to Vote

- The court **CONCLUDES** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that Plaintiffs fundamental right to vote is severely burdened because Defendants have not resolved, nor even

properly investigated, the vote counting failures that have occurred during previous Georgia elections using the Dominion BMD system.

- The court **CONCLUDES** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that Plaintiffs fundamental right to vote is severely burdened because Defendants have not mitigated the security risks and vulnerabilities demonstrated by Dr. Halderman for future Georgia elections conducted on the Dominion BMD system.

- The Court **CONCLUDES** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that Plaintiffs fundamental right to vote is severely burdened because agents of the state of Georgia have willfully disregarded court orders concerning the legality of the Dominion BMD system in respect to Georgia law.

- The Court **CONCLUDES** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that Plaintiffs fundamental right to vote is severely burdened because the Defendants have shown little willingness to abide by previous court orders.

<u>Equal Protection</u>

- The court **CONCLUDES** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that Plaintiffs Equal Protection rights have been violated, and will be violated, because no Defendant admits

responsibility for cybersecurity in statewide elections when compared to locally administered municipal elections that do not require as much cybersecurity protection.

ORDERS OF THE COURT:

The court shall **APPOINT** a Special Master to oversee the 2024 General Election for the purpose of ensuring the security, integrity, auditability and transparency of the election and the Special Master shall be able to use all legal means to enforce the orders of the court.

**PROPOSED REMEDY**

- The Court **NOW HOLDS** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that the Defendants have willfully disregarded court orders concerning the legality of the Dominion BMD system in respect to Georgia law.

- The Court **NOW HOLDS** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that the Defendants have shown little willingness to abide by previous court orders.

- The Court **NOW HOLDS** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that that the erasure of memory

cards containing ballot images, audit logs or cast vote records prior to the expiration of the federally mandated 22-month retention period is a violation of federal law.

- The Court **NOW HOLDS** by a preponderance of the evidence from the testimony and the exhibits admitted at trial that that the erasure of memory cards containing ballot images, audit logs or cast vote records prior to the expiration of the state mandated 24-month retention period is a violation of state law.

### ORDERS OF THE COURT

- The court **FINDS** that Georgia's 2024 General Election is in jeopardy given the Defendants' testimony that clearly showed no one in the SOS office is responsible for cybersecurity and their overall lack of responsibility to satisfactorily resolve vote counting problems and security risks.

- The Court hereby **ENJOINS** the Defendants from operating another election using the Dominion BMD System in its present form and without adequate assurances that the system can be operated in a constitutionally sufficient manner, or, in the alternative by using paper ballots in place of the BMD devices.

- The court hereby **APPOINTS** _____ as a Special Master to oversee the 2024 General Election for the purpose of ensuring the

security, integrity, auditability and transparency of the election and the Special Master shall be able to use all legal means to enforce the orders of the court.

- That the parties appear before this Court on the ___ day of _____, 2024, thereupon to provide further testimony to the Court on the nature of the remedy to be applied.

- And, in the interim the Court ORDERS, pursuant to Article VI Clause 2 of the United State Constitution, that all physical ballots preserved, or to be preserved, in accordance with federal law be made publicly available.