The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3

 4   DONNA CURLING, ET AL.,           :
                                      :
 5            PLAINTIFFS,             :
     vs.                              :   DOCKET NUMBER
 6                                    :   1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,      :
 7                                    :
              DEFENDANTS.             :
 8

 9
```

10    **TRANSCRIPT OF ORAL ARGUMENTS ON MOTION FOR SUMMARY JUDGMENT**

11                            **PROCEEDINGS**

12                 **BEFORE THE HONORABLE AMY TOTENBERG**

13                 **UNITED STATES DISTRICT SENIOR JUDGE**

14                            **MAY 2, 2023**

15                             **1:10 P.M.**

16

17

18

19

20

21    *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22                     *TRANSCRIPT PRODUCED BY:*

23

      *OFFICIAL COURT REPORTER:*          *SHANNON R. WELCH, RMR, CRR*
24                                        *2394 UNITED STATES COURTHOUSE*
                                          *75 TED TURNER DRIVE, SOUTHWEST*
25                                        *ATLANTA, GEORGIA  30303*
                                          *(404) 215-1383*

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3   FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
     SCHOENBERG:

 4

 5        DAVID D. CROSS
          SONJA SWANBECK
 6        CAROLINE MIDDLETON
          MORRISON & FOERSTER, LLP

 7
          ADAM SPARKS
 8        HALSEY KNAPP
          KREVOLIN & HORST

 9

10   FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
     WILLIAM DIGGES, III, AND RICARDO DAVIS:

11

12        BRUCE P. BROWN
          BRUCE P. BROWN LAW

13        ROBERT A. McGUIRE III
          ROBERT McGUIRE LAW FIRM

14
          CARY ICHTER
15        ICHTER DAVIS

16

17   FOR THE STATE OF GEORGIA DEFENDANTS:

18
          CAREY A. MILLER
19        JOSH BELINFANTE
          VINCENT RUSSO
20        JAVIER PICO PRATS
          ALEXANDER DENTON
21        ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

22        BRYAN TYSON
          DIANE LaROSS
23        BRYAN JACOUTOT
          FRANK B. STRICKLAND
24        TAYLOR ENGLISH DUMA

25                                  (...CONT'D....)
```

```
1   (...CONT'D....)

2
    ON BEHALF OF DEFENDANT FULTON COUNTY, GEORGIA:
3

4        KAYE BURWELL
         DAVID LOWMAN
5        FULTON COUNTY ATTORNEY'S OFFICE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **(Atlanta, Fulton County, Georgia; May 2, 2023.)** |
| 3 | THE COURT:  Please have a seat. |
| 4 | Good afternoon.  We're here for oral arguments in |
| 5 | Curling, et al., v. Raffensperger, et al.  This is Case |
| 6 | 1:17-CV-2989. |
| 7 | As always, we have a host of counsel.  But I might as |
| 8 | well get you for the record to introduce yourselves. |
| 9 | Go ahead. |
| 10 | MR. CROSS:  Sure.  David Cross of Morrison Foerster |
| 11 | on behalf of Curling plaintiffs, Your Honor. |
| 12 | MS. SWANBECK:  Sonja Swanbeck from Morrison Foerster |
| 13 | for the Curling plaintiffs, Your Honor. |
| 14 | MS. MIDDLETON:  Caroline Middleton for the Curling |
| 15 | plaintiffs, Your Honor. |
| 16 | MR. SPARKS:  Adams Sparks, Krevolin & Horst, for the |
| 17 | Curling plaintiffs.  Good afternoon, Your Honor. |
| 18 | MR. KNAPP:  Halsey Knapp, Krevolin & Horst, on behalf |
| 19 | of the Curling plaintiffs.  Good morning or good afternoon, I |
| 20 | guess. |
| 21 | THE COURT:  Good morning, good afternoon, and all of |
| 22 | that. |
| 23 | MR. KNAPP:  It has been a long day already. |
| 24 | MR. McGUIRE:  Robert McGuire for the Coalition |
| 25 | plaintiffs, Your Honor. |

```
 1              MR. BROWN:  Bruce Brown for the Coalition plaintiffs.
 2              MR. LOWMAN:  David Lowman for Fulton County.  And
 3     with me is Kaye Burwell.
 4              MR. TYSON:  And good afternoon, Your Honor.  Bryan
 5     Tyson for State defendants.
 6              And if it is okay with you, I'll just kind of run
 7     through everybody.
 8              THE COURT:  Yes.
 9              MR. TYSON:  Carey Miller from Robbins; Vincent Russo,
10     Robbins Firm as well; Josh Belinfante.
11              THE COURT:  Wait a second.  I'm just -- I --
12              MR. TYSON:  I'm sorry.  Mr. Miller, Mr. Russo,
13     Mr. Belinfante.  And then Mr. Pico-Prats from the Robbins Firm.
14              THE COURT:  I'm sorry.  Can you stand up so I can see
15     you?  All right.
16              MR. TYSON:  Bryan Jacoutot from our firm is here.  He
17     had to step out briefly.  Diane LaRoss also from Taylor
18     English.  Frank Strickland from Taylor English as well came to
19     observe.  And Alex Denton from Robbins as well.
20              THE COURT:  Okay.  Wonderful.  Thank you very much.
21              MR. ICHTER:  Cary Ichter as well on behalf of certain
22     of the Coalition, et als.
23              THE COURT:  All right.  Very good.  Thank you very
24     much.  Just a few preliminary matters.
25              **(There was a brief pause in the proceedings.)**
```

```
1              THE COURT:  Just so I don't forget this housekeeping

2    matter, I would appreciate if the Curling plaintiffs would do

3    the same as the State of Georgia and Coalition did in giving us

4    an identification of its exhibits.  We have -- basically

5    you-all had more exhibits, and you did them Exhibit 1, 2, 3, 4,

6    5.  And it would be very helpful if we could get a chart that

7    said what each document was.

8              And if you could put it on the docket, that way then

9    we'll be able to more easily find it.  I'm not going to say

10   file everything again.  But at least we'll have the

11   correspondence.  And if we go further in this case, do that

12   anew.

13             A few just sort of other matters.  Where is the State

14   on the GBI investigation?

15             MR. TYSON:  So, Your Honor, I'll begin.  If

16   Mr. Miller or Mr. Russo has anything to add, they are welcome

17   to do that.

18             Our understanding of the state of the GBI

19   investigation is it remains ongoing.  The GBI is not providing

20   regular updates to the Secretary or the SEB, as we understand

21   it, because it is a pending criminal matter.  And that is as

22   much as we know at this point.

23             THE COURT:  Have you been given any information as to

24   an anticipated date for wrapping up the investigation?

25             MR. TYSON:  We have not, Your Honor.  And the
```

1    Secretary's office, I know, has inquired of that and has not

2    been given that information either.

3            THE COURT:  Okay.  Has the Secretary of State's

4    office implemented CISA's recommendations as to the adjustments

5    in the BMD system?

6            MR. TYSON:  And, Your Honor, where that stands is

7    Mr. Sterling testified, I believe, at his 30(b)(6) deposition

8    about the physical security elements are largely in place.  The

9    other recommendations from CISA related to kind of the

10   operations of the Dominion software itself.  Dominion had

11   approved by the EAC in late March about six weeks ago a new

12   version of its software that addresses the various software

13   components of the CISA recommendations.

14           We have spent hours with the technical staff in the

15   Secretary's office, hearing from folks with Dominion.  The way

16   that that process -- a couple of pieces about that upgrade for

17   the Court to be aware.

18           One is no jurisdiction has yet installed that upgrade

19   as of yet.  It has not been used in any election yet.  Unlike

20   the changes that had to be made in late 2020 right before the

21   election, the upgrade process is a very intensive multistep

22   process that involves multiple pieces of media, multiple

23   components, and it involves touching every piece of the

24   election system.

25           So every ballot-marking device has to have three

1    different pieces of media installed on it to complete the

2    upgrade.  Every precinct scanner has to be upgraded.  Every

3    central count scanner has to be upgraded.  And every election

4    management server also has to either be replaced or upgraded.

5    So the implementation process for doing that is very involved.

6            Also, once a county begins that process, they can't

7    go back.  So once you complete upgrading part of your equipment

8    to 5.17, there is then now no ability for that system to talk

9    to the 5.5 system that was used before.

10           So where things stand at the moment is the

11   Secretary's office is still in the process of developing an

12   implementation plan, of getting that, touching all the

13   components of the system to do that upgrade.  But given the

14   scale and the scope of that, there is a Dominion component of

15   Dominion doing part of that work, the Secretary's office doing

16   part of that work.

17           So as of now, that is all in development.  But at

18   this point, there is not a timeline.  Given the scope of what

19   is necessary, they don't anticipate that being completed this

20   year.  It likely will be a 2025 type of upgrade, given all that

21   is involved and the election schedule in 2024.

22           THE COURT:  Okay.  So it won't be done for the 2024

23   election?

24           MR. TYSON:  That's correct, Your Honor.

25           THE COURT:  And just -- I know that CISA had its

1    recommendations, but I just want to make sure I understand.

2            Is it what you are telling me is that in order to

3    implement those recommendations they need -- there needed to be

4    a wholesale upgrade in the system?

5            MR. TYSON:  So yes, Your Honor.  Yes and no, I guess.

6    So in part, some of the CISA recommendations related to

7    physical security.  Those don't require a software upgrade.

8    But for the components --

9            THE COURT:  Physical security surrounding the machine

10   or in -- or the way the -- or kind of changes in the way that

11   the machine is positioned in a voting area?

12           MR. TYSON:  It is more just making sure the sealing

13   is in place, who has access to it, how that access is

14   controlled, those types of basic physical security things.

15           The remainder of the recommendations there related to

16   the operation of the software.  And it is things like that you

17   can't do an installation or launching another application on

18   the ballot-marking device itself.  So that requires an update

19   to components of the system as to how the ballot-marking device

20   boots up.  So that is an example of a recommendation CISA made,

21   not allowing other applications to be launchable, that requires

22   a software change to do that.

23           That is the thing that just got approved by the EAC,

24   I think it was, late March or early April.  So relatively

25   recently when that took place.

```
1              THE COURT:  When you say not any other applications

2   be launchable, do you mean in that particular -- the server

3   there or do you mean on the -- I'm just -- you know, there are

4   so many different parts of the computer system.  And we have

5   heard a lot of testimony in the 2020 hearing about, you know --

6   in one or more counties about the main server having lots of

7   other programs, games, games that came from other countries

8   that could be launched and could be -- and have -- could have

9   anything on them potentially.

10             Is that what you're talking -- what are we talking

11  about, just to be sure I understand?

12             MR. TYSON:  Yes.  So I'm not talking about that

13  specifically.

14             The CISA recommendations obviously emerged from

15  Dr. Halderman's report about the ballot-marking device itself.

16  So in terms of that, it primarily relates to -- the software

17  upgrade primarily relates to what the ballot-marking device is

18  capable of doing and not doing with its software.

19             But as part of that process, you also have to upgrade

20  all the other components of the system, which would include the

21  election management server.  As part of that process, I don't

22  know that that was a specifically included -- I'm working off

23  memory of CISA recommendations.  But I don't know that the

24  server was specifically included in those recommendations.  But

25  it would be included in an update to the software system for
```

1   5.17, which is the new version from Dominion.

2          THE COURT:  Well, as long as we're talking about an

3   upgrade, I hadn't planned to ask you at this point, but I'm

4   just going to get some of the basic fact developments that I --

5   information out there.

6          So as other states, including Colorado, have a system

7   where they do not rely on QR codes but are otherwise comparable

8   BMD systems and just simply you vote and it produces -- the

9   vote is captured without going through the QR interface.

10          Has that been under discussion for 2025?

11          MR. TYSON:  For 2025, not yet, Your Honor.  There are

12   a couple of reasons.  I can give some context for why.

13          So I believe the Colorado system is not yet fully --

14   what you are referring to is what is called a full-face ballot,

15   where instead of printing a QR code with a list of candidates,

16   it prints out what looks like an absentee ballot with the

17   bubbles filled in by the computer of what is there.

18          I believe Colorado's system has not yet been

19   implemented.  I think that is what they were trying to move to.

20   I don't understand that it has been implemented.  I'm not sure

21   there is anything in the record on that.

22          I know when the announcement was made a year or two

23   ago it was that they were looking to move to that kind of

24   system as soon as it was certified.

25          The challenges for us in Georgia moving to a

1    full-face ballot is it would require both the software upgrade

2    to the 5.17 version of the Dominion system -- that would be

3    kind of part one.  But part two is Georgia uses an 18-inch

4    ballot for its ballots for a full-face-sized ballot.  The

5    current printers that are in use with the Dominion BMDs will

6    only handle an 11-inch or 14-inch-sized printer paper.

7            And so if we were going to move to a full-face ballot

8    system, it would require converting basically or actually

9    replacing all the printers for the ballot-marking devices to be

10   able to do that.

11           The other challenge with a full-face ballot is it is

12   a longer ballot.  And so instead of being all in an 8-1/2-by-11

13   sheet of paper, you have possibly the double-sided ballots.  So

14   the scanning gets more complex.  Or multiple pages.  Where like

15   in Gwinnett County, for example, that were required to be

16   bilingual ballots, there could be multiple pages.  Then if a

17   voter has to scan multiple pages in, that introduces challenges

18   on the audit side other issues.

19           Those are all things that are being looked at.  But I

20   think the baseline piece is, even if we move to that, the

21   scanners still function exactly the same, which it looks for a

22   point on the ballot itself, just like it does with a QR code,

23   just like it does with a hand-marked ballot.

24           So at the end of the day, the scanner operates the

25   same.  The difference is all together pieces that have to go to

1    moving to that full-face ballot system.

2              THE COURT:  Well, it may work the same.  But

3    obviously there was significant testimony at least from

4    Dr. Halderman in the 2020 hearing about how QR codes provide a

5    whole other avenue of potential hacking or alteration of

6    results.

7              MR. TYSON:  And, Your Honor --

8              THE COURT:  And I thought -- let me just ask you this

9    question.

10             My recollection of Dominion's initial bid that it

11   provided to the State was that they gave you -- the State

12   various options, including having a full -- what you're talking

13   about now?  I mean, basically a full printout model that you

14   would see, that you weren't relying on the QR code.

15             Am I just misremembering that?

16             MR. TYSON:  Your Honor, my recollection of what

17   Dominion was offering at the point was they didn't yet have an

18   EAC-certified system that would do a full-face ballot in the

19   2020 cycle when we were working through that.  And the initial

20   contract said if they later get an EAC-approved full-face

21   ballot, that would be offered to Georgia.

22             So where that stands now is that is 5.17.  5.17 is

23   EAC-approved.  It will generate a full-face ballot.  The

24   challenge is the printers that we have will not be able to

25   generate that.

1          I think one other piece Mr. Miller was going to talk

2    about but I'll just kind of preview is I don't think there is

3    anything in the record and even the testimony from Dr. Stark

4    and others that moving to a full-face ballot would resolve the

5    plaintiffs' claims.  So I think their claims about

6    verifiability and the other issues they raise are the same with

7    that, either a little bit less so than with the QR code.  But I

8    think the evidence would show that there is nothing that would

9    actually resolve their claims if we moved to that kind of

10   model.

11         THE COURT:  All right.  Well, of course, plaintiffs

12   can address that while you are speaking.  I guess the thing

13   that I thought was noteworthy was there was all this -- there

14   was significant testimony in the past about, if you get your

15   printout from the current system, all you have is sort of a

16   hanging name or a hanging yes-or-no on a proposition and you

17   don't have the proposition addressed.  And this is,

18   particularly as you go down the ballot, very hard to remember.

19   You may remember who you are going to vote for for Governor.

20   But after that, it can go blurry.

21         And we all have had the experience of probably having

22   friends and colleagues saying, who is running for county

23   commissioner?  Who is running for -- who are you voting for for

24   that?  Even for lieutenant governor.  I mean, anything other

25   than the Governor and the President, people not really

1   remembering what they were -- where they were going necessarily

2   and was that the name or was it not the name.

3          So that is -- and so the whole notion of proofing

4   your ballot becomes harder when you don't have all of the

5   information there.

6          All right.  So that is what I thought the relevance

7   of some of that was in terms of the plaintiffs' claims at

8   least.

9          MR. TYSON:  Thank you, Your Honor.

10         MR. CROSS:  Your Honor, could I just address a couple

11   of things?

12         THE COURT:  Yes.

13         MR. CROSS:  I totally understand why Your Honor is

14   asking the questions you're asking.  Those are important

15   questions.

16         I do want to say though, just to preserve our record,

17   none of what Mr. Tyson just said is in the record.  So just for

18   the sake of the decision Your Honor is going to have to make in

19   the summary judgment motion, we would object to that being

20   considered.  They certainly had an opportunity to put in any of

21   the things that he wanted to represent.  And I will say also --

22   we'll talk more about this.

23         But Mr. Sterling's testimony was a bit of different

24   from Mr. Tyson described.  I recall asking him whether any of

25   the CISA implementations -- mitigations had been implemented.

1    And his answer as I recall was he didn't know.  And he was a

2    representative of the State.

3            And Mr. Tyson points out that they have physical

4    protective measures at least.  We just learned yesterday --

5    Your Honor may have read -- that a number of e-pollbooks were

6    stolen from a county.  So we are still in a position where the

7    system is evidently not secure.

8            The last two points on this, Your Honor, briefly.

9    The point about moving to full-face ballots, again that is also

10   not in their briefing.  They actually -- and I confirmed this

11   last night.  They don't make any feasibility argument at all.

12           You might remember in the PI context that was a key

13   focus was sort of the cost and burden of moving to a new

14   system.  That is not any interest that they offer at this stage

15   of the case.  They have very specific interests that they

16   allege justify what they are doing.  They do not argue

17   feasibility or any burden or expense to switch -- to implement

18   anything that we're asking.

19           Lastly, Your Honor, while Mr. Tyson is right that

20   eliminating a QR code will not give us the full scope of the

21   relief we're asking for, it is certainly a critical component

22   of the relief we're asking for.  So if that is all we got --

23   certainly we hope it is not.  We think we're entitled to

24   more -- but that is part of the relief that we're asking for.

25   And I wanted to make that clear.

1          Thank you, Your Honor.

2          THE COURT:  All right.  Well, I definitely note your

3    concern that the conversation and the information provided are

4    not in the record.  You are living and breathing this case.

5    And also counsel for the State is living and breathing other

6    dimensions of it practical.  And as a reality that I have had

7    to live with it a long time too but not with that intensity.

8          These were just things that I wanted to understand in

9    terms of the landscape of the case here.

10          MR. CROSS:  Totally understand, Your Honor.

11          THE COURT:  All right.  So -- but I do understand

12    that, to the extent it is not in the record, it is not in the

13    record.

14          So I know we gave you a laundry list and beyond of

15    issues and matters that had been raised.  And basically we were

16    trying to do this to frame the conversation because these were

17    all the sorts of issues that you had raised.  And just for

18    those who are in the audience, this was a multipage set of

19    questions and -- that counsel did not receive until yesterday.

20    But they have been busy working.  So I don't think this is

21    anything new to them.

22          I just simply posed the questions.  You don't have to

23    go through each of these questions.  That is not the

24    anticipation.  The anticipation was simply that we all be on

25    the same wave level so as to, you know, what some of the

1    matters are that have been presented that the Court is

2    cognizant of and that we want to all grapple with today.

3              So do not feel like you have to touch every one of

4    these issues.  And you can apportion your time as you see fit.

5    And at some point, we'll take a break and we'll figure out is

6    there something that we really missed.

7              But as the plaintiffs bear the burden of proof, I'm

8    going to let them go first.  But tell me what you are thinking

9    about time and how you want to proceed and rebuttal to the

10   argument provided by the defendants.

11             MR. CROSS:  Sure, Your Honor.  So what we were

12   planning to do today was I was going to start just briefly on a

13   couple of key sort of macro points.  I was going to hand it to

14   my colleague, Sonja Swanbeck, who will address standing for the

15   Curling plaintiffs.  My colleague, Ms. Middleton, is prepared

16   to address some evidentiary issues.  One of which you have in

17   your order.  I think it is Question 12 about the MITRE report.

18   And then Mr. McGuire -- sorry.  Then I will get back up at some

19   point to address the merits.

20             I have a question for you on that, which we'll come

21   back to.  And then Mr. McGuire and Mr. Brown will address the

22   issues for the Coalition plaintiffs.

23             The one question I had for you procedurally was:  Is

24   it more helpful to Your Honor to hear argument from both sides

25   on standing and then go to merits or to do it altogether?

```
1            THE COURT:  Given the way my brain works these
2    days -- I mean, obviously there is interface between standing
3    and the actual evidence.  So that is fine.
4            How do you feel about that?
5            MR. TYSON:  Your Honor, that makes sense.  We
6    actually kind of divided our argument the same way that we were
7    going to handle standing as an issue -- I was going to handle.
8    Mr. Miller would address the merits piece.  So we had thought
9    of it as kind of a divided piece anyway.
10           We're happy to proceed however works for you.  I
11   think just our only request is since it is our motion we have
12   the chance to kind of close when we're all said and done.  But
13   I think that's our only request in terms of --
14           THE COURT:  That is fine.  It is your motion.  So you
15   are welcome to go first actually.  I was not thinking about
16   that.  So --
17           MR. CROSS:  We were assuming they would go first
18   since it is their motion.  But whatever Your Honor prefers.
19           THE COURT:  That is fine.  It is your motion.  I'm
20   just in a trial mode since that is what I have been recently --
21   more recently up to.  So --
22           MR. TYSON:  If it is all right with Your Honor, we'll
23   begin with standing.  Then do you want me to conclude standing
24   and move to standing for the plaintiffs to respond to that
25   point?
```

1          THE COURT:  That is right.  That is right.

2          MR. TYSON:  We can do that.  All right.

3          So we do appreciate the questions.  We had planned to

4    answer, I told Mr. Martin, about maybe half of them already.

5    But the others we want to make sure we address.  So we have

6    tried to work those in to address them as we go.

7          Let me get myself connected here.

8          Thank you, Your Honor.  Again, Bryan Tyson for the

9    State defendants.

10          So, obviously, I know as you have mentioned already

11    we have been here for a while on this case.  A lot has

12    transpired since we started with the Congressional election in

13    2017.  But I think it is important to emphasize, as we get

14    started today, that we're at a motion for summary judgment.  It

15    is now time for the plaintiffs to come forward with admissible

16    evidence if there are any issues remaining for trial.  And as

17    you see from both of our motions, we submit there aren't any

18    issues remaining for trial.

19          So this is, again, I think one of the things that is

20    also important to recognize -- I know this Court is aware --

21    is, as best I can tell, this is the only case that is still

22    kind of hanging out there in terms of questions about the

23    voting machines and other issues related to that.  All the

24    others uniformly nationwide have been dismissed on standing

25    issues.

```
 1              And so getting into those issues is obviously very
 2    important for us to work through that.  And obviously those
 3    cases were dismissed at a far more deferential standard than
 4    what the plaintiffs have today.  So I'm going to walk through
 5    just the various jurisdictional pieces beginning with mootness.
 6    And I know we have had a lot of conversation about mootness and
 7    the DRE claims.
 8              But I thought it would be just good for us to begin
 9    just to sort of focus in on what is still pending in the case.
10    From the Coalition plaintiffs' third amended complaint, we have
11    a fundamental right to vote count and we have an equal
12    protection count.
13              And for the third amended complaint, it relates to
14    voting on the AccuVote DREs, relates to those who vote on the
15    AccuVote DRES are going to be treated differently than other
16    similarly situated electors.  So these are all claims about
17    DREs.  And, again, no Georgia voter has voted on a DRE in at
18    least a statewide election for at least three years.
19              Curling plaintiffs have similar claims, fundamental
20    right to vote claim in their third amended complaint, under
21    First and Fourteenth Amendment due process and equal
22    protection.  Again, there are questions about the system and
23    the burden on the right to vote as to the DRE system.
24              And as you have seen in our briefing, we believe the
25    Court really focused on the mootness of the case in terms of
```

1    these claims.  I think that the individual counts at least have

2    to be moot because we're at a point where the DREs are

3    decertified.  They can't be reused in Georgia.  We have

4    distributed BMDs to all counties following House Bill 316.

5    Used those in several elections.

6            So not only is there nothing further the Court can

7    order related to the DRE claims specifically, but also there is

8    no longer any redressability for purposes of standing because

9    the Court can't order any relief as to DREs.

10           And I think the questions from the Court indicate

11   that if there is a question about something that comes over

12   from the DRE system into the new system, which we would submit

13   that is not really an issue, but that is what the evidence is

14   here -- we have to look at that in context of the BMD claims.

15   It is not a stand-alone claim as to the DREs.  That is a claim

16   as to the BMDs themselves.  So I just wanted to address that

17   issue at the outset.

18           Next issue I think that is important here, because

19   we're already starting in the separation of the two counts and

20   the two complaints, is the issue of whether one plaintiff is

21   enough.  I think that the *Town of Chester* case that we cite

22   makes very clear you have got to have standing for each claim

23   and each form of relief.

24           So what we have in this case is not just

25   disagreements over case strategy and not just different

1    attorneys.  We have different complaints that are seeking

2    different, even if sometimes overlapping, relief.  We have

3    different strategy.  We have different experts and witnesses.

4          And then as the Court flagged in its question, that

5    also goes to the issue of attorneys' fees.  So I don't think it

6    is enough -- and I'll talk about the Coalition for Good

7    Governance and organizational standing in a few minutes.  But

8    it is not going to be enough to just say the Coalition has

9    diversion of resources standing, and therefore everyone else

10   who is here is good.

11         We would submit that given the requirements of *Town*

12   *of Chester* this Court should dismiss any plaintiff in this case

13   that does not have standing at this point instead of relying on

14   the single plaintiff rule.

15         It also is important to note that the single

16   plaintiff rule is one of those issues that from a judicial

17   efficiency standpoint is why it exists.  And here it doesn't

18   make sense to have this case continue on all these different

19   fronts if there is not a plaintiff that can carry that forward.

20         Also I wanted to just touch on at this point why we

21   believe the Eleventh Circuit's language about standing in the

22   appeal from the preliminary injunction orders as to the

23   Coalition is not dispositive.

24         The Eleventh Circuit obviously in that case was

25   reviewing the entry of a preliminary injunction.  And they only

1   found that the Coalition had credibly made the assertion -- the

2   assertion that they diverted resources.  That was before we had

3   a 30(b)(6) of the Coalition.  That was before we had a lot of

4   the discovery into standing.

5           We're now at a point in the case where that is no

6   longer a dispositive issue because the Court has to -- the

7   plaintiffs can't rely on their allegations any more or rely on

8   their declarations.  They have to have evidence -- admissible

9   evidence at this stage in order to show that this Court has

10  jurisdiction.  And as we'll talk about, we submit they do not.

11          So moving to the BMD claims that are at issue here,

12  Coalition plaintiffs have these in their first supplemental

13  complaint, as the Court has noted, an additional Count 1 and 2.

14  Claims about being unable to verify their vote due to a QR

15  code.  Having -- deprived of having RLAs.  Deprived of a

16  trustworthy and verifiable election process.

17          Their equal protection claims are treating voters

18  differently because of the difference in mail-in voting and

19  Dominion BMD votes that are cast in the case.

20          Similarly, we have the Curling plaintiffs in their

21  Counts 3 and 4 of their third amended complaint focusing on

22  similar issues.  And we're going to talk a little bit more

23  about what is the burden in a little bit.  But I think one of

24  our initial questions is --

25          THE COURT:  Can you just go a little slower?

