The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3

 4   DONNA CURLING, ET AL.,            :
                                       :
 5          PLAINTIFFS,                :
     vs.                               :   DOCKET NUMBER
 6                                     :   1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,       :
 7                                     :
            DEFENDANTS.                :
 8

 9

10      TRANSCRIPT OF BENCH TRIAL - VOLUME 10A PROCEEDINGS

11           BEFORE THE HONORABLE AMY TOTENBERG

12          UNITED STATES DISTRICT SENIOR JUDGE

13                   JANUARY 23, 2024

14

15

16

17

18

19

20

21   MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                 TRANSCRIPT PRODUCED BY:

23
     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

```
 1            A P P E A R A N C E S   O F   C O U N S E L

 2
     FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
 3   SCHOENBERG:

 4
          DAVID D. CROSS
 5        MARY KAISER
          RAMSEY W. FISHER
 6        MATTHAEUS MARTINO-WEINHARDT
          BEN CAMPBELL
 7        AARON SCHEINMAN
          MORRISON & FOERSTER, LLP
 8
          HALSEY KNAPP
 9        ADAM SPARKS
          KREVOLIN & HORST
10
          CHRISTIAN ANDREU-VON EUW
11        THE BUSINESS LITIGATION GROUP

12

13   FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
     WILLIAM DIGGES, III, AND MEGAN MISSETT:
14
15        BRUCE P. BROWN
          BRUCE P. BROWN LAW
16
          ROBERT A. McGUIRE III
17        ROBERT McGUIRE LAW FIRM

18
     FOR THE PLAINTIFFS LAURA DIGGES, WILLIAM DIGGES, III, MEGAN
19   MISSETT, AND RICARDO DAVIS:

20
          CARY ICHTER
21        ICHTER DAVIS

22   ON BEHALF OF RICARDO DAVIS:

23
          DAVID E. OLES, SR.
24        LAW OFFICE OF DAVID E. OLES

25                           (...CONT'D....)
```

```
 1   (...CONT'D....)

 2   FOR THE STATE OF GEORGIA DEFENDANTS:

 3
         VINCENT RUSSO
 4       JOSH BELINFANTE
         JAVIER PICO-PRATS
 5       EDWARD BEDARD
         DANIELLE HERNANDEZ
 6       ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

 7       BRYAN TYSON
         BRYAN JACOUTOT
 8       DIANE LAROSS
         DANIEL H. WEIGEL
 9       DONALD P. BOYLE, JR.
         TAYLOR ENGLISH DUMA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>**I N D E X   T O   P R O C E E D I N G S**</u>

<u>**THE PLAINTIFFS' CASE (Continued)**</u>

<u>**WITNESS**</u>                                                <u>**PAGE**</u>

CATHY LATHAM (Videotaped Deposition)                  19

DOUG LOGAN (Videotaped Deposition)                    21

JEFFREY LENBERG (Videotaped Deposition)               21

WENDELL STONE (Videotaped Deposition)                 21

JAMES BARNES (Videotaped Deposition)                  22


RULE 52(c) MOTION

  Argument
    by Mr. Tyson                                       81
    by Mr. Fisher                                      88
    by Mr. McGuire                                     94

<u>**THE DEFENDANTS' CASE**</u>

<u>**WITNESS**</u>                                                <u>**PAGE**</u>


RYAN GERMANY

    Direct Examination
      By Mr. Bedard                                    99
    Cross-Examination
      By Mr. Cross                                    134
    Cross-Examination
      By Mr. Brown                                    153

                                      * * *


CERTIFICATE                                           168

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; January 23, 2024.)**

THE COURT:  I think you threw too many things at us yesterday.  So we were still looking at them.

All right.  So were we at the issue of your offering the depositions?  Is that what you want to do at this juncture?

MR. CROSS:  I think we were planning to play the rest of the videos.  We have cut them back a bit.  It is a little over 40 minutes.

THE COURT:  All right.  That's fine.

MR. CROSS:  There are a couple of quick preliminary matters if we could, Your Honor.  One is, Your Honor might recall at the start of the trial the State asked that the parties agree to disclose witnesses two business days in advance instead of one.  We agreed to that.  Although they had objected to that in December.

They also asked us at the start of the trial to disclose our witnesses in the order in which we plan to call them.  We have done that every day.  We've often erred on the side of providing witnesses two to three days out.

Your Honor directed them to provide their witnesses over the weekend.  We did get witnesses.  But the list we got last night had two new witnesses that had not been disclosed.  They dropped one.  And they refuse to tell us the order in which they will call them, other than to say they start the day

1    with Mr. Germany.

2           We're just asking for a directive since we thought we

3    had an agreement that we will get witnesses at least two

4    business days in advance and we will get them in the order in

5    which they plan to call them, as we did.

6           MR. TYSON:  Your Honor, we did provide the list as

7    required last night at 6:00 P.M.  We went back and looked after

8    we got Mr. Cross' email about order.

9           From our count, I think only three of the seven or

10   eight days we have been in trial did the plaintiffs proceed in

11   the order they provided the list to us the night before.

12          And so from our perspective, we're happy to do that

13   if we need to.  We obviously have some things moving around.

14   Mr. Hamilton, for example, was going to go -- we had to move

15   some things with that.  It happens in trial.

16          We provided, just as they did for us, we're going to

17   start with Mr. Germany.  We'll keep things posted.  They have

18   the menu of what we're going to look at today.  But we'll do

19   whatever the Court -- we're trying to make this work in as fair

20   a way as possible given that we also had a bunch of witnesses

21   sitting here when they did not go in the order they had given

22   to us the night before.  So --

23          THE COURT:  Well, as you can well imagine, it is not

24   something I really can parse as to what happened.  I think that

25   you should do the best you can to give them in the order,

1   understanding that things happen and people's schedules go

2   upside down.  And then advise as soon as you can if the

3   schedule is having to change.

4          I mean, that's all I can really say.  I mean, things

5   will run more smoothly, obviously, if that happens.

6          And I understood parenthetically on Saturday that it

7   was a possibility you wouldn't -- we wouldn't reach any

8   defendants' witnesses on Monday.  But the spirit of the whole

9   thing was to get it done.

10          And also it was a weekend.  And, therefore, it was

11   the obvious time that plaintiffs' counsel would need -- want to

12   take advantage of an order to prepare so that things could run

13   more smoothly.  And you had two long weekends -- three-day

14   weekends, in fact, to do that.  So it just sort of -- you know,

15   I'm just trying to get you all obviously to have as much time

16   as you can under very crunched circumstances.

17          MR. TYSON:  Certainly, Your Honor.  We appreciate

18   that.  We'll continue to follow that.

19          I did just want to clarify.  One of the challenges

20   for us the first day of trial was the list we received before

21   the weekend before trial changed significantly by that Monday

22   night email the day before trial.

23          So again, we're all trying to work the best we can,

24   but we'll proceed accordingly.

25          THE COURT:  All right.  Well, thank you.  And

```
 1    inevitably people are juggling a lot of balls, including the
 2    Court, so there are things that happen.  That's all.
 3             I understood there was some issue -- I mean, I know
 4    that we're going to deal with your proffer when you're through
 5    with these witnesses, and we'll discuss that at some -- and
 6    that will take a little while.
 7             I understand that Mr. Oles made a motion to call
 8    somebody from the Coalition.  And I don't really understand
 9    what is going on.  So I'm going to just try to address that as
10    well while we're trying to sort some things out.
11             MR. OLES:  I can address that, Judge.
12             Judge, we are not making a motion to call anyone from
13    the Coalition.  If there was any error -- we had simply filed a
14    motion asking for my client to be able to bring in his laptop
15    while he is here so that he can keep his job.
16             THE COURT:  I thought there was somebody else --
17             MR. OLES:  Because everyone -- it is so important for
18    him to be here, that way we would be able to --
19             THE COURT:  Excuse me just a second.
20             There's some confusion about what you're asking for
21    because there was a reference to somebody -- maybe you copied
22    something in it and it ended up being incorrect.
23    Ms. Greenhalgh, is that --
24             MR. McGUIRE:  Ms. Greenhalgh.
25             THE COURT:  Ms. Greenhalgh.  Is this relating to
```

1    Ms. Greenhalgh or not?  Because it is what we thought related

2    to Ms. Greenhalgh.

3              MR. OLES:  We're certainly not -- my client is not

4    interested in Ms. Greenhalgh.  I believe what Mr. Cross brought

5    to my attention this morning was that my assistant may have

6    attached the wrong document.

7              THE COURT:  Okay.  That's what we got.

8              MR. OLES:  She filed a motion requesting Mr. Davis --

9              THE COURT:  That is the confusion on my part.  We've

10   got a lot of --

11             MR. OLES:  Thank you.  I apologize for that, Judge.

12             THE COURT:  Talking about moving parts.  All right.

13             So you're asking instead not for Ms. Greenhalgh but

14   for your client to bring in what?

15             MR. OLES:  He would like to bring his phone and his

16   laptop so that he can continue to work while he is attending.

17             THE COURT:  But he wants to work for his job at this

18   point?  Is that what you are saying while he is --

19             MR. OLES:  That is what he would like to do.  He

20   would like to maintain a presence here.  But if he can go out

21   and work, then he can try and do both.

22             THE COURT:  Does anyone else have any position as to

23   that?

24             MR. CROSS:  Your Honor, we do have a concern, and I

25   addressed it with Mr. Oles this morning, about how the

1   electronic equipment might be used.  And what has unfolded in

2   the last day that has us concerned is, one of the points we've

3   made is that the case Mr. Davis is advancing is not only within

4   the --

5           THE COURT:  Wait a second.

6           Do you need --

7           COURTROOM DEPUTY CLERK:  We're good.

8           MR. CROSS:  The case he's advancing, it is not within

9   the scope of the claims here.  But it is directly at odds.

10          Let me just play something real quick for the Court

11  so you can understand where the concern is coming from.

12                  **(Playing of the videotape.)**

13          THE COURT:  Can you -- what is it that you're going

14  to play, first of all?

15          MR. CROSS:  So this is an interview that Garland

16  Favorito, Mr. Oles' litigation consultant, gave with Mike

17  Lindell yesterday.  And what he says is, is what we long

18  suspected, he admits that what they are after in this case is

19  relief to eliminate scanners.

20          And he acknowledges that that is at odds with the

21  other plaintiffs.  He acknowledges that they are trying to put

22  in evidence like evidence of scanners counting ballots twice to

23  do that.  And what they want to do is eliminate, his words, the

24  entire existing voting system.

25          And so it is not just -- the two points are, one, the

1    Court has no authority to do that because it is not within the

2    scope of the claims.

3              And two, it is directly at odds with the relief we're

4    seeking and the fundamental position we have taken in this case

5    that scanners are the right way to do it.

6              And so, you know, respectfully to Mr. Oles, we have

7    been told time and time again, including Your Honor, that they

8    are only pursuing the relief in the case.  His litigation

9    consultant has now acknowledged that is not happening.  And we

10   have wasted a lot of time pursuing this.

11             And now we have a concern, given the lack of candor

12   about what is really happening, about bringing in electronic

13   equipment and how that might be used.

14             MR. OLES:  Well, Judge, I don't think that has

15   anything to do with my request before the Court, which is

16   simply that Mr. Ricardo Davis be allowed to bring his phone in

17   and his laptop so that he can continue to work while he is

18   attending, because counsel has repeatedly pointed out that my

19   client is not here.  And it is only as a result of counsel's

20   repeated insistence that my client be physically present that

21   he is making this request.

22             THE COURT:  All right.  Let me just say, first of

23   all, as to your client's presence, it is up -- the two of you

24   can decide.  My concern, I wanted to articulate, was simply

25   that especially when you are examining somebody that is

1   relating to your client's interests, if you're relying solely

2   on your consultant and not on your client, it gives -- it is

3   not -- we're not in a criminal proceeding.  So it is not like

4   you've abandoned your client or he has not been present when he

5   needed to be in a criminal proceeding.

6          But there is an interest in your representing

7   obviously the person who has been a party in this case and was

8   deposed for years.

9          It is not a mandate if he has to be -- you know, he

10  has work obligations, he can be outside the courtroom.  But it

11  was -- there were days on end that he was not present and that

12  you were looking -- it looked to me also as if you were looking

13  to Mr. Favorito for -- and it was only after I asked you about

14  it that you indicated he was your consultant.

15         And that is -- that was my concern.  Because if on

16  one hand your client has indicated he wanted new counsel

17  because he was -- had some disagreements with his Coalition

18  counsel, and there was -- as to the claims or the way

19  everything was being pursued that was very late in being

20  advanced on his part, but in November -- late November, then,

21  you know, the natural thought was on my part, well, then he

22  would want to be here with you.

23         MR. OLES:  Yes.  Understood.

24         THE COURT:  So that was really my concern rather than

25  have somebody else, a third person, even if he is close with

1    Mr. Favorito, guiding the case.  That was of concern.

2          You know, we have -- I have some concerns about a

3    whole other laptop coming in under the circumstances here.

4    But -- and I don't want to have to monitor obviously that your

5    client is doing his work rather than reporting on something

6    else.

7          And maybe a better compromise is he brings in -- and

8    I don't know really the nature of what he has to do every day.

9    If he wants -- perhaps if he is here some days and not others,

10   that would be better as a compromise.  I can't mandate that he

11   be present but -- under the circumstances, but I don't -- it

12   just is not proper, it seems to me, for him to bring -- to be

13   part of a case of this magnitude and not at least listen in

14   some of the time.  So that is the circumstances.

15         And if I see, instead, that he's, you know, doing any

16   type of social media instead and communicating about the case

17   in that way, that would be a concern.  I don't -- because that

18   would be -- I mean, I have expressed this before to everybody.

19         So he is -- is Mr. Davis here now?  I don't see him,

20   but ...

21         MR. OLES:  I do know it is -- he had -- he was

22   dropping off his wife at work this morning.  And he is on the

23   State's called witness list today.  So he must be available for

24   that.

25         THE COURT:  Why don't we wait on this until we can --

1    until he is here personally.

2          MR. TYSON:  And, Your Honor, just to be clear, from

3    the State's perspective, we don't have any objection to

4    Mr. Davis bringing his laptop and phone in.  Ms. Marks

5    obviously has had her equipment.  I think everybody has.  So we

6    don't have any objection.

7          THE COURT:  And I understand that.  But I haven't

8    had -- I have had ongoing communications obviously with

9    everyone who is in this room, including Ms. Marks, not

10   separately but -- and she has counsel who is working with her

11   as well.  So I have got that.

12         But Mr. Davis, his participation in the case more

13   recently has been uneven and so -- and I don't know, you

14   know -- and I have never talked about to him -- which I have

15   Ms. Marks and in other proceedings, about what the proper scope

16   of her -- her role when you're in the court.

17         So I would like to do that and then find out a little

18   more from him.  And then we can proceed to address that.

19         MR. OLES:  And we are certainly -- I'm certainly more

20   than happy to produce him, Judge.  But as I must say this, as I

21   look around the courtroom, I see no one here to represent

22   Secretary Raffensperger or any member of the board, unless they

23   were subpoenaed in.  I see no one -- I see some of the Curling

24   and Coalition Plaintiffs.  But certainly not all of them.

25         And no one in this courtroom has suggested that there

```
1   is anything wrong with them not all being here for the whole
2   time of this case.  And I appreciate what the Court is
3   expressing, and my client is sincere about his interest in the
4   case.  Otherwise he wouldn't have gotten me coming in at the
5   last second in a high profile case on this 23rd floor of this
6   building before Your Honor right before your retirement and
7   placing my career at risk and my reputation in order to do
8   this, which is only to say --
9           THE COURT:  I'm not retiring.  I mean, maybe there
10  are people here who would like me to retire, but I'm not
11  retiring.  I just want to be -- assure you --
12          MR. OLES:  Maybe I'm --
13          THE COURT:  -- my father gave his last concert when
14  he was 95.  He died 101.  There were students all around him
15  all the way to the end.  So, unfortunately, I have been --
16  fortunately from a health perspective and a life perspective
17  I've -- I have been blessed by his presence in my life.
18          But, unfortunately, he seems to have told me, stay
19  young by being engaged.  So ...
20          MR. OLES:  Well, I personally hope that Your Honor
21  will be here for a long time.
22          But I feel hounded by Mr. Cross and persecuted by
23  Mr. Cross.
24          THE COURT:  All right.  Mr. Cross --
25          MR. OLES:  I believe it is unfair.
```

1          THE COURT:  Mr. Cross, don't persecute counsel.  All

2     right?

3          I mean, I understand this is upsetting.  What has

4     happened is still upsetting.  And I have to say almost all the

5     other plaintiffs have been, in fact, here on a day in, day out

6     basis.  It is not -- I am not taking attendance.

7          It was the circumstances of having required a new --

8     injecting a new lawyer who wants to do different things not

9     necessarily on the pretrial order and his not being here and

10     the reliance on Mr. Favorito in this context.  I mean, that is

11     the bottom line why -- their concerns and some of mine.

12          So, anyway, he is going to come here and we're going

13     to discuss with him what he needs.  I don't have any problem

14     with his having a computer or a cell phone.  I just want to

15     make sure he understands basically the parameters of use inside

16     the courthouse.

17          MR. OLES:  All right.

18          THE COURT:  And I don't think -- well, I know you do

19     a range of work.  You're not in the federal court routinely.

20     And so -- and this place is a very picky place about the use of

21     technology --

22          MR. OLES:  I understand.

23          THE COURT:  -- inside the court.  So it is important

24     that I communicate that to him.

25          As to lindellplan.com, we'll deal with that later to

```
 1    the extent that it's relevant.
 2             MR. OLES:  At the risk of provoking further uproar in
 3    the Court, before the plaintiffs close their case, my client
 4    has asked me to proceed with the proffers that we suggested
 5    that we would do earlier as each of these issues have come up.
 6             And I would like the opportunity to place on the
 7    record three proffers of evidence that --
 8             THE COURT:  How long is this?  Or is it something
 9    that we should do --
10             MR. OLES:  Five, ten minutes.  It is going to be
11    short.
12             THE COURT:  All right.  Well, why don't we hear -- go
13    ahead with the -- unless somebody else among the group thinks
14    it is better just simply to have the proffers.  But I was
15    thinking we should just go ahead with the videotape at this
16    point, and then you can do the proffers.
17             MR. OLES:  Thank you, Judge.
18             THE COURT:  And I want to say, Mr. Oles, also that I
19    do appreciate your entire manner has been completely
20    professional and courteous, and I very much appreciate that
21    given the tension around the circumstances in this case and all
22    of the things that people also experience during litigation of
23    a large case, which makes people exhausted and lose their cool
24    at times.
25             MR. OLES:  Thank you, Judge.  I appreciate that.
```

```
 1            MR. CROSS:  Your Honor, if I could, I would just echo
 2    that.  I'm sorry Mr. Oles feels persecuted.  Our issue is not
 3    with Mr. Oles.  He's doing his job.  Our issue is what we will
 4    get to eventually about the --
 5            THE COURT:  Well, you can tell me later on.  Let's
 6    hold that off.  I don't need to hear it twice.  I'll hear it
 7    I'm sure very eloquently presented, your concern, later on.
 8            MR. CROSS:  Your Honor, could we ask what the witness
 9    order is for today?
10            MR. TYSON:  Your Honor, Mr. Germany and then our plan
11    is to go to Mr. Evans if there is time.
12            THE COURT:  Okay.  Remind me who Mr. Evans is.
13            MR. TYSON:  Mr. Evans took Mr. Harvey's place as the
14    elections director for the Secretary.
15            THE COURT:  Okay.
16            I mean, Mr. Harvey is, of course, somebody I've known
17    for years either through this case and otherwise.  So I was
18    forgetting that -- I didn't forget he left.  I just forgot
19    Mr. Evans' name in the process.
20            Okay.  All right.  Is there anything else that we
21    need to deal with?
22    **THE PLAINTIFFS' CASE (Continued).**
23            MR. SCHEINMAN:  Then, Your Honor, at this time the
24    plaintiffs intend to continue with the videos we were
25    presenting yesterday.
```

```
 1              At this time we would like to show you an excerpt

 2     from the deposition of Cathy Latham.  This was taken on

 3     August 8th of 2022.  And the attorneys you will hear are David

 4     Cross for the plaintiffs and Mr. Pico-Prats for the defendants.

 5              This is Tab 6 in the binder we gave you yesterday, if

 6     you would like to follow along.

 7                     (The videotaped deposition clip of CATHY LATHAM

 8                     was played.)

 9              MR. SCHEINMAN:  Thank you, Your Honor.

10              And one quick correction, there was a third attorney

11     voice in the middle.  That was Russell Abney on behalf of the

12     Coalition for Good Governance.

13              THE COURT:  You're going to have to speak up.

14              MR. SCHEINMAN:  All right.  There was a third

15     attorney voice I didn't mention in the middle of that passage.

16     That was Russell Abney on behalf of the Coalition for Good

17     Governance, just so the record is clear, Your Honor.

18              THE COURT:  Which one of these entries?

19              MR. SCHEINMAN:  That is the entry on page -- it is 5

20     and 6 from Lines 203, is where Mr. Abney's examination began,

21     and then Mr. Pico-Prats took over from everything after marked

22     line -- after Page, forgive me, 207.

23              THE COURT:  There is nothing with 207 here.

24              MR. SCHEINMAN:  I was referring to the line markings

25     from -- the page markings, forgive me, from the original
```

```
 1    deposition that are next to the passages.
 2            THE COURT:  This jumps from 205 to 206 and then from
 3    206.09 to 208.06.
 4            MR. SCHEINMAN:  Right.  So the numbers with 208 are
 5    also Mr. Prats.  His examination began on 207 of the original
 6    transcript.
 7            THE COURT:  You're going to just have to come up
 8    here.  I can't get down what you are saying.
 9            MR. SCHEINMAN:  I was simply trying to correct, Your
10    Honor, that Mr. Prats' examination began on Page 207 of the
11    original transcript, and so anything with a page number higher
12    than that was him.  And everything from Page 198 to 206 was
13    Russell Abney on behalf of the Coalition.
14            THE COURT:  All right.  But I don't have those here,
15    but can I look at them --
16            MR. SCHEINMAN:  Yes.  I --
17            THE COURT:  You're not proffering -- just to go back.
18    The materials in this that you have provided me as a highlight,
19    these are not the full extent of your proffer?
20            MR. SCHEINMAN:  Correct.  Those will be --
21            THE COURT:  And there are other pages that are
22    contained in the proffer?
23            MR. SCHEINMAN:  Yes, Your Honor.
24            THE COURT:  All right.  I guess this ended up being
25    more confusing than I thought.
```

```
1              MR. SCHEINMAN:  I apologize.  I just --

2              THE COURT:  That's fine.

3              MR. SCHEINMAN:  I did not want to leave that out.

4         So up next we're going to play selections from the

5    deposition of Doug Logan.  This was taken on November 18, 2022.

6    And you'll hear from Bruce Brown on behalf of the plaintiffs.

7              (The videotaped deposition clip of DOUG LOGAN

8                   was played.)

9              MR. SCHEINMAN:  Your Honor, up next plaintiffs intend

10   to introduce the -- selections from the deposition of Jeffrey

11   Lenberg.  This was taken on November 21st, 2022.  And you'll

12   hear from Bruce Brown again and Caroline Middleton on behalf of

13   the Curling Plaintiffs.

14             THE COURT:  Thank you.

15             MR. SCHEINMAN:  It is Tab 7 in your binder.

16             (The videotaped deposition clip of JEFFREY

17                  LENBERG was played.)

18             MR. SCHEINMAN:  Your Honor, up next plaintiffs offer

19   a selection from the deposition of Wendell Stone.  Mr. Stone

20   was the 30(b)(6) representative for the Coffee County Board of

21   Elections & Registration.  This deposition was on

22   September 1st, 2022.  And you'll hear from David Cross.  It is

23   Tab 9 in the binder.

24             (The videotaped deposition clip of WENDELL

25                  STONE was played.)
```

1           MR. SCHEINMAN:  Your Honor, up next we would like to

2    present a selection from the deposition of James Barnes.  This

3    deposition was taken on July 20th, 2022.  You'll hear from

4    David Cross.  This is the last clip you'll hear from me.

5           Thank you.

6           THE COURT:  What is the tab?  I'm sorry.

7           MR. SCHEINMAN:  It is Tab 1, Your Honor.  Tab 1.

8           THE COURT:  Thank you.

9               **(The videotaped deposition clip of JAMES BARNES**

10              **was played.)**

11          MR. CROSS:  That's all the video, Your Honor.  I

12   think the next thing is the depositions.

13          MR. CAMPBELL:  Yeah.  So, Your Honor, at this time we

14   would like to offer the Court the list which reflects the

15   designations, the counters, the objections, and the exhibits

16   that we are intending to offer through the designations.

17          I can grab it.

18          May I approach?

19          THE COURT:  Yes.

20          MR. CAMPBELL:  And so we are offering the transcripts

21   which we just handed which reflect the designations and

22   counters, and we also have video files in one of the sleeves on

23   the binder.

24          And these are for James Barnes, Eric Chaney, Ben

25   Cotton, Alex Cruce, Misty Hampton, Cathy Latham, Doug Logan,

1   Jeffrey Lenberg, Wendell Stone, Janice Johnston, Dean

2   Felicetti, Michael Shamos, Gabriel Sterling, Merritt Beaver,

3   David Hamilton, and Juan Gilbert.

4          And then we are also offering the following exhibits,

5   which are not in dispute -- and if it is easier to follow

6   along, I have a list printed out of the exhibits, if that would

7   be easier for you.

8          THE COURT:  Yes.

9          Why don't you just introduce the list rather than

10  reading them all aloud.  That will be easy to follow.

11         MR. CAMPBELL:  So at this time we would like to

12  introduce that list of exhibits, which we have reached an

13  agreement with defense counsel on.

14         THE COURT:  Do you want to give it a number, the

15  list, so we can find it?

16         MR. CAMPBELL:  604.

17         THE COURT:  604?

18         MR. CAMPBELL:  Yes.  Thank you so much.

19         MR. MARTINO-WEINHARDT:  Thank you, Your Honor.

20         I'm Matthaeus Martino-Weinhardt again for Curling

21  plaintiffs.  There are about ten exhibits where the parties

22  have not reached agreement that plaintiffs would like to offer

23  through the deposition designations.  I think this should be

24  relatively brief.

25         But if we may be heard on those ten exhibits, I can

1    go through them.

2              THE COURT:  Do I have a list of those?

3              MR. MARTINO-WEINHARDT:  You do not.  But I'm going to

4    go through them one by one, and I can provide a list

5    afterwards.

6              THE COURT:  All right.

7              MR. MARTINO-WEINHARDT:  I understand that defendants

8    are going to make their objections to each one, and they vary.

9              So the first one would be Curling --

10             THE COURT:  Just one second.

11             Were there any objections relative to the deposition

12   submissions?

13             MR. BEDARD:  Yes, Your Honor.  I think that they are

14   included in that list though.  As we mentioned yesterday I

15   think there is a few to make a ruling on those as you see fit.

16   We didn't feel a need to take up the Court time on those.

17             THE COURT:  All right.  Thank you.

18             MR. MARTINO-WEINHARDT:  Your Honor, I could just name

19   the ten exhibits and let defense counsel make their objections

20   to those and then address those objections if that would be --

21             THE COURT:  All right.

22             MR. MARTINO-WEINHARDT:  -- a way to go through it.

23             So the exhibits would be Curling Plaintiffs'

24   Exhibit 19, 22, 28, 97, 98, 292, 293, 345, 358, and 198.  Those

25   are the exhibits that plaintiffs are offering through the

```
 1   deposition designations as to which the parties have not

 2   reached agreement.

 3             THE COURT:  Do I have those -- collection of those in

 4   front of me?

 5             MR. MARTINO-WEINHARDT:  They are in this binder.

 6             THE COURT:  In the one that has already been turned

 7   up?

 8             MR. MARTINO-WEINHARDT:  Yes, Your Honor.

 9             The large binder includes both the exhibits which are

10   agreed and the ones to which there are objections.

11             THE COURT:  Since I want my law clerks to be able to

12   look at them too, if you could just share your book -- a copy

13   of one of your books now with them.

14             MR. MARTINO-WEINHARDT:  I apologize, Your Honor.  It

15   seems maybe that one thick binder has the transcripts.  I can

16   provide the one with the exhibits.

17             THE COURT:  Okay.

18             Thank you.

19             Is there an extra one for the clerks just simply so

20   they can look at -- we'll give you it back --

21             MR. MARTINO-WEINHARDT:  We have additional.

22             THE COURT:  All right.

23             So Exhibit 19 -- is that PX 63 or is it --

24             MR. MARTINO-WEINHARDT:  It is PX 19.  It should be at

25   Tab 8.
```

```
 1              THE COURT:  All right.  Tab 8.  All right.  Fine.

 2   This is Fortalice Solutions' technical assessment prepared for

 3   the Secretary of State draft --

 4              (There was a brief pause in the proceedings.)

 5              THE COURT:  All right.  Proffered Exhibit 19 was a

 6   Fortalice Solutions' technical assessment prepared for the

 7   Secretary of State Georgia, draft August 25th, 2020.

 8              What is the objection?

 9              MR. BEDARD:  Yeah, Your Honor.  I actually think we

10   can take 19, 98, 292, and 293 all together because they are all

11   various drafts of the same document.

12              We basically had two substantive objections and then

13   one kind of note for the record.  The first one is just that

14   they were unauthenticated in the deposition.  You know, I

15   talked through with plaintiffs' counsel if there was another,

16   you know, area in which they -- there was some authentication

17   of the document because they were produced by Fortalice.  And

18   there wasn't.

19              And in the deposition that they cited to, there was

20   no authentication from Mr. Hamilton.  So that is -- that was

21   just our first objection.

22              The second one was --

23              THE COURT:  Is Mr. Hamilton going to be joining us?

24              MR. BEDARD:  Say that again.

25              THE COURT:  Is Mr. Hamilton going to be joining us?
```

1          MR. BEDARD:  He will, Your Honor.  I just don't think

2    he is someone -- because these are produced by Fortalice and

3    they are drafts from Fortalice's production, he is not exactly

4    a witness who can authenticate them.

5          And that was -- to that point actually, just for the

6    note for the record, on all of these, I wanted to note that

7    these were drafts that were shown to him, self-noted as drafts,

8    not final versions, which was a concern on our end.

9          And then the third or the second substantive

10   objection was just hearsay to the extent that they are being

11   offered for the truth of whatever conclusions Fortalice is

12   saying they did or didn't do within them.

13         And I'll note on that, to the extent we're discussing

14   hearsay objections, one of the categories for which we have

15   already reached an agreement with plaintiffs' counsel is a

16   category of documents to which we wanted to note a hearsay

17   objection.  And plaintiffs' counsel said we're not offering

18   this for the truth.

19         Those have already been submitted.  So to the extent

20   we're discussing them now, it is because plaintiffs have said

21   we do want to offer these for the truth for some reason.

22   So ...

23         MR. MARTINO-WEINHARDT:  Your Honor, I can address

24   those objections.

25         So Mr. Bedard addressed them as a group.  But I

```
1    actually think these are differently situated.  So PX 19 in
2    particular, defendants made no objection in the proposed
3    pretrial order.  So our position is they have waived any
4    objection to that.
5            That is Docket 1728 at Page 107 of 847 going by the
6    ECF numbers.  There was no objection made in the PTO to PX 19.
7    So on that basis, we would argue the objection was waived and
8    it should be admitted.
9            Going to the substance, however, this -- these were
10   discussed during the deposition of Mr. Beaver, not
11   Mr. Hamilton.
12            MR. BEDARD:  I'm sorry.
13            MR. MARTINO-WEINHARDT:  First as to hearsay, it is
14   well established in the record by now that Fortalice was the
15   Secretary of State's agent at this time for conducting
16   cybersecurity assessments.  Mr. Beaver testified to that effect
17   live.  We have the Fortalice Secretary of State contract in the
18   record as well.
19            That is PX 588.  That is in evidence.  So it is clear
20   that Fortalice was acting as the Secretary of State's agent in
21   preparing these reports.  And for that reason they are opposing
22   party statements and not hearsay.
23            THE COURT:  Okay.
24            MR. MARTINO-WEINHARDT:  And then briefly as to
25   authentication, Your Honor, 901(b)(4) states that
```

1   authentication can be based on the appearance, contents,

2   substance, internal patterns, or other distinctive

3   characteristics of a document taken together with all the

4   circumstances.  And Eleventh Circuit law is clear that

5   authentication can be based solely through the use of

6   circumstantial evidence.  For instance, *United States v. Smith*,

7   918 F.2d 1501.

8          These Fortalice draft reports were discussed by

9   Mr. Beaver at his deposition.  He testified to the contents of

10  the assessment that Fortalice was doing.  For example, he

11  testified at his deposition that the summary in those drafts

12  accurately captured the work that was being done by Fortalice

13  at the time.

14         Visually and formatting-wise they look just like the

15  Fortalice reports that are in evidence.  They were produced by

16  Fortalice.  And the reports themselves describe in detail the

17  work that Fortalice did.

18         THE COURT:  When you say they were produced by

19  Fortalice -- and I'm perfectly aware we are dealing with

20  Fortalice.  But are you saying they produced them to you or

21  that they were produced for the -- for the Secretary of State?

22         MR. MARTINO-WEINHARDT:  Fortalice produced them to us

23  in the litigation.

24         THE COURT:  In the litigation.  So you had a subpoena

25  or did you guys request them?

1          MR. CROSS:  I can help with that, because he may not

2    remember.  There was a dispute with the State on getting

3    documents and deposition testimony from Fortalice.  Your Honor

4    tabled the issue of a deposition and directed the State to

5    direct Fortalice, as I recall, to produce the documents.

6          And so that is how we did it.  It was not a subpoena

7    enforced on Fortalice because we were going to have to do that

8    in North Carolina.

9          Your Honor found that because they were operating as

10   an agent the documents were within the possession, custody, and

11   control of the State, which turned out to be right because

12   Fortalice did produce the documents at the direction of the

13   State in response to your order.

14          MR. MARTINO-WEINHARDT:  So all --

15          THE COURT:  All right.  Well, obviously the

16   authentication one is not going to hold up.

17          But anyway, what else?  What next?

18          And I'm just -- you know this -- I hope this is not

19   the character of some of the other objections raised by the

20   State.  Because this seems kind of flaky, frankly, the

21   objections here relative to, you know, making a good faith

22   objection that something really is -- given the fact that the

23   role that was played by Fortalice in this time period, that it

24   was an agent, that it produced these documents on behalf of the

25   State, and that the State's personnel have looked at it, have

1    been deposed about it.

2         It just seems sort of flaky, frankly, to be -- for us

3    to be fighting about that at this point.  I mean, I can say

4    more legalistic reasons.  But that is my reaction as a whole

5    just relative to moving through this with some time --

6    proceeding with -- on an expeditious basis.

7         So tell me what are the -- I mean, I will obviously

8    look at it.  But tell me what the other objections are that are

9    not to -- because there are one, two, three, four, five, six

10   other documents.

11        MR. BEDARD:  Sure.  Just quickly on those Fortalice

12   ones, just so the record is clear, again our -- the

13   authentication was one, but it was hearsay on the other ones.

14   And the biggest issue about the authentication piece is just

15   that they are self-marked as drafts, not as finals.

16        THE COURT:  I'm sorry.  You're going to have to slow

17   down.

18        MR. BEDARD:  Sorry.

19        They are just self-marked as drafts.  That was kind

20   of the biggest point beyond the hearsay objection.

21        THE COURT:  Right.  But even if they are drafts, they

22   are drafts that were reviewed apparently by Mr. Beaver in his

23   capacity as chief information officer.

24        MR. BEDARD:  I've got no objection to Mr. Beaver's

25   testimony in the deposition on that basis, Your Honor.  I just

1   think the Court should rely on Mr. Beaver's testimony rather

2   than the documents themselves.

3           THE COURT:  All right.

4           MR. BEDARD:  That is the point I'm trying to get

5   across.

6           THE COURT:  All right.  Well, we will take a look at

7   it.

8           MR. BEDARD:  I do apologize for saying Mr. Hamilton.

9           THE COURT:  That's all right.  No problem.  I mean,

10  everyone has a lot they are juggling, and I didn't mean -- the

11  flaky remark was not directed at you personally.

12          MR. BEDARD:  That was fine.

13          THE COURT:  It was an element of candor.  That is

14  all.

15          MR. BEDARD:  I think briefly on Plaintiffs'

16  Exhibit 22 and Plaintiffs' Exhibit 28, I actually do think

17  Mr. Fisher and I had reached an agreement yesterday.

18          Our only objection was going to be the extent it was

19  suggesting a legal conclusion on Mr. Hamilton's part in that

20  exhibit.  Mr. Fisher said they are not -- they are fine with

21  that.  So we're fine to move along with those.

22          THE COURT:  22 and 28 are okay?

23          MR. BEDARD:  Yes, that is fine with that

24  understanding.

25          THE COURT:  All right.  Fine.  Great.

1            MR. MARTINO-WEINHARDT:  Correct, Your Honor.

2            MR. BEDARD:  What is -- the ones I have are based on

3    an order from an email from Mr. Fisher, so they are a little

4    out of order.  So whatever is next for you, Your Honor.

5            THE COURT:  I have -- the remaining ones I had were

6    97, that is the -- and then three others.

7            MR. BEDARD:  So 97.

8            MR. MARTINO-WEINHARDT:  Your Honor, I think there are

9    several where the objections were the same as to the Fortalice

10   report we just discussed because there are other Fortalice

11   reports.  That would be 97, 98, 292, and 293.

12           THE COURT:  Right.  But we already discussed those.

13   We just didn't discuss 97.

14           Is 97 something different than the others?

15           MR. BEDARD:  No, 97 is one of the Fortalice.

16           THE COURT:  It is one of the Fortalice ones.  Okay.

17   We'll take a look at those.

18           MR. BEDARD:  That is fine.

19           THE COURT:  Then the next ones are 345, 358, and 498.

20           MR. CAMPBELL:  I think it is 198, Your Honor.

21           THE COURT:  Okay.  Sorry.  345, 358, and 198.  Excuse

22   me.

23           MR. BEDARD:  So on 345, Your Honor, these come from

24   the deposition of Mr. Felicetti.  They are supposedly texts

25   between Ms. Cathy Latham and Scott Hall.  Mr. Felicetti is not

1    obviously part of those conversations.

2           I believe in the deposition it was conveyed to him

3    that these had come from Mr. Maggio's phone.  They are not --

4    they weren't Bates labeled, to my recollection.

5           So the two things we had were, again, an

6    authentication issue.  Mr. Maggio was up here.  They could have

7    been presented to him to authenticate them.  I'm not aware that

8    they have been.  And I was willing to withdraw it if there was,

9    you know, somewhere in the record plaintiffs could point me to.

10   But I hadn't heard that.

11          So we had an authentication issue and then just a

12   hearsay objection, which again the Court can, I think, take

13   that and note that for the record.  But those were our two

14   objections.

15          THE COURT:  All right.  Is there any other place

16   Counsel maintains that you had these documents authenticated?

17          MR. CAMPBELL:  Yes, Your Honor.  In Mr. Felicetti's

18   deposition, he does state that that is what the document is.

19   It is on Page 113, Lines 9 through 14.  He states that the

20   texts are between --

21          THE COURT:  Well, but has he seen them or he is the

22   recipient?  He can say I can see it.  How does that make him

23   able to authenticate it?

24          MR. CAMPBELL:  He is not the recipient, Your Honor.

25   He had testified that that -- or he had said under oath that is

what the document was.

        And, Your Honor, also as to --

        MR. CROSS:  He was a 30(b)(6) witness, just to be
clear.  So he was testifying on behalf of SullivanStrickler,
not in an individual capacity.

        THE COURT:  Okay.  So you're saying, Mr. Cross, that
in his 30(b)(6) capacity he was able to testify and confirm
that this was a text between Mr. -- Ms. Latham and who?  I'm
sorry.

        MR. CROSS:  Mr. Maggio.

        THE COURT:  Mr. Maggio?

        MR. CAMPBELL:  Yeah.  And Mr. Hall.

        MR. CROSS:  And that, as we have seen with the other
evidence, those texts were part of the work that Mr. Maggio was
doing for SullivanStrickler.  This wasn't sort of on the side.
This was they were engaged to do this work.  And Mr. Felicetti
testifying on behalf of the corporation authenticated those
documents.

        THE COURT:  I see.  All right.

        Now, with that clarification.

        MR. BEDARD:  Yeah.  Can we have control of the
documents?  Because my recollection Mr. Maggio, one, is not
part of that conversation.  I could be corrected.  But I think
it is just between Ms. Latham and Mr. Hall.

        So if we could have control.  Again, I'm more than

```
 1    willing to be corrected.  My notes ...
 2            While they work that out -- and we can check that,
 3    Your Honor --
 4            THE COURT:  It is the clear to the gentleman to
 5    operating the machine?  Are you looking -- it's over here?  All
 6    right.
 7            MR. BEDARD:  I think to the other points --
 8            THE COURT:  Yes.
 9            MR. BEDARD:  -- my understanding is, again, these
10    came from Mr. Maggio's personal phone, according to the
11    representation from counsel in that deposition.
12            If they were produced pursuant to a subpoena to
13    SullivanStrickler, then maybe that is a slightly different
14    issue.  But again, I don't think in the deposition -- all
15    Mr. Felicetti could do is say I see that is what you're putting
16    in front of me.
17            THE COURT:  Well, I think the real question is
18    whether they produced them pursuant to the subpoena that
19    attended his deposition.  So ...
20            MR. BEDARD:  And see these are text messages
21    between --
22            MR. FISHER:  Your Honor, if I may.  This is Ramsey
23    Fisher.  I just want to read the portion of the deposition
24    testimony through which we are offering this document.
25            THE COURT:  All right.
```

1              MR. FISHER:  This is a text thread between Paul

2      Maggio and Cathy Latham; right?

3              Yes, sir.

4              And this comes from Paul Maggio's phone; right?

5              Yes, sir.

6              So Dean Felicetti, in the deposition as a 30(b)(6)

7      witness, authenticated that these text messages came from Paul

8      Maggio's phone and that this was a text conversation between

9      Cathy Latham and Paul Maggio.

10             Now, there's two texts on the screen.  One is a text

11     thread between Cathy Latham and Paul Maggio.  The other one is

12     a text thread between Scott Hall and Paul Maggio.

13             THE COURT:  So how do I tell?

14             MR. FISHER:  What was that?

15             THE COURT:  So when she -- I'm having trouble -- is

16     the green Maggio?

17             MR. FISHER:  That's right.

18             THE COURT:  All right.  And that's between Maggio and

19     Ms. Latham?

20             MR. FISHER:  Correct.

21             THE COURT:  And you had -- and your subpoena

22     requested this?  Your 30(b)(6) notice?

23             MR. FISHER:  That's right, Your Honor.  Correct.

24             THE COURT:  All right.  I think that is sufficient

25     foundation for introduction of this then with Mr. Felicetti

1    serving as a 30(b)(6) witness and Mr. Maggio being an employee
2    or partner, doesn't matter whichever.  He is producing it.  He
3    has produced it and is verifying that that is what it is.

4            All right.  So let's move on past that one.  That was
5    345.  It is admitted.

6            And 358?

7            MR. BEDARD:  Yeah.  358 was just briefly -- and I
8    think there may have been some back-and-forth with plaintiffs
9    about this.  It is solely -- it is an email from Scott Hall to
10   Alex Cruce forwarding an email from Misty Hampton attaching
11   some files that are labeled ICC log and S log files.

12           Mr. Cruce -- we've got no issues with the emails
13   themselves.  The issue is about where did the attachments come
14   from and what are the attachments.

15           Mr. Cruce, throughout his deposition, says I don't
16   know where the attachments come from, I don't know what they
17   are.  So it was just an authentication question as to what the
18   attachments were, or potentially a lack of foundation, however
19   the Court wants to characterize it, as to what those
20   attachments are and where they came from.

21           MR. CAMPBELL:  Your Honor, we're not trying to
22   authenticate the attachments within the email.  We are more
23   showing that there was an email that was sent with those
24   attachments and the attachments were sent from Hall -- Mr. Hall
25   to Mr. Cruce and Ms. Hampton.  That is -- we're not trying to

1    authenticate --

2         THE COURT:  Just go over who -- from Scott Hall to

3    Alex Cruce and then also from -- to Hamilton?

4         MR. BEDARD:  I think I can clarify this.  I believe

5    the underlying email is from Misty Hampton to Scott Hall.

6    Scott Hall forwards that to Alex Cruce.  It is at least what

7    the documents are saying.

8         The original email from Misty Hampton had attachments

9    to it.  Those get forwarded to Alex Cruce through Scott Hall.

10   The question is just the authentication of the attachments to

11   the email.

12        THE COURT:  All right.

13        MR. BEDARD:  Because he said he couldn't -- he didn't

14   know where they came from.  If plaintiffs are saying we are not

15   offering it for that, then that is fine.

16        THE COURT:  That is what I heard him saying.

17        MR. CAMPBELL:  Yes, Your Honor.

18        THE COURT:  All right.  Well, then that is resolved

19   too.

20        And 198?

21        MR. BEDARD:  Yeah.

22        THE COURT:  So the substance of 358 is in.  It is

23   just the attachment is -- reference to the attachment is okay.

24   It is just it is not being admitted for purposes of showing the

25   content of the --

```
 1              MR. BEDARD:  Exactly.  And there is no actual content
 2    to the email.  It is just the email.  So I have got no
 3    authentication issues with the email.
 4              THE COURT:  All right.  And 198?
 5              MR. BEDARD:  Yeah.  198 is an email from Dominion to
 6    Gabe Sterling.  And our objection was just as to hearsay as to
 7    the truth of the underlying email from Dominion to
 8    Mr. Sterling.
 9              Again, I think we could have potentially included
10    this in the previous category, but my understanding is
11    plaintiffs have a position that the truth of the underlying
12    email should be admitted for the truth.  And that would be our
13    objection.
14              THE COURT:  Okay.
15              MR. CAMPBELL:  Your Honor, with this one, it is a
16    party opponent statement.  There is no hearsay.  It is from
17    Mr. Sterling and it is to Dominion.
18              We have heard --
19              THE COURT:  So it is not Dominion to Gabe Sterling
20    but Sterling --
21              MR. CAMPBELL:  Mr. -- Dominion to Mr. Sterling.
22              Mr. Beaver has testified that Dominion was an agent
23    of the State for the purposes of election security.  With that
24    agency in mind, this is a party opponent email to a party
25    opponent.  We don't think that hearsay factors in here.
```

1           MR. BEDARD:  Our response to that, Your Honor, I

2    think is, we've had discussions about the status of Dominion

3    previously.  Our position is the contracts are clear that

4    they're an independent contractor.

5           And as Your Honor notes -- you know, if they were a

6    party opponent, I think they could have been allowed to testify

7    here, but ...

8           THE COURT:  Well, the only thing is, is it true

9    Mr. Beaver unequivocally stated in his testimony that Dominion

10   was functioning and had assumed the responsibility of being

11   the -- essentially the -- exclusively responsible for security

12   issues on behalf of the Secretary of State?

13          MR. BEDARD:  I don't think that changes their

14   independent contractor status, Your Honor.  I think you can

15   hire outside information security professionals, for example,

16   I'm sure, you know -- and that doesn't necessarily all of a

17   sudden turn them into an agent and a party opponent for

18   purposes of hearsay.  Corporations do this all the time.

19          I'm not sure what the internal workings are of the

20   court as far as their IT security professionals, but that may

21   be the case for the court too.

22          THE COURT:  They are ours I think for the reasons you

23   might guess.

24          MR. BEDARD:  But just to make the point I think,

25   independent contractor status for IT professionals is regular

1      and I don't think that turns them into agents.

2               MR. BROWN:  Your Honor, this is Bruce Brown for the

3      Coalition Plaintiffs.

4               On this point, the hearsay rules allow evidence that

5      comes in that has a sufficient reliability.  The State is

6      taking a very unusual position that the statements by their

7      contractor hired to manage the security of the State's election

8      system is not reliable enough to be admitted into evidence.

9      That is what we're hearing.

10              We think this is just a game to waste time and give

11     us trouble getting in evidence that is clearly admissible.

12              THE COURT:  What I'm really confused about is this.

13     198 is a one-page exhibit.  That is the one we're talking about

14     right now.  And it is -- it is a letter from -- or email from

15     Gabriel Sterling to Beau Roberts at Dominion.  So I'm ...

16              MR. BEDARD:  The underlying email, Your Honor, from

17     Dominion to Gabe.

18              THE COURT:  Well, where is that?

19              MR. BEDARD:  It is just lower down.  It begins with

20     the on Monday, December 20th.

21              THE COURT:  I see.

22              So let me just ask plaintiffs' counsel:  Are you

23     actually -- does it make a difference to you that -- the

24     information contained in here?  For instance, as to the

25     Paulding County server and work station were not communicating

1    with each other, regional tech reconciled the issue and sent

2    log file to engineering, tell me what the relevance of that as

3    well -- then another one was DeKalb County had issues with

4    absentee ballots not scanning.

5         I mean, he's reporting in.  Does it matter what he's

6    reporting in, Mr. Roberts?

7         I mean, I realize what the question is that

8    Mr. Sterling --

9         MR. CROSS:  No, Your Honor.

10        THE COURT:  -- asks is are they duplicating them on

11   hand-marked or BMD.  That is -- obviously can be admitted for

12   the truth of what it is saying.  But it is really just a

13   question.  That is from Mr. Sterling.

14        So I'm just really -- are we fighting about anything

15   here?

16        MR. CROSS:  No.  It is a fair question.  We think it

17   comes in for the truth, but we do not need to offer it for the

18   truth.  So we'll simplify and say we are not.  The Court will

19   not take it for that purpose.

20        THE COURT:  All right.  Very good.

21        MR. BEDARD:  Thank you, Your Honor.

22        THE COURT:  Let's take a break for five minutes, and

23   we'll keep on running.  What is next?

24        MR. MARTINO-WEINHARDT:  I have one last bit of

25   housekeeping.  One trial exhibit on which Your Honor deferred

44

```
 1   ruling on admissibility.
 2            THE COURT:  Which one is that?
 3            MR. MARTINO-WEINHARDT:  That is Exhibit 261.
 4            THE COURT:  What is it?
 5            MR. MARTINO-WEINHARDT:  If I may approach.  This was
 6   an email that was offered during the testimony of Mr. Chris
 7   Harvey.
 8            THE COURT:  Harry, could I see it?
 9            Thank you.
10            All right.
11            MR. MARTINO-WEINHARDT:  Your Honor, defendants had
12   raised a hearsay objection which they appear to be standing on.
13   We're not offering it for the truth.  Whether true or not, the
14   statements were made and the Secretary of State's office had
15   notice of what those were.  So it is an effect on the listener.
16   It is not offered for the truth.
17            THE COURT:  Well, I'll admit it on that basis.
18            MR. MARTINO-WEINHARDT:  Thank you, Your Honor.
19            THE COURT:  It is not for the truth of each of the
20   statements.
21            MR. TYSON:  And, Your Honor, we would just add for
22   the State that our -- the basis for that is that the notice and
23   the effect on the Secretary really doesn't matter unless the
24   underlying report is true, which was the basis for our
25   objection.
```

```
 1              THE COURT:  Well, it is not completely so, because
 2     you're being -- you're being notified of problems, what do you
 3     do to follow up on them.  You have a competent person who has
 4     raised the questions from Georgia Tech.  It is not some just
 5     average citizen who has no computer experience who is bringing
 6     this to the attention of the highest levels in the department.
 7              I think it has a -- it has a limited value.  But it
 8     is allowed for the purpose of the fact that he received it.
 9     The individuals received it, the Secretary of State's office,
10     and it was bringing them attention problems they thought were
11     of significance.  Whether that is true or not is another
12     matter.  So ...
13              All right.  On that basis, it is admitted.
14              MR. MARTINO-WEINHARDT:  Thank you, Your Honor.
15              THE COURT:  I'm going to look at the other ones we
16     were talking about, that were the group ones from Fortalice
17     and -- during the five-minute break.
18              MR. MARTINO-WEINHARDT:  Thank you, Your Honor.
19              THE COURT:  What is after this, if anything?
20              MR. CROSS:  The motion on the Fifth Amendment.  I
21     imagine they have a response.
22              THE COURT:  All right.  Well, we'll do it later then.
23     And I think that I see, Counsel --
24              MR. OLES:  There is -- Mr. Davis is here and the
25     matters of our proffers, Judge.
```

```
 1              THE COURT:  Okay.  We'll deal with that too.

 2              Good morning, Mr. Davis.

 3              MR. DAVIS:  Good morning.

 4              Sorry for the delay.

 5              THE COURT:  No problem.  No problem.

 6              This is the break we have before we break for lunch

 7    so it won't be long.

 8              COURTROOM SECURITY OFFICER:  All rise.

 9              (A brief break was taken at 11:42 AM.)

10              THE COURT:  All right.  I'm getting to the point

11    where it is such a messy desk here and all the different

12    notebooks coming up that it is kind of miserable.

13              Okay.  So what we were left with was the -- the

14    documents from Fortalice.  And as I understand it, counsel have

15    confirmed that each one of the reports dealt with a different

16    matter.  They were not just different drafts of the same

17    report.

18              Is there any contention as to that?

19              MR. BEDARD:  No, Your Honor.

20              THE COURT:  Okay.  Well, having reviewed many

21    Fortalice reports in the past and understanding the role that

22    Fortalice played during that time frame as the contractor and

23    the chief contractor for -- for the Secretary of State's office

24    relative to security issues like in the election realm and

25    other realms as well, I would say that this report has all the
```

1   indicia of reliability.

2          And while they might be drafts, there is no

3   indication that they are successive drafts.  If the Secretary's

4   office wants to present information that they are -- it was not

5   the final draft or the final version, they're welcome to do

6   that.  But they are the evidence that the -- in the reports

7   that Fortalice produced to plaintiffs.

8          And I think under those circumstances that they do

9   have all of the essential earmarks of authenticity and being

10  business records of Fortalice that make them acceptable.  And I

11  therefore will admit them.

12         So I think that takes care of all of those issues.

13         Are we through with the document -- is there anything

14  else I haven't dealt with as to the documents?

15         All right.  So we're moving on now to discussing the

16  motion for -- relative to the request that I make an inference

17  or that the deposition testimony and the taking of the Fifth

18  gives rise to an inference that I should make against the

19  Secretary of State's office.

20         I'm just wanting to make sure I have everything here

21  on this.

22         Well, let me allow defense counsel to address these

23  first.  I know I have your positions.  I think really the

24  question I have is -- really it ultimately relates to is this

25  a -- the adverse inference, is that against each of the

1    individuals or are you asking for it to be taken against the --

2    which seemed to be what you were arguing -- what the plaintiffs

3    were arguing, that the testimony should be considered relative

4    to the defendants' liability in this case?

5            Is that -- am I correct?

6            MS. KAISER:  Your Honor, we would say that the

7    adverse inferences should be drawn against the individual

8    witnesses.

9            THE COURT:  Just the individual witnesses, not the --

10           MS. KAISER:  Yes.

11           THE COURT:  Okay.  I thought you were somehow -- from

12   what you had submitted, that it was a more far reaching that

13   you were -- what you were arguing about.  But that is a whole

14   other matter then.

15           Go ahead.

16           MR. MILLER:  Your Honor, to be clear, the essence of

17   that would be to draw the inference against the State

18   defendants who would not be able to dispute it, to

19   cross-examine the individual that took the Fifth Amendment.

20           So the issue is, as I understand plaintiffs' motion,

21   they are seeking to establish the facts on the basis of the

22   nonparty invoking the Fifth Amendment such that the State is

23   then, you know, stuck defending in this case with that fact

24   already established based solely on the Fifth Amendment

25   inference.

1          If the Court would like to hear, you know, argument

2    as to the substance, I'll be truthful, Your Honor, I don't

3    think much has changed since we discussed this in the motion in

4    limine context.

5          THE COURT:  I see.

6          MR. MILER:  There is no loyalty existing between

7    these individuals.  Quite the opposite.

8          THE COURT:  I guess this is what is confusing to me.

9    I mean, why -- and I am trying to understand it -- is that

10   plaintiffs say then that this -- for instance, on Mr. Chaney --

11   let me just begin on Page 4 of this, which is, I guess,

12   Document 1793 at the ECF Page 7.

13          This was about Ms. Latham staying at the Willard

14   Hotel on or around December 17, 2020, the same day that one of

15   the two executive orders -- draft executive orders was drafted.

16   And you're saying today that you can't tell us anything about

17   your involvement with that.  And the Fifth Amendment.

18          And then they say -- and there's lots of other

19   testimony about her staying at the Willard Hotel.  Only adverse

20   inference they ask for here is that Ms. Latham was in DC

21   staying at the Willard Hotel on or around December 17, 2020.

22          So it doesn't mean that that is against -- the

23   inference is not one, one way or the other, that is against the

24   State.  It simply says under these circumstances this is the --

25   as a proper adverse inference when she took the Fifth.

```
 1            MR. MILLER:  Your Honor, I respectfully -- I disagree
 2    with the plaintiffs here.  The -- getting to the question as to
 3    whether it is a proper adverse witness requires establishing
 4    the factors from Coquina.
 5            THE COURT:  Right.
 6            MR. MILER:  There is a complete absence of those
 7    factors.  Your Honor, we discussed this with plaintiffs'
 8    counsel before.  I think they wanted to forgo their side of
 9    argument on the motion.  I'm happy to argue the motion's
10    substance.  I do --
11            MR. CROSS:  That is not what we said.
12            THE COURT:  All right.
13            MR. MILLER:  I'm sorry.  To clarify, forgo opening
14    argument on the motion.  I do think they are going to want to
15    reply.
16            Does that correct it?
17            THE COURT:  You know, tell me what -- how you want to
18    handle this.
19            MR. CROSS:  We propose exactly what Your Honor
20    started with.  Let them respond to the motion and we would
21    respond.  That is all.  We're trying to be efficient.  We did
22    not waive argument.
23            THE COURT:  I guess, let me just say, the most
24    fundamental issue I can see here is -- just in terms of
25    clarifying the dispute for me, is the State's contention that
```

1    every adverse inference they ask for is really an adverse

2    inference against the -- against the State, is what you said to

3    me, or the Secretary of State's office.

4           MR. MILER:  Your Honor, it establishes a fact in this

5    case against the State as the defendants.  So I don't think

6    they are trying to draw that -- I don't know if the Secretary

7    of State was at the Willard Hotel.  But it establishes a fact

8    in the case that we are the defendants in.

9           THE COURT:  But some of these, such that as

10   Ms. Latham was in DC staying at the Willard Hotel -- I mean, I

11   can't imagine that you would actually contest it is not true.

12          MR. MILLER:  Your Honor, it skips a step here,

13   respectfully, because the starting point is, I'm not sure what

14   the relevance is.

15          But setting that aside, the issue becomes, you know,

16   at this point we're establishing facts that are immaterial to

17   the case.  It is not about a vulnerability, you know, and facts

18   that the State is now going to have to contest against as to

19   how this is going to fit into the plaintiffs' case with a

20   witness that is outside of the subpoena range that has invoked

21   her Fifth Amendment right not to testify.

22          Your Honor, I can't sit here and tell you whether or

23   not Ms. Latham was at the Willard Hotel or not.  I certainly

24   wasn't there.  But, you know, the question here becomes a

25   nonparty witness that is not here for the judge to evaluate or

1    the Court to evaluate the reliability of the testimony.

2           You know, what facts are we establishing.  And then,

3    frankly, if it is an irrelevant fact there is no need for

4    establishing that fact and it shouldn't be admitted into

5    evidence anyway.

6           MS. KAISER:  Your Honor, if I may just briefly make

7    one point, which is that counsel for the State was present at

8    each of these depositions and had the opportunity to question

9    each of these witnesses.

10          MR. MILLER:  Your Honor, may I just briefly go

11   through the *Coquina* factors here?  Because I think it will --

12          THE COURT:  I read *Coquina* over again this morning.

13   So I don't think that that is helpful.  I think it would be

14   helpful to -- if you want to argue about it relative to each of

15   these.  I'm not saying I'm wild about drawing all sorts of

16   inferences.  And there might be some that it is proper and some

17   here that are not.

18          What I will say is I was confused by the memoranda

19   from plaintiffs about this because it did seem like you were

20   trying to bind -- bind the State through these.  And it seems

21   to me there are some adverse inferences that could be drawn

22   that -- one way or the other that are simply to make the record

23   clearer that are not -- that might be appropriate.  But there

24   are other ones that are not.  So ...

25          MS. KAISER:  Your Honor, if I may just direct you to

1    one sentence in the introduction of our brief.  It is in the

2    middle of Page 1.  The inferences plaintiffs seek concerns

3    specific concrete facts for which the invocations are the only

4    available proof.  Plaintiffs are not seeking an inference of

5    defendants' liability.

6            THE COURT:  But then you say on Page 14 here

7    defendants and the Coffee County witnesses are indeed aligned

8    with respect to the Fifth Amendment invocations.

9            MS. KAISER:  Your Honor, I think what we meant there

10   is that there is really no indication here.  The *LiButti* factor

11   is cited in the *Coquina* case.  They are intended to get at the

12   trustworthiness of the invocations.

13           We do not think there is any indication here that

14   these Fifth Amendment invocations were not trustworthy.  There

15   is no indication that the witnesses were taking the Fifth

16   Amendment in order to harm the defendants' position in this

17   case.

18           Every indication is that they were genuine

19   invocations of the Fifth Amendment.

20           THE COURT:  Well, *Coquina* and *LiButti* really are, in

21   substantial part, also focused on who is an agent for purposes

22   of binding somebody else and whether it is a daughter and her

23   father or it is an agent -- somebody who is an officer of the

24   bank and then the bank itself.  Here we're in a somewhat

25   different posture other than -- so ...

1          MS. KAISER:  Your Honor, I would just say that --

2          THE COURT:  That's the reason why I found it

3     confusing, frankly, as to what the plaintiffs were saying on

4     one hand in the introduction versus what they say -- a few say

5     later on.

6          MS. KAISER:  And, Your Honor, I guess what I would

7     say is you have heard over and over throughout this case that

8     the State relied on the counties to safeguard the election

9     equipment.

10          So with respect to the conduct that is at issue, we

11     do think that there is not necessarily an agency relationship

12     but absolutely a relationship between the State and the

13     counties when it comes to physically securing the election

14     equipment.

15          THE COURT:  Well, there is a relationship.  But that

16     doesn't mean that something that somebody says in the county is

17     binding or who is a bad actor for the county even if they are a

18     county officer or they are a county -- someone else in the

19     county that it is binding on the State.  It might have

20     implications.

21          So really in the end what is useful for me to hear at

22     this point -- and we may just have to revisit it after lunch,

23     but -- is the concern that counsel for the State argues is

24     that, you know, if I accept anything -- of these as binding and

25     on the party making the statement, then it doesn't -- then it

```
 1    will also -- if it is an established fact via that then it is
 2    going to be binding ultimately on the Secretary of State.
 3              And they contend that is not fair, as you know.
 4    So -- because they won't have had an opportunity, they say, to
 5    have challenged whatever the inference is.
 6              So answer that instead.  Because I think that would
 7    be helpful.
 8              MS. KAISER:  Sure, Your Honor.  Yes.
 9              I think -- we are not saying that the testimony of
10    these witnesses is binding on the State or the Secretary of
11    State.  They have the opportunity to rebut any of these
12    inferences in their case.  So maybe that is where the
13    disconnect is.
14              And they had the opportunity to ask these witnesses
15    questions at the deposition.  They have the opportunity to put
16    in evidence in their case if they think there is evidence that
17    contradicts any of these inferences and could rebut the
18    inferences.  So it is not an ultimate finding of fact.
19              THE COURT:  Do you want to respond?
20              MR. MILLER:  Sure, Judge, if I may.
21              I want to correct one issue I said with respect to
22    the State relying on the counties.  You know, the State
23    certainly does rely on county election superintendents to
24    fulfill their independent legal obligations under Georgia law
25    that they took an oath to uphold.
```

1          So, you know, if that is the nature of the loyalty of

2     the relationship that we're using to establish, you know, an

3     adverse inference, then in that instance it turns the entire

4     concept on its head such that, you know, the Peace

5     Officer Standards and Training Council is then subject to a

6     nonparty adverse witness just because a police officer invoked

7     the Fifth Amendment in some unrelated context.

8          And particularly as to these witnesses here, Your

9     Honor -- and this was discussed at length in our motion in

10    limine, that this is a unique issue where we have got text

11    messages that were used in the same depositions.  In fact, one

12    of them was a portion of a prior request for the adverse

13    inference, that showed that these individuals were directly

14    working to try and do anything they could to harm Governor Kemp

15    and Secretary Raffensperger.

16         That does not show any relationship or control or

17    loyalty between these individuals.

18         And to add to that, Your Honor, Ms. Latham and other

19    of the witnesses who is in here -- but she sought to recall the

20    Secretary of State, you know, and put forth a recall petition

21    to put the Secretary back on the ballot under the recall

22    process under Georgia law.

23         But, you know, with respect to the specific factual

24    inferences they are seeking to admit, to the extent that it

25    does not go to establishing liability under Section 1983, then,

1    Your Honor, that is inadmissible as irrelevant evidence.

2         And that is an Eleventh Circuit case, *Cook ex Rel.*

3    *Estate of Tessier v. Sheriff Monroe County*.  That is 402 F.3d

4    1092, at 1105.  That is an Eleventh Circuit from 2005.

5         That case isn't dealing with adverse inferences but

6    it is dealing with the issue of admissibility in a 1983

7    liability case.

8         So even if we get there, to establishing the *LiButti*

9    factors that this would be an appropriate circumstance under

10    which to draw the inference, which I respectfully submit it is

11    not, it is still irrelevant and thus inadmissible with respect

12    to establishing 1983 liability of the State defendants.

13         THE COURT:  Okay.  Matt?

14              **(There was a brief pause in the proceedings.)**

15         THE COURT:  Is there anything further that

16    plaintiffs' counsel wish to say?

17         MS. KAISER:  Thank you, Your Honor.

18         I would just say I think some of the facts that

19    Mr. Miller was just reciting are, frankly, irrelevant, because

20    the purpose of the *LiButti* factors is not to establish whether

21    there is loyalty between the party and the nonparty.

22         Again, it is to -- it is to assess whether the

23    invocation of the Fifth Amendment is genuine or whether there

24    is some indication that the nonparty invoked the Fifth

25    Amendment in order to torpedo the parties' litigation position

1    or otherwise damage the party to the litigation.

2           And we maintain there is simply no evidence of that

3    here and that under all of the circumstances these were -- the

4    evidence indicates that these were genuine invocations of the

5    Fifth Amendment.  They are supported by corroborating evidence

6    in the record.  And we believe that these are trustworthy

7    invocations.

8           Again, the purpose is not to bind the Secretary of

9    State.  It is simply to help the Court connect the dots on the

10   Coffee County breaches, which Mr. Skoglund confirmed yesterday

11   was the largest election security breach in recent U.S. history

12   and has serious implications for the security of Georgia's

13   voting system in future elections.

14          MR. MILLER:  Your Honor, if I may just briefly,

15   because that goes to the *LiButti* factor, the compatibility of

16   the interest.

17          The inquiry there is, as it states in *LiButti*,

18   compatibility of the interest of the party and nonparty and the

19   outcome of the litigation.

20          You know, whether for better or worse, these

21   individuals that are down there were out there looking for Hugo

22   Chavez' ghost on the Dominion machines.  They do not want to

23   have Dominion machines run in Georgia.  Different motivations.

24   But they have the same outcome aligned in the interest of the

25   litigation.

```
 1                 And that is with the plaintiffs, not with the
 2      defendants.  And, you know, Your Honor, that is where the
 3      inquiry comes in.  That is specifically what LiButti calls for.
 4      And it is just not -- it is not met here.
 5                 THE COURT:  Okay.  Well, I'm going to think about all
 6      that you-all have said and we'll take a lunch break.  Because
 7      there were some difficult issues that you also had raised in
 8      connection with what we're going to discuss late in the day,
 9      I'm going to take a full hour break today.
10                 Who is the first witness that the State -- you're
11      going to rest?  I guess the plaintiff is going to rest other
12      than -- is that right? -- at this juncture?
13                 MR. CROSS:  We are going to rest other than resolving
14      the Mr. Persinger issue since that also bears on the merits.
15                 THE COURT:  Okay.  Is the Persinger matter that we
16      said we would address at 4:00 P.M.?
17                 MR. CROSS:  Correct.
18                 THE COURT:  So you're not going to rest, in fact, or
19      are you saying we should just stay open?  What --
20                 MR. CROSS:  Yeah.  I mean, I think they should go
21      ahead and call their first witness because we've scheduled
22      Mr. Persinger.  Our case will remain open with that sort of
23      caveat because we just have to resolve that.
24                 MR. TYSON:  And, Your Honor, from our perspective, I
25      don't think we can -- if there is an open issue of the
```

1  evidence, our 52(c) motion is when the evidence has closed from

2  the plaintiffs.  So ...

3          THE COURT:  I don't know why you didn't raise that

4  though yesterday -- I mean, I'm going to hear your argument.

5  But in terms of the schedule I wish you had raised that

6  yesterday.

7          MR. TYSON:  And, Your Honor, I may have misunderstood

8  Mr. Cross.  I didn't understand that the Mr. Persinger issues

9  were related to the merits of their case at all.  I thought

10  that was a separate issue at this point in the case, which is

11  why I didn't think it was a part of that.

12          THE COURT:  I see.

13          MR. CROSS:  That is in my email on Saturday, and I

14  also said it multiple times yesterday.

15          MR. TYSON:  I apologize.  I misunderstood that.  That

16  was the reason why I didn't think it was part of the

17  plaintiffs' case.

18          THE COURT:  All right.  And I know that you had

19  something to say, Mr. Oles.

20          MR. OLES:  As a matter of proffers.

21          THE COURT:  Go ahead.

22          Do you have something else?  You wanted to call

23  somebody or --

24          MR. OLES:  Well, I have my client here if the Court

25  wanted to hear from him.

```
1              THE COURT:  About the --

2              MR. OLES:  About his request on the electronic

3    equipment.

4              THE COURT:  Sure.

5              Mr. Davis, would you come up here for a moment.

6              Thank you.

7              Just right here is fine.  I'm just going to ask you a

8    question or two.  Okay.

9              I understand you want to be able to bring a cell

10   phone and your computer to be here so that you can come in and

11   out of the court and do work; is that right?

12             MR. DAVIS:  That is correct.

13             THE COURT:  If you do that, do you understand I would

14   have the -- have to ask you this question, first of all, you

15   understand that I will -- it would not be appropriate to start

16   taping or recording anything that is happening in the

17   courtroom?

18             MR. DAVIS:  I understand that, Your Honor.  I was

19   apprised of that before I came in the trial.

20             THE COURT:  Okay.  And you understand that you can't

21   be putting out Tweets while you are here either?  I'm not

22   saying you ever did.  I'm just saying this is -- I'm not

23   looking for you to be sending out any type of social media

24   communications while you are in the courtroom.

25             MR. DAVIS:  Absolutely.  Absolutely.
```

```
1              THE COURT:  And my understanding is you are -- this

2    is just simply so you can be in communication probably with

3    your family or with work.

4              MR. DAVIS:  That is correct.

5              As a matter of fact, this morning I was in the middle

6    of a testing call for a system that we were remediating.  They

7    found some problems with the system.  We were testing the fix.

8              And then due to the discussions earlier today that I

9    did not hear, I had to shut down that meeting and leave that

10   meeting so that I could take care of the testing later.

11             So again, my apologies for not being here earlier,

12   but ...

13             THE COURT:  That is fine.  That is fine.  I

14   understand people have lives beyond litigation.  But -- okay.

15   As long as that's your understanding of your obligations

16   here --

17             MR. DAVIS:  Oh, yes.

18             THE COURT:  -- in terms of the security of -- and

19   protocols in this court, it is acceptable.  I would not --

20             MR. CROSS:  Your Honor?

21             THE COURT:  Just a second.

22             I know that Mr. Favorito is a consultant to your

23   attorney.  But he hasn't been authorized to have a phone here.

24   So I don't -- you understand this is -- what I am authorizing

25   is for you personally.
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1          MR. DAVIS:  As a plaintiff, that is correct.

2          THE COURT:  As plaintiff.  All right.

3          MR. CROSS:  If we could get clarity on one thing,

4     Your Honor.  There are multiple people who during the opening

5     statements saw Mr. Davis seated with a laptop on his lap on the

6     bench in the well.  I'm not sure how that happened.  But if we

7     could get clarity that there has been no recordings made

8     already of anything.

9          THE COURT:  Is that -- have you made any recordings?

10         MR. DAVIS:  No.

11         THE COURT:  All right.  You understand that if you

12    have made any recordings it would be in violation of the

13    Court's rules?

14         MR. DAVIS:  Yes.  I personally don't want to incur

15    any federal fines.

16         THE COURT:  All right.  I'm not in the business of

17    fines.  It is really more like, you know, there is a sanction

18    of some sort that is -- when you don't do this.  And I wouldn't

19    want it to be related to your interest in this case.

20         MR. DAVIS:  Thank you.

21         THE COURT:  All right.

22         MR. OLES:  Judge, there was also the matter of the

23    proffers.  We have three proffers related to testimony --

24         THE COURT:  All right.  I'm going to let Mr. Davis

25    sit down at this time.

1              And you can -- Mr. Oles, then you can go ahead.

2              And do we have -- all right.  Go ahead.

3              MR. OLES:  This is just going to be --

4              THE COURT:  Closer to the mic.  Thank you.

5              MR. OLES:  Are you prepared to receive them now or --

6              THE COURT:  Well, I don't even know what they are.

7              MR. OLES:  Okay.

8              Previously the Court -- we had asked to present

9    certain testimony on behalf of some of the witnesses, some of

10   which the Court allowed.  And I did ask at the time -- I know

11   for sure at least on two of them -- that we be allowed to

12   proffer into the record on the matter of the testimony that was

13   excluded that we believe would have been put into the record.

14             So that is all I am asking.

15             THE COURT:  Is there any objection to that from any

16   of the other parties?

17             MR. TYSON:  Not from the State, Your Honor.

18             MR. CROSS:  No, Your Honor.

19             THE COURT:  All right.  Go ahead.

20             MR. OLES:  Can I get my notes?

21             THE COURT:  Yes.

22             MR. OLES:  Thank you.

23             Your Honor, I have three proffers.  The first is

24   related to Frances Watson.  I will say at the outset I'm not

25   asking the Court to revisit this at this time.  I understand

1    the Court's ruling.  I'm merely putting this into the record so

2    that the record is complete --

3                    THE COURT:  All right.

4                    MR. OLES:  -- on appeal.

5                    After agreeing that the -- after -- well, the Court

6    allowed me to present Ricardo Davis to -- allowed me to address

7    certain -- to address adverse witness Frances Watson only one

8    question about duplicate ballots and no questions about other

9    issues.

10                   Had I been able to ask Ms. Watson questions that

11   Mr. Davis believes were within the scope of the trial issues as

12   defined by the Court in its motion or in its order on summary

13   judgment back in November, we believe that that testimony from

14   Ms. Watson would have shown, first, that Ms. Watson was not

15   truthful originally about her investigative findings that

16   claimed there were no problems with the Dominion system

17   re-count.

18                   Second, that Ms. Watson was not truthful in claiming

19   that the Coffee County re-count problems were attributable to

20   human error and not having batches properly separated.

21                   Third, we believe it would have exposed a lack of

22   corroborating evidence in the record to support any of Frances

23   Watson's findings about the Coffee County re-count.

24                   THE COURT:  Any of her findings or funding?

25                   MR. OLES:  Her -- her findings.

1          THE COURT:  Findings.  All right.  About the

2     re-count.

3          MR. OLES:  Yes.  I'm sorry.

4          THE COURT:  That is all right.

5          MR. OLES:  I'll speak a little clearer.

6          In addition, that Ms. Watson was not -- Ms. Watson

7     was not truthful about claiming to have found no duplicate

8     pristine ballots that were accepted in the Fulton County 2020

9     election.

10          And finally, we believe that we could have

11     established through her that Mr. Germany was not truthful when

12     he claimed that Mr. Chaney made false statements about the

13     Dominion re-count problems and the lack of support from the

14     Secretary of State's office.

15          With respect to Dr. Philip Stark, the Court did allow

16     me to present two questions and some limited follow-up on

17     behalf of my client, Mr. Davis.

18          However, had we been permitted to ask him further

19     questions, we believe that Dr. Stark would likely have been

20     able to confirm the following:

21          First, that a digital ballot image is required by the

22     Dominion voting system to produce tabulated votes for the

23     ballot.

24          Two, that Dr. Stark believes digital ballot images

25     are election records that should be retained according to

1    federal and state law.

2          Three, that Dr. Stark is not aware that those ballot

3    images are retained for either the period of 22 months under

4    state law or 24 months under federal law consistently.

5          Next, we believe that Dr. Stark would have confirmed

6    that it is technically impossible to have more certified votes

7    than ballot images if the election processes are followed

8    correctly.  We believe he would have confirmed that there were

9    17,852 certified 2020 Fulton County votes that had no original

10   ballot image files.

11         We believe that he would be able to confirm that

12   votes that have -- votes with missing ballot images are an

13   indication of electronic vote tampering.

14         We believe he also would have confirmed that 376,863

15   original Dominion ballot images for the certified Fulton County

16   2020 election are missing.

17         And finally, that the missing original ballot images

18   would have made it impossible to accurately audit the 2020

19   election.

20         In connection with this proffer, we would ask the

21   Court to admit into the record what is Docket Number 1346-1 in

22   the case, which is Dr. Stark's original declaration -- amended

23   declaration of March 9, 2022, which again we only offer for

24   purposes of this proffer.

25         Third, Dr. Alex Halderman.  We were given -- we were

1  not permitted to ask any questions of Dr. Halderman.  However,

2  had we been -- Mr. Davis been permitted to do so, we believe

3  that from his testimony Mr. Davis could have established that

4  Dominion has no available patch that is proven to address all

5  of the security concerns revealed in his extensive security

6  analysis upon which he presented in this case.

7          Two, that the irregular remote access that occurred

8  in Coffee County during the election poses a threat to the

9  entire Dominion voting system.

10         Three, that intruders could attack and infect either

11 the ICX BMD or the ICP scanner that reads the QR codes for all

12 in-person voting.

13         Four, that intruders could also attack and infect the

14 county election management server and not simply the BMD.

15         Fifth, that both the ICP in-person scanners and the

16 ICC mail-in ballot scanners cannot detect photocopied ballots.

17         Six, that malware could reside on either the ICX

18 precinct scanners, the ICC central absentee ballot scanner, or

19 even the election management server.

20         Seven, we believe Dr. Halderman would have agreed

21 with Dr. Stark's conclusions that Georgia's audit procedures

22 are wholly inadequate.

23         Eight, we believe his testimony would have

24 established that the only way to rule out malware-based fraud

25 is with hand count results or very comprehensive audits for

1    each race on the ballot.

2            Nine, that all Dominion system components were

3    developed without sufficient attention to security during

4    design, software engineering, and testing.

5            Ten, that malware that is spread by an election

6    management server could also infect other servers.

7            Eleven, that malware could also be programmed to

8    infect ICP in-person voting scanners and not simply the BMDs.

9            Twelve, that malware could also be programmed to

10   infect the ICC absentee ballot scanners.

11           Thirteen, Dr. Halderman was not given the opportunity

12   to examine the server that prepares election projects for the

13   current or previous Dominion system despite claims by Ryan

14   Germany's Secretary of State investigative report that he

15   would.

16           Fourteen, Dr. Halderman would have found similar

17   security deficiencies in the Dominion servers, election

18   projects, and other components had he been given that

19   opportunity to examine them.

20           Finally, fifteen, that Dr. Halderman would have

21   explained why Paul Maggio was able to image copy every Dominion

22   voting system component, except the BMD.

23           That concludes our proffer for the record, Judge.

24           THE COURT:  Okay.  Would you -- if you have a version

25   that you could file of that in the record, it would probably be

```
 1    helpful.  I mean, it will be obviously recorded in the
 2    transcript.  But I think if you would make that a written
 3    proffer.
 4              MR. OLES:  Thank you, Judge.  We'll do that.
 5              THE COURT:  If there is something that you are
 6    referencing there that is not in the record, if you could
 7    attach whatever the documents are.
 8              MR. OLES:  We will do that, Judge.
 9              May I have a day or so to do that?
10              THE COURT:  Sure.  Sure.
11              MR. OLES:  Thank you.
12              MR. BROWN:  Your Honor, if I may just say for the
13    record -- this is apparent to Your Honor, but it may not be
14    entirely clear -- by not responding to that proffer, of course,
15    the plaintiffs are not suggesting that there is any merit to
16    any of that evidence.  But instead, that is simply a proffer to
17    preserve the objection under Rule 103.
18              Thank you, Your Honor.
19              MR. TYSON:  And, Your Honor, just so the record is
20    complete, we would also object to the admission of the
21    particular report of Dr. Stark that Mr. Oles referenced, if
22    that becomes necessary.
23              THE COURT:  All right.
24              Did you want to add something, Mr. Brown?
25              MR. BROWN:  No.  I was just going to say he wasn't
```

1  moving to admit that.  He was simply making a proffer.  It has

2  already been rejected.

3          MR. TYSON:  And to be clear, Your Honor, I apologize.

4  We also would object to the proffer obviously that Mr. Oles has

5  offered.

6          THE COURT:  Okay.

7          Well, he has made the proffer he wanted.  I have

8  allowed him to perfect the record from his perspective.  And

9  that's fine.

10          And I don't think you have to go and assemble

11  everything, actually.  I think that you did a very good job in

12  describing your summary.  So you don't have to do anything

13  further, Mr. Oles.

14          MR. OLES:  Thank you, Judge.

15          THE COURT:  All right.

16          All right.  It is 20 of 1:00.  Because I've had a

17  criminal case matter that has arisen, we're going to just

18  convene another extra five minutes.  So we're talking about a

19  quarter of 2:00.

20          COURTROOM SECURITY OFFICER:  All rise.

21          THE COURT:  I'm just finishing something here.  So

22  just go ahead on your way.

23                  **(A lunch break was taken.)**

24          THE COURT:  Please have a seat.

25          Well, with respect to plaintiffs' motion for adverse

 1   inferences that is briefed at Document 1793, I don't know

 2   whether the motion is also at the same docket number.  But

 3   assuming it is, this is my thought is that there are some

 4   reasonable factual inferences that the Court can draw from the

 5   testimony that has been given, even with or without

 6   consideration of the witnesses' invocation of the Fifth

 7   Amendment.

 8          And some of the inferences that plaintiffs suggest

 9   are reasonable ones.  At least there is enough evidence in the

10   depositions to support them.  And I will look at them -- at the

11   testimony again in that light.

12          But I think to ask me to wholesale determine that --

13   make a wholesale determination with respect to the testimony

14   offered by each of these witnesses mentioned in Doc 1793 that

15   they -- that I can make the factual findings suggested by the

16   testimony as an adverse inference as a matter of -- basically,

17   a matter of law is going too far.

18          I think that the defendants are entitled -- and they

19   haven't presented their case -- to present relevant evidence

20   that might or might not clarify, refute, or mitigate the

21   testimony given or -- and the cross-examination of their

22   witnesses can also elicit information that would be relevant to

23   the Court's making adverse inferences, not as a matter of law,

24   but based on the evidence presented.

25          And all counsel in this case, I believe, understand

1    that my focus in this case has always been evidence and facts.

2    I think it puts the Court's findings in a more vulnerable

3    position for me to make a judgment as a matter of law that each

4    of the adverse inferences suggested here are established.  And

5    because of the Fifth Amendment invocation and the circumstances

6    of the testimony, I think, as I said, some of these findings

7    are sort of almost clear from the record, such as Ms. Latham

8    was in DC staying at the Willard Hotel.  I don't need a -- to

9    draw an adverse inference to get to that point anyway.  There

10   are others as well.

11          And so I'm going to deny the motion for adverse

12   inferences and proceed based on the evidence actually

13   presented.

14          MR. CROSS:  Your Honor, could I add one quick thing?

15          Understanding you're denying the motion, you're not

16   going to draw an inference, the one thing that I would just add

17   to also support the Fifth Amendment invocations being in the

18   record, in the *Coquina* case that has gotten a lot of

19   discussion, the Court cites to an Eighth Circuit case.  It is

20   *Cerro,* C-E-R-R-O, *Gordo Charity*, and it's 819 F.2d 1471 at

21   1482.

22          And what the *Coquina* case points out on reliance on

23   that is that the Fifth Amendment invocations also provide -- it

24   informs the finder of fact why the parties with the burden of

25   proof resorted to less direct and more circumstantial evidence

74

```
 1    than the witnesses' own account of what had occurred.
 2            And so the only point being made -- we understand
 3    Your Honor's ruling.  There won't be adverse inferences.  But
 4    to the extent the State argues there are certain things we
 5    didn't prove up that these witnesses could testify to, we would
 6    say Your Honor could look at the adverse -- or sorry, could
 7    look at the invocation as a reason why we weren't able to
 8    develop certain things, and so that is the only other point.
 9            THE COURT:  All right.  I mean, that is fair.  I will
10    look at the Eighth Circuit case.  I think I would do that
11    anyway as well because it is obvious sometimes from the way the
12    invocation has proceeded that that is true.
13            And I guess I'm a little -- I'm hoping that my law
14    clerks got this, and I'm not -- and I didn't get it right.  But
15    I'm a little confused about the State's position that -- I have
16    to rule on their -- their motion as to exclusion of
17    Dr. Halderman's testimony as a condition of their proceeding in
18    their case.
19            Maybe I misunderstood that, and that is why I am
20    asking.
21            MR. TYSON:  Your Honor, I'm happy --
22            THE COURT:  On our 4:00 hearing.  Because I said, why
23    are we -- why are you saying I can't -- that we're going to now
24    suddenly do it earlier?
25            MR. TYSON:  So, Your Honor, a couple of things.  I
```

think, number one, we at least were under the impression that

the 4:00 discussion related to Mr. Cross' email from Sunday and

the allegations that were contained in it --

THE COURT:  Okay.

MR. TYSON:  -- not specifically for Dr. Halderman and

his testimony.

THE COURT:  Okay.

MR. TYSON:  But we have gone back and looked at

lunch.  We don't see why there is any reason to hold up

plaintiffs resting or how that would affect the merits of their

case at this point.

I'm happy to be corrected on that.  But from our

perspective, we don't see there is a connection between the

close of their evidence and what we're going to talk about at

4:00.  But we can proceed however you would like to.  If we

need to do that now before they close, we can do that.  If we

need to approach it some other way, that is our view on that.

THE COURT:  Okay.  Well, I think you were -- in any

event, you wanted to raise -- you wanted to do something before

the close of evidence, and I think that is fine what you are

suggesting.  But I look to plaintiffs' counsel to address that.

MR. CROSS:  As to how this bears on the merits?  Is

that the question?

THE COURT:  No.  I mean, basically, what defense

counsel said was that they had talked about the issue of -- did

1    what they needed in order for you to close, and they decided

2    after consultation, as I understand it, that they thought they

3    could preserve their motion properly without having testimony

4    first on your -- your concerns regarding Mr. Persinger's --

5              MR. CROSS:  And we agree with that.

6              THE COURT:  -- exam.  So therefore, I felt like we

7    are fine.

8              MR. CROSS:  Yes.

9              THE COURT:  And so that is the question.

10             Do you feel comfortable in closing at this point,

11   though you are going to be clarifying issues regarding

12   Mr. Persinger --

13             MR. CROSS:  Yes.

14             THE COURT:  -- later in the afternoon?

15             MR. CROSS:  Yes.  My understanding is they are going

16   to go ahead and call their first witness.  We'll deal with

17   Mr. Persinger at 4:00.  They are preserving their Rule 52

18   objection despite calling the witness, is my understanding, and

19   so nothing is getting waived.

20             MR. TYSON:  So, Your Honor, Mr. Brown and I had a

21   discussion.  I said I would go back and talk to my team about

22   that.

23             From our perspective, we went back and looked.  We

24   don't see how the issues from Mr. Cross' email on Sunday have

25   anything to do with whether they can close their case.  I think

1   our original proposal was, do that later because of that.

2           So our view is they can rest now.  We can move 52(c)

3   now.  And then after that is concluded, we can call our first

4   witness.  We don't see a reason to get out of order at this

5   point.

6           THE COURT:  All right.

7           MR. CROSS:  Right.  So on that, Your Honor, while I

8   appreciate Mr. Tyson's view, it is our decision on when we

9   rest.  And Rule 52(c) is clear on its face.  Your Honor cannot

10  hear a Rule 52 motion and rule on it until we are fully heard.

11  That is the language.  And so we will not have been fully heard

12  on the evidence in our case until we have resolved the

13  Persinger issue, and I can explain that briefly.

14          We will show later -- we have begun to lay out, but

15  we will show later that what has transpired coming out of this

16  inspection is that Mr. Persinger has shown himself to be --

17          THE COURT:  All right.  No, I'm not going to hear it

18  in public.

19          MR. CROSS:  This goes to the merits, Your Honor.

20          THE COURT:  I'm sorry.  I'm not going to hear it

21  right now because that is what you wanted to raise.  We're

22  going to discuss it whenever we discuss it.

23          MR. CROSS:  Understood.

24          THE COURT:  And some of it may end up being

25  completely in another hearing as well, but I am -- I feel

```
 1    like --

 2              MR. CROSS:  Understood.

 3              THE COURT:  -- I do not want -- I mean, I don't want

 4    you saying things that I would say would not be proper for the

 5    public record until I have heard them at least once.

 6              MR. CROSS:  Understood.

 7              Let me say it this way:  The inspection itself has

 8    created a risk for future elections.

 9              THE COURT:  All right.  I just want you to --

10              MR. TYSON:  No.  No.

11              THE COURT:  -- I want you to stop at this juncture.

12              You don't need to be saying any of this for purposes

13    of my having a hearing, which I have already said I'll have on

14    your concerns, so no.  I mean, we can have the hearing -- if it

15    is your view as opposed now to the State's view that you need

16    to have this in the record before you close, then we'll just --

17    we'll -- you know, as soon as -- we can do that now.  I mean,

18    that is fine.

19              MR. CROSS:  The only reason I was saying anything was

20    there was --

21              THE COURT:  Just --

22              MR. CROSS:  -- to explain the merits connection.

23              THE COURT:  You don't have to describe it at this

24    point.

25              MR. CROSS:  Understood.
```

```
 1              THE COURT:  You can describe it when it is all --
 2   we're through.  But we --
 3              MR. CROSS:  So do we want to do Persinger now and
 4   then -- or how do you want to --
 5              MR. TYSON:  Your Honor, I think if Mr. Cross is
 6   taking the position that the resolution of the issues related
 7   to Mr. Persinger are part of their merits case, I think we have
 8   to deal with it before they rest.
 9              Our view is that it is not a part of the merits case,
10   but that apparently is theirs.
11              THE COURT:  If there is a dispute about it, then I --
12   all right.
13              And are we going to deal with any of the Dr. --
14   Mr. Persinger's reporting issues at this same time?
15              Let me just put it that way.
16              MR. TYSON:  I think that is part of the allegations
17   in the email, Your Honor.
18              THE COURT:  Okay.  Then there are some other things I
19   want to talk to you about too.
20              Let's do it.  The decider in chief is there.  I
21   really have a great group to work with me.  It is a pleasure.
22   I know all of you depend on your colleagues, but it is a real
23   pleasure and saving grace that I have such great people who
24   work with me.  And I want to thank them because they have also
25   been working day and night, and I think no one harder than
```

```
1    Shannon.
2            Okay.  All right.  Ladies and gentlemen, I'm very
3    sorry to be disruptive of the experience of sitting in the
4    hearing.  But because there were a number of highly
5    confidential data-related issues that came up, I'm going to
6    have to close this hearing to anyone but identified counsel
7    who -- and we'll have to go over that as well.  I don't know
8    how long this will take.  It could take half an hour; it could
9    take more.  I don't know.
10           But we'll continue -- and your first witness, again,
11   is?
12           MR. TYSON:  Our first --
13           THE COURT:  Ryan Germany, or has that changed?
14           MR. TYSON:  No.  That is still the case, Your Honor.
15   Mr. Germany.
16           THE COURT:  So I think we will get to Ryan Germany,
17   but -- so if you want to hang out, please feel free to do so.
18   I would appreciate if you would not sit -- get too close to the
19   doorway, though, because that can be distracting.  So there is
20   a lot of room on the other side closer to the ceremonial
21   courtroom also.  Thank you.
22                       (The public proceedings were thereby adjourned
23                        at 2:11 PM when the Court heard sealed
24                        proceedings, and then the public proceedings
25                        continued at 3:43 PM, as follows:)
```

1        MR. CROSS:  Yes, Your Honor.  On behalf of plaintiffs

2   Donna Curling, Donna Price, Jeffrey Schoenberg, we rest our

3   case at this time.  Obviously, we reserve the right for

4   rebuttal.

5        MR. McGUIRE:  And, Your Honor, on behalf of

6   plaintiffs, the Coalition for Good Governance, Laura Digges,

7   William Digges III, and Megan Missett, we rest -- the Coalition

8   plaintiffs rest their case as well.

9        MR. OLES:  On behalf of Mr. Davis, he rests his case.

10       MR. TYSON:  Your Honor, at this time, the defendants

11   would move for a motion -- move for judgment on partial

12   findings under Rule 52(c) of the Federal Rules and are ready to

13   be heard on that.

14       THE COURT:  Go ahead and proceed.

15       MR. TYSON:  Mr. Martin, if we can let Mr. Montgomery

16   have screen control.

17       And, Your Honor, if I may approach, I have copies of

18   the presentation.

19       Your Honor, as I know you are aware, under Rule 52(c)

20   once a party has been fully heard on an issue, like the posture

21   of the case now at the end of the plaintiffs' case, you can

22   enter a judgment against them on the grounds that controlling

23   law would require that.  At this stage, you are now able to

24   weigh credibility, weigh the evidence.  There is no requirement

25   of deferring to the nonmoving party in terms of the view of the

 1    evidence.

 2            And so we would submit that there are at least two

 3    bases.  We'll discuss those for our motion.  One is

 4    jurisdiction and standing.  I'll just touch on those briefly.

 5    The other is the merits of the Anderson-Burdick claims that are

 6    currently pending before the Court.

 7            First of all, just briefly on traceability, what we

 8    have heard from the plaintiffs in terms of their potential

 9    injuries is that they don't -- they are concerned about voting

10    an absentee ballot because they -- concerned they may not

11    receive that in time.  As both a matter of law and as a matter

12    of fact, as the plaintiffs have testified, they -- those

13    ballots and applications are handled by counties, not by the

14    State.  So as a result, there is no traceability for any

15    injuries related to absentee ballots.

16            For injuries related to ballot-marking devices, this

17    Court has discussed and the plaintiffs referenced the idea of:

18    They don't know what the scanner is interpreting in terms of

19    their votes that are being cast, and they have asserted a right

20    to know that their votes are cast as counted.

21            What this Court has heard from their testimony is

22    that those plaintiffs also don't know what a scanner is

23    counting for their hand-marked paper ballots.  They believe and

24    have more faith in a hand-marked paper ballot than they do in a

25    ballot-marking device ballot, but they don't have the ability

1    to confirm that that hand-marked ballot will remedy their

2    injury.

3            Plaintiffs also agree that there were risks involved

4    with hand-marked paper ballots and those ballots not being

5    scanned properly by a scanner.  So in terms of injury, Your

6    Honor, we would submit that the plaintiffs have not shown a

7    cognizable injury under Article III.

8            In terms of their claims, again, we are proceeding,

9    as everyone is aware, under an Anderson-Burdick claim, which

10   means the plaintiffs at this point in the case have to identify

11   what the burden on the right to vote is so that then this Court

12   can weigh the State interests related to the imposition of that

13   burden.

14           In terms of the burdens that the plaintiffs have

15   presented to you, this Court talked about in its summary

16   judgment order the plaintiffs' right to cast an effective

17   accurately counted vote, and you discussed whether they can

18   present evidence of an actual or imminent threat to their right

19   to have their votes counted as cast.

20           At the conclusion of the evidence here, Your Honor,

21   we would submit that the plaintiffs have not shown an actual or

22   imminent threat.  In fact, as their experts -- multiple of

23   their experts indicated in the letter they signed after the

24   November 2020 election, the existence of technical flaws is not

25   enough; it is simply speculation.

1          So we would submit that at this point, the only

2     evidence the plaintiffs have submitted to you regarding a

3     burden on the right to vote is speculative.  It is not actual

4     and imminent as this Court required in its summary judgment

5     order.

6          Plaintiffs were also given multiple opportunities

7     during the course of this case to connect the various

8     complaints they had about the administration of elections.

9     They were not able to connect those to one particular element.

10    And as we talked about at the beginning, this is a situation

11    where there must be a burden on the right to vote, not merely a

12    burden as a result of normal things that happen in the course

13    of an election.

14          In addition to the speculation in terms of the

15    burden, the plaintiffs have presented you no evidence of

16    compromise of an election.  Everyone has agreed on that.  They

17    presented to you no evidence of compromise of the registration

18    system.  They presented no evidence of malware on Coffee County

19    election equipment.  They have agreed that all voting systems

20    face cybersecurity risks, and neither Dr. Halderman nor

21    Mr. Skoglund was able to quantify any of those risks.  They

22    could talk about degrees, but they couldn't tell you exactly

23    what the change was in terms of the risk.

24          And as this Court -- or actually, Judge Jones in the

25    Fair Fight case, when looking at Dr. Halderman's testimony,

1    talked about the importance of quantifying the likelihood of

2    whether the system was or will be hacked.  And the plaintiffs

3    have provided you now with no evidence of what that actually

4    means.

5         The other evidence they presented is State inaction,

6    that there is something that happened and the State didn't

7    respond sufficiently.  This is very similar to a claim brought

8    by President Trump's campaign before the November 2020 election

9    in Pennsylvania.  The allegation there was that Pennsylvania

10   had not done enough to secure its elections against voter

11   fraud.

12        The district court noted it was an unusual claim

13   under Anderson-Burdick.  We raised at the beginning of this

14   case that this was an unusual case under Anderson-Burdick

15   because it is not about what the State did, it is about what

16   the State allegedly did not do.  And as that Court in

17   Pennsylvania said, it is much less natural for a Court to

18   evaluate whether the Government had a good reason for not doing

19   something differently or for failing to do more to prevent or

20   reduce the risk of misconduct by third parties that could

21   burden the right to vote.

22        What the plaintiffs have given you here is limited

23   evidence about State inaction.  Ms. Watson and Mr. Blanchard

24   both testified that a business card from Cyber Ninjas was not

25   enough to place anyone on notice, or at least them, a potential

1    access to the system.

2          When the State did receive notice after the phone

3    call between Ms. Marks and Mr. Hall was played, it looked at

4    the server.  There is testimony to that.  The GBI has the

5    investigation, and at least two guilty pleas have resulted so

6    far.

7          The evidence also shows the equipment was replaced,

8    again with no indication of malware or compromise.  As we

9    raised earlier, the Coffee County breach was an intervening

10   criminal act, and in terms of injury, none of the plaintiffs

11   live in Coffee County.

12         Another area that shows the lack of a burden is the

13   lack of a remedy the Court can order.  All systems require some

14   degree of trust.  All have risks.  At least some voters would

15   continue using ballot-marking devices under the plaintiffs'

16   theory, as Dr. Stark discussed yesterday.

17         What you have heard in testimony is getting rid of QR

18   codes would not address the plaintiffs' claims.  Doing more

19   audits would not address the plaintiffs' claims.  Doing more

20   logic and accuracy testing would not address the plaintiffs'

21   claims.  Adding additional cybersecurity measures would not

22   address the plaintiffs' claims.

23         The evidence before the Court shows that any problems

24   with BMDs were the result of human error, not machine

25   malfunctions.  And ultimately, Your Honor, this is not just a

1    class action as to all voters; it must be something that would

2    address the plaintiffs' alleged burdens.

3           And to the point, if there are, we get to the State

4    interest piece, assuming you find a burden.  You have before

5    you Dr. Halderman's discussion of the advantages of

6    ballot-marking devices over hand-marked paper ballots, the

7    disability access issues Mr. Skoglund talked about.

8    Mr. Sterling explained the procurement process, the reasons for

9    selecting Dominion.  No bidders participated who did not have a

10   QR code option.  And you have heard testimony that the State

11   has taken action on the CISA recommendations by implementing a

12   write-once, read-many approach for election projects and

13   implemented parallel monitoring.

14          So, Your Honor, we would submit that at this point in

15   the case, based on all of the evidence the plaintiffs have

16   offered, they have not shown a burden on the right to vote

17   through the use of ballot-marking devices and -- especially not

18   a severe burden.  And to the extent they have, the State

19   interests clearly outweigh any burden on the right to vote.

20   Thank you.

21          THE COURT:  Thank you.

22          Would you share a copy of your PowerPoint with

23   Mr. Martin?  And he will distribute it to us.

24          MR. TYSON:  Yes, Your Honor.  I provided three copies

25   and also to the plaintiffs.

```
1              THE COURT:  Thank you.

2              COURTROOM DEPUTY CLERK:  There's two of them over

3    here.

4              MR. FISHER:  Good afternoon, Your Honor.

5              THE COURT:  Good afternoon.

6              MR. FISHER:  Your Honor, I want to start by directing

7    the Court to what Judge Jones did in Fair Fight.  Same motion

8    was brought.  The Court deferred judgment on it until the close

9    of all the evidence.  You should do the same thing here.

10   There's still evidence coming in that bears on the issues in

11   this case through the State's case, and the right thing to do

12   is wait until you have all that evidence before making a

13   ruling.

14             But if the Court is inclined to consider this motion

15   now, it should deny it.  And I want to respond to the three

16   points that Mr. Tyson brought up.

17             First, on standing, the State ignores two critical

18   points on standing, Your Honor.  First, it ignores the one

19   plaintiff rule.  This Court already decided the one plaintiff

20   rule applies in this case in summary judgment based on the

21   Coalition's organizational standing, and it also ignores that

22   the Court already determined that the concern about having

23   confidence that a ballot will be counted as cast is a

24   cognizable injury under Article III.  That is at Docket 705,

25   Pages 85 through 86.
```

```
1                The Court already determined that this is a

2      cognizable injury under Article III, and that is exactly what

3      you heard each of the individual plaintiffs testify about in

4      that case.  You heard Donna Curling testify about it, Donna

5      Price testify about it, and Jeff Schoenberg testify about it.

6      They all said that they lack confidence that the current system

7      will allow them to cast a ballot that they have confidence --

8      reasonable confidence will be counted as cast.  So that is

9      standing.

10               On the merits, Your Honor, you know, the case --

11     their case really boils down to the argument that this is a

12     speculative injury, that it is not actual and imminent, that it

13     is speculative, it is not realistic.  Well, we saw

14     Dr. Halderman in open court hack a BMD voting and caused it to

15     change votes with nothing but a pen.  That is it.  Just a pen.

16     And he testified that it wasn't just him.  He taught Jeff

17     Schoenberg how to hack a BMD to change votes in less time than

18     it takes to actually cast a vote.

19               And we didn't see a single shred of evidence in

20     Dr. Halderman's cross challenge any of the vulnerabilities that

21     he's identified explaining why this machine is so easy to hack.

22     Instead, during his cross, we heard what we heard today.  There

23     is no evidence of any altered outcome.  There is no evidence of

24     any malware.  There is no evidence of any hacked elections.

25               Well, to borrow a phrase from my colleague,
```

1    Mr. Brown, that might all be interesting, but it is entirely

2    unresponsive to our claims.  Our claims are not about past

3    elections.  They are not about outcomes.  They are about the

4    potential for votes to be changed in future elections.  And

5    what was demonstrated in court, what you saw with your own eyes

6    with a ballpoint pen is that anybody can walk into a voting

7    booth and hack a BMD and cause it to do just that.

8         I want to just read to the Court what Dr. Halderman

9    said.  What keeps me up at night is what if someone -- what if

10   some fanatics on the internet, you know, recruit a few dozen

11   people to go around a state like Georgia on election day and

12   program BMDs even in a simple way that will really visibly swap

13   votes.  It would be chaos, and it would take tremendous work to

14   figure out the full scope of that chaos.  We would have to go

15   around and inspect every single BMD to determine if something

16   was wrong, and you probably couldn't know for sure, even with

17   careful inspection, how many BMDs have actually been affected.

18        That takes us directly to Coffee County.  The

19   evidence about the breach in Coffee County is undisputed in

20   this case, Your Honor.  You saw photos of it.  You saw videos

21   of it.  SullivanStrickler, Doug Logan, Jeffrey Lenberg, Alex

22   Cruce, all of them, gaining access to nearly every piece of

23   election equipment in the Coffee County elections office,

24   imaging it, and then putting it on the internet.

25        Uncontrolled distribution.  That is the term that

1    Kevin Skoglund applied to this.  You know, Merritt Beaver, I'll

2    remind the Court, he testified at his deposition that the

3    software for the EMS server is a roadmap for bad actors.  He

4    testified here that it is a piece of a roadmap for bad actors.

5    Frankly, it doesn't matter.  The point is that either a piece

6    of a roadmap or a roadmap for bad actors who have an interest

7    in changing votes in Georgia is an uncontrolled distribution on

8    the internet.

9         We are beyond the threshold of whether or not the

10   threat to the plaintiffs' right to have their vote counted as

11   cast is speculative or we're beyond that threshold.  We're

12   beyond the threshold of whether the State should do something

13   about that threat.  The evidence plainly shows that there is an

14   actual and imminent threat to that right.

15        On the point about State inaction, let's just review

16   what the evidence says and what the evidence has shown about

17   the State's control over voting equipment.

18        Well, we know they own it.  Gabriel Sterling

19   testified about that.  We know that only the SEB can grant

20   access to election equipment.  Gabriel Sterling testified about

21   that too.  We know that only the State can determine and make

22   the decision to step away from the current electronic voting

23   system and force counties to use paper ballots.  That decision

24   can only come from the State.

25        And we know that county election officials, like

1    those we saw in the deposition videos from Coffee County, rely

2    on the State when it comes to cybersecurity and investigations

3    into issues about relating to election equipment.

4         We also know that the State has failed to properly

5    investigate those issues.  We saw this in a number of different

6    instances.

7         Just to give the Court a snapshot, with respect to

8    Fortalice, Merritt Beaver testified that he didn't even review

9    the assessment from Fortalice in 2019 that was supposed to

10   include an assessment of how easy it was to hack a BMD.  Didn't

11   even review it.  Kicked it over to Dominion.  And he testified

12   in 2020 he asked Fortalice to stop providing written reports

13   because they were taken out of context by the public.

14        We saw it again with CISA.  Dr. Halderman testified

15   that there is no evidence that Georgia has changed any of its

16   practices to diligently implement the mitigations that were

17   recommended by CISA.

18        And, of course, we saw with Coffee County -- we heard

19   a lot of testimony about the investigation in Coffee County,

20   but one point sticks out.  Joshua Blanchard, no one in his

21   office -- no one ever actively investigated the Coffee County

22   breaches.

23        On relief, Your Honor, again, this issue has already

24   been decided.  The Court at summary judgment held that it could

25   order remedial measures without invading the legislature.

1   That's Docket 1705 at 102.  Nothing has changed here today.

2   But I'll note that enjoining the BMDs here in Georgia under the

3   conditions of which they are implemented -- which, by the way,

4   is the only thing that plaintiffs are seeking.  We're not

5   seeking an injunction against BMDs everywhere, just here in

6   Georgia under the conditions in which they are currently

7   implemented.

8           That would not encroach on the legislature.  There is

9   already a law existing in Georgia that if the electronic method

10  of voting is rendered impossible or impractical, paper ballots

11  should be used.  The Court enjoining the use of BMDs would not

12  encroach on the legislature.

13          Finally, on State interests, it is a balancing test.

14  You have to weigh it.  We didn't hear any evidence of any of

15  the State witnesses about what interests could possibly justify

16  the use of BMDs.  They could have asked witnesses from the

17  Secretary of State's questions about that.  They didn't.  They

18  didn't ask a single witness a question about that.  The only

19  witness who did testify about State interests articulated the

20  exact sort of generalized regulatory interests that this Court

21  decided on summary judgment might not be sufficient to justify

22  the use of BMDs even if the burden is slight.

23          The burden is not slight here.  It is severe.  And

24  for that reason, the balancing test favors enjoining BMDs.

25          Thank you, Your Honor.

1          THE COURT:  Mr. McGuire?

2          MR. McGUIRE:  Thank you, Your Honor.

3          For the Coalition Plaintiffs, I just wanted to add a

4   couple of points on top of what Mr. Fisher said.

5          So at the beginning of our opening, I told you we

6   were going to talk about evidence that fell into four buckets.

7   The first one was injury -- was standing, and then the

8   Anderson-Burdick test with the burden and the State interest,

9   and finally, relief.

10          Standing is essentially established here because

11   Mr. Tyson didn't even attempt to challenge the organizational

12   standing of the organizational plaintiff here, Coalition for

13   Good Governance.

14          The only evidence in the record shows that Coalition

15   has diverted resources away from activities that it would do to

16   opposing the State's required use of BMDs, and that diversion

17   of resources gives the Coalition for Good Governance

18   organizational standing, which, in turn, under the one

19   plaintiff rule, extends to remaining plaintiffs.

20          In addition, as for the individual plaintiffs, it is

21   important to emphasize that we have made this point in the

22   past.  Standing is distinct from the merits.  So the injury

23   that can give you standing doesn't even have to be illegal

24   conduct.  It just has to be something that is an identifiable

25   trifle that infringes on legally protected interests that you

1    are entitled to observe.

2           So just to take one example from the testimony that

3    is not contradicted, the requirement that you cast a vote on a

4    BMD where your vote is encoded in a QR code that you cannot

5    read, that infringes on a legally protected interest because

6    you certainly have an interest in knowing what votes you are

7    casting.  And if you cast a BMD ballot into a scanner -- and

8    that is when your vote is cast is when you cast it into the

9    scanner, not when you print it.

10          When you cast it into the scanner, you cannot know

11   for sure the votes that you are casting, and that informational

12   injury is an infringement on a legally cognizable interest for

13   the individuals.

14          Turning to the Anderson-Burdick --

15          THE COURT:  Let me just ask you one question.

16          Just -- obviously, there was a great deal of

17   presentation in the summary judgment motion regarding Coalition

18   standing and maybe a lot less during trial.

19          So are you standing on what you presented in the

20   summary judgment motion, or is there something in particular

21   you want me to focus on here?

22          MR. McGUIRE:  As far as the organization standing?

23          THE COURT:  Right.

24          MR. McGUIRE:  Well, Rhonda Martin's testimony really,

25   we believe, kind of rolled up what was in the summary judgment

1    motion.

2            THE COURT:  All right.

3            MR. McGUIRE:  As far as the Anderson-Burdick test,

4    you have the burden side and you have the State interest side.

5            On the burden side, because standing and the merits

6    are distinct, we have argued in this case that the Court is

7    entitled to look at a larger -- to take a larger view of the

8    burden on voting than the kind of particularized injuries that

9    would give someone standing as an individual to come to court

10   and invoke the jurisdiction of the Court.

11           So the point of Article III in the case of a

12   controversy requirement is you have to have a stake in the

13   outcome of the litigation, and that is why -- that is why the

14   injury-in-fact requirement has to be satisfied.  But once you

15   satisfy that and you have a stake in the outcome of the

16   litigation, then the Court is entitled to look at the merits of

17   the lawsuit.  And the merits can consider harms that are larger

18   than the particularized injury.  As long as the relief that you

19   are seeking addresses both, the particularized injury and the

20   harms that make you right on the merits, they don't have to be

21   the same.  They are distinct.

22           And in this case, we have shown evidence that proves

23   that people who vote on BMDs are more likely to cast an

24   ineffective vote than people who vote by other means.  They are

25   treated differently.  They have -- it violates the Equal

1    Protection Clause.  Their fundamental right to vote is burdened

2    by the fact that their vote is less likely to be effective, in

3    part because of the insecurity of the system, and for the

4    various other reasons that we have shown in the evidence.

5           On the flip side, the other side of that balancing is

6    the State interests, and the evidence that you heard, both from

7    Mr. Sterling and from Mr. Mashburn, is that the State does not

8    have an interest in forcing voters to use BMDs for in-person

9    voting.  At best, they have an interest they allege in

10   following the law.

11          But the Court is entitled to weigh that interest, and

12   that interest should be -- the weight of that asserted interest

13   should be discounted by the fact that the State picks and

14   chooses which laws it decides to follow in making people use

15   these machines.

16          So the State interest does not -- under the evidence

17   in front of the Court right now certainly does not outweigh the

18   burdens on the voters.

19          And finally, for the relief prong, enjoining the

20   required use of BMDs as the standard method for in-person

21   voting will solve both the standing injuries and the burden on

22   voting that weighs on the merits.  And so because we've

23   established evidence that shows all of these things, and

24   because the State has not put on any evidence to contradict it,

25   we believe you should deny the Rule 52 motion.  Thank you.

```
 1                THE COURT:  Thank you.

 2                Anything you wanted to say, Mr. Oles?

 3                MR. OLES:  Not at this time, Judge.  My client adopts

 4     the arguments of the co-plaintiffs at this point in the case.

 5                THE COURT:  Thank you.

 6                MR. OLES:  If it is appropriate, we would request a

 7     little bit of time -- to the extent that we have now a

 8     difference in standing as a matter of his separation from the

 9     parties, we would request a little bit of time to address that,

10     but that would be all.  Thank you.

11                THE COURT:  Well, I think -- discuss the one

12     plaintiff rule because I think your client probably is still

13     covered by that.  So discuss it with -- you can discuss it with

14     your co-counsel, or you can look -- go back and read my order

15     on the motion for summary judgment.

16                MR. OLES:  All right.  We will, Judge.

17                THE COURT:  Okay.  All right.  Well, I'm going to

18     defer ruling on the motion until the conclusion of trial and my

19     review of all of the evidence after that.  It is too complex

20     and weighty of a set of issues for me not to hear everything

21     when there really still are live disputes that -- as indicated

22     by the evidence I have heard.

23                So would the State like to call its first witness?

24     **THE DEFENDANTS' CASE.**

25                MR. BEDARD:  Yes, Your Honor.  The State calls Ryan
```

1  Germany.

2                    **(There was a brief pause in the proceedings.)**

3          THE COURT:  He's lost.  He said Groundhog Day is not

4  for me.

5          MR. BEDARD:  As we know, he has never been here

6  before.

7                    **(There was a brief pause in the proceedings.)**

8          COURTROOM DEPUTY CLERK:  Please raise your right

9  hand.

10                        **(Witness sworn)**

11         COURTROOM DEPUTY CLERK:  Please, once again, if you

12  would, state your name and spell your name for the record.

13         THE WITNESS:  My name is Ryan Germany, R-Y-A-N,

14  Germany, like the country, G-E-R-M-A-N-Y.

15     Whereupon,

16                         RYAN GERMANY,

17     after having been first duly sworn, testified as follows:

18                       DIRECT EXAMINATION

19  BY MR. BEDARD:

20  **Q.**   Good morning, Mr. Germany.  You have obviously testified

21  in the plaintiffs' case, so I want to just cover a few things

22  real quick just to remind the Court.

23     You used to work for the Secretary of State's office;

24  correct?

25  **A.**   Yes.

1   **Q.**   Your title when you worked there was general counsel?

2   **A.**   Yes.

3   **Q.**   When did you first begin working at the Secretary's

4   office?

5   **A.**   January 2014.

6   **Q.**   Who was the Secretary when you were hired?

7   **A.**   Secretary Kemp.

8   **Q.**   And who was the Secretary when you left the Secretary's

9   office?

10   **A.**   Secretary Raffensperger.

11   **Q.**   So fair to say --

12          THE COURT:  Remind me which date when you were

13   working under Governor Kemp and when he was --

14          THE WITNESS:  I was hired -- I started, as I said, in

15   January 2014, so I was with him until -- then Secretary

16   Raffensperger was -- took office in January 2019.  And then, of

17   course, for a few months there was Secretary Crittenden.  I

18   worked for her as well.

19   BY MR. BEDARD:

20   **Q.**   So to state the obvious, you worked over multiple

21   administrations; right?

22   **A.**   Yes.

23   **Q.**   Okay.  Have you ever heard of the SAFE Commission?

24   **A.**   Yes.

25   **Q.**   What was the SAFE Commission?

A.     The SAFE Commission was something that then-Secretary Kemp put in place.  It stands for the Secure Accessible and Fair Elections Commission.  We put that in place in the Secretary of State's office following the 2018 General Assembly general session.  So it was about probably springtime 2018 we put that in place.

Q.     And what was the task of the SAFE Commission?

A.     So the SAFE Commission -- so at that point, there had been both in that legislative session in 2018 and in previous ones -- certainly, the one before that in 2017, I believe, even in 2016, there were discussions about moving to a new voting system.  The previous DRE voting system was getting old, and we knew that there would have to be a replacement.

       So the Secretary of State's office put in -- stood up the SAFE Commission really to try to bring together different stakeholders in the election process.

       Particularly with Georgia voting system, different stakeholders were going to have -- they were going to have things to do with that voting system, and we just wanted to make sure that their voice was heard, that they could bring their expertise here from other experts, and then make a recommendation to the General Assembly.

Q.     Did you have any role with the SAFE Commission?

A.     Yes.

Q.     What was your role in regards to the SAFE Commission?

**A.**   So my role was basically helping with all the
administrative tasks.  The SAFE Commission didn't have any
staff.  So I helped set up meetings, and I helped get material
that they considered from the different voting system vendors.
I did an initial draft of the final report.  I think I did a
presentation to them on Georgia procurement law just to give
them a sense of what that process was like.

**Q.**   You mentioned a report.

Did the SAFE Commission produce a final report?

**A.**   Yes.

**Q.**   Okay.

MR. BEDARD:  May I approach, Your Honor?

THE COURT:  Yes.

BY MR. BEDARD:

**Q.**   Mr. Germany, have you seen this document before?

**A.**   Yes.

**Q.**   Is this a true and correct copy of the SAFE Commission
report?

**A.**   Yes.  The only thing I would add is that I believe the
report included some appendices.

**Q.**   You jumped the gun on me.  I'll go ahead and move to this
next one.

MR. BEDARD:  Your Honor, may I approach again?

THE COURT:  Yes.

1   BY MR. BEDARD:

2   **Q.**   Mr. Germany, have you seen this document before?

3   **A.**   Yes.

4   **Q.**   Are these the appendices you were just referring to?

5   **A.**   Yes.   Appears to be.

6   **Q.**   Okay.   Are both of these documents publicly accessible on

7   the Secretary of State's website?

8   **A.**   Yes.

9   **Q.**   And have you seen them recently on the Secretary's

10  website?

11  **A.**   Yes.

12  **Q.**   When did you most recently see them?

13  **A.**   I believe it was Sunday.

14  **Q.**   Okay.

15  **A.**   This past Sunday.

16          MR. BEDARD:   At this point, Your Honor, we would move

17  to admit Defendants' Exhibits 856 and 1224 into evidence.

18          THE COURT:   Any objections?

19          MR. CROSS:   One second, Your Honor.

20              **(There was a brief pause in the proceedings.)**

21          MR. CROSS:   No objection, Your Honor.

22          THE COURT:   It is admitted.

23  BY MR. BEDARD:

24  **Q.**   All right.   Let's talk about the commission again.

25          You mentioned that the SAFE Commission was kind of tasked

with exploring options for a new voting system for Georgia.

Why -- from your perspective, what is the benefit of establishing a commission like the SAFE Commission to study an issue like this?

**A.**   Well, I think there's a few benefits.  One, the legislative session is usually pretty crowded with issues. Again, the session only lasts from January until the end of March, beginning of April, and so there might not be a lot of time to consider things, especially things that have kind of a technical element.

So we wanted to -- with this commission, we thought we could -- it did include legislators, of course.  So it kind of enlarges the time they can consider something.

We also wanted to make sure that the voices that really have a stake in the election system, particularly local election officials -- that they have their expertise provided to and then hopefully listened to.

And, you know, a lot of times in the session, the people that the legislature hears from the most are kind of the loudest or just the most activist.  And so we really wanted to make sure that local election officials in particular had a -- an option to let their -- at least some of their voices be heard.

**Q.**   You don't have to kind of go through everybody's name, but relatively speaking, how many members, give or take, were on

1   the SAFE Commission?

2   **A.**   I believe it was kind of between 15 and 18.  I know we had

3   some -- the Secretary of State was a member, and then we had

4   some -- the decision of whatever new voting system Georgia went

5   to was going to be up to the legislature.  So we had members of

6   the legislature from both the House and the Senate, and then

7   from both parties and the House and the Senate.  And then we

8   had local election officials as part of it, and we wanted to

9   have a cross-section of -- we had rural.  I think we had a

10  probate judge from a rural county, and we had some election

11  officials from more populated counties as well.

12      We had representatives from -- or at least people that had

13  experience with the different political parties, and we had a

14  disability expert and a cybersecurity expert, and then we had a

15  couple of voters at-large.

16  **Q.**   Why -- well, scratch that.

17      I think you just testified to this.

18      Was the SAFE Commission tasked with actually choosing

19  Georgia's next election system?

20  **A.**   No.

21  **Q.**   What was its purpose?

22  **A.**   Their purpose was to hear evidence, use their expertise,

23  and then hear additional expertise, and then make a report and

24  recommendation to the General Assembly.

25  **Q.**   All right.  So you said they are providing recommendations

1    to the legislature.

2        Who made the final decision on what type of voting system

3    to adopt for Georgia?

4    **A.**    The legislature.

5    **Q.**    In providing its recommendations and evaluating this

6    evidence, what factors did the SAFE Commission look at?

7    **A.**    They looked at a lot of different factors, and I think

8    that was a big reason why we wanted to have a commission

9    particularly of people who have experience running elections in

10   Georgia because there is a lot of different factors that go

11   into it.

12       But, of course, cybersecurity was a factor.  Accessibility

13   was a factor for disabled voters in particular, but also just

14   accessibility overall, ease of use and kind of just a general

15   operation of it.  It has got to be able to be operated.

16   Election officials have to be able to do this.  They have to

17   train poll workers who are, you know, essentially volunteers.

18       So there's -- think about how you store it, and there's

19   just a lot of different aspects, and we wanted people to look

20   at -- who had that expertise and could look at each aspect of

21   running an election.

22            MR. BEDARD:  Jim, can we pull up --

23            THE COURT:  Yeah.  Could you just hold one second.

24            Just before you ask -- let me ask you a question.  I

25   may have just missed it.

```
 1            Did you have a specific role in shepherding the SAFE

 2    Commission?

 3            I might have missed that.

 4            THE WITNESS:  I didn't have an assigned role or

 5    anything.  It was just sort of duties that fell to me in my

 6    capacity as general counsel to the Secretary of State's office.

 7            THE COURT:  And if you wouldn't mind, I don't want to

 8    take this over, but I just want to make sure I understand what

 9    the foundation of his testimony is and what the

10    responsibilities you had were.

11            MR. BEDARD:  Sure.  I don't think -- I believe this

12    is all in the record so far.  I think Mr. Germany has already

13    testified to this.  He effectively served as staff for the SAFE

14    Commission because there was no staff, so he did an initial

15    draft of the final report, and he assisted in kind of the

16    administrative side for the SAFE Commission.

17            THE COURT:  Did you attend all of their hearings?

18            THE WITNESS:  I believe I did, yes.

19            THE COURT:  Go ahead.

20            MR. BEDARD:  Jim, can we pull up 856, please.  Can we

21    go to Page 3, and can we highlight kind of the bottom paragraph

22    there?

23    BY MR. BEDARD:

24    Q.   You see here, this is the SAFE Commission report which you

25    just testified to.
```

1      It says here, SAFE Commission's mission is to thoroughly

2   study and discuss all options for Georgia's next voting system

3   with a focus on security transparency, voter experience,

4   accessibility and inclusion, voters' ability to adjust to a new

5   system, and the ability of election officials to adapt to a new

6   system quickly and accurately.

7      Do you see that?

8   **A.**   Yes.

9   **Q.**   Does that reflect kind of your understanding of the

10   various factors the SAFE Commission was considering during

11   their deliberations?

12   **A.**   Yes.  I think that -- I think all those were considered,

13   and probably even additional ones, just because it is hard to

14   list all of them.

15   **Q.**   Let's see.  Were there any limitations placed on the types

16   of systems that the SAFE Commission could look at that you are

17   aware of?

18   **A.**   Well, we worked with voting -- the voting system

19   vendors -- the different vendors to get information on the

20   systems that were available, so I guess the limitations were

21   just what systems were actually available in the market.

22   **Q.**   Is that a practical limitation on the SAFE Commission's --

23   on the scope of systems that the SAFE Commission could look at?

24   **A.**   Well, this was something -- you know, we envisioned the

25   General Assembly doing something quickly or in the next

1   session, which is what ended up happening.  It had to be

2   looking at what is actually available on the market.

3   **Q.**   And maybe let me ask my question a different way.

4        In setting up the SAFE Commission, did the Secretary's

5   office or any other kind of entity put any limitations on the

6   types of systems that the SAFE Commission could look at?

7   **A.**   No.

8   **Q.**   Did the SAFE Commission consider hand-marked paper

9   ballots?

10  **A.**   Yes.

11  **Q.**   And did it consider ballot-marking devices?

12  **A.**   Yes.

13  **Q.**   Did it consider any other types of systems, to your

14  knowledge?

15  **A.**   I would say it considered kind of a hybrid of those -- of

16  those two options as well.

17  **Q.**   All right.  Was the SAFE Commission the first attempt in

18  Georgia at studying the new voting system?

19  **A.**   I know there had been hearings in previous legislative

20  sessions regarding moving to a new voting system.

21  **Q.**   If you look at the -- on Page 3 of the SAFE Commission

22  report where it is titled Background, does that appear to you,

23  to your understanding, an accurate depiction of kind of the

24  background leading to the SAFE Commission?

25  **A.**   Yes.

**Q.**    Okay.  How did the SAFE Commission do its work?

**A.**    So what the SAFE Commission did was it had public meetings

and it -- we had different people come in who hopefully had

some expertise in certain aspects of voting.  So I know one of

the initial things we did was I worked with the voting system

vendors to get information regarding their available systems,

like documentary information.  So we got that and shared that

with the SAFE Commission.

We also set up a demonstration by the voting system

vendors of the different types of equipment and systems.  And

my recollection is they were all very cooperative with the

process and participated, the vendors and the commission

members.

And then we had public meetings where we had different

members of the SAFE Commission -- for instance, we had a

disability expert on the commission, and she moderated a

discussion with other disability experts so the commission

could hear their -- their thoughts and then also engage in a

discussion with them.

We had a similar process with cybersecurity.  We had an

expert on the panel or -- on the commission, and he moderated a

discussion with other experts, other cybersecurity experts.

And we did a similar thing for voting rights, and we had people

who, you know, generally are on different sides of election

litigation come in and talk about, you know, what they see.

1           And then we provided -- Secretary of State staff provided

2    information, I believe, about audits or other things that might

3    be of interest.

4           And then, of course, the commission is allowed -- or was

5    able to engage and ask questions, and then those meetings

6    included public comment as well where the public could make

7    their views known.

8    **Q.**   Were you at all of those meetings?

9           I think you already testified in response to the judge's

10   question.

11   **A.**   I believe I was at all of them.

12   **Q.**   Were those meetings transcribed in any way?

13   **A.**   Yes.

14   **Q.**   How were they transcribed?

15   **A.**   We had a court reporter present at each one.

16   **Q.**   Let's talk about one of those meetings.

17           MR. BEDARD:  Your Honor, may I --

18   BY MR. BEDARD:

19   **Q.**   Let me ask you this first.

20           Did the commission meet in August of 2018?

21   **A.**   I don't recall the exact date, but that sounds right.

22   **Q.**   Did it meet in, I think, around Augusta around that time?

23   **A.**   We had a meeting in Columbia County, I remember.

24   **Q.**   Were you there?

25   **A.**   Yes.

1   Q.   And was that meeting transcribed as well?

2   A.   Yes.

3         MR. BEDARD:  Okay.  Your Honor, may I approach?

4         THE COURT:  Yes.

5         MR. BEDARD:  These ones are going to be big.

6   BY MR. BEDARD:

7   Q.   Mr. Germany, have you seen the document in front of you

8   before?

9        I know it is a lot of paper.

10  A.   Yes.

11  Q.   What is the document in front of you?

12  A.   This looks like a transcription of the SAFE Commission

13  meeting that took place on August 30, 2018, in Columbia County.

14  Q.   Is this transcript available online publicly anywhere?

15  A.   Yes, it is available at the Secretary of State's website.

16  Q.   Have you seen it there recently?

17  A.   Yes.

18        MR. BEDARD:  And at this point, Your Honor, I think

19  we would move 1222 -- Defendants' Exhibit 1222 into evidence.

20        MR. CROSS:  Your Honor, we object to this as hearsay.

21  It is a massive document with lots of people talking.  I'm also

22  not sure what the relevance is.

23        MR. BEDARD:  I think I can shortcut the hearsay

24  objection.  We're not offering it for the truth of whatever

25  anybody is testifying to in here.  It goes towards what is the

```
 1   information available to the SAFE Commission.

 2             THE COURT:  I'm sorry.  It goes to?

 3             MR. BEDARD:  The information that was presented to

 4   the SAFE Commission in making their recommendations, and I

 5   believe -- well, I'll leave it there for now because I think

 6   that answers the hearsay objection unless -- is that the only

 7   objection to that as well?

 8             MR. CROSS:  Well, and relevance.

 9             MR. BEDARD:  So to relevance, plaintiffs have already

10   put in Dr. Lee's presentation to the SAFE Commission.  I

11   believe you already heard either testimony or throughout this

12   case allegations against that the State didn't listen to,

13   quote-unquote, its own cybersecurity expert.

14             So they have put the SAFE Commission and the evidence

15   that was in front of the SAFE Commission at issue in this case,

16   and I think talking about some of the other things that were

17   also in front of the SAFE Commission is also relevant.  I

18   won't --

19             THE COURT:  How many meetings were there?

20   BY MR. BEDARD:

21   Q.   How many meetings were there, Mr. Germany?

22   A.   I want to say there were four or five.

23             THE COURT:  And were the materials presented to the

24   commission in the process of that?

25             I mean, I know Dr. Lee presented something because we
```

```
1   saw it at another hearing.

2              THE WITNESS:  Yes.  Yes, there was different

3   materials presented at -- at different meetings, and then I

4   think the documentation provided by the voting system vendors

5   was also presented -- or maybe not presented, but sort of given

6   to the SAFE Commission members.

7              THE COURT:  And how many members were there on this

8   commission?

9              THE WITNESS:  I can't recall exactly.  Kind of

10  15-to-18-type of range.

11             THE COURT:  Well, I'm going admit it for its -- I'm

12  not sure how relevant it is, but it may be relevant, and there

13  may be parts that they want to rely on.  It is not harmful, in

14  any event.

15             MR. BEDARD:  Certainly, Your Honor.  I think to the

16  extent it is not helpful, I would, I suppose, say the same

17  thing about Mr. Lee's presentation, so --

18             THE COURT:  Yes.  I understand.

19  BY MR. BEDARD:

20  Q.   Let's go through --

21             MR. BEDARD:  I think it is also relevant in some

22  other areas that I think will become clear.

23  BY MR. BEDARD:

24  Q.   In this meeting, did the SAFE Commission hear testimony

25  from the disability community?
```

```
 1              MR. CROSS:  I'm sorry.  Which meeting?

 2              MR. BEDARD:  The August 30, 2018, meeting that we're

 3    referring to.

 4              MR. CROSS:  I thought this was multiple meetings.

 5              This is only one meeting?

 6              MR. BEDARD:  This is one.

 7              THE COURT:  Oh, I thought it was multiple.

 8              MR. BEDARD:  No, it is not all of them.  This is just

 9    the August meeting, Your Honor.

10              THE COURT:  It is just which meeting?

11              MR. BEDARD:  The August 2018 meeting.

12              THE COURT:  And that dealt with disability issues

13    or --

14              MR. BEDARD:  There were a variety of issues

15    discussed.  But one of the issues I want to discuss right now

16    is the disability panel.

17              THE COURT:  All right.

18    BY MR. BEDARD:

19    Q.   So, Mr. Germany, I believe the question was:  In this

20    meeting, did the SAFE Commission hear from the disability

21    community?

22    A.   Yes.

23    Q.   Who is on -- or in what forum did it hear from the

24    disability community?

25    A.   So we had a disability expert as a member of the
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

commission, and then she moderated a discussion where other
experts in the disability community came in and talked to the
commission about their concerns and desires regarding different
voting systems.

**Q.**   Who is on that disability panel?  Do you recall?

**A.**   I don't recall.

**Q.**   All right.  Let's go to -- if you flip to Page 84 in your
transcript.

            MR. CROSS:  Sorry.  What page?

            MR. BEDARD:  84.

BY MR. BEDARD:

**Q.**   Do you want to flip through Pages 84 -- well, let me ask
you this:  Would reviewing the transcript refresh your
recollection as to who was on that panel?

**A.**   Yes.

**Q.**   Okay.  If you want to flip through Pages 84 through about
87, just briefly.

**A.**   Amy Howell was the disability expert on the SAFE
Commission who moderated the panel.  I think she is with the
State Department of Behavioral Health and Developmental
Disabilities.

     It looks like the other panelists were Lou Ann Blake who,
at least at the time, was the deputy director of the National
Federation of the Blind and the Jernigan Institute and served
as a manager of the National Federation of the Blind's HAVA

1     Training and Technical Assistance Grant for the United States

2     Department of Health and Human Services.

3       I won't read the whole thing.  Anne Kuhns was also on the

4     panel.  She was -- Kuhns is K-U-H-N-S.  She was with the staff

5     attorney with the Georgia Advocacy Office.  And then Elizabeth

6     Jones was a director and COO of the Shiloh Community Center

7     that provides health and wellness services to senior citizens

8     and persons with disabilities.

9     **Q.**    Okay.  Were you there when they presented?

10    **A.**    Yes.

11    **Q.**    What concerns from the disability community did they

12    convey to the SAFE Commission?

13       MR. BROWN:  Your Honor, I would object on two

14    grounds.  First, that's explicitly asking for hearsay for the

15    truth of the matter asserted, first.

16       Second, it is irrelevant because we are not objecting

17    for the use of BMDs for those with disabilities.

18       MR. BEDARD:  Well, I think, Your Honor, when we get

19    into testimony, you'll see that some of the concerns that they

20    expressed go towards the unique use of BMDs for disabled voters

21    as opposed to the rest of the voting community.

22       MR. BROWN:  That is the lawyer testifying, and --

23       MR. BEDARD:  Well, I wasn't able to ask the question

24    because of the objection, so --

25       MR. BROWN:  If it were from one of the participants,

1    it would be rank hearsay.

2         MR. BEDARD:  Again, Your Honor, it is not about the

3    truth of the matter.  It is about what is the information --

4         THE COURT:  All right.  Well, ask what the concern

5    was, but I don't -- it is true that the plaintiffs have never

6    objected to it, the use of BMDs for -- to address the

7    accommodation needs of anyone who is disabled who desires to

8    use it.

9         MR. BEDARD:  I think we can address that concern here

10   in just a couple of questions, Your Honor.

11   BY MR. BEDARD:

12   **Q.**   What concerns did they raise to the commission,

13   Mr. Germany?

14   **A.**   So I recall that one of the main concerns from the

15   disability community was the -- the idea of disabled people

16   having to vote on different equipment than the nondisabled

17   voters.

18        I recall that was a topic that I think went across all of

19   the disability experts that they had concerns about.

20        MR. CROSS:  Your Honor, one additional objection to

21   this.  We've heard a number of times that these folks were

22   considered disability experts, so it is also back-dooring

23   expert testimony.  They had an opportunity to identify and

24   present an expert on these issues, and now we have no one who

25   can respond.

```
 1              MR. BEDARD:  First off, Your Honor, I think I would
 2    respond and say that we made a similar objection to
 3    Ms. Nakamura during her testimony testifying as to things that
 4    she observed in her work, and I believe Your Honor ruled that
 5    she could at least testify to what she had heard and to her
 6    work in that space.
 7              I think Mr. Germany is here.  It is relevant.  Again,
 8    it goes towards the information that the SAFE Commission had in
 9    front of it when it made a recommendation to the legislature
10    about what system to approve.  It is again not being admitted
11    for the truth of the matter, but I also think it goes towards
12    the State interests that are being considered here.
13              Mr. Germany, also based on a question I will be
14    asking here a bit -- I expect him to testify these are concerns
15    as well.
16              MR. BROWN:  Objection, Your Honor.
17              THE COURT:  Don't say what you expect him to testify
18    about.
19              MR. BEDARD:  Well, I wasn't going to say, you know --
20              THE COURT:  All right.  Well, who were you -- who was
21    testifying to you that -- I mean, are we talking about citizens
22    or are you talking about experts who say they want the same
23    system no matter what?
24              That is what you were referring to when we suddenly
25    veered into expert testimony.
```

```
 1              THE WITNESS:  I was talking about the people that I
 2    mentioned on this disability panel that presented to the SAFE
 3    Commission.
 4              THE COURT:  All right.
 5    BY MR. BEDARD:
 6    Q.   Let's go to --
 7              MR. CROSS:  Sorry, Your Honor.  Could we just get
 8    clarity?  Because he referred to them as experts.  If they are
 9    not suggesting these people are experts, then I'll withdraw the
10    objection.
11              THE COURT:  Who was -- how many people on the panel,
12    if you recall, and who was an expert in terms of qualifications
13    and experience, not by virtue of their own personal experience?
14              THE WITNESS:  So the people on the panel, again, it
15    was moderated by Amy Howell.  She was a member of the SAFE
16    Commission.  She was with the Department of Behavioral Health
17    and Developmental Disabilities.  The other panelists were Lou
18    Ann Blake, deputy director of the National Federation of the
19    Blind and the Jernigan Institute where she had worked since
20    2005.  And for eight years, Ms. Blake had served as the manager
21    of the National Federation of the Blind, other HAVA training,
22    the Help America Vote Act training, and the Technical
23    Assistance Grant for the United States Department of Health and
24    Human Services.
25              And it says she was responsible for working -- I'm
```

1    reading from the transcript -- for working with election

2    technology developers, voting rights advocates, election

3    officials to ensure that the voting process is accessible to

4    blind voters.

5         It goes on to say she's published a number of

6    scholarly --

7         THE COURT:  I don't need to hear every part of her

8    qualifications.  I'm just trying to find out how many people

9    were on it and how many were experts by these sorts of

10   qualifications.

11        THE WITNESS:  So she was the first one.  There was

12   three -- it was the people I mentioned earlier.

13        The next one was Anne Kuhns who was a staff attorney

14   with the Georgia Advocacy Office.  They are the nonprofit,

15   federally mandated entity who advocate on behalf of individuals

16   with disabilities.

17        MR. CROSS:  Your Honor, I might be able to make this

18   easier.

19        If the State is not going to take the position in our

20   case that any of the people who spoke are experts under the

21   Rule of 702, they are not offering any of these people as

22   experts, then I don't think we need to walk through it.  That's

23   fine.  So I think it is really a question of the State.

24        MR. BEDARD:  Again, Your Honor, we're not asking you

25   to rely on their opinion as expert testimony.  What I think it

1    goes towards is, again, because when we had this objection

2    during the plaintiffs' case in chief, we didn't think the

3    selection of the machines and all that -- and I think during

4    the pretrial conference as well was particularly relevant.  We

5    lost on that objection.  The plaintiffs put up Dr. Lee's

6    presentation, other issues about the selection of machines.  I

7    think we're entitled to then respond, and what other

8    information was in front of the SAFE Commission and the

9    legislature --

10            THE COURT:  All right.  That's fine.  You have done

11   that.  So why don't you move on at this point.

12            MR. BEDARD:  Right.  I think if we can establish what

13   the concerns were that were raised --

14            THE COURT:  I think he --

15            MR. BEDARD:  -- by those experts.

16            THE COURT:  But go ahead.

17            MR. BEDARD:  Thank you.

18   BY MR. BEDARD:

19   **Q.**   I believe, Mr. Germany, you testified that there was

20   concern that disabled voters be able to use the same system as

21   everyone else.

22        Do you recall what the reasons were they were saying why

23   that was important to the disabled community?

24   **A.**   Well, in a lot of jurisdictions -- first of all, every

25   polling place is required to have one -- at least one

1    ballot-marking device or DRE or accessible-type voting machine.

2        In a lot of jurisdictions not in Georgia, that is the only

3    ballot-marking device or DRE that is in the -- that is in that

4    polling place, so everyone else would be voting, for instance,

5    on hand-marked paper.

6        In that situation, I know there's a lot of things that

7    come up where maybe the poll workers aren't very well-trained

8    on that equipment.  Sometimes it is not even set up because it

9    is used infrequently.  And then there is also issues with the

10   ballot that comes from a ballot-marking device or a DRE looks

11   different.

12       And so there was concerns raised that -- I think, in this

13   panel that that -- it goes to voter privacy concerns where that

14   is the -- if there is only one voter using that machine in a

15   precinct, then it is easy to identify if you look at a ballot

16   image, for instance, who that voter is.

17       And the other thing that I would say is -- and I think

18   this came up in the panel also.  In Georgia previously, we --

19   every voter used the same equipment.  Every voter used the

20   DREs, disabled or nondisabled.

21           MR. BROWN:  Your Honor, I would object.  I don't know

22   if he's recounting what happened in the hearing in Columbus or

23   if he is simply arguing a point on behalf of the State

24   defendants.

25           MR. BEDARD:  I think --

1          THE COURT:  I think you could move through this a lot

2     quicker, frankly.  I think it is fine to indicate that there

3     were concerns about being as accommodating as possible in

4     addressing the concerns of the disability community.  I don't

5     know that we have to do much more than that.

6          If this was a paramount deciding factor, then maybe

7     we do, but I haven't heard that in anything I have ever -- that

8     the State has ever presented, that it was the paramount

9     determining factor in the selection of the equipment.

10         MR. BEDARD:  I think what Mr. Germany testified to,

11    Your Honor, is that the SAFE Commission is considering a

12    variety of factors in coming to their recommendation.  This is

13    an important one.

14         THE COURT:  That is fine.

15         MR. BEDARD:  I'm not saying it is the paramount one,

16    so that is what we were trying to establish and what exactly

17    that concern was that was raised to them from that community.

18         But I hear you, Your Honor.

19         THE WITNESS:  Too is a lot of the factors compete.

20    So, you know, you can't have one paramount because they compete

21    with each other.

22         THE COURT:  I understand that, but there's -- you

23    know, you weigh what you think is important, and this is

24    obviously an important factor.  I deal with lots of disability

25    issues.  I have, throughout my legal career, dealt with them.

1    I understand that.

2          But I'm just saying in terms of the -- maybe the SAFE

3    Commission actually made a finding about it, for all I know.  I

4    don't know that.  I only have what your summary is.  And I

5    don't doubt it was a factor.

6          The question -- and there is nothing -- and I realize

7    there were a lot of considerations.  I mean, I think you've

8    covered it.  But if there is something more that you think is

9    really significant, go for it.  I don't mean to be stepping on

10   your presentation such that it will -- if it is going to -- you

11   think there's something a lot more significant than what I have

12   heard, fine.

13         MR. BEDARD:  I'll try and move along.  I think I can

14   point the Court because the transcript is already in evidence

15   to Pages 90 through 92 or so as to where those -- the exact

16   verbatim concerns that were raised.

17   BY MR. BEDARD:

18   **Q.**   Beyond the disability community and the concerns that they

19   raised in the SAFE Commission, Mr. Germany, you mentioned,

20   what -- was the preexisting system in Georgia?

21   **A.**   Before this system, we had a DRE system in Georgia.

22   **Q.**   And on that system, did disabled voters vote in the same

23   manner as nondisabled voters?

24   **A.**   Yes.  On the same equipment.

25   **Q.**   How long had that system been in place in Georgia?

1 **A.** That system was in place from 2002 until this current

2 system was put in place in 2020.

3 **Q.** So as the general counsel for the Secretary's office, did

4 you have any concerns about moving to a hand-marked paper

5 ballot in light of that history and context?

6 **A.** Moving from a system where all voters voted on the same

7 equipment to one where disabled voters had to vote on different

8 equipment, yes, I was concerned that would have been seen as

9 moving backwards, basically, and I think that could have opened

10 up potential litigation or other kind of legal issues.

11 **Q.** Okay.  Moving on from --

12   THE COURT:  Okay.  Let me ask you a question.

13   Did you consider or did the commission consider

14 having an optional -- an option that you could vote on --

15 anyone could vote, including disabled voters on this

16 machinery --

17   THE WITNESS:  I know --

18   THE COURT:  -- but that it wasn't a mandate as the

19 only option?

20   THE WITNESS:  I know one of the things that they

21 considered was a hybrid model.  I think what they considered as

22 hybrid more so was ballot-marking devices for early voting

23 because of some of the unique challenges with early voting

24 given the way that you can vote at any early voting location in

25 your county.

1          I don't know if they considered directly kind of an

2     either/or approach for any voter.

3          THE COURT:  Well, we just have heard testimony that

4     there are locations around the country, states and cities

5     that -- as well as counties that basically give -- allow people

6     to decide how they want to vote.  I mean, they come in, they

7     could be disabled voters, they could be nondisabled voters, and

8     they can decide if they want to do that or if they want to do a

9     hand ballot and do it right there.

10         Did you-all consider that -- not you, but the

11    commission?  Do you remember?

12         THE WITNESS:  I know they considered a hybrid model

13    of both types.  I don't know if they specifically considered --

14    considered that.

15         THE COURT:  Okay.

16         THE WITNESS:  I can't recall, I should say.

17         THE COURT:  All right.

18    BY MR. BEDARD:

19    **Q.**  I'll move on, Mr. Germany.

20         You've mentioned that local officials were also on the

21    SAFE Commission.

22         What specific concerns did the local officials raise to

23    the commission?

24    **A.**  One thing local election officials raised was that -- the

25    issue of early voting in Georgia.  Early voting is very popular

1   in Georgia, but it is unique because you can go vote at any

2   early voting location in your county as opposed to on election

3   day you have to go to your assigned precinct.

4        So that means that early voting locations have to have the

5   option of providing every single different possible ballot

6   combination in the county to any voter that shows up, and they

7   don't -- they don't really know, you know, which voter is going

8   to show up where in early voting.

9        And then they also raised in -- on election day in

10  Georgia, because we had a DRE-based system previously, our

11  precincts had kind of developed in a way where there is a lot

12  of different ballot combinations in a precinct, especially in a

13  lot of counties, especially in Fulton County.

14       There are some counties that only have one precinct for

15  the entire county.  I think that is something that has

16  developed -- that developed really because of the DRE-based

17  system where it was easy to pull up any ballot combination on

18  any machine.

19       Of course, with hand-marked ballots, you don't really have

20  that.  You usually have one ballot style per precinct.  But in

21  Georgia we have -- I think it is the majority of voters now

22  voting early in person where they can vote at any location in

23  the county.  And in the more populous counties like Fulton,

24  there is a lot of early voting locations.  But then they have

25  some of those same issues on election day where they are going

1      to have -- I think Georgia somewhat uniquely has a lot of

2      different ballot combinations in precincts even on election

3      day.

4          And I guess the concern they raised is when you have that,

5      if you have hand-marked paper, you kind of raise the risk of

6      poll workers maybe not giving the voter the correct ballot.

7      You wouldn't have that risk as much in a polling place where

8      there is only one available ballot combination.

9      **Q.**   Okay.  I want to move on just briefly.

10         Are you familiar with Marilyn Marks?

11     **A.**   Yes.

12     **Q.**   And who is Ms. Marks?

13     **A.**   She is -- she is one, I guess, executive director or kind

14     of the head of one of the plaintiffs in this case, and she has

15     been involved in Georgia advocating for hand-marked paper

16     ballots.  And I think she was in other states prior to Georgia

17     advocating for hand-marked paper ballots.

18     **Q.**   Did she appear in front of the SAFE Commission?

19     **A.**   Yes.

20     **Q.**   And did she advocate for hand-marked paper ballots at the

21     SAFE Commission?

22     **A.**   Yes.

23     **Q.**   Back to the county officials real quick -- well, I'll

24     scrap that for now.

25         The final meeting, when was the final meeting of the SAFE

1   Commission?

2   **A.**   To my recollection, it was early January 2019.  We wanted

3   to have a report, you know, prior to or at the very beginning

4   of the legislative session in 2019.

5   **Q.**   And what did it do at that hearing?

6   **A.**   What did the SAFE Commission do?

7   **Q.**   Yes.

8   **A.**   We went through the initial draft report that I had

9   drafted, and they made different suggestions and discussions,

10  and they had different votes on edits and things like that.

11  **Q.**   Did they make any amendments to the report during that

12  meeting?

13  **A.**   Yes.

14  **Q.**   Are you familiar with Dr. Wenke Lee?

15  **A.**   Yes.

16  **Q.**   Was he on the SAFE commission?

17  **A.**   Yes.

18  **Q.**   Did he propose any changes to the final report?

19  **A.**   Yes.

20  **Q.**   Did the SAFE Commission accept any of those changes?

21  **A.**   Yes.

22  **Q.**   Did they accept all of those changes?

23  **A.**   No.

24  **Q.**   At the end of the day -- well, let me back up real quick.

25         Did the SAFE Commission in its final report consider the

1    views expressed to it from the disability community?

2              MR. CROSS:  Your Honor, the only thing he can testify

3    to is his own personal knowledge.  He can't speak to what any

4    individual member of the SAFE Commission considered or not.  He

5    can talk about what was presented to them, but that's as far as

6    he can go.

7              MR. BEDARD:  Let me rephrase.

8    BY MR. BEDARD:

9    **Q.**   In its final report, did the SAFE Commission's final

10   report incorporate the concerns raised by the disability

11   community?

12   **A.**   Yes.

13   **Q.**   Did it incorporate the concerns raised by local officials?

14   **A.**   Yes.

15   **Q.**   Did it incorporate cybersecurity concerns raised by

16   Dr. Lee and others?

17   **A.**   Yes.

18   **Q.**   What was the -- if you can recall, what was the final vote

19   from the SAFE Commission on the final report?

20   **A.**   What was the --

21   **Q.**   Let me ask you this:  You testified previously it was

22   about 15 to 18 members on the SAFE Commission.

23        When it came time for the final vote on the

24   recommendations on the final SAFE Commission report, how many

25   members voted against it that you recall?

**A.**    I think by the end of it, the co-chair, Secretary

Crittenden, and she had added Secretary Raffensperger --

Secretary Raffensperger at the time, just because of his

election -- so I think we had 18 members at that time, and I

think three people voted against adoption of the final report.

**Q.**    Okay.  So out of the final meeting, from what you can

recall, only three members voted against it?

**A.**    Yes.

**Q.**    Okay.  Those that voted against it, did they have the

opportunity to express their views?

**A.**    Yes.

**Q.**    How did they express their views?

**A.**    So in the appendices to the report that we also included

to the General Assembly, there is a minority report.

**Q.**    And were those views also conveyed to the legislature?

**A.**    Yes.

**Q.**    Was everything within the appendices conveyed to the

legislature?

**A.**    Yes.

**Q.**    Okay.  And the final report was also conveyed to the

legislature?

**A.**    Yes.

**Q.**    Okay.  On one brief topic, just a couple of questions,

Mr. Germany.

        As general counsel, were you involved in this litigation?

1    **A.**    Yes.

2    **Q.**    Are you familiar with --

3          MR. BEDARD:  And, Your Honor, before I ask this

4    question, I just want to be clear this is not going to get into

5    anything that has been the subject of any sealed proceedings in

6    this case, which I'm not even aware of.  So I just wanted to

7    preface that.

8    BY MR. BEDARD:

9    **Q.**    Are you familiar with Jim Persinger?

10   **A.**    I know his name.

11   **Q.**    Okay.  In what capacity are you familiar with

12   Mr. Persinger?

13   **A.**    I know he was hired as a consulting expert in this case.

14   **Q.**    Do you recall roughly when he was hired?

15   **A.**    I believe he was hired -- my recollection was refreshed

16   when I testified previously -- in kind of the spring, May,

17   abouts, 2021.

18   **Q.**    If you can recall, what was he hired to do?

19   **A.**    He was hired to do kind of a forensic image or forensic --

20   some type of expert kind of work regarding the KSU server.

21   **Q.**    I'm sorry.

22          You said the KSU server?

23   **A.**    Yes.

24   **Q.**    Did his engagement have anything to do with Coffee County

25   at the time he was engaged?

```
 1   A.    No, not initially.

 2          MR. BEDARD:  I'll reserve for redirect, Your Honor.

 3                      CROSS-EXAMINATION

 4   BY MR. CROSS:

 5   Q.    Good afternoon, Mr. Germany.

 6   A.    Good afternoon.

 7   Q.    You mentioned that one of the things that was discussed

 8   with the SAFE Commission, you referred to it as a hybrid of

 9   hand-marked paper ballots and BMDs.

10          What was that?

11   A.    My recollection was there was discussion about -- because

12   of some of those concerns about early voting in particular

13   where you can -- you can go anywhere in your county and get --

14   have to have -- every location has to have every potential

15   ballot style available, that they thought about, what if we did

16   BMDs for early voting and hand-marked paper for election day?

17   Q.    And why was that not adopted as a recommendation?

18          MR. BEDARD:  I would again just object reflecting

19   Mr. Cross' objection as to him not being able to speak into the

20   mind of any SAFE Commission member.

21          MR. CROSS:  I'll withdraw that.

22   BY MR. CROSS:

23   Q.    Mr. Germany, if you would, grab Exhibit 1224, the

24   appendices to the SAFE Commission report.

25   A.    Yes, sir.
```

1 Q. And if you flip to maybe ten or so pages in, you'll see

2 there is a PowerPoint presentation, Cybersecurity

3 Considerations for Voting Systems.

4     THE COURT:  Is the report in here, or is this just

5 the hearing?

6     MR. CROSS:  1224 --

7     THE COURT:  Is it separate?

8     MR. CROSS:  The appendices are separate from the

9 report.  The report was a different exhibit.  It was

10 Exhibit 858 -- 856.

11     MR. BEDARD:  That's correct, Your Honor.  They are

12 technically separate PDFs --

13     THE COURT:  858?

14     MR. CROSS:  856 looks to be the report, and then the

15 appendices to that report were admitted as Exhibit 1224.

16     THE COURT:  So what is 1222 then?

17     MR. BEDARD:  1222 is the transcript from, I believe,

18 August 2018.

19     THE COURT:  From one hearing?

20     MR. BEDARD:  Yes, Your Honor.

21       **(There was a brief pause in the proceedings.)**

22 BY MR. CROSS:

23 Q. So, Mr. Germany, do you have Dr. Wenke Lee's PowerPoint

24 presentation in front of you?

25 A. Yes.

**Q.**   And Dr. Wenke Lee served as a member of the SAFE
Commission; right?

**A.**   Yes.

**Q.**   I think you mentioned him earlier.

      In fact, he was the only cybersecurity expert on the
commission; correct?

**A.**   Yes.  I would agree with that.

**Q.**   Do you recall he was handpicked by then-Secretary of State
Brian Kemp who is now the Governor?

**A.**   I don't know if I would agree with that characterization.

**Q.**   You disagree that the Secretary of State asked Dr. Lee to
serve on this commission?

**A.**   I don't recall if it was Secretary of State or the
Secretary of State's office.  My recollection is we reached out
to Georgia Tech and said, hey, do you guys have any
recommendations for someone who would be good on this?

      And they recommended Dr. Lee.

**Q.**   Fair to say that something as important as who was going
to be the only cybersecurity expert on the SAFE Commission, if
Secretary Kemp thought you had the wrong guy, he would have let
people know; right?

**A.**   I don't think it was like that.  I think it was we wanted
someone with a cybersecurity expertise.  We reached out to
Georgia Tech.  They recommended Dr. Lee.  He was -- he agreed
to serve, which is a big part of it.  It is a volunteer thing.

```
 1        And he participated, and then his views were his views.
 2   And we wanted them to be, you know, shared with everyone on the
 3   commission.
 4   Q.   Mr. Germany, you have devoted almost the entirety of your
 5   testimony today to talking about the SAFE Commission; right?
 6   A.   I have just been answering the questions that I've been
 7   asked.
 8   Q.   Right.  And you certainly thought it was important for the
 9   Court to understand the SAFE Commission, what they considered,
10   who was on it.
11        You talked to who was on it and referred to them as
12   experts; correct, sir?
13   A.   Yes.
14   Q.   Okay.  Are you now suggesting that the then-Secretary
15   now-Governor Kemp was indifferent as to who served as the only
16   cybersecurity expert on this commission?  He just left it up to
17   others?
18   A.   I know we reached out to Georgia Tech.  I don't think that
19   Secretary Kemp and Dr. Lee or anyone in the Secretary of
20   State's office had any kind of previous relationship, so it was
21   really based on their recommendation.
22        And then someone who was willing to serve, and Dr. Lee
23   was, and there was certain, you know, kind of preconceived
24   ideas of what people's positions needed to be.  We wanted it to
25   be kind of a full-throated discussion.
```

1   **Q.**   All right.  Flip to the second page of Dr. Lee's

2   PowerPoint, if you would.

3       And just so we understand, the PowerPoint --

4           THE COURT:  Are you putting it up or --

5           MR. CROSS:  I'm sorry?

6           THE COURT:  Is it up on the screen?

7           MR. CROSS:  We can pull it up.

8           Do you have it?

9           THE COURT:  No.  Go ahead.

10          MR. BROWN:  What is the number of the exhibit?

11          MR. CROSS:  It is Exhibit 1224.

12          Yeah, the challenge is this is an exhibit that the

13  defense added.

14          THE COURT:  All right.  That is fine.

15          MR. CROSS:  It is not a criticism.  That is why we

16  don't have it.

17          Didn't we get an extra copy?  Does anybody have an

18  extra copy?

19          MR. BEDARD:  Jim wants to put it up.

20          MR. CROSS:  Do you mind?

21          Thank you so much.

22          MR. BEDARD:  1224.

23          MR. CROSS:  So if we can go to Page 2 of Dr. Lee's

24  PowerPoint, which may be 10 or 12 pages in.  Next page.  Thank

25  you.

139

BY MR. CROSS:

**Q.**   Mr. Germany, you see here Dr. Lee's background; right?

**A.**   Yes.

**Q.**   As you indicated, he was and still is a professor at Georgia Tech; right?

**A.**   I don't know if he still is, but I don't --

**Q.**   He was at the time?

**A.**   Yes.

**Q.**   And if you come down, do you see below are comments that he included in the slides -- on each of the slides?  Do you see that?

**A.**   Yes.

**Q.**   And these comments are generally what he delivered when he gave this as an oral presentation to the SAFE Commission; right?

**A.**   I think that is right, yes.

**Q.**   And if we look at Page 2, you can see that he actually summarizes his background, more than 20 years in cybersecurity.

Do you see that?

**A.**   Yes.

**Q.**   Okay.  And you're not suggesting that, to your knowledge, the SAFE Commission just simply disregarded or dismissed his opinions out of hand; right?

**A.**   Correct.

**Q.**   Now, if we can go to Page 7 of Dr. Lee's presentation to

1    the SAFE Commission, do you see the heading Advanced Persistent

2    Threats?

3    **A.**    Yes.

4    **Q.**    And if you look at the first -- in his notes, do you see

5    where he describes what an advanced persistent threat is in the

6    first paragraph?

7         And I'll read the second sentence.  You see where he says,

8    such an attack aims to quietly carry out its malicious

9    activities so that it is hard to not only detect the attack,

10   but also access the damage upon detection.

11        Do you see that?

12   **A.**    Yes.

13   **Q.**    And do you see the third line from the bottom in his

14   comments he writes, APT -- Advanced Persistent Threat --

15   malware is designed to carry out activities below the detection

16   threshold?

17        Do you see that?

18   **A.**    Yes.

19   **Q.**    Do you have any knowledge, as you sit here, as to how the

20   SAFE Commission considered in adopting the current voting

21   system that this type of threat would be detected?

22             MR. BEDARD:  Objection, Your Honor.  I just say I

23   think it misrepresents prior testimony as to whether the SAFE

24   Commission was adopting the next voting system.

25             MR. CROSS:  Did I misspeak?  I'm sorry.  Let me say

1     that again.

2              THE COURT:  Recommending.

3              MR. CROSS:  Yes.  Recommended.  Let me ask the

4     question again for you.

5     BY MR. CROSS:

6     **Q.**   Based on your experience in dealing with the SAFE

7     Commission, do you have any knowledge as to how the commission

8     planned or whether it even considered that the voting system

9     that it recommended would address the concern raised here, that

10    APT malware is designed to carry out activities below the

11    detection threshold?

12    **A.**   I know Dr. Lee presented this to the SAFE Commission.

13    Dr. Lee also moderated a panel similar to that disability panel

14    where they had other -- he had other cybersecurity experts

15    present also and ask different questions.

16         And my impression is that the SAFE Commission took into

17    account all of -- all of that, in addition to all the other

18    things that they had to take into account.  And then, you know,

19    they weighed them however they wanted to individually.

20         But my impression was that they were paying attention.  I

21    know Dr. Lee, I think, made this -- I don't know if it is this

22    particular one, but a presentation like this individually and

23    to all of the SAFE Commission.  So I think they took it into

24    account.

25    **Q.**   But as you sit here, despite all your experience working

```
 1   with the SAFE commission, you can't identify any specific

 2   measures that you heard discussed in any meeting where the

 3   members of the SAFE Commission said, the system we recommend

 4   will resolve this concern?  You can't identify any measures for

 5   the Court; right, sir?

 6   A.   Not off the top of my head, no.

 7   Q.   If you flip to Page 8, if you would, still in Dr. Lee's

 8   presentation.  The heading here is Achieving Cybersecurity.

 9        Do you see that?

10   A.   Yes.

11   Q.   And Option Number 2 is keep away would-be attackers.

12        Do you see that?

13   A.   Yes.

14   Q.   And you then identify as the insider attacks -- you

15   identified that as threat.

16        Do you see that?

17   A.   Yes.

18   Q.   And if you come down in his comments in the third

19   paragraph, he presented to the SAFE Commission his concern that

20   the second approach is to keep our cyber systems away from the

21   would-be attackers so that they cannot compromise our systems.

22        Do you see that?

23   A.   Yes.

24   Q.   And fair to say that the breaches that occurred in Coffee

25   County are exactly the type of attack that he warned here;
```

1    right?

2    **A.**   I would think they would be more of kind of the insider

3    issue that he talks about just after that.

4    **Q.**   Right.  If you come down to comments, the paragraph

5    beginning finally, he explains about an insider attack by rogue

6    staff member or volunteer; right?  Yes?

7    **A.**   I'm sorry.

8    **Q.**   Last paragraph.

9    **A.**   Yes.

10   **Q.**   Now, if you come to Page 9, if you would --

11   **A.**   Coffee County was the insider, kind of let those people

12   in, which would be a problem in any type of system.

13   **Q.**   If you come to -- well, let's just hit that because you

14   said it.

15        You said it would be a problem in any type of system;

16   right, sir?

17   **A.**   Yes.

18   **Q.**   So let's jump ahead for a moment then.

19        Do you recall that the central point of Dr. Lee's

20   objection that he laid out in this presentation to BMDs was

21   that it greatly increased risk?  You say that this type of risk

22   could happen in any system.  His opinion that he laid out was,

23   you mitigate against that risk with hand-marked paper ballots.

24        Do you recall that?

25             MR. BEDARD:  Sorry.  Just before he answers, just

1   establish the same consideration for plaintiffs' concerns that

2   Dr. Lee's opinions are not being offered as opinion testimony

3   by plaintiffs in this case but merely something that was

4   considered by the SAFE Commission.

5           MR. CROSS:  Your Honor, unlike the hearing transcript

6   which came in not for the truth, they offered Exhibit 1224

7   without any limitation.  It is in for the truth.

8           MR. BEDARD:  I don't -- plaintiffs didn't object on

9   hearsay grounds, Your Honor.

10          MR. CROSS:  Exactly.

11          MR. BEDARD:  If they are offering, then I'm objecting

12  to them using Dr. Lee's opinions as for the truth of the matter

13  asserted.  I think that is just a backdoor way around getting

14  expert testimony in, which is just what the plaintiffs objected

15  to us doing.

16          Again, it is a document.  It is a public document the

17  Court can consider.  It was certainly considered by the SAFE

18  Commission.  But I don't think you can take Mr. Lee's opinions

19  for the truth.

20          MR. CROSS:  That's not how the rules of evidence

21  work.  They offered Exhibit 1224 without any limitation on the

22  Court's consideration.  There is no limitation.  It is in for

23  the truth.

24          MR. BEDARD:  And I believe my answer was in response

25  to their objection.  Maybe I'm getting the exhibits mixed up.

1   But it was that I could shortcut all of this and say I'm not

2   offering the SAFE Commission report or its appendices for the

3   truth of the matter.

4           Again, the point is, this is just a backdoor way of

5   getting expert testimony in, and that is inappropriate under

6   rule -- is it, you know, 701 or 601, so --

7           THE COURT:  Well --

8           MR. BEDARD:  And 26, for that matter.

9           THE COURT:  Dr. Lee, who has appeared in this court

10   and given testimony before --

11           MR. CROSS:  He has not.  I do want to be clear.

12           THE COURT:  But in any event, I think you can

13   question the witness about it without it being -- so that he is

14   familiar with the fact.  Because, apparently, the witness

15   attended the meetings.

16           And I don't think you can backdoor the expert

17   testimony, but I think you can ask him about it because

18   obviously Dr. Lee is an esteemed, experienced cybersecurity

19   specialist and was the only one on the commission.  You can ask

20   him about how they dealt with the issues he raised.

21           MR. BEDARD:  I think our concern, Your Honor -- and I

22   appreciate you saying he can't backdoor the expert testimony

23   in.  But I believe the question when I was asking about the

24   disability community was very clear, we could not rely on that

25   for opinion testimony.  I think those people within their field

 1    are just as equally considered as Dr. Lee in his.

 2           THE COURT:  I don't think that I discouraged you.  I

 3    allowed you to fully explore that.

 4           MR. BEDARD:  I just want to make sure we're on the

 5    same field here.

 6           THE COURT:  However, I need a restroom break, so I'm

 7    going to -- we're going to -- I'm just going to go and come

 8    right back.  If anyone else is as desperate as me.  I'll be

 9    much nicer if I can go.

10           COURTROOM SECURITY OFFICER:  All rise.

11              **(A brief break was taken at 5:16 PM.)**

12           THE COURT:  Okay.

13    BY MR. CROSS:

14    **Q.**  Mr. Germany, just a few more questions on this.  Still on

15    Exhibit 1224.

16        Could you flip to Page 9 of Dr. Lee's presentation.

17    **A.**  Yes.

18    **Q.**  And if you look here, the heading is Achieving

19    Cybersecurity.

20        Do you see that?

21    **A.**  Yes.

22    **Q.**  And if you come down in the first paragraph, you see that

23    he provides what he refers to as a textbook definition that he

24    teaches in his classes on achieving cybersecurity.

25        Do you see that in the first paragraph?

1    A.    Yes.

2    Q.    And he goes on to state, security is a state of well-being

3    for information and infrastructures in which the possibility of

4    successful, yet undetected theft, tampering, and disruption of

5    information and services is kept low or tolerable.

6          And tolerable is emphasized.

7          Do you see that?

8    A.    Yes.

9    Q.    Security goals include confidentiality, authenticity,

10   integrity, and availability.

11         Do you see that?

12   A.    Yes.

13   Q.    And to your knowledge, when he presented this and

14   discussed this as a standard for cybersecurity for a voting

15   system, no one in the SAFE Commission told him that it was

16   necessary to provide a mathematical quantification of

17   cybersecurity; right?

18   A.    I don't think so.

19   Q.    Now, if you flip to Slide 13, please, and here again,

20   we've got the heading Cybersecurity and Voting Systems.

21         Do you see that?

22   A.    Yes.

23   Q.    And if you come to the second paragraph, it provides

24   another scientific standard where he writes, one security

25   feature that a voting system must have is to be -- and he puts

1      in quotes -- strong, software-independent.

2          Do you see that?

3   **A.**   Yes.

4   **Q.**   And when he articulated this as a cybersecurity standard

5      for voting system, to your recollection and knowledge, no one

6      on the SAFE Commission disputed that that would be an

7      appropriate cybersecurity standard; right, sir?

8   **A.**   Not to my knowledge.

9   **Q.**   If you come to the last paragraph, you can see where he

10     explains the SAFE Commission, what he was talking about with

11     the standard.  He writes, if a voting system is strong,

12     software-independent, then it can recover from cyber attacks.

13     This obviously requires another trail of voters' evidence that

14     cannot be tampered or deleted by the software.

15         Do you see that?

16  **A.**   Yes.

17  **Q.**   Okay.  Last thing on this, if you come to Slide 15, still

18     a heading of Cybersecurity and Voting Systems.

19         And if you come to the second paragraph, do you see the

20     bolded sentence?

21  **A.**   Yes.

22  **Q.**   So the recommendation of the only cybersecurity expert who

23     served on the commission was that the best approach is require

24     the voters to hand-mark paper ballots that are then scanned and

25     tallied by cyber systems but also dropped in a safe box;

1  correct, sir?

2  **A.**   Yes.

3  **Q.**   And if you come to the last paragraph, four lines from the

4  bottom, do you see the line that begins, it absolutely cannot?

5       Do you see that language four lines from the bottom?

6  **A.**   Yes, I see that.

7  **Q.**   And so the recommendation -- the opinion of the only

8  cybersecurity expert who served on the SAFE Commission was that

9  whatever this new system would be, it absolutely cannot be a

10  barcode, QR code, or any other kind of encoding scheme that is

11  readable only by a machine because the cyber system that reads

12  the ballots also can be compromised and lie to the voter or the

13  auditor.

14       That was his recommendation; right?

15  **A.**   He -- I think he is referring to -- the next sentence

16  talks about the manual -- during a manual review, a human must

17  be able to view evidence of the voter's original act.

18       So I'm not sure if he's referring in his previous sentence

19  to a manual review or to something, you know, scanned by a

20  scanner.

21  **Q.**   Well, if you come to the first sentence of the paragraph,

22  he explains, regardless of whether a paper ballot is

23  hand-marked or is a printout received from a ballot-marking

24  device.

25       Do you see that context?

1    **A.**    Yes.

2    **Q.**    And then he goes on, it absolutely cannot be a barcode, QR

3    code, or any other kind of encoding scheme.

4         That was his recommendation; right, sir?

5    **A.**    Well, you read the part, regardless of whether a paper

6    ballot is hand-marked or is a printout receipt from a

7    ballot-marking device, he says it must be easily and clearly

8    readable and manually countable.

9         And so, obviously, the way it works in Georgia is the

10   manual count like an audit is done using the text on the

11   ballot, and the scanner reads a QR code.

12   **Q.**    Right.  The official tabulation is a QR code; right?

13   **A.**    Yes.  And the audit looks at the manual or the text to --

14   **Q.**    I'm sorry.

15        If an audit is done, someone reviews the human readable

16   text; right?

17   **A.**    An audit is required to be done after every statewide

18   election.

19   **Q.**    Right.  So in the rare event where a contest is subject to

20   an audit, that is what you're talking about when the human

21   readable text is reviewed; right?

22   **A.**    I don't know that I would agree it is rare.  It is after

23   every statewide election.  But the text on the ballot that

24   lists the candidate's name is what is audited.

25   **Q.**    And even when there is an audit, the tabulation is what

1    controls; right?  The tabulation of the QR code?

2            MR. BEDARD:  Your Honor, I just object.  I think it

3    is starting to get outside the scope of the direct.  The direct

4    was just about the information that is presented to the SAFE

5    Commission by various people.  I think Mr. Cross is now

6    asking --

7            THE COURT:  Your objection is sustained.

8            MR. BEDARD:  Thank you.

9    BY MR. CROSS:

10   **Q.**   Do you have the SAFE Commission report, 856, in front of

11   you?

12   **A.**   Yes.

13   **Q.**   And if you come to Page 3 of the background section, the

14   last paragraph there that was put up, do you see that, the SAFE

15   Commission's mission?  Do you see that?

16   **A.**   Yes.

17   **Q.**   And do you recall that that was actually highlighted on

18   the screen for you to read?

19   **A.**   Yes.

20   **Q.**   And it indicates that part of the mission was a focus on

21   security; is that right?

22   **A.**   Yes.

23   **Q.**   And the only expert who served on the commission and gave

24   a presentation throughout the SAFE Commission's proceedings on

25   cybersecurity was Dr. Lee; is that right?

1   **A.**   He -- Dr. Lee also moderated a panel that had other

2   cybersecurity experts present to the commission.

3   **Q.**   They didn't serve on the commission?

4   **A.**   Right.  Maybe I misunderstood your question.  I'm sorry.

5            MR. CROSS:  Your Honor, give me one moment.

6                    **(There was a brief pause in the proceedings.)**

7            MR. CROSS:  Your Honor, I don't have any more

8   questions at this time, but we reserve the right to recall

9   Mr. Germany as a rebuttal witness.

10           Oh, sorry.  I did -- I apologize.  There was one

11   thing I forgot.

12   BY MR. CROSS:

13   **Q.**   You mentioned that Mr. Persinger was engaged in May of

14   2021 to examine a server that had been taken from KSU.

15   **A.**   We had received a copy of that server from the FBI, but

16   the original server was a KSU server.

17   **Q.**   Just so we have the timing right, this was the same month

18   when the Secretary's office learned about the card from Cyber

19   Ninjas in the Coffee County elections office; right?

20   **A.**   Yes.  My recollection on that was refreshed when we spoke

21   last week.

22   **Q.**   And it was the same time when the Secretary's office

23   actually took the EMS server from Coffee County because it was

24   inaccessible; right?  Do you recall that?

25   **A.**   I believe that was around the same time.

1   **Q.**   Are you aware that Mr. Persinger in the summer of 2022

2   submitted, I think, at least two declarations?

3   **A.**   I know he submitted -- I can think of one, but I don't

4   dispute that.

5   **Q.**   You testified the other day that you had involvement

6   working with outside counsel on litigation strategy and

7   discovery.

8        Did you have any role or involvement with his

9   declarations -- the one submitted in 2022?

10   **A.**   No, not to my recollection.

11   **Q.**   Would it surprise you that in none of the declarations

12   Mr. Persinger has submitted he has ever so much as mentioned

13   KSU?

14   **A.**   I wouldn't know one way or the other.

15   **Q.**   But that wouldn't surprise you if that was the purpose of

16   his engagement, when he was engaged in the very same month you

17   guys took an EMS server from Coffee County?

18          MR. BEDARD:  Objection, Your Honor.  Asked and

19   answered.

20          THE COURT:  Well, you can answer it.

21          THE WITNESS:  It doesn't surprise me.

22          MR. CROSS:  Okay.  Thank you.

23                CROSS-EXAMINATION

24   BY MR. BROWN:

25   **Q.**  Mr. Germany, Bruce Brown.  One follow-up question on the

1  KSU server.

2      What did the KSU server investigation in May of 2021 have

3  to do with this litigation, or did it?

4  **A.**  It did have to do with this litigation.  Litigation

5  counsel was probably -- my role is basically, you know, if they

6  want to hire someone, they kind of run it by me as the in-house

7  counsel, and I am good with it.

8  **Q.**  Help me out.

9      The KSU server was an issue back when I was in my fifties,

10 I think, when --

11         THE COURT:  When I was 25.

12 BY MR. BROWN:

13 **Q.**  What possible -- just explain it to us because it looks

14 really fishy, quite frankly.

15     What possible relevance would it have to this litigation

16 today or in May of 2021?

17         MR. BEDARD:  I would object just to the extent that

18 Mr. Germany -- his understanding of the relevance is coming

19 from litigation counsel in this case on the basis of privilege.

20         THE COURT:  Well, he can answer to the extent that he

21 knows and not reveal litigation -- any sort of privileged

22 information.

23 BY MR. BROWN:

24 **Q.**  I mean, without anything more, it looks really fishy.

25     Can you help us out here?

1              MR. BEDARD:  Objection, Your Honor.  Argumentative.

2              THE WITNESS:  Could you repeat the question.

3    BY MR. BROWN:

4    Q.   Do you know what connection the KSU server has to this

5    litigation such that it would require the State to hire an

6    expert for the KSU server when they did not even hire an expert

7    for this litigation in chief?

8              MR. BEDARD:  Objection, Your Honor.  I don't think

9    that is established at all.

10             MR. BROWN:  They don't have one.  But go ahead answer

11   the question.

12             THE COURT:  All right.  Just simplify it.  Don't jump

13   into the whole other set of facts.  You know that.

14   BY MR. BROWN:

15   Q.   What was he doing with the KSU server in May of 2021 --

16             MR. BEDARD:  I would object.

17             MR. BROWN:  -- that was relevant to this litigation,

18   just generally, without exposing any --

19             MR. BEDARD:  I think the subject matter of what he

20   was doing is itself work product and attorney-client.  He is

21   hired as a consulting expert relevant to the litigation.  The

22   only reason this is even relevant is because plaintiffs put at

23   issue why Mr. Persinger was hired.  We have answered that

24   question.  I don't think that he can testify as to what

25   Mr. Persinger was doing.  That is privileged as a consulting

```
 1   expert.
 2            MR. CROSS:  Rule 502 is clear on this, Your Honor.
 3   You can't invoke privilege as a sword and shield.  And what it
 4   says is, if you have deliberately waived privilege -- 502(a),
 5   if I remember right -- if you have deliberately waived
 6   privilege and there is additional information that would
 7   provide a complete understanding of the facts, that has to come
 8   out.  They want to use what they claim was privileged
 9   information about why he was retained, which no one has ever
10   heard before in years, but then not get us -- let us
11   cross-examine on that.
12            So it either gets stricken from the record and the
13   Court can't consider it, or we are entitled to examine the
14   facts of what he was actually doing and why anybody thought it
15   mattered at that time.
16            MR. BEDARD:  Well, Your Honor, I answer two points.
17            First off, this is Mr. Brown's questioning, not
18   Mr. Cross'.
19            Two, I will say we haven't used it as a sword and
20   shield.  We have used it as a shield and a shield.  We're
21   not -- we haven't invoked privilege.  We haven't exposed
22   privileged information to answer an inference that plaintiffs
23   are trying to draw.  We have just answered the factual
24   question, what was he hired for?  He was hired as a consulting
25   expert in relation to the KSU server.  That's it, which they
```

1    don't -- what he was doing is beyond the scope.

2           Again, I would reiterate that again, this is

3    Mr. Brown's questioning, not Mr. Cross'.

4           MR. BROWN:  Your Honor, I adopt everything that

5    Mr. Cross was saying.

6           THE COURT:  Actually --

7    BY MR. BROWN:

8    **Q.**    But, Mr. Germany, you testified on direct that you

9    volunteered the information that Mr. Persinger was hired in

10   2021 to do something with the KSU server.

11          And you testified in response to my question that that

12   was, by counsel, relating to this litigation; correct?

13   **A.**    Yes.

14   **Q.**    Can you tie up those two observations?  What was the --

15   just general, at a very general level.  Because it is not

16   apparent by anything we know about the case.

17   **A.**    My understanding is that he was hired to look at the -- do

18   some kind of forensic -- I don't know if analysis is the right

19   word or just view of the KSU server.  And my general

20   recollection, I know the KSU server was at issue in a lot of

21   the Court's orders, and I think it became apparent at some

22   point that we needed to have someone look at it, but I really

23   can't say more than that.

24   **Q.**    Are you sure he was not also looking at the Coffee County

25   server at the same time --

**A.**    Yes.

**Q.**    -- at the same place?

**A.**    Yes.

          THE COURT:  You are sure that he was not?

          THE WITNESS:  I am completely 100 percent sure.

          THE COURT:  Thank you.

BY MR. BROWN:

**Q.**    You testified that the legislature --

**A.**    No.  I just think later on he did look at the Coffee
County stuff.

**Q.**    Right.  You testified that the legislature as opposed to
the SAFE Commission selected the BMDs; right?

**A.**    The legislature passed the law that put the system in
place, the BMD -- the BMD requirement.

**Q.**    Right.  And the legislature also decided that hand-marked
paper ballots would be the backup if the ballot-marking devices
could not be used; correct?

**A.**    There was a law that talks about, you know, if it is an
impossible, or I think impracticable is the word, then you
use -- yes, you have emergency ballots of hand-marked paper
ballots.

**Q.**    But you use hand-marked paper ballots; right?

**A.**    In that situation, yes.

**Q.**    You testified that --

**A.**    You also use hand-marked paper for absentee ballots.  They

1    put that in place as well.

2    **Q.**   You testified to the effect that one of the concerns of

3    the SAFE Commission was that disabled voters should not vote on

4    different systems; correct?

5    **A.**   One of the concerns presented to the SAFE Commission, yes,

6    that is right.

7    **Q.**   But voters who need assistance today in Georgia vote on a

8    different BMD than voters who do not need assistance; correct?

9    **A.**   Well, it depends.  If you are talking about -- there is

10   usually one BMD in every polling place that has -- would you

11   like me to answer?

12   **Q.**   Yeah.  There is one BMD -- I mean, there is one BMD in

13   every --

14   **A.**   I think the question you asked about voters that need

15   assistance, and that is a larger subset of voters.

16       And one other thing that came up, I think, in that

17   disability panel was the ability of voters -- maybe not just

18   voters who are completely blind, but voters who might need --

19   they can make larger text or adjust contrast, and those are

20   things that you can do on a BMD that you can't obviously do on

21   a hand-marked paper ballot.

22   **Q.**   Or may not need to.

23       But, Mr. Germany, what I'm getting at is that the BMD that

24   we saw Dr. Halderman hack into here -- are you with me?  Do you

25   know which one that was?

1    **A.**   No.

2    **Q.**   Just a normal BMD.

3    **A.**   I'm not aware of that.

4    **Q.**   That a BMD -- that a voter that needs assistance has a

5    separate plug-in to a BMD; right?

6    **A.**   It is the same BMD.  It has what is called a -- the

7    abbreviation is ATI, like audio tactile interface, I think.

8    **Q.**   Right.

9    **A.**   That allows --

10   **Q.**   And in each voting location, the BMD is set aside with the

11   indication that it is for those needing assistance; correct?

12   **A.**   Well, there's multiple types of needing assistance, I

13   think, is why I'm having a little --

14   **Q.**   The machine -- there is one machine that is different in

15   every voting location because HAVA requires one machine to be

16   available for assistive technology; correct?

17   **A.**   It is not a different machine.  Any BMD can have that --

18   that interface.

19   **Q.**   It is a different -- it is the same screen.  Okay?

20        But, in fact, in the Dominion contract, the State actually

21   purchased 3,000 ATIs so that the BMDs could be equipped with

22   this additional equipment in every polling location; correct?

23   **A.**   Yes.

24   **Q.**   And so right now in every polling location, there is a BMD

25   with a different configuration than all the other ones; right?

**A.**   I wouldn't agree that it is a different configuration.

**Q.**   And so a voter who is using that is using a different machine and different system than all the other voters; right?

**A.**   No.

**Q.**   How can you sit here and say that it is bad for them to do that when that is exactly what the law does?  It has to do that; right?

MR. BEDARD:  Your Honor, I think --

THE WITNESS:  No, I don't agree.  I have already said no.

THE COURT:  I think counsel wants to make an objection.

MR. BEDARD:  I think counsel is not allowing the witness to fully answer the question as he is cutting him off, so I would just ask for the witness to be able to answer the question.

THE COURT:  All right.  State the question again and let him answer.  Thank you.

BY MR. BROWN:

**Q.**   Today, the State of Georgia provides technology to assist voters with disabilities that is different than the technology for voters who do not need that; correct?

**A.**   The BMD is the same.

**Q.**   I didn't ask that.  That is not responsive.

**A.**   There is an additional interface that you referred to.

1    The ATI is something that is attached to the BMD in each

2    polling place.

3    **Q.**   And that is visible.

4        If I go into a polling place and a person with

5    disabilities is voting on that, it looks different than what a

6    person who is voting on a BMD without that unit; right?

7    **A.**   I think one of the main differences is usually that is --

8    that setup is at a different height.  It is more of like at a

9    wheelchair level.

10   **Q.**   Exactly.

11   **A.**   The ballot that comes out of that system is the exact

12   same -- it is the same system.  It just has that ATI, which

13   would not be the case if it was just set up for disabled voters

14   and everyone else used hand-marked.  The ballot would not be

15   the same.

16   **Q.**   But you are treating disability voters differently; right?

17   There is a separate table, there are signs, and there's

18   different gear coming out of the BMD; right?

19   **A.**   I would say they are voting on the same system, and there

20   are some differences to try to allow them to best vote

21   privately and independently.

22   **Q.**   And those differences are to assist voters with

23   disabilities; right?  It is not a bad thing to distinguish them

24   in that respect, is it?

25   **A.**   The ATI is a tool that they can use.  The overall system

1  is the same as -- and that existed in the DRE system too.  It

2  was the same equipment, same DREs, but they had an ATI

3  interface on those as well.

4  **Q.**   Did the SAFE Commission recommend QR codes, yes or no?

5  **A.**   They had a long list of recommendations.  I can't recall

6  specifically.

7  **Q.**   You --

8  **A.**   I would say this:  Given they did have interaction with

9  all the vendors and they saw the technology that was available,

10 the technology that was available was -- I think there was some

11 QR codes and some barcodes coming out of BMD ballots.  The SAFE

12 Commission did recommend using ballot-marking devices for all

13 in-person voting.  And my recollection is there was one vendor

14 that perhaps used optical character recognition to read a

15 ballot.

16     But my understanding is -- I mean, the SAFE Commission

17 would have known from the vendor demonstrations what a

18 ballot-marking device ballot looked like.  It would have been

19 either a QR code or a barcode.

20 **Q.**   Let me ask it in a different way.

21     The SAFE Commission did not recommend QR codes, did it?

22 **A.**   They recommended that Georgia use a ballot-marking

23 device-based system for in-person voting.  I think they would

24 have known that that -- what that included based on the vendor

25 demonstrations that they were privy to.

```
 1              MR. BROWN:  Your Honor, he is not answering my
 2   question.
 3   BY MR. BROWN:
 4   Q.   It is very simple.
 5        Did they recommend QR codes?
 6   A.   I don't think your question really makes sense because
 7   what they recommend is an overall voting system and then other
 8   recommendations as well.
 9   Q.   Okay.
10   A.   I don't think they specifically said QR codes, barcodes,
11   optical character recognition.  I know they specifically made a
12   recommendation to use ballot-marking devices.
13              MR. BROWN:  Thank you, Mr. Germany.
14              MR. BEDARD:  Just one minute, Your Honor.
15              THE COURT:  Sure.
16              **(There was a brief pause in the proceedings.)**
17              MR. BEDARD:  No further questions, Your Honor.
18              THE COURT:  May this witness be excused?
19              MR. BEDARD:  On our part, yes.
20              THE COURT:  Is he subject to recall?
21              MR. CROSS:  Yes, we -- depending on -- yes is the
22   answer.  Yes.
23              THE COURT:  All right.  Don't discuss your testimony
24   with anyone, and thank you very much for coming back today and
25   your patience.  Thank you.
```

```
 1              THE WITNESS:  Thank you.

 2              (There was a brief pause in the proceedings.)

 3              THE COURT:  Do you-all have some issue you need to

 4    address?

 5              MR. MILLER:  Sorry.

 6              THE COURT:  That's all right.  That's all right.

 7              MR. TYSON:  Your Honor, Mr. Miller and I were

 8    discussing -- I think we've been trying to compare notes with

 9    the plaintiffs on which exhibits are in and out, and I

10    believe -- I think we're down to only one discrepancy.

11              I'm sorry.  We resolved it then.  I have good news to

12    report then.

13              THE COURT:  All right.  Very good.

14              Well, we're going to adjourn today.

15              Did you have something?

16              MR. BELINFANTE:  Just a housekeeping measure, Your

17    Honor.  I think this may have been discussed when I was out of

18    the room.

19              We intend to call Blake Evans tomorrow.  He is

20    participating in a panel sponsored by the federal government at

21    1:40.  It is virtual, but he will need to be out by 1:00.  I

22    was going to ask the Court if it would indulge us to either

23    have a late lunch tomorrow --

24              THE COURT:  That's fine.

25              MR. BELINFANTE:  I'll leave it at that and hope we
```

 1    can finish with him.

 2              THE COURT:  That's fine.

 3              MR. BELINFANTE:  Thank you.

 4              THE COURT:  Of course, he's welcome to do a phone

 5    call in the courthouse too.  We could probably make room for

 6    him.

 7              MR. BELINFANTE:  It is a Zoom base, but I will

 8    discuss that with him for sure.

 9              THE COURT:  All right.  All right.  So we'll see you

10    tomorrow morning at 9:30.  And Blake Evans is the witness.

11              Do we have an idea how long his testimony will take?

12              MR. BELINFANTE:  I would think depending on -- in

13    lawyer time, I would say anywhere from 45 to 90 minutes.  I

14    know that's a big stretch.

15              THE COURT:  On your side?

16              MR. BELINFANTE:  On our side, yes, Your Honor.  And I

17    think that just depends on how quickly we can get through some

18    of the exhibits.

19              THE COURT:  All right.  Very good.

20              All right.  Is there anything counsel needs to

21    address with the Court?

22              MR. CROSS:  So the plan is still we're starting with

23    the Persinger issue and then Mr. Evans?  I thought that is how

24    we had left it.

25              THE COURT:  Well, I don't know.

```
 1              MR. RUSSO:  My understanding is you-all -- the

 2    plaintiffs were going to provide a -- Curling plaintiffs were

 3    going to provide us something from Dr. Halderman which we were

 4    going to review.  We raised the issue of Blake Evans.

 5              THE COURT:  You wanted to go --

 6              MR. RUSSO:  We wanted to get through that.

 7              THE COURT:  Yeah, so it may be that we end up going

 8    through with Mr. Evans first.

 9              MR. CROSS:  Okay.

10              MR. RUSSO:  I think we were still trying to figure

11    out if they were going to rest at that time, and then they came

12    back.

13              MR. CROSS:  Got it.  We'll start with Mr. Evans.

14    Okay.  Thank you.

15              THE COURT:  All right.  We'll see you tomorrow then.

16              COURTROOM SECURITY OFFICER:  All rise.  Court is

17    adjourned.

18                   (The proceedings were thereby adjourned at 5:52

19                   PM.)

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3    UNITED STATES OF AMERICA

4    NORTHERN DISTRICT OF GEORGIA

5

6         I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

7    the United States District Court, for the Northern District of

8    Georgia, Atlanta Division, do hereby certify that the foregoing

9    167 pages constitute a true transcript of proceedings had

10   before the said Court, held in the City of Atlanta, Georgia, in

11   the matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13   23rd day of January, 2024.

14

15

16   _____
                   SHANNON R. WELCH, RMR, CRR
17                 OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

169

**BY MR. BEDARD: [20]** 99/19 100/19 102/14 102/25 103/23 107/23 111/18 112/6 113/20 114/19 114/23 115/18 116/11 118/11 120/5 122/18 125/17 127/18 131/8 133/8
**BY MR. BROWN: [9]** 153/24 154/12 154/23 155/3 155/14 157/7 158/7 161/19 164/3
**BY MR. CROSS: [8]** 134/4 134/22 135/22 139/1 141/5 146/13 151/9 152/12
**COURTROOM DEPUTY CLERK: [4]** 10/7 88/2 99/8 99/11
**COURTROOM SECURITY OFFICER: [4]** 46/8 71/20 146/10 167/16
**MR. BEDART: [103]** 24/13 26/9 26/24 27/1 28/12 31/11 31/18 31/24 32/4 32/8 32/12 32/15 32/23 33/2 33/7 33/15 33/18 33/23 35/21 36/7 36/9 36/20 38/7 39/4 39/13 39/21 40/1 40/5 41/1 41/13 41/24 42/16 42/19 43/21 46/19 98/25 99/5 102/12 102/23 103/16 106/22 107/11 107/20 111/17 112/3 112/5 112/18 112/23 113/3 113/9 114/15 114/21 115/2 115/6 115/8 115/11 115/14 116/10 117/18 117/23 118/2 118/9 119/1 119/19 121/24 122/12 122/15 122/17 123/25 124/10 124/15 125/13 131/7 133/3 134/2 134/18 135/11 135/17 135/20 138/19 138/22 140/22 143/25 144/8 144/11 144/24 145/8 145/21 146/4 151/2 151/8 153/18 154/17 155/1 155/8 155/16 155/19 156/16 161/8 161/13 164/14 164/17 164/19
**MR. BELINFANTE: [6]** 165/16 165/25 166/3 166/7 166/12 166/16
**MR. BROWN: [14]** 42/2 70/12 70/25 117/13 117/22 117/25 119/16 123/21 138/10 155/10 155/17 157/4 164/1 164/13
**MR. CAMPBELL: [13]** 22/13 22/20 23/11 23/16 23/18 33/20 34/17 34/24 35/12 38/21 39/17 40/15 40/21
**MR. CROSS: [75]** 5/7 5/11 9/24 10/8 10/15 18/1 18/8 22/11 30/1 35/3 35/10 35/13 43/9 43/16 45/20 50/11 50/19 59/13 59/17 59/20 60/13 62/20 63/3 64/18 73/14 75/22 76/5 76/8 76/13 76/15 77/7 77/19 77/23 78/2 78/6 78/19 78/22 78/25 79/3 81/1 103/19 103/21 112/20 113/8 115/1 115/4 116/9 118/20 120/7 121/17 131/2 134/21 135/6 135/8 135/14 138/5 138/7 138/11 138/15 138/20 138/23 140/25 141/3 144/5 144/10 144/20 145/11 152/5 152/7 153/22 156/2 164/21 166/22 167/9 167/13
**MR. DAVIS: [10]** 46/3 61/12 61/18 61/25 62/4 62/17 63/1 63/10 63/14 63/20
**MR. FISHER: [8]** 36/22 37/1 37/14 37/17 37/20 37/23 88/4 88/6
**MR. MARTINO-WEINHARDT: [24]** 23/19 24/3 24/7 24/18 24/22 25/5 25/8 25/14 25/21 25/24 27/23 28/13 28/24 29/22 30/14 33/11 35/8 43/22 44/3 44/5 44/11 44/18 45/14 45/18
**MR. McGUIRE: [6]** 8/24 81/5 94/2 95/22 95/24 96/3
**MR. MILER: [3]** 49/6 50/6 51/4
**MR. MILLER: [8]** 48/16 50/1 50/13 51/12 52/10 55/20 58/14 165/5
**MR. OLES: [42]** 8/11 8/17 9/3 9/8 9/11 9/15 9/19 11/14 12/23 13/21 14/19 15/12 15/20 15/25 16/17 16/22 17/2 17/10 17/17 17/25 45/24 60/20 60/24 61/2 63/22 64/3 64/5 64/7 64/20 64/22 65/4 65/25 66/3 66/5 70/4 70/8 70/11 71/14 81/9 98/3 98/6 98/16
**MR. RUSSO: [3]** 167/1 167/6 167/10
**MR. SCHEINMAN: [17]** 18/23 19/9 19/14 19/19 19/24 20/4 20/9 20/16 20/20 20/23 21/1 21/3 21/9 21/15 21/18 22/1 22/7
**MR. TYSON: [26]** 6/6 7/17 14/2 18/10 18/13 44/21 59/24 60/7 60/15 64/17 70/19 71/3 74/21 74/25 75/5 75/8 76/20 78/10 79/5 79/16 80/12 80/14 81/10 81/15 87/24 165/7
**MS. KAISER: [9]** 48/6 48/10 52/6 52/25 53/9 54/1 54/6 55/8 57/17
**THE COURT: [292]**
**THE WITNESS: [19]** 99/13 100/14 107/4 107/18 114/2 114/9 120/1 121/14 121/11 124/19 126/17 126/20 127/12 127/16 153/21 155/2 158/5 161/9 165/1

**.**

**...CONT'D [2]** 2/25 3/1

**1**

**10 [1]** 138/24
**100 percent [1]** 158/5
**101 [1]** 15/14
**102 [1]** 93/1
**103 [1]** 70/17
**107 [1]** 28/5
**1092 [1]** 57/4
**10A [1]** 1/10
**1105 [1]** 57/4
**113 [1]** 34/19
**11:42 [1]** 46/9
**12 [1]** 138/24
**1222 [4]** 112/19 112/19 135/16 135/17
**1224 [9]** 103/17 134/23 135/6 135/15 138/11 138/22 144/6 144/21 146/15
**13 [1]** 147/19
**1383 [1]** 1/25
**14 [2]** 34/19 53/6
**1471 [1]** 73/20
**1482 [1]** 73/21
**15 [3]** 105/2 131/22 148/17
**1501 [1]** 29/7
**167 [1]** 168/9
**17 [2]** 49/14 49/21
**17,852 [1]** 67/9
**1705 [1]** 93/1
**1728 [1]** 28/5
**1793 [3]** 49/12 72/1 72/14
**18 [4]** 21/5 105/2 131/22 132/4
**19 [7]** 24/24 25/23 25/24 26/5 26/10 28/1 28/6
**198 [8]** 20/12 24/24 33/20 33/21 39/20

**1983 [3]** 56/25 57/6 57/12
**1:00 [2]** 71/16 165/21
**1:17-CV-2989-AT [1]** 1/6
**1:40 [1]** 165/21
**1st [1]** 21/22

**2**

**20 [1]** 71/16
**20 years [1]** 139/18
**2002 [1]** 126/1
**2005 [2]** 57/4 120/20
**2014 [2]** 100/5 100/15
**2016 [1]** 101/11
**2017 [1]** 101/10
**2018 [8]** 101/4 101/5 101/9 111/20 112/13 115/2 115/11 135/18
**2019 [4]** 92/9 100/16 130/2 130/4
**2020 [11]** 26/7 49/14 49/21 66/8 67/9 67/16 67/18 83/24 85/8 92/12 126/2
**2021 [6]** 133/17 152/14 154/2 154/16 155/15 157/10
**2022 [8]** 19/3 21/5 21/11 21/22 22/3 67/23 153/1 153/9
**2024 [3]** 1/13 5/2 168/13
**203 [1]** 19/20
**205 [1]** 20/2
**206 [2]** 20/2 20/12
**206.09 [1]** 20/3
**207 [4]** 19/22 19/23 20/5 20/10
**208 [1]** 20/4
**208.06 [1]** 20/3
**20th [2]** 22/3 42/20
**215-1383 [1]** 1/25
**21st [1]** 21/11
**22 [3]** 24/24 32/16 32/22
**22 months [1]** 67/3
**23 [2]** 1/13 5/2
**2394 [1]** 1/24
**23rd [2]** 15/5 168/13
**24 months [1]** 67/4
**25 [1]** 154/11
**25th [1]** 26/7
**26 [1]** 145/8
**261 [1]** 44/3
**28 [3]** 24/24 32/16 32/22
**292 [3]** 24/24 26/10 33/11
**293 [3]** 24/24 26/10 33/11
**2:00 [1]** 71/19
**2:11 [1]** 80/23

**3**

**3,000 [1]** 160/21
**30 [8]** 21/20 35/3 35/7 37/6 37/22 38/1 112/13 115/2
**30303 [1]** 1/25
**345 [5]** 24/24 33/19 33/21 33/23 38/5
**358 [6]** 24/24 33/19 33/21 38/6 38/7 39/22
**376,863 [1]** 67/14
**3:43 [1]** 80/25

**4**

**40 minutes [1]** 5/9
**402 F.3d [1]** 57/3
**404 [1]** 1/25
**45 [1]** 166/13
**498 [1]** 33/19

## 4

**4:00** 75/15 76/17
**4:00 discussion [1]** 75/2
**4:00 hearing [1]** 74/22
**4:00 P.M [1]** 59/16

## 5

**502 [2]** 156/2 156/4
**52 [9]** 4/10 60/1 76/17 77/2 77/9 77/10 81/12 81/19 97/25
**588 [1]** 28/19
**5:16 [1]** 146/11
**5:52 [1]** 167/18

## 6

**601 [1]** 145/6
**604 [2]** 23/16 23/17
**63 [1]** 25/23
**6:00 P.M [1]** 6/7

## 7

**701 [1]** 145/6
**702 [1]** 121/21
**705 [1]** 88/24
**75 [1]** 1/24

## 8

**819 [1]** 73/20
**84 [4]** 116/7 116/10 116/12 116/16
**847 [1]** 28/5
**85 [1]** 88/25
**856 [5]** 103/17 107/20 135/10 135/14 151/10
**858 [2]** 135/10 135/13
**86 [1]** 88/25
**87 [1]** 116/17
**8th [1]** 19/3

## 9

**90 [2]** 1/4 125/15
**90 minutes [1]** 166/13
**901 [1]** 28/25
**918 [1]** 29/7
**92 [1]** 125/15
**95 [1]** 15/14
**97 [7]** 24/24 33/6 33/7 33/11 33/13 33/14 33/15
**98 [3]** 24/24 26/10 33/11
**9:30 [1]** 166/10

## A

**AARON [1]** 2/7
**abandoned [1]** 12/4
**abbreviation [1]** 160/7
**ability [4]** 82/25 108/4 108/5 159/17
**able [24]** 8/14 8/18 25/11 34/23 35/7 48/18 61/9 65/10 66/20 67/11 69/21 74/7 81/23 84/9 84/21 106/15 106/16 111/5 117/23 121/17 122/20 134/19 149/17 161/15
**Abney [3]** 19/11 19/16 20/13
**Abney's [1]** 19/20
**about [126]** 6/8 8/20 9/12 9/25 11/12 11/12 12/13 13/2 13/16 14/14 14/15 15/3 16/20 18/4 23/21 31/1 31/3 31/14 38/9 38/13 41/2 42/12 42/13 43/14 45/16 48/13 49/13 49/16 49/19 51/17 52/14 52/15 52/19 59/5 61/1 61/2 65/8

65/8 65/11 65/23 66/1 66/7 66/12 71/18 74/15 75/14 75/25 76/21 79/11 79/19 82/9 83/15 84/8 84/10 84/22 85/1 85/15 85/15 85/23 87/7 88/22 89/3 89/4 89/5 89/5 90/2 90/3 90/3 90/19 91/13 91/15 91/16 91/19 91/20 92/3 92/19 93/15 93/17 93/18 93/19 94/6 101/5 101/11 103/24 106/18 110/25 111/2 111/16 113/6 113/16 116/16 118/2 118/3 118/19 119/10 119/18 119/21 119/22 120/1 122/6 124/3 125/3 126/4 131/5 131/22 134/11 134/12 134/15 137/5 143/3 143/5 145/13 145/17 145/20 145/23 148/10 149/16 150/20 151/4 152/18 156/9 157/16 158/18 159/19 159/14
**abouts [1]** 133/17
**absence [1]** 50/6
**absentee [6]** 43/4 68/18 69/10 82/10 82/15 158/25
**absolutely [6]** 54/12 61/25 61/25 149/4 149/9 150/2
**accept [3]** 54/24 130/20 130/22
**acceptable [2]** 47/10 62/19
**accepted [1]** 66/8
**access [6]** 68/7 86/1 87/7 90/22 91/20 140/10
**accessibility [3]** 106/12 106/14 108/4
**accessible [4]** 101/2 103/6 121/3 123/1
**accessible-type [1]** 123/1
**accommodating [1]** 124/3
**accommodation [1]** 118/7
**according [2]** 36/10 66/25
**accordingly [1]** 7/24
**account [4]** 74/1 141/17 141/18 141/24
**accuracy [1]** 86/20
**accurate [1]** 109/23
**accurately [4]** 29/12 67/18 83/17 108/6
**achieving [3]** 142/8 146/18 146/24
**acknowledged [1]** 11/9
**acknowledges [2]** 10/20 10/21
**across [2]** 32/5 118/18
**act [3]** 86/10 120/22 149/17
**acting [1]** 28/20
**action [2]** 87/1 87/11
**actively [1]** 92/21
**activist [1]** 104/20
**activities [4]** 94/15 140/9 140/15 141/10
**actor [1]** 54/17
**actors [3]** 91/3 91/4 91/6
**actual [6]** 40/1 83/18 83/21 84/3 89/12 91/14
**actually [22]** 26/9 27/5 28/1 32/16 42/23 51/11 71/1 73/12 84/24 85/3 89/18 90/17 105/18 108/21 109/2 125/3 139/17 151/17 152/23 156/14 157/6 160/20
**ADAM [1]** 2/9
**adapt [1]** 108/5
**add [7]** 44/21 56/18 70/24 73/14 73/16 94/3 102/19
**added [2]** 132/2 138/13
**Adding [1]** 86/21
**addition [4]** 66/6 84/14 94/20 141/17
**additional [8]** 25/21 86/21 105/23 108/13 118/20 156/6 160/22 161/25
**address [22]** 8/9 8/11 14/18 24/20

29/23 47/22 59/16 65/6 65/7 68/4 75/21 86/18 86/19 86/20 86/22 87/2 98/9 118/6 118/9 141/9 165/4 166/21
**addressed [2]** 9/25 27/25
**addresses [1]** 96/19
**addressing [1]** 124/4
**adjourn [1]** 165/14
**adjourned [3]** 80/22 167/17 167/18
**adjust [2]** 108/4 159/19
**administration [1]** 84/8
**administrations [1]** 100/21
**administrative [2]** 102/2 107/16
**admissibility [2]** 44/1 57/6
**admissible [1]** 42/11
**admission [1]** 70/20
**admit [7]** 44/17 47/11 56/24 67/21 71/1 103/17 114/11
**admits [1]** 10/18
**admitted [11]** 28/8 38/5 39/24 40/12 42/8 43/11 45/13 52/4 103/22 119/10 135/15
**adopt [1]** 106/3 157/4
**adopted [1]** 134/17
**adopting [2]** 140/20 140/24
**adoption [1]** 132/5
**adopts [1]** 98/3
**advance [2]** 5/15 6/4
**advanced [4]** 12/20 140/1 140/5 140/14
**advancing [2]** 10/3 10/8
**advantage [1]** 7/12
**advantages [1]** 87/5
**adverse [21]** 47/25 48/7 49/19 49/25 50/3 51/1 51/1 52/21 56/3 56/6 56/12 57/5 65/7 71/25 72/16 72/23 73/4 73/9 73/11 74/3 74/6
**advise [1]** 7/2
**Advocacy [2]** 117/5 121/14
**advocate [2]** 121/15 129/20
**advocates [1]** 121/2
**advocating [2]** 129/15 129/17
**affect [1]** 75/10
**affected [1]** 90/17
**after [19]** 1/6 6/7 10/18 12/13 19/21 19/22 45/19 54/22 65/5 65/5 76/2 77/3 83/23 86/2 98/19 99/17 143/3 150/17 150/22
**afternoon [5]** 76/14 88/4 88/5 134/5 134/6
**afterwards [1]** 24/5
**again [42]** 7/23 11/7 21/12 23/20 26/24 31/12 34/5 34/12 35/25 36/9 36/14 40/9 52/12 57/22 58/8 62/11 67/23 72/11 80/10 83/8 86/8 92/14 92/23 99/11 102/23 103/24 104/7 118/2 119/7 119/10 120/14 121/24 122/1 134/18 141/1 141/4 144/16 145/4 147/19 157/2 157/2 161/17
**against [20]** 41/18 47/25 48/1 48/7 48/17 49/22 49/23 51/2 51/2 51/5 51/18 81/22 85/10 93/5 113/12 131/25 132/5 132/7 132/9 143/23
**agency [2]** 40/24 54/11
**agent [8]** 28/15 28/20 30/10 30/24 40/22 41/17 53/21 53/23
**agents [1]** 42/1
**agree [8]** 5/14 76/5 83/3 136/7 136/10 150/22 161/1 161/9

**A**

**agreed [6]** 5/15 25/10 68/20 84/16 84/19 136/24
**agreeing [1]** 65/5
**agreement [6]** 6/3 23/13 23/22 25/2 27/15 32/17
**ahead [17]** 17/13 17/15 48/15 59/21 60/21 64/1 64/2 64/19 71/22 76/16 81/14 102/21 107/19 122/16 138/9 143/18 155/10
**AIDED [1]** 1/21
**aims [1]** 140/8
**AL [2]** 1/4 1/6
**Alex [7]** 22/25 38/10 39/3 39/6 39/9 67/25 90/21
**aligned [2]** 53/7 58/24
**all [177]**
**allegation [1]** 85/9
**allegations [3]** 75/3 79/16 113/12
**allege [1]** 97/9
**alleged [1]** 87/2
**allegedly [1]** 85/16
**allow [6]** 42/4 47/22 66/15 89/7 127/5 162/20
**allowed [10]** 11/16 41/6 45/8 64/10 64/11 65/6 65/6 71/8 111/4 146/3
**allowing [1]** 161/13
**allows [1]** 160/9
**ALLOY [1]** 3/6
**almost [3]** 16/4 73/7 137/4
**along [4]** 19/6 23/6 32/21 125/13
**aloud [1]** 23/10
**already [19]** 25/6 27/15 27/19 33/12 48/24 63/8 71/2 78/13 88/19 88/22 89/1 92/23 93/9 107/12 111/9 113/9 113/11 125/14 161/9
**also [66]** 5/17 6/20 7/10 12/12 17/8 17/22 20/5 22/22 23/4 35/2 39/3 53/21 55/1 59/7 59/14 60/14 63/22 67/14 68/13 69/6 69/7 69/9 70/20 71/4 72/2 72/22 73/17 73/23 79/24 80/21 82/22 83/3 84/6 86/7 87/25 88/21 92/4 104/14 106/13 110/9 110/18 112/21 113/17 113/17 114/5 114/21 117/3 118/22 119/11 119/13 123/9 123/18 127/20 128/9 132/13 132/15 132/20 140/10 141/13 141/15 148/25 149/12 152/1 157/24 158/15 158/25
**altered [1]** 89/23
**Although [1]** 5/15
**always [1]** 73/1
**am [10]** 16/6 46/9 48/5 49/9 62/24 64/14 74/19 77/25 154/7 158/5
**amended [1]** 67/22
**Amendment [18]** 45/20 48/19 48/22 48/24 49/17 51/21 53/8 53/14 53/16 53/19 56/7 57/23 57/25 58/5 72/7 73/5 73/17 73/23
**amendments [1]** 130/11
**America [2]** 120/22 168/3
**among [1]** 17/13
**AMY [3]** 1/11 116/18 120/15
**analysis [2]** 68/6 157/18
**Anderson [7]** 82/5 83/9 85/13 85/14 94/8 95/14 96/3
**Anderson-Burdick [7]** 82/5 83/9 85/13 85/14 94/8 95/14 96/3

**ANDREU [1]** 2/10
**ANDREU-VON [1]** 2/10
**Ann [2]** 116/22 120/18
**Anne [2]** 117/3 121/13
**another [9]** 26/15 43/3 45/11 71/18 77/25 86/12 114/1 147/24 148/10
**answer [12]** 55/6 144/24 153/20 154/20 155/10 156/16 156/22 159/11 161/14 161/15 161/18 164/22
**answered [3]** 153/19 155/23 156/23
**answering [2]** 137/6 164/1
**answers [2]** 113/6 143/25
**any [89]** 1/8 7/7 8/13 9/22 13/15 14/3 14/6 14/22 16/13 24/11 28/3 34/15 46/18 53/13 55/11 55/17 56/16 61/23 63/9 63/12 63/15 64/15 64/15 65/22 65/24 68/1 70/15 70/16 75/9 75/18 78/12 79/13 82/14 84/21 86/23 87/19 89/20 89/23 89/24 89/24 92/15 93/14 93/14 97/24 101/23 102/2 103/18 108/15 109/5 109/5 109/13 111/12 114/14 121/20 121/21 126/4 126/24 127/2 128/1 128/6 128/17 128/18 128/22 130/11 130/18 130/20 131/3 133/5 134/20 136/15 137/20 140/19 141/7 142/1 142/2 142/4 143/12 143/15 143/22 144/7 144/21 145/12 149/10 150/3 152/7 153/8 154/21 155/18 160/17
**anybody [4]** 90/6 112/25 138/17 156/14
**anyone [9]** 8/12 9/22 80/6 85/25 118/7 126/15 137/19 146/8 164/24
**anything [24]** 11/15 15/1 18/20 20/11 43/14 45/19 47/13 49/16 54/24 56/14 57/15 61/16 63/8 71/12 76/25 78/19 98/2 107/5 124/7 133/5 133/24 154/24 157/16 166/20
**anyway [5]** 16/12 30/17 52/5 73/9 74/11
**anywhere [3]** 112/14 134/13 166/13
**apologies [1]** 62/11
**apologize [7]** 9/11 21/1 25/14 32/8 60/15 71/3 152/10
**apparent [3]** 70/13 157/16 157/21
**apparently [3]** 31/22 79/10 145/14
**appeal [1]** 65/4
**appear [3]** 44/12 109/22 129/18
**appearance [1]** 29/1
**appeared [1]** 145/9
**Appears [1]** 103/5
**appendices [8]** 102/20 103/4 132/13 132/17 134/24 135/8 135/15 145/2
**applications [1]** 82/13
**applied [1]** 91/1
**applies [1]** 88/20
**appreciate [8]** 7/17 15/2 17/19 17/20 17/25 77/8 80/18 145/22
**apprised [1]** 61/19
**approach [11]** 22/18 44/5 75/17 81/17 87/12 102/12 102/23 112/3 127/2 142/20 148/23
**appropriate [5]** 52/23 57/9 61/15 98/6 148/7
**approve [1]** 119/10
**April [1]** 104/8
**APT [2]** 140/14 141/10
**are [227]**

**area [2]** 26/16 68/12
**areas [1]** 114/22
**aren't [1]** 123/7
**argue [3]** 28/7 50/9 52/14
**argued [1]** 96/6
**argues [2]** 54/23 74/4
**arguing [4]** 48/2 48/3 48/13 123/23
**argument [7]** 4/11 49/1 50/9 50/14 50/22 60/4 89/11
**Argumentative [1]** 155/1
**arguments [1]** 98/4
**arisen [1]** 71/17
**around [13]** 6/13 14/21 15/14 17/21 49/14 49/21 90/11 90/15 111/22 111/22 127/4 144/13 152/25
**Article [4]** 83/7 88/24 89/2 96/11
**Article III [4]** 83/7 88/24 89/2 96/11
**articulate [1]** 11/24
**articulated [2]** 93/19 148/4
**as [216]**
**aside [2]** 51/15 160/10
**ask [34]** 18/8 42/22 49/20 51/1 55/14 61/7 61/14 64/10 65/10 66/18 67/20 68/1 72/12 93/18 95/15 106/24 106/24 109/3 111/5 111/19 116/12 117/23 118/4 126/12 131/21 133/3 141/3 141/15 145/17 145/19 161/15 161/24 163/20 165/22
**asked [11]** 5/13 5/17 12/13 17/4 64/8 92/12 93/14 136/11 137/7 153/18 159/14
**asking [13]** 6/2 8/14 8/20 9/13 48/1 64/14 64/25 74/20 117/14 119/14 121/24 145/23 151/6
**asks [1]** 43/10
**aspect [1]** 106/20
**aspects [2]** 106/19 110/4
**assemble [1]** 71/10
**Assembly [5]** 101/4 101/22 105/24 108/25 132/14
**asserted [4]** 82/19 97/12 117/15 144/13
**assess [1]** 57/22
**assessment [5]** 26/2 26/6 29/10 92/9 92/10
**assessments [1]** 28/16
**assigned [2]** 107/4 128/3
**assist [2]** 161/20 162/22
**assistance [8]** 117/1 120/23 159/7 159/8 159/15 160/4 160/11 160/12
**assistant [1]** 9/5
**assisted [1]** 107/15
**assistive [1]** 160/16
**assumed [1]** 41/10
**assuming [2]** 72/3 87/4
**assure [1]** 15/11
**ATI [5]** 160/7 162/1 162/12 162/25 163/2
**ATIs [1]** 160/21
**ATLANTA [5]** 1/2 1/25 5/2 168/8 168/10
**attach [1]** 70/7
**attached [3]** 1/4 9/6 162/1
**attaching [2]** 1/7 38/10
**attachment [2]** 39/23 39/23
**attachments [10]** 38/13 38/14 38/16 38/18 38/20 38/22 38/24 38/24 39/8 39/10

**A**

**attack [6]**  68/10 68/13 140/8 140/9 142/25 143/5
**attackers [2]**  142/11 142/21
**attacks [2]**  142/14 148/12
**attempt [2]**  94/11 109/17
**attend [1]**  107/17
**attendance [1]**  16/6
**attended [2]**  36/19 145/15
**attending [2]**  9/16 11/18
**attention [5]**  9/5 45/6 45/10 69/3 141/20
**attorney [6]**  19/10 19/15 62/23 117/5 121/13 155/20
**attorney-client [1]**  155/20
**attorneys [1]**  19/3
**attributable [1]**  65/19
**audio [1]**  160/7
**audit [8]**  67/18 68/21 150/10 150/13 150/15 150/17 150/20 150/25
**audited [1]**  150/24
**auditor [1]**  149/13
**audits [3]**  68/25 86/19 111/2
**August [8]**  19/3 26/7 111/20 112/13 115/2 115/9 115/11 135/18
**August 2018 [2]**  115/11 135/18
**August 25th [1]**  26/7
**August 30 [2]**  112/13 115/2
**August 8th [1]**  19/3
**Augusta [1]**  111/22
**authenticate [5]**  27/4 34/7 34/23 38/22 39/1
**authenticated [3]**  34/16 35/17 37/7
**authentication [13]**  26/16 26/20 28/25 29/1 29/5 30/16 31/13 31/14 34/6 34/11 38/17 39/10 40/3
**authenticity [2]**  47/9 147/9
**authority [1]**  11/1
**authorized [1]**  62/23
**authorizing [1]**  62/24
**availability [1]**  147/10
**available [15]**  13/23 53/4 68/4 108/20 108/21 109/2 110/6 112/14 112/15 113/1 129/8 134/15 160/16 163/9 163/10
**average [1]**  45/5
**aware [9]**  29/19 34/7 67/2 81/19 83/9 108/17 133/6 153/1 160/3
**away [4]**  91/22 94/15 142/11 142/20

**B**

**back [18]**  5/8 6/7 20/17 25/20 38/8 56/21 65/13 75/8 76/21 76/23 98/14 118/22 129/23 130/24 146/8 154/9 164/24 167/12
**back-dooring [1]**  118/22
**backdoor [4]**  144/13 145/4 145/16 145/22
**background [5]**  109/22 109/24 139/2 139/18 151/13
**backup [1]**  158/16
**backwards [1]**  126/9
**bad [6]**  54/17 91/3 91/4 91/6 161/5 162/23
**balancing [3]**  93/13 93/24 97/5
**ballot [59]**  56/21 66/21 66/23 66/24 67/2 67/7 67/10 67/12 67/15 67/17

68/16 68/18 69/1 69/10 69/21 69/24 82/24 82/25 82/25 83/1 86/15 87/6 87/17 88/23 89/7 95/7 109/11 123/1 123/3 123/10 123/10 123/15 126/5 126/22 127/9 128/5 128/12 128/17 128/20 129/2 129/6 129/8 134/15 149/22 149/23 150/6 150/7 150/11 150/23 158/16 159/21 162/11 162/14 163/12 163/15 163/18 163/18 163/22 164/12
**ballot-marking [17]**  82/16 82/25 86/15 87/6 87/17 109/11 123/1 123/3 123/10 126/22 149/23 150/7 158/16 163/12 163/18 163/22 164/12
**ballots [28]**  10/22 43/4 65/8 66/8 68/16 82/13 82/15 82/23 83/4 83/4 87/6 91/23 93/10 109/9 128/19 129/16 129/17 129/20 134/9 143/23 148/24 149/12 158/16 158/20 158/21 158/22 158/25 163/11
**ballpoint [1]**  90/6
**balls [1]**  8/1
**bank [2]**  53/24 53/24
**barcode [3]**  149/10 150/2 163/19
**barcodes [2]**  163/11 164/10
**Barnes [3]**  22/2 22/9 22/24
**base [1]**  166/7
**based [16]**  29/1 29/5 33/2 48/24 68/24 72/24 73/12 87/15 88/20 119/13 128/10 128/16 137/21 141/6 163/23 163/24
**bases [1]**  82/3
**basically [8]**  16/15 26/12 72/16 75/24 102/1 126/9 127/5 154/5
**basis [10]**  16/6 28/7 31/6 31/25 44/17 44/22 44/24 45/13 48/21 154/19
**batches [1]**  65/20
**Bates [1]**  34/4
**be [174]**
**bears [3]**  59/14 75/22 88/10
**Beau [1]**  42/15
**Beaver [9]**  23/2 28/10 28/16 29/9 31/22 40/22 41/9 91/1 92/8
**Beaver's [2]**  31/24 32/1
**became [1]**  157/21
**because [80]**  8/17 8/21 9/1 11/1 11/18 12/15 12/17 13/17 26/10 26/17 27/2 27/20 30/1 30/7 30/9 30/11 30/20 31/9 33/10 35/22 39/13 45/1 51/13 52/11 52/19 55/4 55/6 56/6 57/19 58/15 59/6 59/21 59/23 71/16 73/5 74/11 74/22 77/1 77/21 79/24 80/4 80/19 82/10 85/15 92/13 94/10 95/5 96/5 97/3 97/22 97/24 98/12 106/10 107/14 108/13 113/5 113/25 117/16 117/24 120/8 122/1 123/8 124/20 125/14 126/20 128/1 128/10 128/16 132/3 134/11 143/13 145/14 145/17 149/11 152/23 154/13 155/22 157/15 160/15 164/6
**become [1]**  114/22
**becomes [3]**  51/15 51/24 70/22
**BEDARD [3]**  3/5 4/18 27/25
**been [48]**  5/23 6/10 11/7 12/4 12/7 14/13 15/15 15/17 16/5 17/19 25/6 27/19 31/1 34/7 34/8 38/8 41/6 62/23 63/7 64/13 65/10 66/18 66/19 68/2 68/22 69/18 71/2 72/5 73/1 77/11 79/25 81/20 90/17 92/24 99/5 99/17 101/8 109/19 125/25 126/8 129/15 133/5 137/6 137/6

132/14 163/16 163/18 165/17
**before [35]**  1/11 6/11 6/22 7/20 7/21 7/22 11/15 13/18 15/6 15/6 17/3 46/6 50/8 61/19 75/16 75/19 78/16 79/8 82/6 85/8 86/23 87/4 88/12 99/6 101/10 102/15 103/2 106/24 112/8 125/21 133/3 143/25 145/10 156/10 168/10
**began [3]**  19/20 20/5 20/10
**begin [2]**  49/11 100/3
**beginning [6]**  84/10 85/13 94/5 104/8 130/3 143/5
**begins [2]**  42/19 149/4
**begun [1]**  77/14
**behalf [7]**  2/22 19/11 19/16 20/13 21/6 21/12 30/24 35/4 35/17 41/12 64/9 66/17 81/1 81/5 81/9 121/15 123/23
**Behavioral [2]**  116/20 120/16
**being [28]**  8/22 12/19 12/19 15/1 15/19 16/9 20/24 27/10 29/12 38/1 39/24 41/10 45/2 45/2 47/9 62/11 73/17 74/2 77/24 82/19 83/4 119/10 119/12 124/3 134/19 144/2 145/13 147/2
**believe [40]**  9/4 15/25 34/2 39/4 58/6 64/13 65/13 65/21 66/10 66/19 67/5 67/8 67/11 67/14 68/2 68/20 68/23 72/25 82/23 95/25 97/25 101/10 102/19 103/13 105/2 107/11 107/18 111/2 111/11 113/5 113/11 115/19 119/4 122/19 133/15 135/17 144/24 145/23 152/25 165/10
**believes [2]**  65/11 66/24
**BELINFANTE [2]**  3/4 3/6
**below [3]**  139/9 140/15 141/10
**BEN [2]**  2/6 22/24
**bench [2]**  1/10 63/6
**benefit [1]**  104/2
**benefits [1]**  104/5
**best [5]**  6/25 7/23 97/9 148/23 162/20
**better [4]**  13/7 13/10 17/14 58/20
**between [17]**  33/25 34/20 35/8 35/24 36/21 37/1 37/8 37/11 37/12 37/18 49/6 54/12 56/17 57/21 75/13 86/3 105/2
**beyond [7]**  31/20 62/14 91/9 91/11 91/12 125/18 157/1
**bidders [1]**  87/9
**big [4]**  106/8 112/5 136/25 166/14
**biggest [2]**  31/14 31/20
**bind [3]**  52/20 52/20 58/8
**binder [7]**  19/5 21/15 21/23 22/23 25/5 25/9 25/15
**binding [6]**  53/22 54/17 54/19 54/24 55/2 55/10
**bit [5]**  5/8 43/24 98/7 98/9 119/14
**Blake [6]**  116/22 120/18 120/20 165/19 166/10 167/4
**Blanchard [2]**  85/23 92/20
**blessed [1]**  15/17
**blind [5]**  116/24 120/19 120/21 121/4 159/18
**Blind's [1]**  116/25
**BMD [31]**  43/11 68/11 68/14 69/22 89/14 89/17 90/7 90/15 92/10 95/4 95/7 158/14 158/14 159/8 159/19 159/12 159/12 159/20 159/23 160/2 160/4 160/5 160/6 160/10 160/17 160/24 161/23 162/1 162/6 162/18 163/11
**BMDs [22]**  69/8 86/24 90/12 90/17 93/2 93/5 93/11 93/16 93/22 93/24 94/16

**B**

**BMDs... [11]** 96/23 97/8 97/20 117/17 117/20 118/6 134/9 134/16 143/20 158/12 160/21
**board [2]** 14/22 21/20
**boils [1]** 89/11
**bolded [1]** 148/20
**book [1]** 25/12
**books [1]** 25/13
**booth [1]** 90/7
**borrow [1]** 89/25
**both [13]** 9/21 25/9 68/15 82/11 85/24 96/19 97/6 97/21 101/9 103/6 105/6 105/7 127/13
**bottom [5]** 16/11 107/21 140/13 149/4 149/5
**box [1]** 148/25
**BOYLE [1]** 3/9
**BRAD [1]** 1/6
**breach [3]** 58/11 86/9 90/19
**breaches [3]** 58/10 92/22 142/24
**break [10]** 43/22 45/17 46/6 46/6 46/9 59/6 59/9 71/23 146/6 146/11
**Brian [1]** 136/9
**brief [14]** 23/24 26/4 46/9 53/1 57/14 99/2 99/7 103/20 132/23 135/21 146/11 152/6 164/16 165/2
**briefed [1]** 72/1
**briefly [11]** 28/24 32/15 38/7 52/6 52/10 58/14 77/13 82/4 82/7 116/17 129/9
**bring [8]** 8/14 9/14 9/15 11/16 13/12 61/9 101/15 101/20
**bringing [4]** 11/12 14/4 45/5 45/10
**brings [1]** 13/7
**brought [4]** 9/4 85/7 88/8 88/16
**BROWN [10]** 2/15 2/15 4/20 21/6 21/12 42/2 70/24 76/20 90/1 153/25
**Brown's [2]** 156/17 157/3
**BRUCE [6]** 2/15 2/15 21/6 21/12 42/2 153/25
**BRYAN [2]** 3/7 3/7
**buckets [1]** 94/6
**building [1]** 15/6
**bunch [1]** 6/20
**burden [20]** 73/24 83/11 83/13 84/3 84/11 84/12 84/15 85/21 86/12 87/4 87/16 87/18 87/19 93/22 93/23 94/8 96/4 96/5 96/8 97/21
**burdened [1]** 97/1
**burdens [3]** 83/14 87/2 97/18
**Burdick [7]** 82/5 83/9 85/13 85/14 94/8 95/14 96/3
**business [6]** 2/11 5/14 6/4 47/10 63/16 85/24

**C**

**C-E-R-R-O [1]** 73/20
**call [14]** 5/18 5/25 6/5 8/7 8/12 59/21 60/22 62/6 76/16 77/3 86/3 98/23 165/19 166/5
**called [2]** 13/23 160/6
**calling [1]** 76/18
**calls [2]** 59/3 98/25
**came [12]** 36/10 37/7 38/20 39/14 61/19 80/5 116/2 123/18 131/23 144/6 159/16 167/11

**campaign [1]** 85/8
**CAMPBELL [1]** 2/6
**can [126]** 6/23 6/24 6/25 7/2 7/4 7/16 7/23 8/11 8/15 9/16 9/20 9/21 10/11 10/13 11/17 11/24 12/10 13/25 14/18 17/16 18/5 20/15 22/17 23/15 23/25 24/4 25/15 25/20 26/10 27/4 27/23 29/1 29/5 30/1 31/3 34/12 34/22 34/22 35/21 36/2 39/4 41/14 43/11 50/24 59/25 61/10 62/2 64/1 64/1 64/20 72/4 72/15 72/22 75/15 75/16 76/25 77/2 77/2 77/3 77/13 78/14 78/17 79/1 80/19 81/15 81/21 83/12 83/17 86/13 90/6 91/19 91/21 91/24 94/23 96/17 98/13 98/14 104/13 106/22 107/20 107/20 107/21 112/23 118/9 118/25 122/12 125/13 126/24 127/8 128/1 128/22 131/2 131/5 131/6 131/18 132/6 133/18 134/13 134/13 138/7 138/23 139/17 139/25 144/17 144/18 145/12 145/16 145/17 145/19 146/9 148/9 148/12 149/12 153/3 153/20 154/20 154/25 155/24 157/14 159/19 159/20 160/17 161/5 162/25 166/1 166/17
**can't [19]** 13/10 20/8 49/16 51/11 51/22 61/20 74/23 114/9 124/20 127/16 131/3 142/1 142/4 145/22 156/3 156/13 157/23 159/20 163/5
**candidate's [1]** 150/24
**candor [2]** 11/11 32/13
**cannot [9]** 68/16 77/9 95/4 95/10 142/21 148/14 149/4 149/9 150/2
**capacity [5]** 31/23 35/5 35/7 107/6 133/11
**captured [1]** 29/12
**card [2]** 85/24 152/18
**care [2]** 47/12 62/10
**career [2]** 15/7 124/25
**careful [1]** 90/17
**Carolina [1]** 30/8
**Caroline [1]** 21/12
**carry [3]** 140/8 140/15 141/10
**CARY [1]** 2/20
**case [92]** 4/2 4/14 10/3 10/8 10/18 11/4 11/8 12/7 13/1 13/13 13/16 14/12 15/2 15/4 15/5 17/3 17/21 17/23 18/17 18/22 41/21 48/4 48/23 51/5 51/8 51/17 51/19 53/11 53/17 54/7 55/12 55/16 57/2 57/5 57/7 59/22 60/9 60/10 60/17 63/19 67/22 68/6 71/17 72/19 72/25 73/1 73/18 73/19 73/22 74/10 74/18 75/11 76/25 77/12 79/7 79/9 80/14 81/3 81/8 81/9 81/21 81/21 83/10 84/7 84/25 85/14 85/14 87/15 88/11 88/11 88/20 89/4 89/10 89/11 90/20 96/6 96/11 96/22 98/4 98/24 99/21 113/12 113/15 121/20 122/2 129/14 133/6 133/13 144/3 154/19 157/16 162/13
**cast [15]** 82/19 82/20 83/16 83/19 88/23 89/7 89/8 89/18 91/11 95/3 95/7 95/8 95/8 95/10 96/23
**casting [2]** 95/7 95/11
**categories [1]** 27/14
**category [2]** 27/16 40/10
**Cathy [7]** 19/2 19/7 22/25 33/25 37/2 37/9 37/11
**cause [1]** 90/7
**caused [1]** 89/14

**caveat [1]** 59/25
**cell [2]** 16/14 61/9
**Center [1]** 117/6
**central [2]** 68/18 143/19
**ceremonial [1]** 80/20
**Cerro [1]** 73/20
**certain [6]** 64/9 65/7 74/4 74/8 110/4 137/23
**certainly [13]** 7/17 9/3 14/19 14/19 14/24 51/23 55/23 95/6 97/17 101/10 114/15 137/8 144/17
**certified [3]** 67/6 67/9 67/15
**certify [1]** 168/8
**chair [1]** 132/1
**challenge [3]** 89/20 94/11 138/12
**challenged [1]** 55/5
**challenges [2]** 7/19 126/23
**Chaney [3]** 22/24 49/10 66/12
**change [4]** 7/3 84/23 89/15 89/17
**changed [6]** 7/21 49/3 80/13 90/4 92/15 93/1
**changes [4]** 41/13 130/18 130/20 130/22
**changing [1]** 91/7
**chaos [2]** 90/13 90/14
**character [3]** 30/19 163/14 164/11
**characteristics [1]** 29/3
**characterization [1]** 136/10
**characterize [1]** 38/19
**Charity [1]** 73/20
**Chavez' [1]** 58/22
**check [1]** 36/2
**chief [5]** 31/23 46/23 79/20 122/2 155/7
**chooses [1]** 97/14
**choosing [1]** 105/18
**Chris [1]** 44/6
**CHRISTIAN [1]** 2/10
**Circuit [5]** 29/4 57/2 57/4 73/19 74/10
**circumstance [1]** 57/9
**circumstances [11]** 7/16 13/3 13/11 13/14 16/7 17/21 29/4 47/8 49/24 58/3 73/5
**circumstantial [2]** 29/6 73/25
**CISA [3]** 87/11 92/14 92/17
**cite [1]** 1/4
**cited [2]** 26/19 53/11
**cites [1]** 73/19
**cities [1]** 127/4
**citizen [1]** 45/5
**citizens [2]** 117/7 119/21
**City [1]** 168/10
**claim [4]** 83/9 85/7 85/12 156/8
**claimed [2]** 65/16 66/12
**claiming [2]** 65/18 66/7
**claims [12]** 10/9 11/2 12/18 69/13 82/5 83/8 86/18 86/19 86/21 86/22 90/2 90/2
**clarification [1]** 35/20
**clarify [4]** 7/19 39/4 50/13 72/20
**clarifying [2]** 50/25 76/11
**clarity [3]** 63/3 63/7 120/8
**class [1]** 87/1
**classes [1]** 146/24
**Clause [1]** 97/1
**clear [18]** 14/2 19/17 28/19 29/4 31/12 35/4 36/4 41/3 48/16 70/14 71/3 73/7 77/9 114/22 133/4 145/11 145/24 156/2
**clearer [2]** 52/23 66/5

**C**

clearly [3]  42/11 87/19 150/7
clerks [3]  25/11 25/19 74/14
client [16]  8/14 9/3 9/14 11/19 11/20
12/2 12/4 12/16 13/5 15/3 17/3 60/24
66/17 98/3 98/12 155/20
client's [1]  11/23 12/1
clip [6]  19/7 21/7 21/16 21/24 22/4 22/9
close [11]  12/25 17/3 75/14 75/16
75/20 76/1 76/25 78/16 80/6 80/18 88/8
closed [1]  60/1
closer [2]  64/4 80/20
closing [1]  76/10
CM [2]  1/2 1/3
CM/ECF [2]  1/2 1/3
co [3]  98/4 98/14 132/1
co-chair [1]  132/1
co-counsel [1]  98/14
co-plaintiffs [1]  98/4
COALITION [16]  2/13 8/8 8/13 12/17
14/24 19/12 19/16 20/13 42/3 81/6 81/7
94/3 94/12 94/14 94/17 95/17
Coalition's [1]  88/21
code [8]  87/10 95/4 149/10 150/3
150/11 150/12 151/1 163/19
codes [7]  68/1 86/18 163/4 163/11
163/21 164/5 164/10
Coffee [24]  21/20 53/7 58/10 65/19
65/23 68/8 84/18 86/9 86/11 90/18
90/19 90/23 92/1 92/18 92/19 92/21
133/24 142/24 143/11 152/19 152/23
153/17 157/24 158/9
cognizable [4]  83/7 88/24 89/2 95/12
colleague [1]  89/25
colleagues [1]  79/22
collection [1]  25/3
Columbia [2]  111/23 112/13
Columbus [1]  123/22
combination [3]  128/6 128/17 129/8
combinations [2]  128/12 129/2
come [30]  16/12 17/5 20/7 33/23 34/3
38/13 38/16 55/5 61/10 91/24 96/9
110/3 110/25 123/7 127/6 139/9 142/18
143/4 143/10 143/13 146/7 146/22
147/23 148/9 148/17 148/19 149/3
149/21 151/13 156/7
comes [8]  37/4 42/5 43/17 54/13 59/3
92/2 123/10 162/11
comfortable [1]  76/10
coming [11]  10/11 13/3 15/4 46/12
77/15 88/10 124/12 154/18 162/18
163/11 164/24
comment [1]  111/6
comments [5]  139/9 139/13 140/14
142/18 143/4
commission [128]  100/23 100/25
101/1 101/3 101/7 101/8 101/15 101/23
101/25 102/2 102/9 102/17 103/24
103/25 104/3 104/3 104/11 105/1
105/18 106/6 106/8 107/2 107/14
107/16 107/24 108/10 108/16 108/23
109/4 109/6 109/8 109/17 109/21
109/24 110/1 110/2 110/8 110/12
110/15 110/16 110/17 110/21 111/4
111/20 112/12 113/1 113/4 113/10
113/14 113/15 113/17 113/24 114/6
114/8 114/24 115/20 116/1 116/3
118/19 117/12 118/12 119/3 120/3
120/16 122/8 124/11 125/3 125/19
126/13 127/11 127/21 127/23 129/18
129/21 130/1 130/6 130/16 130/20
130/25 131/4 131/19 131/22 131/24
134/8 134/20 134/24 136/2 136/6
136/12 136/19 137/3 137/5 137/9
137/16 139/14 139/22 140/1 140/20
140/24 141/7 141/7 141/12 141/16
141/23 142/1 142/3 142/19 144/4
148/14 145/2 145/19 147/15 148/6
148/10 148/23 149/8 151/5 151/10
151/23 152/2 152/3 158/12 159/3 159/5
163/4 163/12 163/16 163/21
Commission's [5]  108/1 108/22 131/9
151/15 151/24
communicate [1]  16/24
communicating [2]  13/16 42/25
communication [1]  62/2
communications [2]  14/8 61/24
community [15]  114/25 115/21 115/24
116/2 117/6 117/11 117/21 118/15
122/23 124/4 124/17 125/18 131/1
131/11 145/24
compare [1]  165/8
compatibility [2]  58/15 58/18
compete [2]  124/19 124/20
competent [1]  45/3
complaints [1]  84/8
complete [4]  50/6 65/2 70/20 156/7
completely [5]  17/19 45/1 77/25 158/5
159/18
complex [1]  98/19
component [1]  69/22
components [2]  69/2 69/18
comprehensive [1]  68/25
compromise [6]  13/7 13/10 84/16
84/17 86/8 142/21
compromised [1]  149/12
computer [4]  1/21 16/14 45/5 61/10
COMPUTER-AIDED [1]  1/21
concept [1]  56/4
concern [21]  9/24 10/11 11/11 11/24
12/15 12/24 13/1 13/17 18/7 27/8 54/23
88/22 118/4 118/9 122/20 124/17 129/4
141/9 142/4 142/19 145/21
concerned [4]  10/2 82/9 82/10 126/8
concerns [29]  13/2 16/11 53/2 68/5
76/4 78/14 116/3 117/11 117/19 118/12
118/14 118/19 119/14 122/13 123/12
123/13 124/3 124/4 125/16 125/18
126/4 127/22 131/10 131/13 131/15
134/12 144/1 159/2 159/5
concert [1]  15/13
concluded [1]  77/3
concludes [1]  69/23
conclusion [3]  32/19 83/20 98/18
conclusions [2]  27/11 68/21
concrete [1]  53/3
condition [1]  74/17
conditions [2]  93/3 93/6
conduct [2]  54/10 94/24
conducting [1]  28/15
conference [1]  122/4
confidence [4]  88/23 89/6 89/7 89/8
confidential [1]  80/5
confidentiality [1]  147/9
configuration [2]  160/25 161/1
confirm [4]  35/7 66/20 67/11 83/1
confirmed [5]  46/15 58/10 67/5 67/8
67/14
confused [3]  42/12 52/18 74/15
confusing [3]  20/25 49/8 54/3
confusion [2]  8/20 9/9
connect [3]  58/9 84/7 84/9
connection [5]  59/8 67/20 75/13 78/22
155/4
consider [13]  88/14 96/17 104/9
104/13 109/8 109/11 109/13 126/13
126/13 127/10 130/25 144/17 156/13
consideration [3]  72/6 144/1 144/22
considerations [2]  125/7 135/3
considered [19]  48/3 102/4 108/12
109/15 118/22 119/12 126/21 126/21
127/1 127/12 127/13 127/14 131/4
137/9 140/20 141/8 144/4 144/17 146/1
considering [2]  108/10 124/11
consistently [1]  67/4
constitute [1]  168/9
consultant [5]  10/16 11/9 12/2 12/14
62/22
consultation [1]  76/2
consulting [4]  133/13 155/21 155/25
156/24
contained [3]  20/22 42/24 75/3
contend [1]  55/3
content [2]  39/25 40/1
contention [2]  46/18 50/25
contents [2]  29/1 29/9
contest [3]  51/11 51/18 150/19
context [6]  16/10 49/4 56/7 92/13
126/5 149/25
continue [6]  7/18 9/16 11/17 18/24
80/10 86/15
continued [3]  4/2 18/22 80/25
contract [2]  28/17 160/20
contractor [6]  41/4 41/14 41/25 42/7
46/22 46/23
contracts [1]  41/3
contradict [1]  97/24
contradicted [1]  95/3
contradicts [1]  55/17
contrast [1]  159/19
control [6]  30/11 35/21 35/25 56/16
81/16 91/17
controlling [1]  81/22
controls [1]  151/1
controversy [1]  96/12
convene [1]  71/18
conversation [2]  35/23 37/8
conversations [1]  34/1
convey [1]  15/13
conveyed [4]  34/2 132/15 132/17
132/20
COO [1]  117/6
Cook [1]  57/2
cool [1]  17/23
cooperative [1]  110/11
copied [1]  8/21
copies [2]  81/17 87/24
copy [7]  25/12 69/21 87/22 102/17
138/17 138/18 152/15
Coquina [5]  50/4 52/11 52/12 53/11
53/20 73/18 73/22
corporation [1]  35/17
Corporations [1]  41/18

**C**

**correct [28]**  20/9 20/20 33/1 37/20 37/23 48/5 50/16 55/21 59/17 61/12 62/4 63/1 99/24 102/17 129/6 135/11 136/6 137/12 139/24 149/1 157/12 158/17 159/4 159/8 160/11 160/16 160/22 161/22
**corrected [3]**  35/23 36/1 75/12
**correction [1]**  19/10
**correctly [1]**  67/8
**corroborating [2]**  58/5 65/22
**Cotton [1]**  22/25
**could [67]**  5/12 7/12 18/1 18/8 24/18 25/12 34/6 34/9 35/23 35/25 36/15 40/9 41/6 44/8 52/21 55/17 56/14 62/10 63/3 63/7 66/10 68/3 68/10 68/13 68/17 69/6 69/7 69/9 69/25 70/6 73/14 74/5 74/6 74/6 76/3 80/8 80/8 84/22 85/20 92/24 93/15 93/16 101/20 104/12 106/20 106/23 108/16 108/23 109/6 110/18 111/6 119/5 120/7 124/1 126/9 126/14 126/15 127/7 127/7 143/22 145/1 145/24 146/16 155/2 158/17 160/21 166/5
**couldn't [3]**  39/13 84/22 90/16
**Council [1]**  56/5
**counsel [38]**  7/11 11/18 12/16 12/18 14/10 16/1 23/13 24/19 26/15 27/15 27/17 34/16 36/11 42/22 45/23 46/14 47/22 50/8 52/7 54/23 57/16 72/25 75/21 75/25 80/6 98/14 100/1 107/6 126/3 132/25 153/6 154/5 154/7 154/19 157/12 161/11 161/13 166/20
**counsel's [1]**  11/19
**count [8]**  6/9 65/17 65/19 65/23 66/2 66/13 68/25 150/10
**countable [1]**  150/8
**counted [6]**  82/20 83/17 83/19 88/23 89/8 91/10
**counters [2]**  22/15 22/22
**counties [10]**  54/8 54/13 55/22 82/13 91/23 105/11 127/5 128/13 128/14 128/23
**counting [2]**  10/22 82/23
**country [2]**  99/14 127/4
**county [50]**  5/2 21/20 42/25 42/3 53/7 54/16 54/17 54/18 54/19 55/23 57/3 58/10 65/19 65/23 66/8 67/9 67/15 68/8 68/14 84/18 86/9 86/11 90/18 90/19 90/23 91/25 92/1 92/18 92/19 92/21 105/10 111/23 112/13 126/25 128/2 128/6 128/13 128/15 128/23 129/23 133/24 134/13 142/25 143/11 152/19 152/23 153/17 157/24 158/10
**couple [6]**  5/11 74/25 94/4 105/15 118/10 132/23
**course [11]**  18/16 70/14 84/7 84/12 92/18 100/17 104/12 106/12 111/4 128/19 166/4
**court [87]**  1/3 1/6 1/9 1/1 1/23 6/19 8/2 10/10 11/1 11/15 14/16 15/2 16/19 16/23 17/3 22/14 24/16 32/1 34/12 38/19 41/20 41/21 43/18 49/1 52/1 58/9 60/24 61/11 62/19 64/8 64/10 64/25 65/5 65/12 66/15 67/21 72/4 73/19 80/23 82/6 82/17 82/21 83/11 83/15 84/4 84/24 85/12 85/16 85/17 86/13

60/23 88/7 88/8 88/14 88/15 88/22 89/1 89/5 89/14 90/5 90/8 91/2 92/7 92/24 93/11 93/20 96/6 96/9 96/10 96/16 97/11 97/17 99/22 111/15 125/14 137/9 142/5 144/17 145/9 156/13 165/22 166/21 167/16 168/6 168/7 168/10 168/17 168/17
**Court's [6]**  63/13 65/1 72/23 73/2 144/22 157/21
**courteous [1]**  17/20
**courthouse [3]**  1/24 16/16 166/5
**courtroom [6]**  12/10 14/21 14/25 61/17 61/24 80/21
**cover [1]**  99/21
**covered [2]**  98/13 125/8
**created [1]**  78/8
**credibility [1]**  81/24
**criminal [4]**  12/3 12/5 71/17 86/10
**critical [1]**  88/17
**criticism [1]**  138/15
**Crittenden [2]**  100/17 132/2
**cross [25]**  2/4 4/18 4/19 4/9 9/4 15/22 15/23 15/24 16/1 19/4 21/22 22/4 35/6 48/19 60/8 72/21 79/5 89/20 89/22 105/9 134/3 151/5 153/23 156/11 157/5 156/18 157/3
**Cross' [6]**  6/8 75/2 76/24 134/19 156/18 157/3
**cross-examination [5]**  4/18 4/19 72/21 134/3 153/23
**cross-examine [2]**  48/19 156/11
**cross-section [1]**  105/9
**crowded [1]**  104/6
**CRR [3]**  1/23 168/6 168/16
**Cruce [9]**  22/25 38/10 38/12 38/15 38/25 39/3 39/6 39/9 90/22
**crunched [1]**  7/16
**CURLING [10]**  1/4 2/2 14/23 21/13 23/20 24/9 24/23 81/2 89/4 167/2
**current [5]**  69/13 89/6 91/22 126/1 140/20
**currently [2]**  82/6 93/6
**custody [1]**  30/10
**cut [1]**  5/8
**cutting [1]**  161/14
**CV [1]**  1/6
**cyber [6]**  85/24 142/20 148/12 148/25 149/11 152/18
**cybersecurity [31]**  28/16 84/20 86/21 92/2 105/14 106/12 110/20 110/22 113/13 131/15 135/2 136/5 136/19 136/23 137/16 139/18 141/14 142/8 145/18 146/19 146/24 147/14 147/17 147/20 148/4 148/7 148/18 148/22 149/8 151/25 152/2

**D**

**damage [2]**  58/1 140/10
**DANIEL [1]**  3/8
**DANIELLE [1]**  3/5
**data [1]**  80/5
**data-related [1]**  80/5
**date [2]**  100/12 111/21
**daughter [1]**  53/22
**DAVID [7]**  2/4 2/23 2/24 19/3 21/22 22/4 23/3
**DAVIS [20]**  2/19 2/21 2/22 9/8 10/3 11/16 13/19 14/4 14/12 45/24 46/2 61/5 63/5 63/24 65/6 65/11 66/17 68/2 68/3

**day [23]**  5/19 5/25 7/13 7/20 7/22 10/2 13/8 16/5 16/5 49/14 59/8 70/9 79/25 90/11 99/3 128/3 128/9 128/25 129/3 130/24 134/16 153/5 168/13
**days [7]**  1/4 5/14 5/20 6/4 6/10 12/11 13/9
**DC [3]**  49/20 51/10 73/8
**deal [9]**  8/4 16/25 18/21 46/1 76/16 79/8 79/13 95/16 124/24
**dealing [2]**  29/19 57/5 57/6 141/6
**dealt [5]**  46/15 47/14 115/12 124/25 145/20
**Dean [2]**  23/1 37/6
**December [4]**  5/16 42/20 49/14 49/21
**December 17 [2]**  49/14 49/21
**December 20th [1]**  42/20
**decide [3]**  11/24 127/6 127/8
**decided [5]**  76/1 88/19 92/24 93/21 158/15
**decider [1]**  79/20
**decides [1]**  97/14
**deciding [1]**  124/6
**decision [5]**  77/8 91/22 91/23 105/4 106/2
**declaration [2]**  67/22 67/23
**declarations [3]**  153/2 153/9 153/11
**defendants [15]**  1/7 3/2 19/4 24/7 28/2 44/11 48/18 51/5 51/8 53/7 57/12 59/2 72/18 81/10 123/24
**defendants' [8]**  4/14 7/8 48/4 53/5 53/16 98/24 103/17 112/19
**defending [1]**  48/23
**defense [3]**  23/13 24/19 47/22 75/24 138/13
**defer [1]**  98/18
**deferred [2]**  43/25 88/8
**deferring [1]**  81/25
**deficiencies [1]**  69/17
**defined [1]**  65/12
**definition [1]**  146/23
**degree [1]**  86/14
**degrees [1]**  84/22
**DeKalb [1]**  43/3
**delay [1]**  46/4
**deleted [1]**  148/14
**deliberately [2]**  156/4 156/5
**deliberations [1]**  108/11
**delivered [1]**  139/13
**demonstrated [1]**  90/5
**demonstration [1]**  110/9
**demonstrations [2]**  163/17 163/25
**deny [3]**  73/11 88/15 97/25
**denying [1]**  73/15
**department [5]**  45/6 116/20 117/2 120/16 120/23
**depend [1]**  79/22
**depending [2]**  164/21 166/12
**depends [2]**  159/9 166/17
**depiction [1]**  109/23
**deposed [2]**  12/8 31/1
**deposition [37]**  19/2 19/7 20/1 21/5 21/7 21/10 21/16 21/19 21/21 21/24 22/2 22/3 22/9 23/23 24/11 25/1 26/14 26/19 28/10 29/9 29/11 30/3 30/4 31/25 33/24 34/2 34/18 36/11 36/14 36/19 36/23 37/6 38/15 47/17 55/15 91/2 92/1 92/17 92/21
**depositions [5]**  5/6 22/12 52/8 56/11

**D**

**depositions...** [1] 72/10
**deputy** [2] 116/23 120/18
**describe** [3] 29/16 78/23 79/1
**describes** [1] 140/5
**describing** [1] 71/12
**design** [1] 69/4
**designations** [5] 22/15 22/16 22/21 23/23 25/1
**designed** [2] 140/15 141/10
**desires** [2] 116/3 118/7
**desk** [1] 46/11
**desperate** [1] 146/8
**despite** [3] 69/13 76/18 141/25
**detail** [1] 29/16
**detect** [2] 68/16 140/9
**detected** [1] 140/21
**detection** [3] 140/10 140/15 141/11
**determination** [1] 72/13
**determine** [3] 72/12 90/15 91/21
**determined** [2] 88/22 89/1
**determining** [1] 124/9
**develop** [1] 74/8
**developed** [4] 69/3 128/11 128/16 128/16
**developers** [1] 121/2
**Developmental** [2] 116/20 120/17
**device** [8] 82/25 123/1 123/3 123/10 149/24 150/7 163/18 163/23
**device-based** [1] 163/23
**devices** [9] 82/16 86/15 87/6 87/17 109/11 126/22 158/16 163/12 164/12
**devoted** [1] 137/4
**DIANE** [1] 3/8
**did** [93] 5/22 6/5 6/6 6/10 6/16 6/21 7/19 21/3 27/12 29/17 29/25 30/6 30/12 38/13 50/21 52/19 61/22 62/9 64/10 66/15 70/24 71/11 75/25 85/15 85/16 86/2 87/9 88/7 93/19 100/3 101/23 102/5 102/5 102/9 103/12 104/12 106/6 107/1 107/14 107/17 107/18 109/4 109/8 109/11 109/13 110/1 110/2 110/5 110/23 111/20 111/22 114/24 115/20 115/23 117/11 118/12 125/22 126/3 126/13 126/13 127/10 127/22 129/18 129/20 130/5 130/6 130/11 130/18 130/20 130/22 130/25 131/9 131/13 131/15 132/9 132/12 133/24 134/15 140/25 152/10 153/8 154/2 154/3 154/4 155/6 158/9 163/4 163/8 163/12 163/21 163/21 164/5 165/15
**didn't** [29] 18/18 19/15 24/16 27/12 32/10 33/13 39/10 60/3 60/8 60/11 60/16 74/5 74/14 85/6 89/19 92/8 92/10 93/14 93/17 93/18 94/11 102/2 107/4 113/12 122/2 138/17 144/8 152/3 161/24
**died** [1] 15/14
**difference** [2] 42/23 98/8
**differences** [3] 162/7 162/20 162/22
**different** [49] 16/8 33/14 36/13 46/11 46/15 46/16 53/25 58/23 92/5 101/15 101/17 102/4 105/13 106/7 106/10 106/19 108/19 109/3 110/3 110/10 110/14 110/24 114/2 114/3 116/3 118/16 123/11 126/7 128/5 128/12 129/2 130/9 130/10 135/9 141/15 159/4

159/8 160/14 160/17 160/19 160/25 161/1 161/2 161/3 161/21 162/5 162/8 162/18 163/20
**differently** [4] 28/1 85/19 96/25 162/16
**difficult** [1] 59/7
**DIGGES** [6] 2/13 2/13 2/18 2/18 81/6 81/7
**digital** [2] 66/21 66/24
**diligently** [1] 92/16
**direct** [8] 4/17 30/5 52/25 73/25 99/18 151/3 151/3 157/8
**directed** [3] 5/21 30/4 32/11
**directing** [1] 88/6
**direction** [1] 30/12
**directive** [1] 6/2
**directly** [5] 10/9 11/3 56/13 90/18 127/1
**director** [5] 18/14 116/23 117/6 120/18 129/13
**disabilities** [8] 116/21 117/8 117/17 120/17 121/16 161/21 162/5 162/23
**disability** [27] 87/7 105/14 110/16 110/17 114/25 115/12 115/16 115/20 115/24 115/25 116/2 116/5 116/18 117/11 118/15 118/19 118/22 120/2 124/4 124/24 125/18 131/1 131/10 141/13 145/24 159/17 162/16
**disabled** [13] 106/13 117/20 118/7 118/15 122/20 122/23 123/20 125/22 126/7 126/15 127/7 159/3 162/13
**disagree** [2] 50/1 136/11
**disagreements** [1] 12/17
**disclose** [2] 5/14 5/18
**disclosed** [1] 5/23
**disconnect** [1] 55/13
**discounted** [1] 97/13
**discouraged** [1] 146/2
**discovery** [1] 153/7
**discrepancy** [1] 165/10
**discuss** [14] 8/5 16/13 33/13 59/8 77/22 77/22 82/3 98/11 98/13 98/13 108/2 115/15 164/23 166/8
**discussed** [15] 28/10 29/8 33/10 33/12 49/3 50/7 56/9 82/17 83/17 86/16 115/15 134/7 142/2 147/14 165/17
**discussing** [4] 27/13 27/20 47/15 165/8
**discussion** [10] 73/19 75/2 76/21 87/5 110/17 110/19 110/22 116/1 134/11 137/25
**discussions** [4] 41/2 62/8 101/11 130/9
**dismissed** [1] 139/22
**dispute** [6] 23/5 30/2 48/18 50/25 79/11 153/4
**disputed** [1] 148/6
**disputes** [1] 98/21
**disregarded** [1] 139/22
**disruption** [1] 147/4
**disruptive** [1] 80/3
**distinct** [3] 94/22 96/6 96/21
**distinctive** [1] 29/2
**distinguish** [1] 162/23
**distracting** [1] 80/19
**distribute** [1] 87/23
**distribution** [2] 90/25 91/7
**district** [8] 1/1 1/1 1/12 85/12 168/4 168/7 168/7 168/17

**diversion** [1] 94/16
**diverted** [1] 94/15
**DIVISION** [2] 1/2 168/8
**do** [157] 5/6 6/12 6/18 6/25 7/14 9/19 9/21 9/24 10/6 10/23 10/23 11/1 11/5 11/15 13/8 13/21 14/17 15/7 16/8 16/18 17/5 17/9 17/16 17/19 23/14 24/2 24/3 25/3 27/12 27/21 30/7 32/8 32/16 35/16 36/15 37/13 41/18 43/17 45/2 45/3 45/22 47/5 47/8 50/10 50/14 53/13 54/11 55/19 56/14 58/22 60/22 61/11 61/13 61/13 63/18 64/2 68/2 70/4 70/8 70/9 71/12 74/10 74/24 75/16 75/16 75/19 76/10 76/25 77/1 78/3 78/17 79/3 79/3 79/4 79/20 80/17 82/24 85/16 85/19 88/9 88/11 90/7 91/12 94/15 101/19 106/16 108/7 110/1 116/5 116/12 122/22 124/5 124/7 127/8 127/8 127/9 127/11 130/5 130/6 133/14 133/18 133/19 133/24 135/23 136/8 136/15 138/8 138/20 139/9 139/10 139/19 140/1 140/4 140/11 140/13 140/17 140/19 141/7 142/9 142/12 142/16 142/22 143/19 143/24 145/11 146/20 146/25 147/7 147/11 147/21 148/2 148/15 148/19 149/4 149/5 149/25 151/10 151/14 151/15 151/17 152/24 154/3 154/4 155/4 157/10 157/17 159/8 159/20 159/20 159/24 161/5 161/6 161/22 165/3 166/4 166/11 168/8
**Doc** [1] 72/14
**docket** [7] 1/5 1/5 28/5 67/21 72/2 88/24 93/1
**Docket 1705** [1] 93/1
**Docket 1728** [1] 28/5
**Docket 705** [1] 88/24
**Docket Number 1346-1** [1] 67/21
**document** [18] 1/8 9/6 26/11 26/17 29/3 34/18 35/1 36/24 47/13 49/12 72/1 102/15 103/2 112/7 112/11 112/21 144/16 144/16
**Document 1793** [2] 49/12 72/1
**documentary** [1] 110/7
**documentation** [1] 114/4
**documents** [16] 27/16 30/3 30/5 30/10 30/12 30/24 31/10 32/2 34/16 35/18 35/22 39/7 46/14 47/14 70/7 103/6
**does** [16] 9/22 34/18 34/22 42/23 43/5 50/16 55/23 56/16 56/25 97/7 97/16 97/17 108/9 109/22 138/17 161/6
**doesn't** [9] 38/2 41/16 44/23 49/22 54/16 54/25 91/5 94/23 153/21
**doing** [15] 13/5 13/15 18/3 29/10 35/15 85/18 86/18 86/19 108/25 144/15 155/15 155/20 155/25 156/14 157/1
**Dominion** [25] 40/5 40/7 40/17 40/19 40/21 40/22 41/2 41/9 42/15 42/17 58/22 58/23 65/16 66/13 66/22 67/15 68/4 68/9 69/2 69/13 69/17 69/21 87/9 92/11 160/20
**don't** [100] 8/8 11/14 13/4 13/8 13/11 13/17 13/19 13/25 14/3 14/6 14/13 16/1 16/13 16/18 17/12 18/6 20/14 23/9 27/1 36/14 38/15 38/16 40/25 41/13 42/1 49/2 51/5 51/6 52/13 59/25 60/3 62/24 63/14 63/18 64/6 71/10 71/12 72/1 73/8 75/9 75/13 76/24 77/4 78/3 78/12 78/23

**D**

**don't... [54]** 80/7 80/9 82/9 82/18 82/22 82/25 96/20 104/24 107/7 107/11 111/21 116/6 118/5 119/17 121/7 121/22 122/11 123/21 124/4 125/4 125/5 125/9 127/1 127/13 128/7 128/7 128/19 136/10 136/13 136/22 137/18 138/16 139/6 139/6 141/21 144/8 144/18 145/16 146/2 147/18 150/22 152/7 153/3 155/8 155/10 155/12 155/24 157/1 157/18 161/9 164/6 164/10 164/23 166/25
**DONALD [1]** 3/9
**done [8]** 5/19 7/9 29/12 85/10 122/10 150/10 150/15 150/17
**DONNA [7]** 1/4 2/2 2/2 81/2 81/2 89/4 89/4
**dooring [1]** 118/22
**doorway [1]** 80/19
**dots [1]** 58/9
**doubt [1]** 125/5
**Doug [4]** 21/5 21/7 22/25 90/21
**down [13]** 7/2 20/8 31/17 42/19 58/21 62/9 63/25 89/11 139/9 142/18 143/4 146/22 165/10
**dozen [1]** 90/10
**Dr [1]** 79/13
**Dr. [55]** 66/15 66/19 66/24 67/2 67/5 67/22 67/25 68/1 68/20 68/21 69/11 69/16 69/20 70/21 74/17 75/5 84/20 84/25 86/16 87/5 89/14 89/20 90/8 92/14 113/10 113/25 122/5 130/14 131/16 135/23 136/1 136/11 136/17 136/24 137/19 137/22 138/1 138/23 139/2 139/25 141/12 141/13 141/21 142/7 143/19 144/2 144/12 145/9 145/18 146/1 146/16 151/25 152/1 159/24 167/3
**Dr. Alex [1]** 67/25
**Dr. Halderman [12]** 68/1 68/20 69/11 69/16 69/20 75/5 84/20 89/14 90/8 92/14 159/24 167/3
**Dr. Halderman's [4]** 74/17 84/25 87/5 89/20
**Dr. Lee [15]** 113/25 131/16 136/11 136/17 136/24 137/19 137/22 141/12 141/13 141/21 145/9 145/18 146/1 151/25 152/1
**Dr. Lee's [11]** 113/10 122/5 138/1 138/23 139/2 139/25 142/7 143/19 144/2 144/12 146/16
**Dr. Philip [1]** 66/15
**Dr. Stark [6]** 66/19 66/24 67/2 67/5 70/21 86/16
**Dr. Stark's [2]** 67/22 68/21
**Dr. Wenke [3]** 130/14 135/23 136/1
**draft [8]** 26/3 26/7 29/8 47/5 49/15 102/5 107/15 130/8
**drafted [2]** 49/15 130/9
**drafts [12]** 26/11 27/3 27/7 27/7 29/11 31/15 31/19 31/21 31/22 46/16 47/2 47/3
**draw [7]** 48/17 51/6 57/10 72/4 73/9 73/16 156/23
**drawing [1]** 52/15
**drawn [2]** 48/7 52/21
**DRE [8]** 101/12 123/1 123/3 123/10

123/21 126/10 128/16 163/7
**DRE-based [2]** 128/10 128/16
**DREs [2]** 123/20 163/2
**DRIVE [1]** 1/24
**dropped [2]** 5/24 148/25
**dropping [1]** 13/22
**due [1]** 62/8
**duly [1]** 99/17
**DUMA [1]** 3/9
**duplicate [2]** 65/8 66/7
**duplicating [1]** 43/10
**during [17]** 17/22 28/10 44/6 45/17 46/22 63/4 68/8 69/3 84/7 89/22 95/18 108/10 119/3 122/2 122/3 130/11 149/16
**duties [1]** 107/5

**E**

**each [19]** 17/5 24/8 43/1 44/19 46/15 47/25 52/8 52/9 52/14 69/1 72/14 73/3 89/3 106/20 111/15 124/21 139/10 160/10 162/1
**earlier [7]** 17/5 62/8 62/11 74/24 86/9 121/12 136/4
**early [13]** 126/22 126/23 126/24 127/25 127/25 128/2 128/4 128/8 128/22 128/24 130/2 134/12 134/16
**earmarks [1]** 47/9
**ease [1]** 106/14
**easier [3]** 23/5 23/7 121/18
**easily [1]** 150/7
**easy [5]** 23/10 89/21 92/10 123/15 128/17
**ECF [4]** 1/2 1/3 28/6 49/12
**echo [1]** 18/1
**edits [1]** 130/10
**EDWARD [1]** 3/5
**effect [4]** 28/16 44/15 44/23 159/2
**effective [2]** 83/16 97/2
**effectively [1]** 107/13
**efficient [1]** 50/21
**eight [3]** 6/10 68/23 120/20
**eight days [1]** 6/10
**eight years [1]** 120/20
**Eighth [2]** 73/19 74/10
**either [11]** 18/17 61/21 67/3 68/10 68/17 91/5 113/11 127/2 156/12 163/19 165/22
**either/or [1]** 127/2
**election [51]** 40/23 42/7 46/24 54/8 54/13 55/23 58/11 66/9 66/25 67/7 67/16 67/19 68/8 68/14 68/19 69/5 69/12 69/17 83/24 84/13 84/16 84/19 85/8 87/12 90/11 90/23 91/20 91/25 92/3 101/16 104/15 104/16 104/21 105/8 105/10 105/19 106/16 106/21 108/5 110/24 121/1 121/2 127/24 128/2 128/9 128/25 129/2 132/4 134/16 150/18 150/23
**elections [13]** 18/14 21/21 58/13 78/8 84/8 85/10 89/24 90/3 90/4 90/23 101/3 106/9 152/19
**electronic [6]** 10/1 11/12 61/2 67/13 91/22 93/9
**element [1]** 32/13 84/9 104/10
**Eleven [1]** 69/7
**Eleventh [3]** 29/4 57/2 57/4
**Eleventh Circuit [1]** 57/4

**theft [1]** 92/22
**eliminate [2]** 10/19 10/23
**Elizabeth [1]** 117/5
**eloquently [1]** 18/7
**else [15]** 8/16 9/22 12/25 13/6 17/13 18/20 30/17 47/14 53/22 54/18 60/22 122/21 123/4 146/8 162/14
**email [24]** 6/8 7/22 33/3 38/9 38/10 38/22 38/23 39/5 39/8 39/11 40/2 40/2 40/3 40/5 40/7 40/12 40/24 42/14 42/16 44/6 60/13 75/2 76/24 79/17
**emails [1]** 38/12
**emergency [1]** 158/20
**emphasize [1]** 94/21
**emphasized [1]** 147/6
**employee [1]** 38/1
**EMS [3]** 91/3 152/23 153/17
**encoded [1]** 95/4
**encoding [2]** 149/10 150/3
**encroach [2]** 93/8 93/12
**end [20]** 12/11 15/15 27/8 54/21 77/24 81/21 104/7 130/24 132/1 167/7
**ended [3]** 8/22 20/24 109/1
**enforced [2]** 30/7
**engage [2]** 110/18 111/5
**engaged [5]** 15/19 35/16 133/25 152/13 153/16
**engagement [2]** 133/24 153/16
**engineering [2]** 43/2 69/4
**ENGLISH [1]** 3/9
**enjoining [4]** 93/2 93/11 93/24 97/19
**enlarges [1]** 104/13
**enough [5]** 42/8 72/9 83/25 85/10 85/25
**ensure [1]** 121/3
**enter [1]** 81/22
**entire [5]** 10/24 17/19 56/3 68/9 128/15
**entirely [2]** 70/14 90/1
**entirety [1]** 137/4
**entitled [7]** 72/18 95/1 96/7 96/16 97/11 122/7 156/13
**entity [2]** 109/5 121/15
**entries [1]** 19/18
**entry [2]** 1/5 19/19
**envisioned [1]** 108/24
**Equal [1]** 96/25
**equally [1]** 146/1
**equipment [22]** 10/1 11/13 14/5 54/9 54/14 61/3 84/19 86/7 90/23 91/17 91/20 92/3 110/10 118/16 123/8 123/19 124/9 125/24 126/7 126/8 160/22 163/2
**equipped [1]** 160/21
**Eric [1]** 22/24
**erred [1]** 5/19
**error [3]** 8/13 65/20 86/24
**especially [5]** 11/25 87/17 104/9 128/12 128/13
**essence [1]** 48/16
**essential [1]** 47/9
**essentially [3]** 41/11 94/10 106/17
**establish [6]** 48/21 56/2 57/20 122/12 124/16 144/1
**established [10]** 28/14 48/24 55/1 66/11 68/3 68/24 73/4 94/10 97/23 155/9
**establishes [2]** 51/4 51/7
**establishing [8]** 50/3 51/16 52/2 52/4 56/25 57/8 57/12 104/3

**E**

**Estate [1]** 57/3
**esteemed [1]** 145/18
**ET [2]** 1/4 1/6
**EUW [1]** 2/10
**evaluate [3]** 51/25 52/1 85/18
**evaluating [1]** 106/5
**Evans [9]** 18/11 18/12 18/13 165/19
166/10 166/23 167/4 167/8 167/13
**Evans' [1]** 18/19
**even [23]** 12/25 31/21 54/17 57/8 64/6
68/19 72/5 90/12 90/16 92/8 92/11
93/22 94/11 94/23 101/10 108/13 123/8
129/2 133/6 141/8 150/25 155/6 155/22
**event [4]** 75/19 114/14 145/12 150/19
**eventually [1]** 18/4
**ever [7]** 61/22 92/21 100/23 124/7
124/8 153/12 156/9
**every [21]** 5/19 13/8 51/1 53/18 69/21
90/15 90/22 121/7 122/24 123/19
123/19 128/5 134/14 134/14 150/17
150/23 159/10 159/13 160/15 160/22
160/24
**everybody [2]** 13/18 14/5
**everybody's [1]** 104/24
**everyone [9]** 8/17 14/9 32/10 83/9
84/16 122/21 123/4 137/2 162/14
**everything [8]** 12/19 19/21 20/12 47/20
71/11 98/20 132/17 157/4
**everywhere [1]** 93/5
**evidence [77]** 10/22 10/22 17/7 28/19
29/6 29/15 35/14 42/4 42/8 42/11 47/6
52/5 55/16 55/16 57/1 58/2 58/4 58/5
60/1 60/1 65/22 70/16 72/9 72/19 72/24
73/1 73/12 73/25 75/14 75/20 77/12
81/24 82/1 83/18 83/20 84/2 84/15
84/17 84/18 85/3 85/5 85/23 86/7 86/23
87/15 88/9 88/10 88/12 89/19 89/23
89/23 89/24 90/19 91/13 91/16 91/16
92/15 93/14 94/6 94/14 96/22 97/4 97/6
97/16 97/23 97/24 98/19 98/22 103/17
105/22 106/6 112/19 113/14 125/14
144/20 148/13 149/17
**ex [1]** 57/2
**exact [4]** 93/20 111/21 125/15 162/11
**exactly [11]** 27/3 40/1 50/19 84/22 89/2
114/9 124/16 142/25 144/10 161/6
162/10
**exam [1]** 76/6
**examination [10]** 4/17 4/18 4/19 19/20
20/5 20/10 72/21 99/18 134/3 153/23
**examine [6]** 48/19 69/12 69/19 152/14
156/11 156/13
**examining [1]** 11/25
**example [4]** 6/14 29/10 41/15 95/2
**except [1]** 69/22
**excerpt [1]** 19/1
**excluded [1]** 64/13
**exclusion [1]** 74/16
**exclusively [1]** 41/11
**Excuse [2]** 8/19 33/21
**excused [1]** 164/18
**executive [3]** 49/15 49/15 129/13
**exhausted [1]** 17/23
**exhibit [20]** 24/24 25/23 26/5 32/16
32/16 32/20 42/13 43/25 44/3 112/19
134/23 135/9 135/10 135/15 138/10

**Exhibit 1222 [1]** 112/19
**Exhibit 1224 [6]** 134/23 135/15 138/11
144/6 144/21 146/15
**Exhibit 19 [3]** 24/24 25/23 26/5
**Exhibit 22 [1]** 32/16
**Exhibit 261 [1]** 44/3
**Exhibit 28 [1]** 32/16
**Exhibit 858 [1]** 135/10
**exhibits [15]** 22/15 23/4 23/6 23/12
23/21 23/25 24/19 24/23 24/25 25/9
25/16 103/17 144/25 165/9 166/18
**Exhibits 856 [1]** 103/17
**existed [1]** 163/1
**existence [1]** 83/24
**existing [3]** 10/24 49/6 93/9
**expect [2]** 119/14 119/17
**expeditious [1]** 31/6
**experience [10]** 17/22 45/5 80/3
105/13 106/9 108/3 120/13 120/13
141/6 141/25
**experienced [1]** 145/18
**expert [29]** 105/14 105/14 110/16
110/21 113/13 115/25 116/18 118/23
118/24 119/25 120/12 121/25 133/13
133/20 136/5 136/19 137/16 144/14
145/5 145/16 145/22 148/22 149/8
151/23 155/6 155/6 155/21 156/1
156/25
**expertise [7]** 101/21 104/16 105/22
105/23 106/20 110/4 136/23
**experts [19]** 83/22 83/23 101/21
110/17 110/22 110/22 116/2 118/19
118/22 119/22 120/8 120/9 121/9
121/20 121/22 122/15 137/12 141/14
152/2
**explain [3]** 77/13 78/22 154/13
**explained [2]** 69/21 87/8
**explaining [1]** 89/21
**explains [3]** 143/5 148/10 149/22
**explicitly [1]** 117/14
**explore [1]** 146/3
**exploring [1]** 104/1
**exposed [2]** 65/21 156/21
**exposing [1]** 155/18
**express [2]** 132/10 132/12
**expressed [3]** 13/18 117/20 131/1
**expressing [1]** 15/3
**extends [1]** 94/19
**extensive [1]** 68/5
**extent [13]** 17/1 20/19 27/10 27/13
27/19 32/18 56/24 74/4 87/18 98/7
114/16 154/17 154/20
**extra [4]** 25/19 71/18 138/17 138/18
**eyes [1]** 90/5

**F**

**F.2d [2]** 29/7 73/20
**F.3d [1]** 57/3
**face [2]** 77/9 84/20
**fact [23]** 7/14 16/5 30/22 45/8 48/23
51/4 51/7 52/3 52/4 55/1 55/18 56/11
59/18 62/5 73/24 82/12 83/22 96/14
97/2 97/13 136/5 145/14 160/20
**factor [8]** 53/10 58/15 106/12 106/13
124/6 124/9 124/24 125/5
**factors [12]** 40/25 50/4 50/7 52/11 57/9
57/20 106/6 106/7 106/10 108/10

**138/11 136/12 144/6 144/2 148/15
124/12 124/19**
**facts [10]** 48/21 51/16 51/17 50/2 53/3
57/18 73/1 155/13 156/7 156/14
**factual [4]** 56/23 72/4 72/15 156/23
**failed [1]** 92/4
**failing [1]** 85/19
**fair [10]** 6/19 43/16 55/3 74/9 84/25
88/7 100/11 101/2 136/18 142/24
**faith [2]** 30/21 82/24
**false [1]** 66/12
**familiar [6]** 129/10 130/14 133/2 133/9
133/11 145/14
**family [1]** 62/3
**fanatics [1]** 90/10
**far [8]** 41/20 48/12 72/17 86/6 95/22
96/3 107/12 131/5
**father [2]** 15/13 53/23
**Favorito [5]** 10/16 12/13 13/1 16/10
62/22
**favors [1]** 93/24
**FBI [1]** 152/15
**feature [1]** 147/25
**federal [6]** 16/19 63/15 67/1 67/4 81/12
165/20
**federally [1]** 121/15
**Federation [4]** 116/24 116/25 120/18
120/21
**feel [5]** 15/22 24/16 76/10 77/25 80/17
**feels [1]** 18/2
**Felicetti [7]** 23/2 33/24 33/25 35/16
36/15 37/6 37/25
**Felicetti's [1]** 34/17
**fell [2]** 94/6 107/5
**felt [1]** 76/6
**few [7]** 24/15 54/4 90/10 99/21 100/17
104/5 146/14
**field [2]** 145/25 146/5
**fifteen [1]** 69/20
**Fifth [21]** 45/20 47/17 48/19 48/22
48/24 49/17 49/25 51/21 53/8 53/14
53/15 53/19 56/7 57/23 57/24 58/5
68/15 72/6 73/5 73/17 73/23
**fifties [1]** 154/9
**Fight [2]** 84/25 88/7
**fighting [1]** 31/3 43/14
**figure [2]** 90/14 167/10
**file [2]** 43/2 69/25
**filed [5]** 1/2 1/6 1/8 8/13 9/8
**files [4]** 22/22 38/11 38/11 67/10
**final [20]** 27/8 47/5 47/5 102/5 102/9
106/2 107/15 129/25 129/25 130/18
130/25 131/9 131/9 131/18 131/19
131/23 131/24 132/5 132/6 132/20
**finally [7]** 66/10 67/17 69/20 93/13
94/9 97/19 143/5
**finals [1]** 31/15
**find [4]** 14/17 23/15 87/4 121/8
**finder [1]** 73/24
**finding [2]** 55/18 125/3
**findings [9]** 65/15 65/23 65/24 65/25
66/1 72/15 73/2 73/6 81/12
**fine [24]** 5/10 21/2 26/1 32/12 32/20
32/21 32/23 32/25 33/18 39/15 61/7
62/13 62/13 71/9 75/20 76/7 78/18
121/23 122/10 124/2 124/14 125/12
138/14 165/24 166/2
**fines [2]** 63/15 63/17
**finish [1]** 166/1

**F**

**finishing [1]** 71/21
**FIRM [1]** 2/17
**first [40]** 7/20 10/14 11/22 24/9 26/13 26/21 28/13 47/23 59/10 59/21 61/14 64/23 65/14 66/21 76/4 76/16 77/3 80/10 80/12 82/7 88/17 88/18 94/7 98/23 99/17 100/3 109/17 111/19 117/14 117/15 119/1 121/11 122/24 140/4 140/6 146/22 146/25 149/21 156/17 167/8
**FISHER [7]** 2/5 4/12 32/17 32/20 33/3 36/23 94/4
**fishy [2]** 154/14 154/24
**fit [2]** 24/15 51/19
**five [6]** 17/10 31/9 43/22 45/17 71/18 113/22
**five minutes [2]** 43/22 71/18
**five-minute [1]** 45/17
**fix [1]** 62/7
**flaky [3]** 30/20 31/2 32/11
**flaws [1]** 83/24
**flip [9]** 97/5 116/7 116/12 116/16 135/1 138/1 142/7 146/16 147/19
**floor [1]** 15/5
**focus [4]** 73/1 95/21 108/3 151/20
**focused [1]** 53/21
**FOERSTER [1]** 2/7
**folks [1]** 118/21
**follow [8]** 7/18 19/6 23/5 23/10 45/3 66/16 97/14 153/25
**follow-up [2]** 66/16 153/25
**followed [1]** 67/7
**following [5]** 1/1 23/4 66/20 97/10 101/4
**follows [2]** 80/25 99/17
**force [1]** 91/23
**forcing [1]** 97/8
**foregoing [1]** 168/8
**forensic [3]** 133/19 133/19 157/18
**forget [1]** 18/18
**forgetting [1]** 18/18
**forgive [1]** 19/22 19/25
**forgo [2]** 50/8 50/13
**forgot [2]** 18/18 152/11
**formatting [1]** 29/14
**formatting-wise [1]** 29/14
**Fortalice [36]** 26/2 26/6 26/17 27/2 27/11 28/14 28/17 28/20 29/8 29/10 29/12 29/15 29/16 29/17 29/19 29/20 29/22 30/3 30/5 30/7 30/12 30/23 31/11 33/9 33/10 33/15 33/16 45/16 46/14 46/21 46/22 47/7 47/10 92/8 92/9 92/12
**Fortalice's [1]** 27/3
**forth [2]** 38/8 56/20
**fortunately [1]** 15/16
**forum [1]** 115/23
**forwarded [1]** 39/9
**forwarding [1]** 38/10
**forwards [1]** 39/6
**found [5]** 30/9 54/2 62/7 66/7 69/16
**foundation [3]** 37/25 38/18 107/9
**four [6]** 31/9 68/13 94/6 113/22 149/3 149/5
**Fourteen [1]** 69/16
**frame [1]** 46/22
**Frances [3]** 64/24 65/7 65/22

**frankly [8]** 30/20 31/2 32/3 34/3 57/19 91/5 124/2 154/14
**fraud [2]** 68/24 85/11
**free [1]** 80/17
**front [12]** 25/4 36/16 97/17 112/7 112/11 113/15 113/17 119/7 119/9 122/8 129/18 135/24 151/10
**fulfill [1]** 55/24
**full [5]** 1/8 20/19 59/9 90/14 137/25
**full-throated [1]** 137/25
**fully [5]** 77/10 77/11 81/20 146/3 161/14
**Fulton [6]** 5/2 66/8 67/9 67/15 128/13 128/23
**functioning [1]** 41/10
**fundamental [3]** 11/4 50/24 97/1
**funding [1]** 65/24
**further [5]** 17/2 57/15 66/18 71/13 164/17
**future [3]** 58/13 78/8 90/4

**G**

**G-E-R-M-A-N-Y [1]** 99/14
**Gabe [3]** 40/6 40/19 42/17
**Gabriel [4]** 23/2 42/15 91/18 91/20
**gaining [1]** 90/22
**game [1]** 42/10
**Garland [1]** 10/15
**gave [5]** 10/16 15/13 19/5 139/14 151/23
**GBI [1]** 86/4
**gear [1]** 162/18
**general [14]** 100/1 101/4 101/4 101/22 105/24 106/14 107/6 108/25 126/3 132/14 132/25 157/15 157/15 157/19
**generalized [1]** 93/20
**generally [3]** 110/24 139/13 155/18
**gentleman [1]** 36/4
**gentlemen [1]** 80/2
**genuine [3]** 53/18 57/23 58/4
**GEORGIA [47]** 1/1 1/25 3/2 5/2 26/7 45/4 55/24 56/22 58/23 90/11 91/7 92/15 93/2 93/6 93/9 101/17 102/6 104/1 105/4 106/3 106/10 109/18 117/5 121/14 123/2 123/18 125/20 125/21 125/25 127/25 128/1 128/10 128/21 129/1 129/15 129/16 136/15 136/24 137/18 139/5 150/9 159/7 161/20 163/22 168/4 168/8 168/10
**Georgia's [4]** 58/12 68/21 105/19 108/2
**GERMANY [39]** 4/16 6/1 6/17 18/10 66/11 80/13 80/15 80/16 99/1 99/13 99/14 99/16 99/20 102/15 103/2 107/12 112/7 113/21 115/19 118/13 119/7 119/13 122/19 124/10 125/19 127/19 132/24 134/5 134/23 135/23 137/4 139/2 146/14 152/9 153/25 154/18 157/8 159/23 164/13
**Germany's [1]** 69/14
**get [32]** 5/22 6/3 6/4 7/9 7/15 18/4 20/8 32/4 39/9 53/11 57/8 63/3 63/7 64/20 73/9 74/14 77/4 80/16 80/18 87/3 102/3 108/19 110/6 117/18 120/7 133/4 134/13 138/17 151/3 156/10 166/17 167/6
**gets [1]** 156/12
**getting [11]** 30/2 42/11 46/10 50/2

79/19 86/17 101/12 144/13 144/25 145/5 159/23
**ghost [1]** 58/22
**Gilbert [1]** 23/3
**give [11]** 6/25 23/14 25/20 42/10 92/7 94/23 96/9 102/6 104/25 127/5 152/5
**given [16]** 6/20 6/21 11/11 17/21 30/22 67/25 69/11 69/18 72/5 72/21 84/6 85/22 114/5 126/24 145/10 163/8
**gives [3]** 12/2 47/18 94/17
**giving [1]** 129/6
**go [52]** 6/14 6/21 7/1 9/20 17/12 17/15 18/11 20/17 24/1 24/4 24/22 39/2 48/15 52/10 56/25 59/20 60/21 64/1 64/2 64/19 71/10 71/22 76/16 76/21 80/7 81/14 90/11 90/14 98/14 102/21 104/24 106/10 107/19 107/21 114/20 116/7 117/20 120/6 122/16 125/9 128/1 128/3 131/6 134/13 138/9 138/23 139/25 146/7 146/9 155/10 162/4 167/5
**goals [1]** 147/9
**goes [11]** 58/15 77/19 112/25 113/2 119/8 119/11 121/5 122/1 123/13 147/2 150/2
**going [77]** 6/14 6/16 6/18 8/4 8/9 8/9 10/13 16/12 16/12 17/10 19/13 20/7 21/4 24/3 24/8 26/23 26/25 28/5 28/9 30/7 30/16 31/16 32/18 45/15 50/14 51/18 51/19 55/2 59/5 59/8 59/9 59/11 59/11 59/13 59/18 60/4 61/7 63/24 64/3 70/25 71/17 72/17 73/11 73/16 74/23 75/14 76/11 76/15 77/17 77/20 77/22 79/13 80/5 94/6 98/17 101/18 101/18 105/5 112/5 114/11 119/19 121/19 125/10 128/7 128/25 133/4 136/18 146/7 146/7 146/7 165/14 165/22 167/2 167/3 167/4 167/7 167/11
**gone [1]** 75/8
**good [23]** 2/13 10/7 19/12 19/16 30/21 43/20 46/2 46/3 71/11 81/6 85/18 88/4 88/5 94/13 94/17 99/20 134/5 134/6 136/16 154/7 165/11 165/13 166/19
**Gordo [1]** 73/20
**got [14]** 5/22 6/8 9/7 9/10 14/11 31/24 38/12 40/2 56/10 74/14 106/15 110/7 147/20 167/13
**gotten [2]** 15/4 73/18
**GOVERNANCE [6]** 2/13 19/12 19/17 81/6 94/13 94/17
**government [2]** 85/18 165/20
**Governor [4]** 56/14 100/13 136/9 137/15
**grab [2]** 22/17 134/23
**grace [1]** 79/23
**grant [3]** 91/19 117/1 120/23
**great [4]** 32/25 79/21 79/23 95/16
**greatly [1]** 143/21
**green [1]** 37/16
**Greenhalgh [7]** 8/23 8/24 8/25 9/1 9/2 9/4 9/13
**Groundhog [1]** 99/3
**grounds [3]** 81/22 117/14 144/9
**group [5]** 2/11 17/13 27/25 45/16 79/21
**guess [11]** 20/24 41/23 49/8 49/11 50/23 54/6 59/11 74/13 108/20 129/4 129/13
**guiding [1]** 13/1
**guilty [1]** 86/5

**G**

**gun** [1] 102/21

**guy** [1] 136/20

**guys** [3] 29/25 136/15 153/17

**H**

**hack** [6] 89/14 89/17 89/21 90/7 92/10 159/24

**hacked** [2] 85/2 89/24

**had** [110] 5/15 5/23 5/23 6/3 6/14 6/20 6/21 7/13 8/13 12/17 13/21 14/5 14/8 14/8 26/12 29/24 32/17 33/5 34/3 34/5 34/11 34/16 34/25 34/25 37/21 39/8 41/2 41/10 43/3 44/11 44/14 48/12 52/8 55/4 55/14 59/7 60/5 60/18 62/9 64/8 65/10 66/18 67/9 68/2 69/18 71/16 74/1 75/25 76/20 84/8 85/10 85/18 101/8 104/21 105/2 105/3 105/5 105/8 105/9 105/9 105/10 105/12 105/12 105/13 105/14 106/20 107/10 109/1 109/19 110/2 110/3 110/3 110/14 110/14 110/15 110/20 110/20 110/23 111/15 111/23 115/25 118/19 118/23 119/5 119/8 120/19 120/20 122/1 125/21 125/25 126/7 128/10 128/11 130/8 130/10 132/2 132/4 136/20 137/20 141/14 141/14 141/18 152/1 152/14 152/15 153/5 163/2 163/5 166/24 168/9

**hadn't** [1] 34/10

**Halderman** [13] 67/25 68/1 68/20 69/11 69/16 69/20 75/5 84/20 89/14 90/8 92/14 159/24 167/3

**Halderman's** [4] 74/17 84/25 87/5 89/20

**half** [1] 80/8

**Hall** [12] 33/25 35/12 35/24 37/12 38/9 38/24 38/24 39/2 39/5 39/6 39/9 86/3

**HALSEY** [1] 2/8

**Hamilton** [8] 6/14 23/3 26/20 26/23 26/25 28/11 32/8 39/3

**Hamilton's** [1] 32/19

**Hampton** [5] 22/25 38/10 38/25 39/5 39/8

**hand** [33] 12/16 43/11 54/4 68/25 82/23 82/24 83/1 83/4 87/6 99/9 109/8 123/5 126/4 127/9 128/19 129/5 129/15 129/17 129/20 134/9 134/16 139/23 143/23 148/24 149/23 150/6 158/15 158/20 158/22 158/25 159/21 162/14 168/12

**hand-mark** [1] 148/24

**hand-marked** [25] 43/11 82/23 82/24 83/1 83/4 87/6 109/8 123/5 126/4 128/19 129/5 129/17 129/20 134/9 134/16 143/23 149/23 150/6 158/15 158/20 158/22 158/25 159/21 162/14

**handed** [1] 22/21

**handle** [1] 50/18

**handled** [1] 82/13

**handpicked** [1] 136/8

**hang** [1] 80/17

**happen** [4] 7/1 8/2 84/12 143/22

**happened** [5] 6/24 16/4 63/6 85/6 123/22

**happening** [4] 11/9 11/12 61/16 109/1

**happens** [2] 6/15 7/5

**happy** [3] 6/12 14/20 50/9 74/21 75/12

**hard** [2] 108/13 140/9

**harder** [1] 79/25

**harm** [2] 53/16 56/14

**harmful** [1] 114/13

**harms** [2] 96/17 96/20

**Harry** [1] 44/8

**Harvey** [2] 18/16 44/7

**Harvey's** [1] 18/13

**has** [87] 1/6 10/1 10/2 11/1 11/9 11/14 11/18 12/4 12/7 12/9 12/10 12/16 13/8 14/5 14/5 14/10 14/13 14/25 16/3 17/4 17/19 25/6 25/15 32/10 34/21 38/3 40/22 42/5 45/3 45/5 45/7 45/7 46/25 49/3 51/20 58/12 60/1 63/7 68/4 71/1 71/4 71/7 71/17 72/5 73/1 73/18 74/12 77/15 77/16 78/7 80/13 81/20 82/17 82/21 84/16 86/4 87/11 91/16 92/4 92/15 92/23 93/1 94/15 94/24 96/14 97/24 99/5 106/15 107/12 124/8 128/15 129/1 129/14 133/5 134/14 145/9 145/11 153/12 153/12 155/4 156/7 156/9 159/10 160/4 160/6 161/6 162/12

**hasn't** [1] 62/23

**HAVA** [3] 116/25 120/21 160/15

**have** [290]

**haven't** [7] 14/7 47/14 72/19 124/7 156/19 156/21 156/21

**having** [13] 7/3 16/7 16/14 37/15 46/20 65/20 76/3 78/13 88/22 99/17 118/16 126/14 160/13

**he** [183]

**he's** [10] 10/8 13/15 18/3 43/5 43/5 89/21 99/3 123/22 149/18 166/4

**head** [3] 56/4 129/14 142/6

**heading** [5] 140/1 142/8 146/18 147/20 148/18

**health** [6] 15/16 116/20 117/2 117/7 120/16 120/23

**hear** [27] 17/12 18/6 18/6 19/3 21/6 21/12 21/22 22/3 22/4 49/1 54/21 60/4 60/25 62/9 77/10 77/17 77/20 93/14 98/20 105/22 105/23 110/18 114/24 115/20 115/23 121/7 124/18

**heard** [33] 23/25 34/10 39/16 40/18 54/7 77/10 77/11 78/5 80/23 81/13 81/20 82/8 82/21 86/17 87/10 89/3 89/4 89/22 89/22 92/18 97/6 98/22 100/23 101/20 104/23 113/11 118/21 119/5 124/7 125/12 127/3 142/2 156/10

**hearing** [13] 42/9 74/22 77/25 78/13 78/14 80/4 80/6 114/1 123/22 130/5 135/5 135/19 144/5

**hearings** [2] 107/17 109/19

**hears** [1] 104/19

**hearsay** [20] 27/10 27/14 27/16 28/13 28/22 31/13 31/20 34/12 40/6 40/16 40/25 41/18 42/4 44/12 112/20 112/23 113/6 117/14 118/1 144/9

**height** [1] 162/8

**held** [2] 92/24 168/10

**help** [5] 30/1 58/9 120/22 154/8 154/25

**helped** [2] 102/3 102/3

**helpful** [5] 52/13 52/14 55/7 70/1 114/16

**helping** [1] 102/1

**her** [17] 14/5 14/10 14/16 14/16 49/19 51/21 53/22 65/15 65/24 65/25 65/25

**here** [92] 6/21 8/15 8/18 9/20 10/9 11/19 12/22 13/3 13/9 13/19 14/1 14/21 15/1 15/10 15/21 16/5 16/9 16/12 19/23 20/8 20/14 30/21 34/6 36/5 40/25 41/7 42/24 43/15 45/24 46/11 47/20 49/20 50/2 50/24 51/12 51/22 51/24 51/25 52/11 52/17 53/6 53/10 53/13 53/24 56/8 56/19 58/3 59/4 60/24 61/5 61/7 61/10 61/21 62/11 62/16 62/23 71/21 73/4 83/20 85/22 88/3 88/9 91/4 93/1 93/2 93/5 93/23 94/10 94/12 95/21 99/5 101/21 107/24 108/1 112/25 118/9 119/7 119/12 119/14 135/4 139/2 140/19 141/9 141/25 142/8 142/25 146/5 146/18 147/19 154/25 159/24 161/5

**hereby** [1] 168/8

**hereunto** [1] 168/12

**HERNANDEZ** [1] 3/5

**hey** [1] 136/15

**high** [1] 15/5

**higher** [1] 20/11

**highest** [1] 45/6

**highlight** [2] 20/18 107/21

**highlighted** [1] 151/17

**highly** [1] 80/4

**him** [32] 8/18 13/12 13/19 14/14 14/18 14/20 15/14 16/13 16/24 20/12 27/7 34/2 34/7 34/22 39/16 60/25 66/18 71/8 89/16 100/15 119/14 119/17 134/19 136/4 145/17 145/20 147/15 161/14 161/18 166/1 166/6 166/8

**himself** [1] 77/16

**hire** [4] 41/15 154/6 155/5 155/6

**hired** [14] 42/7 100/6 100/14 133/13 133/14 133/15 133/18 133/19 155/21 155/23 156/24 156/24 157/9 157/17

**his** [64] 8/14 8/15 9/15 9/15 9/17 10/23 11/8 11/16 11/17 12/17 12/20 13/5 13/22 14/4 14/12 15/3 15/13 15/17 16/9 16/14 18/3 20/5 29/9 29/11 31/22 35/7 36/19 38/15 41/9 61/2 63/5 68/3 68/5 68/23 71/8 75/6 81/9 89/22 91/2 92/20 98/8 107/9 131/3 132/3 133/10 133/24 137/1 137/1 139/18 139/22 140/4 140/13 142/18 142/19 143/22 146/1 146/24 149/14 149/18 150/4 153/6 153/16 154/18 166/11

**history** [2] 58/11 126/5

**hit** [1] 143/13

**hold** [4] 18/6 30/16 75/9 106/23

**Honor** [179]

**Honor's** [1] 74/3

**HONORABLE** [1] 1/11

**hope** [3] 15/20 30/18 165/25

**hopefully** [2] 104/17 110/3

**hoping** [1] 74/13

**HORST** [1] 2/9

**Hotel** [7] 49/14 49/19 49/21 51/7 51/10 51/23 73/8

**hounded** [1] 15/22

**hour** [2] 59/9 80/8

**house** [3] 105/6 105/7 154/6

**housekeeping** [2] 43/25 165/16

**how** [40] 9/25 11/13 17/8 30/6 34/22 37/13 50/17 51/19 63/6 75/10 75/22 76/24 79/4 80/8 89/17 90/17 92/10

**H**

**how... [23]** 104/25 106/18 110/1 111/14 113/19 113/21 114/7 114/12 120/11 121/8 121/9 125/25 127/6 131/24 132/12 140/19 141/7 144/20 145/20 161/5 166/11 166/17 166/23
**Howell [2]** 116/18 120/15
**however [8]** 1/7 28/9 38/18 66/18 68/1 75/15 141/19 146/6
**Hugo [1]** 58/21
**human [7]** 65/20 86/24 117/2 120/24 149/16 150/15 150/20
**hybrid [5]** 109/15 126/21 126/22 127/12 134/8

**I**

**I'll [20]** 18/6 27/13 44/17 49/2 66/5 78/13 82/4 91/1 93/2 102/21 113/5 120/9 125/13 127/19 129/23 134/2 134/21 140/7 146/8 165/25
**I'm [86]** 7/15 8/9 14/19 15/9 15/10 15/12 18/2 18/7 22/6 23/20 24/3 28/12 29/19 30/18 31/16 32/4 34/7 35/8 35/25 37/15 41/16 41/19 42/12 42/15 43/14 45/15 46/10 47/20 50/9 50/13 51/13 52/15 52/15 59/5 59/9 60/4 61/7 61/21 61/22 61/22 63/6 63/16 63/24 64/24 65/1 66/3 71/21 73/11 74/13 74/13 74/14 74/15 74/21 75/12 77/17 77/20 77/20 80/2 80/5 98/17 112/21 113/2 114/11 114/11 115/1 120/25 121/8 124/15 125/2 133/6 133/21 138/5 140/25 143/7 144/11 144/25 145/1 146/6 146/7 149/18 150/14 152/4 159/23 160/3 160/13 165/11
**I've [5]** 15/17 18/16 31/24 71/16 137/6
**ICC [4]** 38/11 68/16 68/18 69/10
**ICHTER [2]** 2/20 2/21
**ICP [3]** 68/11 68/15 69/8
**ICX [2]** 68/11 68/17
**idea [3]** 82/17 118/15 166/11
**ideas [1]** 137/24
**identifiable [1]** 94/24
**identified [3]** 80/6 89/21 142/15
**identify [6]** 83/10 118/23 123/15 142/1 142/4 142/14
**ignores [3]** 88/17 88/18 88/21
**III [8]** 2/13 2/16 2/18 81/7 83/7 88/24 89/2 96/11
**illegal [1]** 94/23
**image [5]** 66/21 67/10 69/21 123/16 133/19
**images [6]** 66/24 67/3 67/7 67/12 67/15 67/17
**imagine [3]** 6/23 45/21 51/11
**imaging [1]** 90/24
**immaterial [1]** 51/16
**imminent [5]** 83/18 83/22 84/4 89/12 91/14
**implement [1]** 92/16
**implemented [3]** 87/13 93/3 93/7
**implementing [1]** 87/11
**implications [2]** 54/20 58/12
**importance [1]** 85/1
**important [9]** 8/17 16/23 94/21 122/23 124/13 124/23 124/24 136/18 137/8
**imposition [1]** 83/12

**impossible [4]** 67/6 67/18 93/10 158/19
**impracticable [1]** 158/19
**impractical [1]** 93/10
**impression [3]** 75/1 141/16 141/20
**inaccessible [1]** 152/24
**inaction [3]** 85/5 85/23 91/15
**inadequate [1]** 68/22
**inadmissible [2]** 57/1 57/11
**inappropriate [1]** 145/5
**inclined [1]** 88/14
**include [3]** 92/10 104/12 147/9
**included [7]** 24/14 40/9 102/20 111/6 132/13 139/10 163/24
**includes [1]** 25/9
**including [4]** 8/1 11/7 14/9 126/15
**inclusion [1]** 108/4
**incorporate [3]** 131/10 131/13 131/15
**incorrect [1]** 8/22
**increased [1]** 143/21
**incur [1]** 63/14
**indeed [1]** 53/7
**independent [6]** 41/4 41/14 41/25 55/24 148/1 148/12
**independently [1]** 162/21
**indicate [1]** 124/2
**indicated [5]** 12/14 12/16 83/23 98/21 139/4
**indicates [2]** 58/4 151/20
**indication [9]** 47/3 53/10 53/13 53/15 53/18 57/24 67/13 86/8 160/11
**indicia [1]** 47/1
**indifferent [1]** 137/15
**individual [8]** 35/5 48/7 48/9 48/19 89/3 94/20 96/9 131/4
**individually [2]** 141/19 141/22
**individuals [8]** 45/9 48/1 49/7 56/13 56/17 58/21 95/13 121/15
**indulge [1]** 165/22
**ineffective [1]** 96/24
**inevitably [1]** 8/1
**infect [5]** 68/10 68/13 69/6 69/8 69/10
**inference [19]** 47/16 47/18 47/25 48/17 48/25 49/20 49/23 49/25 51/1 51/2 53/4 55/5 56/3 56/13 57/10 72/16 73/9 73/16 156/22
**inferences [16]** 48/7 52/16 52/21 53/2 55/12 55/17 55/18 56/24 57/5 72/1 72/4 72/8 72/23 73/4 73/12 74/3
**information [22]** 31/23 41/15 42/24 47/4 72/22 108/19 110/6 110/7 111/2 113/1 113/3 118/3 119/8 122/8 147/3 147/5 151/4 154/22 156/6 156/9 156/22 157/9
**informational [1]** 95/11
**informs [1]** 73/24
**infrastructures [1]** 147/3
**infrequently [1]** 123/9
**infringement [1]** 95/12
**infringes [2]** 94/25 95/5
**initial [4]** 102/5 107/14 110/5 130/8
**initially [1]** 134/1
**injecting [1]** 16/8
**injunction [1]** 93/5
**injuries [5]** 82/9 82/15 82/16 96/8 97/21
**injury [13]** 83/2 83/5 83/7 86/10 88/24 89/2 89/12 94/7 94/22 95/12 96/14

**98/18 96/19**
**inquiry [2]** 58/17 59/3
**insecurity [1]** 97/3
**inside [2]** 16/15 16/23
**insider [4]** 142/14 143/2 143/5 143/11
**insistence [1]** 11/20
**inspect [1]** 90/15
**inspection [3]** 77/16 78/7 90/17
**instance [7]** 29/6 42/24 49/10 56/3 110/15 123/4 123/16
**instances [1]** 92/6
**instead [7]** 5/15 9/13 13/15 13/16 55/6 70/16 89/22
**Institute [2]** 116/24 120/19
**integrity [1]** 147/10
**intend [3]** 18/24 21/9 165/19
**intended [1]** 53/11
**intending [1]** 22/16
**interaction [1]** 163/8
**interest [20]** 12/6 15/3 58/16 58/18 58/24 63/19 87/4 91/6 94/8 95/5 95/6 95/12 96/4 97/8 97/9 97/11 97/12 97/12 97/16 111/3
**interested [1]** 9/4
**interesting [1]** 90/1
**interests [10]** 12/1 83/12 87/19 93/13 93/15 93/19 93/20 94/25 97/6 119/12
**interface [4]** 160/7 160/18 161/25 163/3
**internal [2]** 29/2 41/19
**internet [3]** 90/10 90/24 91/8
**interpreting [1]** 82/18
**intervening [1]** 86/9
**interview [1]** 10/15
**introduce [3]** 21/10 23/9 23/12
**introduction [3]** 37/25 53/1 54/4
**intruders [2]** 68/10 68/13
**invading [1]** 92/25
**investigate [1]** 92/5
**investigated [1]** 92/21
**investigation [3]** 86/5 92/19 154/2
**investigations [1]** 92/2
**investigative [2]** 65/15 69/14
**invocation [5]** 57/23 72/6 73/5 74/7 74/12
**invocations [9]** 53/3 53/8 53/12 53/14 53/19 58/4 58/7 73/17 73/23
**invoke [2]** 96/10 156/3
**invoked [4]** 51/20 56/6 57/24 156/21
**invoking [1]** 48/22
**involved [3]** 83/3 129/15 132/25
**involvement [3]** 49/17 153/5 153/8
**irregular [1]** 68/7
**irrelevant [5]** 52/3 57/1 57/11 57/19 117/16
**is [777]**
**isn't [1]** 57/5
**issue [35]** 5/5 8/3 18/2 18/3 30/4 31/14 34/6 34/11 36/14 38/13 43/1 48/20 50/24 51/15 54/10 55/21 56/10 57/6 59/14 59/25 60/10 75/25 77/13 81/20 92/23 104/4 113/15 127/25 143/3 154/9 155/23 157/20 165/3 166/23 167/4
**issues [32]** 17/5 38/12 40/3 41/12 43/3 46/24 47/12 59/7 60/8 65/9 65/11 76/11 76/24 79/6 79/14 80/5 87/7 88/10 92/3 92/5 98/20 104/6 115/12 115/14 115/15 118/24 122/6 123/9 124/25 126/10

**I**

**issues...** [2] 128/25 145/20
**it** [492]
**it's** [3] 17/1 36/5 73/20
**its** [18] 56/4 65/12 65/12 77/9 83/15
84/4 85/10 92/15 98/23 105/21 106/5
110/1 113/13 114/11 130/25 131/9
140/8 145/2
**itself** [3] 53/24 78/7 155/20

**J**

**JACOUTOT** [1] 3/7
**James** [3] 22/2 22/9 22/24
**Janice** [1] 23/1
**JANUARY** [8] 1/13 5/2 100/5 100/15
100/16 104/7 130/2 168/13
**January 2014** [2] 100/5 100/15
**January 2019** [2] 100/16 130/2
**JAVIER** [1] 3/4
**Jeff** [2] 89/5 89/16
**JEFFREY** [6] 2/2 21/10 21/16 23/1 81/2
90/21
**Jernigan** [2] 116/24 120/19
**Jim** [4] 106/22 107/20 133/9 138/19
**job** [4] 8/15 9/17 18/3 71/11
**Johnston** [1] 23/1
**joining** [2] 26/23 26/25
**Jones** [3] 84/24 88/7 117/6
**JOSH** [1] 3/4
**Joshua** [1] 92/20
**JR** [1] 3/9
**Juan** [1] 23/3
**judge** [21] 1/12 8/11 8/12 9/11 11/14
14/20 17/17 17/25 45/25 51/25 55/20
63/22 69/23 70/4 70/8 71/14 84/24 88/7
98/3 98/16 105/10
**Judge Jones** [2] 84/24 88/7
**judge's** [1] 111/9
**judgment** [14] 65/13 73/3 81/11 81/22
83/16 84/4 88/8 88/20 92/24 93/21
95/17 95/20 95/25 98/15
**juggling** [2] 8/1 32/10
**July** [1] 22/3
**July 20th** [1] 22/3
**jump** [2] 143/18 155/12
**jumped** [1] 102/21
**jumps** [1] 20/2
**juncture** [1] 5/6 59/12 78/11
**jurisdiction** [2] 82/4 96/10
**jurisdictions** [2] 122/24 123/2
**just** [182]
**justify** [2] 93/15 93/21

**K**

**K-U-H-N-S** [1] 117/4
**KAISER** [1] 2/5
**keep** [5] 6/17 8/15 43/23 142/11 142/20
**keeps** [1] 90/9
**Kemp** [8] 56/14 100/7 100/13 101/1
136/9 136/20 137/15 137/19
**kept** [1] 147/5
**Kevin** [1] 91/1
**Kicked** [1] 92/11
**kind** [37] 26/13 30/20 31/19 46/12
95/25 96/8 103/25 104/9 104/12 104/19
104/24 105/2 106/14 107/15 107/21
108/9 109/5 109/15 109/23 114/9
126/10 127/1 128/11 129/5 129/13

153/16 153/19 155/20 157/20 157/23
137/25 143/2 143/11 149/10 150/3
154/6 157/18
**KNAPP** [1] 2/8
**knew** [1] 101/13
**know** [121] 7/14 8/3 11/6 12/9 12/21
13/2 13/8 13/15 13/21 14/13 14/14
16/18 26/14 26/16 30/18 30/21 34/9
38/16 38/16 39/14 41/5 41/16 47/23
48/23 49/1 50/17 51/6 51/15 51/17
51/24 52/2 54/24 55/3 55/22 56/1 56/2
56/4 56/20 56/23 58/20 59/2 60/3 60/18
62/22 63/17 64/6 64/10 72/1 78/17
79/22 80/7 80/9 81/19 82/18 82/20
82/22 89/10 90/10 90/16 91/1 91/18
91/19 91/21 91/25 92/4 95/10 99/5
104/18 105/2 106/17 108/24 109/19
110/4 110/24 110/25 112/9 113/25
119/19 123/6 123/21 124/5 124/20
124/23 125/3 125/4 126/17 126/20
127/1 127/12 127/13 128/7 128/7 130/3
133/10 133/13 136/10 136/21 137/2
137/18 137/23 139/6 141/12 141/18
141/21 141/21 145/6 149/19 150/22
153/3 153/14 154/5 155/4 155/13
157/16 157/18 157/20 158/18 159/25
164/11 166/14 166/25
**knowing** [1] 95/6
**knowledge** [8] 109/14 131/3 139/21
140/19 141/7 147/13 148/5 148/8
**known** [4] 18/16 111/7 163/17 163/24
**knows** [1] 154/21
**KREVOLIN** [1] 2/9
**KSU** [15] 133/20 133/22 152/14 152/16
153/13 154/1 154/2 154/9 154/4 155/6
155/15 156/25 157/10 157/19 157/20
**Kuhns** [3] 117/3 117/4 121/13

**L**

**labeled** [2] 34/4 38/11
**lack** [7] 11/11 38/18 65/21 66/13 86/12
86/13 89/6
**Ladies** [1] 80/2
**laid** [2] 143/20 143/22
**language** [2] 77/11 149/5
**lap** [1] 63/5
**laptop** [6] 8/14 9/16 11/17 13/3 14/4
63/5
**large** [3] 17/23 25/9 105/15
**larger** [5] 96/7 96/7 96/17 159/15
159/19
**largest** [1] 58/11
**LAROSS** [1] 3/8
**last** [13] 5/23 6/7 10/2 15/5 15/13 22/4
43/24 143/8 148/9 148/17 149/3 151/14
152/21
**lasts** [1] 104/7
**late** [4] 12/19 12/20 59/8 165/23
**later** [11] 16/25 18/5 18/7 45/22 54/5
62/10 76/14 77/1 77/14 77/15 158/9
**Latham** [16] 19/2 19/7 22/25 33/25
35/8 35/24 37/2 37/9 37/11 37/19 49/13
49/20 51/10 51/23 56/18 73/7
**LAURA** [3] 2/13 2/18 81/6
**law** [22] 2/15 2/17 2/24 25/11 29/4
55/24 56/22 67/1 67/4 67/4 72/17 72/23
73/3 74/13 81/23 82/11 93/9 97/10
102/6 158/13 158/18 161/6

**laws** [1] 97/4
**lawsuit** [1] 96/17
**lawyer** [3] 16/8 117/22 166/13
**lay** [1] 77/14
**leading** [1] 109/24
**learned** [1] 152/18
**least** [17] 6/3 13/13 39/6 64/11 72/9
75/1 78/5 82/2 85/25 86/5 86/14 104/22
105/12 116/23 119/5 122/25 153/2
**leave** [4] 21/3 62/9 113/5 165/25
**Lee** [17] 113/25 130/14 131/16 136/1
136/11 136/17 136/24 137/19 137/22
141/12 141/13 141/21 145/9 145/18
146/1 151/25 152/1
**Lee's** [14] 113/10 114/17 122/5 135/23
138/1 138/23 139/2 139/25 142/7
143/19 144/2 144/12 144/18 146/16
**left** [5] 18/18 46/13 100/8 137/16
166/24
**legal** [4] 32/19 55/24 124/25 126/10
**legalistic** [1] 31/4
**legally** [3] 94/25 95/5 95/12
**legislative** [4] 101/9 104/6 109/19
130/4
**legislators** [1] 104/12
**legislature** [17] 92/25 93/8 93/12
104/19 105/5 105/6 106/1 106/4 119/9
122/9 132/15 132/18 132/21 158/8
158/11 158/13 158/15
**Lenberg** [4] 21/11 21/17 23/1 90/21
**length** [1] 56/9
**less** [5] 73/25 85/17 89/17 95/18 97/2
**let** [29] 10/10 11/22 24/19 42/22 47/22
49/11 50/20 50/23 63/24 78/7 79/15
81/15 95/15 104/22 106/24 109/3
111/19 116/12 126/12 130/24 131/7
131/21 136/20 140/25 141/3 143/11
156/10 161/18 163/20
**let's** [13] 18/5 38/4 43/22 79/20 91/15
103/24 108/15 111/16 114/20 116/7
120/6 143/13 143/18
**letter** [2] 42/14 83/23
**level** [2] 157/15 162/9
**levels** [1] 45/6
**liability** [5] 48/4 53/5 56/25 57/7 57/12
**LiButti** [5] 53/10 53/20 57/8 57/20
58/15 58/17 59/3
**lie** [1] 149/12
**life** [2] 15/16 15/17
**light** [2] 72/11 126/5
**like** [42] 9/15 9/19 9/20 10/22 12/3
14/17 15/10 17/6 19/1 19/6 22/1 22/14
23/11 23/22 29/14 46/24 49/1 52/19
63/17 75/15 76/6 78/1 81/20 90/11
91/25 98/23 99/14 102/7 104/3 104/4
110/7 112/12 116/22 128/23 130/10
136/22 141/22 150/10 159/11 160/7
162/8 163/18
**likelihood** [1] 85/1
**likely** [3] 66/19 96/23 97/2
**limine** [2] 49/4 56/10
**limitation** [4] 108/22 144/7 144/21
144/22
**limitations** [3] 108/15 108/20 109/5
**limited** [3] 45/7 66/16 85/22
**Lindell** [1] 10/17
**lindellplan.com** [1] 16/25
**line** [6] 1/6 16/11 19/22 19/24 140/13

183

**L**

**line...** [1] 149/4
**lines** [4] 19/20 34/19 149/3 149/5
**Lines 9** [1] 34/19
**list** [15] 5/22 6/6 6/11 7/20 13/23 22/14 23/6 23/9 23/12 23/15 24/2 24/4 24/14 108/14 163/5
**listen** [2] 13/13 113/12
**listened** [1] 104/17
**listener** [1] 44/15
**lists** [1] 150/24
**litigation** [28] 2/11 10/16 11/8 17/22 29/23 29/24 57/25 58/1 58/19 58/25 62/14 96/13 96/16 110/25 126/10 132/25 153/6 154/3 154/4 154/4 154/15 154/19 154/21 155/5 155/7 155/17 155/21 157/12
**little** [10] 5/8 8/6 14/17 33/3 66/5 74/13 74/15 98/7 98/9 160/13
**LITTLEFIELD** [1] 3/6
**live** [3] 28/17 86/11 98/21
**lives** [1] 62/14
**LLC** [1] 3/6
**LLP** [1] 2/7
**local** [7] 104/15 104/21 105/8 127/20 127/22 127/24 131/13
**location** [8] 126/24 128/2 128/22 134/14 160/10 160/15 160/22 160/24
**locations** [3] 127/4 128/4 128/24
**log** [3] 38/11 38/11 43/2
**Logan** [4] 21/5 21/7 22/25 90/21
**logic** [1] 86/20
**long** [11] 7/13 10/17 15/21 17/8 46/7 62/15 80/8 96/18 125/25 163/5 166/11
**look** [32] 6/18 14/21 20/15 25/12 25/20 29/14 31/8 32/6 33/17 45/15 72/10 74/6 74/7 74/10 75/21 96/7 96/16 98/14 106/6 106/19 106/20 108/16 108/23 109/6 109/21 123/15 139/17 140/4 146/18 157/17 157/22 158/9
**looked** [8] 6/7 12/12 30/25 75/8 76/23 86/3 106/7 163/18
**looking** [9] 5/4 12/12 12/12 36/5 58/21 61/23 84/25 109/2 157/24
**looks** [8] 112/12 116/22 123/10 135/14 150/13 154/13 154/24 162/5
**lose** [1] 17/23
**lost** [2] 99/3 122/5
**lot** [26] 8/1 9/10 11/10 32/10 73/18 80/20 92/19 95/18 104/8 104/18 106/7 106/10 106/19 112/9 122/24 123/2 123/6 124/1 124/19 125/7 125/11 128/11 128/13 128/24 129/1 157/20
**lots** [3] 49/18 112/21 124/24
**Lou** [2] 116/22 120/17
**loudest** [1] 104/20
**low** [1] 147/5
**lower** [1] 42/19
**loyalty** [4] 49/6 56/1 56/17 57/21
**lunch** [6] 46/6 54/22 59/6 71/23 75/9 165/23

**M**

**machine** [12] 36/5 86/24 89/21 123/1 123/14 128/18 149/11 160/14 160/14 160/15 160/17 161/3
**machinery** [1] 126/16

**machines** [5] 58/22 58/23 97/15 122/3 122/6
**made** [20] 8/7 10/3 28/2 28/6 44/14 63/7 63/9 63/12 66/12 67/18 71/7 74/2 94/21 106/2 119/2 119/9 125/3 130/9 141/21 164/11
**Maggio** [13] 34/6 35/10 35/11 35/14 35/22 37/2 37/9 37/11 37/12 37/16 37/18 38/1 69/21
**Maggio's** [4] 34/3 36/10 37/4 37/8
**magnitude** [1] 13/13
**mail** [1] 68/16
**mail-in** [1] 68/16
**main** [2] 118/14 162/7
**maintain** [2] 9/20 58/2
**maintains** [1] 34/16
**majority** [1] 128/21
**make** [33] 6/19 16/15 24/8 24/15 24/19 34/22 41/24 42/23 47/10 47/16 47/18 47/20 52/6 52/22 70/2 72/13 72/15 73/3 91/21 96/20 101/20 101/21 104/14 104/21 105/23 107/8 111/6 121/17 130/11 146/4 159/19 161/11 166/5
**makes** [2] 17/23 164/6
**making** [9] 8/12 11/21 30/21 54/25 71/1 72/23 88/12 97/14 113/4
**malfunctions** [1] 86/25
**malicious** [1] 140/8
**malware** [10] 68/17 68/24 69/5 69/7 69/9 84/18 86/8 89/24 140/15 141/10
**malware-based** [1] 68/24
**manage** [1] 42/7
**management** [8] 68/14 68/19 69/6
**manager** [2] 116/25 120/20
**mandate** [3] 12/9 13/10 126/18
**mandated** [1] 121/15
**manner** [2] 17/19 125/23
**manual** [5] 149/16 149/16 149/19 150/10 150/13
**manually** [1] 150/8
**many** [12] 5/3 46/20 87/12 90/17 104/25 113/19 113/21 114/7 120/11 121/8 121/9 131/24
**March** [2] 67/23 104/8
**March 9** [1] 67/23
**Marilyn** [1] 129/10
**mark** [1] 148/24
**marked** [28] 19/21 31/15 31/19 43/11 82/23 82/24 83/1 83/4 87/6 109/8 123/5 126/4 128/19 129/5 129/15 129/17 129/20 134/9 134/16 143/23 149/23 150/6 158/15 158/20 158/22 158/25 159/21 162/14
**market** [2] 108/21 109/2
**marking** [17] 82/16 82/25 86/15 87/6 87/17 109/11 123/1 123/3 123/10 126/22 149/23 150/7 158/16 163/12 163/18 163/22 164/12
**markings** [2] 19/24 19/25
**Marks** [6] 14/4 14/9 14/15 86/3 129/10 129/12
**Martin** [2] 81/15 87/23
**Martin's** [1] 95/24
**MARTINO** [2] 2/6 23/20
**MARTINO-WEINHARDT** [2] 2/6 23/20
**MARY** [1] 2/5
**Mashburn** [1] 97/7
**massive** [1] 112/21

**material** [1] 102/5
**materials** [3] 20/18 113/23 114/3
**mathematical** [1] 147/16
**Matt** [1] 57/13
**matter** [29] 38/2 43/5 44/23 45/12 46/16 48/14 59/15 60/20 62/5 63/22 64/12 71/17 72/16 72/17 72/23 73/3 82/11 82/11 91/5 98/8 117/15 118/3 119/11 119/23 144/12 145/3 145/8 155/19 168/11
**mattered** [1] 156/15
**matters** [2] 5/12 45/25
**MATTHAEUS** [2] 2/6 23/20
**may** [40] 1/2 1/4 9/5 22/18 23/25 30/1 36/22 38/8 41/20 44/5 52/6 52/10 52/25 54/22 55/20 58/14 60/7 70/9 70/12 70/13 77/24 81/17 82/10 102/12 102/23 106/25 111/17 112/3 114/12 114/13 133/16 138/24 152/13 154/2 154/16 155/15 159/22 164/18 165/17 167/7
**maybe** [19] 8/21 13/7 15/9 15/12 25/15 36/13 55/12 74/19 95/18 109/3 114/5 123/7 124/6 125/2 129/6 135/1 144/25 152/4 159/17
**McGUIRE** [4] 2/16 2/17 4/12 94/1
**me** [67] 8/19 10/10 11/22 12/12 13/12 15/4 15/10 15/18 17/4 18/5 18/12 19/22 19/25 20/18 22/4 25/4 31/7 31/8 33/22 34/9 36/16 42/22 43/2 47/22 49/8 49/11 50/17 50/23 50/25 51/3 52/21 54/21 65/6 65/6 66/16 72/12 73/3 78/7 79/15 79/21 79/24 90/9 95/15 95/21 98/20 99/4 100/12 102/21 106/24 107/5 109/3 111/19 116/12 126/12 130/24 131/7 131/21 140/25 141/3 146/8 152/5 153/21 154/6 154/8 159/11 159/24 163/20
**mean** [34] 7/4 7/4 8/3 13/18 15/9 16/3 16/10 18/16 31/3 31/7 32/9 32/10 43/5 43/7 49/9 49/22 51/10 54/16 59/20 60/4 70/1 74/9 75/24 78/3 78/14 78/17 113/25 119/21 125/7 125/9 127/6 154/24 159/12 163/16
**means** [4] 83/10 85/4 96/24 128/4
**meant** [1] 53/9
**measure** [1] 165/16
**measures** [4] 86/21 92/25 142/2 142/4
**MECHANICAL** [1] 1/21
**media** [2] 13/16 61/23
**meet** [2] 111/20 111/22
**meeting** [18] 62/9 62/10 111/23 112/1 112/13 114/24 115/1 115/2 115/5 115/9 115/10 115/11 115/20 129/25 129/25 130/12 132/6 142/2
**meetings** [12] 102/3 110/2 110/14 111/5 111/8 111/12 111/16 113/19 121/3 114/3 115/4 145/15
**MEGAN** [3] 2/13 2/18 81/7
**member** [8] 14/22 105/3 115/25 120/15 131/4 134/20 136/1 143/6
**members** [11] 104/25 105/5 110/13 110/15 114/6 114/7 131/22 131/25 132/4 132/7 142/3
**memoranda** [1] 52/18
**mention** [1] 19/15
**mentioned** [12] 24/14 72/14 102/8 103/25 120/2 121/12 125/19 127/20 134/7 136/4 152/13 153/12

**M**

**menu [1]** 6/18
**merely [3]** 65/1 84/11 144/3
**merit [1]** 70/15
**merits [16]** 59/14 60/9 75/10 75/22 77/19 78/22 79/7 79/9 82/5 89/10 94/22 96/5 96/16 96/17 96/20 97/22
**Merritt [3]** 23/2 91/1 92/8
**messages [3]** 36/20 37/7 56/11
**messy [1]** 46/11
**met [1]** 59/4
**method [2]** 93/9 97/20
**mic [1]** 64/4
**Michael [1]** 23/2
**middle [4]** 19/11 19/15 53/2 62/5
**Middleton [1]** 21/12
**might [17]** 5/12 10/1 11/13 41/23 47/2 52/16 52/23 54/19 72/20 72/20 90/1 93/21 104/8 107/3 111/2 121/17 159/18
**Mike [1]** 10/16
**Miller [2]** 57/19 165/7
**mind [4]** 40/24 107/7 134/20 138/20
**mine [1]** 16/11
**minority [1]** 132/14
**minute [2]** 45/17 164/14
**minutes [5]** 5/9 17/10 43/22 71/18 166/13
**misconduct [1]** 85/20
**miserable [1]** 46/12
**misrepresents [1]** 140/23
**missed [2]** 106/25 107/3
**MISSETT [3]** 2/13 2/19 81/7
**missing [3]** 67/12 67/16 67/17
**mission [3]** 108/1 151/15 151/20
**misspeak [1]** 140/25
**Misty [4]** 22/25 38/10 39/5 39/8
**misunderstood [4]** 60/7 60/15 74/19 152/4
**mitigate [2]** 72/20 143/23
**mitigations [1]** 92/16
**mixed [1]** 144/25
**model [2]** 126/21 127/12
**moderated [7]** 110/16 110/21 116/1 116/19 120/15 141/13 152/1
**moment [3]** 61/5 143/18 152/5
**Monday [3]** 7/8 7/21 42/20
**monitor [1]** 13/4
**monitoring [1]** 87/13
**Monroe [1]** 57/3
**Montgomery [1]** 81/15
**month [2]** 152/17 153/16
**months [3]** 67/3 67/4 100/17
**more [33]** 7/5 7/13 14/12 14/18 14/19 20/25 31/4 35/25 38/22 48/12 63/17 67/6 73/2 73/25 80/9 82/24 85/19 86/18 86/19 96/23 105/11 124/5 125/8 125/11 126/22 128/23 139/18 143/2 146/14 152/7 154/24 157/23 162/8
**morning [9]** 9/5 9/25 13/22 46/2 46/3 52/12 62/5 99/20 166/10
**MORRISON [1]** 2/7
**most [4]** 50/23 103/12 104/19 104/20
**motion [32]** 4/10 8/7 8/12 8/14 9/8 45/20 47/16 48/20 49/3 50/9 50/14 50/20 56/9 60/1 65/12 71/25 72/2 73/15 74/16 76/3 77/10 81/11 82/3 88/7 88/14 95/17 95/20 96/1 97/25 98/15

98/18
**motion's [1]** 50/9
**motivations [1]** 58/23
**move [14]** 6/14 32/21 38/4 77/2 81/11 81/11 102/21 103/16 112/19 122/11 124/1 125/13 127/19 129/9
**moving [11]** 6/13 9/12 31/5 47/15 71/1 101/11 109/20 124/4 126/6 126/9 126/11
**Mr [8]** 4/11 4/12 4/12 4/18 4/19 4/20 35/8 40/21
**Mr. [185]**
**Mr. Abney's [1]** 19/20
**Mr. Beaver [6]** 28/10 28/16 29/9 31/22 40/22 41/9
**Mr. Beaver's [2]** 31/24 32/1
**Mr. Bedard [1]** 27/25
**Mr. Blanchard [1]** 85/23
**Mr. Brown [3]** 70/24 76/20 90/1
**Mr. Brown's [2]** 156/17 157/3
**Mr. Chaney [2]** 49/10 66/12
**Mr. Chris [1]** 44/6
**Mr. Cross [10]** 9/4 15/22 15/23 15/24 16/1 35/6 60/8 79/5 151/5 157/5
**Mr. Cross' [6]** 6/8 75/2 76/24 134/19 156/18 157/3
**Mr. Cruce [3]** 38/12 38/15 38/25
**Mr. Davis [15]** 9/8 10/3 13/19 14/4 14/12 45/24 46/2 61/5 63/5 63/24 65/11 66/17 68/2 68/3 81/9
**Mr. Evans [6]** 18/11 18/12 18/13 166/23 167/8 167/13
**Mr. Evans' [1]** 18/19
**Mr. Favorito [4]** 12/13 13/1 16/10 62/22
**Mr. Felicetti [5]** 33/24 33/25 35/16 36/15 37/25
**Mr. Felicetti's [1]** 34/17
**Mr. Fisher [4]** 32/17 32/20 33/3 94/4
**Mr. Germany [32]** 6/1 6/17 18/10 66/11 80/15 99/20 102/15 103/2 107/12 112/7 113/21 115/19 118/13 119/7 119/13 122/19 124/10 125/19 127/19 132/24 134/5 134/23 135/23 137/4 139/2 146/14 152/9 153/25 154/18 157/8 159/23 164/13
**Mr. Hall [4]** 35/12 35/24 38/24 86/3
**Mr. Hamilton [6]** 6/14 26/20 26/23 26/25 28/11 32/8
**Mr. Hamilton's [1]** 32/19
**Mr. Harvey [1]** 18/16
**Mr. Harvey's [1]** 18/13
**Mr. Lee's [2]** 114/17 144/18
**Mr. Maggio [6]** 34/6 35/10 35/11 35/14 35/22 38/1
**Mr. Maggio's [2]** 34/3 36/10
**Mr. Martin [2]** 81/15 87/23
**Mr. Mashburn [1]** 97/7
**Mr. McGuire [1]** 10/16
**Mr. Miller [2]** 57/19 165/7
**Mr. Montgomery [1]** 81/15
**Mr. Oles [12]** 8/7 9/25 11/6 17/18 18/2 18/3 60/19 64/1 70/21 71/4 71/13 98/2
**Mr. Oles' [1]** 10/16
**Mr. Persinger [14]** 59/14 59/22 60/8 76/12 76/17 77/16 79/7 133/12 152/13 153/1 153/12 155/23 155/25 157/9
**Mr. Persinger's [2]** 76/4 79/14

Mr. Pico-Prats [2] 19/4 19/21
**Mr. Prats [1]** 20/5
**Mr. Prats' [1]** 20/10
**Mr. Ricardo [1]** 11/16
**Mr. Roberts [1]** 43/6
**Mr. Skoglund [3]** 58/10 84/21 87/7
**Mr. Sterling [7]** 40/8 40/17 40/21 43/8 43/13 87/8 97/7
**Mr. Stone [1]** 21/19
**Mr. Tyson [2]** 88/16 94/11
**Mr. Tyson's [1]** 77/8
**Ms. [32]** 8/23 8/24 8/25 9/1 9/2 9/4 9/13 14/4 14/9 14/15 33/25 35/8 35/24 37/19 38/25 49/13 49/20 51/10 51/23 56/18 65/10 65/14 65/14 65/18 66/6 66/6 73/7 85/23 86/3 119/3 120/20 129/12
**Ms. Blake [1]** 120/20
**Ms. Cathy [1]** 33/25
**Ms. Greenhalgh [7]** 8/23 8/24 8/25 9/1 9/2 9/4 9/13
**Ms. Hampton [1]** 38/25
**Ms. Latham [9]** 35/8 35/24 37/19 49/13 49/20 51/10 51/23 56/18 73/7
**Ms. Marks [5]** 14/4 14/9 14/15 86/3 129/12
**Ms. Nakamura [1]** 119/3
**Ms. Watson [7]** 65/10 65/14 65/14 65/18 66/6 66/6 85/23
**much [11]** 7/15 17/20 23/18 49/3 85/17 124/5 129/7 138/21 146/9 153/12 164/24
**multiple [8]** 60/14 63/4 83/22 84/6 100/20 115/4 115/7 160/12
**must [7]** 13/23 14/20 84/11 87/1 147/25 149/16 150/7
**my [69]** 8/14 9/3 9/5 9/5 9/9 11/15 11/18 11/20 11/24 12/15 12/21 12/24 15/3 15/7 15/7 15/13 15/17 17/3 25/11 31/4 34/4 35/22 36/1 36/9 40/10 60/13 60/24 62/1 62/11 64/20 66/17 72/3 73/1 74/13 76/15 76/18 76/21 78/13 89/25 98/3 98/14 98/18 99/13 102/1 107/5 109/3 110/11 124/25 130/2 133/15 134/11 136/14 141/16 141/20 142/6 144/24 148/8 152/20 153/10 154/5 154/9 157/11 157/17 157/19 163/13 163/16 164/1 167/1 168/12

**N**

**Nakamura [1]** 119/3
**name [8]** 18/19 24/18 99/12 99/12 99/13 104/24 133/10 150/24
**National [4]** 116/23 116/25 120/18 120/21
**natural [2]** 12/21 85/17
**nature [2]** 13/8 56/1
**nearly [1]** 90/22
**necessarily [3]** 16/9 41/16 54/11
**necessary [2]** 70/22 147/16
**need [24]** 6/13 7/11 10/6 18/6 18/21 24/16 43/17 52/3 73/8 75/16 75/17 78/12 78/15 121/7 121/22 146/6 159/7 159/8 159/14 159/18 159/22 161/22 165/3 165/21
**needed [2]** 12/5 76/1 137/24 157/22
**needing [2]** 160/11 160/12
**needs [4]** 16/13 118/7 160/4 166/20
**neither [1]** 84/20

**N**

**never [3]**  14/14 99/5 118/5
**new [12]**  5/23 12/16 16/7 16/8 101/11 104/1 105/4 108/4 108/5 109/18 109/20 149/9
**news [1]**  165/11
**next [19]**  20/1 21/4 21/9 21/18 22/1 22/12 30/17 33/4 33/19 43/23 67/5 102/22 105/19 108/2 108/25 121/13 138/24 140/24 149/15
**nicer [1]**  146/9
**night [7]**  5/23 6/7 6/11 6/22 7/22 79/25 90/9
**Nine [1]**  69/2
**Ninjas [2]**  85/24 152/19
**no [79]**  11/1 14/21 14/23 14/25 26/20 28/2 28/6 31/24 32/9 33/15 38/12 40/1 40/2 40/16 43/9 43/16 45/5 46/5 46/5 46/19 47/2 49/6 52/3 53/10 53/15 58/2 63/7 63/10 64/18 65/8 65/16 66/7 67/9 68/4 70/25 75/24 77/17 78/10 78/10 78/14 79/25 80/14 81/24 82/14 84/15 84/17 84/18 85/3 86/8 87/9 89/23 89/23 89/24 92/15 92/20 92/21 103/21 105/20 107/14 109/7 115/8 118/24 119/23 130/23 134/1 138/9 142/6 144/22 147/15 148/5 153/10 156/9 158/9 160/1 161/4 161/9 161/10 163/4 164/17
**nondisabled [4]**  118/16 123/20 125/23 127/7
**none [2]**  86/10 153/11
**nonmoving [1]**  81/25
**nonparty [6]**  48/2 51/25 56/6 57/21 57/24 58/18
**nonprofit [1]**  121/14
**normal [2]**  84/12 160/2
**North [1]**  30/8
**North Carolina [1]**  30/8
**NORTHERN [3]**  1/1 168/4 168/7
**not [258]**
**note [7]**  26/13 27/6 27/6 27/13 27/16 34/13 93/2
**notebooks [1]**  46/12
**noted [2]**  27/7 85/12
**notes [5]**  36/1 41/5 64/20 140/4 165/8
**nothing [5]**  19/23 76/19 89/15 93/1 125/6
**notice [5]**  37/22 44/15 44/22 85/25 86/2
**notified [1]**  45/2
**November [7]**  12/20 12/20 21/5 21/11 65/13 83/24 85/8
**November 18 [1]**  21/5
**November 2020 [2]**  83/24 85/8
**November 21st [1]**  21/11
**now [39]**  11/9 11/11 13/19 25/13 27/20 28/14 35/20 37/10 42/14 47/15 51/18 64/5 74/23 75/16 77/2 77/3 77/21 78/15 78/17 79/3 81/21 81/23 85/3 88/15 97/17 98/7 113/5 115/15 118/24 128/21 129/24 136/9 137/14 137/15 139/25 143/10 147/19 151/5 160/24
**now-Governor [1]**  137/15
**number [14]**  1/5 1/6 1/5 20/11 23/14 67/21 72/2 75/1 80/4 92/5 118/21 121/5 138/10 142/11
**Number 2 [1]**  142/11

**O**

**oath [2]**  34/25 55/25
**object [10]**  70/20 71/4 112/20 117/13 123/21 134/18 144/8 151/2 154/17 155/16
**objected [3]**  5/16 118/6 144/14
**objecting [2]**  117/16 144/11
**objection [42]**  14/3 14/6 26/8 26/21 27/10 27/17 28/2 28/4 28/6 28/7 30/22 31/20 31/24 32/18 34/12 40/6 40/13 44/12 44/25 64/15 70/17 76/18 103/21 112/24 113/6 113/7 117/24 118/20 119/2 119/16 120/10 122/1 122/5 134/19 140/22 143/20 144/25 151/7 153/18 155/1 155/8 161/12
**objections [15]**  22/15 24/8 24/11 24/19 24/20 25/10 26/12 27/14 27/24 30/19 30/21 31/8 33/9 34/14 103/18
**obligations [2]**  12/10 55/24 62/15
**observations [1]**  157/14
**observe [1]**  95/1
**observed [1]**  119/4
**obvious [3]**  7/11 74/11 100/20
**obviously [21]**  6/13 7/5 7/15 12/7 13/4 14/5 14/8 30/15 31/7 34/1 43/11 70/1 71/4 81/3 95/16 99/20 124/24 145/18 148/13 150/9 159/20
**occurred [3]**  68/7 74/1 142/24
**odds [3]**  10/9 10/20 11/3
**off [6]**  13/22 18/6 119/1 142/6 156/17 161/14
**offer [7]**  21/18 22/14 22/16 23/22 27/21 43/17 67/23
**offered [9]**  27/11 44/6 44/16 71/5 72/14 87/16 144/2 144/6 144/21
**offering [12]**  5/5 22/20 23/4 24/25 27/17 36/24 39/15 44/13 112/24 121/21 144/11 145/2
**office [26]**  2/24 44/14 45/9 46/23 47/4 47/19 51/3 66/14 90/23 92/21 99/23 100/4 100/9 100/16 101/4 101/14 107/6 109/5 117/5 121/14 126/3 136/14 137/20 152/18 152/19 152/22
**officer [5]**  31/23 53/23 54/18 56/5 56/6
**Officer Standards [1]**  56/5
**official [8]**  1/1 1/2 1/3 1/7 1/23 150/12 168/6 168/17
**officials [13]**  91/25 104/16 104/21 105/8 105/11 106/16 108/5 121/3 127/20 127/22 127/24 129/23 131/13
**often [1]**  5/19
**Oh [3]**  62/17 115/7 152/10
**okay [57]**  9/7 18/12 18/15 18/20 25/17 28/23 32/22 33/16 33/21 35/6 39/23 40/14 46/1 46/13 46/20 48/11 57/13 59/5 59/15 61/8 61/20 62/14 64/7 69/24 71/6 75/4 75/7 75/18 79/18 80/2 98/17 100/23 102/11 103/6 103/14 110/1 112/3 116/16 117/9 126/11 126/12 127/15 129/9 132/6 132/9 132/20 132/23 133/11 137/14 139/21 146/12 148/17 153/22 160/19 164/9 167/9 167/14
**old [1]**  101/12
**OLES [14]**  2/23 2/24 8/7 9/25 11/6 17/18 18/2 18/3 60/19 64/1 70/21 71/4

**Oles' [1]**  10/16
**once [5]**  78/5 81/20 87/12 96/14 99/11
**one [131]**  5/12 5/15 5/24 7/19 10/2 10/25 12/16 14/21 14/23 14/25 19/10 19/18 22/22 24/4 24/4 24/8 24/9 24/10 25/6 25/13 25/15 25/16 25/19 26/13 26/13 26/22 27/14 30/16 31/9 31/13 33/15 33/16 35/22 37/10 37/11 38/4 40/15 42/13 42/13 43/3 43/24 43/25 44/2 46/15 49/14 49/23 49/23 52/7 52/22 53/1 54/4 55/21 56/11 63/3 65/7 73/14 73/16 75/1 79/25 82/3 84/9 88/18 88/19 92/20 92/20 92/21 94/7 94/18 95/2 95/15 98/11 101/10 102/22 103/19 104/5 106/23 110/4 111/15 111/16 115/5 115/6 115/15 117/25 118/14 118/20 118/24 121/11 121/13 122/25 122/25 123/14 124/13 124/15 124/20 126/7 126/20 127/24 128/14 128/20 129/8 129/13 129/14 132/23 134/7 135/19 141/22 145/19 147/15 147/24 148/5 152/5 152/10 153/3 153/9 153/14 153/25 155/10 156/9 159/2 159/5 159/10 159/12 159/12 159/16 159/25 160/14 160/15 162/7 163/13 164/14 165/10
**one-page [1]**  42/13
**ones [15]**  25/10 31/12 31/13 33/2 33/5 33/16 33/19 45/15 45/16 52/24 72/9 101/10 108/13 112/5 160/25
**ongoing [1]**  14/8
**online [1]**  112/14
**only [48]**  1/2 1/6 6/9 10/3 11/8 11/19 12/13 15/8 32/18 41/8 49/19 53/3 65/7 67/23 68/24 74/2 74/8 78/19 84/1 91/19 91/21 91/24 93/4 93/18 94/14 102/19 104/7 113/6 115/5 123/2 123/14 125/4 126/19 128/14 129/8 131/2 132/7 136/5 136/19 137/15 140/9 145/19 148/22 149/7 149/11 151/23 155/22 165/10
**open [4]**  59/19 59/22 59/25 89/14
**opened [1]**  126/9
**opening [3]**  50/13 63/4 94/5
**operated [1]**  106/15
**operating [2]**  30/9 36/5
**operation [1]**  106/15
**opinion [5]**  121/25 143/22 144/2 145/25 149/7
**opinions [4]**  139/23 144/2 144/12 144/18
**opponent [5]**  40/16 40/24 40/25 41/6 41/17
**opportunities [1]**  84/6
**opportunity [10]**  17/6 52/8 55/4 55/11 55/14 55/15 69/11 69/19 118/23 132/10
**opposed [4]**  78/15 117/21 128/2 158/11
**opposing [2]**  28/21 94/16
**opposite [1]**  49/7
**optical [2]**  163/14 164/11
**option [6]**  87/10 104/22 126/14 126/19 128/5 142/11
**optional [1]**  126/14
**options [3]**  104/1 108/2 109/16
**oral [1]**  139/14
**order [25]**  5/18 5/24 6/4 6/8 6/11 6/21 6/25 7/12 15/7 16/9 18/9 28/3 30/13

**O**

**order...** [12]  33/3 33/4 53/16 57/25
65/12 76/1 77/4 83/16 84/5 86/13 92/25
98/14
**orders** [3]  49/15 49/15 157/21
**organization** [1]  95/22
**organizational** [4]  88/21 94/11 94/12
94/18
**original** [11]  19/25 20/5 20/11 39/8
67/9 67/15 67/17 67/22 77/1 149/17
152/16
**originally** [1]  65/15
**other** [73]  5/25 10/21 13/3 14/15 16/5
20/21 29/2 30/19 31/8 31/10 31/13
33/10 34/15 35/13 36/7 37/11 43/1
45/15 46/25 48/14 49/18 49/23 52/22
52/24 53/25 56/18 59/11 59/13 64/16
65/8 69/6 69/18 74/8 75/17 79/18 80/20
82/5 85/5 96/24 97/4 97/5 101/21 109/5
109/13 110/17 110/22 110/22 111/2
113/16 114/22 116/1 116/22 120/17
120/21 122/6 122/7 123/17 124/21
126/10 129/16 141/14 141/14 141/17
149/10 150/3 152/1 153/5 153/14
155/13 159/16 160/25 161/3 164/7
**others** [6]  13/9 33/6 33/14 73/10
131/16 137/17
**otherwise** [3]  15/4 18/17 58/1
**our** [48]  5/18 6/9 6/12 18/2 18/3 18/10
26/21 27/8 28/3 31/12 32/18 34/13 40/6
40/12 41/1 41/3 44/22 44/24 45/25 53/1
56/9 59/22 59/24 60/1 69/23 74/22
75/12 75/17 76/23 77/1 77/2 77/3 77/8
77/12 79/9 80/12 81/2 82/3 90/2 90/2
94/5 121/19 128/10 142/20 142/21
145/21 164/19 166/16
**ours** [1]  41/22
**out** [45]  5/20 8/10 9/20 11/18 14/17
16/5 21/3 23/6 30/11 33/4 36/2 58/21
61/11 61/21 68/24 73/22 77/4
77/14 77/15 80/17 90/4 92/13 92/20
121/8 132/6 136/14 136/23 137/18
139/23 140/8 140/15 141/10 143/20
143/22 154/8 154/25 156/8 162/11
162/18 163/11 165/9 165/17 165/21
167/11
**outcome** [5]  58/19 58/24 89/23 96/13
96/15
**outcomes** [1]  90/3
**outset** [1]  64/24
**outside** [5]  12/10 41/15 51/20 151/3
153/6
**outweigh** [2]  87/19 97/17
**over** [15]  5/9 5/22 19/21 36/5 39/2
52/12 54/7 54/7 80/7 87/6 88/2 91/17
92/11 100/20 107/8
**overall** [3]  106/14 162/25 164/7
**own** [6]  74/1 90/5 91/18 113/13 120/13
131/3

**P**

**P.M** [2]  6/7 59/16
**page** [29]  1/5 4/3 4/15 19/19 19/22
19/25 20/10 20/11 20/12 28/5 34/19
42/13 49/11 49/12 53/2 53/6 107/21
109/21 116/7 116/9 138/1 138/23
138/24 139/17 139/25 142/7 143/10

**148/16 151/13**
**Page 1** [1]  53/2
**Page 107** [1]  28/5
**Page 113** [1]  34/19
**Page 14** [1]  53/6
**Page 198** [1]  20/12
**Page 2** [2]  138/23 139/17
**Page 207** [1]  20/10
**Page 3** [3]  107/21 109/21 151/13
**Page 4** [1]  49/11
**Page 7** [2]  49/12 139/25
**Page 8** [1]  142/7
**Page 84** [1]  116/7
**Page 9** [2]  143/10 146/16
**pages** [8]  20/21 88/25 116/12 116/16
125/15 135/1 138/24 168/9
**Pages 84** [2]  116/12 116/16
**Pages 85** [1]  88/25
**Pages 90** [1]  125/15
**panel** [16]  110/21 115/16 116/5 116/14
116/19 117/4 120/22 120/11 120/14
123/13 123/18 141/13 141/13 152/1
159/17 165/20
**panelists** [2]  116/22 120/17
**paper** [25]  82/23 82/24 83/4 87/6 91/23
93/10 109/8 112/9 123/5 126/4 129/5
129/15 129/17 129/20 134/9 134/16
143/23 148/24 149/22 150/5 158/16
158/20 158/22 158/25 159/21
**paragraph** [13]  107/21 140/6 142/19
143/4 143/8 146/22 146/25 147/23
148/9 148/19 149/3 149/23 149/21 151/14
**parallel** [1]  87/13
**parameters** [1]  16/13
**paramount** [4]  124/6 124/8 124/15
124/20
**parenthetically** [1]  7/6
**parse** [1]  6/24
**part** [21]  9/9 12/20 12/21 13/13 32/19
34/1 35/14 35/23 53/21 60/11 60/16
79/7 79/9 79/16 97/3 105/8 121/7
136/25 150/5 151/20 164/19
**partial** [2]  1/8 81/11
**participants** [1]  117/25
**participated** [3]  87/9 110/12 137/1
**participating** [1]  165/20
**participation** [1]  14/12
**particular** [8]  28/2 70/21 84/9 95/20
104/21 106/13 134/12 141/22
**particularized** [3]  96/8 96/18 96/19
**particularly** [5]  56/8 101/17 104/15
106/9 122/4
**parties** [9]  5/14 23/21 25/1 64/16 73/24
85/20 98/5 105/7 105/13
**parties'** [1]  57/25
**partner** [1]  38/2
**parts** [2]  9/12 114/13
**party** [13]  12/7 28/22 40/16 40/24
40/24 41/6 41/17 54/25 57/21 58/1
58/18 81/20 81/25
**passage** [1]  19/15
**passages** [1]  20/1
**passed** [1]  158/13
**past** [5]  38/4 46/21 90/2 94/22 103/15
**patch** [1]  68/4
**patience** [1]  164/25
**patterns** [1]  29/2
**Paul** [7]  37/1 37/4 37/7 37/9 37/11

**39/12 69/21**
**Paulding** [1]  42/25
**pause** [9]  26/4 57/14 99/2 99/7 103/20
135/21 152/6 164/16 165/2
**paying** [1]  141/20
**PDF** [1]  1/1
**PDFs** [1]  135/12
**Peace** [1]  56/4
**pen** [3]  89/15 89/15 90/6
**pending** [1]  82/6
**Pennsylvania** [3]  85/9 85/9 85/17
**people** [33]  8/1 15/10 17/22 17/23
62/14 63/4 79/23 90/11 96/23 96/24
97/14 104/18 105/12 106/9 106/19
110/3 110/23 112/21 118/15 120/1
120/9 120/11 120/14 121/8 121/12
121/20 121/21 127/5 132/5 136/21
143/11 145/25 151/5
**people's** [2]  7/1 137/24
**per** [1]  128/20
**percent** [1]  158/5
**perfect** [1]  71/8
**perfectly** [1]  29/19
**perhaps** [2]  13/9 163/14
**period** [3]  1/4 30/23 67/3
**permitted** [3]  66/18 68/1 68/2
**persecute** [1]  16/1
**persecuted** [2]  15/22 18/2
**Persinger** [19]  59/14 59/15 59/22 60/8
76/12 76/17 77/13 77/16 79/3 79/7
133/9 133/12 152/13 153/1 153/12
155/23 155/25 157/9 166/23
**Persinger's** [2]  76/4 79/14
**persistent** [3]  140/1 140/5 140/14
**person** [13]  12/7 12/25 45/3 68/12
68/15 69/8 97/8 97/20 128/22 162/4
162/6 163/13 163/23
**personal** [3]  36/10 120/13 131/3
**personally** [5]  14/1 15/20 32/11 62/25
63/14
**personnel** [1]  30/25
**persons** [1]  117/8
**perspective** [9]  6/12 14/3 15/16 15/16
59/24 71/8 75/13 76/23 104/2
**petition** [1]  56/20
**Philip** [1]  66/15
**phone** [12]  9/15 11/16 14/4 16/14 34/3
36/10 37/4 37/8 61/10 62/23 86/2 166/4
**photocopied** [1]  68/16
**photos** [1]  90/20
**phrase** [1]  89/25
**physically** [2]  11/20 54/13
**picks** [1]  97/13
**picky** [1]  16/20
**PICO** [3]  3/4 19/4 19/21
**PICO-PRATS** [1]  3/4
**piece** [5]  31/14 87/4 90/22 91/4 91/5
**place** [22]  16/20 16/20 17/6 18/13
34/15 85/25 101/2 101/3 101/6 112/13
122/25 123/4 125/25 126/1 126/2 129/7
158/2 158/14 159/1 159/10 162/2 162/4
**placed** [1]  108/15
**placing** [1]  15/7
**plainly** [1]  91/13
**plaintiff** [8]  59/11 63/1 63/2 88/19
88/19 94/12 94/19 98/12
**plaintiffs** [75]  1/5 2/2 2/13 2/18 6/10
10/21 14/24 16/5 17/3 18/24 19/4 21/6

**P**

**plaintiffs... [63]** 21/9 21/13 21/18 23/21 23/22 24/25 27/20 34/9 38/8 39/14 40/11 42/3 47/7 48/2 49/10 50/2 52/19 53/2 53/4 54/3 59/1 60/2 70/15 72/8 75/10 81/1 81/6 81/8 82/8 82/12 82/17 82/22 83/3 83/6 83/10 83/14 83/21 84/2 84/6 84/15 85/2 85/22 86/10 87/15 87/25 89/3 93/4 94/3 94/19 94/20 98/4 113/9 118/5 122/5 129/14 144/3 144/8 144/14 155/22 156/22 165/9 167/2 167/2

**plaintiffs' [29]** 4/2 7/11 18/22 24/23 26/15 27/15 27/17 32/15 32/16 44/22 48/20 50/7 51/19 57/16 60/17 71/25 75/21 81/21 83/16 86/15 86/18 86/19 86/20 86/22 87/2 91/10 99/21 122/2 144/1

**plan [4]** 5/18 6/5 18/10 166/22
**planned [1]** 141/8
**planning [1]** 5/7
**play [4]** 5/7 10/10 10/14 21/4
**played [8]** 19/8 21/8 21/17 21/25 22/10 30/23 46/22 86/3
**Playing [1]** 10/12
**pleas [1]** 86/5
**please [6]** 71/24 80/17 99/8 99/11 107/20 147/19
**pleasure [2]** 79/21 79/23
**plug [1]** 160/5
**plug-in [1]** 160/5
**PM [4]** 80/23 80/25 146/11 167/19
**point [41]** 9/18 17/16 27/5 31/3 31/20 32/4 34/9 41/24 42/4 46/10 51/13 51/16 52/7 54/22 60/10 73/9 74/2 74/8 75/11 76/10 77/5 78/24 83/10 84/1 87/3 87/14 91/5 91/15 92/20 94/21 96/11 98/4 101/8 103/16 112/18 122/11 123/23 125/14 143/19 145/4 157/22
**pointed [1]** 11/18
**points [8]** 10/2 10/25 36/7 73/22 88/16 88/18 94/16 156/16
**police [1]** 56/6
**political [1]** 105/13
**poll [3]** 106/17 123/7 129/6
**polling [8]** 122/25 123/4 129/7 159/10 160/22 160/24 162/2 162/4
**popular [1]** 127/25
**populated [1]** 105/11
**populous [1]** 128/23
**portion [3]** 1/4 36/23 56/12
**poses [1]** 68/8
**position [12]** 9/22 11/4 28/3 40/11 41/3 42/6 53/16 57/25 73/3 74/15 79/6 121/19
**positions [2]** 47/23 137/24
**possession [1]** 30/10
**possibility [2]** 7/7 147/3
**possible [5]** 6/20 124/3 128/5 154/13 154/15
**possibly [1]** 93/15
**posted [1]** 6/17
**posture [2]** 53/25 81/20
**potential [5]** 82/8 85/25 90/4 126/10 134/14
**potentially [2]** 38/18 40/9
**PowerPoint [6]** 87/22 135/2 135/23

138/2 138/3 138/24
**practical [1]** 108/22
**practices [1]** 92/16
**PRATS [4]** 3/4 19/4 19/21 20/5
**Prats' [1]** 20/10
**precinct [6]** 68/18 123/15 128/3 128/12 128/14 128/20
**precincts [2]** 128/11 129/2
**preconceived [1]** 137/23
**preexisting [1]** 125/20
**preface [1]** 133/7
**preliminary [1]** 5/11
**prepare [1]** 7/12
**prepared [3]** 26/2 26/6 64/5
**prepares [1]** 69/12
**preparing [1]** 28/21
**presence [3]** 9/20 11/23 15/17
**present [16]** 11/20 12/4 12/11 13/11 22/2 47/4 52/7 64/8 65/6 66/16 72/19 83/18 111/15 118/24 141/15 152/2
**presentation [16]** 81/18 95/17 102/6 113/10 114/17 122/6 125/10 135/2 135/24 139/14 139/25 141/2 142/8 143/20 146/16 151/24
**presented [27]** 18/7 34/7 68/6 72/19 72/24 73/13 83/15 84/15 84/17 84/18 85/5 95/19 113/3 113/23 113/25 114/3 114/5 114/5 117/9 120/2 124/8 131/5 141/12 142/19 147/13 151/4 159/5
**presenting [1]** 18/25
**preserve [2]** 70/17 76/3
**preserving [1]** 76/17
**President [1]** 85/8
**President Trump's [1]** 85/8
**pretrial [3]** 16/9 28/3 122/4
**pretty [1]** 104/6
**prevent [1]** 85/19
**previous [7]** 40/10 69/13 101/9 101/12 109/19 137/20 149/18
**previously [6]** 41/3 64/8 123/18 128/10 131/21 133/16
**PRICE [3]** 2/2 81/2 89/5
**print [1]** 95/9
**printed [1]** 23/6
**printout [2]** 149/23 150/6
**prior [4]** 56/12 129/16 130/3 140/23
**pristine [1]** 66/8
**privacy [1]** 123/13
**privately [1]** 162/21
**privilege [5]** 154/19 156/3 156/4 156/6 156/21
**privileged [4]** 154/21 155/25 156/8 156/22
**privy [1]** 163/25
**probably [8]** 62/2 69/25 90/16 98/12 101/5 108/13 154/5 166/5
**probate [1]** 105/10
**problem [6]** 16/13 32/9 46/5 46/5 143/12 143/15
**problems [7]** 45/2 45/10 62/7 65/16 65/19 66/13 86/23
**procedures [1]** 68/21
**proceed [7]** 6/10 7/24 14/18 17/4 73/12 75/15 81/14
**proceeded [1]** 74/12
**proceeding [5]** 12/3 12/5 31/6 74/17 83/8
**proceedings [19]** 1/10 1/21 14/15 26/4

59/14 60/22 80/24 80/24 99/2 99/7 103/20 133/5 135/21 151/24 152/6 164/16 165/2 167/18 168/9
**process [9]** 18/19 56/22 87/8 101/16 102/7 110/12 110/20 113/24 121/3
**processes [1]** 67/7
**procurement [2]** 87/8 102/6
**produce [5]** 14/20 30/5 30/12 66/22 102/9
**produced [13]** 1/22 26/17 27/2 29/15 29/18 29/20 29/21 29/22 30/24 36/12 36/18 38/3 47/7
**producing [1]** 38/2
**product [1]** 155/20
**production [1]** 27/3
**professional [1]** 17/20
**professionals [3]** 41/15 41/20 41/25
**professor [1]** 139/4
**proffer [13]** 8/4 20/19 20/22 64/12 67/20 67/24 69/23 70/3 70/14 70/16 71/1 71/4 71/7
**Proffered [1]** 26/5
**proffering [1]** 20/17
**proffers [9]** 17/4 17/7 17/14 17/16 45/25 60/20 63/23 63/23 64/23
**profile [1]** 15/5
**program [1]** 90/12
**programmed [2]** 69/7 69/9
**prohibited [1]** 1/7
**projects [3]** 69/12 69/18 87/12
**prong [1]** 97/19
**proof [2]** 53/4 73/25
**proper [6]** 13/12 14/15 49/25 50/3 52/16 78/4
**properly [4]** 65/20 76/3 83/5 92/4
**proposal [1]** 77/1
**propose [2]** 50/19 130/18
**proposed [1]** 28/2
**protected [2]** 94/25 95/5
**Protection [1]** 97/1
**protocols [1]** 62/19
**prove [1]** 74/5
**proven [1]** 68/4
**proves [1]** 96/22
**provide [9]** 5/21 6/6 24/4 25/16 73/23 147/16 156/7 167/2 167/3
**provided [9]** 6/11 6/16 20/18 85/3 87/24 104/16 111/1 111/1 114/4
**provides [4]** 117/7 146/23 147/23 161/20
**providing [5]** 5/20 92/12 105/25 106/5 128/5
**provoking [1]** 17/2
**PTO [1]** 28/6
**public [10]** 77/18 78/5 80/22 80/24 92/13 110/2 110/14 111/6 111/6 144/16
**publicly [2]** 103/6 112/14
**published [1]** 121/5
**pull [4]** 106/22 107/20 128/17 138/7
**purchased [1]** 160/21
**purpose [7]** 43/19 45/8 57/20 58/8 105/21 105/22 153/15
**purposes [6]** 39/24 40/23 41/18 53/21 67/24 78/12
**pursuant [2]** 36/12 36/18
**pursued [1]** 12/19
**pursuing [2]** 11/8 11/10
**put [21]** 10/21 55/15 56/20 56/21 64/13

**P**

put... [16] 79/15 97/24 101/2 101/3 101/5 101/14 109/5 113/10 113/14 122/5 126/2 138/19 151/14 155/22 158/13 159/1

puts [2] 73/2 147/25

putting [5] 36/15 61/21 65/1 90/24 138/4

PX [5] 25/23 25/24 28/1 28/6 28/19

**Q**

QR [15] 68/1 86/17 87/10 95/4 149/10 150/2 150/11 150/12 151/1 163/4 163/11 163/19 163/21 164/5 164/10

qualifications [3] 120/12 121/8 121/10

quantification [1] 147/16

quantify [1] 84/21

quantifying [1] 85/1

quarter [1] 71/19

question [43] 36/17 38/17 39/10 43/7 43/13 43/16 47/24 50/2 51/24 52/8 61/8 61/14 65/8 75/23 76/9 93/18 95/15 106/24 109/3 111/10 115/19 117/23 119/13 121/23 125/6 126/12 133/4 141/4 145/13 145/23 152/4 153/25 155/2 155/11 155/24 156/24 157/11 159/14 161/14 161/16 161/17 164/2 164/6

questioning [2] 156/17 157/3

questions [16] 45/4 55/15 65/8 65/10 66/16 66/19 68/1 93/17 111/5 118/10 132/23 137/6 141/15 146/14 152/8 164/17

quick [7] 5/11 10/10 19/10 73/14 99/22 129/23 130/24

quicker [1] 124/2

quickly [4] 31/11 108/6 108/25 166/17

quietly [1] 140/8

quite [2] 49/7 154/14

quote [1] 113/13

quote-unquote [1] 113/13

quotes [1] 148/1

**R**

race [1] 69/1

RAFFENSPERGER [7] 1/6 14/22 56/15 100/10 100/16 132/2 132/3

raise [7] 60/3 75/19 77/21 99/8 118/12 127/22 129/5

raised [21] 30/19 44/12 45/4 59/7 60/5 85/13 86/9 122/13 123/12 124/17 125/16 125/19 127/24 128/9 129/4 131/10 131/13 131/15 141/9 145/20 167/4

RAMSEY [2] 2/5 36/22

range [3] 16/19 51/20 114/10

rank [1] 118/1

rare [2] 150/19 150/22

rather [4] 12/24 13/5 23/9 32/1

re [5] 65/17 65/19 65/23 66/2 66/13

re-count [5] 65/17 65/19 65/23 66/2 66/13

reach [1] 7/7

reached [8] 23/12 23/22 25/2 27/15 32/17 136/14 136/23 137/18

reaching [1] 48/12

reaction [1] 31/4

read [11] 36/23 52/12 87/12 90/8 95/5

read-many [1] 87/12

readable [4] 149/11 150/8 150/15 150/21

reading [2] 23/10 121/1

reads [3] 68/11 149/11 150/11

ready [1] 81/12

real [6] 10/10 36/17 79/22 99/22 129/23 130/24

realistic [1] 89/13

realize [2] 43/7 125/6

really [36] 6/24 7/4 8/8 11/12 12/24 13/8 30/22 42/12 43/12 43/14 44/23 47/23 47/24 51/1 53/10 53/20 54/21 63/17 79/21 89/11 90/12 95/24 98/21 101/15 104/14 104/20 121/23 125/9 128/7 128/16 128/19 137/21 154/14 154/24 157/22 164/6

realm [1] 46/24

realms [1] 46/25

reason [12] 27/21 28/21 54/2 60/16 74/7 75/9 77/4 78/19 85/18 93/24 106/8 155/22

reasonable [3] 72/4 72/9 89/8

reasons [5] 31/4 41/22 87/8 97/4 122/22

rebut [2] 55/11 55/17

rebuttal [2] 81/4 152/9

recall [28] 5/13 30/5 56/19 56/20 56/21 111/21 114/9 116/5 116/6 118/14 118/18 120/12 122/22 127/16 131/18 131/25 132/7 133/14 133/18 136/8 136/13 143/19 143/24 151/17 152/8 152/24 163/5 164/20

receipt [1] 150/6

receive [3] 64/5 82/11 86/2

received [5] 7/20 45/8 45/9 149/23 152/15

recent [1] 58/11

recently [4] 14/13 103/9 103/12 112/16

recipient [2] 34/22 34/24

reciting [1] 57/19

recognition [2] 163/14 164/11

recollection [13] 34/4 35/21 110/11 116/14 130/2 133/15 134/11 136/14 148/5 152/20 153/10 157/20 163/13

recommend [6] 142/3 163/4 163/12 163/21 164/5 164/7

recommendation [11] 101/22 105/24 119/9 124/12 134/17 137/21 148/22 149/7 149/14 150/4 164/12

recommendations [8] 87/11 105/25 106/5 113/4 131/24 136/16 163/5 164/8

recommended [6] 92/17 136/17 136/24 141/3 141/9 163/22

Recommending [1] 141/2

reconciled [1] 43/1

record [31] 17/7 19/17 26/13 27/6 28/14 28/18 31/12 34/9 34/13 52/22 58/6 64/12 64/13 65/1 65/2 65/22 67/21 69/23 69/25 70/6 70/13 70/19 71/8 73/7 73/18 78/5 78/16 94/14 99/12 107/12 156/12

recorded [1] 70/1

recording [1] 61/16

recordings [3] 63/7 63/9 63/12

records [2] 47/10 66/25

recounting [1] 123/22

recover [1] 4/12

recruit [1] 90/10

redirect [1] 134/2

reduce [1] 85/20

reference [2] 8/21 39/23

referenced [2] 70/21 82/17

referencing [1] 1/5 70/6

referred [4] 120/8 134/8 137/1 161/25

referring [6] 19/24 103/4 115/3 119/24 149/15 149/18

refers [1] 146/23

reflect [2] 22/21 108/9

reflecting [1] 134/18

reflects [1] 22/14

refresh [1] 116/13

refreshed [2] 133/15 152/20

refuse [1] 5/24

refute [1] 72/20

regarding [8] 76/4 76/11 84/2 95/17 109/20 110/6 116/3 133/20

regardless [2] 149/22 150/5

regards [1] 101/25

regional [1] 43/1

registration [2] 21/21 84/17

regular [1] 41/25

regulatory [1] 93/20

reiterate [1] 157/2

rejected [1] 71/2

Rel [1] 57/2

related [11] 9/1 60/9 63/19 63/23 64/24 75/2 79/6 80/5 82/15 82/16 83/12

relates [1] 47/24

relating [4] 8/25 12/1 92/3 157/12

relation [1] 156/25

relationship [6] 54/11 54/12 54/15 56/2 56/16 137/20

relative [7] 24/11 30/21 31/5 46/24 47/16 48/3 52/14

relatively [2] 23/24 104/25

relevance [7] 43/2 51/14 112/22 113/8 113/9 154/15 154/18

relevant [12] 17/1 72/19 72/22 113/17 114/12 114/12 114/21 119/7 122/4 155/17 155/21 155/22

reliability [3] 42/5 47/1 52/1

reliable [1] 42/8

reliance [2] 16/10 73/22

relied [1] 54/8

relief [7] 10/19 11/3 11/8 92/23 94/9 96/18 97/19

rely [6] 32/1 55/23 92/1 114/13 121/25 145/24

relying [2] 12/1 55/22

remain [1] 59/22

remaining [2] 33/5 94/19

remark [1] 32/11

remedial [1] 43/1

remediating [1] 62/6

remedy [2] 83/1 86/13

remember [4] 30/2 111/23 127/11 156/5

remind [4] 18/12 91/2 99/22 100/12

remote [1] 68/7

rendered [1] 93/10

repeat [1] 155/2

repeated [1] 11/20

repeatedly [1] 11/18

rephrase [1] 131/7

**R**

**replaced [1]** 86/7
**replacement [1]** 101/13
**reply [1]** 50/15
**report [37]** 33/10 44/24 46/17 46/25 69/14 70/21 102/5 102/8 102/9 102/18 102/20 105/23 107/15 107/24 109/22 130/3 130/8 130/11 130/18 130/25 131/9 131/10 131/19 131/24 132/5 132/13 132/14 132/20 134/24 135/4 135/9 135/9 135/14 135/15 145/2 151/10 165/12
**reporter [6]** 1/3 1/6 1/23 111/15 168/6 168/17
**reporting [4]** 13/5 43/5 43/6 79/14
**reports [9]** 28/21 29/8 29/15 29/16 33/11 46/15 46/21 47/6 92/12
**represent [1]** 14/21
**representation [1]** 36/11
**representative [1]** 21/20
**representatives [1]** 105/12
**representing [1]** 12/6
**reputation [1]** 15/7
**request [8]** 11/15 11/21 29/25 47/16 56/12 61/2 98/6 98/9
**requested [1]** 37/22
**requesting [1]** 9/8
**require [4]** 81/23 86/13 148/23 155/5
**required [8]** 6/7 16/7 66/21 84/4 94/16 97/20 122/25 150/17
**requirement [5]** 81/24 95/3 96/12 96/14 158/14
**requires [3]** 50/3 148/13 160/15
**reserve [3]** 81/3 134/2 152/8
**reside [1]** 68/17
**resolution [1]** 79/6
**resolve [2]** 59/23 142/4
**resolved [3]** 39/18 77/12 165/11
**resolving [1]** 59/13
**resorted [1]** 73/25
**resources [2]** 94/15 94/17
**respect [10]** 53/8 54/10 55/21 56/23 57/11 66/15 71/25 72/13 92/7 162/24
**respectfully [4]** 11/6 50/1 51/13 57/10
**respond [8]** 50/20 50/21 55/19 85/7 88/15 118/25 119/2 122/7
**responding [1]** 70/14
**response [6]** 30/13 41/1 45/21 111/9 144/24 157/11
**responsibilities [1]** 107/10
**responsibility [1]** 41/10
**responsible [2]** 41/11 120/25
**responsive [1]** 161/24
**rest [13]** 5/7 59/11 59/11 59/13 59/18 77/2 77/9 79/8 81/2 81/7 81/8 117/21 167/11
**resting [1]** 75/10
**restricted [1]** 1/3
**restroom [1]** 146/6
**rests [1]** 81/9
**result [4]** 11/19 82/14 84/12 86/24
**resulted [1]** 86/5
**results [1]** 68/25
**retained [3]** 66/25 67/3 156/9
**retire [1]** 15/10
**retirement [1]** 15/6
**retiring [2]** 15/9 15/11

**reveal [1]** 134/21
**revealed [1]** 68/5
**review [7]** 91/15 92/8 92/11 98/19 149/16 149/19 167/4
**reviewed [3]** 31/22 46/20 150/21
**reviewing [1]** 116/13
**reviews [1]** 150/15
**revisit [2]** 54/22 64/25
**Rhonda [1]** 95/24
**RICARDO [4]** 2/19 2/22 11/16 65/6
**rid [1]** 86/17
**right [179]**
**rights [2]** 110/23 121/2
**rise [10]** 46/8 47/18 71/20 146/10 167/16
**risk [10]** 15/7 17/2 78/8 84/23 85/20 129/5 129/7 143/21 143/21 143/23
**risks [4]** 83/3 84/20 84/21 86/14
**RMR [3]** 1/23 168/6 168/16
**roadmap [4]** 91/3 91/4 91/6 91/6
**ROBBINS [1]** 3/6
**ROBERT [1]** 2/16 2/17
**Roberts [2]** 42/15 43/6
**rogue [1]** 143/5
**role [10]** 14/16 30/23 46/21 101/23 101/25 102/1 107/1 107/4 153/8 154/5
**rolled [1]** 95/25
**room [4]** 14/9 80/20 165/18 166/5
**ROSS [1]** 3/6
**roughly [1]** 133/14
**routinely [1]** 16/19
**rule [18]** 4/10 68/24 70/17 74/16 76/17 77/9 77/10 77/10 81/12 81/19 88/19 88/20 94/19 97/25 98/12 121/21 145/6 156/2
**Rule 103 [1]** 70/17
**Rule 502 [1]** 156/2
**Rule 52 [5]** 76/17 77/9 77/10 81/12 97/25
**ruled [1]** 119/4
**rules [4]** 42/4 63/13 81/12 144/20
**ruling [6]** 24/15 44/1 65/1 74/3 88/13 98/18
**run [4]** 7/5 7/12 58/23 154/6
**running [3]** 43/23 106/9 106/21
**rural [2]** 105/9 105/10
**Russell [3]** 19/11 19/16 20/13
**RUSSO [1]** 3/3
**RYAN [7]** 4/16 69/13 80/13 80/16 98/25 99/13 99/16

**S**

**safe [105]** 100/23 100/25 101/1 101/7 101/8 101/15 101/23 101/25 102/2 102/9 102/17 103/25 104/3 105/1 105/18 106/6 107/1 107/13 107/16 107/24 108/1 108/10 108/16 108/22 108/23 109/4 109/6 109/8 109/17 109/21 109/24 110/1 110/2 110/8 110/15 112/12 113/1 113/4 113/10 113/14 113/15 113/17 114/6 114/24 115/20 116/18 117/12 119/8 120/2 120/15 122/8 124/11 125/2 125/19 127/21 129/18 129/21 129/25 130/6 130/16 130/20 130/25 131/4 131/9 131/19 131/22 131/24 134/8 134/20 134/24 136/1 136/19 137/5 137/9 139/14 139/22 140/1 140/20 140/23

**safe [1]** 141/2 141/23 142/1 142/3 142/19 144/4 144/17 145/2 147/15 148/6 148/10 148/25 149/8 151/4 151/10 151/14 151/24 158/12 159/3 159/5 163/4 163/11 163/6 163/21
**safeguard [1]** 54/8
**said [31]** 27/17 27/20 32/20 34/25 39/13 50/11 51/2 55/21 59/6 59/16 60/14 73/6 74/22 75/25 76/21 78/13 85/17 89/6 90/9 94/4 99/3 100/14 105/25 133/22 136/15 142/3 143/14 143/15 161/9 164/10 168/10
**same [37]** 26/11 33/9 46/16 49/14 56/11 58/24 72/2 79/14 88/7 88/9 96/21 114/16 119/22 122/20 123/19 125/22 125/24 126/6 128/25 144/1 146/5 152/17 152/22 152/25 153/16 157/25 158/2 160/6 160/19 161/23 162/12 162/12 162/15 162/19 163/1 163/2 163/2
**sanction [1]** 63/17
**satisfied [1]** 96/14
**satisfy [1]** 96/15
**Saturday [2]** 7/6 60/13
**saving [1]** 79/23
**saw [12]** 63/5 89/13 90/5 90/20 90/20 92/1 92/5 92/14 92/18 114/1 159/24 163/9
**say [58]** 5/25 7/4 11/22 14/20 15/8 16/4 17/18 26/24 29/18 31/3 34/22 36/15 43/18 46/25 48/6 49/10 49/18 50/23 52/18 53/6 54/1 54/4 54/4 54/7 55/4 57/16 57/18 60/19 64/24 70/12 70/25 74/6 78/4 78/7 98/2 100/11 109/15 113/22 114/16 119/2 119/17 119/19 119/22 121/5 123/17 127/16 136/18 140/22 140/25 142/24 143/21 145/1 156/19 157/23 161/5 162/19 163/8 166/13
**saying [26]** 9/18 20/8 27/12 29/20 32/8 35/6 39/7 39/14 39/16 43/12 49/16 52/15 54/3 55/9 59/19 61/22 61/22 74/23 78/4 78/12 78/19 122/22 124/15 125/2 145/22 157/5
**says [10]** 10/17 38/15 49/24 54/16 91/16 108/1 120/25 140/7 150/7 156/4
**scanned [3]** 83/5 148/24 149/19
**scanner [10]** 68/11 68/18 82/18 82/22 83/5 95/7 95/9 95/10 149/20 150/11
**scanners [8]** 10/19 10/22 11/5 68/15 68/16 68/18 69/8 69/10
**scanning [1]** 43/4
**schedule [2]** 7/3 60/5
**scheduled [1]** 59/21
**schedules [1]** 7/1
**SCHEINMAN [1]** 2/7
**scheme [2]** 149/10 150/3
**SCHOENBERG [4]** 2/3 81/2 89/5 89/17
**scholarly [1]** 121/6
**scientific [1]** 147/24
**scope [8]** 10/9 11/2 14/15 65/11 90/14 108/23 151/3 157/1
**Scott [7]** 33/25 37/12 38/9 39/2 39/5 39/6 39/9
**scrap [1]** 129/24
**scratch [1]** 105/16
**screen [5]** 37/10 81/16 138/6 151/18

**S**

screen... [1] 160/19
sealed [2] 80/23 133/5
seat [1] 71/24
seated [1] 63/5
SEB [1] 91/19
second [16] 8/19 10/5 15/5 24/10 26/22 27/9 62/21 65/18 103/19 106/23 117/16 138/1 140/7 142/20 147/23 148/19
Secretary [51] 14/22 18/14 26/3 26/7 28/15 28/17 28/20 29/21 41/12 44/14 44/23 45/9 46/23 47/19 51/3 51/6 55/2 55/10 56/15 56/20 56/21 58/8 66/14 69/14 93/17 99/23 100/6 100/7 100/8 100/10 100/15 100/17 101/1 101/3 101/14 103/7 105/3 107/6 111/1 112/15 132/1 132/2 132/3 136/8 136/11 136/13 136/14 136/20 137/14 137/19 137/19
Secretary's [8] 47/3 100/3 100/8 103/9 109/4 126/3 152/18 152/22
section [3] 56/25 105/9 151/13
Section 1983 [1] 56/25
secure [2] 85/10 101/2
securing [1] 54/13
security [18] 40/23 41/11 41/15 41/20 42/7 46/24 58/11 58/12 62/18 68/5 68/5 69/3 69/17 108/3 147/2 147/9 147/24 151/21
see [61] 13/15 13/19 14/21 14/23 14/23 24/15 34/22 35/19 36/15 36/20 42/21 44/8 45/23 49/5 50/24 60/12 75/9 75/13 76/24 77/4 89/19 103/12 107/24 108/7 108/15 110/25 117/19 135/1 139/2 139/9 139/10 139/17 139/19 140/1 140/4 140/7 140/11 140/13 140/17 142/9 142/12 142/16 142/22 146/20 146/22 146/25 147/7 147/11 147/21 148/2 148/9 148/15 148/19 149/4 149/5 149/6 149/25 151/14 151/15 166/9 167/15
seek [1] 53/2
seeking [7] 11/4 48/21 53/4 56/24 93/4 93/5 96/19
seem [1] 52/19
seemed [1] 48/2
seems [6] 13/12 15/18 25/15 30/20 31/2 52/20
seen [8] 34/21 35/13 102/15 103/2 103/9 112/7 112/16 126/8
selected [1] 158/12
selecting [1] 87/9
selection [5] 21/19 22/2 122/3 122/6 124/9
selections [2] 21/4 21/10
self [3] 27/7 31/15 31/19
self-marked [2] 31/15 31/19
self-noted [1] 27/7
Senate [2] 105/6 105/7
sending [1] 61/23
senior [2] 1/12 117/7
sense [2] 102/7 164/6
sent [3] 38/23 38/24 43/1
sentence [6] 53/1 140/7 148/20 149/15 149/18 149/21
separate [6] 60/10 135/7 135/8 135/12 160/5 162/17

separated [1] 65/20
separately [1] 14/10
separation [1] 98/8
September [1] 21/22
September 1st [1] 21/22
serious [1] 58/12
serve [4] 136/12 136/25 137/22 152/3
served [8] 107/13 116/24 120/20 136/1 137/15 148/23 149/8 151/23
server [26] 42/25 68/14 68/19 69/6 69/12 86/4 91/3 133/20 133/22 152/14 152/15 152/16 152/16 152/23 153/17 154/1 154/2 154/9 155/4 155/6 155/15 156/25 157/10 157/19 157/20 157/25
servers [2] 69/6 69/17
services [4] 117/2 117/7 120/24 147/5
serving [1] 38/1
session [7] 101/5 101/9 104/6 104/7 104/18 109/1 130/4
sessions [1] 109/20
set [8] 98/20 102/3 110/9 123/8 155/13 160/10 162/13 168/12
setting [2] 51/15 109/4
setup [1] 162/8
seven [2] 6/9 68/20
several [1] 33/9
severe [2] 87/18 93/23
Shamos [1] 23/2
SHANNON [4] 1/23 80/1 168/6 168/16
share [2] 25/12 87/22
shared [2] 110/7 137/2
she [25] 9/8 14/10 37/15 49/25 56/19 110/16 116/1 116/19 117/4 117/4 119/4 119/5 119/5 120/15 120/16 120/19 120/25 121/11 129/13 129/13 129/14 129/16 129/18 129/20 132/2
she's [1] 121/5
shepherding [1] 107/1
Sheriff [1] 57/3
Sheriff Monroe [1] 57/3
shield [4] 156/3 156/20 156/20 156/20
Shiloh [1] 117/6
short [1] 17/11
shortcut [2] 112/23 145/1
should [23] 6/25 17/9 17/15 23/23 25/24 28/8 32/1 40/12 47/18 48/3 48/7 59/19 59/20 66/25 88/9 88/15 91/12 93/11 97/12 97/13 97/25 127/16 159/3
shouldn't [1] 52/4
show [5] 19/1 56/16 77/14 77/15 128/8
showed [1] 56/13
showing [2] 38/23 39/24
shown [9] 27/7 65/14 77/16 83/6 83/21 87/16 91/16 96/22 97/4
shows [7] 86/7 86/12 86/23 91/13 94/14 97/23 128/6
shred [1] 89/19
shut [1] 62/9
side [12] 5/20 35/15 50/8 80/20 96/4 96/4 96/5 97/5 97/5 107/16 166/15 166/16
sides [1] 110/24
signed [1] 83/23
significance [1] 45/11
significant [2] 125/9 125/11
significantly [1] 7/21
signs [1] 162/17
similar [6] 69/16 85/7 110/20 110/23

he [2] 14/1/13
simple [2] 90/12 164/4
simplify [1] 43/18 155/12
simply [18] 8/13 11/16 11/24 17/14 20/9 25/19 49/24 52/22 58/2 58/9 62/2 68/14 69/8 70/16 71/1 83/25 123/23 139/22
since [5] 6/2 25/11 49/3 59/14 120/19
sincere [1] 15/3
single [4] 89/19 90/15 93/18 128/5
sir [9] 37/3 37/5 134/25 137/12 142/5 143/16 148/7 149/1 150/4
sit [6] 51/22 63/25 80/18 140/19 141/25 161/5
sitting [2] 6/21 80/3
situated [1] 28/1
situation [3] 84/10 123/6 158/23
six [2] 31/9 68/17
skips [1] 51/12
Skoglund [4] 58/10 84/21 87/7 91/1
sleeves [1] 22/22
Slide [2] 147/19 148/17
Slide 13 [1] 147/19
Slide 15 [1] 148/17
slides [2] 139/10 139/10
slight [2] 93/22 93/23
slightly [1] 36/13
slow [1] 31/16
Smith [1] 29/6
smoothly [2] 7/5 7/13
snapshot [1] 92/7
so [231]
social [2] 13/16 61/23
software [5] 69/4 91/3 148/1 148/12 148/14
software-independent [2] 148/1 148/12
solely [4] 12/1 29/5 38/9 48/24
Solutions' [2] 26/2 26/6
solve [1] 97/21
some [62] 6/13 6/15 8/3 8/5 8/10 8/20 12/17 13/2 13/9 13/14 14/23 16/11 26/16 27/21 30/19 31/5 38/8 38/11 45/4 51/9 52/16 52/16 52/21 56/7 57/18 57/24 59/7 62/7 63/18 64/9 64/9 66/16 72/3 72/8 73/6 75/17 77/24 79/18 86/13 86/14 90/10 102/20 104/22 105/3 105/4 105/10 110/4 113/16 114/21 117/19 126/23 128/14 128/25 133/20 134/12 157/18 157/21 162/20 163/10 163/11 165/3 166/17
somebody [11] 8/8 8/16 8/21 11/25 12/25 17/13 18/16 53/22 53/23 54/16 60/23
somehow [1] 48/11
someone [10] 27/2 54/18 90/9 96/9 136/16 136/23 137/22 150/15 154/6 157/22
something [36] 6/24 8/22 10/10 13/5 17/8 30/22 33/14 54/16 60/19 60/22 70/5 70/24 71/21 75/19 85/6 85/19 87/1 90/15 91/12 94/24 95/20 101/1 104/13 108/24 108/25 113/25 125/8 125/11 128/15 136/18 144/3 149/19 157/10 162/15 165/15 167/3
sometimes [2] 74/11 123/8
somewhat [2] 53/24 129/1
somewhere [1] 34/9

**S**

**soon [2]** 7/2 78/17
**sorry [27]** 18/2 22/6 28/12 31/16 31/18
33/21 35/9 46/4 50/13 66/3 74/6 77/20
80/3 113/2 115/1 116/9 120/7 133/21
138/5 140/25 143/7 143/25 150/14
152/4 152/10 165/5 165/11
**sort [11]** 7/14 8/10 31/2 35/15 59/22
63/18 73/7 93/20 107/5 114/5 154/21
**sorts [2]** 52/15 121/9
**sought [1]** 56/19
**sounds [1]** 111/21
**SOUTHWEST [1]** 1/24
**space [1]** 119/6
**SPARKS [1]** 2/9
**speak [4]** 19/13 66/5 131/3 134/19
**speaking [1]** 104/25
**specialist [1]** 145/19
**specific [5]** 53/3 56/23 107/1 127/22
142/1
**specifically [6]** 59/3 75/5 127/13 163/6
164/10 164/11
**speculation [2]** 83/25 84/14
**speculative [4]** 84/3 89/12 89/13 91/11
**spell [1]** 99/12
**spirit [1]** 7/8
**spoke [2]** 121/20 152/20
**sponsored [1]** 165/20
**spread [1]** 69/5
**spring [1]** 133/16
**springtime [1]** 101/5
**SR [1]** 2/23
**staff [7]** 102/3 107/13 107/14 111/1
117/4 121/13 143/6
**stage [1]** 81/23
**stake [3]** 96/12 96/15 104/15
**stakeholders [2]** 101/16 101/18
**standard [6]** 97/20 147/14 147/24
148/4 148/7 148/11
**Standards [1]** 56/5
**standing [19]** 44/12 82/4 88/17 88/18
88/21 89/9 94/7 94/10 94/12 94/18
94/22 94/23 95/18 95/19 95/22 96/5
96/9 97/21 98/8
**stands [1]** 101/2
**Stark [7]** 66/15 66/19 66/24 67/2 67/5
70/21 86/16
**Stark's [2]** 67/22 68/21
**start [7]** 5/13 5/17 5/25 6/17 61/15 88/6
167/13
**started [2]** 50/20 100/14
**starting [3]** 51/13 151/3 166/22
**state [95]** 3/2 5/13 26/3 26/7 28/17
29/21 30/2 30/4 30/11 30/13 30/20
30/25 34/18 40/23 41/12 42/5 44/22
48/17 48/22 49/24 51/2 51/5 51/7 51/18
52/7 52/20 54/8 54/12 54/19 54/23 55/2
55/10 55/11 55/23 55/25 56/20 57/12
58/9 59/10 64/17 67/1 67/4 69/14 74/4
82/14 83/12 85/5 85/6 85/15 85/16
85/23 86/2 87/3 87/10 87/18 88/17
90/11 91/12 91/15 91/21 91/24 92/2
92/4 93/13 93/15 93/19 94/8 96/4 97/6
97/7 97/13 97/16 97/24 98/23 98/25
99/12 100/20 105/3 111/1 113/12
116/20 119/12 121/19 121/23 123/23
124/8 136/8 136/11 136/13 147/2 147/2

**State's [27]** 13/23 14/3 28/15 28/20
30/25 42/7 44/14 45/9 46/23 47/19
50/25 51/3 66/14 74/15 78/15 88/11
91/17 93/17 94/16 99/23 101/4 101/14
103/7 107/6 112/15 136/14 137/20
**State's called [1]** 13/23
**State's contention [1]** 50/25
**State's election [1]** 42/7
**State's office [1]** 45/9
**State's perspective [1]** 14/3
**stated [2]** 41/9 168/11
**statement [2]** 40/16 54/25
**statements [6]** 28/22 42/6 44/14 44/20
63/5 66/12
**states [14]** 1/1 1/12 1/24 28/25 29/6
34/19 58/17 117/1 120/23 127/4 129/16
168/3 168/7 168/17
**statewide [1]** 150/17 150/23
**station [1]** 42/25
**status [3]** 41/2 41/14 41/25
**stay [2]** 15/18 59/19
**staying [5]** 49/13 49/19 49/21 51/10
73/8
**STENOGRAPHY [1]** 1/21
**step [2]** 51/12 91/22
**stepping [1]** 125/9
**Sterling [14]** 23/2 40/6 40/8 40/17
40/19 40/20 40/21 42/15 43/8 43/13
87/8 91/18 91/20 97/7
**sticks [1]** 92/20
**still [14]** 5/4 16/4 57/11 80/14 88/10
98/12 98/21 139/4 139/6 142/7 146/14
148/17 166/22 167/17
**Stone [4]** 21/19 21/19 21/25 23/1
**stood [1]** 101/14
**stop [2]** 78/11 92/12
**store [1]** 106/18
**strategy [1]** 153/6
**stretch [1]** 166/14
**stricken [1]** 156/12
**strong [2]** 148/1 148/11
**stuck [1]** 48/23
**students [1]** 15/14
**study [2]** 104/3 108/2
**studying [1]** 109/18
**stuff [1]** 158/10
**style [2]** 128/20 134/15
**subject [5]** 56/5 133/5 150/19 155/19
164/20
**submissions [1]** 24/12
**submit [6]** 57/10 82/2 83/6 83/21 84/1
87/14
**submitted [7]** 27/19 48/12 84/2 153/2
153/3 153/9 153/12
**subpoena [6]** 29/24 30/6 36/12 36/18
37/21 51/20
**subpoenaed [1]** 14/23
**subset [1]** 159/15
**substance [5]** 28/9 29/2 39/22 49/2
50/10
**substantial [1]** 53/21
**substantive [2]** 26/12 27/9
**successful [1]** 147/4
**successive [1]** 47/3
**such [9]** 46/11 48/22 51/9 56/4 73/7
79/23 125/10 140/8 155/5
**sudden [1]** 41/17

**suddenly [2]** 74/24 119/24
**sufficient [4]** 37/24 42/5 69/3 93/21
**sufficiently [1]** 85/7
**suggest [1]** 72/8
**suggested [4]** 14/25 17/4 72/15 73/4
**suggesting [6]** 32/19 70/15 75/21
120/9 137/14 139/21
**suggestions [1]** 130/9
**SullivanStrickler [4]** 35/4 35/15 36/13
90/21
**summarizes [1]** 139/18
**summary [13]** 29/11 65/12 71/12 83/15
84/4 88/20 92/24 93/21 95/17 95/20
95/25 98/15 125/4
**summer [1]** 153/1
**Sunday [4]** 75/2 76/24 103/13 103/15
**superintendents [1]** 55/23
**support [4]** 65/22 66/13 72/10 73/17
**supported [1]** 58/5
**suppose [1]** 114/16
**supposed [1]** 92/9
**supposedly [1]** 33/24
**sure [30]** 16/15 18/7 31/11 41/16 41/19
47/20 51/13 55/8 55/20 61/4 63/6 64/11
70/10 70/10 90/16 95/11 101/20 104/14
104/21 107/8 107/11 112/22 114/12
146/4 149/18 157/24 158/4 158/5
164/15 166/8
**surprise [3]** 153/11 153/15 153/21
**suspected [1]** 10/18
**sustained [1]** 151/7
**swap [1]** 90/12
**sword [2]** 156/3 156/19
**sworn [2]** 99/10 99/17
**system [71]** 10/24 42/8 58/13 62/6 62/7
65/16 66/22 68/9 69/2 69/13 69/22
84/18 85/2 86/1 89/6 91/23 97/3 101/12
101/12 101/17 101/19 102/4 104/1
104/15 105/4 105/19 106/2 108/2 108/5
108/6 108/18 109/18 109/20 110/5
110/9 114/4 119/10 119/23 122/20
125/20 125/21 125/21 125/22 125/25
126/1 126/2 126/6 128/10 128/17
140/21 140/24 141/8 142/3 143/12
143/15 143/22 147/15 147/25 148/5
148/11 149/9 149/11 158/13 161/3
162/11 162/12 162/19 162/25 163/1
163/23 164/7
**systems [18]** 84/19 86/13 108/16
108/20 108/21 108/23 109/6 109/13
110/6 110/10 116/4 135/3 142/20
142/21 147/20 148/18 148/25 159/4

**T**

**tab [8]** 19/5 21/15 21/23 22/6 22/7 22/7
25/25 26/1
**Tab 1 [2]** 22/7 22/7
**Tab 6 [1]** 19/5
**Tab 7 [1]** 21/15
**Tab 8 [2]** 25/25 26/1
**Tab 9 [1]** 21/23
**table [1]** 162/17
**tabled [1]** 30/4
**tabulated [1]** 66/22
**tabulation [3]** 150/12 150/25 151/1
**tactile [1]** 160/7
**take [24]** 7/12 8/6 24/16 26/10 32/6
33/17 34/12 43/19 43/22 59/6 59/9

**T**

take... **[13]** 62/10 80/8 80/8 80/9 90/13 95/2 96/7 104/25 107/8 121/19 141/18 144/18 166/11

taken **[13]** 11/4 19/2 21/5 21/11 22/3 29/3 46/9 48/1 71/23 87/11 92/13 146/11 152/14

takes **[3]** 47/12 89/18 90/18

taking **[5]** 16/6 42/6 47/17 53/15 79/6

talk **[9]** 75/14 76/21 79/19 84/22 94/6 103/24 110/25 111/16 131/5

talked **[9]** 14/14 26/15 75/25 83/15 84/10 85/1 87/7 116/2 137/11

talking **[13]** 9/12 42/13 45/16 71/18 112/21 113/16 119/21 119/22 120/1 137/5 148/10 150/20 159/9

talks **[3]** 143/3 149/16 158/18

tallied **[1]** 148/25

tampered **[1]** 148/14

tampering **[2]** 67/13 147/4

taping **[1]** 61/16

task **[1]** 101/7

tasked **[2]** 103/25 105/18

tasks **[1]** 102/2

taught **[1]** 89/16

TAYLOR **[1]** 3/9

teaches **[1]** 146/24

team **[1]** 76/21

tech **[6]** 43/1 45/4 136/15 136/24 137/18 139/5

technical **[6]** 26/2 26/6 83/24 104/10 117/1 120/22

technically **[2]** 67/6 135/12

technology **[7]** 16/21 121/2 160/16 161/20 161/21 163/9 163/10

TED **[1]** 1/24

tell **[12]** 5/24 18/5 31/7 31/8 37/13 43/2 49/16 50/17 51/22 84/22

ten **[6]** 17/10 23/21 23/25 24/19 69/5 135/1

ten minutes **[1]** 17/10

tension **[1]** 17/21

term **[1]** 90/25

terms **[14]** 50/24 60/5 62/18 81/25 82/8 82/18 83/5 83/8 83/14 84/14 84/23 86/10 120/12 125/2

Tessier **[1]** 57/3

test **[4]** 93/13 93/24 94/8 96/3

testified **[32]** 28/16 29/9 29/11 34/25 40/22 82/12 85/24 89/16 91/2 91/4 91/19 91/20 92/8 92/11 92/14 99/17 99/20 105/17 107/13 107/25 111/9 122/19 124/10 131/21 133/16 153/5 157/8 157/11 158/8 158/11 158/24 159/2

testify **[14]** 35/7 41/6 51/21 74/5 89/3 89/4 89/5 89/5 93/19 119/5 119/14 119/17 131/2 155/24

testifying **[6]** 35/4 35/17 112/25 117/22 119/3 119/21

testimony **[55]** 30/3 31/25 32/1 36/24 41/9 44/6 47/17 48/3 49/19 52/1 55/9 63/23 64/9 64/12 65/13 68/3 68/23 72/5 72/11 72/13 72/16 72/21 73/6 74/17 75/6 76/3 82/21 84/25 86/4 86/17 87/10 92/19 95/2 95/24 107/9 113/11 114/24 117/19 118/23 119/3 119/25 121/25

127/3 137/5 146/23 144/2 144/14 145/5 145/10 145/17 145/22 145/25 164/23 166/11 168/12

testing **[5]** 62/6 62/7 62/10 69/4 86/20

text **[14]** 35/8 36/20 37/1 37/7 37/8 37/10 37/12 56/10 150/10 150/13 150/16 150/21 150/23 159/19

textbook **[1]** 146/23

texts **[4]** 33/24 34/20 35/14 37/10

than **[31]** 5/25 12/24 13/5 14/20 20/12 20/25 23/9 32/2 33/14 35/25 53/25 59/12 59/13 67/7 74/1 79/25 82/24 89/17 96/8 96/18 96/24 118/16 124/5 125/11 139/18 157/23 159/8 160/25 161/3 161/21 162/5

thank **[50]** 7/25 9/11 17/17 17/25 19/9 21/14 22/5 22/8 23/18 23/19 24/17 25/18 43/21 44/9 44/18 45/14 45/18 57/17 61/6 63/20 64/4 64/22 70/4 70/11 70/18 71/14 79/24 80/21 87/20 87/21 88/1 93/25 94/2 97/25 98/1 98/5 98/10 122/17 138/21 138/24 151/8 153/22 158/6 161/18 164/13 164/24 164/25 165/1 166/3 167/14

that **[1065]**

that's **[26]** 5/10 7/4 8/2 9/7 21/2 22/11 32/9 37/17 37/18 37/23 54/2 62/15 71/9 93/1 117/14 121/22 122/10 131/5 135/11 144/20 156/25 165/6 165/6 165/24 166/2 166/14

theft **[1]** 147/4

their **[67]** 5/21 16/11 17/3 17/23 24/8 24/19 41/13 41/20 42/6 50/8 55/12 55/16 55/24 59/21 60/9 72/19 72/21 74/16 74/16 74/17 74/18 75/10 75/14 76/3 76/16 76/17 76/25 79/7 81/8 82/8 82/19 82/20 82/21 82/23 83/1 83/8 83/18 83/19 83/22 83/23 89/11 91/10 97/1 97/2 101/20 101/21 104/16 104/22 104/22 105/22 105/22 107/17 108/11 110/6 110/18 110/18 111/7 113/4 116/3 120/13 121/25 124/12 132/10 132/12 137/21 144/25 145/25

theirs **[1]** 79/10

them **[66]** 5/4 5/8 5/19 5/21 5/25 6/4 6/5 6/25 14/24 15/1 20/15 23/10 24/1 24/4 25/12 25/13 27/4 27/12 27/20 27/25 29/20 29/22 29/25 34/7 34/21 36/18 41/17 42/1 43/10 45/3 45/10 47/10 47/11 50/20 56/12 64/5 64/11 69/19 72/10 72/10 78/5 79/24 81/22 85/25 88/2 89/7 90/22 102/6 102/7 103/9 103/12 108/14 110/19 111/11 115/8 120/8 124/17 124/25 131/5 137/2 137/11 141/19 144/12 161/5 162/20 162/23

themselves **[3]** 29/16 32/2 38/13

then **[99]** 7/2 9/21 12/20 12/21 14/17 14/18 17/16 18/10 18/23 19/21 20/2 23/4 24/20 26/12 27/9 28/24 33/6 33/19 34/11 36/13 37/25 39/3 39/15 39/18 43/3 45/22 48/14 48/23 49/10 49/18 52/2 53/6 53/24 54/25 54/25 55/1 56/3 56/5 56/25 62/8 64/1 77/3 78/16 79/4 79/11 79/18 80/24 83/11 90/24 94/7 96/16 100/15 100/16 101/1 101/21 104/17 105/3 105/6 105/7 105/14 105/23 105/23 110/14 110/18 111/1

111/4 117/5 143/5 116/1 117/5 120/9 121/22 122/7 123/9 123/15 124/6 128/9 128/24 135/14 135/16 136/8 137/1 137/14 137/22 141/18 142/14 143/18 144/11 148/12 148/24 150/2 156/10 158/19 164/7 165/11 165/12 166/23 167/11 167/15

then-Secretary **[3]** 101/1 136/8 137/14

theory **[1]** 86/16

there **[175]**

there's **[13]** 8/20 37/10 49/18 88/2 88/10 104/5 106/18 106/18 123/6 124/22 125/11 160/12 162/17

thereby **[2]** 80/22 167/18

therefore **[3]** 7/10 47/11 76/6

therein **[1]** 168/11

these **[56]** 8/5 17/5 19/18 20/19 22/24 27/2 27/6 27/7 27/21 28/1 28/9 28/21 29/8 30/24 33/23 34/3 34/16 36/9 36/20 37/7 47/22 49/7 49/24 51/9 52/8 52/9 52/15 52/20 53/14 54/24 55/10 55/11 55/14 55/17 56/8 56/13 56/17 58/3 58/4 58/6 58/20 72/14 73/6 74/5 97/15 97/23 103/4 103/6 112/5 118/21 118/24 119/14 120/9 121/9 121/21 139/13

they **[245]**

they're **[2]** 41/4 47/5

thick **[1]** 25/15

thing **[21]** 7/9 22/12 41/8 63/3 73/14 73/16 88/9 88/11 93/4 102/19 110/23 114/17 117/3 123/17 127/24 131/2 136/25 148/17 152/11 159/16 162/23

things **[33]** 5/3 6/13 6/15 6/17 7/1 7/4 7/12 8/2 8/10 16/8 17/22 34/5 74/4 74/8 74/25 78/4 79/18 84/12 97/23 99/21 101/19 104/9 104/9 110/5 111/2 113/16 119/3 123/6 126/20 130/10 134/7 141/18 159/20

think **[184]**

thinking **[1]** 17/15

thinks **[1]** 17/13

third **[9]** 12/25 19/10 19/14 27/9 65/21 67/25 85/20 140/13 142/18

Thirteen **[1]** 69/11

this **[273]**

thoroughly **[1]** 108/1

those **[62]** 20/14 20/20 23/25 24/2 24/15 24/16 24/20 24/20 24/24 25/3 25/3 27/19 27/24 29/11 31/11 32/21 33/12 33/17 34/1 34/13 35/14 35/17 38/19 38/23 39/9 44/15 47/8 47/12 50/6 67/2 82/3 82/4 82/12 82/22 83/4 84/9 84/21 92/1 92/5 108/12 109/15 109/16 111/5 111/8 111/12 111/16 117/17 122/15 125/15 128/25 130/20 130/22 132/9 132/15 134/12 143/11 145/25 157/14 159/19 160/11 162/22 163/3

though **[4]** 24/14 60/4 76/11 80/19

thought **[18]** 6/2 8/16 9/1 12/21 20/25 45/10 48/11 60/9 72/3 76/2 104/11 115/4 115/7 134/15 136/20 137/8 156/14 166/23

thoughts **[1]** 110/18

thread **[3]** 37/1 37/11 37/12

threat **[10]** 68/8 83/18 83/22 91/10 91/13 91/14 140/5 140/14 140/21 142/15

Threats **[1]** 140/2

**T**

**three [15]**  5/20 6/9 7/13 17/7 31/9 33/6
63/23 64/23 67/2 68/10 87/24 88/15
121/12 132/5 132/7
**three days [1]**  5/20
**three-day [1]**  7/13
**threshold [5]**  91/9 91/11 91/12 140/16
141/11
**threw [1]**  5/3
**throated [1]**  137/25
**through [34]**  8/4 18/17 22/16 23/23
24/1 24/4 24/22 24/25 26/15 29/5 31/5
34/19 36/24 39/9 47/13 52/11 52/20
66/11 79/2 87/17 88/11 88/25 104/24
114/20 116/12 116/16 116/16 121/22
124/1 125/15 130/8 166/17 167/6 167/8
**throughout [5]**  38/15 54/7 113/11
124/25 151/24
**thus [1]**  57/11
**tie [1]**  157/14
**time [48]**  7/11 7/15 11/7 11/7 11/10
13/14 15/2 15/21 18/11 18/23 19/1
22/13 23/11 24/16 28/15 29/13 30/23
31/5 41/18 42/10 46/22 63/25 64/10
64/25 79/14 81/3 81/10 82/11 89/17
98/3 98/7 98/9 104/9 104/13 111/22
116/23 131/23 132/3 132/4 133/25
139/7 152/8 152/22 152/25 156/15
157/25 166/13 167/11
**times [4]**  17/24 60/14 104/18 118/21
**timing [1]**  152/17
**title [1]**  100/1
**titled [1]**  109/22
**today [14]**  6/18 13/23 18/9 49/16 59/9
62/8 89/22 93/1 137/5 154/16 159/7
161/20 164/24 165/14
**together [3]**  26/10 29/3 101/15
**told [4]**  11/7 15/18 94/5 147/15
**tolerable [2]**  147/5 147/6
**tomorrow [4]**  165/19 165/23 166/10
167/15
**too [13]**  5/3 25/12 39/19 41/21 46/1
72/17 79/19 80/18 91/21 98/19 124/19
163/1 166/5
**took [11]**  18/13 19/21 48/19 49/25
55/25 100/16 112/13 141/16 141/23
152/23 153/17
**tool [1]**  162/25
**top [2]**  94/4 142/6
**topic [2]**  118/18 132/23
**torpedo [1]**  57/25
**TOTENBERG [1]**  1/11
**touch [1]**  82/4
**towards [5]**  112/25 117/20 119/8
119/11 122/1
**traceability [2]**  82/7 82/14
**trail [1]**  148/13
**train [1]**  106/17
**trained [1]**  123/7
**training [4]**  56/5 117/1 120/21 120/22
**transcribed [3]**  111/12 111/14 112/1
**transcript [17]**  1/1 1/5 1/7 1/8 1/10
1/22 20/6 20/11 70/2 112/14 116/8
116/13 121/1 125/14 135/17 144/5
168/9
**transcription [1]**  112/12
**transcripts [3]**  1/2 22/20 25/15

**transparency [1]**  108/3
**transpired [1]**  77/15
**treated [1]**  96/25
**treating [1]**  162/16
**tremendous [1]**  90/13
**trial [13]**  1/10 5/13 5/17 6/10 6/15 7/20
7/21 7/22 43/25 61/19 65/11 95/18
98/18
**trifle [1]**  94/25
**trouble [2]**  37/15 42/11
**true [9]**  41/8 44/13 44/24 45/11 51/11
74/12 102/17 118/5 168/9
**Trump's [1]**  85/8
**trust [1]**  86/14
**trustworthiness [1]**  53/12
**trustworthy [2]**  53/14 58/6
**truth [22]**  27/11 27/18 27/21 40/7 40/11
40/12 43/12 43/17 43/18 44/13 44/16
44/19 112/24 117/15 118/3 119/11
144/6 144/7 144/12 144/19 144/23
145/3
**truthful [5]**  49/2 65/15 65/18 66/7
66/11
**try [6]**  8/9 9/21 56/14 101/15 125/13
162/20
**trying [18]**  6/19 7/15 7/23 8/10 10/21
20/9 32/4 38/21 38/25 49/9 50/21 51/6
52/20 121/8 124/16 156/23 165/8
167/10
**turn [2]**  41/17 94/18
**turned [2]**  25/6 30/11
**TURNER [1]**  1/24
**Turning [1]**  95/14
**turns [2]**  42/1 56/3
**Tweets [1]**  61/21
**Twelve [1]**  69/9
**twice [2]**  10/22 18/6
**two [29]**  5/14 5/20 5/23 6/3 7/13 10/25
11/3 11/23 26/12 31/9 34/5 34/13 37/10
49/15 61/8 64/11 66/16 66/24 68/7 82/2
86/5 88/2 88/17 109/16 117/13 153/2
156/16 156/19 157/14
**type [11]**  13/16 61/23 106/2 114/10
123/1 133/20 140/21 142/25 143/12
143/15 143/21
**types [6]**  108/15 109/6 109/13 110/10
127/13 160/12
**TYSON [4]**  3/7 4/11 88/16 94/11
**Tyson's [1]**  77/8

**U**

**U.S [1]**  58/11
**ultimate [1]**  55/18
**ultimately [3]**  47/24 55/2 86/25
**unauthenticated [1]**  26/14
**uncontrolled [2]**  90/25 91/7
**under [32]**  7/16 13/3 13/11 34/25 47/8
49/24 55/24 56/21 56/22 56/25 57/9
58/3 67/3 67/4 70/17 75/1 81/12 81/19
83/7 83/9 85/13 85/14 86/15 88/24 89/2
92/3 93/6 94/18 97/16 100/13 121/20
145/5
**underlying [5]**  39/5 40/7 40/11 42/16
44/24
**understand [29]**  8/7 8/8 10/11 14/7
16/3 16/22 24/7 46/14 48/20 49/9 60/8
61/9 61/13 61/15 61/18 61/20 62/14
62/24 63/11 64/25 72/25 74/2 76/2

16/16 114/10 124/22 125/1 137/9 138/3
**understanding [17]**  7/1 32/24 36/9
40/10 46/21 62/1 62/15 73/15 76/15
76/18 108/9 109/23 154/18 156/7
157/17 163/16 167/1
**understands [1]**  16/15
**understood [7]**  7/6 8/3 12/23 77/23
78/2 78/6 78/25
**undetected [1]**  147/4
**undisputed [1]**  90/19
**unequivocally [1]**  41/9
**uneven [1]**  14/13
**unfair [1]**  15/25
**unfolded [1]**  10/1
**unfortunately [2]**  15/15 15/18
**unique [4]**  56/10 117/20 126/23 128/1
**uniquely [1]**  129/1
**unit [1]**  162/6
**UNITED [9]**  1/1 1/12 1/24 29/6 117/1
120/23 168/3 168/7 168/17
**unless [4]**  14/22 17/13 44/23 113/6
**unlike [1]**  144/5
**unquote [1]**  113/13
**unrelated [1]**  56/7
**unresponsive [1]**  90/2
**until [11]**  13/25 14/1 77/10 77/12 78/5
88/8 88/12 98/18 100/15 104/7 126/1
**unusual [3]**  42/6 85/12 85/14
**up [54]**  8/22 11/23 17/5 19/13 20/7
20/24 21/4 21/9 21/18 22/1 24/16 25/7
30/16 34/6 45/3 46/12 61/5 66/16 74/5
75/9 77/24 80/5 88/16 90/9 95/25
101/14 102/3 105/5 106/22 107/20
109/1 109/4 110/9 122/5 123/7 123/8
123/18 126/10 128/6 128/8 128/17
130/24 137/16 138/4 138/6 138/7
138/19 144/25 151/14 153/25 157/14
159/16 162/13 167/7
**uphold [1]**  55/25
**upon [2]**  68/6 140/10
**uproar [1]**  17/2
**upsetting [2]**  16/3 16/4
**upside [1]**  7/2
**us [23]**  5/3 5/17 5/24 6/11 6/16 6/22
7/20 10/2 26/23 26/25 29/22 31/2 42/11
49/16 87/23 90/18 144/15 154/13
154/25 156/10 156/10 165/22 167/3
**use [26]**  16/15 16/20 29/5 87/17 91/23
93/11 93/16 93/22 94/16 97/8 97/14
97/20 105/22 106/14 117/17 117/20
118/6 118/8 122/20 156/8 158/20
158/22 158/25 162/25 163/22 164/12
**used [13]**  10/1 11/13 56/11 93/11
99/23 123/9 123/19 123/19 156/19
156/20 158/17 162/14 163/14
**useful [1]**  54/21
**using [8]**  56/2 86/15 123/14 144/12
150/10 161/2 161/2 163/12
**usually [4]**  104/6 128/20 159/10 162/7

**V**

**value [1]**  45/7
**variety [2]**  115/14 124/12
**various [5]**  26/11 84/7 97/4 108/10
151/5
**vary [1]**  24/8
**veered [1]**  119/25
**vendor [3]**  163/13 163/17 163/24

**V**

**vendors [8]** 102/4 108/19 108/19 110/6 110/10 110/12 114/4 163/9
**verbatim [1]** 125/16
**verifying [1]** 38/3
**version [2]** 47/5 69/24
**versions [1]** 27/8
**versus [1]** 54/4
**very [22]** 7/16 12/19 16/20 17/20 18/7 42/6 43/20 68/25 71/11 80/2 85/7 110/11 123/7 127/25 130/3 145/24 153/16 157/15 164/4 164/24 165/13 166/19
**via [1]** 55/1
**video [2]** 22/11 22/22
**videos [4]** 5/8 18/24 90/20 92/1
**videotape [2]** 10/12 17/15
**videotaped [5]** 19/7 21/7 21/16 21/24 22/9
**view [10]** 75/17 77/2 77/8 78/15 78/15 79/9 81/25 96/7 149/17 157/19
**views [7]** 111/7 131/1 132/10 132/12 132/15 137/1 137/1
**VINCENT [1]** 3/3
**violates [1]** 96/25
**violation [1]** 63/12
**virtual [1]** 165/21
**virtue [1]** 120/13
**visible [1]** 162/3
**visibly [1]** 90/12
**Visually [1]** 29/14
**voice [3]** 19/11 19/15 101/20
**voices [2]** 104/14 104/22
**VOLUME [1]** 1/10
**volunteer [2]** 136/25 143/6
**volunteered [1]** 157/9
**volunteers [1]** 106/17
**VON [1]** 2/10
**vote [33]** 67/13 83/11 83/17 84/3 84/11 85/21 87/16 87/19 89/18 91/10 95/3 95/4 95/8 96/23 96/24 96/24 97/1 97/2 118/16 120/22 125/22 126/7 126/14 126/15 126/24 127/6 128/1 128/22 131/18 131/23 159/3 159/7 162/20
**voted [5]** 126/6 131/25 132/5 132/7 132/9
**voter [14]** 85/10 108/3 123/13 123/14 123/16 123/19 123/19 127/2 128/6 128/7 129/6 149/12 160/4 161/2
**voter's [1]** 149/17
**voters [33]** 86/14 87/1 97/8 97/18 105/15 106/13 117/20 118/17 121/4 122/20 125/22 125/23 126/6 126/7 126/15 127/7 127/7 128/21 148/24 159/3 159/7 159/8 159/14 159/15 159/17 159/18 159/18 161/3 161/21 161/22 162/13 162/16 162/22
**voters' [2]** 108/4 148/13
**votes [16]** 66/22 67/6 67/9 67/12 67/12 82/19 82/20 83/19 89/15 89/17 90/4 90/13 91/7 95/6 95/11 130/10
**voting [72]** 10/24 58/13 66/22 68/9 68/12 69/8 69/22 82/9 84/19 89/14 90/6 91/17 91/22 93/10 96/8 97/9 97/21 97/22 101/11 101/12 101/17 101/19 102/4 104/1 105/4 106/2 108/2 108/18 108/18 109/18 109/20 110/4 110/5

110/9 110/23 114/4 116/4 117/21 121/2 121/3 123/1 123/4 126/22 126/23 126/24 127/25 127/25 128/2 128/4 128/8 128/22 128/24 134/12 134/16 135/3 140/20 140/24 141/8 147/14 147/20 147/25 148/5 148/11 148/18 160/10 160/15 162/5 162/6 162/19 163/13 163/23 164/7
**vs [1]** 1/5
**vulnerabilities [1]** 89/20
**vulnerability [1]** 51/17
**vulnerable [1]** 73/2

**W**

**wait [3]** 10/5 13/25 88/12
**waive [1]** 50/22
**waived [5]** 28/3 28/7 76/19 156/4 156/5
**walk [2]** 90/6 121/22
**want [55]** 5/6 7/11 7/19 10/23 12/22 13/4 15/11 16/14 17/18 21/3 23/14 25/11 27/21 36/23 50/14 50/17 52/14 55/19 55/21 58/22 61/9 63/14 63/19 70/24 78/3 78/3 78/9 78/11 79/3 79/4 79/19 79/24 80/17 88/6 88/15 90/8 95/21 99/21 107/7 107/8 113/22 114/13 115/15 116/12 116/16 119/22 127/6 127/8 127/8 129/19 133/4 145/11 146/4 154/6 156/8
**wanted [28]** 11/24 12/16 27/6 27/16 50/8 60/22 60/25 71/7 75/19 75/19 77/21 94/3 98/2 101/19 104/11 104/14 104/20 105/8 106/8 106/19 130/2 133/6 136/22 137/2 137/24 141/19 167/5 167/6
**wanting [1]** 47/20
**wants [7]** 9/17 13/9 16/8 38/19 47/4 138/19 161/11
**warned [1]** 142/25
**was [368]**
**wasn't [8]** 26/18 35/15 51/24 70/25 89/16 117/23 119/19 126/18
**waste [1]** 42/10
**wasted [1]** 11/10
**Watson [9]** 64/24 65/7 65/10 65/14 65/14 65/18 66/6 66/6 85/23
**Watson's [1]** 65/23
**way [26]** 6/20 8/18 11/5 12/18 13/17 15/15 24/22 49/23 52/22 68/24 71/22 74/11 75/17 78/7 79/15 90/12 93/3 109/3 111/12 126/24 128/11 144/13 145/4 150/9 153/14 163/20
**we [356]**
**we'll [23]** 6/17 6/18 7/18 7/24 8/5 16/25 25/20 33/17 43/18 43/23 45/22 46/1 59/6 70/4 76/16 78/16 78/17 80/7 80/10 82/3 166/9 167/13 167/15
**we're [48]** 6/2 6/12 6/16 6/18 6/19 7/23 8/4 8/10 9/3 10/7 11/3 12/3 16/12 21/4 22/9 42/13 44/13 47/15 50/21 51/16 53/24 56/2 59/8 71/17 71/18 74/23 75/14 77/21 79/2 91/11 91/11 93/4 112/24 115/2 121/24 122/7 146/4 146/7 156/20 165/10 165/14 166/22
**we've [10]** 5/19 9/9 10/2 38/12 41/2 59/21 97/22 118/21 147/20 165/8
**website [3]** 103/7 103/10 112/15
**week [1]** 152/21

**weekend [3]** 5/22 7/10 7/21
**weekends [2]** 7/13 7/14
**WEIGEL [1]** 3/8
**weigh [6]** 81/24 81/24 83/12 93/14 97/11 124/23
**weighed [1]** 141/19
**weighs [1]** 97/22
**weight [1]** 97/12
**weighty [1]** 98/20
**WEINHARDT [2]** 2/6 23/20
**WELCH [3]** 1/23 168/6 168/16
**welcome [2]** 47/5 166/4
**well [90]** 6/23 6/23 7/25 8/10 11/14 12/21 14/11 15/20 16/18 17/12 18/5 28/14 28/18 30/15 32/6 34/21 36/17 39/18 41/8 42/18 43/3 44/17 45/1 45/22 46/20 46/25 47/22 53/20 54/15 59/5 60/24 63/6 64/6 65/5 71/7 71/25 73/10 74/11 75/18 77/25 80/7 81/8 89/13 89/25 91/18 95/24 98/11 98/17 100/18 104/5 105/11 105/16 108/18 108/24 109/16 111/6 112/1 113/5 113/7 113/8 114/11 116/12 117/18 117/23 118/4 119/15 119/19 119/20 122/4 122/24 123/7 127/3 127/5 129/23 130/24 143/13 145/7 147/2 149/21 150/5 153/20 154/20 156/16 159/1 159/9 160/12 163/3 164/6 165/14 166/25
**well-being [1]** 147/2
**well-trained [1]** 123/7
**wellness [1]** 117/7
**Wendell [3]** 21/19 21/24 23/1
**Wenke [3]** 130/14 135/23 136/1
**went [5]** 6/7 76/23 105/4 118/18 130/8
**were [136]** 5/4 5/5 5/7 12/11 12/12 12/12 14/23 15/14 18/24 24/11 26/14 26/17 27/7 27/7 28/9 29/8 29/15 29/18 29/21 30/7 30/9 30/10 31/22 33/5 33/9 34/5 34/13 35/14 35/16 36/12 38/18 38/24 41/5 42/25 44/14 44/15 45/10 45/16 45/16 46/13 46/16 48/2 48/3 48/11 48/13 48/13 52/19 53/14 53/15 53/18 54/3 56/11 56/13 58/3 58/4 58/21 59/7 60/9 62/6 62/7 65/11 65/16 65/19 66/8 67/8 67/25 67/25 69/2 75/1 75/3 75/18 80/4 80/22 83/3 84/6 84/9 86/24 92/13 92/16 94/6 100/6 100/12 101/11 101/18 101/18 103/4 104/25 107/10 108/12 108/15 108/20 108/20 108/21 110/11 111/8 111/12 111/14 111/24 113/16 113/19 113/21 113/22 113/23 114/7 115/14 116/22 117/9 117/25 118/21 119/20 119/24 120/17 121/9 121/9 122/13 122/22 122/22 124/3 124/16 125/7 125/16 127/20 132/15 132/25 135/15 137/1 141/20 163/25 165/7 167/2 167/2 167/3 167/10 167/11 167/18
**weren't [2]** 34/4 74/7
**what [202]**
**whatever [8]** 6/19 27/11 33/4 55/5 70/7 105/4 112/24 149/9
**wheelchair [1]** 162/9
**when [57]** 6/21 8/4 11/25 12/4 14/16 15/13 29/18 37/15 49/25 54/13 60/1 63/18 66/11 77/8 79/1 80/23 84/25 86/2 92/2 95/8 95/8 95/9 95/10 98/21 100/1 100/3 100/6 100/8 100/12 100/13

**W**

**when... [27]** 103/12 117/9 117/18 119/9 119/24 122/1 129/4 129/25 131/23 133/14 133/16 139/13 145/23 147/13 148/4 150/20 150/25 152/18 152/20 152/22 153/16 154/9 154/10 154/11 155/6 161/6 165/17

**whenever [1]** 77/22

**where [39]** 10/11 19/20 23/21 33/9 38/13 38/16 38/20 39/14 42/18 46/11 55/12 56/10 59/2 84/11 95/4 109/22 110/14 111/6 116/1 120/19 123/7 123/13 125/15 126/6 126/7 128/8 128/11 128/17 128/22 128/25 129/7 134/13 140/5 140/7 141/14 142/2 147/24 148/9 150/19

**whereof [1]** 168/12

**Whereupon [1]** 99/15

**whether [21]** 36/18 44/13 45/11 50/3 51/22 53/22 57/20 57/22 57/23 58/20 72/2 76/25 83/17 85/2 85/18 91/9 91/12 140/23 141/8 149/22 150/5

**which [65]** 5/18 5/25 6/5 11/15 14/14 15/8 17/23 19/18 22/14 22/21 22/21 23/5 23/12 25/1 25/9 25/10 26/16 27/8 27/14 27/16 30/11 34/12 36/24 43/25 44/2 44/12 44/24 48/2 49/11 52/7 53/3 57/10 57/10 58/10 60/10 64/10 67/22 67/23 68/6 78/13 83/9 93/3 93/3 93/6 94/18 97/14 100/12 107/24 109/1 115/1 115/10 128/7 133/6 136/25 138/24 143/12 144/6 144/14 147/3 156/9 156/25 159/25 162/12 165/9 167/3

**whichever [1]** 38/2

**while [11]** 8/6 8/10 8/15 9/16 9/18 11/17 36/2 47/2 61/21 61/24 77/7

**who [70]** 12/7 14/9 14/10 15/10 16/8 18/12 27/4 35/8 39/2 45/3 45/5 45/5 63/4 79/23 80/7 87/9 91/6 93/19 96/23 96/24 100/6 100/8 106/2 106/9 106/17 106/20 110/3 110/24 115/23 116/5 116/14 116/19 116/22 118/7 118/7 118/24 119/20 119/20 119/22 120/11 120/12 121/13 121/15 121/20 123/16 129/12 136/9 136/16 136/18 137/10 137/11 137/15 137/22 145/9 148/22 149/8 151/23 159/7 159/8 159/18 159/18 161/2 161/22 162/6

**whole [7]** 7/8 13/3 15/1 31/4 48/13 117/3 155/13

**wholesale [2]** 72/12 72/13

**wholly [1]** 68/22

**why [30]** 13/25 16/11 17/12 23/9 49/9 54/2 60/3 60/11 60/16 69/21 73/24 74/7 74/19 74/22 74/23 75/9 89/21 96/13 96/13 104/2 105/16 106/8 122/11 122/22 134/17 138/15 155/23 156/9 156/14 160/13

**wife [1]** 13/22

**wild [1]** 52/15

**will [48]** 1/3 5/25 6/3 6/4 7/5 8/6 15/21 18/3 19/3 20/20 23/10 27/1 31/7 32/6 43/18 47/11 52/11 52/18 55/1 59/22 61/15 64/24 70/1 70/8 72/10 74/9 77/11 77/14 77/15 80/8 80/16 83/1 85/2 87/23 88/23 89/7 89/8 90/12 97/21 98/16

114/22 119/13 125/10 142/7 158/19 165/21 166/7 166/11

**Willard [7]** 49/13 49/19 49/21 51/7 51/10 51/23 73/8

**WILLIAM [3]** 2/13 2/18 81/7

**willing [3]** 34/8 36/1 137/22

**wise [2]** 29/14

**wish [2]** 57/16 60/5

**withdraw [3]** 34/8 120/9 134/21

**within [9]** 10/3 10/8 11/1 27/12 30/10 38/22 65/11 132/17 145/25

**without [10]** 69/3 72/5 76/3 92/25 144/7 144/21 145/13 154/24 155/18 162/6

**witness [30]** 4/3 4/15 13/23 18/8 27/4 35/3 37/7 38/1 50/3 51/20 51/25 56/6 59/10 59/21 65/7 76/16 76/18 77/4 80/10 93/18 93/19 98/23 99/10 145/13 145/14 152/9 161/14 161/15 164/18 166/10

**witnesses [25]** 5/14 5/18 5/20 5/21 5/22 5/23 6/3 6/20 7/8 8/5 48/8 48/9 52/9 53/7 53/15 55/10 55/14 56/8 56/19 64/9 72/14 72/22 74/5 93/15 93/16

**witnesses' [2]** 72/6 74/1

**won't [5]** 46/7 55/4 74/3 113/18 117/3

**word [2]** 157/19 158/19

**words [1]** 10/23

**work [28]** 6/19 7/23 9/16 9/17 9/21 11/17 12/10 13/5 13/22 16/19 29/12 29/17 35/14 35/16 36/2 42/25 61/11 62/3 79/21 79/24 90/13 99/23 110/1 119/4 119/6 133/20 144/21 155/20

**worked [6]** 100/1 100/18 100/20 108/18 110/5 120/19

**workers [3]** 106/17 123/7 129/6

**working [9]** 14/10 56/14 79/25 100/3 100/13 120/25 121/1 141/25 153/6

**workings [1]** 41/19

**works [1]** 150/9

**worse [1]** 58/20

**would [158]** 7/11 8/18 9/15 9/19 9/20 12/22 13/10 13/17 13/18 14/17 15/10 17/5 17/6 18/1 19/1 19/6 22/1 22/14 23/6 23/11 23/22 24/9 24/20 24/23 28/7 33/11 40/12 44/21 46/25 48/6 48/17 48/18 49/1 50/20 51/11 52/13 54/1 54/6 55/6 57/9 57/18 59/16 61/5 61/13 61/15 62/19 63/12 64/13 65/14 65/21 66/19 67/5 67/8 67/11 67/14 67/18 67/20 68/20 68/23 69/15 69/16 69/20 69/24 69/25 70/2 70/20 71/4 72/22 73/16 74/5 74/10 75/10 75/15 76/21 78/4 78/4 80/18 80/18 81/11 81/23 82/2 83/6 83/21 84/1 86/14 86/18 86/19 86/20 86/21 87/1 87/14 87/22 90/13 90/13 90/14 93/8 93/11 94/15 96/9 98/6 98/9 98/10 98/23 99/12 101/13 102/19 103/16 109/15 112/19 114/16 116/13 117/13 118/1 119/1 123/4 123/17 123/21 126/8 134/18 134/23 136/7 136/10 136/16 136/20 138/2 140/21 141/9 142/7 142/11 142/21 143/2 143/2 143/10 143/12 143/15 148/6 149/9 150/22 153/11 154/15 154/17 155/5 155/16 156/6 157/2 158/16 159/10 161/15 162/13 162/14 162/19 163/8 163/17 163/18 163/23 165/22 166/12

**would-be [2]** 142/11 142/21

**wouldn't [9]** 7/7 7/7 15/4 63/18 107/7 129/7 153/14 153/15 161/1

**write [1]** 87/12

**write-once [1]** 87/12

**writes [3]** 140/14 147/24 148/11

**written [2]** 70/2 92/12

**wrong [4]** 9/6 15/1 90/16 136/20

**Y**

166/13

**Yeah [12]** 22/13 26/9 35/12 35/21 38/7 39/21 40/5 59/20 106/23 138/12 159/12 167/7

**years [5]** 12/8 18/17 120/20 139/18 156/10

**yes [133]** 12/23 20/16 20/23 22/19 23/8 23/18 24/13 25/8 32/23 34/17 36/8 37/3 37/5 39/17 48/10 55/8 62/17 63/14 64/21 66/3 76/8 76/13 76/15 81/1 87/24 98/25 99/25 100/2 100/22 100/24 101/24 102/10 102/13 102/16 102/19 102/24 103/3 103/5 103/8 103/11 107/18 108/8 108/12 109/10 109/12 109/25 111/13 111/25 112/2 112/4 112/10 112/15 112/17 114/2 114/2 114/18 115/22 116/15 117/10 125/24 126/8 129/11 129/19 129/22 130/7 130/13 130/15 130/17 130/19 130/21 131/12 131/14 131/17 132/8 132/11 132/16 132/19 132/22 133/1 133/23 134/25 135/20 135/25 136/3 136/7 137/13 139/3 139/8 139/12 139/16 139/20 140/3 140/12 140/18 141/3 142/10 142/13 142/17 142/23 143/6 143/9 143/17 146/17 146/21 147/1 147/8 147/12 147/22 148/3 148/16 148/21 149/2 149/6 150/1 150/13 151/12 151/16 151/19 151/22 152/20 157/13 158/1 158/3 158/20 158/23 159/5 160/23 163/4 164/19 164/21 164/21 164/22 166/16

**yesterday [11]** 5/4 10/17 18/25 19/5 24/14 32/17 58/10 60/4 60/6 60/14 86/16

**yet [1]** 147/4

**you [548]**

**you'll [7]** 21/6 21/11 21/22 22/3 22/4 117/19 135/1

**you're [22]** 8/4 8/20 9/13 10/13 12/1 14/16 16/19 19/13 20/7 20/17 31/16 35/6 36/15 45/2 45/2 49/16 59/10 59/18 73/15 73/15 139/21 150/20

**you've [3]** 12/4 125/7 127/20

**you-all [4]** 59/6 127/10 165/3 167/1

**young [1]** 15/19

**your [254]**

**Z**

**Zoom [1]** 166/7