# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, ET AL., <br> **Plaintiffs,** <br><br> v. <br><br> BRAD RAFFENSPERGER, ET AL., <br> **Defendants.** | Civil Action No. 1:17-cv-02989-AT |

## PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY

Defendants offer *FDA v. Alliance for Hippocratic Medicine*, No. 23-235 (U.S. June 13, 2024), as supplemental authority and urge this Court to find Plaintiffs lack standing under it for two reasons. First, Defendants explain that *Hippocratic Medicine* bars "general complaints about the way in which government goes about its business," (Dkt. 1850 at 2), and requires causation that "screens out plaintiffs who were not injured by the defendant's action," (*id*. at 3). Based on these holdings, Defendants argue "none of the Plaintiffs in this case have established an injury that is personal to them or that is causally connected to any action of Defendants." (*Id*. at 3.) Second, Defendants argue that *Hippocratic Medicine* is inconsistent with Plaintiffs' invocation of organizational standing by Coalition for Good Governance ("CGG"). Defendants not only have misread *Hippocratic Medicine* but also are misrepresenting Plaintiffs' standing injuries. Defendants' latest attempt to defeat

Plaintiffs' standing should—like all their previous efforts—be rejected.

As a threshold matter, this Court and the Eleventh Circuit already have found that Plaintiffs have established Article III standing. *See* Dkt. 1705 at 71-108 (finding at the summary judgment stage that CGG has organizational standing and therefore standing was established for all Plaintiffs under the One Plaintiff Rule); *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022) (holding, on appeal from preliminary injunction, that CGG and its members have standing because CGG established organizational "standing to sue for the injunctive relief sought below").

Setting aside that the Eleventh Circuit's holding, in particular, is binding law of the case, *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1291 (11th Cir. 2005), the unanimous decision in *Hippocratic Medicine* broke no new ground that requires any earlier standing rulings to be revised; to the contrary, *Hippocratic Medicine* merely applied the "well-known and firmly rooted" "fundamentals of standing" to the uniquely weak standing theories at issue there. Slip op. at 7. The decision did not alter the well-established principles of constitutional law that this Court and the Eleventh Circuit have already applied to find standing here, and the purported injuries that failed to satisfy Article III in *Hippocratic Medicine* are readily distinguishable from the harms shown at trial both to be threatened to, and to have been previously suffered by, the Individual and Coalition Plaintiffs.

I. **Unlike in *Hippocratic Medicine*, Plaintiffs Here Proved Up Standing with Specific Facts and Evidence at Trial**

State Defendants' effort to analogize Plaintiffs' injury to that alleged by the plaintiff doctors in *Hippocratic Medicine*, *see* Dkt. 1850 at 3, misstates (as State Defendants have throughout these proceedings) the nature of the injuries-in-fact that are threatened by State Defendants' intended enforcement of state laws and rules requiring the use of Dominion ImageCast X-Prime Touchscreen Ballot Marking Devices ("BMDs") by all in-person voters. As the evidence at trial demonstrated, State Defendants' requirement that in-person voters in Georgia must use BMDs has inflicted and will continue to inflict concrete and individualized harms on the Individual Plaintiffs and CGG Members every time they vote. "The Supreme Court has 'long recognized that a person's right to vote is 'individual and personal in nature' and 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' as they have alleged a concrete and particularized injury." *Ga. Ass'n of Latino Elected Offs., Inc. ("GALEO") v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022) (quoting *Gill v. Whitford*, 585 U.S. 48, 65-66 (2018)). The record at trial established that the BMD requirement for in-person voting has actually inflicted, and imminently will inflict with certainty, the following concrete and particularized injuries on the Individual Plaintiffs and CGG Members:

- Burdening the right to vote by requiring the Individual Plaintiffs and CGG Members to ratify the completeness and accuracy of a computer's restatement of their personal voting selections at least twice: first on the BMD's summary screen and again on the BMD's printed ballot card. Trial Tr. Vol. 2 at 50:5-15, 56:4-57:2; Trial Tr. Vol. 8A at 155:6-8. And this burden imposes a difficult cognitive/memory test not substantially different from a prohibited literacy test because each Plaintiff is required to conduct each review without the benefit of all the selections and other information that were originally available to them on the original ballot display, since both the summary screen and the printed ballot card (purport to) include only each voter's personal selections, not the original context and complete detail (e.g., the full list of candidates) first presented to the voter by the BMD. Trial Tr. Vol. 1 at 142:9-22; Trial Tr. Vol. 2 at 18:9-20, 29:16-30:14, 34:6-21; Trial Tr. Vol. 5A at 12:12-20; Trial Tr. Vol. 8A at 154:8-155:14, 165:1-16. Unlike with other forms of voting, such as hand-marked paper ballots, each Plaintiff has nothing other than their own personal memory to determine if a selection is wrong or a contest is missing or different from the selection they previously made. Forcing voters to verify and ratify the output of computer BMDs imposes a unique standing injury on each Plaintiff by subjecting them to an individually