```
 1              MR. TYSON:  Certainly.
 2              THE COURT:  Thank you.
 3              MR. TYSON:  Sorry, Ms. Welch.  I have so much to say.
 4              THE COURT:  It is not Ms. Welch.  It is my brain.
 5    And you are very smooth.  But maybe my mind doesn't work quite
 6    that quickly.
 7              MR. TYSON:  No problem, Your Honor.
 8              So we'll talk a little bit about the burden.  We also
 9    want to talk about what is the injury and what are the
10    plaintiffs alleging as their injury in their complaints.
11              And there is a claim for the Curling plaintiffs about
12    protection of the vote.  Accurate counting of the vote is
13    another issue in their third amended complaint and also the
14    verification of the ballots.  And we'll talk a little bit about
15    whether verification is a claim, an injury or a burden, being
16    asserted by the Curling plaintiffs or not.
17              But at this point, I think it is important to note
18    that all of our state law claims are no longer in the case at
19    this point.  And so if the plaintiffs have an issue with state
20    law issues, they have a remedy for that.  They are able -- if
21    there is a violation of state law they believe is occurring,
22    they can go to superior court.  They can ask for mandamus.
23    They can ask for declaratory relief.  They can get a judgment
24    from a superior court on a violation of state law.
25              And what we've seen from the Georgia superior courts
```

1  is, when they are faced with a question about whether the BMD

2  system complies with Georgia law, Fulton County Superior Court

3  says, yes, it does.  When faced with a question about ballot

4  secrecy -- and we cited this earlier in the case in Sumter

5  County Superior Court where the Coalition sued about that.  It

6  was a county issue.  And there was no relief entitlement there.

7          So we can't bootstrap our state law violations into a

8  federal violation at this point.  The question for the Court

9  now is, is there an injury, Number 1, to get us across

10  standing.  But then when we get to the merits, what is the

11  burden and how do we categorize that burden on the right to

12  vote?

13          So let's talk a little bit about the law on injuries.

14  And I know the Court has already dialed into this question on a

15  few points.  The words concrete and particularized we're going

16  to talk a lot about today and what is the difference in that

17  from a generalized grievance.  It obviously flows from the fact

18  that this court is a court of limited jurisdiction.

19          So I wanted to start with *Reynolds* and *Gill* because

20  the Court asked about those specifically.  And we're currently

21  litigating issues related to standing for redistricting cases

22  in the redirecting cases in the three-judge panel case with

23  Judge Grimberg and Judge Jones and Judge Branch.

24          In a redistricting context, which is what both

25  *Reynolds* and *Gill* were, the injury to a voter is, I live in a

1  district, the district is configured in such a way that my vote

2  is being diluted, so therefore that is my injury that I can

3  bring forward as a claim.

4        That is different than a normal voting case.  There

5  is a lot of very specific things related to district cases.

6  And so that is also where a large number of people in a

7  district could share the same injury.  Because everybody in a

8  50,000-person state house district may have their vote dilution

9  claim.

10       But they still have something unique to them.  And

11  what *Gill* says very clearly is, you can't sue about districts

12  you don't live in.  You can't bring a claim against the entire

13  state.  You have to bring it just for your own injury.

14       So that is the major distinction between that case

15  and the types of cases we're dealing with here.  We don't have

16  regional claims about the voting system.  We don't have

17  county-specific claims about the voting system.  We have a

18  general claim about the voting system statewide.

19       And so in terms of the injury, unlike a voter in

20  *Reynolds v. Sims* or in the redistricting cases who lives in a

21  particular district and says, this district is the problem,

22  here we have an injury that is identical for all 10 million

23  Georgians.  Every single Georgian who is eligible to vote and

24  is registered can bring the exact same claim.  That's why this

25  case is a generalized grievance instead of being more specific

1    and tailored like those redirecting cases were.

2           And that's what leads us to the *Wood* case.  And I

3    think it is important to recognize that Mr. Wood was trying to

4    get the state to follow its law.  That was part of what was the

5    issue.  But the main claim -- the main problem with Mr. Wood's

6    claims post 2020 were that his claims were identical to every

7    other Georgia voter.  And that is what distinguishes this case

8    versus a toxic tort case or a redistricting case.

9           In a toxic tort case or a redistricting case, yes,

10   lots of people may share the same injury, but it is still

11   individualized to them.  But in this case, the injuries that

12   are being alleged are common to every person, every voter in

13   the State of Georgia.  And so it has to be more narrow on that

14   front.

15          So let me talk about the impact of *Tsao* and *Muransky*,

16   which I know the Court has asked about as well.

17          THE COURT:  Well, let me just say one thing -- ask

18   you one thing about what you are arguing about Mr. Wood is that

19   he still was arguing that he was injured because his vote was

20   diluted because people were voting who weren't authorized to

21   vote or were -- whether through an absentee ballot or some

22   other reason.

23          But there was a specter of a lot of inappropriate --

24   unauthorized inappropriate voters.  So it wasn't like he was in

25   the same position as everybody else because he says, my vote

1    really was proper, and all these other people's votes weren't,

2    and they have diluted my vote.  And that's -- it is not just

3    that we all have the same injury because he is saying there is

4    a whole bunch of people who voted who shouldn't have voted and

5    who the various counties allowed to vote who shouldn't -- who

6    weren't really authorized to vote and who may have also stuffed

7    ballots -- that there might have been stuffed ballots.  And

8    that is not exactly like everyone is in the same position

9    because he has a sort of -- there is a conspiracy dimension

10   that is the specter of his claims.

11           MR. TYSON:  Yes, Your Honor.  And I think it is

12   important to remember that he made those allegations, and that

13   wasn't enough.  So the specter, I think, and the fear element

14   is the big piece there.

15           Mr. Wood was afraid that this had happened.  He

16   thought he could prove this up.  But even that allegation

17   wasn't enough.  And when we get into the Curling plaintiffs'

18   and the Coalition plaintiffs' claims, I think what you will see

19   is their claims are primarily we think maybe somebody might

20   hack the system.  It is very similar in terms of fear of what

21   might happen that could affect their vote versus a specific

22   vote dilution and a specific district like you have in *Gill* or

23   in *Reynolds*.

24           So we think that is where --

25           THE COURT:  Well, it is a different claim.  But I'm

1    not sure I accept that they are running by fear because I think

2    that they actually had a fair amount of a record to support

3    that it wasn't mere fear.  We wouldn't say if the -- when there

4    were various counties in Georgia that had -- where the Russians

5    were able to get people registered and voting that were not

6    actually -- we don't say that is fear.  I mean, there is a

7    reality also of hacking or failure that can -- that is not just

8    simply some specter that there is -- that was cast in

9    Mr. Wood's case.

10              MR. TYSON:  Well, Your Honor, I think that leads us

11   very logically into *Tsao* and to *Muransky* and the data breach

12   cases.  Because I think it is important to remember that in

13   those cases, there was a reality.  Mr. Tsao, Dr. Muransky, they

14   could both point to situations where, when credit card

15   information was accessed, somebody's identity was stolen or

16   there were improper purchases made on a credit card.  They

17   could point to data that showed that happened following a data

18   breach.

19              But what is important in those cases is the Eleventh

20   Circuit found that that still wasn't enough, an elevated risk

21   of harm.  Even when there had been that kind of harm in the

22   past was not enough.  And so I think, again, it is important to

23   recognize, yes, Mr. Tsao took action by destroying the

24   receipts, so did Mr. Muransky.  And there was some steps taken.

25   But that was ultimately the last on the list of items the

1   Eleventh Circuit considered about why there wasn't an elevated

2   risk of harm that had been alleged in those cases.

3         I think in a lot of ways the plaintiffs would be

4   better off from a strictly standing perspective if they alleged

5   that hacking had occurred in an election, that an election

6   outcome had been altered.  I think that they -- maybe they

7   don't get all the way there.  But I think they get closer in

8   terms of their injury than what they have alleged and what

9   their evidence shows here.  Because unlike Mr. Tsao and

10  Dr. Muransky, they can't point to any situation where votes

11  have actually been altered as a result of hacking in an

12  election.  They are not willing to say that the 2020 election

13  was stolen or that the election results in Georgia were not

14  correct.

15        Those are things Mr. Wood was willing to say.  They

16  are not willing to say that.  And I understand why.  But

17  ultimately we're not even fully into the land of *Tsao* and

18  *Muransky* because those cases had situations where there had

19  been injuries from data breaches in the past.  So it could be

20  particularized to somebody.

21        But also those are situations where, kind of like the

22  case here, we have access but no proof of malware or hacking.

23  And so the various pieces of the data breach cases I think map

24  very well on to this one because the ultimate issue is the

25  plaintiffs have had the ability to review voting equipment in

1    Georgia extensively.  They have had access to DREs that were

2    used in Georgia elections.  And Dr. Halderman testified there

3    was no evidence of malware that he had found.

4          They have had access to GEMS databases that were

5    actually used in elections.  Dr. Halderman found no malware

6    there.  They have had access to Dominion ballot-marking

7    devices.  There are vulnerabilities.  That is what

8    Dr. Halderman found.  No actual compromises.

9          We're going to talk, I'm assuming, today a lot about

10   Coffee County.  Plaintiffs have had access to what happened in

11   Coffee County.  And they have found access but no malware or

12   other things that were installed that are part of the record in

13   this court.

14         And so coming to our data breach piece, you have

15   access, just like you had with the data breach in *Tsao* and

16   *Muransky*, but you don't have the next step of that injury being

17   particularized because it affected an election.  And that is

18   where there is a lack of injury for the individual plaintiffs

19   in this part of the case.

20         So ultimately we're not even to the level, I would

21   say, of what was alleged in those cases because we haven't even

22   gotten beyond from access into any potential injury that would

23   happen.

24         So for the individual --

25         THE COURT:  Can I stop you for a second?

1          MR. TYSON:  Certainly.

2          THE COURT:  Do you-all have a paper version also of

3    the -- of the slide show you are presenting here?

4          MR. TYSON:  I apologize, Your Honor.  Mr. Miller and

5    I were discussing that right as we walked in.  Neither of us

6    printed our slides.  We'll be happy to email them to the Court

7    and anybody else afterwards.  I apologize for that.

8          THE COURT:  Thank you.  That's all right.

9          MR. TYSON:  Your Honor, let me then move -- that's

10   our individual standing piece.  I'll come back to one more

11   component of that, which is for the Curling plaintiffs, as far

12   as individual standing goes, what is the testimony.  They do

13   not vote on Dominion BMDs except for in a couple of isolated

14   instances.  They are all afraid of the Dominion system being

15   unverifiable.  Back to our fear question of what might happen.

16         They don't have any knowledge of manipulation of

17   election results as a result of the Dominion BMDs.  And what

18   we've tried to do on the slide is just cite where the statement

19   of -- our statement of facts was either undisputed or it was a

20   statement -- a declaration from one of the plaintiffs that

21   these are not disputed facts about this portion of the case.

22         Ms. Curling agrees that, like other systems, like a

23   Dominion-based BMD system, hand-marked paper ballot systems

24   have risks.  And the Curling plaintiffs exercised their option

25   to vote absentee, just as they are free to do to vote a

1    hand-marked paper ballot option.

2          Similarly for the Coalition plaintiffs, there is a

3    couple that have voted on a BMD in a couple of isolated

4    instances.  They likewise have no knowledge of manipulation or

5    hacking.  As far as the individual plaintiffs go, we're not in

6    a situation where they are able to allege a particularized harm

7    as to any component of what is happening for them.

8          So in terms of the individual plaintiffs, we don't

9    see that there is any sort of concrete and particularized

10   injury, anything that distinguishes them from *Tsao* and

11   Muransky.

12         Moving to the Coalition itself, the organizational

13   plaintiff, *City of South Miami*, I think, is very instructive.

14   I highlighted some pieces there.  The members can only have

15   standing as to anything an individual could allege.  So even if

16   there is issues, the Coalition admits they don't have a list of

17   members.  They are not aware of membership-related issues in

18   terms of who their members are.  But even if they had that, any

19   member would only have the same injury that any of the

20   individual plaintiffs would have.  So there is nothing that

21   would show they could have associational standing because they

22   can't -- they would only stand in the shoes of their members.

23         And on the organizational standing side of the

24   equation, I think the important piece that *South Miami* adds to

25   the look at organizational standing is we don't see there is

1    any evidence of diversion of resources except to fund this

2    litigation.  And litigation expenses can't be a diversion.

3         But even if the Coalition had diverted resources,

4    *City of South Miami* makes it clear that you can't divert

5    resources because of something that is a speculative harm.  So

6    if the harm is speculative and the injury is not certainly

7    impending as to the individual plaintiffs, then any diversion

8    the Coalition made also can't be an injury because it is not

9    certainly impending either.

10        In this case, you had a situation where these

11   organizations in response to this Florida law had done all the

12   things that the Coalition is saying it does here.  They had

13   educated their members.  They had held workshops.  They had

14   done a variety of things.  And the Eleventh Circuit said no,

15   speculative harms are no more cognizable dressed up as an

16   organizational injury than as an associational one.

17        THE COURT:  Let me just say:  I mean, I think that

18   the setting and the legal posture of the *City of South Miami* is

19   really different than these election cases and some of the

20   other kind of comparable cases that you have relied on.

21        This is -- the court in *City of South Miami* really

22   seems to be very focused on almost the lion's issues that we

23   can't really -- to be pinning their claims to the

24   unpredictability of either crime or misdeeds in law enforcement

25   is way too broad.

```
 1            And I mean, it has a whole other -- it seems like a

 2    very different posture.  Let me just say that.  And I'm not

 3    sure that it is reliable for that purpose -- for the purpose

 4    you are arguing.

 5            I mean, I think that there are a lot of standing and

 6    challenging standing cases in the Eleventh Circuit.  But I

 7    don't think that this sets a whole new standard because it is

 8    so critical of the core theory of the claims asserted here.

 9            MR. TYSON:  Your Honor, one thing I think that the

10    Eleventh Circuit definitely criticizes the district court for

11    in City of South Miami is drawing connections to disparate

12    things.  I think, as the court said in that case, everyone

13    agrees racial profiling is an injury.  There is no question

14    about that.

15            I think clearly here too, if somebody's vote is not

16    counted, if there was something particularized to an individual

17    voter, maybe we would get to an injury on that.  I think the

18    issue for City of South Miami and the issue here is where is

19    the intersection of the fear of racial profiling with an injury

20    versus here where is the interception of a fear of hacking of

21    the election system and an injury that results from that.  So

22    I --

23            THE COURT:  I wouldn't say it is just a hacking of

24    it.  It is really the function -- the fact is there is hacking

25    and then there's manipulation within that.
```

 1            MR. TYSON:  Certainly.

 2            THE COURT:  So -- and I don't -- though I don't --

 3    though I think that there is racial profiling and there

 4    probably was -- I haven't looked at the record in this case.

 5    But it seemed to me still that the circuit court seemed just

 6    very suspicious of the entire theory of the case.

 7            And maybe there is plenty of reason to be suspicious

 8    here as well.  But the plaintiffs have presented a body of

 9    significant expert evidence.  And we do have also a peculiar

10    circumstance where the software for Dominion was put on the

11    web.

12            MR. TYSON:  Your Honor, I think that your distinction

13    of hacking and manipulation is an important one because I would

14    categorize it as access and manipulation.  So can somebody get

15    access to the system is one question.  Have they done harm with

16    that access is something else.

17            And I think that kind of throws us back to *Tsao* and

18    *Muransky*.  Data breaches are access.  Somebody got access to

19    someone's personal information.  Did they do anything with that

20    is a different question.  So I think we would be looking at the

21    same issues here in terms of the evidence at this stage.

22            Let me just talk briefly about traceability.  The

23    Court had asked us about the acts and omissions of the State

24    defendants, that if something were -- if the State defendants

25    took action that made the system vulnerable to hacking, can you

1  get traceability to the State defendants or is there kind of a

2  cutoff in the causal chain there.

3       And I think that there is a -- there is kind of two

4  ways to look at this.  One is you could ask the question like

5  Judge Luck asked in oral argument in this case on the Eleventh

6  Circuit, you know, what if a polling place was located

7  intentionally in a location that was known to flood every

8  November and that was just understood?  The kind of deliberate

9  indifference almost -- maybe you get to that point where there

10 is a choice made that leads to a burden on the right to vote.

11      But ultimately I think the issue here is there is

12 independent -- for the plaintiffs to be able to find

13 traceability, they have to explain how the actions of the State

14 were not cut off in the causal chain by this independent action

15 by a third party to actually engage in manipulation of the

16 system.

17      Again, I think this is a theme you will hear a lot

18 today too that every voting system has vulnerabilities.

19 There's vulnerabilities in an electronic-based system.  And

20 there are vulnerabilities in the plaintiffs' preferred

21 hand-marked paper ballot system.  But just because the State

22 decides to use one system over another and encounter one set of

23 vulnerabilities versus another doesn't mean that you get

24 traceability to the State defendants.

25      I'll also address, Your Honor, the State Election

1  Board question you had asked.  From our perspective, post

2  *Jacobson*, the Court can't order the State Election Board to

3  adopt a regulation.  You can't order the State Election Board

4  to necessarily take action and investigate something.  So from

5  our perspective, the State Election Board are not proper

6  defendants for any issues in the case that are remaining.

7       But to the extent the case is only about

8  ballot-marking devices, we think they are definitely not proper

9  parties because that is reserved by statute solely to the

10  Secretary.  So that was our argument on that point there.

11       So let me close out my portion of the standing

12  question about what the plaintiffs' experts say about Dominion

13  equipment in Georgia in this case versus how it impacts the

14  injury claims otherwise.

15       And so in, for example, our statement of material

16  facts, we have the statement, experts recognize BMDs as a safe

17  and secure voting system, citing the National Academy of

18  Sciences study.  And the plaintiffs dispute that.  They say

19  that new science has developed since that was first stated.

20       In Dr. Halderman's deposition, he stated when asked,

21  you can't say that Joe Biden won the electoral votes in Georgia

22  without some election fraud being involved?  And the answer

23  was, as an expert, I cannot rule out the possibility.  And

24  exploit those in a way that would have affected the outcome of

25  the 2020 Presidential election in Georgia; correct?  And his

1  comment was, I have no evidence that that happened, but I can't

2  rule it out.

3          Similarly, Dr. Halderman testified that every Georgia

4  voter has a rational reason for doubt of their vote being

5  counted as long as Georgia uses Dominion ballot-marking

6  devices.  The Coalition plaintiffs have said similarly there is

7  a reasonable basis to question every election conducted in

8  Georgia as long as we use Dominion BMDs.

9          But then in contrast to that in terms of where the

10  injury goes, is it hacking, is it access, the plaintiffs all

11  signed a document -- and this is part of Dr. Halderman's

12  deposition on November 16, 2020 -- that says specifically,

13  altering an election outcome involves more than simply the

14  existence of a technical vulnerability.  Because as we have

15  emphasized here, a vulnerability alone is not an injury.  It is

16  maybe something that could become an injury later.  But it is

17  not an injury today.  And it is not an injury for purposes of

18  standing.  And that is a statement that was signed by

19  Dr. Appel; it was signed by our expert, Dr. Gilbert; by

20  Dr. Halderman; by Mr. Hursti.  All of them agreed a

21  vulnerability alone doesn't get you across a compromise of the

22  system.

23          And so, Your Honor, from the State defendants'

24  perspective, the time has come to remove this last lingering

25  cloud over the Dominion system in Georgia and dismiss this case

41

1   based on jurisdiction alone because the plaintiffs cannot

2   demonstrate a concrete and particularized injury that is

3   traceable to the State defendants that we can remedy.

4           So with that, unless the Court has other questions,

5   I'll conclude the standing portion of our argument.  Then we

6   can either go to Fulton defendants on standing, or however you

7   would like to proceed from there, Your Honor.

8           THE COURT:  I think that is -- I think it is fine.

9   We can move on.

10          MR. TYSON:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          Did Fulton have any -- was Fulton County going to say

13  anything?

14          MR. LOWMAN:  No, Your Honor.

15          THE COURT:  All right.  Thank you.

16          MR. CROSS:  Could I hand these up?

17          THE COURT:  Yes.

18          MR. CROSS:  May it please the Court, Your Honor.

19          THE COURT:  Yes.

20          MR. CROSS:  So like I said earlier, I'm just going to

21  hit a few macro points.  Then Ms. Swanbeck is going to address

22  standing for us.  And I believe Mr. McGuire is going to do it

23  for the Coalition.

24          Let me just start though where Mr. Tyson just

25  finished, which was -- I think he doesn't realize it.  But he

1    just acknowledged standing in this case because -- or at least

2    he acknowledged that his own expert, Dr. Juan Gilbert,

3    acknowledges standing.  Because he is right, there is a letter

4    that is signed by their own expert that says, as he just said,

5    a vulnerability can become an injury in the future.

6            And what they do in their brief is they fundamentally

7    misstate the legal standard, and they have done that again

8    today.  You heard him talk about how the injury has to be

9    certainly impending.  And that's what they say in their brief.

10           That is misleading because it is only part of the

11    standard.  As Your Honor pointed out in your questions, the

12    Eleventh Circuit, among other courts, including the Supreme

13    Court in *Spokeo* and *Clapper*, have been very clear that you

14    don't have to have suffered that particular harm yet.  If it is

15    a substantial risk of harm, that is enough for standing.

16           And I'm going to talk through that a little more and

17    particularly focus on the *Muransky* decision, which I think is a

18    really helpful decision for us and for the Court.

19           He also said, you know, Dr. Halderman testified he

20    can't rule out the possibility that something happened in an

21    election that may have affected votes or outcomes.

22           Well, of course, he can't.  I mean, he is a computer

23    science expert.  He is a leading cybersecurity expert who is

24    aware of vulnerabilities.  The sad reality is that no one can

25    rule that out as a definitive possibility.

1          And we're not -- that is not our case.  No one is

2     saying that there has to be a voting system that rules that out

3     as any possibility.  What we're talking about is a standard

4     that just says the system has to be reasonably reliable.  And

5     I'm going to explain what that means and why that is important.

6          Now, let me just take us a step back -- oh, one thing

7     I think I can probably help with, Your Honor.  On the DREs,

8     speaking for the Curling plaintiffs, we do not dispute -- and

9     we tried to make this clear in our brief -- the counts that go

10    to the DREs, the legal claims to the DREs themselves, we do not

11    dispute that those are moot.  We won.  We prevailed.  We have

12    an injunction that remains in place today.  The State complied

13    with that injunction, as Secretary Raffensperger himself has

14    acknowledged on numerous occasions, including in testimony

15    before Congress.

16          It is a little frustrating because Your Honor might

17    recall we predicted this.  We were before Your Honor about two

18    years ago asking to dismiss those claims ourselves as moot.

19    And the State objected.  And we said, well, they are going to

20    do it at summary judgment.  And now here we are.  But we have

21    no objection to dismissing the claims as long as that doesn't

22    preclude us from relying on evidence, for example, that we have

23    developed around the DREs to the extent the Court finds that it

24    is relevant for the BMD system.

25          So let me just start here.  I will tell Your Honor,

1    as many summary judgment arguments as I have done, I have never

2    once started out with the standard because the judges are

3    intimately familiar, as you are, with it.  But it matters here.

4    And here is why.  The State in their briefing and their

5    argument today completely ignore the standard.  And they are

6    arguing this as if we are at trial, as if Your Honor gets to

7    call balls and strikes on the facts.  And you don't.  It is not

8    allowed at this stage.

9         And this is how Mr. Tyson began his argument.  He

10   said, there aren't any issues remaining for trial.  That may be

11   one of the most inaccurate statements I have ever heard in a

12   court of law because every party in this case agrees that there

13   are hundreds of material facts that this Court has to resolve.

14        You can start with the State's own filing.  It is a

15   very unusual summary judgment filing for a defendant.

16   Normally, defendants come in with a really small set of facts.

17   They say, this is all that matters, they are undisputed, and

18   they resolve the case in our favor.

19        To the State's credit, they acknowledge the dense

20   record and the complexity of this case.  They put in a

21   statement of material facts of over 400.  They have told this

22   Court that every single one of those facts is material to the

23   outcome of this case.  We have disputed well over half.  We

24   have disputed them with evidence -- with reams of evidence,

25   documents and testimony from the State, from third parties like

1    the folks involved in the Coffee County intrusion.

2            So I would respectfully submit to Your Honor, looking

3    at the scope of the briefing, the scope of the issues, the

4    complexity of some of the issues, it may seem that this is a

5    challenging motion on which Your Honor has to write a lengthy

6    detailed decision.

7            I respectfully submit, Your Honor, this right here

8    resolves it.  Your Honor can and I would say should write a

9    single-page ruling that says that the defendants acknowledge

10   that there are numerous material facts and that under the

11   Rule 56 standard, which binds the Court, we have to go to

12   trial.  That is the end of it.

13           What they are asking you to do is for some reason to

14   go beyond that and wade in to fact issues and fact disputes and

15   legal issues that you are going to have to resolve at trial.

16   It makes no sense to do that now.

17           THE COURT:  Well, don't I have to wade into standing?

18           MR. CROSS:  That is where you anticipated I was

19   going.  Yes, Your Honor.

20           The reason the answer is no is because, again, when

21   you look at their own briefing, even their standing arguments

22   rely on disputed facts.  And those are facts that have to get

23   resolved at trial where we have an opportunity to prove up that

24   we're right and they are wrong.  Your Honor doesn't get to

25   resolve those fact disputes here, even as to the standing

1    issue.

2         Instead, what Your Honor has to do under Rule 56 is

3    to construe all those fact disputes in our favor.  You have to

4    take the facts in the light most favorable to us.  All

5    inferences have to be drawn in our favor.  And they are asking

6    you to do the opposite, to draw all of these fact arguments

7    that they want to make in their favor.  That only happens at

8    trial.

9         So as we have said from the beginning of this case,

10   it is not unusual -- there are cases like this.  We have cited

11   authority on this -- standing oftentimes is bound up in a lot

12   of the same fact disputes that go to the merits.  That is

13   intimately true in this case.  And they acknowledge it in the

14   way that they have briefed it.  So I would like to make it as

15   easy for Your Honor as we can to move on.  But that is where we

16   are.

17        The two other things I want to touch on briefly, Your

18   Honor, their reply brief accuses -- they call us, I think, a

19   weathervane spinning in the wind or something to that effect.

20   And candidly, Your Honor, we were scratching our heads.  We

21   couldn't figure out what that was about.

22        Our theory has always been consistent.  From the very

23   start of this case on the DREs, certainly the fact aspects of

24   how that -- what the constitutional violation is has moved over

25   time as we have dealt with different systems that have some of

1    the same and some different vulnerabilities and problems.

2              But again and again in this case, we have stated our

3    theory exactly the same, which is a fundamental right to

4    participate in the election process that accurately and

5    reliably records their votes.  That is the standard that we're

6    arguing here.  And it comes straight out of the Supreme Court.

7    And that their holding is it is not just the right to cast a

8    vote but to have your vote counted.

9              Now, what has changed?  The defendants' theory has

10   fundamentally shifted.  And there is a reason for that.

11   Because every time we have met the standard that they have

12   acknowledged was the standard we had to meet, they moved the

13   goal post.  It is like we are running for the end zone and

14   every time we get there they move it another 100 yards and say

15   you haven't scored yet.

16             Look at how this has evolved.  In 2019, this is what

17   they said.  Curling and Coalition plaintiffs' respective

18   complaints are devoid of any allegations that hacking, security

19   vulnerabilities, or other problems have been identified -- not

20   just exploited -- but even identified in Georgia's BMD voting

21   system.  Well, we hit that out of the park with the DREs and

22   then with Dr. Halderman's report on the BMD system.

23             2020, they say, Curling plaintiffs do not point to

24   any new identified active security risks or hacking potential.

25   Again, no argument that we have to show actual hacks, that we

1   have to show a security risk or hacking potential.  Again, we

2   hit that out of the park with Dr. Halderman's report.

3          Then we get to 2021.  Then they say, plaintiffs here

4   do not allege an actual breach of the BMD system.  They say in

5   *Tsao* there that had been an actual compromise to the point of

6   sale system.  Well, then we hit that out of the park because we

7   had the Coffee County breach, an actual compromise of the

8   voting system in Georgia in its operational environment, with

9   all of the internet connectivity and access to removable media,

10  every aspect of that system.

11         So they move the goal post again to where we are

12  today where now their theory is it doesn't matter that you have

13  shown it has been compromised.  It doesn't matter that you have

14  shown that there is this breach.  It doesn't matter that you

15  show the system has been hacked.  Now you have to show that

16  your individual votes were altered as a result of all of this

17  terrible stuff that has happened that we have never been able

18  to protect voters against and that we told the Court for years

19  was impossible.

20         And so that is simply not the law.  And we will talk

21  through that more today.  But you can see how the goal posts

22  have moved continuously as we met every standard they have

23  thrown up.

24         Here is where we are, Your Honor.  As we said before,

25  the U.S. Supreme Court has made clear that the right to vote is

1   the most fundamental of all rights.  We have been over this.

2   But it is also the right to participate in the democratic

3   process, and it is the right to have your vote count as cast,

4   to have it counted.

5          Their approach -- when you read their briefs and you

6   hear their arguments, what they are asking the Court to

7   conclude is that is not the right, that the sole extent of

8   their duty is to just offer a system that allows you to cast

9   your vote and nothing more.  That they have discharged their

10   duty at which you have cast it.  And that is wrong.

11          And you can see it in exactly what they say.  Taking

12   the first quote at the bottom, this is -- this was mind-blowing

13   to us when we read this in their reply brief.  They wrote this

14   as the State.  There is no legally protected interest in

15   verifying one's vote or in voting on a reasonably secure

16   system.

17          That absolutely cannot be right.  And here is why:

18   If the right to vote goes beyond casting a vote and includes

19   the right to have your vote counted, then the system has, at a

20   bare minimum, to have these characteristics.  And the reason

21   is:  If a voter can't verify that their ballot for

22   tabulation -- and, again, we're not talking about verifying

23   after it has been tabulated.  We're not suggesting that voters

24   get to go into the back room of seeing ballots counted in some

25   way or dig into the software themselves and figure out things.

1          The point is:  Verifying for tabulation.  That's what
2     we write in our brief.  If they can't verify that the ballot on
3     its face reflects their selections, then their vote is truly
4     illusory.  If the only thing the State is obliged to do is give
5     them a system that spits out a ballot and they then tabulate
6     that and leave and they have no idea if what is getting
7     tabulated reflects their selection, then it is not a right to
8     have your vote counted.  It is merely a right to cast a vote.
9          And the second part of this is also important, which
10    gets to what I was --
11              THE COURT:  Let me just stop you right there.
12              MR. CROSS:  Sure.
13              THE COURT:  And while I completely recognize and at
14    one level embrace your thought, at the same time, you know,
15    historically people have voted and they used lever machines and
16    all sorts -- and paper ballots in boxes and had -- didn't know
17    whether it was counted or not.  I mean, we don't know how
18    something is counted in the end.  We are hoping that there is
19    an honest process.
20              But that is sort of my question about when you say
21    you have the right to verify.  I mean, yes, we have a right to
22    look at what is being -- as we're casting our ballots.  And,
23    you know, we have a right not to be in a rigged system or a
24    system that doesn't reflect anyone's votes or being in a
25    totalitarian state where you nominally get to vote but it

1       doesn't make any -- it is not really true.

2             But I'm not sure how you cross the bridge exactly

3       when you say I have an absolute right -- I have a right to look

4       at whether -- at my vote and see is what you are saying.  But

5       you are taking it, it seems to me, several yards further.

6             MR. CROSS:  And that gets to the reasonable

7       reliability point, Your Honor.  But I do want to be clear.

8       When we're talking about verifying a vote, we're talking about

9       verifying the ballot.  That is what we're saying.

10            The verification part of what we're arguing is just

11      verifying the ballot.  Your ability to look at your ballot and

12      know that the selections that are going to be tabulated --

13      right? -- that that is accurate, reflects what you cast.

14            THE COURT:  All right.

15            MR. CROSS:  And so that is not doable in this system.

16            Now to get to your question is the reasonably secure

17      piece.  So what the State says is there is no right -- no

18      legally protected interest in a reasonably secure system.

19            Well, that's where we get to the question you're

20      asking, which is yes, once the voter leaves, they don't know

21      whether their vote actually counts.  There are things that can

22      happen.  Right?  There are things that have happened in the

23      past, whether it is a glitch or it is someone engaging in some

24      sort of malconduct.  That is why the reasonable security is so

25      important.  Because for voters to have confidence -- and the

1    State themselves emphasized the critical importance of voter

2    confidence -- you have to be able to trust that this system,

3    grounded in facts and reality and science, not just wishful

4    thinking as the State tends to argue -- that it is reasonably

5    secure and so you can have reasonable confidence that your vote

6    counts.

7              This is what they are arguing, which is why it is so

8    troubling.  If a voter does not have a legally protected

9    interest in a reasonably secure system, which is the lowest

10   measure of security -- right? -- that it is just reasonable --

11   we're not saying gold standard.  We're not saying an old

12   castle.  It just has to be reasonably secure.

13             And courts apply reasonable standards all over.  In

14   fact, in this context, they themselves argue that they only

15   have to have an interest in -- or defend a system that is

16   reasonable and nondiscriminatory.  So even in the voting

17   context when the courts look at balancing the interests the

18   State has against the burden, it talks about a reasonable

19   nondiscriminatory system.  So the courts are saying it has to

20   be a reasonable system.

21             If it is not reasonably secure, then the only thing

22   left is something that is reasonably insecure or unreasonably

23   insecure.  I don't actually even know what they are arguing.

24   But that is the nominal measure that anyone can articulate.

25             And so if the State is saying it doesn't have to have

1    even the nominal measure of security, of reliability, then your

2    vote is truly illusory.  And that is all we are saying, Your

3    Honor, particularly in light of what we have produced here.

4          Just briefly, Your Honor, again the goal posts keep

5    moving.  When we were here in 2020, they acknowledge that there

6    was a burden.  You know, the argument at that time was that the

7    burden was slight or in Mr. Tyson's words extremely slight.

8    And they argued voters have the opportunity to verify the

9    ballots.

10         Now we're facing a new theory, which is there is no

11   burden at all and that there is not even a legally cognizable

12   interest in verifying your ballot.  And that cannot be the law,

13   Your Honor.

14         As Your Honor has shown, we have ample evidence of

15   injury.  They have offered no new facts, no new evidence on

16   which Your Honor would reach a different finding.

17         They literally cite five exhibits in their entire

18   brief.  Their whole argument -- and I think in their reply

19   brief they cite one exhibit, which is a hearing transcript.

20         This is not summary judgment.  This is not them

21   coming in and saying there is new evidence to reach a different

22   ruling.  That evidence is one in which a reasonable fact-finder

23   can never rule in the plaintiffs' favor.  They are just

24   recycling the same arguments and telling Your Honor you got it

25   wrong.