experienced, personalized burden in voting—a burden that is especially challenging for older voters like some who testified at trial. Trial Tr. Vol. 1 at 88:15-89:25, 142:23-143:15, 191:21-192:3; Trial Tr. Vol. 2 at 18:9-20:6; Trial Tr. Vol. 8A at 174:8-175:2. Not only must voters bear this burden to ensure the correct recording of their own vote choices, but they must also bear it because of Defendants' deliberate decision to foist part of their own responsibility for detecting election security problems onto the shoulders of every individual voter.

- Even if the Individual Plaintiffs and CGG Members somehow could confirm the selections on the BMD screen and in the human-readable text of their BMD-printed ballot—and even putting aside the severe burdens associated with those unnecessary efforts—each Plaintiff still cannot know whether the printed BMD ballot accurately records *their personal voice* as captured by *their own individual selections* because the portion of the ballot that is actually tabulated as the vote is encoded in a QR code, which Plaintiffs cannot read. *E.g.* Trial Tr. Vol. 1 at 72:16-25, 142:9-22, 201:3-9, 207:1-6; Trial Tr. Vol. 2 at 12:12-15, 16:21-17:13, 19:20-23, 34:4-21, 41:3-17, 50:9-15, 56:4-17; Trial Tr. Vol. 5A at 12:1-7, 12:12-19; Trial Tr. Vol. 8A at 154:4-155:14, 167:18-168:17. This burdening of the right to vote is yet another injury imposed on each Plaintiff.

- Individual Plaintiffs and CGG Members who wish to try to avoid the foregoing harms by means of absentee voting will be forced to instead incur different burdens such as being required to vote before election day and thus without the benefit of critical, late-breaking information regarding the election; forgoing civic engagement at a physical polling place; enduring uncertainty as to whether receipt of their ballot by election officials will be deemed timely and counted; and struggling to even obtain an absentee ballot in the first place. Trial Tr. Vol. 1 at 146:8-148:12, 148:19-25, 149:1-6, 200:25-202:23; Trial Tr. Vol. 2 at 40:23-41:2, 42:15-1949:20-23, 51:9-23; Trial Tr. Vol. 8A at 153:21-154:3.  Even if Plaintiffs manage to overcome all the hurdles with absentee voting and cast a ballot that way, they still may not avoid the harms of the BMD system since their ballot may be damaged by mail ballot processing equipment such as envelope slitters, or might arrive through the mail in such condition that election officials may decide to replicate it on the BMD system to be scanned and counted.  Trial Tr. Vol. 1 at 73:9-25, 90:20-91:11, 92:14-24, 171:18-23, 173:6-22.  Not only does the risk of having their mail ballots replicated onto BMD ballots subject Plaintiffs to the ills of the BMD system, but no Plaintiff will ever know if this has occurred.  Thus, even

absentee voting (with all its own forms of injury-in-fact) does not ensure that Plaintiffs can avoid the injuries threatened by the BMD system.

## II. The Plaintiff Doctors' Standing Theories in *Hippocratic Medicine* Were Highly Speculative and Unsupported by Facts and Law

Unlike here, the speculative and highly attenuated theories of harm espoused by the plaintiff doctors in *Hippocratic Medicine* were unsupported by record evidence or any existing precedent. The doctors' first theory was that they *might* be injured by FDA's regulatory actions regarding mifepristone if those actions increased the number of complications suffered by patients who used mifepristone, in turn requiring more emergency abortions, thus forcing the plaintiff doctors to render abortion-related treatment against their consciences. *Hippocratic Medicine*, slip op. at 14. That attenuated theory of injury failed because "federal conscience laws definitively protect doctors from being required to perform abortions or to provide other treatment that violates their consciences," and the plaintiff doctors offered no evidence of any doctor being forced "to provide . . . abortion-related treatment that violated the doctor's conscience." *Id.* at 14-15. In contrast, the record here amply demonstrates that Plaintiffs cannot avoid the harms of Georgia's BMD system, as detailed above. Their individual right to vote has been directly and severely burdened by State Defendants' requirement that they cast any in-person vote on the BMD system that the Secretary of State personally selected, and those burdens will continue absent relief from this Court. *See* section I, *supra*.