```
 1              Let me finish with Muransky and then hand it to

 2     Ms. Swanbeck.  They spent a lot of time emphasizing Muransky.

 3     Your Honor asked about this.  Muransky, I think, just is the

 4     nail in the coffin of their argument on the standard for both

 5     standing and the Anderson-Burdick injury piece because they

 6     argue those two similarly and they certainly turn on similar

 7     facts.

 8              So they say that we have to show some sort of

 9     injury -- that we have to show some misuse of data.  That is

10     what they say.  We heard it again today.  That is a

11     fundamentally misstatement of the law.  Muransky actually says

12     the opposite.

13              What it says is, even without any direct harm, a

14     plaintiff can establish an injury in fact by showing that a

15     statutory violation created a real -- a risk of real harm.  And

16     we're arguing, Your Honor, that we have substantial evidence of

17     a risk of real harm, Your Honor.

18              The court goes on, what is required then?  The

19     plaintiff needs to plead an injury that is concrete,

20     particularized, and actual or imminent rather than conjecture

21     or hypothetical.  Our inquiry narrows again.  What they say

22     concrete is, is it just has to be real.  It has to be a real

23     injury in the future.

24              And here the court goes on further, Your Honor,

25     rejecting the argument that the State has made here.  In
```

1    particular makes the point, Your Honor, both identity theft and

2    a material risk of identity theft plainly qualifies injuries

3    under the statute and under this opinion.  Because it says,

4    again, to begin, this opinion makes clear that anyone who

5    properly pleads a material risk of identity theft would have

6    standing.  The court then goes on again, factual allegations

7    that establish a risk that is substantial, significant, or

8    poses a realistic danger will clear this bar.

9         We have put in reams of evidence from the leading

10   election security experts, Your Honor.  We clearly get beyond

11   this bar at least under the Rule 56 standard.

12        Now, at trial, maybe Your Honor will disagree with

13   us.  But at this point in the case, that is not a decision Your

14   Honor gets to make.

15        THE COURT:  And I think it is in *Tsao* that they

16   actually show -- that the plaintiff actually showed there was

17   a -- something like a 16 percent chance of hacking and it

18   was -- which seems to me, frankly, from a personal perspective

19   a real one I wouldn't like to live with.  But it didn't seem to

20   bother the circuit.

21        MR. CROSS:  Right.  And Ms. Swanbeck is going to dig

22   into this more.  But I will just say one of the easy

23   distinguishing factors for *Tsao* and *Muransky* is -- what the

24   Court points out there is there really is no -- there are no

25   facts substantiating their harm or that there is a substantial

1   risk.

2          You have got the GAO report, for example, that says

3   it is a nominal risk.  I agree with you.  From a consumer

4   standpoint, it seems like a significant risk.  The Eleventh

5   Circuit disagreed.  But that is very different here.  Right?

6   Because here we have got the CISA report that says the

7   opposite.  CISA has come in and validated our findings and said

8   to the State, these things can be exploited; and if you don't

9   mitigate them, they likely will be.

10          And we sit here today, almost a year later, and they

11   have not mitigated these measures, as they tell you.  And so,

12   again, our evidence goes way beyond anything in *Tsao* that is

13   pled or in *Muransky*.  And Ms. Swanbeck will dig into that a

14   little more.

15          And so what we're faced with again is briefing and

16   arguments that just sort of ignore the reality of the evidence.

17   They don't respond to our evidence at all.  When you look at

18   their reply brief, it is just legal arguments.  There is no

19   response and no engagement on the facts.  And they say things

20   like plaintiffs' possess, quote, idiosyncratic views of the

21   risk of using BMD-like systems.

22          Respectfully, Your Honor, the only idiosyncratic view

23   on BMD systems is the State of Georgia.  They do not have a

24   single election security expert -- not one -- who is here

25   telling Your Honor that it is okay to use this system.  Not

1    one.  Ben Adida says he tells his clients, use hand-marked

2    paper ballots and a BMD for those who need them, people with

3    disabilities, for example.  Gilbert -- Dr. Gilbert has

4    literally gotten a patent or is seeking a patent and designing

5    one because of the same flaws that we have identified, that

6    they are not transparent, they are not reliable.

7           Michael Shamos said, don't use this, don't use QR

8    codes.

9           Dr. Wenke Lee said don't use this.

10          So there isn't any idiosyncratic view on BMDs.  It is

11   not on our side of the aisle, Your Honor.  And that at the very

12   least raises a fact dispute on both standing and merits that

13   has to go to trial.

14          Last thing, Your Honor, I do want to drive home the

15   simplicity of this.  When we were in the DREs, it was a bigger

16   lift because it was -- you had to have a whole new system.

17   That is not where we are.

18          As I said before, there is no argument from the State

19   that what we are asking poses any burden on them at all.  They

20   don't offer any allegations or evidence much less on cost, on

21   inconvenience, on feasibility.  We heard that time and time

22   again in the PI context.  Here, none of those arguments appear

23   in their brief.  And they don't make any effort to argue that

24   what they are doing is narrowly tailored, even to an

25   important -- rationally related to an important interest, much

less a compelling one.

THE COURT:  Well, should I still consider the record before me about the problems with paper ballots?  I mean, there were many -- there was a lot of evidence about that.  I raised concerns about them also in the case from the very start in terms of administration and feasibility.

Are you saying that none of that can be considered at this juncture?

MR. CROSS:  I think it depends on what it is.  I guess I would say two arguments.  One, I think Your Honor cannot consider it for the purpose of this motion because they don't rely on it.  If they are going to make that argument, they are bound by the scope of what is in their papers.  And that is what the Court has to consider.

The second thing I would say is it also depends on what it is.  For example, you know, they rely on things like Dr. Coomer's declaration, which is not -- the Court can't consider because there is no testimony that is going to come in from him at trial.  So I think you would even have to dig down to whether the underlying evidence is admissible.

But the more fundamental point, Your Honor, on the hand-marked paper ballots is sure, there are issues with hand-marked paper ballots.  There are issues with every voting system.  But how the balancing works out and how the injury assessment is determined for standing and for the merits is a

 1     quintessential fact dispute that has to be resolved at trial.

 2          And, Your Honor, you are going to hear that from us

 3     over and over again because our sense is where they want to

 4     draw the Court is into an engagement on the facts and on the

 5     merits and that is how they brief it, that is how they argue it

 6     today.  And that is not where we are.

 7          The only question for the Court is do we have just

 8     enough evidence taken in the light most favorable to us, taking

 9     all inferences in our favor -- just enough evidence on -- and

10     at least one disputed fact to get to trial on standing and on

11     the merits.  And the answer to that, Your Honor, is beyond

12     dispute when the State itself tells you there are over 400

13     material facts that this Court has to resolve in their favor to

14     grant summary judgment.

15          With that, I'll hand it off to Ms. Swanbeck for

16     further discussion.

17          THE COURT:  I'm going to take a restroom break.  So

18     I'm going to say let's just take five minutes.

19          COURTROOM SECURITY OFFICER:  All rise.

20          **(A brief break was taken at 2:29 PM.)**

21          THE COURT:  Mr. Cross, can I ask you one question

22     before your colleague comes up?  I just want to clarify.

23          Are you asserting a right to verify essentially --

24     your ballot as essentially as a part of the right to vote?

25          MR. CROSS:  Yes.

1          THE COURT:  And that basically you are saying

2     encompasses I get to look at the ballot and check that it

3     actually is a -- it reflects my choices?

4          MR. CROSS:  Correct.  Correct.

5          THE COURT:  And does it mean that under the

6     circumstances here I get to actually have a printed version?

7     Because, of course, for years, people voted without seeing a

8     printed version when they did at least lever voting.

9          MR. CROSS:  If I could answer that in two parts, Your

10    Honor.  The science and the overwhelming consensus is that it

11    really should be a hand-marked paper ballot because then you

12    don't have to verify it.  Right?  You know all the marks you

13    made.  If there is a mistake, that's your mistake.  But you

14    know that whatever selection is on there, you made that

15    selection.  And that is why the overwhelming consensus is you

16    should do hand-marked paper ballots because they are inherently

17    verified by the voter having filled them out.

18         THE COURT:  All right.  Well, that is scientific and

19    a judgment.  But I'm just asking you from a legal perspective

20    in the context here --

21         MR. CROSS:  Yes.  So that is why it was a two-part

22    answer.

23         The other part is yes.  It has to at least have a

24    paper record.  And there doesn't seem to be a dispute about

25    that.  The State even seems to acknowledge coming out of

1   shutting down the DREs -- you have to do -- you have to have

2   today a paper record that a voter can and, in fact, has

3   verified that it reflects their selections.  Right?  So that

4   the moment it gets tabulated, whatever happens from there gets

5   to the second part of what we're talking about.  But the moment

6   it gets tabulated, that that ballot reflects their selections

7   and they can be sure of that.  That -- Your Honor, if that is

8   not at least --

9           THE COURT:  That is separate and apart from --

10           MR. CROSS:  The reasonable reliability piece.

11           THE COURT:  The reasonable reliability.  Is that what

12   you are saying?

13           MR. CROSS:  Yes.  Our view is those two work in

14   conjunction.  Because if you have one without the other, you

15   have a system that doesn't provide -- it doesn't provide a

16   voter any reasonable expectation or confidence that it will

17   count.

18           Again, the Supreme Court says it has to be a right to

19   count.  So you have to be able to verify the ballot.  So now I,

20   as a voter, know, okay, once this goes in, it reflects my

21   choices.  Once it gets tabulated, what is getting tabulated

22   reflects my choices.  And if there is an issue later with the

23   tabulation and there is a hand recount or an audit, that ballot

24   will reflect my choices in terms of what they are looking at.

25           THE COURT:  What were you saying about the Supreme

```
 1    Court has said about the count?
 2            MR. CROSS:  Just that the Supreme Court has
 3    repeatedly said that the right to vote is not just the right to
 4    cast a vote but to have it counted.
 5            So as we take the State's position, the State is sort
 6    of writing off that last piece to just say really all they have
 7    to do is provide a means for you to cast a vote.  Because if
 8    you can't verify your selections and the system doesn't have to
 9    at least be reasonably reliable, which means it doesn't have to
10    be reliable at all because there is no measure of reliability
11    less than reasonableness, then it is just an illusory system.
12            All you are really doing -- all the State is telling
13    you is we'll let you cast a vote.  Beyond that, cross your
14    fingers, hope and pray it goes the way you want.
15            THE COURT:  What do you think is your best authority
16    for the second part of the prong here --
17            MR. CROSS:  Sure.
18            THE COURT:  -- about it has got to have reasonable
19    reliability, that you have to be -- that it actually -- your
20    vote really does have to be properly counted?
21            MR. CROSS:  So a couple of things here, Your Honor.
22    Here on slide six, *U.S. v. Classic* is I think maybe the first
23    articulation of it.  The Court also talks about it in the
24    *Reynolds v. Sims*.
25            But, again the court says, obviously included within
```

1    the right to choose, secured by the Constitution, is the right

2    of qualified voters within a state to cast their ballots and

3    have them counted.

4            So, again, without those two metrics, you can't --

5    and the other thing that I sort of skipped over, they rely

6    heavily on the *New Project Georgia* case putting aside footnote

7    one, in which case no one is really allowed to rely on it.

8    Just putting it aside since they are, we'll respond to it.

9            Here the Eleventh Circuit emphasizes, again citing

10   the *Burdick* case in the Supreme Court, we also know that the

11   right to vote is the right to participate in the electoral

12   process that is -- and this is the key language -- necessarily

13   structured to maintain the integrity of the democratic system.

14           What we would say, Your Honor, is if the voting

15   system doesn't at least allow a voter to ensure that their

16   ballot reflects their selections and it is not at least

17   reliable by some reasonable measure, meaning it is literally

18   unreliable or you just don't know, then it does not at all meet

19   the requirement of necessarily structured to maintain the

20   integrity of the democratic system.

21           Because a voting system where voters have no idea if

22   their ballots reflect their choices and then they don't know if

23   the system itself is reliable to tabulate those choices doesn't

24   help the integrity of the democratic system at all.

25           In fact, what it does is undermine that system,

1  basically creates opportunity for voters to lose confidence,

2  and somehow we get crazy conspiracy theories, which is what we

3  are trying to protect against.

4          Did I answer your question?

5          THE COURT:  And just briefly -- and then let's move

6  on to your colleague -- why do people need to verify their

7  selection?  Why do people need that right as part and parcel of

8  the right to cast a vote?

9          MR. CROSS:  Because, again, if they can't verify

10  their selections, then they don't know if what is going to get

11  tabulated reflects their voice as a voter.  Right?  And the

12  courts have said your voice -- it is actually in here.  Right?

13  No right is more precious in a free country than that of having

14  a voice in the election of those who make the laws.

15          If you can't verify that your ballot reflects your

16  voice in that election, then your vote is illusory at best.

17  And so, again, it is inherent in the notion that every voter

18  has a personal and individualized voice.  The ballot is what

19  reflects that voice.  It is the record of that voice.  It is

20  what gets tabulated for that voice.

21          And if they -- if they don't even know what it

22  reflects, then they have no choice in the process, unless they

23  just get lucky.  And luck should not be the premise of the most

24  fundamental right of all rights that we bear as citizens of the

25  United States.

```
 1              THE COURT:  All right.  Thank you very much.
 2              MR. CROSS:  All right.
 3              MS. SWANBECK:  May it please the Court, Your Honor.
 4              THE COURT:  Yes.
 5              MS. SWANBECK:  So as Mr. Cross mentioned, I'll be
 6    focusing on the standing arguments today for Curling
 7    plaintiffs.
 8              So this Court has held at the motion to dismiss phase
 9    that plaintiffs discharge their burden on standing.  And
10    defendants simply recycle those same arguments.  They don't
11    make any new factually-based arguments.  Again, as Mr. Cross
12    mentioned, they only produced five exhibits in their motion and
13    then one on reply.
14              THE COURT:  But it is your burden.  And that burden
15    keeps on -- becomes more and more heavy as the litigation
16    proceeds.
17              So I'm not sure why we are focused on their five
18    exhibits when it is the plaintiffs' burden.
19              MS. SWANBECK:  Yes, Your Honor.  That is what I was
20    getting to next is that plaintiffs have amassed a massive
21    record of evidence here.  We have presented hundreds of
22    disputed -- material disputed facts that a fact-finder at trial
23    should weigh.  But -- and the fact that the defendants ignore
24    those facts should not give this Court any reason to also
25    ignore those facts.
```

1           So because the State defendants made some points on

2    the one plaintiff rule that I would like to respond to up top,

3    I'll move to that point first.

4           THE COURT:  Okay.  Great.

5           MS. SWANBECK:  So as you know, Your Honor, the

6    Eleventh Circuit decision handed down in October ruled that the

7    Coalition plaintiffs have standing to bring their voting --

8    their challenges due to the diversion of resources that they

9    have to make and the harms that they have to ameliorate on

10   election day.

11          And that is -- that is an opinion that was made at

12   the preliminary injunction phase with an evidentiary record and

13   is binding on this Court.

14          And we believe that Curling plaintiffs should be

15   allowed to proceed under the one plaintiff rule in addition --

16   we should be allowed to proceed under the one plaintiff rule

17   because it is a matter of judicial efficiency at this point

18   where the Court has looked at standing several times in this

19   case already and has repeatedly rejected the State's argument.

20   So as matter of judicial efficiency, it makes sense to

21   proceed -- to proceed beyond standing at this point.

22          And all of the cases that State defendants rely on

23   are inapposite for the basic reason that, first, they rely on

24   only damages cases.  They rely on *TransUnion* and *Town of*

25   *Chester v. Laroe*, which again courts from the Supreme Court,