7

The doctors' alternative standing theory—that FDA's actions would "divert[] resources and time from other patients to treat patients with mifepristone complications; increas[e] [the] risk of liability suits from treating those patients; and potentially increas[e] insurance costs"—was similarly too speculative to establish standing. *Hippocratic Medicine*, slip op. at 18. As with their other theory of injury, and again in contrast to the ample record of both past and imminent injury here, the doctors offered no evidence showing that FDA's actions had "caused an increase in the number of pregnant women seeking treatment from the plaintiff doctors *and* caused a resulting diversion of the doctor's time and resources from other patients." *Id.* (emphasis in original). And "perhaps more to the point" this theory was entirely unsupported by previous decisions and would open the courthouse doors to a flood of lawsuits from public safety professionals "challeng[ing] general safety regulations as unlawfully lax." *Id.* at 18-19. Again, in stark contrast, burdens on the right to vote have long been recognized as sufficient to establish Article III injury. *See*, *e.g.*, *GALEO*, 36 F.4th at 1114. And the injury to Plaintiffs here has already occurred in past elections and will occur again in each future election as long as State Defendants continue to impose on Plaintiffs the unreliable BMD system that the Secretary of State personally selected.

### III. *Hippocratic Medicine* Does Not Suddenly Vitiate CGG's Standing

Nor does *Hippocratic Medicine* undermine the prior rulings by this Court and

the Eleventh Circuit that CGG has organizational standing under binding Eleventh Circuit precedent. As the Eleventh Circuit explained, "voting advocacy organizations like the Coalition have standing to sue when a policy will force them 'to divert personnel and time to educating volunteers and voters' and to resolving problems that the policy presents 'on election day.'" *Curling*, 50 F.4th at 1121 (quoting *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008)). The Eleventh Circuit concluded that, as of the preliminary injunction appeal, "the Coalition credibly made that assertion," and thus rejected State Defendants' argument that CGG and its members "lack[ed] standing to challenge Georgia's voting systems." *Id.*

That should end the matter. The evidence at trial bore out CGG's assertion that State Defendants' BMD requirement forced CGG to divert resources from its mission of informing legislative policies and debates regarding election issues and educating legislators, voters, and the general public regarding election integrity and security. *See* Trial Tr. Vol. 1 at 116:4-14. State Defendants invoke *Hippocratic Medicine*, but they do not argue that it changed the fundamental principles of standing law the Eleventh Circuit's earlier ruling applied. *See* Dkt. 1850 at 3-4.

Nor could they. *Hippocratic Medicine* does not purport to alter those longstanding principles. Most relevant here, *Hippocratic Medicine* does not undermine the Eleventh Circuit's recognition, both in these proceedings and

9

previous decisions, that "an organization has standing if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *GALEO*, 1100 F.4th at 1114 (internal quotation mark omitted). That line of cases, which is the basis for CGG's organizational standing here, derives from the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), which held that organizations enjoy Article III standing to challenge illegal practices that "perceptibly impair[]" their activities, including because combating the unlawful practices "drain[s]" the organizations' resources. *Id.* at 379; *see also Browning*, 522 F.3d at 1165-66 (citing *Havens* as the basis for a diversion of resources theory of organizational standing).

*Hippocratic Medicine* did not overrule *Havens*. *See Hippocratic Medicine*, slip op. at 22-23. Rather, it distinguished *Havens*'s holding—that the plaintiff organization suffered Article III injury because "Havens's actions directly affected and interfered with HOME's core business activities"—on the basis that "FDA's actions relaxing regulation of mifepristone have not imposed any similar impediment to the medical associations' advocacy businesses." *Id.* at 23. Unlike the plaintiff organization in *Havens*, the medical associations' purported injury was merely "incurring costs to oppose FDA's actions." *Id.* at 22. "But an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate

10

against the defendant's action." *Id.*

Eleventh Circuit case law confirms that, unlike the medical associations in *Hippocratic Medicine*, CGG's claimed harms fall squarely within the rule from *Havens*. CGG's mission is to further "constitutional liberties and individual rights," with a "focus[] on elections," and includes educating legislators, voters, and the general public regarding election integrity and election security issues, "inform[ing] legislative policy," and fostering debate surrounding election issues. Trial Tr. Vol. 1 at 115:16-116:14. State Defendants' unlawful BMD requirement has "directly affected and interfered with" activities germane to those missions, forcing CGG to divert resources away from them. *Hippocratic Medicine*, slip op. 23. These resources were and are diverted not only to advocate against the requirement but also to investigate the Coffee County breaches and to educate election officials and voters. Coalition Pl. Ex. 10; Trial Tr. Vol. 15 at 162:7-23. The record at trial showed that as a result, CGG has been forced to stop nearly all other activities related to its missions. Trial Tr. Vol. 1 at 120:15-121:5. Under Eleventh Circuit law a "voting advocacy organization" has suffered Article III injury when unlawful election policies force it to divert resources from other activities essential to its mission. *Raffensperger*, 50 F.4th at 1121; *GALEO*, 36 F.4th at 1114-15; *Browning*, 522 F.3d at 1165-66.

In any event, CGG may establish standing not only "through its own injury in

11

fact" but also "through its members." *GALEO*, 36 F.4th at 1114. "An organization has standing to enforce the rights of its members 'when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Browning*, 522 F.3d at 1160 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).  As explained above, CGG's members, like the Individual Plaintiffs, have suffered injury to their right to vote sufficient to show each member's own Article III standing. Remedying that injury is obviously germane to CGG's mission. And nothing about the claims asserted here or the relief requested requires the participation of individual CGG members as Plaintiffs. *See id.* ("[W]hen the relief sought is injunctive, individual participation of the organization's members is not normally necessary." (internal quotation marks omitted)).

## IV. Conclusion

State Defendants' Supplemental Notice is just their latest attempt to escape the facts and the law that establish Plaintiffs' standing here beyond any reasonable debate. Not only do they offer no reason for this Court to depart from its own prior rulings, but they offer no basis for this Court to ignore—and contravene—binding Eleventh Circuit precedent, *including in this very case*. The Supreme Court did not

suddenly upend decades of well-established standing jurisprudence in *Hippocratic Medicine*, which it would have had to do for this Court to now depart from that controlling jurisprudence.  The Court should adhere to its prior rulings and those of the Eleventh Circuit in this case and enter a judgment—including injunctive relief—for Plaintiffs as soon as possible to protect them from the harms of State Defendants' unconstitutional voting system.

Respectfully submitted this 9th day of July, 2024.

 */s/ David D. Cross*
David D. Cross (*pro hac vice*)
Mary G. Kaiser (*pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036
Telephone: (202) 346-4000
DCross@goodwinlaw.com
MKaiser@ goodwinlaw.com

 */s/ Halsey G. Knapp, Jr.*
Halsey G. Knapp, Jr.
GA Bar No. 425320
Adam M. Sparks
GA Bar No. 341578
KREVOLIN & HORST, LLC
1201 West Peachtree Street, NW
Suite 3250
Atlanta, GA 30309
(404) 888-9700

*/s/ Christian G. Andreu-von Euw*
Christian G. Andreu-von Euw
(*pro hac vice*)
THE BUSINESS LITIGATION GROUP, PC
150 Spear Street
San Francisco, CA 94105
(415) 765-6633
christian@blgrp.com

*Counsel for Plaintiffs Donna Curling, Donna Price & Jeffrey Schoenberg*

<table>
<tr><td>

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

</td><td>

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III
Admitted Pro Hac Vice
 (ECF No. 125)
ROBERT MCGUIRE LAW FIRM
113 Cherry St. #86685
Seattle, Washington 98104-2205
(253) 267-8530

</td></tr>
</table>

*/s/ Russell T. Abney*
Russell T. Abney
Georgia Bar No. 000875
WATTS GUERRA, LLP
4 Dominion Drive, Building 3
Suite 100
San Antonio, TX 78257
(404) 670-0355

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges & Megan Missett*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## **CERTIFICATE OF COMPLIANCE**

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Halsey G. Knapp, Jr.*
Halsey G. Knapp, Jr.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-cv-02989-AT** |

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2024, a copy of the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ Halsey G. Knapp, Jr.*
Halsey G. Knapp, Jr.

16