```
1    Eleventh Circuit, courts across the country treat damages cases
2    differently for purposes of the one plaintiff rule.  And that
3    is because with damages cases there's the potential risk of
4    directing a defendant to -- to pay out additional monetary
5    damages to a plaintiff.  But that is not the case in injunctive
6    relief.
7              THE COURT:  Is it because of that or because of the
8    individualized nature of a damage claim?
9              MS. SWANBECK:  Your Honor, it is because of the fact
10   that it is monetary damages.  And that is why -- that is
11   explicitly why courts across the country treat injunctive
12   relief cases differently and are much more likely to use the
13   one plaintiff rule in injunctive relief cases because of the
14   fact that the relief is inherently duplicative where two
15   different plaintiff groups are asking for the same kinds of
16   relief.
17             And that gets to the other point that they made that
18   Curling and Coalition plaintiffs are making different claims
19   and different -- or asking for different relief.  And we don't
20   believe that that is true on a practical level here.  We're
21   both asking for relief as it relates to the BMD system.  Our
22   claims are fully encompassed by the Coalition's claims here.
23             And as far as defendants quibble with minor
24   differences in the type of relief, that doesn't matter because,
25   as *Town of Chester v. Laroe* said, it is the same form of relief
```

 1    that matters.  Not whether the type -- the relief requested is
 2    exactly the same.  That is not what any court has used that is
 3    binding on this Court.  For example, *Crawford v. Marion County*,
 4    which is a, you know, seminal voting rights case -- the court
 5    in that case actually did apply the one plaintiff rule.  And in
 6    that case, it was two separate plaintiff groups.  One was made
 7    up of William Crawford and other candidates.  And the other
 8    plaintiff group was organizational mainly.
 9         And in that case, William Crawford's group had filed
10    a case in state court with their own complaint.  It had been
11    removed to federal court and consolidated with a case brought
12    by the Indiana democratic party.
13         So, again, in that case, two separate plaintiff
14    groups, one individual candidates and one organizational,
15    proceeding on different complaints, represented by different
16    counsel.  And in that case, the Supreme Court did not hesitate
17    to use the one plaintiff rule.  And that is even though the
18    complaints included that there were different complaints
19    involved.
20         William Crawford's plaintiff group alleged a
21    violation of the Fourteenth Amendment, the VRA, and the Indiana
22    state constitution, and the Indiana democratic party alleged a
23    violation of the Fourteenth Amendment, the VRA, and the First
24    Amendment.  They didn't have any claim involving the Indiana
25    state constitution.  And yet the Supreme Court and the Seventh

1    Circuit didn't hesitate to apply the one plaintiff rule there

2    to allow William Crawford and his group to proceed in the case

3    because the Indiana democratic party group had clearly

4    established standing.  So that is very clear Supreme Court

5    precedence.

6            But there is also case law from this district not too

7    long ago, *Martin v. Kemp*, which involved an incredibly similar

8    case as this.  That involved organizational plaintiffs and a

9    group of individual plaintiffs who are each part of a case

10   proceeding under their own complaints and represented by their

11   own counsel.

12           It brought challenge against the State defendants

13   or -- sorry -- the Georgia statute -- that regulation that

14   permitted the rejection of absentee ballot applications and

15   alleged procedural and substantive due process claims.

16           And in that case, the complaints were similar but

17   they were not identical.  And in particular, the relief part of

18   those complaints were different.  The individuals claims were

19   encompassed entirely by the organizational plaintiffs' claims.

20   But in terms of the form of relief that they asked for, they

21   were not.  They -- they asked for the same form of relief,

22   injunctive relief, against that particular regulation.  But

23   they did not actually have the same identical language.

24           And in particular, they asked for more specific

25   relief.  They asked for the court to order specific procedures

1    to be followed by the state in adjudicating and providing

2    notice for absentee ballot applications and signature

3    mismatches.

4          And the Court there in this district didn't hesitate

5    to use the one plaintiff rule.  So it is just not an uncommon

6    phenomenon for courts to use the one plaintiff rule in cases

7    incredibly similar to this one.

8          THE COURT:  Well, the defendants argue that there

9    have been differences and disagreements in the past between the

10   plaintiffs as to how -- how to proceed and what relief they are

11   seeking.  And I know that at some point that was true.  I

12   haven't seen it manifested in years.  But I'll give you the

13   opportunity to address that.

14         MS. SWANBECK:  Of course, Your Honor.

15         First, I would just point out that the binding

16   precedent here doesn't ever mention whether there are

17   disagreements between the parties.  We have not seen any case

18   where anything but the -- how similar the complaints or the

19   relief are.

20         And, second, the parties have not had really any

21   disagreements on a macro level as to case strategy.  Whether

22   there has been some minor back-and-forth, that is potentially

23   true.  But there haven't been any macro disagreements here to

24   the extent that this Court finds it relevant.

25         But, again, that is not really what we're looking at

1  here.  We're looking at the complaint or -- sorry -- the claims

2  and the relief.

3        And that gets to the point of fees that State

4  defendants find very relevant.  First, I would like to note

5  that courts have used their discretion in awarding attorneys'

6  fees including to plaintiffs in cases where the plaintiff was

7  allowed to proceed under the one plaintiff rule.

8        For instance, in the Fourth Circuit in a case called

9  *Shaw v. Hunt*, that court ruled that plaintiffs could be

10  considered prevailing plaintiffs for purposes of awarding

11  attorneys' fees.  And that is because the plaintiffs in that

12  case had made significant contributions to the outcome of the

13  case.  So, one, there are cases where attorneys' fees can be

14  awarded to plaintiffs.

15        And -- but putting that aside for a second, Your

16  Honor --

17        THE COURT:  You mean to both sets of plaintiffs?

18        MS. SWANBECK:  Both sets, Your Honor.  Sorry.

19        Putting that aside, Your Honor, the only question

20  today is will we go to trial.  And since the Coalition

21  plaintiffs already have established standing, that question is

22  answered.  The Coalition will be going to trial.  But it is

23  just a question of whether Curling will be allowed in.

24        And Curling plaintiffs fully intend to completely

25  prove up standing by presenting numerous facts that go to

1    standing at trial.  As Mr. Cross said, the standing and the

2    merits here are really bound up together.

3           And so by the time we eventually get to attorneys'

4    fees, the standing elements will be completely proven up.  So

5    it is really redundant to focus on them at this point.  And it

6    makes more sense as a matter of judicial efficiency to proceed

7    to trial under the one plaintiff rule.

8           And then one final note on this, Your Honor, because

9    I want to make sure to discuss how wrong the State defendants

10   are on the law.

11          THE COURT:  The law of what?

12          MS. SWANBECK:  I'm sorry?

13          THE COURT:  On the law of what?

14          MS. SWANBECK:  On the case law, Your Honor.

15          THE COURT:  All right.  Make your last point.  And

16   then I'll find out what you are trying to say.

17          MS. SWANBECK:  Sorry.  So they rely on *Town of

18   Chester v. Laroe* and *Thiebaut v. Colorado Springs Utilities*.

19   First on *Town of Chester v. Laroe*, as I mentioned, that is a

20   damages case.  And, second, they rely on it for the proposition

21   that plaintiffs must seek identical relief.  But that is not

22   what the Court said at all.  It just said again, as I

23   mentioned, that plaintiffs must each seek the same form of

24   relief requested in the complaint.

25          And importantly in that case, the court did not make

1    any finding as to whether the plaintiffs' claims were -- and

2    requested relief were different or similar enough to proceed

3    under the one plaintiff rule.  It just said that they have to

4    have the same form of relief.  And it remanded to the lower

5    court to make a consideration.

6          And then on *Thiebaut*, which they also used for the

7    proposition that the claims and the relief must be identical,

8    that was not at all addressed in that case.  That case was

9    simply a question where a plaintiff was trying to argue to the

10   Tenth Circuit that the one plaintiff rule is a mandatory rule

11   instead of a rule of discretion for the court.

12         And in that case, the circuit court rightly ruled of

13   course not.  The court has to -- the lower court has to look at

14   whether this is a matter of judicial efficiency.  But there is

15   nothing in that ruling that addressed how similar or different

16   the complaint must be.

17         THE COURT:  Thank you.

18         MS. SWANBECK:  With that, I'll move on to the

19   standing argument.

20         So if Your Honor decides that standing is appropriate

21   to look at here, I want to first discuss some of the

22   concreteness arguments that defendants raise and particularly

23   *Tsao* and *Clapper*.

24         So upfront, as plaintiffs have repeatedly noted, the

25   system causes injuries even if it were to operate as designed.

So plaintiffs were injured in all previous elections using the system, and they are certain to experience this harm again if this system is still in place in the next election.  And, again, plaintiffs have alleged hundreds of facts going to that that are hotly disputed in this case and should be proven up at trial.

Second, State defendants mischaracterize the *Tsao* court's holding and the standard that the Eleventh Circuit was operating under.  As you can see here, they say literally the opposite of what the *Tsao* court said.  The *Tsao* court said, evidence of actual misuse is not necessary for a plaintiff to establish standing following a data breach.

And then somehow in the State defendants' reply, it turns into a plaintiff must demonstrate specific evidence of at least some use -- misuse of the relevant data.  And that is just not what the *Tsao* court said at all.

Second, in *Tsao*, the court really conducted a factual inquiry, a deep dive into the particular facts that *Tsao*, the plaintiff, was alleging in the particular context of a data breach, which is incredibly different from the voting rights context.

In *Tsao*, the court looked at, one, the fact that the plaintiff had immediately canceled his credit cards.  So the fact that he had said -- he had presented evidence about like a 16 percent chance wasn't actually applicable to him because he

1    had immediately been able to mitigate the harm in that case.

2            And, second, he had provided that statistic in a

3    Government report, the GAO report, that he presented.  But the

4    GAO report actually presented evidence that worked against him.

5    Because the Government in that report said that the type of

6    information that was exposed in the data breach that Tsao

7    was -- was bringing his case about -- the type of information

8    released was not actually likely to lead to any fraud and that

9    furthermore in general the report said that breaches of

10   consumer information don't tend to lead to increases in

11   identity theft or fraud on existing accounts.

12           So that is why it found that there was not a

13   substantial risk of future harm because it had conducted an

14   intense factual inquiry into Tsao's allegations.  And that is

15   in stark contrast to the facts of this case where plaintiffs

16   have alleged a massive record of vulnerabilities and actual

17   manipulation and where election security experts, the

18   intelligence community warn every election cycle that U.S.

19   elections are the target of hacking efforts.  And even the

20   defendants' own cybersecurity consultant, Theresa Payton, said

21   that it is not a matter of if but when an election will be

22   hacked.  So it is a virtual certainty that this harm will come

23   to pass in this forum.

24           State defendants argue that Curling plaintiffs'

25   injuries are merely speculative because they cannot demonstrate

1    a single instance of hacking or manipulation that actually

2    affected the integrity of the election system.  That is a

3    quote.

4            But plaintiffs actually have amassed a massive record

5    of several critical vulnerabilities, as well as numerous

6    circumstances affecting the system's integrity and showing how

7    ill-equipped the system is to withstand attacks.

8            Defendants flatly ignore these facts, including the

9    breach of the Coffee County election hardware, the uploading of

10   Georgia's election software.  And they ignore the fact that

11   that is an instance of manipulation.

12           Their refusal to grapple with any of these facts

13   shows how necessary it is to have a fact-finder at trial to

14   resolve the bearing that these facts have on the injuries

15   suffered by Curling plaintiffs.

16           *Tsao* is also inapplicable here, Your Honor, because

17   as a consumer case the plaintiff was able to mitigate the harm

18   by canceling his credit card as the Eleventh Circuit noted.

19   But plaintiffs have to use this election system going forward

20   if they wish to vote.  There is no mitigation that they can

21   take except for the one -- the one alternative that State --

22   the State defendants offer, which is, oh, you don't like this

23   system, go vote absentee.

24           And the plaintiffs have tried that here, Your Honor.

25   But that system carries its own burdens as plaintiffs have

1    demonstrated through the factual record showing that they have

2    each -- or sorry -- that they have suffered burdens.  And Donna

3    Price and Donna Curling have suffered actual disenfranchisement

4    trying to use that system.

5            So the only mitigation measure that the State says

6    that we can take --

7            THE COURT:  Remind me what happened to Ms. Curling.

8    What were the things that happened where they are saying

9    disenfranchised?

10           MS. SWANBECK:  Your Honor, first, Ms. Curling tried

11   to vote absentee.  She requested an absentee ballot, and it

12   never actually arrived.  The same happened to Ms. Price, Your

13   Honor, where they just didn't ever receive their absentee

14   ballots.  So --

15           THE COURT:  Well, you know, there is an argument to

16   me to be made that all election systems are imperfect.  And I

17   don't know why the coincidence of their not getting their

18   ballots on a timely basis.

19           But it is -- I realize that somebody may not still

20   want to vote on one or another system.  But they do have that

21   option.  It is not like they are deprived of that option by

22   choosing the other basically if it doesn't come in time -- the

23   ballot doesn't come in time.

24           And I mean, it is not -- it is not ideal.  But no one

25   ever said these systems were ran perfectly either.

1    MS. SWANBECK:  No, Your Honor.  But we have -- but

2    they have to be reasonably reliable for all of the reasons that

3    Mr. Cross mentioned.

4         Again, I only mention absentee voting in that context

5    as an analogous attempt at a mitigation measure.  But as this

6    Court has already noted, the fact that plaintiffs can vote

7    absentee is not, you know, relevant on the -- to the State

8    defendants' duty to provide a constitutional reasonably

9    reliable in-person voting measure.  This Court said that in its

10   order in 2020.

11        THE COURT:  I'm not saying that I was wrong, but I

12   could have been, I mean.  I mean, certainly the State probably

13   said I was wrong.  So, you know -- and the law has been quickly

14   evolving, let me say, and changing.

15        MS. SWANBECK:  Yes, Your Honor.  It has been.  And

16   that only increased the burdens that are involved in absentee

17   voting after SB 202.

18        So if anything, we would say that absentee voting is

19   even harder to use as a mitigation measure.

20        THE COURT:  So are the plaintiffs going to respond to

21   the question of -- or the point made that -- in the record by

22   the defendants that it has been two years since the Coffee

23   County breach, roughly speaking, and that there is no evidence

24   that there has been alteration or a hack or malware since that

25   time?

```
1              I mean, it definitely posed risks for the system.
2     But on the other side -- especially when posted on the web,
3     and -- but sort of the obvious question is:  In the standing
4     context, is there actually concrete evidence, even if it is not
5     nailed down on all sides, that there was a material risk to the
6     plaintiffs that has been now manifested or to the voters as a
7     result of that --
8              MS. SWANBECK:  Yes, Your Honor -- sorry.
9              THE COURT:  -- as a result of that breach, just to
10    clarify the question?
11             MS. SWANBECK:  Yes, Your Honor.  Couple of points on
12    that.
13             The fact that there is no evidence that votes have
14    been altered doesn't render the risk sort of speculative.  If
15    that were the law, then the substantial risk standard would
16    actually be meaningless.  Because in every case where the
17    alleged harm is the risk -- or sorry -- in every case where
18    alleged harm is the risk, then plaintiffs would not be able to
19    show any actual harm.
20             THE COURT:  I'm sorry.  I don't understand what you
21    are saying.
22             MS. SWANBECK:  Sorry, Your Honor.
23             THE COURT:  That's all right.  It may be a glitch in
24    my own brain.
25             MS. SWANBECK:  Let me try again.  So if the
```

```
 1    substantial -- if that were the law, then the substantial risk
 2    standard would be meaningless.  Because in every case where the
 3    alleged harm is the risk of some future injury, the harm
 4    necessarily hasn't happened.
 5          THE COURT:  But doesn't there have to be a
 6    substantial material risk at minimum?
 7          MS. SWANBECK:  Yes, Your Honor.
 8          THE COURT:  And how do we assess sort of -- how do we
 9    assess when we have reached that point?  In one way you might
10    obviously is something had happened.  But we have now gone two
11    years.  That is why I mention the two years.
12          I mean, I think it was obviously alarming.  But where
13    nothing materializes in two years, does it mean that, in fact,
14    enough proactive measures have been taken and therefore the
15    system is not reasonably at risk?
16          MS. SWANBECK:  No, Your Honor.  That is not the case
17    at all.
18          First, I would like to say, again, this depends on
19    careful consideration of the reams of evidence that plaintiffs
20    have produced in this case related to Coffee County.
21          And, second, there is no evidence -- as Mr. Tyson
22    just admitted, there is not really evidence that the State has
23    actually mitigated the risks of the system that existed at that
24    point in time.  And Gabe Sterling even admitted that the State
25    should implement those mitigations.
```

```
 1            And to the extent that they have been working on

 2   them, they haven't yet.  And time and again in this case, they

 3   have insisted that they are working on mitigations.

 4            And, two, they won't be implemented in time for the

 5   2025 election, which means that plaintiffs will -- or sorry --

 6   2024 election, which means that plaintiffs will experience this

 7   harm yet again in the next election.

 8            THE COURT:  Or risk of harm.

 9            MS. SWANBECK:  Yes, the risk of harm.  Again --

10            THE COURT:  All right.  So let me just ask you

11   this -- I know that probably Mr. Cross took up some of your

12   time.  And I'm going to ask Mr. Cross as well because, you

13   know, obviously the Coalition counsel wants to speak also.

14            So let's just -- we're at ten after 3:00.  I have

15   probably gobbled up more time than was warranted on my

16   questioning in the beginning.

17            But tell me -- I don't want to cut off your argument.

18   But I also want to make sure, just big picture, that all sides

19   have enough time.

20            So can you just turn around and all just chat for a

21   second and see where you are on the schedule of time?  Are you

22   almost through or not?

23            MS. SWANBECK:  Sorry.  Yes, I am.  I have a few more

24   points.  But yes.

25            THE COURT:  That is fine.
```

```
 1                All right.  Why don't you try to wrap up in about two
 2       minutes.  Can you do that?
 3                MS. SWANBECK:  Yes, Your Honor.
 4                THE COURT:  And then plaintiffs' counsel can confer
 5       and -- all right.
 6                    (There was a brief pause in the proceedings.)
 7                MS. SWANBECK:  Thank you, Your Honor.
 8                First, I just want to check with you and see if there
 9       are any particular outstanding questions you have for us.
10                THE COURT:  Well, I guess -- just the tail end of my
11       question was:  Does the fact that there has not been an
12       apparent breach in the last two years since the Coffee County
13       breach affect the speculativeness question?  Does it just
14       simply make it -- tilt it towards the Government?
15                MS. SWANBECK:  No, Your Honor, that is not the case
16       at all.  Because, again, with Coffee County, the information
17       from the system was uploaded to the internet.  It has been
18       floating out there, and no one knows who has access to it.  The
19       State defendants cannot say for sure who has it.  They can't
20       say who still might have hard copies of that data.  They can't
21       say where it is online.  They can't say what nation states
22       might have been working on it or what other non-nation state
23       hacking groups might have it.
24                There is the -- we do have evidence that the log-in
25       credentials were shared, that it was downloaded around the
```

1    world.  So the fact that it hasn't --

2           THE COURT:  You presented that evidence?

3           MS. SWANBECK:  Yes, Your Honor.

4           THE COURT:  That is fine.

5           MS. SWANBECK:  Yes, we have exhibits on that that we

6    can share with you.

7           THE COURT:  Thank you.

8           MS. SWANBECK:  So the fact that it hasn't brought

9    about an actual hack in an election is not relevant here

10   because the data is out there and can be actively worked on.

11          And, also, I would add that the fact that they

12   haven't held anyone accountable in the last two years increases

13   the risk of harm here.  Because the fact that they wouldn't

14   have even known about this breach if it weren't for the

15   plaintiffs in this case -- and the discovery is deeply

16   concerning and would encourage bad actors to take advantage of

17   this system, even though they had multiple red flags that they

18   ignored.  We have --

19          THE COURT:  Okay.  I understand that.  All right.

20   Move on from that.

21          MS. SWANBECK:  Yes, Your Honor.  So being mindful of

22   my time, I can wrap up now and turn it over to Ms. Middleton.

23          THE COURT:  Thank you very much.

24          MR. CROSS:  If I could add one quick thing while

25   Mr. McGuire is walking up.  Just on that last question, the

1    only thing I would add is *Muransky* makes clear that the line

2    you're asking about, you know, when do we get across that line

3    on substantial risk, is fact driven.  And that at this stage of

4    the case means we go to trial.

5            Thank you, Your Honor.

6            MR. McGUIRE:  Good afternoon, Your Honor.  Robert

7    McGuire for the Coalition plaintiffs.  It is nice to see you in

8    person.  I'm usually on the television.

9            I'm going to address standing for us, and Mr. Brown

10   is going to address the merits.  And you've already heard a

11   good deal about standing.  So I'll basically jump right in.

12           The purpose of standing -- the purpose of the whole

13   doctrine is to make sure that the people who come in to argue

14   the merits of a case have a stake in outcome.  And that is a

15   distinct analysis from whether the merits are going to be

16   successful.

17           And if there is like one big point that I could make,

18   the high-level point, is that standing is distinct from the

19   merits and it has to be treated distinctly from the merits.

20   And standing in no way depends upon your ability to prevail on

21   the merits.

22           Standing is a completely distinct analysis.  And what

23   you look at when you look at standing is you look at the three

24   elements that are set out in *Spokeo* and all the other cases.

25   They begin with the invasion of a legally cognizable interest.

1    That interest has to be invaded.  The invasion has to be

2    concrete and particularized.  And it has to be actual -- it has

3    to be either actual, meaning it has already occurred, or it has

4    to be imminent, meaning it is about to occur.  And it can't be

5    conjectural or hypothetical.

6            In this case, there is an easy way to find standing,

7    and there are a lot of hard ways to find standing.  And the

8    State keeps wanting to drag us into the hard ways to find

9    standing, and we don't want to go there.  We can prevail, if we

10   have to show the hard ways that we have standing.

11           But there are a lot of easy ways that we have

12   standing, and they get us into court and allow us to argue the

13   merits.  And so I would like to focus on those.

14           And what those -- what those easy ways are is you

15   look for an injury in fact to a cognizable interest that is

16   caused by the defendants' challenged conduct.  And the conduct

17   that we're challenging here is the enforcement of the

18   requirement for in-person voters to use this voting system, the

19   Dominion voting system.  If you don't use it in person, you

20   have to use it as an absentee voter.

21           Each component of the voting system that we're

22   challenging in our two claims imposes injuries on a cognizable

23   interest of the plaintiffs.  And those injuries are going to be

24   certainly suffered when our plaintiffs interact with those

25   components of the voting system.

1          So just to start with the BMD as an example, when a

2     voter interacts with a BMD, they print out a ballot card that

3     is meant to contain their voting selections but they don't know

4     for sure if what is in there actually is their voting

5     selections.

6          So there's two kinds of injuries there.  There is an

7     injury to my interest in knowing for sure that what is going to

8     get counted on this ballot card actually is what I touched on

9     the screen.  I can't tell because it is in a QR code.  That is

10    an invasion of interest in knowing that what is on that card is

11    my vote.

12         To the extent that I don't really care about checking

13    my ballot, there is an invasion of my interest in not checking

14    it because the state has rules that require me to check it.  I

15    have to check this 40-, 50-item ballot and make sure that all

16    of the races in it are accurate.  There is a rule that actually

17    imposes that legal obligation on me.

18         THE COURT:  But we know that no one does that.

19    Because that's all the testimony in the preceding case, that

20    only a very small percentage of people do it.  That was the

21    concern the plaintiffs had, that it was a system that

22    discouraged in some ways voter compliance with that principle.

23         MR. McGUIRE:  Yeah.  It is the nature of the BMD

24    itself that makes that a problem.  Because if you were marking

25    a hand-marked paper ballot, you would have been the person who

1        put the marks in the different spaces for the options.

2              What the BMD introduces into that equation is it puts

3        a machine between you and the paper.  And so you actually do

4        have to check to see if the paper represents what you wanted to

5        do.

6              So that is a burden.  Whether you want to do it or

7        not, it is a burden to have to do that.  To have to verify a

8        machine's interpretation of your physical actions of touching

9        the screen, that is burden.  And you have to do it if you want

10       to make sure your votes represent your choices.

11             So that is kind of a mundane and pedestrian injury.

12       It is not certainly as glorious as, you know, the voting system

13       is subjected to being hacked.  But it is an injury that is

14       caused by their requirement that we use this component.  And it

15       is redressable by the relief we're seeking.

16             So we have standing to be in court based on that

17       injury and to make an argument on the merits to defeat that the

18       system is unconstitutional under the *Anderson-Burdick* test.

19       And once we move to the merits, we can bring in all kinds of

20       other arguments that are perhaps more general, that perhaps

21       apply more broadly because we have standing.  We have a

22       particularized injury that is related to the conduct we're

23       challenging.  So the similar --

24             THE COURT:  Are you saying -- I guess are you saying

25       that the conduct you're challenging is just the requiring you

1    to go -- the voter to look at the ballot --

2           MR. McGUIRE:  No.

3           THE COURT:  -- under circumstances where you don't --

4    haven't memorized the ballot?  Or what are you --

5           MR. McGUIRE:  No.  Well, the conduct we're

6    challenging is the requirement that we use this voting system

7    to vote.

8           THE COURT:  But, you know, there is always a voting

9    system.  That would mean every single voting system could be

10   challenged.

11          MR. McGUIRE:  Well, if a person has an interest -- a

12   legally cognizable interest that is invaded, then they would

13   have standing if it is redressable and there is causation.  I

14   mean, if it seems like something people shouldn't challenge,

15   they do have standing to come and challenge it.

16          People challenge things all the time where they are

17   not going to win, but they do have standing because they have

18   an injury that affects them.

19          THE COURT:  Well, what is the injury?  That they

20   didn't get to choose the system?  I mean, I'm with you -- you

21   know, obviously as Mr. Tyson said, I have been here a long time

22   on this, and they are ready to get rid of me in this case.

23          But it can't be that any time there is a new voting

24   system you have an automatic right -- you have an automatic

25   right because you're a -- you can bring lawsuits.  But that in

terms of your having even arguable standing, there has to be

some reason that -- something that evidences harm or risk of

harm.

MR. McGUIRE:  Right.  I think --

THE COURT:  All right.  I'm just getting tied up in

something I don't need to be.

MR. McGUIRE:  Well, and perhaps I picked a bad

example because there are other injuries that I think there

might be more sort of intuitively injurious.  Like, for

example, HAVA gives the voter a right.  It doesn't give the

voter a right to sue.  But it gives the voter a legal interest

in being able to read and correct the errors on their ballot.

That cannot be done with BMDs.  So that is a legally cognizable

interest that would give you standing.

THE COURT:  That's a little clearer.

MR. McGUIRE:  Yeah.  And so the BMD prevents you from

doing that.  I could go through each component.  But we have

alleged those kinds of injuries that are kind of mechanical and

kind of maybe pedestrian.  But they apply to each of the

components that we're challenging in the system.  And those

injuries get us into court.

And we know the State has cited a bunch of cases

because obviously these are future injuries that are going to

happen when we interact with the voting system.  But this is

not speculative or hypothetical.  We know our people are going

1    to interact with the voting system.  The HAVA injury that I

2    just said is absolutely going to happen to them.  It is not

3    speculative at all.  It is certainly impending under *Clapper*.

4          And so whatever case you want to look at, if you want

5    to look at *Tsao*, if you want to look at *Muransky*, *Clapper*,

6    *Spokeo*, or *TransUnion*, we have an injury.  It is a future

7    injury that is certainly impending.  And, you know, each one of

8    those you could go through and check off why that is true.

9          But it is true for all of the various injuries that

10   each of the components causes to us.  And that's --

11         THE COURT:  What is individual about it as opposed to

12   a group harm to all citizens in the State of Georgia?

13         MR. McGUIRE:  I mean, it is a requirement -- the

14   injuries will be experienced individually.  In the same way

15   that if you're on a plane that goes down, everyone on the plane

16   is going to experience an injury from that accident.  But it is

17   going to be individually experienced by you.  You and your --

18   hopefully if you survive, you would have a claim.

19         And I think it is important to look at -- when we're

20   talking about something like the use of a voting system, it is

21   going to affect a lot of people.  But that doesn't insulate it

22   from being challenged.  It doesn't mean nobody has standing.

23         Because to the extent people are going to have

24   individual experiences interacting with it that are going to

25   injure them that are not generalized grievances, then they have

1    standing.  And many people might have standing.

2         Just to jump real quick to the *Wood* case because I

3    think the *Wood* case is a good counter example.  In *Wood*, what

4    the Court -- what the Court held was that his injury was

5    essentially -- he alleged two things.  The first one was an

6    interest in election integrity.  And that was not a Lin Wood

7    specific injury.  That was a generalized interest of

8    everyone -- shared by everyone.  But he alleged it as his

9    injury, and it wasn't particularized to him.

10        That is different than a person who is personally

11   experiencing not being able to validate the votes that they

12   just cast because they can't read the QR code and having to

13   figure out if this actually is what they wanted to vote on.

14   That is a very different -- very personalized injury and it is

15   distinct.

16        The other injury that *Wood* had was -- and I think you

17   might have gotten at this a little bit earlier.  Wood brought

18   in an equal protection claim.  But the problem with his equal

19   protection claim, if you read the case carefully, is that he

20   didn't allege my vote is diluted compared to what.  He didn't

21   have a comparator.  And that was actually the grounds that the

22   Eleventh Circuit -- if I recall the case, that the Eleventh

23   Circuit decided his equal protection claim was insufficient.

24        So we don't think *Wood* is even -- I mean, obviously,

25   it is an Eleventh Circuit precedent.  But it doesn't apply

1    because our injuries are individualized.

2         Jumping to the question of the organizational

3    standing -- well, actually before I do that, let me get the

4    other two prongs.  So there is injury.  And then there is two

5    other prongs of standing, which is that it be fairly traceable

6    to the challenged conduct.  The injury has to be fairly

7    traceable, and the injury has to redressable by a judicial

8    order.

9         The fairly traceable element, they have -- the other

10   side has questioned that for Fulton.  And they have questioned

11   it for the State Election Board.  And we believe the case law

12   is very clear that if an injury is attributable to more than

13   one actor they are both -- relief can be given against either

14   one of them.

15        And in this case, it is certainly true.  Fulton is

16   responsible for the settings of scanners.  Fulton is

17   responsible to make sure that we have secrecy in voting.  The

18   State Election Board is responsible for enforcing the use of

19   the voting system and for referring people to the Attorney

20   General if they don't comply with the voting laws.

21        So all of the parties in the case have something --

22   some role in -- and some causative connection to the injuries

23   that are caused by the conduct we're challenging, which is

24   requiring us to use the voting system.  So they are all

25   properly named as defendants because the injury is fairly

1    traceable to their conduct.

2           The issue of redressability, which I think -- I mean,

3    obviously, if the Court were to issue an order that people were

4    not required to vote using the Dominion system, that would

5    redress all the injuries that we have raised.

6           Paper ballots, I think the Court -- Your Honor, you

7    asked the question about aren't there problems with paper

8    ballots.  And that is a consideration which doesn't bear on

9    standing.  That bears on the kind of relief -- the nature of

10   relief that the Court ultimately awards.

11          But as far as the injury causation redressability

12   analysis goes, standing exists regardless of what alternatives

13   may be out there.

14          Coalition for Good Governance is an organization as

15   well.  And I think -- I don't know if you have any further

16   questions about the *South Miami* case.  We don't believe it

17   changed anything that applies -- that affects us, that

18   diminishes our standing.

19          We believe that the Eleventh Circuit's finding at the

20   preliminary injunction stage that we had organizational

21   standing is law of the case.  We think it is binding on the

22   Court.  And we think it is binding on future Eleventh Circuit

23   panels as well because that is what the case law that we have

24   found says.

25          And the preliminary injunction stage actually

1    involves evidence.  It involves the weighing of evidence.

2    Whereas, this stage, we're only trying to show that we have

3    evidence.  So the preliminary injunction stage is arguably a

4    more rigorous standard to meet than the one that we're faced

5    with in this motion.  So we believe organizational standing

6    should be satisfied.

7           Those are the primary points I wanted to make.  But I

8    wanted to go through just a couple of points made by Mr. Tyson

9    and address them.

10          THE COURT:  All right.

11          MR. McGUIRE:  First, he -- I just can't let this one

12   go.  He made an issue of the fact that this is the only case

13   about voting machines that is still outstanding.  And just for

14   the record, this voting case predated all the other voting

15   cases, as he well knows.

16          So we're not actually proceeding along with the same

17   kind of plaintiffs that were bringing those cases, with the

18   same interests that motivated those plaintiffs.  We had

19   problems with the DRE voting system long before the 2020

20   election came up.  And our issues with the BMD system were

21   unrelated to the 2020 election specifically.  They are about

22   the constitutionality of this voting system.

23          Bruce is going to address the mootness issue and our

24   position on that.

25          On the issue of whether one party is enough,

1    obviously we believe we have standing.  The issue under Article

2    III is whether the Court has power to hear a case or

3    controversy.  And if our claims are co-extensive with claims of

4    the other plaintiffs' groups, then there is a case of

5    controversy.  And the one plaintiff rule we believe should span

6    the groups.  And our standing should be imputed to the other

7    group as well.

8           And we believe that our case is actually somewhat

9    broader than theirs.  We're actually challenging a few more

10   things than they are.  So the claims they are making I think

11   are encompassed within the claims that we already have standing

12   for.  So we think that they should be good.

13          Mr. Tyson made the point that there are no state law

14   claims listed in the complaint.  And that is true.  I know one

15   of the questions from the Court concerned the issues of HAVA

16   and issues of the Georgia state law.

17          Those are relevant to standing because they are

18   sources of a legally protected interest.  So HAVA is the source

19   of a legally protected interest.  The Georgia state

20   constitutional right to voting in secrecy is the source of a

21   legally protected interest.  Georgia statute is to guarantee

22   absolute secrecy in voting.  Those all provide sources of

23   legally protected interests that are invaded by this voting

24   system for purposes of standing.

25          Now, do we have a HAVA claim?  No.  Do we need to

1    prevail on a HAVA claim?  No.  But we do have the interest.

2    The interest is invaded.  There is causation and

3    redressability.  So it is important from the perspective that

4    it gives us standing to make our larger claims.

5           Mr. Tyson also talked about how our injuries are

6    confined to really a fear of hacking or a fear of sort of some

7    future exploit that might happen with the voting system.  And

8    just to reiterate, that is certainly a consideration that is --

9    that should be weighed on the merits.

10          But -- and if we were to take the hard road to find

11   standing, we could argue that that is actually a source of

12   injury for us that gives us standing.  But we have already got

13   standing based on lots of the other more simple things.  The

14   issue --

15          THE COURT:  Well, you could have standing but not

16   have a viable claim, couldn't you?

17          MR. McGUIRE:  I mean, it is possible.  The merits are

18   distinct from standing certainly.

19          We believe that certainly at this stage we have put

20   in enough evidence that we would survive on the merits for

21   summary judgment.  And Bruce will address that.

22          But the fear of hacking is -- it has to be kept in

23   mind.  That is not necessary for us to have standing.  The fact

24   that -- you don't have to find that there has been an exploit

25   or even that there is a threat of exploit that is sufficiently

1   imminent and substantial to give us an injury in order for us

2   to have standing.  Because we already have it for lots of other

3   reasons.

4           And I would also just make the practical point as

5   well because Your Honor asked the question about whether there

6   was any evidence of hacking or malware at this point after the

7   Coffee County breach.  I'm not prepared to say there is

8   evidence.  But I would respectfully remind the Court that in

9   the earlier phases of this case we heard copious expert

10  testimony about how the threats to voting systems that we're

11  faced with are brought by very sophisticated actors and those

12  actors are most likely to not leave evidence of hacks.

13          So the fact that there isn't something is -- I mean,

14  that is equally likely to be seen if there has been a hack as

15  if there hasn't been a hack.  Because the people who are going

16  to be the most dangerous and the biggest threats to exploiting

17  vulnerabilities in the voting system are the ones who won't

18  leave signs that they have been in there.  Because the point is

19  to change an election without letting people know it has

20  happened.

21          Unless the Court has any specific questions for me, I

22  think that is it for standing.

23          THE COURT:  Thank you very much.

24          MR. McGUIRE:  Thank you, Your Honor.

25          MR. TYSON:  I have checked with counsel for Fulton

1    County.  And they have indicated that I can go ahead and close

2    the standing portion, if that is all right.

3            THE COURT:  You're going to be quick?  Because I'm

4    looking at the clock.  Although I'm happy to go past 5:00, I

5    don't want to be here after 6:00.  That's for sure.

6            MR. TYSON:  Absolutely.  I'll do my best to wrap this

7    up quickly.  Your Honor, Bryan Tyson for the State defendants.

8            So I think a couple of points are important here.

9    First is:  At this stage in the case, we are entitled by

10   Rule 56 to point to the lack of evidence in favor of the claims

11   and have that be -- consider the plaintiffs' burden that is to

12   come forward with admissible evidence.

13           So at this stage, if there is an absence of evidence

14   on a point, it is their burden to come forward with showing

15   something that is still a triable fact.

16           And the plaintiffs are correct that they can show

17   standing through a threatened future injury.  But I think it is

18   important to look at what *Muransky* says about exactly that

19   point.  And so at Page 927 in Muransky, the Eleventh Circuit

20   said, we recognize that material risk of harm is somewhat an

21   indefinite term.  One thing is definite, however, whatever

22   material may mean, conceivable and trifling are not on the

23   list.  The court went on to say, there must be something more

24   than a minor or theoretical risk and the formulation describe

25   it as a significant or substantial risk, that they are

1    consistent in recognizing a high standard for the risk of harm

2    analysis in a robust role in assessing that risk.

3           And also we were criticized for our quote about the

4    some evidence out of the *Muransky* decision.  That actually was

5    a mis-cite to the *Tsao* case, which at Page 1344 says, however,

6    without specific evidence of some misuse of class members'

7    data, a named plaintiff's burden to plausibly plead factual

8    allegations sufficient to show the threatened harm of future

9    identity theft was certainly impending -- or there was a

10   substantial risk -- would be difficult to meet.

11          So, again, I think that we come back to, at the end

12   of the day, the plaintiffs have to show something more than

13   just this could conceivably happen, this might happen.

14          Ultimately at the end of the day, while plaintiffs

15   say there are, you know, many disputed facts in this case --

16   and, of course, there are -- very few of them though are

17   material for the consideration for this Court to actually

18   consider on the issue.

19          And so I would just point the Court back to our slide

20   that we put up previously on this question of what are the

21   undisputed facts as it relates to standing.  What we have heard

22   from the plaintiffs in terms of that claim is that the

23   undisputed -- the facts that they are alleging as an injury is

24   a verifiability of their ballots.  Can they verify their

25   ballots?

1          And ultimately at the end of the day, as this Court

2    has pointed out, while you may be able to look at a ballot, no

3    one knows how that ballot is being considered by a scanner,

4    whether it is a hand-marked paper ballot or whether it is

5    something else, whether it is a BMD-marked ballot.

6          What the undisputed facts before this Court show is

7    that the plaintiffs are afraid of voting on an unverifiable

8    system, that they have no knowledge of any manipulation that

9    led to a change in election results, that they agree that

10   hand-marked paper ballots have risks.

11         And so at the end of the day, where we end up on

12   standing is the plaintiffs have a policy disagreement with the

13   State of Georgia in terms of how we approach voting in the

14   state.  They are trying to convert what is their policy

15   disagreement, a generalized grievance, into an individualized

16   harm.

17         But what the Court heard consistently is that there

18   is no individual harm there; that every Georgia voter has the

19   same potential injury as alleged by the plaintiffs, which is

20   they can't look at their ballot and see what their ballot says.

21         A couple of other points, Your Honor.  There was some

22   discussion on the one plaintiff rule about the *Crawford* case.

23   In *Crawford*, obviously there was one footnote that referenced

24   that issue.  It was a photo ID case.  And the issue was whether

25   the court could hear -- the Supreme Court could hear the

1     appeal.  So not directly on point for this.

2              The *Martin v. Kemp* case that was cited by plaintiffs,

3     I was part of that case.  That was a case that involved

4     preliminary injunctions only and was an issue specifically

5     relating to the processing of absentee ballots before the 2018

6     election.

7              I think the key is, while the Curling plaintiffs say

8     their relief is similar, I think as we get into the merits, we

9     are going to see the relief is very different.  Coalition

10    plaintiffs now have claims where they don't want the scanners

11    used -- the precinct scanners as it currently stands.  That is

12    distinct from the Coalition plaintiffs.  There is a lot of

13    divergence on those points in terms of what is being sought.

14             So kind of their fallback position for the Curling

15    plaintiffs is, well, we have to go look at the merits to

16    determine what the ultimate result is on standing.  And at

17    summary judgment, this Court has to determine have the

18    plaintiffs come forward with admissible evidence that shows

19    they have a legally cognizable injury that is traceable to the

20    State defendants so that this case can continue.

21             And that is the threshold showing that we have to get

22    to before we can get to the merits.  And the plaintiffs have

23    had every opportunity to do that.  What they have presented in

24    terms of the undisputed facts, the facts they haven't disputed

25    in our statement of material facts, is enough to demonstrate

1    there is no such injury.

2         So at the end of the day, Your Honor, this is a

3    generalized grievance.  There is no basis why this case should

4    be considered differently for Mr. Wood.  And as you recall,

5    Mr. Wood in the *Wood* -- the second appeal in the Eleventh

6    Circuit, one of the allegations Mr. Wood made was that Hugo

7    Chavez had in the past hacked elections using Dominion

8    equipment and therefore he had a foreseeable risk of harm.

9         There is no such allegation here.  And that was on a

10    were his allegations sufficient in a complaint.  Same as in

11    *Tsao*.  Same as in *Muransky*.  Those were threshold motion to

12    dismiss cases.

13         We're here on summary judgment.  The evidentiary

14    standard is higher.  And the plaintiffs have failed to carry

15    that burden.  So we would ask for a judgment on the standing.

16         THE COURT:  Thank you.

17         MR. TYSON:  Your Honor, would you like to move to

18    merits immediately?

19         THE COURT:  Yes.  I will just say in case -- so I

20    don't lose the flow of this is that I would like you to

21    think -- I mean, you are welcome to say anything you want while

22    during the argument.  But when you-all go back to your

23    respective offices or homes -- I know this is sort of an

24    arbitrary way of saying something.

25         But if there are ten specific documents you think

```
 1    that are the most important on the merits or on standing but --

 2    and particularly portions of declarations that might at least

 3    focus us very specifically on the evidence that -- we're going

 4    to read everything.  But this is sort of like the 10 hits that

 5    you think are the most revealing -- thank you -- or 20 when

 6    we're talking about both.

 7                 MR. MILLER:  Careful what you wish for with 20.

 8                 THE COURT:  I know.  Well, ten documents, ten

 9    declarations or portions of depositions that you think carries

10    the day.

11                 MR. McGUIRE:  Your Honor, how quickly would you like

12    us to submit that?

13                 THE COURT:  Well, by Friday would be good.  I would

14    like to be able to talk about them a little bit with my law

15    clerks before I'm basically consumed on something else and

16    gone.

17                 If I could have them by Friday morning, that would be

18    great.  If you can't, you can't.  I mean, everyone has worked a

19    lot.  So I don't need to have you going crazy.  We're not going

20    to have an order obviously out right away.  That is fine if you

21    can't do that.  Just -- then between yourselves agree what the

22    date is.  Let's not have it past Tuesday.

23                 MR. MILLER:  Thank you, Your Honor.

24                 As Mr. Tyson pointed out and argued for us, the State

25    defendants contend that plaintiffs continue to --
```

```
 1              (There was a brief pause in the proceedings.)
 2         MR. MILLER:  Your Honor, as Mr. Tyson pointed out,
 3    the State defendants continue to maintain that the plaintiffs
 4    lack standing to press their claims.  But even if they did have
 5    standing to continue on the claims, they fail on the merits for
 6    at least three reasons.
 7         The first of which being the plaintiffs have not
 8    identified a burden on the right to vote at all.  And to the
 9    extent they have identified a burden on the right, that burden
10    is minimal and ordinary as a matter of law.
11         Second, assuming the evidence demonstrates some
12    burden in this case, the alleged burdens are not proximately
13    caused or not tied to the actions of the State defendants.  At
14    best, they flow indirectly from the enforcement of the BMD
15    system.
16         Third -- and, again, assuming that a burden on the
17    right to vote has been identified, which flows directly from
18    the enforcement of the BMD system, the State's justifications
19    outweigh any burden imposed by the reasonable and
20    nondiscriminatory requirement of the use of the Dominion BMD
21    system.
22         Your Honor, at bottom, this case is about a remedy
23    and search of a burden.  No matter how unconnected that
24    potential burden may be to the use of the Dominion BMD system,
25    hand-marked paper ballots are the focus of what the plaintiffs
```

1    seek.

2          So setting the table just briefly, it is beyond

3    dispute that the Constitution delegates time, place, and manner

4    regulations and power to the states.  Of course, this general

5    grant of authority is intention with the individual and

6    personal right to vote which may then be vindicated within the

7    federal judiciary's constitutionally prescribed role.

8          So this leads to the necessary question of, what is

9    the right to vote?  And we know, of course, that the right to

10   vote does not encompass the right to vote in any manner, that

11   the right to vote is not absolute.

12         And I think as, in fact, was on one of the

13   plaintiffs' slides earlier, in *Burdick*, the Supreme Court

14   described that the right to vote is the right to participate in

15   an electoral process that is necessarily structured to maintain

16   the integrity of the democratic system.

17         Of course, those two prongs recognize what

18   essentially comes out of the *Anderson-Burdick* framework.  But

19   before we get there, I know the Court had a specific question

20   on this, you know, whether there is a right -- or burden on the

21   right to vote at all.

22         And cited to this passage from *Jacobson* -- if there

23   is such a thing as PowerPoint school, I know this is something

24   they tell you not to do.  But I wanted to make sure we get the

25   whole thing in here.

THE COURT:  Thank you.

MR. MILLER:  Most acutely, this list from *Jacobson* illustrates at least five different categories of cognizable burdens on the right to vote.  Does the statute make it more difficult to vote?  The first case citing to *Crawford* and *Common Cause*.  That is just simply not the case here.

Second, does it make it more difficult to choose a candidate of choice?

Third, does it limit ballot access which thus interferes with a voter's ability to support their preferred candidate and associate for political means, or does it burden the rights of -- the associational rights of political parties themselves?

And, finally, the fifth issue is, does the alleged burden create some risk that votes will go uncounted or improperly counted, as described in *Wexler v. Anderson*, which is the case *Jacobson* relies upon here in this last highlight.

So in this context, Your Honor, only these five categories of these types of claims burdening the right to vote is the last category pointing to *Wexler*.

But another case also casts doubt on whether certain rules and regulations burden the right to vote at all.  In *New Georgia Project*, the plaintiffs challenged the absentee ballot receipt deadline under *Anderson-Burdick*.  And there in evaluating and weighing the burden imposed by the deadline, the

1    court noted that a look at the evidence shows that Georgia's

2    election day deadline does not implicate the right to vote at

3    all.  And it then went on to note how this mitigates the

4    chances voters would be unable to cast their ballots.

5          So put another way, what *New Georgia Project* is

6    looking at here is the chances that voters would be unable to

7    participate in the electoral process, the first aspect of what

8    *Burdick* describes to us as the right to vote, and recognizing

9    that this process must necessarily be structured.

10         Now, I recognize -- I do want to address briefly -- I

11   know the Court had a couple of questions about *New Georgia*

12   *Project*.  And it is indeed a stay-panel opinion.  But what has

13   happened since the issuance of this stay-panel opinion is that

14   it has been repeatedly cited in multiple merits panels opinions

15   for the crux of the issues that the State defendants posit for

16   them.

17         It was cited on the Eleventh Circuit's order in the

18   appeal in this case, as to weighing of the burdens, what is a

19   severe burden and what is not.  But even setting that aside --

20   you know, it is almost like a selective incorporation of sorts.

21         But setting that aside, at minimum the Eleventh

22   Circuit's stay-panel opinion is certainly persuasive authority

23   on a district court, which is the same conclusion that Judge

24   Jones came to in the *Fair Fight v. Raffensperger* case where he

25   relied upon it in his final order.

1          Setting that aside -- you know, nevertheless despite

2     *New Georgia Project* questioning as to whether the election day

3     deadline in that matter implicated the right to vote at all,

4     they went ahead and weighed the burdens under *Anderson-Burdick*.

5     So taken together with *Jacobson*, we know that not all laws

6     which regulate elections implicate the right to vote.

7          And, two, to the extent that the context of the

8     overall electoral scheme on that right is being implicated,

9     that itself mitigates the alleged burden imposed.  So that is

10    the example of *New Georgia Project* where it is reviewing the

11    manners in which you can return an absentee ballot, the time at

12    which you get an absentee ballot, that you can request it early

13    enough, and that early voting in person remains available at

14    any point in time, and that you can show up on election day and

15    cancel your absentee ballot.

16          Of course, absentee ballots are not squarely at issue

17    in this case.  But the point here is that, in evaluating the

18    burden, the Court has to look at the overall context of the

19    electoral scheme.

20          Now, in addition to establishing that the challenged

21    law implicates the right to vote, to prevail on such an action,

22    the plaintiffs must also demonstrate an affirmative causal

23    connection between the state law that allegedly deprives the

24    constitutional right under Section 1983 and the burden imposed.

25          So -- and in some contexts, you know, various

1    different courts have considered it in relation to the burden

2    itself that is imposed on what is the character of the burden.

3    In fact, in the appeal in this case, Section 1983 is not

4    directly cited for the proposition.  But the Eleventh Circuit

5    recognized there has got to be some tie between the alleged

6    burden imposed and the allegations and evidence that are before

7    the Court when it is weighing the burden, character, and

8    magnitude thereof.

9          So in the context of claims challenging the First and

10   Fourteenth Amendment, of course, the *Anderson-Burdick* framework

11   applies.  This framework, as the Court is familiar with, weighs

12   the character and magnitude of the burden that the state's

13   ruling imposes against the state's interests which justify the

14   law.  If it is a severe burden, it must be narrowly tailored.

15   But if it is reasonable and nondiscriminatory, then a state's

16   regulatory interests were generally justified.

17         And to demonstrate anything above run-of-the-mill

18   process regulations, necessarily the burden must rise above the

19   mere inconvenience.  There must be something real imposed, some

20   real burden imposed.  Because, otherwise, you would tie the

21   hands of the state and render the constitutional grant to

22   regulate times, places, and manner nugatory.  It would be

23   meaningless.  Because at every point along the way, the federal

24   judiciary would be able to step in and dictate whether a state

25   law has been violated, for example.

1          So what is the challenged statute at issue?  OCGA

2     21-2-300 provides that as a matter of law all equipment used

3     for casting and counting votes in county, state, and federal

4     elections shall be the same in each county in this state.  And

5     then it goes on to state in (a)(2) that as soon as possible,

6     once the equipment is certified by the Secretary of State,

7     elections shall be conducted with the use of scanning ballots

8     marked by electronic ballot markers and tabulated by using

9     ballot scanners for voting at the polls and for absentee

10    ballots cast in person, i.e., in-person early voting.

11          And too big to fit on the slide here, but (a)(3) also

12    provides -- and, you know, as a matter of law, we certainly

13    don't dispute it -- that the equipment, once certified by the

14    EAC, is furnished by the state with the option for the counties

15    to purchase more.

16          So in this case where plaintiffs are seeking both a

17    traditional injunction to prohibit enforcement of 21-2-300 and

18    at the same time a mandatory injunction that the replacement

19    for 21-2-300 must be hand-marked paper ballots, this is at

20    bottom a facial challenge and not an as-applied challenge.

21    There is no allegation that because the statute is applied to a

22    particular person and that person's particular set of

23    circumstances that that person is -- you know, the burden is

24    imposed by that manner.

25          To put it more bluntly, the issue here is that there

1   has been no testimony or evidence in the record that there is a

2   system which would resolve plaintiffs' burden that complies

3   with this statutory scheme.

4         So in sum, Your Honor, the legal framework here is a

5   burden on the right to participate in the process that is not

6   one imposed by reasonable non-discriminatory restriction and

7   which burden is proximately caused by the State defendants

8   under the color of state law.

9         So here at this point, I do want to briefly touch

10  on -- I know Your Honor posed the question about the equal

11  protection claims.  The way that the Coalition or -- Curling

12  and Coalition -- Coalition to a somewhat lesser extent --

13  claims are pleaded seem to indicate to me at least that it is a

14  First and Fourteenth Amendment combined challenge, which is of

15  the type that *Lee* distinguishes from the traditional equal

16  protection challenge.

17        I think the only real substantive difference is that

18  rather than establishing the kind of count as a matter of law,

19  Fourteenth Amendment, First Amendment, Coalition's claim just

20  simply states in the pleading that it infringes upon the

21  fundamental right or burdens the fundamental right to vote.

22        At this juncture, Your Honor, as much as I would

23  prefer that we have the traditional equal protection standard

24  because there has been no discriminatory intent alleged, what I

25  will not venture to do is lead this Court down a path for a

1     problem down the road.

2          So, nonetheless, the issue at hand here is, what is

3     the burden?  Of course, before it can be weighed, a burden must

4     be identified.

5          If we look at the deposition testimony, the Curling

6     plaintiffs for their part testified to a variety of concerns.

7          Mr. Schoenberg generally testified under oath that

8     the source of his harm was that, every time I vote on a system

9     that is not reasonably secure, I can't know that I have

10    participated in the democratic process in a meaningful way.

11         Ms. Price explained that not having voter

12    verification on the Dominion BMD system is her barrier to her

13    ability to vote.

14         And Ms. Curling testified at least initially that she

15    viewed her concerns as resolved so long as risk-limiting audits

16    as prescribed by Dr. Stark were in place.  Though that

17    testimony was later revised in the errata sheet to state that

18    it would not be resolved because the QR code still exists.

19         Coalition plaintiffs likewise struggle to identify

20    their burden imposed by the BMD system.

21         Mr. Digges explained his harm is being forced to use

22    the absentee ballot system.

23         And somewhat consistently, Ms. Digges explained that

24    she has never voted on a BMD and never intends to.

25         Mr. Davis compared the complaint of a lack of

1  integrity by audit to independently verify that such is the

2  case.

3  And Ms. Missett explained that her concerns were not

4  about whether malware had ever been introduced to the BMD

5  system but rather the possibility, meaning that that could

6  happen.

7  And then at the motion to dismiss stage, this Court

8  identified three alleged burdens it viewed as common to all

9  plaintiffs based upon the claims as pled.

10  The first of which is the susceptibility to

11  cybersecurity risks and manipulation.

12  The second here being the verifiability question of

13  the paper ballot produced by the BMD system.

14  And the third being concerns over auditability.  In

15  other words, as stated here at Doc 751, that the BMD system is

16  incapable of being meaningfully audited.

17  Now, the Court also pointed to three additional

18  alleged burdens that are viewed as unique to the Coalition

19  plaintiffs.  The only one of which that remains at issue here

20  is the allegations regarding ballot secrecy, the others having

21  been dismissed or abandoned or otherwise mooted along the way.

22  For example, the third there being implementation and time to

23  conduct elections.

24  So let's look at these three alleged burdens.

25  Cybersecurity risks and manipulation.  The undisputed facts are

114

1    that all computers are susceptible to hacking and that both the

2    Dominion BMD system and plaintiffs' preferred hand-marked paper

3    ballot system utilized computers.

4           No one disputes that all balloting systems have

5    cybersecurity and manipulation risks.  But even still, these

6    are only risks.  And, again, despite reviewing a sampling of

7    memory cards from the DREs and the DREs themselves, along with

8    the forensic images of Coffee County election equipment and the

9    Dominion BMD separate and apart from that, no evidence of

10   malicious code or ballot manipulation has been produced.

11          And pertinent here, when considering the risk, there

12   is also no evidence that self-propagating and adaptable malware

13   such that this malware or malicious code moves between machines

14   and that can continue to be effective on multiple elections

15   down the road even exists.  Dr. Appel testified he had never

16   seen such a thing.

17          So under the law under these facts then, there is no

18   deprivation owing to this alleged burden because nothing has

19   yet occurred.  Moreover, the lack of imminence here is not only

20   particularly problematic for Article III purposes, but it is so

21   too on the merits to the extent a claim can be based on such a

22   risk of future harm.

23          And even still, the only state action involved in

24   this context, which is again 21-2-300, which plaintiffs seek to

25   enjoin, is requiring the use of the Dominion BMD system.

1          Moving on to verifiability, it is important to note

2     here with respect to verifiability that it is this alleged

3     burden that the Court found imminence for at the motion to

4     dismiss stage.  In other words, that it was certainly impending

5     that voters who were going -- or excuse me.  Let me back up --

6     found it was certainly impending at the motion to dismiss stage

7     reasoning so because, quote, plaintiffs intend to vote in every

8     person -- in person in each upcoming election in Georgia.  That

9     is Doc 751 at 38.  That was what was pleaded.

10          And the State defendants do not dispute that the

11     ballot has a QR code.  This is the QR code and the ballot

12     summary on the ballot.  Now, whether a voter chooses to verify

13     the ballot's printed text remains the voter's choice.  But,

14     nonetheless, voters are reminded to review their ballots by

15     both poll workers and on the BMD itself when the ballot prints.

16          THE COURT:  Right.  But we have gone over that many

17     times.  It is true you are reminded.  But if you can't -- it

18     would be one thing -- you know, just as a voter, we all know

19     that basically once you conclude your ballot and you say it is

20     done, you print it, and then you don't get to go back and look

21     at the screen because -- so you are basically -- there is a

22     memory test dimension of it because of the fact that you don't

23     have what the choices are or what the questions were or what

24     the offices were, as you would in other circumstances.

25          MR. MILLER:  So I think the only distinction there

1    would be that, if I'm hearing the Court correctly -- I want to

2    make sure I understand the question.  But with an absentee

3    ballot, it would show the selections you did not pick?

4              THE COURT:  When I sneezed, I stopped hearing you.

5              MR. MILLER:  Just so I understand the Court's

6    question correctly is that the memory test aspect is that, in

7    essence, that an absentee ballot would show you the selections

8    you did not pick in addition to ones that you did bubble in?

9    Am I understanding that correctly?

10             THE COURT:  Well, you could say it that way.  But you

11   could say it also that -- basically go back to the question --

12   what we discussed at the beginning of the hearing.

13             It could print out just as easily -- and perhaps it

14   is not so easily.  But it is -- that the actual ballot choices

15   as they appear prints out and that you are able to see what you

16   selected and what was the position again and you look it over.

17   Because you definitely may not remember who you voted for for

18   dog catcher.

19             It doesn't make any -- maybe it is a party position.

20   Maybe you're not really a strict party voter.  I have no idea.

21   But I think that those are -- those are the issues at least

22   that some of the expert testimony in other hearings went to.

23             MR. MILLER:  Sure.

24             THE COURT:  And affidavits that people don't tend to

25   remember who they voted for.

1          Now, it doesn't mean that people will do it, as you

2     well know.  But that is --

3          MR. MILLER:  So, Your Honor, three items to that

4     point.  The first of which is that -- and I don't have a copy

5     of a ballot on the slide here.  But I know the plaintiffs had

6     one on their earlier slide.

7          But what the ballot itself demonstrates is each

8     position, if it is no selection or reads no selection, and then

9     your vote with each one with the party moniker behind it.  And

10    that comes out that you are reviewing as you take it to the

11    scanner.

12         Now, Number 2, the important issue here is that this

13    verifiability only matters if there is an action of a third

14    party to do one of these vote hacks that has never happened in

15    real life in the wild to switch the human readable text but not

16    the QR code or to switch both the text and the QR code.

17         And third, Your Honor, and most importantly is that

18    the Ninth Circuit held 20 years ago that the lack of a voter

19    verifiable paper ballot simply does not constitute a severe

20    burden on the right to vote.  And that is *Weber v. Shelley*, 347

21    F.3d 1101.  And in that case, they were upholding at that time

22    the use of a DRE system.

23         And, Your Honor, one final point here is that, if the

24    verifiability itself is the burden -- the actual burden imposed

25    here, which I do not dispute with the Court that as far as the

1    Court's reasoning on the certainly impending matter, that this
2    is the one that is certainly impending.  They are getting a
3    ballot that has a QR code and a printed summary.  But that also
4    still, you know, only matters each time the voter refuses to
5    review the text and the third party manipulates it.
6           Next, Your Honor, under auditability, the facts here
7    indicate that the 2020 hand count confirmed the outcome of the
8    results of the Presidential election.  The 2022 risk-limiting
9    audit by the Secretary of State confirmed the correct outcome.
10          The plaintiffs offered no evidence of an inferior
11   type of review of BMD ballots in an audit and no evidence that
12   the audit failed to detect manipulation or confirmed an
13   incorrect outcome, just that they maintain it could be the
14   case.
15          But, Your Honor, this is *Wexler*.  *Wexler* talked about
16   differential procedures as related to DRE voting jurisdictions
17   counties in Florida versus hand-marked paper ballot counties in
18   Florida.  The only difference here between *Wexler* is that there
19   is not a different -- in that case, there was a facially
20   different regulation that said, if you have an overvote on a
21   hand-marked paper ballot, you're interpreting intent.  If you
22   have an overvote on a DRE system, then the DRE machine itself
23   handles it.
24          There is no allegation here that the votes themselves
25   are treated differently in any meaningful way by the statute or

1    law, whether it is on the counting of the votes or on the

2    recounting of the votes or on the auditing of the votes.

3           And finally, Your Honor, and most, you know,

4    importantly here, it is not even clear what is sought with

5    respect to auditability.  Dr. Stark contends that even a

6    hand-marked paper ballot audit would be insufficient in

7    Georgia.  He does so based upon statutes and regulations he's

8    not reviewed and an audit which he has never observed in one

9    PowerPoint attached to his declaration, in which he cursorily

10   skimmed over the process.

11          That being the case, Your Honor is correct as she

12   ruled in the 2020 preliminary injunctions there is just nothing

13   to do here with respect to auditing without determining that

14   the Dominion BMD system itself is constitutionally insufficient

15   without it.

16          But even if that is the case, the plaintiffs maintain

17   that there is no audit that could audit the Dominion BMD

18   system.

19          Now, a few additional items which the State

20   defendants contend --

21          THE COURT:  I guess that is a little different than

22   *Wexler* -- *Wexler* where the Florida regulations provide that if

23   a manual recount becomes necessary the canvassing board shall

24   order the printing of one official copy of the ballot image

25   report from each touchscreen voting machine that has recorded

1    undervotes for the affected race.  So that was a different way

2    that they went about it.

3           And they -- and then they had further review

4    processes about how -- how an audit was to be done for each of

5    the variety of ways that people could vote in Florida.  But --

6           MR. MILLER:  Yes, Your Honor.  I didn't mean to cut

7    you off.

8           THE COURT:  All I'm trying to say is that I think it

9    circles back to my question in the beginning about the status

10   of a process that did not use the QR code.  But that is --

11   because there are other -- there are more ways to meaningfully

12   audit when you actually have a printout of what people have

13   seen that they knew that they voted on that is not produced by

14   a QR code.  Because most of the testimony from both the expert

15   for the plaintiffs as well as your expert who was the expert

16   on -- particularly also on disability issues faced by -- faced

17   by voters is that -- in the voting process was that there was

18   typically otherwise a low rate of people looking at their

19   ballots.

20          And yes, the people basically have to own

21   responsibility for that.  But it still is -- from the

22   perspective of the state assuring a functional and reliable

23   system, it is something that the state -- it would seem would

24   have a very strong interest in because it is a computerized

25   system with all sorts of other risks that we know every year

1    more about in our world.

2         MR. MILLER:  Sure.  And I will grant that *Wexler* is

3    an imperfect analogy because *Wexler* is dealing with recount

4    procedures as opposed to audit procedures.  But that is an

5    important distinction also to recognize when we are here

6    talking about whether a lack of auditability renders a voting

7    system unconstitutionally insecure.

8         The simple fact of the matter is that no court in the

9    United States has ever ruled that audits must be had;

10   otherwise, you cannot use electronic machines or hand-marked

11   paper ballots, whatever variety of types of votes.

12        And by the same token, there are still -- as last I

13   recall, the entire state of Louisiana still utilizes DREs.  So

14   the logical conclusion there is that, you know, that also has

15   to go away.

16        So, Your Honor, these are issues that become an issue

17   of what is a material fact.  There is nothing material as to

18   this auditability question.  We don't doubt that there is a

19   dispute.  Again, Dr. Stark is more than critical of every

20   single audit principle that the State deploys.  But he also

21   says that there is no audit you can do to a BMD system.  So

22   there is no reason for us to need to discuss it here.

23        THE COURT:  Wouldn't you say -- I'm moving off track.

24   But if you argue that, then you would say the State was silly

25   to spend any resources in auditing the results of the

1    Presidential election where every vote was purportedly at least

2    counted.

3              I don't know.  I don't think -- I think there are

4    reasons why you have to have audits, and there are reasons --

5    and I'm not just saying that personally.  And I think that is

6    also reflected in why you have -- when you have run-off votes,

7    why you end up having sometimes to look at every single vote.

8              MR. MILLER:  Sure.  And I certainly will grant Your

9    Honor that there are strong reasons to deploy audits, which the

10   State does, but which at bottom that decision to deploy audits

11   is a policy decision that the Georgia legislature has made.

12             Your Honor, with respect to secret ballots and the

13   Dominion BMD system, this is a claim that does not go to the,

14   you know, heart of the initial claims but has kind of been in

15   and out of this case at various points.

16             But as Your Honor addressed it in the order on the

17   scanner remedy, there has been no evidence of any plaintiff or

18   voter generally claiming disclosure of a ballot or nowhere that

19   such disclosure led to a chilling effect, no evidence of any

20   voter, poll watcher, or election worker going to the great

21   lengths that plaintiff suggests that would reveal a secret

22   ballot.

23             And as Your Honor noted, the State Election Board

24   promulgated regulations concerning the BMD layout.  And at the

25   end of the day, if state law is not being followed, the State

1    Election Board can seek civil enforcement as to the BMD machine

2    layout and screens and so forth.

3            As to the extent that there is a state law claim,

4    that doesn't in and of itself confer federal jurisdiction.

5    They are happy to go to Fulton County Superior Court and state

6    a claim for declaratory relief that the system violated ballot

7    secrecy.  You know, if that is the case, that is something that

8    the Fulton County Superior Court can handle or, frankly,

9    another superior court in the state.

10           And lastly, Your Honor, two items that -- or another

11   item that we have maintained is, you know, not a part of the

12   case but given Your Honor's questions prior to the hearing we

13   wanted to address just simply State defendants' position as to

14   the Poll Pad and the paper pollbook backups.

15           No material facts have changed since the Eleventh

16   Circuit's decision last fall.  There remains no evidence of any

17   voter unable to vote -- unable to be located in either the

18   backup pollbook or the Poll Pad itself.  That is something the

19   Eleventh Circuit recognized on appeal is that there wasn't

20   evidence tying the alleged burden, potential lines and so

21   forth, to the alleged violation.  But there also was not

22   necessarily evidence that the remedy would resolve the issue.

23           And so, Your Honor, at this point, this is simply a

24   matter where nothing has changed.  And we believe the Eleventh

25   Circuit's opinion controls.

1            So that leads us, Your Honor, to weighing the burden.

2   So, again, from the beginning, do these items implicate and

3   burden the right to vote at all?  Only possibly to the extent

4   it creates the risk that some votes will go uncounted or be

5   improperly counted per *Jacobson* citing to *Wexler*.  And

6   ultimately in *Wexler*, the issue was whether the statute was

7   justified in applying the different recount rules, as we

8   discussed before.  And the court thereto questioned whether the

9   voters in touchscreen jurisdictions were burdened at all by the

10  difference in procedures there.

11           So on that equal protection claim in that case

12  applying *Anderson-Burdick*, the Court found that the remote

13  possibility of allegedly inferior review due to the different

14  recount procedures was reasonable and justified.

15           And on due process, the Court in short order

16  determined that whatever the burden is it is likewise

17  justified.  But the alleged burden of particular types of

18  auditability does not impose this nor do the Poll Pads or the

19  secret ballot allegations, for that matter.  It is only

20  potentially the verifiability and the alleged risks.

21           But, again, the alleged risk requires that there is

22  some additional step by a third-party invidious actor that

23  comes in to manipulate or otherwise inject malicious code into

24  the system.

25           And in *Weber*, the Court found that the touchscreen

1    voting systems remedy a number of potential problems like

2    undervotes, overvotes, et cetera.  And in this case -- or in

3    that case, you know, albeit at the hypothetical price of

4    programming, worms, and malware, as the Court noted in -- the

5    Ninth Circuit noted in that case, that it does not leave the

6    voters without any protection from fraud or means of verifying

7    votes or any way to audit or recount.

8            And the verifying votes is quite important here as to

9    this verifiability issue.  That the Ninth Circuit went that far

10   on -- that was a DRE system.  That is not a system that prints

11   out a paper ballot that is then actually scanned.  It is not a

12   system that prints out a voter verifiable paper audit trail or

13   VVPAT that is simply a receipt that is never scanned.  It is

14   just a DRE.  And even still verifiability is -- you know, any

15   risks of this verifiability or the alleged security risks can

16   be mitigated because plaintiffs are free to utilize absentee

17   ballots -- or hand-marked paper ballots as absentee voters.

18           Now, this gets into the question where the Court had

19   a couple of particular questions as to whether there were

20   discrete claims intended to be challenged as to absentee

21   ballots.  And as a preliminary issue, State defendants disagree

22   that there is any ability for them to challenge the absentee

23   ballot scheme at this juncture in the case.  It is not in their

24   complaint.  It is well past time for amended complaints.  And

25   the issue of the burden imposed has to do with the Dominion BMD

1    system, not the hand-marked paper ballots conducted by

2    absentees.

3           But even still, plaintiffs cannot go to hypothetical

4    future problems with absentees, which are not certain to occur

5    and which would be the results of, say, a county official who

6    neglects to send out a ballot in a timely manner.  That is a

7    matter of law that was decided in *Fair Fight Action* as to this,

8    you know, who is in charge of absentee ballot administration.

9    And this court also noted it in the *Georgia Shift* case as to

10   the administration of absentee ballots is a county board

11   function.  So it cannot be both ways.  Both on the alleged

12   burden, there has to be some relation to what the State is

13   doing.  But likewise on the -- what now is kind of the

14   alternatives create the burden, there still has to be some

15   relation to what the State is doing.  And, frankly, that burden

16   is not even what they allege.

17          In their complaints, the plaintiffs allege that

18   absentee ballots are treated as a preferred system of voting.

19   This is so because they point to the verifiability, the same

20   things that we discussed.  If it is the preferred system of

21   voting, then the plaintiffs are free to join that preferred

22   class of voters that they see as, you know, being the case.

23          That was what the Eleventh Circuit told Lin Wood.

24   That was what the Second Circuit told some other election folks

25   in *Bognet*.  And so -- excuse me -- the Third Circuit.  And that

1    remains the case.  Nobody is forcing anybody to vote on any

2    particular kind of system.

3             And finally, Your Honor, given this set of facts, if

4    there is a burden imposed at all, it is a minimal

5    nondiscriminatory, reasonable burden and the

6    state's justifications outweigh any burden.

7             In this case, it is undisputed that Dominion BMDs

8    avoid the problem of overvotes.  Dominion BMDs can and have

9    been subject to risk-limiting audits, though admittedly not of

10   the type that Dr. Stark would prefer to have.

11            But, again, it remains unclear what type is possible

12   that he would prefer to have in the BMD system.  And the

13   Dominion BMD provides an equal means for disabled voters to

14   exercise their right to vote too.

15            The Court had a question about this in the context of

16   ADA.  I want to be clear as to what the State is saying here.

17   It is not that a hand-marked paper ballot jurisdiction that

18   offers BMDs as a -- essentially akin to a reasonable

19   accommodation -- not that that in and of itself creates a

20   problem.

21            It is because in order to get to that in this case

22   the Court would have to determine that the BMDs themselves are

23   so constitutionally deficient that they cannot be used except

24   for by disabled voters.

25            So, in other words, when we talk about who is forcing

1    anybody to vote in a particular manner, that is the closest we

2    come to forcing to vote in a particular manner because it is

3    the type of accessible voting that is available.

4            I want to be clear about the context of that.  It is

5    not just that it always is.  It is that the logical step to get

6    there in this case imposes that issue.

7            And finally, Your Honor, I'll just end with a word on

8    trial.  There have been a lot of discussions about alleged

9    facts and what is disputed.

10           But to be clear, the State's position is that the

11   vast majority of facts are simply immaterial to whether the

12   facial challenge unconstitutionally -- the Dominion BMD system

13   unconstitutionally burdens the right to vote.

14           And you heard earlier on the standing section that

15   phrases such as properly counted, reasonably reliable -- I

16   think the last one I heard was constitutionally reasonably

17   reliable manner of a voting person.

18           But in this case, the plaintiffs' experts have

19   refused to quantify any risk of various voting systems.  Given

20   that, what on earth would we be going to trial on?

21           And the plaintiffs cannot point to that simply burden

22   is a dispute of material fact.  You know, whether the burden

23   exists, that is a legal test that the Court applies.  The

24   factual matter is simply what is the burden or what is the

25   allegation.  The character and magnitude is something that the

1    Court determines.  You know, same type of setting as if sitting

2    on a jury trial.  A factual dispute is what is the type of

3    alleged burden the Court determines.  Given the circumstance of

4    facts, what is the character and magnitude?  But here there is

5    no dispute as to what the alleged burden is.  At least I don't

6    believe so.  Although, I should caveat.  I think at one point

7    this verification scheme was disclaimed in plaintiffs'

8    briefing.  And so I'm interested to hear if I have missed the

9    mark as to what the alleged burden is.

10           But at bottom, we would simply be going to trial on a

11   policy choice.  And that is not a trial that is subject to the

12   federal judiciary's constitutionally permissible actions.  That

13   is a legislative hearing that has already occurred on multiple

14   occasions down the street at the capitol.

15           So, Your Honor, with that, I will wrap up.  I know

16   the Court is cognizant on time.  But if there are any

17   additional questions, I'm happy to answer them.

18           THE COURT:  Thank you very much.  I think we should

19   take a five-minute break.

20           And let me ask one thing though before we do that.

21   It is really not clear to me at this juncture whether the

22   nature of the claims that the plaintiffs really have against

23   Fulton County or what -- because it seems like you really --

24   that the plaintiffs are now very focused on the systemic

25   issues.  And there were also sorts of -- during the course of

1    the elections held before, there were many administrative

2    issues.

3            But I'm -- is Fulton County an actual necessary party

4    is one thing ultimately at least the plaintiffs have to

5    address.  I mean, because obviously none of the other counties

6    were deemed so.  And maybe Fulton County was necessary when you

7    were trying to get an injunction and you thought that the --

8    you had a different -- had magnified concerns about the

9    administration of the elections or thought that there was very

10   valuable information that Fulton County could provide.

11           I'm not -- you know, there are many different

12   possibilities, I know.  And I take that all in good faith.  But

13   I just want to know now do you think that they are a necessary

14   party and are you -- or not.

15           But let's take a five-minute break so I can get some

16   air into my brain.

17           COURTROOM SECURITY OFFICER:  All rise.

18           **(A brief break was taken at 4:31 PM.)**

19           MR. McGUIRE:  Your Honor, Rob McGuire for Coalition

20   plaintiffs.  I just wanted to answer your question that you

21   asked at the very end.

22           We touched base internally.  And our view about

23   Fulton County is that they are not technically a necessary

24   party in the Rule 19 sense.  But since we can obtain relief

25   through an order just against them, we believe that they should

remain in the lawsuit.  And for that reason, we wouldn't be

willing to let them out voluntarily for that reason.

THE COURT:  All right.  Maybe I don't -- you are

willing to let them out voluntarily because you -- or you are

not willing to let them out voluntarily?

MR. McGUIRE:  No.  So we don't think that they were

required by the rules to be joined as a necessary party under

Rule 19 at the beginning.  But we do believe that they are an

appropriate party.  Because if we get an order just against

them and not against the Secretary, we can still get most of

the relief that we're looking for.  So we think that our claims

against them are viable, and we want to pursue them.

If, on the other hand, we let them out, then it is

possible that we wouldn't be able to get some relief that we

would be able to get if they remained a party.

THE COURT:  All right.  Well, we'll follow up.  Thank

you.

Who is going next?

MR. CROSS:  I am.  I'm back.  Sorry, Your Honor.

THE COURT:  That is all right.

But I know this is kind of a blunt question.  But in

light of the Eleventh Circuit's decisions in *Tsao* and *Muransky*

in particular, can you provide any information that is more

concrete regarding the scope of the risk that you say was

created, for instance, by the breach in Coffee County and the

1   posting?

2         I mean, obviously for whatever reasons, including

3   maybe perhaps fraud analysis, the 16 percent figure wasn't

4   deemed very impressive to the circuit in *Tsao*, I guess it was.

5   I don't know how that was calculated.  So I'm just putting that

6   aside for now because there were many different -- but what --

7   is there any testimony, is there any evidence that tells us

8   what this -- kind of concretely what the scope of the risk is?

9         MR. CROSS:  Yes, Your Honor.  The only reason I was a

10  little bit struggling to answer is because it is a lot of

11  evidence.  It is not one particular thing.

12        So we would point you to Dr. Halderman's 100-page

13  report.  We would point you to the CISA advisory, the testimony

14  of Theresa Payton, who is the founder of Fortalice, which

15  Merritt Beaver testified still to this day serves in the

16  capacity as the chief information security officer for the

17  Secretary's office, who unlike *Tsao* where the evidence was that

18  the risk that was contemplated was unlikely.  Theresa Payton

19  said this will happen.  It is not if.  It will happen.  This is

20  their chief information security officer -- her organization.

21  She's the one that they rely on to assess the security of their

22  IT structure.

23        Again, we have got CISA saying the opposite of the

24  GAO.  CISA is coming in and saying all these vulnerabilities

25  that Dr. Halderman has found are very serious.  And they tell

1    the states you need to mitigate them as soon as possible.

2         We're now almost a year later, and the State has done

3    nothing to do that.  So that is just a piece of it.  You know,

4    we would also point to things like the Coffee County breach --

5    right? -- that shows -- and to take a step back for a moment,

6    Your Honor, it is important to think about how this case has

7    evolved in the way that I started with.  And here is why.

8         Remember, their defense to Dr. Halderman's report was

9    it is pie in the sky academic nonsense.  Secretary

10   Raffensperger literally went on a media tour saying this is all

11   nonsense, no one could ever get access to the equipment or to

12   the voting system in the way that Dr. Halderman did, this is

13   all artificial, and it is saying the sky is falling when it is

14   not.

15        We knew that that was not true when he said it.  And,

16   in fact, Merritt Beaver testified that what Dr. Halderman did

17   is exactly how you do a cybersecurity assessment.  Dr. Gilbert

18   said if he was going to have a cybersecurity assessment done of

19   a voting machine he would ask Alex Halderman and Andrew Appel.

20        But then we get to Coffee County, which just drives a

21   stake through the heart of the only defense they have on the

22   merits of this case.  Despite everything that Mr. Miller had to

23   say today -- by the way, I will just say we're at a

24   disadvantage to respond because Mr. Miller had an argument that

25   does not appear in any of their briefing.  Lots of citations to

1    statements of facts and other things, none of that is in their

2    briefing.

3          But putting that aside, that was their defense for

4    years was yes, the system is vulnerable.  Yes, these exist.

5    But it is not a problem.  CISA says it is a serious problem.

6    Act on it now.  They do nothing.

7          And now we know that you can get access to the

8    system, and it just happened again.  Something like a dozen

9    electronic pollbooks were just taken out of a county.  And so

10   still to this day, we are so far afield from what is in *Tsao*

11   where what the Court points out on the pled allegations is,

12   one, they were able to immediately mitigate any harm because

13   they canceled their credit cards.

14         They also are a consumer.  They never have to go back

15   and use that system that was breached ever again.  They have

16   that as a consumer choice to walk away from it.  As a voter,

17   you don't.  You have to vote in this system if you want to vote

18   in person.

19         And, again, it is -- how we think about a consumer

20   breach is very different than how we should think about the

21   breach of a voting system because of the Supreme Court's

22   emphasis time and time again as to how important that is to the

23   democracy and not just to the individual impact on a voter.

24         THE COURT:  Well, again, I don't -- I'm just looking

25   for where we got that 16 percent.  Is that -- you are saying

1   that was the GAO?

2           MR. CROSS:  I don't remember -- what -- my memory is

3   that what really drove the result in *Tsao* was the GAO report

4   saying that even -- two things:  One, that the type of

5   information that was breached is not the type of information

6   that enables identity theft.  That is not our case.  The

7   information that was breached here is exactly the information

8   needed to hack and compromise votes.  That is exactly what

9   Merritt Beaver testified to.  He said this software is the

10  roadmap for hackers to hack an election.  So that is point one.

11          Point two is GAO said, even with -- even if you had

12  the type of information that would be -- that could lead to

13  identity theft, it is just so unlikely because it never

14  happens.

15          And here, Your Honor, we have CISA coming in and

16  saying these vulnerabilities are very serious.  They could be

17  exploited, and it is so important, that the risk of

18  exploitation is so high, that you need to mitigate them now.

19  That was in June of last year.

20          So we're just in a very, very different posture.

21  And, again, *Tsao* had a handful of allegations in a complaint

22  that the Court was looking at.

23          Here, we have amassed reams of evidence from the

24  leading election security experts.  All of whom again -- the

25  last thing I'll say on this, Your Honor.  Again, there the GAO

```
1    is saying it is not a big deal.  The State's own election
2    security experts keep agreeing with us.
3            Your Honor might recall in your 2019 injunction
4    decision, you know, as I read that decision, Dr. Shamos'
5    testimony was one of the pivotal things Your Honor relied on,
6    that even Dr. Shamos again, their own expert, said, don't use
7    this system.  You haven't done all of these things that needed
8    to get done.  So you shouldn't be using it.  That is where we
9    are now.
10           I mean, it is difficult to comprehend a state
11   defending a voting system and saying it meets the minimal
12   muster for constitutional right to vote when they cannot find
13   even one expert that endorses it.  How is that not dispositive?
14   How does that not mean that we get summary judgment?
15           If you literally can't find one expert to say that
16   this system is okay, that it works, and we can trust it, then
17   that should be the end of the analysis in favor for us.  At the
18   very least, it creates a fact dispute to resolve at trial.
19           Juan Gilbert is literally creating a new BMD because
20   he acknowledges this one is not reliable.  That is what is
21   written in his patent.
22           Again, Ben Adida says you need to use hand-marked
23   paper ballots with one BMD for the folks who need it.
24           THE COURT:  All right.  Well, just going back to what
25   my question was -- first of all, I found the passage, and I
```

1    think it is more -- the GAO report was something different

2    quite than I had seen it.  It just simply said that GAO

3    reviewed the 24 largest data breaches in the consumer area

4    between January 2000 and June 2005 and found that only 4 of the

5    24 breaches, roughly 16.66 percent, resulted in some form of

6    identity theft and only three resulted in account theft or

7    fraud.  Given the low rate of accident theft -- excuse me -- of

8    account theft, the GAO report simply does not support the

9    conclusion that the breach here presented a substantial risk

10   that *Tsao* would suffer unauthorized charges on his cards or

11   account draining.  We recognize that the GAO report is over a

12   decade old, and it is possible that some breaches may present a

13   greater risk of identity theft than others.

14          So then they go on even if we're going to put it

15   aside.  But -- so I want to, A, correct myself by just reading

16   that into the record.

17          But does anyone in the record who was a witness one

18   way or the other attempt to identify the magnitude of the risk

19   in a quantitative sense?

20          MR. CROSS:  In a numerical sense, the answer is no.

21   My recollection is that Dr. Halderman was asked this in his

22   deposition.  And what he explained -- and I think Dr. Appel may

23   have as well -- that is just not feasible in a cybersecurity

24   world.

25          There is no numerical standard by which you can come

1    in and say, there is an X percent chance of this happening.

2    What you do is what Dr. Halderman did; what Dr. Appel has done;

3    what Mr. Skoglund has done; Dr. Springall working together with

4    Dr. Halderman; and what CISA did, which is you look and see are

5    there vulnerabilities.  Then you assess the magnitude of those

6    not in a quantitative sense but in a qualitative sense.  Are

7    they serious vulnerabilities?  Could they be exploited?  And if

8    so, could they be exploited in a way that would affect votes

9    and election outcomes?

10           If the answer to those questions is yes, then you

11   have a serious problem.  And you have to take measures to

12   mitigate those vulnerabilities.  And that is exactly what CISA

13   says.  That is why the CISA report is so powerful.  It is the

14   federal agency that is responsible for election security.

15           And while they were saying Halderman is wrong but

16   they had no expert who disagreed with him and saying it didn't

17   matter, CISA comes in finally and says, not only is he right,

18   but he is right about how serious this is.  It wasn't a report

19   that came out and said, these are kind of small trivial things;

20   deal with them if you choose; or when you have the resources,

21   mitigate them.  It says mitigate them as soon as possible.

22           And it emphasizes they can be exploited.  Put that

23   together with Theresa Payton saying it is going to happen.  We

24   are way beyond the world of *Tsao*.

25           The other thing I will also say --

1          THE COURT:  All right.  So I'll just say this.  I

2   mean, which is given developments in our nation and the legal

3   system and the political system and the whole climate since

4   2019, is it really -- the type of relief you're looking for, is

5   that something a court really is competent to require or

6   handle?

7          MR. CROSS:  Yes, Your Honor.  And if you look -- if

8   you look at the *Stewart v. Blackwell* case from the Sixth

9   Circuit, for example, we would say it is almost directly on

10  point.  Right?

11          What the Court said there was they stopped the use of

12  a particular voting system because they found a

13  disproportionate number of undervotes and overvotes.  The Court

14  did not require the plaintiff to come in and say that my vote

15  was not counted.  It was enough to look at the impact more

16  broadly and say, we've got a system here that we can see is

17  just not reliable.  And so -- and the Court said you can't use

18  it.

19          So I would say there is absolutely precedent on point

20  for this, Your Honor, for what we're asking and the science is

21  solidly on our side.

22          The other thing I would also point to you that is

23  another key difference from *Tsao*, Your Honor, if you have slide

24  44 in front of you -- again --

25          THE COURT:  I don't think I have any slides right now

1    in front of me.  But you mean -- like paper.

2            MR. CROSS:  Oh, I'm sorry.

3            THE COURT:  I can look --

4            MR. CROSS:  There it is.

5            In *Tsao*, again, what the Court finds is that the

6    allegations as pled make clear that there is no real risk of

7    future harm.  And part of that is because of the plaintiffs'

8    ability to mitigate against that harm.  Cancel the credit

9    cards.  Not use the breached service.

10           Here -- and so that plaintiff knew they had not been

11   affected.  They knew it with 100 percent certainty because they

12   had canceled the credit card and they could see there were no

13   fraudulent expenses and the information that was taken could

14   not be used for identity theft.

15           This is testimony from Gabriel Sterling as the

16   corporate representative, Your Honor.  Do you know whether

17   anyone has looked to see whether a back door was created to the

18   EMS server or any other voting equipment through the folks that

19   were there on January 2021 in Coffee County?

20           Testifying as the State, I would not have knowledge

21   of that right now because, again, it has been handed over to

22   the GBI.

23           The State is here today and has no idea whether there

24   are nefarious actors that have a back door into their voting

25   system to do whatever they please.

1          And we know that individuals were there day in and

2     day out, five to eight hours a day, in January.  We can see

3     some of the tinkering they did.  We can't see all of it because

4     of the alterations Mr. Persinger made to the EMS server.

5          And then we get to the other question, Your Honor.

6     Has your office considered whether those set of circumstances,

7     coupled with the amount of time they spent there, the changes

8     they made to the EMS server that we know of so far, whether any

9     of that conveys to you that they actually were not just looking

10    historically, meaning they were trying to figure out something

11    in the past, but looking prospectively -- were they looking for

12    ways to manipulate the elections going forward?

13         He says, but yes.  To answer your question, we do

14    take into account that could have happened.  But the likelihood

15    in our mind is probably not.  He is guessing.  And, again, that

16    is kind of out of our hands until GBI finishes everything on

17    the criminal side.

18         The Secretary of State's office is telling the public

19    they don't have any idea whether this system works.  That is

20    not *Tsao*.  The plaintiff in *Tsao* knew that he was protected,

21    and the Eleventh Circuit emphasizes that.  It is pivotal to

22    their ruling.

23         Here, the Secretary of State says they have no idea

24    if this system works and whether someone currently has a back

25    door into it to do whatever they choose.

1          And picking up on Mr. Miller's argument about the

2     *Jacobson* case, when you walk through what he highlighted, I

3     think it drives home how strong our case is.  He identified

4     five types of burdens, and at least four of them are on the

5     nose.

6          One is whether the conduct makes it more difficult

7     for individuals to vote.  We've been through that.  We have

8     been through it on the standing issue.  It is certainly more

9     difficult to vote in the BMD system when again you can't read a

10    QR code, you can't verify your ballot, you have no idea --

11         THE COURT:  It doesn't make it more difficult to

12    vote.  You might not like it, but it doesn't make it more

13    difficult to vote.

14         MR. CROSS:  I would respectfully disagree, Your

15    Honor, because the act of voting is not just casting it.  The

16    act of voting is casting a vote and having reasonable

17    confidence it will count.  And so it makes it more difficult to

18    have your voice heard because you have no idea of what is being

19    heard as your voice.

20         Does that make sense, Your Honor?

21         THE COURT:  It makes sense.  But I would prefer to

22    have some real authority for that proposition.

23         MR. CROSS:  Understood.  Understood.  And, again, I

24    do think the Sixth Circuit case --

25         THE COURT:  *Stewart*?

1          MR. CROSS:  -- is on point on that.  It then goes on

2    in *Jacobson*, the language Mr. Miller has highlighted, does it

3    burden the ability to choose the candidate of their choice?  It

4    gets back to the verification point.  I won't repeat that.

5    They cannot verify that their candidate has been chosen.

6          Does it burden the associational rights of political

7    parties by interfering with their ability to freely associate

8    with voters and candidates of their choosing?

9          Their response is, well, it doesn't do that, and you

10   can always vote by absentee.  You can avoid this system.  Well,

11   that is that exact burden.  If your choice is to vote absentee

12   from the privacy of your home or wherever, then you are not

13   getting to associate with your voters.  And that is exactly

14   what is being discussed here by being at the polls voting in

15   person.

16          But then --

17          THE COURT:  I'm sorry.  What is being discussed here?

18          MR. CROSS:  It says, nor does it burden the

19   associational rights of political parties by interfering with

20   their ability to freely associate with voters and candidates of

21   their choice.  Your Honor, the focus here is on political

22   parties.

23          But I would extrapolate that for Your Honor that one

24   of the things -- one of the burdens is the inability to vote in

25   person and to associate with other voters, with other citizens,

1    and be part of that democratic process.

2              THE COURT:  You are saying that that is in *Stewart*?

3              MR. CROSS:  I'm saying that is in *Jacobson*.

4              THE COURT:  In *Jacobson*?

5              MR. CROSS:  Yes, Your Honor.

6              And the last one was, to state the obvious -- this is

7    in the case -- the statute certainly does not create the risk

8    that some votes will go uncounted or be improperly counted.

9    That is the key issue in this case.  And on that, that is a

10   hotly contested fact dispute that has to be resolved at trial.

11             And, of course, *Jacobson* is saying that's exactly the

12   type of burden that would rise to the level of rendering some

13   sort of voting system or something that burdens the act of

14   voting unconstitutional.  And that is an issue that has to get

15   resolved at trial.

16             I'm trying to just focus on specific points because I

17   don't want to tell you what we've already got in the brief.

18             Couple of follow-up points here, Your Honor.

19   Mr. Miller mentioned that malware to alter votes does not

20   exist.  I'm not sure where he is getting that from.

21   Dr. Halderman details that.

22             **(There was a brief pause in the proceedings.)**

23             MR. CROSS:  Dr. Halderman's report details that in

24   depth.  I won't repeat the specifics of it.

25             You asked a question that gets to something

1   Mr. Miller said.  He talked about how voters review their

2   ballot as they take it to the scanner.  Your Honor has pointed

3   out a number of times that the studies, including the state's

4   own study, shows that that is not accurate.

5          You asked a question about whether that is

6   self-inflicted.  And to answer that question, Your Honor, we

7   would say no.  And the reason is this:  If a voter can vote by

8   hand-marked paper ballot and do that in person and participate

9   in that democratic process, then they don't have to review

10  their ballot.  They have made those selections.

11         So the state is choosing to impose a burden on them

12  by having them touch it on a touchscreen and then print it out

13  and then have to go back and figure out, did the computer

14  interpret my selections right?  Did it print it right?  That is

15  a burden.

16         And, Your Honor, there is absolutely no argument from

17  the state tailoring any --

18         THE COURT:  Why is it a burden?  I'm still -- I'm not

19  impressed by that in some way.  It is obviously -- you know, it

20  seems it is important to do and perhaps have the right to do.

21  And I understood your arguments about that.

22         But why is it a burden?  It is not like the people

23  have to go from one office to the next to get an identification

24  card, which could be far more burdensome potentially and now

25  seems to be authorized.  It is quite different in that regard.

1          MR. CROSS:  What I would say, Your Honor, is I guess

2     two points.  One, it is a burden because it is not something

3     voters have to do or should have to do to cast their vote.

4     Right?  If they are voting by hand-marked paper ballot, that

5     burden doesn't exist.  They know that they are the ones that

6     made the selections on that ballot.

7          The point at which the computer is now interpreting

8     it and printing it for you, they have now injected an extra

9     step in the process that a voter has to take to figure out, is

10    my ballot -- does it reflect my selections?  Let's put aside

11    the QR code for a moment because we have covered that.

12         Even if it was being tabulated on the human readable

13    portion, as Your Honor has pointed out and as the studies

14    show -- the science shows, voters are really bad at being able

15    to remember everything and find alterations.

16         Dr. Gilbert's own study showed that voters often --

17    if you change something on their ballot, they won't find it.

18    They won't see it.

19         And so that is where the burden comes from is, if I

20    filled out my ballot, those are my selections.  I'm done, and I

21    pass it off.  If there is a computer that is doing that for me,

22    I now have the burden of figuring out, is everything I selected

23    right?  Can I even discern that from the ballot?  Does it have

24    all the information I need?  And am I going to be able to

25    reliably do that, or am I going to miss somewhere along the

1  way?

2        And the balancing test gets to -- you could look at

3  that either under, is it narrowly tailored to a compelling

4  state interest?  The answer is no.  Or is it even rationally

5  related to an important state interest?  The answer again is

6  no.

7        Let's be clear.  They have not identified any state

8  interest in the BMD system, and that is their burden.  That is

9  their obligation.  They identify sort of these amorphous --

10        THE COURT:  Well, the burden is on you to show -- it

11  is on them to show that they have a compelling state interest

12  or perhaps a lesser than compelling interest depending on the

13  nature of your proof.

14        I mean -- and they have -- the reality is the State

15  has -- is vested with the authority still to select the system.

16  Now, if the system doesn't work, that is something else.  But

17  if the system has major faults that puts voting at risk, that

18  is something else.

19        But I don't think that they have the burden to show

20  in this -- as to this particular issue that you are raising

21  about the question of voters reviewing their ballots -- I think

22  they have -- it would have a strong interest though one would

23  think still in making sure that people -- the voters are an

24  extra form of auditing, and it supports the integrity of the

25  system.

1          And that is why I started out with the questions I

2     had in the beginning of the hearing.

3          All right.  Let's move on.

4          MR. CROSS:  Your Honor, on the state interest, a

5     couple of brief points on this.  One, they don't offer any

6     evidence for any of the state interest.  They just write it as

7     lawyers.  And that is not sufficient.  They need to actually

8     come forward with some evidence to prove up what they are

9     saying.

10         THE COURT:  Prove up what?  That they have to show

11    a -- you are saying they have to show they have a compelling

12    and important interest in BMDs.

13         Doesn't that come after you have established that

14    there is a constitutional violation then?

15         MR. CROSS:  After we have established there is a

16    burden and then you weigh them.  Then the weighing determines

17    whether there is a constitutional violation.

18         Interestingly, Your Honor, they are talking out of

19    both sides of theirs mouths on this issue.  And here is why.

20    When we say you were concerned about the risk of this system

21    affecting voters, they say, well, that is not a legitimate

22    interest.  That is literally the same interest they offer

23    twice.

24         When you read what they wrote, this is their

25    language.  They say that -- they cite the *Weber v. Shelley*

1    case, and they point out that the state interest here is

2    avoiding potential manipulation and errors associated with

3    hand-marked paper ballots.  They talk about how mechanical and

4    human errors may thwart voter intent.  That is the same thing

5    that we have offered.

6         So it can't be, well, because it is forward looking,

7    you are trying to protect against some future risk, that

8    doesn't matter.  They are offering the same thing.  They are

9    just offering it on a different side.  And that is a fact

10   dispute that has to get resolved.

11        The same with the second, Your Honor.  They say they

12   get to decide the manner of elections.  Well, first of all, the

13   Supreme Court has been clear that is not an unmitigated or

14   unfettered right.  As the court said in the *Republican Party of*

15   *Connecticut* case, the power to regulate the time, place, and

16   manner of elections does not justify the abridgment of

17   fundamental rights such as the right to vote.

18        But here again they say they are entitled to take

19   measures to reduce fraud and count votes.  Okay.  Well, that is

20   interest.  We're saying the same thing.

21        So it can't be that they get to say their interest

22   gets to be mitigating some future risk and we don't get to say

23   the same thing on the other side.  In fairness, we both get to

24   say that.  But that gets to a fact dispute that Your Honor then

25   has to resolve on the evidence to figure out which of those

1    burdens is greater and whether theirs is narrowly tailored to a

2    compelling state interest or at least rationally related to an

3    important state interest.

4         THE COURT:  But voters themselves could decide to use

5    absentee ballots.  I mean, that is obviously the alternative.

6         MR. CROSS:  It is, Your Honor.  But they are asking

7    you to plow new ground on that.  When you look at the cases --

8    you can look at *Crawford* on the photo requirement.  You can

9    look at *Common Cause* on the photo requirement.  In each of

10   those cases, the voters could avoid the photo requirement by

11   voting absentee.  They don't have to vote in person.

12        Not one of those cases -- same with *Lee* looking at

13   the other side on signature match.  If you don't like signature

14   match, go vote in person.

15        In not one of these cases when the courts were

16   analyzing and assessing a burden that has been offered -- not

17   once do they go and look and say, well, you've got an

18   alternative and you can escape that.  If that were the legal

19   standard, then in both *Crawford* and *Common Cause*, they would

20   not have engaged in this fact intensive exercise they do.  They

21   would have just said, we are done at the point that you can

22   avoid a photo requirement by voting absentee.

23        That is the new law they are asking Your Honor to

24   create.  That is not the law.  It has never been the law.

25        THE COURT:  All right.  Do you want to move on?

```
 1              MR. CROSS:  Yes.

 2              THE COURT:  Because it is 5:15 and I know you

 3   probably have other folks here who want to --

 4              MR. CROSS:  Yes, Your Honor.

 5              THE COURT:  I realize I took some time to sort of

 6   gather my thoughts after the last speaker.

 7              MR. CROSS:  So just quickly, Your Honor, I do think

 8   it is worth noting again, starting with your question -- I'm

 9   not going to spend much time on this.  But, again, I do want to

10   distinguish this from the other cases like Tsao and others.

11   I'm not going to walk through it all.

12              (There was a brief pause in the proceedings.)

13              MR. CROSS:  I would direct you that we have lots of

14   evidence.  For example, evidence showing the insecurity of the

15   voting system here, the critical security vulnerabilities.  I'm

16   not going to walk through the breach.

17              I do want to pause just briefly on this slide.  We

18   have heard a number of times that we have to show a misuse of

19   data.  We have explained that that is not the right standard.

20   It is not accurate.

21              But let's just accept that for a moment.  Here we

22   have, Your Honor -- this is from Mr. Skoglund.  Dr. Halderman

23   says the same.  There was a misuse of data here.  This wasn't

24   just SullivanStrickler copying the data and handing it off.

25              The people who got that data have done all sorts of
```

1   things with it, including creating a virtual machine with it.

2   It was then uploaded.  The folks can tinker with.

3          But more importantly we know from what we have from

4   Coffee County, even after the alterations that the state made

5   through Mr. Persinger, we know that these people made

6   alterations, abnormal and reckless changes to that particular

7   software.

8          So there was a misuse of the data that was taken in a

9   way that could affect future votes.  And as Mr. Sterling

10  testified, they have no idea the degree to which that could

11  affect future votes and whether the system still works.

12         Your Honor, I do think it is worth noting just

13  briefly the Coffee County breach is truly unprecedented.  This

14  is the entirety of -- what you have in front of you here, Your

15  Honor, is literally the entirety of what the State has to say

16  about Coffee County in their opening motion.  That is it.

17         They cannot engage with us on the facts.  Because as

18  soon as they do, they lose or at the very least they lose this

19  motion.

20         The idea that you can write a brief in this case and

21  devote a handful of sentences, a single paragraph and say, you

22  win on summary judgment is just -- does not at all comply with

23  Rule 56.

24         Again, they acknowledge in their own motion they

25  don't know whether the system works.  This is their reply.

1    They quote us.  We point out, defendants do not even know if

2    the Coffee County breach led to an infection of Georgia's

3    voting system or alterations that could disenfranchise voters.

4            One would hope that at this stage of the case they

5    would say we do know, and here is our evidence that shows that

6    this cannot happen, ergo we win.  Their response is, it is not

7    our burden to disprove the Curling plaintiffs' claims.

8            One, that is just an oversimplification of their

9    burden in the case because we have shown the evidence that

10   establishes this substantial risk.  It then falls to them to

11   refute that evidence.  Their response is to say, you are right,

12   we don't know, but it doesn't matter.  And, of course, it does.

13           THE COURT:  Well, in the context of *Muransky* and

14   *Tsao*, which I recognize are merely data breach cases in the

15   consumer context, which is still different than elections --

16   but in the context of the Coffee County breach, would that mean

17   that still though that you -- that, in fact, it still remains

18   plaintiffs' responsibility or burden to show that some votes

19   were misused or were manipulated or that the data system was

20   misused or that the equipment was misused?

21           I mean, we know that it was accessed.  And I guess

22   you could call it misuse from the perspective of data being

23   taken off of it.

24           But beyond that, something that would endanger --

25   materially endanger the system at large.

```
1              MR. CROSS:  Right, Your Honor.  And, again, we don't
2     have to show misuse.  But let me respond to your question.  We
3     do have it because it is not just the software being taken.
4              It is Jeffrey Lenberg, for example, spending five
5     straight days there, making whatever alterations and tests, and
6     doing -- uploading software, anything that he was doing on that
7     in the operational environment.  Right?  This wasn't in a lab
8     where he could tinker with it and maybe have no impact on the
9     system.  He sat in the Coffee County EMS server room with
10    direct access to the server, to the ICC, to the BMDs, to all
11    the equipment in there, hours -- like five to eight hours a day
12    from what I recall for five straight days.  And that is way
13    above Tsao.  Right?
14             In Tsao, it was we have taken the data.  We have left
15    the operational system, and now we might do something with it.
16    And the Court there still says, look, if you could have facts
17    that show us a substantial risk of identity theft, that will
18    pass the bar for standing and for injury in fact.  You just
19    don't have it here for the reasons we have talked about.
20             In Muransky, the same thing.  The Court says, look,
21    if there was a disclosure of information that could lead to
22    identity theft, then we would get there.  But here you have got
23    a handful of credit card numbers and the facts made clear that
24    that doesn't lead to substantial risk.
25             Here we have someone spending a week sitting in
```

1    there.  And he is doing it after having gotten access to the

2    software weeks earlier.  So he had access to the software by

3    which he could do all sorts of things, including design

4    malware.  Then come back and sit in the operational environment

5    of the state, upload anything he wants, create a back door, do

6    other things, and the State is telling you, we don't know if

7    any of that was done.  That is the opposite of *Tsao* and

8    *Muransky*.

9              THE COURT:  Well, is that because they say they don't

10   know what the GBI has found?  And I assume it seemed like the

11   GBI was working on this.

12             Does that mean the case should be stayed until the

13   GBI gives its report?

14             MR. CROSS:  No, Your Honor.  Because the state

15   that -- the burden is on the parties in this case.  Let's be

16   clear.  The Secretary of State told this Court over and over

17   again for a period of months that they were investigating this.

18             First, they said they investigated it and publically

19   claimed it didn't happen.  Then they said we are investigating

20   it.  But then we learned that Mr. Persinger, who was retained

21   in May of 2021, by the way, when they first learned that Doug

22   Logan and Cyber Ninjas have been in that office -- his

23   declaration says he's retained that same month.  He does

24   nothing.  They don't have him do anything until we raised the

25   Coffee County breach.  Then he puts in his declaration he

1    didn't look for malware.  He didn't look to see if the system

2    was compromised at all.

3            They have the capability to do that.  Fortalice could

4    do that.  Mr. Persinger presumably can do that.  I think he

5    said he could in his declarations.

6            They have made a deliberate decision not to look.

7    And we can infer from that it is because they are terrified

8    from what they will find.  Again, that is so vastly different

9    from *Muransky* and *Tsao* where the court said, if we take all

10   your allegations as true, there is no risk of harm because we

11   can tell this is not the type of data that will lead to an

12   identity theft or can lead to harm and you have already taken

13   mitigation measures.  That is not this case.  There are no

14   mitigation measures.  Not even with what CISA has mandated.

15           So I just would say, Your Honor, it is hard to

16   imagine a more compelling case of where voters should not be

17   susceptible to a voting system when the representative of the

18   Secretary of State's office says we genuinely don't know if it

19   still works.  We genuinely don't know if these people have a

20   back door into it.  No, we don't wait, because it is on them to

21   figure that out.  The longer we wait, the worse the burden.

22           The last two points, Your Honor, just really briefly,

23   You had two questions that I wanted to get to.  One is adverse

24   inferences.

25           **(There was a brief pause in the proceedings.)**

MR. CROSS:  Adverse inferences.  You asked about
that, Your Honor.  And I will just say I do think, as we've
laid out in our brief, we are entitled to adverse inferences.
And just to give you really quickly some specific examples,
these are some of the questions we asked Mr. Chaney.  Are you
aware of anyone ever having compromised the EMS server in
Coffee County?  Fifth Amendment.  Did they load any software on
to it at all?  Fifth Amendment.  Did they alter any of the
software or firmware on any of that equipment?  Fifth
Amendment.  Did they upload any malware?  Fifth Amendment.  Did
they upload anything to the EMS server that could have any
impact on the elections in the State of Georgia?  Fifth
Amendment.  Did they connect any devices to any election
equipment in the Coffee County election office that could have
an impact on elections in the State of Georgia?  Fifth
Amendment.  Was it their intent to do that?  Fifth Amendment.

He selectively invoked the Fifth Amendment, which is
why the inference is powerful here.  There were lots of
questions where he did not invoke the Fifth.  On those, he did.

THE COURT:  But he is not a representative of the
State.

MR. CROSS:  He doesn't have to be, Your Honor.  For
Your Honor to draw the adverse inference, you can draw it from
that.  They have the ability to put on evidence to refute the
inference.  It is not an irrebuttable inference.

```
1              But Your Honor can and should draw that inference in
2    our favor, particularly here under the Rule 56 standard where
3    the Court is obligated to draw all inferences in our favor.
4              Lastly, EAC -- Your Honor asked about that.  And I
5    just wanted to say the reason why the EAC certification doesn't
6    satisfy or doesn't get to the constitutional requirements is
7    because that is not what the EAC does.
8              The EAC -- this is kind of how I think about it.  If
9    you bought a computer and walked into Best Buy and asked the
10   Geek Squad to look at it and figure out whether it functions
11   and operates, it turns on, all the applications work, and it
12   looks kind of generally reliable, that is what EAC does.  They
13   are relying on a standard that was developed 18 years ago.
14             In fact, Your Honor may not know this.  The DREs are
15   still certified today by the EAC.  They are still certified
16   today.
17             But if you were to walk out of the Geek Squad and
18   have a cybersecurity expert look at your computer or the Geek
19   Squad will have told you, this is fine, you can use it, it does
20   what it is generally supposed to do, the cybersecurity expert
21   will look deeper and say, well, it turns out you have actually
22   got a back door or malware or vulnerability and you don't want
23   to use this computer.
24             That is the difference.  The EAC is not doing the
25   latter.
```

1          Did I answer all Your Honor's questions?

2          THE COURT:  You did.

3          MR. CROSS:  Thank you.

4          THE COURT:  Mr. Brown?

5          MR. BROWN:  Bruce Brown for the Coalition plaintiffs.

6    Good afternoon, Your Honor.

7          THE COURT:  Good afternoon.

8          MR. BROWN:  Even without indulging in the

9    presumptions that the Coalition plaintiffs as the nonmoving

10   party are entitled, the evidence is persuasive that a severe

11   burden in the right to vote is almost certain to occur.

12         Because of that, a number of things are true.

13   Number 1, we have more than established the hard way of

14   establishing standing that Mr. McGuire described.  We have

15   established the easy ways of doing standing running away, even

16   without that.

17         What is also true is that we have come very close

18   already to establishing that the BMDs in Dominion's system are

19   unconstitutional under the *Burdick* balancing test.

20         Now, a couple of things that I would like to address

21   very quickly is that it is very -- for our case to be -- I

22   don't know what the severe burden was in the *Tsao* or the

23   *Muransky* case.  Those are standing cases.

24         On the merits here, we do not have to show

25   disenfranchisement to be a burden, even a severe burden.  It is

1    a sliding scale.  How Your Honor, as a matter of fact when all

2    the evidence is in, gauges the burden, whether it is the

3    highest -- we believe it should be -- or just beneath that,

4    will determine the justification that the State has to show to

5    supply that.

6         We believe that the State's justifications will be

7    totally absent because they are the same as ours.  Everybody

8    needs an accountable system.  And that is what our argument is

9    about is an accountable result, a result that people can have

10   confidence in.

11        The plaintiffs are on the same side as the public in

12   this case and the same side as the Government and the Secretary

13   of State.  We want accountable results that people can have

14   confidence in, accountable results that are important now more

15   than ever and in the future even more, particularly with the

16   increasing threats presented by artificial intelligence and by

17   cybersecurity and everything else.

18        It has become -- I fear that in a couple of months,

19   if not one month, given the advancement in technology, the

20   questions that we're looking at here are going to look quaint.

21   I just hope they are not tragic.  Because the risks that we

22   have identified and proven are unlike the issues that have come

23   up in that string cite of cases in the *Jacobson* court.  This is

24   a new case.  This is a different case.

25        There is analogies to it in the other voting cases.

 1   But this is new because we have proven a new and very serious

 2   threat that needs to be evaluated under the standards of those

 3   cases but in a new way.  And that is what we have come for you

 4   to do.

 5          Our view on the BMDs, although it is a new threat,

 6   there is a lot of existing wisdom that can be applied to what a

 7   BMD is or a BMD ballot is.  A BMD ballot is hearsay.  It is

 8   rank hearsay.  The declarant is the voter, who is long gone, a

 9   formal choice gone with a push of a button.  The BMD ballot is

10   hearsay.

11          THE COURT:  What makes it different than again the

12   lever?

13          MR. BROWN:  You could never get it into court.

14          THE COURT:  You could never get what?

15          MR. BROWN:  A ballot produced by a BMD into court

16   because it is hearsay.  The declarant is gone.

17          THE COURT:  Well, you wouldn't get a lever -- the old

18   lever system into court either.

19          MR. BROWN:  Maybe not.  Maybe not.  But you could get

20   a hand-marked paper ballot.  And that is why when they say they

21   want this particular result, no, it doesn't have to be

22   hand-marked paper ballot maybe but it needs to be audited and

23   it needs to be verifiable.  And a hand-marked paper ballot does

24   that.  And it is what the State has already prescribed in their

25   laws you should do if there is an emergency and if the BMD is

1    impossible or impractical.  And they already use it.  They

2    already use hand-marked paper ballots.  They use them for

3    in-person voting.  They use them for absentee voting.

4          They have got the scanners for them.  The scanner

5    need to be fixed.  But they have the scanners for them.  They

6    have the EMS form.  They have everything.  All we are saying is

7    don't use that screen, just let people write them out.  It is

8    such a -- look, artificial intelligence and these other very

9    scary things present such difficult problems in other areas

10   that I'm sure Your Honor is going to be confronted with soon.

11         Copyright law, patent law are going to be so

12   difficult with all of these advances about how you solve these

13   really difficult problems.  This problem is so easy to solve

14   that the failure to do so is manifestly unreasonable is what

15   our position is.  It is when you can make it so much better so

16   easily.  To refuse to do so --

17         THE COURT:  Let me just say -- let's say I accept

18   that proposition.  But am I the one -- given where the law has

19   gone, am I the one to do that or is it simply that this is

20   legislative decision that they need -- that the State should --

21   in light of all the things you are saying should change it?

22         MR. BROWN:  Shouldn't do it on summary judgment and

23   we didn't move on summary judgment.  But under the *Anderson v.*

24   *Burdick*, that is -- the Supreme Court has said, to answer that,

25   yes.  We have a burden to show that there is a burden on the

1  right to vote that is outweighed -- but that is the cause of

2  action.

3        If we were arguing for an *Anderson-Burdick* cause of

4  action before those cases, then it would be a harder answer.

5  But the Supreme Court has already said that.  It said, and it

6  is a sliding scale.  And it can be even a minor burden.  It has

7  to be a burden, but it doesn't have to be a huge one.

8        And so -- and Congress has said -- under Rule 56 has

9  already given you the authority to resolve factual disputes in

10  only certain instances.

11        And so we're not -- you're not -- we don't think

12  you're out on a limb.  You would be if there was an

13  *Anderson-Burdick*.  But their argument would wipe those cases

14  away in any sort of modern problem that has real consequences.

15        One argument that I did want to address in

16  particular, Your Honor, is the -- and Mr. Cross did a very good

17  job of sort of explaining how absentee -- you can't hold that

18  this mode of election is beyond review just because you can do

19  something else, just like with the photo ID.

20        I will call your attention to the case that we cite

21  in the brief.  It is by Judge Tjoflat.  And it is really an

22  eloquent restatement.  And it is the -- *Bourgeois* is the name

23  of the decision I think is the way you pronounce it.  387 F.3d,

24  and the quotation that we're looking is at 1324.

25        But it is in the -- it is in -- it is not a voting

rights case.  But it is a First Amendment case.  But what Judge Tjoflat does is explain how malignant and bad it is for the state to justify one unconstitutional mode by saying you can do something else.  He said, indeed, the very purpose of the unconstitutional conditions doctrine is to prevent the Government from suddenly pressuring citizens, whether purposely or inadvertently, into surrendering their rights.

So we believe that is one of their most repeated arguments that they have is that you can vote absentee.  On the facts, Your Honor, we have also shown that voting absentee -- and you have noted this in your opinions -- that there are all sorts of problems with voting absentee.

But there is one fact that will probably make our top ten when we give it to you on Friday.  And that is what counties are doing, Judge -- the counties are taking hand-marked paper ballots that come in in the mail.  And if they are torn when the automatic thing opens them, they put those into the BMD.  They fill out the BMD and let the BMD do it.  So you can't -- it is not an alternative.

And we don't know -- and one of your questions was how prevalent is that.  We don't know.  They have never responded to that evidence or rebutted it significantly.

And so we think that as a matter of law -- it is wrong as a matter of constitutional law to say, just because you can do absentee voting, that it is okay to have an

1    unreliable in-person voting.  But in any event, absentee voting

2    has its own problems running away.

3            We have three claims I do want to mention.  We have

4    three claims.  The State did not move for summary judgment on

5    those three claims, period.  I could not quite understand what

6    Mr. Miller was saying about it today.  He put up a slide about

7    our Poll Pad claims -- that discuss the Poll Pad claims.  That

8    is not in their brief.

9            But you know about our scanner setting claim.  That

10   came back from the Eleventh Circuit.  That is clearly in this

11   case.  They didn't move for summary judgment on that.  They

12   have not even mentioned it.

13           In terms of the ballot privacy claims --

14           THE COURT:  But wasn't the scanner setting claim

15   actually set forth in the complaint?  I mean, it was -- I

16   viewed it originally as sort of part of the -- almost the -- in

17   a more organic way -- but I'm not sure that that was correct --

18   as related to the voting but -- and the absentee -- and the

19   absentee ballots, which were the alternative.

20           MR. BROWN:  In terms of why it is in the complaint is

21   that our complaint challenges the Dominion voting system, not

22   the BMD.  And they -- the State defendants say that -- they say

23   it wrong so many times they get us to saying it wrong, to their

24   credit.

25           But we challenged in this -- this is what Your Honor

1    cited also in keeping this in the case.  To the first

2    supplemental complaint Paragraph 67 and 70, we challenge the

3    EMS, e-pollbooks, BMDs, and the scanners.  It has always been

4    in our case.  They keep on saying that it is not in the case.

5    But they don't ever explain it.  They didn't move on it.

6           It went all the way to the Eleventh Circuit and back.

7    It is close to a preliminary injunction.  That case -- that is

8    still in the case.

9           In terms of the Poll Pads, Your Honor has addressed

10   that, I think, three or four different times already.  The last

11   time they raised this -- this is -- I think they are probably

12   going to complain about the amount of our attorneys' fees that

13   we get awarded.  But the last time it was their fourth time.

14   This is the fifth time they are saying the Poll Pads aren't in

15   this case.  The fourth time they made that argument, you called

16   their argument fantastical because it was so clearly within the

17   case.

18          And that is their only argument.  Their only argument

19   for the Poll Pad claims or the scanner claims or the ballot

20   secrecy claims is that it is not in the case.  And that is just

21   false.  On the -- so that covers the scanner settings.

22          And you will recall, Your Honor, the scanner settings

23   was -- Ms. Dufort testified about the mistakes that the

24   scanners were making -- egregious mistakes, actual

25   disenfranchisement.  She -- in our papers, same problem again.

1     So the same scanner problem that she testified about at the

2     trial in the PI are reappearing again.  So that came --

3              THE COURT:  Didn't the State though adjust some of

4     the settings?

5              MR. BROWN:  It did.  This is post those adjustments.

6     So it is still happening.  And so that needs to be tried if we

7     don't get preliminary injunctive relief.  Or either way, we

8     would be entitled to have a trial on that.

9              Poll Pads I have already mentioned.  On the Poll Pads

10    on the evidence, we have copious evidence that there continues

11    to be problems with the Poll Pads.  So the burden on the right

12    to vote has increased.

13             It is easier to fix now because they have a port --

14    if they want to do this, they could do it.  They don't need to

15    print it out.  They could just use a jump drive.  Because the

16    newer versions, they can use a jump drive to put them in.

17             It is also more vulnerable now than it was before

18    because they are now connected to the internet.  They were very

19    proud of the fact that the Poll Pads were never connected to

20    the internet.  Well, Misty Hampton and -- down in Coffee County

21    testified that, oh, yeah, we watch Netflix on our Poll Pads,

22    which I think means it is connected to the internet.

23             So they are even more dangerous.  They continually

24    have problems.  And we're entitled to -- and there is no

25    argument from the State defendants that they are entitled to

1    summary judgment on that.  There is just none.  So that is the

2    Poll Pads.

3              The third claim -- the third and fourth claims are

4    the secrecy claims.  We briefed that extensively.  We explain

5    in the brief how ballot secrecy is still in the case.  They

6    don't say why it is not.  They don't say why motion for summary

7    judgment should be granted on it.  There is just no argument

8    about it.  They just say, very strangely, that you've dismissed

9    it.  And you haven't.

10             You discuss it in the motion to dismiss and in the

11   preliminary injunction.  So those claims are still alive.

12             Finally, Your Honor -- now, they may come up in the

13   rebuttal and say some other argument.  It is not briefed.  And

14   they didn't move on those four separate claims.

15             On mootness, to be brief and also to be precise, I

16   would like to direct the Court to what we say about mootness in

17   our response to the statement of material fact.  I think it is

18   important because this is a joint statement by both Curling and

19   Coalition as to the mootness.

20             It is also important because drawing the line between

21   what is moot and not moot is technical and important.  And we

22   have already -- we have set it forth.  So our joint response,

23   Document 1638, docket page at the top 28, Paragraph 34.

24             THE COURT:  Page 28?

25             MR. BROWN:  It is -- yeah, Page 28.  And then it is

1    Paragraph 34.  We explain which claims we won on and that are

2    no longer in the case and which claims -- and which issues are

3    not moot.

4         I don't believe there is a substantial light between

5    the State and the defendants on this issue.  But this is a

6    little bit more precise on it.

7         Your Honor, just one other point on the ballot

8    secrecy.  Although this goes to standing, ballot secrecy is

9    a -- is a powerful fact for injury under Article III because

10   the State has made it a crime for a voter to view another

11   voter's screen.

12        It is almost impossible to avoid doing that.  So to

13   vote in person, you have to risk being charged with a felony.

14   That is a burden.  That is clearly a burden that will give you

15   standing, standing to get into court to try to get relief that

16   would redress that, which is getting rid of the BMDs.

17        I note that the Coalition plaintiffs allege this in

18   their separate statement of material facts.  But in addition,

19   we point out that the Curling -- one of the Curling plaintiffs,

20   Mr. Schoenberg, also alleges that.

21        So on the Curling side, there is also very tangible

22   and specific injuries that the BMD causes that would give the

23   Curling plaintiffs standing.

24        Thank you, Your Honor.

25        THE COURT:  Thank you.

1          MR. MILLER:  Your Honor, I'll be very brief.  But I

2     will talk a little more deliberately before I have something

3     thrown at me by Ms. Welch.

4          THE COURT:  She wouldn't do that.

5          MR. MILLER:  Just to address a couple of points --

6     and I wouldn't blame her for that either, by the way.

7          Just to address a couple of quick points pointed out

8     there.  Starting first with this discussion about the pollbook

9     theft that was in the news here over the last couple of days,

10    two quick issues.  We have heard a lot about -- let me get this

11    on the -- well, I don't need it at the moment.

12         We've heard a lot about how various allegations are

13    purportedly not in the record, not in the pleadings, not in the

14    summary judgment.  There is nothing about this pollbook theft

15    in Dekalb County.  But I also want to be very pointed on this

16    because enjoining the BMD system -- the Dominion BMD system

17    will not eliminate the risk of a criminal stealing an iPad out

18    of an elections warehouse.  It just will not.

19         Under any system, there is going to be some form of

20    laptop or computer to check in a voter.  There is going to be

21    some form of laptop or computer or scanner that is a computer

22    that tabulates the votes, that contains the voter registration

23    system.  It will always be there in some form.

24         I want to touch briefly on one item, which was this

25    passage in *Jacobson* that Mr. Cross touched on.

1            I was trying to make this full screen, if I can --
2   there we go.
3            The point here is out of these -- out of these five
4   items, as Your Honor pointed out, the statute does not make it
5   more difficult to vote.  This is not about going to the DMV and
6   getting a photo ID.  This is not about having to do some
7   additional step in that regard.
8            I think I'm losing my connection.
9            This is also not about choosing a candidate of your
10  choice.  *Burdick* is about write-in voting.  There is no
11  allegation that you cannot vote for who you want to.  It is an
12  allegation that, due to some potential chain of events
13  involving the actions of a third party intervening with the
14  Dominion BMD system, that the vote would be altered or
15  manipulated, which really puts it into that fifth category,
16  which is the point.
17           I won't spend a ton of time on these others.  I think
18  they just plainly don't apply here.  But our point with this
19  passage is that, of these types of claims, the only type of
20  claim that is a colorable First and Fourteenth Amendment burden
21  on the right to vote is one that alleges, you know, the risk of
22  votes being uncounted or improperly counted.
23           And so that is the point as to when we look at each
24  of these burdens which one of those fit that category.  For
25  example, the auditability does not fit that category.  Nothing

1    in the audits is about tabulating the votes.  It is about a

2    check on the back end.

3            So just briefly on that point.  One additional item.

4    Mr. Cross pointed out that I had stated there was no vote

5    switching malware.  That is not precisely what I had stated.

6    What I had stated is that there is no malicious code --

7    vote-stealing malicious code that is both adaptable such that

8    it can work on multiple different elections nor

9    self-propagating.  That comes from Dr. Appel's deposition

10   testimony.  Dr. Appel himself, I mean, is -- and the plaintiffs

11   will tell you.  He is a preeminent expert in the field of

12   election security.  He has never seen it.

13           And that goes to the point of both the -- you know,

14   this concept -- and I won't dig into the mootness aspect

15   because I think we addressed as to the difference between

16   mootness of a claim and where factual matters intervene.  But

17   that factor goes into the factual matter of this question of

18   can something snake its way from the old DRE system to the BMD

19   system.  Not if there is not adaptable or self-propagating

20   malware that somehow knew what the system was going to be.

21           THE COURT:  Couldn't, in fact, be the malware that --

22   whatever was done that I don't know about when whoever was

23   working in the Coffee County office and now they have posted it

24   and they have a certain group of people and perhaps bunches of

25   other people who are not identified to us who could be working

1    on it -- why isn't that a true threat?

2            MR. MILLER:  So, first of all, that somebody could be

3    working on it isn't -- it is not necessarily a material fact at

4    issue.  The material fact at issue is whether it has been done

5    or it is certainly impending to be done.

6            THE COURT:  Right.  And the State has not answered

7    that -- I mean, they -- I think there has been significant

8    colorable evidence.  And I think that -- I understand that the

9    State's vesting this in the GBI to investigate.

10           But it has been a significant period of time.  And so

11   you are asking me to rule on this without -- for the State when

12   all of the information is within the State's access.

13           And I don't know -- I mean, I'm not -- I'm not

14   complaining.  I'm just saying it is a problem.

15           MR. MILLER:  To be clear, Your Honor, all the

16   information is not within the State defendants' access.  The

17   GBI is a separate state agency.

18           THE COURT:  I understand that.

19           MR. MILLER:  I don't represent the GBI.

20           THE COURT:  I understand that.  And the Secretary of

21   State's office asked for the GBI to investigate.  So it is not

22   that the GBI wasn't capable independently to do that.  But that

23   is not what happened here.

24           MR. MILLER:  I understand your point on this.  But

25   also the corollary to this is that it is plaintiffs' burden to

1    show that.  They have had this information and system -- I

2    mean, heck, we had probably a dozen depositions of these

3    various people that went in there.  We've got the forensic

4    images of, you know, what they did.  And there is nothing in

5    there that they did that anybody testified to or otherwise --

6              THE COURT:  What do I do with the testimony that

7    essentially one of the critical people took the Fifth?

8              MR. MILLER:  So, Your Honor, I would point the Court

9    to *Coquina Investments v. TD Bank, North America*.  And the

10   citation for that is 760 F.3d 1300.

11             And what that case is about is in the context of this

12   adverse inference for a Fifth Amendment -- invocation of a

13   Fifth Amendment privilege where it is a nonparty and the

14   inference sought to be drawn is against a party.

15             And what the Eleventh Circuit applied in that case is

16   it adopted a case-by-case analysis that considered four

17   factors.  One, whether a relationship exists between the --

18   excuse me.  I'm sorry.  I got tripped up -- whether a

19   relationship exists between the party against whom the

20   inference is being drawn and the nonparty invoking the

21   privilege and what the type of relationship that is.

22             There is no relationship between the State defendants

23   and Mr. Chaney.

24             MR. CROSS:  Sorry to interrupt.  Do we have a copy of

25   this case?  I think this is new.

```
 1              MR. MILLER:  Well, I mean, I have been trying to
 2    figure out what kind of adverse inference we're drawing for a
 3    little while now.  But --
 4              MR. CROSS:  Well, you didn't --
 5              THE COURT:  All right.  Listen, you have a computer
 6    there.  I mean, you can always -- I'll let you -- if you want
 7    to submit two pages afterwards about Coquina, that is fine.
 8              MR. CROSS:  They didn't respond to this in their
 9    reply.
10              THE COURT:  All right.  In oral argument, all sorts
11    of things happen.
12              So go ahead.
13              MR. MILLER:  And so the second factor at issue here
14    is whether the defendants have control over the individual that
15    is invoking the Fifth Amendment privilege or even had control.
16    No circumstance of that matter here.  Whether there is an
17    alignment of interests in the outcome of this litigation, there
18    is no alignment of interest.  In fact, if there is any
19    alignment of interest, it is these same individuals who allowed
20    the folks searching for Hugo Chavez's malware on the Dominion
21    BMD system -- they are going to want the Dominion BMDs gone.
22    If anything, it is a complete opposite interest.
23              And then finally as to whether the nonparty witness
24    has a material role in the litigation.  And that is simply not
25    the case here.
```

1          Maybe at most, they meet the fourth factor.  But even

2     with all of these factors, there also, under *Coquina*, has to be

3     some form of corroborating evidence as to the Fifth Amendment

4     invocation.

5          So the example here would be if Mr. Chaney or

6     Ms. Latham or Mr. Lenberg or any of these other characters

7     invoked a Fifth Amendment privilege as to whether I entered the

8     building or whether -- I think one of the lines of questions

9     frequently were whether Ms. Latham held the door open and

10    invited people in.

11         There is corroborating evidence to those.  It is the

12    security images, the footage.  For an adverse inference to be

13    drawn that goes to whether vote-stealing manipulating malware

14    was installed on the devices is a completely different story.

15    And there is zero corroborating evidence for that.  In fact,

16    there is a complete absence of corroborating evidence for that.

17    So that is the answer -- the Fifth Amendment privilege

18    invocation.

19         And as to Coffee County more generally, I just want

20    to point out, Your Honor, that when a local election board

21    refuses to follow State Election Board rules and regulations

22    and state law, that, again, is not an action that is directly

23    traceable to something of the State defendants.

24         It is a similar situation that was discussed with

25    respect to the pollbooks.  If a local election official is not

1    using the paper pollbook backup that is required, that is not

2    some injury that comes back to the State defendants.

3          So that -- and, finally, Your Honor, I'll note that

4    there is not a plaintiff here from Coffee County.  I realize

5    the allegation is something more, that somehow it is going to

6    snake its way from Coffee County back to the central system.

7          But at least with respect to the concrete

8    allegations, there is nobody from Coffee County vindicating

9    their interest here at this point.  I think --

10         THE COURT:  I think that sort of diminishes the

11   problem about if it is posted on the internet, the software, in

12   any manipulated form and other actors can use it and

13   potentially -- and use it in nefarious ways.

14         MR. MILLER:  And I want to be clear, Your Honor, that

15   the State defendants are not, you know, suggesting that there

16   is no problem, there is nothing wrong with the scenario.

17         THE COURT:  I understand that.

18         MR. MILLER:  But it is a -- you know, what is the

19   actual impact of that -- again, the real irony is these people

20   were looking for that malware.  They didn't find it.  The

21   plaintiffs came in and looked at the system, again looking for

22   that malware presumably.  Although at some point, I believe

23   Dr. Halderman testified he wasn't asked to look for the

24   malware.  Not entirely sure why.

25         But, nonetheless, plaintiffs came in and looked at

1    the forensic images.  They didn't find it.  What was done in

2    Coffee County is the same thing that would have been done on a

3    hand-marked paper ballot with unauthorized access.  They ran a

4    bunch of ballots through the scanner.  And Ms. Latham brought

5    her scanner from the church and ran ballots through it.

6              THE COURT:  So has the GBI or the Secretary of

7    State's office done a full examination of the software that was

8    posted on the internet?  And I realize with some access

9    requirements.

10              MR. MILLER:  Your Honor, with respect to a full

11    examination, I can't speak to that, sitting here today.  There

12    is nothing in the record indicating that.  There is also

13    nothing in the record that indicates a full examination of the

14    plaintiffs that showed something different.

15              I would also point out to the Court, Your Honor, that

16    this is somewhat ironic in that Your Honor will recall the

17    discussion over the GEMS database and whether that needed to be

18    subject to a protective order.

19              And a certain group of the plaintiffs insisted that

20    it didn't need to be subject to a protective order whatsoever.

21    And now we're in the flip side scenario here.  So --

22              THE COURT:  All right.

23              MR. MILLER:  But, Your Honor, just a couple of quick

24    points.

25              With respect to the Poll Pads, the issue here is that

1    the State defendants move for summary judgment on all items in

2    the complaint.  We don't believe that the Poll Pad allegation

3    is a part of the complaint.

4         And if we look at the allegations here that I just

5    wanted to pull up briefly, these are about how the BMDs

6    themselves allegedly burden or infringe on the fundamental

7    right to vote.  And it has got nothing about paper pollbooks,

8    pollbook backups, nor the Poll Pad check-in systems themselves.

9         With respect to the ballot secrecy issue, I will

10   concede that is at least a part of the Coalition plaintiffs'

11   equal protection claim.  It is included therein.

12        But the bottom line with respect to ballot secrecy,

13   Your Honor, is that the gravamen of the issue is that this is a

14   state law matter.  And Judge Jones in *Fair Fight* in a

15   preliminary injunction order filed there found the same thing

16   on an interpretation of state law.

17        Finally, Your Honor, I want to quickly address one or

18   two brief points.  I think there was a statement made earlier

19   with respect to the burden and the severity of the burden and

20   what the State's right is to regulate elections.

21        To be clear, the State does, in fact, have an

22   unfettered right to regulate elections pursuant to their

23   constitutionally granted authority in Article I.  That is

24   constricted by the text in that provision which says Congress

25   may regulate the regulations for senators and representatives.

1    And it is also restricted to the extent that a severe burden on

2    the right to vote is imposed or something more than a minimal

3    burden at the very least.

4            Because in that instance, the State's reasonable and

5    nondiscriminatory restrictions are subject to no evidentiary

6    showing on behalf of the State whatsoever.  They will survive

7    the *Anderson-Burdick* test.

8            Finally, I just want to reiterate one point that I

9    made briefly in the opening argument.  I think that it became

10   more acutely at issue here after the Coalition plaintiffs'

11   claims is that at bottom the -- what is the triable issue here?

12           And the Coalition plaintiffs and the Curling

13   plaintiffs too have a lot of ideas about how to administer

14   elections.  But the proper audience for those ideas about how

15   to administer elections is a few blocks away under the gold

16   dome.

17           It is not simply because it is a good idea.  That

18   does not amount to a constitutional right, which can be

19   vindicated within the power of the Court.

20           THE COURT:  Thank you very much.

21           MR. MILLER:  Thank you.

22           THE COURT:  Fulton County's representative has been

23   very spare and efficient in his remarks.

24           Was there anything you needed to say?

25           MR. LOWMAN:  Your Honor, in light of your earlier

1    question to the plaintiffs and in light of the argument here

2    today, it is clear that we will rest on our briefs and that

3    they will speak for themselves.  And I think they show why

4    we -- and I think you understand why we are not a proper party

5    to this case.

6              THE COURT:  Thank you.

7              All right.  Well, it has obviously been a very long

8    argument.  We aren't trying to pretend we are living in another

9    era with Clarence Darrow with great advocacy that goes on

10   forever.  And -- but it has been very helpful.  And, of course,

11   the reality is hearings are necessary sometimes to get the

12   judge absolutely focused and understanding some issues that may

13   have eluded her or him.

14             And I greatly appreciate all the preparation that

15   went into this.

16             MR. CROSS:  Your Honor, could I ask one quick thing?

17             THE COURT:  Yes.

18             MR. CROSS:  One of the questions you had in your

19   written questions about the admissibility of the MITRE

20   report -- could Ms. Middleton have like two minutes on that?

21             THE COURT:  Yes, she can.

22             MR. CROSS:  Thank you.

23             THE COURT:  I know she is all ready for it.  But, you

24   know, if she does do this, I do have to allow the State to

25   respond.

```
 1              MR. CROSS:  Yes, of course.  Okay.

 2              THE COURT:  Thank you for your patience.

 3              MS. MIDDLETON:  Good evening, Your Honor.  Caroline

 4   Middleton for the Curling plaintiffs.

 5              The MITRE report in this case is admissible on

 6   several grounds.  The plaintiffs objected to the MITRE report

 7   in the summary judgment filing.  State defendants did not

 8   respond to that objection at all in their reply filings, much

 9   less rebut it.  That was their opportunity to do so.  Any

10   argument now is untimely and waived.

11              The Court should also not consider the MITRE report

12   because it is immaterial.  It is not cited, and defendants do

13   not rely on it in their briefs.

14              State defendants' attempt to now offer the MITRE

15   report into evidence as an expert report is extremely untimely.

16   Local Rule 26.2(c) states, any party who desires to use the

17   testimony of an expert witness shall designate the expert

18   sufficiently early in the discovery period to permit the

19   opposing party the opportunity to depose the expert, unless the

20   failure to comply was justified.

21              Here in this case, the parties agreed and the Court

22   approved expert discovery deadlines.  State defendants made no

23   mention of MITRE and produced no report from MITRE by those

24   deadlines.

25              This Court previously emphasized the importance of
```

1    the expert discovery deadlines by excluding a report from

2    plaintiffs that it found to be untimely.  In January 2022,

3    State defendants objected to one of plaintiffs' experts as

4    untimely and this Court excluded it.

5         In keeping with State defendants' position and the

6    Court's corresponding ruling, State defendants' disclosure of

7    MITRE as an expert or introduction of the MITRE report is

8    especially untimely now.  And it would be manifestly unfair and

9    highly prejudicial to plaintiffs for the Court to consider the

10   MITRE report but not Dr. Buell's report.

11        As of today, State defendants have not disclosed

12   MITRE or anyone from MITRE as an expert.  We don't even know

13   who specifically prepared the MITRE report, how many

14   individuals prepared it, what their training and qualifications

15   was to constitute being an expert, what specific expertise is

16   being offered for any such individuals, what all they

17   considered or relied upon for that report, or any of the

18   information that parties are required to disclose under Rule 26

19   with an expert report.

20        That failure, which has persisted since the report

21   was first disclosed, is not justified.  State defendants have

22   offered no justification for waiting until long after the

23   expert discovery deadlines to put forward the MITRE report as

24   expert testimony.  They had ample opportunity to do so within

25   the schedule ordered by the Court, and they chose not to.

1          Moreover, while State defendants received the MITRE

2     report by at least May of 2022, they sat on it for four months

3     until September of 2022 to provide a copy to plaintiffs and

4     file it on the docket.  That untimely disclosure is unjustified

5     and highly prejudicial to the plaintiffs.

6          The Court should also not consider the MITRE report

7     because it is hearsay.  State defendants claim that MITRE

8     provided their findings of an independent expert technical

9     review.  And expert reports are generally inadmissible hearsay.

10          While the Court has some way to consider hearsay at

11     the summary judgment phase, such as expert reports, it can only

12     do so where it concludes that the statements will come in at

13     trial through admissible evidence.  Here, no such conclusion

14     would be appropriate.

15          Plaintiffs have had no opportunity to cross-examine

16     MITRE or the other court declarants whose statements are

17     contained in it.  We don't even know who wrote it or how many

18     individuals wrote it or who State defendants would offer as an

19     expert witness or which witnesses would testify.

20          And also the unsigned MITRE report does not fall into

21     any of the hearsay exceptions.  It does not qualify as a

22     business record given State defendants' statement that it is an

23     expert report.  It is not a -- it is not a public record.

24     Unlike CISA, for example, MITRE is not a public agency.  And

25     the MITRE report does not fall within the residual hearsay

1    exception because it lacks all indicia of reliability and

2    because of the bias of Dominion in directing the report's

3    production.

4           The MITRE report quotes extensively from the

5    Halderman report despite this Court's protective order

6    prohibiting any disclosure of Dr. Halderman's reports to third

7    parties, such as MITRE.

8           It provides a critically incomplete and misleading

9    picture of the facts, as well as Dr. Halderman's analyses and

10   findings, which CISA validated.  For example, a foundational

11   assumption underlying the report and the opinions offered in it

12   is that nobody can gain access -- unauthorized access to

13   Georgia's voting system.  But we know from Coffee County that

14   is not true.  That objectively wrong assumption reveals a lack

15   of rigor and reliability with which the MITRE report was

16   prepared.

17          As Mr. Miller mentioned, we just learned yesterday of

18   another breach of Georgia's voting system relating to the Poll

19   Pads.

20          The MITRE report also wrongly assumes for its

21   opinions that the human readable text of the BMD ballots is

22   what gets tabulated and counted for elections.  The MITRE

23   report also lacks reliability because it was created for

24   Dominion's commercial purposes.

25          THE COURT:  All right.  I sort of said yes, we could

```
1    have a sum, but how much longer are we going?
2              MS. MIDDLETON:  I have one minute.
3              THE COURT:  I think I have heard enough.  Thank you.
4    I appreciate -- if you have something in your last minute that
5    you want to say --
6              MS. MIDDLETON:  I was going to touch on discovery.  I
7    am done with hearsay.
8              THE COURT:  I understand you would want discovery.
9              MS. MIDDLETON:  Okay, Your Honor.  Thank you for the
10   opportunity.
11             THE COURT:  If I were to allow it, you want to be
12   able to conduct a discovery deposition of the author or
13   authors?
14             MS. MIDDLETON:  Yes.
15             THE COURT:  Is that right?
16             MS. MIDDLETON:  Yes.  The plaintiffs have not had an
17   opportunity for discovery, but it would be highly prejudicial
18   to allow it at this time given the stage -- this very late
19   stage of the case.
20             THE COURT:  All right.  And did the State rely on the
21   MITRE report in its responses to the --
22             MS. MIDDLETON:  It did not, Your Honor.  So our
23   position is that that was an opportunity to do so.  And because
24   they didn't, that that is waived.
25             THE COURT:  All right.  Thank you very much.
```

```
 1                MS. MIDDLETON:  Thank you, Your Honor.
 2                MR. MILLER:  Your Honor, I'll just very briefly
 3     respond.
 4                State defendants' position, frankly, is that both the
 5     CISA report and the MITRE report are not material facts at
 6     issue right now.
 7                THE COURT:  Well, let's -- we're not going to go back
 8     to the --
 9                MR. MILLER:  I'm not going to go back --
10                THE COURT:  I'm just going to say.  You got me to
11     exclude Dr. Buell's report.  And so it would be very hard for
12     me to consider allowing the MITRE report.
13                MR. MILLER:  I understand, Your Honor.
14                The only point to say it wasn't a material fact is
15     simply that, first of all, the State did not hire MITRE.  The
16     State did not engage MITRE.  That was a Dominion response.
17                THE COURT:  I understand that.
18                MR. MILLER:  As the Court indicated with respect to
19     the CISA report -- as I recall, we raised it in a discovery
20     conference as to whether the CISA report was going to be
21     considered at trial or on the merits.  And as we understood it,
22     the CISA report was a factual development.  Likewise here, the
23     State's position is that MITRE is a factual development.
24                We don't think either matter in the context of this
25     motion.  But the State's position is only if one comes in the
```

1    other does too.  And with respect to Your Honor's --

2         THE COURT:  I don't think that the -- they are in

3    different positions though.  There was an official

4    responsibility in the federal law for CISA's reports.  It

5    doesn't mean that they are 100 percent accurate.  You can

6    challenge anything there but -- especially if this -- you know,

7    at the juncture that this was created, if it was something that

8    you wanted to pursue, I think it needed to be raised right

9    away.

10        MR. MILLER:  Your Honor, to that point on the timing,

11   this was a publicly announced finding in May of 2022.

12        THE COURT:  But was it publicly announced in this

13   case?  I remember the MITRE case -- that it came out.  But it

14   doesn't mean that it was clear that the State defendants wanted

15   to use it.

16        MR. MILLER:  We never made a formal Rule 26

17   disclosure, no, Your Honor.

18        THE COURT:  That is what I'm saying.

19        MR. MILLER:  We never did.

20        THE COURT:  I'm just going to say it is not likely to

21   be authorized.

22        MR. MILLER:  Okay.  And I will make one last point as

23   to Your Honor's prior ruling as to Dr. Buell, which was that

24   the Court ruled that Dr. Buell could not come in because he had

25   been absent for years but that Dr. Stark could incorporate

1     Dr. Buell's report.

2          THE COURT:  I remember.  I remember.  But you had

3     every opportunity, didn't you, to question the doctor about his

4     amended report or were you foreclosed from doing that?

5          MR. MILLER:  We only got that opportunity probably

6     on -- I think that was in the fall of 20 -- forgive me.  The

7     case merges together a little bit.

8          THE COURT:  We had a lot of trouble with discovery, I

9     recognize.  But you did get that opportunity.

10         MR. MILLER:  Correct.  To be fair, we were still

11    taking depositions of Dr. Halderman in January a week before we

12    filed the motion.

13         But with that, Your Honor, I will sit down.

14         THE COURT:  Thank you very much.

15         MR. CROSS:  Thank you, Your Honor.

16         THE COURT:  Thank you, everybody.  Well, again, if

17    you are going to get this -- if you need more than Friday, just

18    agree on when it is going to be sent.

19         Thank you for all the preparation you did for this.

20    I think that I want to -- State counsel sent us an electronic

21    version of the -- didn't you?

22         MR. TYSON:  Yes, Your Honor.

23         THE COURT:  If we could get an electronic version of

24    Curling plaintiffs' show-and-tell also.

25         Anything with my team over there?

1          All right.  Thank you very much.  And it was very

2     helpful.  I want to thank also the very interested audience for

3     your absolutely extraordinary attention and quiet though and

4     lack of oohs and ahhs.  But, of course, oral argument is not

5     evidence.

6          Good to see you-all.  I hope everyone stays well.

7     And you have given us a lot to work on.  Thank you.

8                         **(The proceedings were thereby concluded at 6:18**

9                         **PM.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES OF AMERICA

4    NORTHERN DISTRICT OF GEORGIA

5

6         I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

7    the United States District Court, for the Northern District of

8    Georgia, Atlanta Division, do hereby certify that the foregoing

9    190 pages constitute a true transcript of proceedings had

10   before the said Court, held in the City of Atlanta, Georgia, in

11   the matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13   4th day of May, 2023.

14

15

16

17   _____
     SHANNON R. WELCH, RMR, CRR
18   OFFICIAL COURT REPORTER
     UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25